**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| FLOYD S. BLEDSOE,<br><br>Plaintiff,<br><br>v.<br><br>JEFFERSON COUNTY, KANSAS; RANDY CARRENO; TROY FROST; ORIN TURNER; ROBERT POPPA; ROY DUNNAWAY; JIM VANDERBILT; GEORGE JOHNSON; JIM WOODS; TERRY MORGAN; MICHAEL HAYES; JEFFREY HERRIG, in his individual and official capacity; UNKNOWN OFFICERS OF THE JEFFERSON COUNTY POLICE DEPARTMENT, and UNKNOWN OFFICERS OF THE KANSAS BUREAU OF INVESTIGATION,<br><br>Defendants. | Case No. 2:16 CV 2296<br><br>District Judge Daniel D. Crabtree<br>Magistrate Judge Gerald L. Rushfelt<br><br>JURY TRIAL DEMANDED |

**FIRST AMENDED COMPLAINT**

Plaintiff Floyd S. Bledsoe, by his attorneys, Loevy & Loevy, files this Complaint against Defendants Jefferson County, Kansas; Randy Carreno; Troy Frost; Orin Turner; Robert Poppa; Roy Dunnaway; Jim Vanderbilt; George Johnson; Jim Woods; Terry Morgan; Michael Hayes; Jeffrey Herrig; Unknown Officers of the Jefferson County Police Department; and Unknown Officers of the Kansas Bureau of Investigation, and states as follows:

## INTRODUCTION

1. Plaintiff Floyd S. Bledsoe ("Floyd") was wrongfully convicted of the November 1999 sexual abuse and murder of a fourteen-year-old girl named Camille Arfmann.

2. The true perpetrator was Floyd's older brother, Thomas Bledsoe ("Tom"). Shortly after the murder, Tom confessed to the crime and turned himself in to the Jefferson County

Sheriff's Department. Tom and his attorney disclosed details of the crime; led officers to Camille's body, which had been buried on the property where Tom lived; and surrendered Tom's recently purchased gun, which had been used to shoot Camille.

3. Despite knowledge of Tom's guilt, the Defendants framed Floyd for the murder.

4. As the centerpiece of their scheme, the Defendants fabricated, orchestrated, and staged a false recantation by Tom that implicated Floyd. In the weeks that followed, the Defendants continued to fabricate and shape Tom's story to fit facts emerging from the criminal investigation and silenced Tom when he repeatedly tried to come clean.

5. Simultaneously, the Defendant Officers deliberately concealed and suppressed the evidence that would have proven Floyd's innocence. The Defendant Officers withheld all of the details of Tom's numerous confessions, including his explanation for where and why he had killed Camille and facts he could have known only by committing the murder himself. The Defendant Officers likewise suppressed physical evidence from Tom's truck, Tom's home, and the crime scene, as well as other evidence of Tom's guilt – all while fabricating additional evidence against Floyd to bolster their flimsy case.

6. Due to Defendants' foul play, Floyd was convicted in April 2000 of Camille's death and sentenced to life in prison.

7. In 2015, Floyd finally secured DNA testing that identified Tom as the likely source of sperm found inside Camille's vagina at the time of her death, while excluding Floyd. Tom killed himself shortly after the DNA results inculpated him, confessing yet again to Camille's murder in a series of suicide notes. In his final words, he explained: "the Jefferson County police and Jim Vanderbilt made me do it"; "I was told to keep my mouth shut"; and "I tried telling the truth but no one would listen."

8. After fifteen years of wrongful imprisonment, Floyd's conviction was overturned and he regained his freedom.

9. Plaintiff now brings this action to obtain justice and to redress the devastating injuries that Defendants have caused him.

**JURISDICTION AND VENUE**

10. This action is brought pursuant to 42 U.S.C. § 1983 to redress the Defendants' deprivation of Plaintiff's rights secured by the U.S. Constitution.

11. This Court has jurisdiction of Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction of his state law claim for indemnification pursuant to 28 U.S.C. § 1367.

12. Venue is proper under 28 U.S.C. § 1391(b). Plaintiff resides in this judicial district, the majority of the Defendants reside in this judicial district, and the events and omissions giving rise to Plaintiff's claims occurred within this judicial district.

**PARTIES**

13. Plaintiff Floyd S. Bledsoe is a resident of Hutchinson County, Kansas, who spent fifteen years in prison for a crime he did not commit.

