**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| FLOYD S. BLEDSOE, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:16-CV-02296 |
| | ) | |
| v. | ) | |
| | ) | |
| JEFFERSON COUNTY, KANSAS, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**JEFFERSON COUNTY DEFENDANTS' MEMORANDUM IN
SUPPORT OF THEIR MOTION FOR JUDGMENT ON THE PLEADINGS**

Respectfully submitted by:

FOULSTON SIEFKIN LLP

By:   /s/*Toby Crouse*
      Toby Crouse, #20030

9225 Indian Creek Parkway, Suite 600
Overland Park, KS 66210-2000
Telephone: 913.498.2100
Facsimile: 913.498.2101
Email: tcrouse@foulston.com

*and*

David E. Rogers, #13320
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
Telephone: 316.267.6371
Facsimile: 316.267.6345
Email:  drogers@foulston.com

ATTORNEYS FOR JEFFERSON
COUNTY DEFENDANTS

514676

1

## TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................................2

GLOSSARY.....................................................................................................................4

I.     INTRODUCTION..................................................................................................6

     A.    Governing standard:  Federal Rule of Civil Procedure 12(c)...........................7

     B.    Factual allegations ...............................................................................7

II.    ARGUMENT AND AUTHORITIES......................................................................18

     A.    The Amended Complaint does not allege that any of the individual Jefferson County defendants violated clearly established law. .......................18

         1.   The Amended Complaint fails to allege a constitutional deprivation. ...........................................................................19

            a.   The Fourteenth Amendment due process claims fail as a matter of law. ...............................................................19

               (1)   The availability of post-deprivation process precludes Floyd's due process claims...............................19

               (2)   None of the individual Jefferson County Defendants are alleged to have acted with intent or malice.................20

               (3)   The Amended Complaint fails to identify material evidence that any of the individuals fabricated or suppressed. ....................................................21

               (4)   None of the evidence denied Floyd notice or an opportunity to be meaningfully heard before a jury. .........25

            b.   The Fourth Amendment malicious prosecution claim fails as a matter of law. .......................................................25

                (1)   The state-court proceedings did not terminate in Floyd's favor...................................................27

                (2)   There was probable cause to believe Floyd killed Arfmann. ..................................................28

                (3)   Floyd has not and cannot allege causation........................29

                (4)   Floyd fails to allege the Jefferson County Defendants acted with malice. ...........................................31

            c.   Counts II, V, VI, and VIII do not invoke a constitutional right. .................................................................33

514676

(1)    Neither conspiracy nor failing to intervene is an independently actionable deprivation. ..............................33

(2)    Indemnification is not independently actionable. .............35

2.    The Amended Complaint does not allege the individual Jefferson County Defendants personally participated in any deprivation................36

3.    The Jefferson County Defendants are entitled to qualified immunity, as they are not alleged to have violated clearly established law. .........................................................39

**B.**    **The Amended Complaint asserts no plausible official-capacity claim against the Jefferson County Defendants. ........................................43**

1.    The lack of an underlying constitutional violation precludes an official-capacity claim. .........................................................43

2.    The official-capacity Jefferson County Defendants are not amenable to suit. .....................................................................43

a.    Jefferson County is not a proper defendant in this action..............43

b.    The Sheriff is entitled to Eleventh Amendment immunity. ...........44

3.    There is no official policy or custom that caused Floyd's alleged violations.........................................................................45

**III.**    **CONCLUSION .........................................................................48**

514676

## GLOSSARY

The Jefferson County Defendants offer the following glossary of terms and citation conventions used in their Memorandum in Support. *Cf.* 10th Cir. R. 28.2(C)(6).

| PEOPLE OR ENTITIES | |
|---|---|
| **Arfmann** | Camille Arfmann was Plaintiff's fourteen-year-old sister-in-law, who was murdered on or about November 5, 1999. ECF No. 75, ¶¶ 28, 31. |
| **Carreno** | Defendant Randy Carreno was a Sheriff's Deputy for the Jefferson County Sheriff at the time of the Arfmann murder, investigation, and trial. ECF No. 75, ¶ 14. |
| **Frost** | Defendant Troy Frost was a Sheriff's Deputy for the Jefferson County Sheriff at the time of the Arfmann murder, investigation, and trial. ECF No. 75, ¶ 14. |
| **Poppa** | Defendant Robert Poppa was a Sheriff's Deputy for the Jefferson County Sheriff at the time of the Arfmann murder, investigation, and trial. ECF No. 75, ¶ 14. |
| **Dunnaway** | Roy Dunnaway was the Sheriff of Jefferson County, Kansas, during the investigation and trial concerning Arfmann. ECF No. 75, ¶ 15. His duties were set out in Chapter 19, Article 8 of the Kansas Statutes. |
| **Herrig** | Defendant Jeffrey Herrig was, at the time of the Arfmann investigation and murder trial, the Undersheriff for Sheriff Dunnaway. ECF No. 75, ¶ 16. He is currently the elected Sheriff of Jefferson County, Kansas, ECF No. 75, ¶ 25, and his duties are set out in Chapter 19, Article 8 of the Kansas Statutes. |
| **Floyd** | Plaintiff Floyd Bledsoe was the man convicted of murdering Arfmann. ECF No. 75, ¶ 1. *See generally Bledsoe v. Bruce*, 569 F.3d 1223 (10th Cir. 2009); *Bledsoe v. Kansas*, 283 Kan. 81, 150 P.3d 868 (2007); *Kansas v. Bledsoe*, 272 Kan. 1350, 39 P.3d 38 (2002). |
| **Hayes** | Defendant Michael Hayes was the lawyer who represented Tom Bledsoe with regard to the murder charges that were pending against Tom Bledsoe. ECF No. 75, ¶ 22. |
| **Tom** | Thomas "Tom" Bledsoe was the older brother of Floyd Bledsoe, who Floyd contends was the "true perpetrator" of Arfmann's murder. ECF No. 75, ¶ 2. Tom allegedly committed suicide after 2015 DNA testing suggested Tom was a likely source for seminal fluid found on a vaginal swab from Arfmann's body. ECF No. 75, ¶¶ 94–96. |
| **Vanderbilt** | Defendant Jim Vanderbilt was the elected County Attorney for Jefferson County, Kansas, during the investigation and trial concerning the murder of Arfmann. ECF No. 75, ¶ 21. |
| **Jefferson County Defendants** | As pleaded, the Jefferson County Defendants are Carreno, Frost, Poppa, Dunnaway, Herrig, and Jefferson County, Kansas. |

4

| COURT DOCUMENTS, TERMS, AND OTHER ITEMS | |
|---|---|
| **Amended Complaint** | Floyd's First Amended Complaint, ECF No. 75. |
| ***Bledsoe I*** | *State of Kansas v. Bledsoe*, 272 Kan. 1350, 39 P.3d 38 (2002). In *Bledsoe I*, the Kansas Supreme Court affirmed the jury conviction of first-degree premeditated murder, aggravated kidnapping, and aggravated indecent liberties. |
| ***Bledsoe II*** | *Bledsoe v. State of Kansas*, 283 Kan. 81, 150 P.3d 868 (2007). In *Bledsoe II*, the Kansas Supreme Court, following an evidentiary hearing in the Jefferson County District Court, denied Bledsoe's request, pursuant to K.S.A. 60-1507, for habeas corpus relief. |
| ***Bledsoe III*** | *Bledsoe v. Bruce*, Case No. 07-3070-RDR, 2008 WL 2549029 (D. Kan. June 23, 2008). Judge Rogers granted Bledsoe's request, pursuant to 28 U.S.C. § 2254, for habeas corpus. In particular, the Court concluded that Bledsoe "was denied his constitutional right to effective assistance of counsel." |
| ***Bledsoe IV*** | *Bledsoe v. Bruce*, 569 F.3d 1223 (10th Cir. 2009). In *Bledsoe IV*, the Tenth Circuit reversed the District Court's decision, in *Bledsoe III*, that granted Bledsoe federal habeas corpus relief. |
| **Transcript *or* Tr.** | Trial transcript, attached as Exhibit 2 to the Jefferson County Defendants' Answer to First Amended Complaint, ECF No. 79, for the murder trial of *State of Kansas v. Bledsoe*, Jefferson County, Kansas Case No. 99-CR-325-FE. |

\* \* \* \* \*

5

I.    <u>**INTRODUCTION**</u>

Historical fiction is a wildly popular literary genre. Its allure is attributable to the story's connection to a real event; the entertained reader does not mind how much (or little) is fact or fiction. The stories can be idyllic or nightmarish. Floyd Bledsoe's Amended Complaint falls into the latter category.

At the turn of the century, the State of Kansas prosecuted, convicted, and imprisoned Floyd for a crime he has always maintained that he did not commit. But the jury was told about Floyd's claims of innocence, his alibi, the lack of physical evidence connecting him to the murder, and most importantly, his brother's three confessions to the crime. The jury convicted him anyway. And the Kansas and federal courts turned away his direct and collateral appeals time and again. Only recent DNA testing methods (and his brother's alleged suicide) were capable of undermining the State's confidence in the conviction.

Floyd's Amended Complaint omits these unassailable historical facts, which are contained in the transcripts. It describes a wide-ranging, inexplicable conspiracy that impugns the integrity of state and local law enforcement officers. The allegations make for a page-turning story. But they do not even purport to reflect reality: a jury and federal courts have already considered and rejected the very evidence the Amended Complaint now claims was exculpatory. Instead, the Amended Complaint relies on speculation, offers *post hoc* supposition to excuse the jury's verdict, and offers facts pleaded "on information and belief."

Novels can be, and frequently are, based on exactly this sort of emotional yarn. But viable Section 1983 complaints may not be. The Jefferson County Defendants are, therefore, entitled to judgment as a matter of law.

514676

## A.   Governing standard:  Federal Rule of Civil Procedure 12(c)

Floyd's Amended Complaint fails to state a claim upon which relief may be granted. This Motion technically arises under Rule 12(c) because the Jefferson County Defendants previously filed an Answer invoking immunity defenses. *See* ECF No. 79; *Brown v. Montoya*, 662 F.3d 1152, 1160 n.4 (10th Cir. 2011). Even so, the standards applicable to Rule 12(b)(6) and 12(c) motions are the same. *See generally Morris v. City of Colo. Springs*, 666 F.3d 654, 660 (10th Cir. 2012). This Court must, therefore, determine whether the Amended Complaint contains factual assertions that sufficiently show Floyd is plausibly entitled to relief from each of the named Defendants. *See* Fed. R. Civ. P. 8(a); *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214–15 (10th Cir. 2011).

