## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

FLOYD S. BLEDSOE,

      Plaintiff,

v.

BOARD OF COUNTY COMMISSIONERS
OF THE COUNTY OF
JEFFERSON, KANSAS,
RANDY CARRENO,
TROY FROST,
ROBERT POPPA,
JIM VANDERBILT,
GEORGE JOHNSON,
JIM WOODS,
TERRY MORGAN,
MICHAEL HAYES,
JEFFREY HERRIG *in his individual
and official capacity*, and
UNKNOWN OFFICERS OF THE
JEFFERSON COUNTY SHERIFF'S
DEPARTMENT and KANSAS
BUREAU OF INVESTIGATION,

      Defendants.

Case No.  16-2296-DDC-JPO

## MEMORANDUM AND ORDER

This matter comes before the court on defendants Board of County Commissioners of the County of Jefferson, Kansas ("Jefferson County"); Jeffrey Herrig, in his individual and official capacity; Randy Carreno; Troy Frost; and Robert Poppa's (collectively, the "Jefferson County defendants") Motion to Dismiss Second Amended Complaint (Doc. 144).  Plaintiff Floyd S. Bledsoe has filed a Response (Doc. 151) and the Jefferson County defendants have replied (Doc. 152).  For reasons explained below, the court grants in part and denies in part the Jefferson County defendants' Motion to Dismiss.

## I.      Factual Background

The following facts are taken from plaintiff's Second Amended Complaint (Doc. 141). Because defendants' Motion to Dismiss relies on Fed. R. Civ. P. 12(b)(6), the court must accept the well-pleaded facts as true and view them in the light most favorable to plaintiff.  *See Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1240 (10th Cir. 2000) (explaining that, on a motion to dismiss, the court must "accept the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff" (citation omitted)).  This lawsuit follows plaintiff's wrongful conviction for sexual abuse and murder of a 14-year-old girl named Camille Arfmann. A state court jury convicted plaintiff in April 2000, and he was sentenced to life in prison. Plaintiff was released from prison in 2015 after DNA testing exonerated him and, instead, identified his brother, Thomas Bledsoe ("Tom"), as the likely wrongdoer.

### A.  Camille's Murder

In November 1999, plaintiff was 23 years old and married to his wife, Heidi.  The couple had two young sons, and plaintiff worked as a farmhand at a dairy farm in McLouth, Kansas. The couple invited Heidi's younger sister, Camille, to live with them in hopes of improving her school attendance.  Plaintiff's older brother, Tom, then 25 years old, lived nearby with his parents.  Tom had little social life, and he suffered from some intellectual limitations and partial deafness.  Tom had a history of abnormal sexual behavior that included pursuit of young girls, though he was an active member of a Sunday school group for children at the Countryside Baptist Church.

On November 5, 1999, Camille took the bus home from school.  She arrived at plaintiff's home around 4:20 p.m.  Her friend Robin Meyer stopped by to visit at 5:00 p.m., but Camille was not there.  Plaintiff and Heidi reported Camille's disappearance to the Jefferson County

Sheriff's Department and they spent the next 48 hours trying to find Camille.  They stopped the search on November 7, 1999, after Tom confessed that he had murdered Camille.

Tom's parents arranged for defense attorney defendant Michael Hayes[1] to represent Tom. Later that evening, Tom and Mr. Hayes met with personnel at the Jefferson County Sheriff's Department ("Sheriff's Department").  Roy Dunnaway,[2] then the Sheriff of Jefferson County, defendant Robert Poppa[3] (who worked as a law enforcement officer in the Sheriff's Department), and Jim Woods[4] (who worked as a law enforcement officer for the Kansas Bureau of Investigation ("KBI")) attended this meeting, as did other unknown defendants.  Through Mr. Hayes, Tom informed these defendants that he had murdered Camille and that he knew where to find her body.  Tom or Mr. Hayes also revealed other details about Camille's murder, including that Tom had shot her in the head and moved her body to bury it in a trash dump.  Tom and Mr. Hayes took these defendants to his parents' property where Tom had been living.  They found Camille's body underneath a foot of dirt, plywood, and garbage that included an X-rated movie and t-shirt that read:  Countryside Baptist Church.  The wounds on Camille's body matched Tom's description of her murder.  Defendants found three of four missing bullet casings at Camille's burial site.

---

[1]    The court previously denied defendant Hayes's Motion to Dismiss plaintiff's First Amended Complaint under Fed. R. Civ. P. 12(b)(6).  Doc. 114.

[2]    Roy Dunnaway was named as a defendant in plaintiff's First Amended Complaint but passed away on February 24, 2017.  Plaintiff thus has removed him as a defendant in his Second Amended Complaint as instructed by the court.  *See* Doc. 140 at n.1.

[3]    Defendant Poppa is one of the Jefferson County defendants who now move to dismiss.

[4]    The court previously denied defendant Woods' Motion to Dismiss plaintiff's First Amended Complaint under Fed. R. Civ. P. 12(b)(6).  Doc. 114.

The coroner recovered semen from inside Camille's vagina, but he was unable to determine whether Camille had been sexually abused.  Mr. Hayes surrendered the murder weapon—Tom's newly purchased Jennings 9mm firearm—to the police officers.  Tom was charged with Camille's murder and taken to the Jefferson County Jail.  Despite the evidence against Tom, defendants planned to frame plaintiff for Camille's murder.

### B.  The plan to frame plaintiff

Several days after Tom's arrest, Mr. Hayes, along with Jefferson County prosecutor defendant Jim Vanderbilt[5] and other unknown defendants, met to devise a plan to fabricate Tom's testimony.  The lead detective on Camille's murder case, defendant Randy Carreno from the Sheriff's Department,[6] had focused his investigation on plaintiff even after Tom had surrendered.  Mr. Hayes, Mr. Carreno, and other defendants conspired to secure false statements from Tom which would pin Camille's murder on plaintiff.  Allegedly, Mr. Hayes previously had helped Mr. Vanderbilt avoid exposure for misappropriating county funds.  So, Mr. Vanderbilt was indebted to Mr. Hayes and became a willing ally in the plan to frame plaintiff.

The plan went like this:  Tom would recant his confession and claim that he had run into plaintiff on Saturday, November 6, 1999, at a roadside intersection.  Tom would say that plaintiff had confessed to Camille's murder and had given him extensive details about the crime.  Then, Tom would say that plaintiff persuaded him to take the blame for the murder by threatening to expose his deviant sexual history—including viewing X-rated movies and attempting to have sex

---

[5]     The court previously denied defendant Vanderbilt's Motion to Dismiss plaintiff's First Amended Complaint under Fed. R. Civ. P. 12(b)(6).  Doc. 114.  The Tenth Circuit affirmed the court's decision that defendant Vanderbilt "does not enjoy absolute immunity from suit for allegedly fabricating evidence against [p]laintiff during the preliminary investigation of [Camille's] murder."  Doc. 139 at 21.  The Circuit declined to consider defendant Vanderbilt's arguments that plaintiff had failed to allege "sufficient facts to demonstrate the existence of a conspiracy" because it lacked appellate jurisdiction.  *Id.*

[6]     Defendant Carreno is one of the Jefferson County defendants who now move to dismiss.

with a dog.  Mr. Hayes, Mr. Vanderbilt, and other defendants planned and coached Tom about recanting his confession.  Tom was manipulated easily.  Shortly before Tom recanted his confession, Mr. Hayes told plaintiff something about how he planned to take Tom off the "hot seat" and replace him with plaintiff.

Defendant George Johnson,[7] who worked as a law enforcement officer for the KBI, administered polygraph examinations to both Tom and plaintiff on November 12, 1999.  At some point during his examination, Tom recanted his confession and replaced it with the story that Mr. Hayes and others had coached him to give.  During his polygraph examination, Tom failed this question:  "Did you shoot Zetta ARFMANN, between 5 and 8 Nov. '99?"[8]  Doc. 141 at ¶ 58.

Overcome with guilt following the examination, Tom confessed again to Sheriff Dunnaway, Mr. Johnson, Mr. Vanderbilt, and other defendants, admitting that he had murdered Camille.  Mr. Johnson instructed Tom to continue lying to implicate plaintiff, and Tom acquiesced.  Then, plaintiff took the polygraph examination and truthfully denied any involvement in Camille's murder.

That evening, Mr. Vanderbilt released Tom from jail and dropped the charges against him.  Plaintiff alleges an agreement was reached for Tom's release, and this agreement was never disclosed to plaintiff.  Sheriff Dunnaway and other defendants then arrested plaintiff, and they continued to use Tom's fabricated statements to frame plaintiff.  Specifically, Mr. Carreno and other defendant officers knowingly and purposefully falsified Tom's statements about meeting plaintiff at the roadside intersection so that they fit the timeline for the period when they

---

[7]    The court previously denied defendant Johnson's Motion to Dismiss plaintiff's First Amended Complaint under Fed. R. Civ. P. 12(b)(6).  Doc. 114.

[8]    Other than this quoted provision, the Second Amended Complaint refers to the victim as Camille. Zetta appears to be another name the victim went by.  *See* Doc. 141 ¶ 58; Doc. 145 at 12 & n.2.

believed plaintiff lacked an alibi.  Plaintiff alleges Mr. Carreno was with plaintiff during much of the day on Saturday, November 6 because they were searching for Camille together.  And, these defendants knew the roadside meeting never had happened.

Additionally, defendants, including Mr. Carreno, coached Tom to provide false explanations about how he had known so many details about Camille's death.  Tom's false account became the centerpiece of the prosecution's evidence against plaintiff.

Overall, various law enforcement officers were involved in investigating Camille's death, and plaintiff's subsequent prosecution and conviction.  Defendants Randy Carreno, Troy Frost, Robert Poppa, and Jeffrey Herrig worked as law enforcement officers in the Sheriff's Department, along with two individuals no longer named as defendants—Sheriff Dunnaway and law enforcement officer Orin Turner—and other unknown defendant officers.  The Second Amended Complaint refers to Mr. Herrig, Mr. Carreno, Mr. Frost, Mr. Poppa, and the unknown law enforcement officers from the Sheriff's Department named as defendants in this case as the "Jefferson County Defendant Officers."  Doc. 141 at ¶ 17.  Mr. Herrig was the Undersheriff at the time of the events.  He reported to Sheriff Dunnaway, but Mr. Herrig oversaw the day to day operations at the Sheriff's Department (including supervising Mr. Carreno, Mr. Frost, Mr. Poppa, and other unknown officers).  Sheriff Dunnaway supervised Mr. Herrig and also supervised Mr. Carreno, Mr. Frost, Mr. Poppa, Mr. Turner, and other unknown officers.  Now, Mr. Herrig serves as the Sheriff of Jefferson County, Kansas.  He oversees the Sheriff's Department and is responsible for its policies and practices.  He is sued in both his individual capacity and in his official capacity as the Jefferson County Sheriff.

Defendants Terry Morgan, Jim Woods, and George Johnson worked as law enforcement officers for the KBI.[9]  Mr. Morgan, Mr. Woods, and Mr. Johnson along with other unknown KBI officers involved in Camille's case (collectively, the "KBI Defendant Officers") were integral and active participants in investigating Camille's death.  The KBI Defendant Officers gathered physical evidence, executed search warrants, photographed the crime scene and victim, conducted and reviewed polygraph examinations and interviews, completed police reports, and directed Mr. Carreno to interview certain witnesses.  *Id.* at ¶ 18.

The Second Amended Complaint refers to the Jefferson County Defendant Officers (named to include Mr. Carreno, Mr. Frost, Mr. Poppa, and Mr. Herrig, among others) and the KBI Defendant Officers (named to include Mr. Morgan, Mr. Woods, and Mr. Johnson, among others) as the "Defendant Officers."  *Id.* at ¶ 19.  The court similarly refers to this group collectively as the "defendant officers."

### C.  Plaintiff's prosecution and conviction

The defendant officers withheld evidence of Tom's guilt from plaintiff's defense to ensure plaintiff would be prosecuted and convicted.  For example, Mr. Woods and other defendant officers withheld Tom's detailed description about how he had tried to have sex with Camille in his truck and shot her when she laughed at him.  The defendant officers including Mr. Poppa and Mr. Woods, along with Sheriff Dunnaway, withheld Tom's statements to them the night he turned himself in, where he described Camille's wounds and her body's location.  And the defendant officers, including Mr. Frost, withheld evidence that Tom had a history of pursuing young girls of similar age to Camille and that Tom had made sexual advances toward Camille a

---

[9]     As explained *supra*, notes 4 and 7, the court previously denied defendant Woods' and defendant Johnson's Motions to Dismiss.  The court also previously denied defendant Morgan's Motion to Dismiss plaintiff's First Amended Complaint under Fed. R. Civ. P. 12(b)(6).  Doc. 114.

few weeks before her disappearance.  The defendant officers, including Mr. Carreno, withheld information about Tom's activities between November 8 and November 12, 1999.  And, Mr. Johnson and other unknown defendants, along with Sheriff Dunnaway, purposefully withheld documents showing Tom's inculpatory statements during the polygraph examination.

Additionally, the defendant officers suppressed physical evidence of Tom's guilt. Plaintiff alleges Mr. Frost, Mr. Herrig, Mr. Poppa, and Mr. Woods, along with Sheriff Dunnaway and other defendant officers, thoroughly searched plaintiff's home and vehicle.  Mr. Carreno also properly collected clothing of another suspect for forensic examination.  But, in furtherance of the conspiracy to frame plaintiff for Tom's crime, the defendant officers, specifically including Mr. Morgan, Mr. Woods, Mr. Herrig, Mr. Frost, and Mr. Poppa, along with Sheriff Dunnaway, purposefully did not subject Tom's home, clothing, or vehicle to any similarly rigorous forensic examination.  These defendants intentionally refrained from collecting any physical evidence from Tom's truck—where Tom confessed he had shot Camille—or the shovel Tom identified as the one he had used to bury Camille.  And, they recovered Tom's weapons and ammunition after allowing Tom's father to handle them and turn them over, thus contaminating this evidence.

The defendant officers also generated false evidence against plaintiff.  Mr. Johnson reported to Mr. Vanderbilt that plaintiff had exhibited deception during his polygraph examination, and that Tom had exhibited truthfulness.  But Mr. Johnson knew this characterization was false.  Mr. Frost and Mr. Turner falsely claimed that plaintiff had confessed to visiting his home around the time Camille disappeared, and Mr. Frost signed an affidavit containing this false information to support a request for a search warrant.  Plaintiff never made any statement to Mr. Frost or Mr. Turner that he had been to his house around the time of Camille's disappearance.  But, Mr. Frost and Mr. Turner manufactured this evidence to frame

plaintiff.  And, the prosecution used the manufactured evidence about plaintiff's confession to bring charges against plaintiff and, ultimately, secure plaintiff's conviction.

Mr. Vanderbilt offered plaintiff a plea deal:  plaintiff would serve five years in exchange for pleading guilty.  Plaintiff rejected the deal and, in April 2000, a jury convicted him for murder, aggravated kidnapping, and taking indecent liberties with a child.  The trial judge sentenced plaintiff to life in prison plus 16 years.

### D.  Post-Conviction Relief

In June 2008, a federal district court granted plaintiff habeas relief and he was released on bond.  The Tenth Circuit Court of Appeals reversed the ruling in July 2009, and plaintiff was forced to return to prison.  Then, in October 2015, plaintiff secured additional forensic testing for some of the physical evidence officers had collected from the crime scene.  New DNA test results indicated Tom was the likely source of the semen found on Camille's vaginal swab.  The test also excluded plaintiff as the source of the semen.  Tom committed suicide shortly after this new DNA testing.  He left a note that read:

> I sent an innocent man to prison.  The Jefferson County police and county attorney Jim Vanderbilt made me do it.  I was told by Vanderbilt to keep my mouth shut.  Now I am going to set thing[s] right.

> I killed Camille Arfmann on November 5, 1999.  I had sex with her and killed her.

> . . . I drove up to the ditch where the family dump trash and tried to convince her not to tell. . . .  I went to my truck and got my 9mm gun that was behind my seat and pushed her to the ground to try to scare her, but it failed [and] the gun went off behind her head. . . .  I as well might go ahead and say it I raped and murdered a 14 year girl.

> I tried telling the truth but no one would listen.  I was told to keep my mouth shut.  It tore me up doing it.  I would ask for forgiveness, but I know none will come.  Not even from God.

> Floyd S Bledsoe is an innocent man.

Tom E Bledsoe is the guilty one.

Doc. 141 at ¶ 101.

Tom also drew a diagram depicting where he shot Camille before moving her body to the trash dump.  Using Tom's diagram, the police found the fourth missing bullet casing.  The Jefferson County court vacated plaintiff's conviction on December 8, 2015, and the Jefferson County Attorney dismissed the charges against him.  Plaintiff left prison, but returned home from prison having missed his sons' childhood and many years with loved ones.  Plaintiff continues to suffer physiological pain and suffering, humiliation, constant fear, anxiety, deep depression, despair, rage, and other physical and physiological effects.

### E.  Plaintiff's Claims

Plaintiff brings eight claims against the Jefferson County defendants.  Plaintiff brings the following claims under 42 U.S.C. § 1983 against all defendants:  (Count I) due process violation for fabricating Tom's testimonial evidence; and (Count II) conspiracy to deprive plaintiff's constitutional rights by fabricating Tom's testimonial evidence.

Plaintiff brings the following § 1983 claims against the defendant officers:  (Count III) *Brady v. Maryland*[10] violation for withholding exculpatory evidence and fabricating evidence; and (Count VI) failure to intervene.

Plaintiff brings the following claims under § 1983 against the defendant officers and Mr. Hayes:  (Count IV) malicious prosecution and unlawful pretrial detention; and (Count V) conspiracy to deprive constitutional rights.

---

[10]     373 U.S. 83 (1963).

Finally, plaintiff brings a claim for municipal liability (Count VII) against Jefferson County and Sheriff Herrig in his official capacity, and a state law claim for indemnification (Count VIII).

## II.    Legal Standards

The Jefferson County defendants ask the court to dismiss all the claims against them under Fed. R. Civ. P. 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6).[11]

Under Rule 12(b)(6), a defendant may move to dismiss for failing to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). When considering a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court must assume that the factual allegations in the complaint are true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). But this requirement does not extend to every assertion made in a complaint. The court is "'not bound to accept as true a legal conclusion couched as a factual allegation.'" *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "'Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice'" to state a claim for relief. *Bixler v. Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678). Also, the complaint's "[f]actual

---

[11]    On the claims against Sheriff Herrig in his official capacity, the Jefferson County defendants also assert an Eleventh Amendment immunity argument. "The defense of sovereign immunity is jurisdictional in nature, depriving courts of subject-matter jurisdiction where applicable." *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urban Dev.*, 554 F.3d 1290, 1295 (10th Cir. 2009). So, the court generally would consider defendants' immunity argument under Fed. R. Civ. P. 12(b)(1). *See Davis v. California*, No. 17-2125-JAR-JPO, 2017 WL 4758928, at *1 (D. Kan. Oct. 20, 2017) (construing Rule 12(b)(6) motion seeking dismissal based on sovereign immunity as a Rule 12(b)(1) motion); *Hibben v. Okla. ex rel. Dep't of Veterans Affairs*, No. 16-cv-111-TLW, 2017 WL 1239146, at *4  (N.D. Okla. Mar. 31, 2017) (explaining that though defendants cited Rule 12(b)(6) in their motion, sovereign immunity is a "jurisdictional bar," but plaintiff's claim "should be dismissed regardless of whether it is based on Rule 12(b)(1) or Rule 12(b)(6)"); *cf. Ruiz v. McDonnell*, 299 F.3d 1173, 1180–82 (10th Cir. 2002) (analyzing whether defendant was entitled to sovereign immunity under Rule 12(b)(1), but analyzing whether defendant constituted a "person" within the meaning of § 1983 under Rule 12(b)(6)). But, as explained *infra* in Part III.E.1.b., the court concludes Eleventh Amendment immunity does not apply to the claims against Sheriff Herrig. So, the court need not expound on the legal standard for Rule 12(b)(1) claims.

allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (citations omitted). The court thus must take "[a]ll well-pleaded *facts*, as distinguished from conclusory allegations" as true. *Generation Res. Holding Co., LLC v. Spencer Fane LLP*, 964 F.3d 958, 965 (10th Cir. 2020) (alteration and emphasis in original) (citation and internal quotation marks omitted). It also must draw "all reasonable inferences in favor of the non-moving party." *Id.* (citation and internal quotation marks omitted); *see also Doe v. Woodard*, 912 F.3d 1278, 1285 (10th Cir. 2019).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556); *see also Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009) ("The question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." (citation omitted)). Essentially, "the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007). This plausibility standard reflects the requirement in Fed. R. Civ. P. 8 that pleadings must provide defendants with fair notice of the nature of the claims as well as the grounds upon which each claim rests. *See Khalik v. United Air Lines*, 671 F.3d 1188, 1191–92 (10th Cir. 2012); *see also* Fed. R. Civ. P. 8(a)(1) (providing a complaint must contain "a short

and plain statement of the claim showing that the pleader is entitled to relief"); *Iqbal*, 556 U.S. at 678 (explaining Rule 8 "does not require 'detailed factual allegations,' but it demands more than . . . [a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action'" which, "'will not do'" (quoting *Twombly*, 550 U.S. at 555)).

Some of the Jefferson County defendants' dismissal arguments don't rely on plaintiff's Second Amended Complaint but on the 686-page transcript of plaintiff's criminal jury trial, the entirety of which they attach to their Motion to Dismiss.  *See* Doc. 145-1.  They also rely on orders from plaintiff's state court case and appellate and habeas proceedings.  They contend the court may consider the transcript from plaintiff's state court trial, without converting their motion to dismiss to a motion for summary judgment.  Doc. 145 at 6 n.1 (arguing plaintiff's criminal trial and its transcript are "part and parcel of his claims" so the court should consider the transcript and citing "*Cf. Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009)").  But, while the court may consider "attached exhibits and documents incorporated into the complaint by reference" or "documents referred to in the complaint if the documents are central to plaintiff's claims and the parties do not dispute the documents' authenticity," the trial transcript here is not a document that plaintiff incorporated by reference or otherwise referred to in the Second Amended Complaint.  *Smith*, 561 F.3d at 1098 (citations and internal quotation marks omitted).

That said, plaintiff never objects to the transcripts' authenticity or defendants' citations to it.  And, the court may consider "facts subject to judicial notice," which may include "pleadings, court orders, motions and certified transcripts of hearings from the state court case."  *Cont'l Coal, Inc. v. Cunningham*, 511 F. Supp. 2d 1065, 1070–71 (D. Kan. 2007) (citing *Trusdale v. Bell*, 85 F. App'x 691, 693 (10th Cir. 2003) (noting magistrate judge took judicial notice of

district court records about plaintiff's criminal conviction)).  But, "the state court documents are admitted only for the purpose of establishing that various allegations and statements were made and that the hearings took place, [and] not for the truth of the allegations or statements."  *Id.* at 1071; *see also Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) ("[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment.  This allows the court to take judicial notice of its own files and records, as well as facts which are a matter of public record.  However, the documents may only be considered to show their contents, not to prove the truth of matters asserted therein." (internal citations and quotations omitted)).  And, it is within the court's discretion to decide whether to consider such materials.  *See Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999).

The court thus may consider the transcript only for its contents.  But, exercising its discretion, the court does so only where defendants have referred with particularity to specific portions of the transcript.  For example, at times, defendants refer generally to "Ex. 1" or "the transcript."  *See* Doc. 145 at 35–36, 41 n.21, 42.  This kind of sweeping, indiscriminate reference isn't a proper technique.  "Judges are not like pigs, hunting for truffles buried in briefs."  *Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (citation and internal quotation marks omitted).  The court declines defendants' unwelcome invitation to scan the near 700-page transcript, particularly at this stage of the proceedings, to discern whether it supports defendants' citation when defendants themselves haven't bothered to do so.  *Cf. Chilcoat v. San Juan Cnty.*, No. 4:19-cv-00027-DN-PK, 2020 WL 1516141, at *2 n.24 (D. Utah Mar. 30, 2020) (considering transcript from preliminary hearing in state criminal case because it was a matter of public

record, quoted in the complaint, and the claims against defendants arose from statements made during that hearing).

## III.    Analysis

The Jefferson County defendants assert a barrage of arguments for dismissal.  *First*, defendants assert the Second Amended Complaint does not allege the individual Jefferson County defendants personally participated in depriving any of plaintiff's rights, so plaintiff has failed to state plausible claims.  Defendants also assert plaintiff's conspiracy and failure to intervene claims (Counts II, V, and VI) do not invoke a constitutional right and are not independently actionable.  *Second*, they contend plaintiff's Fourteenth Amendment due process claims fail as a matter of law.  *Third*, they contend plaintiff's Fourth Amendment malicious prosecution claim fails as a matter of law.  *Fourth*, they contend the individual Jefferson County defendant officers are entitled to qualified immunity.  *Fifth*, they argue the Second Amended Complaint does not assert plausible *Monell* claims against Jefferson County or Sheriff Herrig in his official capacity.  And, defendants argue plaintiff's Count VIII—which asserts an indemnification claim—does not invoke a constitutional right and thus is not independently actionable.  Many of the Jefferson County defendants' arguments share a common, underlying theme:  they contend the Second Amended Complaint just asserts conclusions and lacks the requisite factual allegations needed to support the claims.  The court addresses each argument, in turn, below.

### A.  Pleading Personal Participation, Conspiracy, and Failure to Intervene

Because the allegations against each individual Jefferson County defendant play into certain of the Jefferson County defendants' other arguments for dismissal in the sections that follow, the court first addresses the individual Jefferson County defendants' arguments that

plaintiff hasn't pleaded their personal participation adequately to state claims here.  Plaintiff asserts Mr. Herrig, Mr. Frost, Mr. Carreno, and Mr. Poppa each are liable for depriving plaintiff of his constitutional right to a fair trial under Fourteenth Amendment due process by (1) fabricating Tom's testimonial evidence that inculpated plaintiff in the murder (Count I); and (2) withholding or suppressing exculpatory evidence and fabricating additional evidence to implicate plaintiff (Count III).  Plaintiff asserts these defendants are liable based on their individual actions or based on their actions in furtherance of a conspiracy to commit the constitutional violations (Count II).

Specifically, Count I alleges defendants "deprived [p]laintiff of his constitutional right to a fair trial by fabricating Tom's testimonial inculpation of [plaintiff]."  Doc. 141 at ¶ 115. Defendants "fabricated and solicited false testimony from Tom implicating [p]laintiff in the crime that they knew was false; obtained [p]laintiff's conviction using that false evidence; and failed to correct fabricated evidence that they knew to be false when it was used against [p]laintiff at his criminal trial," which denied plaintiff "his constitutional right to a fair trial guaranteed by the Fourteenth Amendment."  *Id.* at ¶¶ 116, 118.  Count II alleges a conspiracy among defendants to frame plaintiff by using the fabricated testimony by Tom, thus depriving plaintiff "of his constitutional right to due process."  *Id.* at ¶ 123.  Count III alleges the defendant officers "deprived [p]laintiff of his constitutional right to a fair trial," which is "guaranteed by the Fourteenth Amendment" by "withholding and suppressing exculpatory evidence and fabricating additional evidence against [p]laintiff besides Tom's false testimony."  *Id.* at ¶¶ 129, 134.

And, plaintiff asserts a claim against the individual Jefferson County defendants for causing plaintiff's malicious prosecution and unlawful pretrial detention (Count IV), or based on

their participation in a conspiracy to maliciously prosecute him (Count V).  Plaintiff also contends the individual Jefferson County defendants are liable based on their failure to intervene to prevent the constitutional deprivations (Count VI).

Specifically, Count IV alleges the defendant officers and Mr. Hayes "accused [p]laintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against [p]laintiff without any probable cause for doing so, in violation of his rights secured by the Fourth Amendment and the procedural and substantive due process components of the Fourteenth Amendment." *Id.* at ¶ 140.  The defendant officers are alleged to have "caused [p]laintiff to be unreasonably seized and improperly subjected to judicial proceedings" when no probable cause existed. *Id.* at ¶ 141.  And, plaintiff alleges, the defendant officers "subjected [p]laintiff to unauthorized and arbitrary governmental action that shocks the conscience" because they "deliberately and intentionally" framed plaintiff for a crime they knew he didn't commit by fabricating, suppressing, and withholding evidence. *Id.* at ¶ 142.  Count V alleges a conspiracy among the defendant officers and Mr. Hayes to frame plaintiff and deprive plaintiff of his constitutional rights "by maliciously causing [p]laintiff's prosecution, by fabricating evidence[,] . . . and by withholding exculpatory information from [p]laintiff's defense and the prosecution[.]" *Id.* at ¶ 148.  And, Count VI alleges that the defendant officers failed to intervene "to prevent the violation of [p]laintiff's constitutional rights, even though they had the opportunity to do so." *Id.* at ¶ 154.

The court delves into the elements of the § 1983 claims in Counts I, III, and IV in more detail to address defendants' specific arguments for dismissal in Parts III.B. and III.C.  In this section, the court addresses defendants' general argument that plaintiff hasn't alleged personal

participation, conspiracy, or failure to intervene, which is how the parties set up these dismissal arguments. *See* Doc. 145 at 36–38, 39–43; Doc. 151 at 14–17, 34–36; Doc. 152 at 4–10, 15–16.

First, in Part III.A.1. the court considers the Jefferson County defendants' argument that the court should dismiss the conspiracy counts (Counts II and V) and failure to intervene count (Count VI) as not independently actionable. Next, the court turns to the Jefferson County defendants' argument that plaintiff's use of "defendants" or "defendant officers" for certain factual allegations in his Second Amended Complaint means plaintiff hasn't alleged adequately Mr. Herrig, Mr. Frost, Mr. Carreno, and Mr. Poppa's personal participation in any alleged constitutional deprivations or conspiracy to commit those deprivations. Doc. 145 at 37–43. They argue that the court must disregard plaintiff's allegations as conclusory, or inadequate to show agreement and concerted action or to put defendants on notice of the accusations against them. *Id.* at 37–39. For conspiracy liability, defendants argue plaintiff relies on vague, conclusory allegations that a collective group of defendants acted in concert to frame plaintiff by fabricating inculpatory evidence and withholding exculpatory evidence, but never provides details supporting an unlawful agreement that includes these Jefferson County defendants. *Id.* at 37.

The court already has rejected similar arguments when asserted by various other defendants. *See* Doc. 114. Likewise now, as discussed in Part III.A.2., plaintiff's use of collective defined terms in certain allegations within the Second Amended Complaint doesn't doom plaintiff's claims because, as discussed in Part III.A.3., plaintiff has alleged specific facts against each individual defendant from which the court can infer they agreed to join the alleged conspiracy. Because plaintiff adequately pleads a conspiracy and each defendant's personal participation in it, his failure to intervene theory also is plausible, as the court explains in Part

III.A.4.  In short, plaintiff has alleged specific acts by each defendant to put them on notice of the claims against them and which could support a reasonable inference that they joined the alleged conspiracy and are liable for the deprivations either directly or under conspiracy and failing to intervene liability theories.  Thus, the allegations against Mr. Herrig, Mr. Carreno, Mr. Frost, and Mr. Poppa sufficiently allege their personal participation to survive the Rule 12(b)(6) motion.

### 1.  Conspiracy and Failure to Intervene as Independent Counts

The Jefferson County defendants contend Counts II, V, and VI aren't independently actionable claims but are, instead, different methods of imposing liability for underlying violations asserted in other counts.  Doc. 145 at 36.  Thus, they argue, the court should dismiss these claims "as separate 'counts' because they are not independent deprivations."  *Id.*  Plaintiff's Response doesn't appear to refute the premise that his conspiracy and failure to intervene claims are inextricably linked to his allegations that the Jefferson County defendants are liable for the constitutional deprivations specified in Counts I, III, and IV, though the conspiracy and failure to intervene claims are styled as separate counts.  *See* Doc. 151 at 34–36.

Indeed, § 1983 claims provide a remedy only where a plaintiff has been deprived of a right secured by the Constitution or federal law.  *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002).  And, a § 1983 conspiracy or failure to intervene claim thus must include a constitutional deprivation.  *See Dixon v. City of Lawton*, 898 F.2d 1443, 1448–49 & n.6 (10th Cir. 1990) (explaining a plaintiff may assert a § 1983 conspiracy claim as a means "to impose liability on one defendant for the actions of another performed in the course of the conspiracy" and that such a claim requires a plaintiff to plead and prove both a conspiracy and a deprivation of constitutional rights because the "essence" of the claim "is the deprivation of the right rather than the conspiracy"); *Estate of Booker v. Gomez*, 745 F.3d 405, 422 (10th Cir. 2014) (describing how

an officer who himself hasn't used excessive force could be liable under § 1983 if he is present at the scene and fails to intervene to prevent another officer's use of excessive force). Thus, to be actionable, plaintiff's conspiracy and failure to intervene claims must be tied to the constitutional deprivations alleged in the surrounding Counts I, III, and IV.

Defendants are correct that no separate constitutional right against conspiracies exists. *See* Doc. 145 at 36. They also are correct that the Constitution doesn't sponsor a duty requiring intervention. *See id.* Plaintiff, in turn, never contends Counts II, V, and VI are based on any such separate constitutional right. Still, the court doesn't find it necessary to dismiss the conspiracy and failure to intervene counts. The parties are represented by sophisticated counsel here and can understand the intent of the conspiracy and failure to intervene claims and how those counts tie to the counts that specify the underlying § 1983 constitutional deprivations. *See* Doc. 152 at 15–16 (Reply recognizing the conspiracy and failure to intervene liability theories "become[] relevant" if the court finds plaintiff adequately has pleaded violations of his constitutional rights). In short, the Second Amended Complaint's Counts II, V, and VI, when coupled with Counts I, III, and IV, are plaintiff's way of meeting his requirement to plead both the constitutional deprivation and a conspiracy or failure to intervene—*i.e.*, the conspiracy and failure to intervene claims are a means to impose liability on a defendant for actions that other defendants performed in the course of the conspiracy or for which he should have intervened to prevent. *See Dixon*, 898 F.2d at 1449.

Thus, the court focuses the analysis on whether the alleged actions of the individual Jefferson County defendants suffice to state claims against them for the alleged constitutional deprivations either directly or under any of the alternative methods for imputing liability alleged in the Second Amended Complaint. As explained below, the court concludes plaintiff has

pleaded each individual Jefferson County defendant's personal participation sufficient for plaintiff's constitutional deprivation claims to survive the Jefferson County defendants' Motion to Dismiss.

### 2.   Collective Allegations and Alleging a Conspiracy

As explained in Part II, under Rule 12(b)(6), a plaintiff may not rely on "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Iqbal*, 556 U.S. at 678. Instead, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). And, it's true that "collective and generalized allegations . . . are insufficient" to establish an individual's liability under § 1983. *Walker v. Mohiuddin*, 947 F.3d 1244, 1249– 51 (10th Cir. 2020) (explaining plaintiff's allegations against group of 16 "defendants" or "healthcare providers" weren't sufficiently specific to show defendant violated plaintiff's clearly established right to medical care where the complaint never explained defendant's role in plaintiff's deficient medical care). Instead, a plaintiff must demonstrate that "'each defendant . . . caused a violation of plaintiff's clearly established constitutional rights, and that each defendant acted with the constitutionally requisite state of mind.'" *Id.* (quoting *Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013)); *see also Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) ("[I]t is particularly important [in a § 1983 action against multiple government actors] that the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her.").

So, § 1983 allegations must "'make clear exactly *who* is alleged to have done *what* to *whom*, . . . as distinguished from collective allegations.'" *Pahls*, 718 F.3d at 1225 (quoting *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011) (further quotation omitted)).

