**FILED**
**United States Court of Appeals**
**Tenth Circuit**

# UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

**November 15, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

FLOYD S. BLEDSOE,

     Plaintiff - Appellee,

v.

RANDY CARRENO; TROY FROST;
ROBERT POPPA; JEFFREY HERRIG,

     Defendants - Appellants,

and

BOARD OF COUNTY
COMMISSIONERS FOR THE COUNTY
OF JEFFERSON, KANSAS; JIM
VANDERBILT; GEORGE JOHNSON;
JIM WOODS; TERRY MORGAN;
MICHAEL HAYES; UNKNOWN
OFFICERS OF THE JEFFERSON
COUNTY SHERIFF'S DEPARTMENT;
UNKNOWN OFFICERS OF THE
KANSAS BUREAU OF
INVESTIGATION,

     Defendants.

No. 20-3252
(D.C. No. 2:16-CV-02296-DDC-GLR)
(D. Kan.)

_____

## JUDGMENT

_____

Before **HOLMES**, Chief Judge, **EBEL** and **EID**, Circuit Judges.

_____

This case originated in the District of Kansas and was argued by counsel.

The judgment of that court is affirmed in part and reversed in part. The case is remanded to the United States District Court for the District of Kansas for further proceedings in accordance with the opinion of this court.

Entered for the Court

CHRISTOPHER M. WOLPERT, Clerk

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**November 15, 2022**

**UNITED STATES COURT OF APPEALS**

**Christopher M. Wolpert**
**Clerk of Court**

**FOR THE TENTH CIRCUIT**
_____

FLOYD S. BLEDSOE,

     Plaintiff - Appellee,

v.

RANDY CARRENO; TROY FROST;
JEFFREY HERRIG; ROBERT POPPA,

     Defendants - Appellants,

BOARD OF COUNTY
COMMISSIONERS FOR THE COUNTY
OF JEFFERSON, KANSAS; GEORGE
JOHNSON; JIM WOODS; TERRY
MORGAN; MICHAEL HAYES;
UNKNOWN OFFICERS OF THE
JEFFERSON COUNTY SHERIFF'S
DEPARTMENT; UNKNOWN OFFICERS
OF THE KANSAS BUREAU OF
INVESTIGATION; JIM VANDERBILT,

     Defendants.

No. 20-3252

_____

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 2:16-CV-02296-DDC-GLR)**
_____

Eric Turner, Foulston Siefkin LLP, Overland Park, Kansas (Michael J. Norton, Foulston
Siefkin LLP, Wichita, Kansas, with him on the briefs), for Defendants-Appellants.

Ruth Brown (Theresa Kleinhaus and Russell Ainsworth with her on the brief), Loevy & Loevy, Chicago, Illinois, for Plaintiff-Appellee.

_____

Before **HOLMES**, Chief Judge, **EBEL** and **EID**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

Plaintiff-Appellee Floyd Bledsoe spent sixteen years in prison for the November 1999 murder of his fourteen-year-old sister-in-law Camille in Jefferson County, Kansas—a crime he did not commit. In 2015, new DNA testing and a suicide note from Bledsoe's brother Tom supported Bledsoe's longstanding claim that Tom was the killer and Bledsoe was innocent. A state court subsequently vacated Bledsoe's convictions and prosecutors dismissed all charges against him.

In 2016, Bledsoe filed this 42 U.S.C. § 1983 action against ten named defendants, most of whom were Kansas law enforcement officers. Bledsoe alleged that Defendants conspired to fabricate evidence implicating him in the murder and intentionally suppressed evidence that would have proved his innocence, thereby causing him to be charged, tried, and convicted without even probable cause to believe he was guilty. At issue in this appeal is the district court's denial of a motion to dismiss filed pursuant to Federal Rule of Civil Procedure 12(b)(6) by Defendant-Appellants Randy Carreno, Troy Frost, Jeffrey Herrig, and Robert Poppa, all of whom were law enforcement officers employed by the Jefferson County Sheriff's

Office.[1]  In their Rule 12(b)(6) motion, Appellants asserted that they were entitled to qualified immunity because Bledsoe 1) failed to state claims adequately alleging that Appellants deprived Bledsoe of his constitutional rights, and/or 2) any constitutional violations Bledsoe did adequately allege against Appellants were not clearly established in 1999, when the events at issue occurred.  The district court denied Appellants qualified immunity on most of Bledsoe's claims.  Having jurisdiction under 28 U.S.C. § 1291 to consider this interlocutory appeal from the denial of qualified immunity, see Mitchell v. Forsyth, 472 U.S. 511, 530 (1985), we AFFIRM in part the district court's judgment denying Appellants qualified immunity, and REVERSE in part.

In doing so, we first conclude that the Supreme Court's decision in Parratt[2] does not preclude Bledsoe's substantive due process claims.  We further conclude that Bledsoe adequately alleged substantive due process and Fourth Amendment claims against each Appellant for evidence fabrication and for suppressing exculpatory evidence (Counts I and III), a malicious prosecution claim (Count IV), conspiracy claims (Count II and V), and a failure-to-intervene claim (Count VI). Lastly, we conclude that all the constitutional violations Bledsoe has alleged except

―――――――――――――――

[1] Bledsoe frequently refers to all defendants as a group.  Where possible, this opinion will refer to the ten named defendants generally as "Defendants," will refer to the defendant law enforcement officers as "Defendant Officers," and when discussing these four officers from the Sheriff's Office specifically will use "Appellants."

[2] Parratt v. Taylor, 451 U.S. 527 (1981), overruled on other grounds by Daniels v. Williams, 474 U.S. 327, 328 (1986).

his failure-to-intervene claim were clearly established in 1999.  The district court,

therefore, correctly denied Appellants qualified immunity on all but the

failure-to-intervene claim.

## I.  BACKGROUND

### A.  Factual Overview

For the purposes of this appeal, we accept Bledsoe's well-pled factual

allegations as true and draw all reasonable inferences in his favor.  Ullery v. Bradley,

949 F.3d 1282, 1287 (10th Cir. 2020).[3]  Those facts paint a dark picture of law

enforcement's plot to convict Bledsoe falsely.

In November 1999, Bledsoe was twenty-three years old and working as a

farmhand.  He lived in Jefferson County with his wife Heidi and their two young

sons.  Heidi's fourteen-year-old sister Camille was living with the family at that time

as well.  Bledsoe's older brother Tom, then twenty-five years old, lived nearby with

his parents.  Tom was "partially deaf," "had a limited social life, certain intellectual

---

[3] Appellants argue that some of the allegations in Bledsoe's complaint are "contrary
to the prior criminal and post-conviction proceedings" and thus should not be
accepted as true, even at this stage of litigation.  Aplt. Br. at 6 (citing Kan. Penn
Gaming LLC v. Collins, 656 F.3d 1210, 1214 (10th Cir. 2011)).  In support of that
argument, Appellants attached to their Rule 12(b)(6) motion a transcript of Bledsoe's
state criminal trial, which the district court agreed to consider for its contents where
Defendants provided specific citations to the transcript.  This court can rely on the
trial transcript "to show [its] contents, not to prove the truth of the matters asserted
therein."  Tal v. Hogan, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (internal
quotation marks omitted).  Accordingly, the facts recited here are taken from
Bledsoe's Second Amended Complaint and to some extent from the district court's
opinion below. We assume them to be true for the purposes of this appeal.  We reject
Appellants' general assertions on appeal as to what the trial transcript says in an
attempt to contradict Bledsoe's factual allegations.

limitations, and a history of troubling sexual behavior that included pursuing young girls." (2d Am. Compl. (Aplt. App. 26-53) at ¶ 28.)

On November 5, 1999, Camille arrived home from school at 4:20 p.m., but was not there when her friend stopped by at 5:00 p.m. Bledsoe and Heidi reported the girl's disappearance to the Jefferson County Sheriff's Office and searched for Camille for the next forty-eight hours. On November 7, Tom separately told his Sunday school teacher and his parents that he had killed Camille. Tom's parents immediately hired attorney Michael Hayes to represent Tom.[4] Hayes and Tom met with Sheriff's Office personnel that same evening, November 7. They told officers that Camille had been shot several times, including once in the back of the head, and that her body was hidden in the trash dump on the property where Tom lived. Tom and Hayes then took officers to that trash dump, where they found Camille's body, along with three bullet casings, an X-rated movie, and a T-shirt that read "Countryside Baptist Church," of which Tom was a member. (Id. at ¶¶ 28, 38.) Camille's wounds matched Tom's description. Hayes turned over the murder weapon—Tom's recently purchased nine-millimeter pistol. The coroner found sperm in the victim's vagina, but could not say who it belonged to or whether Camille had been forcibly sexually abused. Tom was arrested and charged with Camille's murder.

---

[4] Hayes is a named defendant in this suit, but he is not involved in this appeal.

Despite this substantial evidence against Tom, Defendants allegedly conspired to frame Bledsoe instead for the murder.[5]  Defendants did so despite the fact that Bledsoe's whereabouts were accounted for from the time Camille went missing on November 5 to the time of Tom's confession on November 7.  Bledsoe's alibi was corroborated by numerous witnesses, a time-stamped receipt, phone records, and even testimony of Appellant Carreno—the lead investigator on the case—who had searched for Camille alongside Bledsoe on November 6.

Bledsoe alleges that Defendants' general plan to frame him was to have Tom recant his confession and to coach Tom to explain that he knew the details of the murder because Bledsoe had told him those details.  Specifically, Tom would state falsely that he met Bledsoe at a roadway intersection on Saturday, November 6, at which time Bledsoe confessed to Tom that he had killed Camille, told Tom the details of the murder, and "persuaded Tom to take the blame by threatening to expose Tom's history of viewing X-rated movies, masturbating, and attempting to have sex with a dog."  (Id. at ¶ 52.)  Bledsoe claims that this meeting never happened.

"Shortly before Tom's staged recantation," Tom's defense attorney "Hayes sought [Bledsoe] out and told him that Hayes was taking Tom off the 'hot seat' and putting [Bledsoe] on, or words to that effect."  (Id. at ¶ 55.)  On November 12, a

---

[5] At this point, the motive for the scheme is unclear, but one theory alleged by Bledsoe is that the prosecutor Jim Vanderbilt—another named defendant who is not involved in this appeal—was indebted to Hayes for helping Vanderbilt "avoid . . . legal exposure for Vanderbilt's appropriation of county funds for personal use." (2d Am. Compl. at ¶ 51.)

