UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FLOYD S. BLEDSOE,

        Plaintiff,

v.                                              Case No.  16-2296-DDC-ADM

JIM WOODS, ESTATE OF GEORGE JOHNSON,
TERRY MORGAN, and MICHAEL HAYES,

        Defendants.

**MEMORANDUM IN SUPPORT OF**
**DEFENDANT MICHAEL HAYES' MOTION FOR SUMMARY JUDGMENT**

      Defendant Michael Hayes submits the following Memorandum in Support of his Motion
for Summary Judgment.

## I.  NATURE OF THE CASE AND INTRODUCTION

      On November 5, 1999, Camille Arfmann went missing in Jefferson County, Kansas.  In
the early morning hours of November 8, 1999, her body was found on the property where the
parents of the Plaintiff, Floyd S. Bledsoe, and Thomas E. Bledsoe ("Tom Bledsoe") lived.  The
crime was investigated by the Jefferson County Sheriff's Department and the Kansas Bureau of
Investigation.  Tom Bledsoe was initially charged with the murder of Camille Arfmann.  The
Jefferson County Attorney at the time who filed the charges was Jim Vanderbilt ("Mr.
Vanderbilt").  Defendant Michael Hayes ("Mr. Hayes") was appointed by the District Court of
Jefferson County to represent Tom Bledsoe on the murder charges.  Mr. Hayes was a well-
respected criminal defense attorney in Jefferson County.  A few days after Tom Bledsoe was
charged with murder, the charges against Tom Bledsoe were dismissed, and Mr. Vanderbilt filed
murder charges against Plaintiff.

Plaintiff was ultimately convicted of murder on April 28, 2000 following a four (4) day jury trial in the District Court of Jefferson County, Kansas.  After the Plaintiff's conviction, the Plaintiff appealed his conviction, but it was affirmed by the Kansas Supreme Court in 2002.  *See*, *State v. Bledsoe*, 272 Kan. 1350, 39 P.3d 38 (2002).  The Plaintiff's request for habeas corpus relief was denied by the state trial court, and that denial was upheld by the Kansas Supreme Court in 2007.  *See*, *Bledsoe v. State*, 283 Kan. 81, 150 P.3d 868 (2007).  The Plaintiff then sought habeas relief from the United States District Court of Kansas.  That request was granted by the U.S. District Court in 2008, but the Tenth Circuit reversed that decision, denying Plaintiff's habeas request in 2009.  *See*, *Bledsoe v. Bruce*, 569 F.3d 1223 (10th Cir. 2009).

Plaintiff claims that Mr. Hayes was involved in a conspiracy with law enforcement officers and Mr. Vanderbilt to frame him for Camille Arfmann's murder.  All of the claims asserted by the Plaintiff against Mr. Hayes in this lawsuit are asserted under 42 U.S.C. § 1983. The Plaintiff has asserted four claims against Mr. Hayes: (1) Count I: Due Process Violation (fabricating Tom's statements); (2) Count II: Conspiracy to Deprive Constitutional Rights (conspiratorial conduct in concert with Mr. Vanderbilt); (3) Count IV: Malicious Prosecution and Unlawful Pretrial Detention; and (4) Count V: Conspiracy to Deprive Constitutional Rights (conspiratorial conduct unknown to Mr. Vanderbilt).

As will be explained in detail below, all the claims against Mr. Hayes must be dismissed, because Mr. Hayes was a court-appointed private defense attorney for Tom Bledsoe.  Mr. Hayes was not a state actor and did not conspire with state actors.  Rather, Mr. Hayes performed the traditional functions of a court appointed criminal defense attorney.  There is no evidence upon which a reasonable jury could conclude that there was a conspiracy between Mr. Hayes and the state actors, *i.e.,* the law enforcement officers and Mr. Vanderbilt.

Furthermore, Mr. Hayes is entitled to summary judgment in his favor, because:  (1) Plaintiff has abandoned his Count I claim against Mr. Hayes; (2) Plaintiff's claims against him, to the extent they assert Fourteenth Amendment procedural due process claims, are barred; (3) Plaintiff does not have evidence of malice or willful conduct; (4) and the evidence does not support the elements of a malicious prosecution claim.

Accordingly, Mr. Hayes is entitled to summary judgment in his favor on all of Plaintiff's claims.

## II.  STATEMENTS OF UNCONTROVERTED FACTS

The following statements of fact are uncontroverted for the purposes of this Motion for Summary Judgment:

1.  In November 1999, Plaintiff was 23 years old and living with his wife Heidi Bledsoe ("Heidi"), the couple's 1- and 2-year-old sons, Cody and Christian Bledsoe, and Heidi's 14-year-old sister, Camille Arfmann.  (Pretrial Order [Doc. 329], Stipulated Fact i).

2.  Plaintiff's brother is Tom Bledsoe.  (Pretrial Order [Doc. 329], Stipulated Fact iv).

3.  On November 5, 1999, Camille Arfmann went missing. (Pretrial Order [Doc. 329], Stipulated Fact viii).

4.  On November 7, 1999 Oskaloosa attorney Jim Swoyer contacted attorney Mr. Hayes about representing Tom Bledsoe.  (Pretrial Order [Doc. 329], Stipulated Fact xiv; and Hayes Depo. Vol. 1. 61:25-62:3, 65:24-66:15, cited portions of Hayes Depo. Vol. 1 attached as Exhibit 1).

5. Hayes was a criminal defense attorney with a good reputation.  (Frost Depo. 37:7-21, cited portions of Frost Depo. attached as Exhibit 2; and Vanderbilt Depo. 27:19-28:4, cited portions of Vanderbilt Depo. attached as Exhibit 3).

6. Mr. Hayes met with Tom Bledsoe on November 7, 1999, and Tom Bledsoe ultimately became Mr. Hayes' client.  (Pretrial Order [Doc. 329], Stipulated Fact xiv; and Hayes Depo. Vol. 1. 69:17-70:13).

7. The Kansas Bureau of Investigation ("KBI") and the Jefferson County Sheriff's Office ("JCSO") investigated Camille Arfmann's homicide (Pretrial Order [Doc. 329], Stipulated Fact xv).

8. Roy Dunnaway ("Sheriff Dunnaway") was the Sheriff of Jefferson County, Kansas during the investigation of the murder of Camille Arfmann.  (Pretrial Order [Doc. 329], Stipulated Fact xvii).

9. Sheriff Dunnaway ran the investigation into the Arfmann homicide.  (Vernon Depo. 16:14-20, cited portions of Vernon Depo. attached as Exhibit 4).

10. Jeffrey Herrig ("Mr. Herrig") was the Undersheriff of Jefferson County, Kansas during the Arfmann investigation.  (Herrig Depo. 39:3-7, cited portions of Herrig Depo. attached as Exhibit 5).

11. Randy Carreno ("Mr. Carreno"), Troy Frost ("Mr. Frost"), Robert Poppa ("Mr. Poppa"), and Kirk Vernon ("Mr. Vernon") worked as law enforcement officers for the JCSO during the Arfmann homicide investigation.  (Second Amended Complaint [Doc. 141], ¶14; Pretrial Order [Doc. 329], Stipulated Fact x; Depo. of Vernon, 30:12-22).

12. Mr. Carreno was the lead detective on the case.  (Vernon Depo. 16:21-13).

13. George Johnson ("Mr. Johnson"), Jim Woods ("Mr. Woods"), and Terry Morgan ("Mr. Morgan") worked as law enforcement officers for the KBI during the Arfmann homicide investigation.  (Pretrial Order [Doc. 329], Stipulated Facts xvi, xviii, and xxxix).

14. On November 7, Mr. Woods was a Senior Special Agent with the KBI.  (Pretrial Order [Doc. 329], Stipulated Fact xvi).

15. Because Jefferson County was in the region Mr. Woods covered, Sheriff Dunnaway asked him to assist with the homicide investigation.  (Pretrial Order [Doc. 329], Stipulated Fact xvii).

16. KBI also assigned Mr. Morgan to assist in the investigation.  (Pretrial Order [Doc. 329], Stipulated Fact xviii).

17. After meeting with Tom Bledsoe on November 7, 1999, Mr. Hayes called Sheriff Dunnaway, and told him that he might be able to help law enforcement find Camille Arfmann.  (Hayes Depo. Vol. 1. 74:4-20).

18. After speaking with Sheriff Dunnaway by phone, Mr. Hayes met with Sheriff Dunnaway at the Jefferson County Law Enforcement Center.  (Hayes Depo. Vol. 1. 75:12-15).

