Michael C. Hayes - 03/22/2023

1              IN THE UNITED STATES DISTRICT COURT

2                   FOR THE DISTRICT OF KANSAS

3

4

5

6    FLOYD BLEDSOE,

7                   Plaintiff,

8    vs.                          Case No. 2:16 CV 02296

9    JEFFERSON COUNTY, KS, et al.,

10                  Defendants.

11

12

13

14

15         VIDEO-RECORDED VIDEOCONFERENCE DEPOSITION OF

16   MICHAEL C. HAYES, a Defendant, taken on behalf of

17   the Plaintiff, pursuant to Notice, on

18   March 22, 2023, at Ramada by Wyndham Topeka,

19   420 Southeast Sixth Street, Topeka, Kansas 66607,

20   before

21

22                   MYLES A. MEGEE

23

24   Certified Realtime Reporter, Registered Professional

25   Reporter, Certified in Kansas, Missouri, and Iowa.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

EXHIBIT 1

1          A.    "Mr. Bledsoe."

2          Q.    All right.  Because we got a transcript

3     here, "Mr. Bledsoe" might be a little confusing

4     to determine which Bledsoe we're talking about.  Are

5     you okay with using either -- "Mr. Bledsoe, Sr.," to

6     refer to the father?

7          A.    No.

8          Q.    How would you refer to Floyd L. Bledsoe to

9     distinguish him from Tom or Floyd Bledsoe?

10         A.    "Tom's father."

11         Q.    All right.  When was the last time you

12    spoke to Tom's father?

13         A.    When he hired me is the last time --

14         Q.    Do you consider --

15         A.    -- I recall.

16         Q.    All right.  Do you consider Tom's father

17    to be Floyd's father?

18         A.    Yes, sir.

19         Q.    Okay.  Why -- why do you refer to Tom's

20    father as "Tom's father" and not "Tom and Floyd's

21    father"?

22         A.    No particular reason other than this case

23    is about Tom Bledsoe, and Floyd's father is who

24    asked me to represent Tom.

25         Q.    How did you first meet Tom's father?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1          A.    What?

 2          Q.    How did you first meet Tom's father?

 3          A.    When Jim Swoyer called me.

 4          Q.    When did you last review the reports that

 5   you reviewed in preparation for this deposition?

 6          A.    I don't recall.

 7          Q.    Did you fly to Kansas for this deposition,

 8   or did you drive?

 9          A.    I drove.

10          Q.    Did you drive with anyone?

11          A.    My wife.

12          Q.    Did you review any reports last night?

13          A.    No, sir.

14          Q.    How about this morning?

15          A.    No, sir.

16          Q.    When was the last time that you reviewed

17   any of the reports that you have in relation to the

18   Bledsoe matter?

19          A.    Probably been last week.

20          Q.    Was there anything that you wanted to do

21   in preparation for this deposition but didn't have

22   the opportunity to do so?

