## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FLOYD BLEDSOE,
    Plaintiff,

vs.        Case No. 2:16 CV 02296

JEFFERSON COUNTY, KS, et al.,
    Defendants.

DEPOSITION OF
TROY FROST,
taken on behalf of the Plaintiff, pursuant to Amended Notice of Deposition, beginning at 9:35 a.m. on the 20th day of February, 2023, at the offices of Appino & Biggs Reporting Service, 5111 S.W. 21st Street, in the City of Topeka, County of Shawnee, and State of Kansas, before Barbara J. Hoskinson, Certified Court Reporter, Kansas License No. 0434 and Missouri License No. 999.

## Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

    Mr. Russell Ainsworth (video conference)
    Ms. Ruth Brown (video conference)
    Loevy & Loevy
    311 N. Aberdeen St., 3rd Floor
    Chicago, Illinois, 60607
    312-243-5900
    russell@loevy.com
    ruth@loevy.com

ON BEHALF OF THE DEFENDANTS FROST, CARRENO, HERRIG, POPPA & JEFFERSON COUNTY:

    Mr. Eric Turner
    Foulston Siefkin, LLP
    7500 College Boulevard, Suite 1400
    Overland Park, Kansas, 66210
    913-498-2100
    eturner@foulston.com

## Page 3

    Mr. Michael J. Norton
    Foulston Siefkin, LLP
    1551 N. Waterfront Pkwy, Suite 100
    Wichita, Kansas, 67206
    316-267-6371
    mnorton@foulston.com

ON BEHALF OF THE DEFENDANT VANDERBILT:

    Mr. Patric S. Linden
    Case Linden, PC
    2600 Grand Blvd., Suite 300
    Kansas City, Missouri, 64108
    816-979-1500
    patric.linden@caselinden.com

## Page 4

ON BEHALF OF DEFENDANTS MORGAN, WOODS, JOHNSON ESTATE:

    Mr. Shon Qualseth
    Assistant Attorney General
    120 SW 10th Ave, 2nd Floor
    Topeka, Kansas, 66612
    785-368-8424
    shon.qualseth@ag.ks.gov

ALSO PRESENT:

    Mr. Michael Hayes (video conference)

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street, Topeka, KS 66604, 785-273-3063, www.appinobiggs.com
6420 W. 95th Street, Suite 101, Overland Park, KS 66212, 913-383-1131
800 E. 1st Street, Suite 305, Wichita, KS 67202, 316-201-1612

EXHIBIT 2

Page 37

1  two to three weeks ago?
2      A.  My son and his grandson wrestle and I saw
3  him at a wrestling meet.
4      Q.  Did you talk about the case, the Bledsoe
5  case?
6      A.  No, sir, huh-uh.
7      Q.  Do you know Mike Hayes?
8      A.  Yes, I know Mike Hayes.
9      Q.  How do you know Mike Hayes?
10     A.  When I first started out Mike Hayes was a
11 defense attorney and, so, I was well aware of Mr.
12 Hayes as being a defense attorney, and then as --
13 I'm sorry, go ahead, sir.
14     Q.  Please continue, I cut you off.
15     A.  And then through the years knowing Mike
16 as the, you know, prosecutor and defense attorney.
17     Q.  Why do you say that you're well aware of
18 him as a defense attorney?
19     A.  Just because I, you know, with the cases
20 that I've had and him being a defense attorney for
21 those and, you know, so, just -- (incomplete)
22     Q.  And, so, you got to know from experience
23 that if you left holes in your police reports a
24 defense attorney might try to make it seem that
25 your investigation was not credible by pointing

Page 38

1  out those holes, right?
2      A.  Yes, sir.
3      Q.  And, so, you as a detective would try to
4  document the steps that you took in an
5  investigation so it was clear to anybody what
6  happened from the time of the crime to the time
7  that you identify your suspect, right?
8      A.  Yes, sir.
9      Q.  Because if you leave out steps in your
10 investigation then that might suggest to a defense
11 attorney that this investigation was done
12 improperly in some way, right?
13         MR. TURNER:  Object to form.
14     A.  Can you ask the question again, please?
15 BY MR. AINSWORTH:
16     Q.  Sure.  So, what I mean by documenting the
17 steps of the investigation is that to take as an
18 example, one step of an investigation is if you
19 conduct the search of a suspect's residence you
20 should document that you conducted that search,
21 right?
22     A.  Yes, sir.
23     Q.  So everybody knows, you know, what was
24 searched and who searched it and when it was
25 searched, right?

