# JIMMIE ALLEN VANDERBILT

---

**Page 1**

```
IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF KANSAS


FLOYD BLEDSOE,
     Plaintiff,

     vs.                  Case No. 2:16 CV 02296

JEFFERSON COUNTY, KS, et al.,
     Defendants.



          VIDEOTAPED DEPOSITION OF
          JIMMIE ALLEN VANDERBILT,
taken on behalf of the Plaintiff, pursuant to
Notice to Take Deposition, beginning at 9:45 a.m.
on the 13th day of March, 2023, at the offices of
Appino & Biggs Reporting Service, 6420 West 95th
Street, Suite 101, in the City of Overland Park,
County of Johnson, and State of Kansas, before
Cori R. Power, CCR, CVR, Kansas License No. 1739,
Missouri License No. 1436.
```

**Page 2**

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

   Mr. Russell Ainsworth (via videoconference)
   Ms. Ruth Z. Brown (via videoconference)
   Loevy & Loevy
   311 North Aberdeen Street, 3rd Floor
   Chicago, IL 60607
   312-243-5900
   russell@loevy.com
   ruth@loevy.com

ON BEHALF OF DEFENDANT VANDERBILT:

   Mr. Patric S. Linden
   Case Linden, P.C.
   2600 Grand Boulevard, Suite 300
   Kansas City, MO 64108
   816-979-1516
   patric.linden@caselinden.com

**Page 3**

ON BEHALF OF DEFENDANTS JEFFERSON COUNTY,
FROST, CARRENO, POPPA & HERRIG:

   Mr. Michael J. Norton
   Foulston Siefkin, LLP
   1551 North Waterfront Parkway
   Suite 100
   Wichita, KS 67206
   316-267-6371
   mnorton@foulston.com

   Mr. Eric Turner (via videoconference)
   Foulston Siefkin
   7500 College Boulevard
   Suite 1400
   Overland Park, KS 66210
   913-498-2100
   eturner@foulston.com

**Page 4**

ON BEHALF OF DEFENDANTS MORGAN, WOODS
& JOHNSON ESTATE:

   Mr. Shon D. Qualseth
   Attorney General's Office
   Memorial Building, 2nd Floor
   120 Southwest 10th Avenue
   Topeka, KS 66612
   785-368-8424
   shon.qualseth@ag.ks.gov

ON BEHALF OF DEFENDANT HAYES:

   Mr. Vincent M. Cox
   Cavanaugh, Biggs & Lemon
   3200 Southwest Huntoon Street
   Topeka, KS 66604
   785-440-4000
   vcox@cavlem.com

ALSO PRESENT:
   Mr. Michael Hayes (via videoconference)
   Mr. Tyler Toelkes, Videographer

---

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street, Topeka, KS 66604, 785-273-3063, www.appinobiggs.com
6420 W. 95th Street, Suite 101, Overland Park, KS 66212, 913-383-1131
800 E. 1st Street, Suite 305, Wichita, KS 67202, 316-201-1612

EXHIBIT 3

Page 25

1  the second election why you should win?
2      A.  I did a good job on my first term, I can
3  do a good job on my second term.  That was about
4  it.  I believe I told people that Mike could do a
5  good job also.
6      Q.  Who became the county attorney after you
7  left?
8      A.  Mike Hayes.
9      Q.  Did Mike Hayes ever try to prosecute you?
10     A.  He was a prosecutor in McLouth and
11 Oskaloosa.  Oh, a speeding ticket in Oskaloosa, so
12 technically he would have been prosecuting me for
13 that I guess.
14     Q.  Did he ever attempt to prosecute you, to
15 your knowledge, for any crime other than the
16 speeding ticket?
17     A.  I don't recall anything.  I don't know.
18     Q.  Well, how many times have you been --
19 tried to be prosecuted apart from, you know,
20 traffic violations?
21         MR. LINDEN:  Objection.  Form.
22 You can answer.
23 BY MR. AINSWORTH:
24     Q.  And let me strike that question and ask
25 it better.

