# ROBERT L. POPPA

### Page 1

```
IN THE UNITED STATES DISTRICT COURT
    FOR THE DISTRICT OF KANSAS


FLOYD BLEDSOE,
    Plaintiff,

    vs.                Case No. 2:16 CV 02296

JEFFERSON COUNTY, KS, et al.,
    Defendants.


            DEPOSITION OF
            ROBERT L. POPPA,
taken on behalf of the Plaintiff, pursuant to
Amended Notice of Deposition, beginning at 9:35
a.m. on the 21st day of February, 2023, at the
offices of Appino & Biggs Reporting Service, 5111
S.W. 21st Street, in the City of Topeka, County of
Shawnee, and State of Kansas, before Barbara J.
Hoskinson, Certified Court Reporter, Kansas
License No. 0434 and Missouri License No. 999.
```

### Page 2

```
            APPEARANCES


ON BEHALF OF THE PLAINTIFF:

    Ms. Ruth Brown (video conference)
    Loevy & Loevy
    311 N. Aberdeen St. 3rd Floor
    Chicago, Illinois, 60607
    312-243-5900
    ruth@loevy.com


ON BEHALF OF THE DEFENDANTS FROST, CARRENO,
HERRIG, POPPA & JEFFERSON COUNTY:

    Mr. Eric Turner
    Foulston Siefkin, LLP
    7500 College Boulevard, Suite 1400
    Overland Park, Kansas, 66210
    913-498-2100
    eturner@foulston.com
```

### Page 3

```
    Mr. Michael J. Norton
    Foulston Siefkin, LLP
    1551 N. Waterfront Pkwy, Suite 100
    Wichita, Kansas, 67206
    316-267-6371
    mnorton@foulston.com


ON BEHALF OF THE DEFENDANT VANDERBILT:

    Mr. Patric S. Linden
    Case Linden, PC
    2600 Grand Blvd., Suite 300
    Kansas City, Missouri, 64108
    816-979-1500
    patric.linden@caselinden.com
```

### Page 4

```
ON BEHALF OF DEFENDANTS MORGAN, WOODS,
JOHNSON ESTATE:

    Mr. Shon D. Qualseth
    Assistant Attorney General
    120 SW 10th Ave, 2nd Floor
    Topeka, Kansas, 66612
    785-368-8424
    shon.qualseth@ag.ks.gov


ALSO PRESENT:

    Mr. Michael Hayes (video conference)
    Mr. Brett Knapp Videographer
```

Appino & Biggs Reporting Service, Inc.
5111 SW 21st Street, Topeka, KS 66604, 785-273-3063, www.appinobiggs.com
6420 W. 95th Street, Suite 101, Overland Park, KS 66212, 913-383-1131
800 E. 1st Street, Suite 305, Wichita, KS 67202, 316-201-1612
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

EXHIBIT 6

Page 73

1    MR. TURNER: Object to form.
2    A.  The sheriff said that to Mike Hayes.
3    BY MS. BROWN:
4    Q.  Sheriff said that to Mike Hayes, okay.
5    A.  Yes.
6    Q.  Okay and, what was said next?
7    A.  Excuse me?
8    Q.  What happened next?
9    A.  I really don't remember. I just know
10   that he was mad. He went out and started yelling
11   at Mike Hayes, is this -- did you kill that girl,
12   and I do remember that 'cause he was mad and
13   yelling and I don't, I don't remember if they came
14   in the conference room or they went into the
15   evidence -- the interview room, I'm not sure.
16   Q.  Okay, and that was Sheriff Dunnaway, Tom
17   Bledsoe and Mike Hayes, correct?
18   A.  Yes.
19   Q.  Okay. Was Jim Vanderbilt in the
20   conference room with you?
21   A.  The notes here said he was, but I don't
22   remember -- I really don't remember who was in the
23   conference room, to tell you the truth. It's been
24   too long.
25   Q.  You don't remember Vanderbilt being in

Page 74

1    the hallway during that altercation between
2    Sheriff Dunnaway and Mike Hayes and Tom Bledsoe,
3    do you?
4    A.  No, ma'am, I do not.
5    Q.  Okay, so, during this -- by 1138 hours
6    when you were at the conference room and you had
7    been briefed on the investigation so far, fair to
8    say that you had been briefed that Tom Bledsoe had
9    admitted to being involved?
10   A.  Yes, I'm sure I was.
11   Q.  Okay, and you had been advised during the
12   briefing that the victim was in a field with a
13   bullet to the head, correct?
14   A.  I believe so.
15   Q.  Okay, and that was from -- the briefing
16   was by Sheriff Dunnaway, correct?
17   A.  I'm sure, yes.
18   Q.  Okay, and that had occurred by 1138
19   hours, correct?
20   A.  What had? That he had told me this, is
21   that what you're saying?
22   Q.  Yes.
23   A.  Yes, yes.
24   Q.  Did you ask any questions during the
25   briefing?

