# JOEL RANDY CARRENO

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FLOYD BLEDSOE,
   Plaintiff,

vs.           Case No. 2:16 CV 02296

JEFFERSON COUNTY, KS.,
et al.,
   Defendants.

VIDEOTAPED DEPOSITION OF
JOEL RANDY CARRENO,
taken on behalf of the Plaintiff, pursuant to
Notice to Take Deposition, beginning at 9:35 a.m.
on the 1st of February, 2023, at the office Appino
& Biggs Reporting Service, Inc., in the City of
Topeka, County of Shawnee, and State of Kansas,
before Douglas R. Stone, RPR, Kansas CCR No. 1518,
Missouri CCR No. 1035.

## Page 2

APPEARANCES

ON BEHALF OF THE PLAINTIFF:

   Mr. Russell Ainsworth (Via teleconference)
   Ms. Ruth Brown (Via teleconference)
   Loevy & Loevy
   311 N. Aberdeen Street, 3rd Floor
   Chicago, Illinois 60607
   312-243-5900
   russell@loevy.com
   ruth@loevy.com

ON BEHALF OF DEFENDANTS JEFFERSON COUNTY,
KANSAS, RANDY CARRENO, TROY FROST,
ROBERT POPPA, AND JEFFREY HERRIG:

   Mr. Michael J. Norton
   Foulston, Siefkin, L.L.P.
   1551 N. Waterfront parkway, Suite 100
   Wichita, Kansas 67206
   316-267-6371
   mnorton@foulston.com

## Page 3

   Mr. Eric Turner
   Foulston Siefkin, L.L.P.
   7500 College Blvd., Suite 1400
   Overland Park, Kansas 66210
   913-498-2100
   eturner@foulston.com

ON BEHALF OF DEFENDANTS KANSAS BUREAU
OF INVESTIGATIONS, JAMES WOODS,
TERRY MORGAN, ESTATE OF GEORGE JOHNSON:

   Mr. Shon D. Qualseth
   Attorney General's Office
   120 Southwest 10th Avenue
   Memorial Building, Room 200
   Topeka, Kansas 66612
   785-296-2215
   shon.qualseth@ag.ks.gov

## Page 4

ON BEHALF OF DEFENDANT MICHAEL HAYES:

   Mr. Vincent M. Cox (Via teleconference)
   Cavanaugh, Biggs & Lemon, P.A.
   3200 S.W. Huntoon
   Topeka, Kansas 66604
   785-440-4000
   vcox@cavlem.com

ON BEHALF OF DEFENDANT JAMES VANDERBILT:

   Mr. Patric S. Linden
   Case Linden, P.C.
   2600 Grand Blvd., Suite 300
   Kansas City, Missouri 64108
   816-979-1500
   patric.linden@caselinden.com

ALSO PRESENT:
   Ms. DeeDee Wynn (Via teleconference)
   Ms. Maria Makarn (Via teleconference)
   Mr. Michael Hayes (Via teleconference)
   Mr. Brett Knapp, Videographer

Appino & Biggs Reporting Service, Inc.
5111 SW 21st Street, Topeka, KS 66604, 785-273-3063
6420 W. 95th Street, Suite 101, Overland Park, KS 66212, 913-383-1131
800 E. 1st Street, Suite 305, Wichita, KS 67202, 316-201-1612
www.appinobiggs.com
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

EXHIBIT 8

Page 181

1 fingers at each other so I didn't get the response
2 I wanted.
3     Q.  So I'm to understand that you're
4 conducting a interview with Floyd Bledsoe about a
5 homicide, right?
6     A.  Right.
7     Q.  And at this point was Tom -- Tom still
8 incarcerated in the jail on the 12th?
9     A.  I don't recall.
10    Q.  In any event, unbeknownst to you Tom and
11 Mike Hayes walked down the hall to the very
12 interrogation room where your -- where you've got
13 Floyd, right?
14    A.  Correct.
15    Q.  And then they knock on the door --
16    A.  I don't know if they did.  There was a
17 knock at the door.
18    Q.  Okay.  Somebody knocked on the door?
19    A.  Correct.
20    Q.  And you -- did you answer the door?
21    A.  I did.  Yes.
22    Q.  And who was in the -- who was in the
23 interrogation with you and Floyd at that time?
24    A.  I -- I don't recall.
25    Q.  Well, actually, do you remember Special

