## Page 1

```
 1 .
 2       IN THE UNITED STATES DISTRICT COURT
 3            FOR THE DISTRICT OF KANSAS
 4 .
 5 .
 6 FLOYD S. BLEDSOE,
 7      Plaintiff,
 8 .
 9   vs.           Case No. 2:16 CV 02296
10 .
11 JEFFERSON COUNTY, KS, et al.,
12      Defendants.
13 .
14 .
15              DEPOSITION OF
16            FLOYD SCOTT BLEDSOE, Jr.,
17 taken on behalf of the Defendants, pursuant to
18 Notice of Deposition, beginning at 9:35 a.m. on
19 the 5th day of April, 2023, at the offices of
20 Foulston Siefkin, LLP, 1551 North Waterfront
21 Parkway, Suite 100, in the City of Wichita, County
22 of Sedgwick, and State of Kansas, before Barbara
23 J. Hoskinson, Certified Court Reporter, Kansas
24 License No. 0434 and Missouri License No. 999.
25 .
```

## Page 2

```
 1              APPEARANCES
 2 .
 3 .
 4 ON BEHALF OF THE PLAINTIFF:
 5 .
 6    Ms. Ruth Brown
 7    Loevy & Loevy
 8    311 N. Aberdeen St. 3rd Floor
 9    Chicago, Illinois, 60607
10    312-243-5900
11    ruth@loevy.com
12 .
13 .
14 ON BEHALF OF DEFENDANTS MORGAN,
15 Woods, JOHNSON ESTATE:
16 .
17    Mr. Shon Qualseth
18    Assistant Attorney General
19    120 SW 10th Ave, 2nd Floor
20    Topeka, Kansas, 66612
21    785-368-8424
22    shon.qualseth@ag.ks.gov
23 .
24 .
25 .
```

## Page 3

```
 1 ON BEHALF OF DEFENDANT HAYES:
 2 .
 3    Mr. Vincent M. Cox
 4    Cavanaugh, Biggs & Lemon, PA
 5    3200 SW Huntoon Street
 6    Topeka, Kansas, 66604
 7    785-440-4000
 8    vcox@calemon.com
 9 .
10 .
11 ALSO PRESENT:
12 .
13    Mr. Michael Hayes (video conference)
14 .
15 .
16 .
17 .
18 .
19 .
20 .
21 .
22 .
23 .
24 .
25 .
```

## Page 4

```
 1                 INDEX
 2 .
 3 .
 4 Certificate----------------------------- 160
 5 .
 6 .
 7               WITNESS
 8 ON BEHALF OF DEFENDANTS:              PAGE
 9 FLOYD SCOTT BLEDSOE, Jr.
10 Direct-Examination by Mr. Qualseth       5
11 Cross-Examination by Mr. Cox           116
12 Redirect-Examination by Mr. Qualseth   154
13 .
14 .
15              EXHIBITS
16 DEPO EXHIBIT NO.:                   MARKED
17 No 400  Second Amended Complaint        5
18 No 401  Article by Candice Pires        5
19 No 402  Plaintiff's First Amended
20         Response to Hayes' First
21         Set of Interrogatories        134
22 PREVIOUSLY MARKED:
23 No 56  Copy of Memo notebook
24 .
25 .
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

EXHIBIT 11

## FLOYD SCOTT BLEDSOE, JR.

### Page 93

1 morning. I don't remember the exact time.
2    Q. And that's okay, I'm not asking you for
3 an exact time. Was Randy Carreno with you during
4 the afternoon of November, November 6, 1999?
5    A. Yes.
6    Q. How much of the afternoon?
7    A. It was several hours, if I recall
8 correctly. Once again, I can't -- 25 years ago,
9 you know.
10    Q. I understand. Were you with Randy
11 Carreno the evening of November 6th, 1999?
12    A. I believe I was. I don't remember what
13 time he dropped me off.
14    Q. Was it dark out?
15    A. Honestly, I don't remember. You -- I
16 mean, as near as I can remember, Randy testified
17 and I have no reason to dispute what time he
18 dropped me off.
19    Q. You understand, I realize it's been 20
20 some years.
21    A. Yes.
22    Q. And -- but I don't know what you remember
23 and what you don't.
24    A. Right.
25    Q. Some people remember things very

### Page 94

1 vividly --
2    A. Right.
3    Q. -- and I don't know what you remember.
4    A. I mean, if you have, you know, Randy
5 Carreno's testimony I'll review it and, you know,
6 be able to tell you clearer, you know, or any of
7 these peoples' testimony and say yeah or nay.
8 It's just I don't remember.
9    Q. But that's, that's an accurate statement,
10 you were with Randy Carreno at times throughout
11 that day?
12    A. Yes.
13    Q. Turn to paragraph 48 on page 9 of Exhibit
14 400. It states, "Several days after Tom's arrest
15 defendant Hayes, defendant Vanderbilt, and/or
16 other unknown defendants held a meeting to put
17 into action their scheme to fabricate Tom's
18 testimony." Where was that meeting held?
19    A. I have no personal knowledge.
20    Q. Do you know the basis for that claim?
21    A. I have no personal knowledge outside of
22 client-attorney privilege.
23    Q. Well, I mean, this isn't privileged, I
24 mean this statement. This is a public document.
25 It's got to be based on something, doesn't it?

### Page 95

1    A. It is.
2    Q. And it's based on your personal
3 knowledge, correct?
4    A. No.
5    Q. So, you don't know anything about a
6 meeting?
7    A. I didn't have -- in 1999 and 2000 I did
8 not have personal knowledge of this.
9    Q. When did you gain personal knowledge of
10 this allegation?
11    A. While --
12       MS. BROWN: And you can only testify to
13 the extent that you can do so --
14       THE WITNESS: Right.
15       MS. BROWN: -- based on personal
16 knowledge independent of your counsel.
