Page 1

```
 1  .
 2        IN THE UNITED STATES DISTRICT COURT
 3            FOR THE DISTRICT OF KANSAS
 4  .
 5  .
 6  FLOYD BLEDSOE,
 7      Plaintiff,
 8  .
 9      vs.          Case No. 2:16 CV 02296
10  .
11  JEFFERSON COUNTY, KANSAS,
12  et al.,
13      Defendants.
14  .
15  .
16          VIDEOTAPED DEPOSITION OF
17              RONNIE BURK,
18  taken on behalf of the Plaintiff, pursuant to
19  Notice to Take Deposition, beginning at 10:02 a.m.
20  on the 3rd day of April, 2023, at the offices of
21  Appino & Biggs Reporting Service, 5111 Southwest
22  21st Street, in the City of Topeka, County of
23  Shawnee, and State of Kansas, before Ksenija M.
24  Zeltkalns, RPR, Kansas CCR No. 1461.
25  .
```

Page 2

```
 1               APPEARANCES
 2  .
 3  .
 4  ON BEHALF OF PLAINTIFF:
 5  .
 6      Ms. Ruth Brown (By Videoconference)
 7      Loevy & Loevy
 8      311 North Aberdeen Street
 9      Third Floor
10      Chicago, Illinois  60607
11      312.243.5900
12      ruth@loevy.com
13  .
14  .
15  ON BEHALF OF DEFENDANTS ESTATE OF
16  GEORGE JOHNSON; TERRY MORGAN;
17  JIM WOODS; MICHAEL HAYES:
18  .
19      Mr. Shon D. Qualseth
20      Attorney General's Office
21      120 Southwest Tenth Avenue
22      Second Floor
23      Topeka, Kansas  66612
24      785.368.8424
25      shon.qualseth@ks.gov
```

Page 3

```
 1  ALSO PRESENT:
 2  .
 3      Mr. Efrain Soto, Videographer
 4      Mr. Michael Hayes (By Videoconference)
 5  .
 6  .
 7  .
 8  .
 9  .
10  .
11  .
12  .
13  .
14  .
15  .
16  .
17  .
18  .
19  .
20  .
21  .
22  .
23  .
24  .
25  .
```

Page 4

```
 1                  INDEX
 2  .
 3  .
 4  Certificate ------------------------------ 119
 5  .
 6  .
 7                 WITNESS
 8  ON BEHALF OF PLAINTIFF:              PAGE
 9  RONNIE BURK
10  Direct-Examination by Ms. Brown         6
11  Cross-Examination by Mr. Qualseth     112
12  .
13  .
14                EXHIBITS
15  DEPO EXHIBIT NO.:                  MARKED
16  No 186  February 25, 2016, Memorandum    6
17  No 187  Complaint                        6
18  No 190  February 10, 2016, Report        6
19  No 192  February 25, 2016, Report        6
20  No 194  February 2016 Phone Number E-mails  6
21  No 197  December 24, 2015, E-mails
22      Re: Director's Meeting               6
23  No 199  November 29, 2015, E-mails,
24      Subj: Bledsoe Hearing Meeting        6
25  No 204  December 9, 2015, Report         6
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

EXHIBIT 13

# RONNIE BURK

Page 21

1  know, local law enforcement agencies, the KBI is
2  seen as having a lot more experience. Is that
3  fair?
4      A.  Yes.
5      Q.  Okay. So were you the lead agent for the
6  KBI that worked on re-investigation of the Arfmann
7  homicide beginning in 2015?
8      A.  Yes.
9      Q.  Okay. And who else worked with you on
10 that re-investigation?
11     A.  It was Captain Kirk Vernon from Jefferson
12 County. He was the -- basically my primary
13 liaison with Jefferson County.
14     Q.  Okay. And who else worked with you at
15 KBI on the re-investigation, if anyone?
16     A.  I don't believe anyone else did.
17     Q.  All right. Okay. And the reopening of
18 the Arfmann homicide investigation, that was --
19 was that prompted by Tom Bledsoe's suicide or some
20 other event?
