## IN THE UNITED STATES DISTRICT COURT FOR THE
## DISTRICT OF KANSAS

| | | |
|---|---|---|
| FLOYD S. BLEDSOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:16CV2296 |
| | ) | District Judge Daniel D. Crabtree |
| THE BOARD OF COUNTY COMMISSIONERS | ) | Magistrate Judge Gerald Rushfelt |
| OF THE COUNTY OF JEFFERSON, KANSAS; | ) | |
| RANDY CARRENO; TROY FROST, ROBERT | ) | |
| POPPA; JIM VANDERBILT; GEORGE | ) | |
| JOHNSON; JIM WOODS; TERRY MORGAN; | ) | |
| MICHAEL HAYES; JEFFREY HERRIG, in his | ) | |
| Individual and personal capacity; UNKNOWN | ) | |
| OFFICERS OF THE JEFFERSON COUNTY | ) | |
| SHERRIFF'S DEPARTMENT; and UNKNOWN | ) | |
| OFFICERS OF THE KANSAS BUREAU OF | ) | |
| INVESTIGATION, | ) | |
| | ) | |
| Defendants. | ) | |

### EXPERT REPORT OF J. NICK BADGEROW

**I, J. Nick Badgerow, provide the following report setting forth my qualifications and opinions in this matter:**

## I.      BACKGROUND AND QUALIFICATIONS.

1.      I am, and have been since April 1976, licensed to practice law by the Supreme Court of the State of Kansas.  I am, and have been at all times since that date, an attorney in good standing authorized to practice before the courts of this State.

2.      I received a Bachelor of Arts degree (with honors) from The Principia College in Elsah, Illinois, in 1972.  I received a juris doctor degree from the University of Missouri - Kansas City in December, 1975.

3. I am licensed to practice before the following courts: Supreme Court of the State of Kansas; Supreme Court of the State of Missouri; United States District Courts for the District of Kansas, the Western District of Missouri and the Northern District of Oklahoma; United States Courts of Appeals for the Tenth Circuit, Eighth Circuit, Fourth Circuit, and Federal Circuit; the United States Court of Federal Claims; and the United States Supreme Court.

4. I am a member of the following legal associations:

- Kansas Bar Association; I received the Outstanding Service Award from this Association in 1995 and in 2009; I received the Distinguished Service Award from this Association in 2020.
- Missouri Bar Association;
- Johnson County Bar Association; I received the President's Award from this Association in 2004; I received the Justinian Award from this Association in 20213;
- Wyandotte County Bar Association;
- Former Member: Earl E. O'Connor American Inn of Court (Secretary, 1993-1995; Counselor, 1995-1996; President, 1996-1997; Past-President, 1997-1998).

5. I have received the following appointments:

- Member, Kansas Judicial Council (1994 to 2018);
- Member, Kansas State Board of Discipline for Attorneys (2000 to 2016);
- Member, Kansas Supreme Court/KBA Joint Commission on Professionalism (2010 to 2013);
- Chairman, Kansas Judicial Council Civil Code Advisory Committee (1995 to 2018);
- Chairman, Kansas Bar Association Ethics Advisory Opinion Committee (member, 1995 to 2018; Chairman, 2005 to 2018);
- Chairman, Kansas Bar Association Ethics 2000 Commission (2002 to 2004);
- Chairman, Kansas Bar Association Ethics 20/20 Commission (2013);
- Co-Chair, Civil Justice Reform Act Committee, District of Kansas (1995 to 1998);
- Chairman, Ethics and Grievance Committee, Johnson County Bar Association (member 1987 to 2019, Chairman 1995 to 2019);
- Member, Rules and Forms Committee, United States District Court, District of Kansas (2004);
- Member, Mediation Panel, United States District Court, District of Kansas (1992-1998, 2003 to date).

6.     I was Board Certified in Civil Litigation by examination, by the National Board of Trial Advocates (1994), and I am listed in *Who's Who in American Law* and in *Who's Who in America.* I am a co-author of the *Kansas Employment Law Handbook*, first published by the Kansas Bar Association in 1994, and its Second Edition published in 2001.

7.     I am also co-author and co-editor of the *Kansas Ethics Handbook*, published by the Kansas Bar Association in 1996, a co-author of the 2001 Supplement, co-author and co-editor of the Second Edition published in 2009; and co-author and sole editor of the Third Edition published in 2015.  I authored the chapter on Conflicts of Interest in that Handbook.  I have published more than 70 bar review and bar journal articles about legal professional ethics and civil procedure. Those articles are listed in the *curriculum vitae* which is attached hereto as Exhibit A and incorporated herein by reference.  Finally, I have presented about 200 seminars, mainly on topics related to professional responsibility for attorneys.

8.     I have been called upon to serve as an expert witness in more than fifty cases.  These cases have involved the ethical conduct of one or more attorneys, interpretations and applications of the Model Rules of Professional Conduct including the issue of conflicts of interest.  A listing of the occasions on which I have provided testimony as an expert witness is set forth in Exhibit B, attached hereto.

9.     For 25 years, I served as Professional Responsibility Counsel for my law firm until January 2019, and in that position, I oversaw the drafting, adoption and application of rules, policies, practices and procedures for compliance with the Rules of Professional Conduct applicable to attorneys, and consulted regularly with attorneys in the firm on these subjects.  This position included the drafting, establishment, oversight, and enforcement of policies and procedures on conflicts of interest, and the resolution of issues relating to conflicts.

10.     In addition, I have served as lead trial counsel in numerous civil cases tried before juries and courts in the State of Kansas, including in the United States District Court for the District of Kansas.

11.     I have been asked to review certain materials and to render an opinion regarding the conduct of attorney Michael Hayes in the representation of one Thomas Bledsoe, particularly as it relates to his conflict of interest in representing Mr. Bledsoe in a case being prosecuted by District Attorney Jim Vanderbilt, while simultaneously representing Mr. Vanderbilt in his then-pending divorce action, as well as the conduct of attorney Jim Vanderbilt.

12.     In reaching the opinions set forth herein, I have reviewed the documents and materials listed in Exhibit C, attached hereto.

13.     My hourly rate is $750.  To date, I have expended 10.2 hours in reviewing documents, researching, reaching my opinions, and preparing this Report.

## II.   UNDERLYING FACTS.

14.     In November 1999 a fourteen-year-old girl named Camille Arfmann was murdered in Jefferson County, Kansas. Second Amended Complaint ("Comp.") ¶1.

15.     Shortly after the murder, one Thomas Bledsoe secured legal representation from Attorney Michael Hayes ("Hayes"), and then turned himself in to the Jefferson County Sheriff's Department for Camille Arfmann's murder. Thomas Bledsoe and Hayes disclosed details of the crime, led officers to Arfmann's body which had been buried on the property where Thomas Bledsoe lived, and surrendered Thomas Bledsoe's recently purchased gun as the murder weapon. Hayes Answer to Second Amended Complaint ("Hayes Answer") ¶¶2, 41, 36.

16.     Thomas Bledsoe was then charged with the murder.  November 9, 1999 Criminal Complaint by Jim Vanderbilt against Thomas Bledsoe, *State of Kansas v. Tom Bledsoe,* Case No. 99 CR 318 ("99CR318").

17.     Thereafter, despite evidence of Thomas Bledsoe's guilt, the focus of the investigation and prosecution instead turned to Thomas Bledsoe's brother, plaintiff Floyd S. Bledsoe.  Videotaped interview of Floyd S. Bledsoe, November 12, 1999, Case No. 99 CR 325 ("99CR325"); November 15, 1999 Criminal Complaint by Jim Vanderbilt against Floyd S. Bledsoe, *State of Kansas v. Floyd S. Bledsoe*, 99CR325.

18.     Floyd S. Bledsoe was then charged with the murder for which Thomas Bledsoe had turned himself in. November 15, 1999 Criminal Complaint by Jim Vanderbilt against Floyd S. Bledsoe, *State of Kansas v. Floyd S. Bledsoe*, Case No. 99 CR 325 ("99CR325"). On the same day, the charges against Thomas Bledsoe were dismissed. November 15, 1999 Motion and Order to Dismiss Case No. 99 CR 318 against Thomas Bledsoe, signed by Jim Vanderbilt.

19.     In April 2000, Floyd S. Bledsoe was convicted of murder in the first degree and sentenced to life in prison. Hayes Answer ¶¶ 6, 95.

20.     In 2015, the conviction of Floyd s. Bledsoe was overturned and he was released from prison after fifteen years.  Hayes Answer ¶¶ 8, 103.

21.     Hayes was appointed by the District Court of Jefferson County, Kansas, to represent Thomas Bledsoe. November 9, 1999 Order appointing/assigning Michael Hayes as counsel for Thomas Bledsoe, 99 CR 318; Hayes Answer to Second Am. Compl. ¶21.

22.     Simultaneously, while representing Thomas Bledsoe in the criminal case, Hayes was also representing District Attorney Jim Vanderbilt in his divorce case. October 12, 1999 Petition for Divorce by Jim Vanderbilt, signed by Michael Hayes, Case No. 99 D 160; see also,

e.g., November 9, 2000 Separation and Property Settlement Agreement, signed by Michael Hayes (JCDC 10-38); August 20, 2002 Letter from Michael Hayes to Attorney Sherri Loveland (Simmons 64); August 26, 2002 Journal Entry of Contempt Hearing, signed by Michael Hayes (Simmons 65-67).

23.     Hayes participated actively and aggressively in the efforts to secure the charging of Floyd S. Bledsoe by Hayes's client, District Attorney Vanderbilt, and thereby to take the focus off of Hayes's other client, Thomas Bledsoe. Videotaped interview of Floyd S. Bledsoe, November 12, 1999, 99CR325.

## III.   **CONFLICTS OF INTEREST.**

24.     Attorney conduct in Kansas is governed by the Kansas Rules of Professional Conduct, Kansas Supreme Court Rule 226 ("KRPC"). The Rules quoted, and principles stated, in this Report are those as they existed in the year 1999, when the subject conduct occurred.

25.     Conflicts of interest between concurrent clients are governed by Rule 1.7(a), KRPC, which provided, in 1999:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless
 (1) The lawyer reasonably believes the representation will not adversely affect the relationship with either client; and
 (2) Each client consents after consultation.

See Kansas Ethics Opinion 90-2 (1990) (conflict – clients not consent after consultation).

The 1999 Comment [to Rule 1.7] provides in part:

Loyalty is an essential element in the lawyer's relationship to a client. An impermissible conflict of interest may exist before representation is undertaken, in which event the representation should be declined. If such a conflict arises after representation has been undertaken, the lawyer should withdraw from the representation." 1995 Kan. Ct. R. Annot. 275.

*Matter of Brantley*, 260 Kan. 605, 624, 920 P.2d 433, 444 (1996). A well-known Kansas Supreme Court case clearly holds:

> Loyalty is paramount in an attorney's relationship with a client. Generally, the loyalty thread holds the attorney from representation directly adverse to the client without the client's consent. The Smiths did not consent. Concurrent representation of clients with adverse interests is prima facie improper.

*Barragree v. Tri-County Elec. Co-op., Inc*., 263 Kan. 446, 461, 950 P.2d 1351 (1997).  See also, *Sola-Morales v. State*, 300 Kan. 875, 883, 335 P.3d 1162 (2014):

> The right to counsel extends a duty of loyalty from counsel to the client so "[a] defendant in a criminal trial must have '"representation that is free from conflicts of interest."' [Citations omitted.]" *State v. Bowen*, 299 Kan. 339, 343, 323 P.3d 853 (2014).

## IV.    CONDUCT OF DEFENSE ATTORNEY MICHAEL HAYES.

26.    The representation of a criminal defendant while simultaneously representing the District Attorney represents a direct and concurrent conflict of interest in violation of the applicable ethical rules in 1999.  Thomas Bledsoe's interests in the criminal case in which he was a defendant were directly adverse to the interests of prosecutor Jim Vanderbilt who was prosecuting Thomas Bledsoe in that criminal case; attorney Hayes' simultaneous representation of Thomas Bledsoe and District Attorney Jim Vanderbilt represents a direct conflict of interest.  See, e.g, *Armstrong v. People*, 701 P.2d 17, 27 (Colo. 1985).

> The prosecutor and the defense attorneys here were adversaries for the purpose of this trial. . . . [T]he defense attorneys owed a duty to [the defendant] to endeavor to refute the prosecutor's arguments and to impeach his witnesses. This being so, . . . the defense attorneys were subject to the encumbrance that the prosecutor might take umbrage at a vigorous defense of [the defendant] and dispense with the services of their firm. . .
> A defense attorney must be free to use all his skills to provide the best possible defense for his client. Despite the noblest of intentions, the defense attorneys here may have been tempted to be less zealous than they should have been in the presentation of [the defendant's] case. This possibility is sufficient to constitute an actual conflict of interest as a matter of law.

*Howerton v. Danenberg*, 621 S.E.2d 738, 740-41, 279 Ga. 861 (Ga. 2005).  See also, *Zuck v. Alabama*, 588 F.2d 436, 439-440 (5th Cir. 1979) (criminal defense counsel also simultaneously represented the prosecutor – conflict of interest); *People v. Curren*, 228 P.3d 253, 261 (Colo. App.

2009) ("actual conflict of interest" in simultaneous representation of criminal defendant and district attorney); *Sallie v. State*, 499 S.E.2d 897, 269 Ga. 446 (Ga. 1998) (completely impermissible).

27.     It makes no difference that Hayes' representation of District Attorney Vanderbilt was in a divorce case. *South Carolina v. Gregory*, 364 S.C. 150, 612 S.E.2d 449 (2005) (defense counsel's representation of prosecutor in divorce action created actual and direct conflict of interest).  This is such a stark and unprecedented departure from accepted ethical legal practice – to serve simultaneously as the attorney of a defendant in a criminal case, *and* as the personal divorce attorney of the prosecutor of that same criminal case – that it would be obvious to any reasonable attorney that such representation constitutes a conflict.

28.     The conflict of interest was not waivable.

29.     Under Rule 1.7, KRPC (in 1999), a conflict of interest may be waived only IF (a) "the lawyer reasonably believes the representation will not adversely affect the relationship with the other client" AND "each client consents after consultation."  The Kansas Bar Association Legal Ethics Opinion Committee set forth guidance for lawyers considering whether consent is even possible in a 1993 Opinion:

> Counsel must from the outset:
>
> 1. Review the functions being performed by the lawyer in the representation, the likelihood that actual conflict will arise and the likely prejudice to each of the clients from the conflict if it does arise.
>
> 2. The attorney must assure himself or herself that a disinterested lawyer would not find fault with the multiple representation.
>
> 3. Insure from the outset that multiple clients have interests which are not -- and will not become -- fundamentally antagonistic to each other;
>
> 4. their interests in common representation are generally aligned even though there is some slight difference of interest among them;
>
> 5. that each client is advised fully of the possible consequences of multiple representation on each client;

6. that each client is fully advised of the possible problems that multiple representation will present to the attorney;

7. that each client is advised to seek separate independent legal advice about such representation; and

8. that each client consent in writing.

Kansas Ethics Opinion 93-9 (June 18, 1993).

30.     In the present case, attorney Hayes could not have reasonably and actually believed that the competent and diligent representation of neither Thomas Bledsoe nor Jim Vanderbilt would not have been adversely affected by the conflicting representation. See, e.g., New York Bar Ethics Opinion 1015 (August 04, 2014) ("conflict is nonconsentable if the lawyer cannot 'reasonably' believe that the lawyer will be able to provide competent and diligent representation to the affected client"); *Whitman v. Estate of Whitman*, 259 N.J.Super. 256, 265, 612 A.2d 386 (N.J. Super. 1992) ("cannot reasonably believe").

> Not all conflicts are waivable: when an attorney cannot reasonably believe that its representation will not be adversely affected, the conflict cannot be waived. See *CenTra, Inc. v. Estrin*, 538 F.3d 402, 413 (6th Cir.2008).

*Eternal Pres. Associates Llc v. Accidental Mummies Touring Co. LLC*, 759 F.Supp.2d 887, 892 (E.D. Mich. 2011).

31.     The need for informed consent to conflicts of interest is particularly significant in a criminal case, where the criminal defendant's life and liberty are at stake.

> See also *United States v. Davis*, 239 F.3d 283, 287 (2d Cir.2001) (absent knowing waiver, defendant entitled to new, conflict-free counsel to pursue motion to withdraw plea, when particularized allegations made that create actual conflict of interest with defendant's present counsel); *People v. Vaughn*, 200 Ill.App.3d 765, 146 Ill.Dec. 516, 558 N.E.2d 479 (1990) (error to fail to provide conflict-free counsel to assist defendant in preparing motion to set aside plea based on ineffective assistance of counsel); . . .

*State v. Hulett*, 293 Kan. 312, 263 P.3d 153, 158 (2011).

32.     Even if the conflict of interest in the present case could be waived, there is no evidence of any waiver of the conflict by either client. E.g., *Matter of Brantley*, 920 P.2d 433, 437, 260 Kan. 605 (1996) ("At no time did Respondent consult with his purported client Mary Storm, or obtain her consent to his materially adverse representation of her step-son"); *In re Evans*, 285 Kan. 167, 169 P.3d 1083, 1089 (2007). There is no evidence that now-deceased client Thomas Bledsoe or Jim Vanderbilt waived the conflict. There is no reference to any disclosure of a conflict of interest, or written waiver, in the criminal case docket. Waiver cannot be assumed by silence on the subject. E.g., *State v. Ashue*, 145 Wash.App. 492, 502, 188 P.3d 522 (2008) (burden to establish a valid waiver is upon the prosecution); *Tatham v. Rogers*, 283 P.3d 583 , 595 (Wash. App. 2012) (same).

33.     Even if attorney Hayes were to claim that his now-deceased client orally waived the conflict, that would not be enough, since the waiver, must result from actual "consultation." E.g., *In re Studtmann*, 427 P.3d 964, 967 (Kan. 2018) ("The respondent did not obtain informed consent"); *In re Johnson*, 294 Kan. 575, 585, 276 P.3d 213 (2012) ("Respondent admits that he did not obtain an informed consent").

34.     Because a nonwaivable conflict of interest existed, Hayes should have declined the representation of Thomas Bledsoe. Moreover, under the Code of Professional Responsibility, criminal defense counsel has a duty to notify the court of a conflict of interest and take appropriate steps to withdraw from a case when an actual conflict arises.  *Commonwealth v. Zabek*, 86 Mass. App. Ct. 520, 18 N.E.3d 685, 690 (2014).

35.     Rule 1.16(a), KRPC, provided in 1999:

(a) Except as stated in paragraph (c), a lawyer shall not represent a client or, where representation has commenced, shall withdraw from the representation of a client if:

(1) the representation will result in violation of the rules of professional conduct or other law; . . .

See, e.g., *In re Dickens*, 309 Kan. 336, 357, 435 P.3d 21 (2019) ("the respondent was required to withdraw from the representation because of the conflict of interest which developed between the respondent and G.N. and D.N"); *In re Ayesh,* 485 P.3d 1155, 1162 (Kan. 2021) ("The respondent was obligated to withdraw from the representation of all defendants when the conflict between Mr. Frobish and the other defendants became known").  Hayes failed to discharge this duty as well, and thereby violated Rule 1.16(a).

## V.    CONDUCT OF DISTRICT ATTORNEY JIM VANDERBILT.

36.    A prosecutor is not ethically permitted to pursue a prosecution in which he has a conflict of interest. A county attorney's prosecution of one criminal defendant while simultaneously being a client of an alternative suspect's attorney represents an obvious, direct, and concurrent conflict of interest in violation of the applicable ethical rules in 1999.

37.    A conflict of interest exists in the prosecution of a criminal case whenever the circumstances evidence a reasonable possibility that the prosecutor may not exercise his discretionary function in an even-handed manner.  E.g., *State v. Cope*, 30 Kan. App. 2d 893, 895–96 (2002). "The key . . . is whether the prosecutor has a significant personal interest in the litigation which would impair the prosecutor's obligation to act impartially toward both the State and the accused." *State v. Rivera*, 48 Kan. App. 2d 417, 435 (2012) (quoting *Cope*, 30 Kan.App.2d at 897). The prosecutor must be "disinterested." *Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 810 (1987); *Clearwater-Thompson v. Michael A. Grassmueck, Inc.*, 160 F.3d 1236, 1237 (9th Cir. 1998). A prosecutor "is not disinterested if he has, or is under the influence of others who have, an axe to grind against the defendant, as distinguished from the appropriate interest that members of society have in bringing a defendant to justice with respect to the crime with which he is charged."

*People v. Dehle*, 166 Cal. App. 4th 1380, 1388 (2008) (collecting cases). "[T]he district attorney is expected to exercise his or her discretionary functions in the interests of the People at large, and not under the influence or control of an interested individual." *Id.*; *see also, e.g.*, *Com. v. Balenger*, 704 A.2d 1385, 1389 (Pa. Super. Ct. 1997) (a criminal defendant has "a right to have his case reviewed by an administrator of justice with his mind on the public purpose, not by an advocate whose judgment may be blurred by subjective reasons.").

38.    To serve simultaneously as the prosecutor dismissing charges against a criminal defendant while simultaneously receiving legal services from that defendant's attorney is a conflict of interest. Indeed, it is such a stark and unprecedented departure from accepted ethical legal practice that it would be obvious to any reasonable attorney that such representation constitutes a conflict.

39.    As prosecutor, Vanderbilt had a duty to maintain the integrity of the prosecution from conflicts of interest for the benefit of the victim and the public, as well as a duty to protect the fair trial rights of Thomas Bledsoe and Floyd S. Bledsoe.  The county attorney "holds a position of quasi-judicial authority and [] is held to a higher standard and required to protect the fair trial rights of the defendant." *State v. Gray*, 25 Kan.App.2d 83, 958 P.2d 37, 40 (1998).

40.    Vanderbilt also had a specific ethical duty to bring both Hayes's conflict of interest and his own conflict of interest to the Court's attention. Rule 8.3(a), KRPC (1999), mandates:

> (a) A lawyer having knowledge of any action, inaction, or conduct which in his or her opinion constitutes misconduct of an attorney under these rules shall inform the appropriate professional authority.

See also *In re Kenny*, 289 Kan. 851, 217 P.3d 36, 38 (2009); *In re Pyle*, 278 Kan. 230, 240, 91 P.3d 1222 (2004) ("He never met the requirements of KRPC 8.3 after forming an opinion that Conderman had committed an ethical violation").  Under the Code of Professional Responsibility, a prosecutor has a duty to notify the court and take appropriate steps to withdraw from a case when

an actual conflict arises. *Commonwealth v. Zabek*, 86 Mass. App. Ct. 520, 18 N.E.3d 685, 690 (2014)

41.     In the present case, District Attorney Jim Vanderbilt was more aware than anyone of the irreconcilable conflicts of interest under which both he, and his lawyer, Michael Hayes, suffered.  He had a duty to bring these conflicts to the court's attention and seek Mr. Hayes's disqualification from the representation of Thomas Bledsoe.  Vanderbilt failed to obey this duty.

## VII.    PARTICIPATION OF DEFENSE ATTORNEY HAYES IN INTERROGATION OF CRIMINAL DEFENDANT FLOYD S. BLEDSOE

42.     Attorney Hayes, at the instruction, or at least acquiescence, of his client, District Attorney Jim Vanderbilt, engaged in a strenuous examination of Floyd S. Bledsoe, in the presence of his other client, Thomas Bledsoe, and law enforcement officers.

43.     Rule 4.4(a), KRPC (1999), provides as follows:

(a) In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person.

See, e.g., *In re Comfort*, 159 P.3d 1011, 1017 (Kan. 2007) (letter sent and publicized calculated to embarrass, despite other stated purpose; lawyer censured); *In re Royer*, 276 Kan. 643, 655, 78 P.3d 449 (2003) (lawyer suspended).

44.     The comments of the Indiana Supreme Court are apropos of this point:

Effective, professional representation does not include abusive, insulting, and threatening behavior. We are not unmindful that in the heat of conflict emotional outbursts are possible. However, the aggressive nature of the comments and acts made by Respondent in this case clearly goes beyond acceptable standards of professionalism. It was contrary the Oath of Attorneys which requires abstention from offensive personality; it undermines public confidence in and respect for the legal system; and it is prejudicial to the administration of justice.

*Matter of Burns*, 657 N.E.2d 738, 740 (Ind. 1995).  See also, *In re Stanley Chang Woon Foo*, 159 A.D.3d 1218, 1220, 72 N.Y.S.3d 249 (N.Y. App. Div. 2018) ("aggressive and inappropriate remarks to parties with whom he had dealings and the context in which such remarks were spoken here. . . were prejudicial to the administration of justice and adversely reflected on [respondent's] fitness as a lawyer); *State ex rel. Oklahoma Bar Ass'n v. Andre*, 957 P.2d 545, 549, 1998 OK 29 (Okla. 1998)("Harassing a witness [by aggressive, abusive and intrusive conduct] . . . clearly falls outside the permissible bounds of aggressive advocacy).

45.     During this examination, Attorney Hayes acted in an abusive, insulting, demeaning, overly aggressive, and unprofessional manner towards Floyd S. Bledsoe in violation of Rule 4.4(a), that no reasonable attorney would have thought compliant with that rule.

46.     Given the dismissal of charges against Thomas Bledsoe and pursuit of charges against Floyd S. Bledsoe shortly after the November 12 videorecorded interview, Vanderbilt appears to have acquiesced to the conduct of attorney Hayes in his videotaped attacks against Floyd Bledsoe.

47.     But for the conflicted representation of District Attorney Vanderbilt and Thomas Bledsoe, Attorney Hayes' improper conduct towards Floyd Bledsoe would likely not have been allowed by the sheriff's office or the prosecutor.

I reserve the right to modify my opinions upon receipt of any additional materials.

Dated:  May 20, 2023

SPENCER FANE LLP

_____

J. Nick Badgerow #9138
6501 College Boulevard, Suite 500
Overland Park, Kansas 66210
(913) 345-8100
(913) 345-0736 (Facsimile)
nbadgerow@spencerfane.com

15

**EXHIBIT A**
**CIRRICULUM VITAE**





# J. Nick Badgerow

Direct dial: (913) 327-5134
nbadgerow@spencerfane.com

6201 College Boulevard, Suite 500
Overland Park, Kansas 66211

## BIOGRAPHICAL SUMMARY

**Birthdate:** April 7, 1951

**Bar Admissions:**

> Kansas, 1976
> Missouri, 1986
> United States District Court, District of Kansas
> United States District Court, Western District of Missouri
> United States District Court, Northern District of Oklahoma
> United States Courts of Appeals, Tenth Circuit, Eighth Circuit, Fourth Circuit, and
> Federal Circuit
> United States Claims Court
> United States Supreme Court

**Legal Education:**

University of Missouri (Kansas City, Missouri)
> Juris Doctor, 1975 - Law Review Staff

American Arbitration Association, Arbitrator I Training, (2003); Arbitrator II Training (2004).

**Undergraduate Education:**

The Principia College (Elsah, Illinois) - B.A. (honors), 1972

> Business Administration and English Literature (including one semester at
> University of London, England)
> Phi Alpha Eta Scholastic Honor Fraternity

**Post Graduate Employment:**

| | |
|---|---|
| **1986 - present:** | Spencer Fane Britt & Browne, Overland Park, Kansas |
| | Partner |
| **1976 – 1985 :** | McAnany, Van Cleave & Phillips, Kansas City, Kansas |
| | Associate, 1976 - 1979 |
| | Partner, 1979 – 1985 |

**Professional Activities:**

Member, American Bar Association  (Association of Professional Responsibility Lawyers)

Member, Kansas Judicial Council, appointed by Kansas Supreme Court (1994 - 2018)

Chairman, Kansas Judicial Council Civil Code Advisory Committee (1995 - 2018)

Member, Kansas State Board of Discipline for Attorneys, appointed by Kansas Supreme Court (2000 - 2016)

Member, Kansas Supreme Court Commission on Professionalism (2010 - 2013)

Chairman, Kansas Bar Association, Ethics 2000 Commission (2001 – 2002)

Chairman, Kansas Ethics 20/20 Commission (2013)

Chairman, Kansas Bar Association, Ethics Advisory Opinion Committee (Chairman, 2005 - 2019); (Member, 1997-2005)

Chairman, Johnson County (Kansas) Bar Association Ethics and Grievance Committee (Chairman, 1989 - 2018) (Member, 1987 – 1989)

Co-Chair, Civil Justice Reform Act Committee, United States District Court – District of Kansas (1995 - 1998)

Member, Forms and Procedures Committee, U.S. District Court, District of Kansas (2003 - 2004)

Missouri Bar Association

Wyandotte County (Kansas) Bar Association

Kansas City Metropolitan Bar Association  (past Chair, Civil Rights Committee)

Earl E. O'Connor Inn of Court  (Secretary, 1993 - 1995); (Counselor, 1995 - 1996); (President, 1996 - 1997)

**Publications:**

Casenote, 43 U.M.K.C. L. Rev. 211 (1974).

"Dealing With Change: The New Federal Rules of Civil Procedure," 63 Kansas Bar Journal 26 (April, 1994).

"The Fork in the Road: A Practitioner's Guide to the 1997 Changes in the Code of Civil Procedure," 66 Kansas Bar Journal 32 (June-July, 1997).

"Improper Advances: The Rule Against Sex with Clients," 67 Kansas Bar Journal 40 (June-July, 1998).

"Not with My Client You Don't: The Propriety of Contacting Represented Parties," 2 Johnson County Bar Association Barletter 6 (January 1998).

"Can We Talk?: The Lawyer's Ethical, Professional and Proper Duty to Communicate with Clients," 7 Kansas Journal of Law and Public Policy 105 (Spring, 1998).

"Resuscitating the Principle of Perjury," Kansas Association of Defense Counsel Legal Letter, p.1 (March 1999).

"Lawyers Beware: Increasing Efforts to Invade the Attorney-Client Privilege Through Examination of Attorneys' Fee Statements," Kansas Association of Defense Counsel Legal Letter, p. 1 (December 1999).

"The Lawyers' Creed of Professionalism: Some Observations from the Field," 69 Kansas Bar Journal 24 (February, 2000).

"A Profession on the Threshold: The Bar Considers Multiple Discipline Practice," 69 Kansas Bar Journal 12 (March, 2000).

"Can't We All Just Get Along?": A Review of Successful Partnering Between Inside and Outside Counsel, 70 Kansas Bar Journal 12 (March, 2001).

"Honor in Battle: The Conflict Between Candor and Zealous Advocacy," 70 Kansas Bar Journal 16 (October, 2001).

"Nip it in the Bud: Kansas Adopts Diversion for Lawyer Discipline," Johnson County Bar Association Barletter, (December 2001).

"May It Please the Court: A Tribute to Charles S. Schnider," 71 Kansas Bar Journal 16 (September, 2002).

"Walking the Line: Government Lawyer Ethics," 12 Kansas Journal of Law and Public Policy 437 (Spring, 2003).

"Have Gun – Will Travel: Where Should Depositions Be Taken?" Kansas Association of Defense Counsel Legal Letter, p. 1 (Summer 2003).

"Ethics and E-Mail: Sender Beware," 73 Kansas Bar Journal 9 (January, 2004).

"Notarize This: The Notary's and the Lawyer's Liability for Forged Signatures," 73 Kansas Bar Journal 18 (September, 2004).

"Avoiding and Defending Against Mold Suits," (with Kelly A. Campbell), 1 Mold & Moisture Management Magazine 30 (October, 2004).

"Fitting the Mold: It's All About the Construction," (with Kelly A. Campbell), Toxic Torts and Environmental Law 20 (DRI) (January 2005).

"Rattling the Saber: The Ethics of Threatening Criminal and Disciplinary Prosecution," 61 Journal of the Missouri Bar 13 (January 2005), available online at http://www.mobar.org/journal/2005/janfeb/index.htm

"Don't Threaten Me: A Lawyer's Duties Under Rule 8.3," 74 Kansas Bar Journal 14 (April 2005).

"Mold and the 'Expert': All is Not as it Seems," (with Kelly A. Campbell), 2 Mold & Moisture Management Magazine No. 2, p. 6 (April, 2005).

"Law School Faculty, LLP: Law Professors as a Law Firm," (with Prof. Michael H. Hoeflich), 53 University of Kansas Law Review 853 (May, 2005).

"Renewing Your Vows: A New Look at the Lawyer's Oath of Admission – Part I," 2 Kansas Prosecutor, No. 1, p. 17 (Spring, 2005); and "Part II," 2 Kansas Prosecutor, No. 2, p. 17 (Summer, 2005).

"New Law Impacts Contractors: Kansas Enacts Fairness in Private Construction Act," (with Dave Seitter and Danielle Curtiss), 105 Midwest Contractor 12 (June 2005).

"Disease of the Mold Experts: How Some Experts Fuel the Mold Frenzy," (with Kelly A. Campbell), 2 Mold and Moisture Magazine No. 3, p. 8 (July 2005).

"From Solo to Megafirm:  You Need a General Counsel," 75 Kansas Bar Journal 22 (January, 2006).

"Please Leave the Room:  Who May Attend Depositions?," (with Lindsay Noelle Todd), Kansas Defense Journal, Winter 2006, p. 1.

"Lawyers for Lawyers: Why Your Firm Should Consider Naming Its Own General Counsel," 20 Missouri Lawyers Weekly No. 31, p.17, July 28, 2006.

"The Horse and the Barn Door: Ethics of Inadvertent Disclosure," 75 Kansas Bar Journal 15 (September, 2006).

"Kansas Ethics Complaints: Rules, Procedures, and Recommendations," 30 Kansas Trial Lawyers Journal 6 (November, 2006).

"Acceptable Interference: The Ethics of Giving a Second Opinion," 76 Kansas Bar Journal 20 (January, 2007).

"Lawyers in the Middle: The Three Way Tension Among Lawyers, Clients, and Fee-Payers," Kansas Defense Journal, Spring 2007, p. 3.

"New Horizons: Kansas Adopts Ethics 2000 Changes," 76 Kansas Bar Journal 20 (June, 2007).

"Apocalypse at Law: The Four Horsemen of the Modern Bar – Drugs, Alcohol, Gambling and Depression," 18 The Professional Lawyer No. 3, p. 2 (Fall 2007). Reprinted with permission at 77 Kansas Bar Journal 19 (February, 2008).

"Rules vs. Rules: A Conflict on Inadvertent Production," 77 Kansas Bar Journal 19 (January, 2008).

"ESI Comes to the K.S.A.: Kansas Adopts Federal Civil Procedure Rules on Electronic Discovery," 77 Kansas Bar Journal 30 (August, 2008).

"Law Firm In-House Counsel: Interface with E-Discovery," 78 Kansas Bar Journal 17 (March, 2009).

"Conflicts and Confidentiality: Duties When A Lawyer Changes Firms," 79 Kansas Bar Journal 21 (January 2010).

"Tweet This: The Ethics of Social Networking," 79 Kansas Bar Journal 17 (May 2010).

"www.lawfirm.com: A Web of Risks," 79 Kansas Bar Journal 9 (November/December 2010), reprinted with permission at 7 ABA Section of Environment, Energy & Resources Ethics Committee Newsletter 6 (March 2011).

"Found Email Treasure: But Can You Use It?," 81 Kansas Bar Journal 10 (January 2012).

"The Regulation of Courtesy: Does Kansas Need a Code of Professionalism?" (with Prof. Michael H. Hoeflich), 60 University of Kansas Law Review 413 (2012), available on-line at http://www.law.ku.edu/publications/lawreview/pdf/04_Hoeflich_Final.pdf.

