**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | | |
|---|---|---|
| FLOYD BLEDSOE, | ) | Case No. 2:16 CV 02296 |
| | ) | |
| Plaintiff, | ) | Judge Daniel D. Crabtree |
| | ) | |
| v. | ) | Magistrate Angel D. Mitchell |
| | ) | |
| JEFFERSON COUNTY, KS, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ......................................................................................................... 1

STATEMENT OF UNDISPUTED FACTS ................................................................. 2

    A.  Camille Arfmann disappears from her Oskaloosa home; Floyd is innocent of her murder. ........................................................................................... 2

    B.  Lead Case Agent Jim Woods and Agent George Johnson join the investigation......... 4

    C.  Tom confesses repeatedly to the murder, reveals the location of Camille's body, and turns over his gun (the murder weapon). ....................................................... 5

    D.  Tom implicates Floyd with a "Roadside Encounter" account; Floyd is arrested in Tom's place............................................................................................ 8

    E.  Floyd obtains a court order requiring production of police records. ........................... 9

    F.  Woods receives Tom's detailed confessions regarding how and why Tom killed Camille.......................................................................................................... 10

    G.  Woods receives evidence that impeaches Tom's alibi. .............................................. 11

    H.  Woods and Johnson receive evidence that impeaches Tom's account of the "Roadside Encounter." ................................................................................. 12

    I.  Woods withholds Tom's detailed confessions and evidence impeaching Tom's alibi; Woods and Johnson withhold evidence impeaching Tom's "Roadside Encounter" account. ..................................................................................... 15

    J.  Floyd is convicted after an unfair trial...................................................................... 18

    K.  No probable cause supports Floyd's prosecution and Defendants do not contend otherwise.................................................................................................... 21

    L.  After years of wrongful imprisonment, Floyd secures the favorable termination of his criminal case. ........................................................................................... 26

LEGAL STANDARD................................................................................................... 27

ARGUMENT ............................................................................................................... 27

  I.  There is no genuine dispute that Woods and Johnson suppressed evidence about the true perpetrator in violation of *Brady*.................................................................... 27

    A.  Woods and Johnson received evidence implicating the true perpetrator, Tom, that was favorable to Floyd...................................................................................... 29

            1.       Tom's detailed confessions ........................................................................29

            2.       Tom's admissions that impeach his alibi ....................................................30

            3.       Tom's inconsistent and impossible accounts of the Roadside

                        Encounter ................................................................................................31

      B.   Defendants Woods and Johnson suppressed this exculpatory evidence. ................... 34

      C.   The suppressed evidence was material as a matter of law. ........................................ 36

II.  Plaintiff has established a deprivation of his constitutional rights that supports liability
against Defendant Hayes as a co-conspirator. .................................................................... 41

III.   Plaintiff has satisfied two elements of his malicious prosecution claim. ....................... 42

      A.   Defendants do not contest the absence of probable cause to support Plaintiff's arrest
and prosecution. ....................................................................................................... 42

      B.   Plaintiff's criminal prosecution terminated favorably. ............................................. 46

CONCLUSION ........................................................................................................................... 47

## TABLE OF AUTHORITIES

CASES

*Adler v. Walmart Stores*, 144 F.3d 664 (10th Cir. 1998)...............................................27

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)...............................................27

*Banks v. Reynolds*, 54 F.3d 1508 (10th Cir. 1995) ........................................29

*Baptiste v. J.C. Penney Co.*, 147 F.3d 1252 (10th Cir. 1998)........................................43

*Bies v. Sheldon*, 775 F.3d 386 (3d Cir. 2014) ...............................................36

*Bledsoe v. Board of Cty. Comm'rs*, 501 F. Supp. 3d 1059 (D. Kan. 2020)...................27

*Bledsoe v. Bruce*, 569 F.3d 1223 (10th Cir. 2009) .......................................18

*Bledsoe v. State*, 283 Kan. 81 (2007)...............................................................18

*Bowen v. Maynard,* 799 F.2d 593 (10th Cir. 1986) ...........................................38, 39, 40

*Brady v. Maryland*, 373 U.S. 83 (1963) ...............................................37, 38, 39, 40, 41

*Dennis v. Sec'y, Pennsylvania Dep't of Corrs.*, 834 F.3d 263 (3d Cir. 2016)...........................31

*Douglas v. Workman*, 560 F.3d 1156 (10th Cir. 2009) .........................................33, 34

*Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) ................................................39

*Fontenot v. Crow*, 4 F.4th 982, 1067-68 (10th Cir. 2021).........................................33

*Frasier v. Evans*, 992 F.3d 1003 (10th Cir. 2021)..............................................41

*Goudy v. Basinger*, 604 F.3d 394 (7th Cir. 2010)...............................................39

*Grider v. City of Auburn*, 618 F.3d 1240 (11th Cir. 2010) ........................................41

*Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014 (10th Cir. 2001)....................................41

*House v. Bell*, 547 U.S. 518 (2006) ................................................................30

*Johnson v. Kraft Foods North America, Inc.*, 236 F.R.D. 535 (D. Kan. 2006)...........................43

*Karr v. Smith*, 774 F.2d 1029 (10th Cir. 1985)...............................................42

*Kerns v. Bader*, 63 F.3d 1173 (10th Cir. 2011) .............................................................42

*Kyles v. Whitley*, 514 U.S. 419 (1995)................................................................28, 36, 37

*Nuckols v. Gibson*, 233 F.3d 1261 (10th Cir. 2000) ......................................................38

*Perry v. Rushen*, 713 F.2d 1447 (9th Cir. 1983).............................................................29

*Scott v. Mullin*, 303 F.3d 1222 (10th Cir. 2002)......................................................29, 37

*Shrum v. Cooke*, 60 F.4th 1304 (10th Cir. 2023).......................................................42, 46

*Smith v. Cain*, 565 U.S. 73 (2012) ...........................................................28, 36, 37

*Smith v. Sec'y of New Mexico Dep't of Corrs.*, 50 F.3d 801 (10th Cir. 1995) ............27, 28, 36, 41

*Snell v. Turnell*, 920 F.2d 637 (10th Cir. 1990)..............................................................41

*State v. Bledsoe*, 272 Kan. 1350 (2002)........................................................................18

*Stickler v. Greene*, 527 U.S. 263 (1999) ......................................................................27

*Thompson v. Clark*, 142 S. Ct. 1332 (2022) ...........................................................42, 46

*U.S. v. Agurs*, 427 U.S. 97 (1976).................................................................................29

*U.S. v. Bagley*, 473 U.S. 667 (1985)....................................................................28, 36, 40

*U.S. v. Brown*, 617 F.3d 857 (6th Cir. 2010) .................................................................30

*U.S. v. Buchanan*, 891 F.2d 1436 (10th Cir. 1989).......................................................28

*U.S. v. Davis*, 137 F.3d 1048 (10th Cir. 1999) ............................................................43

*Wilkins v. DeReyes*, 528 F.3d 790 (10th Cir. 2008).......................................................42

*Williams v. Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010)..........................................28, 31

*Wilson v. Hamm*, No. 1:19-cv-284, 2023 WL 2655880 (M.D. Ala. Mar. 27, 2023)...................30

*Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272 (Fed. Cir. 2012) ..........................44, 45

*Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416 (7th Cir. 2005).........44, 45

RULES

Fed. R. Civ. P. 37 ................................................................................................................44, 45, 46

Fed. R. Civ. P. 56 ....................................................................................................................27, 41

**INTRODUCTION**

At the age of 23, Plaintiff Floyd S. Bledsoe ("Floyd") was wrested from his wife and two young sons when he was wrongfully arrested, prosecuted, and convicted for a heinous crime he did not commit: the murder and sexual assault of his 14-year-old sister-in-law, Camille Arfmann ("Camille"). From the start, it was clear that Tom Bledsoe ("Tom")—Plaintiff's brother—was responsible. In the days after Camille went missing, Tom repeatedly confessed to the crime and turned himself in to the officers working on the case. Accompanied by his lawyer, Tom turned over the murder weapon—his recently-purchased gun—and led police to Camille's body, which was buried behind Tom's house.

Remarkably, after Tom turned himself in and was booked into jail, Defendants shifted their attention from Tom and framed Floyd for the crime instead. The centerpiece of their scheme was a purported "Roadside Encounter" that the Defendants helped Tom falsify: an account that, on the Saturday after Camille's disappearance, during a chance encounter, Floyd supposedly confessed to Tom that he had shot Camille multiple times and buried her in the dump, and then threatened Tom not to disclose the confession. Defendants also developed and vouched for Tom's false alibi at the time of Camille's disappearance: that he was in Lawrence, far away from the victim, and thus could not have been responsible for Camille's disappearance. All of this was false. Fifteen years later, DNA evidence confirmed that Tom was the perpetrator and exculpated Floyd. After reading about the DNA evidence in the news, Tom committed suicide and claimed responsibility (yet again) for Camille's murder in his suicide notes. The Jefferson County District Court overturned Floyd's conviction without opposition from the prosecution, and Plaintiff received a Certificate of Innocence, also unopposed.

1

Over the course of Plaintiff's civil suit, he has amassed overwhelming evidence that his wrongful conviction resulted from constitutional violations committed by Defendant Kansas Bureau of Investigation agents Jim Woods, George Johnson, and Terry Morgan; Tom's attorney, Defendant Michael Hayes; and their co-conspirators. Plaintiff intends to present that evidence at trial. Yet certain of these violations are so stark and unchallenged that the evidence supports only one conclusion: that Woods and Johnson violated Plaintiff's *Brady* rights. They did so by suppressing Tom's detailed confessions and insider knowledge of the crime; early accounts that impeached Tom's alibi; and Tom's inconsistent and impossible early accounts of the "Roadside Encounter." Accordingly, Plaintiff seeks summary judgment against Defendants Woods and the Estate of George Johnson on his *Brady* claim, and asks this Court to deem the violation established as a matter of law as a predicate constitutional violation in support of Plaintiff's conspiracy claim against Defendant Hayes.

In addition, two elements of Plaintiff's malicious prosecution claim—lack of probable cause and favorable termination—are also established as a matter of law against all remaining Defendants. As such, Plaintiff is entitled to partial summary judgment on these elements.

## STATEMENT OF UNDISPUTED FACTS

**A.      Camille Arfmann disappears from her Oskaloosa home; Floyd is innocent of her murder.**

1.      In November 1999, Plaintiff Floyd S. Bledsoe ("Floyd" or "Bledsoe") was 23 years old and living in a trailer home at 15200 Fairview Rd. in Oskaloosa, Kansas, with his wife Heidi Bledsoe ("Heidi"), the couple's 1- and 2-year-old sons, Cody and Christian Bledsoe, and Heidi's 14-year-old sister, Camille Arfmann ("Camille"). Exh. 1 (Pretrial Order), Stipulation i.

2.      Camille had moved in with Floyd and Heidi because she was not getting along with her mother and was having attendance issues at her prior high school. Exh. 1, Stipulation ii.

2

In the fall of 1999, Camille was getting good grades at Oskaloosa High School and had a good attendance record. Exh. 1, Stipulation iii.

3.      In November 1999, Tom Bledsoe, Floyd's brother, was 25 years old and lived with his parents, Floyd L. Bledsoe Sr. and Catherine Bledsoe, at 11477 Osage Rd. in Oskaloosa. Exh. 1, Stipulation vi & Stipulation iv. Camille regularly attended Countryside Baptist Church with Tom. Exh. 1, Stipulation iv.

4.      On November 5, 1999, Camille went missing.  The information that was initially available to law enforcement was that a school bus driver dropped off Camille at the trailer where she lived at 4:20 or 4:30 p.m. and Camille had gone missing by 5:00 or 5:15, when her friend Robin Meyer stopped by and found that Camille's backpack and a half-eaten brownie were in the trailer, but Camille was not. Exh. 1, Stipulation viii & Stipulation x.

