# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

FLOYD S. BLEDSOE,

      Plaintiff,

v.               Case No.  16-2296-DDC-ADM

JIM WOODS, ESTATE OF GEORGE JOHNSON,
TERRY MORGAN, and MICHAEL HAYES,

      Defendants.

## PRETRIAL ORDER

On June 22, 2023, U.S. Magistrate Judge Angel D. Mitchell conducted a pretrial conference in this case by videoconference. Plaintiff Floyd S. Bledsoe appeared through counsel Russell Ainsworth. Defendants Jim Woods, Estate of George Johnson, and Terry Morgan appeared through counsel Shon Qualseth. Defendant Michael Hayes appeared through counsel Vincent Cox.[1]

This pretrial order supersedes all pleadings and controls the subsequent course of this case. It will not be modified except by consent of the parties and the court's approval, or by order of the court to prevent manifest injustice. *See* Fed. R. Civ. P. 16(d) & (e); D. Kan. Rule 16.2(a).

1.  **PRELIMINARY MATTERS.**

  a.  **Subject-Matter Jurisdiction.** Subject-matter jurisdiction is invoked under 28 U.S.C. §§ 1331 and 1367, and is not disputed.

---

[1] Former defendants Jim Vanderbilt, Randy Carreno, Troy Frost, Robert Poppa, Jeffrey Herrig, and Board of Commissioners for Jefferson County did not appear, as they have been dismissed from the case due to settlement.

**b.** **Personal Jurisdiction.** The court's personal jurisdiction over the parties is not disputed.

**c.** **Venue.** Venue in this court is not disputed.

**d.** **Governing Law.** Subject to the court's determination of the law that applies to the case, the parties believe and agree that the substantive issues in this case are governed by 42 U.S.C. § 1983 and related case law.

## 2. STIPULATIONS.

a. The following facts are stipulated:

i. In November 1999, Plaintiff Floyd S. Bledsoe ("Floyd" or "Bledsoe") was 23 years old and living in a trailer home at 15200 Fairview Rd. in Oskaloosa, Kansas, with his wife Heidi Bledsoe ("Heidi"), the couple's 1- and 2-year-old sons, Cody and Christian Bledsoe, and Heidi's 14-year-old sister, Camille Arfmann ("Camille").

ii. Camille had moved in with Floyd and Heidi because she was not getting along with her mother and was having attendance issues at her prior high school.

iii. In the fall of 1999, Camille was getting good grades at Oskaloosa High School and had a good attendance record.

iv. Camille regularly attended Countryside Baptist Church with Floyd's brother, Tom Bledsoe ("Tom").

v. Tom was partially deaf.

vi. In November 1999, Tom was 25 years old and lived with his parents, Floyd L. Bledsoe Sr. and Catherine Bledsoe, at 11477 Osage Rd. in Oskaloosa.

vii. At the time of Camille's murder, Tom drove a black Mazda truck. Floyd drove a green Chevy Nova.

viii. On November 5, 1999, Camille went missing. The information that was initially available to law enforcement was that a school bus driver named Dorothy McClung dropped off Camille at the trailer where she lived at 4:20 or 4:30 p.m. and Camille had gone missing by 5:00 or 5:15, when her friend Robin Meyer ("Meyer") stopped by and found that Camille's backpack and a half-eaten brownie were in the trailer, but Camille was not.

ix.     On the afternoon and evening of November 5, Floyd was working at the Zule Dairy in McLouth, Kansas.

x.      On November 6, Jefferson County Detective Sgt. Carreno interviewed Meyer. Meyer said she arrived at Camille's trailer between 5:00-5:15 p.m. on Friday. She walked in and yelled for Camille and saw Camille's school bag and coat on the couch in the living room. She was in the residence approximately 2 minutes, then left.

xi.     After Tom attended a church service at Countryside Baptist Church on November 7, he left an answering-machine message for one of the church elders, Jim Bollinger ("Bollinger").

xii.    Tom then called his father. At Floyd's preliminary hearing, Tom testified (both on direct examination and cross-examination) that he confessed to his father during the call that he had killed Camille.

xiii.   Tom then left another answering-machine message for Bolinger.

xiv.    On November 7, Oskaloosa attorney Jim Swoyer contacted attorney Michael Hayes ("Hayes") about representing Tom, and Hayes began representing him.

xv.     The Kansas Bureau of Investigation ("KBI") and the Jefferson County Sheriff's Office ("JCSO") investigated Camille's homicide.

xvi.    On November 7, Jim Woods ("Woods") was a Senior Special Agent with the KBI.

xvii.   Because Jefferson County was in the region Woods covered, Jefferson County Sheriff Roy Dunnaway ("Dunnaway") asked him to assist with the homicide investigation.

xviii.  KBI also assigned Agent Terry Morgan ("Morgan") to assist in the investigation.

xix.    Tom, Hayes, and law-enforcement officers remained at the Law Enforcement Center until the early morning hours of November 8.

xx.     In the early morning hours of November 8, Tom and Hayes led law-enforcement officers to a location at a garbage dump in a ditch on the property adjacent to Tom's residence where he lived with his parents.

xxi.    At approximately 2:30 a.m. on November 8, officers found Camille's body buried under at least a foot of dirt, covered by sheets of plywood.

xxii.   A Countryside Baptist Church t-shirt was found near Camille's body.

xxiii.   On November 8, Hayes turned over Tom's Jennings 9mm firearm to law enforcement.  Tom had purchased that firearm on October 23, 1999.

xxiv.   An autopsy later revealed that Camille died as a result of multiple gunshot wounds: one to the back of her head and three to her torso.

xxv.   The bullet casings recovered from the crime scene were fired from Tom's Jennings 9mm firearm.

xxvi.   Camille had abrasions on her back consistent with being dragged.

xxvii.   Only a small amount of blood was observed at the bottom of the grave site.

xxviii.   During the early hours of November 8, Hayes drove Tom back to the Jefferson County Law Enforcement Center.  Once there, Tom was arrested and booked into jail for Camille's murder.

xxix.   Tom purchased ammunition at Rusty's, a sporting goods store in Lawrence, Kansas, on November 5, 1999.

