# EXHIBIT 7



STATE OF KANSAS.
JEFFERSON COUNTY
FILED

IN THE DISTRICT COURT OF JEFFERSON COUNTY, KANSAS

Aug 24  4 20 PM '00

CLERK OF DIST COURT

State of Kansas                                    Plaintiff

        Vs                                Case No. 99CR325

Floyd Scott Bledsoe                                Defendant


                        T R A N S C R I P T

                            Sentencing


        Proceedings had before the Honorable Gary L. Nafziger, District
Judge, Second Judicial District, Jefferson County, Kansas on the 14th
of July, 2000.


                            APPEARANCES

        Jim A. Vanderbilt, Jefferson County Attorney appears for the
State of Kansas.  The defendant appears in person by and through John
R. Kurth, 701 Kansas, 2nd Floor, Atchison, Kansas  66002.


                THE COURT:  We are on the record.  This is 99CR325,
State v. Bledsoe.  This is on this morning for the remainder of your
motions, Mr. Kurth, more particularly the motion for new trial and
then in the alternative for sentencing.  Defendant appears in person
by and through Mr. Kurth.  The State appears by and through Mr.
Vanderbilt, County Attorney.  Are you ready to proceed?

FORM 2094 ® PENGAD • 1-800-631-6989

                        Alice L. Henning                            1
                      Court Transcriptionist

JC_015555

1     MR. KURTH:  We are, Judge.

2     MR. VANDERBILT:   The State is prepared.

3          THE COURT:  You proceed Mr. Kurth.

4     MR. KURTH:  Judge, I'd like to present a few witnesses if

5 we may.  I'd start out with Ms. Walker.

6          THE COURT:  Step up here please ma'am.  This lady

7 will swear you in.

8

                          VERNA WALKER
9
       Called as a witness on behalf of the Defendant, having been
10
first duly sworn, testified as follows:
11

12

13                       DIRECT EXAMINATION

14 BY MR. KURTH:

15     Q.   Ms. Walker, thank you for coming this morning.  Would you

16 state your name for the record please.

17     A.   Verna Walker.

18     Q.   Ms. Walker, where do you live?

19     A.   At 307 Cherokee here in Oskaloosa.

20     Q.   And do you know my client, Floyd Bledsoe?

21     A.   Yes.

22     Q.   How do you know him?

23     A.   I was his first grade teacher.

24     Q.   And did you have contact with him and his family at the

25 time that Zetta Camille Arfman was located, her body was located?

1      A.    That Saturday morning right after lunch my niece and I

2  went out.  She wanted to see her husband that was out there helping

3  them look and the little boys were upset and I -

4      Q.    Okay.  When you say little boys, what little boys?

5      A.    Floyd and Heidi's.

6      Q.    Okay.  Their two little boys?

7      A.    Yes.  And so there wasn't a whole lot we could do to help

8  except take the little boys in and get them away from the atmosphere

9  for awhile.

10      Q.    You - you had talked to me a little earlier about this is

11  that right?

12      A.    Yes.

13      Q.    And you were concerned about the condition of the

14  environment of the boys, is that a fair statement?

15      A.    Needless to say everybody out there was upset.

16      Q.    Correct.

17      A.    And they were just babies.  I think at that time Chris

18  was only about two and the baby was eight or nine months old.

19      Q.    And what kind of comments or what were you hearing that

20  gave you some concern about the boys - what they were being around

21  and their environment?

22      A.    I didn't hear anything because I was away from everyone.

23  We went down and were talking to - I met Heidi.  I had never met her

24  before and we talked with her brother, Dale for a little bit and I

25  met a sister, but I can't remember her name, but we thought we could

1    help if we took the little boys into town and got them away from

2    there for a little bit, so we took them in for two hours.

3         Q.    Were they upset?

4         A.    Yes, there wasn't – they were – well of course the baby,

5    you can't tell with a little one but Cody was upset his daddy was out

6    talking to police.  At the time we got there there were all kinds of

7    police and they had the dogs and they had been looking for Camille.

8         Q.    I don't want to put words in your mouth but when we spoke

9    you had mentioned something about the boys hearing that Camille had

10   been taken away in two body bags.  Things like that. That she was all

11   cut up.

12        A.    That was the next day on Sunday.

13        Q.    That was Sunday?

14        A.    Yes.

15        Q.    You took –

16        A.    I took some food out to the family.  I thought they could

17   use something warm.

18        Q.    Did you take the boys again on Sunday?

19        A.    No.

20        Q.    What was it you heard on Sunday?

21   A.    I just heard that – the rumors around town were that Cody kept

22   saying that Uncle Tom went bang, bang, bang and shot Aunt Millie.

23        Q.    What did you hear about the body bags?

24        A.    That's what they said that a – Heidi's mother had said

25   that she was put in two body bags.

1        Q.    Was the young man upset?

2        A.    Floyd?

3        Q.    The boy?  The little boys.

4        A.    I didn't see the boys that day.

5        Q.    You took the boys for some time is that correct?

6        A.    On Saturday.

7        Q.    And then who did they - who did they want to be with?

8   Who calmed them down emotionally?

9        A.    They wanted their daddy all the time they were there.

10       Q.    Okay.

11       A.    And their momma.

12       Q.    Pretty consistent with what you had experienced in the

13  family?  Boys are closer to their father?

14       A.    Yes.

15       Q.    Did law enforcement ever speak with you, Ms. Walker,

16  about this?

