# EXHIBIT 8

1

1   IN THE DISTRICT COURT OF JEFFERSON COUNTY,
2   KANSAS

3   STATE OF KANSAS,                    ORIGINAL

4   -------------------Plaintiff,  )
                                   ) Case No.
5            vs.                   ) 99-CR-325
                                   )
6   FLOYD S. BLEDSOE,              )
                                   )
7   -------------------Defendant.  )

8

9                TRANSCRIPT OF MOTION TO VACATE JUDGMENT

10          MOTION TO VACATE JUDGMENT had before the

11   Honorable Gary Nafziger, Chief Judge of the

12   District Court of JEFFERSON County, Kansas, on

13   the 8th of December, 2015.

14

15                        APPEARANCES

16          The Plaintiff appeared by JASON BELVEAL,

17   JEFFERSON COUNTY ATTORNEY, 300 Jefferson

18   Street, Suite 200, PO Box 351, Oskaloosa,

19   Kansas 66066.

20          The Defendant appeared in person and by

21   JEAN K. G. PHILLIPS, ALICE CRAIG, and ELIZABETH

22   SEALE CATEFORIS, PROJECT FOR INNOCENCE,

23   UNIVERSITY OF KANSAS SCHOOL OF LAW, 409C Green

24   Hall, Lawrence, Kansas 66045.

25

2

```
1                    I N D E X

2                 W I T N E S S E S

3   DEFENDANT'S WITNESSES

4   WITNESS              DIRECT CROSS REDIRECT RECROSS
    Detective Kirk
5   Vernon............... 6
    Ramon Gonzalez....... 40
6

7                 E X H I B I T S

8   DEFENDANT'S EXHIBITS     MARKED OFFERED RECEIVED
    1  Stipulation..........    *       5        6
9   2  Arrest Report........    *      13       13
    3  Envelope and Letter..    *      26       26
10  4  Envelope and Letter..    *      27       27
    5  Letter...............    *      28       29
11
    (* The exhibit was marked prior to the
12  proceeding.)

13

14

15

16

17

18

19

20

21

22

23

24

25
```

HAYES 0055

Exhibit 242 at 002

1         THE COURT:  That neither party is

2    challenging?  I'm sorry.

3         MS. CRAIG:  The results or the

4    science behind it.

5         THE COURT:  You intend to offer

6    evidence as to their interpretation?

7         MS. CRAIG:  Yes, Your Honor.

8         THE COURT:  Very well.

9       This is your agreement?

10        MR. BELVEAL:  It is, Judge.  Thank

11   you.

12        THE COURT:  Defendant's Exhibit

13   Number 1, then, is admitted and received as a

14   stipulation as to the DNA evidence.

15        (Thereupon, Defense Exhibit 1 was

16   admitted.)

17        MS. CRAIG:  Thank you, Judge.

18      At this time, I'd like to call Detective

19   Kirk Vernon to the stand.

20            DETECTIVE KIRK VERNON,

21       called as a witness on behalf of the

22       Defendant, was sworn, and testified

23       as follows:

24            DIRECT EXAMINATION

25   BY MS. CRAIG:

Exhibit 242 at 006

7

```
1    Q.  Could you please state your name for the

2        record.

3    A.  Kirk Vernon.

4    Q.  What do you for a living?

5    A.  I'm the captain of detectives with the

6        Jefferson County Sheriff's Office.

7    Q.  How long have you been with the Jefferson

8        County Sheriff's Office?

9    A.  Almost 21-and-a-half years.

10   Q.  Were you involved in the original investigation

11       of this case?

12   A.  Yes, I was.

13   Q.  How were you involved?

14   A.  I was a newer detective at the time, and I was

15       given several leads to follow-up on throughout

16       the course of the investigation, so I would go

17       out and conduct an interview or go out and look

18       for this and then return my results to those

19       that were in charge at the time.

20   Q.  So you weren't the primary detective?

21   A.  No, I was not.

22   Q.  Okay.  I'd like to start our conversation today

23       talking about the underlying crime itself just

24       for a background.

25           Can you provide us a brief description of
```

HAYES 0060

Exhibit 242 at 007

8

```
 1        what happened on November 5, 1999.
 2   A.   On November 5, 1999, Zetta Camille Arfmann got
 3        off her school bus and went into her residence
 4        and was -- after that, was never seen again.
 5   Q.   Did she live with Floyd and Heidi Bledsoe?
 6   A.   And their two small children.
 7   Q.   And was there a search for Camille that
 8        weekend?
 9   A.   Yes, there was.
10   Q.   Was she ever found?
11   A.   She ultimately was found in the very early
12        morning hours of Monday, November 8th.
13   Q.   Where was she found?
14   A.   On the Floyd, Laverne, Catherine, and Tom
15        Bledsoe property.
16   Q.   And how did you obtain the information to find
17        out where she was located?
18   A.   That information was provided to us on Sunday
19        evening by Tom Bledsoe and his attorney.
20   Q.   And how was Camille Arfmann killed?
21   A.   She was killed with four gunshot wounds.
22   Q.   Back in this original investigation that
23        weekend, who was the original suspect?
24   A.   Tom Bledsoe was arrested for this in the early
25        morning hours of November 8, 1999.
```

