# EXHIBIT 10

IN THE DISTRICT COURT OF JEFFERSON COUNTY,
KANSAS

STATE OF KANSAS,                )  ORIGINAL
                                )
------------------Plaintiff,    )
                                )  Case No.
       vs.                      )  99-CR-325
                                )
FLOYD S. BLEDSOE,               )
                                )
------------------Defendant.    )

TRANSCRIPT OF MOTION TO VACATE JUDGMENT

       MOTION TO VACATE JUDGMENT had before the
Honorable Gary Nafziger, Chief Judge of the
District Court of JEFFERSON County, Kansas, on
the 8th of December, 2015.


                   APPEARANCES

       The Plaintiff appeared by JASON BELVEAL,
JEFFERSON COUNTY ATTORNEY, 300 Jefferson
Street, Suite 200, PO Box 351, Oskaloosa,
Kansas 66066.

       The Defendant appeared in person and by
JEAN K. G. PHILLIPS, ALICE CRAIG, and ELIZABETH
SEALE CATEFORIS, PROJECT FOR INNOCENCE,
UNIVERSITY OF KANSAS SCHOOL OF LAW, 409C Green
Hall, Lawrence, Kansas 66045.

2

I N D E X


W I T N E S S E S

DEFENDANT'S WITNESSES

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| Detective Kirk | | | | |
| Vernon............... | 6 | | | |
| Ramon Gonzalez....... | 40 | | | |


E X H I B I T S

DEFENDANT'S EXHIBITS

| | | MARKED | OFFERED | RECEIVED |
|---|---|--------|---------|----------|
| 1 | Stipulation.......... | * | 5 | 6 |
| 2 | Arrest Report........ | * | 13 | 13 |
| 3 | Envelope and Letter.. | * | 26 | 26 |
| 4 | Envelope and Letter.. | * | 27 | 27 |
| 5 | Letter............... | * | 28 | 29 |

(* The exhibit was marked prior to the proceeding.)

HAYES 0055

1      investigation?

2  A.  I believe it did.

3  Q.  So that information is now coming into

4      question.  Is that fair to say?

5  A.  Yes.

6  Q.  Do you have any physical evidence at this point

7      in time linking Floyd Scott Bledsoe to the

8      killing of Camille Arfmann?

9  A.  There's none that I'm aware of.

10  Q.  Okay.  Does your current investigation

11      undermine your confidence in the original

12      conviction of Floyd Scott Bledsoe?

13  A.  Yes, it does.

14          MS. CRAIG:  Your Honor, I don't have

15      any further questions.

16          MR. BELVEAL:  I don't have any

17      cross-examination, Judge.

18          THE COURT:  You may step down.  Thank

19      you.

20          MS. CRAIG:  Your Honor, at this time

21      I'd like to call Ramon Gonzalez to the stand.

22              RAMON GONZALEZ,

23      called as a witness on behalf of the

24      Defendant, was sworn, and testified

25      as follows:

HAYES 0093

|    |                                                              |
|----|--------------------------------------------------------------|
| 1  | DIRECT EXAMINATION                                           |
| 2  | BY MS. CRAIG:                                                |
| 3  | Q.  Can you state your name for the record.                 |
| 4  | A.  Ramon C. Gonzalez, Junior.                              |
| 5  | Q.  What do you do for a living?                            |
| 6  | A.  Currently?                                              |
| 7  | Q.  Yes.                                                    |
| 8  | A.  I'm a part-time investigator with the Jefferson        |
| 9  |     County Sheriff's Office.                                |
| 10 | Q.  How long have you been doing that?                     |
| 11 | A.  Since 1980.                                            |
| 12 | Q.  Were you involved in the original investigation         |
| 13 |     of this case?                                          |
| 14 | A.  No, I was not.                                          |
| 15 | Q.  Were you asked to review the original                  |
| 16 |     investigation?                                         |
| 17 | A.  Yes, I was.                                            |
| 18 | Q.  Who asked you to do that?                              |
| 19 | A.  Captain Kirk Vernon.                                   |
| 20 | Q.  Do you, to your knowledge, know why you were           |
| 21 |     asked to participate in that?                          |
| 22 | A.  Because I was not here in 1999 and they were           |
| 23 |     looking for an objective view of the case.            |
| 24 | Q.  Okay.  You may need to speak up or speak into          |
| 25 |     the microphone a little bit so we can hear you.        |

1      Thank you.

2   A.  Is that better?

3   Q.  Yes.   Thank you.

4           What have you reviewed as part of your

5       investigation?

