# EXHIBIT 14

IN THE DISTRICT COURT OF JEFFERSON COUNTY, KANSAS

STATE OF KANSAS
JEFFERSON COUNTY
FILED
2005 JAN 11 A 9:27
SHERRY L. SEIFERT
CLERK OF DIST COURT

Floyd S. Bledsoe — Plaintiff

Vs — Case No. 03CV19

State of Kansas — Defendant

TRANSCRIPT

(Bench Trial)

Proceedings had before the Honorable Gary L. Nafziger, District Judge, Second Judicial District, Jefferson County, Kansas, on the 22nd day of October, 2004.

APPEARANCES

The plaintiff appears in person by and through Richard Ney, 200 North Broadway, Suite 300, Wichita, Kansas 67202 and co-counsel Jessica Kunen. The State of Kansas appears by and through Lee J. Davidson, Assistant Attorney General, Criminal Litigation Division, 120 SW 10th Street, 2nd Floor, Topeka, KS 66612 and co-counsel Chris Ailsliger.

THE COURT: This is 03CV19, Bledsoe vs. State of Kansas. Defendant - Plaintiff is present and in person represented by Mr. Ney. The State's represented by Mr. Davidson and we're ready for hearing. Are you ready to proceed?

FORM 2094 PENGAD • 1-800-631-6989

INDEX

Witnesses: (Plaintiff's)

| | | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|---|
| 1. | Dr. Marilyn Anne Hutchinson | 5 | 29 | 32 | |
| 2. | Jean Phillips | 33 | 81 | 92, 101 | 100 |
| 3. | Tammy Dressler Arfmann | 102 | 107 | | |
| 4. | Floyd Scott Bledsoe | 108 | | | |

Witnesses: (Defendant's)

| | | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|---|
| 1. | John R. Kurth | 140 | 146 | 164 | |
| 2. | Jimmie Vanderbilt | 166 | 170 | | |

FORM 2094 PENGAD • 1-800-631-6989

Alice L. Henning
Court Transcriptionist

JC_003377

MR. NEY: Yes, Your Honor. We'd call Floyd Bledsoe.

THE COURT: Okay, do you want to start now or do you want to take a short break?

MR. NEY: It's certainly up to the Court? We can take a break if the Court wishes.

THE COURT: Yeah, we've been going an hour, let's do that cause we'll - I'm sure you'll take about an hour with him probably.

MR. NEY: I would expect, Your Honor.

THE COURT: Okay, let's take a recess and then we'll start with petitioner's testimony. Thank you.

(THEREUPON a short recess was taken.)

THE COURT: Call your witness.

MR. NEY: Thank you, Your Honor. We would call Floyd Bledsoe to the stand.

FLOYD SCOTT BLEDSOE

Called as a witness on behalf of the Plaintiff, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

By Mr. Ney:

Q. Would you state your name for the record please?

A. Floyd Scott Bledsoe.

Q. And Floyd, were you the defendant in a case in Jefferson County, 99CR325?

A. Yes, I was.

FORM 2094 PENGAD • 1-800-631-6989

Q. And are you currently, obvious to us, but are you currently in custody for that case?
A. Yes, I am.
Q. Alright. And what sentence are you serving?
A. Twenty five to life plus fourteen years, something like that.
Q. Who was your attorney in that case?
A. John Kurth.
Q. He was your trial attorney?
A. Yes.
Q. Alright. And was he appointed or was he retained?
A. He was appointed.
Q. And let me ask you this, how long - obviously we know you were arrested in November—
A. Right.
Q. Early part of November. How long were you in custody prior to trial?
A. Roughly about nine months I believe, thereabouts.
Q. Okay, and we know that - that basically the trial happened in - I'm sorry - in April.
A. Yeah, so I guess that would be six months.
Q. Okay, so about six months perhaps. And Mr. Kurth was your attorney that entire time, is that correct?
A. Yes.
Q. Okay. And can you tell us how often you saw Mr. Kurth prior to trial, from the time of his appointment in the case in November and the trial in April?