14. Defendants Randy Carreno, Troy Frost, Orin Turner, Robert Poppa, and other unknown law enforcement officers worked as law enforcement officers in the Jefferson County Sheriff's Office at the time of the events giving rise to Plaintiff's wrongful conviction.

15. Defendant Roy Dunnaway was the Sheriff of Jefferson County, Kansas, at the time of the events giving rise to Plaintiff's wrongful conviction. In that role, Defendant Dunnaway was responsible for supervising Defendants Jeffrey Herrig, Randy Carreno, Troy

Frost, Orin Turner, Robert Poppa, and other unknown law enforcement officers of the Jefferson County Sheriff's Department.

16. Defendant Jeffrey Herrig was the Undersheriff of Jefferson County, Kansas, at the time of the events giving rise to Plaintiff's wrongful conviction. Herrig reported to Defendant Dunnaway and was responsible for the day to day operations of the Jefferson County Sheriff's Office, including the supervision of Defendants Randy Carreno, Troy Frost, Orin Turner, Robert Poppa, and other unknown law enforcement officers of the Jefferson County Sheriff's Department.

17. Defendants Dunnaway and Herrig acted in a supervisory capacity over the other Jefferson County Defendant Officers at all times relevant to this Complaint. Further, the constitutional injuries complained of herein were proximately caused by a pattern and practice of misconduct within the Jefferson County Sheriff's Department, which occurred with the knowledge and consent of Defendants Dunnaway and Herrig, who personally knew about, participated in, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation by their actions or by their deliberately indifferent failure to act.

18. Collectively, Defendants Randy Carreno, Troy Frost, Orin Turner, Robert Poppa, Roy Dunnaway, Jeffrey Herrig, and unknown law enforcement officers employed by the Jefferson County Sheriff's Department, are referred to as the "Jefferson County Defendant Officers."

19. Defendants George Johnson, Jim Woods, Terry Morgan, and other unknown law enforcement officers worked as law enforcement officers for the Kansas Bureau of Investigation ("KBI") at the time of the events giving rise to Plaintiff's wrongful conviction, and are referred

to, collectively, as the "KBI Defendant Officers." The KBI Defendant Officers were integral and active participants in the investigation of Arfmann's death and directed various aspects of the investigation. Collectively, they gathered physical evidence; executed search warrants; photographed the crime scene and victim; conducted and reviewed polygraph examinations and interviews; completed dozens of police reports; directed Defendant Carreno to interview certain witnesses; and themselves interviewed scores of witnesses including Floyd, Tom, another early suspect, and numerous alibi and other witnesses.

20. The Jefferson County Defendant Officers and the KBI Defendant Officers are referred to collectively as the "Defendant Officers."

21. Defendant Jim Vanderbilt was the Jefferson County Attorney at the time of the events giving rise to Plaintiff's wrongful conviction.

22. Defendant Michael Hayes was a criminal defense attorney representing Tom Bledsoe at the time of the events giving rise to Plaintiff's wrongful conviction. At all times relevant to this Complaint, and as is set forth more fully below, Defendant Hayes acted as a state actor. Hayes acted in concert with, in joint engagement with, and as a willful agent for other Defendants; Hayes and the other Defendants reached a meeting of the minds and acted conspiratorially; Defendant Hayes directly schemed with, conspired with, and collaborated with the Defendant Officers and Defendant Vanderbilt, rather than maintaining an adversarial relationship with them; Defendants facilitated, condoned, and approved of Defendant Hayes's conduct; and Defendants lent significant aid to and received significant aid from Defendant Hayes that went beyond the traditional role of a defense attorney. Defendant Hayes had historically acted as a prosecutor in Jefferson County prior to the events alleged in this Complaint and took on that role again subsequent to the events alleged in this Complaint.

23. Plaintiff sues each of the individual Defendants in his individual capacity unless otherwise noted.

24. Each Defendant Officer sued in his individual capacity acted under color of law and within the scope of his employment when engaging in the misconduct described herein.

25. Defendant Jeffrey Herrig is also sued in his official capacity as the current Sheriff of Jefferson County. As the current Sheriff of Jefferson County, Defendant Herrig oversees the Jefferson County Sheriff's Department, which, at the time of Plaintiff's wrongful conviction, employed Defendants Dunnaway, Carreno, Frost, Poppa, Herrig, and other unknown officers of the Jefferson County Sheriff's Department. The current Jefferson County Sheriff is also responsible for the policies and practices of the Jefferson County Sheriff's Department.