## B.   Factual allegations

Floyd's Amended Complaint identifies the following causes of action:

| COUNT | THEORY | DEFENDANT(S) |
|---|---|---|
| I | Section 1983 – Deprivation of Due Process | All Defendants |
| II | Section 1983 – Conspiracy to Deprive Constitutional Rights | All Defendants |
| III | Section 1983 – Deprivation of Due Process | "Defendant Officers," defined to include Carreno, Dunnaway, Frost, Herrig, and Poppa, as well as KBI Defendants |
| IV | Section 1983 – Malicious Prosecution | Hayes and "Defendant Officers," defined to include Carreno, Dunnaway, Frost, Herrig, and Poppa, as well as KBI Defendants |
| V | Section 1983 – Conspiracy to Deprive Constitutional Rights | Hayes and "Defendant Officers," defined to include Carreno, Dunnaway, Frost, Herrig, and Poppa, as well as KBI Defendants |
| VI | Section 1983 – Failure to Intervene | "One or more" Defendant Officers, which could include Carreno, Dunnaway, Frost, Herrig, or Poppa |
| VII | Section 1983 – "Municipal Liability" | Herrig, in his official capacity, on behalf of Jefferson County, Kansas |
| VIII | State Law – "Indemnification" | Jefferson County, Kansas |

7

For purposes of this Motion, Floyd's well-pleaded factual allegations are set forth below as if they were true, as required by Rule 12 of the Federal Rules of Civil Procedure. But the following summary does not repeat the legal conclusions, speculation, or allegations contrary to the prior criminal and post-conviction proceedings. *See Kan. Penn*, 656 F.3d at 1214; *St. Louis Baptist Temple, Inc. v. FDIC*, 605 F.2d 1169, 1172 (10th Cir. 1979) ("[F]ederal courts, in appropriate circumstances, may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue.").

**1. The background.** In November 1999, Camille Arfmann was fourteen years old. ECF No. 75, ¶ 1. She was the younger sister of Heidi Arfmann, with whom she resided. ECF No. 75, ¶¶ 27–28.

In 1999, Heidi was married to Floyd, who was twenty-three and also lived in the home with Camille. ECF No. 75, ¶¶ 27–28. Heidi and Floyd had two sons together. ECF No. 75, ¶ 27. Floyd worked at a dairy farm in McLouth, Kansas, a small community in Jefferson County, and had, at this point in his life, never been convicted of a crime. ECF No. 75, ¶ 27.

Also free of previous convictions, so far as the Amended Complaint indicates, was Floyd's brother, Tom. Tom was twenty-five at the time, was partially deaf, and had certain undefined social and intellectual limitations. ECF No. 75, ¶ 29. Tom lived with his mom and dad and was an active member of the Countryside Baptist Church in Oskaloosa, where he attended a Sunday School group geared toward children. ECF No. 75, ¶¶ 29–30. He had exhibited sexual behavior Floyd characterizes as "troubling," which included interest in younger girls. ECF No. 75, ¶ 29.

514676

**2. The crime.** On Friday, November 5, 1999, Camille Arfmann attended school. ECF No. 75, ¶ 31. She took the bus home, arriving around 4:20 p.m., but was missing by 5:00 p.m., when her friend Robin Meyer stopped by to visit. ECF No. 75, ¶ 31. Arfmann's coat and book bag were inside the home, but she was not. ECF No. 75, ¶ 31.

Heidi and Floyd reported Arfmann missing to the Jefferson County Sheriff's Department. ECF No. 75, ¶ 32. They assisted with the search for the next two days. ECF No. 75, ¶ 32.

Floyd contends (and contended at trial) that Tom was responsible. ECF No. 75, ¶ 2. A couple days after the murder, on November 7, 1999, Tom made multiple phone calls that can be interpreted as confessions to the crime. ECF No. 75, ¶¶ 2, 33–36. Specifically, he called his Sunday School teacher, Jim Bolinger, twice and his parents once. Tom's calls to Mr. Bolinger were captured on an answering machine. In them, Tom states that he "know[s] where Camille is," that he's going to "turn [himself] in to the police," and that he is sorry. ECF No. 75, ¶¶ 33–36. During this same timeframe—from 4:20 p.m. on November 5, 1999, to 9 p.m. on November 7, 1999—Floyd asserts alibis in the form of "numerous witnesses," a time-stamped receipt, phone records, and testimony of Carreno (specifically regarding Floyd's whereabouts on November 6th, the day following the murder). ECF No. 75, ¶ 46.

On November 7, 1999, after placing his phone calls, Tom voluntarily went to the Jefferson County Sheriff's Department, along with lawyer Michael Hayes, whom Tom's father had engaged to represent Tom. ECF No. 75, ¶¶ 2, 35, 37. There, Tom and his attorney met with Defendants Poppa, Dunnaway, KBI agent Woods, and "other unknown Defendants." ECF No. 75, ¶ 37. Speaking through his lawyer, Tom told those present that Arfmann had been killed and that he knew where her body was. ECF No. 75, ¶ 37. At some point that evening, Tom or his lawyer provided the details that Arfmann had been shot in the head and that she had been killed

in one location and buried in another—the trash dump on the Bledsoe property. ECF No. 75, ¶ 38. Tom and his lawyer led some Defendants to the property belonging to Floyd and Tom's parents. ECF No. 75, ¶ 39. There, officers searched for and found Arfmann's body. ECF No. 75, ¶ 39. Officers also found bullet casings at the site. ECF No. 75, ¶ 40. Tom's lawyer provided Tom's gun, alleged to be the murder weapon, to unidentified officers. ECF No. 75, ¶ 42.

Arfmann had been shot in the head and torso, and sperm was recovered from her vagina. ECF No. 75, ¶¶ 40–41. The coroner could not determine whether the sexual contact had been forcible. ECF No. 75, ¶ 41.

Following the discovery of Arfmann's body, Tom was charged with first degree murder and detained in the jail. ECF No. 75, ¶ 43. Both Tom and Floyd were investigated as suspects. *See* ECF No. 75, ¶ 50.

On Friday, November 12, 1999, KBI agent Johnson administered polygraph examinations to Floyd and Tom. ECF No. 75, ¶ 57. Floyd mistakenly alleges that during his polygraph Tom failed the question, "Did you kill Camille Arfmann?" ECF No. 75, ¶ 59.[1] Floyd took the polygraph and "truthfully disavow[ed]" involvement. ECF No. 75, ¶ 61. Despite this claim about Floyd's subjective state during the polygraph, the results showed deception, and the Amended Complaint does not allege otherwise. *See* ECF No. 79, ¶ 61.

**3. Criminal process.** Following the polygraph examinations, Vanderbilt dropped the charges against Tom and released him from jail, and Floyd was arrested. ECF No. 75, ¶ 62. In

---

[1] This allegation is recited because it is a fact allegation in the Amended Complaint. It is, however, demonstrably false. *See* ECF No. 79, ¶ 59 (citing polygraph examiner's report, ECF No. 79, Ex. 4, which shows Tom answered a truthful "no" when asked whether he shot Arfmann). The Jefferson County Defendants acknowledge that, at this motion-for-judgment stage, the Court will not look beyond the pleadings and into the polygraph report. It is sufficient for now to point out that Floyd does not assert anyone reported to the Jefferson County Defendants that Tom had allegedly failed his polygraph. Nor does the Amended Complaint allege any facts showing the Jefferson County Defendants had any reason to think Tom had not fully passed the examination.

10

April 2000, Floyd stood trial before a jury in Jefferson County. ECF No. 75, ¶ 89. He was charged with murder, aggravated kidnapping, and indecent liberties with a child. ECF No. 75, ¶ 89. Prior to trial, Vanderbilt offered Floyd a plea deal of five years, which Floyd rejected. ECF No. 75, ¶ 88.

At his criminal trial, Floyd argued that he had a sufficient alibi, that there was no compelling evidence against him, and that Tom was the perpetrator, as introduced by his defense attorney in opening statements:

> [W]hat you're going to hear, ladies and gentlemen, is evidence of three confessions from Tom Bledsoe, not Floyd but from Tom. . . . What's interesting about this, though, ladies and gentlemen, is Tom Bledsoe. It's his gun that kills Camille. We know that. It's his gun. It's a nine-millimeter pistol, all right [sic], he bought it about two weeks before this incident. . . . Tom Bledsoe, not Floyd Bledsoe, he bought the rounds that killed Camille. It was his gun that killed Camille, period. Tom Bledsoe killed Camille, ladies and gentlemen.

ECF No. 79, Ex. 2, at 58:4–6, 66:4–8, 22–25 (Defense Opening Statement). In fact, the prosecution informed the jury of Tom's confessions during its opening as well:

> Tom Bledsoe is responsible for alerting the law enforcement officers where she was buried. Thomas Bledsoe told the law enforcement officers that he shot her. Thomas Bledsoe is not the defendant here. Floyd Scott Bledsoe, his brother, is the defendant here. Thomas Bledsoe provided us his gun, said it was the one that was used. Got K.B.I lab evidence indicating yes, it was Thomas's gun that was used.

ECF No. 79, Ex. 2, at 49:23–50:5 (State's Opening Statement). Despite this, the jury convicted Floyd. ECF No. 75, ¶ 89. After the jury found Floyd guilty, the court sentenced Floyd to life in prison, plus sixteen years. ECF No. 75, ¶ 90.

Floyd was not through, however. He and his lawyers made herculean efforts, seeking relief from his conviction from both state and federal courts. *See Bledsoe I–IV*. In these courts,

Floyd argued insufficient evidence, ineffective assistance of counsel, violation of the Confrontation Clause (by the indirect admission of his minor son's statements), and prosecutorial misconduct (on the specific and limited theory that Vanderbilt knew Floyd's minor son was incompetent to testify but still relied on his statements). *See Bledsoe II*, at 88–89. In each of these cases, Floyd propounded—and thoroughly litigated—the notions that he was innocent and that Tom was responsible. Every attempt was denied except that, in June 2008, Floyd briefly obtained habeas relief, which the Tenth Circuit reversed. ECF No. 75, ¶ 93.

In deciding these issues, the appellate courts walked through the salient evidence, which was not limited to Tom's testimony about Floyd, but also included:

- evidence supporting Tom's alibi, *see, e.g., Bledsoe III*, at *1;

- statements of Floyd's minor son (who had, at times, made comments implicating Floyd) and of Arfmann's mother (whom Floyd dissuaded from calling the police soon after Arfmann's disappearance), *see, e.g., Bledsoe I*, at 1355, 1357–58; and

- the live testimony of several individuals, including—

  o Brandi Wampler and Rosa Bollinger (both indicating that Arfmann was scared to be alone with Floyd), *see, e.g., Bledsoe I*, at 1357, *Bledsoe II*, at 876,

  o Floyd's mother (relaying Floyd's comment that he "knew" Tom did not commit the crime), *see, e.g., Bledsoe I*, at 1358,

  o Jim Bollinger (confirming that Tom had no untoward social history of which he was aware), *see, e.g., Bledsoe II*, at 881, and

  o Colonel Knoebel (stating that, on the day Arfmann went missing, he had heard a female screaming for help near the dairy where Floyd worked) *see, e.g., Bledsoe I*, at 1358.

12

514676

Again and again, the courts recognized that the case was difficult and that the jury had made tough choices when presented with both inculpatory and exculpatory evidence:

> On the record before us, this was a difficult case. Two brothers accused each other of vile crimes. There was ample evidence to support each accusation. The jury, after weighing all of its substance and the credibility of the many witnesses, was persuaded that the State prosecuted the right brother. . . .

*Bledsoe II*, at 887; *see also Bledsoe IV* (holding that this decision of the Kansas Supreme Court in *Bledsoe II* was reasonable and provided no occasion for the federal courts to afford habeas relief).

It was only entirely new information—obtained through the use of new technology—that ultimately called the jury's decision into question.