The Tenth Circuit has held that plaintiffs alleging constitutional rights violations must do more than show that "defendants, as a collective and undifferentiated whole, were responsible for those violations." *Id.* at 1228 (citation and internal quotation marks omitted). "They must identify specific actions taken by particular defendants." *Id.  Pahls* also held that "failure to make this showing . . . dooms plaintiffs' § 1983" claims "and entitles defendants to qualified immunity." *Id.*; *see also Robbins*, 519 F.3d at 1250.

But, as this court already has explained, the Tenth Circuit never has adopted a blanket prohibition against collective allegations. *See* Doc. 114 at 28. The Tenth Circuit permits a complaint to refer to defendants collectively so long as "there is no confusion as to whom the allegation is asserted against." *See Briggs v. Johnson*, 274 F. App'x 730, 736 (10th Cir. 2008) (holding that plaintiff's allegations were sufficiently specific under Rule 12(b)(6) where multiple claims were asserted against multiple defendants because it was clear which acts were attributable to three defendants who plaintiff alleged acted in concert and against whom plaintiff asserted the substantive due process claim). And here, plaintiff's allegations, when they refer to the "defendant officers," refer to the KBI Defendant Officers —Mr. Morgan, Mr. Woods, and Mr. Johnson—and the Jefferson County Defendant Officers—Mr. Herrig, Mr. Carreno, Mr. Frost, and Mr. Poppa. The Second Amended Complaint defines "Defendant Officers" to refer to these seven individuals, who plaintiff has alleged were active participants in the investigation of Camille's death, and then, the conspiracy to frame plaintiff. Doc. 141 at ¶¶ 17–19.[12]

---

[12]     The Second Amended Complaint includes unknown law enforcement officers employed by the Sheriff's Department and the KBI as part of the defined "Defendant Officers." Doc. 141 at ¶¶ 17–19. But, for purposes of stating claims against the *named* officers included within the collective defined term, these defendants received sufficient notice of the allegations against them through use of the defined term. It's reasonable to infer that plaintiff intends to include any officers from these law enforcement agencies that participated in the alleged conspiracy to frame him for Tom's crime, but plaintiff does not yet have the benefit of discovery to determine if he should name any other officers in his lawsuit.

That said, the court agrees that the collective use of "defendant officers" doesn't suffice—by itself—to put defendants on notice of the actions each of Mr. Carreno, Mr. Frost, Mr. Herrig, and Mr. Poppa took that violated plaintiff's clearly established constitutional rights. The collective references to all of the investigating officers don't make clear who is alleged to have done what to whom to establish the basis for each § 1983 claim. *Robbins*, 519 F.3d at 1250. However, the court finds the collective allegations against the defined group of defendant officers, coupled with allegations about each Jefferson County defendant officer's individual actions detailed in Part III.A.3., support a reasonable inference that Mr. Herrig, Mr. Carreno, Mr. Frost, and Mr. Poppa were active participants in the alleged conspiracy.

A sufficient *conspiracy* claim under § 1983 requires plaintiff to "allege specific facts showing an agreement and concerted action amongst the defendants." *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1998); *see also Durre v. Dempsey*, 869 F.2d 543, 545 (10th Cir. 1989) (affirming dismissal of § 1983 conspiracy where "plaintiff failed to allege specific facts showing agreement and concerted action among defendants" because "[c]onclusory allegations of conspiracy are insufficient to state a valid § 1983 claim"). "To sufficiently allege joint action," a plaintiff must allege facts that manifest a "'specific goal to violate the plaintiff's constitutional rights by engaging in a particular course of action.'" *Fisher v. Lynch*, 531 F. Supp. 2d 1253, 1264 (D. Kan. 2008) (quoting *Gallagher v. Neil Young Freedom Concert*, 49 F.3d 1442, 1445 (10th Cir. 1995)). Conclusory allegations "'with no supporting factual'" allegations are insufficient. *Id.* at 1263 (quoting *Raiser v. Kono*, 245 F. App'x 732, 736 (10th Cir. 2007)). But, because "[d]irect evidence of an agreement to join a criminal conspiracy is rare, [ ] a defendant's assent can be inferred from acts furthering the conspiracy's purpose." *United States v. Edmonson*, 962 F.2d 1535, 1548 (10th Cir. 1992) (quoting *United States v. Perkins*, 748 F.2d

1519, 1527 (11th Cir. 1984)).  As the court has explained, the court sees no reason why a different rule would apply to allegations of a civil conspiracy.  Doc. 114 at 29.

Collectively, plaintiff asserts defendants all participated in the scheme to fabricate evidence and orchestrate Tom's false recantation implicating plaintiff.  Doc. 141 at ¶ 4.  And, the defendant officers "deliberately concealed and suppressed the evidence that would have proven [plaintiff's] innocence."  *Id.* at ¶ 5.  The defendant officers "withheld all of the details of Tom's numerous confessions, including his explanation for where and why he had killed Camille and facts he could have known only by committing the murder himself."  *Id.*  And, the defendant officers "suppressed physical evidence from Tom's truck, Tom's home, and the crime scene, as well as other evidence of Tom's guilt—all while fabricating additional evidence against [plaintiff] . . . ."  *Id.*

Plaintiff alleges "[d]efendants conspired to frame [plaintiff] for Tom's crime," even though the defendant officers didn't secure inculpatory information against him from interrogating plaintiff, searching his home, car, and clothing, and using bloodhounds to search for evidence.  *Id.* at ¶¶ 43, 46–47.  He asserts that Mr. Hayes, Mr. Vanderbilt, and "other unknown Defendants" held a meeting several days after Tom was arrested to figure out a scheme to fabricate Tom's testimony and frame plaintiff.  *Id.* at ¶ 48.  The allegations that follow indicate Mr. Carreno participated in this meeting, or separately agreed to the plan.  *Id.* at ¶¶ 51–53, 65.  And, plaintiff asserts other defendant officers also helped plan the recantation, construct the false narrative, and coach Tom to follow the plan.  *Id.* at ¶¶ 53–54.  Tom provided the false recantation defendants had coached him to provide.  *Id.* at ¶¶ 57, 65.  And the defendant officers worked to align the fabricated roadside meeting during a timeframe when they believed plaintiff lacked an alibi.  *Id.* at ¶ 64.  Knowing they had a weak case against plaintiff, the defendant

officers "withheld evidence of Tom's guilt," "generated additional false evidence against" plaintiff, and concealed Tom's inculpatory statements.  *Id.* at ¶¶ 68–72, 74–76.  The defendant officers also "actively suppressed physical evidence that would have proven Tom's guilt."  *Id.* at ¶¶ 77–78, 81–83.

While these allegations refer to the investigating officers as a collective group and, alone, don't provide the requisite notice of each individual defendant's alleged conduct, plaintiff alleges all the defendant officers participated in the conspiracy to frame him for a crime he didn't commit.  As noted, the Tenth Circuit has recognized that "[d]irect evidence of an agreement to join a [ ] conspiracy is rare," so the court properly can infer an agreement based on a defendant's actions "furthering the conspiracy's purpose."  *Edmonson*, 962 F.2d at 1548 (citation and internal quotation marks omitted).  And, as explained in Part III.A.3., plaintiff makes several allegations about the individual Jefferson County defendant officers' actions in furtherance of the alleged conspiracy to fabricate and withhold evidence to frame him for Camille's murder.  These allegations, taken together with the collective allegations and the individualized allegations against other defendants summarized in Part I, are sufficient for the court to infer a conspiracy existed, and thus plaintiff has stated plausible claims against the individual Jefferson County defendants based either on their direct actions in depriving plaintiff of his constitutionally protected rights or from their participation in the conspiracy.

As the court describes in this section (Part III.A.2), the factual background section (Part I) , and the section below (Part III.A.3), this is not a case where plaintiff only includes generic collective allegations, and "provide[s] no explanation of how this alleged conspiracy . . . operated, or even a plausible purpose for the conspiracy."  *Cruz v. City of Merriam*, 21 F. Supp. 3d 1177, 1183 (D. Kan. 2014).  Instead, while plaintiff sometimes refers to the collective group

of defendant officers, he also:  (a) makes allegations about specific acts each officer took in furtherance of the conspiracy; (b) explains when the alleged conspiracy began; and (c) specifies how it was executed through both fabricating evidence and withholding exculpatory evidence. *See id.* at 1186 (concluding plaintiff's complaint though "not a model of specificity" was "far from the completely generic complaint in *Robbins*" and specifically alleged which defendants withheld information from the prosecutor); *see also Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980) ("Direct evidence of a conspiracy is rarely available, and the existence of a conspiracy must usually be inferred from the circumstances."); *Birdsong v. Unified Gov't of Kan. City*, No. 13-2090-JAR-TJJ, 2014 WL 2216904, at *2–5 (D. Kan. May 29, 2014) (rejecting defendants' argument that plaintiff's use of "defendants" collectively to plead his claim was insufficient and explaining that Rule 8(a)(2) doesn't require extensive allegations to allege a malicious prosecution conspiracy where defendants "were involved in the events which led to the filing of criminal charges" and the complaint clearly intended to allege all of the referenced defendants "engaged in the alleged activities," and noting that, "prior to discovery, [plaintiff] may not have sufficient knowledge or information to provide the specific level of detail requested by [defendants]" about the extent of each defendant's involvement in the conspiracy to fabricate evidence, suppress exculpatory evidence, and mislead prosecutors).

Indeed, it's reasonable to infer that the officers working on the investigation shared information throughout its course, and, ultimately, worked together to accomplish the alleged constitutional deprivations—*i.e.*, it makes sense that plaintiff groups some of his allegations against the group of people who investigated him, because, he contends, they all were in on it. Defendants argue plaintiff's conspiracy allegations are implausible and there's no reason to believe they planned to frame plaintiff, but instead it's more reasonable to conclude they

genuinely believed plaintiff committed the crimes.  But, plaintiff's allegations, accepted as true, suffice to allege plausibly a conspiracy, and—as explained in more detail in Parts III.B. and III.C.—deprivations of plaintiff's constitutional rights against the Jefferson County defendant officers.  *See Robbins*, 519 F.3d at 1247 (explaining even where facts may be improbable and the likelihood of recovery remote, if the conduct alleged crosses the line from conceivable to plausible it is enough to state a claim).  Indeed, Tom's suicide note accuses the "Jefferson County police" of making Tom conceal the truth so they could prosecute plaintiff.  *Id.* at ¶¶ 7, 66, 101.

### 3.   Personal Participation

As explained individual-by-individual below, plaintiff specifically identifies certain acts by Mr. Carreno, Mr. Frost, Mr. Herrig, and Mr. Poppa which support reasonable inferences that each one participated in the conspiracy to fabricate evidence, withhold evidence, and maliciously prosecute plaintiff, or that suffice to allege they themselves directly violated plaintiff's constitutional rights.  Some of the allegations are thin, and some—standing alone—do not support direct liability for fabricating inculpatory evidence.  But, at the motion to dismiss stage, the allegations are accepted as true and viewed in the light most favorable to plaintiff.  And, because the allegations show acts in furtherance of the alleged conspiracy, they support a reasonable inference of an agreement among defendants to conspire to violate plaintiff's constitutional rights by fabricating inculpatory evidence, withholding exculpatory evidence, and maliciously prosecuting him.  *See* Part III.A.2.  Thus, they suffice to survive the motion to dismiss.

### a.  Mr. Carreno

Mr. Carreno was the lead detective on the investigation into Camille's disappearance. Doc. 141 at ¶ 49.  He focused his investigation on plaintiff as the suspect, even after Tom confessed and turned himself into the police.  *Id.*  And, he conspired with Mr. Hayes and Mr. Vanderbilt to pin the murder on plaintiff and fabricate false statements from Tom to support prosecuting plaintiff instead.  *Id.* at ¶¶ 50–51.  These defendants met and contrived the plan where Tom would recant his confession and claim he ran into plaintiff on Saturday, November 6, when, Tom falsely would assert, plaintiff confessed to the murder, confided details of the crime, and persuaded Tom to take the blame.  *Id.* at ¶ 52.[13]  Mr. Carreno was "physically with [p]laintiff during much of Saturday, November 6th, as they searched for Camille together."  *Id.* at ¶ 45. And he "purposefully falsified Tom's statements" to create the fictitious roadside meeting at a time when he thought plaintiff was lacking an alibi that day.  *Id.* at ¶ 64.  Mr. Carreno also coached Tom how to explain how he knew so many details of the crimes.  *Id.* at ¶ 65.  And, Mr. Carreno withheld documents of Tom's activities between the time he confessed and the time he recanted that confession.  *Id.* at ¶ 72.

These allegations suffice to put Mr. Carreno on notice of the acts he is alleged to have committed to violate plaintiff's constitutional rights against fabricated inculpatory evidence, withheld exculpatory evidence, and malicious prosecution.  Defendants argue these allegations aren't enough because plaintiff is required to allege exactly which of Tom's statements Mr. Carreno altered, "in what way the statements were changed, how the statements were documented, [and] to whom the statements were made."  Doc. 145 at 17.  They also contend

---

[13]      The Second Amended Complaint doesn't specifically list Mr. Carreno as participating in the meeting with Mr. Hayes and Mr. Vanderbilt, but the surrounding allegations support an inference that he was there or participated in a different meeting with Mr. Hayes around the same time frame.  *See* Doc. 141 at ¶¶ 48–53.

plaintiff must allege Mr. Carreno's motivation to falsify Tom's statements, and specify—exactly—when he had an opportunity to coach Tom and with whom Mr. Carreno shared his plans. *Id.*; Doc. 152 at 7.  They also assert plaintiff was obligated to allege the specific documentation of Tom's activities and which of Tom's statements Mr. Carreno had in his possession but failed to turn over to plaintiff's defense.  Doc. 145 at 17.  Finally, defendants contend, plaintiff's allegations of a conspiracy with Mr. Hayes, Mr. Vanderbilt, and Mr. Carreno were purely conclusory, and he needed to identify specific meetings, more factual support for the conspiracy, and defendants' motivations for the conspiracy.  *Id.* at 17–18.

These arguments misapprehend the standard. Fed. R. Civ. P. 8(a)(1) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  It "does not require 'detailed factual allegations.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).  Plaintiff adequately alleges when alleged conspiracy was developed—between Tom's confession and his recantation—as well as details about Mr. Carreno's participation in and acts in furtherance of the conspiracy.  Defendants wrongly argue that plaintiff seeks documentation from the time after the charges against Tom were dismissed, which likely didn't exist because the charges had been dropped.  *Id.* at 17.  But, the Second Amended Complaint seeks the materials between when Tom first confessed and when he recanted his confession—*i.e.*, the period during which defendants are alleged to have come up with the plan to frame plaintiff and coach Tom to help them accomplish this task.  *See* Doc. 141 at ¶¶ 45, 56, 72.  Plaintiff alleges he wasn't provided materials from the time when the investigation should have been focusing on Tom, and it's reasonable to infer based on the surrounding allegations in the Second Amended Complaint that defendants withheld these items to hide exculpatory information from plaintiff. In short, plaintiff has provided sufficient factual allegations showing that, despite Tom's

confession, Mr. Carreno conspired to prosecute plaintiff instead, and did so both by helping to fabricate evidence and withholding evidence from plaintiff.

### b. Mr. Frost

Mr. Frost also worked on the investigation. Doc. 141 at ¶ 79. He withheld evidence, plaintiff alleges, of Tom's history pursuing young girls and the fact that Tom had made sexual advances on Camille a few weeks before her disappearance. *Id.* at ¶ 74. Also, he thoroughly searched plaintiff's home and car, but purposefully failed to use proper evidence techniques when searching Tom's home and clothing and allowed Tom's father to handle the murder weapon. *Id.* at ¶¶ 79, 81. Mr. Frost intentionally didn't collect evidence from Tom's truck, where Tom had confessed to shooting Camille, or the shovel that was used to bury the body. *Id.* at ¶ 82.[14] And, plaintiff alleges Mr. Frost took these actions as part of the scheme to frame plaintiff, and proper evidence recovery would have shown Tom as the perpetrator. *Id.* at ¶¶ 83–84. Also, Mr. Frost falsely claimed that plaintiff had confessed to him that plaintiff went to his house around the time Camille disappeared, and then he used this false confession to secure a search warrant. *Id.* at ¶ 89. He is alleged to have manufactured this statement as part of the scheme to frame plaintiff. *Id.* at ¶ 92.

For plaintiff's allegation that Mr. Frost fabricated plaintiff's confession about having gone home around the time of Camille's disappearance, defendants argue this can't be material because Mr. Frost testified at trial that he may have misheard plaintiff because plaintiff later denied going home. Doc. 152 at 7. This argument is not convincing. Regardless whether Mr. Frost admitted that he may have misheard plaintiff, plaintiff alleges here that Mr. Frost made up

---

[14]     The court recognizes that this allegation refers to "[t]hese defendants" but, in context, it sufficiently is clear which defendants plaintiff is referring to as they are listed in the allegations above as the officers who were conducting this search portion of the investigation. *See* Doc. 141 at ¶¶ 81–82.

plaintiff's confession to returning home.  In part, the Kansas Supreme Court relied on this assertion that plaintiff went home to find the evidence as sufficient to convict plaintiff.  *State v. Bledsoe*, 39 P.3d 38, 43 (Kan. 2002).  The Tenth Circuit recognized that Mr. Frost's testimony that plaintiff had visited his home on the afternoon Camille disappeared was an "important" fact because it gave plaintiff an opportunity to commit the crimes.  *Bledsoe v. Bruce*, 569 F.3d 1223, 1237 (10th Cir. 2009).  The court is unconvinced that this "important" evidence that plaintiff alleges Mr. Frost fabricated was immaterial—and for certain, that dispute isn't one for a court to decide on a Rule 12(b)(6) motion.

For the allegations about Mr. Frost withholding information about Tom's advances toward Camille, defendants argue plaintiff also needed to allege that he "lacked independent knowledge of his brother's social history" and explain how "his defense was hindered by these alleged suppressions."  Doc. 145 at 18.  They cite the trial transcript and argue that plaintiff's criminal defense counsel "extensively" discussed these items at his trial, thus showing that he had independent knowledge or that this material actually was disclosed.  *Id.* at 18 n.6.  The cited testimony discusses certain of Tom's behaviors—like watching X-rated movies or magazines— but it never discusses Tom making sexual advances toward the victim shortly before the crimes were committed.  Doc. 145-1 at 68–69 (Tr. 70:25–71:18).  *Brady* plainly provided plaintiff, accused of committing sexually-laced crimes, a right to know this information.  And, defendants' arguments misapprehend the standard.  Fed. R. Civ. P. 8(a)(1) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  It "does not require 'detailed factual allegations.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Defendants also minimize plaintiff's allegations about proper evidence collection techniques for Tom's gun and truck.  They contend, because the gun was presented at plaintiff's

trial as the murder weapon, that plaintiff's allegations here about any failure to handle that evidence properly isn't material.  Doc. 145 at 16.  But, a reasonable inference from plaintiff's allegation is that while it may have been clear at his trial what weapon was used to commit the murder, the improper evidence collection techniques precluded plaintiff from proving he wasn't the person who pulled the trigger.  Defendants also contend Sheriff Dunnaway searched Tom's truck.  *Id.*  But, again, plaintiff's allegations could support a reasonable inference that defendants here purposefully didn't collect evidence against Tom that could have proven Tom's guilt and established plaintiff's innocence.  Finally, defendants contend the court should view any alleged improper evidence collection techniques as mere negligence.  Doc. 145 at 42.  They contend Mr. Frost and others didn't need to do a better job collecting evidence against Tom because he had confessed.  *Id.*  But the allegations—accepted as true and viewed in the light most favorable to plaintiff as the court must at this stage—also support an inference that defendants acted intentionally, and not merely negligently.  *See Wilson v. Lawrence Cnty.*, 260 F.3d 946, 955–57 (8th Cir. 2001) (affirming denial of qualified immunity and explaining mere negligence in failing to investigate other leads or suspects doesn't violate due process, but a "reckless or intentional failure" to do so "offend[s] a defendant's due process rights").  The course of alleged events show, Tom's confessions notwithstanding, the investigation quickly changed course and focused on plaintiff.  And, a reasonable inference from the conspiracy alleged is that Mr. Frost purposefully failed to collect other evidence that could have revealed the true perpetrator as the person who confessed, rather than plaintiff.  *See Romero v. Fay*, 45 F.3d 1472, 1477–79 (10th Cir. 1995) (explaining Fourth and Fourteenth Amendments require "officers to . . . investigate basic evidence" before an arrest and detention and conduct a reasonable post-arrest investigation, and considering on summary judgment if plaintiff had adduced evidence to support his § 1983

claim that defendants "acted with deliberate or reckless intent" during the post-arrest investigation violating plaintiff's "Fourteenth Amendment right to a reasonable post-arrest investigation," but concluding plaintiff hadn't shown the officers' conduct exceeded negligence).

Again, these allegations suffice.  Plaintiff has provided sufficient factual allegations showing Mr. Frost both withheld (or purposefully didn't collect) exculpatory evidence and also fabricated exculpatory evidence as a means to prosecute plaintiff for a crime he didn't commit.

### c.  Mr. Herrig

The allegations against Mr. Herrig are sparser.  During the pertinent criminal investigation, he was Undersheriff of Jefferson County, responsible for supervising Mr. Carreno, Mr. Frost, Mr. Poppa, and others.  Doc. 141 at ¶ 15.  He, like Mr. Frost, thoroughly searched plaintiff's home and car, but purposefully failed to use proper evidence techniques when searching Tom's home and clothing and allowed Tom's father to handle the murder weapon.  *Id.* at ¶¶ 79, 81.  Mr. Herrig also intentionally didn't collect evidence from Tom's truck, where Tom had confessed to shooting Camille, or the shovel that was used to bury the body.  *Id.* at ¶ 82.[15] And, plaintiff alleges Mr. Herrig took these actions as part of the scheme to frame plaintiff, but proper evidence recovery would have shown Tom as the perpetrator.  *Id.* at ¶¶ 83–84.

None of these allegations assert Mr. Herrig fabricated evidence against plaintiff.  But, they do suffice to support plaintiff's claim that he withheld (or purposefully didn't collect) exculpatory evidence—a theory Count III advances—and maliciously prosecuted plaintiff— Count IV.  And, these actions support an inference that Mr. Herrig joined the conspiracy to frame plaintiff, allowing imputed liability for Count I at the motion to dismiss stage.

---

[15]     While that this allegation refers to "[t]hese defendants," in context it sufficiently is clear which defendants plaintiff is referring to as they are listed in the allegations above as the officers who were conducting this search portion of the investigation.  *See* Doc. 141 at ¶¶ 81–82.

### d.  Mr. Poppa

Mr. Poppa, like Mr. Herrig and Mr. Frost, thoroughly searched plaintiff's home and car, but purposefully failed to use proper evidence techniques when searching Tom's home and clothing and allowed Tom's father to handle the murder weapon.  *Id.* at ¶¶ 79, 81.  Also, Mr. Poppa intentionally didn't collect evidence from Tom's truck, where Tom had confessed to shooting Camille, or the shovel that was used to bury the body.  *Id.* at ¶ 82.[16]  And, plaintiff alleges Mr. Poppa took these actions as part of the scheme to frame plaintiff, but proper evidence recovery would have shown Tom as the perpetrator.  *Id.* at ¶¶ 83–84.  Mr. Poppa was present for Tom's confession, where he disclosed an insider's details about the murder.  *Id.* at ¶¶ 36–39.  And, he is alleged to have withheld documentation of Tom's inculpatory statements on the night he turned himself in.  *Id.* at ¶ 71.

Defendants argue the allegation that Mr. Poppa withheld information about Tom's confession doesn't suffice to allege plausibly Mr. Poppa's liability because, they contend, plaintiff never alleges he lacked independent knowledge of Tom's confessions and doesn't allege how this alleged suppression harmed his defense.  Doc. 145 at 18.  They argue "Tom's inculpatory statements were thoroughly discussed at trial."  *Id.* at 19 n.7.  And thus, they contend, this alleged withholding wasn't material.  *Id.* at 42.  But, the citation to the trial testimony defendants provide doesn't show disclosure to plaintiff of the detailed confession. Perhaps defendants intended to cite a different portion of the testimony.  *See, e.g.*, Doc. 145 at 13; Doc. 145-1 at 68 (Tr. 70:13–24) (discussing how Tom had confessed to his father, his Sunday school teacher, and Mr. Johnson).  But, even if plaintiff knew of these confessions at his

---

[16]     This allegation refers to "[t]hese defendants" but, in context, it sufficiently is clear which defendants plaintiff is referring to as they are listed in the allegations above as the officers who were conducting this search portion of the investigation.  *See* Doc. 141 at ¶¶ 81–82.

trial, this doesn't establish that plaintiff was made aware of the insider details that Tom provided to law enforcement.[17]  And again, defendants' arguments misapprehend the standard.  Fed. R. Civ. P. 8(a)(1) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief."  It "does not require 'detailed factual allegations.'"  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Once more, these allegations suffice to support Counts III and IV against Mr. Poppa. Like Mr. Herrig, plaintiff never alleges that Mr. Poppa personally fabricated any evidence against plaintiff.  But, plaintiff has provided sufficient factual allegations showing Mr. Poppa both withheld (or purposefully didn't collect) exculpatory evidence and maliciously prosecuted plaintiff.  And, these actions support an inference that Mr. Poppa joined the conspiracy to frame plaintiff, allowing imputed liability for Count I at the motion to dismiss stage.

### 4.  Failure to Intervene

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence."  *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994). Also, "an officer who is present but fails to intervene to prevent another law enforcement official from infringing a person's constitutional rights is liable if the 'officer had reason to know . . . that any constitutional violation has been committed by a law enforcement official [ ] and the officer had a realistic opportunity to intervene to prevent the harm from occurring.'"  *Reid v. Wren*, No. 94-7122, 1995 WL 339401, at *2 (10th Cir. June 8, 1995) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

---

[17]     Defendants contend plaintiff knew about the "insider information."  Doc. 145 at 42.  They haven't established that here, however, or, as discussed more in Part III.B. below, convinced the court that the information withheld from plaintiff as part of the alleged conspiracy could not have been material such that the court must dismiss the *Brady* claim at this stage of the case.

Plaintiff's allegations, if proven true, could support a finding that Mr. Carreno, Mr. Frost, Mr. Herrig, and Mr. Poppa failed to intervene to prevent officials from infringing on plaintiff's constitutional rights.  Defendants contend plaintiff had to allege—specifically—when each defendant became aware of a constitutional violation, what steps they could have taken and failed to take to protect plaintiff, and when they had a realistic opportunity to prevent the harm. Doc. 145 at 38.  Plaintiff responds contending his allegations suffice because he has alleged a conspiracy among defendants who all contributed to and allowed fabrication of inculpatory evidence and suppression of exculpatory evidence to continue, leading to his wrongful conviction.  Doc. 151 at 35.  He contends any defendant could have ended the wrongful prosecution and other constitutional violations by coming forward and telling the truth during the "months-long process" that led to "a full criminal" or during his various appellate and habeas proceedings.  *Id.* at 36.  In short, he contends the Jefferson County defendants, who are alleged to have participated in the conspiracy, had ample opportunity to intervene.  The court, finding plaintiff's conspiracy allegations plausible, agrees.

### 5.  Conclusion

In sum, the court doesn't dismiss the claims against the individual Jefferson County defendants based on defendants' argument that the Second Amended Complaint fails to allege personal participation.  Nor does the court dismiss the conspiracy and failure to intervene counts. Despite defendants' arguments to the contrary, the Second Amended Complaint contains sufficient allegations about each individual defendant's personal participation in conduct in furtherance of the alleged conspiracy sufficient to state plausible claims against them. Defendants argue the Jefferson County defendants aren't alleged to have known about the initial meeting between Mr. Hayes and Mr. Vanderbilt and thus couldn't have joined the conspiracy.

Doc. 145 at 42.  But, Mr. Carreno is alleged to have conspired with Mr. Hayes to contrive the plan.  Mr. Frost is alleged to have fabricated evidence to support it.  Mr. Poppa was present for Tom's detailed confession but didn't disclose Tom's detailed knowledge to plaintiff.  Mr. Poppa, Mr. Frost, and Mr. Herrig all purposefully failed to collect evidence that could have exculpated plaintiff as the suspect.  A reasonable factfinder could infer that this team investigating the crimes actively participated in effecting the shift from Tom's detailed confession to his subsequent recantation and the plan to place the blame on plaintiff.

Defendants are correct that the Second Amended Complaint, at times, utilizes collective allegations to address conduct by the defendant officers who all participated in plaintiff's investigation and subsequent prosecution.  But, those collective allegations don't doom plaintiff's claims because plaintiff has alleged specific facts against each individual defendant from which the court plausibly can infer they agreed to join the alleged conspiracy, which suffices to provide them notice of the allegations against them.  *See Kan. Penn Gaming, LLC*, 656 F.3d at 1221 (requiring plaintiff to show "active involvement" to "link them to the deprivation of a constitutional right"); *see also Twombly*, 550 U.S. at 556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of illegal agreement. . . .  The need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement [is] enough heft to 'sho[w] that the pleader is entitled to relief.'" (quoting Fed. R. Civ. P. 8(a)(2)).  Taken together, plaintiff has alleged facts from which a reasonable factfinder can draw an inference that the Jefferson County defendants joined an agreement and pursued a course of concerted action to falsify and withhold evidence and

prosecute plaintiff for murder. And, because plaintiff adequately pleads a conspiracy and each defendant's personal participation in it, his failure to intervene theory also is plausible.

### B.  Fourteenth Amendment Due Process Claims

The Jefferson County defendants direct their second argument for dismissal at plaintiff's claims in Count I (due process violation for fabricating Tom's testimonial evidence) and Count III (*Brady v. Maryland* due process violation for withholding exculpatory evidence and fabricating additional evidence). They contend the Second Amended Complaint does not allege plausible claims for depriving due process rights under the Fourteenth Amendment. Doc. 145 at 21–28. This is so, they argue, because: (1) plaintiff has adequate state law remedies available, (2) plaintiff has not alleged defendants acted with intent or malice, (3) the evidence allegedly fabricated or withheld was not material to plaintiff's trial, and (4) plaintiff had a meaningful opportunity to be heard by a jury. They also direct a similar adequate state law remedy argument at plaintiff's Count IV—the § 1983 claim for malicious prosecution and unlawful pretrial detention asserted against the defendant officers and Mr. Hayes—to the extent it relies on violations of the Due Process Clause of the Fourteenth Amendment.

As explained below in Part III.B.1., Counts I, III, and IV are not viable to the extent they assert Fourteenth Amendment *procedural* due process violations because Kansas law provides an adequate post-deprivation remedy. But, the court does not dismiss Count I and Count III to the extent they rely on substantive due process violations. And, Parts III.B.2.–4. explain defendants' other arguments against Count I and Count III do not merit dismissal either. Finally, as explained in Part III.B.1. and Part III.C.1., the court also doesn't dismiss Count IV to the extent it relies on a Fourth Amendment violation or a substantive due process violation that falls outside the Fourth Amendment's pretrial protections.

### 1.  State Law Remedy

*First*, the Jefferson County defendants contend plaintiff cannot bring his § 1983 claims alleging Fourteenth Amendment due process violations (Counts I, III, and IV) because Kansas tort law recognizes a claim for malicious prosecution and its availability bars any such § 1983 claim under the doctrine in *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 328 (1986).  Doc. 145 at 22–23.  While it is simple to make this argument, the parties' arguments reveal that deciding this dismissal argument is no simple task.  The court divides its analysis into four parts.  First, the court summarizes *Parratt* and the Supreme Court's expansion of the *Parratt* doctrine.  Next, the court explains the parties' arguments for and against dismissal.  Third, the court examines the specific allegations in the Second Amended Complaint and the specific constitutional rights that, according to plaintiff, defendants violated.  Finally, the court analyzes the relevant case law cited by the parties and considers whether Count I, Count III, and Count IV state plausible claims in light of *Parratt*.  For reasons explained below, to the extent Counts I, III, and IV assert Fourteenth Amendment *procedural* due process claims, they are barred by the availability of a Kansas malicious prosecution tort claim.  But, because plaintiff also asserts plausible *substantive* due process claims in these Counts, the court doesn't dismiss Counts I, III, and IV to the extent they rely on substantive due process violations because such substantive due process claims aren't barred by the available Kansas claim for malicious prosecution.

#### a.  The *Parratt* Doctrine

In *Parratt v. Taylor*, prison officials negligently lost an inmate's mail containing less than $25 worth of hobby materials.  451 U.S. at 529.  Normal mail procedure required prisoners to sign for packages addressed to them.  *Id.* at 530.  But *Parratt*'s inmate was in segregation when

the package was delivered, and two employees of the hobby center instead signed for the package.  *Id.*  By the time the inmate/recipient was released from segregation the package couldn't be located.  *Id.*  The inmate sued under § 1983 alleging the prison officials had deprived him of his property *without due process* of law violating the Fourteenth Amendment.  *Id.* (emphasis added).

But, the Supreme Court concluded his § 1983 claim must fail.  The Court explained that Nebraska law recognized a tort claim that provided a remedy "to persons who suffered tortious losses at the hands of the State," and the inmate had alleged "facts that are commonly thought to state a claim for common-law tort normally dealt with by state courts."  *Id.* at 530, 533.  Instead of brining a state tort claim, the inmate had couched his claim as one seeking relief under § 1983 for a deprived constitutional right.  *Id.* at 533.  While plaintiff had alleged a deprivation of property by persons acting under color of state law, the Supreme Court held the final requirement of a Fourteenth Amendment violation had not been satisfied—deprivation *without due process of law*.  *Id.* at 537–44.  This was so because Nebraska tort law provided a remedy that satisfied the requirements of *procedural* due process.  *Id.*

The Court explained that procedural due process sometimes requires a predeprivation hearing; for example, where deprivations of property are "authorized by an established state procedure and due process . . . require[s] predeprivation notice and hearing . . . to serve as a check on the possibility that a wrongful deprivation would occur."  *Id.* at 538.  But sometimes, postdeprivation remedies made available by the state can satisfy due process.  *Id.* at 538–39.  For example, when the value of protecting the public interest outweighs the harm of an immediate deprivation without a prior hearing or when it is impractical to provide any meaningful predeprivation process, the state can satisfy due process by providing a "meaningful means by

which to assess the propriety of the State's action at some time after the initial taking." *Id.* at

539.  "The fundamental requirement of due process is the opportunity to be heard and it is an

opportunity which must be granted at a meaningful time and in a meaningful manner." *Id.* at 540

(internal citation and quotation marks omitted).  This due process requirement does not always

require a predeprivation hearing.  *Id.*

Under *Parratt*'s facts, the loss of the hobby materials was "not a result of some

established state procedure and the State [couldn't] predict precisely when the loss [would]

occur" because the property's loss "result[ed] [from] a random and unauthorized act by a state

employee." *Id.* at 541; *see also id.* at 543 (noting "the deprivation occurred as a result of the

unauthorized failure of agents of the State to follow established state procedure," and "[t]here

[was] no contention that the procedures themselves are inadequate" or "that it was practicable for

the State to provide a predeprivation hearing").  And, because Nebraska tort law offered an

adequate state tort claim procedure to remedy the deprivation, the Court held the state's taking of

the property was not *without due process* and thus did not amount to a Fourteenth Amendment

violation.  *Id.* at 543–44.

The Court determined the availability of the state tort claim sufficed to supply due

process even though the state law claim only allowed an action against the state and not its

employees, did not permit punitive damages, and did not include a right to trial by jury.  *Id.*  It

explained:

> Although the state remedies may not provide the respondent with all the relief
> which may have been available if he could have proceeded under § 1983, that does
> not mean that the state remedies are not adequate to satisfy the requirements of due
> process.  The remedies provided could have fully compensated the respondent for
> the property loss he suffered, and we hold that they are sufficient to satisfy the
> requirements of due process.

*Id.* at 544.