Kansas Bureau of Investigation ("KBI") officer, Defendant Johnson, administered lie detector tests to both Tom and Bledsoe.[6]  During his exam, Tom recanted his confession and incriminated Bledsoe.  But Tom "failed the question" of whether he shot Camille, and was so overcome with guilt immediately after the lie detector test that he confessed again to killing Camille.  (Id. at ¶ ¶ 58–59.)  Nonetheless, the KBI officer told Tom that he should continue lying to implicate Bledsoe.

Bledsoe passed his lie detector test by "truthfully disavowing any involvement in the crime."  (Id. at ¶ 60.)  Defendant Johnson falsified the results, however, inaccurately reporting that Tom had been truthful in denying his involvement in the murder, while Bledsoe had been deceptive in denying that he was involved.  Based on those false polygraph results, the prosecutor dropped the charges against Tom, "pursuant to an agreement that was never disclosed to" Bledsoe or his defense counsel, and arrested and charged Bledsoe.  (Id. at ¶¶ 61–62, 88.)

Tom's fabricated story was "the central piece" of the prosecution's evidence against Bledsoe at trial.  (Id. at ¶ 67.)  Carreno and others at the Sheriff's Office "knowingly and purposefully falsified" Tom's story to fit his fictitious roadside

---

[6] Johnson and several other KBI officers are named defendants in this suit, but are not involved in this appeal.  Bledsoe alleged that these KBI "[o]fficers were integral and active participants in the investigation of [Camille's] death and directed various aspects of the investigation," including gathering physical evidence, executing search warrants, photographing the crime scene and victim, conducting and reviewing the polygraph examinations, interviewing witnesses, and making "dozens of police reports."  (2d Am. Compl. ¶ 18.)

meeting with Bledsoe "into the brief period of time in which they believed (wrongfully) that [Bledsoe] lacked an alibi."  (Id. at ¶ 64.)

Defendants also "withheld evidence of Tom's guilt from [Bledsoe's] defense and the prosecution and generated additional false evidence against [Bledsoe] to secure his prosecution and conviction."  (Id. at ¶ 68.)  For example, in addition to fabricating Tom's story implicating Bledsoe in the murder and falsifying the polygraph results, Defendants fabricated an incriminating statement from Bledsoe indicating that he had returned home at the same time that Camille disappeared from their house.  In fact, Bledsoe had denied returning home that afternoon.

Defendants also failed to disclose to Bledsoe and his defense attorney "Tom's many inculpatory statements" confessing to the murder and his giving specific details of the crime, as well as "evidence that Tom had a history of pursuing young girls roughly Camille's age and had made sexual advances on Camille just a few weeks before her disappearance."  (Id. at ¶ 69, 74.)

In addition, police skewed the investigation towards Bledsoe and away from Tom.  For example, while officers thoroughly searched Bledsoe's home and vehicle and also gathered clothing from a third suspect, they "purposefully declined to subject Tom's home—or even his room or clothing—to any rigorous forensic examination," and "declined to collect any physical evidence from the vehicles Tom drove," including the truck in which Tom said he shot Camille.  (Id. at ¶¶ 81–82.)  Additionally, the officers "intentionally declined to collect any physical evidence from" the shovel Tom said he had used to bury Camille.  (Id. at ¶ 82.)  They also

8

allowed Tom's father to handle the murder weapon—Tom's gun—before turning it over to police.

The prosecutor offered Bledsoe a plea deal under which he would be sentenced to five years' imprisonment if he pled guilty. Bledsoe turned down the deal and went to trial, where a jury convicted him of murder, kidnapping, and taking indecent liberties with a child. The trial judge sentenced Bledsoe to life in prison plus sixteen years. Bledsoe appealed and sought habeas relief, to no avail.

In 2015, after Bledsoe had been in prison for sixteen years, newly available DNA testing established that the semen found in Camille's body likely matched Tom's DNA; it was conclusively not a match for Bledsoe. Tom committed suicide soon after this revelation and left a note stating that he had killed Camille and:

> I sent an innocent man to prison. The Jefferson County police and county attorney Jim Vanderbelt [sic] made me do it. I was told by Vanderbelt [sic] to keep my mouth shut. . . .
>
> . . . .
>
> I tried telling the truth but no one would listen. I was told to keep my mouth shut. . . .
>
> Floyd S Bledsoe is an innocent man.

(Id. at ¶ 101.) Tom also left a diagram that showed where he shot Camille, which led the police to a fourth bullet casing that had not previously been found.

The state trial court vacated Bledsoe's convictions and the county prosecutor dismissed the charges against him. Bledsoe filed the instant action shortly after his release from prison.

## B. Factual Allegations as to Each Appellant

### 1. Randy Carreno

Carreno was a law enforcement officer for the Sheriff's Office and was the lead investigator on Camille's case.  Bledsoe alleged that Carreno knew Bledsoe had not met Tom at the intersection on Saturday, November 6—where Tom falsely said Bledsoe had confessed to killing Camille—because Carreno was with Bledsoe most of that day looking for Camille.  Accordingly, Bledsoe asserts that "Carreno and other Defendant Officers knowingly and purposefully falsified Tom's statements to fit the fictitious roadside meeting into the brief period of time in which they believed (wrongly) that [Bledsoe] lacked an alibi, even though they knew that the entire roadside meeting never happened."  (Id. at ¶ 64.)[7]  Bledsoe further alleged that "Carreno . . . knowingly coached Tom to provide false explanations for how he had known so many details about Camille's murder," and Carreno "purposefully withheld documentation of Tom's activities and statements between November 8th and 12th," the dates Tom was arrested and then released.  (Id. at ¶¶ 65, 72.)

---

[7] Appellants complain that Bledsoe failed to "allege what statements were altered, in what way the statements were changed, how the statements were documented, to whom the statements were made, or what motivation Carreno or anyone else would have had to falsify Tom's statement."  (Aplt. Br. 17.)  The district court correctly rejected these arguments because "Fed. R. Civ. P. 8(a)(1) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'  It 'does not require "detailed factual allegations."'"  (Aplt. App. at 870 (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555) (2009)).)

Additionally, the district court reasonably inferred from the complaint's factual allegations that Carreno was at the meeting between Tom's defense counsel Hayes and prosecutor Vanderbilt when the conspiracy against Bledsoe was hatched, or that Carreno met with Hayes soon thereafter. The district court based that inference on Bledsoe's allegations that Hayes met with prosecutor Vanderbilt and/or others, that Hayes conspired with Carreno to pin the murder on Bledsoe, and that Hayes and Carreno found a willing ally for their scheme in Vanderbilt.

**2. Robert Poppa**

Poppa was a law enforcement officer also employed by the Jefferson County Sheriff's Office. Bledsoe alleged that Poppa was present when, on the night Tom turned himself in, Tom confessed in great detail to murdering Camille. Bledsoe specifically claimed that Poppa, along with other officers,

- "purposefully withheld their documentation of [Tom's] inculpatory statements";

- "purposefully withheld their documentation of Tom's desire to commit suicide";

- "subjected [Bledsoe's] home and vehicle to thorough, rigorous forensic examination," but

- "purposefully declined" to search Tom's home, room, clothing, truck (where Tom said he shot Camille), and the shovel Tom said he used to bury the victim; and

- allowed Tom's father to handle the murder weapon and ammunition, in order to further their scheme of wrongfully framing Bledsoe for the murder.

(Id. at ¶¶ 71, 79, 81–83.)

### 3.  Troy Frost

Frost, too, was a law enforcement officer with the Sheriff's Office.  Bledsoe

alleged that Frost

- "withheld evidence that Tom had a history of pursuing young girls roughly Camille's age and had made sexual advances on Camille just a few weeks before her disappearance";

- "falsely claimed that [Bledsoe] had confessed on two separate occasions to having visited his home at the time Camille disappeared from it";

- "signed a search warrant affidavit to that effect," knowing Bledsoe "had never made such a statement";

- along with Poppa and Herrig, "subjected [Bledsoe's] home and vehicle to thorough, rigorous forensic examination"; but

- "intentionally" and "purposefully declined" to search Tom's home, room, clothing, truck (where Tom said he shot the victim) and shovel Tom said he used to bury the victim; and

- allowed Tom's father to handle the murder weapon and ammunition, in order to further their scheme of wrongfully framing Bledsoe for the murder.

(Id. at ¶¶ 74, 79, 81–83, 89, 92).[8]

---

[8] Relying on the transcript of Bledsoe's criminal trial, Appellants on appeal challenge the veracity of some of the allegations Bledsoe makes against Frost.  Appellants first assert on appeal that we should accept as true Bledsoe's allegation that Frost "falsely claim[ed] that Bledsoe confessed to having visited his home when Camille disappeared," because the trial transcript contradicts that allegation in that Frost admitted on cross-examination that he had merely misunderstood Bledsoe as confessing to the visit.  (Aplt. Br. 43–44.)  The admission induced on cross-examination does not negate Bledsoe's allegation that Frost used the false statement to get a warrant to search Bledsoe's house.  Moreover, the district court correctly held that Frost's false testimony on direct examination was "material" to Bledsoe's convictions because both the state appellate and federal habeas courts expressly relied on Frost's direct-examination testimony that Bledsoe admitted to going home at the time Camille disappeared to uphold his convictions.  (Aplt. App. 897–98.)  Second, Appellants assert that Bledsoe's defense counsel had information that Tom

### 4. Jeffrey Herrig

Undersheriff Jeffrey Herrig was in charge of the day-to-day operations of the

Jefferson County Sheriff's Office, and his duties included the supervision of Carreno,

Poppa, and Frost.  Bledsoe alleged that Herrig, along with Poppa and Frost,

- "subjected [Bledsoe's] home and vehicle to thorough, rigorous forensic
examination"; but

- "intentionally" and "purposefully declined" to search Tom's home, room,
clothing, truck (where Tom said he shot the victim) and the shovel Tom said
he used to bury the victim; and

- allowed Tom's father to handle the murder weapon and ammunition, in order
to further their scheme of wrongfully framing Bledsoe for the murder.

(Id. at ¶¶ 79, 81–83.)

## C.  Procedural background

Bledsoe initiated this 42 U.S.C. § 1983 litigation against ten defendants,

including the four members of the Jefferson County Sheriff's Office who are the

Appellants here,[9] several members of the Kansas Bureau of Investigation, the County

prosecutor Vanderbilt, and Tom's defense attorney Hayes.  Six of Bledsoe's § 1983

claims are relevant in this appeal:

---

had flirted with a fourteen-year-old, so Frost did not suppress information that Tom
had a history of pursuing young girls roughly Camille's age.  But this does not negate
Frost's alleged failure to disclose the highly relevant information that Tom had made
sexual advances toward Camille specifically a few weeks before she was killed.