19. Mr. Hayes recalls Tom Bledsoe being at the Law Enforcement Center that evening as well.  (Hayes Depo. Vol. 1. 75:16-76:6).

20. Mr. Hayes met with Sheriff Dunnaway and told him that Camille Arfmann might be on Tom Bledsoe's father's property buried in a ditch.  (Hayes Depo. Vol. 1. 80:4-12).

21. Mr. Hayes asked Sheriff Dunnaway if they wanted to go see if Camille Arfmann was buried there, and Sheriff Dunnaway agreed.  (Hayes Depo. Vol. 1. 80:15-21).

22. Sheriff Dunaway told Mr. Hayes he wanted any weapons that Tom Bledsoe had, so Mr. Hayes contacted Tom Bledsoe's father, and Tom Bledsoe's father brought a gun to the Law Enforcement Center.  (Hayes Depo. Vol. 1. 82:6-83:13).

23. On November 8, Mr. Hayes turned over Tom Bledsoe's Jennings 9mm firearm to law enforcement. Tom Bledsoe had purchased that firearm on October 23, 1999.  (Pretrial Order [Doc. 329], Stipulated Fact xxiii).

24. Mr. Hayes ultimately provided a 9mm handgun to Mr. Poppa at 1:44 a.m. on November 8, 1999.   (Hayes Depo. Vol. 1. 88:4-21).

25. The timing of when and how the gun was provided by Mr. Hayes to law enforcement was at the request of Sheriff Dunnaway.  (Hayes Depo. Vol. 1. 88:22-89:25).

26. On the evening of November 7, 1999, Tom Bledsoe rode in Mr. Hayes' vehicle on the drive out to try to locate Camille Arfmann.  (Hayes Depo. Vol. 1, 90:19-23).

27. In the early morning hours of November 8, Tom Bledsoe and Mr. Hayes led law-enforcement officers to a location at a garbage dump in a ditch on the property adjacent to Tom Bledsoe's residence where he lived with his parents, and the law enforcement officers did not object to this.  (Hayes Depo. Vol. 1. 90:19-91:5; and Pretrial Order [Doc. 329], Stipulated Fact xx).

28. At approximately 2:30 a.m. on November 8, officers found Camille Arfmann's body buried under at least a foot of dirt, covered by sheets of plywood.  (Pretrial Order [Doc. 329], Stipulated Fact xxi).

29. After Camille Arfmann's body was found, Mr. Hayes drove Tom Bledsoe back to the Law Enforcement Center where he was arrested and booked for murder.  (Hayes Depo. Vol. 1. 93:21-94:13; and Pretrial Order [Doc. 329], Stipulated Fact xxviii).

30. Mr. Poppa did not ask any questions of Mr. Hayes and does not remember being in the same room with Mr. Hayes on the evening of November 7, 1999. (Poppa Depo. 75:6-12, cited portions of Poppa Depo. attached as Exhibit 6).

31. The only person Mr. Poppa saw interviewing Tom Bledsoe was Mr. Carreno. (Poppa Depo. 78:17-80:3).

32. Mr. Poppa only knew Mr. Hayes from Mr. Hayes' time as a prosecutor in Jackson County and Jefferson County. (Poppa Depo.185:20-186:12).

33. Mr. Vanderbilt was the Jefferson County Attorney and was the prosecutor of the criminal cases against Tom Bledsoe and Plaintiff for Camille Arfmann's murder. (Pretrial Order [Doc. 329], Stipulated Fact xlviii).

34. Mr. Hayes represented Mr. Vanderbilt in Mr. Vanderbilt's divorce and property-settlement case, which was filed as case number 99 D 160 in Jefferson County. Mr. Hayes, acting as Mr. Vanderbilt's attorney in that case, signed and/or filed documents including the petition for divorce dated October 12, 1999; the Journal Entry of Judgment of Decree of Divorce dated November 9, 2000; the Separation and Property Settlement Agreement dated November 9, 2000; an Order for Continuance dated May 21, 2002; and a Journal Entry of Contempt Hearing dated August 26, 2002. Mr. Hayes also authored a letter on behalf of Mr. Vanderbilt to his ex-wife's attorney dated August 20, 2002. (Pretrial Order [Doc. 329], Stipulated Fact lxiv).

35. Mr. Hayes did not represent Mr. Vanderbilt in a matter before the Jefferson County Board of County Commissioners regarding Mr. Vanderbilt's use of County funds. (Hayes Depo. Vol. 2. 11:12-16, cited portions of Hayes Depo. Vol. 2 attached as Exhibit 7).

36. Tom Bledsoe was charged with the murder of Camille Arfmann, and Mr. Hayes was appointed by the court as Tom Bledsoe's attorney on November 9, 1999, but as indicated in the First Appearance/Arraignment Journal Entry, Mr. Hayes was appointed previous to November 9, 1999. (Hayes Depo. Vol. 1. 70:14-23; and First Appearance/Arraignment Journal Entry, Hayes 0004-6 attached as Exhibit 14).

37. Mr. Hayes presented Mr. Vanderbilt with arguments that the murder was not committed by Tom Bledsoe but was committed by Plaintiff. (Vanderbilt Depo. 87:17-88:20).

38. As a result of these arguments, Mr. Vanderbilt requested that Tom Bledsoe and Plaintiff take polygraph tests. (Vanderbilt Depo. 88:12-20).

39. Plaintiff voluntarily agreed to take a polygraph examination at the Law Enforcement Center. (Pretrial Order [Doc. 329], Stipulated Fact xxxviii).

40. On November 12, 1999, Mr. Johnson participated in law-enforcement questioning of, and administered polygraph examinations to, Tom Bledsoe and Plaintiff. Mr. Johnson reported that Tom Bledsoe was truthful during his polygraph examination and that Plaintiff was deceptive during his. (Pretrial Order [Doc. 329], Stipulated Fact xxxix).

41. After the polygraph examination, Plaintiff was interrogated and then arrested for Camille Arfmann's homicide. (Pretrial Order [Doc. 329], Stipulated Fact xli).

42. Based upon the polygraph results, Mr. Vanderbilt concluded that he had charged the wrong man with the murder, and decided to dismiss the charges and Tom Bledsoe, and to charge Plaintiff with the murder. (Vanderbilt Depo. 98:11-99:20).

43. During the interrogation of Plaintiff on November 12, 1999, Mr. Hayes came into the interview room and communicated with Plaintiff in the presence of Mr. Johnson and Mr. Carreno.  (Pretrial Order [Doc. 329], Stipulated Fact xlii).

44. Mr. Hayes could not have been in the interview room with Plaintiff on November 12, 1999, without law enforcement officers letting him in.  (Hayes Depo. Vol. 1. 103:3-8).

45. It was not planned for Mr. Hayes and Tom Bledsoe to enter the interview room with Plaintiff, Mr. Johnson, and Mr. Carreno on November 12, 1999. (Carreno Depo. 184:24-185:7, cited portions of Carreno Depo. attached as Exhibit 8).

46. Some law enforcement office let Mr. Hayes into the interview room area, though Mr. Carreno does not know who that might have been (Carreno Depo. 185:17-186:12).

47. Mr. Carreno did not have any conversations with Mr. Hayes specifically prior to the interview of the Plaintiff on November 12, 1999.  (Carreno Depo. 186:24-187:5).

48. The only contact Mr. Carreno recalls having with Mr. Hayes was either in the parking lot at the Sheriff's Department and/or out at the crime scene to where Camille Arfmann was buried.  (Carreno Depo. 187:21-25).

49. Mr. Carreno assumed that Mr. Hayes and Tom Bledsoe came into the interview room to confront Plaintiff.  Mr. Carreno does not know what their actual purpose was. (Carreno Depo. 223:14-19).

50. Mr. Frost did not hear anyone talking about Mr. Hayes and Tom Bledsoe coming into the interview room.  (Frost Depo. 212:3-18).

51. To Mr. Frost's knowledge, Mr. Hayes was not around for the preparation of the search warrant regarding Plaintiff. (Frost Depo. 157:24-158:1).

52. Mr. Hayes did not provide any of the information that was included in the affidavit for the search warrant.  (Frost Depo. 160:7-163:3).

53. Tom Bledsoe was released from jail on bail on November 12, 1999, and the charges against Tom Bledsoe were dismissed on November 15, 1999. (Pretrial Order [Doc. 329], Stipulated Fact xlvi).

54. Mr. Hayes did not pressure Mr. Vanderbilt to dismiss the charges against Tom Bledsoe. (Vanderbilt Depo. 102:7-11).

55. The decision to dismiss the charges against Tom Bledsoe was Mr. Vanderbilt's decision alone.  (Vanderbilt Depo. 102:7-104:7.)