23          A.    I don't know.

24          Q.    Did you review any documents in

25   preparation for this deposition that were not
```

1      A.    No.

2      Q.    Why not?

3      A.    Because I -- if a person was in jail, that

4   would be attorney-client only --

5      Q.    All right.

6      A.    -- and I would be getting their story as

7   to why they're in jail.

8      Q.    What about interviewing a suspect who is

9   an alternate suspect, somebody who is not your

10  client?  Have you ever gone to the law enforcement

11  center, entered an interview room at the law

12  enforcement center with police present, and

13  interrogated a -- an alternate suspect who you

14  didn't represent?

15     A.    No.

16     Q.    Would -- why not?

17     A.    Why would I?

18     Q.    Was that law enforcement's job to do?

19     A.    That's what they get paid to do.

20     Q.    Did you -- in preparation for this

21  deposition, did you review the, you know,

22  45-page-or-so report by Randy Carreno?

23     A.    No, sir.  I did not have that many pages.

24     Q.    When you first -- all right.

25           So you received a call from Jim Swoyer on

| | | |
|---|---|---|
| 1 | | November 7th, 1999; is that correct? |
| 2 | A. | What day is November the 7th? |
| 3 | Q. | It was the Sunday night. |
| 4 | A. | On Sunday, that would be correct. |
| 5 | Q. | Can you tell us what time you received |

that call that Sunday night, November 7th, 1999,

from Jim Swoyer?

| | | |
|---|---|---|
| 8 | A. | I cannot.  No recall. |
| 9 | Q. | Can you -- was it before or after dinner? |
| 10 | A. | I do not recall. |
| 11 | Q. | All right.  What did Jim say to you, and |

what did you say to Jim?

A.    Mr. Swoyer asked me if I would meet with

the Bledsoes and possibly represent Tom Bledsoe is

what I recall.

Q.    Before you received that phone call, had

you met any of the Bledsoes before?

| | | |
|---|---|---|
| 18 | A. | Not that I know of. |
| 19 | Q. | Did you know any -- |
| 20 | A. | Not -- |
| 21 | Q. | -- of the Bledsoes? |
| 22 | A. | Not any of these Bledsoes. |
| 23 | Q. | All right. |
| 24 | A. | Tom's -- |
| 25 | Q. | Did you know any -- |

Michael C. Hayes - 03/22/2023                69

1      Q.    So approximately 10, 15 minutes to get
2   there?
3      A.    I never timed it.
4      Q.    Well, what's your approximation?
5      A.    I have no approximation.  That would be
6   speculation.
7      Q.    Did you do anything between the time that
8   you hung up the phone with Jim Swoyer and the time
9   that you left to go meet him?
10     A.    I have no recall.
11     Q.    Did you say anything else in that
12  conversation -- well, strike that.
13           Did you or Jim say anything else in that
14  conversation that Sunday night that you haven't told
15  us about?
16     A.    Not that I recall.
17     Q.    Where did you go to meet with Tom?
18     A.    I don't know if it was Mr. Swoyer's house
19  or they came to my office.  I do not recall.
20     Q.    Who did you meet with?
21     A.    I don't -- I can't say specific because
22  I don't recall.
23     Q.    Was Tom there?
24     A.    I don't recall.
25     Q.    Was Jim there?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1        A.   Jim Swoyer?

 2        Q.   Yes.

 3        A.   Yes.

 4        Q.   And was Tom's father there?

 5        A.   Yes.

 6        Q.   And your client was Tom; is that right?

 7        A.   That's who my client became.  He was not

 8   my client when I first met with him.

 9        Q.   He was a potential client; right?

10        A.   If the court appointed me.

11        Q.   Well, when did you start representing Tom?

12        A.   It would have been sometime after that

13   meeting.

14        Q.   All right.  Tom was charged with murder --

15   I'm sorry.  I can't remember whether it was the 8th

16   or the 9th.

17        A.   It would have been the following Monday,

18   whatever date that was.

19        Q.   November 8th.  All right.

20             So was it not until Tom was charged that

21   you became his attorney?

22        A.   That's when the court appointed me to be

23   his attorney.

24        Q.   And when did you -- when do you start

25   acting as Tom's attorney?
```

1              THE WITNESS:  Yeah.

2       A.    I will not answer the question, based upon

3  my attorney's advice.

4       Q.    (By Mr. Ainsworth)  All right.  What did

5  you do after that meeting with Jim Swoyer, Tom's

6  father, and possibly Tom?

7       A.    I don't recall what I immediately did.

8       Q.    Well, what did you -- what did you do that

9  you do recall?

10      A.    That I contacted Sheriff Dunnaway.

11      Q.    How did you contact him?

12      A.    Probably by phone.

13      Q.    What did you say to Sheriff Dunnaway, and

14  what did he say to you?

15      A.    I do not recall what Sheriff Dunnaway said

16  to me.  I only know what I may have said to him.

17      Q.    What did you say to Sheriff Dunnaway?

18      A.    That I understood that there was a missing

19  girl and that I might be able to direct him to find

20  her.

21      Q.    Were you wanting to avoid the death

22  penalty for Tom Bledsoe at that time?

23      A.    No.

24      Q.    All right.  So did you say anything else

25  to Sheriff Dunnaway in that conversation?

1        A.    I don't understand your question.

2        Q.    When you called -- when you talked to

3  Sheriff Dunnaway in the conversation you just

4  described, did you say anything else to him?

5        A.    Not that I recall.

6        Q.    Did Sheriff Dunnaway say anything to you

7  in that conversation?

8        A.    I do not recall what he specifically may

9  have said.