Page 39

1      A.  Yes, sir.
2      Q.  Likewise, if you search a suspect's car
3  you should document the fact that a search was
4  conducted, what was searched and who searched it
5  and when they searched it, right?
6      A.  Yes, sir.
7      Q.  And, so, if it comes out that, you know,
8  an item was searched or a vehicle was searched but
9  there's no documentation for it, then that in your
10 experience might be something that a defense
11 attorney could exploit or try to exploit as a hole
12 in the police case to suggest that the criminal
13 investigation was done improperly, right?
14         MR. TURNER:  Object to form.
15     A.  I would say yes, probably so.
16 BY MR. AINSWORTH:
17     Q.  All right.  So, in any event, what did
18 you do to prepare for this deposition?
19     A.  I went over these notes and reports and
20 video that I received from my attorneys the best
21 that I could.
22     Q.  Umm.  So, you reviewed -- and you're
23 referring to a binder that's in front of you, is
24 that right?
25     A.  Yes, sir.

Page 40

1      Q.  Can you show it up to the camera so we
2  can look and see what you're referencing?
3      A.  (Witness complies.)
4      Q.  All right.  So, you've got a binder there
5  and hang onto that.  Is it your understanding that
6  that binder contains all the reports that you
7  filed and all of the notes that you took?
8      A.  Yes, sir.
9      Q.  Are there other portions of -- well, does
10 your binder have Bates numbers in the bottom of
11 it?
12     A.  Yeah, they have numbers on the bottoms of
13 them.
14     Q.  For your notes is it Bates-numbered
15 JC4812 through 4988?
16     A.  Four what?
17     Q.  4812 through 4988.
18     A.  I don't know -- I don't know if I have
19 that.  Four eight --
20     Q.  Excuse me?  You know what, you know what,
21 sir, that's okay --
22     A.  I'm sorry, I'm trying to find it here for
23 you.
24     Q.  Yeah, that's all right.  Perhaps during a
25 break your counsel can just note the Bates numbers

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

Page 157

1 in your report, were you?
2  A.  No, sir.
3  Q.  Okay. 'Cause if you, you know, read your
4 report and your notes it's clear that Floyd spent,
5 you know, a fair amount of time in the hardware
6 store and left, you know, 4:30, 4:35 or somewhere
7 in that territory, right?
8  A.  Yes, sir.
9  Q.  And, so, when you're conducting criminal
10 investigations you want to be accurate, right?
11  A.  As accurate as you can, yes, sir.
12  Q.  Yeah. Umm. Let's take a look at, at
13 Exhibit 81. You got -- you got Exhibit 81 in
14 front of you?
15  A.  Yes, sir.
16  Q.  All right. So, in Exhibit 81, this is a
17 Affidavit and Application for Search Warrant,
18 correct?
19  A.  Yes, sir.
20  Q.  And, so, you know when you're filling out
21 an Affidavit and Application for Search Warrants
22 you're supposed to be accurate, correct?
23  A.  Yes, sir.
24  Q.  Was Michael Hayes around for the creation
25 of this search warrant?

Page 158

1  A.  Not to -- not to my knowledge, no.
2  Q.  Okay. How long did it take you to create
3 this search warrant?
4  A.  Oh, I do not know how long it took me to
5 do it.
6  Q.  All right. Does nine hours sound about
7 right?
8  A.  I don't know how long it took me, sir.
9  Q.  All right. Let's take a look at Exhibit
10 86. Sorry, I don't want you to look at 86.
11 Well, you can, but that's not the next exhibit I
12 want to talk to you about. Sorry, okay, it's
13 Exhibit 80, my apologies. All right, so, taking a
14 look at Exhibit 80 it says, November 13, 1999, at
15 approximately 10 a.m. -- oh, let me stop myself.
16 This report is also dated November 29th, 1999.
17 Was that also a typo?
18  A.  Yes, sir.
19  Q.  And, so, you had typed this report on
20 November 13th but you accidentally wrote in
21 November 29th?
22  A.  That's -- yes, it's -- yeah. Yes.
23  Q.  And, so, this report was typed on
24 November 13th, is that right?
25  A.  Yes, sir.

Page 159

1  Q.  Okay. In any event, at about 10 a.m. on
2 November 13th you went to the Jefferson County
3 Sheriff's Department to meet with the county
4 attorney, Jim Vanderbilt, so you could write some
5 search warrants. "We were writing the search
6 warrants for Floyd Bledsoe's vehicle. The vehicle
7 was a 1974 Chevy Nova, green and white in color.
8 Search warrants for his residence and for the
9 property where the body was found were also
10 written." Do you see that?
11  A.  Yes, sir.
12  Q.  Then it says, "Approximately 11:26 I took
13 Polaroid photos of Floyd Bledsoe's vehicle which
14 was sitting in the parking lot of the Jefferson
15 County Sheriff's Department. We went and worked
16 on the search warrants. They were finally
17 complete around 1947, or 45, sorry." Was that
18 correct?
19  A.  Yes, sir.
20  Q.  So, 1945 is 7:45 in the evening, right?
21  A.  Yes, sir.
22  Q.  So, according to your report you were
23 working on the, started working on the search
24 warrants around 10 a.m. and you stopped to take
25 the photos at 11:26 and then after 11:26 until