Page 26

1      To your knowledge how many times has a
2  prosecutor attempted to prosecute you?
3      A.  Speeding, traffic -- and traffic?  I
4  don't know.
5      Q.  Yeah, apart from traffic violations, how
6  many times has a prosecutor attempted to prosecute
7  you?
8      A.  I would say one.
9      Q.  And when was that?
10     A.  I don't remember, '82, '81, somewhere in
11 there.
12     Q.  And what was that for?
13     A.  Fraternity prank in southern Missouri.
14     Q.  And what was the prank?
15     A.  Somebody in our fraternity rounded up a
16 young calf, and it was -- we were on a canoe
17 trip, so we floated down the river with the young
18 calf in the canoes.
19     Q.  And were you arrested?
20     A.  Yes.
21     Q.  And what were you charged with?
22     A.  I think theft or criminal deprivation of
23 property.  Criminal deprivation of property, I
24 think.  I don't remember.
25     Q.  And were you prosecuted?

Page 27

1      A.  I think I entered into a diversion
2  agreement.  I don't remember.
3      Q.  What county was that in?
4      A.  I don't remember.  In southern Missouri.
5      Q.  All right.  Apart from the prosecution in
6  southern Missouri, have you ever been prosecuted
7  or attempted to be prosecuted for any criminal
8  acts?  So I'm excluding traffic violations.
9          MR. LINDEN:  I'm going to object to the
10 form.  I don't know if I understand what an
11 attempted prosecution is.
12         BY MR. AINSWORTH:
13     Q.  You -- you can answer.
14     A.  I don't think so.  I don't recall.
15     Q.  Did -- did anyone tell you that Mike
16 Hayes was considering prosecuting you for any
17 crime apart from a traffic violation?
18     A.  Not that I'm aware of.  I don't recall.
19     Q.  How would you describe Mike Hayes?
20     A.  Short and wiry.  He's -- I don't know.
21 He's a good defense attorney.  I don't know how to
22 answer that question.
23     Q.  Is he aggressive?
24     A.  He's a zealous attorney; yes, he's
25 aggressive.

Page 28

1      Q.  How would you describe his personality,
2  Mike Hayes's personality?
3      A.  I don't know.  He's usually happy.  I
4  don't know.  He has a pleasant personality.
5      Q.  When you were the county attorney with
6  Mike Hayes, did he ever speak to you in a
7  demeaning manner.
8      A.  No.
9      Q.  So Mike Hayes was always respectful when
10 he spoke to you?
11     A.  I wouldn't say that.
12     Q.  What would you say?
13     A.  We've -- we had a lot of arguments, and
14 we made a lot of agreements.
15     Q.  Have you argued with Mike Hayes about
16 cases?
17     A.  Yes, of course.
18     Q.  Have you argued with Mike Hayes about
19 things other than cases?
20     A.  Well, I'm sure.  Not every conversation
21 we had was about cases.
22     Q.  As a county attorney for Jefferson
23 County, how many homicides did you prosecute?
24     A.  Oh, I don't know.  I don't know, three or
25 four.  I don't recall.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

Page 85

1  learn that Tom knew that the victim had been shot
2  in the head before the body had been unearthed?
3      A.  So you're asking me when Tom -- when I
4  found out that Tom knew it?
5      Q.  Yeah.
6      A.  When did I find out?
7      Q.  Or if you ever learned that.
8      A.  At the beginning -- in the beginning we
9  were operating under the assumption that Tom was
10 -- Tom had killed Camille Arfmann, so we were
11 assuming a lot of things, and I guess at the time
12 I would have assumed that Tom knew that she was
13 shot in the back of the head when Tom shot her in
14 the back of the head.  I guess I wouldn't be too
15 concerned about when he knew it, because he did
16 it, is what we were -- that was what we were
17 working under.
18     Q.  Okay.  And so you assume that Tom had
19 killed Camille based on the events of September --
20 I keep saying September.  You would -- strike
21 that.
22     You assume that Tom killed Camille based on
23 the events on November 7th, and so you don't
24 recall anyone telling you that Tom knew that the
25 victim was shot in the head before the body was