Page 75

1    A.  To who?
2    Q.  To Sheriff Dunnaway or any other law
3    enforcement officers.
4    A.  I may have, but I don't remember what
5    they would have been.
6    Q.  Okay. Did you ask any questions to Mike
7    Hayes or Tom Bledsoe?
8    A.  No, I would not have talked to them.
9    Q.  You were never in the same room as Tom
10   Bledsoe and Mike Hayes on, at the Law Enforcement
11   Center on the evening of November 7th?
12   A.  Not that I remember.
13   Q.  Did you take notes, your own notes on the
14   briefing?
15   A.  No.
16   Q.  Why is that?
17   A.  It was just a briefing. I was talking
18   about the case.
19   Q.  Okay, and you figured somebody else was
20   documenting the important events of that evening,
21   correct?
22   A.  I would have thought so.
23   Q.  Okay. When you arrived at the Law
24   Enforcement Center Roy Dunnaway, Jim Woods, Jim
25   Vanderbilt, Mike Hayes were already present,

Page 76

1    correct?
2    A.  I remember me, Roy, then Mike Hayes and
3    Tom coming in. Whoever else was in the conference
4    room, ma'am, I cannot remember.
5    Q.  Okay, let's take a look at Exhibit 100.
6    A.  Okay.
7    Q.  Okay, and go down to the page that's
8    marked JC2006.
9    A.  Okay.
10   Q.  Can you see that on my screen as well?
11   A.  Yes.
12   Q.  Okay, do you see the very last two
13   sentences there? It says, "I can't remember the
14   exact time Sheriff Dunnaway called me, I know it
15   was before 11 p.m., and told me that Camille had
16   been murdered. I went to the Law Enforcement
17   Center. Sheriff Dunnaway, KBI agent Jim Woods,
18   Jim Vanderbilt, attorney Mike Hayes were present."
19   Do you see that?
20   A.  Yes.
21   Q.  Okay, and so does that refresh your
22   recollection that when you got to the Law
23   Enforcement Center Dunnaway, Woods, Vanderbilt and
24   Hayes were already present?
25   A.  If that's what I wrote in my report then

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

Page 77

1  it would be correct.
2      Q.  Okay.  Did anyone else present
3  information at the briefing other than Sheriff
4  Dunnaway?
5      A.  Excuse me?  I'm sorry, I didn't hear you.
6      Q.  At the briefing that took place in the
7  Law Enforcement Center on the night of November
8  7th did anyone else present information other than
9  Sheriff Dunnaway?
10     A.  I don't recall.  I don't remember.
11     Q.  Okay, you don't recall one way or
12 another?
13     A.  Excuse me?
14     Q.  You don't recall one way or another
15 whether or not anyone else other than Sheriff
16 Dunnaway presented information during the
17 briefing?
18     A.  Right.  I have no idea who did.
19     Q.  Okay.  After receiving the briefing from
20 Sheriff Dunnaway you remained at the Law
21 Enforcement Center for some time before heading to
22 the dump behind Tom's house, right?
23     A.  Yes.
24     Q.  Okay, what did you do during that time?
25     A.  The time that I was there at the LEC, Law

Page 78

1  Enforcement Center?
2      Q.  Yes.
3      A.  Ma'am, I don't remember.
4      Q.  Okay.  Were you just in the conference
5  room with a, you know, group of law enforcement
6  officers?
7      A.  I'm sure I -- yes, I was there.
8      Q.  Okay, and where was Roy Dunnaway during
9  that time?
10     A.  I'm not, I'm not sure.
11     Q.  Okay, where was Tom Bledsoe?
12     A.  I'm not sure.  I'm not sure --
13     Q.  Where was --
14     A.  I'm not sure if he went into the
15 interview room when he came down the hallway or
16 into the conference room, I don't remember.
17     Q.  Okay.  So, it's possible that Tom and
18 Mike Hayes and Sheriff Dunnaway went into an
19 interview room and an interview was conducted that
20 you were not part of, correct?
21     A.  No, I don't know if Roy would be the one
22 interviewing Tom.  Only one I saw interviewing Tom
23 was Randy Carreno.
24     Q.  Okay.  Okay, so, is it possible that
25 Randy Carreno was interviewing Tom and Mike Hayes

Page 79

1  at the conference center on November 7th?
2      A.  I'm not sure what day it was, but I know
3  that Randy did interview him with Mike Hayes
4  'cause I walked in and saw it on the TV camera in
5  the conference room.  There's a camera inside the
6  interview room and there's a TV inside the
7  conference room where you can watch the interview.
8      Q.  Okay.  So, you observed through a video
9  feed an interview that Randy Carreno was carrying
10 out of Tom Bledsoe, is that correct?
11     A.  Yes.
12     Q.  Okay.  Can you orient me in time to when
13 that interview was occurring?  Was it the night of
14 November 7th or was it, you know, a few days
15 after?  When was that?
16     A.  I, I really don't remember which day it
17 was.  It should be in Randy's report I would
18 think.
19     Q.  Okay.  But it was within -- fair to say
20 it was within a, you know, couple days of November
21 7th?
22         MR. TURNER:  Object to form.
23     A.  I'm not sure what day it was on, ma'am.
24 BY MS. BROWN:
25     Q.  Well, was it weeks later?