Page 182

1 Agent Johnson being present with you?
2     A.  During that time?
3     Q.  Yes.  At that time.
4     A.  I think they were getting -- based on
5 what you're stating and based on what I remember
6 we are getting -- or I am getting confused with
7 the interviews.  You're talking about the
8 interview on the 12th where Mike and Tom came in,
9 then your talking about the polygraph where Mike
10 came in, is that correct?
11    Q.  Well, let me see if I can orient you,
12 although it's not really worth it for question.
13 But after the polygraphs you conducted an
14 interview with Floyd, right?
15    A.  With Floyd.  Yes.
16    Q.  Yes.
17    A.  Posttest interview.  Correct.
18    Q.  And then during that interview with Floyd
19 Special Agent Johnson joined you in that
20 interview, and then Tom and Floyd -- Tom and Mike
21 Hayes came into the room?
22    A.  Okay.  You said joined me.  I don't
23 recall Agent Johnson ever leaving.  I don't recall
24 he ever leaving the interview room.
25    Q.  Let me just show you -- okay.  So Exhibit

Page 183

1 10, page 21.  There's a reference that you
2 interviewed Floyd Bledsoe -- F. Bledsoe, see that?
3 Yes?
4     A.  Where's that at again?
5     Q.  Sorry.  The third paragraph on page 21 of
6 Exhibit 10.  I interviewed Floyd S. Bledsoe
7 underlined?
8     A.  Correct.
9     Q.  Going on to page 22 of Exhibit 10.  It
10 says during that time KBI Special Agent George
11 Johnson entered the interview room.  Do you see
12 that?
13    A.  Yes.
14    Q.  Okay.  In any event, there's a knock at
15 the door, you answer the door, correct?
16    A.  Right.  But I -- I want to make sure that
17 you understand what I'm saying.  I don't recall
18 that knock on the door being the same time -- the
19 same date in which Floyd took the polygraph test.
20 I --
21    Q.  Well, on how many occasions did Tom
22 confront Floyd?
23    A.  To the best -- I don't know.  But in
24 answering that, to the best of my knowledge I want
25 to say twice, but I don't know if that's correct.

Page 184

1     Q.  You're just guessing?
2     A.  It's more than a guess.  I don't know.  I
3 don't remember.  I don't remember.
4     Q.  All right.  Well, the second time that
5 Tom confronted Floyd, was that planned?
6         MR. TURNER:  Object to form.
7     A.  No.  And if it was, I had -- then no.  I
8 didn't have any knowledge of that.
9         BY MR. AINSWORTH:
10    Q.  So you're saying that on two different
11 occasions Tom confronted Floyd in -- during one of
12 your interviews with Floyd at the law enforcement
13 center without you having any knowledge that it
14 was going to happen.
15        MR. TURNER:  Object to the form.
16        MR. NORTON:  Misstates the evidence.
17    A.  I will state that I know that there was
18 one encounter to where Tom and Floyd were in the
19 same room at the same time, and during that time
20 Mike Hayes was in the interview.  Now, was that
21 the same day that there was a knock on the door, I
22 don't remember.
23        BY MR. AINSWORTH:
24    Q.  Well, in any event, when you had -- when
25 the incident where Tom and Mike Hayes were in the