17    A. Right. I don't have anything outside of
18 my attorneys.
19 BY MR. QUALSETH:
20    Q. Fair enough, but when did you obtain the
21 knowledge that's the basis of the claim in
22 paragraph 48? I'm asking you when.
23    A. I don't remember exactly when it was
24 brought to my attention.
25    Q. Were you in prison still?

### Page 96

1    A. No.
2    Q. So, it was after you were released in
3 December of 2015 --
4    A. Yes.
5    Q. -- that you got knowledge of this
6 meeting, correct?
7    A. Yes.
8       MS. BROWN: Okay, and I'm not going to
9 allow any further testimony that might reveal
10 attorney-client privileged information.
11       MR. QUALSETH: Again I've not been asking
12 about it.
13       MS. BROWN: Okay.
14 BY MR. QUALSETH:
15    Q. So, you're claiming at this meeting
16 defendant Hayes was there, is that correct?
17    A. Who all was there I do not know.
18    Q. But a meeting was held?
19    A. Yes.
20    Q. Where was it held?
21    A. Once again, I have no personal knowledge.
22    Q. Do you know what was said at that
23 meeting?
24    A. I have no personal knowledge 'cause I was
25 not there.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street           6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604              Suite 101                    Suite 305
785-273-3063                  Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com           913-383-1131                 316-201-1612

# FLOYD SCOTT BLEDSOE, JR.

Page 97

1  Q. It says the meeting was held to put into
2  action the scheme to fabricate Tom's testimony,
3  but you don't know who said what?
4  A. I didn't have no personal knowledge of
5  who said what.
6  Q. Did anyone at that meeting tell you about
7  the meeting?
8  A. I had no personal knowledge of what was
9  said at the meeting.
10  Q. But did anyone at the meeting tell you
11  that it happened?
12  A. I have no personal knowledge that it
13  happened.
14  Q. Okay. Did Kirk Vernon tell you that it
15  happened?
16  A. I have no personal knowledge outside of
17  what -- talking with my attorneys.
18  Q. In paragraph 49 it states, "Defendant
19  Carreno, the lead detective assigned to
20  investigate Camille's murder, had settled on Floyd
21  as a suspect immediately following Camille's
22  disappearance." How do you know that?
23  A. Because he was the lead investigator.
24  Q. But how did you know he had settled on
25  you as a suspect immediately following?

Page 98

1  A. I have no personal knowledge.
2  Q. Do you think it was weird that Carreno
3  had thought of you as a suspect being as someone
4  who lived with Camille?
5  A. Yes.
6  Q. It was weird?
7  A. Yes.
8  Q. Why, why do you think that is? Why was
9  it weird that he thought you might be a suspect?
10  MS. BROWN: Object to the form of the
11  question.
12  A. Yeah, I don't understand what you mean.
13  BY MR. QUALSETH:
14  Q. Well, you just testified that you thought
15  it was weird that Carreno thought you were a
16  suspect, correct?
17  MS. BROWN: Objection, mischaracterizes
18  the prior testimony. Objection, form of the
19  question.
20  A. I thought it was weird that Tom had
21  confessed and then he was still focused on me.
22  BY MR. QUALSETH:
23  Q. But paragraph 49 says that Carreno has
24  settled on you as a suspect immediately following
25  Camille's disappearance --

Page 99

1  A. Uh-huh.
2  Q. -- which would be before Tom confessed,
3  correct?
4  A. When he did it and why he did it I, I
5  don't have personal knowledge of.
6  Q. Well, you're claiming he settled on you,
7  Carreno settled on you as a suspect immediately.
8  You used the word immediately, correct?
9  MS. BROWN: Objection, form, and
10  objection, asked and answered.
11  A. I don't have any personal knowledge of
12  why, how, none of that.
13  BY MR. QUALSETH:
14  Q. You don't know why or how Detective
15  Carreno settled on you as a suspect immediately
16  following Camille's disappearance?
17  A. No personal knowledge.
18  Q. Let's turn to page 10 of Exhibit 400. In
19  paragraph 51 the second sentence states,
20  "Vanderbilt was indebted to Hayes who was helping
21  Vanderbilt avoid his legal exposure of
22  Vanderbilt's appropriation of county funds for
23  personal use." So, let's break that down. How
24  was Vanderbilt indebted to Hayes?
25  A. I have no personal knowledge of that

Page 100

1  because that all -- I just have no personal
2  knowledge. That came out after the fact.
3  Q. When did you start believing that
4  Vanderbilt was indebted to Hayes?
5  A. I, I don't have the personal knowledge of
6  when it happened.
7  Q. And you don't know when you gained some
8  sort of knowledge to put in this lawsuit that
9  Vanderbilt was indebted?
10  A. It was, it was after I got out.
11  Q. Had Vanderbilt told you that he was
12  indebted to Hayes?
13  A. He never told me directly, no.
14  Q. Other than your attorneys, has anyone
15  ever told you that Vanderbilt was indebted to
16  Hayes?
17  A. I have no personal knowledge.
18  Q. Then you claim that Hayes was helping
19  Vanderbilt avoid his legal exposure for
20  Vanderbilt's appropriation of county funds for
21  personal use. What are you referencing as far as
22  Vanderbilt's appropriation of county funds for
23  personal use?
24  A. Other than -- I don't have any personal
25  knowledge of that.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

# FLOYD SCOTT BLEDSOE, JR.

Page 101

1  Q. You don't know whether that happened or
2  not?
3  A. I don't have any personal knowledge, no.
4  Q. But it's in the lawsuit?
5  A. Yes.
6  Q. Then on page 10, Exhibit 400, paragraph
7  52 it says, "as defendants discussed during the
8  meeting." Is that the meeting we've talked about
9  earlier?
10 A. Yes.
11 Q. And you don't know who was at that
12 meeting?