21     A.  I believe it was -- it was a combination
22 of work that had been done by the, I believe it
23 was the Midwest Innocence Project as well as Tom
24 Bledsoe's suicide. I believe both of those had a
25 role in the KBI reopening the investigation.

Page 22

1      Q.  Okay. And when you refer to the work
2  done by The Innocence Project, are you referring
3  to the DNA testing results that they commissioned?
4      A.  Yes.
5      Q.  Okay. What was your understanding of
6  the, you know, the purpose of the re-
7  investigation?
8      A.  My understanding was it was to determine
9  if there was any viable evidence or any new
10 evidence that -- that supported the conviction of
11 Floyd Bledsoe or supported the culpability of
12 Floyd Bledsoe.
13     Q.  Okay. And the primary investigation --
14 well, scratch that.
15     If I refer to this, the KBI investigation
16 that began in 2015 as the re-investigation, is
17 that -- does that make sense to you, that term?
18     A.  Yes, it does.
19     Q.  Is that what you would refer to it as?
20     A.  Yes.
21     Q.  Okay. Okay. Most of the work done on
22 the re-investigation was done in 2015 and 2016,
23 correct?
24     A.  Yes.
25     Q.  Okay. And aside from some follow-up

Page 23

1  forensic testing, you were done with the
2  investigation by about March of 2016. Is that
3  right?
4      A.  Yes.
5      Q.  Okay. After March of 2016 there was some
6  additional lab testing that was done. Is that
7  right?
8      A.  Yes.
9      Q.  Okay. And can you describe what testing
10 was done?
11     A.  There was some evidence that was obtained
12 from the 1999 investigation that was re-submitted
13 to our lab for, I believe it was DNA analysis. I
14 believe it was just DNA analysis.
15     Q.  Okay. And what were the results of that
16 examination?
17     A.  There -- you would have to be specific
18 with items. There was several items sent; some
19 had different results than others.
20     Q.  Okay. What items were sent?
21     A.  I believe there was some clothing from
22 the victim. There was some additional clothing
23 that was obtained, I believe from the victim's
24 house. I believe it was primarily just clothing,
25 if I recall correctly.

Page 24

1      Q.  Was there also some ballistics testing
2  for a casing?
3      A.  I know there was a photograph of a casing
4  that Kirk Vernon and I had recovered when we
5  started the re-investigation, but I can't recall
6  the specific testing that was requested or lab
7  results from that.
8      Q.  Okay. Understood. Do you recall what
9  the testing results were on the clothing from the
10 victim?
11     A.  I believe there was a, it was either a
12 jacket or possibly a sweatshirt, I don't recall
13 specifically. There was a additional unknown
14 profile, I believe, possibly obtained on that item
15 that was subsequently entered in CODIS, but to my
16 knowledge there's never been a match made to that.
17 But I believe some of the other clothing had --
18 actually I do believe there was a pair of socks
19 that possibly DNA was matched to Floyd Sr.
20     Q.  Okay. Other than what you've described,
21 do you recall any other testing that was --
22 testing results that came out of this re-
23 investigation?
24     A.  Testing that I had requested I -- no, I
25 do not.

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

RONNIE BURK

Page 65

1 investigation, correct?
2    A. I wouldn't say specifically what went
3 wrong. It was more of if there was evidence that
4 Floyd was involved or Floyd was responsible, or --
5 and/or support the facts that Thomas was involved
6 based off of his suicide note.
7    Q. Okay. And your investigation, your re-
8 investigation concluded that there was -- there
9 was not evidence that Floyd S. Bledsoe was
10 involved in the murder, correct?
11   A. Correct.
12   Q. Okay. And your re-investigation
13 concluded that there was not evidence that Floyd
14 S. Bledsoe was involved in covering up the crime,
15 correct?