"Brave Lawyers' Work: The Pillars of Professionalism," 81 Kansas Bar Journal 22 (October 2012).

"King vs. Parliament: City Council Immunity from Civil and Criminal Liability Under the Speech or Debate Clause," 99 Kansas Government Journal 9 (January 2013).

"The Beam and the Mote: A Review of the Lawyer's Duty to Report," 82 Kansas Bar Journal 20 (February 2013).

"'You Have Been Endorsed on LinkedIn:' What Now?," 83 Kansas Bar Journal 16 (January 2014).

"20/20 Vision: The Kansas Supreme Court Adopts Changes to the Rules of Professional Conduct," 83 Kansas Bar Journal 22 (March 2014).

"The Move to Cloud City: The Benefits and Risks of Cloud Computing," 84 Kansas Bar Journal 22 (January 2015).

"Artificial People: Why Corporations Cannot Appear in Court Without a Lawyer," 84 Kansas Bar Journal 20 (September 2015).

"Privilege for Hire: Does the Attorney-Client Privilege Extend to Independent Contractors?" 85 Kansas Bar Journal 10 (May 2016).

"Don't Tread on Me: The Separation of Powers Doctrine and the Need for a Strong Judiciary," 85 Kansas Bar Journal 30 (May 2016).

"Outside Counsel Guidelines: 'Legis Devita' = Lawyers Be Warned," Kansas Defense Journal 9 (Summer-Fall 2016).

"Civil Discovery 2017: The Kansas Legislature Adopts Federal Rules on Proportionality," 86 Kansas Bar Journal 22 (September 2017).

"'The Right to Petition for a Redress of Grievances': Lawyers Contacting Government Employees Represented by Counsel," 41 Journal of the Kansas Trial Lawyers Association 16 (November 2017).

"Lawyers' Electronic Advertising: Websites, Blogs, LinkedIn, Etc.," 87 Kansas Bar Journal 40 (March 2018).

"Guidance is Available: The KBA Ethics Advisory Committee," 87 Kansas Bar Journal 9 (June 2018).

"'Blessed are the Peacemakers:' The Case for Civility in the Practice of Law," 88 Kansas Bar Journal 40 (January 2019).

"In House Counsel Beware: Corporate Attorneys and the Practice of Law in Kansas and Missouri," 88 Kansas Bar Journal 44 (May 2019).

"My Court, My Ball: May a Contractual Forum Selection Clause Prohibit Removal to Federal Court?," 42 Journal of the Kansas Trial Lawyers Association No. 4, 8 (May 2019).

"Divided Loyalties: Referral Fees and Conflicts of Interest," 42 Journal of the Kansas Trial Lawyers Association No. 6, 12 (Nov. 2019).

"'So Help Me God:' The Lawyer's Oath of Admission and the Rules of Ethics," 88 Kansas Bar Journal 56 (Nov./Dec. 2019).

"Assistance Please: What May a Paralegal Do and Not Do?," Heartland Paralegal Association Headnotes (Jan./Feb. 2020).

"'Authorized by Law:' Ex Parte Contacts with Government Officials Represented by Counsel," 89 Kansas Bar Journal 47 (Jul./Aug. 2020).

"Friends and Lovers: Conflicts of Interest and New ABA Opinion on Relationships Between Opposing Counsel," 90 Kansas Bar Journal 30 (Jan./Feb. 2021).

"But You Are My Lawyer: Taking a Client's Deposition," 2021 Kansas Defense Journal 11 (July 2021).

"'I Would If I Could:' May a Government Entity Waive a Conflict of Interest on the Part of Outside Counsel?" 107 Kansas Government Journal No. 7, 214 (August-September 2021).

"No Quid Pro Quo: Settling Civil Claims While Criminal Charges Are Pending," 2 Legal Ethics & Malpractice Reporter, No. 12 (December 31, 2021).

"Reorganization And Restructure:  New Supreme Court Rules Relating to Discipline of Attorneys," 91 Kansas Bar Journal 30 (Jan./Feb. 2022).

"Hired Opinions: Ethics and Expert Witnesses," 91 Kansas Bar Journal 27 (Sept./Oct. 2022).

Avoiding the Pitfalls: Ethical Interviewing and Hiring for Lawyers and Law Firms, 92 Kansas Bar Journal 38 (March/April 2023),

Co-Author, Kansas Employment Law Handbook (K.B.A. 1991; 1995 Supp.).

Co-Author and Co-Editor, Kansas Lawyers Ethics Handbook, Second Edition (K.B.A. 2009); Co-Author and Editor, Third Edition (K.B.A. 2015).

**Seminars:**

Presented over 200 seminars, meetings, and programs on litigation, construction and engineering, civil rights and employment, and professional ethics.

**Honors:**

"Best Lawyers in America" (2007 -     ).

"Kansas Super Lawyers," (2005 -    ).

"Best Lawyers in America – Lawyer of the Year," Employment Litigation, Kansas City, Kansas (2012 and 2016); "Best Lawyers in America - Lawyer of the Year," Arbitration (2020).

Chambers, "Litigation Star," and "Labor and Employment Star" (2018).

Robert L. Gernon Award for Outstanding Service to Continuing Legal Education in Kansas, presented by the Kansas Continuing Legal Education Commission (2011).

Distinguished Service Award, Kansas Bar Association (2020); Outstanding Service Award, Kansas Bar Association (1995 and 2009).

Johnson County Bar Association President's Award (2004).

Johnson County Bar Association Justinian Award (2023).

Board Certified in Civil Litigation by the American Board of Trial Advocates (1994).

Mission Valley Hunt Club, President's Award (1986); Conniver Award for Service (1995); Chairman's Award (2000); Thomas C. Reck Memorial Award (2005); Sosland Cup Steeplechase (2004, 2012, 2015, 2018, 2022); Hunter Pace Award (2009, 2010, 2014, 2015, 2018, 2019).

Boy Scouts of America, District Outstanding Service Award (1999); Wood Badge Training Award (2000); District Award of Merit (2001); National Scoutmaster's Award of Merit (2004); Scoutmaster's Key (2005); Adult God & Service Award (2006); Heart of America Council Certified Trainer (2006).  District Chairman, Trailhead District, Heart of America Council (2007 – 2010); Chairman, Strategic Planning Committee, Heart of America Council (2010 - 2012); Assistant District Commissioner, Trailhead District (2012 -   ); Assistant Council Commissioner – Continuing Education (2014 -    ). Heart of America Council Executive Board (2007 -   ); Silver Beaver Award (2008); National Speakers' Bureau (2010 - 2015); Distinguished Commissioner Award (2014); Commissioner Award for Excellence in Unit Service (2014); Doctor of Commissioner Service Award and Doctorate Knot (2014); Order of the Arrow, Vigil Honor (2023); Presiding Chieftain, Tribe of Mic-O-Say (2021).

Who's Who in American Law (1990 -      ); Who's Who in America (1998 -    ); Who's Who in the World (2003 -    ).

**EXHIBIT B**
**LIST OF EXPERT CASES**

## LIST OF CASES
## Expert Reports and Testimony Provided
## J. Nick Badgerow

*Doctor's Associates v. Kessler and Banks*, Case No. 90C12370, District Court of Johnson County, Kansas (1996).  Deposition and hearing testimony.

*Community Bank v. Sloan, Listrom*, Case No. 97C3908, District Court of Johnson County, Kansas (1997). Deposition and trial testimony.

*Curtis Barvick v. Henry Cisneros*,  Case No. 95-2326-GLR, United States District Court for the District of Kansas (1997).  Affidavit.

*State of Kansas v. James Overby*, District Court of Johnson County, Kansas (1997).  Hearing testimony.

*In Re: Caldwell Estate*, District Court for the District of Geary County, Kansas (1997). Report.

*Dean, Witter, Reynolds v. Boller*, Case No. 96-05836, NASD Arbitration, No. 96-05836 (1997).  Report.

*Associated Wholesale Grocers, et al. vs. Americold, Inc., et al.*, 92C4015, District Court of Wyandotte County, Kansas (1997).  Report.

*Stevana Case, et al. vs. Unified School District No. 233, et al.*, Case No. 94-2100-GTV, United States District Court for the District of Kansas (1997).  Affidavit.

*Jackie Holtz and David Gardner, Heirs at Law vs. Kevin J. Lockhart, et al.*, Case No. 98C14, District Court of Pratt County, Kansas (1998).  Report.

*United States of America vs. Dan Anderson, Mark Thompson, et al.*, Case No. 98-20030-JWL, United States District Court for the District of Kansas (1998).  Report.

*In the Matter of the Estate of Jess Gray*, Case No. P-26218, District Court of Johnson County, Kansas (1999).  Hearing testimony.

*United Phosphorus Ltd.  v. Midland Fumigant, Inc.*, Case Nos. 91-2133-O and 95-2267-GTV, United States District Court for the District of Kansas (1999).  Affidavit.

*Diversified Mechanical, Inc. v. James Vore*, Case Numbers 98C13391 and 98C11409, District Court of Johnson County, Kansas (1999).  Affidavit.

*Kenneth Heard, et al. v. Tyree, Eskew, Roberts & Mitchell, L.C., et al.*,  Case No. 98C4965, District Court of Johnson County, Kansas (1999).  Report and deposition.

*Kay-Cee Enterprises, Inc. v. Morton Amster, et al.*, Case No. 00-2025-JWL, United States District Court for the District of Kansas (2000).  Report

*In the Matter of the Marriage of Karey J. Slyter and Paul W. Slyter*, Case No. 01D382. District Court of Miami County, Kansas (2001).  Report.

*In re. Turner & Boisseau, Chartered*, Case No. 00-21915, United States Bankruptcy Court for the District of Kansas (2001).  Affidavit.

*Mark Dugan v. American National Bancshares of Wichita, Inc.*, Case No. 01 C 0206, District Court of Sedgwick County, Kansas (2001).  Affidavit.

*Kenneth L. Saatoff v. Data Systems International*, Case No. 00-CV-7216, District Court of Johnson County, Kansas (2002).  Report.

*Game Face Sports International, Inc. v. Reuben O. Charles, Charles E. Polk, and Stinson Morrison Hecker, LLP*, Case No. 022-11518, Circuit Court of the City of St. Louis, Missouri (2004).  Deposition.

*Marvin Chance, et al. v. US Tobacco Company*, Case No. 05-CV-112, District Court of Seward County, Kansas (2006).  Report and trial testimony.

*Barton J. Cohen, et al. v. Marion Battaglia*, Case No. 07CV2230, District Court of Johnson County, Kansas (2007).  Report.

*Hjersted Family Partnership v. Deborah Hallauer, Hallauer Law Office, and Denver Vold*, Case No. 06-2229-CM, United States District Court, District of Kansas (2008).  Report.

*Nancy Phillips v. David Whipple*, Case No. 0616-CV27977, Circuit Court of Jackson County, Missouri (2009).  Report.

*Board of County Commissioners, Shawnee County, Kansas v. Robert D. Hecht, et al.*, Case No. 09C104, District Court of Shawnee County, Kansas (2010).  Report and deposition.

*East Hills Condominiums, LP v. P.M.,* Case No. 09CV7319, District Court of Johnson County, Kansas (2010).  Report, deposition and jury trial testimony.

*William Gibson, et al. v. Southwestern Bell Telephone Co.,* Case No. 08-CV-2017 EFM/DJW, United States District Court for the District of Kansas.  (2010).  Affidavit.

*Mitchell Sigg, et al. v. Steven Doering*, Case No. 09CV44, District Court of Allen County, Kansas.  (2010).  Report.

*Parks, Trustee v. Consumer Law Associates*, Case No. 08-CV-2017 EFM/DJW, United States District Court for the District of Kansas, and *In re. Steven Carl Lewis*, Case No. 10-10117, United States Bankruptcy Court for the District of Kansas.  (2011).  Report.

*Consumer Law Associates v. Hon. Judi Stork*, Case No. 10C1257, District Court of Shawnee County, Kansas.  (2011).  Report and deposition.

*Parks, Trustee v. Persels & Associates*, Case No. Case No. 09-13443, United States District Court for the District of Kansas, and *In re. Levi A. Kinderknecht*, Case No. 10-05209, United States Bankruptcy Court for the District of Kansas.  (2011).  Report.

*Wiles v. American Family Life Assurance Company*, Case No. 10CV539, District Court of Wyandotte County, Kansas. (2011).  Report.

*Martin K. Eby Construction Company, Inc. v. One Beacon Insurance Company*, Case No. 08-1250-WEB-KGG, United States District Court for the District of Kansas, and *Continental Casualty Company v. One Beacon Insurance Company*, Case No. 08-CV-2392-WEB-KGG, United States District Court for the District of Kansas.  (2011).  Report.

*Parks, Trustee v. Persels & Associates*, Case No. 10-13945, United States District Court for the District of Kansas, and *In re. Megan Diane Ballway*, Case No. 11-5016, United States Bankruptcy Court for the District of Kansas.  (2011).  Report.

*City of Mission, Kansas v. Cody Christ*, Case Nos. C01801, 183179, 183180, City of Mission (Kansas) Municipal Court.  (2011).  Report.

*Hays v. Consumer Law Associates*, Case No. 11-CV-1163-JWL-DJW, United States District Court for the District of Kansas.  (2012).  Report.

*Hodes & Nauser, M.D.'s, P.A. v. Robert Moser, M.D.,* Case No. 11-CV-02365-CM-KMH, United States District Court for the District of Kansas.  (2012).  Report.

*Morris, Trustee v. Persels & Associates*, Case No. 10-12553, United States District Court for the District of Kansas, and *In re. Nicole C. Reints*, Case No. No. 10-05054, United States Bankruptcy Court for the District of Kansas.  (2012).  Report.

*Morris, Trustee v. Persels & Associates*, Case No. 12-CV-01268-JTM-DJW, United States District Court for the District of Kansas, and *In re. Kenny E. Pedigo*, Case No. No. 11-12916, United States Bankruptcy Court for the District of Kansas. (2012). Report.

*Morris, Trustee v. Persels & Associates*, Case No. 12-CV-012270-JTM-DJW, United States District Court for the District of Kansas, and *In re. Eric E. Kaufman*, Case No. No. 10-11038, United States Bankruptcy Case for the District of Kansas.  (2012).  Report.

*Morris, Trustee v. Persels & Associates,* Case No. 12-CV-01269-JTM-DJW, United States District Court for the District of Kansas and *In re. Mark Allen Good*, Case No. No. 10-13160, United States Bankruptcy Court for the District of Kansas.  (2012).  Report.

*Rachel Kannaday v. Charles Ball, Special Administrator*, Case No. 12-CV-2742-RDR-KGS, United States District Court for the District of Kansas. (2013).  Report and Trial testimony.

*Jennifer Kerr v. Vatterott Educational Centers, et al.*, Case No. 1216-CV12385, Circuit Court of Jackson County, Missouri.  (2013).

*Sheryl Tucker, et al. v. Theresa Otto, et al*., Case No. 13-CV-2539, United States District Court for the District of Kansas.  (2014).  Report and deposition.

*Paul T. White v. Vito Barbieri and Barbieri & Associates, LLC*, Case No. 09CV4761, District Court of Johnson County, Kansas.  (2014).  Opinion and deposition.

*Midwest Crane and Rigging, LLC v. Kevin Kelly and Tai Vokins*, Case No. 14CV0771, District Court of Johnson County, Kansas.  (2015).  Opinion and deposition.

*Diane Hooks v. Lee Tieman, John Spencer and Tieman, Spencer, Holaday & Hicks, LLC*, in arbitration before Judge Charles Atwell.  (2015).  Affidavit.

*John A. Moore, et al. v. Jebediah Moore, et al*., Case No. 2015-CV-33, District Court of Brown County, Kansas. (2016).  Opinion and deposition.

*George Hewitt, et al. v. Mark D. Murphy,* Case No. 15CV4294, District Court of Johnson County, Kansas. (2017).  Opinion.

*Goliath Motor Sports, LLC, et al. v. David Novak, et al*., Case No. 2013-CV-000446, District Court of Johnson County, Kansas. (2017 - 2018).  Written Report.

*Southwest National Bank v. Martin, Pringle, Oliver, Wallace & Bauer, LLP*, (Lawsuit not filed) (2017).  Written opinion.

*M.B. And S.E., et al. v. Laura Howard In Her Official Capacity As Kansas Department For Children And Families Secretary, et al.,* Case No. 2:18-CV-02617-DDC-GEB, United States District Court for the District of Kansas.  (2020).  Written Declaration.

*In re Patrick McConathy*, Case No. NO. 90-13449, United States Bankruptcy Court for the Western District of Louisiana.  (2022).  Written Declaration.

**EXHIBIT C**
**MATERIALS REVIEWED**

**Materials Reviewed**

***Floyd S. Bledsoe v. Jefferson County, et al.***, Case No. 2:16-cv-02296
-     Plaintiff Floyd S. Bledsoe's second amended complaint (Docket No. 141)
-     Michael Hayes's answer to second amended complaint (Docket No. 142)

***Jim A. Vanderbilt v. Lisa Vanderbilt* - Divorce Case No. 99 D 160**
-     Docket Sheet for Case No. 99 D 160 (JCDC 39-41)
-     October 12, 1999 Petition for Divorce by Jim Vanderbilt, signed by Michael Hayes (JCDC 1-3)
-     November 9, 2000 Journal Entry of Judgment Decree of Divorce, signed by Michael Hayes (JCDC 4-9)
-     November 9, 2000 Separation and Property Settlement Agreement, signed by Michael Hayes (JCDC 10-38)
-     November 30, 2000 Kansas Quit Claim Deed, notarized by Michael Hayes (Simmons 61)
-     May 21, 2002 Order for Continuance by Michael Hayes (Simmons 62-63)
-     August 20, 2002 Letter from Michael Hayes to Attorney Sherri Loveland (Simmons 64)
-     August 26, 2002 Journal Entry of Contempt Hearing, signed by Michael Hayes (Simmons 65-67)

***State of Kansas v. Thomas Bledsoe*, Case No. 99 CR 318**
-     November 9, 1999 Criminal Complaint by Jim Vanderbilt against Thomas Bledsoe, State of Kansas v. Tom Bledsoe (JC 17992)
-     November 9, 1999 First appearance/arraignment journal entry reflecting appearance of Michael Hayes on Thomas Bledsoe's behalf (Hayes 4-6)
-     November 9, 1999 Order appointing/assigning Michael Hayes as counsel for Thomas Bledsoe, State of Kansas v. Thomas Bledsoe, Case No. 99 CR 318 (Hayes 2-3)
-     November 15, 1999 Motion and Order to Dismiss Case No. 99 CR 318 against Thomas Bledsoe, signed by Jim Vanderbilt

***State of Kansas v. Floyd S. Bledsoe*, Case No. 99 CR 325**
-     Docket Sheet - Case No. 99 CR 325 (JC 3255)
-     Videotaped interview of Floyd S. Bledsoe, November 12, 1999
-     November 15, 1999 Criminal Complaint by Jim Vanderbilt against Floyd S. Bledsoe, State of Kansas v. Floyd S. Bledsoe, Case No. 99 CR 325 (JC 3255)
-     November 15, 1999 Affidavit for Prosecution by Jim Vanderbilt against Floyd S. Bledsoe, State of Kansas v. Floyd S. Bledsoe, Case No. 99 CR 325 (JC 16706-16709)

# CHAPTER 5

# Conflicts of Interest

## J. Nick Badgerow

**§ 5.1**   **I.   INTRODUCTION**

Central to a lawyer's professional responsibilities is his duty of loyalty to the client. The Comments to Rule 1.6 of the Kansas Rules of Professional Conduct1 (found in Rule 226 of the Rules of the Kansas Supreme Court) state the following with regard to loyalty:

> *Loyalty is an essential element in the lawyer's relationship to the client* . . . As a general proposition, loyalty to a client prohibits undertaking representation directly adverse to that client without that client's consent. . . . Loyalty to a client is also impaired when a lawyer cannot consider, recommend or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client.[2]

As the Kansas Court of Appeals held in *Alexander v. Russo*:3

> The relationship between an attorney and his client is one of the highest trust and confidence and, as long as that relationship or the influence of the relationship may exist, the attorney must observe the utmost good faith and candor and must now allow his private interests to conflict with those of his client. *Cf. In re Estate of Seeger*, 208 Kan. 151, 490 P.2d 407 (1971).[4]

A client has a right to expect that his lawyer will act with loyalty to the client's interests, without questioning whether interests of another client (or the interests of a third person, or even the lawyer himself) are actually motivating the lawyer's actions or advice. The Kansas Rules on conflicts of interest are directed to ensuring that this expectation of loyalty is fulfilled, to the extent reasonably possible. The Rules anticipate circumstances which would involve conflicts with a *current client* (Rule 1.7, *see* §§ 5.2-5.2.6, *infra*), conflicts with the interests of a *former client* (Rule 1.9, *see* §§ 5.4-5.4.5, *infra*), and *imputed conflicts*, such as in the cases of lawyers moving laterally to or from another law firm. (Rule 1.10, *see* § 5.5-5.5.2, *infra*). Additionally, this chapter will discuss special situations, such as *informed consent after consultation, withdrawal, "Chinese Walls,"* and *motions to disqualify*. *See* §§ 5.8.1-5.8.4(f), *infra*.

This chapter addresses the version of the Rules adopted in Kansas on March 1, 2014.  None of the text of the Rules discussed in this Chapter was amended by Ethics 20/20.

**§ 5.2**   **II.   CONFLICTS OF INTEREST – CURRENT CLIENT**

The general principles governing conflicts of interest are found in Rule 1.7, which provides as follows:

1.7     Conflict of Interest: Current Clients

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) The representation of one client will be directly adverse to another client;

(2) There is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) The lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) The representation is not prohibited by law;

(3) The representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) Each affected client gives informed consent, confirmed in writing. [5]

Thus, under the new Rules, conflicts with current clients are more closely and accurately defined than in the past.

Summarized, Rule 1.7(a) prohibits:

- Directly adverse representation of two concurrent clients *unless*

- There is actual and reasonable belief of no adverse effect, and

- There is informed consent by both clients, after consultation, confirmed in writing.

The Restatement (Third) of the Law Governing Lawyers ("Restatement") also prohibits conflicts of interest, but is somewhat more general. Section 201 of the Restatement prohibits a lawyer from representing a client if the representation would involve a conflict of interest, and then provides:

A conflict of interest is involved if there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person.[6]

The Restatement then proceeds in subsequent sections to discuss conflicts in civil and criminal litigation, non-litigation matters, corporate representations, and government representations.7

A consideration of the conflicts of interest prohibited by Rule 1.7 requires an evaluation of the following key factors.

§ 5.2.1   **A.  Is the Representation Directly Adverse?**

Rule 1.7 prevents direct adversity to another "client." The attorney-client relationship is

not dependent upon the payment of a fee, nor is a formal contract necessary to create the relationship. The contract may be implied from conduct of the parties. The employment is sufficiently established when it is shown that the advice and assistance of the client are sought and received in matters pertinent to his profession.[8]

Thus, one may be a "client" for purposes of conflicts of interest without having formally hired or paid the lawyer. Rather, one is a client for these purposes if the person sought out and received the lawyer's advice and assistance, including a prospective client who did not ultimately engage the lawyer.

Rule 1.18 (newly numbered after the insertion of new Rule 1.17) imposes the duty to avoid conflicts even with prospective clients who did not end up engaging the lawyer to represent her. Under this Rule, a "lawyer . . . shall not represent a client with interests materially adverse to those of a prospective client in the same or a substantially related matter if the lawyer received information from the prospective client that could be significantly harmful to that person in the matter," absent informed consent, confirmed in writing, with the erection of an appropriate screen.9

However, one who communicates with a lawyer for the purpose of later disqualifying the lawyer is not entitled to this protection.10

Identifying current and former clients is an important part of this process, and lawyers are required to maintain records and to adopt reasonable mechanisms for identifying conflicts before they arise, so that they may be properly addressed.  Comment [3] to Rule 1.7 observes:

> To determine whether a conflict of interest exists, a lawyer should adopt reasonable procedures, appropriate for the size and type of firm and practice, to determine in both litigation and non-litigation matters the persons and issues involved. See also Comment to Rule 5.1. Ignorance caused by a failure to institute such procedures will not excuse a lawyer's violation of this Rule. [11]

Additionally, the importance of detecting and addressing conflicts of interest is recognized in the rule pertaining to client confidentiality, which authorizes the disclosure of client information "to detect and resolve conflicts of interest arising from the lawyer's change of employment or from changes in the composition or ownership of a firm."12  The Comment explains:

> [L]awyers in different firms may need to disclose limited information to each other to detect and resolve conflicts of interest, such as when a lawyer is considering an association with another firm, two or more firms are considering a merger, or a lawyer is considering the purchase of a law practice.  See Rule 1.17, Comment [7].  Under these circumstances, lawyers and law firms are permitted to disclose limited information, but only once substantive discussions regarding the new relationship have occurred.[13]

Once it is determined that both parties are "clients," the next test is to determine whether the proposed representation is "directly adverse" to another client, or can reasonably be foreseen to become directly adverse. In some contexts, this is clear. For example, a lawsuit against a current client is "directly adverse," as would be the conduct of negotiations for one client to purchase the

assets or business of another client. Indeed, the current version of the Kansas Rules prohibits such direct adversity and renders it incapable of being waived.14

The justification for the rule is that the lawyer needs to give advice, to negotiate, and to advocate, for the benefit of one client. The lawyer's thoughts and efforts, and the transaction itself, need to be free from being clouded by the interests of another client.15 They need to proceed without the lawyer experiencing a mental conflict of deciding whose interests to advocate, and without the specter of doubt on the part of either client regarding whose interests are actually being served.16

The Comments to Rule 1.7 make this clear:

> Loyalty to a current client prohibits undertaking representation directly adverse to that client without that client's informed consent. Thus, absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated. The client as to whom the representation is directly adverse is likely to feel betrayed, and the resulting damage to the client-lawyer relationship is likely to impair the lawyer's ability to represent the client effectively. In addition, the client on whose behalf the adverse representation is undertaken reasonably may fear that the lawyer will pursue that client's case less effectively out of deference to the other client, i.e., that the representation may be materially limited by the lawyer's interest in retaining the current client. Similarly, a directly adverse conflict may arise when a lawyer is required to cross-examine a client who appears as a witness in a lawsuit involving another client, as when the testimony will be damaging to the client who is represented in the lawsuit.[17]

Usually, there is little doubt about whether the representation is directly adverse to the interest of another client. In *Petition of Hoang*,18 relying on Rules 1.7, 1.9, and 1.10, the Kansas Supreme Court upheld the disqualification of a public defender because the office of the public defender had previously represented a prosecution witness. Any confidential information conveyed by this former client could be imputed to the challenged attorney. The public defender therefore had a conflict of interest between his duty to represent his present client and his obligation to maintain the attorney-client privilege with regard to the former client. While the court held that the former client could have been protected by restricting the scope of the public defender's cross examination so as to avoid violating the attorney client privilege, such a restriction may have given the defendant a valid claim of ineffective assistance of counsel.

In *Chapman Engineers v. Natural Gas Sales Co.*,19 one party moved under Rule 1.7 to disqualify opposing counsel on the ground that he was concurrently representing another party in a "substantially related" piece of litigation. Following a hearing, the District of Kansas rejected the motion, finding insufficient evidence to prove that the two parties represented by the challenged attorney had "directly adverse" interests.20 The court held that the possibility that adversity might arise was not enough to disqualify the attorney. Rather, the party moving for disqualification must show a reasonable probability that such adversity would occur.21

Joint representation poses potential risks, where multiple clients may later develop adverseness or a conflict. In addition, serving as a mediator, intermediary, 22 or "lawyer for the deal"23 poses risks because of the potential for later confusion (actual or imagined) about the identity of the lawyer's "client." Like many conflicts of interest, if consentable, an informed consent, confirmed in writing, will help to avoid these problems. *See* Forms 5.5 and 5.6 in the Appendix to this Chapter.

On this subject, a thoughtful consideration of the issue needs to be made, because it is likely that, if the lawyer decides that the representation is not "directly" adverse and proceeds with the representation without satisfying the other requirements of the Rule, the other client will make an objection, or take the other appropriate action, so as to require the lawyer to justify any failure to follow the Rule.24

**§ 5.2.2**　**B. Does the Lawyer Reasonably Believe that the Representation will be Materially Limited?**

If the representation of one client would be directly adverse to another client, then the next step is for the lawyer to examine his relationship with the other client. Would the relationship with either client be affected by taking a case or matter directly adverse to that client?25

Issues to be considered in this situation include things such as the confidence and cordiality of the relationship. It also includes the issue of whether the other client will feel chilled in his willingness to share confidential information with the lawyer – knowing that the lawyer has taken action adverse to the client, and might do so again in the future. Thirdly, it includes the appearance of impropriety,26 because each client must wonder whose interests are being advocated. Each client should be confident that his interests, rather than those of his opponent, are being served by the lawyer.

The rule requires the lawyer to have the *actual* and *reasonable* belief that the representation of neither client will be materially limited. This means that a reasonable third party, looking at the transaction or action taken by the lawyer, would conclude that the relationship with the other client would not be affected by the adverse representation.27 Such occurrences are rare.28

This is an objective standard. As noted in the Comment, one must view the situation through the eyes of a "disinterested outsider."

> Consentability is typically determined by considering whether the interests of the clients will be adequately protected if the clients are permitted to give their informed consent to representation burdened by a conflict of interest. Thus, under paragraph (b)(1), representation is prohibited if in the circumstances the lawyer cannot *reasonably* conclude that the lawyer will be able to provide competent and diligent representation. *See* Rule 1.1 (competence) and Rule 1.3 (diligence).[29]

These conflicts are not waivable. For example, as noted above, representing opposing parties in the same litigation matter would never be appropriate.30 And the problem is not limited to civil and criminal litigation, but extends to potential conflicts in all areas, such as business and real estate transactions,31 estate and probate matters,32 and investments.33

> The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client.[34]

Indeed, even the representation of co-parties in a lawsuit can be fraught with risk. In *Kelley's Case*,35 the court found an impermissible (and non-waivable) conflict in a lawyer's representation of two plaintiffs in the same action, because of the adverse, competing, and inconsistent positions asserted by each of them.

**§ 5.2.3**　**C. Have the Clients Consented After Consultation?**

Even if the lawyer *actually and reasonably* believes that the relationship with the client will not be adversely affected by his representation of a second client adverse to that client, in addition, both clients must consent to the adverse representation. There must be *consultation* with each client, and each client's consent must be *knowingly* given,36 and the consent must then be confirmed in writing by both clients.37

> Paragraph (b) requires the lawyer to obtain the informed consent of the client, confirmed in writing. Such a writing may consist of a document executed by the client or one that the lawyer promptly records and transmits to the client following an oral consent. *See* Rule 1.0(b). *See also* Rule 1.0(o) (writing includes electronic transmission). If it is not feasible to obtain or transmit the writing at the time the client gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter. *See* Rule 1.0(b).[38]

This consultation should include a complete disclosure of the adverse nature of the representation, and an understanding that, despite the lawyer's loyalty to the client in other matters, he is loyal only to the other client in the matter at hand.39

> The requirement of a writing does not supplant the need in most cases for the lawyer to talk with the client, to explain the risks and advantages, if any, of representation burdened with a conflict of interest, as well as reasonably available alternatives, and to afford the client a reasonable opportunity to consider the risks and alternatives and to raise questions and concerns. Rather, the writing is required in order to impress upon clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing.[40]

The definitions ("Terminology") in the Kansas Rules detail the type of consultation which shall be provided, in order for the clients to give knowing consent:

> "Informed consent" denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.[41]

While the information imparted will necessarily vary, depending on the situation, it is clear that the adverse representation must be disclosed, as well as the risks and advantages resulting from continued representation despite the conflict. For example, in the case of *In re Wilkinson*,42 the lawyer was held to have improperly represented a client in the sale of another client's property without full disclosure, because he did not inform the client of his intention to satisfy his fee claim against the other client from the proceeds of the sale.

At a minimum, the clients must be informed of the adverse representation, and every effort must be made to foresee – and disclose – the various alternative results which may arise, and the impact of those results. The more detailed information that is provided, the more likely it is that the consultation will be deemed adequate. The "negative" factors could include the risk of presenting a "joint" position which is inconsistent with the "best" position for one or the other of the clients; the risk of "guilt by association" from one client to the other; and the possible absence of real independent judgment and advice from counsel. The "positive" factors from joint representation could include the savings from sharing attorneys' fees and expenses; the benefit of presenting a unified position, without crossfire from a co-party; and the benefit of retaining the initial attorney of one's choosing.

This disclosure may require the imparting of confidential information from the other client, in order to explain the possible adversity or the ramifications of various potential results in the matter. In this situation, lawyers must be mindful of Rule 1.6, regarding confidentiality. If the other client does not consent to the release of confidential information to the new client, then an adequate consultation cannot be concluded, and knowing consent cannot be obtained. As noted in the official Comments:

> Under some circumstances it may be impossible to make the disclosure necessary to obtain consent. For example, when the lawyer represents different clients in related matters and one of the clients refuses to consent to the disclosure necessary to permit the other client to make an informed decision, the lawyer cannot properly ask the latter to consent. In some cases the alternative to common representation can be that each party may have to obtain separate representation with the possibility of incurring additional costs. These costs, along with the benefits of securing separate representation, are factors that may be considered by the affected client in determining whether common representation is in the client's interests.[43]

Therefore, express permission should be obtained from one client to disclose confidential information to the other client, in order to explain the potential for conflict and to obtain knowing consent. *See* Forms 5.1 and 5.2 in the Appendix to this Chapter. Even if disclosure is allowed, Rule 1.6 will still apply. Care should be taken to protect communications from each client as confidential.

## § 5.2.4      D.  Paralegals and Legal Secretaries

The Rules do not allow a lawyer to permit a nonlawyer to engage in conduct which would violate the Rules.44 Rules 5.3 and 8.4(a). Therefore, the interviewing and hiring of nonlawyer employees from other law firms should also be conducted within the confines of Rules 1.7 and 1.9.45 This issue was addressed by the Kansas Supreme Court in the case of *Zimmerman v. Mahaska Bottling Co.*,46 where the Court applied Rule 1.7 principles to uphold the disqualification of a law firm which had hired a legal secretary who had previously been employed by the adverse party's law firm. There, the Court held:

> As previously mentioned, non-lawyers are privy to a great deal of confidential information regarding the litigation in the office they work in. They are also often involved in legal strategy and planning. The client expects and our legal system requires the client's confidences to be protected. To treat non-lawyers in a different manner than lawyers would seriously erode the foundation of the KRPC and place at risk the public trust in the legal system. Because KRPC 1.10 does not allow for the implementation of a screening device or Chinese wall for lawyers, it likewise does not allow for the use of a screening device for non-lawyers.[47]

This means that new employees should be interviewed carefully to determine the identity of matters they worked on, and the particular clients on whose matters they worked, while employed by another law firm. Once this information is obtained, a check should be made for conflicts of interest with any clients represented or matters being handled by the hiring law firm.