5.      Camille had been shot to death. Exh. 1, Stipulation xxiv.

6.      Floyd did not kill Camille. Exh. 2, Certificate of Innocence Order; Exh. 1, Stipulations lxvii, lxviii & lxix; Exh. 3, Suicide Notes; Exh. 1, Stipulation xi; Exh. 4, Answering Machine Audio; Exh. 5, Stipulated Transcription of Answering Machine Messages; Group Exh. 6, Officer Kyle's Transcription and Report of Answering Machine Messages; Exh. 7, Sentencing Hrg. Trans., at 28:19; Exh. 8, Vernon Dec. 2015 Hrg. Testimony, at 11:14-18 & 40:6-9; Exh. 9, Vernon Dep., at 55:29-56:11; Exh. 10, Gonzalez Dec. 2015 Hrg. Testimony, at 47:21-48:5 & 52:6-11.

7.      Defendants do not contend that Floyd killed Camille. Exh. 11, Woods & Morgan Resps. to Second Interrogatories No. 8 ("Q. State whether you contend that plaintiff committed, was an accomplice or accessory to, or assisted in concealing the Arfmann murder . . . A. No."); Exh. 12, Hayes Resp. to First Interrogatories No. 7 ("I am not in a position to offer any opinion

3

on this matter."); Exh. 13, Estate of George Johnson Resp. to First Interrogatories No. 1 ("I have no knowledge of the statements made in this Interrogatory.").

8.      Floyd consistently maintained his innocence.  Exh. 7, Sentencing Hrg. Trans., at 28:19; Exh. 14, Oct. 22, 2004 Hrg. Trans., at 112:9-13:6.

9.      Tom killed Camille. Exh. 3, Suicide Notes; Exh. 1, Stipulations lxvii, lxviii, lxix; Exh. 4, Answering Machine Audio; Exh. 5, Parties' Stipulation of Transcription of Answering Machine Messages; Group Exh. 6, Officer Kyle's Transcription and Report of Answering Machine Messages; Exh. 8, Vernon Dec. 2015 Hrg. Testimony, at 11:14-18, 40:6-9; Exh. 9, Vernon Dep., at 55:29-56:11; Exh. 10, Gonzalez Dec. 2015 Hrg. Testimony, at 47:21-48:5 & 52:6-11.

**B.      Lead Case Agent Jim Woods and Agent George Johnson join the investigation.**

10.      The Kansas Bureau of Investigation ("KBI") and the Jefferson County Sheriff's Office ("JCSO") investigated Camille's homicide. Exh. 1, Stipulation xv.

11.      Senior Special Agent Jim Woods was the "case agent" for Camille's homicide investigation for KBI. Exh. 15, Woods Dep. at 33:25-34:24; Exh. 1, Stipulation xvi. The "case agent" was the agent that was "in charge" of the investigation for the KBI. Exh. 15, Woods Dep. at 33:25-34:5. By Woods's own testimony, he was involved in the investigation of Camille's murder from "start to finish." Exh. 16, Woods Trial Testimony, at 496:8-10; Exh. 15, Woods Dep., at 187:10-188:8.

12.      KBI Agent George Johnson participated in the investigation by administering polygraph examinations and conducting law enforcement questioning of Floyd and Tom. Exh. 1, Stipulation xxxix.

**C.     Tom confesses repeatedly to the murder, reveals the location of Camille's body, and turns over his gun (the murder weapon).**

13.     After Tom attended a church service at Countryside Baptist Church on November

7, he left an answering-machine message for one of the church elders, Jim Bollinger

("Bollinger").  Exh. 1, Stipulation xi.

14.     The answering machine message stated words materially and principally to the

effect of:

> Hi, Jim. This is Tom. I just wanted you to be the first to know. Ah- I know - I lied to you.
> I know where Camille is. And when you get this message I turned myself into the police
> department. You don't know the grief that went through me as I sat there thinking, I
> (inaudible) wish I never did it. I hurt the church. I hurt God. Most of all, I let everybody
> down. All I can say is, I'm sorry. I will pay for the rest of my life for what I have, what I
> have done. And all I can ask is for the church to remain strong. And, ah, please, forgive
> me. Also, one other thing as a favor to me, please remember my Mom and Dad. Help
> them as they go through the (inaudible) help with the pain (inaudible). Thank you, Jim.
> I'm sorry. Bye. (Sunday, 8:55 P.M.)

Exh. 4, Answering Machine Audio; Exh. 5, Stipulation of Transcription of Answering Machine

Messages; Group Exh. 6, Officer Kyle's Transcription and Report; Exh. 17, Tom's Apr. 25, 2000

Trial Testimony, at 308:21-309:20.

15.     Tom then called his father.  At Floyd's preliminary hearing, Tom testified (both

on direct examination and cross-examination) that he confessed to his father during the call that

he had killed Camille. Exh. 1, Stipulation xii.

16.     Tom then left another answering-machine message for Bollinger.  Exh. 1,

Stipulation xiii. Tom's second answering machine message stated words materially and

principally to the effect of:

> Hi, Jim. It's me again, Tom. Please hold - help my Mom and Dad through this. Right
> now, they're, they're disappointed in me. I know the church will be too. All I can ask is
> forgiveness for what I have done. I will pay the rest of my life for what I have done. The
> other night, I wanted to get up and say it in front of the church, but I didn't have enough
> guts. I'm sorry. I don't - I don't know what went through my mind . . But right now you 're

probably shocked. I wish I could turn the clock back, but I can't. I had a choice. I made
my choice. I wish I didn't. Now I'll pay. I'm sorry. Bye. (Sunday, 9:01 P.M.)

Exh. 4, Answering Machine Audio; Exh. 5, Parties' Stipulation of Transcription of Answering

Machine Messages; Group Exh. 6, Officer Kyle's Transcription and Report; Exh. 17, Tom's

April 24, 2000 Trial Testimony, at 310:8-311:8.

17.     Tom left the answering machine messages from the parking lot of the Jefferson

County Sheriff's Department Law Enforcement Center. Exh. 17, Tom Apr. 25, 2000 Trial Test.,

at 309:17-21.

18.     Although Tom never uttered the words "I killed her" on the answering machine

messages, it could be inferred from his words to Bollinger that he was confessing to murder.

Exh. 18, Poppa Dep. 86:18-87:5; Exh. 8, Vernon 2015 Testimony, at 8:22-9:11.

19.     Attorney Michael Hayes ("Hayes") began representing Tom on November 7. Exh.

1, Stipulation xiv.

20.     Tom went to the Jefferson County Law Enforcement Center on the evening of

Sunday, November 7, 1999, and turned himself in, accompanied by Hayes. Exh. 38, Tom's Apr.

26, 2000 Trial Testimony, at 556:16-19; Exh. 19, Carreno Narrative Report, at 8; Exh. 20,

Carreno 11:38p.m. Field Note; Exh. 21, Woods Report of Nov. 7, 1999, at 2; Exh. 15, Woods

Dep., at 90:23-91:13; Exh. 22, Carreno Dep. at 81:24-83:11.

21.     Tom and/or Hayes had disclosed to law enforcement by 11:38 p.m. on November

7, prior to the recovery of Camille's body, that she "was in a field w/a bullet to the head" and

that Tom "admitted involvement" in Camille's death.  Exh. 20, Carreno 11:38 p.m. Field Note;

Exh. 22, Carreno Dep., 81:24-83:11 & 80:6-9; Exh. 15, Woods Dep., at 90:23-91:13; Exh. 21,

Woods Report of Nov. 7, 1999, at 2; Exh. 15, Woods Dep., at 98:19-99:18.

22.     The information that Camille "was in a field w/a bullet to the head" was recorded only in a handwritten field note by Detective Carreno. Exh. 20, Carreno 11:38 p.m. Field Note; Exh. 22, Carreno Dep., at 107:7-108:7 & 81:24-83:11 & 80:6-9. No Police Report[1] that has been produced in this case documents the information law enforcement received (before they recovered Camille's body) that she "was in a field w/a bullet to the head."  Exh. 1, Stipulation lxiii.

23.     Tom, Hayes, and law-enforcement officers remained at the Law Enforcement Center until the early morning hours of November 8. Exh. 1, Stipulation xix.

24.     In the early morning hours of November 8, Tom and Hayes led law-enforcement officers to a location at a garbage dump in a ditch on the property adjacent to Tom's residence where he lived with his parents. Exh. 1, Stipulation xx.

25.     Hayes pointed out a location in a ditch, where several sheets of paneling and plywood were observed. Exh. 21, Woods Report of Nov. 7, 1999, at 3. Tom had told Hayes that Camille was under the plywood. Exh. 17, Tom's Apr. 25, 2000 Trial Test., at 68. At approximately 2:30 a.m. on November 8, officers found Camille's body buried under at least a foot of dirt, covered by sheets of plywood. Exh. 1, Stipulation xxi.

26.     A Countryside Baptist Church t-shirt was found near Camille's body. Exh. 1, Stipulation xxii. Tom regularly attended Countryside Baptist Church. Exh. 1, Stipulation iv.

27.     An autopsy later revealed that Camille died as a result of multiple gunshot wounds: one to the back of her head and three to her torso.  Exh. 1, Stipulation xxiv.

---

[1] As used herein, and as stipulated by the parties in their stipulations, the term "Police Report" includes all police reports produced in this case, excluding handwritten field notes. Exh. 1, Stipulation lv n.2.

28.     On November 8, Hayes turned over Tom's Jennings 9mm firearm to law enforcement.  Tom had purchased that firearm on October 23, 1999.  Exh. 1, Stipulation xxiii. The bullet casings recovered from the crime scene were fired from Tom's Jennings 9mm firearm. Exh. 1, Stipulation xxv.

29.     During the early hours of November 8, Hayes drove Tom back to the Jefferson County Law Enforcement Center.  Once there, Tom was arrested and booked into jail for Camille's murder. Exh. 1, Stipulation xxviii.

**D.     Tom implicates Floyd with a "Roadside Encounter" account; Floyd is arrested in Tom's place.**

30.     Sometime after Tom was booked into the jail, he began implicating Floyd S. Bledsoe in Camille's homicide based on a communication Tom claimed to have had with Floyd on the side of a road on Saturday, November 6 (the "Roadside Encounter"). Exh. 19, Carreno Narrative Report, at 38; Exh. 17, Tom Apr. 25, 2000 Trial Testimony, at 282:14-287:18.

31.     Floyd voluntarily agreed to take a polygraph examination at the Law Enforcement Center.  Exh. 1, Stipulation xxxviii.

32.     On November 12, Agent Johnson participated in law-enforcement questioning of, and administered polygraph examinations to, Tom and Floyd.  Johnson reported that Tom was truthful during his polygraph examination and that Floyd was deceptive during his. Exh. 1, Stipulation xxxix.

33.     Johnson's scoring of Tom's polygraph report was incorrect. The polygraph charts clearly, and obviously, showed that Tom failed, and it would have been obvious to any competent polygraph examiner in 1999 that Tom's test should have been reported as a fail. Exh. 23, Expert Report of Dan Sosnowski, at 5-7.

8

34.     Kansas Bureau of Investigation agents Roger Butler and Rick Atteberry also reviewed Johnson's scoring of Tom's polygraph years later and concluded that the charts indicated deception, and did not support the opinion of truthfulness reported by Agent Johnson. Exh. 24, Butler Report on Johnson Polygraphs, at 2.

35.     Tom was released from jail on bail on November 12, and the charges against Tom were dismissed on November 15. Exh. 1, Stipulation xlvi.