xxx.   At Floyd's criminal trial, Jefferson County Attorney Jim Vanderbilt ("Vanderbilt") presented evidence through Agent Woods that Tom was at Rusty's at 4:30 p.m. on Friday, November 5.

xxxi.   At Floyd's criminal trial, Prosecutor Vanderbilt asked KBI Agent Woods the following questions and Woods answered as follows:

> Q: You participated in the investigation the entire time, is that correct?
>
> A: Yes, sir, start to finish.
>
> Q: Is there any, have you had any occasion or any information inconsistent with the fact that Tom Bledsoe was at Rusty's at 4:30 pm?
>
> A: No, sir.

xxxii.   On November 9, law-enforcement officers questioned Floyd.  The interrogation began at 8:00 p.m.

xxxiii.   Floyd told officers that, on November 5, he drove to work and arrived at around 11:00 a.m.  At approximately 4:00 p.m., Richard Zule ("Zule") gave Floyd $50 to go to Winchester Hardware Store to buy duct tape.  Floyd left in a Zule Dairy farm truck.  When Floyd turned onto Wellman Road, he saw Camille's school bus heading south on Wellman and about to turn onto Fairview.  Floyd arrived at the hardware store at approximately 4:20 p.m., purchased the duct tape, and then looked at sweatshirts.  Floyd discussed embroidery on a sweatshirt with a female employee and, during this time, he saw Billie Summerville ("Summerville") walk into the store.  He and Summerville talked for about 5

minutes, then Floyd paid for a sweatshirt, left, and returned to the dairy. Floyd explained that he was at the dairy, primarily milking cows, into the late evening hours. Then he left to go home.

xxxiv. KBI Agent Morgan interviewed Zule, who said Floyd was working at Zule Dairy the afternoon and evening of November 5. Zule said that, at approximately 4:00 p.m., he sent Floyd on an errand in a 1969 farm truck to purchase duct tape at the Winchester Hardware Store in Winchester, Kansas. Floyd returned to Zule Dairy at 4:45 p.m. with the duct tape in its packaging. Floyd had commented to Zule that he had seen Summerville while at the hardware store and they had talked.

xxxv. Karen Edmonds ("Edmonds") confirmed to law-enforcement officers that Floyd bought duct tape at Winchester Hardware at approximately 4:20 p.m. Edmonds confirmed that after Floyd purchased the duct tape in one transaction, he remained at the store for another 10 to 15 minutes, during which he questioned her about embroidery and purchased a sweatshirt in a second transaction. Edmonds confirmed to law enforcement that Floyd spent 15-20 minutes or more at the hardware store in total, and he left Winchester Hardware at approximately 4:30-4:35 p.m.

xxxvi. Law enforcement recovered the receipt for Floyd's duct tape purchase from Winchester Hardware, and it was time-stamped 5:20 p.m. Law enforcement officers tested the accuracy of the time-stamp on the Winchester Hardware store cash register and determined it was 57 minutes fast. If so, Floyd had received the receipt for the duct tape purchase at 4:23 p.m.

xxxvii. KBI Agent Morgan drove from Winchester Hardware to Floyd's home and then to Zule Dairy, stopping at Floyd's home for three minutes. The entire trip took him 24 minutes.

xxxviii. Floyd voluntarily agreed to take a polygraph examination at the Law Enforcement Center.

xxxix. On November 12, KBI Agent George Johnson ("Johnson") participated in law-enforcement questioning of, and administered polygraph examinations to, Tom and Floyd. Johnson reported that Tom was truthful during his polygraph examination and that Floyd was deceptive during his.

xl. The KBI produced Agent Johnson's handwritten field notes within the polygraph envelopes at KBI Subpoena 1530-1587 and 1588-1624.

xli. After the polygraph examination, Floyd was interrogated and then arrested for Camille's homicide.

xlii. During the interrogation of Floyd on November 12, Tom's defense attorney Hayes came into the interview room and communicated with Floyd in the presence of KBI Agent Johnson and Johnson County Detective Sgt. Carreno.

xliii.   Law enforcement did not collect the shovel Tom said had been used to bury Camille.

xliv.   Johnson prepared a police report regarding Tom's statements to him on November 12.  That report was produced at KBI Subpoena 904-906.

xlv.   An agreed transcript of Johnson's handwritten field notes from his interview with Tom on November 12 is attached as Exhibit A.

xlvi.   Tom was released from jail on bail on November 12, and the charges against Tom were dismissed on November 15.

xlvii.   On November 15, Vanderbilt charged Floyd with the first-degree murder of Camille.

xlviii.   Vanderbilt was the prosecutor of the criminal cases against Tom and Floyd for Camille's murder.

xlix.   The first recorded and preserved interview of Tom by JCSO officers occurred on November 24, 1999.

l.   At all times during the homicide investigation, KBI Agents Woods, Johnson, and Morgan acted within the scope of their employment with KBI.

li.   KBI Agent Woods provided KBI lab analyst Mary Koch ("Koch") with information to the effect that Tom had tried to have sex with Camille in his truck; that Camille had laughed; that Tom had then shot her; and that, per Tom's defense attorney Hayes, Camille was not killed where she was buried.  Koch documented that information in a phone-call log produced at KBI Subpoena 5810.

lii.   The KBI produced Agent Woods's handwritten field notes at KBI Subpoena 1439-1529.

liii.   The KBI produced Agent Morgan's handwritten field notes at KBI Subpoena 2106-2263.

liv.   The handwritten field notes the KBI produced at KBI Subpoena 1459, 1466, 1525-1527, 2249-2250, and 1628-1631, are not in the Jefferson County Attorney's Office or JCSO's production (*i.e.*, the "JC production"), or defense attorney John Kurth's production (*i.e.*, the "Kurth production").

lv.   Other than Johnson's polygraph examination report and Woods's report regarding a receipt from Rusty's, no Police Report that has been produced in

this case[2] documents any statements or information that Tom made or provided (either directly or through Hayes) to law-enforcement officers between November 7 and 23 relating to Camille's murder.

lvi.    No Police Report that has been produced in this case documents any information to the effect that Tom was at home from 4:40-4:45 p.m. on Friday, November 5.