17       A.    No.

18       Q.    That's all I have, Judge.

19             MR. VANDERBILT:  Very briefly.

20

21                    CROSS EXAMINATION

22  BY MR. VANDERBILT:

23       Q.    Ma'am, when you said that Heidi said that there was two

24  body bags could that have been Monday?

25       A.    I don't know.

JC_015559

1          MR. KURTH:   Judge, I don't think it was Heidi that said

2     that.  I believe it was Tommie that said that, the mother.

3          A.    Her mother had said that to Heidi.

4          Q.    Oh, I'm sorry.  I believe you referred to her as –

5          A.    It was hearsay on my part.  Nobody told me that

6     personally.

7          Q.    But that wasn't Sunday was it?

8          A.    No.

9          Q.    It was sometime later?

10         A.    Yeah, well, I don't -- I don't know.

11         Q.    You don't know when it was?

12         A.    No.

13         Q.    Okay.  That's fine.  Nothing further.

14         MR. KURTH:   That's all I have, Judge.

15              THE COURT:   You may step down.

16         A.    Thank you.

17              THE COURT:   Can she be excused?

18         MR. KURTH:   Please.

19              THE COURT:   You are free to go about your business

20     ma'am.  Thank you very much.

21         MR. KURTH:   Judge, I don't believe Mr. Zule is here.  Can

22     I check in the hallway real quick.

23              THE COURT:   Sure.

24         MR. KURTH:   I saw him go downstairs.

25

FORM 2094  ⊕  PENGAD · 1-800-631-6989

1                            RICHARD ZULE

2          Called as a witness on behalf of the Defendant, having been

3     first duly sworn, testified as follows:

4                            DIRECT EXAMINATION

5
      BY MR. KURTH:
6
           Q.    Mr. Zule, I know you've been here before but would you
7
      state your name for the record?
8
           A.    Richard Zule.
9
           Q.    Where do you live at, Mr. Zule?
10
           A.    McLouth.
11
           Q.    Okay.  And you run the dairy farm that Floyd Bledsoe, my
12
      client, worked at.  Is that correct?
13
           A.    Yes.
14
           Q.    Mr. Zule, you testified at the trial in this matter?
15
      Correct?
16
           A.    Pardon me.
17
           Q.    You testified at the trial in this matter?
18
           A.    Yes.
19
           Q.    There was some discrepancy which we discussed after the
20
      trial regarding the time it takes to milk the cattle?  Is that right?
21
           A.    Yes.
22
           Q.    And you had testified that it takes I believe four, four
23
      and a half hours?
24
           A.    Yes.
25
           Q.    To do the actual milking correct?

JC_015561

1       A.    Yes.

2       Q.    And that has been some issue in this case, from the time

3  of beginning to milk, getting the cattle in until the end after

4  cleanup you have informed me it takes about six or so hours is that

5  correct?

6       A.    Probably five to five and a half.

7       Q.    Okay.  So the time line that Mr. Bledsoe called you from

8  the dairy barn about the cattle, cattle were sick and things like

9  that, nothing was out of the ordinary for him to have still been

10  there milking cows, cleaning up after them?

11       A.    Yeah, I mean - about normal.

12       Q.    It was normal?

13       A.    Yes.

14       Q.    How long had he worked for you up to the point in time he

15  was arrested?

16       A.    Well he worked for me a couple years ago and then he

17  worked oh, he hadn't worked for me that long the second time.   I

18  can't really remember.

19       Q.    Okay..  And the time that he took on that day was pretty

20  much normal as every other day wasn't it?

21       A.    Yes.

22       Q.    In fact you had told me before this was probably one of

23  the quicker ones?

24       A.    Yes.

25       Q.    He got in and got with it and did his work.

JC_015562

1        A.    Done it right.

2        Q.    That's all I have, Judge.

3              MR. VANDERBILT:    Nothing.

4                    THE COURT:    You may step down, sir.    Thank you.

5              MR. KURTH:  Can he be excused also, Judge?

6                    THE COURT:    Yeah.  You're free to go about your

7    business.

8          MR. ZULE:    Okay.

9                    THE COURT:    Call your next witness.

10             MR. KURTH:    Judge, we'd like to call Floyd L. Bledsoe to

11   the stand.

12                   THE COURT:    Okay.

13

14                        FLOYD L. BLEDSOE

15        Called as a witness on behalf of the defendant, having been

16   first duly sworn, testified as follows:

17

18                        DIRECT EXAMINATION

19   BY MR. KURTH:

20        Q.    Sir, you are Floyd L. Bledsoe is that correct?

21        A.    Yip.

22        Q.    Mr. Bledsoe, after I subpoenaed your wife for this

23   hearing you called me about June 28th is that correct?

24        A.    Yip.

25        Q.    And is it fair to say you were a little upset?

FORM 2094  ©  PENGAD • 1-800-631-6989

1     A.    Yip.

2     Q.    And you –

3     A.    I was upset because she had left – before she got the

4     subpoena to go visit her brother in Florida. We didn't know that she

5     was going to be subpoenaed or she wouldn't have went.

6     Q.    Getting to the phone calls, what interested me, Mr.

7     Bledsoe, you indicated that I really shouldn't be concerned about the

8     phone conversation with her and her son.

9     A.    I don't see where that has much bearing one way or the

10    other.

11    Q.    I should have been more concerned about the shells that

12    the officers found out in the field is that right?

13    A.    Well, I was – I would have been.

14    Q.    And that was –

15    A.    When the officers spent all – all day Monday –

16    MR. VANDERBILT:   Objection.

17    MR. KURTH:   Hang on there, Mr. Bledsoe.

18    MR. VANDERBILT:   I'd ask that he respond to the question

19    and not go –

20    MR. KURTH:   Let me ask you some questions –

21    THE COURT:   Overruled. I – I think you can inquire

22    contr– you can ask your questions Mr. Kurth and if he runs afield of

23    what you are looking for you can ask him to stop.