9

1    Q.   What prompted his arrest for this?

2    A.   He had made -- you know, his ability to lead us

3         to the body.  He had made statements indicating

4         his guilt to both law enforcement as well as --

5         he had made phone calls to his church or his

6         church pastor, a Jim Bolinger, where he

7         apologized profusely.  Though never

8         specifically admitting to killing her, it could

9         have been absolutely inferred from the messages

10        he left and interpreted that he was, in fact,

11        responsible.

12   Q.   As the investigation progressed, what was

13        the -- did you determine what the murder weapon

14        was?

15   A.   It was determined to be a Jennings

16        9-millimeter.

17   Q.   Who owned that gun?

18   A.   Tom Bledsoe.

19   Q.   Okay.  And did the shell casings found at the

20        scene match that gun?

21   A.   Yes, they did.

22   Q.   I'd like to go a few days back in that original

23        investigation to the day that Camille

24        disappeared.

25             From the original investigation, where

1        was Tom Bledsoe on Friday afternoon?

2   A.  Tom Bledsoe, to the best of the timeline in the

3        investigation that was developed, was at home

4        at the residence where Camille was ultimately

5        found, left at some point in time to go to

6        Lawrence to pick up his paycheck, and we also

7        know that he went to Rusty's Sporting Goods and

8        purchased two boxes of ammunition, and then

9        ultimately showed up at a church retreat on

10       Wellman Road sometime between 6:00 and

11       7:00 p.m.

12  Q.  Between the time he left Rusty's in Lawrence

13       at -- sometime around 4:00 and when he went to

14       church, is there any evidence as to where he

15       was?

16  A.  During the original investigation, no.

17  Q.  So there was no one who could testify as to his

18       whereabouts?

19  A.  That is correct.

20  Q.  Okay.  After he left church that evening, where

21       did he go?

22  A.  To his -- the residence he shared with his

23       parents.

24  Q.  Were all reports that he was there up until the

25       time he went to work the next day?

HAYES 0063

Exhibit 242 at 010

11

1    A.   That is -- that is correct.

2    Q.   Who were the only people who could testify to

3         his whereabouts at that time?

4    A.   His mother and father.

5    Q.   Okay.  What day was Tom Bledsoe arrested?

6    A.   Tom Bledsoe was arrested in the early morning

7         hours of Monday, November 8th.

8    Q.   Okay.  And at some point in time, did he recant

9         his confession?

10   A.   That came about during the course of the week

11        that followed his arrest.

12   Q.   Okay.  And who did he implicate?

13   A.   He implicated his brother, Floyd Scott Bledsoe.

14   Q.   At this point in the investigation, the

15        original investigation, was there any physical

16        evidence to implicate Floyd Scott Bledsoe in

17        the crime?

18   A.   Absolutely none that I'm aware of.

19   Q.   Is it fair to say that after Tom Bledsoe

20        changed his story that the investigation

21        changed and focused on Floyd Scott Bledsoe?

22   A.   There are other factors, but, yes.  That was

23        absolutely one of the main ones.

24   Q.   Okay.  And did Tom Bledsoe take a polygraph

25        examination on November 12th?

12

1   A.   Yes, he did.

2   Q.   Are polygraphs admissible in the court?

3   A.   Only if agreed upon by both of the attorneys

4        representing the matter.

5   Q.   Are they a tool used by law enforcement?

6   A.   Yes, they are.

7   Q.   Was your office informed at that time that Tom

8        Bledsoe passed the polygraph?

9   A.   That was my understanding, yes.

10  Q.   Was Floyd Scott Bledsoe questioned on Friday

11       the 12th?

12  A.   Yes, he was.

13  Q.   And when was he arrested?

14  A.   On Saturday the 13th.

15  Q.   Who filled out the arrest report for Floyd

16       Scott Bledsoe?

17  A.   I did.

18  Q.   Okay.

19            MS. CRAIG:  Your Honor, if I may

20       approach.

21            THE COURT:  You may.

22       BY MS. CRAIG:

23  Q.   I'm showing you what's been marked Defense

24       Exhibit Number 2.  Do you recognize that?

25  A.   Yes, I do.

13

1    Q.   What is it?

2    A.   It's a copy of the arrest report I filled out

3         in 1999.

4    Q.   Is it a fair and accurate depiction of that

5         arrest report?