6   A.  At this point, I reviewed three volumes of the

7       original case file that included all the

8       interviews, all the officer statements, all the

9       evidence, custody receipts, and then also the

10      transcript -- which I reviewed several times,

11      like 600-some pages long.

12  Q.  Did you specifically look into Tom Bledsoe's

13      testimony?

14  A.  Yes, I did.

15  Q.  And were you looking at it in the sense of as

16      to whether it was reliable or not?

17  A.  I was looking at it to see if it coincided with

18      the investigative notes in the other files.

19  Q.  And let me ask you about that testimony at the

20      time.   Did you have any concerns about his

21      hearing impairment?

22  A.  I did, especially based on the transcript

23      because he would often -- when asked a

24      question, he would say, "Pardon?"  And I kept

25      wondering why he would always ask the question

HAYES 0095

1      to be repeated or reiterated.

2   Q.  Did you look into the extent of Tom Bledsoe's

3      hearing impairment?

4   A.  I did.  I interviewed Katherine Bledsoe and

5      asked her if Tom had a hearing impairment and

6      how long he had had it, and she advised that he

7      had had it since childhood.

8          So then I asked her how far Tom would be

9      from you to be able to hear you clearly.  She

10      stated that he was good at reading lips, so as

11      long as he was facing you, he could kind of

12      communicate with you, but if he turned his back

13      on you and walked away three feet, you would

14      have to either yell a little louder or tap him

15      to get his attention.

16  Q.  When did that interview with Katherine Bledsoe

17      take place?

18  A.  December 3rd, I want to say.

19  Q.  So recently?

20  A.  It was recent, yes.

21  Q.  And did you discuss his hearing loss with

22      anyone else?

23  A.  I did.  I interviewed, along with a KBI agent,

24      Ms. Heidi Bledsoe and asked her about the

25      hearing impairment.  She said that he had quite

1          a bit of a hearing impairment.  She pretty well

2          described the same thing, that as long as he

3          was face-to-face with you, he would do okay

4          with reading the lips, but as soon as he would

5          turn away, you would have to repeat the

6          question or he would ask you to ask the

7          question again.

8      Q.  Why was his hearing important to you in your

9          reinvestigation of the case?

10     A.  In my review of the case, the part that struck

11         me during the core testimony was that he

12         stated -- this was one of his many stories --

13         that when he talked to Floyd, he had his hand

14         over his head and was mumbling something about

15         "I" or "we" or "they."

16     Q.  Okay.  Let's step back a minute.  At some point

17         in time, Tom Bledsoe recanted his confessions;

18         is that correct?

19     A.  Several times.

20     Q.  Okay.  Can you describe to us the encounter he

21         testified to involving Floyd Scott Bledsoe.

22     A.  They were on Osage Road, and somehow in the

23         middle of the road, they encountered each

24         other.  It doesn't say why or what, but Tom

25         stated that he put his hand out to stop Floyd,

1          and they stopped side-by-side in two vehicles,

2          and at that time is when he said that Floyd

3          said that they had killed her -- or "they" or

4          "I" or "we."

5                  And as the course of the investigation

6          went on or the testimony went on, he would

7          adjust his stories to fit details that, in my

8          opinion, based on the documentation, would only

9          be known with -- by Tom, but, again, to

10         elaborate that to Floyd, I don't know if --

11         based on their interaction, they really didn't

12         have any love lost to each other.  I don't see

13         them -- based on, again, my interpretation of

14         the files -- that they would spend that much

15         time getting into "I put what on top of her,"

16         "I did this," "I did that."