FORM 2094 PENGAD • 1-800-631-6989

A. Maybe once a month.

Q. Okay, so about a half dozen times?

A. Yes.

Q. Okay, and did he ever sit down with you at any time during those six months or so and go over - I think I counted there's about 500 or so pages, a little more than 500 pages of reports. Did he ever sit down with you and go over those police reports?

A. Only very few of them. The rest of them he just gave to me and said to look over them.

Q. Okay. So he didn't talk to you about all of them or -

A. No.

Q. There were a lot of video tapes also in this case, things that weren't transcribed. Did he ever - did you ever watch those video tapes? Did you ever have copies of them?

A. No. He - he told me that he didn't know how I could watch them or something to that effect.

Q. Okay, and some of those video tapes were your statements?

A. Right.

Q. Did you learn that there were reports that you didn't receive after this case was over?

A. Yes, I didn't receive almost 150 pages or something to that effect.

Q. Okay, and how did you learn that?

A. After we had filed the petition we sequestered all the information that he had and that's when - and plus I gave you all

FORM 2094 PENGAD • 1-800-631-6989

the records I had and then you showed me the 150 pages or so that I did not have.

Q. Okay. You're familiar with what we've introduced into evidence here, Exhibits 1 - let's just talk about one through twelve here.

A. Yes, sir.

Q. Are you familiar with the exhibits?

A. Yes.

Q. Were those reports - and I know ones a video tape and we'll get that, but the reports here, Exhibits 1 through 10 and Exhibit 12, were those reports that you had or did not have?

A. I did not have those.

Q. Okay, so you - at the time of trial or actually until we -

A. Right.

Q. Got together on the case -

A. Yeah.

Q. You didn't have the Exhibits 1 through 10 or 12?

A. That's right.

Q. And you hadn't seen - have you seen those video tapes of Megan Kuntz?

A. No, I have not.

Q. Okay. Or were you aware of the video tape of Megan Kuntz?

A. I was not aware of any video tape.

Q. Alright. Now, what was Mr. Kurth's - if you'd just describe his general attitude about the case?

FORM 2094 PENGAD • 1-800-631-6989

A. I mean he was - he was fairly confident, I mean he said well, the State has nothing against you other than your brother saying that - that he would -- that you confessed to him on the side of the road.

Q. Alright, okay. So, when you say he said that what was his attitude about prevailing in the case?

A. He thought we'd win.

Q. Okay, and that's what he expressed?

A. Right.

Q. Were you ever offered a plea in this case?

A. Yes, I was.

Q. Okay, and explain that to us will you?

A. It was the Friday before trial, Kurth brought a plea to me. He said Vanderbilt had given him the plea and told him that he didn't think that I would accept it, but he wanted to try anyhow and Kurth brought it to me and he showed it to me and that was it.

Q. What was the plea too?

A. It was a plea to five years.

Q. Okay.

A. To something like involuntary manslaughter, but I'm not sure exactly what the charge was, but I know for a fact it was a plea for five years.

Q. Okay, so it was a manslaughter charge as you recall?

A. Right.

Q. And he was talking about the length you would have to serve was five years?

A. Right.

FORM 2094 PENGAD • 1-800-631-6989

Q. And what'd you say to him about the plea?

A. I said - he told me that he didn't think I'd accept it and I said well, I didn't do the crime so I wasn't going to do the time.

Q. So you rejected that?

A. Right.

Q. Okay. Now I want to talk about some of the issues and evidence here. You've heard a lot of testimony, of course you were at trial?

A. Right.

Q. And heard about the statements that your son, Cody, made?

A. Um hmm.

Q. Was that a yes?

A. Yes, sorry.

Q. That's alright. Now, did you ever know about these statements? And let's talk about the statement first, Cody saying Tom did it. Did you ever know about that statement prior to trial?

A. I - I had heard it the night that we were at the church. I - I don't believe - I can't remember the night it was, but Heidi had brought Cody upstairs and said that Cody was saying things that she didn't know how he would say or how he would know them and Cody started off by Uncle Tom shot Camille.