26. Defendant Jefferson County is a county of the State of Kansas. Jefferson County is also obligated to pay any judgments against the individual Defendants employed by Jefferson County and the Jefferson County Sheriff's Department.

**FACTS**

27. In November 1999, Floyd was twenty-three years old and married to Heidi Bledsoe. The couple had two young sons: a two-year-old and a baby. Floyd worked as a farmhand at a dairy farm in McLouth, Kansas. He had never before been convicted of any crime.

28. Camille Arfmann, Heidi's quiet fourteen-year-old sister, had recently come to stay with Heidi and Floyd to improve her attendance at school.

29. Floyd had an older brother, Tom, who was partially deaf. Tom had a limited social life, certain intellectual limitations, and a history of troubling sexual behavior that included pursuing young girls. Even at the age of twenty-five, Tom was an active member of the Sunday School group for children at the Countryside Baptist Church in Oskaloosa.

30. Tom lived nearby with the brothers' parents, Catherine Bledsoe and Floyd L. Bledsoe Sr.

**Camille's Disappearance and Tom's Initial Set of Confessions**

31. On Friday, November 5, 1999, Camille took the bus home from school and arrived at approximately 4:20pm at Heidi and Floyd's home. By 5:00pm, when her friend Robin Meyer stopped by to visit, Camille's coat and book bag were in the home, but Camille was missing.

32. Heidi and Floyd reported Camille's disappearance to members of the Jefferson County Sheriff's Department and spent most of the next 48 hours trying to find Camille, on little sleep.

33. On the evening of Sunday, November 7th, following an emotional church service, Tom revealed that Camille had been murdered. Sitting in the parking lot of the Law Enforcement Center of the Jefferson County Sheriff's Department, Tom made three phone calls confessing to the crime.

34. At 8:55 pm, Tom left an answering machine message for his Sunday School teacher, Jim Bolinger, stating in part: "Hi, Jim, this is Tom. I . . . wanted you to be the first to know . . . . I know where Camille is. And when you get this message, I'm going to turn myself in to the police. . . . All I can say is, I'm sorry. I'll pay for the rest of my life for what I've done."

35. Tom next called his parents, confessed to having killed Camille, and informed them that he was about to turn himself in. Tom's father instructed him to wait for an attorney and took steps to arrange for Defendant Michael Hayes to represent Tom.

36. At 9:01 pm, Tom left a second message for Jim Bolinger, stating in part: "Please help mom and dad through this. Right now they're disappointed. I know that the church will be,

too. All I can ask . . . forgive me for what I've done and I will pay for the rest of my life. . . . I wish I could turn the clock back, but I can't. I made my choice. . . ."

37. Later that evening, Tom, along with his lawyer, Defendant Hayes, met in a conference room at the Law Enforcement Center of the Jefferson County Sheriff's Department with Defendants Poppa, Dunnaway, Woods, and other unknown Defendants. Through Defendant Hayes, Tom informed the Defendants that Camille had been murdered and that he knew the location of her body.

38. During the course of the evening, Tom and/or Defendant Hayes divulged additional details, such as that Camille had been shot in the back of the head and that she had been killed elsewhere before being buried in a trash dump.

39. Tom and Defendant Hayes led Defendants to the property where Tom lived with his parents. Camille had been buried under at least a foot of dirt and plywood in the trash dump, near garbage that included an X-rated movie and a t-shirt that read: Countryside Baptist Church.

40. Just as Tom had communicated, Camille had been shot multiple times, suffering a contact wound to the back of her head and additional gunshot wounds to her torso. Three bullet casings were found at the burial site, but a fourth casing would not be recovered until Tom disclosed its location many years later.

41. Although the coroner was unable to determine whether Camille had been forcibly sexually abused, sperm was recovered from inside her vagina.

42. Defendant Hayes surrendered the murder weapon – Tom's recently purchased Jennings 9mm firearm – to the Defendant Officers.

43. Within a few hours, Tom was charged with first degree murder and booked into the Jefferson County jail.

**Defendants Decide to Frame Floyd for Tom's Crime**

44. Inexplicably, and despite the overwhelming evidence of Tom's guilt, Defendants conspired to frame Floyd for Tom's crime.