**4. Recent DNA testing.** Floyd subsequently sought and obtained additional DNA testing, which allowed the physical evidence to be re-examined using technology not available at the time of his conviction. In October 2015, Floyd obtained these results, which showed that Tom was the likely source of semen found in Arfmann's vagina at the time of her death. ECF No. 75, ¶ 94. Although Floyd's DNA was found elsewhere on Arfmann's person, *see* ECF No. 79, ¶ 94, he was excluded as a source of the vaginal-swab DNA, ECF No. 75, ¶ 94. Following these new results, the Jefferson County District Court vacated Floyd's conviction and granted him a new trial. ECF No. 75, ¶ 97; ECF No. 79, ¶ 1. The prosecutor dismissed the pending charges against Floyd, without prejudice, and Floyd was released from custody. ECF No. 75, ¶¶ 97–98; ECF No. 79, ¶ 8.

Shortly after the  DNA results were released, Tom was found dead, reportedly by suicide. *See* ECF No. 75, ¶ 95. In a series of notes found with Tom's body, he purports to confess to the murder, though the details of this purported confession are starkly inconsistent with those of his

alleged confessions in 1999. *Compare* ECF No. 75, ¶¶ 95–96 *with* ECF No. 75, ¶¶ 71, 78.[2] The notes claim that Tom was told to keep silent by the police and by Vanderbilt. ECF No. 75, ¶ 95.

**5. Section 1983 allegations.** Against this background of alleged facts, Floyd makes only the following specific allegations against the Jefferson County Defendants. The Jefferson County Defendants do not here reproduce the specific allegations made against co-defendants or the vague ones made against the generalized "Defendants" or "other unknown" persons.

Dunnaway. In 1999, Dunnaway was Sheriff. ECF No. 75, ¶ 15. On November 7, 1999, he met with Tom and his lawyer, along with a group of others, at the Sheriff's Department, where Tom informed the group that Arfmann had been murdered and he knew the location of her body. ECF No. 75, ¶ 37. After Tom and Floyd sat for polygraph examinations with the KBI, Dunnaway and others arrested Floyd. ECF No. 75, ¶ 63.[3]

Herrig. In 1999, Herrig was Undersheriff. ECF No. 75, ¶ 16. Now, he is the current Sheriff. ECF No. 75, ¶ 25.[4]

Carreno. In 1999, Carreno was a law enforcement officer at the Sheriff's Department. ECF No. 75, ¶ 14. Carreno was the lead detective assigned to the Arfmann case. ECF No. 75, ¶ 50. He believed Floyd to be a suspect and focused investigation efforts on Floyd. ECF No. 75, ¶ 50. Carreno continued to believe Floyd was a suspect after Tom's confession. ECF No. 75, ¶ 50.

---

[2] For example, Floyd's Amended Complaint sometimes adopts the original story that Arfmann was shot in Tom's truck, *see* ECF No. 75, ¶ 78, and other times asserts—based on the later alleged confession—that Arfmann was shot outdoors in a third location, *see* ECF No. 75, ¶¶ 95–96.

[3] Floyd alleges that Dunnaway "knew" Floyd was innocent, ECF No. 75, ¶ 63, but this is pure conclusion, with no supporting allegations, and should be disregarded as such. Floyd also makes purely legal assertions about Dunnaway's authority and supervisory capacity at the Sheriff's Department and recites conclusory phrases about "ratification and authorization" of deputy conduct. *See* ECF No. 75, ¶¶ 15–18, 25, 157–59.

[4] As with Dunnaway, Floyd proceeds through a recitation of legal elements about Herrig's work as a supervisor and policymaker at the Sheriff's Department. *See* ECF No. 75, ¶¶ 17, 157–59.

14

He and some unidentified "others" altered some equally unidentified statement(s) of Tom's, to refine the time period in which Tom claimed to have talked with Floyd on November 6, 1999. ECF No. 75, ¶ 65. Although Floyd alleges that the purpose of this "falsification" was to place the conversation during a period in which Floyd lacked an alibi, the Amended Complaint does not allege what statements were altered, in what way the statements were changed, how the statements were documented, to whom the statements were made, or what motivation Carreno or anyone else would have had to falsify Tom's statement. Finally, Floyd makes the purely conclusory assertions that Carreno "conspired with" Hayes to obtain false statements from Tom and pin the murder on Floyd, ECF No. 75, ¶ 51, and that he and Hayes worked together with Vanderbilt, over whom Hayes had some untoward influence, ECF No. 75, ¶ 52. Floyd does not provide any factual support for the existence a conspiracy; nor does he identify any possible motivation for such a conspiracy.

Frost. In 1999, Frost was a law enforcement officer at the Sheriff's Department. ECF No. 75, ¶ 14. Frost claimed that Floyd had confessed to going home around the time Arfmann disappeared. ECF No. 75, ¶ 85. Floyd believes he made no such confession. ECF No. 75, ¶¶ 85–86. Frost signed a search warrant affidavit stating that Floyd had visited his home during the relevant timeframe. ECF No. 75, ¶ 85.

Poppa. In 1999, Poppa was a law enforcement officer at the Sheriff's Department. ECF No. 75, ¶ 14. On November 7, 1999, he met with Tom and his lawyer, along with a group of others, at the Sheriff's Department, where Tom informed the group that Arfmann had been murdered and he knew the location of her body. ECF No. 75, ¶ 37.

Floyd makes no other allegations against the individual Jefferson County Defendants.

514676

Defendant Officers. Floyd does, however, make sweeping allegations against a collective group of "Defendant Officers." (Floyd defines this term to mean all of the individual Jefferson County Defendants, all of the individual KBI defendants, and "other unknown" law enforcement officers. ECF No. 75, ¶¶ 18–20.[5]) Floyd alleges all of these Defendant Officers directly received Tom's surrendered gun. ECF No. 75, ¶ 42. He alleges that these Defendant Officers collectively interrogated Floyd and searched his home, clothing, and car but did not obtain inculpatory evidence from these efforts. ECF No. 75, ¶ 47. He also alleges Defendant Officers withheld evidence of Tom's inculpatory statements, his activities between November 8th and 12th, his history of making advances on young girls, and "further information that is unknown." ECF No. 75, ¶¶ 69–70, 72–73, 75–76. Notably, Floyd does not squarely allege that there existed any documentation of Tom's activities between November 8th and 12th—which makes sense, as the prosecutor had dropped charges against Tom by this point—but instead seems to allege that officers *should* have continued to vigorously investigate Tom. *See* ECF No. 75, ¶ 73. In addition, Floyd does not allege that he lacked independent knowledge of his brother's inculpatory statements or social history or that his defense was hindered by these alleged suppressions.[6]

Floyd also alleges that the "Defendant Officers" failed to adequately search for, properly handle, or carefully preserve physical evidence that could have been gathered from Tom's truck,

---

[5] This type of ambiguity alone counsels in favor of disregarding these allegations, as they cannot provide requisite notice to any one of the defendants. *See Robbins v. Oklahoma*, 519 F.3d 1242, 1249–50 (10th Cir. 2008) (holding that, particularly in the Section 1983 context, adequate pleading requires clear identification of "exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state" (emphasis original)).

[6] Nor can he, as his own attorney discussed these items extensively at his trial, showing either Floyd had independent knowledge or, more likely, that full disclosure was made. *See* ECF No. 79, ¶ 5 and Ex. 2, 70:25–71:18.

from the shovel used to bury Arfmann, or from Tom's home. ECF No. 75, ¶¶ 78–80. Floyd is of the opinion that this evidence was potentially exculpatory. ECF No. 75, ¶ 80.

Floyd contends that Defendant Officers "fabricated additional evidence" of an unknown nature and concealed certain undescribed "misconduct." ECF No. 75, ¶ 81. The only concrete fabrication allegations made against identifiable Jefferson County Defendants are those recited above.

Floyd also makes the conclusory allegations that the Defendant Officers "schemed with, conspired with, and collaborated with" Hayes and Vanderbilt, ECF No. 75, ¶ 22, or alternatively, "schemed" only with Hayes and not Vanderbilt, ECF No. 75, ¶ 54. Floyd then adds in a further layer of ambiguity to conclude that certain "other Defendant Officers" falsified certain unidentified statements of Tom's, ECF No. 75, ¶ 65; withheld documentation of Tom's confessions, ECF No. 75, ¶ 71; and/or withheld documentation of Tom's polygraph statements, ECF No. 75, ¶ 74.[7] Beyond the general implication that the goal of this "scheme" was to frame Floyd for murder, the Amended Complaint gives no hint as to the nature, scope, or plan underlying this scheme. Nor does it attempt to provide any motive or explanation for the incredible notion that these eleven-plus individuals, representing four different entities, each subjectively believed Tom to be guilty but still preferred to pursue a more challenging conviction against Floyd.

* * * * *

---

[7] This last allegation is particularly puzzling, as the polygraph evidence was only kept out of Floyd's jury trial by motion of his own defense counsel. *See* ECF No. 79, ¶ 74.

## II.    ARGUMENT AND AUTHORITIES

Floyd Bledsoe's Amended Complaint, like his direct and post-conviction appeals, contends he was framed for a murder that he did not commit. Although long on conclusions and short on facts, Floyd essentially argues that his conviction was based on (i) fabricated testimony from his brother, Tom, (ii) a failure to provide his defense team with unspecified evidence, and (iii) a malicious intent to frame him. These claims do not hold up, however, as several appellate opinions from state and federal courts show. *See* Part I.B.3 *supra*. The only true difference between this claim and the previously rejected claims is that, in 2015, Floyd obtained state-of-the-art DNA testing that confirmed his seminal fluid was not located within the murder victim. That is insufficient to sustain a claim that the individual defendants—fifteen years earlier—violated his constitutional rights. The Jefferson County Defendants thus request judgment in their favor on each of Floyd's claims.

### A.    The Amended Complaint does not allege that any of the individual Jefferson County defendants violated clearly established law.

Floyd identifies two provisions—the Fourth and Fourteenth Amendments—that allegedly give rise to his claims. *See* Part I.B, Table *supra*. But, as demonstrated below, the Amended Complaint fails to state a claim for several reasons. *First*, it does not allege facts sufficient to show a plausible deprivation of either amendment. *Second*, most of the individual Jefferson County Defendants are not alleged to have participated in the alleged deprivations. *Third*, the individuals are immune because the well-pleaded facts do not allege they acted in a manner that, in 1999 or 2000, could have been described either as plainly incompetent or in knowing violation of the law.

1.    __The Amended Complaint fails to allege a constitutional deprivation.__

a.   **The Fourteenth Amendment due process claims fail as a matter of law.**

Floyd's Amended Complaint asserts he was denied a fair trial in violation of his Fourteenth Amendment procedural due process right. Counts I and III assert that this occurred because evidence was fabricated; Count III also asserts that certain evidence was suppressed.

*Pyle v. Kansas*, 317 U.S. 213 (1942), is the analytical origin of both claims. In *Pyle*, the Court concluded that the State violates a criminal defendant's constitutional rights by either fabricating unfavorable, or deliberately suppressing favorable, evidence. *Id.* at 215–16. The Court, in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), applied *Pyle* to conclude that bad faith is not always a necessary element for such a claim. Four things are necessary: (i) there must be an absence of state remedies, (ii) the defendant(s) must have been more than negligent, (iii), the evidence created or withheld must have been material to the trial, and (iv) the use or suppression of evidence must have rendered the criminal proceeding essentially meaningless. *See Brady*, 373 U.S. at 87; *Myers v. Koopman*, 738 F.3d 1190, 1193–94 (10th Cir. 2013); *Tiscareno v. Anderson*, 639 F.3d 1016, 1023 (10th Cir. 2011) (vacated in irrelevant part); *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999). Floyd's allegations do not state a Fourteenth Amendment claim.