41

Since *Parratt*, the Supreme Court has extended its holding to apply to unauthorized, intentional deprivations of property, as well as to liberty deprivations. *Zinermon v. Burch*, 494 U.S. 113, 131–32 (1990) (expanding *Parratt* to liberty deprivations); *Hudson v. Palmer*, 468 U.S. 517, 520, 530–36 (1984) (expanding *Parratt*'s holding that negligent deprivations do not violate the Due Process Clause to include intentional deprivations,[18] provided that "adequate state post-deprivation remedies are available," where corrections officer intentionally destroyed inmate's personal property but the inmate had an adequate state law remedy—a conversion claim—to redress his deprivation of property after the fact and thus the deprivation did not constitute "a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment").  In his concurring and dissenting opinion in *Hudson*, Justice Stevens, joined by Justices Brennan, Marshall, and Blackmun, agreed the inmate had not alleged "a violation of his constitutional right to *procedural* due process."  *Hudson*, 468 U.S. at 541 (emphasis added).  To the extent the inmate asserted a procedural due process violation, Justice Stevens agreed, *Parratt* applied.  *Id.* at 541 n.4.  But, Justice Stevens clarified that he does not "understand the Court's holding to apply to conduct that violates a *substantive* constitutional right—actions governmental officials may not take no matter what procedural protections accompany them . . . ."  *Id.*  And, Justice Stevens disagreed with the Court's holding in *Hudson* because he believed such a substantive right was involved.

---

[18]     Later, in *Daniels v. Williams*, 474 U.S. 327 (1986) the Supreme Court narrowed *Parratt*'s reach to exclude negligent acts.  It determined "that the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property."  474 U.S. at 328–32 (concluding where inmate slipped and fell on a pillow negligently left on a prison staircase this negligence did not deprive plaintiff of his liberty interest in being free from bodily injury without due process of law even though a state tort claim would be barred by sovereign immunity because mere negligence doesn't rise to the level of a Fourteenth Amendment violation—a constitutional violation requires something more deliberate amounting to arbitrary government action).

The *Hudson* majority had held that "the Fourth Amendment proscription against unreasonable searches and seizures does not apply" to searches of a prison cell. *Id.* at 526. But Justice Stevens dissented, contending the inmate had a possessory interest in his non-contraband property inside his cell that deserves Fourth Amendment protections from *unreasonable seizures*, even assuming the inmate did not have an expectation of privacy from searches while imprisoned. *Id.* at 543–58. He explained: "The Fourth Amendment . . . represents a value judgment that unjustified search and seizure so greatly threatens individual liberty that it must be forever condemned as a matter of constitutional principle." *Id.* at 556. And, Justice Stevens noted, "[t]he existence of state remedies for this seizure . . . is . . . irrelevant to the Fourth Amendment question, since 42 U.S.C. § 1983 provides a remedy for Fourth Amendment violations supplemental to any state remedy that may exist." *Id.* at 545 n.9. In short, Justice Stevens opined that the Fourth Amendment provides such an inmate a substantive right, and *Parratt* does not proscribe the inmate's ability to bring a claim under § 1983 for violating this substantive right to be free from unreasonable searches and seizures.

In *Zinermon*, the Supreme Court summarized *Parratt* and *Hudson*'s holdings this way: "[A] deprivation of a constitutionally protected . . . interest caused by a state employee's random, unauthorized conduct does not give rise to a § 1983 *procedural* due process claim, unless the State fails to provide an adequate postdeprivation remedy" because, "where the State cannot predict and guard in advance against a deprivation, a postdeprivation tort remedy is all the process the State can be expected to provide, and is constitutionally sufficient." *Zinermon*, 494 U.S. at 115 (emphasis added).

As explained more fully below, plaintiff frames the right at issue in Counts I and III as the right to a fair trial. And, plaintiff frames the rights at issue in Count IV as: the right to be

free from unreasonable seizures (unlawful pretrial detention); the right not to be prosecuted without probable cause; and the right not to be deliberately and intentionally framed for a crime by fabricated, suppressed, and withheld evidence.  In this court's view, like the Fourth Amendment substantive right against unreasonable seizures, violating the right to a fair trial "so greatly threatens individual liberty that it must be forever condemned as a matter of constitutional principle"—*i.e.*, it constitutes a substantive due process right.  *Hudson*, 468 U.S. at 556 (Stevens, J., dissenting).  As the Supreme Court, Tenth Circuit, and other case law analyzed below shows, the right to a fair trial is a fundamental right.  So, as Justice Stevens concluded in his *Hudson* dissent, the court concludes that the existence of a post-deprivation state law malicious prosecution tort claim doesn't bar Counts I and III's § 1983 claims alleging plaintiff was denied his right to a fair trial because these are *substantive* rights and § 1983 provides a supplemental remedy to any state remedy that may exist.  *See id.* at 545 n.9.  Count IV's reliance on the right not to be prosecuted without probable cause aligns more nearly with a typical claim for procedural due process that would fall within *Parratt*'s holding.  But, because plaintiff ties that claim to a Fourth Amendment unreasonable seizure and Fourteenth Amendment substantive due process right (conscience-shocking conduct in deliberately framing plaintiff causing his incarceration), Count IV's § 1983 claim for malicious prosecution also plausibly alleges deprivations commonly thought of as constitutional deprivations—not ones normally addressed by state law tort claims.  *See Parratt*, 451 U.S. at 533.  Thus, Count IV is not barred by the availability of a state law malicious prosecution tort either.

### b.  The Parties' Arguments

The Jefferson County defendants argue the § 1983 due process claims in Count I and Count III are unavailable under *Parratt* because plaintiff has "adequate post-deprivation

remedies under state law." Doc. 145 at 22.  They contend the claims in Counts I and III assert

violations of plaintiff's "*procedural* due process right" to a fair trial.  Doc. 145 at 21 (emphasis

added); *see also* Doc. 152 at 10.  And, in a footnote, defendants also make this same argument

against plaintiff's Count IV to the extent plaintiff "seeks to rely on the Fourteenth Amendment's

procedural aspects" to support his § 1983 malicious prosecution claim.  Doc. 145 at 28 n.11.  In

short, defendants contend the Supreme Court's *Parratt* doctrine (addressed above) and

subsequent Tenth Circuit cases (addressed below) bar plaintiff's § 1983 claims based on

Fourteenth Amendment *procedural* due process violations.  And, defendants argue that *Parratt*

also bars *substantive* due process claims, though they contend plaintiff hasn't asserted any

substantive due process claims.  Doc. 152 at 13–14.

    Plaintiff responds that *Parratt* doesn't apply to his § 1983 claims alleging Fourteenth

Amendment due process violations.[19]  Doc. 151 at 25–27.  Though not explicitly stated and

contrary to defendants' arguments, plaintiff argues he asserts *substantive*—not *procedural*—due

process claims.  He argues that "*Parratt* dealt with procedural due process claims—where the

deprivation by state action of a constitutionally protected interest was not in itself

unconstitutional—and the only constitutional dimension to the issue was whether the state-

provided process was constitutional."  Doc. 151 at 25.  "Where such deprivations are

unpredictable, random[,] and unauthorized" and it is impossible "for the state to provide a pre-

---

[19]     Plaintiff focuses his arguments on Count IV specifically, and does not reference Count I or Count III directly in his Response on this point.  *See* Doc. 151 at 25 & n.2 (mentioning only Count IV in the main text, but then referring in a footnote to defendants' incorporation of "this same argument" for Count IV's malicious prosecution claim and its "Fourteenth Amendment procedural due process or substantive due process" elements).  The court presumes plaintiff meant to direct his response at Count I, Count III, and Count IV as those are the counts defendants mentioned in their brief.  Overall, plaintiff argues generally that "[t]he *Parratt* doctrine does not apply to [his] due process claims," *id.* at 25, and the court thus addresses the *Parratt* doctrine argument against all three claims cited by the parties that may invoke plaintiff's Fourteenth Amendment due process rights—Count I, Count III, and Count IV.

deprivation remedy," plaintiff recognizes that the court must decide whether an adequate post-deprivation state law remedy exists.  *Id.* (citation and internal quotation marks omitted).  And, plaintiff agrees, availability of "a post-deprivation state law tort claim" in those circumstances means "a constitutional violation of procedural due process has not occurred."  *Id.*  But, plaintiff argues, "[t]he *Parratt* doctrine does not apply to due process claims, like the fabrication or withholding of evidence, that relate the fundamental fairness of a criminal trial."  *Id.*

In short, plaintiff alleges his constitutional right to a fair trial was violated in a way that is prohibited "regardless of the procedures used" because "[t]he right to a fair trial has always been protected by the fundamental protections of the due process clause."  *Id.* at 26.  That is, plaintiff intends to assert *substantive* due process violations—which, he contends, are "not circumscribed by the *Parratt* doctrine"—and not *procedural* due process violations.  *Id.*  He asserts neither *Parratt* nor the Tenth Circuit cases cited by defendants bar his claims that deal with how plaintiff "endured an unfair trial, with pervasive lies and withheld exculpatory evidence, a wrongful conviction, and years of wrongful incarceration."  *Id.*  He notes that all the cases defendants cite considered plaintiffs who were prosecuted but never stood trial.  *Id.*

Despite plaintiff's Response, defendants, in their Reply, continue to frame plaintiff's claims as *procedural* due process claims.  Doc. 152 at 10–15.  They argue because the alleged deprivation of plaintiff's right to a fair trial stems from alleged random and unauthorized failures to follow state procedures and Kansas law provides a means to remedy those failures, plaintiff's claims fail as a matter of law.  *Id.* at 11–12.  Defendants assert that no deprivation of liberty *without due process* occurred unless and until the state has refused to provide an adequate post-deprivation remedy—*i.e.*, they argue that no due process violation exists under plaintiff's alleged facts because a post-deprivation remedy is available.  *Id.*  They frame the alleged conspiracy

conduct as "random and unauthorized" deprivations to which *Parratt* applies to bar the § 1983 claims because a Kansas malicious prosecution tort provides post-deprivation process to remedy deprivation of plaintiff's right to a fair trial.  *Id.*

In short, defendants don't dispute that fabricating and withholding evidence may qualify as impermissible conduct.  *Id.* at 13.  But, they contend, the state has not completed the deprivation of plaintiff's life, liberty, or property *without due process* because the state has provided him with a *post-deprivation process* to remedy the alleged violation through a malicious prosecution tort, thus precluding a § 1983 claim.  *Id.* at 11–13.  As the court understands defendants' position, it asserts that plaintiff wasn't deprived of his liberty *without due process* when he endured an unfair trial and then spent 15 years in prison because, now, he can bring a state law malicious prosecution claim.  And this claim's availability, defendants argue, means his Fourteenth Amendment due process rights never were violated.  Defendants argue the Supreme Court and Tenth Circuit cases discussing *Parratt* don't distinguish between plaintiffs who were detained pretrial and those actually convicted, and that *Parratt* applies either way—*i.e.*, the deprivation of liberty without due process isn't complete where a post-deprivation remedy exists.[20]  *Id.* at 13.

Finally, defendants contend plaintiff hasn't asserted any substantive Fourteenth Amendment due process claims.  *Id.*  But, they assert, if he "later attempts to advance such a claim," *Parratt* still should apply.  *Id.*  They concede that the Tenth Circuit hasn't conclusively determined whether *Parratt* should apply to substantive due process claims, in addition to

---

[20]     As will become evident below, these cases may not distinguish between a malicious prosecution at the pretrial stage and those involving convictions.  But, it's because the facts presented in the cases only arose in the pretrial context—where the Fourth Amendment provides protection for unreasonable seizures—and they never considered what constitutional rights may exist when a plaintiff is convicted by a malicious prosecution.

procedural due process ones.  *Id.*  However, they rely on Tenth Circuit dicta and concurring

opinions to argue *Parratt* should bar those claims as well.  *Id.* at 13–14.  It appears to the court

that plaintiff's Response already had clarified that he indeed intends to assert *substantive* due

process claims, not *procedural* ones.

Below, the court considers the Second Amended Complaint's claims and the various

cases the parties cite to determine whether plaintiff's Fourteenth Amendment due process

claims—whether procedural or substantive—survive defendants' Motion to Dismiss.

### c.   Second Amended Complaint's Due Process Claims

Count I alleges that defendants "deprived [p]laintiff *of his constitutional right to a fair

trial* by fabricating Tom's testimonial inculpation of [plaintiff]."  Doc. 141 at ¶ 115 (emphasis

added).  They "fabricated and solicited false testimony from Tom implicating [p]laintiff in the

crime that they knew was false; obtained [p]laintiff's conviction using that false evidence; and

failed to correct fabricated evidence that they knew to be false when it was used against

[p]laintiff at his criminal trial," all of which denied plaintiff "*his constitutional right to a fair

trial guaranteed by the Fourteenth Amendment*."  *Id.* at ¶¶ 116, 118 (emphasis added).

Count III alleges the defendant officers "deprived [p]laintiff *of his constitutional right to

a fair trial*," which is "*guaranteed by the Fourteenth Amendment*" by "withholding and

suppressing exculpatory evidence and fabricating additional evidence against [p]laintiff besides

Tom's false testimony."  *Id.* at ¶¶ 129, 134 (emphasis added).  These fabrications and

suppressions caused plaintiff's conviction.  *Id.* at ¶ 134.

Count IV alleges the defendant officers "accused [p]laintiff of criminal activity and

exerted influence to initiate, continue, and perpetuate judicial proceedings against [p]laintiff

without any probable cause for doing so, in violation of his rights secured *by the Fourth

*Amendment* and *the procedural and substantive due process components of the Fourteenth Amendment.*"  *Id.* at ¶ 140 (emphasis added).  The defendant officers are alleged to have "caused [p]laintiff to be *unreasonably seized and improperly subjected to judicial proceedings*" when no probable cause existed.  *Id.* at ¶ 141 (emphasis added).  And, plaintiff alleges, the defendant officers "subjected [p]laintiff to *unauthorized and arbitrary governmental action that shocks the conscience*" because they "deliberately and intentionally" framed plaintiff for a crime they knew he didn't commit by fabricating, suppressing, and withholding evidence.  *Id.* at ¶ 142 (emphasis added).

In sum, plaintiff explicitly frames the right at issue in Counts I and III as the right to a fair trial.  He specifies the Fourteenth Amendment as the basis for these claims, but the Second Amended Complaint doesn't specify whether he relies on procedural or substantive aspects of the Due Process Clause.  And, plaintiff frames the rights at issue in Count IV as the right to be free from unreasonable seizures (unlawful pretrial detention), the right not to be prosecuted without probable cause, and the right not to be deliberately and intentionally framed for a crime by fabricating, suppressing, and withholding evidence.  He specifies his Fourth Amendment and Fourteenth Amendment rights (both procedural and substantive) as the basis for this claim.

### d.  Supreme Court, Tenth Circuit, and Other Relevant Cases

Below, the court analyzes the cases cited by the parties to determine if the *Parratt* doctrine and the availability of a malicious prosecution tort claim under Kansas law bars plaintiff's Fourteenth Amendment claims in Counts I, III, and IV as a matter of law.  The court concludes plaintiff's claims—to the extent they rely on substantive due process or Fourth Amendment violations—aren't barred by the *Parratt* doctrine here.  The Jefferson County defendants rely on cases that did not invoke the right to a fair trial or the substantive Fourth and

Fourteenth Amendment rights that plaintiff asserts are at issue here.  So, defendants have not established plaintiff's claims fail as a matter of law to the extent they rely on substantive due process or Fourth Amendment violations.  But, to the extent plaintiff relies on procedural due process violations, the *Parratt* doctrine does bar those claims.

### i.   *Brady*, *Pyle*, *Albright*, and *Manuel*

Plaintiff's Count I and Count III claims stem from two well-known criminal cases:  *Pyle v. Kansas*, 317 U.S. 213 (1942) and *Brady v. Maryland*, 373 U.S. 83 (1963).  In *Pyle*, petitioner alleged that "Kansas prosecuting authorities obtained his conviction" by presenting witness testimony at trial they knew to be perjured, and by repressing other testimony material to petitioner's defense by threatening or intimidating certain witnesses helpful to petitioner.  317 U.S. at 214.  Because petitioner had alleged that "his imprisonment resulted from perjured testimony, knowingly used by the State authorities to obtain his conviction, and from the deliberate suppression by those same authorities of evidence favorable to him," the Supreme Court held the petitioner sufficiently had alleged *a deprivation of his constitutional rights.  Pyle*, 317 U.S. at 216 (emphasis added).

In *Brady*, petitioner admitted at his state law trial that he had participated in the charged murder but, seeking to avoid the death penalty, had argued his companion had been the one who actually killed the victim.  373 U.S. at 84.  After the trial and petitioner's conviction and sentencing, petitioner learned the prosecution had withheld an extrajudicial statement by the companion, admitting that he was the person who had committed the murder.  *Id.*  The Supreme Court explained the prosecution's "suppression of this confession was *a violation of the Due Process Clause of the Fourteenth Amendment*."  *Id.* at 86 (emphasis added).  And, the Court held that "suppression by the prosecution of evidence favorable to an accused upon request *violates*

*due process* where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87 (emphasis added).  But, the Court concluded, petitioner was entitled to a new trial only on the question of punishment, and not his guilt.  *Id.* at 88–91.  The Court explained that the Maryland court correctly had concluded the companion's confession was not admissible on—or material to—the issue of guilt because petitioner already had admitted he participated in the crime.  *Id.*  So, withholding the evidence for purposes of the jury verdict finding petitioner guilty was not equivalent to depriving petitioner of his constitutional due process right.  *Id.*

*Pyle* and *Brady* thus hold that a criminal defendant's due process rights are violated if he is convicted and imprisoned following a proceeding where false evidence knowingly was presented or material favorable evidence was suppressed.  *Pyle* and *Brady* did not arise in the § 1983 context.  But, defendants' arguments that no due process violations exist in Count I and Count III because a state malicious prosecution tort claim is available after the fact aren't persuasive based on their holdings.  These Supreme Court precedents hold that fabricating evidence or withholding material exculpatory evidence to secure a conviction *violates* due process.  They don't suggest state actors can subject a criminal defendant to an unfair trial, but then escape a civil claim for a constitutional violation by relying on the existence of a post-deprivation state tort remedy to establish that no constitutional due process violation occurred. But, that is what the Jefferson County defendants argue here.  They contend a § 1983 claim based on fabricating or withholding evidence depriving plaintiff of a fair trial is not available after *Parratt* because Kansas law recognizes a malicious prosecution tort that can remedy the alleged deprivation and thus, they contend, no liberty deprivation without due process ever occurred.

For their *Parratt* arguments the parties each rely on *Albright v. Oliver*, 510 U.S. 266 (1994), a Supreme Court decision consisting of a plurality opinion, four concurring opinions (two concurring in the judgment), and a dissent.  *Albright*'s divided outcome created several problems for those analyzing Fourth and Fourteenth Amendment claims.  For purposes of the parties' arguments here, Justice Kennedy's opinion concurring in the judgment and Justice Stevens's dissent dive deep into *Parratt* and how, in their opinion, courts should apply its holding.  Though the concurring and dissenting opinions do not constitute binding precedent, the Tenth Circuit has relied on their reasoning in some post-*Albright* cases.  *See, e.g.*, *Browder v. City of Albuquerque*, 787 F.3d 1076, 1079 (10th Cir. 2015) (discussing Justice Kennedy's concurring opinion in *Albright* about *Parratt*); *Becker v. Kroll*, 494 F.3d 904, 918 n.8, 921–22 (10th Cir. 2007) (considering Justice Stevens's dissent, Justice Kennedy's concurrence, and Justice Souter's concurrence to analyze § 1983 claims).

In *Albright*, plaintiff surrendered to defendant, a policeman, after Illinois authorities issued an arrest warrant charging plaintiff with "sale of a substance which looked like an illegal drug."  *Id.* at 268.  Defendant testified at a pretrial hearing that he saw plaintiff sell the look-alike substance, and "the court found probable cause to bind [plaintiff] over for trial."  *Id.* at 269.  But, during a later hearing, the criminal case against plaintiff was dismissed because "the charge did not state an offense under Illinois law."  *Id.*  Plaintiff then sued defendant, asserting a § 1983 claim for violating his "substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon probable cause."  *Id.* at 268.  The Supreme Court held that plaintiff had failed to state a viable § 1983 *substantive* due process claim because "it is the Fourth Amendment, and not substantive due process, under which [plaintiff's] claim must be judged."  *Id.* at 271.

The Court noted that the first step in any § 1983 action "is to identify the specific constitutional right allegedly infringed"—in *Albright*, a "substantive due process right to be free of prosecution without probable cause." *Id.* Plaintiff did not allege a procedural due process violation or a Fourth Amendment violation. *Id.* The Court explained that, generally, it is "reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Id.* at 271–72. (citation and internal quotation marks omitted). The Court acknowledged that it has extended substantive due process protections "to matters relating to marriage, family, procreation, and the right to bodily integrity." *Id.* at 272. But, plaintiff's claim was "markedly different" from those cases. *Id.*

The Court recognized that the Due Process Clause of the Fourteenth Amendment "confers both substantive and procedural rights." *Id.* Still, over time, the Court has "substituted . . . the specific guarantees of the various provisions of the Bill of Rights . . . for the more generalized language contained in the earlier cases construing the Fourteenth Amendment"—*i.e.*, when a particular Amendment in the Bill of Rights explicitly provides constitutional protection, the Court relies on the more specific Amendment, rather than a general substantive due process right. *Id.* at 273. And, in *Albright*, the plurality determined that the Fourth Amendment already provides protections for *pretrial* deprivations of liberty. *Id.* at 274. So, the Court held, "substantive due process . . . can afford him no relief." *Id.* at 275. But, because plaintiff did not allege a Fourth Amendment violation, the court "express[ed] no view as to whether [his] claim would succeed under the Fourth Amendment . . . ."[21] *Id.*

---

[21]    The Supreme Court since has recognized explicitly a § 1983 malicious prosecution claim under the Fourth Amendment for pretrial detentions without probable cause. *See Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 917–19 (2017).

In *Albright*'s underlying appeal, the Seventh Circuit had held that "prosecution without probable cause is a constitutional tort under § 1983 only if accompanied by incarceration or loss of employment or some other palpable consequenc[e]." *Id.* at 269–70 (citations and internal quotation marks omitted). So, the Circuit had affirmed the district court's dismissal of plaintiff's § 1983 claim because, where plaintiff wasn't incarcerated, state tort remedies should suffice without needing to rely on a constitutional violation. *Id.* As summarized above, the Supreme Court affirmed the judgment, but on different grounds: It concluded plaintiff could not base his claim on a *substantive* due process right because a more specific Amendment—the Fourth Amendment—provided adequate protection. *Id.* at 270–71, 275.

But, in a footnote following this summary of the Seventh Circuit's decision, the Supreme Court described a split among the lower courts whether to recognize a § 1983 malicious prosecution claim, *i.e.*, when may a malicious prosecution claim rise to the level of a constitutional violation. *Id.* at 270 n.4. Some circuits recognized a § 1983 malicious prosecution claim based on similar elements to the common law tort. *Id.* In contrast, other circuits—like the Seventh Circuit—required something more rising to an "injury or deprivation of a constitutional magnitude" before allowing a § 1983 malicious prosecution claim. *Id.* And, without deciding the requirements for any such constitutional claim, the Court noted that its plurality opinion in *Albright* makes it "evident that substantive due process may not furnish the constitutional peg on which to hang a [malicious prosecution tort]." *Id.*

Defendants, citing this footnote in *Albright*, argue the court must dismiss plaintiff's Count IV malicious prosecution claim to the extent he relies on a *substantive* due process right against prosecution without probable cause. Doc. 145 at 28 n.11. They note that the Tenth Circuit has stated "the unavoidable construction of *Albright* is that no § 1983 claim will arise

from filing criminal charges without probable cause under the *substantive* due process protections of the Fourteenth Amendment." *Becker*, 494 F.3d at 918 (emphasis added). And, the Tenth Circuit reasoned, *Albright* also precludes a Fourteenth Amendment *procedural* due process claim because "in the initial stages of the criminal proceeding, the Fourth Amendment protects a person's liberty interests under the constitution by ensuring that any arrest or physical incarceration attendant to criminal prosecution is reasonable." *Id.* at 919. So, a plaintiff can't rely on the "more general due process" rights arising under the Fourteenth Amendment because the Fourth Amendment already protects those interests. *Id.*

Defendants are correct that, after *Albright*, a § 1983 malicious prosecution claim alleging unlawful pretrial detention and prosecution without probable cause must invoke the Fourth Amendment as the basis for such a § 1983 malicious prosecution claim relying on *pretrial* constitutional violations. *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 914–19 (2017) (holding § 1983 claim for unlawful pretrial confinement should be based on Fourth Amendment right to be free from seizure except upon probable cause and not Fourteenth Amendment due process rights where petitioner was held in jail for seven weeks after judge relied on fabricated evidence—officer and technician lied in their report about drugs being ecstasy—to find probable cause); *see also Mglej v. Gardner*, 974 F.3d 1151, 1159 & n.3 (10th Cir. 2020) (explaining that where charges were dismissed before trial, the basis for § 1983 claim for initiating a malicious prosecution must be the Fourth Amendment, not the Fourteenth Amendment); *Becker*, 494 F.3d at 919 ("Under the facts of this case, where criminal charges were brought but dismissed before trial, [plaintiff] must allege a violation of the Fourth Amendment in order to proceed on a theory of § 1983 malicious prosecution."). So, plaintiff's Count IV—which asserts the right not to be prosecuted without probable cause and unlawful pretrial detention—must rely on the Fourth

Amendment for pretrial constitutional violations, and not on substantive or procedural Fourteenth Amendment due process rights.  Plaintiff properly asserts the Fourth Amendment as one basis for his Count IV claim.  Doc. 141 at ¶ 140.

But the portions of *Albright* and *Becker* cited by defendants addressed only *pretrial* deprivations of liberty—infringements where the Fourth Amendment provided adequate protection of any violations of the right not to be unreasonably seized or prosecuted without probable cause.  The Supreme Court and Tenth Circuit didn't address what kind, if any, of constitutional violations might arise from a malicious prosecution that continues through a trial and conviction.  Nor did they specify a constitutional basis for any such claim.  As discussed more fully below, plaintiff also bases his Count IV claim on the right to be free from conscience-shocking governmental action deliberately and intentionally framing plaintiff for a crime by fabricating, suppressing, and withholding evidence.  Though the Tenth Circuit's reading of *Albright*, as cited by defendants, establishes that plaintiff can't rely on a substantive due process right not to be prosecuted without probable cause to assert a § 1983 claim for *pretrial* deprivations—because the Fourth Amendment provides adequate protection—it does not foreclose, at least not as a matter of law, a § 1983 malicious prosecution claim under Fourteenth Amendment substantive due process when the malicious prosecution continues through a trial and conviction, subjecting plaintiff to deprivations of a constitutional magnitude beyond the pretrial period.

In short, the court agrees with the Jefferson County defendants that Count IV can't rely on procedural or substantive due process to support a malicious prosecution claim for plaintiff's *pretrial* prosecution and detention.  The court considers defendants' other arguments against Count IV *infra* Part III.C.1.  But for now, the court rejects defendants' arguments that it must

dismiss Count IV because that claim also relies on the Fourth Amendment.  And *Albright* and

*Becker* don't establish that plaintiff, as a matter of law, can't rely on the Fourth Amendment for

his pretrial conduct malicious prosecution claim.  Nor do these cases foreclose as a matter of law

plaintiff from using the Fourteenth Amendment to support his claim that his malicious

prosecution continued into and beyond his criminal trial once the Fourth Amendment has

"drop[ped] out."  *See Manuel*, 137 S. Ct. at 920 n.8 (noting that "once a trial has occurred, the

Fourth Amendment drops out:  [a] person challenging the sufficiency of the evidence to support

both a conviction and any ensuing incarceration does so under the Due Process Clause of the

Fourteenth Amendment").  The court addresses in more detail how the Tenth Circuit has

considered such § 1983 malicious prosecution claims in the next subsection, Part III.B.1.d.ii.

The next batch of *Parratt* arguments directed at the due process violations asserted in

Counts I, III, and IV, relies on Justice Kennedy's concurring opinion in *Albright*.  Justice

Stevens's dissent is instructive as well.

Justice Kennedy agreed with the plurality that "an allegation of arrest without probable

cause must be analyzed under the Fourth Amendment without reference to more general

considerations of due process."  *Albright*, 510 U.S. at 281 (Kennedy, J., concurring in judgment).

But, he also considered whether the Due Process Clause protects a plaintiff's interest in freedom

from malicious prosecution.  *Id.*  He explained that the Court has recognized due process

violations, even when not tied to a more specific guarantee in the Bill of Rights, where the

criminal rule or procedure "offends some principle of justice so rooted in the traditions and

conscience of our people as to be ranked as fundamental."  *Id.* at 282 (citations and internal

quotation marks omitted).  For example, Justice Kennedy noted that the Supreme Court has

"enforced" constitutional requirements "to ensure[] fundamental fairness in the determination of

guilt at trial," by prohibiting things like the "deliberate deception of court and jury by prosecution's knowing use of perjured testimony."  *Id.* at 283 (citation and internal quotation marks omitted).  And, Justice Kennedy assumed for purposes of the analysis that the Due Process Clause would protect "some of the interests granted historical protection by the common law of torts"—like a person's interest in freedom from malicious prosecution.  *Id.* at 283–84.  But, based on *Parratt*, he concluded that "a state actor's random and unauthorized deprivation of that interest cannot be challenged under 42 U.S.C. § 1983 so long as the State provides an adequate postdeprivation remedy."  *Id.* at 284 (first citing *Parratt*, 451 U.S. at 535–44; then citing *Hudson*, 468 U.S. at 531–36 (further citations omitted)).

Plaintiff relies on Justice Kennedy's words here to argue the court should recognize his § 1983 due process claims based on fabricating and withholding evidence denying his right to a fair trial because defendants' actions offended a fundamental right to "fairness in the determination of guilt at trial" and thus violated due process.  *Id.*  The court agrees.  Plaintiff's Count I and Count III claims invoke a due process right that *Parratt* does not preclude.  Justice Kennedy treated the right to be free from malicious prosecution separately from due process rights that ensure fundamental fairness at trial (ones which already are recognized by the Court as due process violations).  *See id.* at 283.  And, he proceeded only to consider whether Fourteenth Amendment due process would recognize the right to be free from malicious prosecution—plaintiff's Count IV here.  *Id.* at 283–84.  And, if so, Justice Kennedy also considered *Parratt*'s effect on such a right.  *Id.*

Justice Kennedy assumed a Fourteenth Amendment due process right could support a malicious prosecution claim.  *Id.*  But, he took the position that one could not avoid the *Parratt* rule by "attaching a substantive rather than procedural label" to the claim, or "treating claims

based on the Due Process Clause as claims based on some other constitutional provision." *Id.* at 285.  Instead, he described the *Parratt* rule—in this context—to mean:  "In the ordinary case where an injury has been caused not by a state law, policy or procedure, but by a random and unauthorized act that can be remedied by state law, there is no basis for intervention under § 1983, at least in a suit based on 'the Due Process Clause of the Fourteenth Amendment *simpliciter.*'"  *Id.* (quoting *Parratt*, 451 U.S. at 536).  For *Albright*'s plaintiff, Illinois law provided a tort remedy for malicious prosecution.  *Id.*  So, Justice Kennedy concluded that the plaintiff couldn't invoke § 1983.  *Id.* at 285–86.  But had state tort law not provided a remedy, Justice Kenney would have allowed a § 1983 malicious prosecution claim under the Due Process Clause.  *Id.* at 286.

Applying Justice Kennedy's rationale here would mean that *Parratt* bars plaintiff's Count IV malicious prosecution claim to the extent plaintiff bases his claim on Fourteenth Amendment due process (procedural or substantive).  Justice Kennedy agreed that Fourteenth Amendment due process protection could protect a person's interest in freedom from malicious prosecution. But it can do so only where no state tort law provides an adequate remedy for violating that interest.  Justice Kennedy also separately recognized constitutional due process violations tied to the fundamental fairness of a trial.  And, he never asserted that *Parratt* would bar a § 1983 claim to vindicate violation of those fundamental rights.  He only considered whether *Parratt* would apply to a § 1983 malicious prosecution claim that asserted an interest typically granted protection by the common law of torts.

Justice Stevens, on the other hand, opined that Fourteenth Amendment due process requires a state to ensure that probable cause exists to support the criminal proceedings.  *Id.* at 291–92 (Stevens, J., dissenting).  His dissent explained it was clear that defendant "either knew

or should have known that he did not have probable cause to initiate criminal proceedings" against *Albright*'s plaintiff.  *Id.* at 292.

First, Justice Stevens considered whether "commencement of formal criminal proceedings deprive[s] the accused person of 'liberty' as that term is used in the Fourteenth Amendment."  *Id.* at 294.  He commented, "Had [plaintiff's] prosecution resulted in his conviction and incarceration, then there is no question [ ] that the Due Process Clause would have been implicated" because the purpose of the Fourteenth Amendment is "to deny States the power to impose this sort of deprivation of liberty until after completion of a *fair trial*."  *Id.* (emphasis added).  He explained that the Due Process Clause protects an individual's interest in "freedom from an improper criminal conviction."  *Id.*  And, Justice Stevens concluded, the Due Process Clause also protects other interests—and the *Albright* plaintiff had alleged a constitutional deprivation of liberty because "the formal commencement of a criminal proceeding" interferes with a person's liberty to a "sufficient magnitude" that it "qualif[ies] as a deprivation of liberty meriting constitutional protection."  *Id.* at 294–96.

Next, Justice Stevens considered "what measure of 'due process' must be provided an accused in connection with this deprivation of liberty."  *Id.* at 296.  He concluded that Fourteenth Amendment due process requires a "responsible decision that there is probable cause to prosecute."  *Id.* at 297.  In *Albright*, plaintiff didn't challenge the adequacy of Illinois's procedures to determine probable cause.  *Id.* at 298.  But, he did claim the probable cause determination was substantively invalid because the evidence was unreliable and defendant had disregarded or suppressed facts about an informant's reliability.  *Id.*  Justice Stevens agreed that a substantive defect in an otherwise facially valid determination of probable cause "does not comport with the requirements of the Due Process Clause."  *Id.* at 300.  He explained that

Supreme Court cases establish that a criminal defendant has been denied due process even though he received a facially valid procedure—such as a trial—when the process was substantively defective because the prosecutor had used perjured testimony and suppressed evidence that would have impeached that perjured testimony. *Id.* at 298. While such a criminal defendant has received the required procedure—a trial—he still is deprived of due process because the trial didn't comport with "fundamental conceptions of justice." *Id.* (citation and internal quotation marks omitted). "Our cases make clear that procedural regularity notwithstanding, the Due Process Clause is violated by the knowing use of perjured testimony or the deliberate suppression of evidence favorable to the accused." *Id.* at 299. Likewise, Justice Stevens dissented, a prosecution following a facially valid probable cause determination based on substantively defective evidence violates due process. *Id.* at 300.

In Justice Stevens's view, the plurality placed too much emphasis on plaintiff's reliance on substantive due process. *Id.* at 300–01. Instead, Justice Stevens asserted, substantive and procedural due process concepts "are not mutually exclusive, and their protections often overlap." *Id.* at 301. Whether the probable cause standard should be "characterized as substantive or procedural," Justice Stevens concluded, the "Due Process Clause operates to protect the individual against the abuse of governmental power, by guaranteeing that no criminal prosecution shall be initiated except on a finding of probable cause." *Id.* at 301–02. He explained that the Court time and again has recognized Fourteenth Amendment due process rights that are not explicitly addressed in the Bill of Rights—like the prohibition against "use of perjured testimony and the suppression of evidence favorable to the accused." *Id.* at 303–04. And, he would not "foreclose[] a general due process claim when a more specific source of protection is absent or, [like the Fourth Amendment in *Albright*], open to question." *Id.* at 305–

61

06.  Justice Stevens described "the constitutional protection against unfounded accusations" as "distinct from, and somewhat broader than, the protection against unreasonable seizures."  *Id.* at 309.  So, he concluded the "the scope of the Fourth Amendment protection does not fully encompass the liberty interest at stake."  *Id.* at 310.