[9] In addition to suing these four employees of the Sheriff's Department, Bledsoe also
sued Roy Dunnaway, who was the Sheriff of Jefferson County at the time of the
murder.  After Dunnaway died, Bledsoe removed him as a named defendant.

**Count I**, alleging all Defendants deprived Bledsoe of due process—a fair trial—in violation of the Fourteenth Amendment by fabricating Tom's "testimonial evidence" used against Bledsoe.

**Count II**, alleging all Defendants conspired to deprive Bledsoe of due process by fabricating Tom's testimonial evidence against Bledsoe.

**Count III**, alleging Defendant Officers (Appellants and the KBI Defendants) deprived Bledsoe of due process—a fair trial—by fabricating additional inculpatory evidence used against Bledsoe and suppressing exculpatory evidence that would have established Bledsoe's innocence.

**Count IV**, alleging Tom's defense attorney Hayes and the Defendant Officers maliciously caused Bledsoe's arrest, pretrial detention, and prosecution without probable cause, in violation of the Fourth and Fourteenth Amendments' due process guarantees.

**Count V**, alleging Tom's defense attorney Hayes and the Defendant Officers conspired to deprive Bledsoe of his constitutional rights by maliciously prosecuting him, suppressing exculpatory evidence and fabricating evidence against Bledsoe.[10]

**Count VI**, alleging the Defendant Officers failed to intervene to prevent the deprivation of Bledsoe's constitutional rights.[11]

Appellants filed a Rule 12(b)(6) motion to dismiss, arguing that Bledsoe failed to state claims against them on which relief can be granted and that they were each entitled to qualified immunity. The district court granted that motion in part, dismissing Counts I, III, and IV to the extent they alleged procedural due process

---

[10] Bledsoe identified Counts II and V as conspiracy counts specifically, but he also alleged a conspiracy in each of Counts I through V.

[11] Bledsoe also pled a municipal liability claim against the County's Board of Commissioners and now-Sheriff Herrig sued in his official capacity (Count VII) and a state-law indemnification claim (Count VIII). Those claims are not at issue in this appeal.

claims and otherwise denied the motion.  Appellants immediately took this interlocutory appeal challenging the partial denial of their motion to dismiss.

## II.  JURISDICTION

This court has jurisdiction under 28 U.S.C. § 1291 to consider Appellants' interlocutory appeal from the "district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law." Mitchell, 472 U.S. at 530. A qualified immunity defense asserted in a Rule 12(b)(6) motion to dismiss generally presents two questions: 1) whether the plaintiff has alleged facts showing a constitutional violation; and 2) whether that constitutional violation was clearly established or obvious at the time of the incident in question.  See VDARE Found. v. City of Colo. Springs, 11 F.4th 1151, 1159, 1175 (10th Cir. 2021), cert. denied, 142 S. Ct. 1208 (2022).

Bledsoe argues that this court lacks jurisdiction to review the district court's determination addressing the first inquiry, whether he failed to state a plausible constitutional claim for relief under Rule 12(b)(6).  We disagree, and conclude that we have proper jurisdiction over the 12(b)(6) questions raised here under the Supreme Court's holding in Ashcroft v. Iqbal, 556 U.S. 662, 671–75 (2009).

In Iqbal, the Supreme Court directly held that a court hearing an interlocutory appeal from the denial of a motion to dismiss based on qualified immunity has "jurisdiction to pass on the sufficiency of his pleadings." Id. at 673.  Iqbal rejected an argument similar to the one made by Bledsoe here, that "a qualified immunity appeal based solely on the complaint's failure to state a claim, and not on the

ultimate issues relevant to the qualified immunity defense itself, is not a proper subject of interlocutory jurisdiction."  Id. at 672 (internal quotation marks omitted). In so holding, the Supreme Court distinguished Johnson v. Jones, upon which Bledsoe relies and which held that an appellate court could not hear an interlocutory appeal from an order denying qualified immunity at the summary-judgment stage of litigation because the legal inquiry at that stage was predominantly "fact-based."  515 U.S. 304, 317 (1995).  Appeals from motions to dismiss, in contrast, are further from the "law-fact divide" and consequently better suited to immediate review.  Iqbal, 556 U.S. at 674; see also Lowe v. Raemisch, 864 F.3d 1205, 1207 (10th Cir. 2017) (stating, in an appeal from the denial of qualified immunity, that "reviewing the sufficiency of a complaint . . . involves a pure issue of law").[12]

Bledsoe's reliance on Johnson instead of Iqbal is therefore unavailing, because this case reaches us on an appeal from a ruling on a motion to dismiss rather than an appeal from summary judgment.  We are bound to follow Iqbal, and accordingly hold that we have proper jurisdiction over issues related to the sufficiency of the pleadings as well as the application of the qualified immunity defense.[13]  We thus have

---

[12] In seeking to portray this appeal as largely "fact-related," Bledsoe notes that Appellants have argued against accepting all of the complaint's factual allegations as true and have disputed the veracity of certain facts based on conflicts with the trial transcripts.  But because we have rebuffed Defendants' efforts to dispute the well-pleaded facts here, see supra note 3, that argument falls flat. We assume the well-pleaded facts to be true, and thus our review is not "fact-related" in the Iqbal sense of the term.

[13] Since Iqbal was issued, this circuit has occasionally held that it lacked jurisdiction to hear an interlocutory appeal from the denial of a motion to dismiss in a § 1983

jurisdiction to review both whether Bledsoe has adequately alleged constitutional

violations and whether the alleged constitutional violations were clearly established

at the time of the events at issue here in 1999.

### III.  DISCUSSION

### A. Substantive Due Process Claims & <u>Parratt</u>

We begin with Appellants' argument that involves only Bledsoe's substantive

due process claims (Counts I, III, and IV).[14]  Initially, Bledsoe based those three

---

case.  One such instance arose via this very litigation: in <u>Bledsoe v. Vanderbilt</u>, the
prosecutor in Bledsoe's case filed an interlocutory appeal challenging the district
court's rejection of his absolute immunity defense, and the court found that it did not
then have jurisdiction "to answer the question whether a plaintiff has adequately
pleaded a cause of action."  934 F.3d 1112, 1120 (10th Cir. 2019).  But that case is
distinguishable because the availability of absolute prosecutorial immunity turns on
whether the prosecutor's activities were either "intimately associated with the
judicial phase of the criminal process" (for which absolute immunity is available), or
instead were investigative or administrative activities (for which only qualified
immunity is available).  <u>Id.</u> at 1117 (quoting <u>Imbler v. Pachtman</u>, 424 U.S. 409, 430
(1976)).  In contrast, one of the two elements of a qualified immunity defense is
whether the plaintiff adequately pled a constitutional claim, so the
adequacy-of-the-pleadings issue is more directly implicated here and is reviewable in
this appeal.  <u>Montoya v. Vigil</u>, in which this court held that it lacked jurisdiction to
consider an interlocutory appeal taken from the denial of a Rule 12(b)(6) motion to
dismiss, is also distinguishable because the defendant there failed to raise qualified
immunity at all in the district court.  898 F.3d 1056, 1063–65 (10th Cir. 2018).
Where, as here, Appellants appeal the denial of a properly raised qualified immunity
defense alongside their challenge to the sufficiency of the pleadings, this court has
jurisdiction to review both issues.  <u>See Iqbal</u>, 556 U.S. at 673.

[14] Counts I and III alleged violations of Bledsoe's due process right to a fair trial,
while Count IV alleged malicious prosecution and unlawful pretrial detention.
Below, Defendants argued as an initial matter that these claims should be construed
as strictly procedural constitutional violations, not substantive due process violations.
But the district court explicitly rejected that argument by finding that Counts I, III,
and IV implicated substantive due process as well.  Appellants have not reasserted
the argument that these claims are strictly procedural on appeal.  Thus, we assume for

claims on both procedural and substantive due process.  The district court dismissed those counts to the extent that they alleged a <u>procedural</u> due process claim, because Kansas tort law recognizes a claim for malicious prosecution and its availability bars any § 1983 procedural due process claim under <u>Parratt</u>.  That ruling is not at issue in this appeal.

The district court held that Counts I, III, and IV should be allowed to proceed, however, to the extent they alleged <u>substantive</u> due process violations because the court held the <u>Parratt</u> abstention doctrine does not apply in the substantive due process context.  Appellants challenge that conclusion on appeal.  They assert that we should extend <u>Parratt</u> to substantive due process claims and thus should "abstain" from deciding Bledsoe's substantive due process claims as well because, like procedural due process claims, Kansas's malicious prosecution and wrongful conviction torts can adequately compensate Bledsoe for any harm he suffered because of the violation of his substantive due process rights, as well as the procedural due process rights.[15]  (Aplt. Br. at 48–49.)

This court applies de novo review to a district court's denial of a motion to dismiss raising <u>Parratt</u> abstention.  <u>See</u> <u>Myers v. Koopman</u>, 738 F.3d 1190, 1193

---

the purposes of the appeal that Bledsoe properly alleged a violation of his substantive due process rights in Counts I, III, and IV.

[15] Kansas law does recognize and provides a potential remedy for these torts. <u>See</u> <u>Lindenman v. Umscheid</u>, 875 P.2d 964, 967 Syl. ¶ 7 (Kan. 1994) (recognizing malicious prosecution claim); Kan. Stat. § 60-5004 (providing "[c]ivil action for persons who were wrongfully convicted and imprisoned").