56. Mr. Vanderbilt's decision to dismiss the charges against Tom Bledsoe and file the charges against Plaintiff was not based upon him being indebted to Hayes in any way. (Vanderbilt Depo. 233:4-11).

57. On November 15, 1999, Vanderbilt charged Plaintiff with the first-degree murder of Camille Arfmann.  (Pretrial Order [Doc. 329], Stipulated Fact xlvii).

58. Mr. Herrig was not present for any of the events on the evening of November 7, 1999 and continuing into the morning of November 8, 1999.  (Herrig Depo. 84:8-14).

59. Mr. Herrig does not know what information was received by law enforcement from Mr. Hayes and Tom Bledsoe on the evening of November 7, 1999 and continuing into the morning of November 8, 1999.  (Herrig Depo. 86:14-87:3).

60. Mr. Herrig was not present for an interview involving Mr. Hayes, Mr. Carreno and Tom Bledsoe that occurred between November 7 and 10, 1999.  (Herrig Depo. 90:20-92:8).

61. In 1999 or 2000 Mr. Herrig did not witness any communications by Mr. Hayes relating to the Arfmann murder.  (Herrig Depo. 96:11-14).

62. The only information that Mr. Herrig was made aware of in 1999 or 2000 regarding communications relating to the Arfmann homicide was that Mr. Hayes and Tom Bledsoe had talked to investigators on the case.  (Herrig Depo. 96:14-97:9).

63. Mr. Herrig never learned what Mr. Hayes and Tom Bledsoe told investigators. (Herrig Depo. 98:5-8).

64. Mr. Herrig neither participated in, nor observed any, questioning of Plaintiff in 1999 or 2000.  (Herrig Depo. 98:9-14).

65. Mr. Woods does not remember Sheriff Dunnaway or Mr. Hayes going away alone to talk for a while on the evening of November 7, 1999.  (Woods Depo. 99:19-21, cited portions attached as Exhibit 15).

66. Mr. Morgan does not recall seeing Mr. Hayes in the Law Enforcement Center during the Arfmann investigation.  (Morgan Depo. 182:14-17, cited portions attached as Exhibit 16).

67. Mr. Vernon participated in the Arfmann investigation in 1999.  (Vernon Depo. 14:2-4).

68. Mr. Vernon was a detective for the Jefferson County Sheriff's Department in 1999 and 2000.  (Vernon Depo. 15:13-16:20).

69. Mr. Vernon did not participate in any of the communications between Tom Bledsoe or Mr. Hayes with law enforcement officers on November 7, 1999.  (Vernon Depo. 109:25-110:4).

70. Mr. Vernon has no direct knowledge of anything stated by Hayes during the Arfmann homicide investigation.  (Vernon Depo. 117:1-13).

71. Mr. Vernon says he saw Mr. Hayes, Mr. Vanderbilt, Mr. Woods, and Sheriff Dunnaway go into a closed-door meeting, and according to Mr. Vernon it was his "perception" that law enforcement began "looking at" Plaintiff as the person that committed the homicide.  (Vernon Depo. 118:15-119:11).

72. However, Mr. Vernon has no knowledge to support a theory that Mr. Hayes was involved in a scheme to frame the Plaintiff for murder.  (Vernon Depo. 174:12-18).

73. Mr. Vernon is not aware of any evidence that any of the Defendants framed the Plaintiff for murder.  (Vernon Depo. 170:17-22).

74. Mr. Vernon is not aware of any evidence as to why any of the Defendants would frame the Plaintiff for murder.  (Vernon Depo. 170:23-171:2).

75. Mr. Vernon is not aware of any evidence that any of the Defendants has a meeting to discuss framing the Plaintiff for murder.  (Vernon Depo. 171:3-6).

76. Mr. Vernon is not aware of any evidence that any of the Defendants conspired to frame Plaintiff.  (Vernon Depo. 171:7-9).

77. Mr. Vernon is not aware of any evidence that any of the Defendants fabricated evidence like getting a false recantation from Tom Bledsoe.  (Vernon Depo. 171:10-13).

78. Mr. Vernon is not aware of any evidence that any of the Defendants intentionally concealed evidence.  (Vernon Depo. 171:14-17).

79. Mr. Vernon is not aware of any evidence that any of the Defendants intentionally suppressed evidence.  (Vernon Depo. 171:18-21).

80. Mr. Vernon is not aware of any evidence that any of the Defendants destroyed evidence.  (Vernon Depo. 171:22-24).

81. Mr. Vernon is not aware of any evidence that any of the Defendants had any ill will, dislike, hatred of, or grudge against the Plaintiff before the Arfmann homicide investigation.  (Vernon Depo. 171:25-172:8).

82. In 1999, Victor J. Braden ("Mr. Braden") was an Assistant County Attorney in Jefferson County, Kansas during the investigation of the murder of Camille Arfmann, and during the prosecution of Plaintiff for the murder of Camille Arfmann.  (Affidavit of Victor J. Braden ¶ 1, attached hereto as Exhibit 9).

83. Although Mr. Braden was not directly involved in the Arfmann case, he recalls that Tom Bledsoe had been arrested for the murder of Camille Arfmann, and that he was represented in that case by Mr. Hayes.  (Affidavit of Victor J. Braden ¶ 2).

84. During the investigation and prosecution of the Camille Arfmann murder, Mr. Braden personally witnessed interactions between Mr. Vanderbilt and Mr. Hayes.  (Affidavit of Victor J. Braden ¶ 4).

85. Mr. Braden believes that Mr. Hayes was persuasive in his arguments to Mr. Vanderbilt in Mr. Hayes' representation of Tom Bledsoe.  However, Mr. Braden did not see or hear Mr. Hayes do anything improper.  (Affidavit of Victor J. Braden ¶ 5).

86. Mr. Braden is aware that Mr. Vanderbilt was involved in a divorce in 1999, and that Mr. Hayes represented Mr. Vanderbilt in that divorce.  (Affidavit of Victor J. Braden ¶ 6).

87. However, Mr. Braden does not believe that Mr. Hayes representing Mr. Vanderbilt in that divorce resulted in a conspiracy between Mr. Hayes and Mr. Vanderbilt as it

related to Mr. Hayes' representation of Tom Bledsoe or the Camille Arfmann murder. (Affidavit of Victor J. Braden ¶ 7).

88. Mr. Braden is not aware of Mr. Hayes or Mr. Vanderbilt working together to fabricate or withhold any evidence with regard to the Camille Arfmann murder.  (Affidavit of Victor J. Braden ¶ 8).

89. Mr. Braden believes the decision to dismiss the charges against Tom Bledsoe was Mr. Vanderbilt's decision alone and was not the result of any improper conduct by Mr. Hayes.  (Affidavit of Victor J. Braden ¶ 9).

90. Mr. Braden believes that, based upon the evidence at the time, it was appropriate for Mr. Vanderbilt to have dismissed the charges against Tom Bledsoe.  (Affidavit of Victor J. Braden ¶ 10).

91. The preliminary hearing in Plaintiff's underlying criminal case was held on November 29, 1999.  (Transcript of Preliminary Hearing, relevant portions attached as Exhibit 10).

92. Tom Bledsoe and two JCSO detectives testified for the state.  Plaintiff's counsel cross-examined each witness.  (Transcript of Preliminary Hearing, relevant portions attached as Exhibit 10).

93. At Plaintiff's preliminary hearing and at Plaintiff's trial, Tom Bledsoe testified and was cross-examined regarding his confessions.  (Plaintiff Depo. 155:9-19, cited portions of Plaintiff Depo. attached as Exhibit 11).

94. After hearing the evidence, Judge Dennis Reiling determined that there was probable cause to believe that Plaintiff had committed the charged crimes.  (Transcript of Preliminary Hearing, relevant portions attached as Exhibit 10).

95. Plaintiff was tried before a jury in April 2000. The trial lasted four days. The jury heard evidence from witnesses including Tom Bledsoe. The jury convicted Plaintiff, who was then sentenced to life in prison.  (Pretrial Order [Doc. 329], Stipulated Fact lxv).

96. Prior to Tom Bledsoe testifying at Plaintiff's trial, Mr. Vanderbilt told Tom Bledsoe to tell the truth.  (Vanderbilt Depo. 194:19-196:1).

97. Vanderbilt did not ask Mr. Hayes to prepare Tom Bledsoe for his trial testimony. (Vanderbilt Depo. 198:7-10).

98. In 2015, Plaintiff's lawyers obtained DNA evidence that identified Tom Bledsoe as a potential source of DNA from semen recovered from Camille Arfmann's body and excluded Plaintiff. Plaintiff's lawyers filed a motion for a new trial.  (Pretrial Order [Doc. 329], Stipulated Fact lxvii).