10       Q.    What did he say in general to you?

11       A.    I do not recall.

12       Q.    What did you do after you talked to

13  Sheriff Dunnaway?

14       A.    Met with Sheriff Dunnaway at the Jefferson

15  County Law Enforcement Center.

16       Q.    Did you tell Sheriff Dunnaway that you

17  were going to be bringing Tom Bledsoe to the police

18  station -- to the law enforcement center?

19       A.    I do not recall.

20             That's over 23 years ago.

21       Q.    Did you go to the law enforcement center?

22       A.    Yes, sir.

23       Q.    Who did you go there with?

24       A.    I do not recall.

25       Q.    Do you recall going to the law

8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500                                   Fax (913) 825-2530
www.cornerstonekc.net          Cornerstone          office@cornerstonekc.net
                               Court Reporting Company LLC

1    enforcement -- do you recall being at the law

2    enforcement center with Tom Bledsoe?

3         A.   I remember Tom Bledsoe being at the law

4    enforcement center.

5         Q.   On the night of that Sunday night?

6         A.   Yes, sir.

7         Q.   What happened when you arrived at the law

8    enforcement center?

9         A.   I had a conversation with

10   Sheriff Dunnaway.

11        Q.   All right.  I'm going to show you what we

12   previously marked as Exhibit 71.

13             MR. COX:  Hey, Russell, could we take a

14   five-minute break before we get to that exhibit?

15             MR. AINSWORTH:  Sure.

16             MR. COX:  Thank you.

17             THE REPORTER:  One moment.

18             Off the record at 11:19 a.m.

19             (A recess was taken.)

20             THE REPORTER:  Okay.  We're back on the

21   record at 11:33 a.m.

22        Q.   (By Mr. Ainsworth)  All right, sir.  Where

23   we left off is, when you arrived at the law

24   enforcement center, what happened?

25        A.   I had a conversation with Sheriff Roy

1    Sheriff Dunnaway specifically said to me.

2        Q.   Okay.  What did -- what did you say to

3    Sheriff Dunnaway?

4        A.   I told Sheriff Dunnaway that I had

5    information of where Camille Arfmann might be.

6        Q.   What else did you say to Sheriff Dunnaway?

7        A.   Just that, to begin with.

8        Q.   Okay.  And then what else did you say to

9    Sheriff Dunnaway?

10       A.   When he asked me where she might be,

11   I told him that she might be in a field on Tom

12   Bledsoe's father's property buried in a ditch.

13       Q.   All right.  What else did you say to

14   Sheriff Dunnaway in that conversation?

15       A.   I asked him if he wanted to go look in the

16   ditch and see if it was correct.

17       Q.   What did Sheriff Dunnaway say?

18       A.   Let's do it.  I mean, that's not what he

19   specifically said.  I don't recall what he

20   specifically said.  I just know that we went to Tom

21   Bledsoe's father's property.

22       Q.   All right.  Let me grab another exhibit.

23   Sorry.  I'm -- I don't know that I have this marked

24   as an exhibit; so let me pull it from our files.

25            THE REPORTER:  Could I get that other one

1    whereabouts of the Arfmann girl's body and also

2    Hayes had a weapon he would turn over.  Dunnaway

3    believed the weapon was a handgun."  Do you see

4    that, sir?

5         A.    Yes, sir.

6         Q.    While you were at the law enforcement

7    center, did you have a handgun that was the --

8    alleged to be the weapon used in the crime?

9         A.    I had no knowledge that it was the weapon

10   alleged to be used in a crime.  And I did not

11   know --

12        Q.    Did you have --

13        A.    -- when I -- whether I had that -- when

14   I obtained that weapon while at the law enforcement

15   center other than I recall I was asked if Tom

16   Bledsoe had any weapons, and I called his father

17   because Dunnaway said, if he did, he wanted it.

18        Q.    Okay.  So Dunnaway said that he wanted any

19   weapons that Tom may have had; is that right?

20        A.    That's what I -- I do not recall

21   specifically.

22        Q.    Okay.  Tom had a .22 and a 9-millimeter;

23   right?

24        A.    I have no idea.

25        Q.    What did you tell Tom's father to do when

1    you called him?

2        A.   That Sheriff Dunnaway wanted to have Tom's

3    weapon and could he bring it to me at the law

4    enforcement center.