Page 160

1 1945 you were working on the search warrants,
2 right?
3  A.  Yes, sir.
4  Q.  So, it took over seven hours, is that
5 right?
6  A.  Yes, sir.
7  Q.  And, so, you were trying to be precise
8 with your search warrants?
9  A.  Yes, sir.
10  Q.  All right. Let's turn back to Exhibit 81
11 and that's your signature on Exhibit 81, the first
12 page, is that right?
13  A.  Yes, sir.
14  Q.  And, so, you're swearing that the
15 information you're providing to the judge is
16 correct, right?
17  A.  Yes, sir.
18  Q.  'Cause you don't want to mislead a judge
19 when they're issuing search warrants, correct?
20  A.  Correct.
21  Q.  All right. Going on to the second page
22 of Exhibit 81, you state that you've received over
23 320 hours of training in the investigation of
24 crimes and that you've participated in the
25 training of the detection and apprehension of

# TROY FROST

Page 161

1 criminals committing violent person crimes such as
2 murder. Then you have approximately nine years of
3 law enforcement experience in Jefferson County,
4 correct?
5   A.  Yes, sir.
6   Q.  All right. So, had you had experience
7 investigating murders prior to this case?
8   A.  No, sir.
9   Q.  This was your first time?
10  A.  Yes, sir.
11  Q.  Why did you say that you had participated
12 in the training of the detection and apprehension
13 of criminals committing violent person crimes such
14 as murder?
15  A.  It's training hour and you have to have
16 40 hours of training so, you know, we do training.
17  Q.  Okay. So, you had training in how to
18 conduct homicide investigations, right?
19  A.  Yes, sir.
20  Q.  All right. Okay, then on page 3 you set
21 forth the probable cause that you had to believe
22 that the items described in paragraph 3 may be
23 found at the premises described in paragraph 4.
24 This probable cause is based upon the following
25 event. And, so, were you compiling the details

Page 162

1 that would go into this report?
2   A.  Yes, sir.
3   Q.  Where did you get the information used to
4 complete this report?
5   A.  I don't know where I got the information.
6 I can't remember.
7   Q.  Okay, but you would have consulted either
8 your fellow officers or their police reports for
9 information that was relevant to the investigation
10 but you didn't personally conduct?
11  A.  Right, yes, sir.
12  Q.  Okay. Did you rely on anyone other than
13 your fellow police officers and their reports for
14 compiling this report?
15  A.  No, sir.
16  Q.  Okay, and, so, Mike Hayes didn't provide
17 you with any information to include in this report
18 -- in this affidavit, right?
19  A.  No, sir.
20  Q.  That's correct?
21  A.  I'm sorry, what was your question?
22  Q.  It's a double negative so I just want to
23 make sure. It's correct that Mike Hayes didn't
24 provide you with any information that you used for
25 this affidavit, right?

Page 163

1   A.  Did he?
2   Q.  He did not provide you any information?
3   A.  No, he did not.
4   Q.  Okay. All right, so, on page 3 it
5 states, "On November 6, 1999, at approximately
6 12:50 a.m. Heidi Bledsoe met with Deputy Mark Doud
7 with the Jefferson County Sheriff's Department and
8 gave him the following information: Zetta Camille
9 Arfmann, Camille, was missing and wanted a missing
10 persons report filed. 2:  Camille is Heidi's
11 sister and lives with her and Heidi's husband,
12 Floyd S. Bledsoe." I'm skipping the addresses.
13 "3, Camille attends the Oskaloosa High School as a
14 freshman. 3A, she rides the bus home from school
15 and usually arrives back at their residence around
16 4:20 p.m.," and then B is blank. Do you see that
17 sir?
18  A.  Yes, sir.
19  Q.  And, so, thus far that's what you typed
20 into this affidavit, is that right?
21  A.  Yes, sir.
22  Q.  And you are the one who typed this
23 affidavit, correct?
24  A.  Yes, sir.
25  Q.  All right, and then it says "4, Camille