Page 86

1  unearthed --
2      A.  I don't --
3      Q.  -- is that fair to say?
4      A.  I don't recall -- yes.  I did know, for
5  some reason know that Tom believed she was shot in
6  the head.  I don't recall when that occurred.
7      Q.  All right.  Did you withhold any
8  exculpatory information from Floyd Bledsoe during
9  his criminal prosecution?
10     A.  No.
11     Q.  So if you had the information, you would
12 provide it to -- to Floyd; is that correct?
13     A.  To his counsel, John Kurth.
14     Q.  Okay.  So if you had any exculpatory
15 information, you would provide it to John Kurth,
16 correct?
17     A.  All the information I had was in my file.
18 I have an open file.  Kurth can walk into my
19 office, he could open the file, and he can read
20 it.  In addition to that, we gave him a copy of
21 everything in my file, so I didn't have any
22 information, inculpatory or exculpatory, that Mr.
23 Kurth didn't know.
24     Q.  All right.  When did -- when was there
25 some doubt in your mind that Tom may have not

Page 87

1  killed Camille?
2      A.  When Tom passed the polygraph and Floyd
3  failed.
4      Q.  All right.  And so up until that point --
5  and -- and just to orientate us, the polygraphs
6  occurred on Friday, November 12th.  Do you
7  understand that?
8      A.  Yes.  And you cut out there a little bit,
9  so I didn't hear everything you said.
10     Q.  Thank you for letting me know, and -- and
11 if that happens, Mr. Vanderbilt, please do let me
12 know, but I'll just repeat the question so you
13 know exactly what you're responding to.
14     The polygraphs occurred on November 12, 1999;
15 do you understand that?
16     A.  Yes.
17     Q.  All right.  So up until November 12,
18 1999, you had no inkling that there was any
19 suggestion that maybe it wasn't Tom who killed
20 Camille, right?
21     A.  I wouldn't call it an "inkling."  I would
22 say that I believed that Tom killed Camille
23 Arfmann, and that Mike Hayes was presenting an
24 alternative that -- among other things that -- was
25 that Floyd was the one that presented him with the

Page 88

1  murder information, and that Floyd did it.
2      And -- and he did that earlier in the week,
3  and I told him that I didn't believe it, and I
4  wasn't going to consider that information in the
5  prosecution of the murder of Camille Arfmann, but
6  he insisted that it was -- his client was being
7  honest when he said he didn't do it and that his
8  brother did it, and I told him that I didn't
9  believe it.  I think that it was just some kind
10 of regretting what he had done and figuring out
11 the ramification of his conduct.
12     Mike Hayes continued to insist that he was
13 being honest and truthful, and I told Mike that
14 the only way that I would even consider whether he
15 was being honest or not is if he took a polygraph,
16 and if Floyd took a polygraph, and that Tom passed
17 the polygraph, and Floyd failed the polygraph, at
18 that point I would be willing to consider whether
19 or not I had made a mistake with charging, if
20 that's what you're talking about.
21     Q.  All right.  So you told -- well, you --
22 you said that it was among other things that Mike
23 Hayes was saying, that one of the other things was
24 that Floyd did it, and Tom was innocent.  What
25 were the other things that Mike Hayes was

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

# JIMMIE ALLEN VANDERBILT

**Page 97**

1  is that correct?
2  A. Yes.
3  Q. And then -- and cut off Tom from saying
4  more about what happened; correct?
5  A. Yes.
6  Q. And that was frustrating to you because
7  you, observing the interview, wanted to know what
8  Tom had to say, right?
9  A. It was extremely frustrating for me
10 because I was still at that point prosecuting Tom
11 Bledsoe. I had him sitting in with a special
12 agent from the KBI. He was admitting that he had
13 done it, which was the first time that he had done
14 that, and he was immediately cut off by George
15 Johnson. Yes, I was furious in an instant that he
16 was cut off, and then it was my understanding that
17 George cut him off because that was inconsistent
18 with his results, but, yeah, I remember that.
19 Q. How did you learn that the reason Johnson
20 cut off Tom Bledsoe when he, you know, confessed
21 to murdering Camille, was because of the polygraph
22 results?
23 A. I don't remember it -- George was the one
24 that didn't believe it. George didn't think that
25 he was telling the truth when that happened, so...