Page 80

1      A.  No, I believe it was the day he came in.
2      Q.  Okay.
3      A.  When Mike brought him in.
4      Q.  Okay, and, so, there was a video feed on
5  you could see an interview and what do you recall
6  Tom Bledsoe saying during that interview?
7      A.  The only thing I remember Tom saying to
8  Randy was that he had had sex with the family dog
9  and Mike Hayes looking up at the camera like he
10 was looking at us and that's pretty much all I
11 really watched of it.
12     Q.  Okay.  Do you recall Tom being questioned
13 by Randy Carreno about, you know, the murder of
14 Camille?
15     A.  I'm sure that's why he was in there, yes,
16 I know.
17     Q.  Okay, so, that was the substance of the
18 interview, you just don't remember the details --
19     A.  Yes.
20     Q.  -- fair to say?
21     A.  Yes.
22     Q.  Okay, and can you give us just a ballpark
23 estimate, I know it's not going to be exact after
24 all these years, but just a ballpark estimate of
25 how long this interview occurred that you remember

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

Page 185

1 one point he was a captain over patrol, but I
2 can't remember when that was.
3    Q.  Okay, but regardless, he was senior to
4 you, is that right?
5    A.  Yeah.  He always has been, yes.
6    Q.  Okay.  Can you describe what your
7 relationship was with Troy Frost back in the 1999-
8 2000 time frame?
9    A.  When I first started Troy Frost was a
10 patrolman and then Troy Frost was promoted to
11 detective, so, we were friends but we didn't go to
12 each other's homes or drink beers together or
13 anything like that.  Other than --
14    Q.  Back in --
15    A.  -- each other at work.
16    Q.  Okay, got it.  Back in 1999 when the
17 Arfmann homicide investigation began was Troy
18 Frost more senior than you at that time?
19    A.  Yes.  In this case he would be.
20    Q.  Okay.  What about, can you describe your
21 relationship with Mike Hayes in the 1999 to 2000
22 time frame?
23    A.  Mike -- when I worked in Jackson County
24 Mike Hayes was the county attorney for Jefferson
25 and Jackson County, so, I only know Mike Hayes

Page 186

1 from giving him cases as a prosecutor.
2    Q.  Okay.
3    A.  We got along okay.  We did not go to each
4 other's homes or socialize.
5    Q.  Okay, but you investigated cases that
6 were prosecuted by Mike Hayes when he was the
7 Jefferson County attorney?
8    A.  Yes, uh-huh.
9    Q.  And you investigated cases that were
10 prosecuted by Mike Hayes when he was the Jackson
11 County attorney?
12    A.  Yes.
13    Q.  Okay.  All right, when is the last time
14 that you spoke with any law enforcement officers
15 about the Arfmann case other than -- outside the
16 presence of your counsel?
17    A.  It's been a long time.  Would have been
18 -- told them there'd been a lawsuit filed against
19 me and that's about all I knew to tell them
20 really.
21    Q.  Okay.  And did you talk to any of the
22 defendants in this case about the lawsuit?
23    A.  No.
24    Q.  Okay.  As you sit here today do you have
25 any regret about any of your conduct during the

Page 187

1 Arfmann homicide investigation?
2    A.  Oh, that's a hard question.  My only
3 regret is probably getting involved to start with.
4    Q.  And why is that?
5    A.  Because it come to this.
6    Q.  Okay.  So, you have regret because of the
7 personal impact that the lawsuit could have on
8 you?
9    A.  Yes.
10    Q.  Do you have any regret that Floyd was
11 incarcerated for around 15 years for a crime that
12 his brother ultimately claimed responsibility for
13 in a suicide note?
14    A.  Well, I don't know if Floyd did it or
15 not.  I haven't seen all the evidence or heard all
16 the evidence to make a decision whether he is
17 innocent or guilty.
18    Q.  Have you made a decision as to whether
19 you think Tom is innocent or guilty?
20    A.  No.  I believe that Tom did what he said
21 he did.
22    Q.  What do you mean by that?
23    A.  In the suicide note.
24    Q.  So, you believe that Tom killed Camille
25 Arfmann?

Page 188

1    A.  He said he did.
2    Q.  Okay, and you believe that's what he did,
3 right?
4    A.  Yes.
5    Q.  Okay.  Do you have any concerns about the
6 actions of any of your fellow officers during the
7 Arfmann investigation?
8    A.  No.  Like I said, I really wasn't the one
9 in charge and as far as their actions go, that
10 wasn't anything I could control, so, no.
11    Q.  Do you think your fellow officers
12 conducted a fair investigation?
13    A.  As fair as they thought they were -- I
14 believe 100 percent they believed they had the
15 right man at the time they did it.
16    Q.  Okay.  So, you think that they, their
17 actions were justified by the fact that they
18 thought that Floyd was the killer, am I
19 understanding --
20    A.  Yes, I believe they believed 100 percent
21 that Floyd was the killer.
22    Q.  Okay, and they had no doubt in their mind
23 that Floyd was the killer and, so, they proceeded
24 against Floyd, fair?
25    A.  Fair.