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# JOEL RANDY CARRENO

### Page 185

1  room with you and Floyd at the law enforcement
2  center during one of your interviews with Floyd,
3  was that planned?
4      A.  No.  No.
5      Q.  Okay.  So how did you first get alerted
6  that Tom and Mike Hayes were going to join you?
7      A.  His mere presence.
8      Q.  When you say his mere presence, you mean
9  a knock at the door and you answering?
10     A.  I don't know if I had the interview room
11  door open or closed.  But I do know this, from the
12  conference room to the interview room it's --
13  there's a door in between and it's secured.  And
14  you have to have a fob in order to enter the area
15  in which I was conducting the interview.  I don't
16  know who used their fob to let them in.
17     Q.  But because it's a secure area somebody
18  had to let Hayes into the area where you were
19  conducting the interview with Floyd, right?
20     A.  Absolutely.  Yes.
21     Q.  And to this day you don't know who it was
22  who orchestrated Hayes and Tom getting to the
23  interview room door.
24         MR. NORTON:  Object to form.
25         MR. COX:  Object to form -- or join.

### Page 186

1      A.  No.
2  BY MR. AINSWORTH:
3      Q.  And in your post interview, you know,
4  huddle where you guys talk about what happened
5  during the interview, you didn't ask anybody how
6  did Hayes and Tom come to be in the interview
7  room?
8      A.  No.
9      Q.  And nobody told you that they were the
10  ones who said -- sent Hayes and Tom into the
11  interview room?
12     A.  I'm going to say, no, and I don't recall.
13     Q.  Hayes used to be the prosecutor of
14  Jefferson County, is that right?
15     A.  That is correct.
16     Q.  And he was the prosecutor when you were
17  deputy there?
18     A.  Yes.
19     Q.  The prosecutor has a fob to get into the
20  building, right?
21     A.  Nuh-uh.  Well, let me back up.  The
22  prosecutor today would not have a fob.  And, no.
23  He would not have had a fob.  No.
24     Q.  All right.  And so did you have any
25  conversations with Michael Hayes before your

### Page 187

1  interview with Floyd on November 12th about what
2  Tom's version was?
3      A.  No.  I -- I didn't need to based on the
4  fact that every time that I interviewed Tom, Mike
5  was present as his attorney.
6      Q.  I'm just going to remind you one more
7  time that as -- you know, based on your report,
8  and just only going off of your report, I don't
9  know what happened, but according to your report
10  you didn't interview Tom until November 24th the
11  day before Thanksgiving.  Okay.  Do you understand
12  that?
13     A.  I hear you.  Yes.
14     Q.  So it's possible you talked to Tom before
15  then but then that would be documented in your
16  report, and so my question is, before November
17  12th, your interview with Floyd on the afternoon
18  of November 12th, did you have any conversations
19  with Mike Hayes about what Tom was saying?
20         MR. TURNER:  Object to form.
21     A.  The only contact that I recall having
22  with Mike was either in the parking lot at the
23  sheriff's department and/or out at the crime scene
24  to where Camille was buried, and I don't recall
25  which location.  But either way, Mike wanted to

### Page 188

1  look at -- my -- my clock inside of my vehicle to
2  make sure that daylight savings time had to have
3  been around the corner and just happened or
4  whatever, and I told him to get the hell away from
5  my vehicle.  So I don't know when that contact
6  was.
7      Q.  Was it the week that Camille's body was
8  recovered?
9      A.  I -- I don't recall.
10     Q.  Was this in a different year like 1988 or
11  -- or 1997 or 1998?
12     A.  I'm not for sure what you're asking, sir.
13     Q.  I mean, the conversation you had with
14  Mike Hayes where he was asking to look in your
15  car, it was around the time of the Arfmann
16  homicide --
17     A.  It was, yes.
18     Q.  Why did you tell him to get the hell away
19  from your vehicle?
20     A.  That it -- why did I tell -- because I
21  meant it.  Get the hell away from my vehicle.  I
22  know what the hell my clock says.  I don't know
23  what to you -- for you to take a look at it.  I
24  knew what it showed and it was correct.  So it
25  was, like, get the hell away from me.  I -- I