13 A. No, I don't.
14 Q. You don't know which defendants were
15 there?
16 A. No.
17 Q. "Pursuant to their scheme Tom would
18 recant his confession." Do you know whose idea
19 that was?
20 A. No, I don't.
21 Q. Do you know if that was Tom's idea?
22 A. I don't know.
23 Q. Paragraph 54 says, "Defendants Hayes,
24 Vanderbilt and/or various defendant officers
25 planned Tom's recantation before it ever

Page 102

1  occurred." Is that the meeting we were referring
2  to earlier?
3  A. Yes.
4  Q. Was there a different plan?
5  A. I have no personal knowledge of it.
6  Q. And you don't know who planned Tom's
7  recantation before it ever occurred?
8  A. No.
9  Q. Then it says, "Defendants Hayes,
10 Vanderbilt and/or various defendant officers
11 coached Tom." What does coached Tom mean?
12 A. To help him on how he should say and what
13 he should say.
14 Q. So, you're claiming the defendants fed
15 Tom answers?
16 A. Yes.
17 Q. Fed Tom testimony?
18 A. Yes.
19 Q. But you don't know who did that?
20 A. I don't -- outside of my attorney-client
21 knowledge, no.
22 Q. And you don't know how it was done?
23 A. No, no personal knowledge.
24 Q. You don't know how Tom was coached?
25 A. No personal knowledge.

Page 103

1  Q. And then it says he was easily
2  manipulable, and that's in reference to Tom,
3  correct?
4  A. Yes.
5  Q. Do you believe Tom was easily
6  manipulable?
7  A. How things are worded and formed I, I
8  don't have knowledge of.
9  Q. Well, do you have personal knowledge in
10 your experience growing up with Tom, could Tom be
11 manipulated by you?
12 A. No.
13 Q. Do you think Tom was manipulated by
14 anybody in his life other than the claims here in
15 this lawsuit?
16 A. I have no personal knowledge.
17 Q. So, despite Tom's certain intellectual
18 difficulties, the defendants were in fact able to
19 coach him successfully to frame you, is that
20 right?
21 A. Yes.
22 Q. Turn to page 11 of Exhibit 400. In
23 paragraph 59, the second sentence states, "Acting
24 in service of defendants' conspiracy, defendant
25 Johnson immediately instructed Tom to continue

Page 104

1  lying to implicate Floyd." What did defendant
2  Johnson say to Tom as far as his instructions?
3  A. I have no personal knowledge.
4  Q. And then it says, "Tom was easily
5  overpowered." In your experience personally
6  growing up with Tom was Tom easily overpowered?
7  A. I have no personal knowledge.
8  Q. Were you easily -- were you able to
9  easily overpower Tom when it came to making
10 decisions in his life?
11 A. No.
12 Q. Paragraph 62 it states, "Sheriff Dunnaway
13 and certain defendants then arrested Floyd even
14 though they knew Floyd was innocent." Who are you
15 referring to as certain defendants knew that you
16 were innocent?
17 A. Who they were and, and all that I don't
18 have any personal knowledge of.
19 Q. Then paragraph 63 on page 11 states, "In
20 the weeks that followed the defendants continued
21 to fabricate Tom's statements regarding his
22 purported roadside meeting with Floyd." Is that
23 in reference to your testimony earlier about
24 Detective Carreno changing the, coaching Tom on
25 changing the time of the meeting --

Page 113

1   A. Yes.
2   Q. And you did complete that form?
3   A. Yes.
4   Q. And you listed your Uncle Gary as an
5   emergency contact?
6   A. Yes.
7   Q. Why did you not list your parents?
8   A. Once again, I didn't have a phone number,
9   I don't believe, at that time.
10  Q. In December of 2000?
11  A. Right, 'cause, you know, to have an
12  emergency contact you have to -- they have to be
13  able to validate that that person can answer a
14  phone and I don't believe I had their phone number
15  at that time.
16  Q. When did your parents start traveling?
17  A. Honestly, I don't know when that was. I
18  know that the -- yeah, it was sometime around the
19  fall of 2000.
20  Q. It was after the trial but before the --
21  A. I believe so, yes.
22  Q. -- the form was completed?
23  A. I don't know the exact dates.
24  Q. And your trial was in April --
25  A. And I might add that my uncle, because he

Page 114

1   was the one I had the most contact with at the
2   time, so, he was -- he had, he was taking care of
3   all my animals and he had basically power of
4   attorney at that time, too.
5   Q. And that's, the document I have just for
6   future reference it's AG679. I think the trial
7   was in April of 2000, is that correct?
8   A. Yeah, it was right after Easter.
9   Q. Had your parents already planned on
10  traveling around in a camper prior to the trial or
11  -- I'll stop there.
12  A. Not that I know of. You know, I mean, I
13  don't remember when they sold everything and left.
14  I don't know. I can't remember.
15  Q. Do you know if the events and your trial
16  caused them to do that?
17  A. Again, I don't know.
18  Q. Had they ever told you?
19  A. No.
20  Q. Did that surprise you that they did that?
21  A. I really don't recall if it did or not at
22  that time. You know, I mean, a lot of older
23  people once they retire travel, so, I don't know
24  if it surprised me.
25  Q. You probably had other things on your

Page 115

1   mind?
2   A. Yeah. Yeah. That's a way to put it.
3   Q. I mean, I don't mean to be flip about it.
4   A. Yeah.
5   Q. I hope you didn't take it as --
6   A. No, no.
7   Q. -- as such. I just would imagine that
8   your parents' well-being were not the first and
9   foremost for you.
10  A. Right.
11      MR. QUALSETH: And I'm going to look at
12  my notes, but I think I have -- that's about all
13  the questions I have with the understanding that
14  if necessary at some future point if we need to
15  ask you about your financial information we can do
16  that at some future time and I'm sure we can work
17  out a mutually agreeable arrangement for that.