16   A. Correct.
17   Q. Okay. And so -- and your re-
18 investigation concluded that there was substantial
19 evidence that Thomas Bledsoe was responsible for
20 the murder, correct?
21   A. Correct.
22   Q. Okay. So was part of what you were
23 looking at to figure out -- to prevent, you know,
24 some -- prevent this sort of thing from happening
25 again where someone who doesn't commit a murder is

Page 66

1 put in prison for a murder that they didn't
2 commit?
3    A. I mean, I think ultimately that's any
4 investigator's responsibility is just find the
5 facts. I can't say that this was specifically the
6 intent of this investigation was to prevent it
7 from ever happening again, but if that's part of
8 gathering the facts, then I would say that's a
9 positive benefit of it.
10   Q. Well, let's take a look at Exhibit 197.
11 And for the record this is the exhibit that's been
12 previously marked 197 and it's Bates-stamped
13 JC8595 to 8596. Okay? And do you see in here
14 that there's an e-mail from yourself to Kirk
15 Vernon and Ramon Gonzalez on December 24th at 8:23
16 a.m.?
17   A. Yes.
18   Q. Okay. And, you know, it sounds to me
19 like you're characterizing part of the re-
20 investigation as identifying what potentially went
21 wrong and preventing this sort of thing from
22 happening again.
23   A. Correct.
24   Q. Okay. So I just want to confirm that
25 that was part of your understanding of what you

Page 67

1 were doing is identifying what potentially went
2 wrong and how to prevent it from happening again?
3    A. I would say probably on a -- as a -- on
4 the side of it, yes.
5    Q. What do you mean on the side of it?
6    A. I mean like I'd said, primarily it was to
7 determine culpability of Floyd and/or Tom and then
8 yeah, I mean if there was obvious errors,
9 investigative errors that were discovered, then
10 yeah, we would want to prevent that from happening
11 again.
12   Q. Okay. So I guess fair to say that it
13 wasn't your top priority to figure out whether or
14 not there were errors in the investigation, that
15 was just something that you looked at kind of as a
16 collateral matter that came up?
17   A. That's fair. Yes.
18   Q. Okay. Okay. And what about the -- the
19 claims made in Tom Bledsoe's suicide notes? So
20 you're familiar -- with you recall Tom Bledsoe's
21 suicide notes, correct?
22   A. Yes.
23   Q. Okay. And do you recall in -- well,
24 let's take a look at them so I get the language
25 right. Let's take a look at Exhibit 205. Okay.

Page 68

1 So just for the record you've been handed Exhibit
2 205 which has been Bates-stamped KBI subpoena 1100
3 to KBI subpoena 1131, and do you see on page 20
4 of this exhibit there's one of Tom Bledsoe's
5 suicide notes?
6    A. Yes.
7    Q. Okay. So in one of Tom Bledsoe's suicide
8 notes he said: I sent an innocent man to prison.
9 The Jefferson County police and county attorney
10 Jim Vanderbilt made me do it. I was told by
11 Vanderbilt to keep my mouth shut. Now I'm going
12 to set things right. Do you see that?
13   A. Yes.
14   Q. Okay. I'm wondering if you -- during
15 your re-investigation was one of your purposes to
16 assess whether law enforcement officers and Jim
17 Vanderbilt had told Tom Bledsoe to keep his mouth
18 shut or was that outside of the scope of your re-
19 investigation?
20   A. I would say it was -- it was probably
21 within the scope, based off of just some of the
22 statements and some of the information that was
23 obtained.
24   Q. Okay. So what did you do to investigate
25 whether there were any undocumented communications

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

Page 69

1 between law enforcement officers and Tom Bledsoe
2 or Tom Bledsoe's attorney Mike Hayes, if anything?
3     A.  There was nothing specifically done.
4     Q.  Okay. Okay. So that's not something you
5 were specifically looking for, just if you
6 happened to see something, you would have noted
7 it. Is that fair to say?