In its Formal Ethics Opinion 90-5, the Kansas Bar Association Ethics Advisory Committee concluded that the disqualification resulting from a violation of Rules 1.7 and 1.9 govern nonlawyers as well as lawyers. It further held that the "Chinese Wall" (also known as "walls of insulation" or "cones of silence," discussed below) are just as inappropriate for nonlawyers as for lawyers.48

In summary, Rule 1.7 prohibits representation of one client directly adverse to another client, unless the lawyer actually and reasonably believes that the relationship will not be adversely affected *and* both clients consent after consultation. In addition, the Rule prohibits any representation (even if not directly adverse) which may be materially limited by the lawyer's responsibilities to another client, to a third person, or to himself, unless the lawyer actually and reasonably believes that the representation will not be adversely affected and the other client consents after consultation.49

**§ 5.2.5**        **E.  Lawyer's Own Interests**

In this regard, the lawyer should be careful not to get into a situation where there is a question of divided loyalty between the duty owed to the client and his loyalty to his own interests. As noted in the Comment to Rule 1.7:

> The lawyer's own interests should not be permitted to have an adverse effect on representation of a client. For example, if the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice. Similarly, when a lawyer has discussions concerning possible employment with an opponent of the lawyer's client, or with a law firm representing the opponent, such discussions could materially limit the lawyer's representation of the client. In addition, a lawyer may not allow related business interests to affect representation, for example, by referring clients to an enterprise in which the lawyer has an undisclosed financial interest. *See* Rule 1.8 for specific Rules pertaining to a number of personal interest conflicts, including business transactions with clients. *See also* Rule 1.10 (personal interest conflicts under Rule 1.7 ordinarily are not imputed to other lawyers in a law firm).[50]

Thus, the lawyer should maintain the duty to the client as foremost. If the situation arises where there is a conflict between the interests of the client and those of the lawyer, the representation cannot continue.

**§ 5.2.6**        **F.  Sex with Clients**

One relatively modern aspect of this conflict is the issue of sexual relations between lawyer and client. One of the problems is that such circumstances lead to a conflict between the lawyer's undivided loyalty to the client and the lawyer's personal interests. Rule 1.7 expressly addresses this issue, stating "A lawyer is prohibited from engaging in sexual relationships with a client unless the sexual relationship predates the formation of the client-lawyer relationship. *See* Rule 1.8(k)." Rule 1.8(k) in turn states:

> (k) A lawyer shall not have sexual relations with a client unless a consensual sexual relationship existed between them when the client-lawyer relationship commenced.[51]

A Kansas disciplinary case which predates Ethics 2000 made it clear that sexual relations with clients are inappropriate under most circumstances.

In the case of *In re Berg*,52 the Supreme Court ordered the disbarment of an attorney, based on the finding that the attorney had engaged in inappropriate sexual relations with three clients. While the Court based its ruling on the finding that several provisions of the Rules of Professional Conduct were violated, one of the primary issues was the conflict between the clients' interests (in reaching early resolutions to their legal problems) and the lawyer's interests (in prolonging the relationships and taking advantage of the clients' vulnerability):

The clients in the present situation never fully understood the complete legal significance of their acts. They were literally compelled to allow respondent's advances in the belief such was necessary to protect their representation.53

The American Bar Association also addressed this issue in a formal opinion prior to the adoption of Ethics 2000.54 Similarly, a number of cases have applied Rule 1.7(b) (as well as several other disciplinary rules) to situations where the lawyer engages in sexual relations with the client, or makes inappropriate advances or comments.55

Even without a specific rule on the subject, there are a number of other rules which are implicated by a sexual relationship, such as the obligation of competence (Rule 1.1), confidentiality (Rule 1.6), independent judgment (Rule 2.1), avoiding conflicts of interest (Rule 1.7(b)), or avoiding violation of "any other rule of professional conduct."56 The Court in *Berg* made the same analysis.57

**§ 5.3**       **III.  INSURANCE COMPANIES AND OTHER THIRD-PARTY PAYERS**

A lawyer is sometimes thrust into situations which may cause a client to question the lawyer's loyalty:

- Lawyers commonly represent a person covered by a policy of insurance which pays for his defense. Will the lawyer exercise independent professional judgment for the client-insured, or will the lawyer mold his defense to suit the requirements and demands of the insurer who is paying the legal fees, and presumably (or at least hopefully) will be the source of additional representation in the future?

- Corporations and businesses are often sued along with an employee or officer of the corporation. In those situations, the corporation paying the bill for representation of both defendants hopes for the economy of a single law firm to represent both. The corporation also perhaps hopes to keep the individual defendant from turning "state's evidence" – agreeing to testify on behalf of the plaintiff in exchange for a lenient settlement or outright dismissal. This approach may also help to solidify a unitary defense strategy. Will the individual constituent come to question whether the law firm is truly loyal to him, or has divided loyalties based on the corporate client also being the source of the fees and the potential source for future representations – and fees?

- Minors sometimes find themselves in need of representation by counsel and, being unable to pay, count on their parents to provide funds for their defense. Will the paying-parents believe that this buys them the right to have input into their child's defense, or an avenue to discover privileged communications?

- In a corporate setting, the same may be asked of corporate parents paying for the representation of a subsidiary company. To which company will the lawyer be truly loyal?

In each of these situations, the lawyer is thrust into the middle of a potential conflict. The lawyer owes a duty of loyalty to represent the client with commitment, dedication and zeal.58 The lawyer also deserves to be paid for his services. The Rules of Professional Conduct provide the framework for analysis of this tension, as well as mechanisms to resolve it.

Someone paying for the representation of another person may be motivated first by the desire the minimize the cost of the representation, while minimizing costs may not be in the best interest of the actual client. Thus, the Kansas Supreme Court has held that one who represents defendants in a mortgage foreclosure action must diligently represent those clients and get the appropriate waivers after disclosure, while being paid by someone who had purchased the clients' redemption rights.59

A related principle is found in the Comments to Rule 1.7, where it is stated:

> A lawyer may be paid from a source other than the client, including a co-client, if the client is informed of that fact and consents and the arrangement does not compromise the lawyer's duty of loyalty or independent judgment to the client. *See* Rule 1.8(f). If acceptance of the payment from any other source presents a significant risk that the lawyer's representation of the client will be materially limited by the lawyer's own interest in accommodating the person paying the lawyer's fee or by the lawyer's responsibilities to a payer who is also a co-client, then the lawyer must comply with the requirements of paragraph (b) before accepting the representation, including determining whether the conflict is consentable and, if so, that the client has adequate information about the material risks of the representation.[60]

Rules 1.8(f) and 1.7(b) must be considered when taking on the representation of a party whose legal fees are being paid by another.

Note that this consent is not required to be "confirmed in writing." The Comments recognize the conflict inherent in this situation, which frequently arises, but allows it to be accommodated by disclosure and consent.

> Because third-party payers frequently have interests that differ from those of the client, including interests in minimizing the amount spent on the representation and in learning how the representation is progressing, lawyers are prohibited from accepting or continuing such representations unless the lawyer determines that there will be no interference with the lawyer's independent professional judgment and there is informed consent from the client. *See also* Rule 5.4(c) (prohibiting interference with a lawyer's professional judgment by one who recommends, employs or pays the lawyer to render legal services for another).[61]

Thus, where someone else is "paying the bills," the lawyer must ensure that the payer also is not "calling the shots" in the representation of the client.

Section 134 of the Restatement takes a negative approach, but adds a whole new subsection:

> (1) A lawyer may not represent a client if someone other than the client will wholly or partly compensate the lawyer for the representation, unless the client consents under the limitations and conditions provided in § 122 and knows of the circumstances and conditions of the payment.

> (2) A lawyer's professional conduct on behalf of a client may be directed by someone other than the client if:

> (a) The direction does not interfere with the lawyer's independence of professional judgment;

(b) The direction is reasonable in scope and character, such as by reflecting obligations borne by the person directing the lawyer; and

(c) The client consents to the direction under the limitations and conditions provided in § 122.[62]

This Rule recognizes the risks inherent in a situation where someone other than the client pays the lawyer to represent the client, but allows it only upon informed consent.

### § 5.3.1    A. Insurance Companies

Much has been written on the subject of the "tripartite" relationship among insurer, insured and defense counsel. "There is a large amount of commentary" about this issue.63

A majority of jurisdictions limit or prohibit lawyers representing insureds from complying with insurers' directives about case management, practice, and billing. *See In re Rules of Prof'l Conduct & Insurer Imposed Billing Rules and Procedures*, 2 P.3d 806 (Mont. 2000) (insurers' contractual requirement of prior approval regarding billing and practice rules for defense counsel appointed to represent insureds violates several rules violates several rules of professional conduct, including Rule 1.8, because of fundamental interference with defense lawyer's duty to exercise independent judgment and to give undivided loyalty to insureds).[64]

The ABA Standing Committee on Ethics and Professional Responsibility has addressed this issue in detail in its Formal Opinion 01-421. Summarized, this opinion holds:

[W]e conclude that lawyers representing insured clients must not permit the client's insurance company to require compliance with litigation management guidelines the lawyer reasonably believes will compromise materially the lawyer's professional judgment or result in his inability to provide competent representation to the insured.[65]

The Opinion goes on to specify that the lawyer must not release confidential client information to an adjuster or auditor without consent of the client, including in the billing statements submitted to the insurer for payment.66

### § 5.3.2    B. Employer Paying for Employee

Another frequent circumstance encountered by defense lawyers arises where an employer and its employee, such as a supervisor or manager, are jointly sued in the same case. Under those circumstances, the employer may feel compelled to pay for the defense of the supervisor or manager, perhaps even to avoid the individual defendant allowing a default to be taken against him.

Employers in employment lawsuits are often responsible and liable, as a matter of law, for the discriminatory or other wrongful acts of their employees, if those acts relate to or arise from the terms and conditions of employment.67 Therefore, employers often find it expedient and beneficial to provide their employee co-defendants with a defense. If the employer and the employee believe, after consultation, that their interests will not be adversely affected, and if they provide knowing consent, then the joint representation is appropriate.68

In *Shadid v. Jackson,*69 plaintiffs sued the city and several of its police officers, claiming brutal treatment. The court found that joint representation of the city and the police officers by the same lawyer created a conflict of interest, because of the potential for conflicting loyalties. The court, while acknowledging that a common defense created no conflict, went on to hold that the

common defense might change during the course of the case – such as a situation where the city came to believe that the police officers did, in fact, act in an inappropriate manner towards the plaintiffs.70 This disqualified counsel from representing the individual defendants.

In *Dunton v. Suffolk*,71 the county attorney jointly represented the county a police officer. The County asserted the defense that the police officer was not acting within the scope of his employment when he (allegedly) assaulted the plaintiff. Of course, this detracted somewhat from the police officer's defense of good faith immunity.72 This irreconcilable (and nonwaivable) conflict created an untenable situation for the police officer, and represented a conflict of interest, disqualifying the lawyer.73

In a New York case, it was the individual employee defendants who brought a motion to disqualify their own counsel, and to compel their employer to engage independent counsel to represent them. In *England v. Town of Clarkstown,*74 the employees (police officers) were being represented by the attorney who was also representing the Town – the officers' employer. The conflict of interest was no technicality: The hired counsel failed to provide zealous representation to the individual defendants, and even failed to communicate with them adequately.

> First, the action/inaction of the attorney currently representing the police officers and the Town is troubling. Counsel never advised these officers of the potential conflicts that could exist between the Town and its employees in a civil rights action. Nor did he inform the defendants that they could be held individually liable and that they were being sued individually for punitive damages. Furthermore, counsel has not been cooperative in providing the defendant police officers with copies of pleadings and motion papers which are germane to the Court's inquiry herein.[75]

Because of a statute requiring the Town to provide independent counsel to its employees when sued, the Court ordered disqualification of the attorney in representing the individual defendants, and ordered the engagement of independent counsel.76

Where the lawyers represented both the employer and the employees, an irreconcilable conflict of interest was found to exist in the West Virginia case of *State ex rel. Morgan Stanley & Co. v. Macqueen,*77 where defendants brought a writ of prohibition against the trial judge, to compel him to disqualify of plaintiffs' counsel in the underlying case.

The plaintiff in the underlying case (the State of West Virginia) sued several brokers for conspiring with State employees to violate state securities laws. Meanwhile, the lawyers for the State were providing counsel and representation to those very State employees accused of being co-conspirators. The broker defendants claimed a conflict of interest. The trial judge refused to disqualify the State's counsel, and the brokers appealed.

On appeal, the Court – citing Rules 1.7 and 1.13, MRPC – held that the plaintiffs' counsel had an irreconcilable conflict of interest, and ordered disqualification.

> Although the State does not name the seven Staff members as actual defendants in the underlying litigation, the pleadings, as framed at the time this case was argued, do potentially implicate these individuals with the alleged wrongdoing in connection with the investment losses at issue. That implication, in and of itself, is sufficient to raise the necessary element of adverse interests. The allegations against the Staff, although asserted collectively rather than individually, nonetheless create potential adverse interests between the State and those individual Staff members, which in turn further create a potential, if not actual, conflict of interest.[78]

When the employer is a public entity, this problem is compounded because of restraints against the public entity giving "informed consent" on behalf of the public that the entity represents. In *Macqueen*, the Court held that the State is incapable of giving its consent to a conflict of interest.

> [T]he State is incapable of granting its consent. . . . The rationale underlying this rule is quite simple: "It is essential that the public have absolute confidence in the integrity and impartiality of our system of justice." . . . Given the obvious public interest inherent in the State's pursuit of its claim for investment losses, the State cannot consent to a dual representation which involves such adversity of interests as to raise even the appearance of such impropriety. *See also Guthrie Aircraft, Inc. v. Genesee County, N.Y.*, 597 F. Supp. 1097, 1098 (W.D. N.Y. 1984) ("[A] municipality may not consent to adverse representation, since the public interest is involved"); In re A. and B., 44 N.J. 331, 209 A.2d 101, 102-103 (1965) ("Dual representation is particularly troublesome where one of the clients is a governmental body. So, an attorney may not represent both a governmental body and a private client merely because disclosure was made and they are agreeable that he represent both interests.").[79]

In the context of a criminal case, where the employer pays for the representation of the employee, the influence exerted by the employer-payer may raise a question of whether the due process rights of the individual employee-defendant were violated by the arrangement. In *Wood v. State of Georgia*,80 the United States Supreme Court remanded for further inquiry and decision, a case where the employee defendant was not paying for his defense in the criminal case, but rather, his defense was being paid by his employer, a co-defendant.81

> Courts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise. One risk is that the lawyer will prevent his client from obtaining leniency by preventing the client from offering testimony against his former employer or from taking other actions contrary to the employer's interest. Another kind of risk is present where, as here, the party paying the fees may have had a long-range interest in establishing a legal precedent and could do so only if the interests of the defendants themselves were sacrificed.[82]

Again, the lawyer will be well-advised to obtain "informed consent" from the client, and to have this informed consent "confirmed in writing."

### § 5.3.3   C.  Parent Paying for Minor

A third, and perhaps less frequent situation, arises when a minor finds himself in trouble and without funds, thereby counting on a parent or guardian to provide the funds for a defense. Oftentimes, the paying parent feels entitled to have input into the defense or even to be granted access to confidential and privileged communications.83 In *People v. White*,84 the Michigan Court of Appeals held that a lawyer was ineffective in representing a minor client, since he was more concerned with the wishes of the client's father, who hired him, than with the best interests of the son/client, concerning the desirability of psychiatric examination.

Because the lawyer will be paid by someone other than the client, informed consent should be obtained and confirmed in writing.

### § 5.3.4   D.  Other Business Relationships with Clients.

Continuing, Rule 1.8 addresses other business relationships between lawyer and client.

- Subsection (g): A lawyer representing multiple clients in a single action shall not agree to an aggregate settlement (or an aggregate plea agreement) on behalf of the clients without the consent of each client after consultation;

- Subsection (h): The lawyer shall not make an agreement prospectively limiting the lawyer's liability for malpractice unless such an agreement is permitted by law and the client is independently represented in making such an agreement; further, the lawyer shall not settle a claim for legal malpractice with an unrepresented client or former client without first advising that person, in writing, that legal representation is appropriate;

- Subsection (i): A lawyer shall not represent a client adverse to a person represented by another lawyer who is the parent, child, sibling or spouse of the first lawyer, without the client's consent after consultation;85

- Subsection (j): A lawyer shall not acquire a proprietary interest in the litigation being handled by the lawyer *except* by acquiring a lien for services rendered or costs advanced, or for a reasonable contingency fee.

**§ 5.4**        **IV. RULE 1.9 – CONFLICTS OF INTERESTS – FORMER CLIENT**

Conflicts with former clients are governed by Rule 1.9, which provides as follows:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the *same or a substantially related matter* in which that person's interests are materially adverse to the interests of the former client unless the former client gives *informed consent, confirmed in writing***.**

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1) Whose *interests* are materially adverse to that person; and

(2) About whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter;

Unless the former client gives informed consent, confirmed in writing.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) Use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client or when the information has become generally known; or

(2) Reveal information relating to the representation except as these Rules would permit or require with respect to a client.[86]

The rule is based on the principle that the lawyer's duty of loyalty and confidentiality survive the termination of the relationship. Former clients should be confident that, even after the lawyer-client relationship has been officially terminated, the lawyer will not take action against the former client in the same matter or a substantially related one, and will not disclose client confidences which were imparted during the existence of the relationship.

Badgerow Subpoena Response 000014

When an attorney is disqualified for violating Rule 1.9, it is the party — and not the attorney — which has standing to appeal.87

§ 5.4.1 **A. Is it the Same or a Substantially Related Matter?**

In determining the existence of a conflict with a former client, the first inquiry is whether the new matter is the same as, or substantially related to, the matter handled for the former client.88

The determination will be based on a factual inquiry. Thus, representation against a former client in the same lawsuit or the same transaction would clearly be prohibited.89 Representation against a former client in a matter which could be deemed "substantially related" to the same lawsuit or transaction would also be prohibited (again, unless knowing consent90 is obtained from the former client).91

§ 5.4.2 **B. What are the Interests of a Former Client?**

The next issue to be determined is whether the complaining party is a "former client." While this should usually not be a difficult issue, there may be circumstances where a review will be required to make the determination. For example, in *Associated Wholesale Grocers, Inc. v. Americold Corp.*,92 several defendants had signed a joint defense agreement, under which lawyers asserted and protected the interests of the group. Thereafter, two members of the joint defense group became adverse to each other, and when one of the law firms represented one of the adverse parties, the trial court disqualified the law firm on the basis of Rule 1.9. In reversing, the Kansas Supreme Court held that the joint defense agreement did not convert the party into a "client" for purposes of Rule 1.9, and therefore held that the law firm could represent the client against the other member of the former joint defense group.93

Unlike Rule 1.7, which prohibits direct adversity to "another client," Rule 1.9 prohibits adversity to the "interests" of a former client. This would imply a larger scope of prohibition in the case of former clients than in the case of current clients.

While no Kansas cases have discussed this difference, a case from Pennsylvania, *Maritrans, GP Inc. v. Pepper, Hamilton & Scheetz*,94 is illustrative of one interpretation which can be made of the term "interests" in the case of former clients. Maritrans was a shipper which competed with a number of other petroleum shipping companies. Pepper, Hamilton & Scheetz is an old and established Philadelphia law firm. Pepper Hamilton had represented Maritrans in all of its labor relations negotiations for over a decade, and had represented Maritrans in a number of complex financial transactions including a debt offering, a conveyance of assets, and an offering of securities. As the legal counsel of Maritrans for over ten years, Pepper Hamilton became intimately familiar with Maritrans' operations and its plans and projections for the future in the shipping industry, and were privy to substantial confidential information about the company.

Pepper Hamilton then began representing, over the course of several years, seven of Maritrans' biggest competitors in the petroleum shipping industry. Although Pepper Hamilton did not represent these other shippers in any action directly adverse to Maritrans, Maritrans still filed suit and obtained an injunction to prevent Pepper Hamilton from representing their competitors in matters substantially related to those which they had formerly represented Maritrans. The intermediate appellate court reversed, but the Pennsylvania Supreme Court affirmed the permanent injunction.

While the court based its decision more on the common law than the Rules of Professional Conduct, it recognized that a lawyer could not undertake a representation adverse to the "interests" of a former client.95 At least in the view of one appellate court, then, the prohibition against representation adverse to the interests of a former client may be broadly defined to include matters unrelated to those in which the former client is involved. It could conceivably be

construed to include the advocacy of legal principles, changes in the law, or theories which, if accepted, would detrimentally affect the interests of a former client. If that definition were accepted, its expansion would be unlimited and would not appear to accord with the spirit of the Rules of Professional Conduct.

## § 5.4.3   C.  When is a Client a "Former Client"?

As discussed above, Rule 1.7 prohibits any representation adverse to a *current* client, even in matters unrelated to those in which the lawyer is representing the client, whereas Rule 1.9 prohibits representation adverse to a *former client* only in "the same or a substantially related matter." Therefore, the lawyer has more freedom to take action against a former client than against a current client. In the case of a substantial new matter, may the lawyer terminate his relationship with a current client, and convert that client into a "former client" for purposes of obtaining this expanded area of representation? The answer is that he decidedly may not.

A lawyer cannot convert a "current client" into a "former client" by dropping the current client like a "hot potato" at the time the potential conflict arises.96 If there is a current client conflict, it must be dealt with under Rule 1.7, or avoided by not taking on the new client.

In *City of Hutchinson v. Gilmore*,97 a lawyer appointed to represent a DUI defendant removed himself from the case (after meeting with the client) because his firm had been on the other side of litigation involving that defendant. The defendant was then found guilty. On appeal, that same lawyer was the new prosecutor, and the defendant moved to disqualify the lawyer under Rule 1.9(a), arguing that since the lawyer had first acted as defendant's appointed counsel, he could not represent the city as prosecutor. The lawyer and the client disagreed as to the substance of the matters discussed in their initial meeting. The case thus involved the question of whether the prosecutor should be disqualified.

On the other hand, a formal termination of the relationship should not be necessary. The court should consider the nature of the representation and the facts of the particular case in deciding whether the attorney-client relationship had actually been concluded. Where there is evidence to indicate that the client no longer considered the law firm to represent him, or that the subject matter of the representation was concluded, then the client should be considered a "former" client, and not a "current" client.98 Again, conflicts with former clients can be waived, based on informed consent. *See* Form 5.3 in the Appendix to this Chapter.

## § 5.4.4   D.  What Elements Must Be Proven to Disqualify Former Counsel?

The Kansas court in *Gilmore* listed four elements necessary to make out a violation under Rule 1.9(a).

1.  That the lawyer and the client had an attorney-client relationship;

2.  That the present litigation is the same or a substantially related matter;

3.  That the interests of a lawyer's new client are adverse to those of the former client; and

4.  That the former client must not have consented to the representation.99

In *Gilmore*, the court found only the first element to be in doubt.

[A] person becomes a client for purposes of privilege and confidentiality rules when that person contacts an attorney *seeking* legal advice. If confidential or privileged information is exchanged, a conflict would arise if that attorney then

switched sides, even if no actual employment resulted from the initial conference.[100]

The court then remanded the case on the issue of whether the attorney had acquired confidential or privileged information.

§ 5.4.5   **E.  Do Not Use Former Client's Confidential Information**

The second section of Rule 1.9 adds an additional prohibition – against the use of client confidential information learned during the representation of the former client. This rule is based on the same principle – that a client has the right to expect that the lawyer, entrusted with secrets and confidences during the representation, will not then use that information to the disadvantage of the former client after the relationship has been terminated.

There are only two exceptions to this rule. The first is that where the information has become generally known, the lawyer may use the information. The second exception is found in Rule 1.6, which allows disclosure and use of client confidential information:

1.  To prevent the client from committing a crime; or

2.  To comply with requirements of law or orders of any tribunal; or

3.  To establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client, to establish a defense to a criminal charge or civil claim against the lawyer based upon conduct in which the client was involved, or to respond to allegations in any proceeding concerning the lawyer's representation of the client.[101]

Unless these limited exceptions apply, the lawyer cannot use or disclose information obtained from a former client to the disadvantage of the former client.

§ 5.5   **V.  RULE 1.10 – IMPUTED CONFLICTS**

Under Rule 1.10, three situations are addressed. The first is the prohibition against a firm taking any actions which one of its lawyers (if he were practicing alone) could not take.

(a) While lawyers are associated in a firm, none of them shall knowingly represent a client when any one of them practicing alone would be prohibited from doing so by Rules 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers in the firm.[102]

The rule of imputed disqualification stated in paragraph (a) is based on "the premise that a firm of lawyers is essentially one lawyer for purposes of the rules governing loyalty to the client, or from the premise that each lawyer is vicariously bound by the obligation of loyalty owed by each lawyer with whom the lawyer is associated."103

What this means in practice is that the entire firm is disqualified if a member of the firm104 has a conflict which prevents him from handling a matter adverse to a current client of the firm or adverse to the interests of a former client in the same or substantially related matter.

§ 5.5.1   **A.  Laterals In**

The hiring of laterals is generally governed by Rule 1.10(a), which prohibits the law firm from representing a client if the lateral coming into the firm has a conflict. Thus, under the Rule,

a lawyer *entering* a firm *brings with him* all the conflicts he had in his prior firm, but only to the extent:

> The matter is the *same or substantially related* to one in which the lawyer's prior firm represented the client; and

> The lawyer had *acquired confidential information* from or about the client which is material to the matter about to be handled.105

Thus, where the departing attorney handled only routine depositions in a case and had not acquired confidential information, there is no imputed disqualification.106

**§ 5.5.2**    **B. Laterals Out**

Rule 1.10(b) relates to lateral lawyers moving *out of* a firm, and allows the firm from handling matters on which the outgoing lawyer would have had a conflict. In these circumstances, the lateral general *takes with him* all of his conflicts, leaving the firm free to take action, in unrelated matters, against the former lawyer's clients, so long as lawyers remaining in the firm did not obtain confidential information from the client (related to the matter) before the departing lawyer took the client with him.

> (b) When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless:

> (1) The matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and

> (2) Any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9 (c) that is material to the matter.[107]

When a lawyer has terminated an association with a firm, the firm *is not prohibited* from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer *unless* the matter is the same or *substantially related* to that in which the formerly associated lawyer represented the client; *and* any lawyer remaining in the firm *has information protected by Rules 1.6 and 1.9(b)* that is material to the matter.

Having "access" to law firm files is not alone evidence of the receipt of confidential information, since it is actual knowledge, and not potential knowledge, which is relevant. *See* Rule 1.10, Comment:

> The rule in paragraph (a) does not prohibit representation where neither questions of client loyalty nor protection of confidential information are presented. Where one lawyer in a firm could not effectively represent a given client because of strong political beliefs, for example, but that lawyer will do no work on the case and the personal beliefs of the lawyer will not materially limit the representation by others in the firm, the firm should not be disqualified. On the other hand, if an opposing party in a case were owned by a lawyer in the law firm, and others in the firm would be materially limited in pursuing the matter because of loyalty to that lawyer, the personal disqualification of the lawyer would be imputed to all others in the firm.[108]

The key issues under Rule 1.10(b) are (a) whether the departed lawyer received material, confidential information during his time at the prior law firm, and (b) now that he has left the law

firm, whether anyone at the firm "has information protected by Rules 1.6 and 1.9(c) that is material to the matter."109 As noted by the Comments to this Rule, "[p]aragraph (a) operates only among the lawyers currently associated in a firm. When a lawyer moves from one firm to another, the situation is governed by Rules 1.9(b) and 1.10(b)."110

Similarly, in *Monroe v. City of Topeka*,111 the Court reversed the trial court's refusal to disqualify a lawyer because of imputed disqualification under Rule 1.10(a). The Supreme Court held that the trial court should have conducted an *in camera* review of notes proffered by the client to show the relationship between the prior representation and the current matter.112

Thus, an evidentiary hearing will need to be held to determine whether the now-departed lawyer obtained confidential information and imparted that confidential information to anyone remaining at the firm.113

## § 5.6     VI. RULE 1.8 – PROHIBITED TRANSACTIONS

Business transactions with clients pose a risk of conflicts of interest, mainly because of the potential for divided loyalty between the client's and the lawyer's own interests.

## § 5.6.1     A. Business Transactions

Consistent with the provision of Rule 1.7, that a lawyer should not proceed where to do so might bring him into conflict with his own interests, is Rule 1.8, which prohibits transactions between lawyers and clients in certain circumstances.

> (a) A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, security or other pecuniary interest adverse to a client unless:
>
> (1) The transaction and terms on which the lawyer acquires the interest are *fair and reasonable* to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client; and
>
> (2) The client is advised in writing of the desirability of seeking and is given a reasonable opportunity to seek the advice of *independent legal counsel* on the transaction; and
>
> (3) The client gives *informed consent, in a writing signed by the client*, to the essential terms of the transaction and the lawyer's role in the transaction, including whether the lawyer is representing the client in the transaction.[114]

Thus, the Rule prohibits the lawyer's acquisition of any interest adverse to a client, unless three specific requirements are met:

- The transaction must be based on *fair and reasonable terms*, so that the lawyer cannot be argued to have taken advantage of the client; *and*

- The client must be given the opportunity to obtain *the advice of independent counsel* to evaluate the transaction, so that the transaction may later be justified as reasonable, rather than indicating that the lawyer took advantage of his relationship with the client; *and*

- The client must give his *informed consent, confirmed in writing*, after having had the opportunity to consult with independent counsel.

As noted, Rule 1.8 prohibits business transactions with, or adverse to, a client, *unless*: (1) there is *fair, full* disclosure to the client, in *writing*, of the transaction and its terms in a manner that the client can reasonably understand; and (2) the client is given a reasonable opportunity to seek the advice of independent counsel; and (3) the client consents in writing.

**§ 5.6.2**   **B. Other Lawyer-Client Transactions and Actions are Limited**

Rule 1.8 also provides for several other protections to clients:

- Subsection (b): The lawyer cannot use client information to the client's disadvantage, without the client's consent;

- Subsection (c): The lawyer shall not prepare any gift instruments giving any substantial gift from the client to the lawyer, or a close relative of the lawyer, except where the lawyer is related to the giver of the gift;

- Subsection (d): The lawyer shall not acquire literary or media rights to a portrayal of information based in substantial part on information relating to the *representation prior to the conclusion of the representation*;115

- Subsection (e): The lawyer shall not provide financial assistance to a client in connection with pending litigation, *except* that he may advance court costs either to be repaid as a contingency of recovering in the litigation or as a payment on behalf of an indigent client;

- Subsection (f): The lawyer shall not accept compensation for representing a client from one other than the client unless (1) the client consents after consultation, (2) there is no interference with the independent judgment of the lawyer and the lawyer-client relationship, and (3) client confidences are protected in accordance with Rule 1.6 (discussed above).

**§ 5.7**   **VII.   RULES 1.11, 1.12, AND 1.13 – GOVERNMENT AND CORPORATE LAWYERS**

The rules against conflicts of interest pose unique problems with respect to government counsel and "inside" corporate counsel.

**§ 5.7.1**   **A. Government Counsel**

A government attorney may face a conflicts issue whenever he represents the governmental client and an individual member or employee of the governmental client. Under Rule 1.13, a lawyer retained by an organization represents the organization.116 However, a lawyer-client relationship may be established with one of the individual members or employees of the government if the lawyer perceives a lawyer is acting as his lawyer. Where the government's interests in a legal matter are not aligned with the interests of the individual, a conflict exists. One area where the problem frequently occurs is in employment litigation.117 In the situation of a conflict of this nature, Rule 1.7 requires that the lawyer inform the individual of the potential conflict, and if the lawyer reasonably believes that continued representation of both parties will not adversely affect the individual's interests *and* an individual client consents, the lawyer may represent both. If these conditions are not met, the lawyer must withdraw from representing the individual.

Rule 1.11 has now been expanded to make it clear that the Rules of Professional Conduct apply to lawyers in public employment, and specifically prohibit a government lawyer from abusing the power of public office.118

**§ 5.7.2**        **B.  Corporate Counsel**

Under Rule 1.13, a lawyer employed or retained by an corporation represents the corporation acting through its duly authorized constituents. The inside corporate lawyer must clarify who is the client or face the risk that the lawyer-client relationship will be established with an individual. Should that happen, Rule 1.7 applies, and the individual "client" must be informed of potential conflicts.

The Kansas federal case of *Professional Service Industries, Inc. v. Kimbrell*,119 is illustrative of the problems which can be encountered by corporate counsel. There, a former corporate CEO attended a meeting with the corporation regarding citations issued by the EPA. This meeting was attended by attorneys who introduced themselves to the former CEO as representing the corporation. At this meeting, the former CEO revealed information about the EPA complaints. Later, when PSI brought suit against the former CEO as a result of the EPA action, he moved to disqualify counsel as the attorneys for the corporation. The individual claimed that at the meeting with the corporation, he believed the lawyers represented the "management team" and that he was part of the team. The court rejected this claim, finding that under Rule 1.13 the former CEO was never a client of the lawyers:

> [The former CEO] never sought nor obtained the legal advice or assistance on any personal legal issue from [the lawyers]. At all times, [the former CEO's] dealings with these attorneys were strictly in his capacity as president of [the corporation]. Unlike the Kansas case law, the attorneys here took no action directed exclusively to the purported client, which resembles legal advice or assistance. The evidence offers no basis for inferring an implied contract.[120]

Further, the court rejected the former CEO's claim under the more lenient "subjective" approach for establishing an attorney-client relationship, which focuses on "whether the party divulging information has the intent to secure legal advice."121 The court found that it would have been unreasonable for the individual to believe that the attorneys present at the meeting with the corporation were acting as his personal representatives.

Additionally, the former CEO contended that the lawyers violated Rule 1.13(d) by failing to disclose their true client when its interests were adverse to those of the individual. The court rejected this argument, finding that since there was "no personal or direct contact between" the individual and the lawyers, and there was no "dealing" between them – a fact essential to finding a violation of Rule 1.13(d). Moreover, there was no "apparent" adversity between the corporation and the individual at the time of the meeting which would have required disclosure. Finally, even if 1.13(d) had been violated, disqualification would not be the appropriate remedy.122

This case demonstrates the need for full disclosure in cases of potential conflict, and establishing that counsel for a corporate entity should make clear that he is representing the entity and not the individuals.

A lawyer who is inside counsel for a corporation faces a similar conflicts issue. Again, Rule 1.13 provides that the organization is the client. Where the interests of the corporation and its individual "constituents" are not aligned, the lawyer must act to protect the interests of his client, the corporation. Where the lawyer is aware of conduct that will expose the corporation to potential legal liability, Rule 1.13 provides a progressive list of steps for the lawyer to consider:

1. Asking for reconsideration of the matter;

2. Advising that a separate legal opinion on the matter be sought for presentation to appropriate authority in the organization; and

3. Referring the matter to higher authority in the organization, including, if warranted by the seriousness of the matter, referral to the highest authority that can act in behalf of the organization as determined by applicable law.[123]

The ultimate step for the lawyer is resignation if none of the other alternatives succeed.124

### § 5.7.3     C. Rule 1.11 – Former Government Lawyer-Employee

This Rule prohibits a lawyer who leaves government employment from representing a party thereafter in connection with a matter in which the lawyer was personally and substantially involved while employed by the government. Rule 1.11(a). Under subsection (c) a private lawyer going into government practice may not, as a government lawyer, handle a matter in which he was personally and substantially involved while in private practice.

Rule 1.11(b) further prohibits a former government lawyer from using, in the later representation of a private client, confidential information learned while employed by the government.

### § 5.7.4     D. Rule 1.12 – Former Judge or Adjudicative Officer

This Rule prohibits a lawyer from representing any party to a matter in which the lawyer had personally and substantially participated as a judge or other adjudicative officer, arbitrator,125 or law clerk. Further, while acting as such a judge, the lawyer shall not solicit or negotiate employment with a party to any matter on which the judge is participating personally and substantially.

### § 5.8     VIII.    ADDRESSING AND RESOLVING CONFLICTS

Once a conflict of interest is discovered under one of the Rules discussed above, the next issue is to determine the manner of addressing, and attempting to resolve, that conflict. Resolution can include obtaining a knowing consent from the client, after consultation (*see* § 5.8.1, *infra*). Attempts may be made to erect a "cone of silence" or a "Chinese Wall," (*see* §§ 5.8.3-5.8.3(c), *infra*), however the validity of such measures erected without consent is doubtful. Finally, an examination will be made of motions to disqualify – the last resort measure to be taken if consent or withdrawal cannot be accomplished. *See* §§ 5.8.4-5.8.4(f)*, infra*.

### § 5.8.1     A. Knowing Consent

Under both Rules 1.7 (relating to conflicts of interest with current clients) and 1.9 (relating to conflicts of interest with former clients), the conflict may be avoided if the client gives "informed consent confirmed in writing."

If knowing consent is given (and if the second factor is established), the conflict may be waived.126 The consent must be knowingly given,127 after full disclosure of all relevant facts.128

### § 5.8.2     B. Withdrawal

If the conflict cannot be resolved by disclosure and consent, then the lawyer must withdraw from the representation. Under Rule 1.15(a)(1), the lawyer must withdraw if the continued representation would result in a violation of the rules of professional conduct.129

**§ 5.8.3**  **C.  Chinese Walls or Walls of Insulation**

The question of whether a conflict can be avoided or mitigated through a wall or shield has been much litigated.

**§ 5.8.3(a)**  **1.  Insulation Walls Rejected for Lawyers in Kansas**

In many jurisdictions, a conflict of interest may be avoided, and the firm of a lawyer with a conflict of interest may continue to represent the client, if that lawyer is screened from access to any information about the case, and if that lawyer is not questioned about the case or his prior representation. The main case on this point appears to be the Seventh Circuit decision in *Cromley v. Board of Education of Lockport Township*.130 There, the court held that

> in deciding the appropriate safeguards necessary in the case of attorney disqualification, we must balance the respective interests of the parties and the public.[131]

Indeed, recognizing that the Kansas Rules of Professional Responsibility recommend a "functional approach" to the issue of whether a law firm should be disqualified, the U.S. District Court for the District of Kansas has held the following in *Geisler v. Wyeth Laboratories*:

> The Tenth Circuit has recognized that this "functional approach" to the issue of firm disqualification may include the adoption of what has been referred to as the "Chinese Wall" exception. *Smith v. Whatcott*, 757 F.2d [1098,] at 1101-02 [(10th Cir. 1985)]. Under this exception, firm-wide disqualification is unnecessary if the firm can prove that the attorney involved in the first matter has been effectively screened from financial interest and participation in the second case.[132]

Judge Patrick Kelly, in the *Geisler* opinion, proceeds with a discussion of the requirements for a sufficient wall, quoting from *Smith v. Whatcott*: the lawyer must be "effectively screened" from actual participation in the case and from inadvertent disclosure of confidential information, and the law firm must have had in place, prior to the hiring of the conflicted attorney, "firm-wide policies promulgated to prevent the inadvertent flow of confidential communication."133

This part of the *Geisler* opinion is now of questionable validity, even in federal court.134 There is no doubt that in Kansas State courts, Chinese Walls are not appropriate under *Parker v. Volkswagenwerk Aktiengesellschaft*.135 In *Parker*, the supreme court expressly rejected a Chinese Wall as a mechanism for avoiding disqualification in the case of a conflict of interest.

> If it is determined that the attorney gained material and confidential information during the course of his or her previous employment, then both the attorney and the firm with whom he or she is presently associated are disqualified. . . .
>
> The model rules thus reject, for lawyers practicing in the private sector at least, any thought that the "taint" of the incoming lawyer can be cured by screening him or her out of the affected client's matter, or by erecting a "Chinese Wall" or by imposing a "cone of silence." 1 Hazard and Hodes, The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct, Rule 1.10, p. 191 (1988 Supp.) And *see* MRPC 1.11(a)(1), and (2)(1988 Kan. Ct. R. Annot. 213).[136]

The court thus rejected the use of Chinese Walls, "unless agreed to by all parties to the litigation."137

The Kansas federal court has applied *Parker* in *Koch v. Koch Industries*.138 There, the firm of Hughes, Hubbard & Reed ("HH&R") had adopted an insulation wall to screen files and information regarding former representation of a party who was now adverse to another client of

the firm. Judge Crow found that "HH&R's implementation of the Chinese Wall does not avert its disqualification."139

After *Parker*, the Kansas Supreme Court had occasion to revisit the issue in the later case of *Lansing-Delaware Water District v. Oak Lane Park, Inc.140* There, the court reaffirmed its holding in *Parker*, concluding that:

> [t]he model rule contains no provisions for use of screening devices in this situation. In fact, such a proposal was rejected at the time the model rules were adopted. Our decision in *Parker* is controlling on this issue, and we find no merit or reason to reconsider that decision.[141]

Thus, absent consent from the client, a screening device is not sufficient to avoid disqualification under the current state of the law in Kansas.

The ABA Ethics 2000 Commission recommended changes for Rule 1.9 including screening as an effective protection against disqualification in many circumstances.142 However, those changes were not adopted as a part of the Kansas Rules. And even under the proposed rule, "if the personally disqualified lawyer participated substantially in representing the former client in the same matter before a tribunal in which the lawyer's new firm represents an adversary of the former client" the lawyer would be disqualified.143

Similarly, the Restatement recognizes and approves screening mechanisms which are "adequate to eliminate involvement by [the subject] lawyer in the representation," so long as "timely and adequate notice has been provided to all affected clients." Again, the screen will only be acceptable where any confidential information communicated to the subject lawyer "is unlikely to be significant in the subsequent matter."144 Therefore, if the subject lawyer did receive material confidential information in the prior representation, the screen will not be effective.

Again, neither the ABA's changes nor the Restatement have been adopted in Kansas on the subject of Chinese Walls.

§ 5.8.3(b)   **2. Are Insulation Walls Permissible for Temporary Lawyers, Temporary Secretaries, Temporary Legal Assistants, and Law Student Interns?**

While the Kansas Rules of Professional Conduct appear to apply generally to lawyers and those who work for them, a special provision may be made for "temporary lawyers," legal assistants, secretaries and other support professionals and summer interns.

As noted by Hazard and Hodes, *The Law of Lawyering*,145 temporary lawyers do not bring conflicts with them, so long as adequate measures are undertaken. Disqualification will not be required

> if the "incoming" law temp is strictly limited to working on the matters for which he or she was hired, and carefully screened from all participation in and knowledge of other matters. If these precautions are taken – and a clear record made – it can validly be said that the law temp is not really "associated with the firm," and therefore does not spread her "taint" in the normal way.[146]

Blessing for this approach is found in the ABA Formal Opinion 88-356.147 The Committee's Opinion finds that certain temporary lawyers are excluded from the prohibitions of Rule 1.10, at least where it can be shown that the temporary lawyer was not "associated with" the firm in a general way.

> [W]hether a temporary lawyer is treated as being "associated with a firm" while working on a matter for the firm depends on whether the nature of the relationship is such that the temporary lawyer has *access to information relating to the representation of firm clients other than the client on whose matters the lawyer is working* and the consequent risk of improper disclosure or misuse of information relating to representation of other clients of the firm.[148]

The Opinion concludes that disqualification must be determined on a case-by-case basis, and that the burden of proof to avoid disqualification will be placed on the firm seeking to avoid disqualification.149 The evidence considered will be the measures taken by the firm to avoid contact by the temporary lawyer with the files of other clients. It will be up to the firm to

> demonstrate that the temporary lawyer had access to information relating to the representation only of certain other clients. If such limited access can be demonstrated, then the temporary lawyer should not be deemed to be "associated with" the firm under Rule 1.10.[150]

The Opinion then provides guidance for the firm.

> In order to minimize the risk of disqualification, firms should, to the extent practicable, screen each temporary lawyer from all information relating to clients for which the temporary lawyer does no work. All law firms employing temporary lawyers should also maintain a complete and accurate record of all matters on which each temporary lawyer works.[151]

Given the nature of their hiring; the fact that they are not licensed lawyers; and the fact that they frequently work for more than one firm in a single summer or during the course of their law school careers, summer associates would appear to be more closely akin to "law temps" than to lateral lawyers. Therefore, the logic and the principles applicable to law temps would appear to apply with equal force to law student/summer associates. It would appear that if the firm takes steps to preclude access by summer associates to files and client information unrelated to their specific assignments, imputed disqualification can be avoided.

§ 5.8.3(c)     **3.   What Mechanisms are Sufficient for a Chinese Wall?**

Assuming that an insulation wall would be appropriate to avoid the disqualification of the firm, for example, where both clients consent or where a summer associate were to come to the firm having worked for a law firm which represents an adverse party in a matter, what steps should be taken to ensure proper protection?

As noted, the District of Kansas approved an insulation wall where it was only demonstrated that the firm prevented the new lawyer from having access to the files in the subject cases,152 even in the absence of any proof that any other institutional mechanisms had been discussed, adopted or implemented.

The Seventh Circuit's discussion in *Cromley* explores the required mechanisms in more detail. In that case,

1. It was "'agreed that absolutely nothing of a substantive nature regarding the instant lawsuit would occur' until decisions were made and the clients made aware of them";

2. The new lawyer was assigned to an office in a different city from the lawyer working on the matter;

3. The lawyer handling the case kept the case files in his own personal office;

4. The firm adopted specific screening procedures and required all members and employees of the firm to read and sign the memorandum describing the internal rules.[153]

In the Annotated Model Rules of Professional Conduct, the following factors are listed:

- Whether the conflicted lawyer was able to gain access to the case files;

- Whether the conflicted lawyer shares in the profits or fees derived from the matter;

- Whether the conflicted lawyer is able to discuss the lawsuit with any of the members of the firm or office personnel; and

- Whether the disqualified lawyer is given the opportunity to review any of the case documents.154

All the authorities agree that, if an insulation wall is to be established, it must be in place when the potentially disqualifying event occurs.155

Thus, it appears that laterals, merged lawyers, legal assistants, and secretaries bring their conflicts with them to their new firms, especially if they worked on the particular matter at issue in the old firm. However, summer associates, temporary secretaries, temporary legal assistants and temporary lawyers may be appropriately screened from files and matters which are adverse to clients being represented by the other firm(s) for which the summer associate has worked, or plans to work. That screening must be in place before the conflict arises. It must assure that the summer associate/temporary has no access to the files of the subject matters; that the summer associate/temporary is not able to discuss the matter with lawyers or staff in the firm; and that the summer associate/temporary will not be given the opportunity to review any of the case documents.

**§ 5.8.4**   **D.  Motions to Disqualify**

Unless the client (or former client, in the case of a Rule 1.9 situation) will give informed consent, confirmed in writing, to the lawyer's continued representation (or at least his law firm's continued representation) in the face of a conflict of interest, then the withdrawal or disqualification of the lawyer and his firm must be addressed. If the lawyer refuses voluntarily to withdraw, a motion to disqualify may be filed.

The courts generally disfavor motions to disqualify, as they can be used as a litigation tactic by the opponent to put pressure on the opposing party by attempting to force out his lawyer.156 However, even if no motion to disqualify is filed, "[a] trial court abuses its discretion if it fails to inquire further after becoming aware of a potential conflict between an attorney and his or her client." *State v. Vann*, 280 Kan. 782, Syl. ¶ 1, 127 P.3d 307 (2006).

In considering such a motion, the court must require a showing of "compelling circumstances" to justify the extraordinary and extreme ruling of discharging a party's counsel of choice.

The right to be represented by counsel of choice is an important one, subject to override only upon a showing of *compelling circumstances*. *See Barragree [v. Tri-County Electric Co-op, Inc].,*263 Kan. [446] at 455 [950 P.2d 1351 (1997)]. "[T]he purpose of the [KRPC] can be subverted when they are involved by

opposing parties as procedural weapons." Rule 226, Scope (1996 Kan. Ct. R. Annot. 266).[157]

In *Lansing-Delaware Water District* the Court stated:

> As pointed out by this court in *Parker* [*v. Volkswagenwerk Aktiengesellschaft*, 245 Kan. 580, 588, 781 P.2d 1099 (1989)], the Comment to MRPC 1.10 indicates that "where lawyers move from one firm to the other, courts must balance the previous client's right of confidentiality, the right of having a reasonable choice of legal counsel, and the right of lawyers to form new associations and take on new clients when leaving a previous association."158

Thus, a hearing on such issues involves a consideration of and deference to a party's choice of counsel, as at least one of the three major factors to be considered. The Kansas Court of Appeals has so held:

> In deciding a motion to disqualify counsel, the trial court must balance several competing considerations, including the privacy of the attorney-client relationship, the prerogative of a party to choose counsel, and the hardships that disqualification imposes on the parties and the entire judicial process. [*Quality Developers, Inc. v. Thorman*,] 29 Kan. App. 2d [702] at 711 [31 P.3d 296 (2001)].[159]

The reason for this heightened scrutiny, and the imposition of a burden to show "compelling circumstances," is that motions to disqualify can be, and often are, misused as strategic litigation tools, rather than as legitimate mechanisms for preserving true attorney-client privileged information. Such motions should not be allowed to divest a party of its counsel of choice, particularly on bald and unsupported allegations and conclusions.

> Motions to disqualify are often disguised attempts to divest opposing parties of their counsel of choice. *Chrispens* [*v. Coastal Refining & Marketing, Inc.*], 257 Kan. [745] at 772 [897 P.2d 104 (1995)].[160]

Another case reversing the disqualification of counsel is *Associated Wholesale Grocers*, which held:

> Motions to disqualify should be reviewed with extreme caution, for they can be misused as a technique of harassment. Such motions are often simply common tools of the litigation process, used for purely strategic purposes.[161]

Because motions to disqualify are "often" used as a tool of harassment, such motions should not only be viewed with "extreme caution," but they must be given "serious, conscientious and conservative" treatment.162

> "Motions to disqualify 'should be reviewed with extreme caution for they can be misused as a technique[ ] of harassment.'" *Chapman Engineers v. Natural Gas Sales Co.*, 766 F. Supp. 949, 954 (D. Kan. 1991). "Such motions are often simply '"common tools of the litigation process, . . . used . . . for purely strategic purposes.'" *Lumbard v. Maglia, Inc.*, 621 F. Supp. 1529, 1539 (S.D. N.Y. 1985). "The right to be represented by counsel of choice is an important one, subject to override only upon a showing of compelling circumstances." *Chapman*, 766 F. Supp. at 954. . . . "[T]he purpose of the [Kansas Rules of Professional Conduct] can be subverted when they are involved by opposing parties as procedural weapons." Rule 226, Scope (1993 Kan. Ct. R. Annot. 256).[163]

Further, a practical, rather than a technical, approach is to be taken in evaluating whether a conflict exists.

> If we choose to adopt a highly theoretical analysis, it is possible to make an elusive argument and "find" a conflict. If, however, we take a down-to-earth, real world, functional approach in which we insure that confidentiality is preserved and that the client's wishes are served, we are hard pressed to find any ethical violation upon which additional legal arguments can be hinged.[164]

If a motion is necessary, it should be filed as soon as the conflict becomes apparent and the lawyer fails, after a reasonable opportunity, to withdraw.  The reason for prompt filing is to avoid the appearance that the motion is, indeed, only a litigation tactic.  Further, if the "other" client or the "former" client truly believes that there is a risk of losing confidential information, then that risk is exacerbated by delay; each day's passage makes it more likely that disclosure has taken place.165 Otherwise, the motion appears even more like a strategic weapon, rather than a device to obtain substantial justice, and the conflicted party could be led into an understanding or belief that that the conflict has been waived.166   Delay in filing and prosecuting the motion to disqualify can lead to a finding that the alleged conflict has been waived – which is different from consent.

As stated by the Kansas Supreme Court, "the extent of actual or potential delay in the proceedings" is one of the factors to be considered in deciding a motion to disqualify.167 Further, "a motion to disqualify should be made with reasonable promptness after the party becomes aware of the conflict to prevent disqualification from being used as a strategic tool to deprive opponents of their counsel of choice after substantial preparation has been completed."168

The "failure to act promptly in filing a motion for disqualification may warrant denial of [the] motion."169  The court will not allow a litigant to delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of a case has been completed.170  As the Kansas federal court has noted:

> A federal court sitting in Kansas and deciding a motion to disqualify for a conflict of interest generally looks to the Kansas Rules of Professional Conduct for guidance. See, e.g., *Graham ex rel. Graham v. Wyeth Laboratories*, 906 F.2d 1419 (10th Cir. 1990). However, an unjustified delay in filing a motion to disqualify alone is sufficient grounds for denying the request. *Redd v. Shell Oil Company*, 518 F.2d 311 (10th Cir. 1975). "A litigant may not delay filing a motion to disqualify in order to use the motion later as a tool to deprive his opponent of counsel of his choice after substantial preparation of the case has been completed." *Monarch Normandy Square Partners v. Normandy Square Associates Limited Partnership*, 1989 W.L. 86963 at *3 (D. Kan. July 26, 1989).171

In presenting a motion to disqualify, reference should be made to the specific provisions of the Kansas Rules of Professional Conduct, and to the Comments which relate to the situation presented. Citation of case authorities and treatises are also helpful.

In deciding a motion to disqualify, there is a weighing process.

> A court deciding a motion to disqualify counsel must balance several competing considerations, including the privacy of the attorney-client relationship, the

prerogative of a party to choose counsel, and the hardships that disqualification imposes on the parties and the entire judicial process. Note, *Disqualification of Attorneys and Their Firms for Conflicts of Interest: A Lack of Consistency in Both Federal and State Courts*, 26 Washburn L.J. 493, 495 (1987).[172]

**§ 5.8.4(a)**   **1. Issues to be Decided**

While the Canons under the former Code mandated an irrebuttable presumption on this issue, the court in *Lansing-Delaware* recognized that the Rules are more flexible. Under the Kansas Rules, an attorney is not disqualified "merely because of that attorney's association with another attorney who represents a client."

Instead, the Kansas Rules require the lawyer to have acquired confidential and material information before that attorney is excluded. Once the lawyer is deemed to have acquired such information, however, the Kansas Rules bar representation by other members of the firm as well as by the "tainted" attorney. KRPC 1.10.

Therefore, when litigating a motion to disqualify under Rule 1.10 – and the lawyer is still with the firm, the only real inquiry is whether, in representing the former client, the lawyer received or had access to confidential client information that is material to the matter being litigated.

> Paragraph (b) operates to disqualify the lawyer only when the lawyer involved has actual knowledge of information protected by Rules 1.6 and 1.9(c). Thus, if a lawyer while with one firm acquired no knowledge or information relating to a particular client of the firm, and then that lawyer joined another firm, neither the lawyer individually nor the second law firm is disqualified from representing another client in the same or a related matter even though the interests of the two clients differ.173

In *Koch v. Koch Industries*,174 the Kansas federal court considered a motion to disqualify brought under Rules 1.9(a) (former client) and 1.10(a) (imputed disqualification). In disqualifying the subject law firm, the court held that the movant has the burden of showing the grounds for disqualification. The movant's burden under Rule 1.9(a) is to show that:

1. The moving party and opposing counsel actually had a prior attorney client relationship;

2. The interests of the opposing counsel's present client are adverse to the movant; and

3. The matters involved in the present underlying lawsuit are substantially related to the matters for which the opposing counsel previously represented the moving party.[175]

The court found that under Kansas law, "substantially related" means that "the factual contexts of the two representations are similar or related."176 If such a substantial relationship is found, the court in *Koch* concluded,

> an irrebuttable presumption arises that the former client revealed facts requiring the attorney's disqualification . . . The court need not inquire into whether the confidential information was actually revealed or whether the attorney would be likely to use the information to the disadvantage of the former client.[177]

A similar case is *Regent Insurance Company v. Insurance Company of North America*.178 There, INA sought to disqualify a law firm from representing Regent under Rule 1.9 on the ground that the firm had previously represented INA. The court listed four elements INA must show in order to meet its initial burden of going forward:

1. That INA and [the law firm] had an attorney-client relationship;

2. That the present litigation is the same or substantially related to the matter in which [the law firm] acted as counsel for INA;

3. That the interests of [the law firm's] present client, Regent, are materially adverse to those of INA; and

4. That INA had not consented to [the law firm's] representation of Regent.[179]

Again resorting to the real issue on these motions, the court considered whether the law firm had acquired confidential information in the course of the prior representation:

Taking the factual allegations of INA' [sic] motion as true, we find nothing that indicates [the law firm] acquired any material and confidential information from INA.[180]

Thus, the inquiry on a motion to disqualify will be whether the lawyer (or his firm) received confidential information in the course of the prior representation.

§ 5.8.4(b)    **2.  Is an Evidentiary Hearing Required?**

The court held in *Lansing-Delaware* that a hearing must be held on the motion to disqualify.

In *Parker*, this court made clear that a trial court must conduct a full evidentiary hearing to decide whether the attorney in question acquired material and confidential information during the course of his former employment.[181]

However, this issue was revisited by the court in *Chrispens*. There, the court stated that, in a motion to disqualify under Rule 1.9, an evidentiary hearing is to be avoided, because such a hearing would result in disclosure of the client confidences which the Rules are intended to protect.182

In a Rule 1.9 motion to disqualify, the trial court is to concern itself with three limited issues, and no others. The court in *Chrispens* imposed on the party moving for disqualification the burden to establish that:

1. The attorney whose disqualification is sought formerly represented the party in a matter;

2. The matter is substantially related to a matter in which the attorney now seeks to represent a new client; and

3. The new client's interest is substantially adverse to the interest of the party seeking disqualification.[183]

However, where the motion to disqualify is based on Rule 1.10 (lateral transfer of lawyer to a new firm), the *Chrispens* court held that an evidentiary hearing will be required. Here, the burden of proof is on the firm whose imputed disqualification is being sought.184 In that hearing, confidential information will be disclosed.

Where a motion to disqualify based on MRPC 1.10(b) has been filed, the district court must have a full hearing to determine whether the attorney in question acquired material and confidential information during the course of his or her former employment. . . . [185]

Note that where the motion to disqualify is based *both* on Rule 1.9 *and* Rule 1.10, the evidentiary hearing must be held.186 Therefore, those bringing motions to disqualify must be aware that the confidences they imparted to former counsel will be fair game for inquiry and will assuredly be brought out in the hearing. "Under these circumstances, disclosure of confidential information will result."187

Similarly, in *Monroe v. City of Topeka*,188 the Kansas Supreme Court reversed the trial court's refusal to disqualify a lawyer because of imputed disqualification under Rule 1.10(a). The Supreme Court held that the trial court should have conducted an *in camera* review of notes proffered by the client to show the relationship between the prior representation and the current matter.

**§ 5.8.4(c)**  **3.  What Happens if the Imputed Lawyer has Left the New Firm?**

If the conflicted lawyer has left the new firm by the time the disqualification of the new firm is sought, then not only must the imputed lawyer have actually obtained confidential information in the course of representing the client at his old firm, but he also must have imparted that confidential information to his new firm during the time he was there, in order for his (temporary) new firm to be disqualified. Rule 1.10 makes this clear.

First, the lawyer is now a lawyer "formerly associated" with the imputed firm under Rule 1.10, which provides:

When a lawyer has terminated an association with a firm, the firm is not prohibited from thereafter representing a person with interests materially adverse to those of a client represented by the formerly associated lawyer and not currently represented by the firm, unless:

1.  The matter is the same or substantially related to that in which the formerly associated lawyer represented the client; and

2.  Any lawyer remaining in the firm has information protected by Rules 1.6 and 1.9 (c) that is material to the matter.[189]

Next, the Comments confirm this, stating: "[p]aragraph (a) operates only among the lawyers currently associated in a firm. When a lawyer moves from one firm to another, the situation is governed by Rules 1.9(b) and 1.10(b)."190

Third, the reason for the Rule is to protect against the use of confidential information. The imputed law firm cannot use what it did not receive. Therefore, the court must determine both that the subject lawyer possessed confidential information and that he communicated that information to his new firm before he left. Thus, if the court determines that a lawyer has left the law firm representing his former client, gone to a second law firm, and then left it, then an evidentiary hearing will need to be held to determine whether the subject lawyer had and imparted confidential information.191

**§ 5.8.4(d)**  **4.  Findings of Fact Must be Made**

In addition to holding a full evidentiary hearing, the court must also make specific findings.

> *Parker* also requires the trial court to make a specific factual finding that the attorney had knowledge of material and confidential information. This requires actual knowledge of the fact in question, which can be inferred from the circumstances. 245 Kan. at 589.192

Note that these findings are required only in a Rule 1.10 disqualification, and not in one under Rule 1.9, where disqualification automatically flows from the substantially related adverse representation.

As the court stated in *Chrispens*, the trial court will make findings of fact under Rule 1.10, based on the evidentiary hearing.

> To support a disqualification order, the district court must make a specific factual finding that the attorney had knowledge of material and confidential information. If it is determined that the attorney gained material and confidential information during the course of his or her previous employment, then both the attorney and the firm with whom he or she is presently associated are disqualified.[193]

There is a good reason not to punish the law firm where the disqualified lawyer temporarily practiced. The lawyer's departure from the firm cures the alleged conflict and obviates disqualification of his now-former firm, if he did not impart confidential information.194 The Restatement agrees:

> (1) Imputation specified in § 123 does not restrict an affiliated lawyer when the affiliation between the affiliated lawyer and the personally prohibited lawyer that required the imputation has been terminated, and no material confidential information of the client, relevant to the matter, has been communicated by the personally prohibited lawyer to the affiliated lawyer or that lawyer's firm.195

In *Sorci v. Iowa District Court for Polk County*, the Court held:

> Most importantly, there does not appear to be a good policy ground which justifies treating members of firms, which formerly employed a personally prohibited lawyer, differently depending upon whether or not the lawyer whose employment was terminated was a former government lawyer. As long as the members of the firm do not possess confidential information, they should be permitted to represent clients in such matters.[196]

Finally, the commentators agree. For example, the Annotated Model Rules states:

> Rule 1.10(b) permits the lawyers who remain with the firm to undertake a representation adverse to a client who has left with the departing lawyer, as long as the matters are not substantially related and none of the remaining lawyers retains (either in memory or in accessible files) any material protected information.[197]

## § 5.8.4(e)   5. Burden of Proof is on the Lawyer

In the hearing held by the trial court under Rule 1.10, the burden of proof is on the law firm which is trying to avoid disqualification.

> The district court must determine motions for disqualification on a case-by-case basis, remembering that the burden of proof lies with the attorney or firm who is sought to be disqualified.[198]

Badgerow Subpoena Response 000032

Thus, the Court is required to find both that the lawyer possessed confidential information and that he imparted it to the firm before he left, in order for the firm to be disqualified.

**§ 5.8.4(f)**   **6.   On Appeal, the Issue is Whether the Findings are Supported by Substantial Competent Evidence**

On appeal, the appellate court applies the "abuse of discretion" standard to the court's findings.

> The determination of whether an attorney has a conflict of interest requiring disqualification is governed by an abuse of discretion standard. *In re Habeas Corpus Petition of Hoang*, 245 Kan. 560, 566-67, 781 P.2d 731 (1989), cert. denied 494 U.S. 1070, 110 S.Ct. 1791, 108 L.Ed.2d 792 (1990). A determination of disqualification will be sustained where the court, in its sound discretion, finds either an actual conflict or a serious potential for conflict. *Wheat v. United State*s, 486 U.S. 153, 164, 108 S.Ct. 1692, 100 L.Ed.2d 140, reh. denied 487 U.S. 1243, 108 S.Ct. 2918, 101 L.Ed.2d 949(1988).[199]

However, de novo review is applied to the interpretation or application of the Rules of Professional Conduct.

> Except where a purely legal issue is involved, a district court's order of disqualification will be reversed only if the court has abused its discretion." *Parker v. Volkswagenwerk Aktiengesellschaft*, 245 Kan. 580, 585, 781 P.2d 1099 (1989). We invoke a de novo standard of review when disqualification is based upon disciplinary or ethical rules. See *Chrispens v. Coastal Refining & Mktg. Inc*., 257 Kan. 745, 761, 897 P.2d 104 (1995) (disqualification of counsel under ethical rules adopted by court quorum of law); see also *State v. Dimaplas*, 267 Kan. 65, Syl. ¶ 1, 978 P.2d 891 (1999) (standard of appellate review on whether disciplinary rule prohibits certain professional conduct question of law subject to plenary review).[200]

In *Lansing-Delaware*, the court reviewed the findings of fact made by the trial court following the substantial competent evidence test.

> When the trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *Leeper v. Schroer, Rice, Bryan & Lykins, P.A.*, 241 Kan. 241, 243, 736 P.2d 882 (1987).[201]

**§ 5.9**   **IX. CONCLUSION**

While lawyers should be free generally to seek, and obtain, employment wherever they can, and new clients generally should be free to select and retain the lawyers of their choosing, already existing clients as well as former clients have a right to expect (1) that their lawyer will be a zealous advocate only for their interests, and (2) that their lawyer will not use against them the information which has been imparted to them in confidence. The Kansas Rules of Professional Conduct resolve these competing interests by finding generally in favor of the current or former client, rather than in favor of the lawyer or the new client.

As with most problems in the practice of law (and most problems in life, generally), these issues can best be avoided in the first place, or resolved if not avoided, by application of the

*Conflicts of Interest*   34

Golden Rule – a common-sense approach to doing only those things, which, if one were in the shoes of the other party, one would want done.

Badgerow Subpoena Response 000034

APPENDIX 5A
**FORM 5.1:  Waiver of Conflicts - Current Client (Rule 1.7)**

January 1, 2015

Mr. Current Client
1000 Main Street
Anytown, Kansas  66101

Re:     New Client vs. Current Client

Dear Current Client:

We have been asked to represent New Client in a suit which was filed by you against New Client in the District Court of Any County, Kansas.

As you know, our firm is presently representing you in a contract negotiation with XYZ Corporation in Nowhere County, Kansas.  You are our client in that matter.  Therefore, by taking on the New Client litigation, our law firm would be representing a client (New Client) adverse to you.  We will do this only if you give your informed consent, confirmed in writing.

You and I have discussed this matter, and you have expressed no objection to our representing New Client in the New Client litigation referred to above.  We have consulted and advised you about the potential positive and negative results from this representation.  Those factors include [here list the positive factors and the negative factors].  We both agree that this representation will not adversely affect our relationship with you, and that we will be able to provide competent and diligent representation to each affected client.  Please indicate your informed consent by signing the space below, stating your consent, after consultation, that our relationship will not be adversely affected by our representation of New Client in the New Client suit, and that you believe we will be able to continue to provide competent and diligent representation to you even after taking on this new representation.  After you have signed the consent, please return one copy to me for my files, and retain the other copy for your files.

I appreciate your consideration, and look forward to hearing from you if you have any questions or comments.

Sincerely,

Kansas Lawyer

KL/me

After consultation and full disclosure of the facts, I hereby give informed consent to any conflict of interest on the part of Kansas Lawyer as to New Client.  I consent to Kansas lawyer representing New Client in the matter adverse to Current Client, and agree that our relationship will not be adversely affected, and that Kansas Lawyer will be able to continue to provide me with competent and diligent representation.

_____

*Conflicts of Interest*    36

CURRENT CLIENT

Badgerow Subpoena Response 000036

APPENDIX 5B
**FORM 5.2:  Waiver of Conflicts - New Client (Rule 1.7)**

January 1, 2015

Mr. New Client
1000 Broadway
Anytown, Kansas  66101

> Re:   New Client vs. Current Client

Dear New Client:

We have been asked to represent you (New Client) in a suit which was filed by Current Client against New Client in the District Court of Any County, Kansas.

As you know, our firm is also presently representing Current Client in a contract negotiation with XYZ Corporation in Nowhere County, Kansas.  Current Client is our client in that matter.  Therefore by taking on the New Client litigation, our law firm would be representing a client (New Client) adverse to Current Client.  We will do this only if you give your informed consent, confirmed in writing.

You and I have discussed this matter, and you have expressed no objection to our representing you (New Client) in the New Client litigation referred to above.  We have consulted about the potential positive and negative results from this representation.  Those factors include: [Here list the positive factors and negative factors].  We both agree that our ongoing and continuing representation of Current Client in the lease negotiation referred to above will not adversely affect our relationship with you, and that we will be able to provide competent and diligent representation to both affected clients.  Please indicate your informed consent by signing this letter in the space below, stating your agreement that after consultation, our relationship will not be adversely affected, that we will be able to provide competent and diligent representation, and that you give informed consent to the continued representation of Current Client in the contract negotiation with XYZ Corporation, while also representing you in the litigation which Current Client has filed against you.  After you have signed the consent, please return one copy to me for my files, and retain the other copy for your files.

I appreciate your consideration, and look forward to hearing from you if you have any questions or comments.

Sincerely,

Kansas Lawyer

KL/me

After consultation and full disclosure of the facts, I hereby give informed consent to any conflict of interest on the part of Kansas Lawyer as to Current Client.  I consent to Kansas Lawyer representing Current Client in the negotiation of a contract with XYZ Corporation while also representing me (New Client) in the matter adverse to Current Client, and agree that our relationship will not be adversely affected and that Kansas Lawyer will be able to provide competent and diligent representation to both affected clients.

*Conflicts of Interest*   38

CURRENT CLIENT

APPENDIX 5C
**FORM 5.3:  Waiver of Conflict - Former Client (Rule 1.9)**

January 1, 2015

Mr. Robert Officer, President
Former Client, Inc.
1000 Maple Drive
Anytown, Kansas  61101

       Re:     ABC Corporation vs. Former Client, Inc.

Dear Mr. Officer:

This firm has been retained to file a lawsuit which ABC Corporation wants to bring against Former Client, Inc. regarding the contract between those parties dated January 1, 2014.  You also will probably recall that my partner, Second Lawyer, represented Former Client, Inc. in the drafting of documents which have been used by Former Client, Inc. in connection with its business.  Thus, Former Client, Inc. is a former client of this law firm, and the ABC Corporation litigation could arguably be substantially related to the work which we did for Former Client, Inc. in the drafting of documents. Additionally, the interests of ABC Corporation are adverse to the interests of Former Client, Inc.

After discussing this matter with me, you have given your informed consent, after consultation with and the advice of [or the opportunity to consult with and obtain the advice of] other counsel, that although there is apparent adversity between the interests of Former Client, Inc. and ABC Corporation, Former Client, Inc. consents, and has no objection to our representation of ABC Corporation in the contract lawsuit.  Of course, as required by Rule 1.9(b) of the Model Rules of Professional Conduct applicable to Kansas lawyers, we will not use confidential information relative to our prior representation of Former Client, Inc. to the disadvantage of Former Client, Inc., except as permitted by Rule 1.6 or when the information has become generally known.

If our understanding of your informed consent is correct, please indicate your consent by signing on the consent located at the bottom of this letter.  Please return one signed copy to me.  You may retain the other copy for your files.

Thank you for your consideration.

       Sincerely,


       Kansas Lawyer

KL/me

After consultation and full disclosure of the facts, and after consulting with independent counsel [or the opportunity to consult with independent counsel], Former Client, Inc. hereby gives informed consent to any conflict of interest on the part of Kansas lawyer as to Former Client, Inc.  Former Client, Inc. consents to Kansas Lawyer representing ABC Corporation in the prosecuting of a lawsuit by ABC

*Conflicts of Interest*   40

Corporation against Former Client, Inc. arising from a contract between ABC Corporation and Former Client, Inc.

FORMER CLIENT, INC.

By_____

Title:_____

Badgerow Subpoena Response 000040

**APPENDIX 5D**
**FORM 5.4:  Waiver of Conflicts - Multiple Representation**

January 1, 2015

Mr. Multiple Client
1000 Main Street
Anytown, Kansas  66101

Re:     Multiple Client Representation

Dear Multiple Client:

We have been asked to represent you and several others (LIST NAMES HERE) in the above-referenced lawsuit/matter.

I have discussed this with you so that you could understand the implications of the multiple representation.  You have stated your understanding that the multiple representation may inhibit my ability to maintain your confidences, as I would do in the case of single client representation.  You understand that I cannot – either now or at any time in the future – agree to withhold information from the other clients I am representing in this matter.  However, after discussing the matter, you and I both agree that my ability to represent you will not be adversely affected by this fact, and that I will still be able to represent you competently and diligently.

In addition, you understand that I owe a duty of loyalty to all the clients I represent in this matter. Therefore, I cannot seek to gain any advantage for you over the other clients.  If you decide that you want to implicate another of my clients as blameworthy in the matters leading up to this litigation, you understand that you will have to seek the services of another attorney.  In such a case, you also agree to waive all conflicts that may have arisen as a result of my former representation of you, so that I can continue to represent the other clients in the matter.

If you disagree with any of the statements in this letter, please inform me immediately so that we can take the appropriate actions.  Otherwise, please to confirm your informed consent, sign this letter in the space provided below, indicating that, after consultation, you agree that our relationship will not be adversely affected by the multiple representation, that I will be able still to represent you and the other multiple clients competently and diligently, and you agree to waive any conflicts in the event that you later decide to seek individual counsel to represent you.

I appreciate your consideration, and look forward to hearing from you if you have any questions or comments.

Sincerely,

Kansas Lawyer

KL/me

*Conflicts of Interest*   42

After consultation and full disclosure of the facts, I hereby waive any conflict of interest which may arrive due to Kansas Lawyer's representation of multiple clients in this matter.  I consent to such multiple representation and agree that our relationship will not be adversely affected.

_____
Multiple Client

APPENDIX 5E
**FORM 5.5:  Waiver of Conflicts - "Attorney for the Deal"**

January 1, 2015

Mr. Business Venturer
1000 Main Street
Anytown, Kansas  66101

Re:      Representing Business Entity to be Formed

Dear Business Venture Clients:

We have been asked to represent you and several others in a business entity that will be formed by you along with X, Y and Z.

You and I have discussed this so that you could understand the implications of this representation.  You understand that my role in this venture will be to advise all of you in the formation of the business entity.  As such, I will be unable to maintain your confidences, as I would if I represented you alone.  You understand that I cannot – either now or at any time in the future – agree to withhold information from the other people/entities involved in this venture.  I am lawyer for the venture, and not for any of you individually.

In addition, you understand that I owe a duty of loyalty to the business entity, and not to you or any participant personally.  Therefore, I cannot seek to gain an advantage for you as opposed to the entity itself.  In the event that you want an attorney to advise you personally or to seek an advantage for yourself within the business entity, you understand that you will have to seek the services of another attorney.

If you disagree with any of the statements in this letter, please inform me immediately so that we can take the appropriate actions.  Otherwise, to confirm your informed consent, please sign this letter in the space provided below, indicating that, after consultation, you understand that I am the "lawyer for the deal" and do not represent you personally.

I appreciate your consideration, and look forward to hearing from you if you have any questions or comments.

Sincerely,

Kansas Lawyer

KL/me

After consultation, consideration and full disclosure of the facts, I hereby give informed consent to any conflict which may result due to Kansas Lawyer's representation in connection with the formation and subsequent operation of the future business entity to be formed by me, along with X, Y and Z.  I understand that Kansas Lawyer does not represent me personally in connection with this transaction and the resulting entity, consent to such representation, and agree to seek individual counsel in the event that I need personal advice.

*Conflicts of Interest*   44



_____

Business Venturer

Badgerow Subpoena Response 000044

---

**ENDNOTES**

1     Formerly known as the MODEL RULES OF PROFESSIONAL CONDUCT, or MRPC, in Kansas the name of the rules was changed by amendments adopted on March 11, 1999 to the KANSAS RULES OF PROFESSIONAL CONDUCT, or KRPC.

2     KRPC 1.7, Comment [1] (emphasis added).

3     1 Kan. App. 2d 546, 571 P.2d 350 (1977).

4     *Id.* at 554.

5     Rule 1.7.

6     RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 201 (2000) (hereinafter "Restatement"). The Restatement can be found in Morgan and Rotunda, 2000 Selected Standards on Professional Responsibility, Foundation Press (2000).

7     Restatement §§ 209, 210, 211, 212, & 214, respectively.

8     *In re Adoption of Irons*, 235 Kan. 540, 548, 684 P.2d 332 (1984), quoting 7 AM. JUR. 2d, ATTORNEYS AT LAW § 118, pp. 187- 88.

9     KRPC 1.18(c).

10    *Id.*, Comment [2].

11    KRPC 1.7, Comment [3].

12    KRPC 1.6(b)(5).

13    KRPC 1.6, Comment [21].

14    KRPC 1.7(b)(iii).

15    Rule 1.7(b) provides a similar proscription against representation of two adverse clients, even where the representation itself is not "directly adverse." That rule includes in its definition of "concurrent representation" the situation where "there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." KRPC 1.7(b).

16    "No man can serve two masters: for either he will hate the one, and love the other, or else he will hold to the one, and despise the other." Matthew 7:24 (King James).

17    KRPC 1.7, Comment [1].

18    245 Kan. 560, 781 P.2d 731 (1989).

19    766 F. Supp. 949 (D. Kan. 1991).

20    *See, e.g., State v. Swoyer*, 228 Kan. 799, 619 P.2d 1166 (1980) (lawyer cannot represent corporation regarding termination of its business affairs while also representing an employee claiming wages from that same corporation).

21    The court also rejected the request for disqualification on the grounds (1) that the two parties represented by the challenged attorney would be "adequately represented" despite the attorney's presence and (2) that the clients gave informed consent, displaying a "reasonable understanding of the legal ramifications" of proceeding. 766 F. Supp. at 956, 957.

22    Rule 2.2 in the prior version of the Kansas Rules expressly addressed the lawyer serving as "intermediary." Rule 2.2 was deleted from the Ethics 2000 version of the Rules, and that deletion was accepted in the KRPC. Pierce, "*Ethics 2000: What That Means for Business Lawyers*," 12 BUSINESS LAW No. 2 (Nov. – Dec. 2002), available online at http://www.abanet.org/buslaw/blt/2002-11-12/pierce.html. The separate rule was deleted on the belief that Rule 1.7 now clearly covers all such situations.

23    Creamer, "*What Gets Lawyers Sued*" (2004), available online at http://64.233.167.104/search?q=cache:X-UM_xeyeJMJ:www.abanet.org/rppt/meetings_cle/spring2004/rp/realestatelawyerssued/creamer.pdf+conflicts+%22l awyer+for+the+deal%22&hl=en&ct=clnk&cd=1&gl=us.

24    This may occur in defending a motion to disqualify, in defending an ethics complaint filed with the Disciplinary Administrator, or in defending a malpractice action.

25    Where there would be an adverse effect on either party, the representation cannot continue. KBA Ethics Op. 88-12.

26    While the term "appearance of impropriety" is not contained in the express language of the KANSAS or MODEL RULES OF PROFESSIONAL CONDUCT, it was one of the underpinnings of the predecessor CODE OF PROFESSIONAL RESPONSIBILITY, KAN. SUP. CT. RULE 225. Under the Code, Canon 9 provided that, "A lawyer should avoid even the appearance of professional impropriety."

27    *In re Glenn*, 238 Kan. 625, 712 P.2d 1278 (1979) (where two parties made assignment agreement, lawyer could not represent both parties because the relationship would be adversely affected).

Badgerow Subpoena Response 000045

| | |
|---|---|
| 28 | Belief that the relationship would not be adversely affected is reasonable, for example, where the lawyer takes action against a corporation or other client which employs numerous lawyers in various disciplines, and does not retain a single lawyer or a small group of lawyers for all of its work. |
| 29 | KRPC 1.7 , Comment [15]. |
| 30 | *Aloyo I. Carreras v. Cable West Corp.*, 624 F. Supp. 1167 (D. P.R. 1986). |
| 31 | *People v. McDowell*, 718 P.2d 541 (Colo. 1986). |
| 32 | *Florida Bar v. Hunt*, 429 So. 2d 1201 (Fla. 1983). |
| 33 | *In re Hartke*, 407 N.W. 2d 671 (Minn. 1987). |
| 34 | *Id.* |
| 35 | 137 N.H. 314, 627 A.2d 597 (1993). |
| 36 | For example, if one of the clients is a minor, a guardian *ad litem* must be appointed to ensure that consent by the minor is knowingly given. KBA Ethics Op. 91-2. |
| 37 | KRPC 1.7(b)(4), and Comment [20]. |
| 38 | KRPC 1.7, Comment [20]. |
| 39 | The client must give informed consent, confirmed in writing, that the relationship between lawyer and client will not be adversely affected. Of course, if the relationship later is affected, the client is free to change counsel and to seek another attorney. |
| 40 | KRPC 1.7, Comment [20]. |
| 41 | KRPC  preamble. |
| 42 | 242 Kan. 133, 744 P.2d 1214 (1987). |
| 43 | KRPC 1.7, Comment [20]. |
| 44 | *See State v. Barrett*, 207 Kan. 178, 483 P.2d 1106 (1971) (lawyer is responsible for conduct of secretaries and other employees). |
| 45 | KBA Ethics Op. 90-5 (non-lawyer employee who worked for law firm representing adverse party could not continue unless both clients consent after consultation, regardless of whether confidential information was imparted); KBA Ethics Op. 88-4 (law clerk covered by the same rules of disqualification); (lawyer and county attorney cannot share secretary, full disclosure does not cure conflict. Citing *State v. Caenen,* 235 Kan. 451, 681 P.2d 639 (1984)). |
| 46 | 270 Kan. 810, 19 P.3d 784 (2001). |
| 47 | *Id.* at *822*. |
| 48 | A contrary opinion was expressed (although disqualification was ordered under the facts of the particular case) in *Smart Industries Corp. v. Superior Court*, 179 Ariz. 141, 876 P.2d 1176 (1994). There, the Court held that a proper Chinese Wall could save defendant's counsel from disqualification, even though he had hired as a secretary a woman who had worked as a key paralegal for plaintiff's law firm. *Accord, Phoenix Founders, Inc. v. Marshall*, 887 S.W.2d 831 (Tex. 1994). However, under the facts of the case, the court held that a proper Chinese Wall was not set up, and ordered disqualification. Note, however, that Chinese Walls are not appropriate under Kansas law, as discussed below. *Accord , Grant v. Thirteenth Court of Appeals*, 888 S.W.2d 466 (Tex. 1994). |
| 49 | *See* Forms 5.1 and 5.2 in the Appendix for a suggested form of consent/waiver to satisfy the requirements of this part of Rule 1.7. |
| 50 | KRPC Rule 1.7, Comment [10]. |
| 51 | KRPC Rule 1.8(k). |
| 52 | 264 Kan. 254, 955 P.2d 1240 (1998). |
| 53 | *Id.* at 271. |
| 54 | ABA Formal Op. 92-364 (July 6, 1992). This opinion concludes that, while there is no absolute ban on sexual relations with clients, such a relationship "may involve unfair exploitation of the lawyer's fiduciary position, and/or significantly impair a lawyer's ability to represent the client competently." A greater degree of scrutiny will be made of the lawyer's conduct where a sexual relationship is involved, according to this ABA opinion. |
| 55 | *See* Annotation*, Sexual Misconduct as a Ground for Disciplining Attorney or Judge*, 43 A.L.R. 4th 1062, 1069, at § 2(b). *Otis' Case,* 609 A.2d 1199 (N.H. 1992) (lawyer disbarred in a case where the lawyer made inappropriate remarks and comments to the client, locked her in his office with him, and made advances which eventually led to an assault); *Drucker's Case*, 133 N.H. 326, 577 A.2d 11998 (1990)(two-year suspension for having sex with client represented in divorce proceeding); *In* re *Disciplinary Proceedings Against Woodmansee*, 147 Wis. 2d 837, 434 N.W.2d 94 (1988) (three-year suspension for "sexually assaulting depressed and vulnerable client"); *Comm. on Prof. Ethics & Conduct of the Iowa State Bar Ass'n v. Hill*, 436 N.W. 2d 57 (Iowa 1989)(indefinite suspension for paying client for sex while representing client in a divorce action); *Bourdon's Case*, 132 N.H. 365, 565 A.2d 1052 (1989)(attorney disbarred for violating Rule 1.7(b) by entering physical and emotional relationship with vulnerable |

client, failing to consult with her about possible conflict of interest; then using information relating to the representation to his own advantage; also violated Rule 2.1 – independent professional judgment); *In re Disciplinary Proceedings Against Ridgeway*, 158 Wis. 2d 452, 464 N.W.2d 671 (1990) (six-month suspension for public defender who initiated and engaged in sexual contact with a client who was facing a parole revocation; attorney also gave client a beer, contrary to the terms of her probation); *In re Wells*, 572 N.E.2d (Ind. 1991)(six-month suspension for unconsented touching of clients and other office visitors); *In re Disciplinary Proceedings Against Gibson*, 124 Wis. 2d 466, 369 N.W.2d 695 (1985), *appeal dismissed*, 106 S. Ct. 375 (90-day suspension for requesting sex from, and kissing and fondling client); *In re Wood*, 489 N.E.2d 1189 (Ind. 1986) (attorney disbarred where he solicited and received sex and took nude photographs of female client and client's minor niece in lieu of fees); *In re Littleton*, 719 S.W.2d 772 (Mo. 1986) (indefinite suspension for attorney who made sexual advances to incarcerated client in car after obtaining client's release on bond and withheld money given to him for client's bond); *Comm. on Professional Ethics & Conduct of State Bar Ass'n v. Durham*, 279 N.W.2d 280 (Iowa 1979) (attorney disciplined for engaging in conduct of a sexual nature with client, who was incarcerated in prison at the time of the encounters).

56   *E.g.*, KRPC 8.4(b), (c), (d), or (g).

57   264 Kan. at 281. For a more complete discussion of the *Berg* case and its ramifications, *see* Badgerow, *Improper Advances: The Rule Against Sex with Clients*, 67 J. KAN. BAR. ASS'N 40 (1998).

58   "A lawyer should act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf." KRPC 1.3, Comment [1].

59   *In re Geeding*, 270 Kan. 139, 12 P.3d 396 (2000).

60   KRPC 1.7 , Comment [13].

61   KRPC 1.8(f), Comment [11].

62   Restatement, *supra* note 6, § 134.

63   ABA, ANNOTATED MODEL RULES OF PROFESSIONAL CONDUCT, 5th ed. (2002), 159, citing numerous journal articles.

64   *Id.* at 158, citing ethics opinions from 28 different states to the same effect.

65   ABA Standing Committee on Ethics and Professional Responsibility, Formal Op. 01-421 (February 16, 2001) available online at http://www.abanet.org/cpr/pubs/fo01-421.html

66   *Id.*

67   *Miller v. Maxwell's Int'l, Inc.,* 991 F.2d 583, 587-88 (9th Cir. 1993), *cert denied*, 510 U.S. 1109 (1994*); Levendos v. Stern Entm't, Inc.*, 909 F.2d 747, 751 (9th Cir. 1993).

68   *Lee v. Hutson*, 600 F. Supp. 957, 959 (N.D. Ga. 1984).

69   521 F. Supp. 87 (E.D. Tex. 1981).

70   *Id.* at 89.

71   729 F.2d 903 (2d Cir. 1984), *modified* 748 F.2d 69 (2d Cir. 1984).

72   *Id.* at 907.

73   *Id.* at 909.

74   166 Misc. 2d 834, 634 N.Y.S.2d 958 (N.Y. Sup. Ct. 1995).

75   *Id.*, 634 N.Y.S.2d at 960.

76   *Id.* at 960.

77   187 W. Va. 97, 416 S.E.2d 55, 60 USLW 2762 (1992).

78   *Id.*, 416 S.E.2d at 60.

79   *Id.*

80   450 U.S. 261, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981).

81   *Id.*, 450 U.S. at 267.

82   *Id.* at 270-71 (footnotes omitted).

83   Note the reminders of the Rule 1.6 duty of confidentiality in KRPC 1.8(f) & 1.9.

84   338 N.W.2d 556 (Mich. App. 1983).

85   Of course, because the family relationship is two-way, both lawyers would have to get the consent, after consultation, from their respective clients.

86   KRPC 1.9 (emphasis added).

87   *Miller v. Insurance Mgmt. Assocs.*, 249 Kan. 102, 815 P.2d 89 (1991).

88   KBA Ethics Op. 92-16 (if the new matter is not the same as or substantially related to the former matter *and* if confidential information will not be used, then continued representation in the new matter is permissible). *See also* KBA Ethics Op. 89-4 (representation of new client in negotiation to reduce unpaid hospital bill is permitted by lawyer who formerly represented hospital in malpractice action).

| | |
|---|---|
| 89 | KBA Ethics Op. 90-2 (where the prior representation was in the same or a substantially related matter, disqualification would be required); KBA Ethics Op. 92-16 (where the prior matter was not substantially related to the new matter, disqualification would not be required). |
| 90 | *See* Form 5.3 in the Appendix for a form of consent to be obtained from the former client to satisfy this Rule 1.9 requirement. |
| 91 | Note here that informed consent, confirmed in writing, is only required from the *former*, and not from the new, client. On the other hand, in the situation of a conflict with a *current* client, consent must be obtained from *both* clients. *See* Rule 1.7. |
| 92 | 266 Kan. 1047, 1059, 975 P.2d 231 (1999). |
| 93 | *Id.* at 1059. |
| 94 | 602 A.2d 1277 (Pa. 1992). |
| 95 | *Id.* at 1284. After remand, the *Maritrans* case settled prior to the trial court's determination of the amount of damages. Pepper Hamilton reportedly paid Maritrans $3,000,000, and the injunction has been vacated. ALAS Loss Prevention Journal, Vol. IV, No. 1, p. 11 (Jan. 1993). |
| 96 | *Truck Ins. Exch. v. Firemen's Fund Ins. Co.,* 8 Cal. Reptr. 2d 228 (Cal. Ct. App. 1992); *Stratagem Dev. Corp. v. Heron Int'l,* 756 F. Supp. 789 (S.D.N.Y. 1991). |
| 97 | 16 Kan. App. 2d 646, 827 P.2d 784 (1992). |
| 98 | *Barragree v. Tri-County Elec. Coop., Inc.*, 263 Kan. 446, 457, 950 P.2d 1351 (1997) (reversing disqualification). |
| 99 | *Gilmore,* 16 Kan. App. 2d at 648, citing *Geisler v. Wyeth Lab.*, 716 F. Supp. 520, 524 (D. Kan. 1989). *See also* KBA Ethics Op. 91-4 (applying same principles); *Chrispens v. Coastal Ref. & Mktg., Inc.*, 257 Kan. 745, 897 P.2d 104 (1995). |
| 100 | *Gilmore,* 16 Kan. App. 2d at 649 (emphasis by the court). |
| 101 | KRPC 1.6(b). |
| 102 | KRPC 1.10(a). |
| 103 | KRPC 1.10, Comment [2]. "Paragraph (a) operates only among the lawyers currently associated in a firm. When a lawyer moves from one firm to another, the situation is governed by Rules 1.9(b) and 1.10(b)." |
| 104 | Here, the term "firm" is loosely defined to include those who hold themselves out to the public as a firm, corporate law departments, or legal services organizations. A determination of whether two or more lawyers constitute a "firm" is a fact based inquiry. KRPC 1.10, Comment [1]. Rule 7.5(d) recognizes implied partnerships, for purposes of the Kansas Rules, when it states that "[l]awyers may state *or imply* that they practice in a partnership or other organization only when that is the fact." (Emphasis added). Sharing office space, sharing staff and secretarial help, using a common file room, letterhead, and/or telephone number, and keeping offices open and unlocked, may indicate a "firm" for conflicts purposes where none is, in fact, intended. |
| 105 | *Pac. Mut. Ins. Co. v. Hoidale, Inc.,* 782 F. Supp. 737 (D. Kan. 1992). |
| 106 | *Nissan Motor Corp. v. Orozco*, 595 So.2d 240 (Fla. App. 1992). |
| 107 | Rule 1.10(b), KRPC. |
| 108 | KRPC 1.10, Comment [3]. *See also Gas-A-Tron v. Union Oil Co*., 534 F.2d 1322 (9th Cir. 1976)(imputed disqualification denied without a showing beyond the fact that lawyer merely had physical access to the files while at his former law firm). |
| 109 | KRPC 1.10(b). |
| 110 | KRPC 1.10, Comment [2]. |
| 111 | 267 Kan. 440, 448-49, 988 P.2d 228 (1999). |
| 112 | *Id. See also Estate of Knackstedt ex rel. Knackstedt v. Niazi*, (unpub.) 135 P.3d 1268 (Kan. App. 2006). |
| 113 | *Sorci v. Iowa Dist. Court for Polk County*, 671 N.W. 2d 482, 495 (Iowa 2003); *Goldberg v. Warner/Chappell Music, Inc*., 125 Cal. App. 4th 752, 765-66, 23 Cal. Rptr. 3d 116, 126 (2005); *Ferguson v. DDP Pharmacy, Inc.,* 174 N.C. App. 532, 539, 621 S.E.2d 323, 328 (2005); *Klein v. Bristol Hosp*., 50 Conn. Supp. 160, 164, 915 A.2d 942, 945 (2006); *Richard v. S. Pac. Transp. Co*., 735 F. Supp. 206, 209 (E.D. La. 1990) (personally disqualified lawyer was with the firm only on a "temporary and trial basis," and therefore, disqualification of the firm was not ordered). |
| 114 | KRPC 1.8(a) (emphasis added). |
| 115 | Presumably, this means that a lawyer can, *after the representation is concluded*, negotiate to acquire interests in literary or media rights to the client's story. However, the use of client information in literary or media portrayals would still be limited by Rule 1.8(b), which prohibits the use of client information adverse to the client, and Rule 1.9(b), which prohibits the use of client confidential information to the disadvantage of the former client except as permitted by Rule 1.6 (which does not apply to literary and media uses). |

116     Rule 1.13(a) provides: "A lawyer employed or retained by an organization represents the organization acting through its duly authorized constituents."

117     *See, e.g.*, *Dutton v. County of Suffolk*, 729 F.2d 903 (2d. Cir. 1984).

118     Ethics 2000 Report at 47 - 47.

119     758 F. Supp. 676 (D. Kan. 1991).

120     *Id.* at 682.

121     *Id.*

122     *Id.*

123     KRPC 1.13(b).

124     Rule 1.13(b) states that if the matter cannot be resolved, and action is about to be taken which is clearly in violation of the law and is likely to result in substantial injury to the organization, "the lawyer shall follow Rule 1.16." That Rule provides, at subsection (a)(1) and (4), that the lawyer shall withdraw from representing a client if "the representation will result in violation of the rules of professional conduct or other law," or if "the client persists in a course of action involving the lawyer's services that the lawyer reasonably believes is criminal or fraudulent."

125     Except an arbitrator selected as a partisan for a party in multiple arbitrator cases. *See* KRPC 1.12(d).

126     *In re Seeger's Estate*, 208 Kan. 151, 490 P.2d 407 (1971); *Matter of Baby H.,* 12 Kan. App. 2d 223, 739 P.2d 1 (1987).

127     *Shongutsie v. State*, 837 P.2d 351 (Wyo. 1992).

128     *Turner v. Galbreath*, 3 Kan. App. 2d 613, 599 P.2d 323 (1979).

129     *Jeffry v. Pounds*, 67 Cal. App. 3d 6, 136 Cal. Rptr. 373 (1977); *Sayler v. Elberfeld Mfg. Co.*, 30 Wash. App. 955, 639 P.2d 785 (1982).

130     17 F.3d 1059 (7th Cir. 1994).

131     *Id.* at 1066.

132     *Geisler v. Wyeth Labs*, 716 F. Supp. 520, 526 (D. Kan. 1989).

133     *Id.* In *Geisler*, Judge Kelly found the specific procedures adopted by the subject law firm to be "sufficient to overcome the presumption of imputed disqualification." 716 F. Supp. at 526.

134     The Kansas Supreme Court's decision in *Parker v. Volkswagenwerk A.G.*, 245 Kan. 580, 781 P.2d 1099 (1989)(discussed below), was decided almost four months *after* Judge Kelly's opinion in *Geisler*. Further, after *Parker*, the federal court decided *Koch v. Koch Indus.*, 798 F. Supp. 1525 (D. Kan. 1992)(discussed below), which follows *Parker*, and rejects Chinese Walls as a method of avoiding disqualification.

135     245 Kan. 580, 781 P.2d 1099 (1989).

136     *Id.* at 589.

137     *Id.* This exception is based, of course, on the proposition that knowing consent can avoid the conflict. *See* § 5.6.2, *supra.*

138     798 F. Supp. 1525 (D. Kan. 1992).

139     *Id.* at 1539.

140     248 Kan. 563, 808 P.2d 1369 (1991).

141     *Id. at* 574.

142     ABA Center for Professional Responsibility, Report of the Ethics 2000 Commission, 44-45, available online at http://www.abanet.org/cpr/e2k/e2k-rule110rem.html

143     *Id.*, ABA Rule 1.10, Comment [1]. The Comment explains: "Determining whether a lawyer's role in representing the former client was substantial involves consideration of such factors as the lawyer's level of responsibility in the matter, the duration of the lawyer's participation, the extent to which the lawyer advised or had personal contact with the former client and the former client's personnel and the extent to which the lawyer was exposed to confidential information of the former client likely to be material in the matter."

144     Restatement, *supra* note 6, § 205.

145     1 HAZARD & HODES, THE LAW OF LAWYERING, §1.10:206 (3d ed. 1994).

146     *Id.*, p. 332 (1992 Supp.), citing RESTATEMENT OF THE LAW GOVERNING LAWYERS § 203, cmt c(iv), Tentative Draft No. 3 (1990).

147     ABA Standing Comm. on Ethics and Prof'l Responsibility, Formal Op. 88-356 (December 16, 1988).

148     Formal Op. 88-356, ABA/BNA LAWYERS' MANUAL ON PROFESSIONAL CONDUCT, 901:120 (1989) (emphasis added).

149     *Id.*

150     *Id.*

151     *Id.* at 901:121.

152   *Geisler,* 716 F. Supp. at 526.

153   *Cromley, supra* note 130, 17 F.3d at 1066. The specific screening procedures adopted in that particular case are not stated in the opinion.

154   ABA, ANNOTATED MODEL RULES OF PROF'L CONDUCT, (6th ed. 2007), p. 188, citing *Manning v. Waring, Cox, James, Sklar & Allen,* 849 F.2d 222 (6th Cir. 1988); *Kovacevic v. Fair Automatic Repair,* 641 F. Supp. 237 (N.D. Ill 1986); and *Nemours Foundation v. Gilbane, Aetna, Federal Ins. Co.,* 632 F. Supp. 418 (D. Del. 1986). These cases also consider the "size of the firm" and the "extent of its departmentalization." Presumably, a larger firm, with more departments, would be less likely to permit sharing of information than a smaller, single practice firm.

155   *E.g., E Z Paintr Corp. v. Padco, Inc.,* 746 F. 2d 1459 (Fed. Cir. 1984).

156   *Freeman v. Chicago Musical Instrument Co.,* 689 F.2d 715 (7th Cir. 1982).

157   *Associated Wholesale Grocers, Inc. v. Americold Corp.,* 266 Kan. 1047, 1057-1058, 975 P.2d 231 (1999) (emphasis added).

158   *Lansing-Delaware Water Dist. v. Oak Lane Park, Inc.,* 248 Kan. 563, 570, 808 P.2d 1369 (1991).

159   *Nat'l Bank of Andover, N.A. v. Aero Standard Tooling, Inc.,* 30 Kan. App. 2d 784, 791, 49 P.3d 547 (2002), *rev. denied* 274 Kan. vi (2002) (affirming denial of motion to disqualify). *See also Chapman Engineers, Inc. v. Natural Gas Sales Co., Inc.,* 766 F. Supp. 949 (D. Kan. 1991) (right to counsel of choice is to be overridden only on a showing of compelling circumstances); *Prof'l Serv. Industries, Inc. v. Kimbrell,* 758 F. Supp. 676 (D. Kan. 1991) (same).

160   *Quality Developers, Inc. v. Thorman,* 29 Kan. App. 2d 702, 711, 31 P.3d 296 (2001), *rev. denied* 272 Kan. 1419 (2001) (affirming denial of motion to disqualify).

161   *Associated Wholesale Grocers, Inc. v. Americold Corp.,* 266 Kan. 1047, 1057, 975 P.2d 231 (1999) (reversing order disqualifying counsel).

162   *Regent Ins. Co. v. Ins. Co. of North America,* 804 F. Supp. 1387, 1390 (D. Kan. 1992); *Koch v. Koch Indus.,* 798 F. Supp. 1525, 1530 (D. Kan. 1992), *citing Prof'l Serv. Indus., Inc. v. Kimbrell,* 758 F. Supp. 676, 680 (D. Kan. 1991).

163   *LeaseAmerica Corp. v. Stewart,* 19 Kan. App. 2d 740, 750, 876 P.2d 184 (1994) (reversing order disqualifying counsel).

164   *Matter of Estate of Koch,* 18 Kan.App.2d 188, 215, 849 P.2d 977 (1993).

165   *State ex rel. Wallace v. Munton,* 989 S.W.2d 641, 647 (Mo. App. 1999) ("a motion to disqualify should be made with reasonable promptness after the party becomes aware of the conflict to prevent disqualification from being used as a strategic tool to deprive opponents of the counsel of their choice after substantial preparation has been completed"); *Brown v. Unified School Dist. 501,* 67 F.3d 312 (Table) (10th Cir. 1995) (citing *Redd v. Shell Oil Co.,* 518 F.2d 311, 312 (10th Cir. 1975) (approving summary rejection of motion to disqualify due to lateness of filing in case)).

166   *Wallace,* 989 S.W.2d at 647 ("One who knowingly refrains from asserting an objection promptly is deemed to have waived the objection."); *Redd v. Shell Oil Co.,* 518 F.2d 311, 312 (10th Cir. 1975) (providing that if a party fails diligently to pursue a motion to disqualify, it waives the right to assert the issue).

167   *Baragree v. Tri-County Elec. Co-op., Inc.,* 263 Kan. 446, 458, 950 P.2d 1351 (1997)(reversing order of disqualification).

168   *State ex rel. Wallace v. Munton,* 989 S.W.2d 641, 647 (Mo. App. 1999).  See also, *Brown v. Unified School District 501,* 67 F.3d 312 (10th Cir. 1995)(*citing Redd v. Shell Oil Co.,* 518 F.2d 311, 312 (10th Cir. 1975)(approving summary rejection of motion to disqualify due to lateness of filing in case).

169   *First Small Bus. Inv. Co. v. Intercapital Corp.,* 108 Wash.2d 324, 337, 738 P.2d 263 (1987).

170   *Id.,* 108 Wash.2d at 337, 738 P.2d 263 (quoting *Cent. Milk Producers Coop. v. Sentry Food Stores, Inc.,* 573 F.2d 988, 992 (8th Cir. 1978)). "Delay in filing [a] motion to disqualify is suggestive of its use for purely tactical purposes and could be the sole grounds for denying a motion to disqualify." *In re Firestorm 1991,* 129 Wash.2d 130, 145, 916 P.2d 411 (1996).  *See also, Lee v. Gadasa Corp.,* 714 So. 2d 610 (Fla. App 1998); *Lackow v. Walter E. Heller & Co., Inc.,* 466 So. 2d 1120, 1122 (Fla. 1985); *Reese v. Ga. Power Co.,* 191 Ga.App. 125, 127(2), 381 S.E.2d 110 (1989)(disqualification curtails a client's right to counsel of choice, and results in expense and delay that are costly both to the client and to the administration of justice); *Jackson v. J.C. Penney Co.,* 521 F.Supp. 1032, 1034 (N.D.Ga. 1981); *Conley v. Arnold,* 93 Ga. 823, 824, 20 S.E. 762 (1894)(failure timely to assert conflict may result in conflict being waived); *Summerlin v. Johnson,* 176 Ga.App. 336, 341, 335 S.E.2d 879 (1985); *Grant v. Thirteenth Court of Appeals,* 888 S.W.2d 466, 468 (Tex. 1994); *In re George,* 28 S.W.3d 511, (Tex. 2000)("A party who fails to file its motion to disqualify opposing counsel in a timely manner waives the complaint." (quoting *Vaughan v. Walther,* 875 S.W.2d 690, 690 (Tex. 1994)); *Cox v. Am Cast Iron Pipe Co,* 847 F2d 725 (11th Cir. 1988).

171  *Coffeyville Resources Refining & Marketing v. Liberty Surplus Insurance Corp.*, 261 F.R.D. 586, 589-91 (D. Kan. 2009)(motion to disqualify opposing counsel denied as untimely). The Kansas federal court later explained its decision in *Coffeyville Resources*: "In *Coffeyville Resources Refining and Marketing v. Liberty Surplus Insurance Corp.*, the court denied a motion to disqualify counsel as unjustifiably delayed. It found that a delay of six months between the pro hac vice admission of the attorneys and the filing of the motion to disqualify them to be fatal to the motion. The court noted that the moving party waited until motions for partial summary judgment were fully briefed and discovery completed before moving to disqualify counsel. The court found this delay to be inexcusable and unjustifiable, as well as unfairly prejudicial." *Layne Christensen Co. v. Purolite Co.*, Civil Action No. 09-2381-JWL-GLR, 2011 WL 1113543, at *5 (D. Kan. March 24, 2011)(denying motion to disqualify as unreasonably delayed).

172  *Lansing-Delaware Water Dist. v. Oak Lane Park, Inc.*, 248 Kan. 563, 571, 808 P.2d 1369 (1991).

173  KRPC 1.9, Comment [5].

174  798 F. Supp. 1525 (D. Kan. 1992).

175  *Id.* at 1532.

176  *Id.* at 1533, quoting *Smith v. Whatcott*, 757 F.2d 1098, 1100 (10th Cir. 1985).

177  *Id.* at 1536. *See also Chrispens v. Coastal Ref. & Mktg., Inc.*, 257 Kan. 745, 897 P.2d 104 (1995), where the court recognized an irrebuttable presumption, which therefore obviates the need for an evidentiary hearing.

178  804 F. Supp. 1387 (D. Kan. 1992).

179  *Id.* at 1390, citing *City of Hutchinson v. Gilmore,* 16 Kan. App. 2d 646, 827 P.2d 784, 787 (1992). *See also Estate of Knackstedt ex rel. Knackstedt v. Niazi*, 135 P.3d 1268 (Kan. Ct. App. 2006).

180  804 F. Supp. at 1392.

181  *Lansing-Delaware*, 248 Kan. at 572.

182  *Chrispens,* 257 Kan. 745, Syl. ¶ 6, 897 P.2d 104 (1995).

183  *Id.*, Syl. ¶ 1.

184  *Id.*, Syl. ¶ 5.

185  *Id.*, Syl. ¶ 9.

186  *Id.*, Syl. ¶ 7.

187  *Id.*, Syl. ¶ 6. *See also Barragree*, 263 Kan. at 462-63, 950 P.2d at 1361-62.

188  267 Kan. 440, 448-49, 988 P.2d 228 (1999).

189  KRPC 1.10(b).

190  KRPC 1.10, Comment [4].

191  *Sorci v. Iowa Dist. Court for Polk County*, 671 N.W. 2d 482, 495 (Iowa 2003); *Goldberg v. Warner/Chappell Music, Inc.*, 125 Cal. App. 4th 752, 765-66, 23 Cal. Rptr. 3d 116, 126 (2005); *Ferguson v. DDP Pharmacy, Inc.*, 174 N.C. App. 532, 539, 621 S.E.2d 323, 328 (2005); *Klein v. Bristol Hosp.*, 50 Conn. Supp. 160, 164, 915 A.2d 942, 945 (2006); *Richard v. S. Pac. Transp. Co.*, 735 F. Supp. 206, 209 (E.D. La. 1990) (personally disqualified lawyer was with the firm only on a "temporary and trial basis," and therefore, disqualification of the firm was not ordered).

192  *Lansing-Delaware*, 248 Kan. at 572.

193  *Chrispens,* 257 Kan. 747, Syl. ¶ 9.

194  *See Solow v. W. R. Grace Co.,* 83 N.Y.2d 303, 632 N.E.2d 437 (1994)(no showing that departing lawyer shared confidential knowledge with firm before departing, so firm not disqualified).

195  Restatement, *supra* note 6, § 124(1).

196  671 N.W.2d 482.

197  ABA, ANNOTATED MODEL RULES OF PROF'L RESPONSIBILITY, p. 179 (6th ed. 2007).

198  *Parker*, 245 Kan. at 589. *See also Chrispens*, 257 Kan. 746, Syl. ¶ 5.

199  *In re Marriage of Sigg*, (unpub.), 238 P.3d 331 (Kan.App. 2010).

200  *Venters v. Sellers*, 293 Kan. 87, 92, 261 P.3d 538 (2011).

201  *Lansing-Delaware*, 248 Kan. at 572. *See also, State v. Gonzalez*, 290 Kan. 747, 755, 234 P.3d 1 (2010).

IN JOHNSON COUNTY KANSAS DISTRICT COURT

IN THE MATTER OF:

Case number: 21 CV 6106

ANDREW C BADGEROW

VS

JOHN NICHOLAS BADGEROW ET AL

PETITION FOR LEGAL MALPRACTICE TORT

THE PETITIONER, ANDREW BADGEROW, OF LAWFUL AGE, ALLEGES AND STATES AS FOLLOWS:

1.  My current address is 315 E 9th Street, Apt A, Ottawa KS 66067.  My business telephone number is 785-251-3228, provided by Google Voice.    My address at the time of incident was 8807 Glenwood St., Overland Park, KS 66207.

2.  The name, age, known residence of the persons having action taken against them are:

    NAME:              JOHN NICHOLAS BADGEROW
    AGE:               70
    KNOWN RESIDENCE:    9000 BIRCH ST, PRAIRIE VILLAGE, KS 66207
    LAW FIRM EMPLOYED BY: SPENCER FANE, LLC
    LAW FIRMS ADDRESS:  6201 College Blvd Suite 500, Overland Park, KS 66211

3.  In filing the case 13CT00178, my adopted father, John Badgerow, did knowingly and willfully commit perjury in a pre planned attempt to deprive me, Andrew Badgerow, of my constitutional rights, my rights to due process, my rights to fair representation by court appointed council, my parental rights, and any unmentioned rights that could otherwise be denied by action of this type, in collaboration with Teresa Ann Badgerow, Mr. Gary D. Bernhardt and Kelli L Badgerow to aid Ms. Kelli Badgerow after she was caught in an act of infidelity 18NOV2013 by Mr. Andrew C Badgerow upon arrival to begin care of minor child C.B., the daughter of Kelli and Andrew. The facts upon which I base my belief are:

COURT CLERK-JOCO,KS
29 DEC PM 2:54 /hv/

My adopted father listed in this petition that I have a history of "bipolar" despite me never being diagnosed with bipolar disorder of any subtype. He claimed without documented evidence that I had attempted to contact him over legal documents. He claimed that I am "...fixated on his spending time with his daughter without anyone getting in his way.", and that "He is not safe to be around his child at this time." He then subsequently claimed that I went to my parent in laws house at 12501 Russell, Overland Park KS 66209 on the date of 21NOV2013 and would not leave, claiming I was "...on the floor moaning.". He proceded to claim that during this alleged episode I "...has not made suicidal threats but has made statements about dying due to what happened to him.". He further claims that I "called the police and was rambling about his wife(who he is currently separated from) and another male subject." He closes that paragraph with "When police arrived Andrew was home alone and continued making bizarre statements, leading police to transport him to the hospital."

Over the past year, as I have been allowed under law, I, Andrew Badgerow, have been exercising my rights to conduct a thorough investigation into a matter that has personally affected me as allowed under US Code, Federal Rules of Civil Procedure, Federal Rules of Evidence and Kansas Statutes. The primary person who pointed this, as well as several other issues, out to me was Jaquelin Nicole Perkins. This investigation was delayed from 2015 as it was not until SEP2021 that the court would communicate with Andrew C Badgerow with any matter other than scheduling in matters regarding 15CV00305. This included several in person attempts with the records department to pull the records necessary for this evaluation. I have uncovered evidence showing that, not only were the ex parte orders in 15CV00305 issued without just cause and in conjunction with messages I did not send, yet have not been given the opportunity to prove I did not send or had someone prove I sent as required under KSC 106960, but also directly linked to the filings in 13CT00178. This was a case filed by John Badgerow against Andrew Badgerow for petition to determine a person to be mentally ill. The court appointed attorney, Darrell Smith, indicated prior to the court hearing on 26NOV2013 in this case that John Badgerow had approached him and pointed out it would be in my best interest to waive my hearing rights so he could get home, pop some pain pills, drink a whisky highball and rest for Thanksgiving. I petitioned the records department in DEC2021 for certified copies from the case that sent me to KUMC, and 13CT00178 is what I was sent. The petition lists many things that John Nicholas Badgerow, having been the man that raised me primarily, would have direct and first hand

knowledge of for decades prior to this event and would know to be false at that time.  He took advantage of his position as an attorney in the state of Kansas and directly created a situation that he was able to dictate, with the help of Mr. Gary D Bernhardt, Mrs. Teresa Ann Badgerow and Ms. Kelli L Badgerow(Bernhardt), the exact course of action to be taken by KUMC despite numerous unverified claims, and because of his position his word was taken as truth, in direct violations of his oath as an attorney, his statement notarized on the last page of the petition for 13CT00178, 18 US Code § 241 and 18 US Code § 242.  He further abused his position into convincing Laura Smith, DO and the District Court of Johnson County into overlooking standard checks and procedures in place to prevent this exact situation from a medical/legal perspective or performing normal record verifications to ensure medical data was accurate.   This was done in an attempt to deprive Andrew Badgerow of 2nd amendment rights, Article 6 of the United States Constitution, 8th amendment rights, 9th amendment rights, 14th amendment rights, all under the US Constitution, the first fourth eighth eighteenth and twentieth articles of the Kansas Bill of Rights, K.S.A 23-3204 parental rights in 15CV00305(still being planned to prevent negative consequence of my walking in on Kelli Badgerow's infidelity at the time of filing 13CT00178), , and inheritance rights for adopted children. Further, Andrew Badgerow believes this to violate several other previsions of United States law, and retains the right to point out additional violations at a later date upon discovery.

4.  John Badgerow has abused his power, as documented with medical records and court records, into ensuring Andrew Badgerow was in a position on 26NOV2013 to be unable to fight the slanderous allegations against him.

5.  According to the medical records from Laura Smith, DO, with the KUMC Kansas City Campus at time of filing 13CT00178, Andrew C Badgerow did not have ADHD or bipolar, observed or indicated in history.

6.  According to the medical records from KUMC for the hospitalization that resulted from 13CT00178, John Badgerow, Teresa Ann Badgerow, Mr. Gary Dean Bernhardt and Kelli L Badgerow all claimed to the hospital a history of schizophrenia, and pointed to records from Dr. Bret Menninger MD as the person who diagnosed.  The hospital did not verify these claims.

7.  The medical records in question from Dr. Brett Menninger clearly show that he has never diagnosed Andrew C Badgerow with Bipolar disorder, schizophrenia, or any other primary issue.

8.  Andrew C Badgerow was diagnosed with ADHD at the age of 6.  This diagnosis was confirmed by several doctors in his life, to include as of 13OCT2021 by the Elizabeth Layton center in

reference to an evaluation for 15CV00305.  Andrew Badgerow has never had his ADHD present in a manner with any kind of mental or cognitive defect.   Andrew Badgerow has no history of mania or psychosis.

9.  Andrew C Badgerow has never been hospitalized at a state mental health facility, voluntarily or involuntarily, despite claims that he had been released from Osawatomie State Hospital less than a week before being hospitalized at KUMC from the results of this petition.

10. Andrew C Badgerow did not have police contact with the Overland Park Police Department on 21NOV2013.

11. Because of the misleading and slanderous lies submitted to the court, as well as the separate set of slanderous and misleading lies submitted by respondent to KUMC in order to get the hospitalization, Andrew C Badgerow knows that John Nicholas Badgerow did knowingly and willfully commit perjury by filing this petition.   Andrew C Badgerow also knows that John Nicholas Badgerow did knowingly and willfully violate 18 US Code § 241 with the direct aid of Teresa Ann Badgerow, Mr. Gary Dean Bernhardt and Kelli L Badgerow in order to cover for Kelli L Badgerow's infidelity witnessed by Andrew C Badgerow on 18NOV2021.

12. Andrew C Badgerow knows from experiences observed that council appointed in 13CT00178, Darrell Smith, was directly influenced by John Nicholas Badgerow into pressuring Andrew C Badgerow to waiving his right to hearing.  Andrew C Badgerow tried to inform Mr. Smith that if he was allowed access to a computer connected to the internet and a cell phone in the hearing he could show enough to prove there was no delusions or psychosis present and that the majority of his claims to KUMC on Friday 22NOV2013 were true and factual, as well as get a hold of his actual psychiatrist instead of the one that was quoted to KUMC, to show just cause that he should not have been held involuntarily.  Mr. Smith instead seemed more concerned with getting home quickly to "…pop some pain pills, drink a whisky high ball and rest for Thanksgiving.", pointing to his rotator cuff as the reasoning for wanting to take this course of action.  This is another person who engaged in an act with John Badgerow in direct violation of 18 US Code § 241 separate from the earlier mentioned violation of 18 US Code § 241.

13. Because they are not attorneys licensed by the Kansas Bar in the state of Kansas to practice law publicly, Andrew Badgerow has chosen to file tort against Teresa Ann Badgerow and Kelli L Badgerow separately, and file a separate medical malpractice and neglect tort against Mr. Gary Dean Bernhardt, since at the time he was a practicing medical doctor.

14. Andrew C Badgerow seeks $1,500,000 in damages and pain and anguish as a direct result of John Nicholas Badgerow's actions with 13CT00178. Andrew C Badgerow at the time of this incident was a self employed cyber security specialist that worked from home so that he could work and take care of minor child C.B. at the same time. Andrew Badgerow asks that full rights be restored, and an investigation opened into collusion between John Badgerow and Judge Neil Foth prior to the 25FEB2015 hearing for 15CV00305, as everything else Jaquelin Nicole Perkins has informed Andrew Badgerow has been shown through court records and medical records to be true. Andrew Badgerow has been dismissed as a result of this hearing by numerous police departments in Kansas as "...just some crazy person that probably hallucinated what your telling me you saw." when attempting to file reports after witnessing felonies.  John Badgerow has demonstrated a history of interfering with the constitutional rights of Andrew Badgerow, admitting in medical records from KUMC that he had, with aid, been attempting to involuntarily commit Andrew Badgerow and deprive him of constitutional and parental rights for a substantial amount of time.   Because Andrew Badgerow was prevented for several years by 15CV00305 from investigating this in a normal timeframe, Andrew asks the court to take the extra amount of time into consideration when calculating pain and suffering multipliers normally applied for a tort of this type.

15. Andrew Badgerow asks that John Badgerow be disbarred and prevented from practicing law in this state after clearly demonstrating no understanding for mental health, what mental health is, when someone is a danger to themselves or others, and directly using his power to influence under false pretenses a hospital and district court in the state of Kansas to involuntarily hold Andrew C Badgerow and deprive him of his otherwise allowed constitutional and parental right, as well as his ability to qualify for multiple jobs.

16. Andrew Badgerow may exercise his right at a later date to also file litigation against John Badgerow in US District Court in conjunction with this petition under 43 U.S. Code § 1988.

17. Andrew Badgerow asks the court to notify the US District Court of Kansas and Western Missouri, in regards to Case 2:18-cv-02617-DDC-GEB, that they are in need of a new ruling from a new arbitrator in the matter, as John Badgerow has demonstrated he does not posses the capability to determine the appropriate needs of another person, or in this case a child in need of care in the custody of Kansas D.C.F.S.

18. Andrew Badgerow request a trial by jury for this issue.

19. Statute of limitations that would otherwise limit action in this matter due to time passed does not apply in this case.   In 15CV00305 in Johnson County, Judge Neil Foth issued no contact orders as a part of the ex parte orders in the case.   These no contact orders prevented Andrew Badgerow from performing any act with the Johnson County District Court, including records searches, with the exception of scheduling of hearings and attendance of hearings.   It was only when in SEP2021 it was pointed out that the reason behind the entire no contact orders may have been a direct violation of Kansas Supreme Court ruling 106960 that Andrew Badgerow was allowed to start pulling court records from the court.

I, Andrew Badgerow, swear that everything in this document is truth to the best of my abilities, under penalty of perjury.

/s/

Andrew Badgerow

315 E 9th Street, Apt A

Ottawa, KS 66067

9133189703

Badgerow Subpoena Response 000057

abadgerow1987@gmail.com

21CV06106
Div4

IN THE DISTRICT COURT OF JOHNSON COUNTY, KANSAS
CIVIL DEPARTMENT

ANDREW C. BADGEROW,                    )
                                        )
            Plaintiff,                  )
                                        )
      vs.                               )        Case No. 21CV6106
                                        )
JOHN NICHOLAS BADGEROW,                 )
                                        )
            Defendant.                  )

**JOURNAL ENTRY OF FINAL DISMISSAL WITH PREJUDICE**

NOW on this 27th day of April, 2022, comes on for hearing the Motion of the defendant to Dismiss (Doc. 6). Plaintiff appears in person pro se. Defendant appears in person and by counsel, Spencer Fane LLP, by Leslie A. Greathouse. After reviewing the pleadings, hearing the statements and arguments of the parties, and for good cause shown, it is hereby

ORDERED that the defendant's Motion to Dismiss be and it is hereby GRANTED, for all the reasons and grounds stated in the Motion, and the Petition (Doc. 1) is hereby DISMISSED WITH PREJUDICE at plaintiff's cost. The Court holds that there is no civil action for perjury, and further that the claims of plaintiff are barred by the statute of limitations. Rule 170 has been complied with.

IT IS SO ORDERED.                       /s/ RHONDA K MASON
                                        Dated: 05/24/22
                                        _____
                                        JUDGE OF THE DISTRICT COURT

*Clerk of the District Court, Johnson County Kansas*
*05/24/22 12:14pm CC*

Badgerow Subpoena Response 000059

Approved:

SPENCER FANE LLP

_/s/ Leslie A. Greathouse_
Leslie A. Greathouse, KS #18656
1000 Walnut, Suite 1400
Kansas City, MO 64106
(816) 474-8100
(816) 474-3216 (Facsimile)
lgreathouse@spencerfane.com
ATTORNEY FOR DEFENDANT

ANDREW BADGEROW

129 North Mahaffie
Olathe, Kansas 66061
(913) 318-9703
Abadgerow1987@gmail.com

PLAINTIFF

_Clerk of the District Court, Johnson County Kansas_
_05/24/22 12:14pm CC_

**Consulting Fee Statement**

***Bledsoe v. Jefferson County, et al.*, Case No. 2:16-cv-02296**

**J. Nick Badgerow**

Consulting Income Statement

Estimate of consulting income revenue for the past four (4) years:

>   2022 - $9,716.85
>   2021 - $0
>   2020 - $0
>   2019 - $0

Badgerow Subpoena Response 000061

"Hired Opinions: Ethics and Expert Witnesses," 91 Kansas Bar Journal 27 (Sept./Oct. 2022).

"Friends and Lovers: Conflicts of Interest and New ABA Opinion on Relationships Between Opposing Counsel," 90 Kansas Bar Journal 30 (Jan./Feb. 2021).

"But You Are My Lawyer: Taking a Client's Deposition," 2021 Kansas Defense Journal 11 (July 2021).

"'I Would If I Could:' May a Government Entity Waive a Conflict of Interest on the Part of Outside Counsel?" 107 Kansas Government Journal No. 7, 214 (August-September 2021).

"Divided Loyalties: Referral Fees and Conflicts of Interest," 42 Journal of the Kansas Trial Lawyers Association No. 6, 12 (Nov. 2019).

ethics: conflicts of interest

# FRIENDS AND LOVERS: CONFLICTS OF INTEREST AND NEW ABA OPINION ON RELATIONSHIPS BETWEEN OPPOSING COUNSEL

by J. Nick Badgerow



## I. INTRODUCTION AND OVERVIEW

As Society evolves (or devolves), relationships among people change. Lawyers are not immune from these changes. Thus, it is important continually to examine and evaluate the relationship which lawyers maintain between and among themselves, particularly as they relate to potential conflicts of interest with opposing counsel, in order best to protect clients' interests. The paradox is that the closer one's relationship to the lawyer on the other side, the more likely there is to be a conflict of interest which will affect the clients of both lawyers.

A recent opinion from the American Bar Association, Formal Opinion 494 ("Opinion"),[1] addresses these issues. While providing little in the way of hard and fast rules, the Opinion raises questions and suggests remedies to be considered and applied when a lawyer finds himself/herself opposed by counsel on the other side with whom the lawyer has an intimate, close, or even passing relationship. The Opinion also provides the opportunity to review the basic rules and processes for considering and addressing concurrent conflicts of interest under the Kansas Rules of Professional Conduct ("KRPC").[2]

## II. CONCURRENT CONFLICTS OF INTEREST AND WAIVER

### A. Basic Principles

The principles governing conflicts of interest with a current client are found in Rule 1.7(a), which provides as follows:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

Badgerow Subpoena Response 000063

(1) the representation of one client will be directly adverse to another client; or

(2) there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.[3]

To summarize, one may not take on the representation of one current client if that representation is directly adverse to another current client, or where the representation will be materially limited by the lawyer's responsibilities to another client, a former client, a third person, or the lawyer's own interest. The Rule goes on to provide a limited exception, containing several specific exceptions:

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if each affected client gives informed consent, confirmed in writing, and:

    (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

    (2) the representation is not prohibited by law; and

    (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.[4]

Thus, in order for there to be an effective waiver, the following conditions must be must:

1. The proposed representation obviously does not involve assertion of a claim by the lawyer in the same litigation or proceeding in which the lawyer is representing the other client;

2. The lawyer has the *actual* belief that s/he will be able to provide competent and diligent representation to both clients; and

3. The lawyer had the *reasonable* belief that s/he will be able to provide competent and diligent representation to both clients; and

4. Each client gives *informed consent*; and

5. That informed consent is *confirmed in writing*.

Thus, absent a determination by the lawyer that the conflict is consentable and the grant of consent by the client, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated. The client as to whom the representation is directly adverse is likely to feel betrayed, and the resulting damage to the client-lawyer relationship is likely to impair the lawyer's ability to represent the client effectively. In ad-

dition, the client on whose behalf the adverse representation is undertaken reasonably may fear that the lawyer will pursue that client's case less effectively out of deference to the other client, i.e., that the representation may be materially limited by the lawyer's interest in retaining the current client.[5]

What follows is an analysis of the steps which a lawyer must follow in order to analyze a conflict, determine whether it may be waived, and then the steps necessary to obtain a proper waiver.

## B. Are They Both Clients?

The first consideration is whether the proposed representation of the proposed client will be directly adverse to another client. The rule precludes direct adversity to another "client." The attorney-client relationship is

not dependent upon the payment of a fee, nor is a formal contract necessary to create the relationship. The contract may be implied from conduct of the parties. The employment is sufficiently established when it is shown that the advice and assistance of the client are sought and received in matters pertinent to his profession.[6]

## C. Is the Representation Directly Adverse?

Once it is determined that both parties are "clients," the next test is to determine whether the proposed representation is "directly adverse" to another client, or can reasonably be foreseen to become directly adverse. In some contexts, this is clear. For example, a lawsuit against a current client is "directly adverse," as would be the conduct of negotiations for one client to purchase the assets or business of another client. Representation of one spouse on a motion to increase child support in a divorce action where the lawyer represented the other spouse in the divorce would be directly adverse.

The justification for the rule is that the lawyer needs to give advice, to negotiate, and to advocate, for the benefit of one client, not splitting his/her loyalties – in fact or in the client's eyes. The lawyer's thoughts and efforts, and the transaction itself, need to be free from being clouded by the interests of another client. They need to proceed without the lawyer confronting a mental conflict of deciding whose interests to advocate, and without the specter of doubt on the part of either client as those whose interests are actually being served.

Thus, absent a determination by the lawyer that the conflict is consentable and the grant of informed consent by the client, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated. The client as to whom the representation is directly adverse is likely to feel betrayed, and the resulting damage to the client-lawyer relationship is likely

Badgerow Subpoena Response 000064

ethics: conflicts of interest

to impair the lawyer's ability to represent the client effectively. In addition, the client on whose behalf the adverse representation is undertaken reasonably may fear that the lawyer will pursue that client's case less effectively out of deference to the other client, i.e., that the representation may be materially limited by the lawyer's interest in retaining the current client.

A thoughtful consideration of the issue needs to be made, because it is likely that, if the lawyer decides that the representation is not "directly" adverse and proceeds with the representation without satisfying the other requirements of the Rule, the other client could make a sufficient objection, or take the other sufficient action, so as to require the lawyer to justify any failure to follow the Rule.

### D. Does the Lawyer Actually and Reasonably Believe That the Relationship Will Not Be Materially Limited?

If the representation of one client would be directly adverse to another client, then the next step is for the lawyer to examine his relationship with the affected client. Would the relationship be affected by taking a case or matter directly adverse to that client? In order to proceed, the lawyer must have the actual belief that there is not "a substantial risk that the representation of" neither client will be materially limited by taking on the representation.[7]

> Even where there is no direct adverseness, a conflict-of-interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests.[8]

Material limitations can include any number of things, such as the confidence and cordiality of the relationship. It also includes the issue of whether the other client will feel chilled in his/her willingness to share confidential information with the lawyer—knowing that the lawyer has taken action adverse to the client, and might do so again in the future. Thirdly, it includes the appearance of impropriety, because each client must wonder whose interests are being advocated. Each client should be confident that his/her interests, rather than those of his/her opponent, are being served by the lawyer.

> Loyalty and independent judgment are essential elements in the lawyer's relationship to a client... [A] conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests... The critical questions are the likelihood that a difference in interests will eventuate and, if it does, whether it will materially interfere with the lawyer's independent

professional judgment in considering alternatives or foreclose a course of action that reasonably should be pursued on behalf of the client.]

These considerations must be kept in mind when evaluating one's relationship with opposing counsel: will that relationship, whether it be intimate, close or just an acquaintance, "materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose a course of action that reasonably should be pursued on behalf of the client."[10]

1. Subjective Belief. First, the belief must be *actual*, i.e. subjectively held in the mind of the lawyer. The lawyer must *actually* believe that s/he can and will represent both clients competently and diligently, and that other interests do not impose material limitations on that competent and diligent representation.

   > "Belief" or "Believes" denotes that the person involved actually supposed the fact in question to be true. A person's belief may be inferred from the circumstances.[11]

2. Objective Belief. Additionally, the belief must be *reasonable*. This means that a reasonable third party, looking at the transaction or action taken by the lawyer, would conclude that the relationship with the other client would not be materially affected by the adverse representation. Such occurrences are rare.

This is an objective standard. As noted in the Comment, one must view the situation through the eyes of a "disinterested outsider."

> [W]hen a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent.

These conflicts are not waivable. For example, representing opposing parties in the same litigation matter would never be appropriate.[13] And the problem is not limited to civil and criminal litigation, but extends to potential conflicts in all areas, such as business and real estate transactions, estate and probate matters, and investments. If the relationship with either client, i.e. zealous, independent, vigorous representation, would be affected because of the conflict, no amount of client consent will cure the conflict.

> The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client.[14]

Badgerow Subpoena Response 000065

### E. Have the Clients Consented After Consultation?

Even if the lawyer *actually* and *reasonably* believes that the relationship with either client will not be adversely affected by his representation of the other client adverse to the first client, both clients must still consent to the adverse representation.

1. There must be consultation with each client;
2. Each client's consent must be knowingly given; and
3. The clients' consent must be confirmed in writing.

This consultation should include a complete disclosure of the adverse nature of the representation and an understanding that, despite the lawyer's loyalty to the client in other matters, he is loyal only to the other client in the matter at hand.

The definitions ("Terminology") in the Model Rules detail the type of consultation which shall be provided, in order for the clients to give knowing consent:

> "Consult" or "Consultation" denotes communication of information reasonably sufficient to permit the client to appreciate the significance of the matter in question.[15]

This "consultation" requires the lawyer to disclose all the potential negative and positive outcomes and eventualities from proceeding in the face of the conflict, as well as the reasonably available alternatives to giving the consent, i.e. to find another lawyer.

> Ordinarily, this will require communication that includes a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives. In some circumstances it may be appropriate for a lawyer to advise a client or other person to seek the advice of other counsel.[16]

While the information imparted will necessarily vary, depending on the situation, it is clear that the adverse representation must be disclosed, as well as the risks and advantages resulting from continued representation despite the conflict. For example, in the case of *In re Wilkinson*,[17] the lawyer was held to have improperly represented a client in the sale of another client's property without full disclosure, because he did not inform the client of his intention to satisfy his fee claim against the other client from the proceeds of the sale.

This disclosure may require the imparting of confidential information from the other client, in order to explain the possible adversity or the ramifications of various potential results in the matter. In this situation, lawyers must be mindful of Rule 1.6, regarding confidentiality. If the other client does not consent to the release of confidential information to the



new client, then an adequate consultation cannot be conducted, and knowing consent cannot be obtained. As noted in the official Comments:

> [T]here may be circumstances where it is impossible to make the disclosure necessary to obtain consent. For example, when the lawyer represents different clients in related matters and one of the clients refuses to consent to the disclosure necessary to permit the other client to make an informed decision, the lawyer cannot properly ask the latter to consent.[18]

Therefore, express permission should be obtained from one client to disclose confidential information to the other client, in order to explain the potential for conflict and to obtain knowing consent.

Even if disclosure is allowed, Rule 1.6 will still apply. Care should be taken to protect communications from each client as confidential.

### F. Is the Clients' Consent "Confirmed in Writing"?

Having satisfied all the foregoing requirements, and obtained the clients' consent, i.e. having waived the conflict *after consultation*, that waiver must then be "confirmed in writing."[19]

> Paragraph (b) requires the lawyer to obtain the informed consent of the client, confirmed in writing. Such a writing may consist of a document executed by the client or one that the lawyer promptly records and transmits to the client following an oral consent.[20]

The requirement of a written record of the clients' consent is for the protection of the lawyer, in case memories "fade" after a bad result.

> [T]he writing is required in order to impress upon clients the seriousness of the decision the client is being asked to make and to avoid disputes or ambiguities that might later occur in the absence of a writing.[21]

Badgerow Subpoena Response 000066

The writing need not be signed by the client, though that would certainly solidify the consent. It should, however, be sent at the time or soon after the consent is obtained.

"Confirmed in writing," when used in reference to the informed consent of a person, denotes informed consent that is given in writing by the person or a writing that a lawyer promptly transmits to the person confirming an oral informed consent. See paragraph (f) for the definition of "informed consent." If it is not feasible to obtain or transmit the writing at the time the person gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter.[22]

Having reviewed the basic concepts of concurrent conflicts and their waiver, obtained through informed consent, confirmed in writing, the focus now turns to the relationships between opposing counsel, and how those relationships potentially involve conflicts of interest.

### III. WHY AVOID CONFLICTS—WHAT CAN HAPPEN?

#### A. Conflicts Are Unethical

The first reason to avoid unwaived or unwaivable conflicts of interest is that the Rules of Professional Conduct prohibit them. And it is every lawyer's ethical duty to comply with those Rules.

Lawyers play a vital role in the preservation of society. The fulfillment of this role requires an understanding by lawyers of their relationship to our legal system. The Rules of Professional Conduct, when properly applied, serve to define that relationship.[23]

#### B. Breach of Ethics Rules Can Lead to Discipline

The Rules of Professional Conduct carry the imprimatur of the Kansas Supreme Court, which enforces those Rules through its Disciplinary Administrator.[24] Rule 8.4(a) makes it professional misconduct to "[v]iolate or attempt to violate the rules of professional conduct."[25] Supreme Court Rule 202 specifically holds that, "Acts or omissions by an attorney... which violate the attorney's oath of office or the disciplinary rules of the Supreme Court shall constitute misconduct and shall be grounds for discipline."[26] For example, in *In re Crandall*,[27] the respondent attorney was suspended six months for, *inter alia*, violating Rule 1.7 by maintaining a concurrent conflict of interest.

#### C. Conflicts of Interest Can Lead to Loss of Clients —and Loss of Fees

Once a conflict of interest is discovered, the "new" client will wonder whether s/he has the undivided loyalty of the lawyer, and would likely seek counsel elsewhere. The lawyer



collects no further fees from that client. And the "old" client would likely feel betrayed by the disloyalty, and thus decline to engage the lawyer any longer, thus leading to a loss of fees from that quarter as well.

#### D. Conflicts of Interest Can Lead to Disqualification

Once a conflict of interest is brought up in litigation, motions often ensue, leading to expensive and time-consuming satellite litigation, diverting the attention of the parties from the real issues in the case. And if the conflict of interest be proven, disqualification of the offending lawyer often results [28]—again with the concomitant loss of future fees, and most likely the disgorgement of fees earned before the disqualification.[29]

#### E. Disqualification Due to a Conflict of Interest also Can affect the Lawyer's Good Name and Reputation among the Bench and Bar

In *Freeman v. Chicago Musical Instrument Co.*, the Court observed that "granting of a disqualification motion all too often impairs the reputation of the disqualified firm."[30]

#### F. Conflicts of Interest Can Lead to Malpractice Claims

Clients who are upset by an unwaived conflict of interest sometimes seek redress for disgorgement, or even damages resulting from the conflict by means of a legal malpractice claim.[31]

### IV. RELATIONSHIPS WITH OPPOSING COUNSEL – ABA OPINION 494

#### A. Family Relationships

As noted above, Rule 1.7(a) recognizes concurrent conflicts in the case of conflicts between the interests of the client and "a personal interest of the lawyer."[32] Thus, when a client seeks to retain the lawyer to represent her in the possible purchase of property in which the lawyer holds an interest, a concurrent conflict obviously arises.[33]

Perhaps the most obvious "personal interest" for a lawyer is, or should be, his/her relationship to close family members. The Comments to Rule 1.7 anticipate this, by finding a conflict where a lawyer proposes to represent a client adverse to

a party represented by someone "closely related by blood or marriage."[34] The Comment proceeds to explain:

> Thus, a lawyer related to another lawyer, e.g., as **parent, child, sibling or spouse**, ordinarily may not represent a client in a matter where that lawyer is representing another client, unless each client gives informed consent. The disqualification arising from a close family relationship is personal and ordinarily is not imputed to members of firms with whom the lawyers are associated.[35]

Clearly, however, this list—however specific it might be—does not cover all the potential relationships which one might have with opposing counsel, and which may materially limit the lawyer's ability to represent his/her client zealously and vigorously. That is where the ABA's recent opinion attempts to step in to fill the breach.

### B. ABA Opinion 494

This Opinion, issued on July 29, 2020, "offers guidance on conflicts that may arise from personal relationships with opposing counsel that fall within the Rules but are not specifically addressed by the Comments."[36] The Opinion "sets out the framework for analysis and identifies three categories of potential relationships between opposing counsel,"[37] viz: Intimate Relationships, Friendships (Close Friendships, Intermediate Friendships, and "Just Friends"), and mere Acquaintances. These categories will be discussed below.

1. **Intimate Relationships.** Even if not married, those who are engaged to be married, cohabiting, or in an exclusive intimate relationship "should be treated similarly to married couples for conflicts purposes."[38] According to Opinion 292, these lawyers *must* disclose their relationship to their clients and "*ordinarily*" may not proceed with the representation, absent informed consent from the clients, confirmed in writing, and only after assuring themselves, actually and reasonably, that the representation of neither client will be materially affected.[39] No guidance is provided as to when informed consent, confirmed in writing would not be required in the "extraordinary" case of an intimate relationship between opposing counsel. Again, this falls to the good judgment of counsel, which likely would err on the side of seeking written, informed consent.

What about intimate but non-exclusive relationships? The Opinion addresses this too:

> Opposing counsel who are in some type of intimate relationship, but are not exclusive, engaged to be married or cohabiting, must carefully *consider* whether the relationship creates a significant risk that the representation of either client will be materially limited by the



lawyers' personal relationships. The *prudent course* would be to disclose to the affected clients and obtain their informed consent.[40]

**Friendships.** This category, in turn, is divided into three sub-components:

a. **Close Friendships.** "Close friendships with opposing counsel *should* be disclosed to each affected client and... *ordinarily* [require] informed consent."[41] Little guidance is provided as to when such disclosure should or should not be made and informed consent should or should not be obtained. Close friendships include those who:

- Exchange gifts at holidays and special occasions;

- Regularly socialize;

- Regularly communicate and coordinate activities

- Routinely spend time at each other's homes;

- Vacation together with families;

- Share a mentor-protégé relationship; or

- Share confidences and intimate details of their lives.

b. **Intermediate Friendships.** Something less than "close friends," but something more than "just friends" are "intermediate friends." These "*might*" require disclosure, but will not "ordinarily" require client consent. Intermediate friendships include those who:

- Once practiced law together and may periodically meet for a meal;

- Try to meet when they are in each other's hometown;

ethics: conflicts of interest



• Were law school classmates or were colleagues years before;

• May stay in touch through occasional correspondence, but do not regularly see one another.

In these circumstances, analysis is necessary to determine whether disclosure and consent are required:

The analysis turns on the closeness of the friendship. If there is a significant risk that the representation of one or more clients will be materially limited by a lawyer's relationships, the lawyers must disclose the relationship to each affected client and obtain that client's informed consent, confirmed in writing, assuming the lawyers reasonably believe they will be able to provide competent and diligent representation to each affected client. If the lawyers cannot do so, one or both of the lawyers must decline or withdraw from the affected representations, consistent with Model Rule 1.16.[42]

c. Just Friends. If the relationship between opposing counsel is a friendship not rising to the levels described above, and if the lawyers conclude, actually and reasonably, that there will be no material deleterious effect on the representation of either client, then disclosure and consent are not required.[43]

2. Acquaintances. "Acquaintances are relationships that do not carry the familiarity, affinity or attachment of friendships... [as their] interactions are coincidental or relatively superficial."[44] There must be little difference between "just friends" and "acquaintances." But, according to the Opinion, this latter group includes those who, by way of example:

• Are members of the same place of worship, professional or civic organizations, or the like;

• May see each other at gatherings, even frequently, without feeling a close personal bond;

• Regularly meet at bar association or other business events;

• Present continuing education programs together;

• Serve on bar association committees or boards together, where their relationship is collegial but not necessarily "friendship.[45]

Lawyers who are acquaintances of opposing counsel *need not* disclose the relationship to clients, although

the lawyer **may** choose to do so. Disclosure **may** be advisable to maintain good client relations. It **may** be helpful to inform a client that the lawyer has a professional connection with opposing counsel and then explain how that will not materially limit the lawyer's objectivity but may, in fact, assist in the representation because the lawyers can work collegially.[46]

So, again, not only is little guidance provided, but the steps to be taken in such a case are left to generalities, and permissive, rather than mandatory, steps. So, the best step when in doubt, after evaluating the situation to be assured that one's representation would not be negatively impacted by proceeding to represent a client adverse to a party represented by a friend or acquaintance, would be to proceed to make full disclosure to the client, and obtain the client's *informed consent, confirmed in writing.*

## V. CONCLUSION

Lawyers are encouraged to be collegial and friendly, even in the face of bitter advocacy in court, in negotiations, or in other adversary interactions. As Shakespeare says: "And do as adversaries do in law, Strive mightily, but eat and drink as friends."[47] But, as lawyers form acquaintances, friendships, or even intimate relationships with other lawyers, they must consider the impact of those relationships on the lawyers duties' of zealous advocacy[48] on behalf of their clients. Opinion 494 sets out one method to evaluate this interplay among relationships, duty to clients, and conflicts of interest. ∎

**About the Author**



**J. Nick Badgerow** is a trial-lawyer partner with Spencer Fane LLP in Overland Park, Kansas. For thirty years, he served as Chairman of the Johnson County Bar Ethics and Grievance Committee. He is Chairman of the KBA Ethics Advisory Opinion Committee; he was a member of the Kansas Judicial Council for 23 years, including Chairman of the Council's Civil Code Advisory Committee and Antitrust Law Committee; he served as Chairman of the Kansas Ethics 2000 Commission and the Kansas Ethics 2020 Commission; and he was a member of the Kansas Supreme Court-KBA Joint Commission on Professionalism. For sixteen years, Nick was a member of the Kansas State Board of Discipline for Attorneys. He is the Editor and a co-author of the KBA's Ethics Handbook, Third Edition (2015).

nbadgerow@spencerfane.com

Badgerow Subpoena Response 000069

ethics: conflicts of interest

1. ABA Formal Opinion 494 (July 29, 2020), link to pdf found at https://www.americanbar.org/news/abanews/aba-news-archives/2020/10/aba-issues-new-guidance-for-lawyers-to-navigate-conflicts-based-/

2. Rule 226, Rules of the Kansas Supreme Court.

3. Rule 1.7(a), KRPC.

4. *Id.*

5. *Id.*, Comment 6.

6. *In re Adoption of Irons*, 235 Kan. 540, 548, 684 P.2d 332 (1984), quoting 7 Am. Jur. 2d, Attorneys at Law §118, pp. 187 - 188.

7. Rule 1.7(a)(2), KRPC.

8. Rule 1.7, KRPC, Comment 8.

9. *Id.*, Comments 1 and 8.

10. *Id.*, Comment 4.

11. Rule 1.0(a), KRPC.

12. MODEL Rules of Professional Conduct, Rule 1.7, Comment 14.

13. See Rule 1.7(b)(3), KRPC.

14. Rule 1.7, KRPC, Comment 8.

15. Rule 1.0(c), KRPC.

16. Rule 1.0, KRPC, Comment 8.

17. *In re Wilkinson*, 242 Kan. 133, 744 P.2d 1214 (1987).

18. Rule 1.7, KRPC, Comment 19.

19. Rule 1.7(b)(4).

20. *Id.*, Comment 20.

21. *Id.*

22. Rule 1.0(b), KRPC.

23. KRPC, Preamble and Scope, para. 13.

24. Rule 205(a), Rules of the Kansas Supreme Court.

25. Rule 8.4(a), KRPC.

26. Kansas Supreme Court Rule 202.

27. *In re Crandall*, 308 Kan. 1526, 1558, 430 P.3d 902 (2018). *See also, In re Hodge*, 307 Kan. 170, 204, 407 P.2d 613 (2017)(lawyer disbarred for, *inter alia*, violating Rule 1.7).

28. See,e.g., *Petition of Hoang*, 245 Kan. 560, 566, 781 P.2d 731 (1989).

29. See, e.g., *Maritrans GP Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277 (1992); *Ulico Cas. Co. v. Wilson, Elser. Moskowitz, Edelman & Dicker*, 16 Misc.3d 1051, 1065 (NY Sup.Ct. 2007) (citing *Feiger v. Iral Jewelry*, 41 N.Y.2d 928, 928-29 (1977)).

30. *Freeman v. Chicago Musical Instrument Co.*, 689 F.2d 715, 720 (7th Cir. 1982). *See also, Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1025 n.6, 1027 (5th Cir.) (attorney is subjected to loss of both reputation and fees), cert. denied, 454 U.S. 895 (1981).

31. *Zimmerman v. Brown*, 49 Kan. App. 2d 143, 306 P.3d 306 (2013) (claim stated; summary judgment for attorney reversed).

32. Rule 1.7(a)(2), KRPC.

33. See e.g. *Stewart Title of the Midwest v. Reece & Nichols Relators*, 294 Kan. 553, 276 P.2d 188 (2012)(lawyer's personal benefits clashed with client's interest: unwaivable conflict of interest).

34. Rule 1.7, KRPC, Comment 11.

35. *Id.* (emphasis added). See also, Rule 1.8(i), KRPC:

(i) A lawyer related to another lawyer as parent, child, sibling or spouse shall not represent a client in a representation directly adverse to a person who the lawyer knows is represented by the other lawyer except upon consent by the client after consultation regarding the relationship.

36. ABA Formal Opinion 494 (July 29, 2020), link to pdf found at https://www.americanbar.org/news/abanews/aba-news-archives/2020/10/aba-issues-new-guidance-for-lawyers-to-navigate-conflicts-based-/ [hereinafter "Opinion"].

37. Opinion.

38. *Id.* See also, e.g., Ariz. Ethics Op. 2001-12 (2001)(defense lawyer in romantic relationship with law enforcement officer who regularly investigates and charges lawyer's clients must obtain client's informed consent to represent client in case where officer is involved).

39. Opinion.

40. *Id.* (emphasis added).

41. *Id.* (emphasis added).

42. *Id.*

43. *Id.*

44. *Id.*

45. *Id.*

46. *Id.* (emphasis added).

47. William Shakespeare, *The Taming of the Shrew*, Act 1, Scene 2.

48. "A lawyer shall act with reasonable diligence and promptness in representing a client." Rule 1.3, KRPC. Comment 1 explains that this includes "commitment . . . dedication . . . and . . . zeal in advocacy upon the client's behalf."



**TranslationPerfect.com**

**LEGAL INTERPRETERS**
**SIGN LANGUAGE & 100+**
**FOREIGN LANGUAGES**

**ON-SITE • OVER THE PHONE**
**DOCUMENT TRANSLATION**

**Interpreters & Translators for courts,**
**depositions, and client meetings**



**Contact Kim Chao**
**913.491.1444**
**kim.chao@translationperfect.com**

**www.TranslationPerfect.com**

# But You Are My Lawyer:
## *Taking a Client's Deposition*

 By J. Nick Badgerow, Spencer Fane LLP[†]

**Summary and Overview.**

Unless a lawyer has the good fortune and privilege to represent a single client, without having to depend on the support and income from a number of clients, the situation sometimes arises where a lawyer is required—in the zealous representation of one client—to seek the testimony, perhaps adverse, from another current or former client. In such a situation, a conflict in the lawyer's loyalties is apparent. In most situations, it would represent a conflict of interest for the lawyer to cross-examine one or more current clients in the course of representing another client.

While concurrent conflicts may be waived in some circumstances, the prospect of adverse effects on the representation of either the client/witness or the new client (or both) is very real, and thus a waiver may be problematic. Another solution would be for the firm to engage another law firm to cross-examine the client/witness. Otherwise, in most cases, it is recommended that the lawyer decline the representation of the new client.

**Zealous Representation**.

It is rudimentary that a lawyer's obligations to his/her client include the duty to represent that client zealously.[1] Rule 1.3 intones: "A lawyer shall act with reasonable diligence and promptness in representing a client." The Comments to this Rule explain that diligence means:

> A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and may take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer should act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf. However, a lawyer is not bound to press for every advantage that might be realized for a client.[2]

So, each lawyer has taken an oath to represent each client with commitment, dedication, and zeal in advocacy. More lawyers are disciplined for lack of zeal than for excessive zeal.[3]

**Seeking Testimony.**

In representing one client zealously, it usually becomes necessary to obtain evidence to support the client's position. Sometimes that evidence is held by persons or entities which are currently, or have previously been, clients of the same lawyer.

---

[1] *See* KANSAS RULES OF PROFESSIONAL CONDUCT, KANSAS SUPREME COURT RULE 226 (hereinafter "KRPC"), Rule 1.3.

[2] *Id.*, Comment [1].

[3] *Compare, e.g. In re Cole*, 268 Kan. 171, 175 (1999); *In re Barta*, 268 Kan. 464, 466 (2000); *In re McPherson*, 287 Kan. 434, 448 (2008), *In re Crandall*, 308 Kan. 1526, 1562 (2018); *In re Kepfield*, 309 Kan. 425, 433 (2019); *In re Jones*, 286 Kan. 544, 550 (2008); *In re Vaughn*, 303 Kan. 976, 981 (2016) to *State v. Folkerts*, 229 Kan. 608, 616 (1981); *Attorney Grievance Comm'n of Maryland v. Queen*, 407 Md. 556, 967 A.2d 198 (Md. 2009) (citing *Attorney Grievance Comm'n v Mahone*, 398 Md. 257, 920 A.2d 458 (2007)).

[†] **J. Nick Badgerow** is a partner with Spencer Fane LLP in Overland Park. He served as a member of the Kansas Board of Discipline for Attorneys (16 years); member Kansas Judicial Council (23 years); chairman of the KBA Ethics Advisory Opinion Committee (14 years); chairman of the Johnson County Bar Ethics and Grievance Committee (30 years); chairman of the Kansas Ethics 2000 Commission; chairman of the Kansas Ethics 20/20 Commission; and member of the KBA/Supreme Court Joint Commission on Professionalism. Nick is editor and co-author of the KBA Ethics Handbook. He has published more than 80 articles and presented more than 200 seminars, mostly on the subject of professional responsibility.



2021 No. 2                                                                12

## ▶ But You Are My Lawyer continued

**Conflicts of Interest.**

It is first necessary to examine the applicable Rule of Professional Conduct pertaining to concurrent conflicts of interest, which is Rule 1.7(a), that provides:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.[4]

To summarize, one may not take on the representation of one current client if that representation is directly adverse to another current client or where the representation will be materially limited by the lawyer's responsibilities to another client, a former client, a third person, or the lawyer's own interest.[5]

**Waiver**.

Rule 1.7 goes on to provide a limited exception to this general rule, with several specific provisions:

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if each affected client gives informed consent, confirmed in writing, and;

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law; and

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.[6]

Thus, in order for there to be an effective waiver, the following conditions must be met:

(1) The proposed representation obviously does not involve assertion of a claim by the lawyer in the same litigation or proceeding in which the lawyer is representing the other client;

(2) The lawyer has the *actual* belief that s/he will be able to provide competent and diligent representation to both clients;

---

[4] Rule 1.7(a), KRPC.
[5] *In re Hodge*, 307 Kan. 170 (2017).
[6] Rule 1.7(b), KRPC



## ▶ But You Are My Lawyer continued

(3) The lawyer had the *reasonable* belief that s/he will be able to provide competent and diligent representation to both clients;

(4) Each client gives *informed consent*, having come to the same conclusion; and

(5) That informed consent is *confirmed in writing*.[7]

**Deposition or Cross-Examination of Another Current Client.**

With this context, would it be a conflict of interest for a lawyer to cross-examine another ongoing client? If so, may the conflict be waived, and under what circumstances?  What other options are available to the lawyer?

"Lawyers who are faced with cross examining a current client as an adverse witness or conducting third party discovery of the client may face many thorny conflicts issues."[8]  Lest there be any doubt, the cross-examination of a current client is adverse. As a Wisconsin Ethics Opinion explains:

> By design, examination of an adverse witness seeks to advance the interests of a represented client by discrediting the witness, either by demonstrating they are untruthful or mistaken. Common strategies include presenting proof of the witness's prior bad conduct, their criminal record, inconsistent prior statements, bias, a history of alcohol or substance abuse, or a faulty memory. Hostile treatment of a current client in a public forum is inevitably harmful to the lawyer-client relationship, undercuts the loyalty owed to the client, may be humiliating to the client, and, if based on information previously obtained from the client, violates the duty of confidentiality. **Cross examination of a current client, whether a party or only a witness, will always be "directly adverse" to that client.**[9]

The Restatement agrees:

> Adverse effect relates to the quality of the representation, not necessarily the quality of the result obtained in a given case. The standard refers to the incentives faced by the lawyer before or during the representation because it often cannot be foretold what the actual result would have been if the representation had been conflict-free.[10]

The Comments to Rule 4-1.7 confirm this:

> Similarly, a directly adverse conflict may arise when a lawyer is required to cross-examine a client who appears as a witness in a lawsuit involving another client, as when the testimony will be damaging to the client who is represented in the lawsuit.  Rule 4-1.7, Comment [6].

---

[7] *In re Johnson*, 294 Kan. 575 (2012); *In re Odo*, 304 Kan. 844 (2016).

[8] "Conflicts of Interest: Examining a Current Client as an Adverse Witness," ABA September 2017, https://www.americanbar.org/news/abanews/publications/youraba/2017/september-2017/conflicts-of-interest--examining-a-current-client-as-an-adverse-/.

[9] *Id.* (Emphasis added)

[10] RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 121, Comment c(i) (2000).  *See* ABA Formal Op. 92-367 at 5-7 (conducting cross examination of client sufficiently adverse to trigger application of Rule 1.7); California Op. 2011-182 at 2 ("adverse" includes actions that are "unfavorable" or "detrimental" even absent significant harm). *See also*, Conn. Op. 99-14 (1999); Md. Op. 81-73 (1981); Mich. Op. RI-239 (1995); Mich. Op. RI-218 (1994); Nassau County Op. 86-46 (1986); Ore. Op. 1991-110 (1991); Pa. Op. 2002-71 (2002); Tenn. Op. 85-F-92 (1985), and Tenn. Op. 85-F-95 (1985), and *West Virginia State Bar Comm. on Legal Ethics v. Frame*, 433 S.E. 2d 579 (W. Va. 1993). Former clients – ABA Formal Op. 92-367; Phil. Bar Assoc. Professional Guidance Committee Op. 2014-1 (2014); Ala. Op. 90-25 (1990); Ariz. Op. 91-05 (1991); and Va. Op. 1407 (1991).



2021 No. 2                                                                                                      14

# ▶ But You Are My Lawyer continued

Thus, the cross-examination of a current client on behalf of another client would represent a conflict of interest under Rule 1.7.

**Deposition of a Former Client.**

The situation with the possible deposition of a former client is somewhat different. Rule 1.9(a), KRPC, provides:

> (a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.[11]

The rule is based on the principle that the lawyer's duties of loyalty and confidentiality survive the termination of the relationship. A former client should be confident that, even after the lawyer-client relationship has been officially terminated, the lawyer will not take action against the former client in the same matter or a substantially related matter and will not disclose client confidences that were imparted during the existence of the relationship.[12]

In determining the existence of a conflict with a former client, the first inquiry is whether the new matter is the same as, or substantially related to, the matter handled for the former client.

The determination will be based on a factual inquiry. Thus, representation against a former client in the same lawsuit or the same transaction would clearly be prohibited. Representation against a former client in a matter that could be deemed "substantially related" to the same lawsuit or transaction would also be prohibited[13] (unless knowing consent is obtained from both clients, as discussed below).

The first issue to be determined is whether the adverse party is a "former client." While this should usually not be a difficult issue, there may be circumstances where a review will be required to make the determination.

The Kansas courts have established four standards in determining whether one is a "former client" against which a lawyer cannot take an adverse representation:

(1) that the lawyer and the client had an attorney-client relationship;

(2) that the present litigation is the same or a substantially related matter;

(3) that the interests of a lawyer's new client are adverse to those of the former client; and

(4) that the former client must not have consented to the representation.[14]

Thus, a lawyer would be precluded from taking the deposition or cross-examining a former client if the present matter is "the same or substantially related" to the former representation.

[11] Rule 1.9(a), KRPC

[12] *Chrispens v. Coastal Refining & Marketing, Inc.*, 257 Kan. 745 (1995)

[13] *Mormon v. City of Topeka*, 267 Kan. 440, 446 (Kan. 1999)("When [Lawyer] became associated with [New Firm], the firm could not knowingly represent a person in the same or a substantially related matter in which [Lawyer], or her former firm, had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by KRPC 1.6 (1998 Kan. Ct. R. Annot. 309) and 1.9(b) that is material to the matter."

[14] *City of Hutchinson v. Gilmore*, 16 Kan. App. 2d 646, 648 (Kan. 1992) (quoting *Geisler v. Wyeth Laboratories*, 716 F. Supp. 520, 524 (D. Kan. 1989))



2021 No. 2                                                                                                    15

## ▶ But You Are My Lawyer continued

Of course, even if the matters are not the same or substantially related, the lawyer would be precluded from using or disclosing confidential information received in the course of representing the former client.[15]

Under Kansas law, "substantially related" means that "the factual contexts of the two representations are similar or related."[16]  If such a substantial relationship is found, the Kansas federal court has concluded,

> an irrebuttable presumption arises that the former client revealed facts requiring the attorney's disqualification . . . The court need not inquire into whether the confidential information was actually revealed or whether the attorney would be likely to use the information to the disadvantage of the former client.[17]

Thus, if the new matter is not the same or substantially related to the representation of the former client, and if the lawyer can represent his/her new client zealously without having to use or disclose information confidential to the former client, it would appear to be acceptable to take the deposition or otherwise to cross-examine the former client—assuming the lawyer is brave enough to try.

**Waiver – Reasonable Belief.**

The question of waiver is problematic.  Can the lawyer actually and reasonably conclude that the representation of the existing client and the new client will not be adversely affected by cross-examination of the existing client on behalf of the new client, or that there is a not a significant risk that the representation of either client will be materially limited by the conflict?

The situation presents the lawyer with two choices, both difficult. The first is to aggressively question the existing client (perhaps using or disclosing protected information that could harm or embarrass the existing client in service to the new client), while betraying the duties of loyalty and confidentiality owed to the existing client who is a witness. The second is to conduct either no examination or a limited examination to protect the witness-client, and by so doing, fail to provide the new client with zealous, competent, and diligent representation, as required by Rules 1.1 and 1.3.

Again, this issue must be examined on a case-by-case basis.  In Opinion 92-367, the ABA Committee stated that "[i]t should be emphasized that the degree of adverseness of interest involved . . . will depend on the particular circumstances in which the question arises."[18]  Is the situation such that there is little dispute about the witness-client's testimony, such that aggressive cross-examination would not be required, even to represent the new client ably?  If so, the conflict can probably be waived.

On the other hand, could the new client reasonably conclude that the lawyer is "pulling his punches" in failing to take every step to shake the witness-client's testimony, or could the existing client conclude that the cross-examination is overly aggressive or damaging to its own interests?  In either case, then, it would be inappropriate to seek a waiver.

Again, the lawyer must come to conclude, reasonably and actually, that there is not a significant risk that the representation of neither the existing client nor the new client would be materially limited

[15] Rule 1.6, KRPC
[16] Koch v. Koch Industries, 798 F. Supp. 1525, 1533 (D. Kan. 1992) (quoting Smith v. Whatcott, 757 F.2d 1098, 1100 (10th Cir. 1985))
[17] Id.
[18] ABA Formal Opion 92-367 (1992), available online at https://www.americanbar.org/products/ecd/chapter/219932 .



Badgerow Subpoena Response 000075

2021 No. 2

16

## ▶ But You Are My Lawyer continued

by the clear conflict before asking each client to give her/his informed consent, confirmed in writing. And of course, whether the lawyer's belief was "reasonable" will be judged after the fact, and after one or both clients has expressed his/her objection.

In most cases, the possibility of a material limitation of the representation of either or both clients is real enough that the conflict cannot be waived. It is likely that there would be direct adverseness that would be disqualifying absent client consent because the lawyer's duty of loyalty to both the existing client-witness and the new client would be compromised. There is also the risk that the lawyer could breach his/her duty of confidentiality to the client-witness and that the lawyer's personal interest in keeping the witness as a client might result in material limitations on the lawyer's ability to aggressively cross-examine the witness on behalf of his/her other client.

**Waiver - Informed Consent, Confirmed in Writing.**

Even if the lawyer *actually and reasonably* believes that the relationship with either client will not be adversely affected by his/her representation of the new client both clients must consent to the adverse representation.

1. There must be consultation with each client;

2. Each client's consent must be knowingly given; and

3. Then the clients' consent must be confirmed in writing.[19]

This consultation should include a complete disclosure of the adverse nature of the representation and an understanding that, despite the firm's loyalty to the current client in other matters, it is loyal only to the prospective client in the matter at hand. The definitions ("Terminology") in the Model Rules detail the type of consultation that shall be provided, in order for the clients to give knowing consent:

"Consult" or "Consultation" denotes communication of information reasonably sufficient to permit the client to appreciate the significance of the matter in question.[20]

This "consultation" requires the lawyer to disclose all the potential negative and positive outcomes and eventualities from proceeding in the face of the conflict, as well as the reasonably available alternatives to giving the consent, for example to find another lawyer.

Ordinarily, this will require communication that includes a disclosure of the facts and circumstances giving rise to the situation, any explanation reasonably necessary to inform the client or other person of the material advantages and disadvantages of the proposed course of conduct and a discussion of the client's or other person's options and alternatives. In some circumstances, it may be appropriate for a lawyer to advise a client or other person to seek the advice of other counsel. [21]

[19] "The new 'mantra' under the KRPCs for a waiver of a potential attorney/client conflict of interest thus becomes 'Informed Consent, Confirmed in Writing.'" *State v. Adams*, 284 Kan. 109, 125 (Kan. 2007)
[20] Model Rules of Professional Conduct, Rule 4-1.0
[21] Rule 1.0, KRPC, Comment [6]



# ▶ But You Are My Lawyer continued

While the information imparted will necessarily vary, depending on the situation, it is clear that the adverse representation must be disclosed, as well as the risks and advantages resulting from continued representation despite the conflict.[22]

Care should thus be taken in drafting the waiver letter.

**Another Option: Separate Counsel.**

A possible alternative solution would be to retain outside counsel just to conduct the cross-examination of the existing client/witness, as suggested in *United States v. Jeffers*,[23] where then-Circuit Judge John Paul Stevens wrote: "there is nothing in the record suggesting any reason why the lawyer could not have been made an offer to have some other lawyer retained for this limited purpose." [24]

A New York City Bar opinion agrees:

To be sure, "it will . . . frequently be the case that a lawyer's taking discovery, whether testimonial or documentary, on behalf of one client, of a third party who is also a client, will present such direct adverseness, so as to be disqualifying under Rule 1.7(a)" ABA 92-367 (October 16, 1992) at 2-3. In circumstances such as these, separate counsel may be brought in for the purposes of issuing the subpoena and taking discovery from the non-party client.[25]

**Conclusion.**

In case of the need to cross-examine a client, even if a lawyer were to conclude that the clear conflict were waivable, if informed consent is not forthcoming, and if separate counsel cannot be engaged to conduct the examination of the current client-witness, then the solution is not to take on the representation of the new client in the matter.  This would appear to be the advisable solution in most cases.

---

[22] *In re Hodge*, 307 Kan. 170 (2017)("The respondent did not adequately inform L.A. of the **material risks and alternatives** to selling CLS' assets to Yard Concerns, as required by KRPC 1.7(b)(4). For example, the respondent failed to adequately inform L.A. of the **benefits** to filing for the protections under chapter 11 of the bankruptcy code. Additionally, the respondent failed to inform L.A. of the risk that Equity Bank would call the note on the building if the assets of the business were sold. The hearing panel concludes that the respondent violated KRPC 1.7(a) when he represented Yard Concerns and CLS simultaneously in the sale of CLS' assets." *Id.*, at 203 (emphasis added))

[23] *United States v. Jeffers*, 520 F.2d 1256 (7th Cir. 1975)

[24] *Id.*, at 1266

[25] New York City Bar Opinion 2001-3 (2001), available online at https://www.nycbar.org/member-and-career-services/committees/reports-listing/reports-detail/formal-opinion-2001-3-limiting-the-scope-of-an-attorneys-representation-to-avoid-client-conflicts.



Badgerow Subpoena Response 000077

expert testimony



# Hired Opinions:
# Ethics and Expert Witnesses

*By J. Nick Badgerow*

## I. Introduction and Overview

The trial of many cases, both civil and criminal, requires the aid of expert witnesses to help the finder of fact understand fields, sciences, and specialized practices with which the average judge or jury is not familiar. In many trials, the aid of a qualified expert witness is very helpful for the court or jury adequately to find the facts and resolve the issues. In some cases, it is absolutely or even legally necessary.[1] For example:

> Expert testimony is necessary to prove a deviation from the standard of care by a health care provider where normal experience and qualifications of laypersons serving as jurors would not permit them to draw proper conclusions. *Pope v. Ransdell*, 251 Kan. 112, 120, 833 P.2d 965 (1992).[2]

As a practical matter, expert witnesses are retained and paid by one of the parties, and then these experts present their paid opinion testimony in support of the party who hired them.

As such, one would expect the expert's testimony to support the position of the party who hired, paid, and called that person to testify. One would not call any witness to testify if the witness's testimony was not expected to be helpful. But is the expert witness merely a "gun for hire," whose opinions will support the highest bidder?

What ethical considerations should confront a proposed expert witness who is considering, studying, arriving at, and then presenting expert opinions? Indeed, are there any? The purpose of this article is to explore and discuss these issues, with the hope that potential expert witnesses will, in fact, give them due consideration.

## II. The Expert's Role

Expert testimony is admissible in Kansas courts under certain specified circumstances. For many years, Kansas followed the test set out in *Frye v. United States*.[3] See *In re Girard*.[4] The *Frye* test required that before expert scientific opinion testimony may be admitted into evidence, the basis of the opinion must ▶

Badgerow Subpoena Response 000078

## III. "GOVERNMENT CANNOT CONSENT"

With this background then, let one explore the issue of whether a lawyer or other person representing a government entity has the power, jurisdiction or authority to grant its informed consent in order to waive a conflict of interest with a current or former lawyer for the government entity.

The principle that there is no authority for a governmental representative to grant a conflict waiver has its genesis in an old ABA Ethics Opinion. The "Government Cannot Consent" rule had its origin in the ABA Committee on Ethics and Professional Responsibility, Formal Opinion 16 (1929). This Opinion barred one member of a law firm from representing criminal defendants in cases prosecuted by another member of the same firm in his capacity as part-time prosecutor. Then, without citation of any justification or supporting authority, the Committee added that "no question of consent can be involved as the public is concerned and it cannot consent."

The principle appears to be based on the argument that lawyers actually may use, or suggest an ability to use, their relationship with the governmental entities to gain an improper advantage for private clients, or alternatively, may secure consent through corruption. However, a number of other Rules of Professional Conduct prevent such conduct by lawyers. And there are plenty of statutes to govern and prevent official misconduct or corruption by a public official in office.

Over the years, this "Government Cannot Consent" principle gained traction. Ethics opinions have stated that the government lawyer's client is the public, and the public cannot consent to a conflict. And a number of cases have applied the principle. In *State ex rel. Morgan Stanley & Company v. MacQueen*, the West Virginia court disqualified a conflicted lawyer even in the face of a government client's waiver, holding:

Therefore, an attorney representing the public may proceed with his public or private representation only in the absence of any conflict of interest.

A number of other cases have adopted and applied the "Government Cannot Consent" concept from ABA Opinion 16.

Indeed, New Jersey has gone so far as to enshrine the principle expressly in its version of Rule 1.7. When referring to conflict waivers, the New Jersey version of the Rule adds: "provided, however, that a public entity cannot consent to any such representation." This comports with that state's bar views on the subject, expressed in two ethics advisory opinions.



## IV. "GOVERNMENT CAN CONSENT"

Of course, if it has the power to do so, any client is free to give or not to give its consent. But, the closer issue is whether a government entity, per se, has the power, jurisdiction or authority to give its informed consent to waive a conflict of interest, should it choose to do so.

First, the ABA itself has abandoned the position taken in its Formal Opinion 16, described above. Informal Ethics Opinion 518 it had stated the view that public bodies can consent to and waive conflicts.

A number of cases have followed suit in rejecting the principle stated in ABA Opinion 16. Indeed, the reverse principle was well stated by the federal court in *Black v. Missouri*:

The Court believes that the power to sue also partakes of the authority to make tactical or procedural and substantive decisions with respect to suits commenced by a district. Nowhere in the statutory scheme governing Missouri school districts is there any prohibition, express or implied, against the waiver of a technical conflict of interest in which counsel for an adversary of the district stands.

The New York Bar has also adopted the principle that a government entity may give its consent to a conflict waiver.

Having considered the so-called "government cannot consent" rule in depth, and giving due regard to its underpinnings and to the concerns expressed by those who would perpetuate the rule, we have concluded that a per se ban is unjustified and should no longer be imposed in this State.

Case authorities and state ethics opinions agree. ABA Opinion 16 was expressly rejected by the Illinois State Bar in its Opinion No. 86-4:

This Committee believes that a per se "rule" that a public entity may never grant consent within the meaning of Rule 5-105 [the Code equivalent to Rule 1.7] is neither compelled by the relevant case law nor required to achieve the purposes of the Code of Professional Responsibility.

The Model Rules themselves now recognize a government's power and authority to consent to a conflict of interest. Rule 1.11 pertains to conflicts of interest in successive government and private employment. Subsection (a) of Rule 1.11 provides:

(a) Except as law may otherwise expressly permit, a lawyer shall not represent a private client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency consents after consultation...

And the Comment to Rule 1.11 states: "The provisions for screening and waiver are necessary to prevent the disqualification rule from imposing too severe a deterrent against entering public service."

Thus, the power and authority of a government entity to give its informed consent, at least under the Rules of Professional Conduct, appears no longer to be in question, at least in those states where this version of the Rules has been adopted.

Badgerow Subpoena Response 000079

## V.   KANSAS ETHICS OPINIONS

A number of Kansas Bar Association Ethics Opinions address the issue and come down in favor of a government's power and authority to give informed consent to waive a conflict of interest.

Kansas Ethics Opinion 02-4 states that:

Obtaining the informed consents of the State Hospital and the private practice clients with regard to the concurrent practices is highly recommended.

Kansas Ethics Opinion 97-2 holds:

Absent these concerns, and assuming [municipal] client consent after consultation, we do not see a per se conflict of interest merely because the son works for city government and the attorney handles cases against the city.

Kansas Ethics Opinion 95-4 expressly finds that the government can consent:

Whether the simultaneous representation of the school board and the cooperative district constitutes a conflict of interest or not, under the Kansas Rules of Professional Conduct the clients can consent to the conflict if done appropriate to the rules, after adequate disclosure, and the lawyer believes the representation of one in a possibly adverse situation will not adversely affect the position of the other client.

Kansas Ethics Opinion 03-03 states:

Pursuant to KRPC 1.13(e), a lawyer for a governmental entity can provide dual representation to a separately elected official provided that it is not a conflict of interest, as set out in KRPC 1.7. If there is a conflict, KRPC 1.7(b) allows the lawyer to represent the official if the lawyer believes that his responsibilities to the governmental entity are not adversely affected, and if the lawyer can obtain consent after a consultation.

Kansas Ethics Opinion 91-2 holds:

Generally, when lawyers represent a government agency, they represent the agency and not the individual public officials, officers, or employees. The rules recognize that such persons can be "clients" and if the interest of an official is adverse to the entity itself, there is a duty to explain who the attorney is working for. If the [government] organization consents, the attorney also may represent principal officials and employees.

## VI.   CONCLUSION

To restate, a government entity is free to consent or not consent to a conflict of interest whenever it chooses, or it is even free to adopt a policy never to consent, and thereby avoid making hard decisions when requested. On the other hand, some conflicts may be waived, and there appears to be no rule which prohibits a Kansas government entity from giving its informed consent to waive a conflict of interest, where the other requirements of Rules 1.7, 1.9, or 1.11 have been met, should it choose to do so. ◉

◉ **J. Nick Badgerow** *is a partner with Spencer Fane in Overland Park. He can be reached at nbadgerow@spencerfane.com.*



![KANSAS BAR ASSOCIATION www.ksbar.org]

Badgerow Subpoena Response 000080

ETHICS

# Divided Loyalties: Referral Fees and Conflicts of Interest

*J. Nick Badgerow*



J. NICK BADGEROW

*J. Nick Badgerow is a partner with Spencer Fane LLP in Overland Park, Kansas. He served for 16 years as a member of the Kansas State Board of Discipline for Attorneys and 23 years as a member of the Kansas Judicial Council (where he also served as chairman of the Council's Civil Code Committee and Antitrust Law Committee). Nick also served for 30 years as chairman of the Johnson County (Kansas) Bar Ethics and Grievance Committee, and he has served for 11 years as chairman of the KBA Ethics Advisory Opinion Committee. He is co-author and editor of the KBA Ethics Handbook (3rd Ed., 2015), and has published more than 60 journal and bar review articles, mostly on ethics subjects. Nick is a trial lawyer specializing in professional liability, construction and employment.*

### Issue.

May a lawyer contract for and receive a fee for referring a client to another lawyer where the referring lawyer would have a conflict of interest in representing the client directly? This article concludes that in most states, such a fee would be inappropriate, but because of the unique nature of Kansas' rule on the subject, the referring lawyer may ethically contract for and receive a fee for the referral of a case in Kansas, despite a conflict of interest, on certain conditions.

### Background.

On occasion, a lawyer consults with potential clients about claims which may require different expertise than that possessed by the lawyer. On other occasions, potential clients come to the lawyer to discuss a claim against some person or entity already represented by the lawyer, and it would be inappropriate for the lawyer to take on the representation by reason of a disqualifying conflict of interest. To accommodate the potential clients, the lawyer may refer the first clients to a lawyer with more expertise in the particular area of law practice involved. And s/he may refer the second potential clients to a lawyer or firm not barred by a conflict of interest in taking on the matter.

On such occasions, the referring lawyer may seek a fee for making the referral, and the receiving lawyer – grateful for such a referral – may agree.

### Rule 1.7(a), Conflicts of Interest.

Before launching into a consideration of the various iterations of Rule 1.5, pertaining to referral fees, it is necessary first to consider the rule on concurrent conflicts of interest. Rule 1.7(a), Kansas Rules of Professional Conduct,[1] provides:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

Badgerow Subpoena Response 000081

(2) there is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

Thus, a lawyer may not represent one current client adverse to another current client,[2] or adverse to the lawyer's own interests.[3]

**Model Rule 1.5(e).[4]**

Rule 1.5(e) of the Model Rules of Professional Conduct provides:

A division of a fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation;

(2) the client agrees to the arrangement, including the share each lawyer will receive, and the agreement is confirmed in writing; and

(3) the total fee is reasonable.[5]

Thus, the Model Rule requires a referring lawyer to "assume[s] joint responsibility for the representation" in order to share in the fees generated by the matter, including a referral fee.

Today most states will allow a simple referral agreement provided that all of the attorneys assume, in writing, joint responsibility for the representation.[6]

Because of this duty of "joint responsibility for the representation," the referring lawyer represents the referred client, and therefore where he would have a conflict of interest in representing the client directly, he also may not – by reason of that conflict -- contract for a referral fee of that client to another lawyer. In *Bloomenthal v. Halstrom,*[7] the Massachusetts appellate court refused to enforce a referral agreement because the referring attorney had a conflict of interest with the client. And in *Evans & Luptak, PLC v. Lizza,*[8] the Michigan appellate court held a referral fee agreement unenforceable where the referring lawyer had conflict of interest.

As noted by the Wisconsin Bar Ethics Advisory Committee:

It must be remembered that in such a [joint responsibility] referral arrangement, the referring lawyer still maintains an attorney-client relationship with the client. It is the ongoing

protection of the client's interests by the referring lawyer that justifies the referring lawyer receiving a fee that is beyond the proportion of the services actually provided by that lawyer . . . **The referring lawyer is still the client's lawyer**, even though the lawyer to whom the matter is referred will usually be the lawyer responsible on a day-to-day basis for the handling of the matter. The duty of joint responsibility imports a serious responsibility as a lawyer and is not a mere hand-off of the case to another lawyer to handle in his or her own unfettered discretion. [9]

The New York State Bar agrees, citing a number of other bar opinions:

In our view, where a lawyer is unable to assume sole responsibility for a matter due to a conflict of interest, that lawyer is also disqualified from assuming joint responsibility and, therefore, the referring lawyer may not accept a referral fee from the receiving lawyer. See, Nassau County Bar Op. 98-07 (1998) (an attorney who is barred from handling a matter due to a conflict of interest may not share in the fee for that matter after the attorney refers the matter to another lawyer); accord, ABA Informal Op. 1088 (1968); Florida Ethics Op. 89-1 (1989); Illinois Advisory Op. 9026 (1990); The State Bar of Michigan Standing Committee on Professional and Judicial Ethics RI-116 (1992); N.J. Ethics Op. 629 (1989); Philadelphia Ethics Op. 89-12 (1989); Virginia Ethics Op. 1160 (1988); but see, Iowa Ethics Op. 87-32 (1988).[10]

Therefore, in those states where Model Rule 1.5 applies, the referring lawyer must retain some responsibility for representation of the client, and therefore Rule 1.7(a) on concurrent conflicts of interest would preclude the referring lawyer from representing the referred client adverse to another client, and therefore would preclude any fee sharing for the referral. ABA Opinion 474 holds:

Because the client is represented by both the referring lawyer and the lawyer to whom the client was referred, a referral fee arrangement under Model Rule 1.5(e) subjects both lawyers to the conflict provisions of Rule 1.7.7.[11]

Opinion 474 therefore concludes:

Rule 1.5(e) allows lawyers who are not in the same firm to divide a fee under certain circumstances. A lawyer who refers a matter to another lawyer outside of the first lawyer's firm and divides a fee from the matter with the lawyer to whom the matter has been referred, has undertaken representation of the client. Unless a client gives informed consent confirmed in writing, a lawyer may not accept a fee when the lawyer has a conflict of interest that prohibits the lawyer from either performing legal services in connection with or assuming joint responsibility for the matter.[12]

Badgerow Subpoena Response 000082

Thus, it is clear that in most states, and under the unrevised version of Rule 1.5(e), a referring lawyer encumbered by a conflict of interest may not receive a fee for referring a client to another lawyer.

## Kansas Rule 1.5(e).

Like every other state, Kansas has adopted the Model Rules of Professional Conduct, with certain notable alterations. However, unlike the Model Rule, Kansas' version of Rule 1.5(e) (appearing at Rule 1.5(g)) is markedly different from the Model Rule, in that it does not require the referring lawyer to assume joint responsibility, or any responsibility, for the referred matter:

> (g) A division of fee, which may include a portion designated for referral of a matter, between or among lawyers who are not in the same firm may be made if the total fee is reasonable and the client is advised of and does not object to the division.[13]

Neither the Rule nor the Comments require that the referring lawyer maintain any responsibility for the referred case. This is unique to Kansas.[14] The Kansas Comment states:

> [4] A division of fee is a single billing to a client covering the fee of two or more lawyers who are not in the same firm. A division of fee facilitates association of more than one lawyer in a matter in which neither alone could serve the client as well, and most often is used when the fee is contingent and the division is between a referring lawyer and a trial specialist, or when a lawyer refers a matter to a lawyer in another jurisdiction. Paragraph (g) permits the lawyers to divide a fee by agreement between the participating lawyers if the client is advised, does not object, and the total fee is reasonable. It does not require disclosure to the client of the share that each lawyer is to receive.[15]

As noted by the Kansas Supreme Court after the adoption of this amended version of the Model Rule:

> The Kansas version of the MRPC was adopted by this court effective March 1, 1988. We modified [Model] Rule 1.5. The Kansas rule regarding division of fees is MRPC 1.5(g), which states: "A division of fee between lawyers who are not in the same firm may be made if the client is advised of and does not object to the participation of all the lawyers involved, and the total fee is reasonable." (1990 Kan.Ct.R.Annot. 222.) . . . The Code Comparison following the Kansas MRPC 1.5 states: "Rule 1.5(g) permits division without regard to the services rendered by each lawyer if the client is advised, does not object, and the total fee is reasonable." (1990 Kan.Ct.R.Annot. 224.) Our adoption of MRPC 1.5(g) as modified eliminates the

requirement that the division of fees be made in proportion to the services performed and the responsibility assumed for the representation.[16]

Under the standard rule of interpretation, *expressio unius est exclusio alterius*, one may assume that, by excluding certain words and phrases contained in the Model Rule, the Supreme Court intended the revised Rule to stand and to be interpreted and applied without those excluded provisions.[17]

Assuming the referring lawyer has no further obligation to the referred party, the Kansas referral fee is earned at the time of the agreement. Thus, under the Kansas Rule, a lawyer may contract for and receive a fee for a referring someone to another lawyer for representation, retaining no responsibility for the matter. Under the Kansas Rule, the client does not even need to be informed of, nor consent to, the proportionate share each lawyer is to receive.

In such a situation, the referring lawyer might never represent the party referred and so may never have an attorney-client relationship with that party. The Kansas Supreme Court has observed that "MRPC 1.5(g) does not require that the referring attorney have an attorney-client relationship with the person referred."[18]

Logically, then, if the referred party never becomes a client of the referring lawyer, the referring lawyer never encounters a conflict of interest in referring the party to another lawyer — though the referred party may assert a claim which is adverse to a current client of the lawyer. The referring lawyer does not represent the referred party, and thus never represents a client adverse to another client. In such a situation, it would not appear to represent any violation of Rule 1.5(g), nor of Rule 1.7(a) for the referring lawyer to contract for and receive a fee for making the referral.

Of course, where the referring lawyer sets up the referred party as a client of the firm, a conflict would arise.[19] And the referring lawyer would likely have a conflict of interest in representing the current client in defending against the claim asserted by the referred party, as such a representation would conflict with the lawyer's own interests, in violation of Rule 1.7(a)(2).

In addition, the referring lawyer and the lawyer receiving the referral should be careful to comply with the requirements of Rule 1.5(g), making sure (a) that "the total fee is reasonable," (b) that "the client is advised of" the division of fees, and (c) that the client "does not object to the division" of fees between the two lawyers.

Badgerow Subpoena Response 000083

## Conclusion.

Rule 1.5(e) of the Model Rules of Professional Conduct would preclude a referring lawyer from receiving a fee for referring a party to another lawyer, where representation of the referred party would represent a concurrent conflict of interest. But in Kansas, if the referring lawyer has no responsibility for the representation and the fee is earned upon the referral, there would appear to be no constraint in Kansas for the referring lawyer to contract for, and receive, a fee for referring a party to another lawyer for representation – even adverse to a current client of the referring lawyer,[20] so long as the referring lawyer does not set up the referred party in his/her own records as a "client" and does not subsequently represent a party adverse to the referred party in the matter.

1   Kansas Rules of Professional Conduct ("KRPC"), Rule 226, Rules of the Kansas Supreme Court. http://www.kscourts.org/rules/Rule-List.asp?r1=Rules+Relating+to+Discipline+of+Attorneys.

2   *Petition of Hoang*, 245 Kan. 560, 566, 781 P.2d 731 (1989)("The Comment to MRPC 1.7 states: '[A] lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated.' 1988 Kan.Ct.R.Annot. 203.")

3   *In re Hawver*, 300 Kan. 1023, 1053, 339 P.3d 573 (2014).

4   The Model Rules of Professional Conduct referred to herein are those adopted by the American Bar Association. https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/. The Model Rules have been adopted (as amended in some states), by each state in the Union. https://www.americanbar.org/groups/professional_responsibility/publications/model_rules_of_professional_conduct/alpha_list_state_adopting_model_rules/.

5   Rule 1.5(e), Model Rules of Professional Conduct, https://www.law.cornell.edu/ethics/aba/current/ABA_CODE.HTM#Rule_1.5.

6   *Daynard v. Ness, Motley, Loadholt, Richardson & Poole, P.A.*, 178 F.Supp.2d 9, 23 (D.Mass. 2001).

7   *Bloomenthal v. Halstrom*, No. 951773B, 1999 WL 1318980 (Mass. Sup. Ct. Mar. 16, 1999).

8   *Evans & Luptak, PLC v. Lizza*, 650 N.W.2d 364 (Mich. App. 2002) (referral fee agreement unenforceable where referring lawyer had conflict of interest).

9   Wisconsin Ethics Opinion 00-01 (2000), https://www.wisbar.org/NewsPublications/WisconsinLawyer/Pages/Article.aspx?Volume=73&Issue=6&ArticleID=20081 (emphasis added).

10  New York State Bar Ethics Opinion 745 (2001), https://www.nysba.org/CustomTemplates/Content.aspx?id=5483.

11  ABA Formal Opinion 474 (2016), https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/aba_formal_opinion_474.pdf.

12  *Id.*

13  Rule 1.5(g), KRPC, http://www.kscourts.org/rules/Rule-Info.asp?r1=Rules+Relating+to+Discipline+of+Attorneys&r2=50.

14  See Kansas Ethics Opinion 93-14 (1993)(referring to the "unique nature of Kansas referral fee . . . rules").

15  *Id.*, Comment [4].

16  *Ryder v. Farmland Mut. Ins. Co.*, 248 Kan. 352, 362, 807 P.2d 109 (1991).

17  See, e.g., *State v. Crawford*, 39 Kan.App.2d 897, 899, 185 P.3d 315 (2008)

18  *Id.*, at 363.

19  See, *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 905, 220 P.3d 333 (2009)(referring law firm set up referred party as a firm client, and maintained ongoing obligations with reference to the referred case).

20  *In re Hodge*, 307 Kan. 170, 217, 407 P.3d 613 (2017)(conflict of interest with lawyer's own personal interest).

Badgerow Subpoena Response 000084

The Restatement (Third) of the Law Governing Lawyers ("Restatement") also prohibits conflicts of interest, but is somewhat more general. Section 201 of the Restatement prohibits a lawyer from representing a client if the representation would involve a conflict of interest, and then provides:

A conflict of interest is involved if there is a substantial risk that the lawyer's representation of the client would be materially and adversely affected by the lawyer's own interests or by the lawyer's duties to another current client, a former client, or a third person.

The Restatement then proceeds in subsequent sections to discuss conflicts in civil and criminal litigation, non-litigation matters, corporate representations, and government representations.

B.   Former Client Conflicts.  Rule 1.9, KRPC, addresses conflicts between lawyers and former clients and provides:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1) Whose interests are materially adverse to that person; and

(2) About whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter;

Unless the former client gives informed consent, confirmed in writing.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) Use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client or when the information has become generally known; or

(2) Reveal information relating to the representation except as these Rules would permit or require with respect to a client.

This Rule is based on the principle that the lawyer's dutis of loyalty and confidentiality survive the termination of the relationship. Former clients should be confident that, even after the lawyer-client relationship has been officially terminated, the lawyer will not take action against the former client in the same matter or a substantially related one, and will not disclose client confidences which were imparted during the existence of the relationship.

## A.   WAIVERS/CONSENTS

As noted before, if the lawyer has the actual and reasonable belief that the interests of neither client will be adversely affected by taking on the representation (and the clients agree), then each client may give its informed consent to waive the conflict.  Under both Rules 1.7 (relating to conflicts of interest with current clients) and 1.9 (relating to conflicts of interest with former clients), the conflict may be avoided if the client gives "informed consent confirmed in writing."

If knowing consent is given (and if the second factor is established), the conflict may be waived.  The consent must be knowingly given, after full disclosure of all relevant facts.  This means that the lawyer must give each client full disclosure of the facts constituting the conflict, as well as a description of all the pros and cons of giving the waiver.

The definitions ("Terminology") in the Kansas Rules detail the type of consultation which shall be provided, in order for the clients to give knowing consent:

"Informed consent" denotes the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct.

At a minimum, the clients must be informed of the adverse representation, and every effort must be made to foresee – and disclose – the various alternative results which may arise, and the impact of those results. The more detailed information that is provided, the more likely it is that the consultation will be deemed adequate.

Informed consent requires that each affected client be aware of the relevant circumstances and of the material and reasonably foreseeable ways that the conflict could have adverse effects on the interests of that client. See Rule 1.0(f) (informed consent). The information required depends on the nature of the conflict and the nature of the risks involved. When representation of multiple clients in a single matter is undertaken, the information must include the implications of the common representation, including possible effects on loyalty, confidentiality and the attorney-client privilege and the advantages and risks involved.

And once informed consent is given, that consent must be confirmed in writing.  Again, the definition in Rule 1.0 is illuminating:

"Confirmed in writing," when used in reference to the informed consent of a person, denotes informed consent that is given in writing by the person or a writing that a lawyer promptly transmits to the person confirming an oral informed consent. See paragraph (f) for the definition of "informed consent." If it is not feasible to obtain or transmit the writing at the time the person gives informed consent, then the lawyer must obtain or transmit it within a reasonable time thereafter.

Badgerow Subpoena Response 000085



*Kansas Supreme Court Commission on Professionalism. He has served as chairman of the Kansas Ethics 2000 Commission, the Kansas Ethics 20/20 Commission, the Kansas Bar Ethics Advisory Committee, and the Johnson County Bar Association Ethics and Grievance Committee. Badgerow is co-author of the KBA Employment Law Handbook and an author and editor of the KBA Ethics Handbook, Third edition. Badgerow has published more than 80 law review and law journal articles and presented more than 200 seminars, mostly on the subjects of attorney ethics, liability, and professional responsibility. Badgerow received the Distinguished Service Award from the KBA in 2020.*

## References

1. For example, an expert's testimony is necessary to establish whether a professional defendant departed from the standard of care applicable to his/her profession and is therefore guilty of negligence. "Under Maryland law, a medical expert witness is essential to prove a causal connection between an alleged negligent act and any alleged damage in complicated medical malpractice cases. See *Craig v. Chenoweth*, 232 Md. 397, 194 A.2d 78, 79 (1963)." *Goodman v. U.S.*, 298 F.3d 1048 (9th Cir. 2002).
2. *Dawson v. Prager*, 276 Kan. 373, 375, 76 P.3d 1036 (2003).
3. *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923).
4. *In re Girard*, 296 Kan. 372, 376, 294 P.3d 236 (2013).
5. *Id.*, at 376.
6. K.S.A. 60-458(b).
7. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993).
8. 590 U.S. at 597.
9. *Kumho Tire Co. Ltd. v. Carmichael*, 526 U.S. 137 (1999).
10. *Smart v. BNSF Railway Co.*, 52 Kan. App. 2d 486, 369 P.3d 966 (2016).
11. *Summers v. Missouri Pacific R.R. System*, 132 F.3d 599, 603 (10th Cir. 1997).
12. *In re Care & Treatment of Cone*, 309 Kan. 321, 325, 435 P.3d 45 (2019); *In re Girard*, 296 Kan. 372, 376, 294 P.3d 236 (2013);
13. *State v. Lyman*, 311 Kan. 1, 21, 455 P.3d 393, *cert. denied* — U.S. —, 141 S. Ct. 174, 207 L.Ed.2d 1106 (2020).
14. *Timmons v. Massachusetts Bay Transp. Authority*, 591 N.E.2d 667, 669, 412 Mass. 646 (Mass. 1992).
15. K.S.A. 60-456(d).
16. *Ford v. Ford*, 54 Ala.App. 510, 513, 310 So.2d 230, 232 (Civ. App.1974).
17. *Van Blargan v. Williams Hospitality Corp.*, 754 F.Supp. 246, 249 (D. P.R. 1991).
18. *Tokio Marine & Fire Ins. Co. v. Grove Mfg. Co.*, 762 F. Supp. 1016 (D. P.R. 1991) (quoting *In re Air Crash Disaster at New Orleans, La.*, 795 F.2d 1230, 1234 (5th Cir.1988).
19. *Secura Ins. Co. v. Wisconsin Public Service Corp.*, 457 N.W.2d 549, 550, 156 Wis.2d 730 (Wis. App. 1990). See also, *Safe. Storage Prop. v. Donahue Favret Cont.*, 13 So.3d 244, 248 (La. App. 2009) ("the expert witness is not an advocate for one side or the other … in the 'swearing-for-hire business.'")
20. *State v. Woolverton*, 35 Kan.App.2d 478, 131 P.3d 1253, 1259 (2006).
21. *Koch Ref. v. Jennifer L. Boudreaux MV*, 85 F.3d at 1182 (citing *Mayer v. Dell*, 139 F.R.D. 1, 3 (D. D.C. 1991)); *Rhodes v. E.I. Du Pont De Nemours & Co.*, 558 F. Supp. 2d 660 (S.D. W. Va. 2008); *Paul v. Rawlings Sporting Goods, Co.*, 123 F.R.D. 271, 281-82 (S.D. Ohio 1988); *Shadow Traffic Network v Superior Court of Los Angeles County*, 29 Cal. Rptr. 2d 693, 699-700 (Cal. Ct. App. 1994); *English Feedlot, Inc. v. Norden Lab., Inc.*, 833 F. Supp. 1498, 1504-05 (D. Col. 1993); *Great Lakes Dredge & Dock Co. v. Harnischfeger Corp.*, 734 F. Supp. 334, 336-37
22. (N.D. Ill. 1990)).
23. *Wyatt v. Hanan*, 871 F. Supp. 415, 419-20 (M.D. Ala. 1994); *Mayer v. Dell*, 139 F.R.D. 1, 3 (D.D.C. 1991); *Great Lakes Dredge & Dock Co. v. Hamischfeger Corp.*, 734 F. Supp. 334,337-39 (N.D. 11. 1990); *Nikkal Indus., Ltd. v. Salton, Inc.*, 689 F. Supp. 187, 191-92 (S.D.N.Y. 1988).
24. See, e.g., *In re Ambassador Group, Inc., Litig.*, 879 F. Supp. 237, 243-46 (E.D.N.Y. 1994); *Wyatt v. Hanan*, 871 F. Supp. 415, 419 (M.D. Ala. 1994); *English Feedlot, Inc. v. Norden Labs., Inc.*, 833 F. Supp. 1498, 1501 (D. Colo. 1993); *Mayer v. Dell*, 139 F.R.D. 1, 3 (D.D.C. 1991); *Great Lakes Dredge & Dock Co. v. Hamischfeger Corp.*, 734 F. Supp. 334,337-39 (N.D. 11. 1990); *Nikkal Industries Ltd. v. Salton, Inc.*, 689 F. Supp. 187, 191-92 (S.D.N.Y. 1988); *Paul v. Rawlings Sporting Goods Co.*, 123 F.R.D. 271,280 (S.D. Ohio 1988).
25. See, e.g., *Koch Refining Co. v. Jennifer L. Boudreaux MV*, 85 F.3d 1178, 1181-82 (5th Cir. 1996); *Cordy v. Sherwin-Williams, Co.*, 156 F.R.D. 575, 582-83 (D.N.L 1994); *W.R. Grace & Co. v. Gracecare, Inc.*, 152 F.R.D. 61 (D. Md. 1993); *Wang Labs., Inc. v. Toshiba Corp.*, 762 F. Supp. 1246, 1248-50 (E.D. Va. 1991).
26. *Erickson v. Newmar Corp.*, 87 F.3d 298 (9th Cir. 1996) (violation of an obligation owed to a tribunal, Model Code predecessor to 3.(c), KRPC.)
27. Compare, *Campbell Industries v. M/V Gemini*, 619 F.2d 24 (9th Cir. 1980) (expert disqualified; confidential information had been disclosed) to *Avco Corp. v. Turn & Bank Holdings, Inc.*, 2017 WL 2224915 (M.D. Pa. May 22, 2017) (expert not disqualified; no confidential information had been disclosed).
28. George Gershwin, "*It Aint Necessarily So*," copyright Gershwin Publishing Company (1935), available online at https://genius.com/George-gershwin-it-aint-necessarily-so-lyrics.
29. Rule 1.3, Kansas Rules of Professional Conduct, Rule 240, Rules of the Kansas Supreme Court.
30. *Id.*, at Comment [1].
31. See, e.g. *In re Dickens*, 309 Kan. 336, 435 P.3d 21 (2019); *In re Davisson*, 266 Kan. 395, 969 P.2d 892 (1998); *In re Knox*, 309 Kan. 167, 432 P.3d 654 (2019); *In re Krogh*, 259 Kan. 163, 910 P.2d 221 (1996); *In re Geniuk*, 307 Kan. 509, 411 P.3d 320 (2018).
32. *Kumho Tire v Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (emphasis added).
33. See, e.g. *Jensen v. Cablevision Sys. Corp.*, 372 F.Supp.3d 95 (E.D. N.Y. 2019); *Brodsky v. Kavo Dental Techs.*, LLC, No. CV PX 15-3587, 2017 WL 6388611 (D. Md. Dec. 14, 2017).
34. *Ford v. Ford*, 54 Ala.App. 510, 513, 310 So.2d 230, 232 (Civ. App.1974).

Badgerow Subpoena Response 000086

# "I WOULD IF I COULD:"
## MAY A GOVERNMENT ENTITY WAIVE A CONFLICT OF INTEREST ON THE PART OF OUTSIDE COUNSEL?

BY J. NICK BADGEROW, PARTNER, SPENCER FANE

## I. INTRODUCTION/OVERVIEW

Government clients are often faced with situations where their former or current outside lawyers seek to take on a matter which is adverse to the outside lawyers' current or former government client. Seeking to take on the adverse representation, and assuming that the conflict is one which can be waived, the outside lawyer may seek a waiver from the government client. Depending on the circumstances, many governments analyze the potential conflict and, if the government's interest will not be adversely affected, give a waiver, known as "informed consent," which is then "confirmed in writing."

Of course, because the government "may" give its consent, it need not do so, and a city may be justified in taking the position that – whether or not it is *permitted* to give its consent – as a matter of policy, it chooses never to do so.

On the other hand, some government lawyers take the position (supported by some authority) that, being a body politic which represents its citizens, a government lawyer or representative is precluded from giving consent to a conflict of interest under any circumstances.

The purpose of this article is, after an overview of the concepts of concurrent conflicts and former client conflicts, to explore the historical and philosophical foundation for the principle that a government can never give its consent to waive a conflict of interest, and the authorities stating the principle that, in fact, the government is free to waive a conflict of interest, should it choose to do so.

The Rules discussed herein are known as the Kansas Rules of Professional Conduct ("KRPC"), found at Rule 226, Rules of the Kansas Supreme Court.



## II. CONFLICTS OF INTEREST

A. Concurrent Conflicts. The general principles governing current conflicts of interest are found in Rule 1.7, which provides as follows:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) The representation of one client will be directly adverse to another client;

(2) There is a substantial risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) The lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) The representation is not prohibited by law;

(3) The representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) Each affected client gives informed consent, confirmed in writing.

**Summarized, Rule 1.7(a) prohibits:**

- Directly adverse representation of two concurrent clients unless
- There is actual and reasonable belief the lawyer can provide competent and diligent representation to both clients, and
- There is informed consent by both clients, after consultation, confirmed in writing.

Badgerow Subpoena Response 000087



> The role of an expert witness is to assist in reaching a proper conclusion from facts presented, which because of want of experience or knowledge the court or jury is incapable of determining by themselves.[28]

of the expert can and should result.[24] In addition, the public interest is a factor to consider in each case. It may also represent an ethics violation on the part of the lawyer who presents an expert with a conflict.[25]

What about an expert previously called as an expert witness to testify for the attorney for the other side? This should not pose a problem, so long as there was no prior relationship also with the opposing party and no confidential or privileged information relating to the new engagement was imparted to the expert in connection with the prior relationship.[26]

Based on these principles, it is important in engaging an expert to inquire closely into any relationships between the expert and the opposing party, past or present. And it is important for the expert closely to examine any available records to determine the existence of any such relationship. Then, if such a relationship is discovered, it is important to analyze whether, in the course of that relationship, any information was disclosed which could arguably relate to the new proposed engagement.

### IV. Do a Good Job — Be Diligent and Rigorous
One would hope that any reliable and professional expert would feel compelled, for the preservation of honor and reputation, to go about the task of studying the case at hand, applying recognized principles, and arriving at an opinion to be applied in the case, in a diligent, arduous manner. Unfortunately, as the song says, "It ain't necessarily so."[27]

Of course, a lawyer-expert is bound by the obligation to be diligent. Rule 1.3 of the Kansas Rules of Professional Conduct requires: "A lawyer shall act with reasonable diligence and promptness in representing a client."[28] The comments on this rule are even more pointed:

A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and may take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer should act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf.[29]

Lack of diligence is one of the most frequently cited violations in the case of lawyer discipline.[30]

In the case of any expert — lawyer or not — and as noted above, the *Daubert* court wished to ensure that the trial judge acted as "gatekeeper" of the expert testimony allowed in the court. The *Kumho Tire* court then later explained:

The objective of that [gatekeeper] requirement is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of **intellectual rigor** that characterizes the practice of an expert in the relevant field.[31]

This would seem to impose upon the expert the obligation to perform tasks with diligence — at least of the level exercised by others in the field. Where an expert has failed to exercise such diligence, the expert has been excluded from testifying.[32] Of course, in many cases, the lure of compensation may well motivate the expert to expend even more time and effort than others in the field, but so long as those hours are well-spent, the court and jury should be the beneficiaries.

### V. Conclusion
Retaining and calling expert witnesses is very common in modern litigation. There are a number of professionals who earn their livelihoods as professional witnesses, and an entire cottage industry of professional witness firms has sprung up to offer experts for a price. But the real purpose of expert witness testimony should be vigilantly kept in mind: An expert is allowed to express opinions based on education, experience, and qualifications in fields with which the ordinary judge or jury is not familiar. So, expert witnesses, and the lawyers hiring them, should keep foremost in thought the obligations that an expert (a) be qualified; have an opinion which will be helpful to the fact finder; and most importantly, have applied reliable, tested, peer-reviewed, and generally accepted principles; (b) do not have a conflict of interest; and (c) go about tasks with diligence and intellectual rigor. ◆

*J. Nick Badgerow is a partner with Spencer Fane LLP in Overland Park and has practiced civil litigation for more than 46 years in the state and federal courts of Kansas and Missouri. Badgerow has been a member of the Kansas Judicial Council, the Kansas State Board of Discipline for Attorneys, and the*

Badgerow Subpoena Response 000088

Thus, expert witnesses, by reason of their special qualifications, are allowed to testify even to the ultimate facts in dispute in the case for which they were hired to testify. As the Kansas Rules of Evidence specify:

> Testimony in the form of opinions or inferences otherwise admissible under this article is not objectionable because it embraces the ultimate issue or issues to be decided by the trier of the fact.[15]

The expert witness is a unique witness, allowed to testify in order to help the fact finder.

> The role of an expert witness is to assist in reaching a proper conclusion from facts presented, which because of want of experience or knowledge the court or jury is incapable of determining by themselves.[16]

As such, should the trial devolve merely to a battle of trained experts, each testifying to a fact and the counter-fact, based on who is hiring them?

> An expert witness should never become solely one party's expert advocate nor a "gun for hire." Rather, an expert witness should be an advocate of the truth with testimony to help the jury and Court reach the ultimate truth in a case, which is the basis of any verdict.[17]

Indeed, some courts view the expert witness, not as an advocate or "hired gun," but as one owing his/her duties to the court instead of the highest bidder.

> Experts whose "opinions are available to the highest bidder have no place testifying in a court of law, before a jury, and with the imprimatur of the trial judge's decision that she is an 'expert,'" and the trial judge must decide whether the signs of competence and of the contribution of the proposed expert will aid in clearly presenting the dispute.[18]

Another court (not in Kansas) has more pointedly observed:

> An expert witness is not an advocate. "An 'expert' is a witness who is permitted to testify as to matters about which the trier of fact has insufficient personal knowledge to make the inferences necessary to arrive at a decision on the ultimate issues in dispute." D. Danner, Expert Witness Checklists, sec. 1:10 at 5-6 (1983).[19]

Under the statutory *Daubert* standards, it is important that the expert witness be **qualified**, as that will be tested by the Court under *Daubert*; have an opinion that will be **helpful** to the fact finder; and most importantly, have applied **reliable**, tested, peer-reviewed and generally accepted principles. It is

important for the lawyer who hires the expert to ensure that the expert is aware of these standards and applies them.

## III. Avoiding Conflicts

While conflicts of interest are a concern for attorneys in taking on clients, conflicts can also cause problems in the engagement of experts, as they may well result in the disqualification of the expert — after all the time, trouble, effort, and cost have been expended to obtain the expert's opinion. In litigation, conflict of interest issues about experts arises most commonly when the opposing party raises questions of confidentiality and the expert's duty of loyalty, associated with a prior or ongoing relationship between the expert and the opposing party. A potential conflict of interest may exist if the expert has been formerly employed by or previously hired as an expert for the other side. The court will have to consider whether previous associations with the opposing party provided the expert with relevant confidential information, and if so, whether that can prejudice the party which previously engaged the expert.

The standard for the admission or exclusion of evidence is fairly straightforward:

> When evidence is admitted under K.S.A. 60-455, "'[t]he trial court must find that "(1) the evidence is relevant to prove one of the facts specified in the statute; (2) the fact is a disputed, material fact; and (3) probative value of the evidence outweighs its potential prejudice." [Citations omitted.]'" *State v. Tolson*, 274 Kan. 558, 563, 56 P.3d 279 (2002) (quoting *State v. Rucker*, 267 Kan. 816, 824, 987 P.2d 1080 [1999]).[20]

But, determining the existence and extent of prejudice in the case of an expert witness with a conflict of interest is more problematic. Where an expert's potential conflict of interest is raised, courts typically apply a three-prong test:

(1)  Was it "objectively reasonable for the first party who claims to have previously retained the expert to conclude that a confidential relationship existed" between it and the expert?

(2)  Was "any confidential or privileged information disclosed by the first party to the expert" in the course of the prior relationship?

(3)  "The public interest in allowing or not allowing an expert to testify." [21]

Thus, if there were no confidential relationship,[22] and/or no confidential information (presumably, relevant to the present dispute) was disclosed to the expert in the course of the prior relationship,[23] then there should be no grounds for disqualifying the expert, and disqualification should not result. But, when these points are established, disqualification ▶

Badgerow Subpoena Response 000089

◀

be generally accepted as reliable within the expert's particular field.[5] Then in 2014, the Kansas statute governing expert testimony, K.S.A. 60-456(b), was changed to read as follows:

(b) If scientific, technical or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue, a witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if: (1) The testimony is based on sufficient facts or data; (2) the testimony is the product of reliable principles and methods; and (3) the witness has reliably applied the principles and methods to the facts of the case.[6]

This statute essentially codifies the principles announced by the U.S. Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*.[7] In *Daubert*, the Court stated that opinion evidence based on scientific knowledge may be admitted only after it has been established that the evidence is reliable and scientifically valid. The *Daubert* court assigned the trial judge the role of "gatekeeper" with "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand,"[8] and to exclude scientific claims supported by junk data. Later, the Court expanded the use of the *Daubert* factors to evaluate non-scientific experts in *Kumho Tire Co. Ltd. v. Carmichael*.[9]

After the Kansas Legislature's adoption of the *Daubert* standards into the Kansas Rules of Evidence, the new standards were first applied by the Kansas Supreme Court in *Smart v. BNSF Railway Co*.[10]

The *Daubert*/60-456(b) standard may be summarized as follows:

(1) The court must decide whether the expert is **qualified** "by knowledge, skill, experience, training, or education" to render an opinion.

(2) The court must determine whether the expert's testimony in the case would be reliable and **helpful** to a jury. A court determines how helpful expert testimony is by evaluating whether the testimony is relevant and whether the "methodology properly can be applied to the facts in issue."[11] Specifically, as defined in K.S.A. 60-456(b), the court determines if the testimony is based on "sufficient facts or data" and is "the product of reliable principles and methods" and whether "the witness has reliably applied the principles and methods to the facts of the case."

(3) The court must determine the **reliability** of proposed scientific testimony by determining:
   a. If the theory has been tested;

   b. whether the theory has been subject to peer review or publication; or
   c. if there is a known or potential rate of error for the theory; and
   d. whether the theory has gained widespread acceptance. While the "general acceptance" test is no longer determinative, it lends a great deal of credibility to the theory.[12]

It is important to note, however, that these standards are not inflexible, and that the court must use judgment in their application, because every case, every expert, and every opinion is different.

These factors are nonexclusive because the reliability inquiry must be tied to the particular circumstances of the particular case. As the U.S. Supreme Court said in *Kumho Tire*, "*Daubert* makes clear that the factors it mentions do not constitute a 'definitive checklist or test.' [Citation omitted.] And *Daubert* adds that the gatekeeping inquiry must be 'tied to the facts' of a particular 'case.'" *Kumho Tire*, 526 U.S. at 150, 119 S.Ct. 1167. In short, the inquiry is "a flexible one." *Daubert*, 509 U.S. at 594-95, 113 S.Ct. 2786; *Kumho Tire*, 526 U.S. at 141, 119 S.Ct. 1167; see *Daubert v. Merrell Dow Pharmaceuticals*, 43 F.3d 1311, 1317 (9th Cir. 1995) ("[W]e do not deem each of them to be equally applicable [or applicable at all] in every case."). "And *Kumho Tire* teaches that '[t]he trial court must have the same kind of latitude in deciding how to test an expert's reliability … as it enjoys when it decides whether or not that expert's relevant testimony is reliable.' 526 U.S. at 152, 119 S.Ct. 1167."[13]

The expert witness is unusual as someone who does not appear in court to present personally known or observed facts. The expert almost never has first-hand knowledge of any of the facts at issue in the case. Instead, the expert witness gleans the facts from employer-provided documents and information and then expresses opinions based on analysis of those facts, measured against specialized education or personal experience.

"The role of an expert witness is to help the jury understand issues of fact beyond their common experience. Under modern standards, expert testimony on matters within the witness's field of expertise is admissible whenever it will aid the jury in reaching a decision, even if the expert's opinion touches on the ultimate issues that the jury must decide. *Commonwealth v. LaCorte*, 373 Mass. 700, 705 [369 N.E.2d 1006] (1977). *Commonwealth v. Montmeny*, 360 Mass. 526, 527-528 [276 N.E.2d 688] (1971)." *Simon v. Solomon*, 385 Mass. 91, 105, 431 N.E.2d 556 (1982).[14]

Badgerow Subpoena Response 000090