36.     Floyd was arrested shortly after the November 12 polygraph examination. Exh. 1, Stipulations xxxix & xli.  On November 15, Floyd was charged with the first-degree murder of Camille.   Exh. 1, Stipulation xlvii.

**E.     Floyd obtains a court order requiring production of police records.**

37.     In December 1999, Plaintiff's defense attorney moved for a court order compelling production of records including: "4. Any and all information or evidence tending to establish the innocence of the Defendant . . . . 5. Any and all statements and reports made by a State witness or prospective State witness, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney. 6. Any and all records from any Police Department or Law Enforcement Agency including all . . . field notes of all officers involved in the investigation of this case. . . . 8. Copies of the file created regarding State v. Tom Ble[d]soe."  Exh. 25, Dec. 1, 1999 Motion to Produce.  The Court granted the motion and entered the order. Exh. 26, Dec. 14, 1999 Order to Produce.

38.     Tom's statements to law enforcement during the investigation of Camille's murder, relating to her murder, whether provided directly by Tom or through his attorney, Defendant Hayes, were required to be documented in Police Reports so that they would be turned over to the prosecution. Exh. 27, Harvey Expert Report, at p. 8, ¶10; Exh. 22, Carreno

Dep. at 178:7-17; Ex. 15, Woods Dep. at 58:15-22; Ex. 15, Woods Dep. at 109:7-14; Woods

Dep. at 162:17-22; Woods Dep. at 166:16-22; Woods Dep. at 169:13-171:11.

**F.      Woods receives Tom's detailed confessions regarding how and why Tom killed Camille.**

39.      The KBI produced Agent Woods's handwritten field notes at KBI Subpoena

1439-1529. Exh. 1, Stipulation lii.

40.      Defendant Woods documented in his field notes at KBI Subpoena 1459 an early

"proffer" on Tom's behalf Woods received from Tom's attorney, Michael Hayes, that there was

"some type of romance . . . supposedly no sex" between the victim, Camille Arfmann, and the

suspect, Tom Bledsoe; that the 25-year-old Tom Bledsoe had been afraid that the 14-year-old

Camille would "accuse him of trying to have sex with her"; and that Tom's truck was used to

transport Arfmann "while alive" and was "currently at parents' house."  Exh. 28, Woods Field

Note re Proffer (KBI Subpoena 1459).

41.      Woods also provided KBI lab analyst Mary Koch with information to the effect

that Tom had tried to have sex with Camille in his truck; that Camille had laughed; that Tom had

then shot her; and that, per Tom's defense attorney Hayes, Camille was not killed where she was

buried.  Koch documented that information in a phone-call log at KBI Subpoena 5810. Exh. 1,

Stipulation li. Woods provided the information to Koch on November 22, 1999. Exh. 29, Koch

Deposition, at 45:8-48:2; Exh. 47, Nov. 22, 1999 phone call log.

42.      The information provided by Hayes that Camille was not killed where she was

buried (Exh. 1, Stipulation li), was corroborated by the physical evidence from the investigation:

only a small amount of blood was observed at the bottom of the grave site (Exh. 1, Stipulation

xxvii) and Camille had abrasions on her back consistent with being dragged (Exh. 1, Stipulation

xxv).

**G.    Woods receives evidence that impeaches Tom's alibi.**

43.    The information that was initially available to law enforcement was that a school bus driver dropped off Camille at the trailer where she lived at 4:20 or 4:30 p.m. on November 5, 1999, and Camille had gone missing by 5:00 or 5:15, when her friend Robin Meyer stopped by and found that Camille's backpack and a half-eaten brownie were in the trailer, but Camille was not. Exh. 1, Stipulation viii; Exh. 1, Stipulation x. The trailer Camille disappeared from was in Oskaloosa (Exh. 1, Stipulation i).

44.    Tom purchased ammunition at Rusty's, a sporting goods store in Lawrence, Kansas, on November 5, 1999, the date Camille went missing.  Exh. 1, Stipulation xxix & viii.

45.    At Floyd's criminal trial, the prosecution presented evidence through Agent Woods that Tom was at Rusty's in Lawrence at 4:30 p.m. on November 5. Exh. 1, Stipulation xxx; Exh. 1, Stipulation xxix.

46.    Rusty's was about 40 minutes to an hour from Tom's home in Oskaloosa in heavy traffic. Exh. 30, Tom's Preliminary Hrg. Testimony, at 89:22-90:6. Tom testified that traffic was heavy on Friday afternoon, November 5, when he returned from Rusty's in Lawrence to Oskaloosa. Exh. 30, Tom's Preliminary Hrg. Testimony, at 82:7-11.

47.    At Floyd's criminal trial, Prosecutor Vanderbilt asked KBI Agent Woods the following questions and Woods answered as follows: "Q: You participated in the investigation the entire time, is that correct? A: Yes, sir, start to finish. Q: Is there any, have you had any occasion or any information inconsistent with the fact that Tom Bledsoe was at Rusty's at 4:30 pm? A: No, sir." Exh. 1, Stipulation xxxi.

48.    Yet Defendant Woods's personal field notes contained an early timeline recounting information received on November 9, 1999, that documented that Tom was at Rusty's in Lawrence at 3:40 p.m. and had returned to his home in Oskaloosa by around 4:40 p.m. on

11

Friday, November 5, 1999. Exh. 31, Excerpt of Woods Deposition Exhibit 7 (Woods field notes), at 30-32 (KBI Subpoena 1525-1527); Exh. 15, Woods Dep., at 125:10-126:1; Exh. 1, Stipulation lii; Exh. 1, Stipulation vi. Woods received the information on the timeline from either Tom or Hayes. Exh. 15, Woods Dep., at 125:10-126:1.

**H.    Woods and Johnson receive evidence that impeaches Tom's account of the "Roadside Encounter."**

49.    Tom's first recorded and preserved interview by Jefferson County Sheriff's Department Officers occurred on November 24, 1999. Exh. 1, Stipulation xlix. During that November 24 interview, Tom stated that, in summary, on the afternoon of Saturday, November 6, while he was driving east on a country road, he saw Floyd driving west; Tom flagged Floyd down; Tom brought up the subject of Camille, and after some questioning, Floyd put his head on the steering wheel, started to cry a little, stated that Camille was dead. After additional questioning, Floyd disclosed that either "we" or "I" "accidentally shot her"; that Camille had been killed with Tom's gun, which "I got out of your truck one day during the week" and then "put back in your truck during the week"; that her body was "in the brome field ditch, underneath some dirt and trash"; and that she had been shot "two or three" times. When Tom asked if Camille had been sexually abused, Floyd responded, "yes, no, I don't know, if you call her shirt and bra being up over her breast." Floyd told Tom not to tell anyone or he would tell them about Tom's past. Exh. 19, Carreno Narrative Report, at 38.

50.    Tom gave a similar account of the Roadside Encounter at Floyd's April 2000 trial. Exh. 17, Tom Apr. 25, 2000 Trial Testimony, at 282:14-288:9. In summary, Tom stated that he got ready to work between 11:00 and 12:00; he left for work between 11:00 and 1:00 p.m.; as Tom was driving, he saw Floyd and waved him down; Tom brought up the subject of Camille, and after some questioning, Floyd had his hand on the steering wheel with his head down, and

stated that Camille was dead. After additional questioning, Floyd disclosed that either "we" or "I" "accidentally shot her"; that Camille had been killed with Tom's pistol, that he had shot Camille two or three times, once in the back of the head and twice in the chest; and that Camille was in the trash dump behind the house underneath some plywood and trash and dirt. When Tom asked if Camille had been sexually abused, Floyd responded, "yes, no, I don't know," and recalled her shirt and bra being above her breast. According to Tom, Floyd told Tom not to tell anyone, and "if anyone comes around snooping, for me to take the blame," and that "if I don't, he'll tell people about my past." Exh. 17, Tom Apr. 25, 2000 Trial Testimony, at 282:14-288:9.

51.     Weeks earlier, on November 12, 1999, KBI Agent George Johnson participated in law-enforcement questioning of Tom. Exh. 1, Stipulation xxxix.

52.     Johnson took handwritten field notes from his interview with Tom on November 12. Exh. 1, Stipulation xlv, Exh. 1, Stipulation xl; Exh. 32, Johnson Field Notes (KBI Subpoena 1628-1631); Exh. 33, Stipulated Translation of Field Notes.

53.     In Johnson's handwritten field notes from the November 12 polygraph, he recorded Tom's account that Tom was: "At home until about 14:00. Went to work. Floyd Bledsoe stopped subject along road."  Exh. 1, Stipulation xlv; Exh. 33, Stipulated Translation of Field Notes, at 1; Ex. 32, Johnson Field Notes (KBI Subpoena 1628-1631), at 1628.

54.     It was impossible for Tom to have left for work at 2:00 p.m. on Saturday, November 6, and *then* run into Floyd on the side of the road because Floyd had been with Detective Carreno, looking for Camille, from 11:40 a.m. to 12:17 p.m., and then again from 1:48 p.m. until 5:35 p.m. on November 6. Exh. 22, Carreno Dep. 75:15-18.

55.     The account Tom gave Johnson on November 12 was inconsistent with Tom's testimony at Floyd's April 2000 trial that the Roadside Encounter had occurred after Tom had

gotten ready for work sometime between 11:00 and 12:00, and ran into Floyd after leaving for work by 1:00 p.m. Exh. 17, Tom Apr. 25, 2000 Trial Test., at 280:19-282:11.

56.     On November 9, 1999, Defendant Woods documented in his field notes still different information from Tom and/or Hayes about the timing of the "Roadside Encounter" with Floyd: that it had occurred sometime between 11:00 a.m. and 1:00 p.m., *before* Tom prepared for work at 1:15 and left "enroute" to Lawrence for work at 2:00 p.m. Exh. 31, Excerpt of Woods Dep. Exhibit 7 (Woods Field Note), at 30 (KBI Subpoena 1525); Exh. 15, Woods Dep. at 127:2-19, 133:1-11.

57.     The information provided to Woods on November 9 about the dialogue during the Roadside Encounter was limited to the following: Floyd "tells Tom two to three shots. Body in dump - Tits exposed, shirt around neck." Exh. 31, Excerpt of Woods Dep. Exhibit 7 (Woods Field Notes), at 30 (KBI Subpoena 1525); Exh. 15, Woods Dep., at 127:2-10. There was no mention in the November 9 account of Floyd having threatened Tom that Floyd would expose information about Tom's past if Tom told on Floyd. Exh. 31, Excerpt of Woods Dep. Exhibit 7 (Woods Field Notes), at 30 (KBI Subpoena 1525); Exh. 15, Woods Dep., at 127:2-10.  There was no mention in the November 9 account of Floyd having disclosed that he had used Tom's gun to commit the murder. Exh. 31, Excerpt of Woods Dep. Exhibit 7 (Woods Field Notes), at 30 (KBI Subpoena 1525); Exh. 15, Woods Dep., at 127:2-10.

58.     Woods received the information on the November 9 timeline from either Tom or Hayes. Exh. 15, Woods Dep., at 125:10-126:1.

59.     On November 9, Woods also received information from Tom and/or Hayes that Tom was saying he met an *unknown* person at some time on *Sunday*, who told him that Camille was dead and where her body was.  Exh. 15, Woods Dep., at 133:15-134; Exh. 31, Excerpt of

14

Woods Dep. Exhibit 7 (Woods Field Notes), at 31 (KBI Subpoena 1526). Woods documented

that information in his field notes. Exh. 31, Excerpt of Woods Dep. Exhibit 7 (Woods Field

Notes), at 31 (KBI Subpoena 1526).

60.     Tom's account at Floyd's trial did not include any account of meeting an

unknown person at some time on Sunday and learning from that unknown person that Camille

was dead and where her body was. Exh. 17, Tom Apr. 25, 2000 Trial Testimony, at 282:14-

288:9.

**I.    Woods withholds Tom's detailed confessions and evidence impeaching Tom's alibi; Woods and Johnson withhold evidence impeaching Tom's "Roadside Encounter" account.**

61.     Other than Johnson's polygraph examination report and Woods's report regarding

a receipt from Rusty's, no Police Report that has been produced in this case documents any

statements or information that Tom made or provided (either directly or through Hayes) to law-

enforcement officers between November 7 and 23 relating to Camille's murder. Exh. 1,

Stipulation lv; *see also* Exh. 34, Woods Nov. 15, 1999 report re Rusty's receipt; Exh. 35,

Johnson's Nov. 12, 1999 polygraph report (KBI Subpoena 904-908).

62.     The KBI Defendants maintained their field notes for their own use and did not

turn them over to the prosecution. KBI Agent Woods confirmed at this deposition that he kept

his field notes from the Arfmann murder investigation to himself, for his own use, during the

investigation. He knew it was his responsibility to type up the information that was pertinent

from his field notes—both the information that was good for the prosecution and the information

that was good for the defense—into typed police reports to be sent to the prosecutor. Ex. 2,

Woods Dep. at 31-32. KBI Agent Morgan likewise testified that his field notes would stay with

him and would not be disseminated, and so he knew that it was his responsibility to ensure that

all relevant information in the field notes—including information that was good for the prosecution and information that was good for the defense—would be transferred to his typewritten reports so that it would be disseminated to the prosecution. Exh. 36, Morgan Dep., at 38:12-41:21.

63.     Woods's handwritten field notes at KBI Subpoena 1459 and 1525-1527 are not in the production of the Jefferson County Attorney or Jefferson County Sheriff's Department. Exh. 1, Stipulation liv.

64.     Johnson's handwritten field notes at KBI Subpoena 1628-1631 are not in the production of the Jefferson County Attorney or Jefferson County Sheriff's Department. Exh. 1, Stipulation liv.

65.     Woods and Johnson's field notes at KBI Subpoena 1459, 1525-1527, and 1628-1631 are not in the production of Floyd's defense attorney, John Kurth. Exh. 1, Stipulation liv; Exh. 36, Letter from John Kurth.

66.     No Police Report that has been produced in this case documents that law enforcement received information to the effect that "Tom claimed he tried to have sex with her in truck, she laughed, he shot her" and "not killed there, thru Tom's attn." Exh. 1, Stipulation lx.

67.     No Police Report that has been produced in this case documents the content and/or circumstances of any receipt of information by law enforcement to the effect that: "some type of romance V + S – supposedly no sex," "S – Afraid V accuse him of trying to have sex with him," "Trk used to transport Victim while Alive." Exh. 1, Stipulation lxi.

68.     No Police Report that has been produced in this case documents any information to the effect that Tom was at home from 4:40-4:45 p.m. on Friday, November 5.  Exh. 1, Stipulation lvi.

69.     No Police Report that has been produced in this case documents any information to the effect that Tom was "enroute Law" at 2:00 p.m. on Saturday, November 6. Exh. 1, Stipulation lvii.

70.     No Police Report that has been produced in this case documents any information to the effect that sometime between 11:00 a.m. and 1:15 p.m. on Saturday, November 6, "L.F. tells Tom 2-3 shots, body in dump, tits exposed, shirt around neck." Exh. 1, Stipulation lviii.

71.     No Police Report that has been produced in this case documents any information to the effect that Tom was "At home until @ 14:00. Went to work. FB stopped [subject] along the road." Exh. 1, Stipulation lix.

72.     No Police Report that has been produced in this case documents the information in Woods' field note setting forth a November 9 timeline of Tom's activities. Exh. 1, Stipulation lv; *see also* Exh. 22, Woods Nov. 15, 1999 report re Rusty's receipt; Exh. 35, Johnson's Nov. 12, 1999 polygraph report (KBI Subpoena 904-908).

73.     Johnson prepared a police report regarding Tom's statements to him on November 12.  That report was produced at KBI Subpoena 904-906. Exh. 1, Stipulation xliv.

74.     In Agent Johnson's report regarding this interview, Johnson documented certain aspects of Tom's account of the Roadside Encounter. Exh. 35, Johnson's Nov. 12 Report of Tom's Polygraph.

75.     Yet Agent Johnson's police report regarding Tom's statements on November 12 *omits* any mention of any account by Tom of the timing of the Roadside Encounter that appears in Johnson's field notes—that Tom was "At home until @ 14:00. Went to work. FB stopped [subject] along the road." Exh. 35, Johnson's Nov. 12 Report of Tom's Polygraph (KBI Subpoena 904-906); Exh. 1, Stipulation lix.

76.    Johnson was aware of the significance of the timing of Tom's account. During a recorded interview of Floyd S. Bledsoe on November 12, Johnson stated in reference to Tom's account: "I don't think his timing is worth shit," and went on to suggest that Floyd's specificity about timing was indicative of lying. Exh. 37, Video of Nov. 12 Interrogation of Floyd Bledsoe, at 3:16:20-3:17.

**J.    Floyd is convicted after an unfair trial.**

77.    Floyd was tried before a jury in April 2000. The trial lasted four days. Exh. 1, Stipulation lxv.

78.    The jury heard evidence from witnesses including Tom and Defendant Woods. Exh. 1, Stipulation lxv; Exh. 16, Woods Trial Testimony.

79.    The primary evidence in the trial against Floyd, and that was considered on appeal, was Tom's statement against Floyd. *E.g.*, *Bledsoe v. Bruce*, 569 F.3d 1223, 1237 (10th Cir. 2009) ("The State introduced other, far more damaging evidence, principally Tom's recitation of Floyd's admissions the day after C.A.'s disappearance.... Tom's credibility was critical; and the jury chose to believe him") (quoting *Bledsoe v. State*, 283 Kan. 81 (2007)); *id. at* 1238 (agreeing with the State's argument that "Tom's credibility . . . was the single most decisive factor for the jury to consider."); *Bledsoe v. State*, 283 Kan. 81 (2007) ("[W]e note that the prosecutor also repeatedly argued that the perpetrator was either Tom or Floyd: '[T]here's only two people that really could have done it.... Now, I'm arguing to you that Floyd did it.' This was the essence of this case . . . ."); *State v. Bledsoe*, 272 Kan. 1350, 1359 (2002) ("The jury heard Tom's testimony. Floyd did not testify. The case was tried and argued to the jury primarily as a contest of Tom's credibility. The jury believed Tom. This it was entitled to do.").

80.    At trial, Tom testified about the Roadside Encounter, inculpating Floyd. Exh. 17, Tom Apr. 25, 2000 Trial Testimony, at 282:14-288:9; Exh. 1, Stipulation lxv.

81.     At trial, Tom was not questioned by either the prosecution or the defense on any of the following admissions:

- That "Tom claimed he tried to have sex with her in truck, she laughed, he shot her" and "not killed there, thru Tom's attn."

- That Tom claimed there was "some type of romance V + S – supposedly no sex," "S – Afraid V accuse him of trying to have sex with him."

- That Tom's truck was "used to transport Victim while Alive."

- That Tom initially said he was at Rusty's in Lawrence at 3:40 p.m., not 4:30 p.m., on Friday, November 5.

- That Tom initially said he was at home in Oskaloosa at around 4:40 p.m. on Friday, November 5, during the window of time Camille went missing.

- That Tom initially said that he did not leave to go "enroute" to Lawrence for work until 2:00 p.m. on Saturday, November 6.

- That Tom initially said that sometime between 11:00 a.m. and 1:15 p.m. on Saturday, November 6, "L.F. tells Tom 2-3 shots, body in dump, tits exposed, shirt around neck," after which time Tom prepared for work at 1:15 p.m.

- That Tom told Agent Johnson on November 12 that, on Saturday, November 6, he was: "At home until @ 14:00. Went to work. FB stopped [subject] along the road."

Exh. 17, Tom's Apr. 25, 2000 Trial Testimony; Exh. 38, Tom's Apr. 26, 2000 Trial Testimony.

82.     None of Plaintiff's defense counsel John Kurth's questions of Tom at either the preliminary hearing or trial reflect any awareness of any accounts of the Roadside Encounter provided on November 9, the day after Tom was arrested. Exh. 30, Tom's Preliminary Hearing

Testimony, at 76:4-6; Exh. 17, Tom's Apr. 25, 2000 Trial Testimony, at 339. At Floyd's

preliminary hearing, Kurth, questioned Tom as follows: "Q. And it was after spending a *week* in

jail that you decided to change your story? A. No." Exh. 30, Tom's Preliminary Hearing

Testimony, at 76:4-6 (emphasis added). At Floyd's trial, Kurth, questioned Tom as follows: "Q.

Your story. Made up your story. Because you sat in that jail for a *week* and you didn't like it, did

you? Didn't like sitting in jail for a week, did you? A. No, sir. Q. So you decided you're going to

tell on your brother?" Exh. 17, Tom's Apr. 25, 2000 Trial Testimony, at 339 (emphasis added).

83.     At trial, the prosecutor emphasized that Tom had never said that he had killed

Camille in his confessions on the night he turned himself in. Exh. 17, Tom's Apr. 25, 2000 Trial

Testimony, at 311:17-312:4 ("Q. You didn't say you killed Camille on the answering machine,

did you? Did you tell Jim Bolinger that you killed Camille? No, sir, I didn't. Q. You told him

that you knew where she was buried? Yes. And that you had done something terrible and you

was going to pay for it for the rest of your life. What was it you had done that was so terrible that

you was going to pay for it the rest of your life? A. I lied to Jim. Q. About what? A. About I

knew where Camille was.").

84.     At Plaintiff's trial, Woods testified that he had not received any information

inconsistent with the fact that Tom was at Rusty's at 4:30 p.m.  Exh. 1, Stipulation xxxi; Exh. 16,

Woods Trial Testimony, at 496:8-14.

85.     Woods was not impeached at trial with any evidence, in fact, Woods *had* received

information that was inconsistent that Tom being at Rusty's in Lawrence at 4:30 p.m.: the

information documented in his field note that Tom was at Rusty's at *3:40 p.m.* and was in

*Oskaloosa* at around 4:40 p.m. Exh. 16, Woods Trial Testimony; Exh. 15, Woods Dep., at

190:21-191:2; Exh. 31, Excerpt of Woods Deposition Exhibit 7 (Woods field notes), at 30-32

(KBI Subpoena 1525-1527); Exh. 15, Woods Dep., at 125:10-126:1; Exh. 1, Stipulation lii; Exh. 1, Stipulation vi.

86.     The jury convicted Floyd, who was then sentenced to life in prison. Exh. 1, Stipulation lxv.

**K.     No probable cause supports Floyd's prosecution and Defendants do not contend otherwise.**

87.     No physical evidence was found during the investigation of Camille's murder that connected Floyd with that crime. Exh. 8, Vernon Dec. 2015 Hrg. Testimony, at 11:14-18, 40:6-9; Exh. 9, Vernon Dep., at 55:29-56:11; Exh. 10, Gonzalez Dec. 2015 Hrg. Testimony, at 47:21-48:5.

88.     On the afternoon and evening of November 5, the date of Camille's disappearance, Floyd was working at the Zule Dairy in McLouth, Kansas. Exh. 1, Stipulations ix & viii.

89.     On November 9, law-enforcement officers questioned Floyd.  Exh. 1, Stipulation xxxii. Floyd told officers that, on November 5, he drove to work and arrived at around 11:00 a.m.  At approximately 4:00 p.m., Richard Zule ("Zule") gave Floyd $50 to go to Winchester Hardware Store to buy duct tape.  Floyd left in a Zule Dairy farm truck. Floyd arrived at the hardware store at approximately 4:20 p.m., purchased the duct tape, and then looked at sweatshirts. Floyd discussed embroidery on a sweatshirt with a female employee and, during this time, he saw Billie Summerville ("Summerville") walk into the store.  He and Summerville talked for about 5 minutes, then Floyd paid for a sweatshirt, left, and returned to the dairy.  Floyd explained that he was at the dairy, primarily milking cows, into the late evening hours.  Then he left to go home. Exh. 1, Stipulation xxxiii.

90.     Law enforcement recovered the receipt for Floyd's duct tape purchase from Winchester Hardware, and it was time-stamped 5:20 p.m.  Law enforcement officers tested the accuracy of the time-stamp on the Winchester Hardware store cash register and determined it was 57 minutes fast.  If so, Floyd had received the receipt for the duct tape purchase at 4:23 p.m. Exh. 1, Stipulation xxxvi.

91.     KBI Agent Morgan interviewed Zule, who said Floyd was working at Zule Dairy the afternoon and evening of November 5.  Zule said that, at approximately 4:00 p.m., he sent Floyd on an errand in a 1969 farm truck to purchase duct tape at the Winchester Hardware Store in Winchester, Kansas. Floyd returned to Zule Dairy at 4:45 p.m. with the duct tape in its packaging.  Floyd had commented to Zule that he had seen Summerville while at the hardware store and they had talked. Exh. 1, Stipulation xxxiv.

92.     Karen Edmonds ("Edmonds") confirmed to law-enforcement officers that Floyd bought duct tape at Winchester Hardware at approximately 4:20 p.m.  Edmonds confirmed that after Floyd purchased the duct tape in one transaction, he remained at the store for another 10 to 15 minutes, during which he questioned her about embroidery and purchased a sweatshirt in a second transaction.  Edmonds confirmed to law enforcement that Floyd spent 15-20 minutes or more at the hardware store in total, and he left Winchester Hardware at approximately 4:30-4:35 p.m.  Exh. 1, Stipulation xxxv.

93.     Summerville confirmed to law enforcement officers that he had spoken to Floyd at the hardware store. Exh. 19, Carreno Narrative Report, at 5.

94.     KBI Agent Morgan drove from Winchester Hardware to Floyd's home and then to Zule Dairy, stopping at Floyd's home for three minutes.  The entire trip took him 24 minutes. Exh. 1, Stipulation xxxvii. If Floyd left Winchester Hardware at approximately 4:30-4:35 p.m.,

as Edmonds told officers, and returned to Zule Dairy by 4:45 p.m, as Zule told officers, he did not have sufficient time to drive to his trailer and abduct Camille in the window of time she went missing. Exh. 22, Carreno Dep., at 237:21-238:8; Exh. 39, Frost Dep., at 155:15-156:6; Exh. 40, Morgan Dep., at 79:6-20. Floyd was driving a 1969 farm truck. Exh. 1, Stipulation xxxiv.

95.     Officers did not locate any alibi witness who could account for Tom's whereabouts between the time that Tom left Rusty's and when he went to church later that evening, sometime between 6:00 and 7:00 p.m. Exh. 8, Vernon Dec. 2015 Hrg. Testimony, at 10:2-10:19.

96.     Tom's account of the Roadside Encounter was not corroborated by any independent evidence. Exh. 10, Gonzalez Dec. 2015 Hrg. Testimony, at 45:20-47:20; Exh. 19, Carreno Narrative Report.

97.     Based on the evidence compiled by investigators, no investigator would have reasonably believed there was probable cause to believe that Floyd was guilty. Given Tom's admissions of guilt, the murder weapon being Tom's, the victim being buried behind Tom's house, Floyd's alibi (that he left the hardware store at 4:30 or 4:35 p.m., returned to work at 4:45 or 4:50 p.m., corroborated by third-party witnesses and a receipt), and the lack of corroboration for Tom's roadside encounter story, no reasonable police officer would have believed there was probable cause to believe Floyd had committed a crime. Exh. 27, Harvey Expert Report at 11 ¶22; Exh. 9, Vernon Dep., at 95:18-98:17; Exh. 8, Vernon Dec. 2015 Hearing Testimony, at 12:23-14:14.

98.     Arresting officer Kirk Vernon refused to sign Plaintiff's arrest report in his own name because of his discomfort with the lack of probable cause to arrest Plaintiff. Exh. 9, Vernon Dep., at 95:18-98:17; Exh. 8, Vernon Dec. 2015 Hearing Testimony, at 12:23-14:14.

99.     In response to contention interrogatories, the KBI Defendants and Defendant Hayes did not identify any facts or evidence that would tend to show that probable cause existed to support Floyd's arrest, prosecution, or trial for Camille's murder. In response to a contention interrogatory served at the start of discovery, Defendant Hayes answered, without objection: "I am not in a position to offer any opinion on this matter." Exh. 12, Hayes Resp. to First Interrogatories No. 13. Defendants Woods and Morgan answered, without objection: "I don't know if there was probable cause to arrest, charge, indict, or prosecute plaintiff."  Exh. 41, Woods Resp. to First Interrogatories No. 12; Exh. 42, Morgan Resp. to First Interrogatories No. 12.

100.     At the end of discovery, Defendants Morgan and Woods, along with Defendant Estate of George Johnson were ordered by the Court to respond to another contention interrogatory regarding probable cause. Exh. 43, May 18, 2023 Hrg. Transcript, at 7; Exh. 44, Order on Mtn. to Compel (Dkt. 313). Again, Woods and Morgan responded, "I don't know if there was probable cause to arrest Plaintiff." Exh. 11, Woods & Morgan Supp. Resp. to Second Interrogatories No. 1. Defendant Estate of George Johnson responded: "I have no knowledge of the statements made in this interrogatory." Ex. 13, Estate of Johnson Resp. to First Interrogatories No. 2.

101.     Plaintiff's counsel put Defendants on notice of their responsibility to supplement their contention interrogatories on probable cause not only with their personal knowledge, but also with any contentions they would present at summary judgment or trial through their counsel. Exh. 45, Email from R. Brown, May 11, 2023; Group Exh. 48, June 2023 Emails from R. Brown. No Defendant supplemented their contention interrogatory responses in response to Plaintiff's counsel's emails. Exh. 11, June 1, 2023 Woods and Morgan Resps., at No. 2; Exh. 42,

July 30, 2021 Morgan Resp., at No. 12; Exh. 41, July 30, 2021 Woods Resp., at No. 12; Exh. 13, June 5, 2023 Estate of Johnson Resp., at No. 2.

102.    Plaintiff requested a discovery conference on the topic. During the June 8, 2023 hearing, Judge Mitchell further put Defendants on notice that they would not be able to take a different position at any point in the future in the litigation if they did not supplement their responses. Exh. 46, June 8, 2023 Hrg. Trans. at 7:11-10:24 ("THE COURT: But in other words you understand that by them -- by virtue of them taking this position in response to Interrogatory No. 1 that they don't know if there was probable cause, you don't intend to come into trial and argue on their behalf otherwise, correct, Mr. Qualseth? . . . THE COURT: Okay. Well, I think that based on this interrogatory response I think, Ms. Brown, you're going to have what you need to argue that under 37(c)(1) they can't take a different position at any point in the future in this litigation. . . . I don't agree with Mr. Qualseth that they are preserving the ability to come in and argue otherwise. I think they're stuck with the answer that they have in this interrogatory response which is I don't know.").

103.    Defendant Hayes's counsel participated in the June 8, 2023 hearing. Exh. 46, June 8, 2023 Hrg. Trans. at 4:4-6.

104.    Defendants did not supplement their responses to the contention interrogatories regarding probable cause following the June 8, 2023 hearing. Exh. 11, June 1, 2023 Woods and Morgan Resps., at No. 2; Exh. 42, July 30, 2021 Morgan Resp., at No. 12; Exh. 41, July 30, 2021 Woods Resp., at No. 12; Exh. 13, June 5, 2023 Estate of Johnson Resp., at No. 2.

**L.      After years of wrongful imprisonment, Floyd secures the favorable termination of his criminal case.**

105.      In 2015, Floyd's lawyers obtained DNA evidence that identified Tom as a potential source of DNA from semen recovered from Camille's body and excluded Floyd. Floyd's lawyers filed a motion for a new trial. Exh. 1, Stipulation lxvii.

106.      Shortly after the press reported the DNA evidence and the motion for a new trial, Tom was found dead. The Wyandotte County Coroner concluded that the manner of death was suicide. Exh. 1, Stipulation lxviii.

107.      Law enforcement officers recovered Tom's phone and found evidence that Tom had reviewed media coverage about Floyd's case shortly before Tom's death. Exh. 9, Vernon Dep. at 40:13-25; 36:11-22.

108.      Along with Tom's body, Bonner Springs Police Department officers recovered the notes depicted at KBI Subpoena 1114-1122. Exh. 1, Stipulation lxix.  The notes stated in part: "I sent an innocent man to prison." "I tried telling the truth but no one would listen. I was told to keep my mouth shut. It tore me up doing it. . . . . Floyd S. Bledsoe is innocent man. Thomas E. Bledsoe is the guilty one." Exh. 3, Suicide Notes.

109.      Floyd spent nearly 16 years in custody before a court overturned his conviction and ordered his release in December 2015. Exh. 1, Stipulation lxvi.

110.      On December 8, 2015, the Jefferson County District Court overturned Floyd's conviction and ordered a new trial.  Jefferson County Attorney Jason Belveal then filed a motion to dismiss the charges against Floyd without prejudice, which the court granted. Exh. 1, Stipulation lxx.

111.      Plaintiff was granted a Certificate of Innocence with no opposition from the State of Kansas. Exh. 2, Certificate of Innocence Order.

26

**LEGAL STANDARD**

Summary judgment is appropriate where a party demonstrates there is no genuine issue of material fact and that judgment is proper as a matter of law. *Adler v. Walmart Stores*, 144 F.3d 664, 670 (10th Cir. 1998); Fed. R. Civ. P. 56(a). An issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "The movant bears the initial burden" of showing "the absence of a genuine issue of material fact and entitlement to judgment as a matter of law." *Adler*, 144 F.3d at 670-71. The nonmovant then takes up the burden of moving beyond the pleadings to "'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671 (quoting Fed. R. Civ. P. 56I).

**ARGUMENT**

I.      **There is no genuine dispute that Woods and Johnson suppressed evidence about the true perpetrator in violation of *Brady*.**

Due process requires that the state disclose material evidence that is favorable to the accused. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In doing so, the state safeguards a defendant's constitutional right to a fair trial. *Id.* at 87. To establish a *Brady* claim, a plaintiff must show "(1) that the prosecution suppressed evidence; (2) that the evidence was favorable to the accused; and (3) that the evidence was material." *Smith v. Sec'y of New Mexico Dep't of Corrs.*, 50 F.3d 801, 824 (10th Cir. 1995) (internal quotations and citation omitted); *see also Bledsoe v. Board of Cty. Comm'rs*, 501 F. Supp. 3d 1059, 1123 (D. Kan. 2020) (internal quotations and citation omitted).

Taking the elements in turn, first, evidence is suppressed when the government knows of the evidence but does not disclose it to defense counsel. *Stickler v. Greene*, 527 U.S. 263, 282

27

(1999). The prosecutor is not the only individual responsible for knowing of and disclosing

evidence; rather, the police officers' knowledge is imputed to the prosecution. *U.S. v. Buchanan*,

891 F.2d 1436, 1442 (10th Cir. 1989). Second, evidence is exculpatory if it is favorable to the

defendant and may encompass impeachment evidence. *Smith*, 50 F.3d at 825. Third, evidence is

material if there is a "reasonable probability that, had the evidence been disclosed to the defense,

the result of the proceeding would have been different." *U.S. v. Bagley*, 473 U.S. 667, 682

(1985). A reasonable probability "does not mean that the defendant would more likely than not

have received a different verdict with the evidence," but that "the likelihood of a different result

is great enough to undermine confidence in the outcome of the trial." *Smith v. Cain*, 565 U.S. 73,

75 (2012) (internal quotation marks and citation omitted). The more specific the defense's

request for certain evidence, the lesser the showing of materiality required to prove a *Brady*

violation. *Smith*, 50 F.3d at 827. And ultimately, the suppressed evidence must be examined for

its cumulative effect on the trial's outcome, not through a piecemeal approach. *Kyles v. Whitley*,

514 U.S. 419, 421, 463 (1995).

Here, there is no genuine dispute that Defendants Woods and Johnson received favorable

evidence that implicated Tom and exculpated Floyd: Tom's detailed confessions revealing his

motive for the crime and information only the true perpetrator would know, evidence impeaching

Tom's alibi, and inconsistent and impossible early accounts of Tom's purported Roadside

Encounter story that cast doubt on Tom's implication of Plaintiff. This body of evidence,

pointing directly to Tom Bledsoe as the true perpetrator, is "classic Brady material." *Williams v.*

*Ryan*, 623 F.3d 1258, 1265 (9th Cir. 2010) (internal quotation marks and citation omitted). There

is no tenable dispute that Woods and Johnson suppressed this information, and that the

withholding was material. By withholding this evidence, Defendants blatantly disregarded

*Brady*'s core proposition: "an overriding concern with the justice of the finding of guilt." *U.S. v.*
*Agurs*, 427 U.S. 97, 112 (1976). As a result, this Court should grant partial summary judgment
on Plaintiff's *Brady* claim.

### A.   Woods and Johnson received evidence implicating the true perpetrator, Tom, that was favorable to Floyd.

#### 1.   Tom's detailed confessions

To begin, the record in this case indisputably establishes that Woods received critical
details of Tom's confessions that inculpated Tom and exculpated Floyd. During the
investigation, Woods received information from Tom and/or Defendant Hayes that Tom had
tried to have sex with Camille in his truck, she had laughed, and he had shot her. PSOF ¶¶ 5, 39-
41. Woods also learned from Tom (through Hayes) that Camille had not been killed at the
location in which her body had been recovered. PSOF ¶ 41. Tom thus not only confessed that he
had shot Camille, but also revealed his motivation (that Camille had laughed at him when he
tried to have sex with her, and he was afraid that his underage victim would expose his sexual
advance). Tom also revealed a detail that only the true perpetrator would have known (that
Camille had not been killed where her body was found), which was corroborated by physical
evidence from the investigation: only a small amount of blood was observed at the bottom of the
grave site and Camille had abrasions on her back consistent with being dragged. PSOF ¶ 42.

This information was favorable as a matter of law, as it reflected Tom's detailed claiming
of responsibility for the crime. The Tenth Circuit has recognized such confession evidence as
"undeniably favorable" to the accused. *Scott v. Mullin*, 303 F.3d 1222, 1230 (10th Cir. 2002)
(internal quotation marks omitted). *See also Banks v. Reynolds*, 54 F.3d 1508, 1517-18 (10th Cir.
1995) (noting that it was "not a close case" to classify jail mate's testimony that another
individual had confessed to the crime as exculpatory evidence); *Perry v. Rushen*, 713 F.2d 1447,

29

1452 (9th Cir. 1983) (finding "third party confessions" to be "highly exculpatory" because "if believed [the confession] would *necessarily* exonerate the defendant of the primary offense"). Additionally, Tom's confession provided his motive for the crime, as he sought to prevent Camille from speaking out about his sexual advance. Where the identity of the perpetrator "is in question," evidence regarding the perpetrator's "motive is key." *House v. Bell*, 547 U.S. 518, 540 (2006).

Tom supplied another key fact in his confession: Camille had been buried in a different location than where she was killed. Such evidence is favorable because it revealed an insider's knowledge of the crime and was corroborated by physical evidence. *See Wilson v. Hamm*, No. 1:19-cv-284, 2023 WL 2655880, at *8 (M.D. Ala. Mar. 27, 2023) (finding to be exculpatory a letter in which the petitioner's accomplice confessed to crime and provided details only the perpetrator would have known); *cf. U.S. v. Brown*, 617 F.3d 857, 863-64 (6th Cir. 2010) (finding confession reliable where it was supported by independent corroborating evidence).

There can be no dispute that such evidence was favorable: Tom's detailed confessions, as received by Defendant Woods, served as powerful evidence that Plaintiff did not commit the crime.

### 2.  Tom's admissions that impeach his alibi

Woods also received exculpatory evidence that Plaintiff could have used to impeach Tom's alibi at trial. It is undisputed that Camille went missing from her Oskaloosa residence between 4:20/4:30 p.m. and 5:00/5:15 p.m. on November 5. PSOF ¶¶ 4, 43. At trial, the prosecutor presented evidence that Tom was far away in Lawrence, at Rusty's sporting goods store, at 4:30 p.m. on November 5, and thus could not have abducted Camille. PSOF ¶¶ 44-46. Vouching for Tom, Woods testified at Plaintiff's criminal trial that he had participated in the

investigation from "start to finish" and had not received any information that was inconsistent with Tom being at Rusty's at 4:30 p.m. the day Camille went missing. PSOF ¶¶ 10-11, 47.

Yet, as documented in Woods's field notes, on November 9, Woods received a timeline of Tom's whereabouts relaying that Tom was at Rusty's at 3:40 p.m. and had returned from Rusty's to his Oskaloosa home by around 4:40 p.m.—in plenty of time to intercept the victim at her home in Oskaloosa before 5:00/5:15 p.m. PSOF ¶ 48. Woods testified that he received this information from either Tom or Defendant Hayes. PSOF ¶ 58.

Tom's admission (whether direct or provided through his attorney) that he was actually in Oskaloosa at the time of her disappearance, was favorable to Floyd as a matter of law. The admission would have allowed Plaintiff to establish Tom's opportunity to abduct the victim, as well as to reveal that Tom was lying when he presented his alibi at trial. It would have refuted the suggestion that Tom's alibi meant he could only have known about the murder from Floyd.There can be no dispute that such evidence was favorable to Floyd: it cast doubt on Plaintiff's guilt and shifted culpability to Tom. *See Dennis v. Sec'y, Pennsylvania Dep't of Corrs.*, 834 F.3d 263, 306, 311 (3d Cir. 2016) (police report casting doubt on alternate suspect's alibi was exculpatory evidence); *Williams*, 623 F.3d at 1264-65, 1267 (eyewitness evidence that alternate suspect was near scene of victim's abandoned car was exculpatory).

### 3. Tom's inconsistent and impossible accounts of the Roadside Encounter

Defendants Woods and Johnson also received evidence that impeached Tom's account of the Roadside Encounter: Tom's prior inconsistent accounts of that encounter. Tom testified at trial that he encountered Plaintiff on the roadside *after* Tom left for work, sometime between 12 p.m. and 1 p.m. on November 6. PSOF ¶ 50. According to Tom, Plaintiff confessed to killing Camille during this encounter and provided extensive details about the crime, including where he

31

had buried her and that he had shot her two to three times, and then said that Floyd had threatened him. PSOF ¶¶ 30, 49, 50.

Yet during the investigation, Woods received an early November 9 account of the "Roadside Encounter" from Tom and/or Hayes. Pursuant to that account, as Woods documented in his field notes, Tom claimed that he ran into Floyd on the side of the road *before* he then prepared for work at 1:15 p.m. and left for work in Lawrence at 2:00 p.m. PSOF ¶ 56. And in the account of the Roadside Confession documented by Woods on November 9, Floyd's statements during the supposed roadside admission were limited to that he had shot Camille two to three times, and her body was in the dump with her "tits exposed, shirt around neck." PSOF ¶ 57. There was no mention that Plaintiff had threatened to expose information about Tom's past if Tom informed on him, nor was there any mention that Plaintiff had used Tom's gun to commit the murder. PSOF ¶ 57. Those details would be added to the account later. Woods received more inconsistent information that he documented in the November 9 timeline: that Tom was claiming to have met an unknown person at some time on *Sunday*, who informed him Camille was dead and told him where her body was located. PSOF ¶ 59.

Johnson received yet another inconsistent (and impossible) account from Tom of the timing of the supposed Roadside Encounter. On November 12, Defendant Johnson conducted polygraph examinations of both Tom and Plaintiff. PSOF ¶¶ 12, 31-34, 51-52. In his handwritten field notes on from his interview with Tom, Johnson recorded Tom's statement that Tom was: "At home until about 14:00. Went to work. Floyd Bledsoe stopped subject along road." PSOF ¶ 53. Yet that was a time during which Floyd could *not* have run into Tom, because as Detective Carreno confirmed, Floyd was with Carreno, looking from Camille, between 11:40 a.m. and 12:17 p.m. and again from 1:48 p.m. until 5:35 p.m. PSOF ¶ 54.

By trial, Tom had fit the Roadside Encounter neatly into the small window of time that Floyd was not with Carreno, but his prior statements received by Woods and Johnson impeached that timing. PSOF ¶ 55. His prior statements also conflicted as to whether he ran into Floyd before or after he left for work, an improbable detail to forget less than a week after the encounter. Plaintiff's defense lawyer could have used the inconsistent, and at times, impossible, accounts to impeach Tom's account of the supposed Roadside Encounter, which was the central evidence connecting Plaintiff to the murder. PSOF ¶¶ 60, 79. Evidence that impeaches the testimony of a central prosecution witness is favorable as a matter of law. *Douglas v. Workman*, 560 F.3d 1156, 1187 (10th Cir. 2009) (impeachment evidence that would have challenged the credibility of the prosecution's key witness was "clearly favorable" to criminal defendant). In addition, evidence that casts doubt on an alleged confession is exculpatory as a matter of law. *See Fontenot v. Crow*, 4 F.4th 982, 1067-68 (10th Cir. 2021) (suppressed evidence that the accused was at a party when the victim went missing and that he quickly recanted his confession was exculpatory). The evidence of the Roadside Encounter's timing was thus favorable as a matter of law to Plaintiff.

Also favorable as a matter of law was the evidence of Tom's earliest account of the dialogue during the Roadside Encounter. In the November 9 disclosure, the dialogue reported by Tom was limited to Plaintiff's supposed stating that he had shot the victim two to three times, buried her in the dump, and left her body with her breasts exposed. That account would be backfilled by the time of trial to make it more credible: Tom would add that Plaintiff had threatened to reveal information about his past if he informed on him (to explain why Tom had initially claimed to have committed the murder himself) and that Plaintiff had used Tom's gun to commit the crime (to explain why Tom had known that his gun was the murder weapon when he

turned himself in). Additionally, the second narrative—Tom meeting a stranger on *Sunday* who had told him Camille was dead and where her body was located—cast doubt on the account's veracity altogether. Evidence that impeaches a critical prosecution witness against the accused is favorable as a matter of law. *Douglas*, 560 F.3d at 1187.

**B.      Defendants Woods and Johnson suppressed this exculpatory evidence.**

Woods and Johnson withheld the exculpatory evidence regarding Tom's confessions, his alibi, and his early accounts of the Roadside Encounter—rather than disclosing it to the prosecution so that it would be turned over to Floyd's defense. This element, too, of Plaintiff's *Brady* claim is thus established as a matter of law.

There is no dispute in this case that the evidence was not turned over. There is no dispute that all of the above-identified information is absent from the Police Reports in the case. PSOF ¶¶ 22, 38, 61, 66-69, 70-72, 75. As the record bears out, Woods did not create any Police Report documenting Tom's confession that Tom had tried to have sex with Camille, she had laughed, and he had shot her. PSOF ¶ 66. The same is true of the information received by Woods that Camille was not killed in the place where she was buried and that a truck was used to transport the victim while she was alive. PSOF ¶ 67. No Police Report contains the timeline of Tom's activities, including the critical information that he was at home from Rusty's by around 4:40 p.m. on the day Camille went missing, that he ran into Floyd between 11:00 a.m. and 1:15 p.m. before leaving for work, and that Floyd told him only about shooting Camille two to three times, where he buried her, and the condition of her body. PSOF ¶ 68-72. Nor did Johnson create a Police Report documenting the timing of Tom's run-in with Plaintiff. PSOF ¶ 75. Instead,

Johnson documented Tom's account of the Roadside Encounter in a Police Report, but omitted the time it occurred. PSOF ¶¶ 73-75.[2]

There is also no dispute that Woods and Johnson kept their field notes to themselves and did not turn those over. The undisputed testimony is that the KBI Defendants maintained their field notes for their own use and did not turn them over to the prosecution. KBI Agent Woods confirmed at this deposition that he kept his field notes from the Arfmann murder investigation to himself, for his own use, during the investigation. PSOF ¶ 62. He knew it was his responsibility to type up the information that was pertinent from his field notes—both the information that was good for the prosecution and the information that was good for the defense—into typed police reports to be sent to the prosecutor. PSOF ¶¶ 38, 62. KBI Agent Morgan testified to the same practice. PSOF ¶ 62. It is further undisputed that the field notes were not in the possession of the prosecutor (the Jefferson County Attorney) or Plaintiff's criminal defense attorney. PSOF ¶¶ 63-65.

Finally, there is no dispute that the evidence was not referenced at trial in any way.  The trial record reflects no questioning or impeachment at trial of Woods, Tom, or any other witness regarding Tom's detailed confessions known to Woods, the November 9 timeline casting doubt on Tom's alibi, the early, inconsistent and impossible accounts of the timeline of the Roadside Encounter, and its initial, limited content. PSOF ¶¶ 77-78, 80-81, 83-85. Indeed, defense attorney Kurth's questioning confirms his lack of knowledge of any accounts of the Roadside Encounter provided until Tom had sat in jail for a week. PSOF ¶ 82.

---

[2] Although immaterial to the *Brady* analysis, the undisputed evidence reflects that Johnson was aware of the significance and implausibility of Tom's account of the timing of the Roadside Encounter on November 12, when Johnson withheld that information from his typed police report. PSOF ¶ 76.

35

The fact that this evidence was not referenced at trial is itself sufficient to find the evidence to have been withheld as a matter of law. *See Smith*, 50 F.3d at 829 (noting that the "most highly probative evidence" of a report's suppression was the "conspicuous absence of any cross-examination of [the alternate suspect] on the matters contained" in the report, given that they were "extremely relevant to [the defendant's] defense."). Here, in addition, there is also no dispute that the information was omitted from all Police Reports in the case, absent from the prosecution file, and absent from the defense file. It is therefore established as a matter of law that Woods and Johnson suppressed the evidence.

**C.     The suppressed evidence was material as a matter of law.**

The withheld evidence was material as a matter of law. The materiality inquiry hinges on whether the cumulative effect of the suppressed evidence would undermine a court's confidence in the verdict. The Court will analyze "the cumulative effect of all such evidence suppressed by the government," rather than considering the evidence "item by item." *Kyles*, 514 U.S. at 421, 436 (1995). *See also Bies v. Sheldon*, 775 F.3d 386, 399 (3d Cir. 2014) ("When the State fails to turn over numerous pieces of favorable evidence . . . the proper focus of *Brady*'s materiality inquiry is on the cumulative effect of the suppressed evidence on the outcome of trial"). The more specific the defense's request for certain evidence, the lesser the showing of materiality required to prove a *Brady* violation. *Smith*, 50 F.3d at 827. Here, each individual piece of suppressed evidence is material; there can be no dispute that, when the evidence is considered cumulatively, a reasonable probability existed that the trial would have had a different outcome had the evidence been disclosed. *Bagley*, 473 U.S. at 682; *see also Smith*, 565 U.S. at 75 (A reasonable probability "does not mean that the defendant would more likely than not have received a different verdict with the evidence," but that "the likelihood of a different result is

36

great enough to undermine confidence in the outcome of the trial."). Thus, summary judgment is warranted on Plaintiff's *Brady* claim against Woods and Johnson.

Beginning with Tom's detailed confessions (PSOF ¶¶ 13-29), during the trial, Prosecutor Vanderbilt conceded that Tom had turned himself in but stressed the lack of Tom's direct confessions of the manner and motive for the murder in support of the prosecution theory that Tom was merely covering for Floyd. PSOF ¶ 83. Tom's detailed confessions about the motivation and manner of the murder directly impugn this prosecution strategy. Had the prosecution or Plaintiff's defense receive the evidence of Tom's motivation (that Camille had laughed at him when he tried to have sex with her, and he was afraid that his underage victim would expose his sexual advance), as well as Tom's insider information about Camille having been killed at a location other than the one in which her body was found, Prosecutor Vanderbilt would have unable to suggest that Tom's initial confessions were vague and indirect, reflecting that Tom was merely taking the blame for his brother's crime. If Plaintiff's defense attorney received access to this evidence, he could have impeached Tom's testimony and cast serious doubt upon it. *See Scott*, 303 F.3d at 1232 (characterizing alleged confession as material because the trial would likely have proceeded differently if the defense could have used it to impeach the confessor and discredit his testimony).

What's more, Tom's disclosure that Camille had not been killed where she was buried— information that was corroborated by the physical evidence—could have been used to elicit that Tom had known insider information about the crime that only the true perpetrator would have known. *Smith*, 565 U.S. at 74-75, 76 (detective's notes revealing inconsistent statements of key prosecution witness were "plainly material"); *Kyles*, 514 U.S. at 441 (disclosure of prosecution

witnesses' inconsistent statements was material because "the value of those two witnesses would have been substantially reduced or destroyed").

*Brady* itself contemplates a similar scenario, finding that suppression of an alternate suspect's confession highly prejudiced the petitioner and violated his due process rights. 373 U.S. at 87-88. So too here, Woods's withholding of Tom's detailed confession evidence impermissibly stacked the odds in the state's favor and was material as a matter of law.

Turning to the timeline evidence, it is also likely that the trial would have concluded differently had Woods disclosed this timeline to the prosecution and defense. Impeachment evidence, particularly concerning an alternate suspect's alibi, is critical *Brady* material. In *Bowen v. Maynard*, the Tenth Circuit held that suppressed witness testimony placing an alternate suspect at the scene of the murders could have altered the trial's outcome. 799 F.2d 593, 612-613 (1986). *See also Nuckols v. Gibson*, 233 F.3d 1261, 1267 (10th Cir. 2000) (finding there was "no doubt Petitioner suffered prejudice" where "impeachment of the witness who held the key to successful prosecution was denied to the defense"). With this evidence in hand, Plaintiff's defense counsel could have exposed the falsity of Tom's supposed alibi and nullified Woods's statement that he possessed no information that would contradict it.

The same analysis applies to the Roadside Encounter evidence. Tom's account of Floyd's supposed confession to Tom during a chance roadside encounter was the primary evidence used to secure Floyd's conviction. PSOF ¶¶ 79, 86. If Floyd's defense counsel had known that Tom's timeline for the confession kept shifting, and was impossible at times, defense counsel could have used it as powerful impeachment evidence to call into question Tom's narrative and credibility. Additionally, the contents of the Roadside Encounter shifted from the bare-bones original version documented in the November 9 timeline, to the version at trial in which Plaintiff

38

supposedly also threatened to expose Floyd's past if he told on him and admitted to using Tom's gun for the murder—details that purported to explain why Tom had initially claimed to have committed the murder himself, and why Tom had known that his gun was the murder weapon when he turned himself in. A shifting narrative is not a credible one. The suppression of this evidence was material as a matter of law. *See Floyd v. Vannoy*, 894 F.3d 143, 167 (5th Cir. 2018) (evidence casting doubt on defendant's confession was material).

Each piece of evidence is material individually, but when the evidence is considered cumulatively, as is required, it becomes indisputable that the cumulative effect of withholding this evidence materially altered the course of trial. Without evidence of Tom's confession to Defendants and evidence that could have impeached his alibi, Defendants cleared Tom of suspicion and deprived Plaintiff of the evidence needed to inculpate him. Without evidence of Tom's shifting timelines and contents for the Roadside Encounter, Plaintiff was hamstrung in his efforts to discredit Tom's falsified account of his supposed confession—the critical evidence used against him at trial. In addition, the case was a close one, because no physical evidence tied Plaintiff to the crime and Plaintiff also presented credible alibi evidence that he was purchasing duct tape and returning to work at Zule Dairy during the window of time that Camille disappeared. PSOF ¶¶ 87-94. *See Bowen*, 799 F.2d at 613 (considering such factors in evaluating materiality).

The suppressed evidence here exceeds that in other cases where courts have deemed it cumulatively material under *Brady*. *See Floyd v. Vannoy*, 894 F.3d 143, 167 (5th Cir. 2018) (suppressed fingerprint and witness evidence indicating presence of a third party at crime scene was material); *Goudy v. Basinger*, 604 F.3d 394, 400-01 (7th Cir. 2010) (withheld police reports impeaching accuracy of eyewitness identifications were material). Indeed, it is difficult to

imagine evidence more material under *Brady* than the true perpetrator evidence withheld in this case.

The Tenth Circuit directly concluded in *Bowen*: "Where, as here, identity is in issue, a creditable alibi defense is presented, and no physical evidence ties the defendant to the crime, material showing that [an alternative suspect] had motive, opportunity, and ability to commit the crime is 'sufficient to undermine [our] confidence in the outcome' of the trial." *Bowen*, 799 F.2d at 613 (quoting *Bagley*, 43 U.S. at 682). The evidence suppressed in Plaintiff's case is egregious enough to push that conclusion one step further. Evidence showing that an alternative suspect confessed to the crime, had motive, possessed details only the perpetrator would know, did not have a credible alibi, and invented a false confession for the defendant is sufficient to vitiate any confidence in the trial's outcome. No reasonable jury could find that Defendants Woods and Johnson did not suppress such evidence in violation of Plaintiff's right to a fair trial.

The specificity of Plaintiff's requests for such information lends even more support to a finding of materiality as a matter of law. Plaintiff's defense counsel explicitly sought this evidence in advance of his criminal trial. Defense counsel requested "[a]ny and all statements and reports made by a State witness," which would have included the entirety of the suppressed evidence. PSOF ¶ 37. Defense counsel specifically requested, "the file created regarding State v. Tom Ble[d]soe," which also encompassed the same. PSOF ¶ 37. Defense counsel asked for "all records from the Police Department or Law Enforcement Agency," including "field notes of all officers involved in the investigation of this case," which encompassed both Woods's and Johnson's field notes. PSOF ¶ 37. Defense counsel also requested, "[a]ny and all information or evidence tending to establish the innocence of the Defendant"—a final category that squarely applies to all of the withheld evidence. PSOF ¶ 33. The court granted Plaintiff's counsel's

motion and ordered the defense to produce this evidence. PSOF ¶ 37. Under this request and the court's subsequent order, "the prosecution was on specific notice of what was sought" and the standard of materiality is therefore less stringent than if the defendant had made a general request or no request. *Smith*, 50 F.3d at 826. Even had defense counsel made only a general request for *Brady* material, or no request at all, the evidence inculpating Tom Bledsoe is "so obviously exculpatory" that it should have been disclosed under any circumstance. *Id.* at 826-27. Plaintiff is entitled to summary judgment on his *Brady* claim against Defendant Woods and Defendant Estate of George Johnson.

## II.   Plaintiff has established a deprivation of his constitutional rights that supports liability against Defendant Hayes as a co-conspirator.

Plaintiff's *Brady* evidence also establishes, as a matter of law, a predicate constitutional violation that supports his conspiracy claim against Defendant Hayes. The undisputed evidence shows that Defendants Woods and Johnson deprived Plaintiff of his constitutional right to a fair trial, in violation of *Brady v. Maryland.*  In so establishing, Plaintiff has further established the first prong of his conspiracy claim against Defendant Hayes.[3] A Section 1983 conspiracy claim requires a showing of an "actual deprivation of rights" as well as a conspiracy. *Snell v. Turnell*, 920 F.2d 637, 701 (10th Cir. 1990); *Frasier v. Evans*, 992 F.3d 1003, 1024 (10th Cir. 2021) ("A plaintiff may state a § 1983 claim for conspiracy to violate constitutional rights by showing a conspiracy existed that resulted in the actual denial of some underlying constitutional right.") (quoting *Grider v. City of Auburn*, 618 F.3d 1240, 1260 (11th Cir. 2010)). Plaintiff has amassed

---

[3] A plaintiff is entitled to seek summary judgment on elements of claims, in addition to claims in their entirety. *See* Fed. R. Civ. P. 56(a) (party must identify "each claim" or "the part of each claim . . . on which summary judgment is sought"); *Harrison v. Eddy Potash, Inc.*, 248 F.3d 1014, 1023 (10th Cir. 2001) (upholding summary judgment on three elements of plaintiff's Title VII claim).

uncontroverted evidence that Defendants Woods and Johnson suppressed exculpatory evidence in violation of his constitutional due process rights. He has thus satisfied the first prong of a Section 1983 conspiracy claim. All that remains to prove this claim is that Woods, Johnson, and Hayes agreed, either implicitly or explicitly, to violate Plaintiff's constitutional rights, and that Hayes took an affirmative act in favor of the conspiracy.

### III.   Plaintiff has satisfied two elements of his malicious prosecution claim.

The undisputed evidence further establishes two elements of Plaintiff's Fourth Amendment unlawful detention/malicious prosecution claim. To prevail on such a claim, Plaintiff must establish that: (1) the defendant's actions precipitated the plaintiff's continued confinement or prosecution; (2) there was no probable cause to justify the original arrest, continued confinement, or prosecution; and (3) the plaintiff suffered damages. *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008), *abrogated on other grounds by Shrum v. Cooke*, 60 F.4th 1304 (10th Cir. 2023).[4] Defendants do not dispute that they lacked probable cause to arrest and prosecute Plaintiff. In addition, this Court need not decide whether favorable termination is required for such a claim (an open question); to the extent required, there is no question that Plaintiff has satisfied any such requirement.

### A.   Defendants do not contest the absence of probable cause to support Plaintiff's arrest and prosecution.

Probable cause exists where an officer knows of facts or circumstances based on "reasonably trustworthy information" that are "sufficient to warrant a prudent [officer] in believing that an offense has been or is being committed" [by the suspect]. *Karr v. Smith*, 774

---

[4] Whether a plaintiff must establish malice to prevail on a Fourth Amendment malicious prosecution claim remains an open question. *Thompson v. Clark*, 142 S. Ct. 1332, 1338 n.3 (2022).

F.2d 1029, 1031 (10th Cir. 1985). The Court will ask "whether a substantial probability existed that the *suspect* committed the crime, requiring something more than a bare suspicion." *Kerns v. Bader*, 63 F.3d 1173, 1188 (10th Cir. 2011) (emphasis added). Courts apply an objective standard to evaluate probable cause; "the subjective belief of an individual officer as to whether there is probable cause is not dispositive." *U.S. v. Davis*, 137 F.3d 1048, 1051 (10th Cir. 1999) (internal quotation marks omitted).

Given Tom's inculpatory answering machine messages, his disclosure of Camille's death, his turning over of the murder weapon (his recently purchased gun), his identification of the location of the body of the victim, who was buried over a foot underground on the property where Tom lived, and Plaintiff's alibi for the time of Camille's disappearance, corroborated by witnesses and a time-stamped receipt, no objective officer would have concluded that probable cause existed to reasonably believe that Plaintiff, and not Tom, had murdered Camille. *See* PSOF ¶¶ 9, 13-29, 95-96 (Tom's confessions), ¶¶ 87-94, 97 (Plaintiff's alibi); *Baptiste v. J.C. Penney Co.*, 147 F.3d 1252, 1259 (10th Cir. 1998) ("While officers may weigh the credibility of witnesses in making a probable cause determination, they may not ignore *available* and *undisputed* facts."). Indeed, Jefferson County Sheriff Deputy Kirk Vernon testified that he took the unusual step of refusing to sign Plaintiff's arrest report because of the obvious lack of probable cause to arrest Floyd for Tom's murder. PSOF ¶¶ 35-36, 98.

Regardless, Defendants have rendered a probable cause analysis unnecessary here. They have forfeited any countervailing argument by failing to provide any contrary position in their response to Plaintiff's contention interrogatories on the subject. Contention interrogatories, which ask for a party's contentions in a case, can "be used to narrow and define the issues for trial." *Johnson v. Kraft Foods North America, Inc.*, 236 F.R.D. 535, 544 (D. Kan. 2006). A

party's failure to respond to such an interrogatory will prevent them from relying on that information at trial. *See* Fed. R. Civ. P. 37I(1) ("If a party fails to provide information . . . as required by Rule 26(a) or I, the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial"); *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 420 (7th Cir. 2005) (finding no abuse of discretion where district court prohibited evidence relating to damages theory after defendant failed to respond to plaintiff's contention interrogatory); *Woods v. DeAngelo Marine Exhaust, Inc.*, 692 F.3d 1272, 1280 (Fed. Cir. 2012) ("district courts have discretion to exclude evidence when a party acts in bad faith or prejudices its adversary by . . . wholly failing[] to respond to contention interrogatories"). Defendants are "afforded, through Rule 26(c), a fair and effective procedure whereby [they] can challenge the request made." Fed. R. Civ. P. 37 advisory committee's note to 1970 amendment. But where a party either fails to object or is compelled to respond, as is the case here, exclusion of evidence is warranted because a lack of response "impose[s] severe inconvenience or hardship on the discovering party" and impedes the discovery process. *Id.*

Plaintiff served contention interrogatories on Defendants Woods, Morgan, Estate of George Johnson, and Hayes, inquiring into their contentions regarding the existence of probable cause to support Plaintiff's arrest, prosecution, or trial. PSOF ¶ 99. Plaintiff served this interrogatory on Defendants Woods, Morgan, and Hayes at the start of discovery. PSOF ¶ 99. Defendants Woods and Morgan responded, without objection, "I don't know if there was probable cause to arrest Plaintiff. I am not aware of all the information obtained during the course of the investigation and subsequent court proceedings." PSOF ¶ 99. Defendant Hayes responded, also without objection, "I was only the court-appointed counsel for Tom Bledsoe, and

I am not in a position to offer any opinion on this matter." PSOF ¶ 99. Defendants never supplemented those responses throughout the discovery period.

At the end of discovery, Plaintiff re-served the same interrogatory on Defendants Woods and Morgan, and also served it on Defendant Estate of George Johnson. The Court ordered those Defendants to respond and overruled their objections. PSOF ¶ 100. Defendant Woods and Morgan then provided the same answer as they had provided in the first instance (that they did not know), while Defendant Johnson responded simply: "I have no knowledge of the statements made in this interrogatory." PSOF ¶ 100. Plaintiff objected that Defendants were improperly limiting the interrogatory to their personal knowledge, and refusing to provide the contentions that their attorneys would make on their behalf at summary judgment and trial. PSOF ¶ 101. These objections led to a hearing, in which the Court made clear that Defendants' failure to supplement their answers would preclude them from adopting a different position on whether there was probable cause in the future. PSOF ¶ 102. The Court noted that under Rule 37(c)(1), Defendants were "stuck" with the interrogatory response they had provided. PSOF ¶ 102. Defendant Hayes's counsel participated in that hearing as well. PSOF ¶ 103. In short, all Defendants were clearly warned that failure to substantively respond would prohibit them from challenging this element at summary judgment and trial. PSOF ¶ 102. Nonetheless, none of the Defendants supplemented their responses and provided their contentions. PSOF ¶ 104.

As a result, all Defendants are now foreclosed from supplying information to support a finding of probable cause for Plaintiff's arrest or prosecution. Fed. R. Civ. P. 37(c)(1); *see also Zenith Electronics Corp.*, 395 F.3d at 420; *Woods*, 692 F.3d at 1280. A contrary result would be unfair, given Defendants' repeated opportunities to answer or supplement their responses and their refusal to apprise Plaintiff of any contentions on probable cause, or the evidence underlying

them, such that Plaintiff would have an opportunity to counter those contentions and the evidence underlying them. A change in Defendants' position on probable cause at this juncture would "impose severe inconvenience or hardship" on Plaintiff, as discovery has closed. *See* Fed. R. Civ. P. 37 advisory committee's note to 1970 amendment. No police officer could have reasonably believed that Plaintiff violated the law, and Defendants do not contend otherwise.

### B.     Plaintiff's criminal prosecution terminated favorably.

To the extent that favorable termination is a required element of a Fourth Amendment unlawful detention claim, that element is undisputed here because Plaintiff's criminal prosecution indisputably ended without a conviction. Following the Supreme Court's decision in *Thompson v. Clark*, 142 S. Ct. 1332, 1335 (2022), a plaintiff seeking to establish favorable termination for purposes of a Section 1983 malicious prosecution claim need only show that the criminal charges against him were dismissed. *Id.*; *see also Shrum*, 60 F.4th 1304, 1311 (10th Cir. 2023) (finding that previous circuit law requiring indication of innocence in dismissal of criminal charges to prove favorable termination is no longer binding after *Thompson*). As Defendants have stipulated, after Plaintiff's attorneys filed a motion for a new trial based on newly discovered DNA evidence, the Jefferson County District Court overturned Plaintiff's conviction and ordered a new trial in December 2015. PSOF ¶¶ 105-110. The State filed a motion to dismiss Plaintiff's criminal charges, which the court granted. PSOF ¶ 110. That is sufficient to satisfy this element as a matter of law. But in case there was any other doubt, Plaintiff was also granted a Certificate of Innocence without any opposition from the State. PSOF ¶¶ 1-3, 6-8, 111. Because the criminal charges against him were dismissed and his prosecution ended without a conviction, Plaintiff's criminal prosecution terminated favorably.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant his motion for partial summary judgment.

Respectfully submitted,

**FLOYD S. BLEDSOE**

BY: /s/ Josh Loevy
    *One of Plaintiff's Attorneys*

Jon Loevy
Russell Ainsworth
Ruth Z. Brown
Theresa Kleinhaus
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
Phone: 312-243-5900
Fax: 312-243-5902

Dionne Scherff
ERICKSON SCHERFF (No. 15066)
10990 Quivira, Suite 200
Overland Park, KS 66210
Phone: (913) 948-9490
Fax: (913) 491-6398

## **CERTIFICATE OF SERVICE**

I, Josh Loevy, an attorney, certify that, on July 19, 2023, I caused the foregoing motion to be filed via the Court's electronic filing system, which effected service on all counsel of record.

/s/ Josh Loevy