lvii.    No Police Report that has been produced in this case documents any information to the effect that Tom was "enroute Law" at 2:00 p.m. on Saturday, November 6.

lviii.    No Police Report that has been produced in this case documents any information to the effect that sometime between 11:00 a.m. and 1:15 p.m. on Saturday, November 6, "L.F. tells Tom 2-3 shots, body in dump, tits exposed, shirt around neck."

lix.    No Police Report that has been produced in this case documents any information to the effect that Tom was "At home until @ 14:00. Went to work. FB stopped [subject] along the road."

lx.    No Police Report that has been produced in this case documents that law enforcement received information to the effect that "Tom claimed he tried to have sex with her in truck, she laughed, he shot her" and "not killed there, thru Tom's attn."

lxi.    No Police Report that has been produced in this case documents the content and/or circumstances of any receipt of information by law enforcement to the effect that: "some type of romance V + S – supposedly no sex," "S – Afraid V accuse him of trying to have sex with him," "Trk used to transport Victim while Alive."

lxii.    No Police Report that has been produced in this case documents that law enforcement received information to the effect that: "2 people shooting tin cans, ricochet hit Camille, shot more so wouldn't suffer."

lxiii.    No Police Report that has been produced in this case documents the information law enforcement received (before they recovered Camille's body) that she "was in a field w/a bullet to the head."

lxiv.    Defense attorney Hayes represented Prosecutor Vanderbilt in Vanderbilt's divorce and property-settlement case, which was filed as case number 99 D 160 in Jefferson County.  Hayes, acting as Vanderbilt's attorney in that case, signed and/or filed documents including the petition for divorce dated October 12, 1999; the Journal Entry of Judgment of Decree of Divorce dated November 9,

---

[2]  As used herein, the term "Police Report" includes all police reports produced in this case, excluding handwritten field notes.

2000; the Separation and Property Settlement Agreement dated November 9, 2000; an Order for Continuance dated May 21, 2002; and a Journal Entry of Contempt Hearing dated August 26, 2002. Hayes also authored a letter on behalf of Vanderbilt's attorney to his ex-wife's attorney dated August 20, 2002.

lxv. Floyd was tried before a jury in April 2000. The trial lasted four days. The jury heard evidence from witnesses including Tom. The jury convicted Floyd, who was then sentenced to life in prison.

lxvi. Floyd spent nearly 16 years in custody before a court overturned his conviction and ordered his release in December 2015.

lxvii. In 2015, Floyd's lawyers obtained DNA evidence that identified Tom as a potential source of DNA from semen recovered from Camille's body and excluded Floyd. Floyd's lawyers filed a motion for a new trial.

lxviii. Shortly after the press reported the DNA evidence and the motion for a new trial, Tom was found dead. The Wyandotte County Coroner concluded that the manner of death was suicide.

lxix. Along with Tom's body, Bonner Springs Police Department officers recovered the notes depicted at KBI Subpoena 1114-1122.

lxx. On December 8, 2015, the Jefferson County District Court overturned Floyd's conviction and ordered a new trial. Jefferson County Attorney Jason Belveal ("Belveal") then filed a motion to dismiss the charges against Floyd without prejudice, which the court granted.

b. The parties have stipulated to the admissibility of the following exhibits for purposes of summary judgment and trial:

i. KBI Police Reports

1. Woods report of November 7, 1999 (KBI Subpoena 761)

2. Woods report of November 8, 1999 (KBI Subpoena 762-763)

3. Johnson report on November 12, 1999 polygraph examination of Tom Bledsoe (KBI Subpoena 904-908)

4. Morgan report re Driving Time from Winchester Hardware (KBI Subpoena 964)

5. Morgan report re Interview of Richard Zule (KBI Subpoena 892-95)

8

ii. KBI Field Notes

    1. Woods field notes (KBI Subpoena 1459, 1466, 1525-1527)

    2. Morgan field notes (KBI Subpoena 2249-2250)

    3. Johnson field notes (KBI Subpoena 1628-1631)

iii. Jefferson County Police Reports

    1. Robert Poppa report of November 7, 1999 (KBI Subpoena 2331-2336)

    2. Troy Frost report of November 29, 1999 (KBI Subpoena 2646-2649)

    3. Heather Kyle report on answering machine messages (JC_004766)

iv. Jefferson County Field Notes

    1. Field note entitled "11-7-99, 23:38" (JC 1645)

    2. Field note by Robert Poppa (JC 18478)

v. Koch telephone contact log (KBI Subpoena 5810)

c. The parties agree to meet-and-confer before trial, and to file additional stipulations of facts and evidence 21 days before trial in order to streamline the presentation of evidence.

## 3. FACTUAL CONTENTIONS.

### a. Plaintiff Floyd's Factual Contentions.

#### i. Defendants were central to Camille's murder investigation.

KBI Agent Woods led the investigation into Camille's death, and KBI Agents Johnson and Morgan were key participants. These defendants fabricated and withheld evidence in a purposeful effort to frame Bledsoe alongside co-conspirators including defendant Hayes and former defendants JCSO officers Dunnaway, Carreno, and Troy Frost ("Frost").

#### ii. Bledsoe is innocent.

Floyd's innocence was apparent back in 1999. On November 7, Tom left two answering-machine messages that amounted to murder confessions and also confessed in a phone call to his

father, and he turned himself in for Camille's murder that evening.  At Tom's father's suggestion, Tom retained an attorney and chose Hayes because Hayes handled murder cases.  Tom and Hayes disclosed Camille's murder to law enforcement and Tom led law enforcement to her dead body, buried on the property Tom lived at with his parents.  In Hayes's presence, Tom admitted his involvement in Camille's murder to officers and, before the recovery of Camille's dead body, he revealed insider knowledge of the crime, such as that Camille had been shot in the head.  Tom and Hayes turned over the murder weapon.  After a polygraph examination on November 12, Tom confessed yet again to having killed Camille.  Tom lacked a corroborated alibi for the time of Camille's disappearance.  During much of November 5-7, Tom was either alone, or his only alibi witnesses were his parents.  The lack of evidence supporting Floyd's guilt, and other evidence of Tom's guilt, also confirms Floyd's innocence.

More recent evidence further confirms that Tom killed Camille.  After years of wrongful incarceration, Floyd filed a motion for a new trial based on exculpatory DNA evidence.  Tom killed himself shortly after reading about the DNA evidence, and he admitted in his suicide notes that he raped and murdered Camille and corroborated the corruption in the investigation of her death.  KBI and JCSD have concluded their investigations; Floyd's criminal case was terminated in his favor; he received an uncontested Certificate of Innocence; and none of the defendants now contend that Floyd killed Camille or had any involvement in concealing her death.

### iii. Agents Woods, Johnson, and Morgan committed egregious constitutional violations.

KBI Agents Woods, Johnson, and Morgan conspired to frame Floyd.  But for their misconduct, Floyd would not have been arrested, prosecuted, or convicted.  In service of the conspiracy, these defendants fabricated evidence against Floyd, suppressed and concealed exculpatory and impeachment evidence, caused Floyd to be prosecuted and tried without probable

cause, and carried out additional acts.  Their misconduct was egregious and shocking—a callous abuse of their authority with foreseeably devastating consequences including Floyd's lengthy wrongful incarceration.

Woods purposefully withheld documentation of Tom's inculpatory revelation of his motive for the killing—that he tried to have sex with Camille in his truck, she laughed, and Tom then shot her—and that, per Hayes, the victim was not killed where she was buried.  That exculpatory information came to light only because a KBI lab analyst documented it in a phone-call log of a conversation with Woods.  Woods and other officers suppressed additional statements that Tom and Hayes provided.  For instance, they concealed that, by 11:38 p.m. on November 7, before recovering Camille's body, Tom had revealed an insider's knowledge of the crime, which was buried in a field note by Detective Carreno.

Johnson and Woods further suppressed critical information that supported and corroborated Tom's guilt, such as: (a) Tom's confession to Johnson after the November 12 polygraph examination; (b) information that Tom's truck was used to transport the victim while alive, that there was some type of romance between Tom and Camille, and that Tom was afraid that Camille would accuse him of trying to have sex with her; (c) Tom's early account to police that an "informer" had told Tom no more than "2-3 shots, where body, in dump, tits exposed, shirt up around neck"; and (d) information about a ricochet hitting Camille and her being shot more so she wouldn't suffer.  Much of this information was buried in handwritten KBI field notes that were kept from Floyd and the prosecution during the investigation and prosecution, and were not produced for the first time until this case.

Woods also withheld critical evidence that Tom's alibi was a lie and changed over time, including a November 9 timeline from Tom through Hayes that was buried in Woods's

handwritten field notes. Woods documented learning from Hayes that Tom was home in Oskaloosa, near the victim, around 4:40 p.m. on Friday, November 5—information that would have impeached the prosecution theory that Tom was in Lawrence, 45 minutes away from the victim, at 4:30 p.m. and thus could not have abducted her. Woods even vouched for the prosecution theory at trial. All the while, Woods kept the fatal impeachment evidence hidden in his field notes.

As the centerpiece of defendants' scheme, they fabricated, orchestrated, and staged a false recantation by Tom in which he claimed he had met Floyd on a roadside on Saturday, November 6, and learned details about the crime from Floyd (the "Roadside Encounter"). According to the police account, Tom did not first divulge the supposed Roadside Encounter to them until the November 12 polygraph. In reality, defendants and officers including Woods, Johnson, Hayes, and Carreno planned Tom's recantation before it ever occurred, constructed its false narrative, and coached Tom to recite it. After Woods, Hayes, and Sheriff Dunnaway met on Tuesday, November 9, the investigation abruptly shifted its focus from Tom to Floyd. That law-enforcement defendants concealed that this meeting occurred (and suppressed information received from Tom and Hayes between November 7-12) is corroborated by officer testimony. Also, officers have no explanation as to why, after they received overwhelming evidence of Tom's guilt on November 7 and 8, they interrogated Floyd for 8 hours on November 9 and asked him questions about the Roadside Encounter. Defendants withheld that they had received information between November 7 and 12 from Tom and Hayes.

Johnson, in concert with other defendants, fabricated results claiming that Tom passed and Floyd failed their polygraph examinations. Johnson and Hayes further weaponized the false results to interrogate, berate, and demean Floyd in an attempt to gather more false evidence.

For much of the time during which Tom initially claimed the Roadside Encounter occurred, Floyd was with Detective Carreno. So, as part of the scheme to frame Floyd, persons including Woods, Johnson, Carreno, and Hayes fabricated Tom's account of the timing of the Roadside Encounter, working to fit it into the exact timeframe when they believed Floyd would lack an alibi based on information known to law enforcement. Woods suppressed an undisclosed timeline from Hayes on November 9 that was captured in his field notes and produced for the first time in this case. The timeline reflected Tom's account that the Roadside Encounter occurred sometime after 11:00 a.m. and before he prepared for work at 1:15 p.m. Johnson suppressed Tom's next account that he was "at home until 14:00" then "went to work," *after* which Floyd purportedly stopped him on the road. Because of defendants' suppression of Tom's early, inconsistent, shifting, and impossible accounts, the trial prosecutor was able to present Tom's unimpeached testimony that the encounter happened between 12:00 and 1:00 p.m.

Johnson and Woods purposefully suppressed the details of Tom's murder confession to Johnson after the polygraph. Contrary to accepted police practices, Johnson responded by cutting Tom off. Woods and Johnson then suppressed Tom's response. Johnson ensured that the videorecording of his exchange with Tom was not preserved and then ducked Floyd's attorney's numerous efforts to obtain information about the suppressed exchange.

Woods and Morgan suppressed additional evidence. They subjected Floyd's home, car, belongings, clothing, and trash to extensive, documented searches to generate false evidence against Floyd. Yet they purposefully refused to conduct even the most basic searches that would have implicated Tom. They refused to search Tom's truck, even after documenting Tom's account that he had transported Camille in his truck on the date of her death. Even though officers obtained written consent to search Tom's home on the property where Camille was recovered, they refused

13

to search it. Woods purposefully suppressed evidence from the crime scene, such as the shovel that Tom revealed he had used to bury Camille. Woods and Morgan refused to search for the murder site, even though they knew from the forensic evidence that Camille had been killed elsewhere, and even though they received (and suppressed) information that Camille was "not killed there, thru Tom's attn." They did not test an additional 9mm firearm collected from Tom's home or investigate Tom's alibi that he went to the bank, alone, at the time Camille disappeared.

Morgan purposefully did not preserve recordings of his interviews with Tom's father, who was Tom's primary alibi witness and the recipient of one of Tom's early confessions. Morgan purposefully suppressed evidence of Tom's guilt when interviewing Tom's father. Morgan also buried in his undisclosed field notes evidence that Tom's father was unsure of Tom's whereabouts at the very time of the morning after Camille's disappearance that a black truck was seen in the field where Camille's body was found near Tom's home.

The existence of a purposeful and conspiratorial scheme to frame Floyd is further confirmed by coordinated acts of misconduct by defendants' co-conspirators. As one example, Detective Frost fabricated in an affidavit that Floyd had a window of opportunity to abduct Camille in the exact timeframe that she disappeared. As another, Frost concocted a false story that Floyd admitted to returning to his home at the exact time Camille disappeared from it. Woods and his co-conspirators further agreed that they would not report the story's falsity, even though they witnessed the videorecording during which Floyd did not make any such admission. There was no probable cause to suspect Floyd of the crime. Indeed, the Jefferson County Sheriff's Deputy who wrote out Floyd's arrest report (Deputy Vernon) took the unusual step of refusing to sign Floyd's arrest report in his own name because he was uncomfortable with the obvious lack of probable cause. Instead, he signed Dunnaway's name.

14

### iv. Defendant Hayes participated in the conspiracy as a state actor.

Tom's defense attorney Hayes participated in the conspiracy and maliciously caused Floyd's wrongful prosecution and seizure without probable cause. He acted in partnership with the State, rather than in the traditional adversarial position of a defense attorney. Prosecutor Vanderbilt and the officers deferred to him. Hayes and Vanderbilt concealed that, at the very same time Vanderbilt was dismissing charges against Hayes's client Tom, Hayes was helping Vanderbilt with his divorce. Hayes had recently served as the former Jefferson County Attorney himself. Even after Tom's suicide, JCSO officers provided Hayes with a set of supposedly confidential investigation documents as a favor.

Hayes exerted undue influence on the investigation and participated with his co-conspirators in knowingly fabricating Tom's account of the Roadside Encounter, including its timing, based on facts that his law-enforcement co-conspirators improperly fed to him. As Floyd arrived for his polygraph, Hayes confronted him in the JCSO parking lot and warned Floyd that Hayes was going to take Tom off the "hot seat" and put Floyd on it, or words to that effect. The lack of evidence suggesting Floyd's guilt, but that he was nevertheless arrested that very evening as indicated by Hayes, is further evidence of a conspiracy between the officers and Hayes.

A few examples of Hayes's partnership with the State and departure from normal police and defense attorney practice are that officers, including Woods, allowed Hayes to transport Tom to and from the burial site alone long after Tom should have been arrested and placed into police custody to prevent escape and destruction of evidence. Officers knew Hayes had the murder weapon while he was at the JCSO Law Enforcement Center on November 7, but they delegated to Hayes the responsibility of transporting and maintaining the weapon until it was finally turned over on November 8, at the burial site. Hayes coordinated collection of guns from Floyd on the

officers' behalf. Remarkably, Hayes was even allowed into the secure area of Floyd's November 12 interrogation and was permitted to directly interrogate Floyd. When Hayes did so, he demeaned and berated Floyd, and tried to manufacture false evidence against him. Hayes also allowed officers to be present with his client, Tom, without Hayes's presence or participation—conduct that reflects his certainty about the outcome of the corrupt investigation. A defense attorney's traditional duties include defending a client within the bounds of legal ethics—not conspiring with officers to build a false case and put an innocent person on the "hot seat."

     **v.**     **Plaintiff suffered damages**.

Floyd suffered devastating damages due to defendants' misconduct and his resulting arrest, prosecution, conviction, and wrongful incarceration for a murder he had nothing to do with. He was deprived of his freedom for nearly two decades, along with other horrific injuries. He will never be the same.

Before Floyd's wrongful imprisonment, he was a 23-year-old with no criminal history, two young sons, and his entire life ahead of him. Defendants' misconduct turned his entire life upside down. He was separated from his sons – a baby and a toddler – and deprived of the opportunity to father them. After missing their entire childhood, he returned home from prison to two adult sons. He was locked behind bars living a life of confinement, mental anguish, and restriction. He was detained in harsh, dangerous, violent, and isolating conditions in maximum security prisons, where he was forced to endure a constant threat of violence. Restrictions on his basic freedom included limitations on his diet, sleep, personal contact, education opportunities, vocational opportunities, athletic opportunities, personal fulfillment, reading, art, television, movies, travel, enjoyment, and expression. He was deprived of the ability to interact freely with his loved ones; to be present for holidays, births, deaths, and other life events; to pursue his passions and interests;

to engage in meaningful labor and develop a career; and to live freely. His incarceration also caused him to lose family relationships and friendships, property, income, and career opportunities. For example, he had to sell his farmland to pay for legal expenses to put towards his defense and post-conviction efforts and resolve a judgment against him based on his criminal conviction in a civil case regarding Camille's murder. He missed out on the benefit of the life experiences gained in one's twenties and thirties, and has now been forced to try to rebuild his life outside of prison without the benefit of those life experiences and resources that ordinarily equip adults for such a task.

Floyd was convicted of a horrific crime – sexually abusing and killing a young girl – and had to endure the stigma, humiliation, injustice, and hardship arising from being wrongly branded a "sex offender" and a murderer in a highly-publicized case. Prison was all the more difficult for him because he had to live with the knowledge that he was being punished for his brother's crime and that others believed in his guilt. Because Floyd was sentenced to life in prison, he feared he would die alone inside the prison walls. Weathering many denied appeals, he faced the very real prospect of spending the rest of his life incarcerated. At one point, after briefly winning habeas relief and release, he was forced to *re-enter* prison when the appellate court reversed.

All of this has caused Floyd detrimental health and psychological effects by causing him physical pain and suffering, psychological damages, severe mental anguish, constant fear, anxiety, deep depression, despair, rage, nightmares, humiliation, embarrassment, indignity, emotional distress, and other physical and psychological effects.

### b. The KBI Defendants Morgan, Woods, and the Estate of George Johnson's Factual Contentions.

Sheriff Dunnaway was in charge of the homicide investigation, and he assigned leads to various investigators to follow up on, including assigning leads to Woods and Morgan. Woods

17

and Morgan investigated the leads Sheriff Dunnaway provided.  Upon request, Johnson performed polygraph examinations of Tom and Floyd.  Johnson had a very good reputation in the Kansas law-enforcement community.  Woods, Morgan, and Johnson were only interested in finding out who committed Camille's homicide.  They did not conduct the investigation with preconceived notions about somehow directing the investigation toward one person in particular, including Floyd.

To that end, the KBI defendants and JCSO personnel continued to follow leads and investigate Tom up to 12 days before Floyd's murder trial – months after Tom had been released and Floyd was arrested.  They also investigated Summerville after Floyd named Summerville as a possible suspect.  Several Evidence Custody Receipts and search warrants between November 17, 1999, and April 12, 2000, listed Tom as a suspect.  At least five Evidence Custody Receipts listed both Floyd and Tom as suspects.  In April of 2000, DNA evidence was taken from both Floyd and Tom.  Tom was listed as the sole suspect in two KBI lab reports, the last of which was dated April 12, 2000.  Floyd's criminal trial began on April 24, 2000.

Neither Morgan, Woods, nor Johnson knew Floyd, Tom, or any of the Bledsoe family before Camille's homicide investigation.  Floyd did not know Morgan, Woods, or Johnson before the investigation.  There is no evidence that any of the KBI defendants acted with malice, evil purpose, ill-will, or any other improper motive toward Floyd or any other individual.

Likewise, neither Woods, Morgan, nor Johnson were involved in any charging decisions in the case.  Vanderbilt testified that he, and he alone, made the decision to dismiss the charges against Tom and to charge Floyd.  The preliminary hearing in Floyd's criminal case was held on November 29, 1999.  Tom and two detectives with the JCSO testified.  Floyd's counsel cross-

examined each witness.  After hearing the evidence, Judge Dennis Reiling determined that there was probable cause to believe that Floyd had committed the charged crimes.

There is no evidence that the KBI defendants were involved in any conspiracy to fabricate evidence, to suborn perjury, or commit any other malicious wrongdoing to frame Floyd.  There is no evidence that the KBI defendants knew of any law-enforcement effort to fabricate evidence, to suborn perjury, or to engage in any other malicious wrongdoing to frame Floyd.  No witnesses have knowledge that any KBI defendants fabricated evidence, suborned perjury, or engaged in any other malicious wrongdoing to frame Floyd.  Tom's alleged suicide notes do not implicate any of the KBI defendants.  There is no evidence that any KBI defendant had any motive to fabricate evidence, suborn perjury, or engage in any other malicious wrongdoing to frame Floyd.  There is no evidence that any of the KBI defendants coached or coerced Tom to give any false statements or testimony.  There is also no evidence that any of the KBI defendants willfully withheld or concealed any evidence in Camille's homicide investigation.

### c.      Defendant Hayes's Factual Contentions.

On November 7, 1999, Hayes was a private-practice, well-respected attorney with a good reputation.  His only role in this case is that he was Tom's court-appointed defense attorney.  Hayes was not a state-actor.  On November 7, Oskaloosa attorney Jim Swoyer first contacted Hayes about representing Tom.  On November 9, Tom was charged with the first-degree murder of Camille, and the Jefferson County District Court formally appointed Hayes to represent Tom on the first-degree murder charge.  As Tom's attorney, Hayes did not have a role in investigating the murder on behalf of the state.  That was law enforcement officers' job.  Hayes did not represent Floyd.  At no time during Hayes's representation of Tom did Hayes know that Tom murdered Camille.

In Hayes's capacity as Tom's attorney, he cooperated with the law-enforcement officers who were investigating Camille's murder, including members of the JCSO and the KBI.  His

19

cooperation with law-enforcement officers was not part of a conspiracy.  It was normal for a criminal defense attorney.  At all times, Hayes's actions were consistent with the traditional adversarial position of a defense attorney.  Hayes's actions in being present in the Jefferson County Law Enforcement Center, and gathering and providing evidence to law-enforcement officials, were taken at law-enforcement officers' request and/or consent.  They were not part of a conspiracy.  Hayes's actions were done in furtherance of his duty to represent Tom to the best of his ability.

Vanderbilt testified that the decision to dismiss the charge against Tom and instead charge Floyd was his decision alone and was not the result of any pressure from Hayes or any "indebtedness" to Hayes.  Vanderbilt did not make this decision because of any wrongdoing by Hayes.  Floyd's allegation that Vanderbilt was indebted to Hayes because Hayes was helping Vanderbilt avoid legal exposure for Vanderbilt's alleged misappropriate of County funds for personal use is not true.  The issue of Vanderbilt allegedly misappropriating County funds was not raised until November 2004, more than four years after the Plaintiff's trial.

At the time of the investigation into Camille's murder, and Floyd's prosecution and conviction, Vic Braden ("Braden") was an Assistant Jefferson County Attorney.  He was personally aware of the murder case and interactions between Hayes and Vanderbilt that related to the case.  According to Braden, the decision to dismiss the charges against Tom was Vanderbilt's decision alone.  Braden was not aware of any inappropriate activity between Vanderbilt and Hayes.  Braden believes that, based upon the evidence at the time, it was appropriate for Vanderbilt to have dismissed the charges against Tom.

The preliminary hearing in Floyd's underlying criminal case was held on November 29, 1999.  Tom and two JCSO detectives testified.  Floyd's counsel cross-examined each witness.

After hearing the evidence, Judge Dennis Reiling determined that there was probable cause to believe that plaintiff had committed the charged crimes. Hayes was not involved in any decisions about whether to charge Floyd or whether there was probable cause.

A jury convicted Floyd after a 4-day trial. His conviction was upheld by the Kansas Supreme Court and the 10th Circuit of the U.S. Court of Appeals.

There is no evidence that Hayes was involved in any conspiracy to fabricate evidence, to suborn perjury, or to commit any other malicious wrongdoing to frame Floyd for the subject crimes. There is no evidence that Hayes had any knowledge of any law-enforcement effort to fabricate evidence, to suborn perjury, or engage in any other malicious wrongdoing to frame Floyd. No witnesses will testify that they have knowledge Hayes fabricated evidence, suborned perjury, or engaged in any other malicious wrongdoing to frame Floyd. There is no evidence that Hayes had any sort of motive to fabricate evidence, suborn perjury, or engage in any other malicious wrongdoing to frame Floyd. There is no evidence that Hayes acted with malice, evil purpose, ill-will, or any other improper motive toward Floyd or anyone else. Tom's alleged suicide notes do not implicate Hayes. Floyd is not aware that Hayes had any problems with him, and Floyd did not have any problems with Hayes. Floyd's only personal knowledge of Hayes's conduct during the investigation is the conversation Hayes had with Floyd in the parking lot of the Jefferson County Law Enforcement Center and Hayes's participation in Floyd's interview on November 12, 1999.

There is no evidence that Hayes coached or coerced Tom to give any false statements or testimony. There is also no evidence that Hayes willfully withheld or concealed any evidence in the homicide investigation.

4.    **LEGAL CLAIMS AND DEFENSES.**

The parties stipulate that the following claims have been dismissed from the case due to settlement: all claims against the Jefferson County Defendants (Vanderbilt, Carreno, Frost, Poppa, Herrig, and Board of Commissioners for Jefferson County), including Count VII (municipal liability) and Count VIII (indemnification against the Board of Commissioners for Jefferson County). In addition, Bledsoe no longer pursues Count VI (failure to intervene) against Woods, Morgan, and Estate of George Johnson. Bledsoe also voluntarily withdraws his due process fabrication claim in Counts I and III against Morgan only.

a.    **Plaintiff's Claims.**

Plaintiff asserts the following remaining claims:

i.    <u>Count I: Due Process Violation (fabricating Tom's statements), 42 U.S.C. § 1983, against Woods, the Estate of George Johnson, and Hayes.</u>  The KBI defendants, acting individually and in concert, and under color of state law, violated Bledsoe's due process rights by fabricating Tom's testimonial evidence against him. They did so deliberately by coercing, assisting, and using suggestion to manipulate Tom into making false statements implicating Floyd, such as by fabricating the timing and contents of Tom's account of his purported Roadside Encounter with Floyd, resulting in Floyd's wrongful conviction and incarceration.

ii.    <u>Count III: Due Process Violation (fabricating other evidence), 42 U.S.C. § 1983, against Woods and Estate of George Johnson.</u>  Woods and the Estate of George Johnson violated Bledsoe's due process rights by fabricating evidence against him other than Tom's testimonial statements. Acting individually and in concert, and under color of state law, they knowingly fabricated false evidence against Floyd, including polygraph results claiming Tom passed and Floyd failed, resulting in Floyd's wrongful conviction and incarceration.

iii.    <u>Count III: Due Process/*Brady* Violation (withholding evidence), 42 U.S.C. § 1983, against Woods, Estate of George Johnson, and Morgan.</u>  The KBI defendants violated Bledsoe's due process rights by withholding exculpatory evidence. Acting in the scope of their employment and under color of state law, they concealed evidence by withholding material from the prosecution and defense that would have inculpated Tom, exculpated Floyd, and called into question the police investigation, such as (a) Tom's admissions to law enforcement (directly and through his counsel Hayes) that he committed the

crime; his shifting, inconsistent, and improbable accounts of the supposed Roadside Encounter; and his admissions that impeached his eventual alibi; (b) Johnson's statements to stop Tom from confessing after the November 12 polygraph; and (c) Tom's father's admissions that he was unsure of Tom's whereabouts at the time a truck matching the description of Tom's truck was seen in the field on the property where Tom lived and where Camille's body was found the morning after her disappearance. Had these defendants documented and disclosed this exculpatory evidence—including evidence of their misconduct—it would have tended to prove Tom's guilt and Floyd's innocence, cast doubt on the entire investigation and prosecution, and impeach critical trial testimony. These actions deprived Floyd of a fair trial.

iv.   <u>Count IV: Malicious Prosecution and Unlawful Pretrial Detention, 42 U.S.C. § 1983, against Woods, the Estate of George Johnson, Morgan, and Hayes.</u> The KBI defendants and Hayes violated Bledsoe's constitutional rights by maliciously prosecuting him and/or causing him to be detained without probable cause. They knew that probable cause did not exist to prosecute Floyd for Camille's murder, and yet they intentionally caused him to be arrested, charged, and prosecuted for that murder. Individually and in concert, they fabricated inculpatory evidence and intentionally withheld and misrepresented exculpatory facts that they knew would have vitiated probable cause against Floyd, and otherwise brought about the initiation and continuation of charges against him. The fabricated, withheld, and misrepresented evidence could have been used to impeach prosecution witnesses at trial, including Tom and law enforcement witnesses. These actions, carried out under color of law, resulted in Floyd being wrongfully detained without probable cause.

v.   <u>Counts II and V: Conspiracy to Deprive Constitutional Rights, 42 U.S.C. § 1983, against Woods, the Estate of George Johnson, Morgan, and Hayes.[3]</u> The KBI defendants and Hayes, acting under the color of state law, agreed amongst themselves and with others (including former defendants in this case dismissed due to settlement and Tom) to act in concert to deprive Floyd of his constitutional rights. This included fabricating Tom's false evidence against Floyd; fabricating polygraph results claiming Tom passed and Floyd failed; creating a false alibi that Tom was in Lawrence at the time Camille went missing; suppressing admissions by Tom (directly and through Hayes) to law enforcement; suppressing Tom's confessions after the November 12 polygraph; suppressing Johnson's misconduct in stopping Tom from confessing after the November 12 polygraph; suppressing Tom's father's admission that he was unsure of Tom's whereabouts at the time a truck matching the description of Tom's truck was seen in the brome field on the property where Tom lived and where Camille's body was found the morning after her disappearance; fabricating a supposed gap in Floyd's alibi at the time of Camille's disappearance; fabricating Floyd's supposed admission that he returned to his

---

[3] Count II addresses conspiratorial conduct in concert with prosecutor Jim Vanderbilt, and Count V addresses conspiratorial conduct unknown to prosecutor Jim Vanderbilt.

trailer at the time Camille disappeared from it; suppressing physical evidence that would have implicated Tom; suppressing the misconduct of the defendants and their co-conspirators; and other acts described in plaintiff's factual contentions above. This conspiracy caused Floyd to be deprived of his right to be free from unreasonable seizure, malicious prosecution, deprivation of liberty without due process of law, and/or the right to a fair trial—all resulting in his wrongful prosecution, conviction, and incarceration.

**b.      Defendants Woods, the Estate of George Johnson, and Morgan's Defenses.**

The KBI defendants deny Bledsoe's claims and assert the following defenses:

    i.      As to Count IV, probable cause existed to prosecute Bledsoe, precluding a malicious prosecution claim.

    ii.     As to Count IV, Bledsoe had an adequate state remedy.

**c.      Defendants Hayes's Defenses.**

Defendant Hayes denies Bledsoe's claims and asserts the following defenses:

    i.      As to Count IV, probable cause existed to prosecute Bledsoe, precluding a malicious prosecution claim.

    ii.     As to all claims, Bledsoe alleges conduct that constitutes, at most, negligence, which is insufficient for a § 1983 violation.

    iii.    As to all claims, Hayes was not a state actor under 42 U.S.C. § 1983 because: (1) he was performing the traditional functions of a court-appointed criminal-defense attorney, and (2) he did not conspire with any state actor.

    iv.     As to Count IV, Bledsoe's Fourteenth Amendment § 1983 malicious prosecution claim should be dismissed because he had an adequate state law remedy.

**5.      DAMAGES AND NON-MONETARY RELIEF REQUESTED.**

Plaintiff's claims for damages and non-monetary relief are as follows:

Bledsoe will accept whatever dollar figure the jury awards for his devastating damages, which include past and future emotional distress, and past and future pain and suffering. Any of defendants who are found liable are jointly and severally liable. Plaintiff will propose that the jury award him between $24 million and $48 million in compensatory damages.

Bledsoe is also entitled to punitive damages against Woods, Morgan, and Hayes for engaging in unconstitutional misconduct, practices, and customs with malice and/or reckless indifference to Bledsoe's constitutionally protected rights, including their fabrication of inculpatory evidence, their suppression of exculpatory evidence, their causing of Bledsoe to be prosecuted and seized without probable cause, and their conspiratorial conduct. Plaintiff will propose that the jury award him $100,000 in punitive damages against each individual defendant.

Bledsoe also seeks attorneys' fees and costs pursuant to 42 U.S.C. § 1988, as well as pre- and post-judgment interest

## 6. AMENDMENTS TO PLEADINGS.

None.

## 7. DISCOVERY.

Under the scheduling order and any amendments, all discovery was to have been completed by **May 31, 2023**. Discovery is complete, other than that Defendant Woods and Morgan will be providing supplemental discovery responses by June 30, 2023, as ordered by the Court.

Unopposed discovery may continue after the deadline to complete discovery so long as it does not delay briefing or ruling on dispositive motions or other pretrial preparations. Although discovery may be conducted beyond the deadline to complete discovery if all parties agree to do so, under these circumstances the court will not be available to resolve any disputes that arise during the course of such extended discovery.

## 8. MOTIONS.

### a. Pending Motions.

None.

### b. Additional Pretrial Motions.

After the pretrial conference, the parties intend to file the following motions:

25

     i.  Motions for summary judgment

     ii.  Motions challenging the admissibility of Plaintiff's expert's testimony

     iii.  Motions in limine

  The dispositive-motion deadline, as established in the scheduling order and any amendments, is **July 19, 2023**.  The parties should follow the summary-judgment guidelines on the court's website:

   *http://ksd.uscourts.gov/wp-content/uploads/2015/10/Summary-Judgment-Guidelines.pdf*

  Principal briefs in support of, or in response to, summary judgment  motions must not exceed 40 pages and replies must not exceed 15 pages.  *See* D. KAN. RULE 7.1(d)(2).  Any motion to exceed these page limits or for an extension of briefing deadlines must be filed at least three days before the brief's filing deadline.  *See* D. KAN. RULE 6.1(a), 7.1(d)(4).

  **c.**  **Motions Regarding Expert Testimony.**  All motions to exclude the testimony of expert witnesses pursuant to Fed. R. Evid. 702-705, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), or similar case law, must be filed no later than **July 19, 2023**.

**9.**  **TRIAL.**

  The trial docket setting, as established in the scheduling order and any amendments, is **April 2, 2024, at 9:00 a.m., in Kansas City, Kansas**.  This case will be tried by jury.  Trial is expected to take approximately 7-10 trial days.  The court will attempt to decide any timely filed dispositive motions approximately 60 days before trial.  If no dispositive motions are timely filed, or if the case remains at issue after timely dispositive motions have been decided, then the trial judge may enter an order or convene another pretrial conference to set deadlines for filing final witness and exhibit disclosures, exchanging and marking trial exhibits, designating deposition

testimony for presentation at trial, motions in limine, proposed instructions in jury trials, and proposed findings of fact and conclusions of law in bench trials.

**10.      ALTERNATIVE DISPUTE RESOLUTION (ADR).**

The parties currently believe the prospects for settlement of this case are uncertain. Plaintiff and the KBI Defendants have a private mediation scheduled for June 28, 2023.

The parties are reminded that, under D. Kan. Rule 40.3, they must immediately notify the court if they reach an agreement that resolves the litigation as to any or all parties. Jury costs may be assessed under this rule if the parties do not provide notice of settlement to the court's jury coordinator at least one full business day before the scheduled trial date.

IT IS SO ORDERED.

Dated July 6, 2023, at Kansas City, Kansas.

s/ Angel D. Mitchell
Angel D. Mitchell
U.S. Magistrate Judge