24    Q.    Hang on a minute, Mr. Bledsoe. They found the shells

25    what about a week later after they found the body?

FORM 2094   ®   PENGAD • 1-800-631-6989

JC_015564

1      A.     Yes.

2      Q.     And you had indicated to me you had heard some shots what

3  they day before they found the shells?

4      A.     The same morning.

5      Q.     The same morning?

6      A.     Um-hum.

7      Q.     Did you tell the officers that?

8      A.     Yes.

9      Q.     Do you remember which officer you told?

10     A.     Carreno.

11     Q.     And you indicated that he didn't pay any more attention

12 to it because –

13     A.     He was – he was more concerned with getting me out of the

14 field, informed me that he had a search warrant to be there and I

15 leave, so I left.

16     Q.     So you heard shots the same morning that they found the

17 shells?

18     A.0    A couple hours before that.

19     Q.     Do you remember how many shells?

20     A.     Three.

21     Q.     And you told Detective Carreno that?

22     A.     Yes.

23     Q.     That's all I have, Judge.

24         MR. VANDERBILT:   Nothing.

25             THE COURT:   You may step down, sir.  Thank you.

JC_015565

1          MR. KURTH:   We call Katherine Bledsoe, Judge.

2

3

4                        KATHERINE BLEDSOE

          Called as a witness on behalf of the defendant, having been
5
     first duly sworn, testified as follows:
6

7

8                        DIRECT EXAMINATION

9    BY MR. KURTH:

10         Q.    Ma'am would you state your name for the record please?

11         A.    Katherine Bledsoe.

12         Q.    And Ms. Bledsoe, you are my client's mother is that

13   correct?

14         A.    Yes.

15         Q.    And you testified at the trial in this matter regarding a

16   phone conversation you and your son had?

17         A.    Yes, I did.

18         Q.    Your son and yourself had a conversation afterwards at

19   the Jefferson County Law Enforcement Center.

20         A.    Well, me and my husband were there together and Floyd.

21   And he --  I stated as I remember the phone call he said I was wrong

22   and he rember-- stated how he remembered it.

23         Q.    Which was how?

24         A.    Well, I don't remember.  I didn't want to argue with him

25   there so I said Floyd, whatever let's drop this, so we talked about

JC_015566

1   other things which was my brother dying of cancer and I've got a

2   sister now that's dying.

3        Q.   So he –

4        A.   And then –

5        Q.   Hang on. So he remembered it different than you did is

6   that right?

7        A.   Yes.

8        Q.   His recollection may be correct and your's may be a

9   little off is that right?

10       A.   I just state it as I remembered it.

11       Q.   So he – he could have been right or both of you may be a

12  little wrong?

13       A.   Well, we might be both wrong.  I don't know.

14       Q.   It happened quite a while ago right?

15       A.   Yes.

16       Q.   He never admitted that he killed Camille did he?

17       A.   No.

18       Q.   That's all I have, Judge.

19

20                         CROSS EXAMINATION

21       By Mr. Vanderbilt:

22       Q.   Just to make sure that the Judge understands your

23  position on this case, do you remember testifying?

24       A.   Yes

25       Q.   At the trial?

FORM 2094   ®   PENGAD • 1-800-631-6989

JC_015567

1          A.    Yes.

2          Q.    When you responded to the question, while Floyd was in

3     jail did he talk – did he call you, you answered yes.   Is that

4     correct?

5          A.    Yes.

6          Q.    And the followup question was at one point that he say

7     something that was unusual.  Do you remember that question?

8          A.    Yeah.

9          Q.    When you said yeah, he was, I don't remember exact date

10    or anything, I know it was in the afternoon.  He called me and he

11    said that he didn't do it and I says well I know Tom didn't do it and

12    he says yes, I know Tom didn't do it, somebody else did.  Do you

13    remember giving that response?

14         A.    Yes, I did.

15         Q.    Was that an accurate response?

16         A.    As far as I can remember.

17         Q.    There was a follow-up question that said did he say who

18    and your response was no.  Do you remember that?

19         A.    Yes.

20         Q.    Is that still and accurate response?

21         A.    Yes.

22         Q.    The follow-up question to that was did he blame it on his

23    dad.  Do you remember that?

24         A.    Yes.

25

JC_015568

1    Q.   Do you remember that your answer was yes, he did and he
2    says well maybe dad did it then?

3        A.   Yes.

4        Q.   Do you remember indicating that after he said that that a
5    you told him, Floyd that's not true?

6        A.   Yes.

7        Q.   Nothing further of this witness.

8

9                       REDIRECT EXAMINATION

10   By Mr. Kurth:

11       Q.   Ma'am, my client indicated to you that he – he said that
12   if Tom wouldn't cover for –

13           MR. VANDERBILT:   Judge, I'm going to object to hearsay
14   at this point.  He's –

15           MR. KURTH:   My client's here, Judge.

16           MR. VANDERBILT:   If he's going to sub– be subject to
17   testify then he can get up and testify and – that he is – that there
18   is no exception for a party's  extra judicial statement offered for
19   the truth of the matter asserted.

20           MR. KURTH:   Judge, that's exactly what they did in trial,
21   but I produced evidence.

22               THE COURT:   That's true.

23           MR. VANDERBILT:   The opposing party can, but he can't
24   and it's clear.

25

JC_015569

1           THE COURT:   This is a post-trial proceeding.

2    You've opened the window, I'll allow Mr. Kurth to inquire.  The

3    objection is overruled.

4           MR. VANDERBILT:   Yes, Your Honor.

5    Q. (By Mr. Kurth) Ma'am, do you recall him saying something

6    like Tom would not cover for me, the only person he would cover for

7    would be dad, something like that?

8       A.    I can't really remember to tell you the truth.

9       Q.    But that's possible about what he said?

10      A.    I don't know.

11      Q.    Okay.  And you said Tom wouldn't do that or that's wrong?

12      A.    Pardon.

13      Q.    You said Tom wouldn't do that or that's wrong, dad didn't

14   have anything to do with it?

15      A.    You're going to have to talk slower or something.  I

16   can't hear you.

17      Q.    Well, you said that Floyd had indicated that perhaps Tom

18   was covering for his father and that perhaps dad did it, is that

19   right?

20      A.    No.

21      Q.    Isn't that what Floyd said?

22      A.    I don't remember I told you.

23      Q.    That's all I have, Judge.

24

25                        RECROSS EXAMINATION

FORM 2094 ® PENGAD • 1-800-631-6989

JC_015570

1    By Mr. Vanderbilt:

2          Q.    You don't remember him saying that do you?

3          A.    Right.

4          Q.    You remember the stuff that you testified to as being

5    accurate?

6          A.    Oh, yes.

7          Q.    Nothing further.

8                MR. KURTH:   Nothing further.

9                    THE COURT:   You may step down, ma'am.

10               MR. KURTH:   Judge, that's all the testimony that I have.

11                   THE COURT:   Okay.  Do you wish to be heard?

12               MR. KURTH:   I would, Judge.  May the – if they need to

13   may the Bledsoe's be excused?

14                   THE COURT:   Yeah, they're free to go.

15               MR. KURTH:   I imagine they will probably stay.  Judge, I

16   know the Court is well aware of the standard on a motion for new

17   trial.  The statute says in the interest of justice.  Judge,

18   certainly we believe, I've presented that before that certainly the

19   elements of aggravated kidnapping and aggravated indecent liberties

20   with a child were not present.  As to the murder charge there has

21   certainly been some new evidence presented, some testimony of Floyd

22   L. Bledsoe regarding the gun shots in the morning that were not made

23   part of any reports or any record that was provided to defense

24   counsel or myself regarding Floyd L. Bledsoe hearing gun shots the

25   morning they found the shells.  Judge, because of that and because we

1   don't believe the evidence was sufficient in this case. Certainly

2   this a difficult case, Judge, and there is a dead girl who is

3   present, not present but it occurred. You know the jury has a tough

4   job, Judge, and this Court has a difficult job in such cases, but if

5   the jury doesn't do right I believe it's up to the Court to do right

6   and that's why the Legislature gives the window of opportunity to the

7   Court to allow a new trial or to set aside the verdict and I know the

8   Court's already ruled on setting aside the verdict, but because of

9   this new information and because of the lack of evidence and

10   insufficiency of the same we are asking the Court that you grant a

11   new trial in the interest of justice and to proceed again on this

12   newly discovered evidence, Judge. That's our request.

13             THE COURT: One -- one question, Mr. Kurth, that

14   evidence that you now assert as newly discovered was available at the

15   time the case was tried.

16             MR. KURTH: Well, apparently it was available to

17   Detective Carreno, but it wasn't made available to anyone else. We

18   have to know about it before we can present it, Judge.

19             THE COURT: Thank you very much, Mr. Kurth.

20             MR. VANDERBILT: Judge, the only information that --

21   even if you grant what Mr. Kurth is saying is accurate, the

22   information that Mr. Zule presented was definitely not newly

23   discovered evidence or it is easily assessable to the defendant.

24   They interviewed him. He worked there. That evidence should have

25   been presented at trial if he wanted it considered and it wasn't,

FORM 2004   ®   PENGAD • 1-800-631-6989

JC_015572

1   that's not newly discovered evidence. The - in the motion it

2   indicated that the mother has now explained or had - was claiming

3   that what she testified to at trial was inaccurate. Clearly today

4   she testified that her - that her statements at trial were accurate.

5   When I went over the questions and responses she reaffirmed her

6   responses. When the defense counsel tried to insert the defendant's

7   comments, she didn't remember those things being said when they were

8   being said. She wasn't going to argue with the defendant during the

9   conversation about what he was trying to indicate was the truth.

10  Now, inherently in an argument means that there is two different

11  people that have two different positions that she brought to you

12  today, she brought you the same testimony that she presented to the

13  jury of the courts and that is not newly discovered evidence, it is

14  not recanta, somebody recanting. The evidence that there was no

15  recantation here today so that the case law on recantation doesn't

16  apply. There is nothing that was not presented. Richard Zule was

17  here to testify. Floyd Bledsoe was on the stand to testify and I

18  have - may I have just a second? And I don't have Detective Carreno

19  here at this point to rebut what Mr. Bledsoe has presented as - as a

20  having occurred during his execution of the search warrant. I've

21  been looking for him, trying to find him but at this point I don't

22  even believe that under the circumstances the fact that he actually

23  heard three gun shots fired over there on that side of the hill where

24  Camille was buried is - is even relevant. He didn't give a time

25  frame. He didn't give anything. We know three gunshots were fired.

1    We found the bullets. We found the the body. We found the casings.

2    It's - none of it's new and none of it indicates that it's somehow in

3    someway the defendant was prejudiced by this initial information that

4    was presented to you today that was not presented at trial and I'd

5    ask that you deny his motion for new trial.

6             THE COURT: Anything else, Mr. Kurth?

7             MR. KURTH:  Just that Mr. Bledsoe did give a time frame,

8    about two hours before they went out there.

9             THE COURT:  Well --

10            MR. VANDERBILT:   Your Honor, that is— that is in

11   abstract records.  We don't have the time that they went out there.

12   Was that 6:00 o'clock in the morning or was that 11:00 o'clock in the

13   morning?

14            THE COURT:  After cons-- considering the testimony

15   presented in support of defendant's motion for a new trial, the Court

16   finds that the defendant has failed to establish by substantial

17   competent evidence that it would be in the best interest of justice

18   for his motion for a new trial to be granted.  The motion is denied.

19   Mr. Kurth your exception is noted and preserved for the purposes of

20   appeal on the record.  I intend to proceed now with sentencing.  Do

21   you need a - some time to a—

22            MR. KURTH:  We're ready, Judge.

23            THE COURT:  Are you ready to proceed?  Are you

24   ready to proceed to sentencing, Mr. Vanderbilt?

25            MR. VANDERBILT:   Yes, Your Honor.

1      THE COURT:   Both of you I take it have had the

2    opportunity to review the presentence investigation report?

3      MR. VANDERBILT:   Yes, Your Honor.

4      MR. KURTH:   Defense has, Judge.

5      THE COURT:   Are there any objections to the history

6    and/or any other matters contained therein.

7      MR. KURTH:   Judge, criminal history shows no record and

8    we have no objection with that.

9      MR. VANDERBILT:   None, sir.

10      THE COURT:   Do you wish to be heard, Mr.

11    Vanderbilt?

12      MR. VANDERBILT:   Judge, it is my recommendation to the

13    Court that you sentence the defendant to the standard sentences in

14    each of the three offenses.  For the offense of First Degree Murder,

15    Premeditated Murder, the standard sentence is a life sentence.  An

16    Aggravated Kidnapping, a Level I Person Felony, the standard sentence

17    is 155 months.  In Aggravated Indecent Liberties With a Child the

18    standard sentence is 41 months.  There are factors in this case that

19    aggravate it.  I did not file a motion for an upward departure

20    because I do not believe that the factors in the statute were

21    sufficiently demonstrated to support a motion for upward departure,

22    but I do believe that the factors and the facts surrounding this case

23    do indicate that Counts I, II and III should be run consecutive.

24    Your Honor, Zetta Camille Arfman was a 14 year old girl, age is

25    enough to support running the sentence consecutive.  The fact that

JC_015575

1    she was taken from her home and subjected to circumstances which were

2    in effect, witnessed by the colonel in this case, Colonel Knoebel.

3    She's screaming, she's begging for help.  The coroner testified that

4    her shirt and bra had to have been lifted above her breasts.  Her

5    body was left like that when she was buried in a trash dump.  After

6    she was dead, while she was laying in the trash dump he put three

7    bullets in her body for whatever reason and then he covered her with

8    trash, but the most offensive, the egregious conduct that he had

9    performed was that while she was alive, while she was able to

10   perceive what was going on, he had a gun to the back of her head, her

11   breasts exposed and he executed her with the gun touching the back of

12   her head.  That alone is egregious and enough to run the sentences

13   consecutive, but the relationship between the victim in this case,

14   Camille, and Floyd Bledsoe being he lived with her, the victim was

15   his wife's sister which they had taken in.  They had a duty to take

16   care of her.  They had a duty not to do these things.  He was

17   responsible, a responsible party for her.  He had indicated to law

18   enforcement officers that he wanted a relationship with Camille

19   Arfman like he had with his wife.  They were getting divorced and

20   murdering her under these circumstances is enough to demonstrate to

21   the Court that for public safety, for public safety a man who would

22   commit these offenses under these circumstances should not be exposed

23   to the public.  There is a - 25 years from now there is going to be

24   another Camille Arfman out there and he will be eligible for parole

25   at that point.  That girl, as well as all of the rest of the girls

JC_015576

1   out there 14 years of age which he may decide that he wanted - wants

2   to take as his wife, concubine, paramour, should be protected because

3   if they are not and they don't want to be they can end up in a trash

4   dump with a bullet in the back of their head and three in their

5   chest.   That's is why I am asking you, not because I don't believe he

6   can be rehabilitated because he can't be - I don't believe he can be

7   rehabilitated,, but because we need to protect people in the State of

8   Kansas and Jefferson County or where ever else he may go from his

9   deeds.   The additional 155 months and the additional 41 months run

10  consecutive would do that and that is the only way this Court can be

11  assured that that Mr. Floyd Scott Bledsoe, the defendant, will not

12  re-offend and it's the only way to protect the people of the State of

13  Kansas.   Thank you.

14                  THE COURT:   Mr. Kurth.

15                  MR. KURTH:   Judge, I likewise did not file a motion for

16  departure.   Under the circumstances we believe the only motion we

17  could file were the motions which we did file with the Court as ruled

18  upon.   We believe the Court is bound pretty much by statute and the

19  sentencing guidelines regarding the sentencing of this matter

20  although we strongly, strongly contest the conviction on the evidence

21  that was presented against us.   As the State has said that you have

22  believe that she was - she was shot in the back of the head and shot

23  three more times.   There was no evidence of any sexual abuse, Judge.

24  There was evidence that her shirt was up and Sergeant Poppa testified

25  that there was no evidence of any sexual abuse, so the only evidence

FORM 2084   ®   PENGAD • 1-800-631-6989

1   they had regarding the Aggravated Indecent Liberties was her shirt
2   had been brought up over her chest. At what point in time that went
3   up we don't know, after she was killed, put in the ground or while
4   being put in the ground, it's certainly possible, but to believe that
5   she was shot in the back of the head by my client with a gun he
6   didn't even know existed, that belonged to his brother is ask— is a
7   little far fetched, so Judge, because he has no record and giving the
8   evidence presented at this case and given for whatever reason because
9   I have spoken to a couple of the jurors, whatever reason they came to
10  their conclusions which is beyond me, we are asking the Court to run
11  the sentences concurrently making him eligible for parole in 25
12  years. That certainly doesn't mean he's only to get out, that just
13  means he's going to be eligible. Certainly we will proceed with
14  appeal possibilities after this sentencing. Given the circumstances,
15  given the evidence presented and given my client's no prior record
16  and the fact that his wife still, Heidi, Camille's sister, doesn't
17  believe there was time for Floyd to have done anything and doesn't
18  believe he did it. Certainly this is a position, a case where it
19  should be run concurrently and that's what we are asking the Court to
20  do.

21              THE COURT:   Thank you, Mr. Kurth.

22              MR. VANDERBILT:   Your Honor, the mother of Zetta Camille
23  Arfman, Tommie Sue Arfman, has requested the opportunity to speak to
24  the Court and address sentencing.

25              THE COURT:   Call her please.

Alice L. Henning
Court Transcriptionist

24

JC_015578

1         MR. VANDERBILT:  Tommie Sue Arfman.

2              THE COURT:  Swear her in.  Swear her in please.

3

4              THE COURT:  Be seated please.

5

6                   <u>TOMMIE SUE ARFMAN</u>

7    Called as a witness on behalf of the State, having been

8  first duly sworn, testified as follows:

9

10

11                  DIRECT EXAMINATION

12  By Mr. Vanderbilt:

13      Q.   I am going to ask you to speak up –

14      A.   Okay.

15      Q.   The microphones – don't pick up all that well.

16      A.   Okay.

17      Q.   What's your full name?

18      A.   It's Tommie Sue Arfman.

19      Q.   And where do you live?

20      A.   204 Grasshopper, Winchester, Kansas.

21      Q.   How are you – how are you related to Zetta Camille

22  Arfman?

23      A.   I'm her mother.

24      Q.   You are aware that today is the sentencing for Floyd

25  Scott Bledsoe?

JC_015579

1      A.    Yes, I am.

2      Q.    Is there something you would like to say to the Court?

3      A.    Yes.

4      Q.    What would that be?

5      A.    Camille wanted to stay over at Heidi's house so she could

6      go to Oskie school because she no liked going to J.C.N. school.   I

7      trusted Heidi and Floyd completely.   I had no idea that Floyd with

8      have any tendencies to do anything other than be like a big brother

9      to her and it wiped me out when I found out that she was missing.   We

10     had no idea where she was.   I called him on the phone and he screamed

11     at me when I said I was going to the cops to get help, to not go.   I

12     knew then that something was deadly wrong because you just had that

13     horrible feeling that he knew more than he was telling me when he

14     said he had no idea where she was.   I went to the cops as soon as I

15     got her older brother and the first cop just listened to us and

16     didn't do anything.   He didn't get anybody to help or anything.   We

17     were terrified so he suggested we look all night long which we

18     continued to do and since this has happened this has been like going

19     through hell except here on earth.   There is no waking up from this

20     nightmare because she's no longer there.   I still look for her to

21     come home at any minute and we know she's not going to.   I can't go

22     to her grave without crying because how do you justify a 14 year old

23     child laying there.   I feel like she hasn't gotten any justice.   He

24     gets all of the rights.   She gets no rights in just Jefferson County.

25     I feel like this is just like one big nightmare.   It feels like were

PENGAD • 1-800-631-6989

FORM 2004   ⊕

JC_015580

1    not getting anything done for her and I think they should give him

2    life.  She got life.  I think he should get life.  I think that's the

3    only justified way it could be since Camille cannot get out of that

4    grave and go on with her life, go on to her church and on to her

5    religion.  She wanted to be a policeman.  I think he should get the

6    same as she got.  She can't get out of that grave.  I don't think he

7    should ever walk out of that jail house alive.  I have to live the

8    rest of my life without my daughter and that's the hardest thing that

9    anybody has every had to do.

10          Q.    And ma'am you understand at this point the death penalty

11   isn't an option right?

12          A.    Yes, but I think they could put him there and keep him

13   there and not let this happen to another little girl, another human

14   being.  He made his choice when he put the gun at the back of her

15   head and when he took her from that trailer and I think we should

16   make our choice of saying, okay you did this, no more, you're not

17   walking out.  We owe that to her and every other kid that walks in

18   America.

19          Q.    Is there anything else that you'd like to say to the

20   Judge or the defendant before you leave the witness stand?

21          A.    Yes.  I'm praying that they will give him the maximum and

22   that's life without parole because I think that's the only way we can

23   justify.  This has took so long, it's been almost a year and I think

24   that's the least we can do for her and her family is to give him the

25   maximum.

JC_015581

1        Q.     Is there anything else?

2        A.     That's all.

3             THE COURT:    Thank you.    Do you have any questions,

4   Mr. Kurth.

5             MR. KURTH:   No, Judge.

6             THE COURT:    You may step down, ma'am.    Thank you

7   very much.

8             MR. VANDERBILT:    I don't believe that there is any

9   further matters that request (inaudible), Judge.

10            THE COURT:    Okay.   Mr. Kurth, do you wish to

11   address the Court any further?

12            MR. KURTH:   No, sir.

13            THE COURT:    Is there anything that you wish to say,

14   Mr. Bledsoe?   This is your opportunity.   You do not have to if don't

15   want to but you may if you wish.

16           MR. BLEDSOE:      Yeah, there is.

17           MR. KURTH:   Judge, is it okay if he stays right here?

18            THE COURT:   Sure.

19          MR. BLEDSOE:      First off, I'd like to say is I didn't do it.

20   I mean you know - while I was sitting - sit at Jefferson County Jail

21   you know, I put in the paper to find out exactly what the definition

22   of proof beyond a reasonable doubt is and it's says that the

23   prosecution has to prove beyond a real doubt, beyond a reasonable

24   doubt, okay.   Well, what is a real doubt?   A real doubt is anything

25   that is based on common sense and logic, then you know, for a jury to

JC_015582

1    convict a person, okay. Common sense tells you if you go to the

2    hardware store at 4:00 o'clock, arrive there at 4:15 p.m., the lady

3    at the hardware store, who I have not even known, you know barely at

4    all says yeah, he was there at 4:15 p.m. and stayed until 4:35 p.m.

5    Richard Zule testifies that I arrived back at the dairy at ten til

6    five.    Okay.  Common sense tells you that's 15, 15.  How could I

7    have left my house if the police got up there and testified that it

8    takes 7 ½ minutes from my house to go to the hardware store.  Okay,

9    and that's just pulling in the driveway and backing out.  Okay,

10   that's not even getting out of the car.  Well, right there you've got

11   to add 7 ½ minutes.  Where's that 7 ½ minutes?  Plus you've got to

12   add another 7 back to make up for what the time he lost, there's at

13   least 14 minutes. You know – when – when this whole thing first

14   started, you know it was 20 minutes that Randy Carreno told me I had.

15   Well when he said where's this 20 minutes and then it went down to 19

16   and then after the trial it was two hours.  Where does this two

17   hours? How could I have done this crime?  You know, Colonel Knoebel,

18   Colonel Knoebel testified that it was per – perstine or you know

19   conditions were right.  He could hear all over him, okay.  My car has

20   no exhaust.  My will testify she can hear me coming.  My wife tes—

21   will – can testify that she could hear my car coming from a mile

22   away. Richard would testify he could hear my— his truck coming from a

23   mile away.  Richard testified I went to the east place. Where Knoebel

24   was was four miles west of where the dairy is, okay.  There is a

25   problem.  If I go east and he's west how can I – how could he have

JC_015583

1  heard me? He didn't even hear a four wheeler. If things are

2  crestine (sic) and he heard these screams why didn't he hear a four

3  wheeler or a truck or a car, okay. They searched my property,

4  nothing turned up. They searched Zule's truck, nothing turn up.

5  They searched my car, nothing turned up. Randy Carreno told me on

6  Monday, he hold me told me he could - the day she was found he could

7  give me a test on my hands to tell him, even if I wore gloves, that I

8  - if I would have shot a gun. I said here they are let's do it, let's

9  get it over with and I'll prove to you I didn't do it. He said no,

10  because I know what the test would be. I said yeah, I didn't do it.

11  Tom Bledsoe, my brother, why - why he's done this I don't know or

12  what he's done I don't know. I wasn't there. All I was doing was

13  what I thought was right. I went to work to support my family and I

14  milked my cows. I came home, I helped to find a little girl. I

15  stopped traffic or 4 ½ hours on the highway. Randy Carreno testifies

16  to that, but yet everybody still says I did it. The person who had

17  two hours of unaccountable time wasn't Floyd Bledsoe, it was Tom

18  Bledsoe. He bought the bullets at 3:50 p.m. I sat down, I figured

19  up time in, time out, that receipt. That receipt says 4:30 in the

20  morning. What - what Rusty's Outdoor Sports store is open at 4:30 in

21  the morning? The cops never once paid attention to that until our

22  trial. And when we - we brought it to our - to - we gave them the

23  receipt they said it says 4:30 and if I'm correct, my - my attorney

24  says 4:30 a.m. or p.m., and they said p.m. and gave them another

25  receipt which was military time and it said the actual p.m. time and

1     so that proved that their clocks were military time, okay. So, that
2     clock was - we figured it up to be 11 hours and 21 minutes off, okay.
3     The problem is, okay, we had four different people went there, okay.
4     One was there six days after she was found and a few days after he
5     proved the ticket, okay. The gentleman got up there from Rusty's and
6     says well, daylight savings time was just right around that time. It
7     was that week before. It wasn't between the two times of the cash
8     register receipts, you know, so there's another problem. Well if
9     that tape is 11 hours 21 minutes that makes it 3:50, no 3:49, okay,
10    that's more than plenty of time to get back to Oskaloosa. That's
11    more than plenty of time to kidnap her and kill her, but the problem
12    is they won't listen to the facts. The facts show I didn't do it.
13    The gentlemen over there that's writing on his desk, he continues to
14    say I have two hours of unaccountable time. I want him to show where
15    my two hours of unaccountable time is. If he can show me where my
16    two hours is then I'll just sit down and shut up and take this time,
17    but he can't because I didn't do it. You know, and then the Friday
18    night of which I was actually arrested, I show up at 1:00 o'clock for
19    questioning, Randy Carreno asked me to stick around for a few more
20    minutes and then it was a few more minutes and a few more minutes you
21    know and then they finally get around to it at 5:00 o'clock. I tell
22    them I have to leave because I have to deal with my wife, my cousin,
23    you know, I had obligations to meet because we were supposed to do
24    the visitation up there at Gus Barnett's. Okay, well he says well
25    I'll get you out of here in plenty of time. Six o'clock rolls around

JC_015585

1   I told him I have to leave, he says no you can't leave, but nobody'll
2   - nobody'll prove that, nobody admits to anything in this county.
3   The sheriff's officer, if there were a road nobody would be able to
4   drive down it cause they were so crooked.  There's only a few good
5   cops left in this county and then I don't - you know, it's 9:00 or
6   10:00 o'clock that night, whenever my wife finally shows up at the
7   police station to see what happens to, I go out into the waiting room
8   to use the restroom and they tell me no, you can't go.  They take me
9   into the jail to take a leak in the - in the locked cell.  They
10  wouldn't let me go out to even talk to my wife to let her know what
11  was going on.  They wouldn't tell her until Sunday when I called my
12  uncle to call her to let her know what's going on.  They never once
13  told her.  You know, Mr. Vanderbilt says in the interest of justice.
14  Justice says that if a client is innocent and he's not been proven
15  beyond even a reasonable doubt.  There was no doubt, it was all doubt
16  that I committed this crime.  You know there was nothing there.
17  Officers, the few good officers left in this county come up and said
18  there is no way you could have done it.  The facts show I set through
19  and listened to it, the facts show you didn't do it.  I said I know,
20  so tell me how you know they came to this conclusion.  One other time
21  Randy Carreno said I did a crime, my wife told him no, he was with me
22  the entire night.  It was over a four wheeler theft.  I had no car,
23  no way out, but yet Randy Carreno still insisted I did it when I -
24  when I had no car so how could I have done it.  Time in and time out
25  Randy Carreno has tried to pin me for crimes I didn't commit and

JC_015586

1    finally he got one by a fluke of an accident.  When - sure nobody

2    could say exactly what time I was where cause you are talking about

3    seven months down the road.  If they could the gentleman over there

4    would have said, well they're lying, you're not actually sure it

5    could have been a few minutes before.  I guarantee you he couldn't

6    have said where he was on what time and what date exactly.  That's

7    all I got.

8             THE COURT:  Thank you very much.    Is there any

9    reason now why sentence should not now be prenounced?

10             MR. KURTH:  Defendant knows --

11             MR.VANDERBILT:    State knows -

12             MR. KURTH:  Defense knows of no reasons.

13             MR. VANDERBILT:    The State knows of no reasons.

14             THE COURT:  Upon the finding and determination

15    based upon a verdict by the jury after they heard the entire trial

16    and evidence in this case that the defendant is guilty of the offense

17    of First Degree Murder, Aggravated Kidnapping and Aggravated Indecent

18    Liberties with a child.  Pursuant to the sentencing guidelines of the

19    State of Kansas which control sentencing in this matter the Court

20    finds that the defendant on the 1st count of First Degree Murder

21    should be sentenced to the custody of the Secretary of Corrections

22    for life.  Count II, Aggravated Kidnapping, the Court finds he should

23    be sentenced to the custody of the Secretary of Corrections for the

24    standard sentence which is 155 months and on the 3rd count,

25    Aggravated Indecent Liberties With a Child, the Court finds he should

JC_015587

1    sentenced to the custody of the Secretary of Corrections for the

2    standard sentence of 41 months.  Based upon the young age of the

3    victim, based upon the aggravated factors in the Counts II and III

4    the Court finds pursuant to K.S.A. 21-4720 that Counts II and III

5    should run consecutive and not concurrent with controlling sentence,

6    which is the first degree murder sentence.  I need to advise you, Mr.

7    Bledsoe, you have a right - you have an absolute right to appeal from

8    the determination of the jury in this case and from the sentence

9    which this Court has pronounced. Mr. Kurth will discuss this with

10   you.  Sentence is deemed to commence the date that he was taken into

11   custody Mr. Kurth.  He is to be given credit for time served to this

12   point and he is remanded to the custody of the sheriff for transport

13   to commence serving sentence.  Thank you very much.

14                  MR. VANDERBILT:    Judge.

15                       THE COURT:   Yes.

16                  MR. VANDERBILT:    There are several things we need to

17   address, maximum good time credit of 15% and court costs.

18                       THE COURT:  Those are included in the sentence.

19                  MR. KURTH:  And I think there was a restitution issue

20   also, Judge in the presentence report.

21                       THE COURT:  Well, I'm going to take that up at a

22   later time.  I think we can resolve that based on the presentence

23   report, Mr. Kurth.  Restitution is ordered, the amount to be

24   determined.  Is there anything else we need to cover at this time

25   gentlemen?

JC_015588

1        MR. KURTH:  No, sir.

2            THE COURT:  Thank you very much.  We are in recess.

3

4

5

6    **********END OF PROCEEDINGS

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Alice L. Henning                          35
Court Transcriptionist

JC_015589

1

2                       C E R T I F I C A T E

3          I, Alice L. Henning, transcriptionist for the Jefferson County

4     District Court in the 2nd Judicial District of the State of Kansas,

5     do hereby certify that the within and foregoing is a correct and

6     partial transcription of the hearing heard before the Honorable Gary

7     Nafziger, District Judge of the Second Judicial District at

8     Oskaloosa, Kansas, on the 14th of July, 2000 in Case No.99CR325,

9     State of Kansas vs. Floyd Scott Bledsoe.

10          Dated: August 24, 2000.

11

12

13

14

15                                  Alice L. Henning

16

17

18

19

20

21

22

23

24

25

Alice L. Henning
Court Transcriptionist

36

JC_015590