6    A.   Yes, it is.

7    Q.   Hasn't been altered or amended?

8    A.   It does not appear to be, no.

9              MS. CRAIG:  Your Honor, I move to

10        admit Defense Exhibit Number 2.

11             MR. BELVEAL:  No objection, Judge.

12             (Thereupon, Defense Exhibit 2 was

13        admitted.)

14   BY MS. CRAIG:

15   Q.   Detective, when you filled out that arrest

16        report, did you have any concerns?

17   A.   Yes, I did.

18   Q.   How do you remember that you had concerns?

19   A.   At the bottom -- typically, when I filled out

20        an arrest report, there's a place at the bottom

21        of the page for the officer's signature where I

22        signed my name, and on this one, I sign --

23        it's -- my name is on there, but it's signed

24        differently.

25   Q.   How is it signed?

14

1   A.   It's signed, "Arresting Officer Roy Dunnaway by

2        Kirk Vernon."

3   Q.   Why did you sign it that way?

4   A.   I had concerns at that point in time that we

5        had reached a level of probable cause

6        concerning Floyd Scott.

7   Q.   You mean that you were concerned you didn't

8        have that level --

9   A.   That is correct.

10  Q.   -- sufficient to fill out that report?

11  A.   That is correct.

12  Q.   And that's why you didn't actually sign your

13       signature?

14  A.   That's why I notated it the way I did.  Yes.

15  Q.   How long was Tom Bledsoe in custody after Floyd

16       Scott Bledsoe was arrested?

17  A.   I'm not sure exactly when Tom got out of jail,

18       whether it was -- but I do know -- you know,

19       whether it was Friday night or Saturday during

20       the day, but I know the charges against him --

21            He was released on an OR bond or a

22       signature bond, and the charges against him

23       were dropped on Monday the 15th.

24  Q.   Okay.  And Floyd Scott Bledsoe was ultimately

25       convicted in Camille Arfmann's death; is that

15

1    correct?

2    A.   That is correct.

3    Q.   And was Tom Bledsoe's testimony crucial to this

4         conviction?

5    A.   I believe it was.  Yes.

6    Q.   Let's talk a little bit about the DNA evidence

7         from the original investigation.

8              Was there DNA testing done during the

9         original investigation?

10   A.   Yes, there was.

11   Q.   And, to your knowledge, were there any

12        conclusive results?

13   A.   Conclusive results identifying anyone?  No.  To

14        my knowledge, there were not.

15   Q.   Okay.  Why did the testing end?

16   A.   To my understanding, there was a letter -- a

17        joint letter that I've seen a copy of -- that

18        was sent to the KBI to request that all testing

19        stop that was signed by Jim Vanderbilt, who was

20        county attorney at the time; Roy Dunnaway, who

21        was sheriff at the time; and Special Agent Jim

22        Woods, who was the agent from the KBI.

23   Q.   And this was prior to trial?

24   A.   That is correct.

25   Q.   Okay.  Let's turn to the recent investigation.

1    I'm going to show you what's marked as -- what

2    was entered into evidence as Defense Exhibit

3    Number 1.

4        Do you recognize the two reports that are

5    attached to that stipulation?

6  A.  Yes, I do.

7  Q.  When did you receive a copy of that report

8    prepared by Serological Research Institute?

9  A.  I had reviewed it briefly sometime around the

10    end of September, first part of October of this

11    year, and then I received an actual physical

12    copy of it sometime shortly after October 20th.

13  Q.  After you received that, were you asked to

14    reopen the investigation into Camille Arfmann's

15    death?

16  A.  Yes, I was.

17  Q.  Who was involved in that investigation?

18  A.  Primarily myself; the special investigator for

19    the sheriff's office, Ramon Gonzalez; other

20    officers from the sheriff's office assisted as

21    they were able; and agents from the Kansas

22    Bureau of Investigation.

23  Q.  Turning to DNA evidence, as part of your work

24    as a police officer, do you review DNA evidence

25    reports?

17

```
 1   A.  Yes, I do.

 2   Q.  Are those results used in evaluating cases for

 3       prosecution?

 4   A.  Yes, they are.

 5   Q.  And those results would become a factor in your

 6       investigation?

 7   A.  Absolutely.

 8   Q.  And in your experience, you've reviewed those

 9       reports in the past?

10   A.  Yes, I have.

11   Q.  And do you have an understanding from a law

12       enforcement perspective what the test results

13       would mean?

14   A.  From a law enforcement perspective, yes.

15   Q.  Okay.  I want to talk about the report and your

16       review of it.  First, the serological report.

17   A.  Mm-hmm.

18   Q.  Let's talk about just the primary findings.

19       I'd like to turn first to the vaginal swab.  I

20       think it's Item Number 12.

21   A.  Yes.

22   Q.  On that vaginal swab, was there evidence found

23       of semen?

24   A.  Yes, there was.

25   Q.  And what were the results of the actual DNA
```

HAYES 0070

**Exhibit 242 at 017**

1     testing involved in that vaginal swab?

2   A.  That -- it identified a possible -- the major

3       contributor, as would be expected, was Zetta

4       Camille Arfmann because it came from her

5       person, and then there was -- Thomas Bledsoe

6       was identified as a minor contributor.

7   Q.  Okay.  What were the statistics on -- what

8       would that mean to a police officer?  Or what

9       would the --

10          I'm sorry.  What were the statistics?

11  A.  The statistics identifying Tom were 1 in 300.

12  Q.  What does that mean to a police officer or to

13      law enforcement?

14  A.  That it's very -- it's very low numbers, very

15      low probability, from the standpoint of if you

16      tested 300 more people, you would find a DNA

17      characteristic that would match the one that

18      matches Tom, and so if you test 600, then you'd

19      find two and so on and so on.

20  Q.  Okay.  Would those results, in concert with

21      additional evidence, become more important to

22      law enforcement?

23  A.  Yes.

24  Q.  So for example, a 1 in 300, as you said, it's

25      not a large probability, but that combined

19

```
 1        with -- that result and prior confessions,
 2        would that become more important?
 3   A.   Yes.
 4   Q.   Okay.  And ownership of the murder weapon.
 5        Would that add to the importance of the
 6        statistics?
 7   A.   I would think so.
 8   Q.   Okay.  And any additional knowledge linking
 9        that person with those statistics, those
10        statistics would then be more important to your
11        investigation?
12   A.   Absolutely.
13   Q.   Okay.  In that report, was Floyd Scott Bledsoe
14        specifically excluded?
15   A.   Yes, he was.
16   Q.   Okay.  What does that mean to you as a law
17        enforcement officer?
18   A.   That he could not have been a contributor to
19        the semen that was found on her vaginal swab.
20   Q.   Okay.  Do these results indicate the presence
21        of male DNA?
22   A.   Yes, they do.
23   Q.   Okay.  And how old was the victim in this case?
24   A.   14.
25   Q.   And was this information available during the
```

20

1      original investigation?

2  A.  No, it was not.

3  Q.  Okay.  And, again, that male DNA was not Floyd

4      Scott Bledsoe?

5  A.  That is correct.

6  Q.  Okay.  I want to go back and talk a little bit

7      about how Camille was buried.  Where was she

8      found?

9  A.  She was found in a ditch on the Bledsoe family

10     property that was used for dumping trash.

11  Q.  Was there an indication of how she got into the

12     ditch?

13  A.  It was always our belief that she had been

14     dragged into that ditch.

15  Q.  Okay.  And I believe -- would she have been

16     dragged, from the evidence, by her feet or from

17     her arms?

18  A.  It would seem, based upon what was seen, that

19     she would have been dragged by her feet, is

20     what we always supposed had happened.

21  Q.  Okay.  So let's go back to the DNA results in

22     the serological report.  What were the results

23     on the left sock?

24  A.  The left sock.  A DNA profile was developed off

25     of it identifying the major contributor as

1        belonging to Floyd Laverne Bledsoe, Floyd

2        Scott's father.

3    Q.  And was that a major profile?

4    A.  Yes, it was.

5    Q.  And do you know what the statistical results on

6        that were?

7    A.  It's 1 in 20 quadrillion, which is --

8    Q.  Is it quadrillion?

9    A.  Quadrillion.

10   Q.  Or could it be 1 in 20 sextillion?  It's on

11       page 12.

12   A.  Page 12.  Regardless, it's a really huge

13       number.

14   Q.  What does that mean to you?

15   A.  That you would have to go through the

16       population of the Earth several thousand times

17       before you could possibly encounter another

18       profile that would match that one.

19   Q.  From your investigation, could this result come

20       from casual touching or transference?

21   A.  The way it was explained to me by both the head

22       biologist from the KBI and another scientist

23       from another crime lab, they both used the same

24       phrase, being that it was possible but highly

25       unlikely.

22

1    Q.  At the time of the original investigation, did

2        your office have a DNA sample of Floyd Laverne

3        Bledsoe?

4    A.  No, we did not.

5    Q.  Have you since received a known sample?

6    A.  Yes, we did.

7    Q.  And when did you receive that sample?

8    A.  I collected that from him on November 18th of

9        this year.

10   Q.  Okay.  Did you have any additional testing done

11       on that sample?

12   A.  Yes, I did.  We sent it to the KBI, and they

13       developed Floyd Laverne Bledsoe's genetic

14       profile from the sample that I collected.

15   Q.  And is that the second report that's contained

16       in the stipulation?

17   A.  Yes, it is.

18   Q.  And what were the findings by the KBI?

19   A.  That the sample I collected from Floyd Laverne

20       and the profile that was developed thereof

21       matched the profile that SRI had for Floyd

22       Laverne Bledsoe so that those profiles were the

23       same.

24   Q.  So his known profile matched what was found on

25       the socks?

1    A.   That is correct.

2    Q.   At the time of the original investigation, did

3         Floyd Laverne Bledsoe ever provide any

4         indication his DNA might be found on the

5         victim?

6    A.   Not that I'm aware of.

7    Q.   Does this potentially place him at the burial

8         of the victim?

9    A.   It potentially could, yes.

10   Q.   Was Floyd Laverne Bledsoe Tom Bledsoe's primary

11        alibi?

12   A.   Yes, he was.  He and his mother.

13   Q.   Okay.  And the DNA results that we discussed

14        here on the socks, that was not available at

15        the time of the original investigation?

16   A.   That is correct.

17   Q.   I'd like to turn at this time to Tom Bledsoe's

18        suicide.  When did he disappear?

19   A.   Tom Bledsoe disappeared from his residence on

20        Sunday, November 1st.

21   Q.   When was he reported missing?

22   A.   He was reported missing to the sheriff's office

23        on Tuesday, November 3rd, by his wife.

24   Q.   When did you find out?

25   A.   I learned that he had been reported to the

**Exhibit 242 at 023**

24

| | |
|---|---|
| 1 | sheriff's office -- I learned about it on |
| 2 | Friday. |
| 3 | Q. Okay. And when was Tom Bledsoe found? |
| 4 | A. On Monday, November 9th. |
| 5 | Q. Can you provide us with details of his death. |
| 6 | A. Tom Bledsoe was found in his vehicle in the |
| 7 | Walmart parking lot in Bonner Springs, Kansas, |
| 8 | by a groundskeeper who then -- he reported it |
| 9 | or someone from his party reported it to the |
| 10 | police department. |
| 11 | They came out and investigated. They |
| 12 | located Tom in his vehicle with a bag over his |
| 13 | head, deceased, and various other supplies that |
| 14 | he had used to kill himself, along with three |
| 15 | letters. |
| 16 | Q. Did you confirm when he obtained those supplies |
| 17 | that he used? |
| 18 | A. A search of the vehicle -- we found a receipt |
| 19 | from Walmart from November 1st where the items |
| 20 | that were in the car that were used to commit |
| 21 | suicide with, the -- you know, all the items on |
| 22 | the receipt were in the car so that it was on |
| 23 | November 1st. |
| 24 | Q. From your investigation, did he contact anyone |
| 25 | prior to killing himself? |

25

1    A.   We found no indication that he had contacted

2         anyone via phone on the day that he left his

3         house.

4    Q.   Was there anything else, in searching his

5         phone, that indicated what he had been doing

6         that day?

7    A.   We found numerous searches on his phone in

8         regard to the thing called The Peaceful Pill,

9         which is a site in regards to committing

10        suicide, and a downloaded chapter in regards to

11        the -- this means of killing oneself.

12             We also found searches to CJ Online,

13        LJ World, WIBW 13 in regards to the various

14        articles that had been in the press in

15        reference to the DNA evidence that was

16        forthcoming.

17   Q.   Okay.  Let's talk about those notes.  How many

18        notes were there?

19   A.   There were three notes in the car.

20   Q.   Okay.  I'm showing you what's been marked as

21        Defense Exhibit 3.  Do you recognize that?

22   A.   Yes, I do.

23   Q.   What is that?

24   A.   It's a photocopy of an envelope and a photocopy

25        of a letter.

1   Q.  So the first page of each of these that I'm

2       going to show you is the outside of the

3       envelope that the letter was contained in.

4   A.  That is correct.

5   Q.  Is that a fair and accurate copy --

6   A.  Yes, it is.

7   Q.  -- of that?

8           MS. CRAIG:  I move to admit Defense

9       Exhibit 3.

10          MR. BELVEAL:  No objection, Judge.

11          THE COURT:  It's admitted and

12      received.

13          (Thereupon, Defense Exhibit 3 was

14      admitted.)

15          MS. CRAIG:  Thank you, Your Honor.

16   BY MS. CRAIG:

17   Q.  Detective, I have a second copy for you to

18       review.  Can you tell us what the -- again,

19       what the envelope says.

20   A.  On the front on the envelope it's written, "To

21       my wife, Mary L. Shaver."

22   Q.  Could you read us the contents of that letter.

23   A.       "Dear Mary,

24          "I am sorry.  I really loved you,

25         but I cannot go on.  It's tearing me up

Exhibit 242 at 026

27

```
 1              inside.  I know the Lord will take care
 2              of you.  Hope you can forgive me.  If
 3              not, that's fine.  I don't think God
 4              will forgive me for what I have done.
 5              Best wishes to you and your kids.
 6              Sorry.
 7                  "Tom B.
 8                  "P.S.  Please cremate me.  It's the
 9              cheapest way."
10   Q.  Thank you.
11              Detective, I'm showing you what's been
12       marked Defense Exhibit 4.  Do you recognize
13       that?
14   A.  Yes, I do.
15   Q.  What is that?
16   A.  It's a copy of the envelope and letter for
17       Tom's parents.
18   Q.  Okay.  Is it a fair and accurate copy?
19   A.  Yes, it is.
20   Q.  Has it been altered or amended in any way?
21   A.  No, it has not.
22              MS. CRAIG:  Your Honor, I move to
23       admit Defense Exhibit 4.
24              MR. BELVEAL:  No objection, Judge.
25              THE COURT:  It's admitted and
```

DEANNA WARNER, CSR
PO Box 327, Oskaloosa, Kansas 66066
Phone: (785) 863-5179 Fax: (785) 863-2369

HAYES 0080

**Exhibit 242 at 027**

28

```
 1      received.
 2                      (Thereupon, Defense Exhibit 4 was
 3      admitted.)
 4      BY MS. CRAIG:
 5   Q. Could you read the contents of that letter,
 6      please.
 7   A. The envelope is addressed, "To my mom and dad,
 8      Floyd and Kathy Bledsoe."
 9                  "Dear Mom and Dad,
10                  "I am sorry I have caused all this
11              pain.  Floyd is innocent.  The CA made
12              me lie and keep my mouth shut.  Please
13              don't be upset with me.  Please tell
14              Floyd I am sorry.
15                  "Love, Tom."
16   Q. Thank you, Detective.
17              Detective, I'm showing you what's marked
18      as Defendant Exhibit 5.  Do you recognize that?
19   A. Yes, I do.
20   Q. And is that the third letter found?
21   A. Yes, it is.
22   Q. Is it a fair and accurate copy of what was
23      found with Tom Bledsoe?
24   A. Yes, it is.
25                  MS. CRAIG:  Your Honor, I move to
```

HAYES 0081

**Exhibit 242 at 028**

1  admit Defense Exhibit 5.

2    MR. BELVEAL:  No objection, Judge.

3    THE COURT:  It's admitted.

4    (Thereupon, Defense Exhibit 5 was

5  admitted.)

6  BY MS. CRAIG:

7 Q. We're going to talk about this in a little more

8  detail.  Could you read this letter into the

9  record, please.

10 A. Yes, I can.  The envelope starts, "To whomever

11  cares."

12 Q. And I understand that some of the grammar is

13  not perfect, so if you could just read it as

14  it's written.

15 A.   "To whom this volves [sic],

16    "I sent an innocent man to prison.

17   The Jefferson County police and County

18   Attorney Jim Vanderbilt made me do it.

19   I was told by Vanderbilt to keep my

20   mouth shut.  Now I'm going to set thing

21   [sic] right.

22    "I killed Camille Arfmann on

23   November 5, 1999.  I had sex with her

24   and killed her.

25    "On November 5, 1999, I stopped by

30

1    my brother's house around 4:30 to

2    5:00 p.m. and Camille was there.  We

3    talked a little and the [sic] went to my

4    parents' house, and she helped me do

5    something.  Sorry.  My mind is blank on

6    what we did.

7         "Then we talked and then the

8    conversation got moved to sex, and she

9    told me she's had sex before.  With

10   whom, I don't know.  Then she asked me,

11   and I said no.

12        "Then it hopped [sic] so fast I

13   don't remember much.  We had sex on my

14   parents' bed.  That's how my father's

15   DNA got on her clothes.

16        "Afterwards, we were leaving, and I

17   asked her not to tell.  That's when I

18   found out she was 14 and I freaked out.

19   So I drove up to the ditch where the

20   family dump trash and tried to convince

21   her not to tell.  Everything was

22   happening so fast, I couldn't think.

23        "I went to my truck and got my

24   9-millimeter gun that was behind my seat

25   and pushed her to the ground to try to

**Exhibit 242 at 030**

1   scare her, but it failed.

2       "When the gun went off behind her

3   head, it was accident.  I didn't mean to

4   kill her.  I, as well, might go ahead

5   and say it:  I raped and murdered a

6   14-year girl.

7       "I tried telling the truth, but no

8   one would listen.  I was told to keep my

9   mouth shut.  It tore me up doing it.  I

10  would ask for forgiveness, but I know

11  none will come, not even from God.

12      "Floyd S. Bledsoe is innocent man.

13  Thomas E. Bledsoe is the guilty one.

14      "And here is the proof.  The crime

15  scene is less than 20 yards from the

16  grave site where I buried her."

17      There's a drawing of the grave site

18  with a line and a circle to indicate the

19  crime scene.

20      "You will find an empty 9-millimeter

21  shell no more than 20 yards of [sic] the

22  ditch.

23      "All that I can say is sorry to all,

24  and I seek forgiveness, but I don't

25  deserve any, not even from God.

32

1          "Thomas E. Bledsoe."

2    Q.   In regards to this note, is it important to

3         your investigation that he actually provides

4         details of the crime?

5    A.   Yes, it is.

6    Q.   Okay.  And in that note, he specifically

7         exonerates Floyd Scott Bledsoe; is that

8         correct?

9    A.   That is correct.

10   Q.   And he indicates he is solely responsible for

11        Camille's death?

12   A.   That is correct.

13   Q.   Does the timing provided by Tom Bledsoe in the

14        note match the evidence of when Camille

15        disappeared?

16   A.   Yes, it does.

17   Q.   Okay.  During the original investigation, was

18        it ever determined where or if a sexual assault

19        occurred?

20   A.   As far as location, no.

21   Q.   Okay.  Tom Bledsoe provides in his letter that

22        he raped Camille in his parents' bedroom.  Is

23        there any evidence to support that?

24   A.   No, there's not.

25   Q.   Why not?

33

| | | |
|---|---|---|
| 1 | A. | To my knowledge, the residence was never |
| 2 | | searched. |
| 3 | Q. | So the residence where Tom Bledsoe lived with |
| 4 | | his parents was not ever searched in the |
| 5 | | original investigation? |
| 6 | A. | That's correct. |
| 7 | Q. | And was Floyd Bledsoe's residence searched? |
| 8 | A. | Yes, it was. |
| 9 | Q. | And were the grounds surrounding the Bledsoe |
| 10 | | house extensively searched, to your knowledge? |
| 11 | A. | To my knowledge, no. Just the area around |
| 12 | | where she was located. |
| 13 | Q. | Okay. Tom Bledsoe, in Defense Number 5, |
| 14 | | provides a map; is that correct? |
| 15 | A. | Yes, it is. |
| 16 | Q. | In that map, he provided an indication of where |
| 17 | | the killing took place? |
| 18 | A. | That is correct. |
| 19 | Q. | Would that -- was there ever knowledge where |
| 20 | | the killing took place in the original |
| 21 | | investigation? |
| 22 | A. | We never -- it was always our belief that she |
| 23 | | was put -- brought to the trash ditch and put |
| 24 | | in there and killed elsewhere. |
| 25 | Q. | Okay. So there's nothing to dispute Tom's |

34

1       statement of where it occurred?

2   A.  That is correct.

3   Q.  Okay.  In Defense Number 5, he actually

4       provides you with information on proof, as he

5       calls it; right?

6   A.  That is correct.

7   Q.  Okay.  And he indicates you'll find a shell

8       casing?

9   A.  That is correct.

10  Q.  Okay.  Let's back up again to the original

11      investigation.  How many times was Camille

12      shot?

13  A.  She was shot four times.

14  Q.  And at the time of the original investigation,

15      how many shells were found?

16  A.  We located four projectiles or bullets and

17      three shell casings.

18  Q.  Okay.  So there was one shell casing missing?

19  A.  That is correct.

20  Q.  Did you follow up on the information in the

21      note?

22  A.  Yes, we did.

23  Q.  How did you do that?

24  A.  Now-Lieutenant Poppa and Detective Sergeant

25      Frost, who were the officers that back in 1999

1   had to excavate Camille from the trash ditch --

2   myself and Investigator Gonzalez and those

3   officers and a lay expert with a metal detector

4   went to the scene.

5        Frost and Poppa, to the best of their

6   ability, identified the location where we

7   believed Camille had been excavated from back

8   in 1999, so we marked that and then we marked

9   the edges of the trash ditch, which was -- it's

10  all cleaned out now, and it's just native

11  ground.

12       And then, using the metal detector, we

13  started a search that extended 100 yards wide

14  from the -- from, basically, the edge of the

15  ditch out 150 yards --

16  Q.  Okay.

17  A.  -- and searched that entire area.

18  Q.  Did you find anything?

19  A.  Yes, we did.

20  Q.  What did you find?

21  A.  We located a shell casing.

22  Q.  Was it buried?

23  A.  It was about an inch, or right thereabouts,

24  underground.

25  Q.  In this entire area that you searched, did you

HAYES 0088

**Exhibit 242 at 035**

36

1      find any other shell casings?

2   A.  No, we did not.

3   Q.  And how quickly did you find the shell casing?

4   A.  The shell casing was located within about ten

5       minutes of the search beginning.

6   Q.  Where was it located?

7   A.  It was located right at 24 feet from the

8       position that Frost and Poppa marked.

9   Q.  And where did Tom Bledsoe indicate you would

10      find the shell casing?

11  A.  Less than 20 yards.

12  Q.  What brand was this shell casing?

13  A.  The shell casing that we located was a

14      9-millimeter CCI brand.

15  Q.  What was the brand of the original shell

16      casings?

17  A.  The original shell casings that were located

18      were 9-millimeter Winchester.

19  Q.  You recovered several boxes of ammunition from

20      Floyd Laverne Bledsoe during the original

21      investigation; is that correct?

22  A.  Yes.

23  Q.  What were -- can you tell us about that

24      ammunition.

25  A.  We collected -- I believe the brand is

1    9-millimeter Sellier and Beloit or Benoit, and

2    that was one of the boxes of ammunition that

3    Tom had purchased Friday afternoon.  It's

4    complete.

5         We had located a box of Winchester 30.30,

6    which was also purchased Friday, November 5th,

7    and then there was a box of Winchester

8    ammunition with numerous rounds missing from

9    it.

10   Q.  Do you know if there was any CCI brand

11       ammunition in the Bledsoe house?

12   A.  No, I do not.

13   Q.  Why not?

14   A.  Because the house was never searched.

15   Q.  And how did you obtain the ammunition that was

16       provided to you?

17   A.  It was provided to law enforcement back in

18       1999.  It was brought to whatever officer by

19       Floyd Laverne Bledsoe.

20   Q.  Did that officer go into the house, to your

21       knowledge?

22   A.  To my knowledge, no.

23   Q.  Has your office done any additional testing to

24       determine if that shell casing was fired by Tom

25       Bledsoe's gun?

Exhibit 242 at 037

38

1    A.   No, we have not.

2    Q.   Why not?

3    A.   We recovered that on, I believe, the 17th, in

4         the middle of the November, and immediately

5         began making inquiry as to what it would take

6         to compare that shell casing to the shell

7         casings recovered back in 1999, and there was

8         just no physical way to get the testing done

9         that we could come up with in time for this

10        hearing.

11   Q.   Okay.  So at this point, we don't have any

12        forensic evidence linking that shell casing to

13        the original crime; is that correct?

14   A.   That is correct.

15   Q.   But we do know it was located exactly where Tom

16        Bledsoe said it would be located.

17   A.   That is correct.

18   Q.   And he indicated that was his corroboration,

19        essentially, of his participation in the crime?

20   A.   Yes.

21   Q.   When you compare the information provided by

22        Tom Bledsoe in the suicide note to the timeline

23        of Camille's disappearance, does it fit?  Does

24        it match?

25   A.   He -- from the time his last known whereabouts

39

1        are to where he reappears, it absolutely can

2        fit within, you know, his explanation of what

3        happened within that window.

4    Q.  Do you have to make any jumps or inferences to

5        make it fit?

6    A.  No.

7    Q.  You previously testified that Tom Bledsoe took

8        a polygraph; is that correct?

9    A.  Yes, I did.

10   Q.  As part of the new investigation, did you have

11       his polygraph reviewed?

12   A.  Yes, we did.

13   Q.  Okay.  Who reviewed that original polygraph?

14   A.  A senior examiner from the KBI.

15   Q.  Did that -- what were the results of that

16       examination for Tom Bledsoe?

17   A.  It said that he had -- based upon his opinion

18       and review of the information, that he had

19       failed.

20   Q.  What question did he fail?

21   A.  "Did you kill" -- "Did you kill Camille

22       Arfmann?"

23   Q.  Although not admissible, did the fact that Tom

24       Bledsoe at the time had passed a polygraph, did

25       that have an impact on the original

40

```
 1          investigation?
 2     A.   I believe it did.
 3     Q.   So that information is now coming into
 4          question.  Is that fair to say?
 5     A.   Yes.
 6     Q.   Do you have any physical evidence at this point
 7          in time linking Floyd Scott Bledsoe to the
 8          killing of Camille Arfmann?
 9     A.   There's none that I'm aware of.
10     Q.   Okay.  Does your current investigation
11          undermine your confidence in the original
12          conviction of Floyd Scott Bledsoe?
13     A.   Yes, it does.
14               MS. CRAIG:  Your Honor, I don't have
15          any further questions.
16               MR. BELVEAL:  I don't have any
17          cross-examination, Judge.
18               THE COURT:  You may step down.  Thank
19          you.
20               MS. CRAIG:  Your Honor, at this time
21          I'd like to call Ramon Gonzalez to the stand.
22                    RAMON GONZALEZ,
23          called as a witness on behalf of the
24          Defendant, was sworn, and testified
25          as follows:
```