17    Q.   So you had concerns about the amount of

18         information that Tom said Floyd conveyed to

19         him?

20    A.   Yes.

21    Q.   Okay.  And you -- did you have concerns about

22         Tom's ability to hear this alleged confession?

23    A.   That was a big concern the more I got into the

24         file and definitely after some of the

25         interviews.  In my mind, I wanted to know, you

HAYES 0098

1    know, sometimes I have a hard time hearing,

2    especially my wife, especially on the distance.

3    I was trying to determine the distance.  How

4    far did he have to be?

5         In the two interviews that I conducted

6    with the two individuals, it was a short

7    distance.  Again, during the trial transcript,

8    at one time or several times he's asked to look

9    at the prosecutor when asked a question, so,

10   again, if it would deter -- I'm not sure he

11   would be able to read your lips.

12   Q.  So what he described was an encounter where

13       they were both still in their vehicles?

14   A.  Yes.  And initially it was just "we," "they,"

15       and then in the transcript, it goes on to be

16       more descriptive to fit the crime scene, and a

17       couple of times he's asked, "So now you're

18       changing your story?"

19            And he says, "Yes.  I lied."

20   Q.  Okay.  So did you have concerns about the

21       stories that changed in his testimony?

22   A.  I had quite a few concerns about -- every time

23       the story changed, it was more to fit what

24       happened at the crime scene rather than having

25       Floyd be at the scene.

1    Q.   Did you also have concerns, based on the
2         relationship between the two brothers, whether
3         this was reliable?
4    A.   I had concerns because, based on Tom's
5         testimony, Floyd has not been out to the dump
6         site in two years and then, all of a sudden, he
7         shows up there and they have this encounter.
8              And I don't know if you're familiar with
9         the county.  Running into someone in the middle
10        of the road would have to be a kind of a 1 in
11        1,000 situation.
12   Q.   And there's no other corroboration of this
13        encounter on the side of the road beyond Tom;
14        is that correct?
15   A.   No corroboration and then changing the story
16        consistently.
17   Q.   And this is the story that Tom uses to place
18        Floyd or inculpate Floyd in the crime; is that
19        correct?
20   A.   That's correct.
21   Q.   And based on your investigation, did you see
22        any other physical evidence that indicated
23        Floyd Scott Bledsoe was involved in this crime?
24   A.   I have to be honest with you.  When I first
25        started the investigation, that was my whole

1    purpose in my mind.  I wanted to find something

2    solid that would implicate Floyd Bledsoe in the

3    murder.

4    Q.   Did you find anything?

5    A.   Not at this time.  I'm still looking.

6    Q.   You also assisted in the investigation of Tom

7         Bledsoe's suicide?

8    A.   Yes.  I was -- I went to the crime scene in

9         Bonner Springs and met with the Bonner Springs

10        Police Department.

11   Q.   And from your investigation, had Tom Bledsoe

12        attempted suicide previously?

13   A.   When I got to the scene over in Bonner Springs,

14        the driver side door was open and Tom's

15        left-hand was hanging out the door, and I could

16        see that it had been bandaged on the -- from

17        the bottom of the wrist a little bit up.

18   Q.   Did you find out what that was?

19   A.   After I interviewed Marylou Shaver, I asked

20        her.  I said I was curious that he had some

21        bandages on his arm, and she said that the week

22        prior, he had come home with a coat wrapped

23        around his hand and had told her that he had

24        tried to cut himself but he couldn't cut deep

25        enough.

HAYES 0101

1   Q.   Who is Ms. Shaver?

2   A.   That's Tom Bledsoe's wife.

3   Q.   Okay.  And you interviewed her?

4   A.   Yes, I did.

5   Q.   So she indicated he had tried to kill himself

6        the week before?

7   A.   Yes, she did.

8   Q.   And had he previously -- did she indicate

9        whether he previously tried to kill herself --

10       himself?

11  A.   During the interview, she stated that four

12       months prior, he tried to hang himself.

13  Q.   Did she indicate an event associated with that

14       hanging?

15  A.   The way she stated it, every time something

16       would come up with Floyd, he would start acting

17       more -- "leave me alone," stay out of my space.

18  Q.   Did she indicate that this hanging -- although

19       she said four months, did she indicate that it

20       was when Floyd was out of custody?

21  A.   She said -- I don't know if he was out of

22       custody or if the issue was coming back up

23       again.

24  Q.   Okay.  I'd like you to look at Defense Exhibit

25       Number 5, which they're up there.  It's also --

```
 1            this is a copy of it.
 2                    THE COURT:  It's all of those.
 3            You'll have to find Number 5.
 4            BY MS. CRAIG:
 5       Q.   Do you recognize that?
 6       A.   Yes, I do.
 7       Q.   How do you recognize that?
 8       A.   This is a copy of what I originally saw at
 9            Bonner Springs.  It was in -- had been taken
10            into evidence and was packaged, so we did not
11            remove it.  We just had copies sent to us, but
12            I read it at the scene at the time of the
13            suicide.
14       Q.   Okay.  And what concerns you -- or what
15            concerns did you have initially when you read
16            that note?
17       A.   The initial concern was that this was possibly
18            the third or fourth confession to the homicide,
19            and the part that got me the most was the
20            diagram.
21       Q.   Okay.  Why was that important to you?
22       A.   Well, here you have a guy that says, "Here's
23            where I killed her."  So that that was a lead
24            that I felt that we needed to follow.
25       Q.   And did you follow up on that?
```

1   A.   We did follow up on that and were able to find

2        a shell casing buried about approximately an

3        inch, inch and a half in the dirt.

4   Q.   Was it important to you in your investigation

5        that he provided specific details?

6   A.   In an investigation, if you have a lead, no

7        matter how weird it is or how farfetched it is,

8        I think it's our responsibility to follow up on

9        it.

10  Q.   And is your concern -- does this add to your

11       concern on the number of times he's provided a

12       confession?

13  A.   Well, it adds to my concern.  Also there's the

14       fact that it was a CCI casing, and we never had

15       an actual search of the residence to see if

16       there was additional bullets in the house.

17  Q.   So does the amount -- let me -- strike that.

18       Does the lack of investigation during the

19       original investigation concern you?

20  A.   I wouldn't say that it was a lack.  I think the

21       officers were acting on what was there at the

22       time.

23       My concern, again, was we have a guy

24       confessing multiple times, and I don't know why

25       we didn't search his room, his house, and the

1    surrounding area.  We did that with Floyd's
2    residence and surrounding area.

3         But, again, I don't see it as a lack.
4    Maybe a lack of direction by somebody to say,
5    "Hey, we need to do this."

6  Q.  Okay.  Based on your current investigation, is
7    your confidence in the underlying conviction
8    undermined?

9  A.  I believe so, just the fact of the lack of
10    evidence that I have not found on Floyd.

11  Q.  Okay.

12         MS. CRAIG:  No further questions.

13         MR. BELVEAL:  I don't have any
14    questions, Judge.

15         THE COURT:  You may step down.

16         THE WITNESS:  Thank you, Your Honor.

17         MS. CRAIG:  Judge, at this time, the
18    defense would rest.

19         THE COURT:  Very well.

20      Are you going to present any evidence?

21         MR. BELVEAL:  I'm not, Judge.  I
22    don't have any rebuttal evidence.

23         THE COURT:  Do you want to make a
24    closing?

25         MS. CRAIG:  Judge, our request --

1     under 21-2512, this Court has to determine

2     under (F)(2) if the evidence is favorable, the

3     DNA evidence.  Our assertion that it was -- is

4     definitely favorable.

5         One, at the time of the original

6     investigation, whether it was based on the

7     science at that time or what was done, there

8     really wasn't DNA evidence available to the

9     investigators, and that evidence has now been

10    done.  It has to be deemed favorable.

11        There is -- on the vaginal swab, there is

12    male DNA.  It is DNA that, although it's a low

13    statistic, does match the original person who

14    confessed to the crime.  That person -- there's

15    additional evidence, as Detective Vernon

16    stated, that increases the importance of that

17    nonexclusion for the vaginal swab.

18        We didn't have any male DNA or semen in

19    the vaginal swab originally and we do now, and

20    Floyd Scott Bledsoe is specifically excluded

21    from that.

22        In addition, we have more evidence that

23    was found on the clothing of the victim.  That

24    clothing implicates somebody else to a strong

25    major component.  That somebody else could have

1    been involved in the burial.

2         Whether that person was involved in the

3.   actual murder, it does tend to put the case in

4    a different light, having DNA from somebody who

5    is completely unassociated, really, with the

6    victim and not associated with the crime scene

7    on the victim's clothing and in such a strong

8    amount.  That's one of the important things, I

9    think, is that it's a major profile and it's a

10   1 in 20 sextillon odds for a match.

11        There was -- again, no DNA was done, so

12   the DNA alone, based on our motion, is

13   favorable.  It's also material because it

14   implicates the main person who testified

15   against Floyd Scott Bledsoe, his brother Tom.

16   It puts more credibility in his original

17   confessions and really kind of questions his

18   recantation and his implication of his brother.

19        Then you add the additional facts that

20   we've known since his suicide.  The fact that

21   we have a suicide note -- three notes,

22   really -- implicating his guilt in the crime.

23   Not only his guilt in the crime, but he added

24   details of the crime and that evidence could be

25   found to support the statements that he's

1    making.

2    So not only do we have a confession, but

3    we have a confession with confirmatory

4    evidence.  That is evidence that clearly

5    exculpates Floyd Scott Bledsoe and indicates

6    his actual innocence, and we're asking, at this

7    time, to take all of this into consideration by

8    the Court, vacate his convictions, and do one

9    of two things.

10    Our request would be that the convictions

11    be vacated and he be released from custody, but

12    at the very least, vacate his convictions and

13    leave it up to the county attorney as to

14    whether or not additional investigation should

15    occur and a new trial should be ordered.

16    I think the original trial, based on all

17    of this evidence in the new investigation,

18    really cannot be relied upon, and I think the

19    confidence that we have in that conviction has

20    been undermined, and we're asking this Court

21    reverse that and vacate his conviction.

22    THE COURT:  Thank you.

23    Mr. Belveal.

24    MR. BELVEAL:  Judge, my office and

25    law enforcement in particular have spent a lot

HAYES 0108

1    of time the last couple of years, an incredible

2    amount of time in the last several weeks,

3    dealing with this case.  I think we've looked

4    at all of the case file that existed from 1999

5    and we looked at everything that's come up

6    since then, and the conclusion that -- that I

7    think we've come to, that law enforcement has

8    come to and that I've come to, is that the

9    interests of justice are best served by finding

10   that the DNA evidence is material, that it is

11   favorable.

12       We would ask that Your Honor vacate, set

13   aside the judgment.  I believe that the

14   appropriate thing to do would be to order a new

15   trial for the defendant, leaving it up to the

16   State to determine whether or not there's

17   enough evidence to proceed against him again.

18       You heard from Special Investigator

19   Gonzalez that the investigation is still

20   continuing.  We're trying to determine whether

21   or not the CCI cartridge that we found matches

22   the gun.  Our understanding is that it will

23   take a significant amount of time to do that

24   just because the KBI is so far behind on those

25   things, although we consulted with another lab

1    as well.

2           But we believe that justice is served by

3    vacating the trial and ordering a new trial for

4    Mr. Bledsoe.  I think that the confidence that

5    we have in the jury verdict from 1999 is just

6    so undermined by this new evidence, not only

7    the DNA, but the DNA coupled with the evidence

8    that we've garnered since then.  The confession

9    from Tom Bledsoe, which seems to corroborate

10   the DNA confession, not only provides

11   additional details but talks about -- talks

12   about the crime with the specificity that one

13   would expect someone who was there would have.

14          The best interests of justice, Judge, I

15   think can only be served by granting the

16   motion.

17          THE COURT:  The DNA evidence, the new

18   evidence, the exculpatory evidence, wasn't even

19   available at the time this case was tried; is

20   that correct?

21          MR. BELVEAL:  That's correct, Judge.

22          THE COURT:  The technology hadn't

23   reached the point where that processing and

24   that testing existed.

25          I need to look at the DNA exhibit.  I

1    haven't seen that.

2           I'm going to recess, come back out in

3    about 15 minutes, and I'll announce my

4    decision.

5           Thank you.

6                  (A recess was taken, after which the

7    following proceedings were had:)

8                  THE COURT:  Be seated, please.

9           After considering the testimony and

10   evidence, including Exhibits 1 through 5

11   presented at this hearing, and considering the

12   arguments advanced by counsel, the Court finds

13   that a reasonable probability exists that the

14   newly discovered evidence would result in a

15   different outcome at trial.

16          Therefore, pursuant to KSA 21-2512, I

17   find that it serves the interest of justice

18   that Defendant be granted a new trial.

19          I'm going to set this matter for tomorrow

20   afternoon, Wednesday the 9th, at 2:30 so we can

21   address the issue of counsel, bond, and, if

22   necessary, a trial setting.  That will give

23   people time to --

24          Or I don't know if you're going to

25   continue to represent him or what you're going

1   to do.

2        I don't know precisely what the State

3   plans to do.  This will give people a chance to

4   think about this, and we will reconvene

5   tomorrow.

6        Are you available then?

7            MS. CRAIG:  Sure.  If necessary, we

8   can be here.

9            THE COURT:  Mr. Belveal?

10            MR. BELVEAL:  Yes, Judge.

11            THE COURT:  We will reconvene

12   tomorrow at 2:30 p.m. and address those issues.

13        Thank you very much for your patience and

14   presentation of evidence.

15            THE COURT:  Be seated, please.

16        I'm advised, Counsel, that you wish to

17   address the Court.

18            MR. BELVEAL:  Judge, following your

19   ruling to overturn the conviction and order a

20   new trial of Mr. Bledsoe, the State would ask

21   that the Court dismiss 99-CR-324 [sic], *State*

22   *of Kansas versus Floyd S. Bledsoe.*  I would ask

23   that you do that without prejudice.

24            THE COURT:  Is there objection?

25            MS. CRAIG:  No, Your Honor.  Not at

1        all.

2                THE COURT:  Very well.  The State's

3        motion to dismiss without prejudice to refiling

4        is granted.  Defendant is to be released.

5                MS. CRAIG:  Thank you, Your Honor.

6                MR. BELVEAL:  Thank you, Judge.

7                THE COURT:  We're in recess.  Thank

8        you.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

HAYES 0113

# C E R T I F I C A T E

STATE OF KANSAS           )
                          ) ss:
COUNTY OF JEFFERSON       )

I, Deanna L. Warner, a Certified Shorthand Reporter, and the regularly appointed, qualified and acting official reporter of the Second Judicial District of the State of Kansas, do hereby certify that as such Official Reporter, I was present at and reported in Stenotype shorthand the above and foregoing proceedings in Case Number 99-CR-325, *STATE OF KANSAS vs. FLOYD S. BLEDSOE*, heard on December 8, 2015, before the Honorable Gary Nafziger, Chief Judge of said District Court.

I further certify that a transcript of my shorthand notes was typed and that the foregoing transcript, consisting of 61 typewritten pages, is a true copy of said **MOTION TO VACATE JUDGMENT**.

**SIGNED, OFFICIALLY SEALED,** and **FILED** with the Clerk of the District Court, JEFFERSON County, Kansas, this June 17, 2016.

_____
Deanna L. Warner, CSR, #1687
Official Court Reporter

DEANNA WARNER, CSR
PO Box 327, Oskaloosa, Kansas 66066
Phone: (785) 863-5179 Fax: (785) 863-2369

HAYES 0114