Q. Okay, so you heard it yourself?

A. Right.

Q. Alright, and this was - can you give us at least roughly when it was?

FORM 2094 PENGAD • 1-800-631-6989

A. I want to say it was either on a Monday or a Tuesday night after she was found.

Q. Alright, so obviously before your arrest?

A. Right.

Q. Okay, and Heidi brought Cody to you?

A. Right.

Q. And did he actu– she said he said these things, but did he say it in your presence?

A. Not without coaching, he did not.

Q. Well how - when you say coaching, what -

A. Not without her saying you know like - I forgot how she brought it to him, but she - she asked him you know who shot Uncle Tom or who shot Mimie and he would say Uncle Tom you know and then he would go - he would be distracted and want to play with other kids.

Q. Okay, like two year olds do?

A. Right.

Q. Okay, but she actually had to ask the question that way for him to say it?

A. Right.

Q. At least when you heard it?

A. Right.

Q. Okay. Did you hear him give any other details at that time?

A. I don't believe so, no.

Q. Okay. Did Heidi or anyone else give you details that they said they had heard from Cody?

FORM 2094 PENGAD • 1-800-631-6989

A. Heidi said that Rose had told her that Cody explained that Tom - Uncle Tom shot Mimie and put her in a ditch or in a truck or something to that effect.

Q. Okay, but you didn't hear that?

A. No, I never heard that.

Q. Did Heidi try to illicit those sort of statements from Cody -

A. Yes.

Q. In your presence?

A. Yes. You know she tried to get him to run through the whole story and he kept wanting to go off and play with the other kids?

Q. Alright, and ust that one occasion when you heard anything like that?

A. Right.

Q. Now, let's go forward in time with that then.

A. Okay.

Q. You've heard and you heard at trial obviously, these statements that Cody allegedly made saying Daddy did it?

A. Um hmm.

Q. Okay.

A. Yes.

Q. Did you ever hear him say that number one?

A. No.

Q. Okay. Did you ever hear about that prior to hearing it in court?

A. No, I did not.

FORM 2094 PENGAD • 1-800-631-6989

Q. Did Mr. Kurth ever set down and talk with you and say, Floyd, here's some evidence we have. Cody has said that you did this crime. Did you ever?

A. No, I did not.

Q. Okay, you look now at all the reports, here's all the reports we have the five hundred and -

A. Yes.

Q. Some pages. I'm sorry, six hundred and thirty seven pages of reports. Is there anything in any of those reports where Cody is recorded or it's made mention of that Cody says Daddy did it?

A. Not to my knowledge, no.

Q. And you've been through those?

A. Right.

Q. When you heard this in opening statement at trial for the first time, Mr. Vanderbilt saying Cody was going to say these things, was that something you were aware of or was that a surprise?

A. That was quite a surprise.

Q. Okay. Now, so this question may be obvious from the last one, but did Mr. Kurth ever tell you that he was going to allow that statement into evidence without objecting, the Daddy did it statement?

A. No, he never did.

Q. Because you were saying you didn't know about it?

A. Right.

Q. Let me ask you this, if he had said look, Floyd, we want to get this statement where Cody says Tom did it bought, what's also

FORM 2094 PENGAD • 1-800-631-6989

going to happen if we let this in that they're going to be able to get in the statement that Cody said you did it. What do you think about that? What would you have said?

A. Well -

MR. DAVIDSON: I'm going to object to relevance. What he would have said now knowing what he knows is not really relevant to these proceedings.

THE COURT: Response.

MR. NEY: Yeah.

THE COURT: Go ahead.

MR. NEY: Your Honor, obviously Mr. Bledsoe is saying he was not told this. I think it is relevant whether he would have given his permission for this or not. Mr. Kurth in deposition says basically he didn't ask him, but I think it is relevant whether he would have made a waiver of that or not? It - it's you know maybe in a sense hindsight, but it's the only time that Floyd would have a chance to respond to this issue.

THE COURT: I'll allow - I'll allow the answer. It's - it's - as I understand it, Mr. Kurth testified that he did not discuss this matter with him, is that right?

MR. NEY: He said - as I'm reading the deposition he says I don't recall that I asked him whether he was okay with it or not.

THE COURT: Well, and he's testified that he hasn't. I'll - I'll allow the answer. It's - It's with the understanding that this also is now with hindsight and knowledge and information that he has now that he wouldn't have had then, but -

FORM 2094 PENGAD • 1-800-631-6989

MR. NEY: I understand, Your Honor.

THE COURT: Overruled.

MR. NEY: Okay.

Q. Do you remember the question, Floyd?

A. Why don't you restate it?

Q. Okay, I'll try. If Mr. Kurth had talked to you about this, if he had come to you, if he had come to you and said, look we're going to put in Tom - the statement from Cody that Tom did it, but if we do so then the prosecutor can put in the statement that - from Cody that says Daddy did it, and he'd asked you what you wanted to do, what would you have said?

A. I would not have allowed it. I mean I would have told him, no, because I mean the only evidence we had pointing at me at all was Tom and you know now they have a two year olds hearsay test— statement saying Daddy did it. I mean there's - plus he's un— he was totally unreliable.

Q. Obviously you knew Cody?

A. Right.

Q. For the first two years of his life. Did Cody ever make up?

A. Sure, I mean - I mean you could be talking about a situation and he'd want to join right in and say you know he knew about the situation.

Q. Okay. I don't how - I mean you - have you been around other two year olds?

A. Sure.

Q. Was he a lot different from other two year olds?

FORM 2094 PENGAD • 1-800-631-6989

A. No, not at all.

Q. So, Cody could - Cody could say something that he had done something, gone somewhere with somebody, etc.?

A. Right, and it never really happened.

Q. And it not be true?

A. Yeah.

Q. Okay. Now, the motion to suppress your statements was also filed in this case, do you recall that?

A. Yes.

Q. Okay. Was the possibility of your ever testifying discussed with Mr. Kurth, your counsel?

A. On the motion to suppress?

Q. On the motion to suppress?

A. No, it was not.

Q. Okay. Let's talk about that motion to suppress. One of the issues involved and you've heard Ms. Phillips testify about it was whether you were free to leave, okay. Now, if called as a witness, if you had been called as a witness what could you have told the Court about that situation?

A. Well you know th-- from the time I got there from like 1:30 Detective Carreno kept coming out saying it'll be just a few more minutes, we need you to hang around you know and then after I was called in there you know they started asking me questions you know I was like - it was getting pretty late. My wife - or my ex-wife, my wife at that time, ex-wife now, Heidi, Heidi would have come and you know she told me we had to be at the funeral home at like five o'clock and I kept telling the guys I had to leave to go

FORM 2094 PENGAD • 1-800-631-6989

get ready for this vigil or visitation deal and they kept saying you know just a few more questions, just a few more questions.

Q. Okay, well let's - you'd gone there originally at 1:30 in the afternoon?

A. Yes.

Q. Alright. What time did they start talking with you?

A. Probably two o'clock.

Q. Alright, and you're saying this - that this visitation was at five?

A. Yes.

Q. How many times do you think between two and five did you say gee, I've got to get going to go to this thing?

A. Quite a few. I mean the closer we got to five the more times I asked them you know I told them I had to leave and they kept saying a few more questions.

Q. Okay, so did they ever say yes you can leave, go ahead if you want?

A. No, they did not.

Q. Alright. So, how long did - did five come and go?

A. Yes.

Q. Okay, what happened?

A. They just kept asking questions so I said hey guys I'm already late for this deal you know I need to leave and they said well just a few more questions you know and throughout the night and finally I had to use the restroom and we started - they had like three or four guys surround me and starting walking me to the restroom and one of them said no, Heidi and his family's out there

FORM 2094 PENGAD • 1-800-631-6989

so they took me and put me - put me back in the jail and told me I could use the restroom in the jail.

Q. Okay, so you were escorted to the restroom?

A. Yes.

Q. And by how many people?

A. Four.

Q. Alright.

A. Or three or four?

Q. Well let me - and what time was this approximately?

A. It was - it was late - I mean it was after the vigil was already been over, probably eight, nine o'clock.

Q. Okay. Floyd, was there a time in your mind where it was clear to you that you were not going to be allowed to leave?

A. Well, yeah. As soon as five o'clock came and gone I knew that you know they were going to keep me there for at least quite a while anyhow.

Q. Okay. After five o'clock did you again ask?

A. Yes.

Q. Make request to leave?

A. Throughout - throughout the entire night you know I think it was probably twelve, no it was later than that, it was probably two, three in the morning I - I said guys I gotta wrap up, I gotta go - I'm tired. I want to go to sleep and then that's when they finally said well, you're not going home so and then they escorted me in the back but -

Q. Did they question you after you said you were tired?

FORM 2094 PENGAD • 1-800-631-6989

A. Yes, they continued questioning me for probably at least another hour.

Q. Okay. And was that questioning like with this guy you knew, the detective you knew?

A. Yes. Well, actually they -- they kept taking turns and questioning me throughout the night.

Q. Now had you explained all this to Mr. Kurth, giving him the details of your -

A. Yes.

Q. Questioning?

A. Yes, I did.

Q. Okay, and that was before this motion to suppress was heard?

A. Yes.

Q. Okay. Now, we've had evidence again and Mr. Kurth did not object to the admission of your statements at trial. Did he ever sit down with you and tell - ask if you wanted to waive that objection to have that dismissed as an issue for appeal?

A. No, he did not.

Q. One thing that - that a happened in this case that a - the issue of a continuance came up just days before the trial, do you remember that?

A. Yes, I do.

Q. Okay, a number of witnesses, like thirty some witnesses had been endorsed?

A. I believe it was thirty two I think, if I'm not mistaken.

FORM 2094 PENGAD • 1-800-631-6989

Q. Okay, was that - did Mr. Kurth ever discuss that with you, the issue of whether to take a continuance to investigate these new witnesses or not?

A. I mean vaguely right - back in the seat he said the Judge is going to offer a continuance, but I don't believe there's anything that they'll be able to testify to that will harm you or anything to that effect is I believe what he said.

Q. Okay, and did he ask you if you wanted to have a continuance?

A. Ah, he said you know if you want it we'll go and I asked him I said well are you ready and he said I'm as ready as I'll ever be.

Q. Okay, did any of those thirty two witnesses testify?

A. Yes, I believe so.

Q. Rose Bolinger?

A. Right.

Q. She testified. Alright. Richard Zule?

A. Yes.

Q. Catherine Bledsoe?

A. Yes.

Q. Brandy Wampler?

A. Yes.

Q. Donald Bolinger?

A. Yes.

Q. And others?

A. Right.

FORM 2094 PENGAD • 1-800-631-6989

Q. Okay, and those were all the witnesses who were endorsed a few days before trial?

A. Exactly. Well, actually I believe it was the Friday before trial so -

Q. One of those witnesses that was endorsed was a Tammy Dressler, do you know her?

A. Yes, I do.

Q. Okay, is that the young lady that testified here this afternoon?

A. Yes, it was.

Q. Okay. Did Mr. Kurth say that he had interviewed Tammy Dressler?

A. No, he did not.

Q. Okay.

A. Or he never told me he did.

Q. Okay, one of the individuals that was interviewed but not called again and Ms. Dressler wasn't called, was Rod Lacy?

A. Right.

Q. Did Mr. Kurth ever say he'd interviewed Mr. Lacy?

A. No, he did not.

Q. Okay, and Dusten Baalmann?

A. He - he told me had subpoenaed him, but he had not talked with him?

Q. Okay, but -- and he was one of those individuals endorsed?

A. Right.

FORM 2094 PENGAD • 1-800-631-6989

Q. Cindy Kelsay, was another individual endorsed, did he ever say he interviewed Cindy Kelsay?

A. No.

Q. And - and you're aware now of course of the testimony each of those witnesses could give. They've been introduced as part of our exhibits here.

A. That is correct.

Q. In any of those cases did you ever waive him, just say oh don't worry, Mr. Kurth, you don't have to interview those witnesses or find out what they are going to say?

A. No, I never did.

Q. Okay, you hadn't waived them being called as witnesses?

A. No.

Q. Was a motion for a change of venue ever discussed with you, Floyd?

A. I - I brought it up to Kurth, yes.

Q. Okay, and why? Why did you bring it up to him?

A. Because I didn't - I didn't believe I could get a fair trial here.

Q. In Jefferson County?

A. Correct.

Q. Why? And why was that?

A. Well, just because of the publicity and it being a small community, rumors were rapid already, so you know there was no way in which to have twelve jurors that had never heard of this case. I mean some of the jurors - some of the jury pool I - I knew or had had contact with.

FORM 2094 PENGAD • 1-800-631-6989

Q. Okay, so you asked Mr. Kurth about that?

A. Correct.

Q. Okay, and again one of the things you were concerned about, there - there were rumors?

A. Right.

Q. Rumors favorable or unfavorable to you?

A. Both, but at the time most of them were unfavorable.

Q. Okay. And what did Mr. Kurth say when you said you were concerned about getting a fair trial and thought a change of venue was appropriate?

A. He told me that he didn't believe the Judge would grant it and that all it would be doing is moved to another smaller community or to another community that the Judge was over.

Q. Okay, would that have been preferable to you? Go to be at another community, one that was a small community?

A. Oh, yeah, by far.

Q. Why?

A. Well, I mean the less likely they were people that I knew, less likely the rumors being spread clear to there.

Q. Okay. So, did Mr. Kurth ever file a motion for change of venue?

A. No, he did not.

Q. Now during trial you wore a bullet proof vest right?

A. Correct.

Q. Can you describe how that appeared on you?

A. Well, it was pretty bulky. I mean you could tell I had one on.

FORM 2094 PENGAD • 1-800-631-6989

Q. Okay, were you wearing something over it?

A. Just a regular dress shirt about as thick as this one.

Q. Okay, so and the bullet proof vest was pretty obvious?

A. Yes, very obvious.

Q. Okay. Did it stick out of the shirt at all?

A. Yes, I mean you could - you could see the ridges up on my shoulders where it hung down and -- on my neck, in fact, my cousin had come up and said I see you have a vest on.

Q. Okay, so it was obvious -

A. Yes.

Q. To - to at least your cousin. Okay, and did you wear that just coming to and from the courthouse or did you wear it during trial?

A. I wore it during trial too.

Q. In front of the jury?

A. Yes.

Q. Were you ever told the reason you were being made to wear that?

A. Just due to the fact that there was potential for something to happen due to some - oh, just due to the fact of the hostile environment possibility I guess, so they put it -

Q. So, again concerns about your safety?

A. Right.

Q. Okay, and perhaps you can answer this I don't know, but were there metal detectors like when people came in and out of the courthouse?

A. No, not at all.

FORM 2094 PENGAD • 1-800-631-6989

Q. Okay, so that wasn't being done.

A. No.

Q. Prior to your arrest, did you ever go on television give interview or interviews about Camille's disappearance?

A. Yes, I did.

Q. Okay, what was - just the circumstances of that?

A. Just basically they asked me about the - about a -- Tom being arrested and how I felt about it and I told them I said well how would anybody feel about it if it was their brother being arrested and tried for murder.

Q. Okay. Did you ever go on television while Camille was still being looked for?

A. Ah, yes.

Q. Okay. Let me ask about that one.

A. Ah, let's see when was that? That was I believe Sunday afternoon.

Q. Okay. Camille hadn't been found yet?

A. Right, she had not been found. They just - they asked me to make a brief statement -- I take - actually at first they - they asked me if the family would be willing to speak and they all declined and then I told them I said I would speak for the family.

Q. Okay.

A. And I told them that if anybody had any information regarding it to please contact either the Sheriff's Department or their local people.

Q. Okay, so you were kinda asking for help?

A. Right.

FORM 2094 PENGAD • 1-800-631-6989

Q. Alright. Was Tom ever on TV in that context, like asking for help to find her?

A. No, he was not.

Q. Okay. Well then let me ask you this when Mr. Kurth, during jury selection, talked to the jurors about Susan Smith, you know the woman who went on TV -

A. Right.

Q. Saying that she wanted help to find her children -

A. Yes.

Q. How did that make you feel?

A. In essence I mean it - it shocked me. I mean I couldn't believe he would even compare the case to Susan Smith's.

Q. Because when she went on TV -

A. Right.

Q. She had actually killed her children -

A. Right.

Q. Was sort of crying crocodile tears, where are they, help me.

A. Exactly. Exactly.

Q. Okay. Did you feel - did you feel a comparison between you and that case?

A. I mean I didn't like it whatsoever. I mean here I'm being compared to somebody who actually had committed their murder and I was just in total shock that I was even being compared.

Q. And you're the only one who'd gone on TV?

A. Right.

Q. What TV station was that?

FORM 2094 PENGAD • 1-800-631-6989

A. I want to say WIBW, but I'm not 100% sure.

Q. Alright, I'm not - Is that a Topeka station?

A. Yes, Topeka station.

Q. Now, again let - let me talk to you about this, one of the - your defense in this case in part was about an alibi, right?

A. Correct.

Q. That you were working at the dairy farm?

A. Right.

Q. Okay, when Camille disappeared?

A. Yes.

Q. Okay, and that was on what night?

A. That she disappeared?

Q. Yes.

A. Friday night at like 4:20 was the last time somebody seen her.

Q. So that's Friday?

A. Right.

Q. Okay. Now then supposedly, according to Tom, you had this conversation with him and say, I did it, but I want you to take the blame, Tom, right?

A. Yes.

Q. Tell me when that took place?

A. Saturday -

Q. According to Tom?

A. Well I mean it's - depend - depending on which story you go by, I mean it was from as late as two o'clock to as early as eleven o'clock.

FORM 2094 PENGAD • 1-800-631-6989

Q. And that was his trial testimony?
A. Right.
Q. At preliminary hearing what'd he say?
A. Between one and two I think, I'm not --
Q. Okay.
A. One hundred percent sure.
Q. Yeah. At the preliminary hearing it says -
A. I want to say it was - it might have been between twelve and one.
Q. Okay. The preliminary hearing you think he says twelve or one?
A. Yeah.
Q. Okay, the record will speak for itself, but -
A. Right.
Q. But it's an hour time -
A. Exactly.
Q. And you believe its twelve and one, right?
A. Right.
Q. Okay, and that's what - of course you were at the preliminary hearing?
A. Yes, I was.
Q. Mr. Kurth was there?
A. Yes.
Q. So that's the time frame you're working on?
A. Correct.
Q. At least at that point?
A. Yes.

FORM 2094 PENGAD • 1-800-631-6989

Q. Okay. Now, that - that a -- meeting that Tom alleges to happen took place where would you say?

A. Over by the Saddle Club, which is just north of town and a little bit west.

Q. Of Oskaloosa?

A. Yes.

Q. Okay, so not very far from here?

A. Correct.

Q. Okay, and you said it's a Saddle Club?

A. Yes.

Q. Okay. Now since trial have you learned that there were people who put you elsewhere during this twelve to one time period?

A. Yes, I have.

Q. Okay, and who was that? Are you aware?

A. Ah, I want to say Leanna Grammer or something to that effect.

Q. Okay, and we've got her statement introduced as Petitioner's Exhibit 4.

A. Correct.

Q. And you've seen the statement of James Gardner?

A. Yes.

Q. As Exhibit 3, and of Dale and Danielle Hauk?

A. Yes, Exhibit 2.

Q. You've read those statements?

A. Yes, I have.

Q. Now they all live at a place - you're gonna tell me Wildhorse Road, right?

FORM 2094 PENGAD • 1-800-631-6989

A. Yes.

Q. Okay, tell me where Wildhorse Road is.

A. Ah, it's - it is north and then east of town, probably ten - I think its twelve miles from town.

Q. Okay, so from the Saddle Club, how long - how far would you be saying?

A. It'd be real close to fifteen miles.

Q. Okay, so even that far from town -

A. Yeah, It'd be - it'd be further because it's on the east side of 59 Highway.

Q. Okay.

A. Just right before you get to the dairy.

Q. Okay, so where these folks live is about fifteen miles from the Saddle Club?

A. Correct.

Q. Where you were supposed to be having this meeting between twelve and one?

A. Correct.

Q. With Tom?

A. Yes.

Q. Okay, and just from your familiarity with the area how long would it take you to drive that route?

A. Probably 20 minutes, 25 minutes, somewhere in that neighborhood.

Q. And you see their -- their statements?

A. Yes.

FORM 2094 PENGAD • 1-800-631-6989

Q. That was introduced and actually they said they see you 12:30 and after 12:30, right?

A. Right.

Q. That evidence was not - those witnesses were not called to testify for you?

A. No, they were not.

Q. Were you ever informed about those witnesses?

A. No, I was not.

Q. And again, why do you think now that it would critical to have those witnesses testify?

A. Well, it would completely refeat (sic) the time that Tom claims to have saw me.

Q. Okay, because you can't be at the Saddle Club -

A. I can't be in two places at once.

Q. Okay. There was other evidence also that you're aware of now about Tom's whereabouts correct?

A. Yes.

Q. Say at 1:30 we have Dusten Baalmann' statement?

A. Yes.

Q. That he was getting gas at that time?

A. Correct.

Q. Okay, and that's now introduced as Petitioner's Exhibit 9. Did you -- were you ever aware of that, this Dusten Baalmann's statement, would be prior to trial?

A. Prior to trial, no.

FORM 2094 PENGAD • 1-800-631-6989

Q. Alright, and then Rod Lacy's statement where he sees your brother, Tom, about 2:00 o'clock or after 2:00 o'clock at Louis Gamble's residence?

A. I never had that statement, no.

Q. The Lacy statement is Exhibit 6. Now, Floyd, one matter too, there was testimony in the trial about a conversation with your mother?

A. Correct.

Q. And you recall that?

A. Yes.

Q. Telephone conversation?

A. Yes.

Q. Okay, was there a witness at least to your end of that telephone conversation?

A. Yes, there was, Daryl Ross.

Q. Okay, now where were you when that conversation took place?

A. I was in - in what's classified as the work release or D Dorm, which is the work release pod.

Q. Okay.

A. And it - it was in the community room and right below the TV.

Q. Alright, now you weren't on work release I take it?

A. No.

Q. Alright, but Daryl Ross was in there?

A. Yes.

Q. And he was another inmate?

FORM 2094 PENGAD • 1-800-631-6989

A. Yes.

Q. Did you - well, let me just ask you this - did you tell Mr. Kurth about your end of that conversation?

A. Yes, I did.

Q. Did you say to your mother, I know Tom didn't do it?

A. No, I did not?

Q. Did you say to your mother dad did it?

A. No, I did not.

Q. Dad may have done it?

A. No, I did not.

Q. Okay. Did Daryl Ross hear that portion?

A. Yes, he did.

Q. Okay, did you talk to Daryl Ross about that?

A. Yes.

Q. Did you inform Mr. Kurth that Daryl Ross was available for testimony on your end of that conversation?

A. Yes, in actuality he told me the day of the trial that a Ross was at the jail and he could get him at any point in time that he needed him.

Q. Was Ross ever called as a witness?

A. No, he was not.

Q. And to put the complete picture and your mother testified later at the motion for new trial and retracted some of that statement she made, right?

A. Right.

Q. I have nothing further, Your Honor.

THE COURT: Thank you, counsel.

FORM 2094 PENGAD • 1-800-631-6989

MR. DAVIDSON: No questions.

THE COURT: No questions? You may step down, sir. Thank you.

MR. NEY: Your Honor, there's just one other matter. We had asked the State to produce today, so it could be introduced into evidence, the audio tape of Tom Bledsoe's statement that his - if you will - the answering machine tape statement, the audio tape that contained a - one of the allegations we made here is that defense counsel should have put that into evidence and played it for the jury so they could hear Tom's confession from his own mouth rather than calling an officer to read it.

THE COURT: His first - his first confession I take it or first statement?

MR. NEY: Yeah, there's two portions, he called the audio tape of the individual at the church and makes the statements. They were read into the record. We can see they were read. We haven't had a chance to compare the actual tape to what was read but again we were asked to put those into evidence. The State cannot find it at this point, so I think what we're asking the Court to do is allow it to be submitted at a later time as an exhibit if it can be found.

THE COURT: Sure.

MR. NEY: If not -

THE COURT: You just reserve the opportunity to offer that when it's located.

MR. NEY: Right or the State to make a statement I guess to the Court that it cannot be found.

FORM 2094 PENGAD • 1-800-631-6989