45. A tremendous volume of evidence showed conclusively that Floyd had nothing to do with Camille's horrible death.

46. Floyd's whereabouts were thoroughly accounted for, at every point from 4:20pm on Friday, November 5th, when Camille went missing, until Sunday, November 7th, at 9 pm, when Tom confessed and revealed where her body had been buried. Floyd's alibi was corroborated by numerous witnesses, a time-stamped receipt, phone records, and even the testimony of Defendant Randy Carreno, who was physically with Plaintiff during much of Saturday, November 6th, as they searched for Camille together.

47. The Defendant Officers interrogated Floyd for hours; subjected his home, clothing, and car to a rigorous forensic examination; and even used a bloodhound to search for evidence. They obtained no inculpatory information from their efforts, however, because Floyd was plainly innocent.

48. Nonetheless, Defendants schemed to pin Camille's murder on Floyd.

**Defendants Fabricate Tom's Testimony**

49. Several days after Tom's arrest, Defendant Hayes, Defendant Vanderbilt, and/or other unknown Defendants held a meeting to put into action their scheme to fabricate Tom's testimony.

50. Defendant Carreno, the lead detective assigned to investigate Camille's murder, had settled on Floyd as a suspect immediately following Camille's disappearance, and continued to focus his investigation on Floyd even after Tom had confessed and turned himself in.

51. Defendant Hayes conspired with Defendant Carreno to pin the murder on Floyd and to obtain false statements from Tom in support.

52. Defendants Hayes and Carreno found a willing ally in Defendant Vanderbilt, then the Jefferson County prosecutor. Vanderbilt was indebted to Hayes, who was helping Vanderbilt avoid his legal exposure for Vanderbilt's appropriation of county funds for personal use.

53. As Defendants discussed during the meeting, pursuant to their scheme, Tom would recant his confession and instead claim that he had run into Floyd on Saturday, November 6th, at a roadside intersection; that Floyd had spontaneously confessed to the murder and provided Tom with extensive details about the crime; and that Floyd had persuaded Tom to take the blame by threatening to expose Tom's history of viewing X-rated movies, masturbating, and attempting to have sex with a dog.

54. On information and belief, Defendant Vanderbilt directly participated in and had knowledge of the above scheme to fabricate Tom's testimony. Alternatively, the scheme was perpetrated solely by the Defendant Officers and Defendant Hayes, who concealed it from Defendant Vanderbilt.

55. Defendants Hayes, Vanderbilt, and/or various Defendant Officers planned Tom's recantation before it ever occurred, constructed its false narrative, and coached Tom – who was easily manipulable – to recite it.

56. Shortly before Tom's staged recantation, Defendant Hayes sought Floyd out and told him that Hayes was taking Tom off the "hot seat" and putting Floyd on, or words to that effect.

57. The staged recantation took place on Friday, November 12th, when Floyd and Tom came in for polygraph examinations administered by Defendant George Johnson.

58. According to Defendants, at some point during the interview with Defendant Johnson, Tom provided the false recantation of his confession that Hayes and other Defendants had coached and coerced him to give.

59. Tom took the polygraph examination and specifically failed the question: "Did you kill Camille Arfmann?"

60. Overcome with guilt immediately after the examination, Tom confessed to the murder yet again to Defendant Johnson, Defendant Vanderbilt, and/or other unknown Defendants. Acting in service of Defendants' conspiracy, Defendant Johnson instructed Tom to continue lying to implicate Floyd, and Tom, who was easily overpowered, acquiesced.

61. Floyd then took the polygraph, truthfully disavowing any involvement in the crime because he had nothing to do with it.

62. That same evening, Defendant Vanderbilt released Tom from jail and dropped the charges against him, pursuant to an agreement that was never disclosed to Floyd.

63. Defendant Dunnaway and other Defendants then arrested Floyd, even though they knew Floyd was innocent.

64. In the weeks that followed, the Defendants continued to fabricate Tom's statements regarding his purported roadside meeting with Floyd.

65. For example, Defendant Carreno and other Defendant Officers falsified Tom's statements to fit the fictitious roadside meeting into the brief period of time in which they believed (wrongly) that Floyd lacked an alibi.

66. Defendants likewise knowingly coached Tom to provide false explanations for how he had known so many details about Camille's murder on November 7th, such as the

location of Camille's body, the number and positioning of her gunshot wounds, and the weapon used to kill her.

67. Later, when Tom committed suicide, he would explain in a suicide note that "the Jefferson County police and Jim Vanderbilt made [him lie]; that he "tried telling the truth but no one would listen"; and that he was "told to keep [his] mouth shut."

68. At trial, Tom's false account constituted the prosecution's central piece of evidence against Floyd.

**The Defendant Officers Withhold Evidence of Tom's Guilt and Fabricate Additional Evidence Against Floyd**

69. Aware of the weakness of the case against Floyd, the Defendant Officers withheld evidence of Tom's guilt from Floyd's defense and the prosecution and generated additional false evidence against Floyd to secure his prosecution and conviction.

70. Critically, the Defendant Officers concealed from Floyd's defense and the prosecution documentation of Tom's many inculpatory statements.

71. For example, Defendant Jim Woods and other Defendant Officers purposefully withheld their documentation of Tom's detailed confession that he had tried to have sex with Camille in his truck, that she had laughed, and that he had then shot her.

72. The Defendant Officers purposefully withheld their documentation of inculpatory statements made by Tom and Defendant Hayes on the night Tom turned himself in, including Tom's disclosure that Camille had been shot multiple times, including in the back of her head; Tom's disclosure that Camille had been killed elsewhere before being buried in a trash dump; and Tom's indications of a desire to commit suicide.

73. The Defendant Officers purposefully withheld documentation of Tom's activities and statements between November 8th and 12th. As one reporter aptly observed, the police

report authored by lead detective Randy Carreno regarding the investigation had glaring omissions and "reads as if the lead detective on the case took a short vacation right at the most critical moment." Joe Miller, The Pitch, Brother's Keeper (Aug. 3, 2000).

74. Finally, Defendant Johnson and other unknown Defendants purposefully withheld their documentation of Tom's statements during the November 12th polygraph examination and interview.

75. In addition, the Defendant Officers withheld evidence that Tom had a history of pursuing young girls roughly Camille's age and had made sexual advances on Camille just a few weeks before her disappearance.

76. The Defendant Officers suppressed and withheld further information that is unknown to Plaintiff to advance their scheme of framing Floyd for Camille's murder.

77. The Defendant Officers withheld all of the above-described information purposefully, to keep exculpatory information from Floyd's defense and the prosecution and to ensure Floyd's prosecution and conviction.

**The Defendant Officers Suppress Physical Evidence of Tom's Guilt**

78. Simultaneously, the Defendant Officers actively suppressed physical evidence that would have proven Tom's guilt, including physical evidence from the truck in which Tom had shot Camille according to his own confession and the shovel that Tom identified as having been used to bury Camille's body.

79. In purposeful furtherance of the conspiracy, Defendant Morgan and other Defendant Officers declined to subject Tom's home – or even his room – to any rigorous forensic examination, and instead intentionally recovered such items as Tom's weapons and ammunition by permitting Tom's father to handle them and turn them over. Defendants failed to

properly recover evidence from Tom's home and the vehicles he drove even though they were well aware of the importance of such evidence, and, in fact, had subjected Floyd's home and vehicle to thorough, rigorous forensic examination.

80. Had it been properly recovered, such evidence would have established Tom as the killer beyond doubt and exculpated Floyd from having anything to do with the crime.

**The Defendant Officers Fabricate Additional Evidence Against Floyd**

81. To further tip the scales against Floyd, the Defendant Officers fabricated additional evidence against Floyd all while concealing their misconduct in manufacturing the false evidence from his defense and the prosecution.

82. For example, after administering the polygraph tests, Defendant Johnson reported to Defendant Vanderbilt and others that Floyd had exhibited deception during the examination, while Tom had been truthful.

83. As Johnson was well aware, this characterization was false.

84. Johnson's false report misled Defendant Vanderbilt, who relied on it in deciding to pursue charges against Floyd.

85. Further, Defendants Turner and Frost falsely claimed that Floyd had confessed to having visited his home at the time Camille disappeared from it, and Frost signed a search warrant affidavit to that effect.

86. In fact, Floyd had never made such a statement and consistently denied it.

87. Defendants' manufactured evidence regarding Floyd's purported confession was used to bring about Floyd's prosecution; presented against him at trial; and emphasized by the prosecution in closing argument to secure Floyd's conviction.

## Floyd's Malicious Prosecution and Trial

88. Defendant Vanderbilt offered Floyd a plea deal of five years prior to trial in recognition of the scant evidence implicating Floyd for Camille's murder. Floyd rejected the deal, refusing to plead guilty to a crime he did not commit.

89. In April 2000, Plaintiff was tried in Jefferson County on charges of murder, aggravated kidnapping, and indecent liberties with a child. Based on Defendants' misconduct, he was convicted.

90. The trial judge sentenced Floyd to life in prison for the murder, plus an additional sixteen years of incarceration for the remaining crimes.

91. Without the Defendants' misconduct, Plaintiff would never have been prosecuted for or convicted of Camille's murder.

## Floyd's Exoneration

92. Floyd never stopped fighting to prove his innocence.

93. In June 2008, a federal district court granted Floyd habeas relief, and he was briefly released on bond. The Tenth Circuit Court of Appeals reversed the ruling in July 2009, however, forcing Floyd to return to prison.

94. In October 2015, after Floyd had fought to obtain additional forensic testing, DNA test results demonstrated that Tom was the likely source for the semen found on a vaginal swab from Camille, while excluding Floyd as a possible source.

95. Shortly thereafter, Tom committed suicide, confessing yet again to the crime in a series of suicide notes. In one of the notes, addressed to "whoever cares," Tom stated in part:

> I sent an innocent man to prison. The Jefferson County police and county attorney Jim Vanderbelt made me do it. I was told by Vanderbelt to keep my mouth shut. Now I am going to set thing right.

> I killed Camille Arfmann on November 5, 1999. I had sex with her and killed her.
>
> . . . I drove up to the ditch where the family dump trash and tried to convince her not to tell . . . . I went to my truck and got my 9mm gun that was behind my seat and pushed her to the ground to try to scare her, but it failed with the gun went off behind her head. . . . . I as well might go ahead and say it I raped and murdered a 14 year girl.
>
> I tried telling the truth but no one would listen. I was told to keep my mouth shut. It tore me up doing it. I would ask for forgiveness, but I know none will come. Not even from God.
>
> Floyd S Bledsoe is innocent man.
>
> Tom E Bledsoe is the guilty one.

96. As further proof of his guilt, Tom drew a diagram of the location at which Camille had been shot in the head, prior to being taken to the trash dump. Using Tom's diagram, detectives found the missing fourth casing.

97. On December 8, 2015, the Court vacated Floyd's conviction and the Jefferson County Attorney dismissed the charges against Floyd.

98. At the age of thirty-nine – more than sixteen years after his arrest – Plaintiff finally walked out of prison a free man.

**Floyd's Devastating Injuries**

99. At the time he was wrongfully accused of murder, Floyd was a twenty-three-year old with two young sons and his entire life ahead of him.

100. Floyd's entire life was turned upside down without any warning by Defendants' misconduct.

101. Most tragically, Plaintiff was separated from his sons – a baby and a toddler – and deprived of the opportunity to father them. He has returned home from prison to two adult sons whose entire childhood he missed, and other relationships changed or lost by years away.

102. During his fifteen years of wrongful imprisonment, Floyd was deprived of the ability to interact freely with his loved ones; to be present for holidays, births, deaths and other life events; to pursue his passions and interests; to engage in meaningful labor and develop a career; and to live freely, as an autonomous being.

103. Instead, Plaintiff was detained in harsh, dangerous, and isolating conditions in maximum security prisons.

104. Plaintiff had been convicted of a horrific crime – sexually abusing and killing a young girl – and had to endure the humiliation and injustice of being wrongly branded a "sex offender" and a murderer.

105. Because Floyd had been sentenced to life in prison, he feared that he would die alone inside the prison walls.

106. As a result of his wrongful conviction and incarceration, Floyd must now attempt to rebuild his life outside of prison, all without the benefit of the life experiences that ordinarily equip adults for such a task.

107. In addition to causing the severe trauma of Plaintiff's wrongful imprisonment and loss of liberty, Defendants' misconduct caused and continues to cause Floyd extreme physical and psychological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and psychological effects.

**COUNT I – 42 U.S.C. § 1983**
**Due Process: Fabrication of Tom's Testimonial Evidence**
**Against All Defendants**

108. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

109. As described more fully in paragraphs 49-65, the Defendant Officers, Defendant Hayes, and Defendant Vanderbilt, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived

Plaintiff of his constitutional right to a fair trial by fabricating Tom's testimonial inculpation of Floyd.

110. In the manner described more fully above, Defendants fabricated and solicited false testimony from Tom implicating Plaintiff in the crime that they knew was false; obtained Plaintiff's conviction using that false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

111. Defendant Vanderbilt acted as an investigator when carrying out the misconduct described in this Count.

112. Defendants' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

113. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

114. As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

115. The misconduct described in this Count by the Jefferson County Defendant Officers was undertaken pursuant to the policy and practice of Jefferson County, Kansas, in the manner more fully described below, in Count VII.

**COUNT II – 42 U.S.C. § 1983**
**Conspiracy to Deprive Constitutional Rights by**
**Fabrication of Tom's Testimonial Evidence**
**Against All Defendants**

116. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

117. After the murder of Camille Arfmann, Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit by fabricating testimonial evidence by Tom that would be used to convict Plaintiff and thereby to deprive him of his constitutional right to due process, as described above, including in paragraphs 49-65 of this complaint.

118. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

119. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

120. The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

121. As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**COUNT III – 42 U.S.C. § 1983**
**Due Process: *Brady* and Fabrication of Additional Evidence**
**Against the Defendant Officers**

122. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

123. As described in detail above in paragraphs 66-84, the Defendant Officers, while acting individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial by withholding and suppressing exculpatory evidence and fabricating additional evidence against Plaintiff besides Tom's false testimony.

124. In the manner described more fully above, including in paragraphs 66-87, the Defendant Officers deliberately withheld exculpatory evidence from Plaintiff and from the prosecution, among others, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

125. In addition, in the manner described more fully above in paragraphs 66-87, the Defendant Officers knowingly fabricated and solicited false evidence implicating Plaintiff the crime; obtained Plaintiff's conviction using that false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff at his criminal trial.

126. The Defendant Officers also knowingly suppressed and concealed physical evidence that would have exonerated Plaintiff.

127. Further, the Defendant Officers concealed, suppressed, and fabricated additional evidence that is not yet known to Plaintiff.

128. The Defendant Officers' misconduct resulted directly in the unjust criminal conviction of Plaintiff, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not and would not have been pursued.

129. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

130. As a result of the Defendant Officers' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

131. The misconduct described in this Count by the Jefferson County Defendant Officers was undertaken pursuant to the policy and practice of Jefferson County, Kansas, in the manner more fully described below in Count VII.

**COUNT IV – 42 U.S.C. § 1983**
**Malicious Prosecution**
**Against the Defendant Officers and Defendant Hayes**

132. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

133. In the manner described more fully above, the Defendant Officers and Defendant Hayes, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional rights.

134. The Defendant Officers and Defendant Hayes accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment.

135. In so doing, the Defendant Officers and Defendant Hayes caused Plaintiff to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting

in injury, and all such proceedings were ultimately terminated in Plaintiff's favor in a manner indicative of his innocence.

136. The Defendant Officers and Defendant Hayes subjected Plaintiff to unauthorized and arbitrary governmental action that shocks the conscience in that Plaintiff was deliberately and intentionally framed for a crime of which he was totally innocent, through the Defendant Officers' and Defendant Hayes's fabrication, suppression, and withholding of evidence.

137. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

138. Plaintiff lacks an adequate state law remedy to redress Defendants' misconduct described in this Count.

139. As a result of the misconduct of the Defendant Officers and Defendant Hayes, described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

140. The misconduct described in this Count by the Jefferson County Defendant Officers was undertaken pursuant to the policy and practice of Jefferson County, Kansas, in the manner more fully described below in Count VII.

**COUNT V – 42 U.S.C. § 1983**
**Conspiracy to Deprive Constitutional Rights**
**Against the Defendant Officers and Defendant Hayes**

141. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

142. After the murder of Camille Arfmann, the Defendant Officers and Defendant Hayes, acting in concert with other co-conspirators, known and unknown, reached an agreement

among themselves to frame Plaintiff for a crime he did not commit and deprive him of his constitutional rights by maliciously causing Plaintiff's prosecution, by fabricating evidence that would be used to convict Plaintiff; and by withholding exculpatory information from Plaintiff's defense and the prosecution, including as described in paragraphs 66-84 of this complaint.

143. In so doing, these co-conspirators conspired to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

144. In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

145. The misconduct described in this count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's clear innocence.

146. As a result of Defendants' misconduct described in this count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

**COUNT VI – 42 U.S.C. § 1983**
**Failure to Intervene**
**Against the Defendant Officers**

147. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

148. During the constitutional violations described herein, one or more of the Defendant Officers stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the opportunity to do so.

149. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Plaintiff's innocence.

150. As a result of the Defendant Officers' failure to intervene to prevent the violation of Plaintiff's constitutional rights, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, emotional pain and suffering, and other grievous and continuing injuries and damages.

151. The misconduct described in this Count by the Jefferson County Defendant Officers was undertaken pursuant to the policy and practice of Jefferson County, Kansas, in the manner more fully described below in Count VII.

**COUNT VII – 42 U.S.C. § 1983**
**Municipal Liability**

152. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

153. As described more fully herein, Jefferson County is itself liable for the violation of Plaintiff's constitutional rights.

154. Plaintiff's injuries were caused by the policies, practices, and customs of the Jefferson County Sheriff's Department, in that employees and agents of the Jefferson County Sheriff's Department regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating criminal defendants in criminal conduct, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner to that alleged herein.

155. The above-described widespread practices, which were so well-settled as to constitute the de facto policy of the Jefferson County Sheriff's Department, were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference

to the problem, thereby effectively ratifying it. Furthermore, the above-described widespread practices were allowed to flourish because the Jefferson County Sheriff's Department declined to implement sufficient training or any legitimate mechanism for oversight or punishment of officers and agents who withheld material evidence, fabricated false evidence and witness testimony, and pursued wrongful convictions.

156. The constitutional violations described in this Complaint were also undertaken pursuant to the policy and practices of the Jefferson County Sheriff's Department in that the constitutional violations were committed with the knowledge or approval of persons with final policymaking authority for Jefferson County and the Jefferson County Sheriff's Department, or were actually committed by persons with such final policymaking authority.

157. Specifically, Jefferson County's final policymakers with respect to functions of the Jefferson County Sheriff's Department were Sheriff Roy Dunnaway and/or Undersheriff Jeffrey Herrig.

158. Defendants Dunnaway and Herrig ratified and authorized the fabrication of evidence against Floyd and the withholding of exculpatory information from Floyd.

159. The ratification and authorization of this misconduct by Defendants Dunnaway and Herrig constituted the official policy of Jefferson County and Defendants Dunnaway and Herrig were deliberately indifferent to the risk that these policies, practices, and customs would lead to the violation of citizens' constitutional rights.

160. The policies, practices, and customs set forth above were the moving force behind the numerous constitutional violations in this case and directly and proximately caused Plaintiff to suffer the grievous and permanent injuries and damages set forth above.

## COUNT VIII – State Law Claim
## Indemnification

161. Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

162. Kansas law requires governmental entities to pay any tort judgment for compensatory damages for which employees are liable within the scope of their employment activities.

163. The Jefferson County Defendant Officers were employees and agents of the Jefferson County Sheriff's Department and Jefferson County, acting at all relevant times within the scope of their employment in committing the misconduct described herein.

164. Jefferson County is obligated by Kansas statute to pay any judgments against the Jefferson County Defendant Officers.

165. Jefferson County is obligated by Kansas statute to pay any judgment entered against the Jefferson County Sheriff in his official capacity.

WHEREFORE, Plaintiff Floyd S. Bledsoe respectfully requests that this Court enter a judgment in his favor and against Defendants Jefferson County, Kansas; Randy Carreno; Troy Frost; Orin Turner; Robert Poppa; Roy Dunnaway; Jim Vanderbilt; George Johnson; Jim Woods; Terry Morgan; Michael Hayes; Jeffrey Herrig; Unknown Officers of the Jefferson County Police Department; and Unknown Officers of the Kansas Bureau of Investigation, awarding compensatory damages, attorneys' fees and costs against each Defendant, punitive damages against each of the individual Defendants, and any other relief this Court deems just and appropriate.

## JURY DEMAND

Plaintiff Floyd S. Bledsoe hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: October 27, 2016

Respectfully submitted,

**FLOYD S. BLEDSOE**

BY**:** /s/ Dionne Scherff
*One of Plaintiff's Attorneys*

Dionne Scherff
Erickson Scherff
10990 Quivira, Suite 200
Overland Park, KS 66210
*Local Counsel*

Jon Loevy
Russell Ainsworth
Ruth Brown
Theresa Kleinhaus
LOEVY & LOEVY
312 North May Street, Suite 100
Chicago, IL 60607
(312) 243-5900

## CERTIFICATE OF SERVICE

I, Dionne Scherff, an attorney, certify that on October 27, 2016, the foregoing was served via the Court's electronic filing system upon all counsel of record.

/s/ Dionne Scherff