(1)   **The availability of post-deprivation process precludes Floyd's due process claims.**

The availability of Kansas tort remedies bars Floyd's due process claims. In *Parratt v. Taylor*, 451 U.S. 527, 535–44 (1981), the Court rejected a due process claim because there were adequate post-deprivation remedies under state law. The Tenth Circuit, relying on the existence of state tort remedies, has applied this bar to procedural due process claims that assert deprivations caused by withholding or fabricating evidence during a prosecution. *See Myers*, 738 F.3d at 1193; *Becker v. Kroll*, 494 F.3d 904, 921 (10th Cir. 2007). Kansas tort law provides an

adequate remedy, by way of a malicious prosecution claim. *See Lindenman v. Umscheid*, 875 P.2d 964, Syl. ¶ 7 (Kan. 1994); *see also, e.g., Jackson v. Geier*, Civ. A. No. 91-2041-V, 1991 WL 278625 at *4 (D. Kan. Dec. 24, 1991). As a result, Floyd's due process claims fail.

(2)   <b>None of the individual Jefferson County Defendants are alleged to have acted with intent or malice.</b>

The due process claims also fail, as a matter of law, because none of the individual Jefferson County Defendants are alleged to have acted with a sufficiently culpable mental state. In *Daniels v. Williams*, 474 U.S. 327, 330–31 (1986), the Court ruled that negligent conduct could not deprive an individual of due process. Rather, something more egregious is required. *Cf. id.* at 334, n.3 (leaving undecided whether intentional conduct is needed or whether recklessness or gross negligence may suffice). And, although bad faith is not always necessary for a *Brady* claim, it *is* required when allegations pertain to destruction of evidence that was only potentially exculpatory. *See United States v. Solis*, 55 F.Supp.2d 1182, 1187 (D. Kan. 1999).

Here, beyond bare and conclusory recitations of the various states of mind that *could* satisfy this element, *see*, *e.g.*, ECF No. 75, ¶ 113, Floyd makes no statements pertaining to the Jefferson County Defendants' mental state. Furthermore, he makes no attempt to show a sufficient mental state for each individual Defendant, as required to state a claim. For example, he contends that a vague group of Defendants collected certain physical evidence in a manner that destroyed its potentially exculpatory nature. ECF No. 75, ¶¶ 78–80 ("Simultaneously, the Defendant Officers actively suppressed physical evidence that would have proven Tom's guilt, including physical evidence from the truck in which Tom had shot Camille  . . . . Morgan and other Defendant Officers declined to subject Tom's home . . . to any rigorous forensic examination, and instead intentionally recovered such items as Tom's weapons . . . by permitting

20

Tom's father to handle them . . . . Had it been properly recovered, such evidence would have established Tom as the killer . . . ."). Not only does Floyd fail to allege how a different mode of collecting this evidence would have exculpated him, but he also fails to allege the requisite bad faith of the Defendant(s) involved. Case law is clear that liability cannot lie under the Fourteenth Amendment without a culpable mental state, and Floyd's claims in Counts I and III fail on that ground alone. *See Daniels*, 474 U.S. at 330–31, 334 n.3; *Solis*, 55 F.Supp.2d at 1187.

### (3) The Amended Complaint fails to identify material evidence that any of the individuals fabricated or suppressed.

What is more, even if Floyd could allege the requisite intent for each of the Jefferson County Defendants, and even if Floyd lacked the adequate post-deprivation remedy that Kansas law offers, he has still not sufficiently identified a material fabrication or suppression in which any of the Jefferson County Defendants personally participated.

***Brady* violation.** Floyd's Amended Complaint asserts that "Defendant Officers" deprived him of a fair trial in violation of *Brady*. ECF No. 75, ¶¶ 122–31, 108–15. *Brady*, of course, recognized that a criminal defendant's right to a fair trial may be effectively denied by the withholding of exculpatory information. *Brady*, 373 U.S. at 86–87. In general, the Tenth Circuit has held that a successful *Brady* claim requires proof that (1) the prosecution suppressed evidence, (2) that was favorable to the accused, and (3) was material to the defense. *See United States v. Geames*, 427 F.3d 1333, 1337 (10th Cir. 2005); *accord Skinner v. Switzer*, 562 U.S. 521, 536 (2011). In discussing the materiality requirement, the Tenth Circuit has held the suppressed evidence must have actually affected the case at trial. *Becker*, 494 F.3d at 924 (citing *United States v. Bagley*, 473 U.S. 667, 678 (1985); *Jean v. Collins*, 221 F.3d 656, 663 (4th Cir. 2000) (en banc) ("A *Brady* violation that resulted in the overturning of the . . . conviction is a

necessary, but not a sufficient, condition for § 1983 liability on the part of the police. . . .")). In addition, evidence is not material for *Brady* purposes when the criminal defendant has independent knowledge of it. *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir. 1999).

In this case, Floyd has asserted some collective of officers withheld evidence of Tom's confessions; details of Tom's activities between November 8 and November 12, 1999; and Tom's history of inappropriate advances toward girls. *See* Part I.B.5 *supra*. Floyd does not allege that any documentation of Tom's activities between November 8th and 12th actually existed. Nor does he allege this hypothetical documentation would have been favorable to him. In fact, Floyd has no claim related to these allegedly withheld items because he cannot allege they meet the materiality requirement. Tom's confessions and social history were thoroughly discussed at Floyd's trial, by Floyd's own counsel no less. *See* Part I.B.5 *supra*. This shows either that Floyd had independent knowledge or that these items were not, in fact, withheld. Regardless, even if the Jefferson County Defendants *had* withheld these items, that action in no way changed the course of the trial—as the jury heard of them anyway—and Floyd has no claim on this basis.

Floyd has also claimed that the Defendant Officers collectively failed to gather certain physical evidence in a responsible manner. *See* Part I.B.5 *supra*. Floyd makes no concrete factual allegations as to why he believes this physical evidence would have been favorable or material. In addition, Floyd's conclusory allegations about the unidentified officers' states of mind are insufficient to transform the alleged conduct into anything more than negligence, which is not actionable and is certainly not sufficient to fulfill the bad-faith requirement for potentially exculpatory evidence. *See Solis*, 55 F.Supp.2d at 1187.

**Fabrication.** The Amended Complaint contends that, as pertains to the Jefferson County Defendants, three items of evidence were fabricated. In particular, Floyd asserts: (i) Defendant

Officers orchestrated Tom's retraction of prior confessions and helped him recount Floyd's alleged roadside confession, ECF No.75, ¶¶ 49–68, (ii) Turner and Frost "falsely claimed that Floyd had confessed to having visited his home at the time Camille disappeared from it," ECF No. 75, ¶ 85, and (iii) "Frost signed a search warrant" based upon Floyd's alleged confession, ECF No. 75, ¶ 85. Although use of fabricated testimony is impermissible, *see Pyle*, 317 U.S. at 216, Floyd's allegations fail to satisfy that standard.

The Tenth Circuit has considered cases dealing with allegedly fabricated evidence, but it does not appear that the court has previously considered the elements necessary to sustain a fabrication claim under the rubric of due process. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1285–86 (10th Cir. 2004) (declining to elaborate on when a Fourth Amendment claim ends and a due process claim begins, simply noting that due process can be offended by the use of fabricated evidence); *see also Anthony v. Baker*, 767 F.2d 657, 662–64 (10th Cir. 1985). Other jurisdictions, however, have done so in greater detail. *See generally Cole v. Carlson*, 802 F.3d 752, 768–71 (5th Cir. 2016) (discussing state of the law across circuits), *vacated and remanded*, 137 S. Ct. 497 (2016); *Halsey v. Pfeiffer*, 750 F.3d 273, 293–95 (3d Cir. 2014) (considering other circuit precedent before holding fabrication can ground a Fourteenth Amendment claim only if a civil plaintiff "can demonstrate that the record supports a conclusion that the allegedly fabricated evidence was so significant that it could have affected the outcome of the criminal case").

Here, Floyd's only concrete factual allegations are that Frost signed a search warrant for Floyd's home and that this warrant was premised on an allegedly false claim. *See* ECF No. 75, ¶ 85. Floyd does not allege that either the warrant or any search pursuant to it yielded evidence that

influenced the jury's verdict.[8] Thus, Floyd has no claim on the basis of Frost's alleged fabrication because, in addition to the above-discussed reasons, materiality and causation are wholly lacking. *See Lippoldt v. Cole*, 468 F.3d 1204, 1219 (10th Cir. 2006) ("A plaintiff must allege factual causation—i.e. 'but for' causation—in order to state a claim under § 1983.").

As to Floyd's claims about Tom and his allegedly fabricated testimony, the Amended Complaint offers little detail and fails to satisfy Floyd's pleading obligations. *See Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008). Except for the abrupt claim that Carreno and "others" altered Tom's statements to create a more favorable timeline for Tom and Floyd's activities the day after Arfmann's death, the Amended Complaint asserts only that some unknown group of officers "fabricated additional evidence" in furtherance of a "scheme." *See* Part I.B.5 *supra*. This is inadequate to state a claim, as is the sparse assertion that Carreno and others at some unknown point, through unknown means, altered unidentified statement(s) in furtherance of a "conspiracy" for which no motive exists. *Cf. Cruz v. City of Merriam*, 21 F. Supp. 3d 1177, 1183 (D. Kan. 2014) (dismissing allegations that "are purely conclusory[]and provide no explanation of how this alleged conspiracy—which supposedly existed between officers and employees of different branches of the City government—operated, or even a plausible purpose for the conspiracy"). In addition to the deficient allegations, public records, of which this Court may take notice, demonstrate the evidence leading to Floyd's conviction included much more than the allegedly fabricated items—showing a lack of materiality. Part I.B.3 *supra*; *see Bledsoe I* (holding evidence sufficient, even in light of claim that Tom's testimony was "highly suspect").

---

[8] Nor could he, as the Transcript shows that the prosecution directly acknowledged to the jury that the search of Floyd's trailer yielded no probative material. *See* ECF No. 79, Ex. 2 at 55:2–56:24, 466:10–18.

514676

**(4)    None of the evidence denied Floyd notice or an opportunity to be meaningfully heard before a jury.**

The right to due process guarantees citizens notice and an opportunity to be heard. *See Morgan*, 166 F.3d at 1310. Although Floyd argues he was denied due process, his criminal case, direct appeal, post-conviction proceedings in state and federal court, and the ultimate procedures resulting in his release—pursuant to the 2015 DNA test—confirm he received both notice of the charges and many opportunities to be heard with able counsel. Floyd has alleged no *facts* showing each of the Jefferson County Defendants personally took actions that materially influenced the outcome of his trial. Thus, he failed to state a colorable Fourteenth Amendment claim, and the Jefferson County Defendants are entitled to judgment on Counts I and III.

**b.  The Fourth Amendment malicious prosecution claim fails as a matter of law.**

In Count IV, Floyd asserts a Fourth Amendment malicious prosecution claim.[9] He contends that "Defendant Officers," perhaps including the Jefferson County Defendants, caused him "to be unreasonably seized and improperly subjected to judicial proceedings for which there was no probable cause." ECF No. 75, ¶ 135. He does not state that any Jefferson County Defendant violated his right to be free from an unreasonable search or seizure.

The Fourth Amendment has now been interpreted to give rise to a claim akin to the tort of malicious prosecution.[10] *See Manuel v. City of Joliet*, 137 S. Ct. 911 (2017); *Sanchez v.*

---

[9] Floyd also references substantive and procedural due process. ECF No. 75, ¶ 134. To the extent he attempts a substantive due process claim, it should be rejected. *See Albright v. Oliver*, 510 U.S. 266, 270 n.4 & 271–72 (1994) (plurality opinion); *Becker*, 494 F.3d at 918–19. And, to the extent he seeks to rely on the Fourteenth Amendment's procedural aspects, the analysis and deficiencies set out for Counts I & III fully apply. Part II.A.2.a *supra*; *see, e.g., Myers*, 738 F.3d at 1193 (holding availability of post-deprivation state remedies bars procedural due process claim).

[10] The individual defendants are entitled to qualified immunity on the malicious prosecution claim because it was not clear in the Tenth Circuit, in 1999–2000, that the Fourth Amendment even supported a malicious prosecution claim. *See Sanchez*, 810 F.3d at 755 (recognizing the court in *Mondragon v. Thompson*, 519 F.3d 1078, 1083 n.4

*Hartley*, 810 F.3d 750, 755 (10th Cir. 2016). *Manuel*, however, was decided on facts in which the State initiated legal proceedings but dismissed them *prior to trial. See* 137 S. Ct. at 915–16. The Supreme Court decided the initiation of pretrial process did not bar a Fourth Amendment claim, *see id.* at 919, but clarified that "[b]y contrast . . . once a trial has occurred, the Fourth Amendment drops out: A person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment." *Id.* at 920 n.8. The Court continued, "*Gerstein* [*v. Pugh*, 420 U.S. 103] and *Albright* . . . both reflected and recognized that constitutional division of labor." *Id.* As a result, in this case—where Floyd proceeded to, and was convicted at, a jury trial, and where he alleges his prosecution was wrongful, but makes no false imprisonment claim—Floyd's claims fall only under the Fourteenth Amendment, and fail for the reasons fully set out in Part II.A.1.a *supra*.

Following the start of his jury trial, Floyd's potential Fourth Amendment malicious prosecution claim "dropped out," to borrow the Supreme Court's phrase. But even if Floyd's claim were not prevented on this basis, he would have failed to show entitlement to relief on this theory. To have stated a malicious prosecution claim, Floyd would have needed to show (1) the original action terminated in his favor; (2) no arguable probable cause supported the original arrest, continued confinement, or prosecution; (3) the defendants caused his continued

---

(10th Cir. 2008), questioned whether the Fourth Amendment could support such a claim, but holding that subsequent cases had recognized it). Indeed, until March of this year, there existed a divide among the circuits as to whether this cause of action existed. *See Manuel*, 137 S. Ct. 911. If the law was unclear to the Tenth Circuit in 2008, and the Seventh Circuit continued to bar the claim until this year, the Jefferson County Defendants should not be held to account for what may be deemed unconstitutional many years after their conduct. *See Reichle v. Howards*, 566 U.S. 658, 669–70 (2012) (quoting *Wilson v. Layne*, 526 U.S. 603, 618 (1999)) (reasoning it is unfair to subject police to damages for picking the losing side in a controversy about a constitutional issue on which judges disagree).

514676

confinement or prosecution; (4) the defendants acted with malice; and (5) he sustained damages. *See Stonecipher v. Valles*, 759 F.3d 1134, 1146 (10th Cir. 2014). This he has not done.

### (1)    The state-court proceedings did not terminate in Floyd's favor.

Floyd contends he was exonerated. In particular, the Amended Complaint asserts that (i) the trial court "vacated Floyd's conviction and the Jefferson County Attorney dismissed the charges . . . ," ECF No. 75, ¶ 97, and (ii) "all such proceedings were ultimately terminated in [his] favor in a manner indicative of his innocence," ECF No. 75, ¶ 135. These allegations need not be credited: the former purports to characterize a court order that is public record, and the latter is a legal conclusion. *See Stan Lee Media, Inc. v. Walt Disney Co.*, 774 F.3d 1292, 1298 n.2 (10th Cir. 2014) (taking notice of documents and docket materials filed in other courts); *Kan. Penn*, 656 F.3d at 1214–15 (observing *Iqbal* and *Twombly* require ignoring legal conclusions).

Circuit law confirms that, to satisfy the favorable-termination element, the dismissal must affirmatively indicate innocence. Specifically, the Tenth Circuit held in *M.G. v. Young*, 826 F.3d 1259, 1262 (10th Cir. 2016), that "the plaintiff must show more than just the withdrawal or vacating of criminal charges—the plaintiff must demonstrate that the criminal proceedings were dismissed for reasons indicative of innocence, and not because of an agreement or compromise, an extension of clemency, or technical grounds having little or no relation to the accused's guilt."

Floyd's malicious prosecution claim fails because the result of his criminal proceedings did not indicate innocence. Instead, his sentence was vacated with the opportunity for retrial—a result insufficient to fulfill this element. *See id.* at 1262–64 (holding element unmet where prosecution stipulated to former convict's petition for relief, without reason for stipulation). In addition, the *circumstances* surrounding this outcome do not indicate actual innocence. First, Floyd has repeatedly presented, to a jury and judges, the allegations that he had an alibi, that he

27

was innocent, and that Tom (or, perhaps, their father) was the killer. These assertions have repeatedly failed to convince neutral arbiters of Floyd's innocence. *See Bledsoe I*, *II*, *IV*. Second, the absence of DNA from Arfmann's vagina may establish Floyd did not have unprotected sex with her leading up to her murder, but neither it nor Tom's alleged suicide notes establishes that Floyd is actually and wholly innocent in her death. Indeed, the trial court merely overturned the conviction in light of new DNA evidence,[11] ordered a new trial, and then granted the State's motion to dismiss without prejudice. *See* ECF No. 79, ¶ 8. This is insufficient to satisfy the favorable-termination element for the already disfavored malicious prosecution claim. *See M.G.*, 826 F.3d at 1263–64. The outcome may have worked to Floyd's benefit, but did not establish his innocence. *See Cordova v. City of Albuquerque*, 816 F.3d 645, 650–54 (10th Cir. 2016).

### (2) There was probable cause to believe Floyd killed Arfmann.

Floyd baldly alleges the judicial proceedings occurred without probable cause. ECF No. 75, ¶¶ 134–35. But he does not say why probable cause was lacking, relying instead on a formulaic recitation of the elements for a malicious prosecution claim. This will not suffice. *See Kan. Penn*, 656 F.3d at 1214. And, in fact, still more is required. To state a viable claim Floyd must show that, at the time, officers lacked even *arguable* probable cause. *Stonecipher*, 759 F.3d at 1141. Arguable probable cause requires only that, in an objective sense, "a reasonable officer could have believed that probable cause existed . . . ." *Id.*

---

[11] Under Kansas law, convicted murderers can petition their convicting court for testing of materials that "can be subjected to retesting with new DNA techniques that provide a reasonable likelihood of more accurate and probative results." K.S.A. 21-2512(a). That is what occurred here: Floyd, with the State's consent, sought and obtained testing of the original vaginal swab with new testing mechanisms. The new methods were able to identify seminal fluid and exclude Floyd as its likely contributor. ECF No. 79, Ex. 3, p. 11. That Floyd's DNA was not on the swab does not establish he was innocent, particularly given the presence of hs DNA on other parts of Arfmann's person. *See* ECF No. 79, Ex. 3, p. 12. Upon retrial, a jury may or may not agree Floyd is innocent, but that is not a result compelled by the new evidence. *Compare with Pierce*, 359 F.3d at 1294–95 (holding favorable termination occurred where plaintiff's only conviction was rape and where a court vacated his conviction while *expressly* finding new DNA evidence established plaintiff was "factually innocent" of rape).

28

The facts pleaded, and confirmed in Floyd's appellate proceedings, amply show there was more than arguable probable cause to believe Floyd killed Arfmann. In fact, probable cause was conclusively established by the trial court's decision to bind Floyd over, the jury's guilty verdict, and the Kansas Supreme Court's decision affirming. *See Bledsoe I*, at 42 (holding evidence was sufficient); *Bledsoe IV*, at 1228–29 (reviewing testimony suggesting Arfmann believed Floyd "had considered pursuing a sexual liaison with" her); *Bledsoe II*, at 887 ("Two brothers accused each other of vile crimes. There was ample evidence to support each accusation."). Floyd cannot now, based on the hindsight afforded by new DNA tests and Tom's alleged suicide note, argue otherwise. *Cf. Taylor v. Meacham*, 82 F.3d 1556, 1564 n.10 (10th Cir. 1996) (noting various circuit applications of collateral estoppel in probable-cause context).

### (3)   Floyd has not and cannot allege causation.

Causation is a necessary element of all Section 1983 claims, especially when asserting that law enforcement maliciously prosecuted a citizen. The Tenth Circuit—long before Arfmann was murdered—applied a rule of causation that precludes liability here.

In *Taylor*, that court rejected a malicious prosecution claim against an investigator because of an intervening preliminary hearing "in which a judge independently listened to testimony, evaluated the credibility of those testifying, reviewed evidence, and concluded that the evidence was sufficient to bind [the suspect] over for trial." *Id.* at 1564. No claim could succeed, the court ruled, because "the preliminary hearing broke the 'chain of causation.'" *Id.*

There are at least two independent acts that broke any causal chain with which Floyd may attempt to corral the Jefferson County Defendants. For one, evidence was presented to the county attorney, who decided to prosecute. *See, e.g.*, *Barham v. Town of Greybull*, 483 F. App'x 506, 509 (10th Cir. 2012) (holding no causation, given prosecutor's independent decision to charge);

*accord Albright*, 510 U.S. at 279 n.5 (Ginsburg, J., concurring) (stating prosecutor, not police, is principal player). For another, a judge allowed Floyd's prosecution to proceed, and a jury convicted him. *See*, *e.g.*, *Taylor*, 82 F.3d at 1564 (holding no causation due to judicial decision).

To be sure, a prosecutor's decision to pursue a case will not always establish probable cause. Where probable cause determinations are directly based on a defendant's flagrant misrepresentation—made with, at minimum, a reckless disregard for truth—plaintiffs are not necessarily barred from contesting probable cause. *See Stonecipher*, 759 F.3d at 1147. But, for a plaintiff to demonstrate this sort of deliberate misrepresentation, he must show the individual officer "in fact entertained serious doubts as to the truth of his allegations," which is *not* equivalent to a "failure to investigate a matter fully, to exhaust every possible lead, interview all potential witnesses, and accumulate overwhelming corroborative evidence." *Id.* at 1142. Not only is Floyd's case devoid of such well-pleaded allegations, *see* Parts I.B.5 & II.A.2.a *supra*, but it also presents a situation in which probable cause arose from numerous sources outside the allegedly fabricated items, *see* Parts I.B.3 *supra* (detailing the evidence on which courts affirmed Floyd's conviction, including many sources he has not attempted to impugn).

The evidence of probable cause for Floyd's arrest and prosecution was substantial. *See* Part I.B.3 *supra*. In addition, a jury—having heard of Tom's confessions, the lack of physical evidence implicating Floyd, and Floyd's alibi—still convicted. Then, the Kansas Supreme Court affirmed. *Bledsoe I.* Finally, the Kansas Supreme Court and the Tenth Circuit rejected Floyd's requests for post-conviction relief.[12] *See Bledsoe II, IV.* Additionally, there are no well-pleaded

---

[12] The conviction and these rulings should estop Floyd from contesting probable cause. *Cf. Taylor*, 82 F.3d at 1564 n.10; *see also Smith v. Arizona*, 620 F. App'x 574, 576 (9th Cir. 2015); *Bodlen v. City of Euclid*, 595 F. App'x 464, 469 (6th Cir. 2014); *Nunez Colon v. Toledo-Davila*, 648 F.3d 15, 21 (1st Cir. 2011).

514676

contentions to suggest evidence was fabricated, impermissible pressure was applied to the prosecutor, or any of the evidentiary concerns outlined in the Amended Complaint would have led to a different result. *See* Part II.A.1.a *supra*. Looking at the facts alleged, there is, as a matter of law, no causal connection between the individual Jefferson County Defendants' pretrial investigation and the resulting criminal conviction Floyd received during his prosecution. *See Taylor*, 82 F.3d at 1564; *accord Crudup v. Schulte*, 12 F. App'x 682, 685 (10th Cir. 2001); *Townes v. City of Tulsa*, 96 F. App'x 656, 657 (10th Cir. 2004) (holding officers entitled to qualified immunity because trial court bound over plaintiff for trial); *Smith v. Barber*, 316 F. Supp. 2d 992, 1026 (D. Kan. 2004) (finding no liability due to detention hearing).

### (4) Floyd fails to allege the Jefferson County Defendants acted with malice.

Malice is a fundamental element of malicious prosecution. *See Stonecipher*, 759 F.3d at 1146. Although Floyd generically declares the "Defendant Officers" acted with malice, ECF No. 75, ¶¶ 135, 137, he alleges no well-pleaded facts to support his conclusion that the Jefferson County Defendants collectively—much less individually, as required—possessed any improper motive to prosecute one brother over the other. His claim, therefore, fails as a matter of law.

Being a disfavored action, *see Cordova*, 816 F.3d at 653, it is hardly surprising that the standard for liability is so high. Malice is a familiar term, requiring proof that a defendant acted with actual evil-mindedness, a specific intent to injure or deprive another of a federal right, and without just cause or excuse. *See generally* Restatement (Second) of Torts, § 668 (1977); *accord Jackson v. Kan. Cnty. Ass'n Multiline Pool*, No. 03-4181, 2006 WL 963838, at *18 (D. Kan. Apr. 6, 2006) (citing *Turner v. Haliburton Co.*, 722 P.2d 1106, 1113 (Kan. 1986). Although malice can be inferred from a lack of probable cause or reckless disregard for truth, something

more than negligence, inattention, or general second-guessing is required. *See Stonecipher*, 759 F.3d at 1142; *Pierce*, 359 F.3d at 1297 n.12.

Floyd's Amended Complaint fails to allege legal malice with regard to any of the Jefferson County Defendants.[13] For example, Floyd describes the alleged desire of "Defendant Officers" to stage a recanting of Tom's confessions in an effort to frame Floyd. ECF No. 75, ¶¶ 44–68. Although it is true the two brothers were both suspects, there is nothing but second-guessing at best (or rank conjecture at worst) to suggest any of the Jefferson County Defendants harbored misgivings about Floyd's guilt. As the Kansas Supreme Court held, the trial record showed "this was a difficult case" with "ample evidence" to support both Tom and Floyd's accusations against each other. *Bledsoe II*, at 887. Floyd can demonstrate no malice with regard to the "Defendant Officers," much less any particular one of them. In fact, Floyd has failed to describe why one or more of the individual Jefferson County Defendants wanted to ignore Tom's repeated confessions and focus instead on Floyd. The only explanation is an honest belief that Floyd—not Tom—was the culprit. If any of the individual Jefferson County Defendants made the wrong choice (and it has not been established that they did), that is a matter of good-faith mistake or, at worst, negligence—not malice.

In addition, Floyd complains that "Defendant Carreno and other Defendant Officers" falsified Tom's statements to fit their theory or "concealed from Floyd's defense and the prosecution documentation of Tom's many inculpatory statements." ECF No. 75, ¶¶ 65–66, 69–70. Although the allegation sounds dastardly, there are at least two reasons why it cannot establish malice. First, Tom's confessions and statements were disclosed, as evidenced by the

---

[13] Each individual must have acted with the culpable mental state. *See Stonecipher*, 759 F.3d at 1142 n.3.

fact that the prosecution described them in opening statements, the defense subjected Tom to cross-examination, and defense counsel argued the alibi and confession issue to the jury. *See* ECF No. 79, ¶¶ 5, 32, 46. Second, the well-pleaded allegations do not indicate who is meant to have falsified what, or why any of the Jefferson County Defendants should have been suspicious. *See* Part II.A.1.a.3 *supra*. Instead, as the Kansas Supreme Court held, there was "ample evidence" to support accusations against both Floyd and Tom. *See Bledsoe II*, at 887.

### c.   Counts II, V, VI, and VIII do not invoke a constitutional right.

Floyd's Amended Complaint also contains an array of concepts that are not individual claims or deprivations. Although listed as separate "counts," they are not independently actionable. Instead, they are methods of imposing liability for underlying violations (conspiracy and failing to intervene) or recovering damages on established liability (indemnification). All should be dismissed as separate "counts" because they are not independent deprivations.

### (1)   Neither conspiracy nor failing to intervene is an independently actionable deprivation.

In Counts II and V, Floyd purports to assert claims for conspiracy. Specifically, he concludes that some or all of the "Defendant Officers" conspired to violate his rights by fabricating and/or withholding evidence and by contributing to a malicious prosecution. In Count VI, Floyd tries to assert a cause of action for "failure to intervene." ECF No. 75, ¶¶ 147–51. The Constitution does not provide a general right to avoid conspiracies or an entitlement to intervention; thus, Section 1983 does not offer an independent cause of action for either claim. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (rejecting "the notion that our cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983"). Instead, conspiracy is a vehicle to impose liability on multiple actors who have

participated in a deprivation. *Cf. Dixon v. City of Lawton*, 898 F.2d 1443, 1449 (10th Cir. 1990) ("[T]he essence of a § 1983 claim is the deprivation of the right rather than the conspiracy."). And failing to intervene is a method of imposing liability on one individual for another's unconstitutional act. It is a form of bystander liability that typically arises in excessive force cases. *See generally Estate of Booker v. Gomez*, 745 F.3d 405, 422 (10th Cir. 2014).

For Floyd to state a plausible conspiracy claim, he must first identify a violation, which he has not done. Parts II.A.2.a–b *supra*. Consequently, as there is no underlying deprivation, there is no viable claim for conspiracy to cause, or failure to prevent, such a deprivation. *Thompson v. City of Lawrence*, 58 F.3d 1511, 1517 (10th Cir. 1995); *Dixon*, 898 F.2d at 1449.

Second, Floyd must plead nonconclusory facts showing agreement and concerted action among the involved defendants. *See, e.g., Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir. 1989) (affirming dismissal of conspiracy claim against prison officials) (citing *Sooner Prods. Co. v. McBride*, 708 F.2d 510, 512 (10th Cir. 1983). By contrast, Floyd relies only on vague, conclusory allegations that "Defendants, acting in concert with other co-conspirators, known and unknown," ECF No. ¶¶ 117, 142, agreed to frame Floyd and then "committed overt acts" in furtherance. *See* ECF No. ¶¶ 119, 145. In short, Floyd essentially concludes that the very fact of his conviction must evidence some undefined and unlawful plan among unidentified persons. This is not an adequate showing of conspiracy. *See Kan. Penn*, 656 F.3d at 1221 ("Such *post hoc ergo prompter hoc* logic does not create a conspiracy."); *see also Twombly*, 550 U.S. at 556–57 (neither "an allegation of parallel conduct and a bare assertion of conspiracy" nor a "conclusory allegation of agreement at some unidentified point" states a claim); *Tonkovich v. Kan. Bd. Regents*, 159 F.3d 504, 533 (10th Cir. 1998) (recognizing plaintiffs must plead specific facts and courts need not stretch to reach inferences that are not patently reasonable); *Cruz*, 21 F. Supp. 3d

34

at 1183 (dismissing conspiracy claim where allegations were conclusory, lacked plausible purpose for a conspiracy, and gave insufficient notice by "the rote listing" of all defendants).

Regarding the failure-to-intervene claim, to state a plausible cause of action Floyd must not only identify a deprivation but must also show the following elements: a defendant was present at the scene, failed to take reasonable steps to protect the plaintiff from an obvious violation, and had a realistic opportunity to prevent the harm. *See Mascorro v. Billings*, 656 F.3d 1198, 1204 n.5 (10th Cir. 2011*); see also Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008). Floyd's conclusory allegations in Count VI do not suffice. *See* ECF No. ¶¶ 147–51. In particular, there is no attempt to identify any individual being near to or aware of an ongoing violation. *See* ECF No. ¶ 148 ("During the constitutional violations described herein, *one or more* of the Defendant Officers stood by . . . ." (emphasis added)). Neither does the pleading allege how or when the purported violations become obvious. Moreover, there is no explanation of what steps—reasonable or otherwise—the unnamed individual(s) could or should have taken. Finally, there is no attempt to describe what realistic opportunity at prevention existed but was unreasonably left untaken. The concept is simply not viable on Floyd's allegations.

### (2)    Indemnification is not independently actionable.

In Count VIII, Floyd contends that he has a state-law indemnification claim against Jefferson County. ECF No. 75, ¶¶ 161–65. In addition to the other deficiencies, *see* Part II.A.2.a–b *supra*, the claim is not colorable. Indemnification is not a right Floyd enjoys; it is a right the Jefferson County employees may—if necessary—invoke. *Cf. Lampkin v. Little*, 85 F. App'x 167, 170 (10th Cir. 2004); *accord Jackson v. City of Cleveland*, No. 15-CV-989, 2016 WL 3547834, at *4 (N.D. Ohio June 30, 2016). In short, Floyd has no independent cause of action for indemnification, and the Jefferson County Defendants request judgment on this count.

514676

2.   **The Amended Complaint does not allege the individual Jefferson County Defendants personally participated in any deprivation.**

Floyd has not met the *Iqbal*/*Twombly*/*Kansas Penn* plausibility standard. His pleading offers little more than legal conclusion and vague, unsupported, and undifferentiated accusations against a host of defendants. *See* Part I.B *supra*. In short, it fails to make a showing under Rule 8.

*First*, the Amended Complaint fails to give notice to the individual defendants, lumping the conduct of all individuals, including the Jefferson County Defendants, together by asserting collective action and preventing any one defendant from ascertaining what act is (and, perhaps more importantly, is not) being alleged against him. *See Robbins*, 519 F.3d at 1250 (rejecting plaintiff's effort to use collective term). *Second*, the Amended Complaint does not allege that each individual Jefferson County Defendant personally participated in conduct that caused Floyd to suffer an alleged constitutional deprivation. *See Kan. Penn*, 656 F.3d at 1221 (affirming dismissal where individuals not alleged to have personally participated in unlawful conduct).

**Collective action.** Plausibility, as with many things in life, depends on context. Floyd contends the "Defendant Officers" and nearly everyone else involved in his investigation and prosecution engaged in a conspiracy to ignore Tom's confessions and instead frame him.[14] Especially in a Section 1983 case alleging conspiracy among immune actors, Floyd's use of collective terms fails to satisfy Rule 8's notice pleading standard.

In fact, the Tenth Circuit long ago stated it was "particularly important" for complaints to "make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with

---

[14] Perhaps it is possible to imagine everyone thought it would be more sporting to dismiss charges against Tom, who had thrice admitted to the crime and whose gun fired the fatal shot, and prosecute Floyd without any physical evidence. But that is far less likely than the obvious conclusion: the defendants genuinely believed Floyd killed Arfmann. *See Iqbal*, 556 U.S. 682 (holding a possible invidious motive was implausible in light of an obvious alternate explanation); *Kan. Penn*, 656 F.3d at 1221 ("Such *post hoc ergo prompter hoc* logic does not create a conspiracy.").

fair notice as to the basis of the claims against him or her, as distinguished from collective actions against the state." *Robbins*, 519 F.3d at 1250. The reason is plain: asserting a vast and amorphous conspiracy on the part of law enforcement, clothed with immunity, undermines Rule 8 and the interests that qualified immunity protects. *Kansas Penn*, 656 F.3d at 1215.

Despite this well-worn rule, the Amended Complaint subjects good public servants to scorn by painting with a broad, indiscriminate brush. For instance, the "Defendant Officers" are alleged to have "withheld evidence of Tom's guilt from Floyd's defense . . . and generated additional false evidence against Floyd . . . ," "concealed from Floyd's defense and the prosecution documentation of Tom's many inculpatory statements," and "withheld" other assorted information concerning Tom's statements. ECF No. 75, ¶¶ 69, 70, 71–79. Assuming that someone, for example, failed to tell the defense about "Tom's many inculpatory statements," one wonders who that person or persons was.[15] But, neither the defendants nor this Court should have to wonder: it is a plaintiff's burden to allege facts declaring who is alleged to have done what to whom. *See Robbins*, 519 F.3d at 1250 (finding lack of notice where it was "impossible for any [defendant] to ascertain what particular unconstitutional acts they are alleged to have committed"). The law is clear—before he is entitled to proceed with this suit, Floyd must show a plausible claim against each individual defendant. He has not done this with regard to any one of the Jefferson County Defendants, and all of them are entitled to judgment.

**Personal participation.** Personal participation in the alleged deprivation(s) is a critical element of Section 1983 liability. *See generally Trujillo v. Williams*, 465 F.3d 1210, 1227–28 (10th Cir. 2006). For example, a supervisor's liability may not be predicated on a theory of

---

[15] The Transcript, of course, blatantly contradicts this assumption. *See* Part I.B.3 *supra* (describing arguments to the jury about Tom's confessions and the lack of physical evidence against Floyd).

*respondeat superior*. *See Rizzo v. Goode*, 423 U.S. 362, 371, 373–76 (1976); *Meade v. Grubbs*, 841 F.2d 1512, 1531 (10th Cir. 1988); *see also Fogarty*, 523 F.3d at 1162. Guilt-by-association, reliance on an individual's supervisory position, or knowledge of another's unlawful conduct is insufficient. *See Iqbal*, 556 U.S. at 677. Instead, plaintiffs must plead each defendant "through the official's own individual actions, has violated the Constitution." *Id.* at 676; *accord Tonkovich*, 159 F.3d at 518 (recognizing Section 1983 "contains an element of causation," meaning "a defendant may not be held liable . . . unless he or she subjected a citizen to the deprivation, or caused a citizen to be subjected to the deprivation"). This Floyd has not alleged.

With regard to Sheriff Dunnaway, he is alleged to have "arrested Floyd, even though [he] knew Floyd was innocent." ECF No. 75, ¶ 63. No facts appear to suggest what basis Dunnaway had to believe Floyd was innocent or to provide any reason Dunnaway should have questioned Floyd's guilt. Carreno is alleged to have—without clear reason—altered Tom's statements to adjust one specific fact: the time at which he spoke with Floyd on the day *after* the murder. ECF No. 75, ¶ 65. Turner and Frost are also lightly treated, as they are alleged to have "falsely claimed that Floyd had confessed to visiting his home at the time Camille disappeared from it," and Frost only is alleged to have signed a warrant to that effect. ECF No. 75, ¶ 85.

These sparse allegations are insufficient to state a claim against Turner, Frost, Carreno, or Dunnaway, and fail to even attempt a claim against the other Jefferson County Defendants. They cannot suffice. *Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013) ("Plaintiffs must do more than show that their rights 'were violated' or that 'defendants,' as a collective and undifferentiated whole, were responsible . . . .") (holding that to state a viable Section 1983 claim and overcome qualified immunity, plaintiffs must show each defendant individually caused a violation *and* possessed the required mental state) (citing *Dodds v. Richardson*, 614 F.3d 1185,

1194 (10th Cir. 2010)). Moreover, Floyd has not sufficiently alleged an underlying violation in which any of the Jefferson County Defendants *could* have participated. *See* Part II.A.1 *supra*.

### 3.   The Jefferson County Defendants are entitled to qualified immunity, as they are not alleged to have violated clearly established law.

In any event, Floyd has not overcome the presumption of qualified immunity that protects against all individual-capacity claims made against the Jefferson County Defendants. The legal framework of qualified immunity tilts decidedly in favor of dismissal. Even if this Court broke new ground by finding the officers' conduct was objectively unreasonable, they are still entitled to judgment as a matter of law because of the breathing room qualified immunity affords.

Suits against government actors allow those wronged by government conduct a method of redress. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982)). Although such suits allow the possible vindication of rights, non-meritorious suits exact a high cost on society and government officials. *See id.* They may unduly interfere with the discharge of official duties, due to the constant threat of litigation. *See Harlow,* 457 U.S. at 814. "[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome, would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties." *Horstkoetter v. Dep't of Pub. Safety*, 159 F.3d 1265, 1277 (10th Cir. 1998) (internal quotations and citations omitted). Thus, the Court has recognized qualified immunity should be liberally applied, given the important interests to society as a whole. *White v. Pauly*, 137 S. Ct. 548, 551–52 (2017).

To address these important interests, government officials performing discretionary duties receive qualified immunity. *See Anderson*, 483 U.S. at 638; *see also Filarsky v. Delia*, 132 S. Ct. 1657, 1667–68 (2012). Qualified immunity shields these officials so long as their conduct

514676

does not violate clearly established federal rights of which a reasonable officer would have known. *See Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In this way, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *see also Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

There is a presumption of qualified immunity for a public official acting in his or her individual capacity. *See Hidahl v. Gilpin Cnty. Dep't Soc. Servs.*, 938 F.2d 1150, 1155 (10th Cir. 1991). To overcome this presumption, a plaintiff must show (i) that the defendant's actions violated the plaintiff's federal constitutional or statutory rights and (ii) that the right was clearly established at the time. *See Siegert v. Gilley*, 500 U.S. 226, 231 (1991); *cf. Harlow*, 457 U.S. at 818 (holding that no discovery is allowed until immunity questions have been resolved). The rigid order-of-battle the Court previously prescribed, *see, e.g., Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 841 n.5 (1998), has become more flexible, *Pearson*, 555 U.S. at 236, permitting this Court to address either step first. *See Weise v. Casper*, 593 F.3d 1163, 1167 (10th Cir. 2010).

Discerning whether the relevant legal rule was clearly established is a narrowly tailored exercise that is context specific. As the Court in *Anderson* recognized, nearly every right—if viewed at a sufficiently high level of generality—is clearly established. *See* 483 U.S. at 639. In order to protect the institutional interests qualified immunity serves, however, more specificity is required. *See White*, 137 S. Ct. 548 (granting petition, vacating judgment, and vacating Tenth Circuit decision because it construed the legal rule at too high of a level). Accordingly, the precise contours of the right must have been so clear that every reasonable official in that circumstance would have understood what he or she was doing violated that right, leaving no debate as to lawfulness. *See Reichle*, 566 U.S. at 664; *al-Kidd*, 563 U.S. at 741. When it is debatable as to whether a violation has occurred, the law by definition cannot be clearly

established, and qualified immunity applies. *See Reichle*, 566 U.S. at 669–70 (quoting *Wilson*, 526 U.S. at 618).

This immunity applies in at least three distinct circumstances: "The protection . . . applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson*, 555 U.S. at 231 (internal quotation and citation omitted). Thus, qualified immunity gives "breathing room to make reasonable but mistaken judgments." *al-Kidd*, 563 U.S. at 743; *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012). As an example, "[o]fficers can have reasonable, but mistaken, beliefs as to the facts establishing the existence of probable cause . . . and in those situations courts will not hold that they have violated the Constitution. Yet, even if a court were to hold that the officer violated the Fourth Amendment . . . [*Anderson*,] still operates to grant officers immunity for reasonable mistakes as to the legality of their actions." *Saucier v. Katz*, 533 U.S. 194, 206 (2001).

All three apply here. *First*, the breathing room afforded by qualified immunity excuses any reasonable mistake of fact the officers may have made. For example, the Amended Complaint alleges officers did not exercise sufficient care in obtaining or investigating certain physical evidence that might have been exculpatory. *See* ECF No. 75, ¶¶ 78–80. But, in addition to the fact that this is insufficient to support a claim, *see* Part II.A.1.a.2–3 *supra*, this is precisely the type of reasonable mistake that qualified immunity anticipates. Even if Floyd were correct that certain items could have been more helpful if investigated differently, qualified immunity excuses the reasonable mistakes of not recognizing the potential value of the evidence, not objecting to Tom's counsel and father playing a role in the voluntary surrender of items, or not identifying other forensic analyses that could, hypothetically, have been available. As another example, the Amended Complaint states Tom's polygraph indicated deceit and Floyd's indicated

514676

truthfulness. *See* ECF No. 75, ¶¶ 59–61. The written polygraph reports showed the opposite, however. *See* ECF No. 79, ¶ 59 & Ex. 4. Thus, to the extent the results were reported in error (and it is not clear they were), the Jefferson County Defendants' reliance on them was an entirely reasonable mistake of fact. Moreover, although the written reports strongly show the reasonability of officers' belief in Floyd's guilt, it is unnecessary—at this stage—to look beyond the Amended Complaint, which alleges that reports of Tom's truthfulness and Floyd's deception were circulated at the time. *See* ECF No. 75, ¶ 82. Finally, to the extent Tom was ultimately not a credible witness or Floyd was factually innocent, it was reasonable for the Jefferson County Defendants to make mistaken judgments about truth and credibility while investigating. The appellate courts have repeatedly acknowledged as much. *See Bledsoe II*, at 887; *Bledsoe IV*.

*Second*, there was no consensus of law in 1999 or 2000 alerting every reasonable officer that the Jefferson County Defendants' conduct was unlawful. For example, regarding the duty to disclose exculpatory evidence, by 1999 it was established that investigators' knowledge would be imputed to prosecutors, but it was unclear what duties investigators themselves might have. *Compare Smith v. Sec'y N.M. Dep't Corrs.*, 50 F.3d 801, 824 (10th Cir. 1995) *with Tiscareno*, 639 F.3d at 1022–23 (decided 2011). If, in 1999 or 2000, the Jefferson County Defendants had a mistaken understanding about whether they should independently identify legally significant items, coordinate with the prosecutor to make disclosures, or affirmatively ensure the prosecution fulfilled its duties, that understanding was reasonable and fell within their immunity.

*Third*, application of the then-prevailing law to the available facts confirms the individuals cannot be described as acting in knowing violation of the law or in a plainly incompetent manner. As the cases show, mistakes about whether facts amount to probable cause are insufficient to destroy immunity. *Saucier*, 533 U.S. at 206. In addition, it is reasonable for

42

officers, who are not legal scholars, to make mistakes about whether certain evidence is exculpatory in a legal sense. As another example, where Floyd asserts that some officers did not participate in deprivations but did fail to intervene, the nonparticipating officers have immunity for mistaken assessments of whether conduct was, in fact, violative. Qualified immunity exists to give room for reasonable but mistaken judgments. Here, the officers deserve that protection, given their efforts to investigate, their contemporary understanding of the facts and of each witness's credibility, and their deference to the prosecutor's probable-cause assessment.

**B.    The Amended Complaint asserts no plausible official-capacity claim against the Jefferson County Defendants.**

Floyd also purports to sue Jefferson County and Herring in his official capacity. There are at least three reasons these claims fail. *First*, Floyd does not allege a violation. *Second*, the defendants are not amenable to suit. *Third*, Floyd fails to satisfy the municipal liability standard of *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 691 (1978).

### 1.    <u>The lack of an underlying constitutional violation precludes an official-capacity claim.</u>

No municipality can be liable without an underlying violation by its officers. *See Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 (10th Cir. 1998); *see also Camuglia v. City of Albuquerque*, 448 F.3d 1214, 1223 (10th Cir. 2006). Floyd did not adequately plead a deprivation. *See* Part II.A *supra*. Thus, the Jefferson County Defendants are entitled to judgment on the official-capacity claims. *See City of L.A. v. Heller*, 475 U.S. 796, 799 (1986).

### 2.    <u>The official-capacity Jefferson County Defendants are not amenable to suit.</u>

#### a.   Jefferson County is not a proper defendant in this action.

Floyd purports to assert a claim against "Jefferson County" for the acts and omissions of the individual law enforcement officers and policies of the Sheriff. ECF No. 75, ¶ 26. There are

two fatal flaws with regard to this effort, one technical and one substantive. Although the former could be corrected with an amended pleading, the latter renders such an amendment futile.

The technical error is obvious and warrants dismissal. Under state law, any suit against a county must name "The board of county commissioners of the county of _____" as the defendant. K.S.A. 19-105. The Amended Complaint fails to state a claim against "Jefferson County" because it is not an entity capable of being sued. *See Johnson v. Sedgwick Cnty. Sheriff's Dep't*, No. 08-2614, 2009 WL 602095, at *2 (D. Kan. Mar. 9, 2009).

The substantive error renders futile an amendment attempting to properly name the Board. Section 1983 claims, such as Floyd has filed, may impose official-capacity liability if— but only if—a municipality's own policy caused the plaintiff to be subjected to a constitutional deprivation. *See generally Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir. 1998). That standard can never be met because neither "Jefferson County" nor its Board of County Commissioners have any authority to set policy for, or direct the operations of, the Sheriff's Department. *See Bd. of Cnty. Comm'rs of Cnty. of Lincoln v. Nielander*, 62 P.3d 247, 251 (Kan. 2003). Rather, the Sheriff is solely responsible for directing law enforcement operations and policies. *See* K.S.A. 19-805. As a result, Jefferson County is not amenable to this Section 1983 lawsuit. *See Mitchell v. Carter*, No. 88-2467, 1989 WL 48536, at *1 (D. Kan. Apr. 21, 1989).

### b. The Sheriff is entitled to Eleventh Amendment immunity.

The Sheriff, in his official capacity, is not amenable to suit in this Court because of his Eleventh Amendment protections. That amendment bars unconsented federal suits for money damages against a state and those acting on its behalf. U.S. Const. amend XI; *Edelman v. Jordan*, 415 U.S. 651, 663 (1974); *Wagoner Cnty. Rural Water Dist. No. 2 v. Grand River Dam Auth.*, 577 F.3d 1255, 1258 (10th Cir. 2009). This protection extends to any suit in which the State is

44

the substantial party in interest, even if not a named defendant. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 101–02 (1984); *see Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

On this basis, the Tenth Circuit has determined that, under Kansas law, sheriffs are immune. *See Hunter v. Young*, 238 F. App'x 336, 338 (10th Cir. 2007). Thus, Herrig is entitled to judgment on the official-capacity claims. *See id.*; *Gadbury v. Bush*, No. 14-3027, 2015 WL 3794441, at *2 (D. Kan. June 17, 2015); *Self v. Cnty. of Greenwood*, No. 12-1317, 2013 WL 615652, at *2 (D. Kan. Feb. 19, 2013); *Brown v. Kochanowski*, No. 07-3062, at *9 n.3, 2012 WL 4127959 (D. Kan. Sept. 19, 2012), *aff'd* 513 F. App'x 715 (10th Cir. 2013); *but see Trujillo v. City of Newton*, No. 12-2380, 2013 WL 535747, at *10 (D. Kan. Feb. 12, 2013) (following *Reyes v. Bd. of Cnty. Comm'rs of Sedgwick Cnty.*, No. 07-2193, 2008 WL 2704160, at *7 (D. Kan. 2008)); *Schroeder v. Kochanowski*, 311 F. Supp. 2d 1241, 1249 n.23 (D. Kan. 2004) (ruling to contrary, as there was no Tenth Circuit authority at the time).

### 3.    There is no official policy or custom that caused Floyd's alleged violations.

Municipal entities may not be liable under Section 1983 through *respondeat superior*. *Monell*, 436 U.S. at 691; *Meyer v. Nava*, 518 F. Supp. 2d 1279, 1286 (D. Kan. 2007). Instead, there must be evidence the entity supported a violation of the particular right through its custom or policy. *See Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80 (1986). Courts have found four situations in which such liability may arise: (1) an express policy that causes a deprivation, *see Monell*, 436 U.S. at 694, (2) a custom or persistent practice with the force or effect of policy, *see Board of County Commissioners of Bryan County v. Brown*, 520 U.S. 397, 411–12 (1997); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989); (3) a single decision by an official with final policymaking power, *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 123–24 (1988); *Pembaur*, 475 U.S. at 480–81; or (4) ratification, by a final policymaker, of a decision—and basis for the

decision—of a subordinate with delegated authority, *see Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1189 (10th Cir. 2010).

Although the Amended Complaint liberally recites key words related to municipal liability, it offers no supporting facts. First, it does not allege an underlying violation. Part II.A *supra*. Second, it provides no facts showing a basis for municipal liability.

Specifically, the Amended Complaint identifies no express municipal policy that could have caused a deprivation. The allegations related to "policies, practices, and customs" assert (in conclusory fashion) that regular behaviors of the Sheriff's Department rose to the level of policy, but the Jefferson County Defendants do not read the allegations to identify a relevant, express policy. *See* ECF No. 75, ¶¶ 152–60. Thus, the first source of municipal liability does not apply.

With regard to customs or practices, Floyd summarily contends the Sheriff's Department "regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence . . . , pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner . . . ." ECF No. 75, ¶ 154. He cites no well-pleaded facts to support this conclusory assertion, meaning it ought to be disregarded. *See Kan. Penn*, 656 F.3d at 1214–15. Although he has no past wrongs to reference, Floyd concludes these "practices" were de facto policy. Again, this conclusion is unsupported and cannot suffice.

Regarding decisions by final policymakers, Floyd does not seem to allege any particular affirmative decision by a policymaker. *See* ECF No. 75, ¶¶ 152–60. Thus, Floyd has not asserted municipal liability on this basis. Instead, he identifies Herrig[16] and Dunnaway as policymakers and then ascribes decisions to them via ratification—the final way to impose municipal liability.

---

[16] In fact, Herrig was not a final policymaker in 1999 or 2000. *Cf.* K.S.A. 19-805 (sheriffs responsible for undersheriffs).

Floyd also fails, however, to plead municipal liability by ratification. As stated, ratification gives rise to municipal liability only if there is a (1) particular decision by a (2) subordinate with delegated authority *and* (3) the final decision-maker ratified both the decision and its basis. *See Brammer-Hoelter*, 602 F.3d at 1189. As a result, the vague allegation that "policymakers with authority . . . exhibited deliberate indifference to the problem, thereby effectively ratifying it" cannot create liability. Neither do Floyd's other allegations suffice: "[C]onstitutional violations were committed with the knowledge or approval of persons with final policymaking authority . . . or were actually committed by persons with such final policymaking authority. . . . Dunnaway and Herrig ratified and authorized the fabrication of evidence against Floyd and the withholding of exculpatory information from Floyd." ECF No. 75 ¶¶ 156, 158. These allegations contain the same fatal flaw as many of Floyd's others—they do not state who is claimed to have done what and, therefore, do not provide notice. *See Robbins*, 519 F.3d at 1249–50. For example, there is no allegation about specific decisions, about which subordinate was involved and whether he or she held delegated authority, or about who ratified the unknown decision(s) and whether that person knew the decision's allegedly suspect basis.

In sum, the Amended Complaint's municipal liability allegations rely on precisely the type of bare recitation of elements that subject a claim to dismissal. *Iqbal*, 556 U.S. at 678–79 ("[W]e are not bound to accept as true a legal conclusion. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." (internal citations omitted)). Thus, the municipal liability claim can be decided in favor of the Jefferson County Defendants.

* * * * *

47

III.   <u>**CONCLUSION**</u>

In 1999, a team of officers searched tirelessly for a missing child, Camille Arfmann. They followed every lead they had and ultimately found her buried in a shallow grave from which they dug her body by hand. As they investigated, they came to believe exactly as a local jury and multiple appellate courts have believed—that Floyd Bledsoe was responsible. Fifteen years later, advanced DNA technology confirmed that Floyd's seminal fluid was not present and, as a result, Floyd's conviction was vacated.

Now, Floyd seeks compensation from virtually every entity that touched Camille Arfmann's case. His impulse is certainly understandable. But it is not legally actionable. What his Amended Complaint lacks in substance, it seeks to supply through sensationalism and stacked inferences. Ultimately, however, it pleads no facts sufficient to show that the Jefferson County Defendants breached Floyd's constitutional rights, and these Defendants respectfully pray for judgment in their favor.

Respectfully submitted by:

FOULSTON SIEFKIN LLP

By:   _/s/*Toby Crouse*_____
     Toby Crouse, #20030

9225 Indian Creek Parkway, Suite 600
Overland Park, KS 66210-2000
Telephone: 913.498.2100
Facsimile: 913.498.2101
Email: tcrouse@foulston.com

*and*

48

David E. Rogers, #13320
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
Telephone: 316.267.6371
Facsimile: 316.267.6345
Email:  drogers@foulston.com

ATTORNEYS FOR JEFFERSON
COUNTY DEFENDANTS

514676

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 27th day of April, 2017**,** I electronically filed the above and foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

<u>        /s/*Toby Crouse*        </u>
ATTORNEY FOR JEFFERSON
COUNTY DEFENDANTS

514676