Justice Stevens then explicitly rejected Justice Kennedy's reliance on *Parratt* and his conclusion that an alternate state remedy precludes a § 1983 malicious prosecution claim.  *Id.* at 313.  Justice Stevens explained:

> The rationale [of *Parratt*] is inapplicable to this case whether one views the claim at issue as substantive or procedural.  If one views the [plaintiff's] claim as one of substantive due process, *Parratt* is categorically inapplicable.  Conversely, if one views his claim as one of procedural due process, *Parratt* is also inapplicable, because its rationale does not apply to officially authorized deprivations of liberty or property.

*Id.* (citations omitted).  Because plaintiff "was subjected to criminal charges by an affirmative, deliberate act of a state official" Justice Stevens asserted that the "filing of criminal charges [was] effectuated through established state procedures under which government agents, such as [defendant were] authorized to act."  *Id.* at 314.  And defendant, "the State's authorized agent" knows precisely when the deprivation of the liberty interest to be free from criminal prosecution will occur—the moment when the charges are filed."  *Id.*  So, "the State is capable of providing a reasoned predeprivation determination . . . prior to the commencement of criminal proceedings[,]" and its "[f]ailure to do so, or to do so in a meaningful way . . . is constitutionally unacceptable."  *Id.*

Justice Stevens concluded that "notwithstanding the possible availability of a state tort action for malicious prosecution, § 1983 provides a federal remedy for the constitutional violation . . . ."  *Id.*  He explained:

> The *Parratt* doctrine is reconcilable with § 1983 only when its application is limited to situations in which *no constitutional violation occurs*.  In the context of certain deprivations of property, due process is afforded—and therefore the Constitution is not violated—if an adequate postdeprivation state remedy is available in practice to provide either the property's prompt return or an equivalent compensation.  In other contexts, however, including criminal cases and most cases involving a deprivation of liberty, the deprivation is complete, and the Due Process Clause has been violated when the loss of liberty occurs.  In those contexts, any postdeprivation state procedure is merely a remedy; because it does not provide the predeprivation process that is "due," it does not avoid the constitutional violation.  In such cases, like this one, § 1983 provides a federal remedy regardless of the adequacy of the state remedy.

*Id.* at 315–16 (citations omitted and emphasis added).

If applied here, Justice Stevens's view of *Parratt* would not bar plaintiff's Counts I, III, or IV under the Fourteenth Amendment because plaintiff's due process rights were violated when the liberty deprivations occurred.  Like Justice Kennedy, Justice Stevens recognized a due process right against liberty deprivations until after a fair trial as separate from a due process right not to have criminal proceedings initiated without probable cause.  And, because due process already was violated, Justice Stevens would allow a § 1983 claim to provide a federal remedy—such as Count IV's malicious prosecution claim—regardless whether state law provides a remedy.  In Justice Stevens's view, this isn't a situation where a state law tort claim affords due process after the deprivation has occurred.  In other words, the state law remedy doesn't mean that a constitutional violation never occurred.

The court next turns to the two Tenth Circuit cases that, in defendants' view, support dismissing plaintiff's Fourteenth Amendment claims under *Parratt*.  Their view aligns with Justice Kennedy's treatment of the *Albright* malicious prosecution claim—providing no § 1983 due process claim where state law provides an adequate remedy to protect a person's interest in freedom from malicious prosecution.  But, after reviewing *Albright* carefully, the court concludes that neither Justice Kennedy's concurrence nor Justice Stevens's dissent demonstrate

that *Parratt* bars plaintiff's claims in Count I or Count III based on violations of his right to a fair trial.  Instead, both Justices merely discussed how they would apply *Parratt* to a § 1983 malicious prosecution claim—plaintiff's Count IV.  Thus, *Albright* doesn't support dismissing the claims in Count I or Count III.  And, neither do the Tenth Circuit cases or others discussed below.

### ii.     Tenth Circuit–*Myers* and *Becker*

In *Myers v. Koopman*, 738 F.3d 1190 (10th Cir. 2013), the Tenth Circuit addressed *Parratt*'s implications where a plaintiff alleged § 1983 malicious prosecution claims based on violations of his Fourth and Fourteenth Amendment rights, but the criminal proceedings never reached trial.  *Id.* at 1192.  Plaintiff alleged that the defendant police officer had secured an arrest warrant by fabricating facts to support a probable cause finding.  *Id.*  First, defendant had falsified an affidavit to secure a search warrant, used the warrant to search plaintiff's property, and found a white substance that field tests incorrectly identified as methamphetamine.  *Id.*  Then, plaintiff alleged, defendant fabricated facts in another affidavit to secure an arrest warrant, and plaintiff surrendered himself into custody based on the arrest warrant.  *Id.*  He remained in custody for three days until he posted bond.  *Id.*  The district attorney filed criminal charges against him, but later testing of the sample revealed it was not methamphetamine.  *Id.* at 1192–93.  The district attorney then dropped all charges.  *Id.* at 1193.

Plaintiff asserted § 1983 claims alleging violations of his Fourth and Fourteenth Amendment rights.  *Id.* at 1193.  For the Fourteenth Amendment claim, plaintiff alleged that the defendant officer had fabricated facts to contrive probable cause to support the arrest warrant and subsequent prosecution.  *Id.*  The district court dismissed the § 1983 Fourteenth Amendment malicious prosecution claim, concluding that Colorado law provided an adequate remedy.  *Id.*

The Tenth Circuit affirmed, reasoning that "[i]f a state actor's harmful conduct is unauthorized and thus could not be anticipated pre-deprivation, then an adequate post-deprivation remedy— such as a state tort claim—will satisfy due process requirements." *Id.*  The Circuit explained that "[s]uch lawlessness could not have been anticipated or prevented pre-deprivation, but a post-deprivation malicious-prosecution claim serves as an effective antidote." *Id.*  Colorado law recognized a state law malicious prosecution claim. *Id.*  And so, "[t]he existence of the state remedy flattens the Fourteenth Amendment peg on which [plaintiff] now tries to hang his § 1983 malicious-prosecution claim." *Id.*  In short, the Tenth Circuit held a postdeprivation state tort remedy for malicious prosecution satisfied plaintiff's due process right because no predeprivation process was possible since defendant's fabrication couldn't have been anticipated or prevented predeprivation. *Id.*

Applying the *Myers* holding to the facts alleged here, plaintiff's Count IV can't rely on Fourteenth Amendment *procedural* due process because Kansas law provides a malicious prosecution tort claim that satisfies procedural due process requirements. *See Lindenman v. Umscheid*, 875 P.2d 964, 974–77 (Kan. 1994) (recognizing Kansas common law's malicious prosecution tort claim). *Myers* viewed the § 1983 malicious prosecution claim in that case as a Fourteenth Amendment *procedural* due process claim barred by an available state law tort claim under *Parratt*—*i.e.*, Colorado law's tort claim for malicious prosecution provided the due process required by the Fourteenth Amendment.  Likewise here, as a matter of law *Myers* precludes plaintiff's Count IV malicious prosecution claim to the extent it relies on procedural due process because defendants' fabricating and withholding evidence couldn't have been anticipated, predeprivation.  Thus, Kansas law's tort claim for malicious prosecution satisfies the procedural due process required by the Fourteenth Amendment.

But, *Myers* also reversed the district court's dismissal of the Fourth Amendment malicious prosecution claim. 738 F.3d at 1194. The Tenth Circuit explained that a constitutional species of tort liability exists under § 1983 where a person is "deprived of rights secured to them by the Constitution." *Id.* "The first step is to identify the specific constitutional right allegedly infringed." *Id.* (citations and internal quotation marks omitted). "Courts then look to common-law torts as analogies to determine the contours—including the accrual date—of § 1983 claims." *Id.* The district court had analogized plaintiff's Fourth Amendment claim in *Myers* to a false imprisonment claim. But, because plaintiff was seized *after* legal process was instituted, the Circuit concluded that the proper analogy was a malicious prosecution tort. *Id.* Plaintiff was challenging the probable cause determination that generated the legal process—an arrest warrant—leading to his detention, but he was not challenging a seizure that took place before legal proceedings were instituted. *Id.* at 1195. And, because malicious prosecution claims do not accrue "until the criminal proceedings have terminated in plaintiff's favor[,]" the Circuit concluded plaintiff's claim was timely and should not have been dismissed. *Id.* at 1194–95. At bottom, the Circuit held the *Myers* plaintiff had "properly stated a Fourth Amendment claim for malicious prosecution[.]" *Id.* at 1195.

Applying this portion of *Myers* to plaintiff's Count IV here, the court concludes our Circuit would recognize plaintiff's § 1983 malicious prosecution claim in Count IV to the extent he bases it on a Fourth Amendment violation of his right not to be unlawfully detained. And, this claim didn't accrue until the proceedings had terminated in plaintiff's favor. Thus, as a matter of law *Myers* doesn't preclude plaintiff's Count IV malicious prosecution claim to the extent he bases it on the Fourth Amendment.

*Myers* merely involved pretrial deprivations and the allegedly malicious prosecution ended long before trial.  This differs substantially from plaintiff's claims here.  *Myers* doesn't address a deprivation of the right to a fair trial.  So, that case doesn't provide authority precluding plaintiff's Count I and Count III claims as a matter of law.  And, the Circuit never considered explicitly whether a *substantive* due process violation could support a § 1983 malicious prosecution claim.  But, it did reject plaintiff's argument that an underlying Fourth Amendment violation could save the Fourteenth Amendment claim.  *Myers*, 738 F.3d at 1194.  And, the Circuit noted that the Fourteenth Amendment (in addition to the Fourth Amendment claim that the Circuit allowed to proceed) could have supported a § 1983 malicious prosecution claim for an unreasonable seizure after legal process was instituted—if no adequate state remedy existed to address the unlawful seizure.  *Id.* at 1194 n.3.  The court addresses the other Tenth Circuit case cited by defendants—*Becker*—in just a moment.  That discussion explains how the Tenth Circuit analyzes substantive versus procedural due process under § 1983 after *Albright*.

In sum, *Myers* establishes that the Tenth Circuit doesn't recognize a § 1983 malicious prosecution claim for Fourteenth Amendment procedural due process violations based on fabricating evidence to create false probable cause for an arrest and prosecution leading to an unreasonable seizure as long as an adequate state law remedy exists.  But, plaintiff's Fourth Amendment malicious prosecution claim here is not barred by *Parratt* because such a claim is based on a specific constitutional right.  And, *Myers* doesn't preclude plaintiff's Count I or Count III claims either, because those claims assert separate violations of plaintiff's right to a fair trial—and not malicious prosecution.

In *Becker v. Kroll*, the Tenth Circuit considered two § 1983 claims:  (1) a claim for malicious prosecution under the Fourth and Fourteenth Amendments, and (2) a claim for

67

outrageous conduct violating plaintiff's substantive due process rights under the Fourteenth

Amendment.  494 F.3d 904, 909 (10th Cir. 2007).  There, plaintiff alleged defendants falsely had

accused and prosecuted her for overbilling for services provided to Medicaid patients as part of a

sham to make her pay civil penalties.  *Id.* at 909–12.  Plaintiff also claimed defendants withheld

exculpatory information from her during the investigation.  *Id.*  Namely, defendants arranged for

an independent neurologist to review plaintiff's records, who had concluded her billing was

appropriate.  *Id.* at 910.  But, they never informed plaintiff of the review and continued the

prosecution.  *Id.*

The district court granted summary judgment against all claims, including claims for

denial of due process, malicious prosecution, conspiracy, and substantive due process, among

others.  *Id.* at 912.  On appeal, plaintiff categorized her constitutional violation claims in three

groups:  "(1) malicious prosecution under the Fourth and Fourteenth Amendment; (2) outrageous

conduct under the Fourteenth Amendment's substantive due process component; and (3)

retaliation under the First Amendment."  *Id.* at 913.  And, the Circuit proceeded to consider "the

murky waters of § 1983-based malicious prosecution claims."  *Id.*

The Circuit explained, "[w]e have repeatedly recognized in this circuit that, at least prior

to trial, the relevant constitutional underpinning for a claim of malicious prosecution under §

1983 must be the Fourth Amendment's right to be free from unreasonable seizures."  *Id.* at 914

(citation and internal quotation marks omitted).  The Circuit agreed "with the district court that a

seizure is necessary to support a § 1983 malicious prosecution claim based on the initiation of

criminal proceedings *that are dismissed before trial*."  *Id.* (emphasis added).  But, it also

separately considered whether defendants had deprived plaintiff of "liberty or property interests

without due process of law" violating the Fourteenth Amendment.  *Id.*  Ultimately, the Circuit

concluded she had not alleged a constitutional violation under either the Fourth or Fourteenth Amendment, so it affirmed summary judgment for defendants. *Id.*

On appeal, plaintiff argued her Fourth Amendment claim relied on the investigation into her billing practices. *Id.* This conduct, she asserted, amounted to a seizure because she was required to travel and attend meetings, incur financial burdens, and was charged criminally. *Id.* But, the Tenth Circuit held these burdens did not amount to a seizure under the Fourth Amendment. *Id.* at 914–916. First, Tenth Circuit precedent "analyzing malicious prosecution under § 1983 . . . always [has] proceeded based on a seizure by the state—arrest or imprisonment[,]" and plaintiff was not arrested or imprisoned. *Id.* at 914–15. The Tenth Circuit declined to adopt a broader definition of a seizure, explaining "[a] groundless charging decision may abuse the criminal process, but it does not, in and of itself, violate the Fourth Amendment absent a significant restriction on liberty"—*i.e.,* the Fourth Amendment protects traditional seizures (arrests and incarcerations) pretrial but not other pretrial restrictions on a person's liberty. *Id.* at 915. So, it held, plaintiff "has not successfully alleged a violation of the Fourth Amendment, [and] she cannot proceed in a claim for malicious prosecution based on an unreasonable seizure." *Id.* at 917.

Unlike the *Becker* plaintiff, plaintiff here was seized pretrial. So, "at least prior to trial," Count IV's malicious prosecution claim must be based on "the Fourth Amendment's right to be free from unreasonable seizures." *Id.* at 914 (citation and internal quotation marks omitted). As noted, plaintiff asserts a Fourth Amendment violation for his Count IV malicious prosecution claim. And, like *Myers*, *Becker* doesn't preclude plaintiff's Count IV malicious prosecution claim as a matter of law to the extent it relies on the Fourth Amendment.

On the Fourteenth Amendment claim, the *Becker* plaintiff argued defendants' investigation of her had deprived her of liberty without due process and thus violated "both the procedural and substantive components of due process." *Id.* at 917–18. Analyzing these arguments required the Tenth Circuit to review *Albright* closely. It noted "that a natural reading of Supreme Court precedent in *Albright v. Oliver* seems to foreclose [plaintiff's] argument that [defendants] violated her due process rights by initiating criminal proceedings against her without probable cause."[22] *Id.* at 918. But, because some of the alleged injuries were "outside the scope of the Fourth Amendment's substantive and procedural protections[,]" the Circuit considered whether "[t]hese injuries might be cognizable as due process violations through a gap in constitutional protection created by *Albright*'s limitation of § 1983 malicious prosecution claims to those based on the Fourth Amendment." *Id.*

The Tenth Circuit first summarized *Albright* and its effect on malicious prosecution claims:

> In *Albright*, the [Supreme] Court specifically rejected the plaintiff's claim that his groundless arrest violated substantive due process rights by depriving him of a "'liberty interest' to be free from criminal prosecution except upon probable cause." Instead, the Court concluded that the Fourth Amendment—not substantive due process—governed the plaintiff's claims. The plurality opinion reasoned, "Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment . . . must be the guide for analyzing these claims.'" The plurality concluded, "it is evident that substantive due process may not furnish the constitutional peg on which to hang" a claim of malicious prosecution[.]
>
> We think the unavoidable construction of *Albright* is that no § 1983 claim will arise *from filing criminal charges without probable cause under the substantive due process protections of the Fourteenth Amendment*. And although the plaintiff in *Albright* did not raise a procedural due process claim, *we find Albright's reasoning regarding substantive due process equally persuasive with regard to the Fourteenth*

---

[22]     The Tenth Circuit described the Supreme Court's decision in *Albright* as concluding "that the Fourteenth Amendment does not provide a *substantive* due process right to be free from prosecution without probable cause," but leaving open "the possibility that a plaintiff could bring such a claim under the Fourth Amendment." *Id.* at 915.

> *Amendment's procedural component.  In the initial stages of a criminal proceeding, the Fourth Amendment protects a person's liberty interests* under the Constitution by ensuring that any arrest or physical incarceration attendant to a criminal prosecution is reasonable. *The more general due process considerations of the Fourteenth Amendment are not a fallback to protect interests more specifically addressed by the Fourth Amendment in this context.*

*Id.* at 918–19 (citations omitted) (emphasis added).

In short, the Tenth Circuit interpreted *Albright* to establish that the Fourth Amendment, not substantive or procedural due process, governs *pretrial* deprivations of liberty.  *See id.*  And, because the criminal charges against *Becker*'s plaintiff were dismissed before trial, the Tenth Circuit concluded she "must allege a violation of the Fourth Amendment in order to proceed on a theory of § 1983 malicious prosecution."  *Id.* at 919.  Applying that holding to this case, plaintiff can't rely on substantive or procedural due process for Count IV's § 1983 claim asserting defendants violated his *pretrial* liberty interest not to be prosecuted and seized without probable cause.  After *Albright*, Fourteenth Amendment substantive due process doesn't support a standalone right to be free from prosecution without probable cause where the Fourth Amendment affords protection.  *Id.* at 915, 918–19.

Still, *Becker* recognizes that the Supreme Court "has yet to clarify the scope of the plurality holding in *Albright*," and "several lines of cases suggest an alternative theory of liability under the Fourteenth Amendment."  *Id.* at 919.  So, the Circuit proceeded to determine whether plaintiff had asserted a procedural or substantive due process constitutional claim that didn't fall within the Fourth Amendment's protection against unreasonable seizures.

Plaintiff argued the investigators had violated her procedural due process rights because she had a "liberty interest in being free from unwarranted investigation and prosecution without probable cause."  *Id.*  The Circuit recognized that its earlier decision in *Pierce v. Gilchrist*, 359 F.3d 1279, 1285–86 (10th Cir. 2004), and other cases suggested that "at some point in the

prosecutorial process, due process concerns can be sufficient to support a claim under § 1983"—

*i.e.*, at some point between arrest and trial the constitutional basis for a § 1983 malicious

prosecution claim shifts from the Fourth Amendment to the Due Process Clause.  *Id.* at 920.

But, *Pierce* didn't require the Circuit to decide when the shift to due process begins because

plaintiff had raised claims under both Amendments and he was detained.[23]  *Id.*  In *Becker*,

however, plaintiff never was incarcerated and, without a Fourth Amendment violation, she only

could rely on Fourteenth Amendment due process.  *Id.*

      To decide plaintiff's appeal, the Circuit merely "assume[d] a procedural due process

analysis applie[d]" and held that "she has not established a due process violation."  *Id.*  The

Circuit held that her "procedural due process interests under these facts were adequately

protected by the Fourth Amendment [and] state tort law," so "she has not established a due

process violation."  *Id.* at 919–20.  It explained that under *Albright* the Fourth Amendment

adequately protected her pretrial liberty interests, so she "has no procedural due process claim

based on [pretrial] deprivations of physical liberty."  *Id.* at 920.  And, the Circuit was unaware of

any other circuit extending "Fourteenth Amendment procedural due process guarantees to

[pretrial] deprivations of liberty."  *Id.*  Still, recognizing the Fourteenth Amendment may protect

"harms to liberty outside the scope of the Fourth Amendment's concern with freedom from

restraint, such as harm to reputation resulting in some tangible injury," the Circuit explained that

"even if [plaintiff] did suffer such injuries . . . procedural due process only protects against them

by providing an adequate post-deprivation hearing in which the injured party may vindicate these

interests."  *Id.* at 920–21.  But, plaintiff already had a state tort remedy available—malicious

---

[23]     Here, as in *Pierce*, plaintiff relies on both the Fourth and Fourteenth Amendments to support his malicious prosecution claim.

prosecution or abuse of process—that would meet the requirements of procedural due process. *Id.* at 921.

The Circuit cited *Parratt*, where the Supreme Court "held that where pre-deprivation remedies cannot anticipate and prevent a state actor's wrongful act, post-deprivation state tort remedies are adequate to satisfy due process requirements." *Id.* (citing *Parratt*, 451 U.S. at 535–44). And, the Circuit agreed with Justice Kennedy's concurrence in *Albright*, where he "argued that in § 1983 malicious prosecution cases a 'state actor's random and unauthorized deprivation of [Fourteenth Amendment due process interests] cannot be challenged under 42 U.S.C. §1983 so long as the State provides an adequate post deprivation remedy.'" *Id.* (quoting *Albright*, 510 U.S. at 284 (Kennedy, J., concurring)). Because plaintiff did "not suggest what pre-deprivation process could have anticipated the malfeasance of the [defendant] investigators and protected her from an abusive investigation," the Tenth Circuit "declined to supply procedural requirements in addition to already-established criminal procedure under the Constitution and state [tort] law." *Id.* Utah tort law, the Circuit concluded, provided "an adequate post deprivation remedy to protect [plaintiff's] *non-Fourth Amendment* liberty interests." *Id.* (emphasis added). In short, because plaintiff never was seized implicating Fourth Amendment rights and had adequate state law remedies for injuries not recognized under the Fourth Amendment, the Circuit held she had "suffered no deprivation of liberty in violation of her procedural due process rights." *Id.*

Applying the Tenth Circuit's rationale from *Becker* to this case, plaintiff cannot assert his Count IV § 1983 malicious prosecution claim based on a Fourteenth Amendment procedural due process violation because defendants' malicious prosecution couldn't have been anticipated, predeprivation, and Kansas provides a malicious prosecution tort remedy. This means that plaintiff's procedural due process right not to be prosecuted without probable cause wasn't

violated, because the postdeprivation process is all that the state can be expected to provide—*i.e.*, no due process violation exists because the postdeprivation tort claim satisfies due process.  But, because plaintiff here alleges he was unlawfully seized pretrial, *Becker* establishes that he may assert Count IV's malicious prosecution claim based on a Fourth Amendment violation, which the court considers further in Part III.C.1., below.

    *Becker* next separately analyzed plaintiff's substantive due process arguments.  The Circuit explained that "Justice Souter's concurrence in *Albright* suggested the possibility that initiating an unwarranted prosecution that is dismissed before trial may in some unusual circumstances result in substantive due process violations separate from a Fourth Amendment seizure."  *Id.* at 922.  The Circuit recognized that *Albright* did not foreclose entirely claims based on Fourteenth Amendment substantive due process violations where the Fourth Amendment does not cover the claim but a substantial deprivation of liberty occurs.  *Id.*  And, plaintiff argued her substantive due process rights were violated because (1) the investigation was groundless and designed to collect civil penalties and (2) defendants withheld material exculpatory evidence from her.  *Id.*  But, the Circuit concluded the facts of this case did not "reveal[] a substantial deprivation sufficient to rise to the level of a substantive due process violation."  *Id.*

    First, the Circuit reviewed the groundless investigation conduct.  *Id.* at 923.  The Tenth Circuit and the Supreme Court have set a "high hurdle for substantive due process claims."  *Id.*  The alleged conduct must constitute more than a government actor intentionally or recklessly causing plaintiff's injuries by abusing or misusing government power.  *Id.*  "'[It] must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking.'"  *Id.* (quoting *Livsey v. Salt Lake Cnty.*, 275 F.3d 952, 957–58 (10th Cir. 2001) (further citations omitted)).  And this conscience shocking requirement is satisfied "in only

the most extreme circumstances, typically involving some violation of physical liberty or personal physical integrity." *Id.* *Becker* concluded that the conduct plaintiff alleged about investigators starting a groundless investigation to secure civil penalties did not rise to a truly conscience shocking level because, while improper conduct, it "do[es] not meet the affronts to personal autonomy" required by precedential case law. *Id.* Instead, she must rely on the "well-defined causes of action under state and federal law" rather than substantive due process. *Id.*

Unlike *Becker*'s plaintiff, Count IV's § 1983 malicious prosecution claim here rises to the level of a substantive due process violation. The court concludes that plaintiff—based on his allegations about conduct during his criminal trial—may assert a Fourteenth Amendment substantive due process violation in Count IV for the period after the Fourth Amendment's pretrial protection against unreasonable seizures dissipated. *See Manuel*, 137 S. Ct. at 920 n.8 (noting that "once a trial has occurred, the Fourth Amendment drops out: [a] person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment"). Accepting plaintiff's allegations as true at this stage of the case, defendants' conspiracy to fabricate evidence, withhold evidence, and frame plaintiff for murder "demonstrate[s] a degree of outrageousness . . . that is truly conscience shocking" and has occurred under circumstances involving a violation of plaintiff's physical liberty. *Becker*, 494 F.3d at 923. Indeed, if it didn't rise to that level, it's difficult to imagine any conduct that could suffice. Thus, plaintiff here plausibly has alleged facts rising to a substantive due process violation.

Finally, the Circuit in *Becker* considered plaintiff's arguments about defendants withholding exculpatory evidence from her. *Becker*, 494 F.3d at 923. The Circuit explained that withholding exculpatory evidence claims have "constitutional weight" because of the Supreme

Court's *Brady* decision, which "determined that a defendant's right to access exculpatory evidence is secured by the Due Process Clause." *Id.* at 924. And, the Circuit noted, "[s]everal other circuits have recognized a § 1983 malicious prosecution-type claim under similar circumstances." *Id.* at 923. For example, the Eighth Circuit had recognized law enforcement conduct conspiring to manufacture and intentionally manufacturing damaging evidence would not fall under the Fourth Amendment's protections, but does merit a substantive due process analysis—*Albright* doesn't foreclose it. *Id.* (citing *Moran v. Clarke*, 296 F.3d 638, 647 (8th Cir. 2002) (en banc) (*abrogated on other grounds by Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911 (2017))). The Eighth Circuit didn't explain explicitly why it "rejected *Albright*'s language limiting § 1983 malicious prosecution to claims based on the Fourth Amendment," but the Tenth Circuit concluded the Eighth Circuit "seem[ed] to base its holding . . . in the substantive due process protections against outrageous and arbitrary government conduct [that] Justice Souter alluded to in his *Albright* concurrence" or rely on "a violation of the right to a fair trial" rather than the right not to be prosecuted except upon probable cause that was at issue in *Albright*. *Id.* at 923 n.13 (citing *Moran v. Clarke*, 359 F.3d 1058, 1061 (8th Cir. 2004)).

The Circuit also noted that the Fourth, Fifth, and Seventh Circuits had allowed § 1983 claims of "constitutional weight" to proceed under the Fourteenth Amendment despite *Albright* where the claims are based on a violation of the "due process right to a fair trial," and not a right not to be prosecuted without probable cause. *Id.* at 924 (citations omitted). But, the Tenth Circuit ultimately did not decide whether it would allow a § 1983 claim based on fabricated inculpatory evidence or withholding exculpatory evidence under Fourteenth Amendment substantive due process or otherwise. Instead, it explained that a *Brady* violation for withholding exculpatory evidence—a due process claim of "constitutional weight"—only can exist when the

76

case goes to trial.  *Id.* at 924.  And the *Becker* plaintiff never went to trial, so she could not "rest her § 1983 claims on a *Brady* violation" and "ha[d] not established a claim for a violation of substantive due process under the Fourteenth Amendment."  *Id.*  (explaining a *Brady* violation requires proof that "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense" (citation and internal quotation marks omitted)).  The Tenth Circuit concluded that "even if *Albright* [did] not foreclose" plaintiff's substantive due process claim with its holding that substantive due process does not provide protection for malicious prosecution claims because the Fourth Amendment governs such claims, "she has not presented a substantive due process violation" because she "never proceeded to trial."  *Id.* at 918 & n.9, 924.

So, while *Becker* didn't consider § 1983 claims like those plaintiff asserts in Count I and Count III, *Becker* recognizes such claims may present viable § 1983 claims.  Though the criminal case against *Becker*'s plaintiff never reached trial, the Circuit recognized the potential for § 1983 substantive due process claims where a plaintiff—as is the case for plaintiff here— went to trial and suffered a due process violation based on fabricated or suppressed evidence that materially affected the trial—*i.e.*, where the fabricated evidence or suppressed evidence undermined confidence in the trial's outcome.  *Id.*  So, *Becker* didn't foreclose plaintiff's Count I and Count III claims here, contrary to defendants' dismissal argument.

In sum, *Becker* holds plaintiff must rely on the Fourth Amendment's protections for his *pretrial* seizure and prosecution without probable cause.  And, *Becker* holds plaintiff's Count IV malicious prosecution claim cannot rely on a *procedural* due process violation because Kansas provides a malicious prosecution tort, which is all the procedural due process the state is required to provide for random and unauthorized deprivations of plaintiff's rights against unlawful pretrial

detention and malicious prosecution lacking probable cause.  But, *Becker* doesn't foreclose plaintiff's ability to rely on a Fourteenth Amendment substantive due process violation for his Count IV malicious prosecution claim to the extent the Fourth Amendment has left a "gap in constitutional protection" and a substantial liberty deprivation exists.  *Id.* at 918, 923.  Nor does it foreclose his Count I and Count III claims based on his right to a fair trial.  So, the court declines to dismiss Counts I, III, or IV based on violations of substantive due process or the Fourth Amendment.

In contrast, the court concludes that *Myers* and *Becker* preclude plaintiff's Fourteenth Amendment *procedural* due process claims in Counts I, III, and IV.  These binding precedent hold a § 1983 malicious prosecution claim based on a Fourteenth Amendment *procedural* due process violation is not viable where an adequate state law remedy exists.  Kansas allows a malicious prosecution tort and the Circuit has held such a recognition is an adequate remedy for purposes of this analysis.  Though *Myers* and *Becker* only considered claims in the pretrial context, the court finds the Tenth Circuit's *Parratt* rationale for § 1983 malicious prosecution *procedural* due process claims also would apply to plaintiff's Count I and Count III's claims to the extent they rely on *procedural* due process rights, not substantive rights.  Like malicious prosecution during the pretrial stage, the state couldn't have anticipated the random and unauthorized conduct at plaintiff's trial, so *Parratt*—together with the availability of a Kansas tort claim—bars any procedural due process component of those claims.

But, *Myers* and *Becker* do not preclude as a matter of law plaintiff's Count I and Count III claims, which rely on a substantive due process right to a fair trial—and not on the right not to be prosecuted without probable cause.  Nor do they foreclose Count IV's claim to the extent it

asserts a Fourth Amendment violation or a substantive due process violation where a gap in the Fourth Amendment's protection exists.

### iii.    Additional Tenth Circuit Law and Persuasive Authority from other Circuits

The court's conclusion that Counts I and III survive defendants' Motion to Dismiss to the extent they rely on the substantive due process right to a fair trial is reinforced by other Tenth Circuit and persuasive authority.

In a post-*Albright* and post-*Parratt* case, the Tenth Circuit, as in *Becker*, recognized the potential for a § 1983 claim based on a *Brady* violation and plaintiff's *substantive* due process right to a fair trial.  In *Morgan v. Gertz*, plaintiff alleged a violation of his "Fourteenth Amendment *substantive* due process rights" because defendants had destroyed exculpatory evidence.  *Morgan v. Gertz*, 166 F.3d 1307, 1309–10 (10th Cir. 1999) (emphasis added). Specifically, a case worker and police detective interviewed a young girl to determine if she was being sexually abused by her stepfather.  *Id.* at 1308.  The first interview was recorded, and the girl gave no indication of abuse.  *Id.*  About six weeks later, they re-interviewed the girl because she since had disclosed details of sexual abuse.  *Id.*  At this second interview, the case worker couldn't find a new blank tape, so she taped over the first interview.  *Id.*  The girl's stepfather, Albert Morgan, then was charged with sexual assault and aggravated incest because of the girl's disclosures during the second interview.  *Id.*  At Morgan's criminal trial, the case worker and detective were questioned about their handling of the first interview tape.  *Id.*  And, Morgan moved for acquittal based on the intentional destruction of exculpatory evidence.  *Id.*  The jury returned a guilty verdict.  *Id.*  But, before entering a judgment of conviction, the court concluded

a *Brady v. Maryland*[24] violation had occurred because the absence of the first interview tape deprived Morgan of a fair trial. *Id.* at 1308–09. The court thus entered a judgment of acquittal. *Id.* at 1308–09.

Morgan then filed a § 1983 action in federal court arguing that the intentional destruction of exculpatory evidence violated his Fourteenth Amendment *substantive* due process rights. *Morgan*, 166 F.3d at 1309–10. The district court granted summary judgment in part for defendants, "concluding entry of the judgment of acquittal provided Morgan all the remedy to which he was entitled." *Id.* at 1309. On appeal, the Circuit first endeavored to determine "the specific constitutional right allegedly infringed" because § 1983 "is not itself a source of substantive rights" and courts must keep in mind the Supreme Court's guidance in *Albright* against "broaden[ing] the concept of substantive due process." *Id.* at 1309–10 (citation and internal quotation marks omitted). The Circuit explained the duties to "disclose and preserve impeachment/exculpatory evidence are grounded in the due process right to a *fair trial*." *Id.* at 1310. And so, "withholding or destruction of evidence violates a criminal defendant's constitutional rights only if, as a result of the withholding or destruction of evidence, the criminal defendant is denied a fair trial." *Id.* (citations omitted).

But, the Circuit concluded plaintiff hadn't alleged a constitutional violation. *Id.* The Circuit explained that cases alleging violations of constitutional rights because of a failure to comply with disclosure and preservation duties fall into two categories. *Id.* Where criminal charges are dismissed *before trial*, "the right to a fair trial is not implicated and, therefore, no cause of action exists under § 1983." *Id.* But, where *convictions are returned* and affirmed on

---

[24]     The Circuit noted that *Brady* "focuses on the duty to *disclose* exculpatory evidence," and the state had disclosed details of the first interview to Morgan. *Id.* at 1309. So, Morgan's argument was controlled not by *Brady* but, instead, by *Arizona v. Youngblood*, 488 U.S. 51 (1988), which governs "the duty to *preserve* exculpatory evidence." *Id.*

direct appeal, *but later are overturned* by way of collateral proceedings, "courts have permitted the exonerated defendant to pursue § 1983 claims based on the denial of a fair trial." *Id.* Because Morgan's case fell within the first category of violations, the Circuit affirmed the district court's summary judgment for defendants. *Id.*

The Circuit explained that the trial court never had entered a judgment of conviction—it acquitted Morgan after the jury found him guilty, but before entering a judgment. *Id.* So, "[r]egardless of any misconduct by government agents before or during trial, a defendant who is acquitted cannot be said to have been deprived of the right to a fair trial." *Id.*; *see also Bailey v. Twomey*, 791 F. App'x 724, 735 (10th Cir. 2019) (reaffirming the Circuit's decision in *Morgan* that a plaintiff who was acquitted before or during a criminal trial cannot assert a Fourteenth Amendment claim for a violation of her right to a fair trial because someone who is acquitted isn't deprived of a fair trial, after separately considering Fourth Amendment malicious prosecution claim).

In short, the Tenth Circuit has recognized the potential for Fourteenth Amendment substantive claims based on the right to a fair trial, separate from a § 1983 malicious prosecution claim. *See Tiscareno v. Frasier*, 603 F. App'x 672, 674, 678–81 (10th Cir. 2015) (considering claim that defendant failed to disclose exculpatory evidence required by *Brady* and allegation that defendant maliciously prosecuted plaintiff as two separate claims, and holding defendant was entitled to qualified immunity on *Brady* claim asserting defendant had violated plaintiff's right to a fair trial because plaintiff wasn't convicted so she couldn't have been deprived of a fair trial); *see also Jackson v. Geier*, No. 91-2041-V, 1991 WL 278625, at *2–4 (D. Kan. Dec. 24, 1991) (agreeing with defendants' *Parratt* argument that plaintiff couldn't bring § 1983 Fourteenth Amendment procedural due process claims for his arrest, day-long incarceration, and

possible charges against him because Kansas law recognized false arrest, false imprisonment, and malicious prosecution claims, but rejecting argument that *Parratt* precluded plaintiff's substantive Fourth Amendment claim that defendants violated his right to be free from unreasonable seizures or any claims that defendants deprived him of other substantive constitutional rights because these § 1983 claims were not barred by *Parratt* despite the existence of state tort remedies).

These cases convince the court that the Tenth Circuit likely would recognize § 1983 claims based on fabricated evidence or withheld exculpatory evidence where a plaintiff has been deprived of a fair trial, in addition to § 1983 malicious prosecution claims based on substantive rights under the Fourth or Fourteenth Amendments.  Here, plaintiff alleges defendants violated his constitutional right to a fair trial.  And he asserts these claims after he was convicted and spent 15 years in prison.  Thus, the claims in Count I and Count III fall into the second category recognized by the Circuit in *Morgan*—a category permitting a plaintiff to pursue § 1983 claims based on the denial of a fair trial.

Other Circuits, despite *Parratt*, also have considered § 1983 claims like those asserted in Count I and Count III.  *See, e.g.*, *Castellano v. Fragozo*, 352 F.3d 939, 942, 956–58 (5th Cir. 2003) (recognizing § 1983 claims for Fourteenth Amendment violations because "a state's manufacturing of evidence and knowing use of that evidence along with perjured testimony to obtain a wrongful conviction deprives a defendant of his long recognized right to a fair trial secured by the Due Process Clause, a deprivation of a right not reached by the *Parratt* doctrine"); *id.* at 962 (Jones, J., concurring and dissenting) (listing cases that have allowed such claims to proceed without mentioning *Parratt* and opining that she would not conclude a state malicious prosecution claim's availability precludes a constitutional remedy where manufactured

evidence and perjured testimony is used to secure conviction); *Newsome v. McCabe*, 256 F.3d 747, 751–53 (7th Cir. 2001) (holding there is no standalone constitutional right not to be prosecuted without probable cause where an adequate state law remedy exists, but also holding *Parratt* doesn't bar a claim that officers withheld exculpatory evidence); *cf. Halsey v. Pfeiffer*, 750 F.3d 273, 279, 289–94 (3d Cir. 2014) (concluding standalone § 1983 claim for fabricating evidence exists under the Fourteenth Amendment separate from Fourth Amendment malicious prosecution claim where defendant is prosecuted and convicted using fabricated evidence).

The court finds a Seventh Circuit case with some strikingly similar facts to those alleged here particularly instructive.  In it, a plaintiff alleged the prosecutor and lab technicians "deprived him of his liberty without due process of law by destroying exculpatory evidence to frame him for [ ] murder."  *Armstrong v. Daily*, 786 F.3d 529, 531 (7th Cir. 2015).  *Armstrong*'s plaintiff was imprisoned for 29 years for raping and murdering the victim.  *Id.*  His conviction in Wisconsin state court was set aside because of newly available evidence due to advancements in DNA testing.  *Id.* at 535.  But, before he could be retried, the prosecution destroyed exculpatory evidence making a fair trial impossible, and the Wisconsin court thus dismissed the criminal charges against plaintiff.  *Id.* at 531.  Plaintiff had spent three more years in prison after the DNA evidence's destruction before the case was dismissed.  *Id.* at 536.

The *Armstrong* plaintiff's § 1983 suit alleged the prosecutor focused on plaintiff as the murderer and did whatever was necessary to build a case against him.  This included destroying potentially exculpatory evidence from the crime scene (drug paraphernalia that could have implicated the real killer was mishandled and lost or destroyed), concealing a confession from the actual killer, and directing lab technicians to perform an inconclusive DNA test that consumed the last sample of evidence that could have proven plaintiff's innocence, among other

indiscretions.  *Id.* at 532.  Plaintiff believed his brother was the murderer, and his brother even

had confessed to an acquaintance who then informed the prosecutor.  *Id.*  Plaintiff alleged the

prosecutor never disclosed this call advising that plaintiff's brother had confessed.  *Id.* at 536.

And, the inconclusive DNA test—ordered by the prosecutor without notice to the court or

defense—was unable to distinguish between family members and—had they used a different

test—the results could have exonerated plaintiff.  *Id.* at 532.

The Seventh Circuit held that *Parratt* did not bar the *Armstrong* plaintiff's federal due

process claims based on the destruction or loss of exculpatory evidence, despite the availability

of state tort remedies for the same wrongs.  *Id.*  It concluded the *Parratt* doctrine "does not apply

to the actions of law enforcement officers that undermine the fairness of a criminal trial."  *Id.*

And, it concluded the bad-faith destruction or loss of exculpatory evidence was clearly

established as a violation of a suspect's due process rights under *Brady*, so the police and

prosecutor were not entitled to qualified immunity.  *Id.* (explaining *Brady* established in 1963

that prosecutors can't suppress exculpatory evidence, so no reasonable police officer or

prosecutor would have concluded it was acceptable to destroy such evidence).  The Seventh

Circuit found defendants' argument that a state tort would provide "a remedy sufficient to satisfy

federal due process requirements" to be "profoundly mistaken."  *Id.* at 539.  The Circuit held

*Parratt* did not bar plaintiff's claims for three reasons.

First, *Armstrong* concluded that "[n]o court has suggested" that *Parratt* applies to bar

claims based on "wrongful conduct" that "corrupted fair fact-finding in the criminal justice

system."  *Armstrong*, 786 F.3d at 539.  Instead, claims "seek[ing] to vindicate rights of fairness"

differ from procedural due process claims which "seek only notice and a hearing before a

deprivation occurs."  *Id.* at 539–40.  In short, the Seventh Circuit concluded plaintiff asserted

*substantive* due process claims when he alleged defendants had violated his right to exculpatory evidence, because he wasn't seeking notice and hearing or alleging some flaw in the procedure like prosecution without probable cause, but had alleged that law enforcement had "acted in bad faith to undermine the reliability of a trial." *Id.* at 540 (citing Justice Kennedy's concurrence in *Albright* distinguishing between fundamental fairness of a trial from claims "limited to prosecution without probable cause," finding the former to be "beyond the reach of *Parratt*"). And, the Seventh Circuit explained every court who had considered *Parratt* in the wrongful conviction context had rejected its application. *Id.* at 540–41. This court is persuaded by this aspect of the Seventh Circuit's reasoning in *Armstrong*. A claim based on violating plaintiff's right to a fair trial alleges a fundamental due process violation and is beyond the reach of *Parratt*.

Second, *Armstrong* found *Parratt* is limited to cases where plaintiff claims he was denied a meaningful predeprivation hearing, but the circumstances would make such a hearing impractical and where the deprivation wasn't accomplished through state procedures. *Id.* at 541–43. The Seventh Circuit declined to read *Parratt* and *Hudson* broadly in a way that would "bar virtually all § 1983 due process claims so long as state law offers some post-deprivation remedy." *Id.* at 542. A post-deprivation remedy, the Seventh Circuit explained, can't cure certain failures to provide a fair pre-deprivation hearing because such a reading of *Parratt* would conflict with "decades of precedent establishing that violations of due process . . . are actionable under § 1983." *Id.* Otherwise, if a post-deprivation tort remedy could "cure any due process problem," long-standing requirements of due process—like a tenured employee's right not to be fired without prior notice and a hearing—would disappear. *Id.* Instead, the Seventh Circuit explained that a plaintiff can bring a supplementary § 1983 claim for substantive due process

constitutional violations even if state law remedies also are available because a state official's conduct violated state law in addition to the Constitution. *Id.* at 542–43. Again, the Seventh Circuit's reasoning is persuasive. A post-deprivation malicious prosecution tort can't cure what long-standing precedent has recognized as a due process violation—depriving a defendant's right in a criminal trial to a fair trial. And, though a state tort remedy also may exist, the § 1983 constitutional claim is viable as supplementary to that remedy.

Finally, the Seventh Circuit's opinion in *Armstrong* explained that *Parratt* doesn't apply to facts like those presented *Armstrong*. *Id.* at 545–546. Not only did the Seventh Circuit conclude defendants' conduct wasn't random and unauthorized, but the Circuit also explained that "this is not a case where a pre-deprivation hearing would have been impractical" because plaintiff wasn't "deprived of his liberty until after he had gone through the most elaborate pre-deprivation procedural protections known to American law: a criminal trial." *Id.* at 545. And, plaintiff's claim was "that the procedure he was due . . . was rendered unfair by [defendants'] wrongdoing." *Id.* The Seventh Circuit reasoned *Parratt* doesn't apply because "the state tort of malicious prosecution simply does not provide an adequate remedy for the deprivations . . . alleged." *Id.* at 545–46. This is so, *Armstrong* explained, because plaintiff's "federal constitutional guarantee of due process" clearly was violated—he lost "his liberty upon conviction at trial"—and only years later could he pursue remedy." *Id.* at 546. The postdeprivation state law remedy doesn't make it so that no constitutional due process violation has occurred. *Id.* It's simply another means to recover money damages, which is "all the civil legal system can offer." *Id.* But, it's not "an adequate or meaningful remedy for years of wrongful imprisonment such that one can say there was no constitutional violation in the first

place." *Id.*  Thus, the Seventh Circuit held that *Parratt* didn't bar the *Armstrong* plaintiff's claims.

The Seventh Circuit's reasoning fits the current case well.  That Kansas provides a malicious prosecution tort remedy does not mean plaintiff's constitutional due process guarantee wasn't violated when he was denied a fair trial simply because he has a postdeprivation claim available to him.  While a state law or federal § 1983 claim are all that the legal system can offer, his allegations rise to the level of a constitutional due process violation and *Parratt* does not bar him from proceeding on his § 1983 claims.

The Jefferson County defendants assert one final argument.  They contend the court should apply *Parratt* to substantive procedural due process claims as well.  Doc. 152 at 13–14. To support this argument, they rely on dicta from a 2015 Tenth Circuit opinion and two concurring opinions from then Judge Gorsuch, written while a member of our Circuit. Specifically, in 2015, the Tenth Circuit considered whether a plaintiff can assert a Fourteenth Amendment substantive due process claim under § 1983 in *Browder v. City of Albuquerque*.  787 F.3d 1076, 1078 (10th Cir. 2015).

In *Browder*, a police officer finished his shift, took a police cruiser, turned on its emergency lights, and drove well over the speed limit on city streets while not performing any police business.  *Id.* at 1077.  He ignored a red light and hit another car, killing one person and severely injuring another, the deceased's sister.  *Id.*  The survivor and her family sued the officer under § 1983 alleging a Fourteenth Amendment substantive due process violation.  *Id.* at 1077– 78.  The defendant argued qualified immunity barred the claim.  *Id.* at 1077.  The Tenth Circuit disagreed—the officer was not entitled to qualified immunity for his actions.  *Id.*

The Circuit explained that "[t]he Supreme Court has interpreted [the Fourteenth Amendment's due process] language as guaranteeing not only certain procedures when a deprivation of an enumerated right takes place (procedural due process), but also as guaranteeing certain deprivations won't take place without a sufficient justification (substantive due process)." *Id.* at 1078. But, the substantive due process doctrine "should be applied and expanded sparingly." *Id.* A court's first task is to carefully describe the "allegedly violated right" and determine if it counts as a "'fundamental right,'" *i.e.*, a right "'objectively, deeply rooted in this Nation's history and tradition.'" *Id.* (citations omitted). Then, the court must determine whether the "government's alleged infringement of the right in question was direct and substantial." *Id.* (citations, alterations, and internal quotation marks omitted). Finally, "[i]f the plaintiff's injury meets these tests [the court] then assess[es] whether the government can muster sufficient justification for its actions." *Id.* "If the infringement is the result of executive action, the Supreme Court has instructed [the courts] to ask whether that action bears 'a reasonable justification in the service of a legitimate governmental objective' or if instead it might be 'characterized as arbitrary or conscience shocking.'" *Id.* at 1078–79 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998) (further quotation omitted)).

The Circuit and district court agreed with plaintiffs. Defendant's actions had crossed the line and qualified as arbitrary or conscience shocking. *Id.* at 1079. Defendant's alleged actions amounted to reckless or deliberate indifference to the fundamental right to life of others, so the Circuit upheld the district court's decision denying defendant's motion to dismiss. *Id.* at 1079–83.

But the Circuit's opinion in *Browder* declined to decide the "open question" "whether *Parratt* requires the plaintiff to show that state law supplies no adequate remedial course before

proceeding in federal court" because defendant had forfeited any *Parratt* argument. *Id.* at 1081. In dicta, the Circuit noted that "[e]ven if the plaintiff can satisfy these [substantive due process] standards, when a state tort suit can provide the same relief as a § 1983 claim and there's no reason to suppose a state court won't fairly hear the claim it is an open question whether federal courts—though empowered to hear the suit—should abstain in favor of the state remedial processes." *Id.* at 1079 (first citing *Parratt*, 451 U.S. at 451; then citing *Lewis*, 523 U.S. at 840 n.4 (further citations omitted)). But, the Circuit "reserve[d] for another day the question whether [*Parratt*] applies to substantive due process claims." *Id.* (citation omitted).

In their Reply, defendants rely on this passage from *Browder* and argue—if plaintiff here tries to assert substantive due process claims (the court concludes he has)—*Parratt* also should preclude his substantive due process claims. Doc. 152 at 13. They also rely on two concurring opinions by Judge Gorsuch, where he opined that he would apply *Parratt* to substantive due process claims. *See Cordova v. City of Albuquerque*, 816 F.3d 645, 661–662 (10th Cir. 2016) (Gorsuch, J., concurring) (opining he would not find a Fourteenth Amendment malicious prosecution claim—whether procedural or substantive—viable after *Parratt* where a state law malicious prosecution claim is available and provides an adequate remedy for the deprivation because "at least seven justices" in *Albright* "seemed to agree that the 'substantive' component of the Fourteenth Amendment's due process clause contains nothing like" a malicious prosecution tort and a malicious prosecution state tort adequately can remedy an "individual's procedural due process rights"); *Browder*, 787 F.3d at 1083–86 (Gorsuch, J., concurring) (promoting abstention where common law can supply a "sound remedy" and "vindicate fundamental rights" without needing to create a constitutional tort under § 1983, and concluding federal courts only should hear such a claim "if a state has overridden the common law and

erected a statutory immunity where the Constitution would recognize none" or where a state has a "facially adequate law . . . but act[s] discriminatorily in practice" or if "a state rule, policy, or custom itself caused the injury" and a potential conflict of interest exists).

For *Browder* specifically, Judge Gorsuch explained that state courts often provide relief following traffic accidents via state law tort suits. *Browder*, 787 F.3d at 1084. So, while a federal court also could provide relief under constitutional tort principles where the conduct was arbitrary or conscience shocking, Judge Gorsuch would decline to have a federal court wade into less certain Fourteenth Amendment substantive due process doctrine when the state tort law system is adequate. *Id.* at 1084–85. In short, Judge Gorsuch would apply *Parratt* to both procedural and substantive due process claims:

> [I]t's hard to identify a principled justification for extending *Parratt* piecemeal to procedural due process claims rather than wholesale to all due process claims. *Zinermon* observed that a substantive due process violation is complete upon a deprivation while a procedural due process violation requires us to wait and see what process the state provides. But it's unclear why that distinction makes a difference when *Parratt*'s logic cuts across both kinds of cases, asking in all events whether there's a need for federal intervention or whether state remedial processes might do just as well.

*Id.* at 1085.

Here, the court declines to apply Judge Gorsuch's view because, as defendants recognize, the Tenth Circuit hasn't decided conclusively that *Parratt* applies to substantive due process claims as well as procedural ones. Doc. 52 at 13–14. *Browder* shows the Tenth Circuit hasn't foreclosed substantive due process claims under *Parratt* yet. And, neither the dicta in *Browder* nor Judge Gorsuch's concurring opinions bind this court. The court declines to apply *Parratt* to plaintiff's substantive due process claims and thus concludes those claims aren't precluded as a matter of law.

### e.  Conclusion

In sum, defendants have not established that *Parratt* bars plaintiff's § 1983 claims in Counts I, III, and IV in their entirety as a matter of law.  The court agrees plaintiff's § 1983 claims, to the extent they allege *procedural* due process violations, are barred because Kansas provides a malicious prosecution tort.  Under *Myers* and *Becker*, the Tenth Circuit found similar malicious prosecution conduct to be random and unauthorized and applied *Parratt* to bar § 1983 malicious prosecution *procedural* due process claims.  But, plaintiff's claims also allege *substantive* Fourteenth Amendment violations, and *Becker* and *Browder* demonstrate that the Tenth Circuit hasn't foreclosed substantive due process claims under *Parratt*—at least not yet. So, the court doesn't dismiss plaintiff's § 1983 substantive due process claims based on his right to a fair trial (Count I and Count III), or his § 1983 malicious prosecution claim based on an unreasonable seizure violating the Fourth Amendment or based on a substantive due process right against conscience shocking conduct that results in a substantial liberty deprivation not covered by Fourth Amendment's protections (Count IV).

The Jefferson County defendants' first argument for dismissing the § 1983 claims alleging Fourteenth Amendment violations—an adequate state law remedy—doesn't foreclose plaintiff's claims in Counts I, III, and IV in their entirety.  The court considers defendants' separate arguments against Count IV's § 1983 malicious prosecution claim *infra* Part III.C.  The court now turns to defendants' arguments that plaintiff hasn't alleged adequately facts to satisfy the elements essential to his claims in Count I and Count III:  that defendants acted with the requisite culpable state of mind to support a § 1983 claim, that the fabricated or suppressed evidence was material to his trial, and that plaintiff lacked a meaningful opportunity to be heard by a jury.

### 2.  Intent or Malice

Next, defendants argue plaintiff hasn't alleged that the individual Jefferson County defendants acted with "a sufficiently culpable mental state."  Doc. 145 at 23.  Defendants contend plaintiff's allegations show mere negligence and not conduct egregious enough to support a constitutional deprivation of due process, as claimed in for Count I and Count III.  *Id.* at 23–24.  Specifically, they argue plaintiff's allegations that Mr. Herrig, Mr. Frost, and Mr. Poppa intentionally avoided examining Tom's house, truck, and belongings "with sufficient rigor" don't explain how a different evidence collection method would have exculpated him.  *Id.* at 23.  And, they contend plaintiff's allegations about their states of mind are bare and conclusory, and thus he "fails to allege the requisite bad faith."  *Id.*

It's true that "the Due Process Clause is simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life, liberty, or property."  *Daniels v. Williams*, 474 U.S. 327, 328 (1986).  Instead, to implicate the Due Process Clause, something more deliberate rising to arbitrary government action is required for a *constitutional* deprivation.  *Id.* at 331–32.  But, where state actors knowingly use false evidence to secure a conviction, their conduct violates the Fourteenth Amendment's due process protection.  *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *see also Anthony v. Baker*, 767 F.2d 657, 662–63 (10th Cir. 1985) (explaining state officers are liable under § 1983 when they "conspire to procure groundless state indictments and charges based upon fabricated evidence or false, distorted, perjurious testimony . . . to maliciously bring about a citizen's trial or conviction," provided the conduct is "so egregious as to subject the aggrieved individual to a deprivation [of due process] of Constitutional dimension" (citations and internal quotation omitted)); *id.* at 665 (describing how evidence could support a finding of malice because others testified that the officer's investigation

wasn't conducted in a "fair and objective" manner but in a way focused on convicting plaintiff, whatever it took).  Likewise, state actors may be liable for a Fourteenth Amendment due process violation under § 1983 if they knowingly or recklessly withhold or destroy exculpatory evidence and those actions deny plaintiff a fair criminal trial.  *Tiscareno v. Anderson*, 639 F.3d 1016, 1021–23 (10th Cir. 2011), *vacated on other grounds by* 421 F. App'x 842 (10th Cir. 2011); *Pierce v. Gilchrist*, 359 F.3d 1279, 1293 (10th Cir. 2004); *Morgan v. Gertz*, 166 F.3d 1307, 1310 (10th Cir. 1999).

Plaintiff's allegations here—accepted as true at the motion to dismiss stage—suffice to support an inference that each defendant held the requisite culpable mental state for the fabricating evidence and *Brady* claims.  Plaintiff alleges that the defendant officers "deliberately concealed and suppressed the evidence that would have proven [plaintiff's] innocence" because they "withheld all of the details of Tom's numerous confessions, including his explanation for where and why he had killed Camille and facts he could have known only by committing the murder himself."  Doc. 141 at ¶ 5.  He also alleges they fabricated Tom's recanted confession that implicated plaintiff, continually silenced Tom, and worked to create facts to pin guilt on plaintiff.  *Id.* at ¶ 4.  He asserts defendants conspired to frame plaintiff for Tom's crime.  *Id.* at ¶¶ 43, 47.

And, as discussed in more detail *supra* Part III.A., the various allegations against defendants in the Second Amended Complaint collectively are supported with specific allegations about each individual Jefferson County defendant permitting a reasonable inference that they joined the conspiracy.  Plaintiff alleges Mr. Carreno helped come up with the fabricated roadside meeting where plaintiff provided Tom details of the murder and then coached Tom to provide this false explanation about how he knew details of the murder.  *Id.* at ¶¶ 52–53, 65.

93

Plaintiff alleges Mr. Frost fabricated a confession by plaintiff placing plaintiff at his house around the time Camille disappeared. *Id.* at ¶¶ 89–92. Mr. Poppa withheld documentation of Tom's inculpatory statements when he turned himself in that "revealed an insider's knowledge of the murder." *Id.* at ¶ 71. Mr. Carreno withheld documentation about Tom's activities and statements after the murder. *Id.* at ¶ 72. Mr. Frost "withheld evidence that Tom had a history of pursuing young girls roughly Camille's age and had made sexual advances toward Camille just a few weeks before her disappearance." *Id.* at ¶ 74. And, plaintiff alleges the defendant officers purposefully didn't use proper search and evidence collection techniques. *Id.* at ¶ 78. Specifically, Mr. Herrig, Mr. Frost, and Mr. Poppa rigorously searched plaintiff's home and car, but didn't do the same searches of Tom's house and car. *Id.* at ¶¶ 79, 81–82. They let Tom's father handle the murder weapon. *Id.* at ¶ 81. They also "intentionally declined to collect any physical evidence" from Tom's truck, where he confessed he had shot Camille, and from the shovel Tom confessed he had used to bury Camille. *Id.* at ¶ 82. Finally, plaintiff makes allegations about the contents of Tom's suicide note, *i.e.*, Tom's note recites that the Jefferson County police made him lie. *Id.* at ¶¶ 7, 66, 101.

These allegations support plaintiff's claim that the defendant officers conspired to prosecute and convict plaintiff for a murder they knew he didn't commit by fabricating inculpatory evidence and suppressing exculpatory evidence. Their alleged actions could support a reasonable inference that they possessed the requisite state of culpability and weren't merely negligent. The Tenth Circuit has recognized that the district court properly can infer malice so long as the allegations, if proven, would support a finding that defendant acted with malice. *See Pierce*, 359 F.3d at 1296–97 (affirming district court's conclusion that "the allegations, if proven, would support that Defendant possessed malice" when performing the alleged actions);

*id.* at 1293 (explaining that the actions of one who "prevaricates and distorts evidence to convince the prosecuting authorities to press charges" can be said to have caused the prosecution); *see also Cruz*, 21 F. Supp. 3d at 1183 (explaining malice or wrongful purpose is often a question of fact for the jury and the court may infer malice from the absence of probable cause).  In short, defendants' second dismissal argument—that the Fourteenth Amendment Due Process claims fail as a matter of law because malice is missing—does not support defendants' motion to dismiss.

### 3.   Materiality

Defendants also claim the Fourteenth Amendment due process claims fail as a matter of law because plaintiff hasn't identified "a material fabrication or suppression in which any of the Jefferson County Defendants personally participated."  Doc. 145 at 24.  The court first considers whether plaintiff has alleged the Jefferson County defendants fabricated material evidence. Then, the court considers whether plaintiff has alleged the Jefferson County defendants withheld material evidence.

### a.   Fabricating Inculpatory Evidence

Where a plaintiff alleges state authorities knowingly used perjured testimony or false evidence to secure a conviction, he has alleged deprivation of his constitutional right to due process.  *Pyle v. Kansas*, 317 U.S. 213, 214, 216 (1942); *see also Halsey v. Pfeiffer*, 750 F.3d 273, 279, 289–94 (3d Cir. 2014) (holding § 1983 supports a standalone claim for fabricating evidence under the Fourteenth Amendment separate from a Fourth Amendment malicious prosecution claim where a criminal defendant is convicted based on the fabricated evidence); *Washington v. Wilmore*, 407 F.3d 274, 277, 282 (4th Cir. 2005) (recognizing § 1983 claim alleging officer fabricated evidence that plaintiff possessed non-public knowledge about the

crime as a constitutional violation because it "resulted in a deprivation of [plaintiff's] liberty"—he was convicted and sentenced to death—and treating claim as separate from a *Brady* violation claim). The Third Circuit's approach applies a materiality requirement to § 1983 fabrication claims that is similar to *Brady* claims. As discussed in the next paragraph, this reasoning permits a § 1983 claim based on defendants' use of fabricated evidence to secure a conviction where "there is a reasonable likelihood that, without the use of that evidence, the defendant would not have been convicted." *Halsey*, 750 F.3d at 294–95 (explaining false evidence supports a § 1983 claim where it "could . . . have affected the jury's verdict"—*i.e.*, when the evidence "was so significant that it could have affected the outcome of the criminal case"). The Tenth Circuit has applied a similar standard for § 1983 malicious prosecution claims and thus, the court predicts the Circuit likely would apply a materiality threshold for a standalone § 1983 fabrication claim based on plaintiff's right to a fair trial too. *See Pierce*, 359 F.3d at 1292 (explaining the Tenth Circuit "has previously held that officers who conceal and misrepresent *material* facts . . . are not insulated from a § 1983 claim for malicious prosecution" (emphasis added)).

Defendants argue the Second Amended Complaint's allegations describing how the defendant officers fabricated Tom's retracted confession, made up a roadside meeting where plaintiff confessed to the crime, and falsely claimed plaintiff went home around the time Camille disappeared don't amount to a constitutional due process violation because these allegations wouldn't have affected the outcome of plaintiff's criminal case. Doc. 145 at 25–26. They contend materiality and causation are lacking, so plaintiff hasn't alleged a constitutional violation. *Id.* at 26. The Jefferson County defendants contend the allegation about Mr. Frost fabricating that plaintiff went home the evening Camille disappeared isn't material because no inculpatory evidence was found at plaintiff's house. *Id.* They assert that investigators secured a

search warrant based on that alleged fabricated confession, but when they searched plaintiff's home no inculpatory evidence was found. *Id.* And, defendants argue, plaintiff's other allegations about fabricated evidence don't satisfy plaintiff's pleading obligations either because they are conclusory and, at times, refer to defendants as a collective group. *Id.* at 27. Finally, defendants again ask the court to rely on the public records from plaintiff's criminal case and various appellate and habeas proceedings which, they assert, show that other evidence besides the allegedly fabricated evidence supported plaintiff's conviction. Defendants thus argue that plaintiff's allegations of false evidence—even if true—wouldn't have affected the verdict in his criminal case. *Id.*

The court rejects defendants' argument. Defendants try to argue that Mr. Frost's testimony—that plaintiff confessed to going home around the time of Camille's disappearance—was immaterial because no inculpatory evidence was found at plaintiff's house when searched. But, as already discussed, the Tenth Circuit recognized that Mr. Frost's testimony that plaintiff had visited his home on the afternoon Camille disappeared was an "important" fact because it gave plaintiff the opportunity to commit the crimes. *Bledsoe v. Bruce*, 569 F.3d 1223, 1237 (10th Cir. 2009). The court is unconvinced that this "important" evidence—evidence that plaintiff alleges Mr. Frost fabricated—was immaterial.

Defendants also contend the Kansas Supreme Court found the evidence sufficient to convict plaintiff, despite plaintiff's argument to that court that his roadside confession to Tom was "highly suspect" and "uncorroborated by any evidence." *State v. Bledsoe*, 39 P.3d 38, 42 (Kan. 2002). The Kansas court did conclude other evidence "corroborate[d] Tom's version of events." *Id.* at 43–44. But, it still considered Tom's version of events, which plaintiff now alleges was fabricated, and even emphasized the materiality of Tom's testimony. *Id.* at 42–44. It

97

described how "[t]he case was tried and argued to the jury primarily as a contest of Tom's credibility" and "[t]he jury believed Tom." *Id.* at 44. Plus, the governing standard on appeal required the Kansas court to view Tom's version of events and the corroborating evidence in the light most favorable to the prosecution. *Id.* at 42. The Kansas court also relied on Mr. Frost's assertion that plaintiff went home after Camille was dropped off after school. *Id.* at 43. Plaintiff alleges defendants concocted all of this testimony as part of their plan to frame him. Plaintiff has alleged that the defendants who participated in the conspiracy fabricated Tom's recanted confession and coached him to provide it, along with the story about how he learned details of the crime from plaintiff. Considering the evidence against plaintiff after setting aside the alleged fabricated evidence—*i.e.*, minus Tom's withdrawn confession, the roadside meeting, or plaintiff's presence at his home around the time of Camille's disappearance—it's not hard to imagine that the outcome of plaintiff's trial might have differed.

Finally, as discussed above, the court rejects defendants' arguments that plaintiff's fabrication allegations are conclusory and don't satisfy his pleading obligations. *See supra* Part III.A. Plaintiff alleges individual conduct and other facts to support the conspiracy's existence and his fabrication allegations. For example, Tom left a note when he committed suicide in which he asserted the Jefferson County police made him lie and prevented him from telling the truth. Doc. 141 at ¶ 101. Defendants' attack on the materiality of the allegedly fabricated evidence is not persuasive.

### b. Suppressing Exculpatory Evidence

A *Brady* violation requires proof that "(1) the prosecution suppressed evidence; (2) the evidence was favorable to the accused; and (3) the evidence was material to the defense." *Becker v. Kroll*, 494 F.3d 904, 924 (10th Cir. 2007) (citation and internal quotation marks

omitted).  "The essence of the *Brady* rule is the proposition that nondisclosure of material exculpatory evidence violates a defendant's due process right to a fair trial."  *Smith v. Sec'y of N.M. Dep't of Corrs.*, 50 F.3d 801, 823 (10th Cir. 1995).

As discussed briefly above, a *Brady* constitutional deprivation doesn't occur unless the evidence withheld was material to guilt or punishment.  *See Brady*, 373 U.S. at 87; *see also United States v. Bagley*, 473 U.S. 667, 678, 682 (1985) (explaining "a constitutional error occurs, and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial" and thus "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"); *Kyles v. Whitley*, 514 U.S. 419, 433–39 (1995) (describing the duty to disclose exculpatory evidence to a criminal defendant after *Brady* and explaining that, to determine materiality, the "suppressed evidence [must be] considered collectively, not item by item," and noting that a *Brady* violation still can occur even if the prosecution has other inculpatory evidence, provided a criminal defendant "show[s] that the favorable evidence [that was suppressed] could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict"); *Smith*, 50 F.3d at 827 (explaining evidence is material if a reasonable probability exists that if disclosed to the jury they may have reached a different result).

To determine whether evidence is material, the court must consider it "in the context of the evidence presented at trial," and should "weigh" the influence of the "undisclosed evidence . . . in light of the whole record."  *United States v. Robinson*, 39 F.3d 1115, 1116–19 (10th Cir. 1994) (affirming *Brady* violation where prosecutor told defense counsel that the witness couldn't identify defendant as the person who retrieved the drugs from the car, but left out the fact that the

witness had provided a description of a person who didn't match defendant, and considering how other evidence presented against defendant at trial "was hardly overwhelming" and the omitted description would have "substantially weaken[ed]" the case against defendant). "What might be considered insignificant evidence in a strong case might suffice to disturb an already questionable verdict." *Id.* at 1119. Importantly, where the defendant is independently aware of the exculpatory evidence a failure to disclose that evidence isn't material for *Brady* purposes. *United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir. 1999).

The Jefferson County defendants argue plaintiff's allegations about the officers withholding Tom's confessions, details of his activities, and history of inappropriate advances are not material under *Brady*. Doc. 145 at 24–25. They assert Tom's confessions and social history were discussed at his criminal trial. *Id.* at 25. They contend the transcript from plaintiff's trial shows either plaintiff had independent knowledge of the evidence or that it was disclosed as *Brady* required. *Id.* And, because Tom's confessions and history were discussed at the trial, defendants argue any failure to disclose those items couldn't have affected the outcome. *Id.* Also, they assert, plaintiff never alleges evidence of Tom's activities would have favored him. *Id.* Finally, defendants argue plaintiff hasn't explained how the officers' alleged failures to collect evidence responsibly could have produced favorable or material evidence. *Id.*

In response, plaintiff argues his Second Amended Complaint "easily alleges . . . *Brady* violations by the Jefferson County Defendants." Doc. 151 at 17. He asserts "[e]vidence of an alternative suspect is classic *Brady* material." *Id.* at 20. And he specifies the various evidence withheld from him, asserting defendants had a duty to disclose the evidence they fabricated as those fabrications constitute suppressed evidence as well. *Id.* at 20–22. Plaintiff doesn't deny that certain evidence of Tom's confessions and social history were discussed at his criminal trial.

*Id.* at 21.  But, he contends, defendants withheld more evidence that would have allowed plaintiff to make a stronger case for his innocence.  *Id*. at 22.

Accepting plaintiff's allegations as true, the court agrees with plaintiff.  He plausibly has alleged the suppressed evidence was material because, without its suppression, the jury may have returned a different verdict.  Indeed, during one of plaintiff's appeals, the Kansas Supreme Court noted that the criminal case "was a difficult case" where "[t]wo brothers accused each other of vile crimes" and "ample evidence" existed to support each accusation.  *Bledsoe v. State*, 150 P.3d 868, 887 (Kan. 2007).  Plaintiff alleges the Jefferson County defendants participated in a conspiracy that involved withholding evidence that would have exculpated plaintiff and inculpated Tom.  *See supra* Part III.A.  If defendants had provided this evidence to plaintiff, he could have presented it at his trial to support his position that Tom was the true culprit.  And, as discussed, the fact that some evidence of Tom's confessions or sexual history was presented at the criminal trial doesn't negate the conclusion that the additional withheld details could have influenced which story the jury chose to believe.

In sum, plaintiff's allegations are sufficient for plaintiff's claims to survive the Jefferson County defendants' motion to dismiss.  Plaintiff provides sufficient allegations to support his claim that the Jefferson County defendant officers conspired to prosecute and convict plaintiff for a murder they knew he didn't commit by suppressing material exculpatory evidence and fabricating material inculpatory evidence.  It's plausible that these actions affected the outcome of plaintiff's criminal trial.  The court thus denies defendants' third due process argument—that the Second Amended Complaint fails to identify any material evidence that the Jefferson County defendant officers fabricated or suppressed.  This argument doesn't foreclose plaintiff's Fourteenth Amendment Due Process claims as a matter of law.

### 4.  Opportunity to be Heard

Finally, the Jefferson County defendants argue the court must dismiss Count I and Count III's § 1983 Fourteenth Amendment due process claims because the right to due process requires notice and an opportunity to be heard.  Defendants argue that plaintiff already has received both notice and the chance to be heard in his criminal trial and various appellate and habeas proceedings.  Doc. 145 at 27.  They also contend plaintiff has alleged no facts capable of showing each of the Jefferson County defendants "took actions that *materially* influenced the outcome of his trial" and thus he hasn't "state[d] a colorable Fourteenth Amendment claim, and the Jefferson County [d]efendants are entitled to judgment on Counts I and III."  *Id.* at 28.  In support, defendants cite *Morgan*, where the Tenth Circuit explained that "withholding or destruction of evidence violates a criminal defendant's constitutional rights only if, as a result of the withholding or destruction of evidence, the criminal defendant is denied a fair trial."  166 F.3d at 1310.

Plaintiff responds that he never has had an opportunity to challenge the fabricated or withheld evidence.  Doc. 151 at 27.  Indeed, plaintiff alleges fabricated inculpatory evidence was used to secure his conviction, and exculpatory evidence that could have helped prove his innocence in his criminal trial was withheld from him.  *See* Part I & Part III.A.  So, he claims, Count I and Count III sufficiently assert that he was denied his constitutional right to a fair trial.

Plaintiff has pleaded plausibly that he was denied a fair trial.  As explained above, *Morgan* held that § 1983 actions alleging Fourteenth Amendment constitutional violations for fabricating or withholding evidence aren't viable when the charges are dismissed before trial because "the right to a fair trial is not implicated."  166 F.3d at 1310.  That is not so here.  Plaintiff falls into the second category discussed in *Morgan*—where a conviction was secured

and later overturned—circumstances under which courts "have permitted the exonerated defendant to pursue § 1983 claims based on the denial of a fair trial." *Id.* And, the court already has rejected the Jefferson County defendants' arguments that plaintiff hasn't pleaded their participation in the alleged conspiracy adequately, Part III.A., and that their actions didn't materially influence his trial, Part III.B.3. Plaintiff thus has adequately pleaded a constitutional due process violation based on defendants fabricating inculpatory evidence and withholding exculpatory evidence from him. *See Wilson v. Lawrence Cnty.*, 260 F.3d 946, 954 (8th Cir. 2001) (recognizing a clearly established § 1983 due process claim where plaintiff alleged defendants "knowingly used false or unreliable evidence" against him at his criminal proceedings to secure his conviction, and explaining due process wasn't satisfied by notice of and the hearing where the government used the trial as a means to deprive plaintiff of his liberty by deliberately deceiving the court and jury with false evidence). The court thus concludes defendants have failed to demonstrate why the court should dismiss Count I or Count III based on their final argument asserting plaintiff already received notice and an opportunity to be heard.

### 5. Conclusion

To summarize, the court declines to dismiss plaintiff's Counts I, III, and IV claims based on Fourteenth Amendment *substantive* due process violations. To the extent plaintiff bases Counts I, III, and IV's claims on *procedural* due process violations, the court agrees with defendants, *i.e.*, such claims are barred by *Parratt* and the availably of a malicious prosecution tort under Kansas law. But, Counts I and III also invoke a substantive due process right to a fair trial, and *Parratt* does not proscribe these claims. And the court doesn't dismiss Count IV's malicious prosecution claim either to the extent it relies on a Fourth Amendment violation or a substantive due process violation under the Fourteenth Amendment (conscience shocking

conduct that results in a substantial liberty deprivation that is not covered by the Fourth Amendment's protections).

And, finally plaintiff has alleged adequately that the Jefferson County defendants acted with the requisite culpable mental state to support § 1983 liability.  He also has alleged the evidence fabricated or withheld was material to his trial and that he was deprived of a meaningful opportunity to be heard by a jury.  Thus, in Counts I and III the Second Amended Complaint plausibly asserts claims for Fourteenth Amendment due process violations.

### C.  Malicious Prosecution Claim

*Third*, the Jefferson County defendants argue Count IV—claims malicious prosecution and unlawful pretrial detention—fails as a matter of law.  Defendants assert the court must dismiss Count IV because:  (1) the Fourth Amendment can't support a malicious prosecution claim after a plaintiff has gone to trial and the Fourteenth Amendment can't support a malicious prosecution claim either because *Parratt* bars such a claim; and (2) plaintiff hasn't alleged facts to support each element of a § 1983 malicious prosecution claim.  The next two subsections take up these arguments separately.

### 1.  Viability of Fourth Amendment or Fourteenth Amendment Malicious Prosecution Claim

The court addressed the Jefferson County defendants' arguments against using the Fourteenth Amendment to support Count IV's § 1983 claim above in Part III.B.1.  As discussed, plaintiff cannot rely on Fourteenth Amendment procedural due process to support Count IV's § 1983 malicious prosecution claim because Kansas law provides a malicious prosecution tort.  *See Becker*, 494 F.3d at 921–24 (holding state law post-deprivation remedy satisfies procedural due process, but recognizing substantive due process may be available if a "substantial deprivation" has occurred and Fourth Amendment protections aren't available).  Nor can

plaintiff rely on substantive due process to support his malicious prosecution claim to the extent

he challenges his pretrial detention because he must rely on the Fourth Amendment for such a

claim. *Albright*, 510 U.S. at 270 n.4 (explaining Fourteenth Amendment "substantive due

process may not furnish the constitutional peg on which to hang" a malicious prosecution claim

where Fourth Amendment provides protection); *Becker*, 494 F.3d at 918–19 ("We think the

unavoidable construction of *Albright* is that no § 1983 claim will arise from filing criminal

charges without probable cause under the substantive due process protections of the Fourteenth

Amendment."); *Taylor v. Meacham*, 82 F.3d 1556, 1560, 1561 n.3 (10th Cir. 1996) (considering

§ 1983 malicious prosecution claim for wrongful arrest and seven-week detention under Fourth

Amendment because, after *Albright*, "Fourteenth Amendment substantive due process standards

have no applicability" for deprivation of pretrial liberty).

But, *Myers* and *Becker* recognize the viability of a § 1983 malicious prosecution claim

based on a Fourth Amendment violation where a plaintiff is seized pretrial. *Myers*, 738 F.3d at

1194–95; *Becker*, 494 F.3d at 914–17; *see also Manuel v. City of Joliet, Illinois*, 137 S. Ct. 911,

917–19 (2017) (holding Fourth Amendment right to be free from unreasonable seizure extends

throughout the pretrial period because the Fourth Amendment protections apply "not just for

arrest" but also for pretrial detention after legal process commences, and explaining that "[i]f the

complaint is that a form of legal process resulted in pretrial detention unsupported by probable

cause, then the right allegedly infringed lies in the Fourth Amendment" because it makes "no

difference" that the deprivation occurred "pursuant to legal process" where that determination

"lacked any proper basis" because the judge had relied on the (allegedly) fabricated evidence).

Now, the Jefferson County defendants argue plaintiff can't assert his § 1983 claim for

unlawful pretrial detention under the Fourth Amendment because he received a trial. To support

their argument that a § 1983 malicious prosecution claim based on a Fourth Amendment violation isn't available after a conviction, defendants rely on a footnote in *Manuel*.  In *Manuel*'s footnote the Supreme Court explained that the Fourth Amendment should be used as the basis to challenge a pretrial detention without probable cause, but that "once a trial has occurred, the Fourth Amendment drops out" and "[a] person challenging the sufficiency of the evidence to support both a conviction and any ensuing incarceration does so under the Due Process Clause of the Fourteenth Amendment."  137 S. Ct. at 920 n.8.  But, this passage from *Manuel* doesn't hold that once the criminal case reaches trial, the trial eviscerates any Fourth Amendment claim for unlawful pretrial detention.  Instead, the criminal case against *Manuel*'s plaintiff never reached trial, and the court thus didn't consider the viability of a Fourth Amendment claim for *pretrial* deprivations had such a claim been asserted *post-trial*.  *Id.* at 914.

Addressing the Fourth Amendment claim at issue in *Manuel*, the Court explained that the "[l]egal process] did not expunge" the claim because "the process he received failed to establish what that Amendment makes essential for pretrial detention—probable cause to believe he committed a crime."  *Id.* at 919–20.  Likewise here, on the facts alleged, neither the legal process plaintiff received pretrial nor his criminal trial provided him the constitutional process he was due—he alleges probable cause was lacking from the start.  The footnote in *Manuel* shows Fourth Amendment protections apply during the pretrial period, so a plaintiff must assert a § 1983 claim for unlawful pretrial detention under the Fourth Amendment.  But, the Court's language about the Fourth Amendment "drop[ping] out" merely indicates a plaintiff must challenge his post-conviction incarceration or other constitutional violations under the Fourteenth Amendment, and not the Fourth Amendment.  *Id.* at 920 n.8.  Which, of course, is precisely what plaintiff has done here.  He asserts his pretrial constitutional violation claim under

the Fourth Amendment (Count IV) and his trial and post-trial constitutional violations under the Fourteenth Amendment (Counts I, III, and IV).

Defendants never direct the court to any binding authority that bars a § 1983 claim for unlawful pretrial detention simply because a plaintiff was tried and convicted. Indeed, Justice Alito's dissent in *Manuel* explained that "an individual may seek damages for pretrial Fourth Amendment violations *even after a valid conviction*." *Id.* at 923–26 (Alito, J., dissenting) (providing examples and opining that he would require a malicious prosecution claim to be based on the Fourteenth Amendment, not the Fourth Amendment, and that the Fourth Amendment claim in *Manuel* more nearly resembled a false arrest or false imprisonment claim, not malicious prosecution).

Here, plaintiff's Fourth Amendment malicious prosecution claim didn't accrue until his criminal proceedings terminated in his favor. *Myers*, 738 F.3d at 1194–95. And, the court concludes the § 1983 claim based on the Fourth Amendment isn't precluded as a matter of law. Where a plaintiff has asserted § 1983 malicious prosecution claims *after* he was tried and convicted, the Tenth Circuit has considered those claims under both the Fourth Amendment and Fourteenth Amendment. *See Pierce v. Gilchrist*, 359 F.3d 1279, 1281–86, 1293–94 (10th Cir. 2004) (allowing § 1983 malicious prosecution claim against forensic chemist who had fabricated inculpatory evidence and withheld exculpatory evidence, leading to plaintiff's conviction and 15 years in prison for a rape he didn't commit based on plaintiff's Fourth Amendment right to be free from unreasonable seizures and Fourteenth Amendment due process right to be free from a deprivation of liberty);[25] *see also Novitsky v. City of Aurora*, 491 F.3d 1244, 1249–51, 1257–59

---

[25]     In *Pierce*, the Circuit explained that the Fourth Amendment governs initial seizures, but "at some point after arrest, and certainly by the time of trial, [the] constitutional analysis shifts to the Due Process Clause." *Id.* at 1285–86. But, because plaintiff's Complaint raised claims under both Amendments, the Circuit determined it was "not necessary . . . to determine where [the] Fourth Amendment analysis ends

(10th Cir. 2007) (recognizing in post-*Manuel* case a § 1983 malicious prosecution claim under Fourth *and Fourteenth* Amendment where plaintiff alleged officers had caused his prosecution that ended in a mistrial followed by a dismissal after 19 months of pretrial detention because officer's report of the arrest inaccurately described seeing a gun before he seized plaintiff and explaining that, in the Tenth Circuit "[w]e look to both the Fourth and Fourteenth Amendments" because by the time of trial the analysis shifts to due process); *Robinson v. Maruffi*, 895 F.2d 649, 650–51, 654–56 (10th Cir. 1990) (recognizing, after plaintiff was tried and convicted in 1990, a § 1983 claim for conspiracy to maliciously prosecute plaintiff which did not accrue until plaintiff was acquitted, where officers were allegedly conspired to deprive plaintiff of his liberty interest without due process under the Fourteenth Amendment by knowingly using false evidence for purposes of prosecuting, convicting, and punishing plaintiff for the murder of another police officer).

In sum, while the Fourth Amendment's protections end by the time of a conviction at trial and a plaintiff thereafter must rely on Fourteenth Amendment due process for constitutional violations, defendants haven't shown a post-trial claim to redress pretrial Fourth Amendment deprivation is precluded as a matter of law.  So, the court next turns to the Jefferson County defendants' arguments that plaintiff hasn't alleged facts to support each required element of his § 1983 malicious prosecution claim.

### 2.  Elements of § 1983 Malicious Prosecution Claims

"[A] § 1983 malicious prosecution claim includes the following [five] elements:  (1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action

---

and [the] due process analysis begins" to decide the appeal from denial of the motion to dismiss.  *Id.* at 1286.  Later in *Manuel*, the Supreme Court clarified that Fourth Amendment protections extend through the entire pretrial detention period.  *Manuel*, 137 S. Ct. at 918–20.

terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages." *Carbajal v. McCann*, 808 F. App'x 620, 630 (10th Cir. 2020) (citing *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008)).  If a plaintiff fails to establish any one of these essential elements, he cannot establish a constitutional violation.  *Margheim v. Buljko*, 855 F.3d 1077, 1085–86, 1089–90 (10th Cir. 2017).  The Jefferson County defendants challenge the first four of these elements, arguing plaintiff hasn't plausibly alleged them and the court must dismiss Count IV for failing to state a claim.

### a.  Causation

The Jefferson County defendants argue that plaintiff hasn't alleged plausibly the first element of his § 1983 malicious prosecution claim—that defendants caused his continued confinement or prosecution.  Doc. 145 at 32–34.  They contend two acts "broke any causal chain."  *Id.* at 32.  First, they rely on the prosecutor's decision to prosecute.  Second, they invoke the trial judge's decision to allow the prosecution to proceed and the jury's subsequent conviction.  Plaintiff responds that these acts did not break the chain of causation because the prosecutor, judge, and jury all relied on the fabricated evidence and lacked access to the exculpatory evidence that defendants withheld.  Doc. 151 at 29–31.  As explained below, plaintiff has alleged plausibly facts that, if proved, would nullify any event breaking the causal chain.

The Tenth Circuit has explained a court's decision that the evidence was sufficient to establish probable cause and bind a criminal defendant over for trial can, sometimes, break the causal chain between a sheriff's investigation and the decision to prosecute.  *Taylor v. Meacham*, 82 F.3d 1556, 1559, 1562–64 (10th Cir. 1996) (concluding, after setting aside sheriff's alleged

deliberately false statements and omissions from the arrest warrant, that probable cause still existed for the arrest and also explaining that plaintiff hadn't presented any evidence to suggest sheriff had included false statements or omitted facts "knowingly or with reckless disregard for the truth, rather than out of negligence or inadvertence[,]" so Circuit affirmed summary judgment in favor of sheriff on § 1983 Fourth Amendment malicious prosecution claim); *see also Barham v. Town of Greybull Wyo.*, 483 F. App'x 506, 509 (10th Cir. 2012) (explaining prosecutor's decision to file charges and state court's decision to bind plaintiff over at preliminary hearing breaks chain of causation where plaintiff "does not allege or show that Defendants exerted any pressure or influence or made any knowing misstatements to the prosecutor"). But, in *Taylor*, probable cause existed even after setting aside the fabricated or omitted evidence. 82 F.3d at 1562–63. And, plaintiff there didn't allege the sheriff had made false or misleading statements after plaintiff's arrest or "caused false or perjured testimony to be presented at the preliminary hearing." *Id.* at 1563–64. So, "the chain of causation [was] broken by an indictment" because "a judge independently listened to testimony, evaluated the credibility of those testifying, reviewed evidence, and concluded that the evidence was sufficient to bind [plaintiff] over for trial." *Id.* at 1564. The facts alleged here differ. Plaintiff alleges that defendants knowingly misrepresented the evidence causing plaintiff's prosecution to continue.

The Tenth Circuit also has explained that the defendant doesn't have to be the person who actually filed the charges against plaintiff to satisfy the causation element of a malicious prosecution claim. *Pierce*, 359 F.3d at 1291–92. And, "officers who conceal and misrepresent material facts . . . are not insulated from a § 1983 claim for malicious prosecution simply because the prosecutor, grand jury, trial court, and appellate court all act independently to facilitate erroneous convictions." *Id.* at 1292. Instead, where defendants provide false information and

withhold exculpatory information in a manner that is instrumental to continuing plaintiff's confinement or prosecution, they are not shielded from liability. *Id.* The actions of one who "prevaricates and distorts evidence to convince the prosecuting authorities to press charges" can be said to cause the prosecution. *Id.* at 1293; *see also Carbajal*, 808 F. App'x at 633 (explaining chain of causation for malicious prosecution claim isn't broken by indictment where police officers had misrepresented facts or concealed them from the prosecutor); *Robinson v. Maruffi*, 895 F.2d 649, 650–51, 655–56 (10th Cir. 1990) (affirming verdict for plaintiff on § 1983 malicious prosecution claim because causal connection between officers' misconduct and plaintiff's injuries wasn't "broken by subsequent, independent[,] and intervening acts of prosecutor, grand jury, state trial court[,] and the New Mexico Supreme Court" where sufficient evidence existed "for the jury to find that the defendants purposefully concealed and misrepresented material facts"). Government officials who "maliciously abuse[] a position of trust to induce the criminal justice system to confine and then to prosecute an innocent defendant" are liable for constitutional violations. *Pierce*, 359 F.3d at 1293.

Here, plaintiff has alleged plausibly that the Jefferson County defendants conspired to fabricate Tom's recanted confession and other evidence implicating plaintiff, as well as to withhold exculpatory evidence that could have proven Tom's guilt and plaintiff's innocence. *See supra* Part III.A. Their actions are alleged to have tainted the entirety of plaintiff's proceedings—from the prosecutor's decision to prosecute, the judicial probable cause determinations, the jury's conviction, and plaintiff's subsequent appeals and habeas proceedings. As explained *infra* Part III.C.2.c., plaintiff plausibly has alleged that probable cause—setting aside the fabricated evidence and taking into account the withheld exculpatory evidence—didn't exist. So, plaintiff plausibly has alleged that the causal chain between the actions of the

Jefferson County defendants' and plaintiff's continued prosecution was not broken because defendants distorted evidence as part of an effort to convince prosecuting authorities to press and pursue charges.  Plaintiff has pleaded the first element of his malicious prosecution claim satisfactorily.

### b.  Termination in Plaintiff's Favor

The Jefferson County defendants next argue plaintiff's criminal proceedings weren't terminated in his favor.  Doc. 145 at 30.  The court already has rejected this argument when other defendants made it.  *See* Doc. 114 at 19, 33, 36.  And, the Jefferson County defendants' arguments renewing it are no more convincing.

A favorable termination means the original criminal proceeding must have terminated "in a manner *indicative* of [plaintiff's] innocence."  *Margheim v. Buljko*, 855 F.3d 1077, 1089 (10th Cir. 2017) (emphasis added).  This means that "plaintiff must show more than just the withdrawal or vacating of criminal charges—the plaintiff must demonstrate that the criminal proceedings were dismissed for reasons indicative of innocence, and not because of an agreement of compromise, an extension of clemency, or technical grounds having little or no relation to the accused's guilt."  *M.G. v. Young*, 826 F.3d 1259, 1262 (10th Cir. 2016).

So, dismissal of criminal charges alone doesn't indicate innocence.  *Margheim*, 855 F.3d at 1086.  Instead, the court must examine the reasons for the dismissal and the circumstances surrounding it to see if it was indicative of innocence.  *Id.*  For instance, a dismissal after evidence is suppressed on technical grounds—where the evidence's trustworthiness isn't questioned—may not indicate innocence.  *Id.*  But, if "a court vacate[s] the conviction because the plaintiff was factually innocent" that would suffice.  *Montoya v. Vigil*, 898 F.3d 1056, 1066 (10th Cir. 2018) (citation and internal quotation marks omitted).  "If, in view of the

circumstances, the case [was] disposed of in a manner that leaves the question of the accused's innocence unresolved, there generally can be no malicious prosecution claim by the accused." *Id.* Only when the proceedings terminate in a way that reaches the merits do the criminal proceedings terminate favorably. *Id.*

The Jefferson County defendants contend plaintiff's sentence was vacated with the opportunity for retrial, so they ask the court to dismiss the malicious prosecution claim. They argue, as a matter of law, that this conclusion in the underlying criminal trial means plaintiff cannot satisfy the favorable termination element. Doc. 145 at 30–31. They rely on plaintiff's appellate and habeas proceedings following his conviction, where various courts concluded the evidence supported his conviction, and on the fact that the charges against him were dismissed without prejudice. *Id.* And, they argue that while the DNA evidence "may establish [plaintiff] did not have unprotected sex with [Camille] leading up to her murder," that fact and Tom's suicide note don't establish that plaintiff "is actually and wholly innocent in her death." *Id.* at 30.

Defendants overstate the standard. The governing law doesn't require plaintiff to prove his innocence beyond a reasonable doubt to bring a § 1983 malicious prosecution claim. He only must allege that the criminal proceedings terminated in a manner that was "indicative of [his] innocence," rather than on technical grounds. *Margheim*, 855 F.3d at 1089. The circumstances surrounding the dismissal here—DNA evidence found within the victim that did not match plaintiff and Tom confessing again to the crime—suffice to allege the proceedings terminated in a manner that touches the merits of his conviction and is indicative of his innocence. *See, e.g.*, *Margheim*, 855 F.3d at 1086 (giving, as an example of a favorable termination, a case where the charges were dismissed after certain witness statements were excluded as inadmissible hearsay

and the prosecutor determined the government couldn't prove the case beyond a reasonable doubt without the excluded testimony (citing *Wilkins*, 528 F.3d at 795, 802–04) and, for contrast, giving, as an example of a non-favorable termination, a dismissal on technical grounds that doesn't affect the evidence's trustworthiness, such as a dismissal on speedy trial grounds (citing *Cordova v. City of Albuquerque*, 816 F.3d 645, 650–51 (10th Cir. 2016))); *M.G.*, 826 F.3d at 1263–64 (noting it was "conceivable" that the state court vacated the convictions because exculpatory evidence that could have been used as "strong impeachment evidence" to "undermine[] the factual basis for the convictions" was withheld—which would support the favorable termination element sufficiently—but concluding on summary judgment that plaintiff hadn't presented any evidence that the state court vacated the charges on this basis as opposed to technical grounds, so plaintiffs hadn't met their burden to show "their convictions were vacated for reasons indicative of innocence"); *Pierce*, 359 F.3d at 1294 (holding favorable termination element satisfied where conviction was vacated based on DNA evidence).[26]  Plaintiff has pleaded the second element of his malicious prosecution claim adequately.

### c.   Probable Cause

The probable cause element of a malicious prosecution claim requires plaintiff to show that "falsification of inculpatory evidence or suppression of exculpatory evidence was necessary to the finding of probable cause:  that without the falsified inculpatory evidence, or with the withheld exculpatory evidence, there would have been no probable cause for his continued confinement or prosecution."  *Pierce*, 359 F.3d at 1295; *see also Wilkins*, 528 F.3d at 805 ("Where false statements have been relied on to establish probable cause, the existence of

---

[26]     Plaintiff also has obtained a Certificate of Innocence from the State of Kansas, which are granted only when a person convicted and imprisoned for a crime shows by a preponderance of evidence that he "did not commit" the crime.  Kan. Stat. Ann. § 60-5004; Doc. 151-1.

probable cause [for § 1983 purposes] is determined by setting aside the false information."
(citation and internal quotation marks omitted)).

The Jefferson County defendants argue plaintiff fails to allege adequately that they lacked probable cause to initiate and continue plaintiff's prosecution.  Doc. 145 at 31–32.  They contend plaintiff hasn't alleged any facts to establish probable cause was lacking, and merely asserts conclusory allegations that they lacked probable cause.  *Id.*  And, these defendants argue, the Jefferson County defendants had arguable probable cause, *i.e.*, from an objective standpoint a reasonable officer could have believed probable cause existed for plaintiff's prosecution.  *Id.* at 31.  They rely on the trial court's decision to bind plaintiff over for trial, the jury's verdict, and plaintiff's various appellate and habeas proceedings to argue probable cause existed.  *Id.* at 31–32.  They note that evidence other than Tom's testimony supported the charges against plaintiff which, they contend, suffices to establish probable cause.  Doc. 145 at 32 n.16, 33–34.

Plaintiff argues he has pleaded adequately that no probable cause existed sufficient to survive defendants' Motion to Dismiss.  The court agrees with him.  Plaintiff has alleged that these defendants joined a conspiracy to fabricate evidence against plaintiff, withhold evidence that could have exculpated him, and executed a plan to frame plaintiff.  *See* Part III.A.  By itself, without Tom's recanted confession or the roadside meetup with plaintiff—the fabricated evidence Mr. Carreno helped to contrive—plaintiff has alleged plausibly that probable cause was lacking.  It's unlikely a reasonable officer would have found probable cause to prosecute plaintiff for the crimes had Tom never recanted his confession and implicated plaintiff.  But there's more. Plaintiff also has alleged Mr. Frost fabricated evidence that plaintiff returned to his house the evening Camille disappeared.  The Kansas Supreme Court and the Tenth Circuit considered this fact in plaintiff's appellate and habeas proceedings.  *State v. Bledsoe*, 39 P.3d 38, 43 (Kan.

2002); *Bledsoe v. Bruce*, 569 F.3d 1223, 1237 (10th Cir. 2009).  Plus, Mr. Poppa didn't disclose insider details about the murder contained in Tom's confession.  Mr. Carreno didn't turn over materials about Tom's activities between the time he confessed and recanted that confession.  Mr. Frost didn't tell plaintiff about Tom's sexual advances toward Camille a few weeks before her disappearance.  Mr. Frost, Mr. Herrig, and Mr. Poppa intentionally refrained from collecting evidence (such as the shovel or Tom's gun) in a manner which could have exculpated plaintiff.  Plaintiff plausibly has alleged that plaintiff, if provided with this evidence, could have shown Tom was the true culprit and that probable cause didn't support the charges against plaintiff.

In short, setting aside the evidence plaintiff alleges was fabricated and taking into account the exculpatory evidence plaintiff alleges defendants withheld from him, plaintiff has alleged plausibly that that the Jefferson County defendants lacked probable cause.  As in *Pierce*, accepting plaintiff's allegations as true, the information fabricated or withheld from him was "significant enough to prejudice [his] constitutional rights."  *Pierce*, 359 F.3d at 1287.  The court is mindful that plaintiff faces the "heavy burden" to show defendants' actions negated probable cause.  *Id.* at 1295.  And, defendants may present their arguments that other evidence supported probable cause in later stages of this case.  But, at the motion to dismiss stage, the court accepts the allegations in plaintiff's Second Amended Complaint as true and concludes they suffice to allege plausibly that there was no probable cause for plaintiff's prosecution.  Plaintiff thus has pleaded the third element of his malicious prosecution claim adequately.

### d.  Malice

Finally, the Jefferson County defendants contend plaintiff hasn't alleged adequately that Mr. Carreno, Mr. Frost, Mr. Herrig, and Mr. Poppa each acted with malice.  *Id.* at 34–36.  For the same reasons discussed above, *supra* Part III.B.2., plaintiff has pleaded adequately this fourth

element of his malicious prosecution claim. From each defendant's acts in furtherance of the conspiracy, the court reasonably can infer they possessed the requisite mental state at the motion to dismiss stage. Indeed, "[m]alice may be inferred if a defendant causes the prosecution without arguable probable cause." *Stonecipher v. Valles*, 759 F.3d 1134, 1137 (10th Cir. 2014); *supra* Part III.C.2.c.

### 3. Conclusion

In sum, defendants haven't convinced the court that it must dismiss as a matter of law plaintiff's Count IV claim based on pretrial constitutional violations under the Fourth Amendment merely because he received a trial. And, plaintiff has alleged enough plausible facts to support each element of his Count IV malicious prosecution claim against Mr. Carreno, Mr. Frost, Mr. Herrig, and Mr. Poppa.

### D. Qualified Immunity

Mr. Herrig, Mr. Carreno, Mr. Frost, and Mr. Poppa—four of the Jefferson County defendant officers—assert qualified immunity as a defense to plaintiff's claims. They ask the court to dismiss the claims against them based on this defense.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Qualified immunity is "'immunity from suit rather than a mere defense to liability.'" *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526

117

(1985)).  So, courts should resolve qualified immunity questions "'at the earliest possible stage in litigation.'"  *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

The Supreme Court has "mandated a two-step [inquiry] for resolving government officials' qualified immunity claims."  *Id.* at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  First, a court must decide whether plaintiff has come forward with facts that "make out a violation of a constitutional right."  *Id.*  Second, the court must determine whether "the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Id.*  Unless the official's alleged conduct violated a clearly established constitutional right, qualified immunity applies.  *Id.*

Once a qualified immunity defense is raised, "plaintiff bears the burden of meeting these two prongs."  *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1219 (10th Cir. 2020).  The court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson*, 555 U.S. at 236.  "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant[s] qualified immunity."  *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001).

## 1.  Violation

The court already has conducted the analysis mandated by prong one.  The court has decided that plaintiff has pleaded adequate facts to support a finding that Mr. Carreno, Mr. Frost, Mr. Herrig, and Mr. Poppa violated his constitutional rights.  *See supra* Parts III.A., III.B., and III.C.

## 2.  Clearly Established

For prong two—determining whether the individual Jefferson County defendants' actions are protected by qualified immunity—the court must decide whether the rights at issue were "clearly established" at the time of their alleged conduct.  *Pearson*, 555 U.S. at 231.  The inquiry "turns on the 'objective legal reasonableness of the action[s], assessed in light of the legal rules that were clearly established at the time [they were] taken.'"  *Id.* at 244 (quoting *Wilson v. Layne*, 526 U.S. 603, 614 (1999)).  And, the court must determine "'whether the violative nature of *particular* conduct is clearly established,'" rather than considering if the right is clearly established in the abstract.  *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)); *see also White v. Pauly*, 137 S. Ct. 548, 552 (2017) (instructing courts not to define the right at issue "'at a high level of generality'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011))); *id.* (noting the "the clearly established law must be 'particularized' to the facts of the case" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))); *Herring v. Keenan*, 218 F.3d 1171, 1176 (10th Cir. 2000) (explaining a "plaintiff cannot simply identify a clearly established right in the abstract and allege that the defendant has violated it" (citation and internal quotation marks omitted)).

"The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  *Pearson*, 555 U.S. at 231 (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).  Officers who "make reasonable but mistaken judgments about open legal questions" still deserve qualified immunity.  *al-Kidd*, 563 U.S. at 743.  The doctrine of qualified immunity thus "protects 'all but the plainly incompetent or those who knowingly violate the law.'"  *Ziglar*, 137 S. Ct. at 1867 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

119

The court previously has determined the constitutional rights at issue in this case were clearly established and not protected by qualified immunity on the facts alleged and accepted as true here.  *See* Doc. 114 at 16–18, 25, 31–32, 36, 38.  In *Pierce v. Gilchrist*, the Tenth Circuit decided this very issue.  359 F.3d 1279, 1282 (10th Cir. 2004).  The plaintiff in *Pierce* spent 15 years in state prison for a rape he had not committed.  *Id.* at 1281.  He eventually was exonerated with DNA evidence, and his conviction was vacated.  *Id.*  Plaintiff brought § 1983 malicious prosecution claims against defendant—a police department forensic chemist—alleging that she maliciously withheld exculpatory evidence and fabricated inculpatory evidence, "which led prosecutors to indict and prosecute" plaintiff for the rape.  *Id.* at 1281.  On appeal from an immunity-based motion to dismiss decision, the Tenth Circuit affirmed the district court's decision that defendant didn't deserve qualified immunity.  *Id.* at 1297–1300.

After determining that plaintiff properly had alleged violations of his constitutional rights, the Tenth Circuit held that the "prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986" when defendant had acted.  *Id.* at 1298.  The Circuit concluded such conduct amounts to a clearly established violation of both plaintiff's Fourth and Fourteenth Amendment rights because defendant had "'fair warning' that the deliberate or reckless falsification or omission of evidence was a constitutional violation."  *Id.* at 1298–99.  It didn't find a significant constitutional difference between providing false evidence to support an arrest and providing false evidence to support continued confinement and prosecution.  *Id.* at 1299.  The Circuit explained:  "Even if there were no case directly on point imposing liability on officials whose falsification of evidence occurred at the post-arrest stage, an official in [defendant's] position could not have

labored under any misapprehension that the knowing or reckless falsification and omission of evidence was objectively reasonable." *Id.*

*Pierce*'s holding applies with equal force here.  Mr. Carreno, Mr. Frost, Mr. Herrig, and Mr. Poppa are not entitled to qualified immunity on the facts alleged and accepted as true at this motion to dismiss stage.  Still, defendants persist asserting four arguments for qualified immunity.

*First*, defendants contend their conduct here was objectively reasonable and qualified immunity excuses any reasonable mistake of fact.  Doc. 145 at 45.  They contend their actions in investigating, gathering evidence, and not providing certain evidence to plaintiff amounted to mere negligence or reasonable mistakes, which are protected by qualified immunity.  *Id.* at 45–46.  And, they argue it was reasonable for them to believe that Tom was a credible witness and plaintiff was guilty, even if these judgments were mistaken.  *Id.* at 46.  On a motion to dismiss, the facts pleaded and all reasonably drawn inferences from those allegations are viewed in the light most favorable to plaintiff.  *See Generation Res. Holding Co., LLC*, 964 F.3d at 965.  Defendants ask the court to view their conduct as making reasonable mistakes.  Their request disobeys the controlling standard.  And, as discussed above in Parts III.A., III.B., and III.C., plaintiff plausibly has alleged these defendants participated in a conspiracy to fabricate evidence against him, withhold exculpatory evidence from him, and maliciously prosecute him for a crime they knew he didn't commit.  Defendants are not entitled to qualified immunity for their conduct when viewed under the proper standard, as plaintiff plausibly has alleged that they knowingly violated plaintiff's constitutional rights.  *See Armstrong v. Daily*, 786 F.3d 529, 546–48 (7th Cir. 2015) (rejecting defendant's argument that evidence didn't have clear exculpatory value because on a motion to dismiss the allegations are viewed in plaintiff's favor and plaintiff had alleged

defendant knew the evidence had exculpatory value and had acted in bad faith, and concluding legal duty to preserve potentially exculpatory evidence was established by 1988).

*Second*, defendants argue they deserve qualified immunity for a reasonable mistake of law because it wasn't clear in 1999 or 2000 that police had a duty to disclose exculpatory evidence, as opposed to the prosecutor.  Doc. 145 at 46.  This argument lacks merit.  It was clear that *Brady*'s disclosure obligations extended to law enforcement officers.  *See Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 824 (10th Cir. 1995); *see also Tiscareno v. Anderson*, 639 F.3d 1016, 1023 (10th Cir. 2011), *vacated on other grounds by* 421 F. App'x 842 (10th Cir. 2011) (explaining "knowing and intentional failure of an investigator to turn over exculpatory evidence creates liability" because *Brady* (decided in 1963) and related cases put police officers on notice that deliberately or recklessly omitting evidence is a constitutional violation); *Pierce v. Gilchrist*, 359 F.3d 1279, 1299 (10th Cir. 2004) (holding law enforcement chemist had fair warning in 1986 that "the deliberate or reckless falsification or omission of evidence was a constitutional violation").  Defendants contend *Smith*—the Tenth Circuit case decided before 1999—doesn't clearly establish their liability for non-disclosure, as opposed to the prosecutor, because *Smith* explains that an officer's knowledge is imputed to the prosecutor but doesn't address an investigator's own liability under § 1983.  Doc. 145 at 46.  But, *Smith* explicitly concludes that "the 'prosecution' for *Brady* purposes . . . extends to . . . law enforcement personnel."  *Smith*, 50 F.3d at 824.  And, the Tenth Circuit explained why.  "[T]he taint on the trial is no less if [police officers], rather than the prosecutors, were guilty of nondisclosure."  *Id.* (citation and internal quotation marks omitted).  *Smith* thus imposed a disclosure obligation on police officers, and defendants had fair notice that their failure to disclose could produce a *Brady* violation in 1995.  And, years before *Smith*, *Brady* itself also put the Jefferson County defendant

officers on notice that their alleged actions amount to a constitutional violation.  *See Tiscareno*, 639 F.3d at 1023; *Pierce*, 359 F.3d at 1299.

> *Third*, defendants argue that "application of the then-prevailing law to the available facts confirms the individuals cannot be described as acting in knowing violation of the law or in a plainly incompetent manner."  Doc. 145 at 47.  Essentially, defendants argue that if they made a mistake whether probable cause existed to prosecute plaintiff or made mistakes about whether certain evidence was exculpatory, these mistakes are entitled to qualified immunity.  They ask the court to grant them qualified immunity because "their efforts to investigate, their contemporary understanding of the facts and of each witness's credibility, and their deference to the prosecutor's probable cause assessment" all amount to reasonable mistakes based on mixed questions of law and fact.  *Id*.  Again, defendants approach qualified immunity from a position that asks the court to disregard the standard it must apply to a motion to dismiss.  As explained throughout this Order, viewing the facts alleged and drawing reasonable inferences from them in plaintiff's favor, defendants don't qualify for qualified immunity because plaintiff has alleged plausibly that their conduct knowingly violated his constitutional rights.

> *Finally,* defendants argue they are entitled to qualified immunity on the malicious prosecution claim (Count IV) because it wasn't clearly established in 1999 or 2000 that "the Fourth Amendment even supported a malicious prosecution claim."  Doc. 145 at 28 n.12.  In support they cite *Sanchez v. Hartley*, where the Tenth Circuit found it was clearly established in 2009 that using a false confession would violate the Fourth Amendment because a 2004 Tenth Circuit decision (*Pierce*) recognized such a claim, even though a later Tenth Circuit decision in dicta had questioned whether the Fourth Amendment, as opposed to the Fourteenth Amendment, could support such a claim.  810 F.3d 750, 759–60 (10th Cir. 2016).  Defendants also argue it

wasn't until the Supreme Court's decision in *Manuel* that the Fourth Amendment definitively supported a malicious prosecution claim.  Before then, defendants contend, the circuits were divided.  Doc. 145 at 28 n.12.  So, defendants say, that they shouldn't "be held to account for what may be deemed unconstitutional years many after their conduct."  *Id.*

Neither argument is convincing because it was clearly established in the Tenth Circuit before 1999 or 2000 that the Tenth Circuit recognized a Fourth Amendment malicious prosecution claim.  In 1996—before the conduct at issue here—the Tenth Circuit explained "[f]ollowing *Albright*, in the § 1983 malicious prosecution context, that constitutional right is the Fourth Amendment's right to be free from unreasonable seizures."  *Taylor v. Meacham*, 82 F.3d 1556, 1558, 1560–61 (10th Cir. 1996) (where plaintiff was arrested, bound over for trial, and jailed for seven weeks); *see also Becker*, 494 F.3d at 914 (citing *Taylor*, 82 F.3d at 1561, to explain the Tenth Circuit has "repeatedly recognized . . . that, at least prior to trial, the relevant constitutional underpinning for a claim of malicious prosecution under § 1983" is the Fourth Amendment); *Wilkins v. DeReyes*, 528 F.3d 790, 805 (10th Cir. 2008) (noting that officers "had fair warning" by 1996 that it would violate the Fourth Amendment to use false evidence to support a probable cause finding and concluding that it has "long been clearly established that knowingly arresting a defendant without probable cause, leading to the defendant's subsequent confinement and prosecution violates the Fourth Amendment's proscription against unreasonable searches and seizures" (citing *Taylor*, 82 F.3d at 1561)).  Thus, no later than 1996 Tenth Circuit precedent clearly recognized malicious prosecution claims under the Fourth Amendment, even if earlier Tenth Circuit cases framed such conduct as a due process violation.

And, as plaintiff aptly notes, the qualified immunity analysis focuses on defendants' conduct—asking whether that conduct violated clearly established law—and not where plaintiff

may seek a remedy.  Doc. 151 at 39; *see Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015)

(explaining qualified immunity asks whether defendant's conduct violated clearly established

law, and "not . . . whether a defendant should have realized he would be held civilly liable for his

actions").  *Brady* and *Pyle* gave defendants fair notice that fabricating and withholding material

evidence amounted to a constitutional violation under the Fourteenth Amendment when such

conduct causes an unfair trial.  No reasonable officer would have thought such conduct doesn't

violate the Constitution if it also caused an unreasonable seizure under the Fourth Amendment

pretrial.  *Reichle v. Howards*, 566 U.S. 658, 664 (2012) ("To be clearly established, a right must

be sufficiently clear that every reasonable official would [have understood] that what he is doing

violates that right."  (citations and internal quotation marks omitted)).

As already explained, plaintiff has alleged facts from which the court can draw a

reasonable inference that these defendants joined an agreement and acted on a concerted basis to

falsify and withhold evidence, and maliciously prosecute plaintiff for murder.  Even if

uncertainty existed in the Tenth Circuit in 1999 or 2000 whether a malicious prosecution claim

following commencement of wrongful legal process alleged conduct violating the Fourth

Amendment or the Fourteenth Amendment, an officer would have understood he was violating

plaintiff's constitutional rights by fabricating inculpatory evidence, withholding exculpatory

evidence, and maliciously prosecuting plaintiff for a crime he knew plaintiff didn't commit.

Thus, the individual Jefferson County defendants are not entitled to qualified immunity.

### E.  Claims against Jefferson County and Sheriff Herrig in his Official Capacity

Finally, the Jefferson County defendants argue the court must dismiss plaintiff's claims

against Jefferson County and Sheriff Herrig in his official capacity.  Plaintiff has asserted a claim

for municipal liability (Count VII) and a state law claim for indemnification (Count VIII).  The

court addresses the municipal liability claim in Part 1, below.  Part 2 considers the indemnification claim.

### 1.  Count VII—Municipal Liability

Count VII alleges Jefferson County[27] and Sheriff Herrig, acting in his official capacity, "are themselves liable for the violation of [p]laintiff's constitutional rights" because "[p]laintiff's injuries were caused by the polices, practices, and customs of the Jefferson County Sheriff's Department . . . ."  Doc. 141 at ¶¶ 159–160.  Plaintiff alleges that employees of the Sheriff's Department "regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating criminal defendants in criminal conduct, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner to that alleged herein."  *Id.* at ¶ 160.  He contends these practices were so widespread that they amount to a policy of the Sheriff's Department, that they "were allowed to exist because municipal policy makers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it," and that the practices "were allowed to flourish" because of insufficient training and oversight.  *Id.* at ¶ 161.  Also, plaintiff alleges the constitutional violations amount to a municipality policy or practice because they "were committed with the knowledge or approval of persons with final policymaking authority . . . or were actually committed by persons with such final policymaking authority"—*i.e.*, Sheriff Dunnaway and Mr. Herrig "ratified and authorized the fabrication of evidence against [plaintiff] and the withholding of exculpatory information from" him.  *Id.* at ¶¶ 162–64.

The Jefferson County defendants assert three arguments for dismissal.  *First*, they argue plaintiff has not alleged a constitutional violation.  *Second*, they contend neither Sheriff Herrig

---

[27]      As a reminder, the court uses "Jefferson County" as shorthand for defendant Board of County Commissioners of the County of Jefferson, Kansas.

nor Jefferson County are amenable to suit.  *Third*, they argue plaintiff has failed to satisfy the

municipal liability standard set forth in *Monell v. Department of Social Services of City of New*

*York*, 436 U.S. 658 (1978).  The court addresses each argument, in turn, below.

### a.  Constitutional Violation

*First*, the Jefferson County defendants argue plaintiff's claims asserting liability against

Jefferson County or Sheriff Herrig in his official capacity must fail because plaintiff has not

pleaded adequately any constitutional violation by the individual Jefferson County defendant

officers and, without an underlying violation by an officer, no municipality liability can exist.

Doc. 145 at 47; Doc. 152 at 16.  A municipality "may not be held liable where there was no

underlying constitutional violation by any of its officers."  *Donahue v. Wihongi*, 948 F.3d 1177,

1199–1200 (10th Cir. 2020) (citations and internal quotation marks omitted).  But, as explained

*supra* Parts III.A., III.B., and III.C., the court largely has rejected the Jefferson County

defendants' arguments asking the court to dismiss the claims against individual defendants.  So,

defendants' first argument for dismissing the claims against Jefferson County and Sheriff Herrig

in his official capacity lacks merit.

### b.  Capacity to be Sued

*Second*, the Jefferson County defendants argue plaintiff cannot sue Jefferson County for

the acts and omissions of law enforcement officers or policies of the Sheriff's Department

because Jefferson County does not have the authority to set policy for, or direct the operations of,

the Sheriff's Department.  Doc. 145 at 48.  Instead, under Kansas law, Sheriff Herrig has sole

responsibility for such matters.  *Id.*  So, they contend, Sheriff Herrig's actions cannot constitute

the "municipality's own policy" and thus cannot state a claim against Jefferson County.  *Id.*

And, they contend, neither can any claims lie against Sheriff Herrig in his official capacity because he is a state actor entitled to Eleventh Amendment immunity.  *Id.* at 48–49.

It is true that "under Kansas law, the sheriff is an elected official tasked with the hiring, firing, and supervision of sheriff deputies," and our court thus has concluded, "a board of county commissioners lacks the authority to supervise or train sheriff deputies, and the conduct of the sheriff and his subordinates cannot be attributed to the county commissioners."  *Humes v. Cummings*, No. 18-2123-DDC-GEB, 2019 WL 1596579, at *4 (D. Kan. Apr. 15, 2019) (citations and internal quotation marks omitted); *see also Wilson v. Sedgwick Cnty. Bd. of Cnty. Comm'rs*, No. 05-1210-MLB, 2006 WL 2850326, at *3–5 (D. Kan. Oct. 3, 2006) (granting board of county commissioners' motion to dismiss § 1983 claim because it had no policy-making or training authority over the Sedgwick County Sheriff's Office employees).  But, "Kansas law [also] provides that an action against a county shall [name] the Board of County Commissioners," as plaintiff has done here (along with naming Sheriff Herrig in his official capacity).  *Harris v. City of Wichita, Sedgwick Cnty.*, 862 F. Supp. 287, 292 (D. Kan. 1994); *see also Schwab v. Kansas*, No. 16-CV-4033-DDC-KGS, 2017 WL 2831508, at *13 (D. Kan. June 30, 2017); *Barngrover v. Cnty. of Shawnee*, No. 02-4021-JAR, 2002 WL 1758914, at *1 (D. Kan. June 10, 2002).  And, recent Tenth Circuit precedent has helped clarify dissonance[28] within this district whether a

---

[28]     *Compare Arnold v. City of Olathe, Kan.*, 413 F. Supp. 3d 1087, 1109 (D. Kan. 2019) (Murguia, J.) (holding sheriff was entitled to Eleventh Amendment immunity), *and Waterman v. Tippie*, No. 18-3295-JTM, 2019 WL 2924997, at *1 (D. Kan. July 8, 2019) (dismissing official capacity claims based on Eleventh Amendment immunity and noting that "[t]he Tenth Circuit and this court have concluded that Kansas Sheriffs are state officers for Eleventh Amendment purposes"), *and Kellogg v. Coleman*, No. 18-1061-JTM, 2019 WL 2207954, at *10–11 (D. Kan. May 22, 2019) (rejecting plaintiff's argument that sheriffs in Kansas are not considered arms of the state entitled to Eleventh Amendment immunity), *and Myers v. Brewer*, No. 17-2682, 2018 WL 3145401, at *5–6 (D. Kan. June 27, 2018) (Murguia, J.) (discussing split within the district and holding Kansas sheriffs are immune under the Eleventh Amendment for official capacity claims against them), *with Manley v. Bellendir*, No. 6:18-cv-1220, 2019 WL 3430563, at *2–4 (D. Kan. July 30, 2019) (Melgren, J.) (discussing split within the district and holding sheriff's actions were not entitled to Eleventh Amendment immunity), *and Estate of Holmes v. Somers*, 387 F. Supp. 3d 1233, 1257–61 (D. Kan. 2019) (Broomes, J.) (recognizing that "most decisions"

sheriff is treated as an arm of the state entitled to Eleventh Amendment Immunity, or if his

actions are taken on behalf of the county.  *See Couser v. Gay*, 959 F.3d 1018 (10th Cir. 2020).

In *Couser*, the Circuit considered whether a Kansas sheriff, when performing law

enforcement functions, is a state official entitled to Eleventh Amendment immunity or a county

official to whom Eleventh Amendment immunity does not apply when sued for damages in his

official capacity under § 1983.  *Id.* at 1021.  In this case, plaintiff sued the sheriffs of two Kansas

counties in their official capacities, seeking to impose municipal liability based on their policies

and practices of failing adequately to train and supervise their officers.  *Id.*  Plaintiff also named

the sheriffs' offices and the county entities as defendants, along with the individual officers

involved in the traffic chase that ended in a shooting and lead to the § 1983 suit.  *Id.*  The district

court concluded the sheriffs were not entitled to Eleventh Amendment immunity because they

act as arms of the county and not as arms of the state when performing local law enforcement

activities.  *Id.* at 1022.  But, the district court still granted one sheriff's motion to dismiss because

plaintiff had not stated a failure-to-train or supervise claim against him.  *Id.*  The remaining

sheriff appealed the district court's denial of Eleventh Amendment immunity.  *Id.*

The Tenth Circuit agreed the Kansas sheriffs were not entitled to Eleventh Amendment

immunity.  *Couser*, 959 F.3d at 1022–32.  It explained that official capacity claims are deemed to

be claims against the entity the official represents.  *See id.* at 1022–23.  So, if a Kansas sheriff is

a state official, he is entitled to Eleventh Amendment immunity for official capacity claims

seeking damages.  *Id.*  But, Eleventh Amendment immunity does not extend to counties.  *Id.* at

---

from our district court "favor a finding of immunity" for Kansas sheriffs, but holding to the contrary and
concluding sheriffs are arms of the county, not the state), *and Reyes v. Bd. of Cnty. Comm'rs of Sedgwick
Cnty.*, No. 07-CV-2193-KHV, 2008 WL 2704160, at *7–9 (D. Kan. July 3, 2008) (analyzing whether
sheriff was an officer of the county or a state official and holding sheriff was acting "as an arm of the
county" and was "not entitled to Eleventh Amendment immunity").

1023.  And so, if an official capacity claim against a sheriff is a suit against a county officer, the sheriff doesn't qualify for Eleventh Amendment immunity.  *Id.*  The Circuit reviewed the framework established by Supreme Court and Tenth Circuit precedent to help determine whether a "sheriff sued in his official capacity was a state or county official for purposes of a § 1983 claim."  *Id.* at 1023–25.  Applying that framework, the Circuit held that a Kansas sheriff "acting in his law enforcement capacity, is a county actor under Kansas law and thus not entitled to Eleventh Amendment immunity."  *Id.* at 1026.

First, the Circuit explained, Kansas law treats sheriffs as county officers.  *Couser*, 959 F.3d at 1026–27.  They are listed as county officers in Kansas statutes.  *Id.*  And, under the Kansas Tort Claims Act, "Kansas courts find the county liable for a sheriff's tortious acts" under a *respondeat superior* liability theory.  *Id.* at 1027.  Second, Kansas sheriffs have autonomy from state oversight when they act in their law enforcement capacity.  *Id.* at 1028–29.  For example, they operate independently from direction by the governor or attorney general and are not treated as state court employees.  *Id.*  Third, "the county funds and the board of county commissioners approves the sheriff's budget."  *Id.* at 1029.  It also sets and pays the sheriff's salary and may audit a sheriff's finances.  *Id.*  Finally, Kansas sheriffs are primarily concerned with local affairs.  *Id.* at 1030.  They are elected at the county level and their law enforcement responsibilities generally are limited to their county.  *Id.*  In sum, all relevant factors supported a finding that Kansas sheriffs are county actors and thus not entitled to Eleventh Amendment immunity.  *Id.* at 1030–32.

The Circuit also rejected the sheriff's argument that he was a state actor because Kansas statutes delegated law enforcement duties to the sheriff.  *Couser*, 959 F.3d at 1030–31.  It explained, "political subdivisions in all states derive their authority in some measure from the

state" but, on the whole, Kansas sheriffs represent the county not the State of Kansas when executing law enforcement duties. *Id.* at 1031.

With the Tenth Circuit's decision in *Couser*, the Jefferson County defendants' arguments that Sheriff Herrig is entitled to Eleventh Amendment immunity for the official capacity claims against him—all briefed before *Couser* was decided—can no longer deliver a punch. *See* Doc. 145 at 48–49 (citing cases decided before and rejected by *Couser*); Doc. 152 at 17–19 (same). He is a county official for the § 1983 claims asserted against him in his official capacity.

But, this conclusion just begs the next question:  Who must plaintiff sue to bring his municipal liability claim against the county based on the policies and practices of the sheriff and his department?  Sheriff Herrig in his official capacity?  The Board of County Commissioners of the County of Jefferson, Kansas?  Both?  *Compare Kelley v. Wright*, No. 2:19-CV-02278-JAR-JPO, 2019 WL 6700375, at *6 (D. Kan. Dec. 9, 2019) (holding sheriff was an arm of the county and "any official-capacity claim against him is the equivalent of an action against the Atchison County Board of County Commissioners"), *and Reyes v. Bd. of Cnty. Comm'rs of Sedgwick Cnty., Kan.*, No. 07-CV-2193-KHV, 2008 WL 2704160, at *7–9 (D. Kan. July 3, 2008) (treating official capacity claim against sheriff as "actually a claim against Sedgwick County" and "equivalent to an action against the Board of County Commissioners"), *with Arnold v. City of Olathe, Kan.*, 413 F. Supp. 3d 1087, 1110 (D. Kan. 2019) (dismissing (i) official capacity claims against city's police chief because they duplicated the claim against the city, (ii) claim against county as duplicating the claim asserted against county's board of commissioners, and (iii) claim against board of county commissioners because it did not oversee sheriff's acts and thus plaintiff's claim was against sheriff in his official capacity and plaintiff had not stated a valid claim against the board of county commissioners), *and Wilson*, 2006 WL 2850326, at *4

(dismissing claims against Sedgwick County board of county commissioners because it possesses no authority to make policies for the sheriff's department or responsibility for training the sheriff's deputies). *Cf. Pembaur v. City of Cincinnati*, 475 U.S. 469, 475 (1986) (summarizing Sixth Circuit's finding that sheriff was a county official with policy making authority and district court's holding that "County Board's lack of control over the Sheriff would not preclude county liability" where Ohio sheriff's acts "may fairly be said to represent the county's official policy" (citations and internal quotation marks omitted)).

The Jefferson County defendants argue such a claim cannot be asserted against Jefferson County (the Board of County Commissioners) because Jefferson County has no control over the Sheriff's Department. Doc. 145 at 48–49; Doc. 152 at 16–17. This argument that plaintiff cannot sue Jefferson County to hold the county liable for the sheriff's policies is tied implicitly to their argument that a sheriff acts on behalf of the state, which the court now has rejected. Plaintiff, on the other hand, argues his claims are against the county and he must name Jefferson County as a matter of Kansas statutory law. Doc. 151 at 39–40; *see also id.* at 41 (noting the suit against Sheriff Herrig "in his official capacity is the same as a suit against the Jefferson County Sheriff's Department (with the Board of County Commissioner[s] as the named defendant . . . .)"). The parties' briefs don't address whether—in the event a sheriff is considered a county actor as the court has concluded here—a plaintiff should name both the sheriff in his official capacity and the board of county commissioners in a suit seeking to hold the county liable for the sheriff's policies.

As explained below, the court agrees with plaintiff that he must name Jefferson County for his suit against the county. So, the court denies defendants' motion to dismiss the claim against Jefferson County based on this second argument. And, because the court has rejected

defendants' Eleventh Amendment immunity argument for the official capacity claims against Sheriff Herrig and defendants did not present any other arguments about his capacity to be sued as a representative of the county, the court also rejects defendants' second argument on the official capacity claims against Sheriff Herrig.

As noted above, official capacity claims are deemed to be claims against the entity the official represents. *See Couser*, 959 F.3d at 1022–23; *see also Barney v. Pulsipher*, 143 F.3d 1299, 1306 & n.4 (10th Cir. 1998). After *Couser*, it's clear that a Kansas sheriff performing law enforcement functions is a county actor, *i.e.*, a suit against the sheriff in his official capacity is a suit against the county. But, as plaintiff correctly argues, Kan. Stat. Ann. § 19-105 directs "[i]n *all* suits or proceedings by or against a county, the name in which the county shall sue or be sued shall be 'The board of county commissioners of the county of _____ []' . . . ." Kan. Stat. Ann. § 19-105 (emphasis added). The Kansas statute is clear—any suit against a county must name the board of county commissioners, as plaintiff has done here by naming Jefferson County as a defendant. So, the court denies defendants' motion to dismiss the claims against Jefferson County under their second dismissal argument. *Cf. Appleby v. Bd. of Cnty. Comm'rs of Douglas Cnty.*, No. 17-2101-DDC-GEB, 2018 WL 3659395, at *13 (D. Kan. Aug. 2, 2018) (concluding plaintiff properly had named board of county commissioners for Title VII claim by sheriff's department employee because Kan. Stat. Ann. § 19-105 requires the board to be named, and explaining that even though the board "has no responsibility over a sheriff's department," plaintiff is required to name his employer—the county—for the claim).

This Kansas statute also permits county officers *to sue* "in their name of office for the benefit of the county." Kan. Stat. Ann. § 19-105. But, this provision is silent whether a county officer—like a sheriff—may *be sued* in his name of office as a representative of the county. *See*

*id.*  This silence is a little puzzling because Kansas law explicitly provides the sheriff is an

independently elected official "responsible . . . for the default or misconduct of the undersheriff

and deputies."  Kan. Stat. Ann. §§ 19-801a; 19-805(a); *see also Wilson*, 2006 WL 2850326, at

*3–4 (discussing the sheriff and his deputies' independent powers from the board of county

commissioners under Kansas law).  And, given this independence, courts have concluded a board

of county commissioners doesn't have authority over and can't be held responsible for a sheriff's

actions or policies.  *See, e.g.*, *Humes*, 2019 WL 1596579, at *4; *Wilson*, 2006 WL 2850326, at

*3–5; *Mitchell v. Carter*, CIV. A. No. 88-2467-S, 1989 WL 48536, at *1 (D. Kan. Apr. 21,

1989); *cf. Blume v. Meneley*, 283 F. Supp. 2d 1171, 1174–75 (D. Kan. 2003) (explaining "the

Board of County Commissioners is only one of many offices that may act on behalf of defendant

Shawnee County" and the sheriff holds another position equal to the position to the board, and

thus the board has "no oversight over" or "vicarious liability for" the sheriff's department); *Bd.*

*of Cnty. Comm'rs of Cnty. of Lincoln v. Nielander*, 62 P.3d 247, 251, 254 (Kan. 2003)

(explaining the sheriff and his deputies are not "subordinate[s] of the board of county

commissioners[,]" instead, the sheriff is a "state officer" with certain powers "coextensive with

the county board" which the board "is not free to usurp" and thus, though the board provides

funding for the sheriff's office, it cannot control the hiring and firing of sheriff's deputies).[29]

Consider *Lee v. Wyandotte County, Kansas*, 586 F. Supp. 236 (D. Kan. 1984).  There, our

court explained that the sheriff is an independently elected official of the county under Kansas

---

[29]	In *Couser*, the Circuit considered the Kansas Supreme Court's language from *Nielander* to the effect that the board of county commissioners can't usurp the sheriff's hiring and firing powers.  *Couser*, 959 F.3d at 1032.  Despite this separation of powers between the board of commissioners and the sheriff, the Circuit focused on the sheriff's function challenged in the suit—his law enforcement duties—and concluded the sheriff acts on behalf of the county in such functions, even though *Nielander* indicates the sheriff may act as a state officer when making personnel decisions and within-budget purchases, *i.e.*, when acting in a "non-law enforcement capacity."  *Id.*

law, separate from the board of county commissioners who "has no authority to supervise, discipline, or remove the sheriff or his subordinates." *Id.* at 238. So, the court held, plaintiffs had failed to state a claim against certain individual county commissioner defendants where plaintiffs claimed that sheriff's officers were not properly trained and supervised. *Id.* 238–39. But, the court continued, considering whether plaintiffs had stated a claim against the county— named separately as a defendant. *Id.* at 240–41. It explained that Wyandotte County could be liable under § 1983 for actions by its sheriff—a county elected official—provided the sheriff's actions fairly could be said to represent the county's official policy. *Id.* So, the court denied summary judgment to the county. *Id.* at 241. Our court since has recognized that a county is not a legal entity with the capacity to be sued under Kansas law; instead, the board of county commissioners should be named. *Harris*, 862 F. Supp. at 292; *Schwab*, 2017 WL 2831508, at *13; *Barngrover*, 2002 WL 1758914, at *1.

In short, the direction given by the Kansas statute, *i.e.*, sue the board of county commissioners in *all* proceedings against the county, indicates a suit against the county *must* name the board of county commissioners. But, Kansas law also provides a sheriff has independent authority over his department and is not subject to oversight from the board of county commissioners. So, a suit against a sheriff in his official capacity as a county officer arguably is another way to assert a claim against the county.[30] For example, the claims in *Couser* were directed at the sheriff in his official capacity, and the Circuit affirmed the claims against him should not be dismissed, at least not based on Eleventh Amendment immunity. The Circuit never considered the question about how properly to sue a Kansas county where the

---

[30]     On the other hand, one could argue the language in Kan. Stat. Ann. § 19-105 permitting county officers to sue "in their name of office for the benefit of the county," without addressing whether a county officer may be sued in his name of office as a representative of the county, implies only the board of county commissioners should be named for a municipal liability claim.

sheriff's department's policies are challenged, but the board of county commissioners doesn't control the sheriff's department.

While the *Couser* case was pending before the district court, before the appeal, the *Couser* defendants had moved to dismiss all claims against McPherson County, Harvey County, and the Sheriff's Offices of each county, arguing these entities could not be sued under Kansas law. *Estate of Holmes v. Somers*, 387 F. Supp. 3d 1233, 1248 (D. Kan. 2019). The district court agreed, explaining that "to state a claim against a county, Plaintiff must sue the board of county commissioners of the county" and that "[t]he Kansas legislature has not provided a county sheriff's department with the capacity to sue or be sued." *Id.* (citation and internal quotation marks omitted). Plaintiff responded that she asserted her municipal liability claims against the sheriffs (who were named in their official capacities as defendants as well) and she proposed amending her complaint to name correctly the board of county commissioners. *Id.* The court dismissed the Sheriff's Offices and the counties, directing plaintiff to file a motion to amend if she wished to maintain properly a claim against the county. *Id.* at 1248–49 & n.8. It later separately considered the municipal liability claims against the sheriffs in their official capacities. *Id.* at 1261–63. But, it did not consider whether such claims against the sheriffs in their official capacities should proceed in addition to the claims against the board of county commissioners, in the event plaintiff amended her complaint to name the board properly.

Here, because the Jefferson County defendants move the court to dismiss the claims against Sheriff Herrig in his official capacity based solely on Eleventh Amendment immunity, the court denies defendants' motion on this ground. And, the court denies the motion to dismiss the claims against Jefferson County because Kan. Stat. Ann. § 19-105 directs a plaintiff to sue the Board of County Commissioners of the county, "[i]n *all* suits or proceedings by or against a

county."  Kan. Stat. Ann. § 19-105 (emphasis added).  The court does not have the benefit of hearing the parties' arguments on the question who should be named for a suit against the municipality where a sheriff is a county officer with authority independent from the board.  The court thus declines, for now, to decide whether, after *Couser*, a plaintiff should name a single defendant for the municipal liability claim, instead of both Jefferson County and Sheriff Herrig in his official capacity.  The court does not dismiss the municipal liability claim based on defendants' arguments about who possesses the capacity to be sued on this claim.

### c.  Municipal Liability under *Monell*

*Finally,* the Jefferson County defendants argue plaintiff has not alleged sufficient facts to support a municipal liability claim under § 1983.  Count VII alleges Jefferson County and Sheriff Herrig in his official capacity "are themselves liable for the violation of [p]laintiff's constitutional rights" because "[p]laintiff's injuries were caused by the polices, practices, and customs of the Jefferson County Sheriff's Department . . . ."  Doc. 141 at ¶¶ 159–160.

In *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978), the Supreme Court explained when a municipality may be held liable under § 1983.  Municipalities may not be held liable under § 1983 for constitutional torts committed by their employees under the doctrine of *respondeat superior*.  *Id.* at 663 n.7, 691–94 (citations omitted).  But, a municipality is a "person" to whom § 1983 applies.  *Id.* at 690.  And, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" § 1983 holds the government "as an entity [ ] responsible . . . ."  *Id.* at 694.  For example, a municipality may be sued under § 1983 if "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation or decision officially adopted and promulgated by that body's

officers." *Id.* at 690.  Or, a municipality may be held liable for a "constitutional deprivation[] visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." *Id.* at 690–91.  In short, if a municipality's own policy or custom causes a violation of plaintiff's constitutional rights, the municipality itself may be held liable. *Id.* at 690–95; *see also Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 403 (1997) (explaining the requirement for "a plaintiff seeking to impose liability on a municipality" to locate a policy of the municipality that caused the injury "ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality").

To state a municipal liability claim, plaintiff must allege:  "(1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) the policy or custom was the moving force behind the constitutional deprivation." *Crittenden v. City of Tahlequah*, 786 F. App'x 795, 800 (10th Cir. 2019) (citing *Monell*, 436 U.S. at 694); *see also Brown*, 520 U.S. at 404–05 (explaining that identifying a decision of a final policymaker alone is not enough to trigger municipal liability, a plaintiff also must show that "the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights"); *Carbajal v. McCann*, 808 F. App'x 620, 637–38 (10th Cir. 2020) (providing a plaintiff must show the existence of a municipal policy or custom and a direct causal link between that policy or custom and the alleged injury, and explaining that conclusory allegations of a policy or custom will not suffice to cross the line to state a plausible claim where no allegations in the complaint "give rise to an inference that the municipality itself established a deliberate policy or custom that caused

[Plaintiffs'] injuries" (citations and internal quotation marks omitted)); *Scott v. City of Albuquerque*, 711 F. App'x 871, 883 (10th Cir. 2017) ("To establish the causation element, the challenged policy or practice must be closely related to the violation of the plaintiff's federally protected right." (citations and internal quotation marks omitted)).

The Tenth Circuit has recognized five ways that an action can qualify as a policy or custom:

> A municipal policy or custom may take the form of (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that . . . is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them— of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Crittenden*, 786 F. App'x at 800 (quoting *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010)). The Jefferson County defendants contend plaintiff has not made any allegations that adequately plead a municipal policy or custom. They identify and discuss four of the five forms above, excluding the failure to train or supervise theory. Doc. 145 at 49–52. Plaintiff argues he has sufficiently pleaded a municipal policy or custom in several of the recognized means, above, though he identifies the categories slightly differently than defendants and does not address form three as a separate category. Doc. 151 at 47. The court now applies each method of showing a municipal policy or custom to the allegations in the Second Amended Complaint.

### i. Formal Policy Statement

For the first form, the Jefferson County defendants contend plaintiff has not alleged an express municipal policy that could have caused a deprivation. Plaintiff agrees he did not allege

an express policy violating his rights.  Doc. 151 at 47.  So, plaintiff has not pleaded municipal liability through the first form of policy identified above.

### ii.    Widespread Practice Amounting to Custom

For the second form, plaintiff argues he has pleaded adequately a widespread practice rising to the level of a municipal policy or custom.  *Id.* at 39–40.  The Second Amended Complaint alleges that employees of the Sheriff's Department "regularly failed to disclose exculpatory evidence to criminal defendants, fabricated false evidence implicating criminal defendants in criminal conduct, pursued wrongful convictions through profoundly flawed investigations, and otherwise violated due process in a similar manner to that alleged [in the Second Amended Complaint]."  Doc. 141 at ¶ 160.  Plaintiff alleges these practices were so widespread that they amounted to a policy of the Sheriff's Department and that they "were allowed to exist because municipal policymakers with authority over the same exhibited deliberate indifference to the problem, thereby effectively ratifying it."  *Id.* at ¶ 161.  He also alleges the Sheriff's Department didn't implement sufficient training and oversight of officers who withheld evidence, fabricated evidence, and pursued wrongful convictions, so the widespread practices "were allowed to flourish."  *Id.*

Defendants contend plaintiff's allegations that the Sheriff's Department regularly failed to disclose exculpatory evidence and fabricated false evidence to pursue wrongful convictions is conclusory and lacks any facts to support it, so the Second Amended Complaint does not allege sufficiently any widespread practices amounting to a custom or de facto policy.  Doc. 145 at 50.  Indeed, plaintiff provides no specific allegations of such conduct in other criminal investigations and prosecutions.  His allegations describe only officers' conduct in plaintiff's own criminal

case.  Then, he provides a single assertion that the Sheriff's Department employees "regularly" engaged in such conduct for other criminal defendants too.  Doc. 141 at ¶ 160.

Plaintiff responds that he need not provide examples of other instances when the Jefferson County defendant officers fabricated and withheld evidence to plead a widespread practice or custom.  Doc. 151 at 47.  He argues that at the pleading stage he must describe only the policy and how it caused the constitutional violations.  *Id.*  In support, plaintiff cites *Martinez v. Winner*, 771 F.2d 424 (10th Cir. 1985).

In *Martinez*, plaintiff alleged law enforcement and others conspired against him because he was a minority and was using his legal skills to promote the rights of oppressed minorities. *Id.* at 433.  He alleged law enforcement wanted to harass him and stop his political and social activism.  *Id.*  For his municipal liability claim, he alleged that the Denver Police Department "had an official policy and plan to . . . deny rights to . . . 'oppressed' national minorities," and, under that plan, the Department had issued a policy and instructions to "get" plaintiff.  *Id.* at 443–44.  Specifically, plaintiff alleged the Department kept a dossier on him and his views and associations, and that it started a "campaign to charge plaintiff and harass him and others advocating unpopular causes with unfounded prosecutions and to discourage him and others from asserting their rights."  *Id.* at 444.  Because of this "racial hatred" plaintiff alleged he was falsely arrested.  *Id.*  The Circuit concluded these allegations were "clearly sufficient, as a matter of pleading, to satisfy the 'policy' or 'custom' requirement of *Monell* . . . ."  *Id.*

Plaintiff argues because the *Martinez* plaintiff "did not name other instances where the [Department's] racial discrimination policy was applied to other racial minorities" but only "provided details about how the plan or custom was applied to him," plaintiff's allegations here that the Sheriff's Department had a custom of withholding exculpatory evidence and fabricating

evidence to pursue wrongful convictions, coupled with his allegations of how they applied this policy to him, suffice to plead a municipal liability claim.  Doc. 151 at 48.  Defendants do not reply to plaintiff's argument.  They instead rely on plaintiff's admission that Jefferson County does not control the Sheriff's Department, believing this "conclusively answers the question of whether [plaintiff] has any claims against the county."  *See* Doc. 152 at 16–17.  Apparently, defendants did not consider what would happen if the court decided the sheriff was a county official, not a state actor.  The Reply merely asserts, generally, that even if Sheriff Herrig is not immune, plaintiff "has not identified what actual policies (express or de facto) or final decisions existed and caused his conviction."  *Id.* at 19.

Nonetheless, the court concludes that the defendants have the better end of this argument. *Martinez* was decided before the pleading standards established by *Twombly* and *Iqbal*.  And, though the court accepts the well-plead allegations in the Second Amended Complaint as true at this stage, plaintiff's allegation that the Sheriff's Department had a widespread practice of fabricating evidence and withholding exculpatory evidence is nothing but a conclusion.  That's not enough.  As the controlling case make clear, counsel's ability to use the required words is not substitute for pleading facts.  *See Iqbal*, 556 U.S. at 678; *Bixler*, 596 F.3d at 756.  Plaintiff provides no facts to support this claim beyond the allegations about his case specifically.  And, while a complaint is not required to contain detailed factual allegations, it must provide enough facts to give rise to a plausible claim.  *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555, 570.

In sum, plaintiff's assertion that a widespread practice existed, while providing only factual allegations about his own criminal prosecution does not provide enough facts to allege a plausible "informal custom amounting to a widespread practice" of fabricating inculpatory evidence or withholding exculpatory evidence.  *Crittenden*, 786 F. App'x at 800 (internal

quotation omitted); *see also Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1290 (10th Cir.

2019) (holding plaintiff's allegations "describing only one similar incident of excessive force

prior to his own injuries—fall far short of plausibly alleging a widespread practice of excessive

force, much less a practice so permanent and well settled as to constitute a custom or usage with

the force of law" (citation and internal quotation marks omitted)); *Jennings v. Stewart*, No. 4:20-

cv-58-AW-MAF, 2020 WL 2610937, at *3–4 (N.D. Fla. May 21, 2020) (rejecting claims of a

policy or custom under *Monell* where plaintiff provided only "broad and conclusory" assertions

that frequent actions like plaintiff's own experience demonstrated a policy but provided no facts

to support an inference a policy existed); *Oceanside Organics v. Cnty. of San Diego*, No. 15-CV-

854-JLS (MDD), 2016 WL 6124465, at *3–4 (S.D. Cal. Oct. 20, 2016) (rejecting formulaic

recitation of *Monell* municipal liability claim as insufficient under *Twombly* and *Iqbal* where

plaintiffs did not provide any factual allegations outside their own experience); *Falk v. Perez*,

973 F. Supp. 2d 850, 863–65 (N.D. Ill. 2013) (concluding plaintiff had not stated a widespread

practice amounting to a custom under *Twombly* and *Iqbal* where she only named the wrongs she

had suffered and then made bare, boilerplate allegations of a policy or custom or failure to train

and thus did not plead adequately a *Monell* claim).

The Tenth Circuit has rejected analogous conclusory allegations where a plaintiff did not

provide any facts to support an inference of a municipal policy or custom.  *See Carbajal*, 808 F.

App'x at 638; *Bauer v. City & Cnty. of Denver*, 642 F. App'x 920, 925 (10th Cir. 2016); *Mocek*

*v. City of Albuquerque*, 813 F.3d 912, 934 (10th Cir. 2015); *cf. Pierce v. Gilchrist*, 359 F.3d

1279, 1283 (10th Cir. 2004) (reviewing claim against employee (not municipality) where

plaintiff supported his allegations of a "pattern and practice of . . . securing convictions on the

basis of falsified or misleading evidence" by pointing to specific instances where forensic analyst

had been reprimanded for misconduct in other cases); *Estate of Holmes*, 387 F. Supp. 3d at 1261–63 (holding plaintiff had stated plausible failure to train and failure to supervise claims against one municipality where plaintiff specifically cited earlier excessive force complaints against the department, but denying claim against other municipality that relied on plaintiff's single incident of excessive force because plaintiff did not allege plausibly any knowledge of inadequacies in training or disciplinary action or that the deficient training was directed by a final policymaker).

### iii. Decision of or Ratification by Final Policymaker

On the third and fourth options of formulating a municipal policy, defendants contend plaintiff has not alleged that a person with final policymaking authority affirmatively decided or ratified a subordinate decision and the basis for it, so plaintiff hasn't alleged any county policy. Doc. 145 at 50–51.

The Second Amended Complaint alleges there was a municipal policy of withholding exculpatory evidence and fabricating evidence to pursue wrongful convictions through flawed investigations because "municipal policymakers with authority over" the criminal investigations allowed such practices to take place and "exhibited deliberate indifference to the problem, thereby effectively ratifying it." Doc. 141 at ¶ 161. Also, plaintiff alleges the constitutional violations were caused by a municipal policy because they "were committed with the knowledge or approval of persons with final policy making authority . . . or were actually committed by persons with such final policymaking authority" for the county—*i.e.*, Sheriff Dunnaway and Undersheriff Herrig "ratified and authorized the fabrication of evidence against [plaintiff] and the withholding of exculpatory information from" him. *Id.* at ¶¶ 162–64. He alleges that the Sheriff and Undersheriff's "ratification and authorization of this misconduct . . . constituted the

official policy" of the county and that they were "deliberately indifferent to the risks that these polices, practices, and customs would lead" to constitutional violations. *Id.* at ¶ 165.

Defendants contend plaintiff has not alleged the third form of municipal policy at all, arguing he "does not seem to allege any particular affirmative decision by a policymaker." Doc. 145 at 50. Defendants recognize plaintiff attempts to allege then-Sheriff Dunnaway and then-Undersheriff Herrig were final policymakers who ratified decisions. But, they contend, Mr. Herrig was not a final policymaker because the sheriff is responsible for his undersheriffs. And, they argue, plaintiff has not pleaded ratification properly because he has not alleged a particular decision by any subordinate with delegated authority or that the final policymaker ratified that decision and its basis. Defendants assert plaintiff's general allegations that policymakers exhibited deliberate indifference or ratified the fabrication and withholding of evidence are too vague to plead a basis for municipal liability. *Id.* at 51. They contend plaintiff must make more specific allegations about who did what; *i.e.* plaintiff must specify what authority was delegated to what subordinate, what decision the subordinate made, and how a final policymaker ratified the decision and the basis for it. *Id.*

Plaintiff's Response briefly addresses defendants' arguments, contending he has alleged a final policymaker ratified the misconduct. Doc. 151 at 47–48. He argues that he has alleged adequately "the decisions to fabricate and withhold evidence were made with the knowledge and approval of the final policymakers, Sheriff Dunnaway and/or Defendant Herrig[,]" which suffices to put Jefferson County on notice of the municipal liability claim. *Id.* at 48.

- ***Who is a Final Policymaker?***

The court first considers who may qualify as a final policymaker. Defendants do not argue that a sheriff isn't a final policymaker. But, they contend, an undersheriff—like Mr.

Herrig was at the time of the alleged conduct—is not a final policymaker.  Plaintiff never address this argument in his Response.  The court agrees with defendants—here, only the sheriff is a "final policymaker" for purposes of establishing municipal liability.

"[W]hether a government employee is a [final] policy-making official is a question of state law."  *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1189 (10th Cir. 2010).  This question focuses on who is "legally a final policymaker for a municipality" by considering:  "(1) whether the official is meaningfully constrained by policies not of that official's own making; (2) whether the official's decision[s] are final—*i.e.*, are they subject to any meaningful review; and (3) whether the policy decision purportedly made by the official is within the realm of the official's grant of authority."  *Id.* (citation and internal quotation marks omitted); *see also City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (plurality opinion) (explaining a municipality is liable only for acts which it has officially sanctioned or ordered and that a final policymaking official may subject the municipality to liability by his actions, but "the challenged action must have been taken [under] a policy adopted by the official . . . responsible . . . for making policy in *that area* of the [municipality's] business" (citation omitted)).

Kansas statutory law grants authority to the sheriff over law enforcement duties.  *See generally* Kan. Stat. Ann. §§ 19-801a–19-828.  It also provides that a sheriff is an elected official for the county and is "responsible . . . for the default or misconduct of the undersheriff and deputies" he appoints to "carry out the duties of the office."  *See* Kan. Stat. Ann. §§ 19-801a; 19-803; 19-805(a).  The sheriff can require the undersheriff and deputies "to attend any meeting or seminars which the sheriff determines will be beneficial to the operation of the sheriff's office."  *Id.* at § 19-805(b).  And, though the sheriff must submit a budget for approval by the board of county commissioners and follow certain personnel policies and procedures established by the

146

board for county employees, a county board otherwise does not otherwise have authority over

the law enforcement policies and procedures of a sheriff's office. *See id.* § 19-805(c)-(d);

*Humes*, 2019 WL 1596579, at *4 (noting our court has concluded "a board of county

commissioners lacks the authority to supervise or train sheriff deputies"); *Wilson* , 2006 WL

2850326, at *3–5 (explaining board of county commissioners has no policy-making or training

authority over the Sedgwick County Sheriff's Office employees); *Blume*, 283 F. Supp. 2d at

1174–75 (explaining "the Board of County Commissioners is only one of many offices that may

act on behalf of defendant Shawnee County" and the sheriff holds another position equal to the

position to the board, and thus the board has "no oversight over" or "vicarious liability for" the

sheriff's department); *Mitchell*, 1989 WL 48536, at *1 (explaining board of county

commissioners has "no authority to direct or control the actions or policies" of the sheriff or his

officers); *Nielander*, 62 P.3d at 251, 254 (explaining the sheriff and his deputies are not

"subordinate[s] of the board of county commissioners[,]" instead, the sheriff has certain powers

"coextensive with the county board" which the board "is not free to usurp"); *cf. Couser*, 959 F.3d

at 1028–31 (explaining Kansas sheriffs derive their authority for law enforcement duties from

state statutes but have autonomy from state oversight when acting in their law enforcement

capacity).

   Thus, a Kansas sheriff is a final policymaker for the county on law enforcement matters.

*See Seifert v. Unified Gov't of Wyandotte Cnty./Kan. City*, 779 F.3d 1141, 1159 (10th Cir. 2015)

(concluding actions of Kansas county sheriff "in his position as the final policymaker for the

Wyandotte County Sheriff's Department, represent the official policy of the Unified Government

and subject it to potential liability"); *Meyer v. Nava*, 518 F. Supp. 2d 1279, 1287 (D. Kan. 2007)

(holding acting supervisor at jail was not final policymaker because sheriff was his supervisor

and, despite some discretion given to the jail supervisor, sheriff was the only official with authority to establish policy).

An undersheriff in Kansas, on the other hand, is appointed by the sheriff and is not provided similar final policymaking authority by Kansas law.  *Meyer*, 518 F. Supp. 2d at 1287. He thus does not have final policymaking authority.  *Estate of Hammers v. Douglas Cnty., Kan. Bd. of Comm'rs*, 303 F. Supp. 3d 1134, 1147 (D. Kan. 2018) (dismissing official capacity claims against undersheriff because only sheriff was final policy maker).  And, the only way Undersheriff Herrig's decisions could form a basis for municipal liability is if he "was delegated authority to make decisions on these matters by final policymakers" (*i.e.*, by Sheriff Dunnaway), "subject to [Sheriff Dunnaway's] final review and approval, and [Sheriff Dunnaway] ratified [his] decisions" and "the basis for them."  *Brammer-Hoelter*, 602 F.3d at 1189–90.

"Liability will be imposed on a government entity for the actions of an official who is subject to review by other policymakers or who is limited by the policy and decisions of others only if the final policymaker ratifies the decision of the subordinate."  *Meyer*, 518 F. Supp. 2d at 1287.  "The final policymaker must not only approve the decision, but also adopt the basis for the decision, and the ratification must be the moving force, or cause, of the alleged constitutional violation."  *Id.*; *see also Bryson*, 627 F.3d at 790 (explaining "a municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for these actions" and holding city's decision to promote chemist despite complaints about her work was not sufficient to establish the city ratified her acts of falsifying evidence and concealing exculpatory evidence because it was not aware of those actions at the time and when city learned of her acts they terminated her).  So, the court considers next whether plaintiff has alleged municipal liability "based on the decisions of

employees with final policymaking authority or the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval." *Brammer-Hoelter* 602 F.3d at 1189 (describing the various ways a plaintiff may establish municipal liability).

- ### *Decision by a Final Policymaker*

Focusing on Sheriff Dunnaway's conduct alone, plaintiff's allegations assert that "Sheriff Dunnaway . . . personally knew about, participated in, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivations by [his] actions or by [his] deliberately indifferent failure to act." Doc. 141 at ¶ 16. While this allegation alone is conclusory and, as discussed above, plaintiff has not alleged adequately a widespread practice, plaintiff alleges other facts that can support a plausible inference that Sheriff Dunnaway joined the conspiracy making the decisions to fabricate evidence, withhold evidence, and maliciously prosecute plaintiff ones by a final policymaker. Thus, at the motion to dismiss stage, plaintiff has alleged a requisite municipal policy sufficient for his claim to survive the motion to dismiss. *See Brown*, 520 U.S. at 405–06 (explaining a single unconstitutional decision attributable to a municipality may trigger municipal liability "where the evidence the municipality had acted and that the plaintiff had suffered a deprivation of federal rights also prove[s] fault and causation").

Specifically, plaintiff alleges Sheriff Dunnaway was present when Tom first confessed to the murder to the police and divulged details about the killing. Doc. 141 at ¶¶ 36–37. And, plaintiff asserts, Tom confessed again to Sheriff Dunnaway, Mr. Johnson, Mr. Vanderbilt, and possibly others, after the polygraph examination where Tom was coached to lie. *Id.* at ¶ 59. But, as part of the conspiracy to frame plaintiff, Mr. Johnson "immediately instructed Tom to

continue lying" and Tom acquiesced.  *Id.*  And, "Sheriff Dunnaway and certain [] Defendants then arrested [plaintiff], even though they knew [he] was innocent."  *Id.* at ¶ 62.  Plaintiff also specifically alleges that "Sheriff Dunnaway and Defendant Officers including Defendants Poppa and Woods purposefully withheld their documentation of inculpatory statements made by Tom and Defendant Hayes on the night Tom turned himself in . . . that revealed an insider's knowledge of the murder . . . ."  *Id.* at ¶ 71.  And, Sheriff Dunnaway "purposefully withheld . . . documentation of Tom's inculpatory statements during the November 12th polygraph examination and interview."  *Id.* at ¶ 73.

A reasonable inference from these allegations—and plaintiff's allegations that all defendants conspired to frame him—is that Sheriff Dunaway joined the conspiracy and helped execute it.  This makes plaintiff's allegation that the decisions to fabricate and withhold evidence constituted municipal policy plausible because Sheriff Dunnaway was the county official with final policymaking authority over law enforcement matters.  *See Brown*, 520 U.S. at 404–05 (explaining that identifying a decision of a final policymaker may trigger municipal liability if a plaintiff also shows that "the municipal action was taken with the requisite degree of culpability and [ ] demonstrate[s] a direct causal link between the municipal action and the deprivation of federal rights"); *Pembaur*, 475 U.S. at 481, 484–85 (concluding that both sheriff and prosecutor were policymakers under Ohio law and explaining "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly," and "[i]f the decision to adopt [a] particular course of action is properly made by that government's authorized decisionmakers" the decision represents "an act of official government policy"); *Thomas v. City of Snyder*, 103 F.3d 145, No. 95-6252, 1996 WL 662453, at *4–7 (10th Cir. Nov. 15, 1996) (unpublished) (describing how when "a

municipal official who is responsible for establishing final policy with respect to the subject matter in question makes a deliberate choice to follow a course of action . . . from among various alternatives, municipal liability will attach to that decision" and providing examples of when even a tailored decision—like a police chief directing arrests regardless of whether facts supported probable cause—may create municipal liability (citation and internal quotation marks omitted)); *Marchese v. Lucas*, 758 F.2d 181, 184, 187–89 (6th Cir. 1985) (concluding county could be liable for sheriff's failure to train and ratification of illegal acts of his officers where plaintiff was severely beaten by sheriff's officers while in custody and "[t]he Sheriff's subsequent failure to order and direct an investigation . . . and to administer censure and punishment served to confirm the existence of an unstated 'policy' of toleration of illegal brutality"); *Munz v. Ryan*, 752 F. Supp. 1537, 1550 (D. Kan. 1990) (noting "[c]ourts have often recognized the final policy or decision making authority of police chiefs or sheriffs such that their actions can be said to represent actions taken by the governmental units they represent" and explaining if police chief was the final authority on searches carried out by the police "there can be no doubt that the illegal search" was attributable to a final policymaker in this case because the chief himself directed the search of plaintiff).

- ***Ratification***

Plaintiff's ratification argument presents a much closer call.  But, at this stage, from allegations in the Second Amended Complaint, plaintiff also has alleged facts that support a plausible inference that Sheriff Dunnaway ratified the decisions of his subordinates and the basis for them.

"[A] municipality will not be found liable under a ratification theory unless a final decisionmaker ratifies an employee's specific unconstitutional actions, as well as the basis for

these actions." *Bryson*, 627 F.3d at 790 (concluding plaintiff presented no evidence that suggested the city ratified the chemist's falsification of test results and concealment of exculpatory evidence once it learned about those actions); *see also City of St. Louis*, 485 U.S. at 127 ("If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final."). "Because a municipality cannot be held liable under a *respondeat superior* theory of liability" a plaintiff "must identify a [final] policymaker who ratified the officer's actions." *Osborn v. Meitzen*, No. CIV-20-96-SPS, 2020 WL 3800547, at *2 (E.D. Okla. July 6, 2020) (citations, internal quotation marks, and alteration omitted). And, a final policymaker's failure to investigate or punish the action "'does not count as ratification.'" *Id.* (quoting *Lynch v. Bd. of Cnty. Comm'rs of Muskogee Cnty.*, 786 F. App'x 774, 787 (10th Cir. 2019)). Instead, plaintiff must allege the final policymaker affirmatively approved the subordinate's decision, adopted the basis for the decision, "'and the ratification must be the *moving force, or cause*, of the alleged constitutional violation.'" *Id.* (quoting *Dempsey v. City of Baldwin*, 143 F. App'x 976, 986 (10th Cir. 2005)); *see also Patrick v. City of Overland Park*, 937 F. Supp. 1491, 1501 (D. Kan. 1996) (explaining to state a § 1983 municipal liability claim on a "theory of ratification" a plaintiff "must allege and prove that the final policymaker affirmatively approved the particular action of the subordinate," and concluding that plaintiff had not done so because the facts alleged showed the municipality reprimanded the action rather than ratified or approve it).

Here, defendants contend plaintiff has not sufficiently alleged what authority was delegated to whom, what decisions were made, or how Sheriff Dunnaway ratified the decisions. But, plaintiff alleges various Jefferson County defendant officers participated in the plan to frame him by fabricating inculpatory evidence and withholding exculpatory evidence. These

officers were subordinates of Sheriff Dunnaway whom he had appointed to help him "carry out the duties of the office" and "for whose official acts" he was responsible.  Kan. Stat. Ann. § 19-805.  This is not to say every decision his subordinates made was made with delegated authority and ratified by the final policymaker simply by virtue of Sheriff Dunnaway being their supervisor.  *Cf. Brown*, 520 U.S. at 405 (where sheriff had not authorized deputy's use of excessive force); *Brammer-Holter*, 602 F.3d at 1190 (where school board had not ratified administrator's directives restricting free speech).  But, plaintiff's allegations here differ from *Brown* and *Brammer-Hoelter*.  And, for reasons explained below, they are sufficient to survive defendants' motion to dismiss.  *See Arnold*, 413 F. Supp. 3d at 1112 (recognizing plaintiff had not included as many facts for his municipal liability claim as for other claims in the complaint, but noting plaintiff "ha[d] not yet been granted discovery into the policies, practices, and customs that may have resulted in the officers' actions" and holding at "this point in the litigation" plaintiff had alleged a plausible *Monell* claim against the city).

In *Brammer-Hoelter*, the Tenth Circuit determined a school administrator was not a final policymaker, so the school[31] could be held liable for her actions only if the school board—the final policymaker—had "delegated authority to [the administrator] to make decisions on these matters, subject to the Board's final review and approval, and the Board ratified her decisions and the basis for them."  602 F.3d at 1190.  The Circuit rejected the administrator's argument that all of her actions in dealing with teachers were authorized by the school board.  *Id.*  She provided no more than her own "non-specific testimony" to support this argument and the summary judgment record contained no other evidence that the board ever ratified her directives

---

[31]     Municipal liability principles applied to the action against Twin Peaks Charter Academy because it was a public charter school.  *Brammer-Hoelter*, 602 F.3d at 1188.  The Tenth Circuit explained that "the Academy is a local governmental entity" who could be subject to municipal liability under § 1983.  *Id.*

restricting speech.  *Id.*  Instead, some evidence showed that the board expressly had questioned her directives at a board meeting.  *Id.*  So, the Circuit affirmed summary judgment against the § 1983 claim in favor of the school.  *Id.*  Similarly, no evidence in *Brown* suggested that the sheriff had authorized an officer's use of excessive force.  *Brown*, 520 U.S. at 405.  In that case, plaintiff based his municipal liability claim on the sheriff's allegedly inadequate hiring procedures.  But, though the sheriff had final authority over hiring matters, the sheriff's decision to hire the officer without screening his record in this one instance did not demonstrate the sheriff was deliberately indifferent to an known or obvious risk that an excessive force violation would occur following that decision.  *Id.* at 408–414.

Here, at the motion to dismiss phase, plaintiff has alleged that Sheriff Dunnaway was responsible for supervising the Jefferson County defendant officers and that he himself participated in the plan to frame plaintiff, resulting in a violation of plaintiff's federal rights. Sheriff Dunnaway, plaintiff alleges, knew plaintiff was innocent.  A reasonable inference from the fact plaintiff's investigation and prosecution continued, despite the final policymaker's knowledge he was innocent, is that Sheriff Dunnaway ratified his subordinates' decisions to fabricate inculpatory evidence and withhold exculpatory evidence and the basis for these decisions—*i.e.*, to frame plaintiff.  *See Moss v. Kopp*, 559 F.3d 1155, 1169 (10th Cir. 2009) (holding plaintiffs had not alleged sufficiently municipal liability because they had not alleged any conduct by the final policymaker sheriff, relying only on facts about the conduct of his deputies, and also did not allege that the sheriff had approved the underlying alleged illegal search); *Harris v. Williams*, 33 F.3d 62, No. 93-7109, 1994 WL 446772, at *2 (10th Cir. Aug. 18, 1994) (unpublished) (concluding no municipal policy existed in part because plaintiff had not alleged the sheriff had "ratified the unidentified jailer's decision"); C.*F.B. v. Hayden*, No. 16-

2645-CM, 2019 WL 1299679, at *12–13 (D. Kan. Mar. 21, 2019) (explaining "the final policymaker's approval of a subordinate's decision is the equivalent of the final policymaker making that decision," which, "if that decision . . . was made deliberately from among various alternatives," could "be considered a municipal policy that gives rise to *Monell* liability"); *see also City of St. Louis*, 485 U.S. at 127–29 (plurality opinion) (describing how actions of non-final policymakers can lead to municipal liability "[i]f the authorized policymakers approve a subordinate's decision and the basis for it" because "their ratification would be chargeable to the municipality because their decision is final," but concluding respondent had pointed to no evidence "so much as hint[ing]" that the final policymaker had found "retaliatory transfers or layoffs . . . permissible"); *cf. David v. City & Cnty. of Denver*, 101 F.3d 1344, 1358 (10th Cir. 1996) (applying pre *Twombly* and *Iqbal* pleading standard and explaining that "[a]ccepting the allegations of [plaintiff's] complaint as true and affording her the benefit of all favorable factual inferences, we cannot say that she could prove no set of facts under which [the final policy maker] . . . ratified the assertedly retaliatory actions").

Whether plaintiff can adduce evidence proving his allegation that Sheriff Dunnaway delegated authority to other officers to make these decisions when conducting plaintiff's criminal investigation, then ratified his subordinates' decisions to fabricate and withhold evidence to frame plaintiff causing his alleged constitutional injuries is a question for summary judgment or trial. *See Arnold*, 413 F. Supp. 3d at 1112 ("The facts of the case may not eventually support that claim, but the allegations at this point are sufficient to allow the claim to proceed."). But, against defendants' motion to dismiss, plaintiff has alleged facts that support a plausible inference he did so.

In sum, accepting the allegations in the Second Amended Complaint as true and drawing reasonable inferences from them, plaintiff plausibly has alleged a municipal policy formed either by a final policymaker's decisions or a final policymaker's ratification of subordinates' decisions and the basis for them.

### iv.     Failure to Train or Supervise

Defendants did not summarize the law or address separately the fifth way to allege a municipal policy or custom—"a failure to adequately train or supervise employees" that "results from 'deliberate indifference' to the injuries that may be caused." *See Brammer-Hoelter*, 602 F.3d at 1189 (quoting *City of Canton v. Harris*, 489 U.S. 378, 388–91 (1989)); *Hollingsworth v. Hill*, 110 F.3d 733, 745 (10th Cir. 1997) ("Where the official policy that forms the basis of a local government liability claim consists of a failure to act, the plaintiff must demonstrate that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants. . . .  [A] local government policymaker is deliberately indifferent when he 'deliberately' or 'consciously' fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in a constitutional injury of the type experienced by the plaintiff." (citation and internal quotation marks omitted)).  Defendants argue generally that plaintiff's allegations that policymakers exhibited deliberate indifference do not sufficiently allege municipal liability *by ratification*.  Doc. 145 at 51.  But plaintiff's Response asserts he also has alleged municipal liability based on a failure to train and failure to supervise theory.  Doc. 151 at 47.  Because the parties never analyze whether plaintiff adequately has alleged municipal liability based on a failure to train or supervise, the court does not consider whether plaintiff has pleaded the fifth form of municipal policy adequately.  Simply put, defendants'

motion hasn't discharged their burden to show that they are entitled to dismissal of a municipal

liability claim asserted based on this theory.[32]

---

[32]     The Second Amended Complaint alleges the Sheriff's Department didn't implement sufficient training and oversight of officers who withheld evidence, fabricated evidence, and pursued wrongful convictions, so the widespread practices "were allowed to flourish." Doc. 141 at ¶ 161.  Plaintiff alleges Sheriff Dunaway "personally knew about, participated in, facilitated, approved, and/or condoned this pattern and practice of misconduct, or at least recklessly caused the alleged deprivation by [his] actions or by [his] deliberately indifferent failure to act." *Id.* at ¶ 16.  And, plaintiff alleges, the Sheriff's Department didn't have "any legitimate mechanism for oversight or punishment" of officers who engaged in such conduct. *Id.* at ¶ 161.

       To establish municipal liability on this basis, plaintiff must demonstrate the sheriff, in his official capacity, "failed to adequately train or supervise" its employees "with deliberate indifference to the harms this failure might cause." *Brammer-Hoelter*, 602 F.3d at 1189; *see also Brown*, 520 U.S. at 405–415 (explaining an inadequate training claim can establish municipal liability in limited circumstances where plaintiff shows the municipality acted with deliberate indifference to an obvious consequence—a constitutional violation—and this conscious disregard for a known or obvious risk makes the failure to train or otherwise take action the cause of the injury); *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989) ("We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact."); *Barney v. Pulsipher*, 143 F.3d 1299, 1307–08 (10th Cir. 1998) (discussing legal standard for a municipal liability claim based on inadequate training under *Brown* and *City of Canton*).

       Typically, to show municipal liability for failing to train, a plaintiff shows "the existence of a pattern of tortious conduct" and that the municipality failed to take action deliberately disregarding the risk of harm from such conduct. *Barney*, 143 F.3d at 1307–08.  But, deliberate indifference also can exist without a "pattern of unconstitutional behavior if a violation of federal rights is a 'highly predictable' or 'plainly obvious consequence' of a municipality's action or in action[.]" *Id.* at 1307–08 (quoting *Brown*, 520 U.S at 409); *see also Bryson*, 627 F.3d at 789 (concluding evidence did not support finding of deliberate indifference where City had not received any complaints about forensic chemist's work at the time of the alleged conduct and her wrongful actions were not otherwise a "highly predictable or a plainly obvious consequence" of the short training period and lack of meaningful supervision); *Osborn*, 2020 WL 3800547, at *3 (denying motion to dismiss failure to train claim despite no allegations of a pattern or practice of similar violations because plaintiff had "sufficiently alleged deliberate indifference to the predictable consequence of the use of deadly force when using patrol vehicles as roadblocks"); *Welch v. Bd. of Cnty. Comm'rs of Sedgwick Cnty.*, No. 19-1057-JWB, 2019 WL 4168824, at *4–5 (D. Kan. Sept. 3, 2019) (holding plaintiff had not stated a plausible municipal liability claim on failure to train or failure to supervise theory where complaint said nothing about the training or supervision that was provided, made only conclusory allegations that the county provided insufficient training or supervision without identifying "any concrete deficiency," and had not alleged deliberate indifference to a need for training or supervision because he alleged no facts that showed "the incident was in fact the product of a training [or supervision] deficiency rather than individual misconduct" and thus had failed adequately to identify a policy of failing to train or supervise, causation, or deliberate indifference).

### v.   Conclusion

In conclusion, plaintiff has failed to allege municipal liability based on an express policy statement adequately.  Plaintiff didn't allege sufficiently "widespread practice" or "de facto policy" of fabricating evidence and withholding exculpatory evidence to pursue wrongful convictions, because he has alleged no facts that plausibly support such a claim.  But, he has alleged sufficiently decisions made or ratified by a final policymaker.  So, the court denies defendants' request to dismiss Count VII—the municipal liability claim.

### 2.   Count VIII—Indemnification

Count VIII alleges that Kansas law requires Jefferson County (either via the Sheriff's Department or the Board of County Commissioners) to pay any tort judgment for which its employees, acting within the scope of their employment, are found liable.  Doc. 141 at ¶ 168.  So, plaintiff alleges Jefferson County must pay any judgment he achieves against the Jefferson County defendant officers.  *Id.* at ¶¶ 169–171.

The Jefferson County defendants argue the court should dismiss this claim for two reasons.  *First,* indemnification is a right the Jefferson County employees may invoke, it is not a right that plaintiff enjoys.  Doc. 145 at 39.  *Second*, to the extent plaintiff seeks indemnification against Sheriff Herrig in his official capacity, the Sheriff's Department is entitled to Eleventh Amendment immunity, and thus cannot be held liable for money damages.  *Id.*  Thus, they argue, Count VIII doesn't assert a recognizable independent cause of action and the court should dismiss it.  *Id.*  For reasons explained above, *supra* Part III.E.1.b., Sheriff Herrig is not entitled to Eleventh Amendment immunity for the official capacity claims against him.  So, defendants' second dismissal argument against the indemnification claim is unpersuasive.

For defendant's first argument, they cite an unpublished Tenth Circuit case analyzing an Oklahoma statute. *See* Doc. 145 at 39 (citing *Lampkin v. Little*, 85 F. App'x 167, 170 (10th Cir. 2004)).  When reviewing the same Oklahoma governmental employee indemnification statute at issue in *Lampkin* in a published opinion, the Tenth Circuit has confirmed *Lampkin*'s holding that a prevailing plaintiff does not have standing to invoke the employee's right to indemnification under Oklahoma law. *Bryson*, 627 F.3d at 791–92 (citing *Lampkin*, 85 F. App'x at 169).  The Oklahoma statute provided the city would pay any judgment entered against an employee for constitutional violations that occurred while the employee was acting within the scope of employment, provided the employee applied for indemnification within 30 days of final judgment and otherwise satisfied the statutory requirements. *Id.* at 791.  The statute stated, explicitly, that only the real party in interest could file an application for indemnification, and that "in no event shall any application be presented nor recovery made under the right of subrogation." *Id.* at 79 (quoting Okla. Stat. tit. 51, § 162(B)(3)).  The Circuit explained that the employee is the real party in interest because the purpose of the Oklahoma statute is to relieve an employee of paying a judgment where the employee meets the statute's prerequisites. *Id.*  And, where the indemnification right is invoked properly, the indemnification award is paid to the employee and not the prevailing plaintiff, who is only an incidental beneficiary. *Id.*  So, the prevailing plaintiff was not entitled to seek an Oklahoma indemnification award from the city for the judgment he obtained against a city employee. *Id.*

Defendants cite *Lampkin* but never address whether Kansas's indemnification statute contains similar language or if Kansas law supports similar reasons to deny a prevailing plaintiff participation in an indemnification claim against a municipality.  The court declines to dismiss plaintiff's indemnification claim where defendants have presented no law or analysis to support a

similar holding for plaintiff's indemnification claim under Kansas law.  Indeed, the Tenth Circuit has noted that *Lampkin*'s holding "rested . . . primarily on specific language" in the Oklahoma statute prohibiting recovery under the right of subrogation.  *Jones v. Courtney*, 466 F. App'x 696, 697–98 & 698 n.2 (10th Cir. 2012) (denying prevailing plaintiff's attempt to hold the Kansas Department of Corrections liable for a judgment based on Eleventh Amendment immunity, rather than adopting the magistrate judge's reason for dismissal which relied on *Lampkin* and concluded a prevailing plaintiff could not use the Kansas Tort Claims Act to recover a judgment from a non-party state entity).  At this juncture, the court thus is unpersuaded by defendants' final dismissal argument.  And so, it denies defendants' motion to dismiss the indemnification claim.[33]

## IV.   Conclusion

For the reasons explained above, the court grants in part and denies in part the Jefferson County defendants' Motion to Dismiss (Doc. 144).  Specifically:

- The court doesn't dismiss the § 1983 claims in Count I (due process violation for fabricating Tom's testimonial evidence), Count III (*Brady v. Maryland* due process violation for withholding exculpatory evidence and fabricating additional evidence), or Count IV (malicious prosecution) based on the Jefferson County defendants' argument that the Second Amended Complaint fails to allege personal participation by the individual Jefferson County defendants.  Nor does the court dismiss the conspiracy counts (Counts II and V) or failure to intervene count (Count VI).

---

[33]      Plaintiff concedes that his indemnification claim "may be premature, as there is not yet an extant judgment for Jefferson County to indemnify."  Doc. 151 at 39 n.3.  Plaintiff states that he "pleads this count . . . to preserve the claim and . . . to place Jefferson County on notice of his intention to seek indemnification of any judgment he obtains in this case."  *Id.*  But, defendants do not move for dismissal on the grounds plaintiff's claim is premature.

- The court grants defendants' Motion to Dismiss the § 1983 claims in Counts I, III, and IV to the extent they assert claims for Fourteenth Amendment *procedural* due process violations because the *Parratt* doctrine bars those claims. Kansas law provides an adequate post-deprivation remedy—a malicious prosecution state law tort claim.

- The court doesn't dismiss the § 1983 claims in Counts I and III to the extent they assert claims for Fourteenth Amendment *substantive* due process violations based on the right to a fair trial. And, the court concludes plaintiff has alleged adequately facts to satisfy the elements essential to these claims.

- The court doesn't dismiss the § 1983 claims in Count IV to the extent they assert claims for a Fourth Amendment violation based on unlawful pretrial detention or a Fourteenth Amendment *substantive* due process violation based on a right against conscience shocking conduct that results in a substantial liberty deprivation not covered by Fourth Amendment's protections. And, the court concludes plaintiff has alleged adequately facts to satisfy the elements essential to these claims.

- The court concludes the individual Jefferson County defendants are not entitled to qualified immunity for the § 1983 claims against them at the motion to dismiss stage.

- The court doesn't dismiss the municipal liability claim (Count VII). Defendants haven't established as a matter of law that Jefferson County and Sherriff Herrig, in his official capacity, aren't amendable to suit. In contrast, the court is persuaded by defendants' arguments that plaintiff has not alleged adequately municipal liability based on an express policy statement or a "widespread practice" or "de facto policy" of fabricating evidence and withholding exculpatory evidence to pursue wrongful convictions. But, plaintiff has alleged decisions made

or ratified by a final policymaker that suffice to allege a municipal policy to survive defendants'
Motion to Dismiss.

- The court doesn't dismiss the indemnification claim (Count VIII).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants Board of
County Commissioners of the County of Jefferson, Kansas; Jeffrey Herrig, in his individual and
official capacity; Randy Carreno; Troy Frost; and Robert Poppa's Motion to Dismiss Second
Amended Complaint (Doc. 144) is granted in part and denied in part.

**IT IS SO ORDERED.**

**Dated this 18th day of November, 2020, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**