(10th Cir. 2013).  However, the application of Parratt to substantive due process claims is an "open question" in our jurisprudence.  Browder v. City of Albuquerque, 787 F.3d 1076, 1079-81 (10th Cir. 2015).  Today, we resolve that question and join other circuits in holding that Parratt abstention does not apply to § 1983 substantive due process claims.[16]

    Parratt involved a § 1983 procedural due process claim alleging that prison officials negligently lost an inmate's mail containing hobby materials.  451 U.S. at 529.  The Supreme Court held that those allegations failed to state a claim for the deprivation of property without due process because the inmate already had adequate state post-deprivation process to seek redress—he could bring a state-law tort claim

---

[16] Bledsoe argues that we cannot review the district court's Parratt interpretation because "[t]his court does not have jurisdiction to review interlocutorily the district court's decision not to abstain." Tarrant Reg'l Water Dist. v. Sevenoaks, 545 F.3d 906, 914 (10th Cir. 2008).  But his cited authority refers to abstention under Younger v. Harris, 401 U.S. 37 (1971), see Tarrant, 545 F.3d at 908–09, and the reasons to refrain from reviewing a decision to abstain under Younger do not cleanly extend to Parratt "abstention."  Younger abstention asks whether a federal action adjudicating a plaintiff's constitutional rights would "improperly interfere[] with a state judicial or administrative proceeding" that is currently pending, even where the plaintiff clearly states a proper federal claim in federal court.  Tarrant, 545 F.3d at 915.  In contrast, the Parratt doctrine asks whether the plaintiff can state a constitutional claim at all in light of alternative state-law remedies that could provide the due process of which plaintiff was allegedly deprived.  See Zinermon v. Burch, 494 U.S. 113, 126 (1990); Parratt, 451 U.S. at 543 (applying doctrine to hold that "the respondent has not alleged a violation of the Due Process Clause of the Fourteenth Amendment").  Consequently, unlike Younger issues, the question of whether Parratt bars a claim is "inextricably intertwined" with the qualified immunity and 12(b)(6) issues that we have held are fair game in this interlocutory appeal.  See Iqbal, 556 U.S. at 673–74; Tarrant, 545 F.3d at 915; see also Alexander v. Ieyoub, 62 F.3d 709, 712 (5th Cir. 1995) (reviewing application of Parratt doctrine de novo despite reviewing Younger abstention for abuse of discretion).  Thus, we exercise jurisdiction to determine whether and how Parratt applies in this case.

against the negligent prison officials and receive full compensation for his property loss.[17]  Id. at 543–44.  The Supreme Court has since extended Parratt to bar § 1983 claims alleging procedural due process violations in the form of state officials' intentional deprivations of property, Hudson v. Palmer, 468 U.S. 517, 519, 533 (1984), and in the form of liberty deprivations where "no predeprivation safeguards would be of use in preventing the kind of deprivation alleged."  Zinermon v. Burch, 494 U.S. 113, 139 (1990).  But the Supreme Court has not yet addressed the question presented here, of whether Parratt applies to substantive due process claims as well.  The Tenth Circuit has expressly left the question open, Browder, 787 F.3d at 1081, and we analyze it now as a matter of first impression.

But we do not write on a blank slate.  The Supreme Court has previously opined on the scope of Parratt, as have multiple other courts of appeals.  In Zinermon, the Supreme Court held that the plaintiff had adequately stated a claim under § 1983 for violation of his procedural due process rights where staff at a state hospital failed to afford him procedural safeguards before he was involuntarily committed.  494 U.S. at 125–30.  On its own, the holding in Zinermon is not particularly helpful here, because the violation alleged there was procedural rather than substantive.  En route to that holding, however, the Court discussed § 1983 and the Fourteenth Amendment's Due Process Clause in more general terms.  It explained that one of the "three kinds of § 1983 claims that may be brought against the State

---

[17] The Supreme Court later overruled Parratt to the extent it held that negligence can support a § 1983 due process claim.  See Daniels, 474 U.S. at 328.

20

under the Due Process Clause of the Fourteenth Amendment" arose from the Clause's

"substantive component that bars certain arbitrary, wrongful government actions

'regardless of the fairness of the procedures used to implement them.'" Id. at 125

(quoting Daniels, 474 U.S. at 331). For that type of due process claim, "the

constitutional violation actionable under § 1983 is complete when the wrongful

action is taken," meaning that a plaintiff "may invoke § 1983 regardless of any

[subsequent] state-tort remedy that might be available to compensate him for the

deprivation of these rights." Id.

These statements by the Supreme Court, while technically dicta, directly

suggest that substantive due process claims are distinguishable from procedural due

process claims for purposes of Parratt's analysis, and so are actionable in federal

court regardless of state-law remedies. That conclusion is sound. "[T]he Due

Process Clause, like its forebear in the Magna Carta, . . . was 'intended to secure the

individual from the arbitrary exercise of the powers of government.'" Daniels, 474

U.S. at 331 (quoting Hurtado v. California, 110 U.S. 516, 527 (1884)). Where the

government takes such an action that is arbitrary in substance rather than procedure,

"the constitutional violation is complete as soon as the prohibited action is taken; the

independent federal remedy is then authorized by the language and legislative history

of § 1983." Id. at 338 (Stevens, J., concurring). "Stated another way, some abuses of

governmental power may be so egregious or outrageous that no state post-deprivation

remedy can adequately serve to preserve a person's constitutional guarantees of

freedom from such conduct." Temkin v. Frederick Cty. Comm'rs, 945 F.2d 716, 720

21

(4th Cir. 1991).  See also Parratt, 451 U.S. at 545 (Blackmun, J., concurring) ("[T]here are certain governmental actions that, even if undertaken with a full panoply of procedural protection, are, in and of themselves, antithetical to fundamental notions of due process.").  Such abuses no doubt fall within the broad category of "deprivation of any rights, privileges, or immunities secured by the Constitution and laws" that Congress expressly intended to reach through § 1983, and to remove them from the purview of that statute would go against its text and its intent. 42 U.S.C. § 1983.  See also Albright v. Oliver, 510 U.S. 266, 315 (1994) (Stevens, J., dissenting).

Additionally, all federal courts of appeals to have considered this question have held that Parratt abstention does not extend to substantive due process claims.  See Dean ex rel. Harkness v. McKinney, 976 F.3d 407, 420–21 (4th Cir. 2020); Armstrong v. Daily, 786 F.3d 529, 539-41 (7th Cir. 2015); Castellano v. Fragozo, 352 F.3d 939, 956 (5th Cir. 2003) (en banc); Smith v. City of Fontana, 818 F.2d 1411, 1413, 1415 (9th Cir. 1987), overruled on other grounds by Hodgers-Durgin v. de la Vina, 199 F.3d 1037, 1040 & n.1 (9th Cir. 1999); Zilich v. Lucht, 981 F.2d 694, 695–96 (3d Cir. 1992); Williams-El v. Johnson, 872 F.2d 224, 228 (8th Cir. 1989); Morello v. James, 810 F.2d 344, 347–48 (2d Cir. 1987).  Though not binding, we find their unanimous reasoning persuasive.

Against the substantial weight of authority in Zinermon and opinions from our sister circuits, Appellants urge the extension of Parratt to substantive due process claims.  They rely almost exclusively on concurring opinions by then-Judge Gorsuch

in two Tenth Circuit cases.  See Browder, 787 F.3d at 1085 (Gorsuch, J., concurring);

Cordova v. City of Albuquerque, 816 F.3d 645, 665 (10th Cir. 2016) (Gorsuch, J.,

concurring), abrogated on other grounds by Thompson v. Clark, 142 S. Ct. 1332,

1335–36 (2022).  In those opinions, Judge Gorsuch emphasized that Zinermon's

language is non-binding dicta and advocated departing from its view of substantive

due process claims under Parratt.  He suggested that plaintiffs could vindicate their

rights just as well via state-law tort claims, and that § 1983 empowering federal

courts to hear substantive due process claims does not necessarily "entail the duty to

do so, for federal courts not infrequently abstain when they have the power to

decide."  Cordova, 816 F.3d at 665 (citing as example Younger v. Harris, 401 U.S.

37, 43–44 (1971)).  But as we have noted, "abstention" under the Parratt doctrine—if

abstention is even the right label—implicates a different set of issues than Younger

abstention.  See supra note 16.  In particular, Parratt does not require that a state

court action be currently pending, instead requiring only the potential for a state tort

action at some point in the future to circumvent federal courts.  As such, neither

principles of equity nor federalism—which were essential to the holding of Younger,

see 401 U.S. at 43–44—apply with equal force in this context, and do not justify a

departure from the language of § 1983 and Zinermon designating federal courts as an

appropriate forum for substantive due process claims.

Judge Gorsuch also rested his defense of extending Parratt in part on the

"famously malleable" "distinction between procedural and substantive due process,"

as well as the Supreme Court's frequent reminders "to proceed with special caution

when handling substantive due process claims." Browder, 787 F.3d at 1085

(Gorsuch, J., concurring). While true that the substantive due process doctrine has

been vociferously debated, it is also true that it has continually endured. See Dobbs

v. Jackson Women's Health Org., 142 S. Ct. 2228, 2246–47 (2022); Dias v. City &

Cty. of Denver, 567 F.3d 1169, 1181 (10th Cir. 2009); Peter J. Rubin, Square Pegs

and Round Holes: Substantive Due Process, Procedural Due Process, and the Bill of

Rights, 103 Colum. L. Rev. 833, 835 (2003). To quarrel with its existence is not

within our power nor our preference. And whether a plaintiff has sufficiently stated a

substantive due process claim, rather than a procedural claim, is a question (albeit a

sometimes difficult one) that is separate from whether that plaintiff may pursue a

federal remedy for such a claim.

Where, as here, the alleged due process violations were concededly substantive

in nature, we hold that Parratt does not apply and a plaintiff may pursue a § 1983

action in federal court regardless of potential state-law tort remedies.

**B. Appellants are not entitled to qualified immunity on any of Bledsoe's § 1983 claims except the failure-to-intervene claims**

We now turn to Appellants' arguments challenging the district court's decision

to deny them qualified immunity from Bledsoe's § 1983 claims. We first set forth

the general legal principles that govern our qualified immunity analysis at the

12(b)(6) stage of litigation, before applying those principles to Appellants' claims of

immunity.

### 1.  Standard of review and relevant legal principles

Where, as here, defendants moved for dismissal of § 1983 claims under Rule 12(b)(6) based on qualified immunity, there is "a presumption that the defendant is immune from suit."  Est. of Smart ex rel. Smart v. City of Wichita, 951 F.3d 1161, 1168 (10th Cir. 2020) (quoting Perea v. Baca, 817 F.3d 1198, 1202 (10th Cir. 2016)) (alterations omitted).  "To overcome this presumption, the plaintiff must show (1) the defendant's actions violated a constitutional or statutory right, and (2) that right was clearly established at the time of the defendant's complained-of conduct."  Truman v. Orem City, 1 F.4th 1227, 1235 (10th Cir. 2021).  "Courts have discretion to decide the order in which they address these two prongs."  Roberts v. Winder, 16 F.4th 1367, 1374 (10th Cir. 2021) (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)).

The first inquiry requires us to decide whether Bledsoe adequately pled a claim for relief that is based on the violation of a constitutional or statutory right.  Here, Bledsoe specifically asserted 42 U.S.C. § 1983 claims against Defendants.  "Section 1983 provides a cause of action for 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' by any person acting under color of state law."  Pierce v. Gilchrist, 359 F.3d 1279, 1285 (10th Cir. 2004).

We review de novo the district court's ruling on a Rule 12(b)(6) motion to dismiss for failure to state a claim for relief.  See Schell v. Chief Justice & Justices of Okla. Supreme Ct., 11 F.4th 1178, 1186 (10th Cir. 2021), cert. denied, 142 S. Ct. 1440 (2022).  "The Federal Rules require a complaint to contain 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  Truman, 1

F.4th at 1235  (quoting Fed. R. Civ. P. 8(a)(2)).  "Rule 8 . . . does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 555).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Id.</u>

In considering whether the complaint's allegations are sufficient, the court first eliminates conclusory allegations, mere "labels and conclusions," and any "formulaic recitation of the elements of a cause of action."  <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 555).  The court then accepts as true all well-pled factual allegations and considers "whether they plausibly give rise to an entitlement to relief."  <u>VDARE Found.</u>, 11 F.4th at 1159.  In conducting this analysis, the court draws all reasonable inferences in favor of the plaintiff.  <u>See Truman</u>, 1 F.4th at 1238.

"In the context of a § 1983 action against multiple individual governmental actors, it is particularly important . . . that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her."  <u>Id.</u> at 1235 (quoting <u>Wilson v. Montano</u>, 715 F.3d 847, 852 (10th Cir. 2013)); <u>see also</u> <u>Fogarty v. Gallegos</u>, 523 F.3d 1147, 1162 (10th Cir. 2008).

The second qualified-immunity inquiry focuses on whether the constitutional violation alleged was clearly established at the time of the events at issue; here that is November 1999, when Defendants first interacted with Bledsoe.  See Pierce, 359 F.3d at 1297.  To demonstrate that a right is "clearly established," a plaintiff must identify "an on-point Supreme Court or published Tenth Circuit decision," or show that "the clearly established weight of authority from other courts has found the law to be as the plaintiff maintains."  Perry v. Durborow, 892 F.3d 1116, 1123 (10th Cir. 2018) (quoting Quinn v. Young, 780 F.3d 998, 1005 (10th Cir. 2015)) (alteration omitted).  Alleging only a violation of abstract rights, without more, is insufficient because "general statements of the law are inherently incapable of giving fair and clear warning" to a government actor.  White v. Pauly, 580 U.S. 73 (2017) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997)).  "But 'a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful.'"  Thompson v. Ragland, 23 F.4th 1252, 1255–56 (10th Cir. 2022) (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002) (brackets, internal quotation marks omitted)).

"[Q]ualified immunity operates to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful."  Hope, 536 U.S. at 739 (internal quotation marks omitted).  "[E]xisting law must have placed the constitutionality of the officer's conduct 'beyond debate.'"  Dist. of Columbia v. Wesby, 138 S. Ct. 577, 589 (2018) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 741 (2011)).  "'[T]he salient question . . . is whether the state of the law' at the time of an incident provided 'fair warning' to

the defendants 'that their alleged [conduct] was unconstitutional.'" <u>Tolan v. Cotton</u>, 572

U.S. 650, 656 (2014) (alterations in original) (quoting <u>Hope</u>, 536 U.S. at 741).

Lastly, we note that here Appellants asserted qualified immunity at the

motion-to-dismiss stage of the litigation.

> The procedural posture of the qualified-immunity inquiry may be critical.
> Because they turn on a fact-bound inquiry, "qualified immunity defenses are
> typically resolved at the summary judgment stage" rather than on a motion
> to dismiss.  <u>Thomas v. Kaven</u>, 765 F.3d 1183, 1194 (10th Cir. 2014).
> "Asserting a qualified immunity defense via a Rule 12(b)(6) motion . . .
> subjects the defendant to a more challenging standard of review than would
> apply on summary judgment." <u>Id.</u> (internal quotation marks omitted). On a
> motion to dismiss, "it is the defendant's conduct <u>as</u> <u>alleged</u> <u>in</u> <u>the</u> <u>complaint</u>
> that is scrutinized for [constitutionality]." <u>Behrens v. Pelletier</u>, 516 U.S. 299,
> 309 (1996).

<u>Thompson</u>, 23 F.4th at 1256; <u>see also</u> <u>Truman</u>, 1 F.4th at 1238.

Before applying these legal principles to each of Bledsoe's claims, we address

several general arguments Appellants make.

## 2. Appellants' general arguments against Bledsoe's § 1983 claims

As a starting point, Appellants make several unavailing arguments that apply

generally to all of Bledsoe's § 1983 claims.  First, Appellants assert that the

complaint's allegations are insufficient due to Bledsoe's use of collective references

to the defendants as a whole or to certain groups of defendants, rather than

identifying specific actions taken by individual defendants.  For example, Bledsoe's

allegations under the specific count headings for conspiracy refer generally to

"Defendants" or "the Defendant Officers" rather than singling out each individual by

name.  (2d Am. Compl. at ¶¶ 123, 148.)  Consequently, Appellants assert that the

complaint "fail[ed] to give notice as to what each appellant is alleged to have done" and so the claims should be dismissed. (Aplt. Br. at 29.) We do not agree. Instead, we will view the collective allegations in tandem with Bledsoe's factual allegations elsewhere in the complaint, which identify specific actions taken by each individual Appellant. Thus, we affirm the district court's holding that Bledsoe's "use of collective defined terms in certain allegations" does not, on its own, "doom [his] claims." (Aplt. App. 859.)

Next, Appellants assert that Bledsoe's claims are facially implausible because there is an equally possible innocent explanation for their charging Bledsoe—that they honestly, but mistakenly, believed he had killed Camille and that, at most, they were negligent in investigating the crime, which is not actionable under § 1983. In both Twombly, 550 U.S. at 566–68, and Iqbal, 556 U.S. at 681–83, the Supreme Court held that the plaintiffs had failed to allege a plausible claim because the allegations were just as easily explained by innocent conduct. See Kan. Penn Gaming, 656 F.3d at 1214–15. Similarly, Appellants assert that they are entitled to qualified immunity because, at most, they were mistaken in believing Bledsoe was guilty of Camille's rape and murder, and their investigation was at most negligent.

Those arguments mischaracterize Bledsoe's allegations. Bledsoe alleges that Defendants fabricated false evidence against him, knowingly suppressed exculpatory evidence that would have proven his innocence, and facilitated his arrest, pretrial detention and trial without probable cause to believe he was guilty. None of those alleged actions, by definition, can be done mistakenly or "innocently."

29

Next we address each of Bledsoe's claims in turn. As the district court noted, Appellants "assert a barrage of arguments for [their] dismissal." (Aplt. App. at 856.) They attack some claims for failing sufficiently to state a plausible constitutional claim for relief pursuant to Rule 12(b)(6), and they attack others for not being clearly established. As we sort through those arguments below, we explain why we mostly agree with the district court that Bledsoe adequately alleged clearly established constitutional violations and further adequately alleged each Appellant participated in those violations.

### 3. With the exception of the failure-to-intervene claims, Bledsoe adequately alleged that each Appellant personally participated in clearly established constitutional violations

#### a. Conspiracy claims (Counts II, V[18])

For ease of discussion, we begin with Bledsoe's claims alleging that Defendants conspired to violate his constitutional rights. This court has recognized "a § 1983 conspiracy claim"; that is, "a conspiracy to deprive a plaintiff of a constitutional or federally protected right under color of state law." Dixon v. City of Lawton, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990). "Provided that there is an underlying constitutional deprivation, the conspiracy claim allows for imputed liability; a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy." Id. "Conclusory allegations of conspiracy[, however,] are insufficient to state a valid § 1983 claim." Frasier v.

---

[18] Importantly, Bledsoe also alleged a conspiracy as part of his substantive constitutional claims, Counts I, III, and IV.

Evans, 992 F.3d 1003, 1024 (10th Cir. 2021) (quoting Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 533 (10th Cir. 1998)), cert. denied, 142 S. Ct. 427 (2021).

Moreover, a § 1983 conspiracy claim for using fabricated or false evidence was clearly established well before 1999. See Anthony v. Baker, 767 F.2d 657, 662 (10th Cir. 1985) (recognizing "that state and federal officers are liable under § 1983 . . . when they conspire to procure groundless state indictments and charges against a citizen based upon fabricated evidence or false, distorted, perjurious testimony presented to official bodies in order to maliciously bring about a citizen's trial or conviction"); see also Dixon, 898 F.2d at 1449 n.6.  Appellants do not argue to the contrary.  Instead, they contend that Bledsoe's conspiracy allegations are too conclusory to stand as a general matter.  We disagree.

A § 1983 plaintiff must "make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state." Robbins v. Oklahoma, 519 F.3d 1242, 1250 (10th Cir. 2008).  But as discussed above, Bledsoe's occasional use of collective references to "the Defendants" or "Defendant Officers" does not automatically defeat his claims.

To state a § 1983 conspiracy claim, Bledsoe had to allege "specific facts showing an agreement and concerted action among defendants," Tonkovich, 159 F.3d at 533—an "agreement upon a common, unconstitutional goal," and "concerted action" taken "to advance that goal," Janny v. Gamez, 8 F.4th 883, 919 (10th Cir. 2021) (internal quotation marks omitted) (quoting Sigmon v. CommunityCare HMO,

Inc., 234 F.3d 1121, 1126 (10th Cir. 2000)).  However, because "[d]irect evidence of

an agreement to join a . . . conspiracy is rare, . . . a defendant's assent can be inferred

from acts furthering the conspiracy's purpose."  United States v. Edmonson, 962 F.2d

1535, 1548 (10th Cir. 1992) (direct criminal appeal) (quoting United States v.

Perkins, 748 F.2d 1519, 1527 (11th Cir. 1984)).  An express agreement is

consequently unnecessary.  See Frasier, 992 F.3d at 1024–25.  Further, while "[t]he

participants in the conspiracy must share the general conspiratorial objective," "they

need not know all the details of the plan designed to achieve the objective or possess

the same motives for desiring the intended conspiratorial result."  Id. at 1024

(quoting Snell v. Tunnell, 920 F.2d 673, 702 (10th Cir. 1990)).

Here, Bledsoe alleged the specific goal of the conspiracy—to frame Bledsoe

despite overwhelming evidence of Tom's guilt.  He alleged that Defendants Hayes

(Tom's defense attorney) and Vanderbilt (the prosecutor) met to plan the fabrication

of Tom's story.  The district court reasonably inferred that Appellant Carreno was

either at that meeting or met with Hayes soon thereafter.  Bledsoe further alleged

concerted action among Defendants.  For example, he alleged that Appellants Herrig,

Poppa, and Frost declined to subject Tom's room and clothing to rigorous forensic

examination, and declined to collect any physical evidence from the truck in which

Tom said he shot Camille or from the shovel he said he used to bury the body.

Bledsoe further identified specific actions Defendants allegedly took to carry

out the plan, including fabricating and supporting Tom's false story; fabricating other

inculpatory evidence, such as the false polygraph test results and the false statement

that Bledsoe had admitted to returning home at the time when Camille disappeared; purposefully neglecting to search for evidence that would implicate Tom in the murder; and suppressing evidence that would tend to exculpate Bledsoe. These allegations were bolstered by Tom's suicide note, which claimed that the Jefferson County police and prosecutor Vanderbilt made Tom send an innocent Bledsoe to prison and refused to listen to Tom. These allegations were sufficient to allege the existence of a conspiracy to violate Bledsoe's constitutional rights, supporting Counts II and V.

Furthermore, Bledsoe alleged that each Appellant participated in the conspiracy. This requires a closer look at the facts, and the allegations are stronger for some Appellants than others. Ultimately, we find the complaint sufficient as to each of them. We summarize here the allegations we have already set forth in greater detail earlier in this opinion.

First up is Randy Carreno, who was the lead investigator. We agree with the district court that Bledsoe adequately alleged that Carreno

- personally participated in the conspiracy to frame Bledsoe;

- joined the conspiracy either by attending the meeting between Tom's defense attorney Hayes and prosecutor Vanderbilt when the conspiracy was hatched, or meeting with Hayes soon thereafter;

- then acted to further the conspiracy by purposefully withholding documentation of Tom's activities and statements made between November 8 and 12, from the time he was arrested until his release from custody;

- coaching Tom to assert the false story of Tom's roadside meeting with Bledsoe on November 6, in order to explain how Tom knew all the details of the murder; and

33

- concocting a time of this meeting for when Carreno believed, wrongly, that Bledsoe had no alibi for his whereabouts.

Second is Robert Poppa. Based on the allegations recited in the factual overview, the district court reasonably found that Bledsoe had adequately alleged that Poppa personally fabricated inculpatory evidence and withheld exculpatory evidence (Count III), and maliciously prosecuted Bledsoe (Count IV). The court further held that "these actions support an inference that Mr. Poppa joined the conspiracy to frame [Bledsoe], allowing imputed liability for Count I at the motion to dismiss stage." (Aplt. App. at 876.) We agree.[19]

Third is Frost. The district court correctly held that Bledsoe had adequately alleged that Frost joined the conspiracy and took actions to further it. Bledsoe alleged, among other things, that Frost, along with Poppa and Herrig, "intentionally declined" to search Tom's room and clothing rigorously, and declined to collect physical evidence from the truck in which he said he shot Camille and the shovel Tom confessed to using to bury Camille's body; let Tom's father handle the murder

---

[19] Appellants rely on the state trial transcript to challenge the veracity of some of Bledsoe's allegations against Poppa, asserting he could not have withheld information Tom revealed when he confessed to the murder, because Tom's "confession was presented to the jury." (Aplt. Br. at 41–42.) The district court did not consider this argument because Defendants failed to give the district court the correct trial transcript cite, and they have again failed to do so on appeal. In any event, the district court correctly rejected the merits of this argument because, even though there was evidence presented to the jury that Tom had initially confessed to the murder, Appellants failed to show that Bledsoe's defense attorney, at the time of trial, had all the details Tom gave law enforcement officials about the murder during his confession.

34

weapon; withheld evidence that Tom had a history of pursuing relationships with young girls and made sexual advances toward Camille a few weeks before her disappearance and murder; and falsely claimed that Bledsoe had twice confessed to returning home at the time Camille disappeared from the Bledsoe house. As previously explained, see supra note 8, the fact that Frost testified on cross-examination at Bledsoe's trial that Frost must have misunderstood Bledsoe to confess that he returned to his home at the time Camille disappeared does not negate the allegations that Frost used this false confession to obtain a search warrant for Bledsoe's home and that the state and federal courts relied on this false confession to uphold Bledsoe's convictions.

Finally we turn to Herrig, against whom Bledsoe provides the fewest specific allegations. The district court held that the factual allegations against Herrig were sufficient "to support [Bledsoe's] claim that [Herrig] withheld (or purposefully didn't collect) exculpatory evidence—a theory Claim III advances—and maliciously prosecuted [Bledsoe]—Count IV." (Aplt. App. at 876.) The district court further held that Herrig's alleged actions, in "intentionally declining," along with Poppa and Frost, to search Tom's room and truck, "support[ed] an inference that Mr. Herrig joined the conspiracy to frame [Bledsoe], allowing imputed liability for Count I at the motion to dismiss stage." (Id. at 874) The district court also stated, generally, that "it's reasonable to infer that the officers working on the investigation shared information throughout its course, and, ultimately, worked together to accomplish the alleged constitutional deprivations." (Id. at 867.) Again we agree. The specific

allegation that Herrig intentionally declined to search Tom's room and belongings thoroughly, despite the clear probable cause that Tom was the culprit, is also supportive of the malicious prosecution and withholding of evidence claim.  In addition, Bledsoe alleged that Herrig acted in concert with Poppa and Frost to search Bledsoe's home, but purposefully to avoid searching the locations and items that Tom implicated in the murder he confessed to committing.  Additionally, the general allegation that Herrig supervised the officers who did undertake more specific unlawful actions supports an inference that he knew about and participated in the conspiracy to frame Bledsoe, and simultaneously failed to intervene.

In sum, the district court correctly held that Bledsoe adequately alleged a conspiracy to frame Bledsoe for Camille's murder, sufficient to support Claims II (conspiracy to fabricate Tom's testimony against Bledsoe) and V (conspiracy to deprive Bledsoe of his constitutional rights), and adequately alleged that each Appellant personally participated in those conspiracies.

We turn now to Bledsoe's substantive constitutional claims.

### b.  Bledsoe's claims alleging that Appellants deprived him of substantive due process by fabricating Tom's false testimony (Count I) and other evidence against him (Count III)

In Counts I and III, Bledsoe alleged that Defendants deprived him of due process by fabricating Tom's false testimony implicating Bledsoe in the murder and fabricating other false evidence against him, and conspired to do so.  On appeal, Appellants do not argue generally that these Counts fail to state plausible claims for the deprivation of substantive due process.  Nor could they.  See Pierce, 359 F.3d at

36

1285–63 (10th Cir.) (addressing claim alleging deprivation of liberty without due process "as the result of the fabrication of evidence by a government official acting in an investigative capacity" (citing Anthony, 767 F.2d at 662)).[20]

Further, this constitutional violation was clearly established by 1999.  In fact, this court has recognized that "the prohibition on falsification or omission of evidence, knowingly or with reckless disregard for the truth, was firmly established as of 1986." Id. at 1298; see also id. at 1298–99 (citing, e.g., Pyle v. Kansas, 317 U.S. 213, 216 (1942), Franks v. Delaware, 438 U.S. 154, 155–56 (1978), Stewart v. Donges, 915 F.2d 572, 581–83 (10th Cir. 1990)).

Appellants' only rebuttal on appeal is that Pierce was not decided "until 2004, five years after the appellants' investigation [of Bledsoe] in 1999."  (Aplt. Br. at 54.) But they misunderstand Pierce's holding—the court expressly held that such claims had been clearly established constitutional violations since 1986, not as of 2004. Thus, Appellants here had fair warning in 1999 that fabricating evidence and knowingly using false testimony against Bledsoe was a violation of his constitutional rights when they began their alleged scheme in 1999.

---

[20] Similar to this case, in Pierce the plaintiff served more than fifteen years in prison for a crime that DNA evidence eventually proved he did not commit. 359 F.3d at 1282–83.  After his release, Pierce filed a § 1983 suit against two defendants: a forensic chemist for the Oklahoma City Police Department who had allegedly fabricated inculpatory evidence and disregarded exculpatory evidence, and an Oklahoma City District Attorney who "fostered an environment within his office wherein questionable prosecutorial tactics, including reliance on unfounded forensic analysis, were routinely used to secure convictions" and worked in concert with the forensic chemist to secure unwarranted convictions.  Id. at 1281–82.

Appellants' primary argument is that Bledsoe failed to allege that each of them participated in these constitutional deprivations. We reject that argument.

Summarizing, Bledsoe alleged the following: lead investigator Carreno knew that Bledsoe had not had a roadside meeting with Tom on November 6, but nevertheless helped concoct that false story to explain why Tom knew all the details of the murder. Further, Carreno coached Tom on this false story, including fitting the fictional meeting into a time period when Carreno thought (wrongly) that Bledsoe did not have an alibi. In support of Tom's fabricated testimony, Appellant Poppa, who was present on the night that Tom turned himself in and confessed in detail to killing Camille, withheld documentation of Tom's confession. Arguably in further support of Tom's fabricated testimony against Bledsoe, Poppa, along with Frost and Herrig, purposefully did not rigorously search the places and things implicated in Tom's confession—his room, truck, and the shovel he used to bury Camille's body. In any event, we agree with the district court that, although there is no clear allegation that Herrig or Poppa fabricated evidence against Bledsoe, the allegations against them support a claim that they conspired with others who fabricated evidence. The same is true for Frost.

Bledsoe's Count III alleged that Defendants fabricated other evidence as well against Bledsoe, and conspired to do so. That conspiracy included Bledsoe's allegation that Frost falsely claimed that Bledsoe had twice admitted to being at home at the time Camille disappeared, when that was, in fact, not the case. Further, Frost used these false statements to obtain a warrant to search Bledsoe's home.

### c. Bledsoe's claim that Appellants suppressed exculpatory evidence (Count III)

In addition to alleging that Frost fabricated evidence against Bledsoe, Bledsoe also alleged that Defendants withheld and suppressed exculpatory evidence. On appeal, Appellants do not contend that those allegations fail to allege a plausible due process violation. See Brady v. Maryland, 373 U.S. 83, 86 (1963) (recognizing suppression of exculpatory evidence violated due process guaranteed under the Fourteenth Amendment); see also Pierce, 359 F.3d at 1298–99. Furthermore, this court has recognized that, "[l]ong before" 1986, it was clearly established "that a defendant's due process rights are implicated when the state . . . withholds exculpatory evidence from the defense." Pierce, 359 F.3d at 1299 (citing Brady, 373 U.S. 83).[21]

---

[21] Though Pierce is sufficient for our purposes of showing clearly established law, Bledsoe highlights one other pre-1999 case that reinforces Pierce's holding and that the district court also relied upon in this case. Smith v. Secretary of the New Mexico Department of Corrections held that Brady requirements "extend[] to . . . law enforcement personnel" and therefore clearly established that officers like these Appellants could be held liable for failing to disclose exculpatory evidence. 50 F.3d 801, 824 (10th Cir. 1995). Appellants' attempt to dispose of Smith is even weaker than their rebuttal to Pierce, as they claim that Smith is inapposite simply because it was a 28 U.S.C. § 2254 habeas corpus case challenging a criminal conviction rather than a § 1983 civil rights case. But a constitutional violation is a constitutional violation in either circumstance, and courts commonly rely on criminal habeas cases in § 1983 qualified immunity analyses. See, e.g., Hope, 536 U.S. at 733 (analyzing qualified immunity and relying on United States v. Lanier, 520 U.S. 259 (1997)); Kapinski v. City of Albuquerque, 964 F.3d 900, 901–02, 905 (10th Cir. 2020) (analyzing qualified immunity and citing Franks v. Delaware, 438 U.S. 154 (1978)). Smith thus further supports our conclusion that Bledsoe's claims alleged in Count III constitute clearly established violations of his substantive due process rights.

Appellants' primary argument is, again, that Bledsoe failed to allege each of them participated in this constitutional violation. We again disagree. Bledsoe alleged:

> - Carreno withheld documentation of Tom's activities and statements while he was in custody, from November 8 to 12, and withheld documentation of Tom's confessions to the murder and his desire to commit suicide;

> - Frost suppressed evidence that Tom made advances towards Camille several weeks before she was murdered;

> - Frost, Poppa and Herrig subjected Bledsoe's home to a "thorough" and "rigorous forensic examination," but purposefully avoided searching Tom's room, truck and the shovel he confessed to using to bury Camille's body (2d Am. Compl. ¶¶ 77–78. 81–83); and

> - their concerted action indicated they were part of the conspiracy to frame Bledsoe.

### d. Bledsoe's malicious prosecution claim (Count IV)

In Count IV, Bledsoe alleged a § 1983 malicious prosecution claim against Defendants. Appellants do not dispute that a constitutional malicious prosecution claim was clearly established by 1999. See Pierce, 359 F.3d at 1298–99; see also Wilkins v. Reyes, 528 F.3d 790, 805 (10th Cir. 2008) (recognizing § 1983 malicious prosecution claim alleging use of coerced false statements to prosecute the plaintiff was clearly established as of 1996). Instead, Appellants contend only that Bledsoe failed to allege a plausible malicious prosecution claim adequately here.

### i. Bledsoe adequately alleged a malicious prosecution claim

Bledsoe specifically alleged that Defendants unlawfully detained him pretrial in violation of the Fourth Amendment and deprived him of substantive due process in

violation of the Fourteenth Amendment by maliciously prosecuting him, all without probable cause.[22]  To state a malicious prosecution claim, Bledsoe had to allege five elements: 1) Defendants caused Bledsoe's continued confinement or prosecution; 2) the original action terminated in Bledsoe's favor; 3) there was no probable cause to support Bledsoe's initial arrest, continued confinement, or prosecution; 4) Defendants acted with malice; and 5) Bledsoe sustained damages.  See Stonecipher v. Valles, 759 F.3d 1134, 1146 (10th Cir. 2014).  The district court ruled that Bledsoe had adequately alleged all five elements, and on appeal Appellants challenge that determination only as to the first, third, and fourth elements.  We disagree and affirm the district court's decision rejecting those arguments.

### *a.* Causation

Appellants assert that they did not cause Bledsoe's arrest, pretrial detention, and prosecution because it was the prosecutor who decided to prosecute Bledsoe, the state trial judge who allowed the case to go forward, and the jury that ultimately convicted Bledsoe.  Those arguments are negated because, accepting Bledsoe's allegations as true, all of those decisions were based on evidence of Bledsoe's guilt that Appellants fabricated or conspired to fabricate, and without exculpatory

---

[22] Appellants do not challenge the district court's holding that Count IV was pled in part as a Fourth Amendment violation and may proceed on that basis as well. Nor could they. The Supreme Court has recognized a "malicious prosecution" claim under the Fourth Amendment challenging pretrial detention without probable cause. Manuel v. City of Joliet, 580 U.S. 357, 137 S. Ct. 911, 919 (2017).

evidence tending to support Bledsoe's innocence that Defendants suppressed or conspired to suppress.  See Pierce, 359 F.3d at 1292–93.

### *b*. Lack of arguable probable cause

Probable cause is "a 'substantial probability' . . . that the suspect committed the crime, requiring something 'more than a bare suspicion.'"  Stonecipher, 759 F.3d at 1141 (quoting Kerns v. Bader, 663 F.3d 1173, 1188 (10th Cir. 2011)).  Probable cause is measured by considering whether, "without the falsified inculpatory evidence, or with the withheld exculpatory evidence, there would be no probable cause for [Bledsoe's] continued confinement or prosecution."  Pierce, 359 F.3d at 1295; see also id. at 1293.

> In the context of a qualified immunity defense . . ., we ascertain whether a defendant violated clearly established law "by asking whether there was 'arguable probable cause'" for the challenged conduct. Kaufman[ v. Higgs], 697 F.3d [1297,] 1300 [(10th Cir. 2012)]. Arguable probable cause is another way of saying that the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists. Cortez v. McCauley, 478 F.3d 1108, 1120 (10th Cir. 2007) [(reh'g en banc)].

Stonecipher, 759 F.3d at 1141.

Appellants, relying on the trial transcript and the state appellate and federal habeas decisions upholding Bledsoe's convictions, argued there was arguable probable cause to arrest, detain, and prosecute Bledsoe because there was some evidence supporting his guilt: "Polygraph findings showed [Bledsoe] had exhibited deception when asked if he killed Camille, statements of his 2-year-old son implicated him, independent witnesses told officers that Camille was afraid of him,

and a witness reported to officers that he heard screaming near his worksite the day Camille went missing." (Aplt. Br. 51.) Even accepting Appellants' rendition of this evidence at the 12(b)(6) stage of this litigation, this evidence does not establish the existence of arguable probable cause when considered with the suppressed exculpatory evidence and without the fabricated evidence of Bledsoe's guilt.[23]

### *c*. Malice

Lastly, Appellants assert that Bledsoe failed to allege that each of them acted with the requisite malice; they argue that at most they acted negligently. But "[m]alice may be inferred if a defendant causes the prosecution without arguable probable cause." Stonecipher, 759 F.3d at 1146. As alleged, Bledsoe was arrested, detained, and prosecuted without arguable probable cause, based instead on evidence Defendants fabricated and without exculpatory evidence that Defendants improperly suppressed. Bledsoe, therefore, adequately alleged that each Appellant acted with the requisite malice.

In sum, Bledsoe adequately alleged a malicious prosecution claim, as well as the two substantive due process claims, against Defendants generally.

---

[23] Bledsoe alleged that Defendant KBI Officer Johnson falsified the results of the polygraph examinations he administered to Tom and Bledsoe, falsely skewing the results to indicate Bledsoe had been deceptive, while Tom had not been deceptive. Appellants assert that Bledsoe's complaint fails to allege that Appellants knew those results were false. But Bledsoe adequately alleged a conspiracy involving Appellants and the other Defendants, including the KBI Defendants like Johnson. Furthermore, the polygraph results that Johnson allegedly skewed indicated the veracity of Tom's story, which Appellants had worked and conspired to fabricate. There are sufficient allegations, then, from which it can be inferred that Appellants knew the polygraph results were false.

### ii. Bledsoe adequately alleged each Appellant participated in the malicious prosecution

On appeal, Appellants argue perfunctorily that Bledsoe failed to allege that each Appellant participated in the malicious prosecution. Bledsoe's allegations against each Appellant, as explained above, are adequate to state a malicious prosecution claim against each of them.

### e. Failure-to-Intervene Claims (Count VI)

In Count VI, Bledsoe asserted a discrete claim alleging that Defendants failed to intervene to stop other officers from violating Bledsoe's constitutional rights. See Fogarty, 523 F.3d at 1164–65. We hold that Count VI adequately stated a § 1983 cause of action for the violation of a constitutional right.[24]

The Tenth Circuit has recognized "that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Vondrak v. City of Las Cruces, 535 F.3d 1198, 1210 (10th Cir. 2008) (quoting Anderson v. Branen,

---

[24] Bledsoe titled Count VI as "Failure to Intervene." (Aplt. App. 50.) He asserted this claim "[a]gainst the Defendant Officers," meaning Appellants and the KBI officers. While Appellants argued in the district court that failure to intervene does not state a separate § 1983 violation, they do not reassert that argument on appeal. Instead, on appeal, Appellants only reassert their separate argument that Bledsoe failed adequately to allege such a claim. When read in the context of all the allegations, Bledsoe has alleged alternate theories of liability for each Appellant: either they each personally participated in the alleged constitutional deprivations, or they conspired with others to deprive Bledsoe of his constitutional rights, or if they did not join the conspiracy, each knew about the others depriving Bledsoe of his constitutional rights and failed to intervene. Thus, the failure-to-intervene claim constitutes an alternative theory that is sufficiently alleged at this stage of the proceedings.

17 F.3d 552, 557 (2d Cir. 1994)); see also Fogarty, 523 F.3d at 1163 (holding that, if an officer "were . . . present . . . with an opportunity to prevent the excessive use of force, he would have had a duty to intervene"); Casey v. City of Fed. Heights, 509 F.3d 1278, 1283 (10th Cir. 2007) (holding that, where the defendant should have known the force used against the plaintiff was excessive, defendant "had some responsibility" to intervene). A plaintiff states a constitutional violation in the form of failure to intervene by alleging that 1) a government officer violated his constitutional rights, 2) a different government actor (the defendant) observed or had reasons to know about that constitutional violation, and 3) the defendant had a realistic opportunity to intervene, but failed to do so. See Jones v. Norton, 809 F.3d 564, 576 (10th Cir. 2015); see also Est. of Booker v. Gomez, 745 F.3d 405, 422–23 (10th Cir. 2014).

Here, Bledsoe alleged all the necessary elements of a failure-to-intervene claim. First, he alleged that Defendants violated his constitutional rights in several ways, including fabricating false evidence against him, suppressing exculpatory evidence, and maliciously prosecuting him without probable cause to believe he was guilty. Second, Bledsoe alleged that each Appellant knew of the ongoing constitutional deprivations. Third, the conspiracy at issue here to frame Bledsoe unfolded over months and months, giving each Appellant a reasonable opportunity to intervene to prevent harming Bledsoe, yet no Appellant did so.

Appellants argue that failure-to-intervene claims are limited to situations involving excessive force claims. We disagree. It is true that Tenth Circuit case law has frequently addressed failure-to-intervene claims in the context of officers failing

to step in when another officer is using excessive force.  See, e.g., Vondrak, 535 F.3d at 1210.  But that is not always the case.  See Reid v. Wren, Nos. 94-7122, 94-7123, 94-7124, 1995 WL 339401, at *1–2 (10th Cir. 1995) (unpublished) (recognizing failure-to-intervene claim involving unlawful search and seizure).  Moreover, most other circuits recognize that failure-to-intervene claims can involve failing to stop constitutional deprivations beyond just the use of excessive force.  See Livers v. Schenck, 700 F.3d 340, 360 (8th Cir. 2012) (noting, in case addressing claims alleging defendants fabricated evidence, suppressed exculpatory evidence and maliciously prosecuted plaintiff, that Second, Fourth, Seventh, and Tenth Circuits, in the unpublished Reid decision, "have recognized a duty to intervene outside of the excessive force context" but the Eleventh Circuit declined to find that a duty to intervene to stop other constitutional violations was clearly established, citing cases).  We hold that a failure-to-intervene claim is not limited to excessive force violations, but can involve other underlying constitutional violations.  Specifically, here, Bledsoe adequately alleged a violation of his constitutional rights premised on Defendants' failure to intervene in the alleged fabrication of evidence against Bledsoe, the suppression of exculpatory evidence that would have proven his innocence, and the malicious arrest, prosecution, and conviction of Bledsoe without probable cause to believe he was guilty.

Appellants nevertheless contend that they are entitled to qualified immunity on Bledsoe's failure-to-intervene claim because such a claim was not clearly established

in 1999.[25]  On this point, we agree.  See Shaw v. Schutte, 36 F.4th 1006, 1020–21

(10th Cir. 2022) (holding claim alleging failure to intervene to stop unreasonable

seizure during a traffic stop was not clearly established as of date of the incident).

Moreover, while Bledsoe might have argued that the duty to intervene in the situation

alleged here would have been obvious to any objectively reasonable law enforcement

officer, see Hope, 536 U.S. at 741, Bledsoe has not made such an argument.  We,

therefore, reverse the district court's decision to deny Appellants qualified immunity on

Bledsoe' failure-to-intervene theory of recovery.

### f. Conclusion

For the foregoing reasons, then, we conclude that Bledsoe adequately alleged

that each Appellant participated in depriving him of his constitutional rights and that,

except for the failure-to-intervene theory, the alleged constitutional violations were

clearly established by 1999.  Said another way, except for the failure-to-intervene

claim, each Appellant was on notice in 1999 that their conduct, as Bledsoe has

alleged it—suppressing exculpatory evidence that would have shown Bledsoe's

---

[25] Appellants did not make this argument until their appellate reply brief.  Ordinarily
arguments not raised until a reply brief are waived.  See Herrera v. City of Espanola,
32 F.4th 980, 990 n.5 (10th Cir. 2022).  But Appellants are correct that once they
asserted qualified immunity in the district court, which they did here, it was
Bledsoe's burden to show both that he had alleged a constitutional violation and that
that violation was clearly established.  See Cox v. Glanz, 800 F.3d 1231, 1245 (10th
Cir. 2015).  Though Bledsoe adequately alleged that failure to intervene under these
circumstances was a constitutional violation, Bledsoe did not meet his burden below
or on appeal of showing that this violation was clearly established at the time of the
violation.  Both Bledsoe and the district court focused their analyses on whether the
constitutional deprivations in which Appellants allegedly failed to intervene were
clearly established, not whether the duty to intervene itself was clearly established.

innocence, fabricating evidence to use against him, and using that evidence to arrest, detain and prosecute him for a crime he did not commit—was unconstitutional. The district court, thus, correctly denied each Appellant qualified immunity on Bledsoe's substantive constitutional claims, and on his conspiracy and personal participation theories of liability. As we noted in Pierce,

> [q]ualified immunity is designed to protect public officials who act in good faith, on the basis of objectively reasonable understandings of the law at the time of their actions, from personal liability on account of later-announced, evolving constitutional norms. [Appellants'] alleged misconduct did not stem from a miscalculation of [their] constitutional duties, nor was it undertaken in furtherance of legitimate public purposes that went awry. Rather, as alleged, [Appellants] engaged in a deliberate attempt to ensure the prosecution and conviction of an innocent man. Such conduct, if it can be proven at trial, violated [Bledsoe's] constitutional rights with "obvious clarity."

359 F.3d at 1299–1300.

## IV.  CONCLUSION

Based on the foregoing, we AFFIRM the district court's denial of the Appellants' motion to dismiss as to all counts but Count VI (failure to intervene), we REVERSE the denial of Appellants' motion to dismiss as to Count VI, and we REMAND to the district court for proceedings consistent with this opinion.

*Bledsoe v. Board of County Commissioners of County of Jefferson, KS*, No. 20-3252

**EID**, Circuit Judge, concurring in part and concurring in the judgment in part.

I join the majority opinion only in its result with respect to two issues.  First, I do not join its holding that § 1983 substantive due process claims are not subject to *Parratt* abstention.[1]  *See* maj. op. at 17–24.  Appellants barely argue the issue in their briefs to us and did not mention it at all during oral argument.  I would deem the issue waived. Second, I do not join the majority's holding that a § 1983 failure-to-intervene claim may arise outside the excessive force context.  *See id.* at 45–46.  We have recently expressed skepticism as to whether such an extension is appropriate, *see Shaw v. Schulte*, 36 F.4th 1006, 1020–21 (10th Cir. 2022), and here it is not necessary to reach the issue because we can simply assume that, even if failure-to-intervene claims exist outside of the excessive force context, the right was not clearly established.  *See* maj. op. at 47. Because the majority decides these two issues on broader grounds than are necessary, I join only the result on these matters and join the remainder of the opinion.

## I.

The majority answers an "open question" in this circuit by holding that *Parratt* abstention "does not apply to § 1983 substantive due process claims."  *Id.* at 19.  As the majority recognizes, *id.* at 22–23, Appellants' argument on this issue consists of citations to two concurring opinions by then-Judge Gorsuch.  *See Browder v. City of Albuquerque*,

---

[1] *Parratt v. Taylor*, 451 U.S. 527 (1981).

787 F.3d 1076, 1085 (10th Cir. 2015) (Gorsuch, J., concurring); *Cordova v. City of Albuquerque*, 816 F.3d 645, 665 (10th Cir. 2016) (Gorsuch, J. concurring), *abrogated on other grounds by Thompson v. Clark*, 142 S. Ct. 1332, 1335–36 (2022).  But Appellants do not meaningfully develop the argument beyond the citations, Aplt. Br. at 48–49, nor do they develop the argument in reply, simply citing to their inadequate opening briefing. Reply Br. at 31.  Moreover, Appellants said nothing—not a word—about *Parratt* at oral argument.  And any advocate would be hard-pressed to miss the issue, as it took up thirty pages of the district court's opinion.  *See Bledsoe v. Bd. of Cnty. Comm'rs of Cnty. of Jefferson, KS*, 501 F. Supp. 3d 1059, 1089–1119 (D. Kan. 2020).  I would deem the argument waived due to inadequate argument.  *See Craven v. Univ. of Colo. Hosp. Auth.*, 260 F.3d 1218, 1226 (10th Cir. 2001) (quoting *Ent. Rsch. Grp., Inc. v. Genesis Creative Grp., Inc.*, 122 F.3d 1211, 1217 (9th Cir. 1997)) ("We will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review."); *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived . . . .").

## II.

The majority additionally—and needlessly—decides that "a failure-to-intervene claim is not limited to excessive force violations, but can involve other underlying constitutional violations."  Maj. op. at 46.  This court recently looked at the issue of whether failure-to-intervene claims extend beyond the excessive force context in *Shaw*.

*See* 36 F.4th at 1020–21.  There, the plaintiff's theory was that the defendant officer

failed to intervene when other officers improperly prolonged a traffic stop to enable a K-9

sweep.  *Id.* at 1021.  The plaintiff based his argument on *Vondrak v. City of Las Cruces*,

535 F.3d 1198 (10th Cir. 2008), which observed that "all law enforcement officials have

an affirmative duty to intervene to protect the constitutional rights of citizens from

infringement by other law enforcement officers in their presence."  *Id.* at 1210 (quoting

*Anderson v. Branen*, 17 F.3d 552, 557 (2d. Cir. 1994)).  But we rejected the plaintiff's

reliance on the "general proposition" of *Vondrak*, noting that its statement was made "in

the context of an excessive force claim."  *Shaw*, 36 F.4th at 1020.  We concluded that

"where the intrusion and permanency of harm from the use of excessive force may

exceed that from the relatively brief prolongation of a traffic stop, *Vondrak* does not

clearly establish that an officer must intervene to prevent an illegal search and seizure."

*Id.*

The majority cites *Shaw*, without further elaboration, to hold that Appellants "are

entitled to qualified immunity on Bledsoe's failure-to-intervene claim because such a

claim was not clearly established in 1999."  Maj. op. at 46–47.  I agree with this holding.

But the majority fails to cite *Shaw*'s skepticism toward extending *Vondrak* beyond

the excessive force context.  Instead, it cites *Vondrak*'s "general proposition," as *Shaw*

put it, that officers have an affirmative duty to intervene to protect against constitutional

violations committed in their presence.  *Id.* at 44.  And while the majority cites to an

unpublished Tenth Circuit case and an Eighth Circuit case (which cites our unpublished

3

case and cases from other circuits) for why such an extension is warranted, *see id.* at 46, none of this authority is binding. It goes on to conclude, based on the cited cases, that Bledsoe "adequately alleged a violation of his constitutional rights premised on Defendants' failure to intervene in the alleged fabrication of evidence against Bledsoe, the suppression of exculpatory evidence that would have proven his innocence, and the malicious arrest, prosecution, and conviction of Bledsoe without probable cause to believe he was guilty." *Id.*

We should be hesitant in this case to extend *Vondrak* beyond its boundaries given *Shaw*'s skepticism and the lack of binding precedent on the issue. Moreover, there is no reason to do so here, where the majority concludes the failure-to-intervene right was not clearly established in any event. To overcome the presumption of qualified immunity, Bledsoe must show that (1) the defendants' actions violated a constitutional or statutory right, and (2) the right was clearly established at the time of the relevant conduct. *See Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021). Courts "have discretion to decide the order in which they address these two prongs and thus may address the clearly established prong first." *Roberts v. Winder*, 16 F.4th 1367, 1374 (10th Cir. 2021) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). In fact, the Supreme Court has encouraged the lower courts not to examine both prongs of the inquiry when one is dispositive of the issue, as this "results in a substantial expenditure of scarce judicial resources on difficult questions that have no effect on the outcome of the case." *Pearson*, 555 U.S. at 236–37. Here we should heed the Court's advice and narrowly hold that,

4

assuming without deciding that there is a failure-to-intervene right in this context, it was not clearly established.

### III.

For these reasons, I respectfully concur in the judgment only with respect to the two issues discussed above.