99. Shortly after the press reported the DNA evidence and the motion for a new trial, Tom Bledsoe was found dead. The Wyandotte County Coroner concluded that the manner of death was suicide.  (Pretrial Order [Doc. 329], Stipulated Fact lxviii).

100.    Along with Tom Bledsoe's body, Bonner Springs Police Department officers recovered the notes depicted at KBI Subpoena 1114-1122.  (Pretrial Order [Doc. 329], Stipulated Fact lxix; and KBI Subpoena 1114-1122, attached as Exhibit 12).

101.    In the notes found with Tom Bledsoe's body, there is a note that appears to bear the signature of Tom Bledsoe that says the following:

"I sent a [sic] innocent man to prison.  The Jefferson county police and county attorney Jim Vanderbilt made me do it.  I was told by Vanderbilt to keep my mouth

shut. . . .  I killed Camille Arfmann . . .”  (KBI Subpoena 1119, attached in Exhibit 12).

102.    There was also another note signed “Tom” that says:  “Floyd is innocent.  The CA made me Lye [sic] and keep my mouth shut.”  (KBI Subpoena 1117, attached in Exhibit 12).

103.    Mr. Hayes is not mentioned in the alleged suicides notes of Tom.  (KBI Subpoena 1114-1122, attached in Exhibit 12; See also, Vernon Depo. 173:9-19).

104.    On December 8, 2015, the Jefferson County District Court overturned Plaintiff's conviction and ordered a new trial. Jefferson County Attorney Jason Belveal (“Belveal”) then filed a motion to dismiss the charges against Plaintiff without prejudice, which the court granted.  (Pretrial Order [Doc. 329], Stipulated Fact lxx).

105.    Ronnie Burke (“Mr. Burke”) is an Assistant Special Agent with the KBI and was the lead agent that worked on the re-investigation of the Arfmann homicide beginning in 2015.  (Burke Depo. 21:5-8, cited portions of Burke Depo. attached as Exhibit 13).

106.    Mr. Burke did nothing specific to investigate whether there were any undocumented communications between law enforcement officers and Tom Bledsoe, or Mr. Hayes.  (Burke Depo. 68:24-69:3).

107.    In February 2016, Mr. Vernon and Mr. Burke attempted to speak with Mr. Hayes about the Arfmann case while Mr. Hayes was at the Jefferson County Law Enforcement Center on other matters, but Mr. Hayes told Mr. Vernon that he was busy that day and the following day.  (Vernon Depo. 139:4-19, 143:6-144:20).

108.    Plaintiff has no personal knowledge to support the allegation that Mr. Hayes, Mr. Vanderbilt, and/or others held a meeting to put into action their scheme to fabricate Tom's testimony.  (Plaintiff Depo. 94:13-22).

109.    Plaintiff has no personal knowledge to support the allegation that Mr. Vanderbilt was indebted to Mr. Hayes who was helping Mr. Vanderbilt avoid his legal exposure of Mr. Vanderbilt's appropriation of County funds for personal use.  (Plaintiff Depo. 99:18-101:3).

110.     Plaintiff has no personal knowledge to support the allegation that Mr. Hayes, Mr. Vanderbilt, or other officers coached Tom Bledsoe.  (Plaintiff Depo. 102:9-25).

111.    According to Plaintiff, Tom Bledsoe could not be manipulated by him.  (Plaintiff Depo. 103:9-12).

112.    Plaintiff has no personal knowledge of Tom Bledsoe being manipulated by anyone in his life.  (Plaintiff Depo. 103:13-16).

113.    Plaintiff has no personal knowledge of Tom Bledsoe being easily overpowered, and Plaintiff was not able to easily overpower Tom Bledsoe.  (Plaintiff Depo. 104:4-11).

114.    Plaintiff never personally saw or heard anyone coach or coerce Tom Bledsoe to make statements.  (Plaintiff Depo. 140:15-22).

115.    No one has told Plaintiff that that they saw or heard Mr. Hayes coach or coerce Tom Bledsoe to make statements.  (Plaintiff Depo. 140:23-141:11).

116.    Prior to the Arfmann case, Plaintiff had only met Mr. Hayes one time, and that was to consult with him about Mr. Hayes possibly representing Plaintiff in a divorce.  (Plaintiff Depo. 116:11-117:7).

117.    Plaintiff did not hire Mr. Hayes to represent him in the divorce, and Plaintiff
stayed married.  (Plaintiff Depo. 117:17-118:7).

118.    Plaintiff did not have any problems with Mr. Hayes.  (Plaintiff Depo. 117:8-10).

119.    Plaintiff was not aware of Mr. Hayes having any problems with him.  (Plaintiff
Depo. 117:11-13).

120.    Mr. Hayes never prosecuted Plaintiff for any crimes.  (Plaintiff Depo. 117:14-16).

121.    During the Arfmann investigation, Plaintiff only spoke to Mr. Hayes two times.
(Plaintiff Depo. 119:17-125:6).

122.    The first was in the parking lot of the Jefferson County Law Enforcement Center.
(Plaintiff Depo. 119:17-121:18).

123.    Plaintiff says that in that conversation, Mr. Hayes questioned him about why he
told police there was a red substance in Tom Bledsoe's truck, and also said to
Plaintiff "I'm going to get Tom off the hot seat and put you on it."  (Plaintiff Depo.
119:17-121:18).

124.    Mr. Hayes denies telling Plaintiff that he was going to get Tom off the hot seat
and put Plaintiff on it.  (Hayes Depo. Vol. 1, 136:17-137:9).

125.    No one else was present for that conversation, except Plaintiff and Mr. Hayes.
(Plaintiff Depo. 119:17-121:18).

126.    The second was in an interview room in the Jefferson County Law Enforcement
Center.  (Plaintiff Depo. 124:21 – 125:6).

127.    Plaintiff believes that Mr. Hayes assisted in a cover-up but cannot not identify
anything that was specifically done by Mr. Hayes, other than the conversation in the

parking lot, and bringing Tom Bledsoe into the interview room with Plaintiff, Mr. Johnson and Mr. Carreno.  (Plaintiff Depo. 122:1 – 125:25).

128.    Plaintiff did not see or hear Mr. Hayes involved in any conspiracy meetings.  (Plaintiff Depo. 141:13-20).

129.    No one told the Plaintiff directly that that Mr. Hayes had a meeting to form a conspiracy.  (Plaintiff Depo. 141:21-142:2).

130.    Plaintiff has no personal information that would lead him to believe that Mr. Hayes would be involved in conspiracy to frame Plaintiff for murder.  (Plaintiff Depo. 142:13-143:7).

131.    Plaintiff has no idea why Mr. Hayes would want to be involved in a conspiracy to frame him for murder.  (Plaintiff Depo. 143:8-9).

132.    Plaintiff does not have enough information, personally, to make him feel comfortable to accuse Mr. Hayes of being involved in a conspiracy to frame him for murder.  (Plaintiff Depo. 143:18-24).

133.    Mr. Poppa never told Plaintiff that Mr. Hayes had done anything wrong.  (Plaintiff Depo. 144:24-145:3).

134.    Mr. Hayes has never fabricated evidence of somebody else's guilt in order to assist a client in beating criminal charges.  (Hayes Depo. Vol. 1. 110:3-17).

135.    Mr. Hayes did not lie to law enforcement or knowingly provide false information to law enforcement during the Arfmann homicide investigation.  (Hayes Depo. Vol. 1. 129:9-15).

### III.  STATEMENT OF THE ISSUES

1.  Was Mr. Hayes a state actor for purposes of Plaintiff's 42 U.S.C. § 1983 claims against him?

    a.  Did Mr. Hayes perform the traditional functions of a court-appointed criminal-defense attorney?

    b.  Did Mr. Hayes conspire with any state actors?

2.  Is Mr. Hayes entitled to summary in his favor on Count I?

    a.  Did Plaintiff abandon his Count I claims against Mr. Hayes in the Pretrial Order?

    b.  Should Plaintiff's Fourteenth Amendment procedural due process claim under Count I be dismissed on summary judgment because of the availability of a Kansas malicious prosecution tort claim?

    c.  Should Plaintiff's Substantive Due Process Claim Under Count I be dismissed on summary judgment because there is no evidence of malice or willful conduct?

3.  Is Mr. Hayes entitled to summary judgment in his favor on Counts II and V?

    a.  Should Plaintiff's Fourteenth Amendment procedural due process claims under Counts II and V be dismissed on summary judgment because of the availability of a Kansas malicious prosecution tort claim?

    b.  Does Plaintiff have sufficient evidence upon which a reasonable jury could conclude there was a conspiracy?

4.  Is Mr. Hayes entitled to summary in his favor on Count IV?

    a.  Should Plaintiff's Fourteenth Amendment procedural due process claim under Count IV be dismissed on summary judgment because of the availability of a Kansas malicious prosecution tort claim?

b.   Are the elements of Plaintiff's malicious prosecution claim satisfied by the

evidence?

## IV.  ARGUMENTS AND AUTHORITIES

### A.  Summary Judgment Standards

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "When it applies this standard, the court views the evidence and draws

inferences in the light most favorable to the non-moving party."  *White v. City of Topeka*, 489 F.

Supp. 3d 1209, 1219 (D. Kan. 2020).  "An issue of 'material fact is "genuine" ... if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party' on the issue."  *Id*.

(quoting *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)).  "And, an issue of fact is

'material' if it has the ability to 'affect the outcome of the suit under the governing law.'"  *White*,

489 F. Supp. 3d at 1219 (quoting *Anderson, Inc*., 477 U.S. at 248).

The party moving for summary judgment bears the initial burden of showing the basis for

its motion.  *White*, 489 F. Supp. 3d at 1219.  "A summary judgment movant can satisfy this

burden by demonstrating 'that there is an absence of evidence to support the nonmoving party's

case.'"  *White*, 489 F. Supp. 3d at 1219 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325

(1986)).  "Summary judgment is not a 'disfavored procedural shortcut.'"  *White*, 489 F. Supp. 3d

at 1219 (quoting *Celotex Corp.*, 477 U.S. at 327).  "Instead, it is an important procedure

'designed "to secure the just, speedy and inexpensive determination of every action.'"  *White*,

489 F. Supp. 3d at 1219 (quoting, *Celotex Corp.*, 477 U.S. at 327, and Fed. R. Civ. P. 1).

### B.  Mr. Hayes is not a State Actor

All of the claims asserted against Mr. Hayes by the Plaintiff are brought under 42 U.S.C. § 1983.  However, Mr. Hayes is not a state actor, nor is there any evidence upon which a reasonable jury could conclude that Mr. Hayes conspired with state actors.  Therefore, all of the Plaintiff's claims against Mr. Hayes must be dismissed on summary judgment.

"Section 1983 provides a cause of action against any person who deprives an individual of federally guaranteed rights 'under color' of state law."  *Filarsky v. Delia*, 566 U.S. 377, 383 (2012) (quoting 42 U.S.C. § 1983).  Consequently, only those "whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983." *Id*. (quoting *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 937 (1982)).

It is "well established that neither private attorneys nor public defenders act under color of state law for purposes of § 1983 when performing their traditional functions as counsel to a criminal defendant."  *Dunn v. Harper Cty*., 520 Fed. Appx. 723, 725–26 (10th Cir. 2013) (citing *Polk County v. Dodson*, 454 U.S. 312, 325 (1981)).  "To prove a conspiracy between private parties and the state under § 1983, the plaintiff must show a joint participation, agreement, or 'meeting of the minds' to violate constitutional rights."  *Good v. Board of County Commissioners of Shawnee County*, 209 F. Supp. 2d 1124, 1129 (D. Kan. 2002).  "There must be sufficient evidence of a conspiracy to prevent the jury from 'engag[ing] in sheer speculation and conjecture.'"  *Id*. (quoting *Six v. Henry*, 42 F.3d 582, 585 (10th Cir.1994)).  "The plaintiff must specifically present facts 'tending to show agreement and concerted action.'"  *Good,* 209 F. Supp. 2d at 1129 (quoting *Hunt v. Bennett*, 17 F.3d 1263, 1268 (10th Cir.1994)).

Here, Mr. Hayes was not a state actor under 42 U.S.C. § 1983 because: (1) he was performing the traditional functions of a court-appointed criminal defense attorney, and (2) he did not conspire with any state actors.

### 1.   Mr. Hayes Performed the Traditional Functions of a Court-Appointed Defense Attorney

The uncontroverted facts establish that Mr. Hayes acted as a court-appointed criminal defense attorney for Tom Bledsoe.  In doing so, Mr. Hayes performed the traditional functions of a court-appointed criminal defense attorney.  The Plaintiff alleges that Mr. Hayes did not perform the traditional functions of a criminal defense attorney because law enforcement officers and Mr. Vanderbilt deferred to him.  That is not supported by the evidence.  The evidence establishes that the law enforcement officers ran the investigation, and Mr. Vanderbilt decided, on his own, to dismiss the charges against Tom Bledsoe and charge Plaintiff.

The Plaintiff also claims that Mr. Hayes did not perform the traditional functions of a criminal defense attorney because he cooperated with law enforcement.  The actions of Mr. Hayes in cooperation with law enforcement that are criticized by Plaintiff are his transporting Tom Bledsoe between the Jefferson County Law Enforcement Center and the location where Camille Arfmann's body was found, gathering weapons and evidence for law enforcement officers, and speaking with the Plaintiff in an interview room in the presence of law enforcement. However, the evidence shows that Mr. Hayes only cooperated with law enforcement officers, as a criminal defense attorney traditionally would.  Cooperating with law enforcement officers is a traditional function of a criminal defense attorney.

The courts have held that an "attorney who spurns the interests of his own client and conspires to subject him to a prison term" is not "performing the traditional functions of defense counsel." *United States v. Cintolo*, 818 F.2d 980, 995 (1st Cir. 1987).  Mr. Hayes was certainly

not spurning the interests of his own client, Tom Bledsoe.  Quite the opposite, Mr. Hayes was

acting in the best interests of his client.  If a law enforcement officer or prosecutor asks a

criminal defense attorney to do something that is in the best interest of the client, then it is

normal for a criminal defense attorney to take those actions.  That is what was done by Mr.

Hayes.  The actions by Mr. Hayes were done in cooperation with law enforcement, not in

conspiracy with them.  Clearly, Mr. Hayes was acting in the best interests of his client, Tom

Bledsoe.  It was Mr. Hayes' duty to advocate for his client.  That is what he did, and he did so

within the traditional functions of a criminal defense attorney.  Thus, Mr. Hayes was not a state

actor under 42 U.S.C. § 1983.

### 2.  Mr. Hayes did not Conspire with State Actors

Plaintiff alleges that Mr. Hayes was a state actor under 42 U.S.C. § 1983 because he

conspired with state actors to frame the Plaintiff for murder and deprive him of his constitutional

rights.  In Mr. Hayes' Memorandum in Support of Motion to Dismiss First Amended Complaint

[Doc. 77], he asserted that the facts alleged by Plaintiff were insufficient for this Court to make a

reasonable inference that Mr. Hayes had conspired with state actors.  *See*, Memorandum in

Support of Motion to Dismiss First Amended Complaint [Doc. 77], pgs. 12-19.  In denying

Hayes' Motion to Dismiss regarding that argument, this Court stated as follows:

> "Plaintiff's allegations, **if backed by admissible evidence**, suffice to support a
> finding that Mr. Hayes conspired with state actors and thus acted under color of
> state law. Either Mr. Hayes, Mr. Vanderbilt, and other defendants met
> several days after Tom's arrest to activate their plan to frame plaintiff—or
> they did not. But **if plaintiff musters admissible evidence** that they conducted
> such a meeting, and agreed at that meeting to put their plan into action, that they
> conducted such a meeting and that agreement to frame plaintiff would constitute
> facts. . . . Similarly, Mr. Carreno and Mr. Hayes either solicited Mr.
> Vanderbilt's agreement to enlist in their plan to frame plaintiff—or they did
> not. **Time will tell whether plaintiff actually can prove these allegations**."
> Memorandum and Order [Doc. 114], pgs. 14-15 (emphasis added).

Time has revealed that Plaintiff cannot actually prove his conspiracy allegations against Mr. Hayes.  Now that discovery is complete, it has been conclusively established that Plaintiff's conspiracy allegations against Mr. Hayes are not "backed by admissible evidence."  The Plaintiff does not have evidence upon which a reasonable jury could conclude that there was joint participation, agreement, or a meeting of the minds between Mr. Hayes and the state actors to violate Plaintiff's constitutional rights.  Rather, the Plaintiff's evidence is so lacking, his claims of conspiracy between Mr. Hayes and the state actors are based upon nothing more than sheer speculation and conjecture.

Plaintiff has not mustered sufficient admissible evidence that Mr. Hayes, Mr. Vanderbilt and other defendants met several days after Tom Bledsoe's arrest.  Plaintiff has also failed to muster sufficient admissible evidence that Mr. Carreno and Mr. Hayes solicited Vanderbilt's agreement to enlist a plan to frame Plaintiff.  In fact, there is no sufficient evidence upon which a reasonable jury could conclude that Mr. Hayes was involved in any conspiracy to fabricate evidence, to suborn perjury, or to commit any other malicious wrongdoing to frame Plaintiff for the subject crimes.  There is no sufficient evidence upon which a reasonable jury could conclude that Mr. Hayes had any knowledge of any law-enforcement effort to fabricate evidence, to suborn perjury, or engage in any other malicious wrongdoing to frame Plaintiff.  There is no sufficient evidence upon which a reasonable jury could conclude that Mr. Hayes had any sort of motive to fabricate evidence, suborn perjury, or engage in any other malicious wrongdoing to frame Plaintiff.  There is no sufficient evidence upon which a reasonable jury could conclude that Mr. Hayes coached or coerced Tom Bledsoe to give any false statements or testimony. There is no sufficient evidence upon which a reasonable jury could conclude that Hayes willfully withheld or concealed any evidence in the homicide investigation.  There is no sufficient

evidence upon which a reasonable jury could conclude that Hayes acted with malice, evil purpose, ill-will, or any other improper motive toward Plaintiff or anyone else.

Plaintiff alleges that Mr. Hayes was aware from the beginning that Tom Bledsoe murdered Camille Arfmann because of the answering machine messages that Tom Bledsoe left for a leader in his church on November 7, 1999.  However, those messages were fully disclosed to law enforcement, Plaintiff and his attorney prior to trial, and the jury.

Plaintiff alleges that on November 7, 1999, Tom Bledsoe admitted to law enforcement officers that he murdered Camille Arfmann, and that this admission was made in the presence of Mr. Hayes.  However, there is no evidence to support this allegation.

Plaintiff alleges that evidence supporting Tom Bledsoe's guilt and Mr. Hayes' knowledge of Tom Bledsoe's guilt is found in law enforcement records including Mr. Carreno's 45-page summary report, Mr. Woods' and Mr. Johnson's filed notes, the deposition of Mary Koch and accompanying exhibits, evidence, forensic and autopsy reports from the investigation, deposition testimony from the officers, and testimony from Plaintiff's preliminary hearing and trial. However, this is not true.  Plaintiff is critical of many of the actions taken (and not taken) by law enforcement and Mr. Vanderbilt, but the actions taken (and not taken) by law enforcement and Mr. Vanderbilt do not show that Mr. Hayes knew of Tom Bledsoe's guilt.  All of this information was in the possession of law enforcement, much of it in possession of Mr. Vanderbilt, and much of it was presented to the jury that found Plaintiff guilty.  As Tom Bledsoe's defense attorney, it was not Mr. Hayes's job to turn information over to the prosecutor or decide what was presented to the jury.  It is incorrect that any evidence shows that Mr. Hayes had knowledge of Tom Bledsoe's guilt.  At most, the evidence shows that Tom Bledsoe had

shared with Mr. Hayes information about the crime, and the possible location of Camille Arfmann's body.

The uncontroverted facts that demonstrate that Plaintiff does not have sufficient evidence upon which a reasonable jury could conclude that Mr. Hayes was involved in a conspiracy with state actors are the following:

### a. Mr. Vanderbilt says that the Decision to Dismiss Charges against Tom Bledsoe and Charge Plaintiff was his Decision

Mr. Vanderbilt testified that the decision to dismiss the charges against Tom Bledsoe and instead charge Plaintiff was his decision alone and was not the result of any pressure from Mr. Hayes or any "indebtedness" to Mr. Hayes.  Mr. Vanderbilt did not make this decision because of any wrongdoing by Hayes.  The evidence does not support Plaintiff's argument that Mr. Vanderbilt made any decisions regarding the Arfmann case because he was indebted to Mr. Hayes in some way.  First, Mr. Vanderbilt denies that was the case.  Second, the fact that Mr. Hayes was representing Mr. Vanderbilt in his divorce did not affect Mr. Vanderbilt's decisions on the case.  According to Mr. Vanderbilt, Mr. Hayes presented arguments and evidence as to why Tom Bledsoe did not commit the crime.  After reviewing the evidence and reviewing the polygraph results, Mr. Vanderbilt decided to dismiss the charges against Tom Bledsoe.

Plaintiff has also alleged in this case that Mr. Hayes was helping Vanderbilt avoid legal exposure for Vanderbilt's alleged misappropriation of County funds.  Mr. Hayes did not represent Mr. Vanderbilt in that matter.

### b. Mr. Braden says there was no Improper Conduct Between Mr. Hayes and Mr. Vanderbilt

At the time of the investigation into Camille Arfmann's murder, and Plaintiff's prosecution and conviction, Mr. Braden ("Braden") was an Assistant Jefferson County Attorney.

He was personally aware of the murder case and interactions between Mr. Hayes and Mr. Vanderbilt that related to the case.  According to Mr. Braden, the decision to dismiss the charges against Tom Bledsoe was Mr. Vanderbilt's decision alone.  Mr. Braden was not aware of any inappropriate activity between Mr. Vanderbilt and Mr. Hayes.  Mr. Braden believes that, based upon the evidence that was available at the time, it was appropriate for Mr. Vanderbilt to have dismissed the charges against Tom Bledsoe.

### c.  Suicide Notes Do Not Implicate Mr. Hayes in a Conspiracy

During the course of this lawsuit, the Plaintiff has often cited the notes that were found with Tom Bledsoe's body when he was found deceased.  As alleged by Plaintiff, those notes appear to be suicide notes of Tom Bledsoe.  Those notes state the Tom Bledsoe murdered Camille Arfmann, and state that Plaintiff is innocent.  The notes also state that "the Jefferson county police" and "county attorney Jim Vanderbilt made me do it" and that "I was told by Vanderbilt to keep my mouth shut."  The notes do not mention Mr. Hayes, and do not implicate Mr. Hayes in any wrong-doing or conspiracy.  Taking the notes on their face, if Mr. Hayes had been involved in any wrong-doing or conspiracy, he certainly would have been mentioned in the notes as well.

### d.  Plaintiff has no Personal Knowledge that Mr. Hayes was Involved in a Conspiracy

Plaintiff conceded in his deposition that the only personal knowledge he has of any actions by Mr. Hayes is his conversation with Mr. Hayes in the Law Enforcement Center parking lot, and Mr. Hayes presence in the interrogation room with Plaintiff on November 12, 1999.  In the parking lot meeting, Plaintiff claims that Mr. Hayes said, "I'm going to get Tom off the hot seat and put you on it."  Mr. Hayes denies saying this.  However, assuming it is true, that

statement is not evidence of a conspiracy.  It is only evidence of an attorney (Mr. Hayes) advocating for his client (Tom Bledsoe).

Plaintiff concedes that, while he believes that Mr. Hayes assisted in a cover-up, he cannot identify anything that was specifically done by Mr. Hayes that implicates Mr. Hayes.  Plaintiff did not see or hear Mr. Hayes involved in any conspiracy meetings.  No one told the Plaintiff directly that that Mr. Hayes had a meeting to form a conspiracy.  Plaintiff has no personal information that would lead him to believe that Mr. Hayes would be involved in conspiracy to frame Plaintiff for murder.  Plaintiff concedes that he does not have enough information, personally, to make him feel comfortable accusing Mr. Hayes of being involved in a conspiracy to frame him for murder.

> **e.  Law Enforcement Officers have no Evidence or Knowledge of a Conspiracy Involving Mr. Hayes**

None of the law enforcement officers that were deposed implicated Mr. Hayes in any wrongdoing.  There is no evidence from any law enforcement office that implicates Mr. Hayes in any wrongdoing.  Notably, Mr. Vernon, who was a JCSCO detective involved in the Arfmann investigation conceded that he has no knowledge to support a theory that Mr. Hayes was involved in a scheme to frame the Plaintiff for murder.  Mr. Vernon is not aware of any evidence that any of the Defendants framed the Plaintiff for murder.  Mr. Vernon is not aware of any evidence as to why any of the Defendants would frame the Plaintiff for murder.  Mr. Vernon is not aware of any evidence that any of the Defendants had a meeting to discuss framing the Plaintiff for murder.  Mr. Vernon is not aware of any evidence that any of the Defendants fabricated evidence like getting a false recantation from Tom Bledsoe.  Mr. Vernon is not aware of any evidence that any of the Defendants intentionally concealed evidence.  Mr. Vernon is not aware of any evidence that any of the Defendants intentionally suppressed evidence.  Mr. Vernon

is not aware of any evidence that any of the Defendants destroyed evidence.  No other Witness

has Presented Evidence that Mr. Hayes was Involved in a Conspiracy

> **f.   The Individual Actions of Mr. Hayes that are Criticized by Plaintiff do not Establish that Mr. Hayes was Involved in a Conspiracy**

Plaintiff criticizes Mr. Hayes for being present in the interrogation room with Plaintiff

and talking to Plaintiff in the interrogation room.  Plaintiff also criticizes Mr. Hayes for

transporting Tom Bledsoe, and for handling evidence.  However, as discussed above, at all times

Mr. Hayes was performing the traditional functions of a criminal defense attorney and was

complying with requests from law enforcement.  Plaintiff is also highly critical of things that

were done and not done by the law enforcement officers and Mr. Vanderbilt.

The Tenth Circuit has recognized that the U.S. Supreme Court has held that

> "even though the defective performance of defense counsel may cause the trial process to deprive an accused person of his liberty in an unconstitutional manner, the lawyer who may be responsible for the unconstitutional state action does not himself act under color of state law within the meaning of § 1983.  *Harris v. Champion*, 51 F.3d 901, 909–10 (10th Cir. 1995) (quoting *Briscoe v. LaHue*, 460 U.S. 325, 329 n. 6 (1983)).

In other words, even if Mr. Hayes' actions were defective in some way, resulting in the

deprivation of Plaintiff's constitutional rights, Mr. Hayes is still not a state actor under § 1983.

Furthermore, the actions of Mr. Hayes that are criticized by Plaintiff with regard to Mr. Hayes

are not proof of a conspiracy, and agreement, or a meeting of the minds with any state actors.

Plaintiff is highly critical of actions that were taken and not taken by the law enforcement

officers and Mr. Vanderbilt and suggests these actions and inactions prove that Mr. Hayes was in

a conspiracy with them.  It does not.  Instead, Plaintiff is asking the finder of fact to purely

speculate that any questionable law enforcement or prosecution tactics were due to a conspiracy

involving Mr. Hayes.  Plaintiff cannot be permitted to rely on this pure speculation.

**g.  There is no Evidence that Mr. Hayes had any Motive to be Involved in a Conspiracy Against Plaintiff**

Finally, there is no evidence that Mr. Hayes would have any motive whatsoever to engage in a conspiracy to frame the Plaintiff for murder.  Mr. Hayes was a well-respected attorney, with a good reputation.  Plaintiff concedes that he did not have any problems with Mr. Hayes, and Plaintiff was not aware of Mr. Hayes having any problems with him.  Mr. Hayes never prosecuted Plaintiff for any crimes.  Plaintiff concedes that he has no idea why Mr. Hayes would want to be involved in a conspiracy to frame him for murder.  Mr. Vernon also testified that he is not aware of any evidence that any of the Defendants (which includes Mr. Hayes) had any ill will, dislike, hatred of, or grudge against, the Plaintiff.  There is no evidence that Mr. Hayes held any malice or ill-will toward Plaintiff, or that he acted with any malice or ill-will toward Plaintiff.

**3.  Case Law Supports the Conclusion that Mr. Hayes was not a State Actor**

There are a couple of instructive cases, one from the District of Kansas, and one from the Tenth Circuit, that support the conclusion that Mr. Hayes was not a state actor.

The *Good* case that is cited above is instructive in demonstrating that Plaintiff's evidence of an alleged conspiracy between Mr. Hayes and the state actors is insufficient.  In *Good*, the plaintiff in that case asserted a § 1983 claim against Gordy, alleging that Gordy had conspired with Hamilton to deprive the plaintiff of constitutional rights.  *Good,* 209 F. Supp. 2d at 1128. Hamilton was a district attorney (a state actor), and Gordy was a private nurse working for a doctor in private practice.  *Id*. at 1126-28.  Gordy argued that there was no evidence to support the plaintiff's allegation of a conspiracy, and pointed out that there was no evidence of any agreement with Hamilton.  *Id*. at 1128.  The court in *Good* found that there was not sufficient evidence of a conspiracy between Gordy and Hamilton and granted summary judgment to

Gordy. *Id*. at 1129.  The court found that there was "no evidence in the record of any agreement between Gordy and Hamilton." *Id*.  The court stated that, "[w]hile the court recognizes that such evidence may be difficult to procure, we also understand that the plaintiff has the burden to produce sufficient evidence of a conspiracy. Here, **a jury would be forced to engage in sheer speculation and conjecture**." *Id*. (emphasis added).

Another instructive case is *Hunt v. Bennett*, 17 F.3d 1263 (10th Cir. 1994).  In *Hunt*, the plaintiff in that case alleged that his public defenders conspired with other state actors to violate his constitutional rights during the criminal investigation and trial that resulted in his conviction. *Id*. at 1265, 1268.  The *Hunt* court recognized "the inherent difficulty of producing direct evidence of a conspiracy" and therefore stated that it would "proceed with caution in considering the pre-trial dismissal of Hunt's complaint" against the public defenders.  *Id*. at 1268.  The *Hunt* court went on to state: "At the same time, however, we have held that '[w]hen a plaintiff in a § 1983 action attempts to assert the necessary "state action" by implicating state officials or judges in a conspiracy with private defendants, mere conclusory allegations with no supporting factual averments are insufficient . . .'" *Id*. (quoting *Sooner Products Co. v. McBride*, 708 F.2d 510, 512 (10th Cir.1983)).  The *Hunt* court concluded that the plaintiff in that case presented "no facts establishing an agreement or meeting of the minds" between the public defenders and the state actors.  *Hunt*, 17 F.3d at 1268.

Like in *Good* and *Hunt*, here the Plaintiff has failed to present sufficient evidence that there was a meeting of the minds or an agreement between Mr. Hayes and the state actors to deprive Plaintiff of his constitutional rights.  Rather, the Plaintiff is asking this Court, and ultimately the jury, to "engage in sheer speculation and conjecture" in order to reach a

conclusion that such a conspiracy between Mr. Hayes and the state actors existed.  *Good,* 209 F. Supp. 2d at 1129.  Plaintiff cannot be permitted to do so.

Consequently, Hayes is entitled to summary judgment in his favor on all of the Plaintiff's claims against him.

### C.  Count I – Due Process Violation (Fabricating Tom Bledsoe's Statements)

Even if Mr. Hayes is somehow found to be a state actor (which he is not), Mr. Hayes is still entitled to summary judgment in his favor on Plaintiff's Count I.  In Count I, Plaintiff alleges a due process violation against Mr. Hayes for fabrication of Tom Bledsoe's testimonial evidence.  Court I must be dismissed against Mr. Hayes on summary judgment because: (1) Plaintiff has abandoned his Count I claim against Mr. Hayes; (2) Plaintiff's Fourteenth Amendment procedural due process claim is barred by the availability of a Kansas malicious prosecution tort claim; and (3) there is no evidence of malice or willful conduct on the part of Mr. Hayes or the state actors.

### 1.    Plaintiff has Abandoned his Claims Against Mr. Hayes in Count I

According to the Pretrial Order, Plaintiff has abandoned his Count I claim against Mr. Hayes.  *See*, Pretrial Order [Doc. 329], pg. 22.  While the heading of Count I indicates it is asserted against Mr. Hayes, the statements made by Plaintiff in support of Count I make it clear that Count I is not actually asserted against Mr. Hayes.  The Plaintiff states the following in support of Count I: "**The KBI defendants**, acting individually and in concert, and under color of state law, violated Bledsoe's due process rights by fabricating Tom's testimonial evidence against him."  *See*, Pretrial Order [Doc. 329], pg. 22 (emphasis added).  Plaintiff makes no reference to Mr. Hayes.  Accordingly, Plaintiff has abandoned his Count I claim against Mr.

Hayes, as Plaintiff appears to have appropriately recognized there is no evidence to support this claim.

**2.   Fourteenth Amendment Procedural Due Process Claim Under Count I must be Dismissed on Summary Judgment**

Even if the Court concludes that Plaintiff is still asserting Count I against Mr. Hayes, it must be dismissed on summary judgment to the extent Count I asserts a Fourteenth Amendment procedural due process claims, they are barred by the availability of a Kansas malicious prosecution tort claim.  *Bledsoe v. Bd. of County Commissioners of County of Jefferson, Kansas*, 501 F. Supp. 3d 1059, 1090 (D. Kan. 2020).

**3.   Substantive Due Process Claim Under Count I must be Dismissed on Summary Judgment because there is no Evidence of Malice or Willful Conduct**

Even if the Court concludes that Plaintiff is still asserting Count I against Mr. Hayes, to the extent Plaintiff alleges substantive due process violations, Count I must be dismissed on summary judgment because there is no evidence of malice or willful conduct on the part of Mr. Hayes or the state actors.  "[T]he Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Instead, to bring a viable § 1983 claim implicating the Due Process Clause, something more deliberate than lack of due care by a state official is required.  *Id.* at 330–32.

Here, at worst the evidence establishes negligence or lack of due care.  There is not sufficient evidence that Mr. Hayes or any state actor engaged in any actions or inactions that were anything more than potentially a negligent act or lack of due care.

For all of these reasons, Mr. Hayes is entitled to summary judgment in his favor on Count I.

**D.  Counts II and V – Conspiracy to Deprive Constitutional Rights**

Even if Mr. Hayes was somehow found to be a state actor (which he is not), Mr. Hayes is still also entitled to summary judgment in his favor on Plaintiff's Counts II and V.   In Counts II and V, Plaintiff alleges that the KBI defendants and Mr. Hayes, acting under the color of state law, agreed amongst themselves and with others to act in concert to deprive Plaintiff of his constitutional rights.  Count II addresses conspiratorial conduct in concert with Mr. Vanderbilt, and Count V addresses conspiratorial conduct unknown to Mr. Vanderbilt. Courts II and V must be dismissed against Mr. Hayes on summary judgment because: (1) Plaintiff's Fourteenth Amendment procedural due process claim is barred by the availability of a Kansas malicious prosecution tort claim; and (2) Plaintiff does not have evidence upon which a reasonable jury could conclude that there was a conspiracy.

> **1.   Fourteenth Amendment Procedural Due Process Claim Under Counts II and V must be Dismissed on Summary Judgment**

To the extent Counts II and V assert Fourteenth Amendment procedural due process claims against Mr. Hayes, those claims are barred by the availability of a Kansas malicious prosecution tort claim.  *Bledsoe v. Bd. of County Commissioners of County of Jefferson, Kansas*, 501 F. Supp. 3d 1059, 1090 (D. Kan. 2020).

> **2.   Plaintiff does not have evidence upon which a reasonable jury could conclude that there was a conspiracy**

Finally, to Count II and V, as stated at length above in Section IV(B)(2), the Plaintiff does not have evidence upon which a reasonable jury could conclude that there was joint

participation, agreement, or a meeting of the minds between Mr. Hayes and the state actors to deprive Plaintiff of his constitutional rights.

For all of these reasons, Mr. Hayes is entitled to summary judgment in his favor on Counts II and V.

### E.  Count IV – Malicious Prosecution

The final claim by the Plaintiff against Mr. Hayes is Count IV.  Again, even if Mr. Hayes was somehow found to be a state actor (which he is not), Mr. Hayes is still entitled to summary judgment in his favor on Count IV.  In Count IV, Plaintiff alleges that the KBI defendants and Mr. Hayes violated Plaintiff's constitutional rights by maliciously prosecuting him and/or causing him to be detained without probable cause.  Court IV must be dismissed against Mr. Hayes on summary judgment because: (1) Plaintiff's Fourteenth Amendment procedural due process claim is barred by the availability of a Kansas malicious prosecution tort claim; and (2) the elements of a malicious prosecution claim are not satisfied by the evidence.

#### 1.  Fourteenth Amendment Procedural Due Process Claim Under Count IV must be Dismissed on Summary Judgment

To the extent Count IV asserts a Fourteenth Amendment procedural due process claim, it is barred by the availability of a Kansas malicious prosecution tort claim.  *Bledsoe v. Bd. of County Commissioners of County of Jefferson, Kansas*, 501 F. Supp. 3d 1059, 1090 (D. Kan. 2020).

#### 2.  The Elements of a Malicious Prosecution Claim are not Satisfied by the Evidence

The evidence does not satisfy the elements of a 42 U.S.C. § 1983 malicious prosecution claim against Mr. Hayes.  A § 1983 malicious prosecution claim requires the following five elements: (1) the defendant caused the plaintiff's confinement or prosecution; (2) the original

action terminated in favor of the plaintiff; (3) no probable cause supported the continued confinement or prosecution; (4) the defendant acted with malice; and (5) the plaintiff sustained damages. *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008).

As to the first element, Mr. Hayes did not cause the Plaintiff's continued confinement or prosecution.  Mr. Hayes, as a court appointed attorney for Tom Bledsoe, had no role, or authority, in deciding whether to prosecute the Plaintiff.  Mr. Vanderbilt was in charge of the prosecution, and the decision to charge the Plaintiff was his alone.  There is also no evidence upon which a reasonable jury could conclude that Mr. Hayes prevaricated or distorted evidence to convince Mr. Vanderbilt to press charges against Mr. Hayes.  *See, Pierce v. Gilchrist*, 359 F.3d 1279, 1297 (10th Cir. 2004).

As to the third element, the preliminary hearing in Plaintiff's underlying criminal case was held on November 29, 1999, and after hearing the evidence, Judge Dennis Reiling determined that there was probable cause to believe that Plaintiff had committed the charged crimes.  Mr. Hayes was not involved in any decisions about whether to charge Plaintiff or whether there was probable cause.

A jury convicted Plaintiff after a 4-day trial.  His conviction was upheld by the Kansas Supreme Court and the 10th Circuit of the U.S. Court of Appeals.  Both of the Kansas state appeals courts, and the Tenth Circuit, found no wrongdoing by any of the actors in the prosecution of the Plaintiff that required reversal of his conviction, or habeas corpus relief.  On appeal of the Plaintiff's conviction, the Kansas Supreme Court concluded that there was sufficient evidence to support the murder conviction.  See, *State v. Bledsoe*, 272 Kan. 1350, 1356-59, 39 P.3d 38 (2002).  Later, in response to Plaintiff's habeas corpus motion, the Kansas Supreme Court concluded that the murder trial was not prejudicial to the Plaintiff, and that the

trial was "fair."  See, *Bledsoe v. State*, 283 Kan. 81, 105-07, 150 P.3d 868, 887 (2007).  Finally, on Plaintiff's petition for writ of habeas corpus to the Federal courts, the Tenth Circuit found that the deficiencies of the performance by Plaintiff's defense counsel at the murder trial were not prejudicial to Plaintiff, and that the Kansas Supreme Court was "not objectively unreasonable" in denying Plaintiff habeas relief.  *Bledsoe v. Bruce*, 569 F.3d 1223, 1240 (10th Cir. 2009).  Thus, the Courts have concluded that there was probable cause to support the original arrest, continued confinement and prosecution of the Plaintiff.  There is also no evidence upon which a reasonable jury could conclude that Mr. Hayes fabricated or withheld any evidence, or conspired with others to do so, that resulted in an incorrect finding of probable cause.

Finally, as to the fourth element, there is also no evidence upon which a reasonable jury could conclude that Mr. Hayes acted with malice.  Plaintiff concedes that did not have any problems with Mr. Hayes, and Plaintiff was not aware of Mr. Hayes having any problems with him.  Mr. Hayes never prosecuted Plaintiff for any crimes.  Plaintiff concedes that he has no idea why Mr. Hayes would want to be involved in a conspiracy to frame him for murder.  Mr. Vernon also testified that he is not aware of any evidence that any of the Defendants (which includes Mr. Hayes) had any ill will, dislike, hatred of, or grudge against the Plaintiff.

For all of these reasons, Mr. Hayes is entitled to summary judgment in his favor on Count IV.

## V.  CONCLUSION

For the reasons stated above, Defendant Michael Hayes' Motion for Summary Judgment should be granted in his favor on all claims asserted against him by the Plaintiff.

/s/ Vincent M. Cox
     Vincent M. Cox - 22051
     CAVANAUGH, BIGGS & LEMON, P.A.
     3200 SW Huntoon
     Topeka, Kansas 66604
     TEL: 785/440-4000
     FAX: 785/440-3900
     vcox@cavlem.com
     ATTORNEYS FOR DEFENDANT
     MICHAEL HAYES

CERTIFICATE OF SERVICE

I hereby certify that on the 19th day of July 2023, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system which will send a notice of electronic filing to all counsel of record.

/s/ Vincent M. Cox
     Vincent M. Cox - 22051
     CAVANAUGH, BIGGS & LEMON, P.A.
     3200 SW Huntoon
     Topeka, Kansas 66604
     TEL: 785/440-4000
     FAX: 785/440-3900
     vcox@cavlem.com
     ATTORNEYS FOR DEFENDANT
     MICHAEL HAYES