5        Q.   Why didn't you leave it to law enforcement

6    to recover the weapon?

7        A.   Would you repeat that question.

8        Q.   Why -- let me stop sharing this for a

9    second.

10            Why didn't you leave it to law enforcement

11   to recover the weapon?

12       A.   I was just going off of what

13   Sheriff Dunnaway requested of me.

14       Q.   Did you tell Tom's father to take any

15   precautions when obtaining the gun?

16       A.   No.  Because I didn't know if there was a

17   gun there.

18       Q.   Okay.  If you'd take a look back at

19   Exhibit 71 that's in front of you.

20       A.   Okay.

21       Q.   All right.  Did you tell Sheriff Dunnaway,

22   before 11:38 p.m. on the Sunday, that Tom Bledsoe

23   had -- had admitted to being involved?

24       A.   No.

25       Q.   Did you tell Sheriff Dunnaway that the

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    that I'm sorry I don't have the hard copy of.  It's

2    just a one-page exhibit.  I'm going to mark it as

3    Exhibit 168, and I'll put it in the chat.

4              All right.  Showing you what we've marked

5    as Exhibit 168.  This is a note from -- signed by

6    Sergeant Poppa.  Luckily, he has good handwriting;

7    so I'm just going to read this to you.

8              It says -- it's dated November 8, 1999.

9    "One model Jennings 9-millimeter semiautomatic

10   handgun unloaded, Serial No. 1375571."  And then it

11   says "Given to this officer, Sergeant Robert L.

12   Poppa, by Attorney Michael L." -- "Michael Hayes on

13   November 8, 1999, 1:44 a.m."  Do you see that, sir?

14        A.    Yes, sir.

15        Q.    Do you have any reason to doubt that you

16   provided the handgun to Sergeant Poppa at 1:44 a.m.?

17        A.    No, sir.

18        Q.    Tom's father brought you the gun while you

19   were still at the law enforcement center; right?

20   That's what you told us earlier.

21        A.    That's what I recall.

22        Q.    Why didn't you give the gun to

23   Sheriff Dunnaway while you were still at the law

24   enforcement center?

25        A.    He didn't ask for it.

```
1        Q.    The reason that you asked --
2        A.    And we did not know that she was killed
3    with a gun.
4        Q.    Okay.  I thought that Sheriff Dunnaway had
5    told you that he wanted any guns that Tom had.  Is
6    that right?
7        A.    Yes.
8        Q.    And you didn't take that as a request from
9    Sheriff Dunnaway to turn over any guns that Tom had,
10   or --
11       A.    That's --
12       Q.    -- did you?
13       A.    That's correct.
14       Q.    So you didn't think he was making a
15   request for Tom's guns; right?
16       A.    I don't know what he was thinking.
17       Q.    I'm not asking what he was --
18       A.    I can only repeat what I was asked and
19   what I did.
20       Q.    Okay.  And you're saying the reason you
21   didn't produce the gun to police at the law
22   enforcement center was because police didn't ask you
23   for the gun; right?
24       A.    And there was no information that I knew
25   that a gun was involved.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1      Q.   So you did not ask Floyd's father to
2   retrieve the 9-millimeter gun from his house; is
3   that right?
4      A.   I didn't know what Tom Bledsoe owned.
5      Q.   And -- and just to be real clear, you
6   didn't say anything to Tom Bledsoe's father about
7   what type of gun you wanted ·him to obtain other than
8   it being Tom's gun?
9      A.   That's what I recall.
10     Q.   Where was Tom while you were at the law
11  enforcement center?  Do you know?
12     A.   I do not recall.
13     Q.   Did he wait out in your car, or did he
14  come inside?
15     A.   I do not recall.
16     Q.   What was Tom's demeanor like while you
17  were at the law enforcement center?
18     A.   I do not recall.
19     Q.   How did you get from the law enforcement
20  center to Tom's father's property?
21     A.   I drove my car.
22     Q.   Who did you drive with?
23     A.   Tom Bledsoe.
24     Q.   Anybody have any trouble with you taking
25  Tom Bledsoe to the -- the scene as opposed to him

1    going with the police?

2          A.    I don't know.

3          Q.    Nobody expressed any problem to you;

4    right?

5          A.    Correct.

6          Q.    All right.  Once you got to the scene --

7    well, strike that.

8                Did -- when you drove to the scene, did

9    you follow anyone, or were people following you?

10         A.    I do not recall.

11         Q.    Did you have any idea, as you drove

12   towards the -- Tom's father's property, where on

13   that property the body -- or the missing girl was,

14   apart from being in a ditch?

15         A.    No.

16         Q.    Had you ever been to that area before?

17         A.    No.

18         Q.    I take it that you were reliant on Tom to

19   show you where to go once you reached the

20   property --

21               MR. COX:  I'm going to --

22         Q.    (By Mr. Ainsworth)  -- is that right?

23               MR. COX:  I'm going to object.  That's

24   asking for attorney-client privileged information.

25   I'm going to direct Mr. Hayes not to answer.

1    buried even though you didn't know where she was

2    buried?

3        A.    All I can tell you is I was told it was in

4    a ditch on Floyd Bledsoe -- the father of Tom

5    Bledsoe's property.  I do not know where on that

6    property it was.  I do not know where or how we got

7    to that location.  I do not recall.

8        Q.    Were you present when the girl's body was

9    unearthed?

10       A.    I do not recall if I was physically

11   present or in the car.

12       Q.    But you were on the scene?

13       A.    I was at the location.

14       Q.    Did you see the victim's body when it was

15   uncovered?

16       A.    I do not recall.

17       Q.    All right.  You drove Tom Bledsoe to the

18   jail after he was -- after the body was uncovered;

19   is that right?

20       A.    I do not recall.

21       Q.    All right.  Let me show you that same --

22   Exhibit 167 on the screen.

23             So I'm going to direct you to the second

24   page of Exhibit 167 to the bottom.  It says

25   "Attorney Hayes drove Thomas Bledsoe to the

```
1    Jefferson County Sheriff's Office jail where he was
2    arrested and booked for murder."  Do you see that?
3         A.   I see that.
4         Q.   Okay.  Do you know Jim Woods?
5         A.   I know Jim Woods.
6         Q.   He a good police officer?
7         A.   Yes, sir.
8         Q.   You know him to lie in his police reports?
9         A.   No, sir.
10        Q.   You trust that he's accurately reporting
11   that you drove Thomas Bledsoe to the jail to be
12   arrested and booked?
13        A.   Yes, sir.
14        Q.   Have you ever done that for another
15   homicide suspect where you -- rather than the person
16   being arrested by police, you drove the person to
17   the jail to be arrested and booked?
18        A.   No, sir.
19        Q.   Can you tell us why it was that, instead
20   of having the police arrest Tom Bledsoe at the scene
21   where the dead girl was found, you instead drove him
22   to the jail where he was arrested and booked?
23        A.   I have no recall.  It was over 23 years
24   ago.  If I would have recalled everything,
25   I wouldn't have had to ask for police reports.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
1    homicide investigation?
2         A.   I have no idea, no recollection.
3         Q.   So you have no -- I take it -- you
4    understand that the law enforcement center is a
5    secure building, and so you couldn't get to the
6    interview room without some police officer letting
7    you in; right?
8         A.   That would be correct.
9         Q.   Where is the -- that interview room in the
10   law enforcement center in regard -- in relation to
11   the conference room?
12        A.   I couldn't tell you today.  I have no
13   recall.  I couldn't direct you.
14        Q.   Do you think it was appropriate for you to
15   be in the interview room with Detective Carreno,
16   Special Agent Johnson, Floyd Bledsoe, and Tom
17   Bledsoe?
18        A.   Couldn't answer that either.
19        Q.   Would you let that happen if you were the
20   county attorney on a case that you were prosecuting?
21   Let a defense attorney come in and question your
22   suspect.
23        A.   Yes.  Law enforcement --
24        Q.   Why --
25        A.   -- if law enforcement thought that was
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    by the bar association?

2        A.   I do not recall.

3        Q.   As a defense attorney, is it appropriate,

4    in your view, to fabricate evidence of somebody

5    else's guilt in order to assist your client in

6    beating the charges?

7        A.   I can't speak for other people.

8        Q.   No.  You.

9        A.   I would never do that.

10       Q.   Okay.  And so you think it's inappropriate

11   for you to fabricate evidence to implicate somebody

12   else in a crime in order to help your client have a

13   better chance of beating the charges; is that right?

14       A.   I cannot speak for other defense counsel.

15   I can only speak for Mike Hayes.  I have never done

16   that, never thought about doing that, and would

17   never do it.

18       Q.   All right.  Jim Vanderbilt testified that

19   he agreed, the -- the Sunday night, not to seek the

20   death penalty against Tom Bledsoe in exchange for

21   you providing the weapon and the knowledge of where

22   the body would be -- or Tom providing the weapon and

23   the knowledge of where the body could be found.  Do

24   you recall that occurring?

25       A.   No, sir.

8700 Monrovia, Suite 310                                      (913) 825-2510
Lenexa, Kansas 66215-3500                                     Fax (913) 825-2530
www.cornerstonekc.net                                         office@cornerstonekc.net

Cornerstone
Court Reporting Company LLC

```
 1    5:30 p.m., Tom met an unknown person, learned that
 2    Camille was dead, and where the body is?
 3         A.    I have no recall.
 4         Q.    Do you have any reason to doubt that you
 5    provided that information to --
 6         A.    I have --
 7         Q.    -- Jim Woods?
 8         A.    -- no recall; so therefore I can't answer.
 9         Q.    At any point during the Arfmann homicide
10    investigation, did you lie to law enforcement?
11         A.    No.
12         Q.    At any point during the Arfmann homicide
13    investigation, did you knowingly provide false
14    information to law enforcement?
15         A.    No.
16         Q.    All right.  You see there's a reference
17    to -- at the bottom of page 2 of Exhibit 135, "8:55,
18    law enforcement center parking lot - first call
19    Bollinger.  Calls dad, knows where Camille is.
20    Tells dad, his gun in dresser drawer.  Dad come to
21    law enforcement center, pick up Tom, takes to Jim
22    Swoyer's.  Dad returns later, pick up Tom's truck."
23    Do you see that?
24         A.    I see it.
25         Q.    Did you provide any of that information to
```

```
 1    enforcement.  They're not the -- making the charging
 2    decisions.  It's the prosecutor.  He's the only one
 3    that can dismiss the case.
 4         Q.   Did anyone from law enforcement, to your
 5    knowledge, question Tom Bledsoe between November 7th
 6    and November 12th, when Tom was given a polygraph
 7    exam?
 8         A.   Not to my knowledge.
 9         Q.   And so if law enforcement officers were
10    questioning Tom between November 7th and -- well,
11    strike that.
12              Did you tell -- well, strike that.
13              Remember, in the video that I showed you,
14    there was a reference to you confronting Floyd in
15    the parking lot?
16         A.   That was what was in the video.
17         Q.   And so did you tell Floyd that you were
18    going to take Tom out of the hot seat and put Floyd
19    in it?
20         A.   Not that I recall.
21         Q.   Is that something that you would do?
22         A.   No.
23         Q.   Why not?
24         A.   Because it would be unethical.
25         Q.   All right.  Tell me why it would be
```

8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500                                Fax (913) 825-2530
www.cornerstonekc.net                              office@cornerstonekc.net

Cornerstone
Court Reporting Company LLC

1  unethical.

2       A.    Because you don't -- you would save that

3  for the testimony and cross-examination of a

4  witness.

5       Q.    And so it's improper to confront, you

6  know, Floyd in the parking lot and tell him that you

7  were going to put him in the -- in the hot seat and

8  take Tom out of it; is that right?

9       A.    I did not do that.

10      Q.    I understand you didn't -- you're saying

11 you did not do that, and I'm just clarifying.  You

12 understood back in 1999 that it would be totally

13 improper for you to tell Floyd, "I'm taking you" --

14 "I'm taking Tom out of the hot seat, and I'm going

15 to put you in it"; right?

16      A.    I'm saying I did not say that.

17      Q.    Mr. Hayes, that would be a great answer if

18 I asked you, "Did you tell" -- we already

19 established that.  You've told us you did not tell

20 Tom -- Floyd that.

21            I'm just saying you knew in 1999 that it

22 would be totally inappropriate for you to tell

23 Floyd, "I'm taking your brother off the hot seat,

24 and I'm putting you in it"; correct?

25      A.    I don't know.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net