Page 164

1 and Heidi were to attend services at the
2 Countryside Baptist Church after school on
3 November 5th, 1999," correct?
4   A.  Yes, sir.
5   Q.  And then "Camille never arrived at the
6 church," right?
7   A.  Yes, sir.
8   Q.  B says, "On November 6, 1999, an
9 extensive search for Camille began. The Jefferson
10 County sheriff and his deputies along with
11 Leavenworth County deputies began searching the
12 eastern edge of Jefferson County and the western
13 edge of Leavenworth County."
14  A.  Yes, sir.
15  Q.  Then it says, "The Jefferson County law
16 enforcement officers were also searching the area
17 near Floyd and Heidi's residence and the City of
18 Oskaloosa. C, on November 7th, 1999, Floyd's
19 brother, Thomas Bledsoe, called a member of his
20 church, James Bolinger, and left a message
21 containing the following information," and then
22 you included that he said, one, Camille was dead;
23 two, Tom was going to go to the police; three, he
24 wanted the church to forgive him; four, he wanted
25 the church to help his family. Do you see that?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

Page 209

1    MR. AINSWORTH: All right, why don't we
2 go off the record and stretch and then come back
3 in five minutes and tell you if I have any more
4 questions for you.
5    THE VIDEOGRAPHER: Time is approximately
6 3:42 p.m., we're going off the record.
7    (THEREUPON, a recess was taken;
8 WHEREUPON, Deposition Exhibit No 98 was marked for
9 identification.)
10   THE VIDEOGRAPHER: Time is approximately
11 3:54 p.m., we're back on the record.
12   BY MR. AINSWORTH:
13   Q. All right, sir, I found one other thing I
14 wanted to ask you about. We're going to mark this
15 as Exhibit 98 and I'm sorry, I don't have a paper
16 copy for you but I just wanted to show this to
17 you. Is this your handwriting, sir?
18   A. Yes, sir, it is.
19   Q. Let me tell you what this is. This is
20 Bates-numbered JC4947 through JC4954 and it
21 appears to be notes that you were taking of Randy
22 Carreno's interrogation of Floyd on November 12th,
23 1999, beginning at 5:20 p.m., but let me ask you,
24 sir, is that your handwriting where it says
25 November 12th, 1999, 1720?

Page 210

1   A. Yes, sir, it is.
2   Q. So, you're taking notes of an interview
3 that was occurring at 5:20 p.m. on November 12th,
4 1999?
5   A. Yes, sir.
6   Q. All right, and so, you're outside the
7 room taking notes, is that right?
8   A. Yes, sir.
9   Q. You were watching all of Floyd's
10 interrogation on the 12th, right?
11   A. Yes, sir.
12   Q. And then at a certain point you went in
13 to talk to Floyd, right?
14   A. Yes, sir.
15   Q. Take a look at page 8. You write -- is
16 that your handwriting where it says "cried while
17 he lied to Randy, or lies to Randy?"
18   A. It looks like my handwriting, yes.
19   Q. And, so, you're referencing Floyd crying
20 when he's trying to protest his innocence and you
21 characterize it as cried while he lies to Randy?
22   MR. TURNER: Object to form.
23   A. Yeah. I mean, that's my notes.
24   BY MR. AINSWORTH:
25   Q. What was Floyd lying about?

Page 211

1   A. I do not know, sir.
2   Q. Why did you say that Floyd was crying
3 while he lied to Randy?
4   A. I do not know what the question was, or I
5 do not know.
6   Q. Randy is Randy Carreno, right?
7   A. Yes, sir.
8   Q. What possible basis did you have to
9 believe that Floyd was crying while he lied to
10 Randy when Floyd was being interrogated by Randy
11 Carreno?
12   A. I do not know.
13   Q. Do you regret writing cried while he lies
14 to Randy about Floyd?
15     MR. TURNER: Object to form.
16   A. No, I do not.
17   BY MR. AINSWORTH:
18   Q. Do you believe that Floyd is innocent?
19   A. Do I believe -- what was the question
20 again?
21   Q. Do you believe that Floyd is innocent?
22   A. Innocent of?
23   Q. Camille Arfmann's murder.
24   A. I do not know.
25   Q. Do you know if Tom is innocent of Camille

Page 212

1 Arfmann's murder?
2   A. I do not know.
3   Q. All right. So, you observed Tom and Mike
4 Hayes enter the interrogation room with Floyd,
5 right?
6   A. Yes, sir.
7   Q. Umm. And that was something that you
8 guys had talked about arranging to have, Tom and
9 Mike Hayes confront Floyd, is that right?
10     MR. TURNER: Object to form.
11   A. That who talked about?
12   BY MR. AINSWORTH:
13   Q. You and Carreno and other members of the
14 investigative team.
15   A. I did not -- I don't -- I didn't -- I
16 don't remember anything about talking to anybody
17 about Mr. Hayes and Tom coming in to the interview
18 room.
19   Q. Was it a surprise to see Tom enter the
20 interrogation room?
21   A. I don't know if I was surprised or not.
22 I don't know.
23   Q. Do you remember when Tom first accused
24 Floyd inside that interrogation room and Floyd
25 said, "What time was it that you saw me," and

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612