**Page 98**

1  Q. So George -- George said that he didn't
2  believe Tom when Tom said that he killed Camille
3  Arfmann?
4  A. Yeah. That's what -- George was the one
5  that didn't believe it, that...
6  Q. And did you have a discussion with the,
7  you know, law enforcement officers on the case
8  after Tom Bledsoe's interview to talk about what
9  Tom had said?
10 A. Yeah.
11 Q. And what conversation was had between you
12 and the law enforcement officers who were present
13 about what Tom had said?
14 A. Well, I'm assuming you're referring to
15 contemporaneously with the test.
16 Q. Well, yes. Contemporaneously with the
17 test.
18 A. Well, I spoke with Jim Woods, and I'm
19 pretty sure Jim was there, and Dunnaway. And
20 you're talking about after -- after I'd learned --
21 after George Johnson had presented to us his
22 interpretation of the results of the polygraph?
23 Q. Yes.
24 A. Yeah. I had to stand there and tell them
25 that I was seriously considering changing my

**Page 99**

1  direction and prosecuting Floyd instead of Tom.
2  Q. What did Jim Woods or Sheriff Dunnaway
3  say in response to you saying you were seriously
4  considering changing directions?
5  A. I -- I don't recall. It was -- we were
6  all fairly stunned. Nobody was expecting this
7  result, and I was just kind of talking out loud,
8  and -- and I -- I don't recall -- I don't even
9  think at the time I was paying a whole lot of
10 attention to what they were saying or doing. I
11 was in a jam. I was trying to come to grasp that
12 I was going to use a -- you know, a whole --
13 using Tom as a witness against his brother, and
14 how -- how impossible that situation would be in a
15 jury trial, but I --
16 Q. And why did -- go ahead. Sorry.
17 A. But I came to the conclusion that I had
18 -- that I was -- I was trying the wrong man for
19 murder, so I made a decision then that I was going
20 to prosecute Floyd.
21 Q. All right. Why -- why was it concerning
22 to you that you were going to have to use Tom as
23 a witness to prosecute Floyd?
24 A. Well, because the history that -- him --
25 what he said, all of the evidence, and then --

**Page 100**

1  just all the evidence. I was comfortably
2  prosecuting Tom, and now I'm uncomfortably using
3  him as a -- as my primary witness to convict his
4  brother. I mean, that was -- I don't know what
5  word to use -- I can use to describe that feeling,
6  but "terrifying" comes to mind.
7  Q. So did you then take the weekend to think
8  over the decision and, you know, assess the
9  evidence and determine what to do?
10 A. No, I don't think so. I think I made up
11 my mind right then and there.
12 Q. Why did you make up your mind right then
13 and there after learning about the polygraph
14 result?
15 A. Tom was being truthful when he -- didn't
16 have anything to do with killing Camille Arfmann.
17 Floyd was being untruthful. So I negotiated an
18 agreement with Mike Hayes to testify against his
19 brother on the condition that he would tell the
20 truth that he didn't really have anything to do
21 with killing Camille Arfmann, and then I was going
22 to have to use his testimony along with the rest
23 of the evidence to convict Floyd.
24 Q. Right. And so in exchange for Tom
25 agreeing to testify against Floyd, truthfully you

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

Page 101

1  agreed to dismiss the murder charges against Tom?
2      A.  No.  No.  In exchange for him to testify
3  truthfully against Floyd, and that he didn't have
4  any participation in the murder of Camille
5  Arfmann, that he wasn't the one that killed
6  Camille Arfmann, then I was granting him immunity,
7  and then I was going to force him to -- to
8  testify against Floyd.
9      Q.  So you -- you granted Tom immunity for
10 what?  For the murder or what?
11     A.  The transaction.
12     Q.  Which transaction?
13     A.  The trans -- it was transactional
14 immunity on the -- on the whole -- the whole
15 occurrence, which would have been --
16     Q.  I see.
17     A.  -- at that point any sexual offense or,
18 you know, whatever else may have happened.
19     Q.  All right.  So you were agreeing to give
20 Tom immunity for any crime he may have committed
21 relating to Camille Arfmann on condition that he
22 would testify truthfully against Floyd; is that
23 correct?
24     A.  Yes.
25         MR. LINDEN:  Objection.  Misstates the

Page 102

1  witness's testimony.
2     BY MR. AINSWORTH:
3      Q.  And -- all right.  And you reached that
4  agreement with Mike Hayes, correct?
5      A.  Yes, eventually.  I don't know if we did
6  it right then or not.
7      Q.  Was Mike Hayes pressuring you to dismiss
8  charges against Tom Bledsoe on November 12th?
9      A.  Mike Hayes wasn't pressuring me to do
10 anything.  I mean, he wasn't trying to use
11 pressure to do it.  He was -- we were in the
12 middle of getting polygraphs done, and he knew I
13 wasn't going to even consider what he was saying
14 to be truthful until -- and it goes on.  There
15 was no -- no pressure from -- from Hayes.
16     He managed to somehow convince Floyd and Tom
17 to take a polygraph.  I didn't even believe Floyd
18 would show up for the polygraph, let alone would
19 fail it, and I certainly had no reason to believe
20 that Tom would pass a polygraph.  I mean, that was
21 insane.
22     Q.  Why did you think that Floyd wouldn't
23 show up for a polygraph?
24     A.  Well, I just didn't think he would take a
25 polygraph.  Why would anybody take a polygraph

Page 103

1  test in a murder case?  They didn't have to
2  voluntarily do it.
3      Q.  Because if you're thinking -- strike
4  that.
5      Go ahead.  I didn't mean to cut you off.
6      A.  Well, he -- he did it, so there you go.
7      Q.  And you didn't think that Floyd would
8  take a polygraph test in a murder case because
9  there is a risk for even an innocent person that
10 the test might come back false, right?
11     A.  Yes.
12     Q.  Yeah.  And so, you know, looking at the
13 situation, I -- I'm wondering why you -- you
14 decided right then and there to switch directions
15 upon receiving the results of the polygraph test
16 instead of doing some additional investigation or
17 weighing the evidence and waiting some time before
18 deciding to let Tom go free and arrest Floyd.
19     A.  Well, I had been extremely familiar with
20 the evidence, the results of the investigation.
21 Mike had presented me with his information that
22 Tom had apparently given him and the results of
23 any investigation that he may have committed or
24 had participated in.  He told me that, and when
25 Tom passed that polygraph indicating that he --

Page 104

1  you know, all of his questions, that Floyd failed,
2  there's just -- I don't see where there's anything
3  to contemplate.
4      I trusted George Johnson, and -- and I had
5  the ultimate confidence in his ability to do his
6  job, so I switched, I changed.  I took the hard
7  way instead of the easy way.
8      Q.  And --
9         MR. LINDEN:  Russell, hold up.  Before
10 you get to your next question, we've been going --
11 it's been about an hour and ten minutes.  Mr.
12 Vanderbilt is uncomfortable; he's standing now.
13 He's got his cane.  Can we take our lunch break?
14        MR. AINSWORTH:  Certainly.  Let's go off
15 the record.
16        THE VIDEOGRAPHER:  The time is 12:38 p.m.
17 We're going off the record.
18        (THEREUPON, a break was taken.)
19        THE VIDEOGRAPHER:  The time is 1:57 p.m.
20 We're back on the record.
21     BY MR. AINSWORTH:
22     Q.  All right, sir.  As I said to you before
23 we broke, if you need a break at any time, please
24 do let us know, and we'll accommodate you, okay?
25     A.  Thank you.

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street       6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604          Suite 101                Suite 305
785-273-3063              Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com       913-383-1131             316-201-1612

Page 193

1 referring to?
2     Q.  What I'm asking about is the
3 inconsistency between Tom being threatened "Don't
4 tell or else I'll reveal this stuff," and then Tom
5 goes and tells the police that the girl is dead
6 and buried at this particular location and reveals
7 all the information that Tom -- that Tom was told
8 under, you know, threat not to tell.
9         MR. LINDEN:  Object to form.
10     You can answer.
11     A.  The -- I didn't believe any of it.  I
12 wasn't going to investigate it.  I didn't believe
13 it.  I thought he was just making it all up.  It
14 sounded like a huge bag of -- anyways.  And I
15 wasn't even going to take into account for
16 anything.
17     It wasn't until after the polygraph that I
18 decided that -- that I should reconsider what was
19 going on, whether I was a prosecuting an innocent
20 man, and whether or not to give weight and
21 credibility to that story that you're talking
22 about.
23     And I had Floyd with a failed polygraph
24 saying that -- indicating that he was lying when
25 he said he didn't kill Camille, and I had a

Page 194

1 truthful polygraph that said that Tom didn't kill
2 Camille, and that changed the way -- the
3 credibility of those statements to the point where
4 I changed my charging decisions, and I dismissed
5 Tom, and I filed against Floyd.  So that -- I
6 would consider that lie detector test to be the
7 reason that I did.
8     We didn't just stop there.  Law enforcement
9 continued their investigation well after, and even
10 during trial that they weren't going to give up
11 trying to find and gather more information about
12 what happened because, you know, we really didn't
13 have a -- a lot of evidence and a complete -- a
14 lot of circumstantial evidence or direct evidence
15 to support everything that was going on, so I
16 don't know how I would answer that question any
17 other way.
18     BY MR. AINSWORTH:
19     Q.  It's -- I guess the question is did you
20 feel there was anything in trial prep that you
21 needed to discuss with Tom about why he was saying
22 he was threatened not to tell and then went to the
23 police and told?
24     A.  Why he did it, the only -- the only thing
25 that -- only reason that I had for him to do it

Page 195

1 was the truth, and I didn't have any contrary
2 evidence that it occurred, you know, other than
3 the fact that what originally happened, and -- and
4 again, the polygraph indicated he didn't kill her,
5 so we were not not investigating.
6     The law enforcement officer continued to
7 investigate all of it.  It wasn't like we just
8 stopped, so your question isn't really a question
9 in that we -- we were actually doing what you're
10 saying we didn't -- didn't do.
11     Q.  I'm -- I'm not trying to suggest an
12 answer.  I'm just trying to find out what
13 happened.  Did you talk with Tom to explore any
14 discrepancy between him saying "Floyd told me not
15 to tell or else he'd, you know, do these bad
16 things, and then I went and I told."
17     A.  No, I didn't -- I didn't interrogate Tom.
18 I didn't inquire, or I didn't ask him -- I didn't
19 interview him or try to trip him up.  I was -- I
20 simply put him in the chair and said "This is
21 where you're going to sit.  This is where I'm
22 going to stand.  You have to tell the truth.  No
23 matter what you told Mr. Hayes, no matter what you
24 told me, when you sit down on that chair and you
25 get sworn in, you have to tell the truth," and

Page 196

1 that's it.  There wasn't any --
2     Q.  So you didn't -- so you didn't prep with
3 him.  You didn't prep with Tom before trial is
4 what you're saying?
5     A.  I talked with him, and no, I actually --
6 I didn't prep him for trial.  It's -- as far as
7 prepping for trial and doing -- no.  I guess Mr.
8 Hayes did all that.  But I -- I wasn't comfortable
9 being around Tom.  I wasn't -- I -- I spent as
10 little time around him after -- before trial as I
11 could.
12     Q.  Why weren't you comfortable around Tom?
13     A.  I considered him to be -- my perception
14 of him was that he wasn't overly intelligent.  He
15 was -- he was a little bit susceptible to -- to
16 everything, and so I didn't want to have any kind
17 of influence over him.
18     Q.  You felt like he was easily suggestible?
19     A.  I didn't know, but I thought he could be
20 if all -- you know, to me.  I -- from -- from an
21 authority figure or something like that.  I just
22 didn't want to get involved in anything like that.
23     Q.  Is there anything wrong with meeting with
24 witnesses to prepare them for trial?
25     A.  I don't believe so.


appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street       6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604          Suite 101                Suite 305
785-273-3063              Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com       913-383-1131             316-201-1612

Page 197

1  Q. You did that in every case that you
2  tried, right?
3  A. Every case that's sensitive, yeah, but
4  where it's necessary I did prep witnesses.
5  Q. If you're putting on the victim of a
6  crime, for example, you'll prep with that person
7  to testify so you know what they're going to say
8  and so you can most effectively elicit their
9  testimony, right?
10 A. Yes.
11 Q. What -- and so why didn't you meet with
12 Tom just to go over his -- what his answers would
13 be to your questions to find out what he was going
14 to say?
15 A. I already knew what he was going to say.
16 He was going to change that story at trial. I
17 suppose it was going to be.
18 Q. And it was a homicide prosecution, right?
19 Didn't you want it to go well?
20 A. Yes. I prepped all the witnesses but
21 Tom.
22 Q. And Tom was the most important witness,
23 right?
24 A. Yes. The only prep I did was I -- I
25 talked enough to him to where -- you know, about

Page 198

1  the courtroom and -- and the procedure so that I
2  can get an idea if he was comfortable with me
3  asking him questions and stuff like that, but as
4  far as substantively, I don't know. I -- I think
5  Mike might have prepped him, but I don't know for
6  sure.
7  Q. Well, did he talk to Mike about -- Mike
8  Hayes about making sure that Tom was ready for
9  trial?
10 A. No. I didn't ask him to prep Tom.
11 Q. Did you talk to Mike about what Tom would
12 say about, you know, this or that thing?
13    MR. LINDEN: Object to form. You can
14 answer.
15    MR. COX: Join.
16 A. No. We already had all the information.
17 He -- he was either -- how do I put it? Tom was
18 either going to testify what he was going to
19 testify, or he was going to testify differently,
20 and I really didn't know what was going to happen
21 for sure with Tom. Any -- anything could have
22 come out of his mouth, you know, something new,
23 something -- and so I just -- let's just do this,
24 and so -- it wasn't exactly the case that I could
25 -- was going to -- yeah.

Page 199

1  BY MR. AINSWORTH:
2  Q. All right. Sometime after your charging
3  decision in this case, you learned that Cody
4  Bledsoe was alleging, you know, initially that Tom
5  did it, and that -- and that daddy did it, right?
6  A. Right, yes.
7  Q. How did you learn about Cody?
8  A. Law enforcement reports.
9  Q. How did you learn that Cody was saying
10 that daddy did it?
11 A. It came to me through law enforcement.
12 They reported it to law enforcement.
13 Q. Right. And how did you learn from law
14 enforcement?
15 A. I don't -- don't remember. They were
16 always coming over and talking about something, so
17 it --
18 Q. Who is "they"?
19 A. All of the law enforcement officers would
20 come over and talk to me about something. That
21 should have been in a report, but I don't recall.
22 Q. You tried to interview Cody, right?
23 A. Yes. I -- I went to see Cody, not to
24 interview him. I wanted to see what I was dealing
25 -- I wanted to watch him, see how he interfaced

Page 200

1  with people, yes.
2  Q. And -- and in your career have you ever
3  put a witness on under five years of age?
4  A. No.
5  Q. Have you ever put a witness on under ten
6  years of age?
7  A. I don't remember doing it.
8  Q. In any event, in your presence Cody
9  didn't say anything about either Tom or daddy
10 committing the crime, right?
11 A. No. We -- we weren't doing it for
12 something. I was just watching him speak and talk
13 and communicate like that. There wasn't...
14 Q. And you determined that you weren't going
15 to be able to put him on the stand?
16 A. Well, if I would have had to put him on
17 the stand I would have, but I didn't want to.
18 Q. How could you put a 2-year-old on the
19 stand?
20 A. I would have no idea how it would work.
21 Q. You've got two kids, right?
22 A. Yes.
23 Q. They're each two years old at one point.
24 A. The way I remember it. I'm not sure I
25 recall that, but yes.

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604         Suite 101                Suite 305
785-273-3063             Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com      913-383-1131             316-201-1612

Page 233

1  MR. COX: This is Vince Cox.
2  CROSS-EXAMINATION
3  BY MR. COX:
4      Q.  I'm Vince Cox.  Mr. Vanderbilt, I
5  represent Mike Hayes in this case.  I just have a
6  couple of questions for you.
7      Was your decision to drop the charges against
8  Tom Bledsoe and to file charges against Floyd
9  Bledsoe based upon you being indebted to Michael
10 Hayes in any way?
11     A.  No.
12     MR. COX: Those are all the questions I
13 have.  Thank you.
14     MR. LINDEN: I have no questions, but
15 I'll reserve my questions for trial.
16     Russell, do you have any follow-up?
17     MR. AINSWORTH: Briefly I do.
18 REDIRECT-EXAMINATION
19 BY MR. AINSWORTH:
20     Q.  Sir, I'm going to show you your
21 interrogatory answers and just direct you to page
22 17 of your responses, and on that page I'm going
23 to read to you a portion of your answer.  You
24 stated "After Tom presented himself to JCSO with
25 his attorney on November 7, 1999, Tom was

Page 234

1  interviewed by JCSO deputies.  I was not present
2  for those interviews and do not have personal
3  knowledge of any statements he may have made
4  during those interviews.  However, it is my
5  understanding that he made potentially inculpatory
6  statements during those interviews."  Did you hear
7  that, sir?
8      A.  Yes.
9      Q.  Now sir, were you lying when you swore in
10 your interrogatory answers that Tom was
11 interviewed by JCSO deputies on November 7, 1999?
12     MR. LINDEN: Object to form.
13     MR. QUALSETH: Same objection.
14     A.  That's not what that sentence says.  It
15 says "After Tom was presented himself to Jeff --
16 Jefferson -- the JCSO with his attorney on
17 November 27th."
18 BY MR. AINSWORTH:
19     Q.  November 7th.
20     A.  November 7th.  I did not -- yeah.
21     Q.  Yes.
22     A.  No.  I -- he was interviewed for -- he
23 was interviewed after that, and he did make lots
24 of statements during those interviews.  None of
25 those -- none of those interviews were on November

Page 235

1  7th.  That first -- that first qualification there
2  was after Tom presented himself to Jefferson
3  County Sheriff's Office with his attorney on
4  November 7, 1999.  What that statement says is
5  that after November 7, 1999, Tom was interviewed
6  several times, and he was.
7      Q.  You're -- you're trying to now say that
8  what you meant in your interrogatory response was
9  that Tom Bledsoe, and -- and I'm just going to go
10 down a little bit where you -- you wrote -- well,
11 you know where this was going, right?  So you're
12 -- you're saying that when you said on or -- after
13 Tom presents himself to JCSO with his attorney on
14 November 7, 1999, Tom was interviewed by JCSO
15 deputies?
16     A.  Yes.
17     Q.  You're saying -- and you're referring to
18 the interviews done by Carreno -- by law
19 enforcement personnel after November 7th, right?
20     A.  Yes.
21     Q.  Okay.  So then those --
22     A.  That's why it's plural with "interviews."
23 There's lots of them.
24     Q.  Yeah.
25     A.  And so --

Page 236

1      Q.  So take a look, Mr. Vanderbilt.  Why does
2  the next paragraph say, "I recall that Tom was
3  interviewed by JCSO deputies on additional
4  occasions"?  And -- and while you're thinking
5  about how to answer that question, also tell us --
6      A.  No, I'm not going to do that.  I'm going
7  answer your question.
8      Q.  All right.  Answer my question, sir.
9      A.  That's referring to all kinds of times
10 that he was spoken to.  I don't understand --
11     Q.  Right.
12     A.  I don't understand what the issue is
13 here.
14     Q.  Okay.  So let's -- we can look at the
15 Bates numbers for those conversations, but those
16 Bates numbers for those other, you know, JC17815,
17 JC17828, and JC17716, these refer to the
18 interviews conducted by JCSO deputies that are
19 documented.  Do -- do you understand that, sir?
20     A.  Yes.
21     Q.  And this paragraph, the one that begins
22 "After Tom presents himself to JCSO with his
23 attorney on November 7, 1999," there's no Bates
24 numbers referenced for that interview, right?
25     MR. NORTON: Object to the form of the

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street         6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604            Suite 101                   Suite 305
785-273-3063                Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com         913-383-1131                316-201-1612