Page 221

1  standing out there. He was standing behind Mike.
2      Q. Okay. So you may have seen Tom, you may
3  not have seen Tom, is that what you're saying?
4      A. I don't remember seeing him out in the
5  hallway. Mike was standing right at the doorway
6  and Tom was with him. Tom was with him.
7      Q. All right. So you saw Tom with Mike, is
8  that right?
9      A. Not -- when he knocked on the door and I
10 opened the door there was Mike Hayes. He walked
11 in, and directly behind him was Tom.
12     Q. So before he walked in you opened the
13 door, and then did you say can I help you, or what
14 do you want, or I'm doing an interrogation here,
15 you can get out of here. What did you say to Mike
16 and Tom?
17     A. I don't know --
18        MR. NORTON: Object -- hang on, hang on.
19 Object to form. Go ahead.
20        THE WITNESS: I don't know that I said
21 anything to them in regard to what you just made
22 reference to. I can tell you this, I -- I know
23 what my thoughts were. I still remember that.
24 BY MR. AINSWORTH:
25     Q. What were your thoughts?

Page 222

1      A. From where I was at during the
2  investigation I was not getting anywhere or where
3  I wanted to be, And I thought -- I remember
4  thinking, well, this might be my chance to be able
5  to hear somebody say it was me. And that didn't
6  happen.
7      Q. I'm -- my confusion -- and it's only on
8  my part, I assure you. This isn't confusing to
9  you as a police officer. But my confusion is as a
10 lay person is that it seems that when you've got a
11 person who tells you your victim is buried and on
12 their property, having been shot in the head with
13 their gun and admits involvement, what -- what
14 more were you looking for with regard to Tom's
15 culpability for the murder that you didn't have?
16     A. And I'm speaking for myself. I'm not
17 speaking for anybody else. I would have liked to
18 have had --
19        THE REPORTER: Repeat that. Like to have
20 had what?
21        MR. AINSWORTH: And -- and I shot her.
22        THE WITNESS: And I shot her.
23 BY MR. AINSWORTH:
24     Q. And so when you saw Tom and Mike Hayes at
25 the door you saw an opportunity for your

Page 223

1  investigation, right?
2      A. That's correct.
3      Q. Because you thought maybe I can talk to
4  Tom now. Up to this point I haven't been able to
5  talk to Tom, maybe Tom can give me a missing piece
6  and tell me I shot her, right?
7         MR. NORTON: Object to the form.
8      A. My thought was -- my thought was now we
9  have the two people that I was concentrating on in
10 the same room, and in hopes that one of the two
11 would have said I shot her, that was my hope.
12 That's what I wanted.
13 BY MR. AINSWORTH:
14     Q. And so you assumed that Tom and Mike
15 Hayes were there because they wanted to confront
16 Floyd? Was that what you were thinking?
17     A. That's what ended up happening. I don't
18 know what their purpose was to come into the
19 interview room.
20     Q. And so you asked zero questions of either
21 Mike or Tom about why they were there, how they
22 got there, or anything about their presence?
23     A. I don't recall --
24     Q. Right.
25     A. -- any conversation with anybody. I just

Page 224

1  don't recall that type of conversation.
2      Q. So that was a security breach for them to
3  be in that location where they were, right?
4         MR. NORTON: Object to form.
5      A. A security breach? I -- and I don't know
6  who let them in, but they were let in by, let's
7  just say, the sheriff. I don't know that I could
8  constitute that as being a security breach.
9  BY MR. AINSWORTH:
10     Q. And no law enforcement personnel was with
11 Mike Hayes when you saw him outside your door,
12 right?
13     A. When I opened the door, that is correct.
14     Q. Did you see any other law enforcement
15 officer, you know, at any point when the door was
16 open and Mike and Tom were coming in?
17     A. No. And I would not have been able to.
18     Q. Have you viewed the tape of this portion
19 of Floyd Bledsoe's interview?
20     A. Yeah. I know -- yes.
21     Q. All right. Let's show you Exhibit 10,
22 that same page, 23. After Tom and Mike enter the
23 interview room it says Floyd S. Bledsoe denied in
24 the presence of his brother Tom Bledsoe that they
25 had contact with him on Saturday between one and

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612