18  Thank you.
19      MS. BROWN: And just to clarify that, you
20  know, we reserve our arguments about whether or
21  not that's necessary, but we would agree that if
22  necessary that we would produce for that.
23      CROSS-EXAMINATION
24  BY MR. COX:
25  Q. Hello, Mr. Bledsoe. My name is Vince Cox

Page 116

1   and I represent Michael Hayes in this lawsuit,
2   okay?
3   A. Yes, sir.
4   Q. And you understand that you've sued
5   Michael Hayes as part of this lawsuit?
6   A. Yes.
7   Q. Was it your understanding that Mr. Hayes
8   represented your brother Tom in the, what I'll
9   call the Arfmann case?
10  A. Yes.
11  Q. Prior to the Arfmann case did you know
12  Mike Hayes?
13  A. I knew of him. Met him I believe one
14  time.
15  Q. And how did you know of him?
16  A. Just, I mean, it was a small town of
17  what, 1200 people, so, I mean --
18  Q. Sure.
19  A. You know, it's like, you know.
20  Q. I take it you knew he was a lawyer?
21  A. Yes.
22  Q. What else did you know about him?
23  A. That he was a county prosecutor at one
24  point in time.
25  Q. Okay. Had you and Mr. Hayes ever had any

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street       6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604          Suite 101                  Suite 305
785-273-3063              Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com       913-383-1131               316-201-1612

# FLOYD SCOTT BLEDSOE, JR.

Page 117

1 negative interactions of any sort up to that
2 point?
3   A.  Outside of me going and talking to him
4 about a divorce one time I don't believe so, but I
5 -- I mean, it's been, let's see -- I'm 42, so, I
6 mean, I can't say that I never saw the guy.  I
7 don't recall ever having --
8   Q.  Okay.  So, after November of 1999 you
9 didn't have any problems with Mr. Hayes?
10   A.  Not that I'm aware of, no.
11   Q.  And were you aware that he had any
12 problems with you?
13   A.  Not that I'm aware of.
14   Q.  When he was serving as county attorney
15 did he ever prosecute you for any crimes?
16   A.  No.
17   Q.  So, you said you had met with him once
18 prior to November 1999, is that correct?
19   A.  Yes.
20   Q.  And was that the time you went to talk to
21 him about a divorce?
22   A.  Yes.
23   Q.  And can you remember the month and year
24 that that happened?
25   A.  It was sometime earlier that year.  I

Page 118

1 think it was in the spring, but I don't --
2 honestly, I don't remember.  All I remember was he
3 said it was like -- I forgot how much -- it was
4 more money than I had and I said, oh, for that
5 price I'll stay married, so, you know, I mean, it
6 was way more money than I could afford for a
7 retainer.
8   Q.  So, you think that happened in the spring
9 of 1999?
10   A.  Yeah.  Again, I don't, I don't know the
11 exact when that was.  It was either -- I'm pretty
12 sure it was around the spring.  I can't remember.
13 I don't know.
14   Q.  Okay, and that was -- at that time you
15 were considering divorcing your first wife, Heidi,
16 is that right?
17   A.  Yes.
18   Q.  And essentially it sounds like he agreed
19 that he would represent you, he quoted you a
20 price, and you decided that was too much, is that
21 fair?
22   A.  Yeah, yeah.
23   Q.  And then prior to the Arfmann homicide
24 investigation you had never spoken with Mr. Hayes
25 any other time?

Page 119

1   A.  Not that I recall.
2   Q.  After meeting with Mr. Hayes earlier in
3 1999 to consult with him about a divorce, when's
4 the next time you remember talking to Mr. Hayes?
5   A.  At the police station in the parking lot.
6   Q.  Okay, and do you remember when that, what
7 day that was?
8   A.  It was the same day as the polygraph.
9   Q.  So, the evidence in this case has
10 indicated that the polygraph happened on November
11 12th, 1999.  Does that sound right?
12   A.  Sure.  I don't -- I just remember I
13 believe it was the same day as the polygraph.
14   Q.  Okay.
15   A.  'Cause I know I was at the police
16 station.
17   Q.  So, when you met Mr. Hayes in the parking
18 lot of the police station were you at the police
19 station because you were there for the polygraph?
20   A.  I believe so.  The best I can remember,
21 yes.
22   Q.  And when you say the police station, are
23 you talking about the Jefferson County Law
24 Enforcement Center?
25   A.  Yes.

Page 120

1   Q.  And who was present for this meeting
2 between yourself and Mr. Hayes in the parking lot?
3   A.  I was -- Randy Carreno came out to the
4 parking lot, said hey, we'll be ready, it'll be a
5 little bit, you know, just hang out out here, you
6 know, and then he went back inside and then Hayes
7 came out at some point.
8   Q.  So, you were waiting outside of the Law
9 Enforcement Center?
10   A.  Yes, by my car.
11   Q.  Okay, and at some point in time Detective
12 Carreno came out and spoke to you?
13   A.  Yes.
14   Q.  And then he went back inside --
15   A.  Yep.
16   Q.  -- the Law Enforcement Center?
17   A.  Yeah.
18   Q.  And then Mr. Hayes came out?
19   A.  Yeah.
20   Q.  What happened next?
21   A.  Mr. Hayes started questioning me about
22 why I'd told police about a red substance in Tom's
23 truck.
24   Q.  And what did you tell him?
25   A.  I told -- or he -- sorry, he said

Page 121

1  something to the -- and I don't remember the exact
2  words so please don't quote me on it, but, you
3  know, it was something to the effect of hey, why
4  -- he was very agitated, which -- you know, and he
5  was questioning me over this and I was like, look,
6  I told him there was a red substance. I don't
7  know what it is. It could be a strawberry, it
8  could be anything. I don't know, I just saw
9  something red, and then that's when he got very
10 adamant and said, "I'm going to get Tom off the
11 hot seat and put you on it."
12     Q. And how did you respond to that?
13     A. It shook me up, you know. It startled
14 me, and then he stormed off and went back inside.
15     Q. Was anything more said by you or Mr.
16 Hayes after the hot seat comment?
17     A. Not, not that I remember. I mean, you're
18 talking 25 years ago. I don't remember.
19     Q. At the time of that conversation you knew
20 that Mr. Hayes was representing your brother Tom,
21 correct?
22     A. Yes.
23     Q. You didn't believe that Mr. Hayes was
24 representing you, did you?
25     A. No.

Page 122

1      Q. Are you claiming in this lawsuit that Mr.
2  Hayes did anything wrong by having that
3  conversation with you in the parking lot?
4      A. I am claiming that Mr. Hayes assisted in
5  a cover-up.
6      Q. What nonprivileged information do you
7  have to support that allegation?
8      A. That very incident in the parking lot.
9      Q. Anything else?
10         MS. BROWN: Object to the form of the
11 question.
12     A. Yeah, I -- to what he played a part in at
13 that point in time outside of that, I don't know.
14 All I know is that they searched and they, I mean,
15 whether it's KBI or police department, whoever,
16 searched all my stuff with forensic, but to my
17 knowledge, they never searched Tom's truck 'cause
18 we have no reports of that, unless you guys have
19 something that I've never seen, you know.
20 BY MR. COX:
21     Q. You understand, don't you, that Mr.
22 Hayes's only duty was to represent your brother to
23 the best of his ability?
24     A. Yep.
25     Q. You understand, don't you, that Mr. Hayes

Page 123

1  had no duty to perform any investigation?
2      A. Right.
3      Q. There have been thousands of pages of
4  documents produced by all of the parties in this
5  lawsuit. Did you know that?
6      A. Yes.
7      Q. Have you reviewed any of those documents?
8      A. Not, not, not all of them, no.
9      Q. Have you reviewed some of them?
10     A. I've seen some, yes.
11     Q. Have you seen any documents that were
12 produced in discovery in this case that support
13 your claim that Mr. Hayes was involved in some
14 sort of cover-up or scheme to frame you?
15        MS. BROWN: Object to the form of the
16 question.
17     A. I really don't understand what you're
18 asking on that.
19 BY MR. COX:
20     Q. Let me try to boil it down to a simpler
21 question. In the documents that you have reviewed
22 that have been produced in discovery in this case
23 have you seen anything that supports your claims
24 of wrongdoing against Mr. Hayes?
25        MS. BROWN: Object to the form of the

Page 124

1  question.
2      A. Outside of the parking lot incident and
3  outside of him bringing Tom in and -- well, you
4  guys have the videotapes of Tom's interrogations,
5  right?
6  BY MR. COX:
7      Q. Videos have been produced in this case,
8  yes.
9      A. Of mine. Do you guys have Tom's?
10     Q. I only have the videos that have been
11 produced. I'm not sure I have the one that you're
12 making reference to. We may. Let me ask you
13 this --
14     A. With, with, with KBI Johnson.
15     Q. Right.
16     A. Do you have that one?
17     Q. We have seen videos of that, correct.
18     A. Okay, where Mr. Hayes came in with Tom?
19     Q. Can I ask you a question?
20     A. Sure.
21     Q. After the meeting with Mr. Hayes in the
22 parking lot that you just told us about, when was
23 the next time you spoke with Mr. Hayes?
24     A. In that room.
25     Q. In the interrogation room or the --

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street       6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604          Suite 101                Suite 305
785-273-3063              Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com       913-383-1131             316-201-1612

# FLOYD SCOTT BLEDSOE, JR.

Page 125

1  A.  Yes.
2  Q.  -- meeting room?
3  A.  Yep.
4  Q.  In the Jefferson County Law Enforcement
5  Center?
6  A.  Yes.
7  Q.  And just let me finish my questions --
8  A.  Sorry.
9  Q.  -- before you answer --
10  A.  I'm sorry.
11  Q.  -- just so we make it easier on her. Not
12  a problem. How much time passed between the
13  meeting in the parking lot and then when you saw
14  Mr. Hayes in the meeting room in the Law
15  Enforcement Center?
16  A.  I have no clue. I didn't have a watch
17  and they didn't have clocks in the room.
18  Q.  Did the polygraph examination happen
19  first before Mr. Hayes came into the room?
20  A.  It had to of.
21  Q.  Okay. So, who was present for this
22  meeting with Mr. Hayes in the meeting room at the
23  Law Enforcement Center?
24  A.  I was in there, Randy Carreno, Tom, and
25  Mr. Hayes.

Page 126

1  Q.  Did Detective Carreno allow Mr. Hayes and
2  Tom into the meeting room?
3  A.  How they came in I do not know.
4  Q.  Did you see them come into the room?
5  A.  Yeah. I mean, it was what, probably a
6  nine by nine room. Pretty small. So, yeah, I
7  saw them walk in.
8  Q.  Did the door to that room lock or do you
9  know?
10  A.  I don't know.
11  Q.  And what's your recollection of what Mr.
12  Hayes said to you in that meeting?
13  A.  I honestly -- I mean, that was a pretty
14  traumatic time from that time forward and I don't
15  totally remember everything that was said. If we
16  had the footage we could watch that, but I don't,
17  I don't remember everything that was said.
18  Q.  Did Detective Carreno not want Mr. Hayes
19  to be there?
20      MS. BROWN: Objection, form, calls for
21  speculation.
22  A.  I don't know.
23  BY MR. COX:
24  Q.  From what you witnessed yourself did
25  Detective Carreno object to Mr. Hayes being in the

Page 127

1  room with Tom?
2  A.  Again, I don't -- I don't remember. I
3  really don't.
4  Q.  From what you saw yourself was Mr. Hayes
5  in that room with the permission of Detective
6  Carreno or the other law enforcement officers?
7  A.  I would assume so, yes.
8  Q.  Have you ever seen or spoken to Mr. Hayes
9  any time since that meeting in the interview room
10  of the Law Enforcement Center?
11  A.  I don't believe so.
12  Q.  Are part of the allegations you are
13  making against Mr. Hayes in this lawsuit based
14  upon some alleged wrongdoing by Mr. Hayes in that
15  meeting in the conference room?
16  A.  I don't know to the legalities issues. I
17  don't know.
18  Q.  Have you told me about all the times you
19  have ever spoken to Mr. Hayes that you can
20  remember?
21  A.  To the best of my memory, yes. I mean,
22  if there's others it's not that I'm not trying to
23  tell you. I mean, to be honest, it's very hard
24  to, to go back.
25  Q.  Sure.

Page 128

1  A.  And I'm trying to remember everything,
2  but I can't tell you a hundred percent for a fact
3  this is exactly the way things went 'cause I don't
4  remember. There was so many hearings, so many
5  different things. I can't recall any other time
6  talking to Mr. Hayes.
7  Q.  Did you ever speak to your brother Tom
8  after you were convicted in the Arfmann case?
9  A.  No.
10  Q.  At some point in time after your
11  conviction were you let out of prison for a short
12  period of time?
13  A.  Yes.
14  Q.  And why did that happen?
15  A.  Because Judge Rodgers ruled that there
16  was more evidence to support that I didn't do the,
17  didn't do the crime than I did and overturned it
18  on I think it was five points. I can't remember
19  now, but on various errors that had happened.
20  Q.  And was Judge Rodgers the judge in the
21  federal lawsuit you filed challenging your
22  conviction?
23  A.  Yes.
24  Q.  And was Judge Rodgers -- was Judge
25  Rodgers' decision ultimately overturned by the


Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604           Suite 101                   Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131                316-201-1612

Page 137

1  there's questions about all of those paragraphs.
2      A.  Oh, okay, I'm sorry.  I'm sorry.
3      Q.  So, there's 11 questions.
4          MS. BROWN:  I'm going to object to the
5  form of the question.
6      A.  I mean, I don't have any personal
7  knowledge as of right now.
8      BY MR. COX:
9      Q.  Okay.  So, nothing that you would change
10 from your personal knowledge?
11     A.  From my personal knowledge, no.
12     Q.  Okay.
13     A.  Unless I misread something, but --
14     Q.  Well, you read it, correct?
15     A.  Yes.
16     Q.  Okay.
17     A.  I mean, you know, it's always possible I
18 misread, but --
19     Q.  But based upon your understanding?
20     A.  Yes.
21     Q.  And I just want to make sure 'cause I
22 don't want to get to trial and you change your
23 mind, you understand that?
24     A.  Yes.  Nothing, nothing from my personal
25 knowledge.

Page 138

1      Q.  Okay.  So, I'll have you then look at
2  Exhibit 400, which was the Second Amended
3  Complaint.
4      A.  Okay.
5      Q.  And I'll have you look at paragraph 55.
6  Do you see that paragraph?
7      A.  Yes.
8      Q.  And that's where you make reference to
9  Mr. Hayes seeking you out and telling you that he
10 was taking Tom off the hot seat and putting you on
11 it, correct?
12     A.  Yes.
13     Q.  And you've already testified today when
14 that happened, correct?
15     A.  Correct.
16     Q.  Have you look at paragraph --
17     A.  To the best of my remembrance.
18     Q.  Okay.  Did he only say it the one time or
19 was there other occasions?
20     A.  Far as I know just the one time.  I mean,
21 I don't, I don't recall other times.
22     Q.  Right.  To the best of your recollection?
23     A.  Yeah.
24     Q.  And I understand this happened 24 years
25 ago now --

Page 139

1      A.  Yeah.
2      Q.  -- but I just want you to answer to the
3  best of what you remember today.
4      A.  Yeah, to the best of my -- to the best of
5  my memory.
6      Q.  Then if you would turn to paragraph 57,
7  that paragraph says, "According to defendants at
8  some point during the interview with defendant
9  Johnson Tom provided the false recantation of his
10 confession that Hayes and other defendants had
11 coached and coerced him to give."  Do you see that?
12     A.  Yes.
13     Q.  What nonprivileged personal information
14 do you have to support that allegation?
15     A.  I guess I don't under -- okay, can you
16 restate your question for me?
17     Q.  Yeah, similar to what Mr. Qualseth was
18 asking you earlier today.  So, what, what
19 information do you personally have that wasn't
20 given to you in privileged communications by your
21 attorneys to support that allegation?
22     A.  That -- I don't --
23     Q.  The allegation that Tom provided a false
24 recantation of a confession that Hayes and other
25 defendants had coached him on.

Page 140

1      A.  Well, I know --
2          MS. BROWN:  Object to the form of the
3  question.
4      A.  I know at some point -- we know that at
5  some point because it came out in trial that Tom
6  said, admitted that he did it, you know, and then
7  at some point in time when -- that was during his
8  polygraph interview because I believe it was Jim
9  Woods or, or Troy Frost or somebody testified to
10 it at trial.  I can't -- I don't remember who,
11 okay?  And then between that time and when I took
12 the polygraph is when Tom then changed his story
13 and said Floyd did it.  So, I don't know when.
14     BY MR. COX:
15     Q.  Did you personally see or hear anyone
16 coach or coerce Tom to say something?
17     A.  No.  I mean, because -- I mean, I hadn't
18 -- they had me in a different area, I guess.  I
19 guess I really -- maybe I'm not understanding your
20 question, but I didn't see anybody say, okay, Tom,
21 this is what you say.  I didn't personally see
22 that, no.
23     Q.  Okay.  Not counting your lawyers, has
24 anybody told you that they saw or heard Mike Hayes
25 or any other defendants coerce or coach Tom to

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

Page 141

1  tell lies?
2     A.  Randy Carreno testified at trial that he
3  gave Tom times to make his story more believable.
4  Other than that, I don't remember.
5     Q.  So, nothing as to Mr. Hayes or anybody
6  else, correct?
7         MS. BROWN:  Object -- objection,
8  mischaracterizes the prior testimony.  Object to
9  the form.
10    A.  Not -- not that I have remembrance at
11 this day and time.
12       BY MR. COX:
13    Q.  Did you ever see Mr. Hayes or hear Mr.
14 Hayes involved in any meetings where he was
15 conspiring with anybody to frame you for the
16 murder of Camille Arfmann?
17    A.  I didn't personally see any of the
18 meetings.  I mean, I was being interviewed and if
19 I wasn't being interviewed I was either in a jail
20 cell or with my family.
21    Q.  Not counting anything your lawyers have
22 told you or shown you, did anyone tell you that
23 Mike Hayes or any of the other defendants had a
24 meeting to form a conspiracy?
25    A.  That told me directly?

Page 142

1     Q.  Correct.
2     A.  Nobody told me directly.
3     Q.  How about indirectly?  And again, I'm not
4  asking about anything your lawyers have told you
5  or shown you.
6         MS. BROWN:  Object to the form of the
7  question.
8     A.  Not that I remember, but, you know, I had
9  several hearings so I can't say as I recall every
10 one of them, you know.  I -- yeah, not that I --
11 not that I can remember.
12       BY MR. COX:
13    Q.  Not counting anything your lawyers have
14 told you or shown you, do you have any information
15 that leads you to believe that Mr. Hayes would
16 want to be involved in some sort of conspiracy to
17 make your brother lie so that you would be
18 convicted of the murder?
19        MS. BROWN:  Object to the form of the
20 question.
21    A.  Can you -- can you restate that, please?
22 I'm trying to make sure I understand.
23       BY MR. COX:
24    Q.  Again, I'm not asking about anything --
25    A.  Yeah, yeah.

Page 143

1     Q.  -- that your lawyers have told you or
2  shown you, but I want to know if you have any
3  information why Mr. Hayes would want to be
4  involved in a conspiracy to coerce your brother or
5  coach your brother to lie so that you were
6  convicted of a murder rather than your brother?
7     A.  I have nothing, no.
8     Q.  Why would, why would he want to do that?
9     A.  I have no idea.
10    Q.  But you understand that's what you're
11 accusing him --
12    A.  Yes.
13    Q.  -- of here, correct?
14    A.  Yes.
15    Q.  And that's a serious accusation, isn't
16 it?
17    A.  Yes.
18    Q.  Do you personally have enough
19 information, not including what your lawyers have
20 told you or shown you, that you feel comfortable
21 making that type of allegation against Mr. Hayes?
22        MS. BROWN:  Object to the form of the
23 question.
24    A.  Not as far as personal information, no.
25       BY MR. COX:

Page 144

1     Q.  Have you look at paragraph 71 of Exhibit
2  400, please, and that paragraph says "Sheriff
3  Dunnaway and defendant officers, including
4  defendants Poppa and Woods, purposely --
5  purposefully withheld their documentation of
6  inculpatory statements made by Tom and defendant
7  Hayes on the night Tom turned himself in before
8  recovery of Camille's body."  Did I read that part
9  correctly?
10    A.  Which one?  Sorry.
11    Q.  Paragraph 71.
12    A.  Okay.
13    Q.  You weren't present for any inculpatory
14 statements made by Tom and defendant Hayes,
15 correct?
16    A.  Correct.
17    Q.  Did any, did anyone tell you, not
18 including your lawyers, that any inculpatory
19 statements were actually made by Tom and Mr.
20 Hayes?
21    A.  Yes.  Sergeant Poppa told me.
22    Q.  And what did he tell you?
23    A.  He said that Tom had confessed to it.
24    Q.  Did Sergeant Poppa tell you that Mr.
25 Hayes had done anything wrong?

Page 145

1    A.  Not -- no, not, not that day.
2    Q.  Any other time?
3    A.  I mean, not -- I mean no, you know.
4    Q.  Just bear with me here a little bit while
5  I look through my notes.
6    A.  Yeah.
7    Q.  I'll hand you something, a document
8  that's been previously marked in this case and
9  it's -- this is Exhibit 56, just pages 115 through
10 121.  Do you see that?
11   A.  Yep.
12   Q.  Do you recognize what these pages show?
13   A.  They're from a notebook.
14   Q.  Was that your notebook?
15   A.  I believe so.
16   Q.  Is it your handwriting on the notebook
17 pages that we see in Exhibit 56?
18   A.  Yes.
19   Q.  What was the purpose of that notebook?
20   A.  To write down different things that
21 people had told us.
22   Q.  And was that during the course of the
23 Arfmann investigation?
24   A.  Yes.
25   Q.  These are people you were talking to or

Page 146

1  who?
2    A.  Yes.
3    Q.  And what were you asking folks?
4    A.  We were passing out flyers and asking
5  them if they had seen or heard anything.
6    Q.  And this is when you were -- when Camille
7  was still a missing person?
8    A.  Yes, yes.
9    Q.  Who did you give this notebook to?
10   A.  I don't remember.
11   Q.  Okay.  I believe Terry Morgan testified
12 that you gave it to him.  Does that sound right?
13   A.  Again, I don't remember who it was.
14   Q.  Okay.
15   A.  I really don't.
16   Q.  Fair enough.  As part of this lawsuit the
17 parties have to do what's called Rule 26
18 disclosures and so I want to ask you about a few
19 of the names that are in your second supplemental
20 Rule 26 disclosures.  The first one I believe we
21 already talked about, but you identified Orville
22 Miller as a possible witness that may have
23 knowledge of your damages.  Does that sound right?
24   A.  Sure.
25   Q.  And I think you said Mr. Miller had a

Page 147

1  dairy that you worked at?
2    A.  Yes.
3    Q.  And his dairy's outside of Hutchinson?
4    A.  Yes.
5    Q.  Then you identify a Jennifer Snell Owens
6  that may have knowledge of your damages?
7    A.  Yep.
8    Q.  Who is she?
9    A.  She's a childhood friend that I grew up
10 with, went to church with.
11   Q.  And she lives in Lawrence now?
12   A.  Yes.
13   Q.  What would she know about your damages?
14   A.  What life was like before and after.
15   Q.  Had you stayed in communication with her
16 this entire time or --
17   A.  Since I got, got released, yes.
18   Q.  Okay.  Do you have any idea what she
19 would say at trial?
20   A.  No, I don't.
21   Q.  Then you've identified Lawrence Xavier
22 Sabelka as a witness that may have knowledge about
23 your damages?
24   A.  Yep.
25   Q.  Does that sound right?

Page 148

1    A.  Yep.
2    Q.  Who is Mr. Sabelka?
3    A.  Just again another childhood friend that
4  I grew up with.  He was --
5    Q.  Is that someone you stayed in
6  communication with during your prison stay and all
7  of that and just after you got out?
8    A.  Actually -- sorry, go ahead.
9    Q.  Yeah, my question was is Mr. Sabelka
10 someone you stayed in contact with during the
11 entirety of your life or you reconnected with him
12 after you got out of prison?
13   A.  So, I knew him before prison and then he
14 actually worked at Lansing when I was there and
15 then we met up again after he worked at Lansing
16 for maybe a year after I returned back to prison
17 and now we know each other outside of prison
18 again.
19   Q.  Do you know what he would testify to
20 about your damages at trial?
21   A.  Again, I've never discussed it with him.
22   Q.  And then Julie McGinnis, do you know who
23 that is?
24   A.  Julie McGinnis.
25   Q.  She's identified as a witness with

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street       6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604          Suite 101                Suite 305
785-273-3063              Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com       913-383-1131             316-201-1612

Page 153

1   A. Yeah. Camille's family said, look, we
2 know you have to fight your appeal so we'll settle
3 for half of what you get out of the land, and
4 that's what they did.
5   Q. I think I'm just about finished if you'll
6 just give me a couple minutes here. Have you ever
7 spoken to Kirk Vernon without your lawyers
8 present?
9   A. Not that I recall.
10  Q. As far as any personal knowledge that you
11 have that wasn't given to you or shown to you by
12 your lawyers, have you told me today about
13 everything that supports your claim against
14 Michael Hayes in this lawsuit?
15     MS. BROWN: Objection, form.
16  A. As near as I can remember.
17     MR. COX: I don't have any other further
18 questions. Thank you.
19     MR. QUALSETH: Do you have any, Ruth?
20     MS. BROWN: I don't have any questions.
21     MR. QUALSETH: I've got a couple follow-
22 ups.
23     REDIRECT-EXAMINATION
24     BY MR. QUALSETH:
25  Q. And maybe you've already testified to it

Page 154

1 earlier so I apologize if you already have. Have
2 you had any contact with Jim Woods since your
3 criminal trial in the year 2000?
4   A. You mean afterwards?
5   Q. Correct.
6   A. Not that I'm aware of. Not that I
7 remember anyways.
8   Q. Have you had any contact with Terry
9 Morgan after the trial in 2000?
10  A. Not that I remember.
11  Q. And have you had any contact with George
12 Johnson since the trial?
13  A. No.
14  Q. I think you testified that you say Robert
15 Poppa had told you that Tom had confessed to the
16 crime?
17  A. I don't, I don't think I said Robert --
18 wait, yeah. I think, I think he told me that
19 that first morning that he came and told us, or
20 that Tom had turned -- something to the -- his
21 exact words I don't know a hundred percent, you
22 know, what was said, but I do know that he came
23 and said that Tom had turned himself in, so, I may
24 have assumed that he, that he said that. I don't
25 know. I know it was Poppa that first told us

Page 155

1 that it was Tom. It was Poppa and whoever the
2 chaplain was at that time and we were asking him
3 why and that's when he said, well, it appears it
4 was some sexually motivated or something. I don't
5 remember his exact words.
6   Q. It was your understanding at that time
7 Tom had done it?
8   A. Yes.
9   Q. And Tom was cross-examined regarding his
10 confessions at his preliminary hearing that you
11 were there for, right?
12  A. Yes.
13  Q. Your lawyer brought it up certainly I
14 would think.
15  A. Yes.
16  Q. And at trial as well, the information
17 that Tom had confessed was also brought up at
18 trial, correct?
19  A. Yes.
20     MR. QUALSETH: That's all the questions I
21 have.
22     MR. COX: Nothing further from me.
23     MS. BROWN: Okay, nothing further. We'll
24 reserve our questions.
25     (THEREUPON, the deposition concluded at

Page 156

1 2:55 p.m.)
2 .
3 .
4 .
5 .
6           SIGNATURE
7 .
8     The deposition of FLOYD SCOTT BLEDSOE,
9 JR., was taken in the matter, on the date, and at
10 the time and place set out on the title page
11 hereof.
12 .
13    It was requested that the deposition be
14 taken by the reporter and that same be reduced to
15 typewritten form.
16 .
17    It was agreed by and between counsel and
18 the parties that the deponent will read and sign
19 the transcript of said deposition.
20 .
21 .
22 .
23 .
24 .
25 .

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street           6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063                  Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com           913-383-1131               316-201-1612