8     A.  That's fair.
9     Q.  So you didn't review the Arfmann homicide
10 file with the intent of seeing whether there was
11 any indication that there were undisclosed
12 communications between law enforcement officers
13 and Tom Bledsoe. Fair?
14     A.  That's fair.
15     Q.  Okay. And you didn't review the Arfmann
16 homicide investigative file to see whether there
17 was evidence of any undisclosed communications
18 between Mike Hayes and law enforcement officers.
19 Fair?
20     A.  That's fair.
21     Q.  Okay. Okay. Did you -- did you note
22 during your re-investigation of the Arfmann
23 homicide that at some point Troy Frost claimed
24 that Floyd S. Bledsoe had confessed to having
25 returned to his trailer at the same time that

Page 70

1 Camille Arfmann went missing from it?
2     A.  I don't recall that specifically.
3     Q.  Okay. So that's not a piece of evidence
4 that you looked -- that you looked into
5 specifically. Is that right?
6     A.  I don't recall.
7     Q.  Oh, you don't recall one way or the
8 other?
9     A.  Right.
10     Q.  Okay. If you had been focused on it,
11 that would have been something you asked Troy
12 Frost about, correct?
13     A.  Correct.
14     Q.  Okay. During the re-investigation you
15 did some follow up with Floyd L. Bledsoe, the
16 plaintiff's father, and Catherine Blats, after
17 receiving some DNA evidence, right?
18     A.  Yes.
19     Q.  Okay. Can you describe what -- why you
20 spoke with them?
21     A.  They were -- it was actually the evening
22 I was assigned this re-investigation, they were up
23 in Kansas, I believe they lived out of state and
24 they were in Kansas for I believe Tom's funeral,
25 actually. So I had an opportunity to speak with

Page 71

1 them in person, so that's why the interview was
2 conducted at that time. Specifically, I wanted to
3 speak with them about the DNA findings on the
4 socks, specifically that Floyd Sr.'s DNA was found
5 on the socks and yeah, to speak to them about --
6 and also about Tom's letters that he had written.
7     Q.  Okay. And how did you get in touch with
8 them?
9     A.  I don't recall actually.
10     Q.  Do you recall if someone else helped you
11 get in touch with them?
12     A.  I don't recall that.
13     Q.  Okay. So at the time that you, you know,
14 before you did the interview, you were aware that
15 The Innocence Project had done some DNA testing
16 that indicated that Floyd L. Bledsoe's DNA
17 matching the profile of Floyd L. Bledsoe was
18 present on Camille Arfmann's sock, correct?
19     A.  Correct.
20     Q.  Okay. And you also, during the interview
21 you collected the DNA profile of Floyd L. Bledsoe
22 yourself, correct?
23     A.  Yes.
24     Q.  Okay. And why did you do that?
25     A.  To have a -- for law enforcement to have

Page 72

1 a known sample from him directly, in case there
2 was further testing required.
3     Q.  Okay. And then the -- there was
4 additional DNA testing done with the DNA profile
5 that you -- sample that you collected from Floyd,
6 correct?
7     A.  I believe so, yes.
8     Q.  Okay. And it confirmed The Innocence
9 Project's DNA testing results. Is that right?
10     A.  Yes.
11     Q.  Okay. You also interviewed Floyd L.
12 Bledsoe about whether, you know, any possible
13 explanation for how his DNA could have gotten on
14 Camille Arfmann's sock. Is that right?
15     A.  Yes.
16     Q.  Okay. And what did he tell you?
17     A.  He had said that they would obtain
18 clothes from -- or they would -- him and his wife
19 would obtain clothes to give to Camille because
20 they were -- they didn't have money for clothes so
21 they would routinely obtain clothes for them and
22 give that to them.
23     Q.  Okay. Did you develop any opinion one
24 way or another about this explanation and whether
25 it provided a sufficient explanation for Floyd L.

Appino Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION