# EXHIBIT 15

1         IN THE UNITED STATES DISTRICT COURT

2           FOR THE DISTRICT OF KANSAS

3

4

5

6 FLOYD BLEDSOE,

7          Plaintiff,

8 vs.                Case No. 2:16 CV 02296

9 JEFFERSON COUNTY, KS, et al.,

10         Defendants.

11

12

13

14

15

16      VIDEO-RECORDED DEPOSITION OF JAMES W. WOODS,

17 a Defendant, taken on behalf of the Plaintiff,

18 pursuant to Notice, on February 2, 2023, at

19 Marriott SpringHill Suites, One Riverfront Plaza,

20 Lawrence, Kansas 66044, before

21

22           MYLES A. MEGEE

23

24 Certified Realtime Reporter, Registered Professional

25 Reporter, Certified in Kansas, Missouri, and Iowa.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1                    APPEARANCES

 2    For the Plaintiff (via videoconference):

 3        MR. RUSSELL AINSWORTH
          MS. RUTH Z. BROWN
 4        MS. MARIA MAKAR
          LOEVY & LOEVY
 5        311 North Aberdeen Street, 3rd Floor
          Chicago, Illinois  60607
 6        russell@loevy.com
          ruth@loevy.com
 7        makar@loevy.com
          (312) 243-5900

 8

 9    For Defendant Jefferson County, Kansas
      Board of Commissioners, Sheriff Jeff Herrig
10    in his individual and official capacity,
      Randy Carreno, Troy Frost, and Robert Poppa:
11
          MR. ERIC TURNER
12        FOULSTON SIEFKIN, LLP
          7500 College Boulevard, Suite 1400
13        Overland Park, Kansas  66210
          eturner@foulston.com
14        (913) 498-2100

15

      For Defendant Jim Vanderbilt:
16
          MR. PATRIC S. LINDEN
17        CASE, LINDEN, KURTZ, BUCK, PC
          2600 Grand Boulevard, Suite 300
18        Kansas City, Missouri  64108
          patric.linden@caselinden.com
19        (816) 979-1500

20
      For Defendants George Johnson, Jim Woods,
21    and Terry Morgan:

22        MR. SHON D. QUALSETH
          KANSAS ATTORNEY GENERAL'S OFFICE
23        120 Southwest 10th Avenue, 2nd Floor
          Topeka, Kansas  66612-1597
24        shon.qualseth@ag.ks.gov
          (785) 368-8424

25
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1                  APPEARANCES (Continued)

 2   For Defendant Michael Hayes (via videoconference):

 3       MR. VINCENT M. COX
         CAVANAUGH, BIGGS & LEMON, PA
 4       3200 Southwest Huntoon Street
         Topeka, Kansas  66604
 5       vcox@cavlem.com
         (785) 440-4000
 6

 7   Also present:

 8       Mr. Michael Hayes

 9

10

11                  TABLE OF CONTENTS

12   EXAMINATION

13   Questions By Mr. Ainsworth                        6

14

15   EXHIBITS

16   4  - 11/15/99 KBI "Investigation Report"        57

17   5  - (Previously marked)                         96

18   6  - 12/2/99 KBI "Investigation Report"         144

19   7  - Woods's handwritten notes                   89

20   41 - (Previously marked)                        146

21   49 - 11/16/99 KBI "Investigation Report"         64

22   50 - 4/26/2000 Transcript of Jury Trial, Volume  67

23        Three

24   51 - Telephone Contact Log Sheets               158

25
```



8700 Monrovia, Suite 310          Cornerstone          (913) 825-2510
Lenexa, Kansas 66215-3500      Court Reporting Company LLC    Fax (913) 825-2530
www.cornerstonekc.net                              office@cornerstonekc.net

1                  TABLE OF CONTENTS (Continued)

2

3     CERTIFICATE OF REPORTER                            201

4     ERRATA SHEET                                       202

5     SIGNATURE PAGE                                     203

6

7     Reporter's Note:  The original exhibits were

8     forwarded to Mr. Ainsworth.

9     (ph) indicates a phonetic spelling.

10    [sic] indicates the text is as stated.

11    Quoted text is as stated by the speaker.

12

13

14

15

16

17

18

19

20

21

22

23

24

25



James W. Woods – 02/02/2023

```
 1              THE REPORTER:  Good morning.  My name is
 2    Myles Megee.  I am a Kansas-certified court
 3    reporter.  We are now on the record.  Today's date
 4    is February 2, 2023, and the time is approximately
 5    9:39 a.m. Central.
 6              This is the Zoom-recorded deposition of
 7    Mr. James Woods in the case of Floyd Bledsoe versus
 8    Jefferson County, Kansas, and others, Case No. 2:16
 9    CV 02296.
10              Would counsel please identify yourselves
11    and whom you represent for the record.
12              MR. AINSWORTH:  This is Russell Ainsworth
13    appearing on behalf of the plaintiff, and I'm joined
14    by Ruth Brown and Maria Makar.
15              MR. QUALSETH:  I'm Shon Qualseth.  I
16    represent Jim Woods and the other KBI defendants,
17    Terry Morgan, and the Estate of George Johnson.
18              MR. TURNER:  Eric Turner.  I represent
19    Defendants Board of County Commissioners for
20    Jefferson County, Sheriff Jeff Herrig in his
21    individual and official capacity, Randy Carreno,
22    Troy Frost, and Robert Poppa.
23              MR. LINDEN:  Patric Linden on behalf of
24    Defendant James Vanderbilt.
25              MR. COX:  Vincent Cox, on behalf of
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1 | Defendant Michael Hayes, appearing via Zoom.

2 | Michael Hayes also appears via Zoom.

3 |       JAMES W. WOODS,

4 | a Defendant, being first duly sworn, testified under

5 | oath as follows:

6 |        EXAMINATION

7 | BY MR. AINSWORTH:

8 |   Q. All right.  Good morning.  Would you

9 | please state and spell your name for the record.

10 |    THE WITNESS:  Can you do anything about

11 | his audio output?  It's -- he's not coming through

12 | real good.

13 |    THE REPORTER:  One moment.

14 |    One moment.

15 |    All right.  Go ahead.

16 |   Q. (By Mr. Ainsworth)  Good morning, sir.

17 | Can you hear me?

18 |   A. Yes.  Better.

19 |   Q. Wonderful.  Could you please state and

20 | spell your name for the record.

21 |   A. James, J-a-m-e-s, W. Woods, W-o-o-d-s.

22 |   Q. And, sir, before we begin, I just want to

23 | go over some of the ground rules.  Is that okay?

24 |   A. Sure.

25 |   Q. First thing I'm going to ask you to do is

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1    to answer out loud with a "Yes" or "No," if the
 2    question calls for it.  All right?
 3         A.   Yes.
 4         Q.   Next thing I'm going to ask you to do is
 5    to wait till I'm done with my question before you
 6    begin your answer.  Okay?
 7         A.   Yes.
 8         Q.   I'll try and do the same with you, that
 9    is, to wait till you're done with your answer before
10    I begin my next question, so we don't make life
11    difficult for Myles.  Okay?
12         A.   Okay.
13         Q.   If you don't understand my question,
14    please ask me to rephrase, reask, or in some way
15    indicate to me that you don't understand my
16    question.  Okay?
17         A.   Okay.
18         Q.   The flip side of that is that if you
19    answer my question, I'll assume that you've
20    understood my question as I phrased it.  Okay?
21         A.   Okay.
22         Q.   Do you have any medical conditions, or are
23    you on any medication that would affect your ability
24    to testify truthfully and accurately here today?
25         A.   No.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

 1        Q.    Is there any other condition, such as

 2   fatigue or stress or you don't like -- well --

 3   fatigue or stress or any other condition that comes

 4   to mind that -- that would affect your ability to

 5   testify truthfully and accurately here today?

 6        A.    I have some pain, but it will not affect

 7   me.

 8        Q.    Okay.  So, sir, we want to make this as

 9   comfortable for you as possible; so, please, if you

10   need a break at any time, that is your right.

11   Please just alert us, and we will accommodate you

12   anytime you want.  All we ask is that you answer any

13   question that's pending before we break.  Okay?

14        A.    Okay.

15        Q.    Thank you.

16             MR. AINSWORTH:  And a quick aside:  I

17   don't suppose any counsel was able to print out that

18   Exhibit 7; is that right?  Because I can ask the

19   hotel to do so while we do some of this background.

20   So I'll do that now.

21             Okay.  Thank you.

22        Q.    (By Mr. Ainsworth)  Mr. Woods, have you

23   ever been deposed before?

24        A.    I think so, but I don't remember when.

25        Q.    Was it while you were working for the KBI?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1          A.   I don't remember.

2          Q.   What was it -- what did it pertain to when

3     you were deposed before?

4          A.   I don't know -- remember.

5          Q.   Did it have to do with your -- you being a

6     law enforcement officer?

7          A.   I don't -- I don't recall.

8          Q.   Was it in a courtroom or in a -- a

9     conference room?

10         A.   I don't recall.

11         Q.   Was this on one time or more than one

12    time?

13         A.   I don't recall.

14         Q.   I'm -- am I right that it's -- it wasn't

15    within the last ten years?

16         A.   I don't recall.

17         Q.   You don't remember.

18              So was it last year?

19         A.   No.

20         Q.   Okay.  It was longer ago than last year.

21    Can you say if it was within the last five years?

22         A.   I don't recall.

23         Q.   Could have been in the last five years

24    that you were deposed, and you don't remember

25    anything about it?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1        A.    Right.
 2        Q.    All right.  Sir, when did you retire from
 3   the KBI?
 4        A.    2000.
 5        Q.    And have you had any employment since
 6   then?
 7        A.    Yes.
 8        Q.    What employment have you had since 2000?
 9        A.    Laird Noller Ford dealership.
10        Q.    What other employment have you had since
11   2000?
12        A.    Grandpa.
13        Q.    Taking care of grandkids?
14        A.    Yes.
15        Q.    Any other employment you have since 2000?
16        A.    No.
17        Q.    Are you currently working?
18        A.    No.
19        Q.    When did you work for the Ford dealership?
20        A.    Shuffled cars from Kansas City to Lawrence
21   and delivered parts.
22        Q.    When did you do that work?
23        A.    I couldn't tell you.  I don't remember.
24        Q.    When was the last time you worked for
25   Ford?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1          A.   I don't know.

 2          Q.   Well, has it been ten years?

 3          A.   Possibly.

 4          Q.   Has it been five years since -- have you

 5    worked for Ford within the last five years?

 6          A.   No.

 7          Q.   Okay.  Are you a high school graduate?

 8          A.   Yes.

 9          Q.   When did you graduate high school?

10          A.   1960.

11          Q.   Ever serve in the military?

12          A.   No, sir.

13          Q.   What was the first law enforcement agency

14    you ever worked for?

15          A.   Sedgwick County, Kansas.

16          Q.   As a deputy?

17          A.   Corrections officer.

18          Q.   Do you have any post-high school

19    educational experience?

20          A.   Yes.

21          Q.   What post-high school educational

22    experience do you have?

23          A.   Year and a half at Wichita State

24    University.

25          Q.   Did you receive a degree or a certificate
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1   from Wichita State?

 2        A.   No.

 3        Q.   Any other post-high school educational

 4   experience you have apart from Wichita State?

 5        A.   Law enforcement training.

 6        Q.   All right.  What law enforcement agencies

 7   have you worked for?

 8        A.   Sedgwick County, Labette County, Johnson

 9   County, Douglas County, and the KBI.

10        Q.   Okay.  When you worked for Sedgwick, did

11   you attend an academy?

12        A.   No.

13        Q.   You were just a -- you were a corrections

14   officer there?

15        A.   Yes.

16        Q.   Do anything else for -- else for Sedgwick

17   apart from being a correctionals offers -- a

18   corrections officer?

19        A.   No.

20        Q.   How about Labette County?

21        A.   Deputy sheriff.

22        Q.   Okay.  Did you attend academy when you

23   worked for Labette?

24        A.   No.

25        Q.   Were you a sworn officer for Labette?
```



8700 Monrovia, Suite 310            Cornerstone            (913) 825-2510
Lenexa, Kansas 66215-3500                                  Fax (913) 825-2530
www.cornerstonekc.net        Court Reporting Company LLC   office@cornerstonekc.net

1        A.   Yes.

2        Q.   Carry a gun and patrol and all that?

3        A.   Yes.

4        Q.   Did you do anything for Labette other than

5   work as a patrol officer in a marked squad car in

6   uniform?

7        A.   I don't understand your question.

8        Q.   Thank you.

9             When you worked for Labette, were you

10  patrolling in a marked squad car in uniform?

11       A.   Yes.

12       Q.   And is that all you did?  Patrol in a

13  marked squad car in uniform.

14       A.   I'd have to say no.

15       Q.   Could you repeat your answer.

16       A.   No.

17       Q.   What else do you do for Labette?

18       A.   Accident investigation, criminal

19  investigation, report writing.

20       Q.   And did you do those activities as part of

21  your duties as a patrol officer?

22       A.   Yes.

23       Q.   And so you were working in a -- in a

24  uniformed capacity the whole time?

25       A.   Most of the time, yes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1      Q.   What did you do when you were out of
2 uniform for Labette?
3      A.   Firearms training.
4      Q.   Interacting with the public, you were
5 always in uniform; is that right?
6      A.   No.
7      Q.   What did you do interacting with the
8 public when you were not in uniform for Labette?
9      A.   Same thing I was doing when I was in
10 uniform.
11      Q.   Why was it that you were not in uniform
12 for Labette?
13      A.   I can't tell you.
14      Q.   Did you do any detective activities or
15 acting as an investigator for Labette?
16      A.   Yes.
17      Q.   What kind of cases would you investigate
18 for Labette as -- in the detective capacity?
19      A.   The normal things.
20      Q.   What are the normal things?
21      A.   Apparently you don't know much about law
22 enforcement.
23      Q.   That's true.  What are the normal things?
24      A.   Investigation of various and sundry
25 activities.



8700 Monrovia, Suite 310          Cornerstone          (913) 825-2510
Lenexa, Kansas 66215-3500         Court Reporting Company LLC    Fax (913) 825-2530
www.cornerstonekc.net                              office@cornerstonekc.net

James W. Woods - 02/02/2023

1     Q.   All right.  Did you do property crimes or

2  crimes against people?

3     A.   Both.

4     Q.   Or both?

5     A.   Both.

6     Q.   All right.  Did you investigate any

7  homicides in Labette?

8     A.   No.

9     Q.   Did you investigate any aggravated

10  batteries in Labette?

11     A.   Yes.

12     Q.   What kind of aggravated batteries did you

13  investigate?

14     A.   I don't recall.

15     Q.   Did you investigate any shootings?

16     A.   Yes.

17     Q.   Okay.  How long did you work for Labette?

18     A.   Two years.

19     Q.   And when did you work for Labette?

20     A.   '63 to '65, I believe.

21     Q.   All right.  Why did you leave Labette?

22     A.   Was a term limit for sheriffs at that

23  point.

24     Q.   And how did that affect you as a deputy?

25     A.   I didn't have a job.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
1        Q.   So the new sheriff didn't hire you?

2        A.   No.

3        Q.   Is that what you mean?

4        A.   No.

5        Q.   You were the sheriff?

6        A.   No.

7        Q.   So why -- why didn't you have a job when

8   the old sheriff left?

9        A.   Because he couldn't run again.  There was

10  term limits.

11       Q.   Okay.  And so was there a new sheriff?

12       A.   Yes.  Every four years.

13       Q.   Did you want to work for the --

14       A.   Every four years.

15       Q.   Did you want to work for the new sheriff?

16       A.   No.

17       Q.   Why didn't you want to work for the new

18  sheriff?

19       A.   Different philosophies.

20       Q.   Okay.  So you -- you decide to leave when

21  your old sheriff left; is that right?

22       A.   Correct.

23       Q.   All right.  Where -- and where did you go

24  after you left Labette?

25       A.   Johnson County, Kansas.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1       Q.    What did you do for Johnson County?

2       A.    Patrol officer.

3       Q.    How long you work for Johnson?

4       A.    About a year.

5       Q.    Did you do anything other than patrol for

6   Johnson County?

7       A.    And accident investigation, criminal

8   investigation.

9       Q.    When you did criminal investigations for

10  Johnson County, did you act as a detective --

11      A.    No.

12      Q.    -- or invest- --

13            Did you act as an investigator?

14      A.    Yes.

15      Q.    All right.  Were you acting as the -- the

16  first responder who would take initial statements

17  from people, and then pass it on to somebody else to

18  investigate?

19      A.    Yes.

20      Q.    All right.  When you worked for Johnson

21  County, did you attend a -- an academy?

22      A.    An academy per se, no.

23      Q.    On-the-job training?

24      A.    Yes.  And training -- in-house training.

25      Q.    What about -- and why did you leave

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   Johnson County?

2       A.   I got a little better offer monetarily at

3   Douglas County.

4       Q.   All right.  What did you do for Douglas

5   County?

6       A.   Same thing.  Patrol.

7       Q.   And when you worked patrol for Douglas

8   County, were you acting as a -- as a uniformed

9   officer in a marked squad car?

10      A.   Yes.  Most of the time.

11           THE REPORTER:  One moment, please.

12           Documents are now in the room.  One

13   moment.

14           Back on --

15           MR. AINSWORTH:  Oh, that's --

16           THE REPORTER:  -- if you're ready.

17           MR. AINSWORTH:  -- very kind of them.

18   Thank you.

19           Thanks, Eric.

20           MR. TURNER:  Uh-huh.

21      Q.   (By Mr. Ainsworth)  All right, sir.  When

22   you worked for Douglas County, how long did you work

23   for them?

24      A.   About five years.

25      Q.   Did you attend an academy with Douglas

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods – 02/02/2023

```
 1    County?
 2         A.    No.
 3         Q.    Did you act as an investigator at all for
 4    Douglas County where you would follow up after
 5    patrol officers took an initial report?
 6         A.    Yes.
 7         Q.    How long did you do that for for Douglas
 8    County?
 9         A.    Three or four years.
10         Q.    What kind of cases would you investigate
11    for Douglas County?
12         A.    The normal realm of criminal activity,
13    accident investigation.
14         Q.    All right.  So you did property crimes and
15    crimes against persons?
16         A.    Right.
17         Q.    Did you investigate any homicides for
18    Douglas County?
19         A.    As a lead officer or as a part of the
20    team?
21         Q.    As a lead officer.
22         A.    No.
23         Q.    Did you investigate any homicides in
24    Douglas County as a -- part of a team?
25         A.    Yes.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1      Q.   How many homicides did you investigate in

2  Douglas County as part of a team?

3      A.   I don't know.

4      Q.   What was your role on that team -- on the

5  team investigating the homicides in Douglas County?

6      A.   A team worker.

7      Q.   And so you would be given tasks to go

8  interview somebody or follow -- follow up on a lead,

9  and you would follow up on it and report back?

10     A.   Yes.

11     Q.   Why did you leave Douglas County?

12     A.   I was hired by the State of Kansas at the

13 KBI.

14     Q.   All right.  When were you hired at KBI?

15     A.   1970.

16     Q.   All right.  And so when you joined KBI,

17 did you attend an academy?

18     A.   Yes.

19     Q.   What academy did you attend?

20     A.   Law enforcement academy at Salina, Kansas.

21     Q.   How long was that academy at Salina?

22     A.   I don't remember.

23     Q.   Did you complete the training?

24     A.   Yes.

25     Q.   And can you tell us, you know, what --

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1    what positions you held with KBI and when you held

 2    them.

 3          A.    '70 to 2000, I was a special agent.

 4          Q.    All right.  Did your job duties ever

 5    change while you were at KBI?

 6          A.    I don't follow your question.

 7          Q.    Sure.  I appreciate you letting me know.

 8                While you were working at KBI, when you

 9    started in 1970, were you doing the same things you

10    were doing when you retired in 2000?

11          A.    Basically.

12          Q.    All right.  So the entire time you were at

13    KBI you were acting as an investigator?

14          A.    Yes.

15          Q.    Did you ever work patrol for KBI?

16          A.    No such thing.

17          Q.    Got it.  Okay.

18                In 1999, did you have a supervisor?

19          A.    Yes.

20          Q.    Who was your supervisor?

21          A.    Directly, it was William Delaney.

22          Q.    Did you work on a team at KBI?

23          A.    Occasionally.

24          Q.    All right.  What would determine whether

25    you were working on a team at KBI?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1        A.   I don't know.

2        Q.   Had you -- how did you meet Special Agent

3   Morgan?

4        A.   Pardon?

5        Q.   How did you meet Special Agent Morgan?

6        A.   When he was hired.

7        Q.   Do you know when that was?

8        A.   No, sir.

9        Q.   Do you know how long before 1999 you met

10   Special Agent Morgan?

11        A.   No.

12        Q.   Before the Arfmann case, did you work

13   homicides with Morgan?

14        A.   I don't remember.

15        Q.   Do you know Michael Hayes before the

16   Arfmann case?

17        A.   Yes.

18        Q.   How did you know Hayes?

19        A.   He was the county attorney at Jefferson

20   County.

21        Q.   And so how did you -- and so how did you

22   come to know him?

23        A.   I don't understand your question.

24        Q.   Did you ever meet him before the Arfmann

25   case?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1          A.    Yes.

2          Q.    And under what -- how did it come up that

3    you were meeting Hayes?

4          A.    Presenting criminal cases for prosecution.

5          Q.    All right.  So you worked cases in

6    Jefferson County before; right?

7          A.    Yes.  Yes.

8          Q.    All right.  Had you worked a homicide in

9    Jefferson County before 1999?

10         A.    Oh, yes.

11         Q.    How many homicides had you worked in

12   Jefferson County --

13         A.    I --

14         Q.    -- before 1999?

15         A.    I don't have a guess.

16         Q.    All right.  Under what circumstances would

17   the KBI come in to assist Jefferson County?

18         A.    A request from the sheriff or the county

19   attorney.

20         Q.    Did you assist on cases other than

21   homicides in Jefferson County?

22         A.    Yes.

23         Q.    What other kinds of cases would you assist

24   in in Jefferson County?

25         A.    Property crimes, person crimes, background

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1   investigations, internal investigations.
 2        Q.   Did you ever socialize with Mike Hayes?
 3        A.   No.  Well, I'll -- let me qualify that.
 4   Mr. Hayes also officiated sporting events.  If
 5   that's -- if that's socializing, I went to some
 6   sporting events that Mr. Hayes refereed.
 7        Q.   And were these youth -- youth leagues or
 8   adult leagues?  What kind of sporting events?
 9        A.   High school.
10        Q.   What sport?
11        A.   Basketball and football, I believe.
12        Q.   Well, that covers them.
13             Do you know Vanderbilt before the Arfmann
14   homicide investigation?
15        A.   Probably.
16        Q.   Do you have a memory of working on a case
17   where Vanderbilt was the CA?
18        A.   No.
19        Q.   Do you know Randy Carreno before the
20   Arfmann homicide case?
21        A.   Yes.
22        Q.   How did you know Randy?
23        A.   He was a employee of Jefferson County
24   Sheriff's Office.
25        Q.   And so you had worked cases with him
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1  before?

2      A.   Probably.

3      Q.   How did you know George Johnson?

4      A.   He was a KBI polygraph examiner.

5      Q.   Had you worked on cases with George

6  Johnson before?

7      A.   Yes.

8      Q.   How about Troy Frost?  Did you know Troy

9  Frost before the Arfmann homicide investigation?

10     A.   Yes.

11     Q.   How did you know Troy Frost?

12     A.   Employee of Jefferson County Sheriff's

13 Office.

14     Q.   Had you worked cases with Troy Frost

15 before?

16     A.   Probably.

17     Q.   What about Sergeant Poppa?  Did you know

18 him before you worked at -- on the Arfmann homicide

19 case?

20     A.   Yes.  Same answer.

21     Q.   Had you worked -- had you worked with

22 Poppa before?

23     A.   Yes.

24     Q.   Were you familiar with all the members of

25 the Jefferson County Investigative Bureau?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1        A.    There is no such thing.

 2        Q.    Fair point.  Were you familiar with all of

 3   the investigators that worked for the -- for

 4   Jefferson County during the Arfmann homicide case?

 5        A.    Yes.

 6        Q.    How did you learn that Tom Bledsoe had

 7   killed himself?

 8        A.    I don't remember.

 9        Q.    Did you have any feeling about how you

10   felt when you learned that Tom -- well, strike that.

11              Did you have any reaction when you learned

12   that Tom Bledsoe had killed himself?

13        A.    Restate your question, please.

14        Q.    Sure.

15              Well, did you ever learn about the suicide

16   notes that Tom Bledsoe left?

17        A.    I don't remember.

18        Q.    Did you read about it in the papers?

19        A.    I don't remember.

20        Q.    How did you learn that Floyd Bledsoe's

21   conviction was overturned?

22        A.    I don't recall.

23        Q.    Are you upset that Floyd Bledsoe's

24   conviction was overturned?

25        A.    No.
```



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1        Q.   Do you think that Floyd Bledsoe should be
 2   in prison?
 3        A.   I'm sorry.  Restate your question.
 4        Q.   Do you think that Floyd Bledsoe should be
 5   in prison?
 6        A.   I don't have an opinion.
 7        Q.   What about Tom Bledsoe?  Do you think that
 8   Tom Bledsoe should have been in prison?
 9        A.   I don't have an opinion.
10        Q.   When you joined KBI and you went to the
11   academy in Salina, did they train you about report
12   writing?
13        A.   Yes.
14             MR. QUALSETH:  Russell, can we stop just a
15   second.  I'm going to -- I'm going to refill Jim's
16   water.
17             MR. AINSWORTH:  Of course.
18             MR. QUALSETH:  Just a short break.
19             THE REPORTER:  Going off the record at
20   10:06 a.m.
21             (A recess was taken.)
22             THE REPORTER:  Back on the record at
23   10:08 a.m.
24        Q.   (By Mr. Ainsworth)  All right.  At Salina
25   did you also receive training in how to collect
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

 1  evidence?

 2      A.   Yes.

 3      Q.   And were you trained that an important

 4  part of a police officer's job is to document the

 5  events of an investigation?

 6      A.   Yes.

 7      Q.   And did you come -- do you sometimes

 8  testify in cases that you investigated?

 9      A.   Yes.

10      Q.   Do you find that your reports were an aid

11  to your memory if you had to testify about something

12  that happened months or years before?

13      A.   Yes.

14      Q.   And did you get the experience that

15  sometimes needle-nose defense lawyers would start

16  trying to poke holes in the investigation if things

17  were left out of the reports?

18      A.   I don't follow your question.

19      Q.   Sure.  Sometimes criminal defense

20  attorneys will attack the evidence, and sometimes if

21  the evidence, you know, supports their client's

22  guilt, they'll attack the investigation.  Has that

23  been your experience?

24      A.   Yes.

25      Q.   Sometimes defense attorneys will attack

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1    the investigation to attack the credibility of the

2    evidence as opposed to the evidence itself; right?

3        A.   Yes.

4        Q.   And so you learned, during the course of

5    your career, that it was important to not leave

6    holes in the investigations that you conducted that

7    might otherwise be exploited by defense lawyers to

8    suggest you weren't doing a good job; right?

9        A.   Yes.

10       Q.   And so you learned that you're supposed to

11   document all of the evidence that you -- well,

12   strike that.

13           It's a tough job being a police officer

14   because you're supposed to document what happens,

15   but you can spend the rest of your life writing down

16   every single thing that happens; is that right?

17       A.   No.

18       Q.   All right.  So you have -- as a police

19   officer, you have to make determinations about what

20   evidence is relevant and pertinent to your

21   investigation and what evidence is not relevant to

22   your investigation; is that right?

23       A.   Probably, yes.

24       Q.   And sometimes, at the beginning of the

25   investigation, it's hard to know which evidence is

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

 1  going to later become pertinent or relevant; right?

 2       A.   Correct.

 3       Q.   You try and be accurate in your reports;

 4  right?

 5       A.   Restate that, please.

 6       Q.   You try and be accurate in the reports

 7  that you create; right?

 8       A.   Yes.

 9       Q.   And at the end, it's a lot -- at the end

10  of your investigation, it's a lot easier to tell

11  what's relevant to the investigation than at the

12  beginning; right?

13       A.   Not always.

14       Q.   Not always, but sometimes?

15       A.   Sometimes.

16       Q.   All right.  And at KBI, you would create

17  typewritten reports; is that right?

18       A.   Correct.

19       Q.   Would you type them, or would you have

20  somebody else type them?

21       A.   A steno pool.

22       Q.   Okay.  So you would handwrite the report

23  and then give it to the steno pool to type up?

24       A.   Either handwritten or tape-recorded.

25       Q.   All right.  And those reports would be

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1  produced to the prosecution; is that right?

2      A.   Say again.

3      Q.   The typewritten reports would be produced

4  to the prosecution at K- -- while you were at KBI;

5  right?

6      A.   I don't understand what you're asking.

7      Q.   I'm asking if your typewritten reports

8  would be produced to the prosecutor in a case that

9  you were investigating.

10     A.   They'd be mailed to him, yes.

11     Q.   Yeah.  Okay.  They'd be in some way

12  transmitted to the prosecutor --

13     A.   Yes.

14     Q.   -- right?

15     A.   Yes, yes.

16     Q.   And at KBI, your field notes -- those were

17  for your purposes while you conducted your

18  investigation; right?

19     A.   Correct.

20     Q.   And the field notes -- what was pertinent

21  from the field notes you would type up into reports

22  and send those on to the prosecutor; right?

23     A.   I would not type them up, no.

24     Q.   Sorry.  What was pertinent from the field

25  notes you would then either dictate the report or

James W. Woods - 02/02/2023

1    handwrite a report to be typed up and mailed to the

2    prosecutor; right?

3         A.   Correct.

4         Q.   And the -- but your field notes you

5    wouldn't send to the prosecutor.  Those would be for

6    your use during your investigation; is that right?

7         A.   Correct.

8         Q.   And it would be your responsibility to

9    make sure that the pertinent information in the

10   field notes was transmitted to the prosecutor;

11   right?

12        A.   Correct.

13        Q.   And you knew that you were supposed to

14   write down the stuff -- or you were supposed to put

15   in your reports the information that was both good

16   for the prosecution as well as the stuff that might

17   be good for the defense; right?

18        A.   Correct.

19        Q.   You weren't supposed to do a one-sided

20   report writing where only the -- the stuff that was

21   good for the prosecution would go into the reports,

22   and the stuff that was good for the defense would

23   stay out; right?

24        A.   I don't understand what you're asking.

25        Q.   You weren't -- you were trained that you

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

 1    were not supposed to only focus on the stuff that

 2    was good for your case, when writing your -- when

 3    writing up your reports, and leave out the stuff

 4    that was good for the defense --

 5              MR. QUALSETH:  Object --

 6         Q.   (By Mr. Ainsworth)  -- correct?

 7              MR. QUALSETH:  -- to form.

 8              You can answer.

 9         A.   We put everything in the report that was

10    pertinent.

11         Q.   (By Mr. Ainsworth)  Got it.  Okay.

12              So when KBI was called in to assist on an

13    investigation, you would be working in conjunction

14    with another agency; right?

15         A.   Correct.

16         Q.   Did you ever get into, like, pissing

17    matches with the local, you know, authorities about

18    who was in charge or who was supposed to do what?

19         A.   Occasionally.

20         Q.   And so how was it supposed to work when

21    you worked with a -- when you were assisting in a

22    local organization?  Who was in charge of the

23    investigation?

24         A.   The local department.

25         Q.   Okay.  And -- and when you came in as the

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1    KBI agent on the KBI end, would there be a special

2    agent in charge of the investigation?

3         A.    A case agent.

4         Q.    A case agent.  Okay.

5         A.    Yeah.

6         Q.    When you started out -- and what are the

7    other special agents called on the case who are not

8    the case agents?

9         A.    Special agents.

10        Q.    Just assisting?

11        A.    Yes.

12        Q.    All right.  So when you started at your

13   career at KBI, were you acting more as an assisting

14   special agent, and then towards the end of your

15   career were you more of a -- more often a case

16   agent?

17        A.    You were always a case agent.

18        Q.    All right.  Were you a case agent more

19   often at the end of your career than at the

20   beginning?

21        A.    No.

22        Q.    Okay.  In the Arfmann homicide, were you

23   the case agent?

24        A.    Yes.

25        Q.    Is it true that you knew that polygraph

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1    results were not admissible in court?
 2         A.   Yes.
 3         Q.   Do you know why they were not admissible
 4    in court?
 5         A.   A court ruling.
 6         Q.   A court ruling saying that the polygraph's
 7    results were not reliable enough to be admissible in
 8    court?
 9         A.   I don't know that they used the word
10    "reliable" or not, but they were not admissible.
11         Q.   All right.  Was it your understanding that
12    the reason the polygraph exams were not admissible
13    was because they weren't accurate enough, whether we
14    say "reliable" or "accurate" or whatever term we
15    used, to be admissible in court?
16         A.   I don't know your -- an answer to your
17    question.
18         Q.   Did you know anything about how reliable
19    polygraph results were when you were a KBI agent?
20         A.   Yes.
21         Q.   What did you know about how reliable they
22    were?
23         A.   About 80 percent.
24         Q.   Where did you get that 80 percent figure
25    from?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1      A.   My figure.

2      Q.   Your figure.  And how did you know that it

3 was 80 percent?

4      A.   That's just a number I pulled out.

5      Q.   Okay.  So you never read any scientific

6 study of the -- you know, how accurate polygraph

7 exams are; right?

8      A.   No.

9      Q.   You'd agree with me that's something we

10 could study; right?  We could, you know, see if

11 people can fool the lie detector test; right?

12           MR. QUALSETH:  Object to the form.

13      Q.   (By Mr. Ainsworth)  You can answer.

14      A.   No.

15      Q.   You don't agree with me?  You don't think

16 we can study how often a lie detector is right or

17 wrong?

18           MR. QUALSETH:  Object to the form.

19      A.   No.

20      Q.   (By Mr. Ainsworth)  All right.  But you

21 think that you can tell how often a polygraph, you

22 know, result is right or wrong?

23      A.   I'll depend upon the examiner.

24      Q.   Okay.  And how did you know if an examiner

25 was good or bad?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1          A.    Their backgrounds.

2          Q.    All right.  So would you study the

3    backgrounds of the polygraph examiners to find out

4    which ones were good or bad?

5          A.    Study them?  No.

6          Q.    All right.  Well, would you investigate

7    the backgrounds of the polygraph examiners to find

8    out if they were good or bad?

9          A.    No.

10         Q.    All right.  Why do you say that the

11   backgrounds of the polygraph examiners affect

12   whether they're accurate or not?

13         A.    That's my opinion.

14         Q.    What's your opinion based on?

15         A.    Experience.

16         Q.    Okay.  What experience leads you to

17   believe that some polygraph examiners' backgrounds

18   lend them to be more accurate than others?

19         A.    The length of time they've been an

20   examiner.

21         Q.    All right.  And how does -- and why does

22   the length of time they've been an examiner affect

23   the -- their efficacy as -- you know, at getting

24   good results or bad results?

25         A.    Well, I think it's like anything.  The

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1  more experience you have, the better you are.

2      Q.   Well, sir, I've been a lawyer for 20

3  years, and I've had plenty of people tell me I'm

4  horse shit at it.  So does it always correlate that

5  the longer you do something, the better you are at

6  it?

7      A.   In your case, I don't know.

8      Q.   All right.  So sometimes it doesn't always

9  mean that you're better at something the longer you

10  do it; right?

11      A.   Not necessarily.

12      Q.   All right.  Did you have any experience

13  with George -- how reliable George Johnson was as a

14  polygraph examiner?

15      A.   Yes.

16      Q.   What was your -- and what experience did

17  you have with how reliable George Johnson was as

18  an -- as a polygraph examiner?

19      A.   George came from the military as an

20  examiner and was very --

21      Q.   Okay.

22      A.   -- well -- well-liked and highly rated.

23      Q.   And how do you know he was highly rated?

24      A.   That's what I was told.

25      Q.   Who told you he was highly rated?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1        A.   Somebody in the KBI.

 2        Q.   Who?

 3        A.   I don't remember.

 4        Q.   And what does it mean to be highly rated

 5   as a polygraph examiner?

 6        A.   I think that's a ludicrous question.

 7        Q.   Well, let me rephrase it.

 8        A.   Thank you.

 9        Q.   Did anyone tell you that they were, you

10   know, studying how reliable George Johnson's results

11   were as compared to other polygraph examiners?

12        A.   No.

13        Q.   Then, what --

14        A.   That was a management job.

15        Q.   Okay.  But what -- then, I'm trying to

16   find out what "highly rated" means in the context of

17   George Johnson as a polygraph examiner.

18        A.   Are you a highly rated lawyer?

19        Q.   It really spans the gamut, my friend.  A

20   lot of -- you know, there's a lot of people on both

21   sides.  But I'm asking you, sir.  What does it mean

22   to be highly rated as a -- what was your

23   understanding of George Johnson being highly rated?

24        A.   From his experience and his testings.

25        Q.   All right.  But you knew that even George
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1    Johnson's polygraph results would not be admissible

 2    in court; right?

 3         A.   Correct.

 4         Q.   They couldn't be used to prove somebody's

 5    guilt; right?

 6         A.   Right.

 7         Q.   When you worked as a police -- as a

 8    special agent, sometimes people would lie to you;

 9    right?

10         A.   Yes.

11         Q.   And sometimes people would give you false

12    information, but they might be doing it

13    unintentionally because they misremembered or

14    misunderstood; right?

15         A.   Possibly, yes.

16         Q.   And so part of your job as a special agent

17    was to look for inconsistencies in what people were

18    telling you; right?

19         A.   Correct.

20         Q.   And then try and investigate to determine

21    if those inconsistencies were evidence of a

22    deliberate attempt to deceive the police or if they

23    were just mistakes; right?

24         A.   Correct.

25         Q.   And so to help you determine whether
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1    people are giving you inconsistent information, you

2    needed to know what was going on in the

3    investigation as a whole; right?

4         A.   Correct.

5         Q.   As the case agent, you were responsible to

6    understand all facets of the investigation; right?

7         A.   No.

8         Q.   What was your responsibility as the case

9    agent?

10        A.   Prepare reports on our activit- -- the

11   agents' activities, make sure they were --

12        Q.   Okay.

13        A.   -- submitted timely.

14        Q.   And as part of your case agent, your -- as

15   part of your role as a case agent, you were supposed

16   to also try and get to the truth of what happened in

17   a case; right?

18        A.   Correct.

19        Q.   You were supposed to develop leads; right?

20        A.   Correct.

21        Q.   And then follow up on leads; right?

22        A.   Either I'd follow up or we'd designate

23   somebody to follow up on them, yes.

24        Q.   And so in order to develop leads, you had

25   to understand both the crime and what witnesses were

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1    saying about the crime; right?

2        A.    Yes.

3        Q.    And so how would you keep yourself, you

4    know, up to date with what was going on in an

5    investigation when you were the case agent?

6        A.    We'd have periodic meetings, briefings,

7    whatever you want to call them.

8        Q.    Well, what did you call them?

9        A.    Briefings.

10       Q.    And who would attend the briefings?

11       A.    All the --

12       Q.    Well, let --

13       A.    Go ahead.

14       Q.    It was a bad question because it's kind of

15   broad.  You did it for 30 years, and, you know --

16   in -- let's say in the Arfmann homicide

17   investigation.  Who would attend the briefings?

18       A.    Everybody involved with the investigation.

19       Q.    And so you'd have you and Morgan from KBI,

20   and then you'd have Dunnaway and Frost and Poppa and

21   Carreno from Jefferson County?

22       A.    Yes.  And sometimes Vanderbilt.

23       Q.    And Vanderbilt as well.

24             And would you guys -- as a result of those

25   meetings, would you make action plans about what

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods – 02/02/2023

1   needed to be followed up on?

2       A.   Yes.

3       Q.   And was somebody responsible for creating

4   those action plans to, you know, figure out what

5   needs to be followed up on?

6       A.   Yes.

7       Q.   Who would be responsible for making the

8   action plan of what needs to be followed up on?

9       A.   In this case, it would have probably been

10  Sheriff Dunnaway.

11      Q.   Why do you say it would probably be

12  Sheriff Dunnaway?  Was he running the investigation?

13      A.   Pretty much, yes.

14      Q.   Why do you say "pretty much"?

15      A.   Well, he's the sheriff.  He's the chief

16  law enforcement officer in the county.

17      Q.   And so he would be present for every

18  briefing?

19      A.   Pardon?

20      Q.   Dunnaway would be present for every

21  briefing; is that right?

22      A.   Best of my knowledge, yes.

23      Q.   Kind of hard to have a meeting, you know,

24  to brief everybody without the person in charge;

25  right?



8700 Monrovia, Suite 310                              (913) 825-2510
Lenexa, Kansas 66215-3500                         Fax (913) 825-2530
www.cornerstonekc.net                       office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1        A.    Correct.
 2        Q.    During the course of the Arfmann homicide
 3   investigation, were you working other cases as well
 4   or just the Arfmann homicide?
 5        A.    I don't remember.
 6        Q.    When you worked the Arfmann homicide in
 7   Jefferson County, where -- would you -- where would
 8   you physically work out of?  Did you have an office?
 9        A.    The sheriff's office.
10        Q.    So you'd go to the sheriff's office, and
11   they'd make a desk and a phone available to you?
12        A.    Yes.
13        Q.    I take it you didn't have a cell phone in
14   1999; is that right?
15        A.    No, sir.
16        Q.    I got that impression.
17        A.    Yes, yes, I did.  I'll correct that.
18        Q.    You did?
19        A.    I had a bag phone.
20        Q.    All right.
21        A.    You ever heard of a bag phone?
22        Q.    Oh, yeah.
23        A.    Okay.
24        Q.    Would you use it?
25        A.    It was in the car.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods – 02/02/2023

1       Q.   Would you use it?

2       A.   Yes.

3       Q.   All right.  An important thing to document

4  in your work as a special agent is any searches that

5  you conduct; right?

6       A.   Correct.

7       Q.   And it's important to document when the

8  search is conducted, who conducted the search, what

9  was searched, and the results of the search; right?

10       A.   Correct.

11       Q.   As well as whether it was done pursuant to

12  consent, a warrant, or, you know, also -- or

13  consistent with the arrest of the person; right?

14       A.   Correct.

15       Q.   And you would document those searches even

16  if they didn't turn up any evidence; right?

17       A.   Correct.

18       Q.   What did you do to prepare for this

19  deposition?

20       A.   Pardon?

21       Q.   What did you do to prepare for this

22  deposition?

23       A.   I met with my counsel.

24       Q.   All right.  And was that -- "counsel" is a

25  funny word.  It can mean one person or more than one

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1   person.  So how many people did you meet with?
 2        A.   One.
 3        Q.   All right.  Was that Shon?
 4        A.   Yes.
 5        Q.   And when did you meet with Shon?  But I
 6   don't want to hear what you guys talked about.
 7   Okay?  So don't tell me what you talked about --
 8        A.   I wasn't --
 9        Q.   -- just when.
10        A.   -- going to.
11        Q.   All right.  Good.  I didn't want Shon to
12   get all nervous, you know.
13             MR. QUALSETH:  I'm cool -- I'm cool as a
14   cucumber, Russell.
15             MR. AINSWORTH:  All right.  Good.
16        A.   Last week was the answer.
17        Q.   (By Mr. Ainsworth)  And for how long did
18   you meet with Shon --
19        A.   I don't --
20        Q.   -- last week?
21        A.   -- remember.
22        Q.   Was it more than an hour?
23        A.   Yes.
24        Q.   Was it more than two hours?
25        A.   I don't know.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1        Q.    Were you there long enough for a meal?

 2        A.    On Shon?  No.

 3              MR. QUALSETH:  I still work for --

 4        Q.    (By Mr. Ainsworth)  Did you meet --

 5              MR. QUALSETH:  -- the State, you know.

 6        Q.    (By Mr. Ainsworth)  -- with Shon --

 7        A.    We work for the State.  Remember?

 8        Q.    Fair.

 9              Did you meet with Shon once or more than

10  once?

11        A.    Once.

12        Q.    Did you review any documents in

13  preparation for this deposition?

14        A.    Yes.

15        Q.    What documents did you review?

16        A.    I don't remember what all we looked at.

17        Q.    All right.  And I don't want to -- I just

18  want to know what you looked at and -- did you look

19  at any police reports?

20        A.    No.

21        Q.    Did you look at any reports that you --

22  you filed?

23        A.    No.

24        Q.    Did you look at any field notes?

25        A.    No.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1      Q.   Did you look at any transcripts of

2  testimony?

3      A.   Yes.

4      Q.   Whose testimony did you look at?

5      A.   Mine.

6      Q.   Did you look at your testimony at trial?

7      A.   I believe that's what it was, yes.

8      Q.   And did you look at testimony from the

9  preliminary hearing?

10     A.   Yes, believe so.

11     Q.   Did you review any video recordings?

12     A.   No.

13     Q.   Did you review any audio recordings?

14     A.   No.

15     Q.   Did you review any photographs?

16     A.   No.

17     Q.   Did you review any discovery responses?

18  And by that I mean written -- written answers to

19  questions that were posed to you that you signed off

20  on.

21     A.   No.

22     Q.   Did you review anything other than

23  transcripts?

24     A.   Bureau records.

25     Q.   Bureau records.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1              What bureau records did you review?
 2        A.   I guess personnel.
 3        Q.   Okay.  Sometimes the bureau didn't like
 4   what you were doing; is that fair to say?
 5        A.   Yes.
 6        Q.   Did you ever get disciplined by the
 7   bureau?
 8        A.   As -- explain your word "discipline."
 9        Q.   Well, let's start with suspensions.  Were
10   you ever suspended by the bureau?
11        A.   No.
12        Q.   Were you ever issued a written reprimand
13   by the bureau?
14        A.   Yes.
15        Q.   Were you ever given an oral reprimand by
16   the bureau?
17        A.   By the bureau, no.
18        Q.   What -- how many written reprimands did
19   you receive from the bureau?
20        A.   I think Shon had three.
21             THE WITNESS:  Is that correct?  Two or
22   three?
23        Q.   (By Mr. Ainsworth)  He can't answer.  You
24   got to -- you're the only one here who can answer,
25   but what were the written reprimands for?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1        A.   I don't -- I couldn't tell you now.

2        Q.   Okay.  Did you ever apply to be a

3   sergeant?

4        A.   No.  No such rank.

5        Q.   What are the -- what's the ranks above you

6   in the bureau?

7        A.   Supervisor.

8        Q.   Did you ever apply to be a supervisor?

9        A.   No.

10       Q.   Why not?

11       A.   I enjoyed doing the work in the field.

12       Q.   All right.  Did you review any other

13  documents in preparation for this deposition apart

14  from what you told me, which is some personnel

15  records and some transcripts --

16       A.   No.

17       Q.   -- of your testimony?

18       A.   No.

19            MR. QUALSETH:  Russell, is this a good

20  time to stop?  We've been going about an hour.

21            MR. AINSWORTH:  Sure.

22            MR. QUALSETH:  We'll take --

23            MR. AINSWORTH:  Let's take five.

24            MR. QUALSETH:  -- a short break.

25            MR. AINSWORTH:  Yeah.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1            THE REPORTER:  We're off the record at
 2    10:33 a.m.
 3            (A recess was taken.)
 4            THE REPORTER:  Okay.  We're back on the
 5    record at 10:41 a.m.
 6       Q.   (By Mr. Ainsworth)  All right, sir.  So,
 7    again, if you need a break at any time, you just let
 8    us know.  All right?
 9       A.   Okay.
10       Q.   I'm going to try not to keep us all
11    here -- here all day.
12            So how did you first learn about the
13    Arfmann homicide investigation?
14       A.   I don't remember.
15       Q.   What did you first -- what were you first
16    told about the Arfmann homicide investigation?
17       A.   I don't remember.
18       Q.   All right.
19            MR. AINSWORTH:  Myles, could you hand the
20    witness what we've marked as Exhi- -- the --
21    actually, it's the exhibit that Eric just brought
22    in.  It should be a 91-page exhibit.
23            MR. TURNER:  Is it 7?
24            MR. AINSWORTH:  Yes.
25            (Sotto voce discussion.)
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1          MR. AINSWORTH:  Is there an issue with the

2     exhibit?

3          MR. QUALSETH:  Yeah.  The -- it only has

4     even numbers.

5          MR. AINSWORTH:  I see.

6          MR. QUALSETH:  Exhibit 7 --

7          MR. AINSWORTH:  I will --

8          MR. QUALSETH:  -- at 90, Exhibit 7 at

9     88 --

10          MR. TURNER:  They're single sided.

11          MR. QUALSETH:  I'm -- here's what I'll do.

12     I'm going to hand them to Myles and have him do what

13     he wants with them.

14          THE REPORTER:  One moment.  Can we step

15     off for a minute?

16          MR. AINSWORTH:  Yes, please.

17          THE REPORTER:  Off the record at

18     10:43 a.m.

19          (A recess was taken.)

20          THE REPORTER:  We are back on the record

21     at 10:45 a.m.

22     Q.   (By Mr. Ainsworth)  Sir, when you reviewed

23     your testimony from the Bledsoe trial, did you

24     observe any errors in the transcription?

25     A.   No.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1      Q.   When you reviewed your testimony from the

2   Bledsoe trial, did you believe that anything you

3   stated was inaccurate?

4      A.   No.

5      Q.   What about from the preliminary hearing?

6   Did you observe any inaccuracies in that transcript?

7      A.   No.

8      Q.   And did you -- in the preliminary hearing

9   testimony, did you observe anything that you thought

10  you had said inaccurately?

11     A.   No.

12     Q.   When was the last time you spoke to

13  Special Agent Morgan?

14     A.   Years ago.

15     Q.   Do you have his phone number?

16     A.   No.

17     Q.   Do you have an email address for him?

18     A.   No.

19     Q.   When was the last time you talked to

20  somebody, apart from your lawyer -- so not talking

21  about any of your lawyers but somebody other than

22  your lawyers -- about the Arfmann homicide

23  investigation or the Bledsoe case?

24     A.   I don't know.

25     Q.   Well, did you let anyone know you were

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1   coming to a deposition here today?

2       A.   Yes.

3       Q.   All right.  Did you talk about why you

4   were coming to a deposition today?

5       A.   Yes.

6       Q.   Did you talk about the case?

7       A.   No.

8       Q.   Have you talked with -- you know, in the

9   last 23 years, have you talked with anyone about the

10  case where you had, you know, one brother who was

11  accusing another brother of committing the murder?

12          MR. QUALSETH:  I'm going to object to the

13  extent it asks for any communications that might

14  violate the marital privilege that exists in Kansas.

15      Q.   (By Mr. Ainsworth)  You can answer.

16      A.   No.

17      Q.   So you didn't -- you haven't talked with

18  anyone at all, even, say, outside your spouse or

19  your lawyer, about the fact that you had a case

20  where one brother brought the murder weapon that was

21  his gun and showed you guys where the body was

22  buried on his property, and it turned out to be the

23  other brother who did it?

24          MR. QUALSETH:  Object to the form.

25      Q.   (By Mr. Ainsworth)  You can answer.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1          MR. QUALSETH:  You can go ahead.

2     A.   I don't understand your question.

3     Q.   (By Mr. Ainsworth)  Did you ever talk

4  about the facts of this case after May of 2000?

5     A.   Probably.

6     Q.   Probably.

7          Because it's kind of a, you know,

8  interesting fact pattern, isn't it?

9          MR. QUALSETH:  Object to the form.

10    A.   No.

11    Q.   (By Mr. Ainsworth)  Did you believe that

12 you had probable cause to arrest Floyd Bledsoe on

13 November 12th, 19- -- 1999?

14         MR. QUALSETH:  Russell, can you repeat the

15 question.  It got a little glitchy in the middle.

16    Q.   (By Mr. Ainsworth)  Did you believe you

17 had probable cause to arrest Floyd Bledsoe on

18 November 12th, 1999?

19    A.   I don't remember.

20    Q.   Do you recall Floyd Bledsoe being arrested

21 and you -- and you thinking, "I don't think we have

22 enough to charge him"?

23    A.   I don't remember.

24    Q.   Whose decision was it to arrest Floyd

25 Bledsoe?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1        A.   I don't remember.
 2        Q.   What -- what -- what do you recall about
 3   the investigation into the Arfmann homicide?
 4        A.   Not much.
 5        Q.   All right.  Well, what do you remember?
 6        A.   Specifically?
 7        Q.   Specifically, yes.
 8        A.   I don't know.
 9        Q.   Well, generally.
10        A.   I don't know.
11        Q.   Do you remember anything about the Arfmann
12   homicide investigation?
13        A.   Not -- no.
14        Q.   Do you remember that there were two
15   brothers involved?
16        A.   Because I've been told that, yes.
17        Q.   All right.  But you don't independently
18   recall this case at all?
19        A.   Very vaguely.
20        Q.   All right.  What do you recall about it
21   very vaguely?
22        A.   Nothing.  Just that it happened.
23        Q.   All right.  Do you remember that it was a
24   14-year-old girl who was murdered, and she was the
25   sister-in-law of the criminal defendant?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1      A.   I don't remember.

2      Q.   All right.  One second.  I'm going to pull

3  up --

4           MR. AINSWORTH:  Myles, could you please

5  hand the witness what we've previously marked as

6  Exhibit No. 4.

7           THE REPORTER:  One moment.

8      Q.   (By Mr. Ainsworth)  All right.  I'm going

9  to show you what we've marked as Exhibit No. 4.

10  This is Bates numbered KBI Subpoena 926 through

11  '927.

12           Can you tell us if this is a report that

13  you either handwrote or dictated?

14      A.   Yes.

15      Q.   How can you tell?

16      A.   It bears my initials and my name at the

17  top.

18      Q.   All right.  So this is an investigative

19  step that you -- that you conducted; is that right?

20      A.   It's a report I generated.

21      Q.   Okay.  And so this is regarding the

22  receipt of a cash register receipt at Rusty's

23  Outdoor Sports.  Do you see that?

24      A.   Yes.

25      Q.   And so -- all right.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods – 02/02/2023

```
 1              You write that "On 11" -- "on November 15,
 2    1999," you "received a cash register receipt for
 3    Rusty's Outdoor Sports, Lawrence, Kansas, from
 4    Michael Hayes, attorney for Tom Bledsoe."  Do you
 5    see that?
 6         A.   Yes.
 7         Q.   And so why did you document that you
 8    received the evidence from Michael Hayes, attorney
 9    for Tom Bledsoe?
10         A.   Procedure.
11         Q.   All right.  So if you received information
12    from Michael Hayes, that was important to your
13    investigation; right?
14         A.   Possibly.
15         Q.   If Michael Hayes was telling you
16    information about what Tom was saying, that would be
17    pertinent to your investigation; right?
18         A.   Yes.
19         Q.   Because he was Tom Bledsoe's lawyer, and
20    so if Michael Hayes was telling you what Tom was
21    saying, you would want to document that; correct?
22         A.   Correct.
23         Q.   All right.  And here it says "The receipt
24    is dated November 5th, 1999, and reflects a time of
25    4:30."  Do you see that?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1        A.   Yes.

2        Q.   All right.  And do you recall a -- an

3    issue in the case being that the victim was last

4    seen at 4:20 in the afternoon on Friday,

5    November 5th, 1999?

6        A.   No.

7        Q.   All right.  In any event, you wanted to

8    trace where Tom Bledsoe was and at what times he was

9    at those places on November 5th, 1999; correct?

10       A.   Apparently.

11       Q.   Okay.  And you wanted to know if the time

12   of 4:30 in the afternoon was accurate; right?

13       A.   I don't remember.

14       Q.   Well, let me show -- let's -- let's

15   mark -- or let's --

16            MR. AINSWORTH:  Please hand the witness

17   Exhibit No. -- I believe it's -- yeah, Exhibit

18   No. 5.

19            THE REPORTER:  Do we want the link in the

20   chat window as well?

21            MR. AINSWORTH:  If people would like it,

22   then I'm happy to have them.  I can also read off

23   the base number of the exhibit.  And Exhibit 5's

24   Bates numbers are KBI Subpoena 928, and it goes

25   through '930.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1          MR. LINDEN:  Yeah, Russ, this is Patric.

2    These are, again, documents that we discussed

3    yesterday.  I don't -- I think there's some

4    confusion as to whether those were supplied to us.

5          MR. AINSWORTH:  I -- and I still don't --

6    I assume that they -- they were and -- but they

7    certainly should be, and I agree that you have a --

8    you've got a right to these documents.

9          MR. TURNER:  This is Eric, and I don't

10   have them either.  And I communicated with Ruth

11   yesterday about that, and I think she's going to get

12   them to us, but we don't have them yet.

13         MR. AINSWORTH:  All right.

14         MS. BROWN:  This is Ruth.  Russell, can I

15   jump in here?

16         MR. AINSWORTH:  Yes, please.

17         MS. BROWN:  You know, I believe they were

18   sent to you.  We're going to be sending you another

19   copy today.  If it would be helpful, I'm happy to

20   email them to you right now.  Would that be helpful?

21         MR. LINDEN:  The court reporter just

22   shared a couple Dropbox links, and I'm going to try

23   to download them now.  The link that was sent

24   previously -- it only has some Bates ranges for the

25   production but not the documents that we're

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1   discussing today; so that's where maybe the
 2   confusion lies.
 3              MR. AINSWORTH:  What -- what -- do you
 4   know what Bates range you have?
 5              MR. LINDEN:  I've got '1 to '285, '286 to
 6   '758.  And then some of these I have not been able
 7   to download yet because of their size.  I can't get
 8   them on the hotel Wi-Fi, but it looks like it skips
 9   after '758.  Give me just a second.
10              It jumps from '758 to '4714.  Then there's
11   a -- let's see -- '4714 to '5402, then '5403, '5405,
12   '5407, and continuing, like, individual items until
13   '5414.  And that's all that was in that upload.
14              MR. AINSWORTH:  That's -- I'm sorry.  I --
15   I thought that these had all been produced, and
16   certainly, you know, we'll send them over today.
17              MS. BROWN:  I'm sorry to ask.  I missed
18   the list.  Can you tell me again the ones that you
19   do have.
20              MR. LINDEN:  Let me do this.  Let me
21   screenshot this, and I can email you here in just a
22   moment.
23              MS. BROWN:  Okay.  Thanks.
24              MR. TURNER:  And this is Eric.  I have the
25   personnel files from '2661 to '4344, but I don't
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1   have before or after, at least not in front of me.
 2   And I think, for the purposes of the deposition, as
 3   long as we have these links, I'm good with that.
 4           MR. AINSWORTH:  And we'll certainly, you
 5   know -- do you have Mr. Woods's field notes?
 6           MR. LINDEN:  Not yet.
 7           MR. AINSWORTH:  Ruth, would you mind
 8   sending those around?
 9           MR. LINDEN:  Yeah.  We're trying to get
10   them downloaded, but, again, we're on hotel Wi-Fi.
11           MR. AINSWORTH:  I see.  And, actually, I
12   sent those around earlier this morning.
13       Q.   (By Mr. Ainsworth)  All right.  In any
14   event, I'm going to show you what we've marked as
15   Exhibit 5.  Are you able to tell if this is a report
16   that you generated, even if you didn't type it, but
17   the content was from you?
18       A.   Are you asking me that?
19       Q.   I am, sir.
20       A.   Yes.
21       Q.   We're back to you now.
22       A.   Okay.
23           MR. TURNER:  Russell, I have one question.
24   I have down that we -- Exhibit 5 we used yesterday
25   as Jefferson County field notes.  And this is also
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1    Exhibit 5.
 2              MR. AINSWORTH:  I know.  It's -- we got a
 3    problem here.
 4              MR. TURNER:  Okay.  Just wanted to make
 5    sure we knew.
 6              MR. AINSWORTH:  Yeah.  I asked that
 7    these -- it's on our end.  I asked that these
 8    reports would be -- exhibits would be numbered
 9    consecutively after yesterday's exhibits, but that
10    didn't happen.  And so what we could do is we could
11    re-mark these just for this deposition, or we could
12    renumber this to begin, you know, later, and give it
13    a unique number.
14              MR. QUALSETH:  How about a 5A?
15              MR. AINSWORTH:  I think we should -- well,
16    I mean, that gets a little confusing to get 5s and
17    5As and 5Bs.  Our -- should we -- should we keep
18    cons- -- you know, consistent numbering among --
19    across all the depositions in the case?  It might
20    make more sense.  I think that would be good.  And
21    so why don't we --
22              Myles, if you're able to re-mark this as
23    Exhibit 49.
24              THE REPORTER:  One moment.
25              MR. AINSWORTH:  Kind -- thank you kindly.
```



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1            MR. QUALSETH:  Sounds good.

2            (Exhibit No. 49 was marked for

3    identification.)

4            THE REPORTER:  It's marked Exhibit 49.

5       Q.   (By Mr. Ainsworth)  Okay.  So take a look

6    at Exhibit 49.  This is the same three-page document

7    that's Bates numbered KBI Subpoena 928 through '930.

8    And, sir, this is your report; is that right?

9       A.   Correct.

10       Q.   You conducted this interview of Kevin

11    Feleay, from Rusty's Outdoor Sports; right?

12       A.   Yes.

13       Q.   All right.  Let's take a look -- the

14    bottom paragraph of the first page of Exhibit 49

15    states "Special Agent Woods requested a sample tape

16    from the rear register.  Upon reviewing the tape, it

17    was noted that the date and time were incorrect.

18    Feleay then ran sample tapes on the two front

19    registers.  Both showed correct dates but were

20    approximately 45 minutes fast."  Do you see that?

21       A.   Yes.

22       Q.   Then going on to the second page of

23    Exhibit 49, it says that "Feleay checked records and

24    stated that, in his opinion, the register tape for

25    November 5th, 1999, would have been accurate for the

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1  date and relatively close for the time.  He

2  explained that apparently some sort of glitch

3  affected only the rear register after closing on

4  Sunday, November 15, 1999, at 7:00 p.m. and opening

5  on Monday, November 15, 1999, at 9:00 a.m.  Copies

6  of three cash register tapes are attached."  Do you

7  see that, sir?

8       A.   Yes, sir.  There's a --

9       Q.   Do you ask --

10       A.   -- discrepancy in the dates.

11       Q.   And the times.

12       A.   Well, more so on the date.  You can't

13  have --

14       Q.   You mean --

15       A.   -- Sunday, the 15th, and Monday, the 15th.

16       Q.   Right.  That seems to be a typo.  I think

17  Monday should have been November 16th.

18       A.   That's up to you.  I don't know.

19       Q.   Or actually should have been Sunday, the

20  14th.

21       A.   I don't know.

22            MR. QUALSETH:  Wait for the question.

23       Q.   (By Mr. Ainsworth)  Let's say you were

24  interested in finding out the accuracy of the

25  register tapes on -- or the times printed on the

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1   register at Rusty's Outdoor Sports, and the manager
 2   said that there was a glitch, and it only affected
 3   the rear register at closing Sunday and then opening
 4   on Monday.  Wouldn't you want to know what that
 5   glitch was?
 6              MR. QUALSETH:  Objection.  Object to the
 7   form.
 8        A.   A glitch is a glitch.
 9        Q.   (By Mr. Ainsworth)  A glitch is a glitch.
10        So all glitches are the same?
11        A.   No.
12        Q.   And I'm a little confused.
13        So just to kind of orient ourselves,
14   November 5th, 1999, was a Friday.  November 7th,
15   1999, was a Sunday.  So November 14th, 1999, was
16   also a Sunday.  You following me?
17        A.   No.
18        Q.   All right.  So November 7th was a Sunday;
19   so seven days later is also a Sunday.  Right?
20        A.   Yes.  That would be correct.
21        Q.   Okay.  So that means if the 14th was a
22   Sunday, the 16th, the date that you interviewed this
23   gentleman, was a Tuesday; right?
24        A.   According to the report.
25        Q.   Okay.  And so your report says that -- and
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1   so when -- when these register tapes, the sample

2   ones, were printed, that was done on Tuesday, the

3   16th; right?

4        A.   Apparently.

5        Q.   And the store manager said that the glitch

6   affected only the rear register and after closing

7   Sunday and -- and before opening Monday.  Is that

8   what you understand this to be?

9        A.   That's what it says, yes.

10       Q.   But the glitch was still affecting the

11   time on the rear register on Tuesday, the 16th;

12   right?

13       A.   Apparently, yes.

14       Q.   And so you had -- the two front registers

15   were 45 minutes off; right?

16       A.   According to the report, yes.

17       Q.   Any reason to doubt the report?

18       A.   No.  I prepared it.

19       Q.   All right.  So it's accurate; right?

20       A.   Other than some typo errors.

21       Q.   All right.  So I want to ask you, sir --

22   let's show you --

23            MR. AINSWORTH:  Myles, would you please

24   grab Exhibit 1 in your stack, but we'll re-mark it

25   as Exhibit 50.  It's Woods's trial testimony.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1              Let me know when the witness has it.
 2              THE REPORTER:  One moment.
 3              MR. AINSWORTH:  Sure.
 4              THE REPORTER:  Okay.
 5              THE WITNESS:  I have the exhibit.
 6         Q.   (By Mr. Ainsworth)  Thank you, sir.
 7              And so for the record, Exhibit 50 is Bates
 8    numbered JC 486 through JC -- oh, sorry -- JC 486
 9    and then '487 and then picks up at '552 through
10    '585.
11              And, sir, I'm going to ask you to turn to
12    page -- the 33rd page of the exhibit, which is Bates
13    numbered --
14         A.   Well, the pages are not numbered, sir.  At
15    least, if they are, I'm not finding them.
16         Q.   That's okay.  Turn -- in the upper
17    right-hand corner, there's -- go to the page 509.
18         A.   Okay.  We can do that.
19         Q.   And this is Bates numbered JC 582.
20         A.   Okay.  509.
21              Okay.  509.
22         Q.   All right.  Thank you, sir.  I'm going to
23    just -- just so we're oriented, if you -- can you
24    see the screen?  You see where it says this is --
25    they're calling Jim Woods?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1       A.   Yes.

2       Q.   All right.  So this is your testimony from

3   the trial, just so you're oriented as to what

4   we're -- what we're looking at.

5            And then on page 509 -- so you can look at

6   the paper copy of the Exhibit 50.  And your

7   testimony -- I guess, if we flip back one page to

8   page 508, that gives you some context.

9            Starting at line 10 on page 508, you're

10  asked the following questions, and you give these

11  following answers:

12           "And on the 16th, you went there to check

13  on the receipts.  Is that a correct statement?"

14           Answer:  "On the receipt and also to

15  interview the clerk whose employee number appeared

16  on the receipt."

17           Question:  "And at the time, you spoke

18  with Kevin Feleay; is that correct?"

19           Answer:  "Yes, sir."

20           And then skipping down to line 19:  "And

21  you asked him, prior to running any receipts, if the

22  date and time would be correct; is that right?"

23           Answer:  "That's correct."

24           Question:  "And he indicated they would be

25  correct; is that right?"

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1            Answer:  "The date would be correct.  He

2     said give or take a few minutes on the time but a

3     ballpark correctness on the time, yes."

4            Question -- and going on to page 509.

5     Question:  "And he ran three receipts for you?"

6            Answer:  "He did."

7            Question:  "Was the date correct?"

8            Answer:  "Two of them were."

9            "Was the time correct?"

10           "Two of them were."

11           "And which one was inaccurate?"

12           "The rear register, which is the

13    ammunition, firearms register."

14           Were you asked those questions, and did

15    you give those answers, sir?

16        A.   Say again.

17        Q.   Were you asked those questions, and did

18    you give those answers, sir?

19        A.   Well, that's what it says here.

20        Q.   All right.  And you've got no reason to

21    doubt that that was your testimony back in 2000;

22    right?

23        A.   No.

24        Q.   That's correct?

25        A.   It's correct.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

 1       Q.   And so back in 2000, you testified at

 2   Floyd Bledsoe's trial that the time on two of the

 3   three receipts -- sample receipts were correct;

 4   right?

 5       A.   Correct.

 6       Q.   But then looking back at Exhibit 49, at

 7   the bottom of page 1 of Exhibit 49, the sample tape

 8   from the rear register was incorrect, and then

 9   samples in the two front registers -- both were 45

10   minutes fast; right?

11       A.   If that's what the -- I don't have the

12   report anymore.

13       Q.   All right.  Well, I'm reading -- it's on

14   the screen, and I'm reading it to you.

15            And so my question is why did you say that

16   two of the three registers gave you the correct time

17   when all three registers gave you the wrong time,

18   and the two front registers were both 45 minutes

19   fast --

20       A.   Two were --

21       Q.   -- approximately?

22       A.   -- were close to correct, and one was way

23   off.

24       Q.   Okay.  So the -- the two that you say were

25   close to correct -- they were 45 minutes fast;

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1  right?
 2       A.   If that's what the report says.
 3       Q.   45 minutes, you know, might not matter,
 4  but it -- it might matter if you're trying establish
 5  when a -- your suspect in a homicide was at a place;
 6  right?
 7            MR. QUALSETH:  Object to the form.
 8       Q.   (By Mr. Ainsworth)  You can answer.
 9       A.   I don't recall.
10       Q.   Well, you just know, generally speaking,
11  that sometimes 45 minutes matters a lot when you're
12  conducting an investigation into where -- where your
13  suspect is in a homicide; right?
14            MR. QUALSETH:  Object --
15       A.   Correct.
16            MR. QUALSETH:  -- to the form.
17       Q.   (By Mr. Ainsworth)  Why did you say that
18  the -- why do you testify that the times on two of
19  the three registers were correct and only one of
20  them was wrong when all three were incorrect?
21       A.   They were not the registers in question.
22       Q.   Okay.  So because they weren't the
23  registers in question, that's why you said the times
24  on those registers were accurate when they weren't
25  accurate?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1        A.    Apparently so.

 2              MR. QUALSETH:  Object to the form.

 3              Go ahead.

 4        A.    Apparently so.

 5        Q.    (By Mr. Ainsworth)  So was it acceptable

 6   to tell the jury that was trying Floyd Bledsoe for

 7   the crime of murder that two of the registers gave

 8   correct times when they didn't give correct times?

 9        A.    That --

10              MR. QUALSETH:  Object to the form.

11        A.    -- would have no bearing.

12              MR. QUALSETH:  Okay.  You need to give me

13   time to object.

14              THE WITNESS:  Okay.

15              MR. QUALSETH:  I object to the form.  It's

16   argumentative.

17              Go ahead.

18        Q.    (By Mr. Ainsworth)  And -- and so it's --

19   it's okay, in your book, because it would have no

20   bearing on the result of the trial?

21              MR. QUALSETH:  Same objection.

22        Q.    (By Mr. Ainsworth)  Is that your

23   testimony, sir?

24        A.    Again, the other two registers had no

25   bearing.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1     Q.   Okay.  I'm just trying to find out.  Was

2 it your understanding in the year 2000, when you

3 testified at Floyd Bledsoe's trial, that you could

4 give false information to the jury if you believed

5 it didn't have any bearing on the outcome of the

6 trial?

7          MR. QUALSETH:  Object to the form.

8     A.   I don't recall.

9     Q.   (By Mr. Ainsworth)  Okay.  So, as you sit

10 here now, was it okay to give false information to

11 the Bledsoe jury on -- on an issue that didn't, in

12 your opinion, have any bearing on the outcome of the

13 trial?

14          MR. QUALSETH:  Object to the form.

15    A.   I didn't knowingly give false information.

16    Q.   (By Mr. Ainsworth)  All right.  How do you

17 know you didn't knowingly give false information?

18          MR. QUALSETH:  Object to the form.

19    A.   You've pointed it out.

20    Q.   (By Mr. Ainsworth)  I -- and how does that

21 answer my question, sir?

22    A.   Well, you pointed out that apparently I

23 gave false information.

24    Q.   How do you know you didn't knowingly give

25 false information?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1         A.   I wouldn't --
 2              MR. QUALSETH:  Same objection.
 3         A.   -- knowingly do that.
 4         Q.   (By Mr. Ainsworth)  Give me one second
 5    here.
 6              Do you remember Mike Hayes representing
 7    Tom Bledsoe?
 8         A.   Yes.
 9         Q.   Did you have any conversations with Mike
10    Hayes about Tom Bledsoe?
11         A.   I don't recall.
12              MR. AINSWORTH:  I take it the hotel hasn't
13    been able to print that exhibit as yet?
14              MR. QUALSETH:  We haven't received
15    anything.
16              MR. AINSWORTH:  That's fine.  All right.
17         Q.   (By Mr. Ainsworth)  I wanted to ask you
18    about George Johnson just to finish that point.
19    Did -- did he -- had you worked on other polygraph
20    examination -- on other cases where he did polygraph
21    exams of the suspect?
22         A.   Probably.
23         Q.   In your experience, had he been good at
24    being able to detect that the suspect in the case
25    you were working was lying?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1           MR. QUALSETH:  Object to the form.

2      A.   George never used the word "lying."

3      Q.   (By Mr. Ainsworth)  Oh, right.  Do you

4  find, in your experience, that George Johnson had --

5  was able to find that the suspects in your cases

6  that you were working were -- indicated that they

7  were deceiving --

8           MR. QUALSETH:  Object to the form.

9      Q.   (By Mr. Ainsworth)  -- or being deceptive?

10     A.   Yes.

11     Q.   How often would George Johnson find that

12  the suspects in cases you were working were -- were

13  deceptive?

14     A.   I have no idea.

15     Q.   All right.  Was it -- if he was -- was

16  there ever a time when you had a suspect give a

17  polygraph -- take a polygraph -- well, strike that.

18          Sometimes George Johnson would give

19  polygraphs to witnesses, and sometimes he would give

20  polygraphs to suspects; right?

21     A.   Correct.

22     Q.   And so sometimes witnesses would -- there

23  would be no deception indicated, and sometimes with

24  witnesses there would be deception indicated; right?

25     A.   Yes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods – 02/02/2023

1    Q.   Was there ever a case where George Johnson

2  did the polygraph exam of a suspect and George

3  Johnson determined that the suspect was not

4  indicating deception?

5    A.   Re- -- rephrase your question, please.

6    Q.   Sure.  Was there ever a time where George

7  Johnson conducted a polygraph exam of a suspect and

8  determined that the suspect was not indicating

9  deception?

10   A.   I don't recall.

11   Q.   Were there times when George Johnson

12 conducted a polygraph exam on -- on a sus- -- on

13 your suspect and determined that the suspect was

14 indicating deception?

15   A.   I don't recall.

16   Q.   Then, where did your 80 percent figure

17 come from?

18   A.   My figure.

19   Q.   You recall the 80 percent figure, but you

20 don't recall the results of any of the examinations

21 conducted by George Johnson?

22   A.   No.  But I dealt with other examiners.

23   Q.   All right.  Do you recall the results of

24 other examiners in the -- the KBI?

25   A.   Yes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1      Q.   All right.  Do you recall other examiners

2  getting -- whether other examiners ever got a "no

3  deception indicated" from conducting a polygraph

4  exam on a suspect?

5      A.   I don't recall that.

6      Q.   Do you recall other polygraph examiners

7  other than George Johnson getting "deception

8  indicated" from a suspect?

9      A.   I would believe so, yes.

10     Q.   Okay.  Would you believe so with George

11 Johnson as well, that he would obtain "deception

12 indicated" from suspects?

13     A.   State the question again, please.

14     Q.   Well, let me put it this way:  I take it

15 that you were pretty good at your job.  Is that

16 right?

17     A.   I thought I was, yes.

18     Q.   And so the suspects that you had in your

19 cases were guilty, in your mind; right?

20          MR. QUALSETH:  Object to the form.

21     A.   No, sir.

22     Q.   (By Mr. Ainsworth)  You had suspects in

23 your case that weren't guilty?

24     A.   No, sir.

25     Q.   Well, how about this:  For the set of

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1   suspects that -- that were charged with crimes and
 2   became, you know, criminal defendants, in your mind,
 3   those people were guilty; right?
 4        A.    No --
 5              MR. QUALSETH:  Object --
 6        A.    -- sir.
 7              MR. QUALSETH:  -- to the form.
 8              THE WITNESS:  Excuse me, Shon.
 9        Q.    (By Mr. Ainsworth)  Well, so you --
10              MR. QUALSETH:  You can answer if you've
11   not.
12        Q.    (By Mr. Ainsworth)  You had cases where
13   you had somebody charged in an investigation that
14   you were conducting, and you didn't think the person
15   was guilty?
16        A.    No, I didn't say that.  It wasn't my
17   job --
18        Q.    Well, that's what I'm trying to find out.
19        A.    -- to determine their guilt.
20        Q.    Right.  I -- and I don't mean whether they
21   were actually guilty or not, because you weren't
22   there, and how could you know.  I just mean that you
23   believed that they were guilty, for the people who
24   were charged with the crime that your investigation
25   discovered.  Right?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1        A.   I don't know.

2        Q.   You don't know.

3            Well, I guess what I'm getting at, to be

4  completely transparent, is that suspects in cases

5  where you've got an idea that they committed the

6  crime -- it's your belief that they were deceiving

7  the police and not being straight about their

8  culpability in the crime; right?

9            MR. QUALSETH:  Object -- object to the

10  form.

11       A.   No.

12       Q.   (By Mr. Ainsworth)  Were you trained that,

13  when you conduct interrogations, you're supposed to

14  only interrogate suspects you believe are guilty?

15       A.   No.

16           MR. TURNER:  Object to the form.

17           THE WITNESS:  Excuse me.

18       Q.   (By Mr. Ainsworth)  Did you interrogate

19  suspects?

20       A.   Ever?

21       Q.   Yeah.

22       A.   Yes.

23       Q.   Did you interrogate suspects that you

24  believed were innocent as well as suspects you

25  believed were guilty?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1        A.   Yes.

2        Q.   So you can't tell me anything about how

3   often George Johnson would determine whether

4   somebody was being deceptive or not deceptive;

5   right?

6            MR. QUALSETH:   Object to the form.

7        A.   No.

8        Q.   (By Mr. Ainsworth)   That's correct?

9        A.   That's correct.

10       Q.   And you can't tell me anything about how

11  reliable George Johnson's polygraph results were;

12  right?

13       A.   No.

14           MR. QUALSETH:   Object to the form.

15           THE WITNESS:   I'm sorry.

16       A.   No.

17       Q.   (By Mr. Ainsworth)   That's correct?

18       A.   Yes.

19       Q.   All right.   I'm going to give you a

20  hypothetical:   If a -- if a person turns themselves

21  in to the police and tells the police that there's a

22  murder victim buried in their backyard and provides

23  the gun that was used to kill the person that was

24  their own gun, would you want to search the vehicle

25  of that individual?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1              MR. QUALSETH:  Object to the form.

2         A.   Yes.

3         Q.   (By Mr. Ainsworth)  Why would you want to

4    search the vehicle of that person?

5         A.   Part of an investigation procedure.

6         Q.   What's -- what's procedure about searching

7    a suspect's vehicle?

8         A.   Gathering evidence.

9         Q.   Because there might be trace evidence of

10   a -- of the crime in the suspect's vehicle?

11        A.   Possibly.

12        Q.   Would you want to search that same

13   suspect's residence?

14        A.   Possibly.

15        Q.   Well, why do you say "possibly"?

16        A.   I don't know all the circumstances that

17   you're throwing out, your hypothetical.

18        Q.   Sure.  All right.  If the -- if the

19   person -- if the victim is buried in the person's

20   property where their house is located, would you

21   want to search the suspect's house?

22             MR. QUALSETH:  Object to the form.

23        A.   Yes.

24        Q.   (By Mr. Ainsworth)  Why would you want to

25   search the suspect's house?

8700 Monrovia, Suite 310                                              (913) 825-2510
Lenexa, Kansas 66215-3500                                          Fax (913) 825-2530
www.cornerstonekc.net          **Cornerstone**          office@cornerstonekc.net
                                Court Reporting Company LLC

James W. Woods - 02/02/2023

```
 1        A.   Again, evidence.
 2        Q.   So -- and -- and do you want to wait to do
 3   that, or do you want to do it as soon as practical
 4   to preserve the evidence that might be at those --
 5   the vehicle or the -- the residence?
 6        A.   As soon as practical.
 7        Q.   Why do you want to do it as soon as
 8   practical?
 9        A.   Evidence could be lost.
10        Q.   And --
11             MR. AINSWORTH:  I hear a woman talking in
12   the background a little bit.  I don't know if
13   that -- Mr. Hayes's microphone is not muted.
14             THE WITNESS:  It must be in your end.
15             MR. AINSWORTH:  It must be on my end.
16             THE WITNESS:  Yes.  There's no --
17             MR. AINSWORTH:  Yeah.  So --
18             THE WITNESS:  -- women in this room.  I
19   can guarantee you.
20             THE REPORTER:  One moment.
21             MR. AINSWORTH:  I appreciate that.
22   So --
23             THE REPORTER:  One moment.
24             MR. AINSWORTH:  -- the only reason I raise
25   it is because Mr. Hayes should be alone while
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1  observing the deposition.
 2          THE WITNESS:  The reporter asked for a
 3  moment.
 4          THE REPORTER:  I only ask because I could
 5  mute him, but that doesn't mean anything.
 6          Go ahead with your record.
 7          THE WITNESS:  Are you ready?  Okay.
 8          Go ahead.
 9          MR. AINSWORTH:  So, Vince, would you just
10  ensure that Mr. Hayes is alone and that nobody else
11  is observing the deposition.  I would appreciate
12  that.
13          MR. COX:  Sure.  It looks like Mr. Hayes
14  is now muted.
15          And, yeah, Mr. Hayes, if you would please
16  make sure you're observing this deposition alone, we
17  would appreciate that.  Thank you.
18          MR. AINSWORTH:  And just for the record, I
19  heard somebody earlier saying "register tapes" when
20  we were talking about the register tapes.  But
21  let's -- let's move forward.  Referring to a female
22  voice saying it, but I trust that that situation has
23  been resolved.
24      Q.  (By Mr. Ainsworth)  Have you looked for
25  ballistics evidence before?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods – 02/02/2023

1        A.    Yes.

2        Q.    Ballistics evidence, such as bullet

3    casings, fired bullets, can help you link a suspect

4    weapon to a crime; right?

5        A.    Well, you're confusing things.  There are

6    bullets and there are casings.  Which are you

7    talking about?

8        Q.    Well, I was referring to both.  I said

9    "bullet casings and fired bullets."

10       A.    Bullet casings is just a casing.  It's not

11   a bullet casing.

12       Q.    All right.  Casing -- then we'll call it

13   "casings and fired bullets."

14       A.    Correct.

15       Q.    Both can be used to try to link a suspect

16   weapon to a crime; right?

17       A.    Correct.

18       Q.    Do you recall being at the gravesite where

19   Camille Arfmann's body was recovered?

20       A.    I don't recall.

21       Q.    Do you recall that she was buried in a --

22   in a ditch with dirt and garbage on top of her?

23       A.    You cut out with your question.

24       Q.    Sure.  Do you recall that Camille was

25   buried in a ditch with dirt and garbage on top of

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1   her?
 2        A.   I don't recall that, no.
 3        Q.   If you're at a crime scene where you
 4   discover a dead body buried in the ground, would you
 5   look for a shovel nearby?
 6        A.   That's -- I don't understand that
 7   question.
 8        Q.   Sure.  Well, let me take a step back.
 9             I'm not a police officer.  I don't have
10   your experience, but it seems to me that, if a body
11   is buried, you might look to see if there's a shovel
12   that was used to bury the body because that shovel
13   might have fingerprints on it that would allow you
14   to identify who buried the body --
15        A.   That was --
16        Q.   -- right?
17        A.   -- not your original question.
18        Q.   It was not.  I'm --
19        A.   No.
20        Q.   I -- I appreciate the chance to --
21        A.   As to your secondary question, yes.
22        Q.   Okay.  So if you're at a crime scene where
23   a body has been buried, you would want to look to
24   see if there was a shovel around, and if you see a
25   shovel, you would inventory that shovel and preserve
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1    it so that it could be tested for prints; right?

 2         A.   Among other things, yes.

 3         Q.   You might also look to see if there's any

 4    blood on the shovel; right?

 5         A.   Correct.  Body fluid.

 6         Q.   And back in 1999, you worked with crime

 7    scene techs; right?

 8         A.   No.

 9         Q.   What did you work with who would collect

10    evidence and find evidence for you?

11         A.   The officers.

12         Q.   Excuse me?

13         A.   The officers that were there.

14         Q.   Okay.  Do you sometimes have somebody who

15    is trained in the ability to use luminol to detect

16    blood evidence?

17         A.   I have had an experience with it, yes.

18         Q.   All right.  Have you ever used luminol

19    yourself?

20         A.   No.

21         Q.   You would have somebody else come in

22    and -- and use luminol to try and find if there was

23    evidence of blood at a scene?

24         A.   I had no faith in luminol.

25         Q.   Why did you have no faith in luminol?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

 1        A.   Because it reflects positive of -- of
 2   reactions on other things besides blood.
 3        Q.   Right.  It was -- it's overinclusive,
 4   isn't it?
 5        A.   Yes.
 6        Q.   But it gives you an indication of what
 7   might have blood on it; right?
 8        A.   Perhaps.
 9        Q.   What would you use rather than luminol to
10   determine if there is blood at a particular crime
11   scene?
12        A.   Nothing.
13        Q.   All right.  Would you collect items of
14   evidence and send them to the lab to be tested for
15   presence of blood?
16        A.   Yes.
17        Q.   Well, sir, I'd like to ask you about your
18   exhibit, but I don't see it.
19             MR. AINSWORTH:  So let's take a break.
20   And I'm going to see if we can call the hotel and
21   see if we can't print a copy of that for you.
22             MR. QUALSETH:  Will do.
23             MR. AINSWORTH:  Let's go off the record.
24             THE REPORTER:  Off the record at
25   11:35 a.m.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company llc

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods – 02/02/2023

 1                 (A recess was taken.)

 2                 THE REPORTER:  Okay.  We are back on the

 3      record at 11:47 a.m.

 4           Q.   (By Mr. Ainsworth)  All right, sir.  So

 5      you have in front of you, I believe, what we've

 6      marked as Exhibit 7.  It should have 91 pages to it.

 7      And I've got Bates numbers of KBI 688 through KBI --

 8      oop.  It's not sequentially paginated; so I'll call

 9      out the Bates numbers as I go to them, but I think

10      everybody has Exhibit 7.

11                 So let me direct your attention to

12      Exhibit -- page 3 of Exhibit 7, and I'll ...

13                 I'm going to just ask you to read

14      Exhibits -- page 3 of Exhibit 7 to yourself, and see

15      if that refreshes your recollection at all about how

16      you came to be notified about the Arfmann homicide

17      investigation.

18           A.   Yes.

19           Q.   All right.  Is that familiar to you that

20      you were notified by Sheriff Dunnaway to -- about

21      the investigation?

22           A.   Yes.

23           Q.   All right.  Let's turn to the next page of

24      Exhibit 7, which is page 4.

25                 Looking at the top of this handwritten

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1   report -- and let me just stop here.  Is this a
 2   sample of the kind of report that you would
 3   handwrite and then provide to the steno pool to
 4   transcribe for you?
 5        A.   Yes.
 6        Q.   Okay.  So the report's dated November 7th,
 7   1999; correct?
 8        A.   Yes.
 9        Q.   And it says, under "Details," "On
10   November 7, 1999, at 11:30 a.m., KBI Special Agent
11   Jim Woods arrived at the Jefferson County Law
12   Enforcement Center and was provided with the
13   following additional information."
14             And I'm just going to stop there.  I've
15   read that correctly; right?
16        A.   Yes.
17        Q.   I think the "a.m." is a typo, because on
18   the previous page, page 3, you said you were
19   notified at 10:50 p.m., and you arrived at 11:30 --
20   says "a.m.," but I think it's supposed to be "p.m."
21   Is that possible it's a scrivener's error?
22        A.   Well, might have been the next day.
23        Q.   Well, you said on November 7th you
24   arrived; so you kept the same date.  And then
25   we'll -- I think it will be clearer, as you go down
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

 1  the page, that you were there that night.

 2       A.   I think perhaps you're correct.  It should

 3  be "p.m."

 4       Q.   Okay.

 5       A.   30-minute drive.

 6       Q.   The report then says "Attorney Mike Hayes

 7  had arrived earlier in the evening accompanied by

 8  Thomas Bledsoe" and that "Hayes related that Thomas

 9  Bledsoe knew the whereabouts of the Arfmann girl's

10  body, and also Hayes had a weapon he would turn

11  over.  Dunnaway believed the weapon was a handgun."

12  Do you see that, sir?

13       A.   Yes.  That's correct.

14       Q.   And so if -- if you get information that

15  Hayes has the weapon that would be turned over

16  related to, you know, a dead 14-year-old child, you

17  would want to recover that gun; right?

18       A.   Correct.

19       Q.   All right.  Any reason to wait to recover

20  the gun?

21       A.   Say that again.

22       Q.   Well, according to your report, Hayes and

23  Tom Bledsoe arrived at the law enforcement center

24  earlier in that evening, and I guess the question

25  is, is there any reason not to recover the gun upon

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
1   their arrival if Mike Hayes, indeed, had a weapon
2   that was related to the -- you know, the dead
3   14-year-old girl?
4       A.   I was not there when Hayes and Bledsoe
5   arrived.
6       Q.   Yeah.  I'm just asking because you've got
7   a lot more law enforcement experience than I do.
8   Would you want to recover the weapon when you
9   learned that they had it, or would you let Hayes and
10  Bledsoe keep the gun until some later point in time?
11      A.   No.  We would ask him to turn it over.
12      Q.   All right.  And then you wrote "Dunnaway
13  further advised that a Jim Bollinger had also
14  contacted JFSO earlier in the evening about two
15  voice-mail messages Thomas Bledsoe had left for
16  Bollinger.  Dunnaway advised that he had officers at
17  the Bollinger home making a recording of the
18  messages."
19          "About 12:30 a.m., November 8, 1999,
20  Special Agent Woods followed Sheriff Dunnaway, other
21  JP County officers" -- sorry -- "JF," meaning
22  Jefferson County officers -- "along with Attorney
23  Hayes and Tom Bledsoe, to a field north of Bledsoe's
24  parents' home.  Upon arrival about 12:40 a.m.,
25  November 8, 1999, Attorney Hayes pointed out a
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1   location in a ditch where several sheets of paneling
 2   and plywood were observed.  The ditch had apparently
 3   used as a dump, as a wide variety of items were" --
 4   "were noted in the ditch."
 5               Do you see that, sir?
 6       A.    Uh-huh.
 7       Q.    Is that a "Yes"?
 8       A.    Yes.  I'm sorry.
 9       Q.    That's okay.
10               Further down the page, it says -- so this
11   is the fourth paragraph on the page.  We're now on
12   page 5 of Exhibit 7.
13               "At 1:44 a.m., November 8th, 1999,
14   Sergeant Poppa received a plastic bag from Attorney
15   Hayes.  Inside the bag, wrapped in a towel, was a
16   silver Bryco Arms/Jenning" -- is that "medium" or
17   "model 9-millimeters" --
18       A.    "Model 9-millimeter."
19       Q.    -- "9-millimeter, semiautomatic pistol."
20               Do you see that, sir?
21       A.    Yes.
22       Q.    All right.  So do you know why the gun
23   was -- was turned over at 1:44 a.m. as opposed to at
24   any point earlier in the evening?
25       A.    I have no idea.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1        Q.   That gun should have been recovered before
 2   you arrived at the scene at 11:30 p.m.; right?
 3        A.   It could have been, yes.
 4        Q.   Oh, not could have been.  It should have
 5   been; right?  As a law enforcement officer, there's
 6   no reason apparent to you why that gun shouldn't
 7   have been recovered before you arrived at 11:30 p.m.
 8   on November 7th; right?
 9        A.   I -- I'm not -- I can't answer that.  I
10   don't know what went on before I got there.
11        Q.   Okay.  And at the time that you arrived,
12   the gun should have been -- at 11:30 p.m., the gun
13   should have been recovered; right?
14        A.   If it had been up to me, yes.
15        Q.   All right.  At the bottom of the page 5,
16   it states "After removing the paneling and plywood
17   along with assorted trash, Detective Frost and
18   Sergeant Poppa then began removing loose dirt.
19   About 2:30 a.m., after removing eight to ten inches
20   of loose dirt, a female body believed to be that of
21   Zetta Camille Arfmann was uncovered."
22             Do you see that, sir?
23        A.   Did I what?
24        Q.   Do you see that, sir?
25        A.   Yes.  I'm following along with you.  Go
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1   ahead.

2        Q.   Great.

3             So when you discover the dead 14-year-old

4   girl buried in Tom Bledsoe's property and his lawyer

5   gives you the gun and she's dead of gunshots, you

6   want to arrest Tom Bledsoe; right?

7             MR. QUALSETH:   Object to the form.

8        A.   It is not Tom Bledsoe's property.

9        Q.   (By Mr. Ainsworth)   It's his parents'

10  property; is that right?

11       A.   Correct.

12       Q.   And he's living at the residence on his

13  parents' property; right?

14       A.   Correct.

15       Q.   Okay.  In any event, if the body is

16  discovered where Tom Bledsoe indicated it would be

17  after the 14-year-old girl is shot to death, and

18  she's found in a ditch behind Tom Bledsoe's house,

19  you want to arrest Tom Bledsoe; right?

20       A.   I don't know what Tom's told Hayes.

21       Q.   Well, he might have told Hayes anything,

22  but --

23       A.   That's correct.

24       Q.   -- that's not my question.

25       A.   That doesn't mean you arrest him.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1        Q.   Why -- so you're saying that -- if I came

2   to you and I said, "I'm going to show you to my

3   house.  In the back of my house, there's a dead

4   girl, 14 years old, that you've been looking for.

5   She's been shot to death.  Here is a gun.  It's a

6   9-millimeter and" -- would you then think that I

7   should be arrested --

8             MR. QUALSETH:  Object to the form.

9        Q.   (By Mr. Ainsworth)  -- in connection with

10  the death of the 14-year-old girl?

11            MR. QUALSETH:  Sorry to --

12       A.   No.

13            MR. QUALSETH:  Sorry to interrupt.

14            I'll object to the form.

15            Go ahead.

16       Q.   (By Mr. Ainsworth)  Why don't you think I

17  should be arrested?

18       A.   You haven't said you shot her or you

19  killed her.  You just --

20       Q.   Okay.

21       A.   -- says, "I know where there's a body."

22       Q.   Sure.

23            Let me -- let me show you what we

24  previously marked yesterday as Exhibit 5.

25            So I'm going to ask you to take a look at

James W. Woods - 02/02/2023

1    the screen in front of you.  This is Exhibit 5,

2    page 18, and these are handwritten notes from Randy

3    Carreno.

4                Do you think Carreno was a good officer?

5         A.    No comment.

6         Q.    Why do you have no comment on Carreno's

7    abilities as a police officer?

8         A.    I didn't work with him every day.

9         Q.    I know, but you worked with him sometimes.

10   Or how about in the Arfmann homicide investigation?

11   Did you think that Carreno was a competent police

12   officer?

13        A.    I never worked an arson within him.

14        Q.    Right.  Just -- but just in your dealings

15   with him in the Arfmann homicide investigation, do

16   you have any -- do you think he was a competent

17   police officer?

18        A.    Well, the sheriff must have thought so.

19        Q.    All right.  Well, what about -- what did

20   you think?  Do you think he was not so good at his

21   job?

22        A.    I don't know.

23        Q.    Well, no.  I know you don't know if he was

24   good or not.  I'm just asking you do you think he

25   was good?

James W. Woods – 02/02/2023

1        A.    I'm not passing judgment on him.

2        Q.    Did you have any thoughts about Randy

3  Carreno's ability as a police officer one way or the

4  other?

5        A.    No.

6        Q.    All right.  So you had no reason to doubt

7  his reports; right?

8        A.    No comment.

9        Q.    Oh.  Then, tell me, sir:  Do you have any

10  reason to doubt the accuracy of Randy Carreno's

11  reports?

12        A.    Not as long as he submitted them.

13        Q.    Did he sometimes not submit his reports?

14        A.    Yes, sir.

15        Q.    All right.  And sometimes it took a long

16  time for his reports to come in?

17        A.    Yes, sir.

18        Q.    Got it.  All right.

19              So here's a handwritten note by Randy

20  Carreno, and it's -- it's dated at the top

21  November 7, 1999.  It says "23:38 hours," or 11:38

22  hours.

23              Do you know that Badge No. 30 was

24  Dunnaway?  Do you remember that?

25        A.    Yes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1      Q.   All right.  It says "On arrival, Dunnaway

2   met with Carreno outside of law enforcement center

3   and advised Tom Bledsoe currently had admitted to

4   being involved.  Dunnaway advised victim was in a

5   field with a bullet to the head."  Do you see that?

6      A.   Yes.

7      Q.   All right.  And you were Badge No. 655; is

8   that right?

9      A.   Correct.

10      Q.   All right.  And so it says that the --

11   that "In the conference room was Mike Hayes,

12   Vanderbilt, Dunnaway, Woods, Poppa, Kyle, and

13   another deputy in the conference room."

14          Do you remember that happening?

15      A.   No.

16      Q.   Do you have any reason to doubt that

17   that's what happened?

18      A.   No.

19      Q.   Do you remember Dunnaway and Mike Hayes

20   going away and talking for a while?

21      A.   No.

22      Q.   All right.  In any event, if you learned,

23   as a law enforcement officer, that not only did Tom

24   Bledsoe say, "You could find the dead body of the

25   14-year-old girl that you're looking for in the

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1    trash heap behind my parents' house.  She's got a

2    bullet to the head, and here's a gun" and he's

3    admitted to being involved, would you arrest Tom at

4    that point?

5              MR. QUALSETH:  Object to the form.

6         A.   Involved in what?

7         Q.   (By Mr. Ainsworth)  So your -- your

8    quibble here is that he's -- he said he's involved,

9    but you don't know what he's involved in, and so

10   you -- you would, as a law enforcement officer, want

11   to have a little more information before you take

12   the leap to arrest Tom Bledsoe for the -- having

13   anything to do with the murder of the 14-year-old --

14             MR. QUALSETH:  Object to the form.

15        Q.   (By Mr. Ainsworth)  -- little girl; is

16   that what you're saying?

17        A.   Would you restate the question.

18        Q.   Sure.  You're saying that you would need

19   more information before you would arrest Tom Bledsoe

20   for having something to do with the murder of the

21   14-year-old girl, based on these facts; right?

22        A.   Correct.

23        Q.   Well, what else would you want?

24        A.   Well, what's he involve- -- what -- what

25   is his involvement?

James W. Woods - 02/02/2023

1        Q.   Right.  You want to know --

2        A.   Did he get rid of the body?  Did he kill

3   her?  I don't know, from what you're asking me.

4        Q.   Well, both of those are crimes; right?

5        A.   Yes.

6        Q.   And so -- but before you would arrest him,

7   you would want to know more about the case before

8   determining whether to arrest Tom; right?

9        A.   Correct.

10       Q.   There's risks in not arresting Tom; right?

11       A.   I'm sorry?

12       Q.   Well, to your investigation as a law

13   enforcement officer, you know that if you don't

14   arrest a suspect, the suspect could flee; right?

15       A.   Occasionally, yes.

16       Q.   The suspect could tamper with or hide

17   evidence; right?

18       A.   Correct.

19       Q.   And the suspect could pose a threat to the

20   community; right?

21       A.   I didn't understand your last word.

22       Q.   "To the community."  Suspects not arrested

23   could pose a threat to the safety of the community;

24   right?

25       A.   Yes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1      Q.   Okay.  Going back to your notes --

2      A.   Okay.

3      Q.   -- in any event, you -- you didn't feel at

4   this point there was sufficient evidence to charge

5   Tom with any crime?

6           MR. QUALSETH:  Object to the form.

7      Q.   (By Mr. Ainsworth)  Is that right?

8      A.   According to the notes you showed me, I

9   wasn't even present.

10     Q.   No, I mean just based on what -- the

11  information you've been provided, you don't think

12  there's sufficient evidence to charge Tom with a

13  crime; right?

14          MR. QUALSETH:  Object to the form.

15     A.   Not my decision.

16     Q.   (By Mr. Ainsworth)  Oh, I'm -- but I'm

17  saying, based on your assessment -- not whether you

18  had the power to arrest him, not whether it was your

19  decision to arrest him, but just your assessment --

20  was there probable cause to arrest Tom Bledsoe when

21  he -- after he admitted to being involved, told

22  officers where they could find the 14-year-old

23  girl's body that was buried out behind his parents'

24  house where he was living, and provided the gun and

25  her body and her body had bullet holes in it?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
1        A.    What's your question?

2        Q.    In your assessment, is there probable

3   cause to arrest him?

4        A.    For something, yes.

5        Q.    Okay.  Bottom of page 6 of Exhibit 7 says

6   "It is noted that only a small amount of blood was

7   observed in the bottom of the gravesite."  Do you

8   see that?

9        A.    No.  I'm still looking for page 6.

10       Q.    Sorry.  My apologies.

11       A.    Well, there is no page 6.

12       Q.    Well, we were looking at it before.

13   So ...

14       A.    I got a 4, but it doesn't -- there's no

15   number up here.

16             MR. QUALSETH:  The numbers are at the

17   bottom.

18       Q.    (By Mr. Ainsworth)  It would be in the

19   bottom right-hand corner.

20             MR. QUALSETH:  Yeah, 5, 6.

21       A.    You're saying "exhibit," not page number.

22             MR. QUALSETH:  Exhibit 7 --

23       Q.    (By Mr. Ainsworth)  Oh, I'm sorry.

24             MR. QUALSETH:  -- page 6.

25       Q.    (By Mr. Ainsworth)  Yeah, I'm talking
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1    about Exhibit 7 --
 2         A.   Okay.  You're -- you're --
 3         Q.   -- page 6.
 4         A.   -- you're not saying the same thing.
 5    Okay.
 6         Q.   Yeah, I should have been more clear.
 7    You're right.
 8         A.   All right.  Page 6, yes.
 9         Q.   All right.  Bottom of page 6, it says --
10    that very last bottom part -- "It is noted that only
11    a small amount of blood was observed in the bottom
12    of the gravesite."  Do you see that?
13         A.   The bottom two words are cut off.  I don't
14    know what they say.
15         Q.   Does that look like "gravesite" to you?
16         A.   It could be.
17         Q.   Okay.  If there is only a very little
18    amount of blood in the gravesite when a 14-year-old
19    girl has been shot to death, does that indicate to
20    you that maybe the victim was shot somewhere else,
21    and her body was moved and then buried in the -- at
22    the gravesite?
23         A.   It would be a possibility.
24         Q.   All right.  So you would want to conduct a
25    search to find out where the victim had been killed;
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1    right?

2         A.    Yes.

3         Q.    And if there are drag marks on the body,

4    that would indicate to you that the victim might

5    have been dragged to the gravesite; right?

6         A.    There's no notation of drag marks.

7         Q.    Okay.  But if there were drag marks on the

8    victim's body, that would indicate to you that the

9    victim had been dragged to the gravesite; right?

10        A.    Well, you're asking for -- for an opinion.

11        Q.    Yes, I am.

12        A.    And I don't -- and there are no drag marks

13   that are noted on the body; so I would say no.

14        Q.    Okay.  But I'm saying, sir, if you -- if

15   there were drag marks on the body, that would

16   indicate to you that the body had been dragged to

17   the site of the grave; right?

18        A.    Correct.

19        Q.    Okay.  And so do you recall that

20   bloodhounds had been used to try and track the

21   victim?

22        A.    In this case, no.

23        Q.    In this case.  Okay.

24              Have you used dogs to try and, you know,

25   track people or track evidence in cases before?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1        A.    Occasionally, yes.

2        Q.    Was that -- would that have been a good

3    idea to use dogs around the gravesite to see if they

4    could pick up the trail of where the body had been

5    dragged?

6        A.    It wasn't even thought about, to my --

7        Q.    How do you know --

8        A.    -- knowledge.

9        Q.    -- it wasn't even thought about?

10       A.    To my knowledge, it wasn't thought about.

11       Q.    You remember that?

12       A.    No.

13       Q.    Then, why did you say it?

14       A.    Because there's nothing in the reports

15   that reflects it.

16       Q.    You've only looked at one police report;

17   right?

18       A.    I'm looking at my notes.

19       Q.    Right.  You're only looking at one copy of

20   your notes; right?

21       A.    Well, that's all you provided me.  Yes.

22       Q.    And what I mean is you're only looking at

23   your notes from one portion of the investigation.

24   Right?

25       A.    Correct.



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1      Q.   And so why do you assume it was never

2   even -- or why do you say it was never even

3   considered to have dogs search for the trail of

4   where the victim was dragged?

5      A.   If dogs were used, it would be reflected

6   in the -- in the notes or in a report.

7      Q.   Right.  So -- okay.  Do you think it was

8   a -- would have been a good idea to have dogs help

9   search for the trail that the victim was dragged to

10   the gravesite?

11      A.   That would have been the sheriff's call,

12   not mine.

13      Q.   All right.  And if Sheriff Dunnaway says,

14   "Jim Woods, I need your 30 years of experience on

15   this one.  What do you think?  Should we call out

16   the dogs, and see if they can pick up the

17   trail?" what would you say?

18      A.   I'd agree with him.

19      Q.   All right.  Because that would be a good

20   idea, right, to have -- to see if the dogs could

21   pick up the trail and find the site where the victim

22   was actually killed?

23      A.   Correct.

24      Q.   All right.  Going on to page 7 of

25   Exhibit 7, at the bottom of the page, it says

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   "Attorney Hayes drove Thomas Bledsoe to the

2   Jefferson County jail, where he was arrested and

3   booked for murder."  Do you see that?

4        A.   Yes.

5        Q.   Do you know why Attorney Hayes was allowed

6   to drive Thomas Bledsoe to the jail where he was

7   arrested?

8        A.   Do I know why?  Because he was in Hayes's

9   custody.

10        Q.   Is Hayes -- was Hayes a police officer or

11   a law enforcement --

12        A.   No.

13        Q.   -- official?

14        A.   It was attorney-client.

15        Q.   So he's not in Hayes's custody; right?

16        A.   Hayes took him to the scene --

17        Q.   Yeah.

18        A.   -- as I recall.

19        Q.   Right.  Do you know why nobody rode with

20   Tom Bledsoe and Mike Hayes to the scene?

21        A.   No, I do not.

22        Q.   You would want to know what Tom Bledsoe

23   was saying about the crime; right?

24        A.   That's correct.

25        Q.   And you would also want to know what Mike

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1    Hayes was saying about the crime; right?

2         A.   No.

3         Q.   Well, if Mike Hayes was telling you

4    information that came from Tom Bledsoe, that would

5    be very interesting to your investigation; right?

6         A.   If it was admissible, yes.

7         Q.   Well, if there are statements made by Tom

8    that Tom -- that Mike Hayes was telling you, those

9    would be very helpful to your investigation, right,

10   potentially?

11        A.   Yes.

12        Q.   And you'd want to document those

13   statements; right?

14        A.   Right.

15        Q.   All right.  Is that procedure to have

16   somebody's lawyer come and arrest -- and drive the

17   suspect in a homicide case to the police station to

18   be booked for murder?

19        A.   It --

20             MR. COX:  Object to form.

21        A.   It has happened before, but it's rare.

22        Q.   (By Mr. Ainsworth)  All right.  When has

23   it happened before?

24        A.   I can't tell you, off the top of my head.

25        Q.   Well, think about it.  Take as much time

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods – 02/02/2023

1    as you need, and think about it.  Any other time

2    where you had a homicide case where, rather than

3    arresting the suspect, you had the suspect's lawyer

4    drive them away from police to the police station?

5              Anything come to mind?

6         A.   Not off the top of my head.

7         Q.   All right.  Why do you say that it's

8    happened before if you can't recall it ever

9    happening?

10        A.   Well, I'm sure it has happened someplace,

11   somehow, someway.

12        Q.   Well, has it ever happened in your

13   experience, sir?

14        A.   Yes.  But I can't tell you when or where

15   or what the circumstances were.

16        Q.   Then why do you say "Yes"?

17        A.   Because Mr. Hayes was a former county

18   attorney there and was well-liked and trusted by law

19   enforcement.

20        Q.   And he built up a lot of trust with law

21   enforcement by being the county attorney; is that

22   right?

23        A.   Correct.

24        Q.   You trusted him?

25        A.   Yes.



8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500          Cornerstone          Fax (913) 825-2530
www.cornerstonekc.net           Court Reporting Company LLC   office@cornerstonekc.net

James W. Woods - 02/02/2023

```
1          Q.   And you liked him?

2          A.   Yes.

3          Q.   You thought he was a good man; right?

4          A.   Yes.

5          Q.   And the other officers also trusted Mike

6    Hayes; right?

7          A.   I believe --

8               MR. QUALSETH:  Object to the form.

9          A.   I believe so.

10              I'm sure there was somebody that didn't

11   like him because they didn't prosecute one of their

12   cases, but outwardly, no.

13         Q.   (By Mr. Ainsworth)  All right.  And so why

14   is the fact that Mike Hayes was well-liked and

15   trusted mean that you've had this happen before,

16   where a lawyer drove the person to the police

17   station to be arrested?

18              MR. QUALSETH:  Object to the form.  I

19   think that mischaracterizes his testimony.

20              Go ahead.

21         A.    It was not in a murder case, as I can

22   recall.  It was on something else.  And it was in a

23   different county.

24         Q.   (By Mr. Ainsworth)  And was that where

25   somebody was turning themselves in to the police; so
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1    they -- they -- the lawyer drove them into the

 2    police station?

 3         A.    Lawyer brought them in to be -- be

 4    arrested, yes.

 5         Q.    And it was not a situation where the

 6    suspect was with the police but then drove

 7    separately to the police station to be booked;

 8    right?

 9         A.    Yes.

10         Q.    Okay.  So this is the only time that you

11    know of where the suspect was with the police but

12    was allowed to leave the police to be driven to the

13    police station to be arrested; right?

14         A.    Yes.

15         Q.    All right.  Let's look at page 8 of

16    Exhibit 7, so the very next page.

17              MR. QUALSETH:  Russell, what are you

18    looking at for time for lunch?

19              MR. AINSWORTH:  Whenever you guys want.

20    You tell me.

21              MR. QUALSETH:  How about a few --

22              MR. AINSWORTH:  And I -- and I

23    defer especially to the deponent.

24              MR. QUALSETH:  How about a few more

25    minutes.  You get to a good stopping place, and let
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    us know.

2              MR. AINSWORTH:  Okay.

3         Q.   (By Mr. Ainsworth)  Looking at -- so let's

4    just do the next two pages, and then we'll take a

5    break.

6              But you see on this next page you've got a

7    reference middle of the page to "Mike Hayes,

8    attorney for suspect, called sheriff's office/Roy

9    Sunday evening, November 7, 1999"?

10        A.   Yeah, I see that.

11        Q.   All right.  And then below that you've got

12   a reference to "Tom Bledsoe," and there's a

13   description of his truck -- his vehicle underneath

14   that; right?

15        A.   Yes.

16        Q.   And then his address is to the right of

17   that; correct?

18        A.   And what?

19        Q.   His address was to the right of that;

20   correct?

21        A.   Yes.

22        Q.   All right.  So, you know, as we discussed

23   before, Tom Bledsoe's truck and his residence should

24   have been searched; right?

25        A.   Yes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1        Q.   All right.  And then going on to the next

2   page, page 9, we've got -- oh, this is Exhibit 7,

3   page 9.  At the top there, it says, in the upper

4   left-hand corner, "Proffer," and then "Some type

5   romance, victim and suspect - supposedly no sex."

6            And then below the line, it says "Suspect

7   afraid victim accuse him of trying to have sex with

8   him" -- "with her.  Hayes has weapon.  Truck used to

9   transport victim while alive.  Currently at parents'

10  house."  Do you see that, sir?

11       A.   Yes, sir.

12       Q.   All right.  So this is information that

13  appears -- so when it says "Proffer," this appears

14  to be information being provided by Mike Hayes to

15  you; is that correct?

16       A.   I don't know.

17       Q.   You don't know.  Okay.

18            In any event, you're told about a reason

19  for the -- what the -- the background -- well,

20  strike that.

21            You're told "Truck used to transport

22  victim while alive"; right?

23       A.   Uh-huh.

24       Q.   "Yes"?

25       A.   Yes.

8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500                                  Fax (913) 825-2530
www.cornerstonekc.com                          office@cornerstonekc.net


Cornerstone
Court Reporting Company LLC

James W. Woods - 02/02/2023

1      Q.   Okay.  And so when you're told that the
2    truck was used to transport the victim while she was
3    alive, that tells you you definitely want to look in
4    the truck because the truck might have trace
5    evidence that could indi- -- such as hair, sali- --
6    you know, body fluids, fingerprints from the victim,
7    that will tie the victim to your suspect's truck;
8    right?
9      A.   Yes.
10     Q.   And you know where the truck is.  It's
11   currently at Tom's parents' house; right?
12     A.   Yes.
13     Q.   All right.  So if you're having a briefing
14   about what to do next in this investigation, the
15   number one thing to do is to search Tom Bledsoe's
16   truck; right?
17          MR. QUALSETH:  Object to the form.
18     A.   Among other things.
19     Q.   (By Mr. Ainsworth)  What are the other
20   things?
21     A.   Search the house.
22     Q.   Yeah.  I'm with you there.
23          And the -- it says "Proffer."  Does that
24   indicate to you that Hayes was trying to, you know,
25   tell you a scenario of how the murder happened?

James W. Woods - 02/02/2023

1      A.   I don't know what Mr. Hayes was trying to
2   converse.
3      Q.   All right.  What -- what did you mean by
4   "Proffer"?
5      A.   I don't know why I wrote it on there right
6   to -- at this day.
7      Q.   Okay.
8      A.   Apparently, it's information from
9   somebody.
10     Q.   Yes.  And -- and so you documented it in
11  your notes --
12     A.   But these are notes.  Nothing more --
13     Q.   Yeah.
14     A.   -- nothing less.
15     Q.   Because your notes -- you know, sometimes
16  they pan out, and sometimes they don't.  And so at
17  the end, you -- you write up the relevant stuff from
18  your notes, and you put them in your reports; right?
19     A.   Correct.
20     Q.   And you determine what's relevant; right?
21     A.   From my training, yes.
22     Q.   Yeah.  Do you think it was relevant that
23  there's a -- some type of romance between the victim
24  and the suspect?
25     A.   Perhaps, yes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1      Q.   Yeah.  Because that might give a motive

2  for why Tom Bledsoe would kill the victim; right?

3      A.   Yes.

4      Q.   Romantic relationships are important to

5  establish in homicide investigations; right?

6      A.   Correct.

7      Q.   Being told that the truck was used to

8  transport the victim while alive -- that's important

9  information to your investigation; right?

10      A.   Yes.

11      Q.   Why is it important to your investigation

12  that the truck was used to transport the victim

13  while alive?

14      A.   Again, trace evidence.

15      Q.   And where it says "Suspect afraid victim

16  accuse him of trying to have sex with her," that's

17  relevant to your investigation because it supplies a

18  motive for why Tom Bledsoe would kill the victim;

19  right?

20      A.   Yes.

21      Q.   All right.  And you wrote "Hayes has

22  weapon."  Do you see that?

23      A.   Yes.

24      Q.   So the time that Hayes had the weapon was

25  Sunday night, November 7th, 1999; right?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1       A.   Yes.

2       Q.   All right.  So it indicates that these

3  notes were given -- were -- these -- sorry.

4            You were told this information on Sunday

5  night, November 7th, while Hayes had the weapon;

6  right?

7       A.   They would -- could have been Sunday night

8  and some Monday also.

9       Q.   Yeah.  Or -- or early Monday morning;

10 right?

11      A.   Yes.

12      Q.   Like, the -- the night of that

13 investigation, the night of the 7th; correct?

14      A.   Yes.  Morning of the 8th.

15      Q.   Yeah.

16           MR. AINSWORTH:  All right.  Folks, is this

17 a good place to stop for lunch?

18           MR. QUALSETH:  This works.

19           THE REPORTER:  One moment.

20           Off the record at 12:25 p.m.

21           (A lunch recess was taken.)

22           THE REPORTER:  Okay.  We are back on the

23 record at 1:33 p.m.

24      Q.   (By Mr. Ainsworth)  All right.  Sir, I'm

25 going to ask you to turn back to Exhibit 7 and look

James W. Woods - 02/02/2023

1   at page 12, briefly.

2        A.   Try again.  You cut out.

3        Q.   I'm sorry.  I'm going to ask you to turn

4   back to page -- to Exhibit 7 and turn to page 12, if

5   you would.

6        A.   Okay.

7        Q.   Okay, sir.  Looking at page 12, there's a

8   reference to "Cody," the "2 1/2-year-old."  Do you

9   see that?

10       A.   Uh-huh.

11       Q.   Is that a "Yes"?

12       A.   Yes.

13       Q.   Did you have anything to do with ever

14   interviewing Cody or interacting with Cody in any

15   way?

16       A.   I don't remember.

17       Q.   Did you have anything to do with whether

18   you thought you could get credible information from

19   a 2 1/2-year-old?

20       A.   That depends on the 2 1/2-year-old.

21       Q.   Well, how about this 2 1/2-year-old in the

22   Arfmann homicide investigation?  Did you have

23   anything to do with --

24       A.   I said I didn't --

25       Q.   -- trying to determine whether the --

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
1        A.    -- interview him.

2              (Reporter clarification.)

3        Q.    (By Mr. Ainsworth)  You got to listen to

4   the whole question, Mr. Woods.

5              So the question is did you have anything

6   to do with determining whether this 2 1/2-year-old

7   kid in the Arfmann homicide investigation had any

8   credible information?

9        A.    I don't know.

10       Q.    Not that you recall?

11       A.    Not that -- I don't know.

12       Q.    Okay.  All right.  Sir, let's -- I'm going

13  to have you turn to page 19 of Exhibit 7.  This is

14  your handwriting; is that right?

15       A.    I'm sorry?

16       Q.    This is your handwriting; is that right?

17       A.    It appears to be, yes.

18       Q.    Okay.  So, at the bottom of the page,

19  there's some notes regarding, I think, searches of

20  Floyd and Catherine's place and Floyd and Heidi's

21  place.  Do you see that?

22       A.    I don't see any reference to a search, no.

23       Q.    Okay.  See where it says "Completed

24  15:21"?  The very bottom entry on the page.

25       A.    Uh-huh.
```



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1          Q.   "Yes"?
 2          A.   I see that, yes.  I don't know who did it.
 3          Q.   Sure.
 4               And then above that, to the right-hand
 5     side, it says "Approx 9:08 a.m. start"?
 6          A.   Right.
 7          Q.   And there's an arrow beneath that pointing
 8     to it, and it says "home approximate 9:08 a.m.
 9     start" time and then, slash, "car 13:15" -- "13:50
10     start" time?
11          A.   Right.
12          Q.   Do you see that?
13          A.   Yeah, I see that.
14          Q.   All right.  So that indicates to you that
15     Floyd and Heidi's home was searched starting at
16     9:08 a.m. --
17          A.   By somebody.
18          Q.   -- and -- by somebody, right -- and that
19     the car was -- started to be searched at 1:50 p.m.
20     by somebody?
21          A.   Right.
22          Q.   And that they were "completed" by
23     3:21 p.m.?
24          A.   Correct.
25          Q.   Okay.  All right.  Let's turn to page 21.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1  The bottom of this page -- it says "Little Floyd" --
 2  oh, sorry.  Tell me when you're there.
 3       A.   Yeah.
 4       Q.   Page 21 of Exhibit 7?
 5       A.   I'm there.
 6       Q.   It says "Little Floyd, blood in truck,"
 7  dash, "Tom's at Dad's house."  Do you see that?
 8       A.   I see that.
 9       Q.   So that's a reference to "Little Floyd,"
10  meaning Floyd S. Bledsoe, saying that "There's
11  possibly blood in Tom's truck at Dad's house."  Is
12  that how you read it?
13       A.   I don't know.
14       Q.   You don't know.  Okay.
15       A.   After --
16       Q.   In any event --
17       A.   -- 24 years, the chicken scratching gets
18  cold.
19       Q.   Okay.  So if you had any indication that
20  there was blood in Tom's truck, you would look to
21  see if there was blood in Tom's truck; right?
22       A.   Somebody would have, yes.
23       Q.   Okay.  All right.  Let me have you turn to
24  page 38 of Exhibit 7.  Tell me when you're there.
25       A.   Okay.  I'm there.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1     Q.   All right.  This is a report that you

2   handwrote; is that correct?

3     A.   Yes.

4     Q.   Appears to be regarding an interview with

5   the co-owner of Lunker Bait & Tackle?

6     A.   Correct.  Shirley Patterson.

7     Q.   And Ms. Patterson told you, on

8   November 10th, 1999 -- the last paragraph says "She

9   could not state that Bledsoe had been in the store

10  on Friday, November 5th, 1999, and added that Friday

11  was a very busy day in the store"; right?

12    A.   That's correct.

13    Q.   So she couldn't tell you one way or the

14  other whether Floyd -- whether Tom was in her store

15  on Friday afternoon; right?

16    A.   She knew Tom from the newspaper, but she

17  couldn't say he was there on the 5th, that's

18  correct.

19    Q.   Okay.  All right.  I want to ask you to

20  turn to page -- turn back to page 30 of Exhibit 7.

21  And just take a look at the top of that page.  And

22  tell me when you're there.

23    A.   I will.

24         Okay.  I'm there.

25    Q.   Thank you.  Okay.  So at the top, it says

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1    "11-9," November 9th, "M. Hayes" -- that's Mike
 2    Hayes; right?
 3         A.   Yes.
 4         Q.   And it says "time line - p.m."  Do you see
 5    that?
 6         A.   Right.
 7         Q.   And this is your handwriting; correct?
 8         A.   Correct.
 9         Q.   Okay.  Then it gives an account for
10    Friday, November 5th, 1999, and so you see there's a
11    reference to "3:25 p.m. - Lunker Bait & Tackle"?
12         A.   Yes.
13         Q.   And then "3:40 p.m. - Rusty's Sports" --
14         A.   Right.
15         Q.   -- "Looked at 30-30.  Waited on by Mike"?
16         A.   Right.
17         Q.   And let me, just for a second, turn back
18    to Exhibit 4.  Remember when Hayes -- we looked at
19    this earlier.  It's on the screen.  Remember when
20    Mike Hayes talked to you?  He said "that Tom Bledsoe
21    purchased a box of 9-millimeter ammo and a box of
22    30-30 ammo at Rusty's Outdoor Sports in Lawrence.
23    He believes a Mike and another known" -- "another
24    male, unknown name, had waited on him."
25              And so, according to your report,
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1    Exhibit 4, Mike -- Mike Hayes told you that a guy
 2    named Mike waited on Tom at Rusty's; is that
 3    correct?
 4         A.   That's -- yes.
 5         Q.   At least --
 6         A.   Mike said --
 7         Q.   -- that's what your notes --
 8         A.   -- Mike.
 9         Q.   -- reflect?
10              Yeah.  And so here on page 30 of
11    Exhibit 7, we have, you know, your notes, "Rusty's
12    Sports - Looked at 30-30.  Waited on by Mike."  You
13    see that?
14         A.   I do.
15         Q.   All right.  So these appear to be
16    statements made to you by Mike Hayes about Tom; is
17    that right?
18         A.   I don't know the author of this, whether
19    it's from Tom or from Mike.
20         Q.   Sure.  But one of the two --
21         A.   One of the --
22         Q.   -- right?
23         A.   -- two, that's correct.
24         Q.   All right.  And then it says "4:40 to
25    4:45" he's "Home"; right?
```



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1        A.    Yes.

2        Q.    And then says "6:00 o'clock Osky Bank,

3   deposit paycheck night deposit."  Do you see that?

4        A.    Yes.  It's "Osky Bank."  That's an

5   abbreviation.

6        Q.    For Oskaloosa Bank?

7        A.    Yes.

8              THE REPORTER:  Russell, one moment,

9   please.

10             (Discussion off the record.)

11        Q.    (By Mr. Ainsworth)  All right.  Then it

12   says "6:00 to" -- "6:15 to 6:20 - At church, Susie,

13   last name unknown, came in behind."  Correct?

14        A.    Yes.

15        Q.    "7:30 - Home to bed" --

16        A.    "9:30."

17        Q.    Oh, sorry.  "9:30."  My apologies.

18             Then "Saturday, November 6th, 8:00 to

19   9:00 a.m. - Up, coffee, visit folks"?

20        A.    Right.

21        Q.    "9:00 a.m. - Unload trailer with dad,

22   folks leave.  Tom works around the house, tinkers

23   lawn mower.  9:00 a.m." -- or -- sorry --

24   "11:00 a.m. - Mom and Dad back, unload truck and

25   trailer"?  Right?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1      A.   Yes.

2      Q.   And then there's a blank, like a dash, and

3  it says "L.F.," which I interpret as Little Floyd

4  from the earlier notes, "tells Tom two to three

5  shots.  Body in dump - Tits exposed, shirt around

6  neck.  Tom to dump, saw fresh dirt.  Looked for gun

7  in truck.  Second magazine, no ammo in drawer."

8      A.   Yes.

9      Q.   Is that right?

10      A.   Yes.

11      Q.   And then it -- and then it says "1:15,

12  Prep for work.  2:00 o'clock, en route" --

13      A.   "Lawrence."

14      Q.   -- to Lawrence?

15      A.   Lawrence.

16      Q.   "2-" -- and then "2:30, At work.  Work

17  3:00 to" -- "3:00 to 11:00 - Work.  11:45 p.m. Home,

18  Mom comments home early."

19      A.   Yes.

20      Q.   You see that?

21           And then the next day, Sunday -- sorry.

22  This is the next page, so page 31 of Exhibit 7.

23  Tell me when you have it in front of you.

24      A.   I've got it.

25      Q.   All right.  So it says "Sunday, 11" --

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1    "November 7th, 8:00 a.m. - up, coffee, folks.

 2    9:00 a.m., Unload trailer.  9:15, Dad to Granny's.

 3    9:20, Prep for church.  9:55, To church.  Noon -

 4    Church out, home, Mom there."

 5              "2:00 o'clock p.m., Dad back, loaded truck

 6    and trailer.  Lloyd, Jason, Jason son with Dad,

 7    unload."

 8              "2:30 p.m., Tom and others back to

 9    Granny's.  4:00 p.m., Back home, unload.  4:30 p.m.,

10    Lloyd, et al., leave.  5:30 p.m., Prep for church.

11    5:50 to 8:30, At church."

12              And then it says "8:30 to 8:55," and then

13    it's scratched out.  It says Meets unknown."  Does

14    that mean unknown person?

15         A.   Yes.

16         Q.   "Meets unknown person, learns Camille

17    dead, where body is, et cetera."

18              And then "8:55 - Law Enforcement Center

19    parking lot - first call Bollinger.  Calls dad,

20    knows where Camille is.  Tells Dad, his gun in

21    dresser drawer.  Dad comes to Law Enforcement

22    Center, pick up Tom, takes to Jim Sawyer's.  Dad

23    returns later, pick up Tom's truck"?

24         A.   Yep.

25         Q.   Do you see that?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1      A.   Yep, yep.

2      Q.   Okay.  And then on -- then on the next

3  page, page 32 of Exhibit 7, it says "Sun" for

4  Sunday, "9:08 p.m. - Law Enforcement Center parking

5  lot, second call Bollinger.  (Dad arrives)."

6           "Tom took gun out of truck Saturday, into

7  house, dresser in bedroom.  Doesn't think his gun

8  murder weapon."

9           "Weeks prior, at Louis Gamble's place,

10  shot pistol, saw and talked with James White."

11           "Billie Summerville and Little Floyd good

12  friends."

13      A.   Yes.

14      Q.   Do you see that?

15           Okay.  So on pages 30 to 32 of Exhibit 7,

16  this is kind of like a rundown that you received

17  from either Mike Hayes or Tom Bledsoe about what Tom

18  Bledsoe was up to the weekend of the 5th through the

19  7th; is that correct?

20      A.   We call it a "time line."

21      Q.   A time line.  Okay.

22           So you got a time line from either Tom

23  Bledsoe or Mike Hayes about where Tom was the

24  weekend of November 5th through the 7th; right?

25      A.   Or somebody else unknown.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1        Q.    What do you mean "somebody else unknown"?
 2        A.    Could not -- it may not have been Tom or
 3  Mike.  It may have been from Sheriff Roy.
 4        Q.    Telling you what -- what either Tom or
 5  Mike told them, you mean?
 6        A.    Well, I don't know where he got the
 7  information.  I don't --
 8        Q.    All right.
 9        A.    I can't tell you who -- who provided this
10  because it doesn't reflect --
11        Q.    Okay.
12        A.    -- in my notes.
13        Q.    Okay.  Well, you have at page -- on
14  page 30, at the top of page 30, it says --
15        A.    "Mike" -- "M. Hayes" on the 9th, yes.
16        Q.    All right.  So this information came from
17  Mike Hayes on November 9th --
18        A.    I don't know that.
19        Q.    -- regarding the time line?
20        A.    I don't know that.
21        Q.    Okay.  Why do you think -- well, then, can
22  you explain to us, in any way, shape, or form, why
23  it says "M. Hayes" at the top of the page --
24  November 9th, "M. Hayes" at the top of page 30 of
25  Exhibit 7?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1      A.   Like I said, after 24 years, it gets cold.

2      Q.   Okay.  So can you tell us any reason why

3  it was not Mike Hayes who gave you this information

4  on November 9th?

5      A.   I can't tell you he did; I can't tell you

6  he didn't.

7      Q.   All right.  Where else would you get

8  information from somebody on November 9th about Tom

9  Bledsoe's activities the weekend of November 5th?

10     A.   Could have been from Sheriff Dunnaway or

11 any of the other investigators.

12     Q.   Okay.  They could have told you what they

13 had learned --

14     A.   What they had gotten from somebody.

15     Q.   All right.  Well, who else would know

16 where Tom was the entire weekend as of November 9th,

17 you know, the day after the body was discovered,

18 other than Tom Bledsoe?

19     A.   I don't know.

20     Q.   All right.  So when you received this

21 information on November 9th, what time did the

22 person say Tom spoke to Little Floyd and learned

23 about the -- you know, the shooting of Camille?

24     A.   Between 11:00 and 1:15 -- 11:00 a.m. and

25 1:15 the next day.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

 1       Q.   You mean 11:00 a.m. and 1:15 on the same

 2   day?

 3       A.   Yeah, perhaps.

 4       Q.   Yeah.

 5       A.   I don't --

 6       Q.   And --

 7       A.   -- show a --

 8       Q.   And, in any event --

 9       A.   -- time change, but it all -- apparently

10   was all on Saturday.

11       Q.   Yeah.  And so the person giving you this

12   information told you that Tom spoke to Little Floyd

13   at some point between 11:00 a.m. and 1:15 p.m.

14   before Tom got ready for work and then left for

15   work; right?

16       A.   I don't know that it was told to me

17   directly.  It could have come out in one of our

18   group meetings, and I just made notes --

19       Q.   Sure.

20       A.   -- of it.

21       Q.   Right.  You -- yeah --

22            (Overlapping indiscernible speech.)

23       A.   To say it came directly to me, no, I don't

24   know that.

25       Q.   (By Mr. Ainsworth)  That was not part of

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1   my question, sir, and I -- I -- I'm just saying that
 2   whoever provided you this information said that Tom
 3   talked to Little Floyd sometime between 11:00 and
 4   1:15, and that was before Tom prepped for work;
 5   right?
 6        A.    Correct.
 7        Q.    And so Tom was not on his way to work at
 8   the time that Tom spoke to Little Floyd.  He spoke
 9   to Little Floyd, then prepped for work, and then
10   would -- left for work; right?
11        A.    Yeah.
12        Q.    All right.  Turning to page 31 of
13   Exhibit 7.
14        A.    Okay.
15        Q.    Can you shed any light on -- you got -- on
16   the Sunday, there's a bunch of arrows in the middle
17   of the page pointing to various points in time.
18   Does that indicate you were trying to figure out
19   when that event happened, or -- or what do those
20   arrows represent?
21        A.    I would suspect that the statement "Meets
22   unknown, learns Camille dead, where body is" fits
23   someplace into those -- where those three arrows
24   went.
25        Q.    Okay.  But you just weren't sure where --
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1       A.   I don't know that I was aware of what was
2   exactly right, but it had to be in that time frame.
3       Q.   Okay.  And so you learned on November 9th
4   that Tom was supposedly saying he met an unknown
5   person at some time on Sunday, who told him that
6   Camille was dead, where the body is, et cetera; is
7   that right?
8       A.   Correct.
9       Q.   All right.  And then on the last -- on
10  page 32 of Exhibit 7, where it says "Doesn't think
11  his gun murder weapon" --
12      A.   Yes.
13      Q.   -- you don't know if that's Mike Hayes
14  saying that or if it's Tom saying that --
15      A.   I don't know --
16      Q.   -- right?
17      A.   -- who said that.
18      Q.   Okay.  But you eventually learn that the
19  gun that was provided was the murder weapon; right?
20      A.   I don't remember.
21      Q.   Okay.  Do you remember that Billie
22  Summerville and Little Floyd had disagreement about
23  Billie, I guess, being sexually suggestive toward
24  Camille?
25      A.   I don't remember that.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

 1       Q.   Okay.  And then just to -- sorry to keep
 2  jumping back and forth, but just to clear up one
 3  thing on page 30.
 4       A.   Okay.
 5       Q.   So on November 9th, you learned that Tom's
 6  story was that he was at Rusty's Sports, you know,
 7  shop around 3:40 p.m., and then he arrived home on
 8  that Friday around 4:40 or 4:45; is that right?
 9       A.   Correct.
10       Q.   And so if the front register receipt that
11  said 4:30 -- if the register was 45 minutes fast,
12  that would be consistent -- that would -- if it --
13  if the register is 45 minutes fast, that would mean
14  the time tran- -- the transaction took place was
15  actually 3:45; right?
16       A.   He doesn't say he made a purchase.
17       Q.   Oh, sure, but we looked at the -- in the
18  exhibit, there was a receipt from -- from 4:4- --
19  from 4:30, and two of the registers were 45 minutes
20  fast.  Do you remember that?
21       A.   Yes.
22       Q.   And so if it was 4:00 -- if the register
23  showed 4:30 but was 45 minutes fast, that would mean
24  the actual time of transaction was 3:45; right?
25       A.   Yes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1        Q.   And so that would be consistent with Tom's

2   report that he was at Rusty's at around 3:40 on

3   November -- or on November 5th --

4        A.   Right.

5        Q.   -- correct?

6             All right.  Let's -- let's go to page 35

7   of Exhibit 7.

8        A.   Okay.

9        Q.   This is -- appears to be another one of

10  your reports; correct?

11       A.   Correct.

12       Q.   And it's dated November 10th, 1999; right?

13       A.   Correct.

14       Q.   And it -- it references photos of the

15  victim --

16       A.   Right.

17       Q.   -- right?

18            And so on the lead that you and

19  Detective Frost followed on November 10th was to go

20  to the funeral home in Oskaloosa and take photos of

21  the victim, Camille Arfmann; right?

22       A.   Correct.

23       Q.   Do you know why you were taking photos of

24  the victim on -- at -- in the funeral home on

25  November 10th rather than, say, searching Tom

James W. Woods - 02/02/2023

```
 1   Bledsoe's truck or searching Tom Bledsoe's house?
 2         A.    That was the lead we were assigned.
 3         Q.    Who assigned you the lead?
 4         A.    I couldn't tell you.
 5         Q.    Who had the authority to assign you leads
 6   in the -- in the Arfmann --
 7         A.    Well, it was the --
 8         Q.    -- investigation?
 9         A.    -- sheriff's case.  Probably the sheriff.
10               (Reporter clarification.)
11               MR. QUALSETH:  Let him finish his
12   questions.  Okay?
13         Q.    (By Mr. Ainsworth)  I'm sorry.
14               Who had the authority to assign you leads
15   during the Arfmann investigation?
16         A.    It was the sheriff's case; so I'm assuming
17   it was the sheriff or maybe one of his designees.
18         Q.    Okay.  Who were his designees during the
19   Arfmann investigation?
20         A.    I couldn't remember all of them.
21         Q.    Would that be, like, Undersheriff Herrig?
22         A.    Yes.
23         Q.    Or Orin Turner?
24         A.    Yes.
25         Q.    The captain.
```



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1              Anyone else other than those two?

2       A.    Frost, Carreno, Poppa -- pretty much the

3   whole department.

4       Q.    All right.  So you're saying that any one

5   of them could have told you what to do; is that

6   right?

7       A.    Well, they may have been the -- the one

8   assigning the leads that day, yes.

9       Q.    All right.  All right.  Page 40 of

10  Exhibit 7.  Tell me when you're there.

11      A.    Okay.

12      Q.    All right.  At the top there, where it

13  says "Rusty's," and then there's a check next to it,

14  and then "Conoco" with a check next to it, is this a

15  example of where you would have a briefing and talk

16  about different leads and -- and what would -- what

17  needed to be done or what was done?

18      A.    Or what was done, yes.  There's another

19  check mark by dad -- or "deed."  I'm sorry.

20      Q.    Uh-huh.  "Deed," yeah.

21            And there's a check mark next to "Tom"?

22      A.    Yes.

23      Q.    All right.  And if you'd go down --

24  there's some writing, and then somebody's, like,

25  drawn over it --

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
1         A.   That's mine.

2         Q.   -- but you could --

3         A.   I would have done that.

4         Q.   Okay.  You would have written it and

5    written over it?

6         A.   Yes.

7         Q.   All right.  It's still legible, and I read

8    it as "Saturday on" -- and then it says "12:00 to

9    1:30," and that's crossed out, and then "1:45 to

10   2:00 p.m."  It says "Informer told Tom," arrow -- I

11   think it's "at home to Ronnie Edmond's" --

12        A.   -- "Edmond's gas station."

13        Q.   -- "gas station"?  Okay.

14        A.   Yeah.

15        Q.   "Two to three shots.  Where body.  In

16   dump.  Tits exposed, shirt up around neck.  Tom to

17   dump, moved some trash, saw fresh dirt move."

18   Right?

19        A.   Correct.

20        Q.   Okay.  Why -- why is this information here

21   crossed out, like -- or not crossed out

22   (indiscernible) --

23             (Overlapping indiscernible speech.)

24        A.   Because it was repetitious.

25             (Reporter clarification.)
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1        A.   Why is it crossed out?  It was --
 2        Q.   (By Mr. Ainsworth)  Why is --
 3        A.   -- repetitious.
 4        Q.   Let me get the question out.  I screwed
 5   up.
 6             Why is there -- why is it scribbled over
 7   on this page 40 of Exhibit 7?
 8        A.   Repetitious.
 9        Q.   When you say "repetitious," what do you
10   mean?
11        A.   It was reflected in other parts of the
12   notes.
13        Q.   Okay.  And do you know what's referred
14   to -- why it says "Informer told Tom"?
15        A.   I don't have a clue at this point, sir.
16        Q.   Okay.  But the -- the time that the
17   "Informer told Tom" was between 1:45 and 2:00 p.m.;
18   is that right?
19        A.   I don't know that.
20        Q.   Well, it says "Saturday on," and then it
21   says "12:00 to 1:30."  That's scratched out.  And
22   then "1:45 to 2:00 p.m." is next to that.  Correct?
23        A.   Yes.
24        Q.   Does that indicate to you that you
25   initially wrote "12:00 to 1:30" and then scratched
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1   out "12:00 to 1:30" and wrote "1:45 to 2:00 p.m."?

2       A.   Could have been a lunch break.

3       Q.   What could have been lunch break?

4       A.   The times.

5       Q.   You think that you initially thought the

6   time -- the lunch break was between noon and 1:30

7   and then scratched that out and said "1:45 to

8   2:00 p.m."?

9       A.   Very possible.

10      Q.   It's (inaudible) --

11           MR. COX:  Yeah, I can hear you as well,

12   Russell.

13           MR. AINSWORTH:  Okay.

14      Q.   (By Mr. Ainsworth)  Sorry.  Let me -- so

15   you think that you got the time wrong on the lunch

16   break from it being 12:00 to 1:30 and then changed

17   to 1:45 to 2:00?

18      A.   I didn't say that.  I said it might

19   reflect a lunch break.

20      Q.   Okay.  Well, your --

21      A.   These are notes.  These are notes, not --

22   this is not a report.

23      Q.   Sure.  And when -- when you include times

24   on your -- in your notes, they're typically

25   reflecting the time that the events occurred, as

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1    depicted in your notes, when they occurred?  That's

2    a terrible question.  Let me withdraw it.

3         A.   Yes.

4         Q.   When you -- when you include times in your

5    notes next to information that you receive, the

6    times typically refer to the information that you

7    receive; right?

8         A.   Correct.  And this is not next to anything

9    other than "Saturday."

10        Q.   Right, but the "Saturday" is right above

11   "Informer told Tom at home to Ronnie Edmond gas

12   station.  Two to three shots.  Where body.  In dump.

13   Tits exposed, shirt up around neck.  Tom to dump,

14   moved some trash, saw fresh dirt move"; right?

15        A.   Yes.

16        Q.   And so that suggests to you that the time,

17   "1:45 to 2:00 p.m.," refers to when the informer

18   told Tom this information --

19        A.   I can't say --

20        Q.   -- right?

21        A.   -- that.

22        Q.   Well, do you have any other explanation

23   for why the time "1:45 to 2:00 p.m." is there?

24        A.   I said it could have been a lunch break.

25   I don't know.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

 1        Q.   All right.  Do you have any other

 2   explanation?

 3        A.   No.

 4        Q.   Okay.  All right.  Going on to the next

 5   page, page 41 of Exhibit 7.

 6        A.   Okay.

 7        Q.   This is a -- a report regarding an

 8   interview with Dr. Barnett -- or Gus Barnett from

 9   the funeral home?

10        A.   Right.

11        Q.   And the middle paragraph there says that

12   "Barnett related that he had described all the

13   victim's wounds and locations, (with the exception

14   of the wounds in the left breast) with the victim's

15   mother, Tommie Arfmann, and sister, Heidi Bledsoe."

16   Do you see that?

17        A.   Yes.

18        Q.   And this interview occurred on

19   November 12th; correct?

20        A.   Yes.

21        Q.   All right.  So you knew, as of

22   November 12th, that Heidi Bledsoe had been told the

23   location of the wounds from the funeral director;

24   right?

25        A.   With the exception of the one in the



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1    breast.

2         Q.    Correct.

3              All right.  Let me -- let me pause the

4    screen sharing, and I'm going to ask you to take a

5    look at a -- another exhibit that we have there.  I

6    just have to pull it up because I got out of my

7    folder.

8              MR. AINSWORTH:  All right.  Exhibit 6 --

9    Myles, if you'd please show that to the witness.

10             THE REPORTER:  One moment.

11        Q.    (By Mr. Ainsworth)  All right.  Showing

12   you Exhibit 6 --

13        A.    Okay.

14             MR. AINSWORTH:  And before we go through

15   it, I just want to state in the record I took a look

16   at the Hightail link that we sent on January 5th

17   over the lunch hour, and there was a ZIP file that

18   includes all of these documents in that ZIP file.

19             But there's two separate ZIP files, and I

20   don't know if counsel only accessed one of the ZIP

21   files, but that ZIP file has these documents and the

22   other ones we've been referencing.

23             But if anyone's having any trouble

24   accessing that, please do let me know.  The ZIP file

25   was entitled "759," dash, "4387, personnel records,

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1   training records, policy mat."

2        Q.   (By Mr. Ainsworth)  All right.  But,

3   Mr. Woods, if you'd take a look at what we've marked

4   as Exhibit 6.

5        A.   Yes.

6        Q.   All right.  You see the reference in this

7   report that you, Sheriff Dunnaway, Detective

8   Carreno, and Vanderbilt had a meeting and reviewed

9   each page of each -- of items already submitted to

10  the KBI lab for examination?

11       A.   Right.

12       Q.   And then you created a -- a memorandum to

13  the KBI lab to tell them what to test and what not

14  to test?

15       A.   Yes.

16       Q.   All right.  And, then, taking a look at

17  the memo, it states "Please" -- so this is the

18  second page of Exhibit 6 -- "Please disregard two

19  prior memos from SSA J. Woods and all prior

20  requested exams on all E.C.R.'s in this case.  Refer

21  to the attached pages for requested exams on items

22  currently at the KBI lab."  Do you see that?

23       A.   Yes.

24       Q.   And then you have -- on pages 3 and 4, you

25  refer to the various items of -- or the pages of the

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1  evidence that was collected; right?
 2       A.   Correct.
 3       Q.   And where you say "Hold," you're telling
 4  the lab to hold the item and not conduct any testing
 5  on it; right?
 6       A.   Correct.
 7       Q.   All right.  And do you recall that there
 8  was a shirt recovered next to the victim's body --
 9       A.   No.
10       Q.   -- or -- not -- sorry.  I shouldn't say
11  that.
12            There was a shirt recovered among the
13  plywood piled on top of the victim's body?
14       A.   No.
15       Q.   All right.  If you recovered a shirt among
16  the plywood on top of the victim's body, should you
17  have tested that to see if it contained any evidence
18  that might shed light on who killed Camille Arfmann?
19       A.   If it was found, it would, yes.
20       Q.   Let me show you what we previously marked
21  as Exhibit 41.  I'm going to display it on the
22  screen.
23            All right.  So Exhibit 41 is Bates
24  numbered KBI Subpoena 967 through KBI Subpoena 986.
25  And if we look at page -- page 13 of Exhibit 41, you
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1  see Exhibit No. 1 -- and I'll show you the
2  page number, page -- this is page number 11.  It's
3  confusing.  It's page 13 of the exhibit but page 11
4  of the evidence receipts.  Do you see that?
5       A.   No.  I see page 11.
6       Q.   Yeah.  Okay.  You see that it's page --
7  it's the 11th page of the evidence custody receipts;
8  right?
9       A.   Yes.
10      Q.   Correct?
11      A.   It's Jeff County evidence receipt, yes.
12      Q.   Okay.  And Item No. 1 is the black
13  T-shirt, Countryside Baptist Church, medium size.
14  Do you see that?
15      A.   I do.
16      Q.   All right.  And so that shirt located in
17  ditch where victim was located should have been
18  tested for blood and fu- -- fluids to see if it
19  might contain any DNA or other forensic material
20  that might suggest who killed Camille Arfmann;
21  right?
22      A.   That's -- was a requested exam, yes.
23      Q.   All right.  And, then, if we take a look
24  at your memo, Exhibit 6, for "Page 11" -- for
25  "Item 1" on "Page 11," you say "Hold."  You see

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1   that?

2        A.    Counselor, you got me so confused, I don't

3   know whether we're up or down.

4        Q.    All right.  Let me try it again.

5              So why don't you grab your paper copy of

6   Exhibit 6.

7        A.    Okay.

8        Q.    Look at page 3 of that document.  And on

9   that document, what do you say to do with the items

10  contained on page 11 of the evidence custody

11  receipts?

12       A.    Page 11, Items 1 through 3 and 4 are

13  "Hold."

14       Q.    Okay.  And so -- and then look back at

15  Exhibit 41, which is on the screen.  You see

16  page 11, Exhibit 1?  And I'll show you the top,

17  page 11, and then at the bottom, Exhibit 1.  That's

18  that black T-shirt; right?

19       A.    Right.

20       Q.    And so you've told the lab not to test the

21  black T-shirt; right?

22       A.    Apparently.

23       Q.    And that was following a meeting between

24  yourself, Carreno, Dunnaway, and Vanderbilt; right?

25       A.    Right.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1         Q.   Okay.  Do you have any -- can you explain
 2   to us why you didn't want the shirt to be tested
 3   that was found near the -- in the ditch where the
 4   victim was -- victim's body was recovered?
 5         A.   At this point, I have no idea.
 6         Q.   It's possible that whoever buried Camille
 7   in that ditch had some kind of blood on the shirt
 8   that they were wearing when she was killed and
 9   discarded that shirt along with the body; true?
10              MR. QUALSETH:  Object to the form.
11         A.   Anything's possible.
12         Q.   (By Mr. Ainsworth)  All right.  Well,
13   that's -- that's a possibility that -- that stands
14   out to you; correct?
15         A.   Anything's possible.
16         Q.   All right.  I want to add another question
17   back on Exhibit 4, the -- sorry -- no -- Exhibit 49.
18   It's actually the -- the one where the register had
19   the glitch in it.  And I don't actually need to
20   reference the report, but do you have any
21   explanation for why you didn't have the store owner
22   explain -- or the store manager explain to you what
23   the glitch was that caused the register to be out of
24   whack?
25         A.   I have no idea.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1     Q.   You don't strike me as a lazy law

2   enforcement officer.  You were -- you were never

3   somebody who didn't want to, you know, investigate

4   and find things out; right?

5     A.   Correct.

6     Q.   And so it wasn't because you couldn't be

7   bothered to find out; right?

8     A.   I don't know.

9     Q.   All right.  Let's turn to page -- so that

10  same Exhibit 7, I'm going to ask you to turn to

11  page 64.

12    A.   Page 64.  I'm there.

13    Q.   Okay.  This is an interview that you

14  conducted with a James White; is that right?

15    A.   Correct.

16    Q.   And so you made contact with Mr. White on

17  December 7th; right?

18    A.   Yes.

19    Q.   And I'm going to turn to page 65 now, once

20  we're oriented.

21    A.   All right.

22    Q.   And I just want to confirm in the -- oh.

23  The -- it's the first long paragraph that says

24  "After first salt block."  Do you see it?

25    A.   Yes.



8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500          Cornerstone            Fax (913) 825-2530
www.cornerstonekc.net              Court Reporting Company LLC   office@cornerstonekc.net

James W. Woods - 02/02/2023

```
1        Q.    Then it says "Said he'd paid around $130
2   for the gun.  Didn't shoot.  Took with us, but left
3   in my truck.  Not real knowledgeable about pistols."
4   Do you see that?
5        A.    Yes.
6        Q.    And I guess I should have backed up a bit
7   to get a little context.
8             It says "After first salt block put out,
9   Tom got a pistol out of his truck, a 9-millimeter,
10  silver color.  Tom indicated he bought at a gun show
11  at Lawrence a week or two prior.  Said he'd paid
12  around $130 for the gun.  Didn't shoot." Do you see
13  that?
14       A.    Yes.
15       Q.    So, according to Mr. White, Tom showed him
16  the gun, but they were not -- he was not shooting
17  the gun with him; right?
18       A.    Right.  According to White.
19       Q.    According to White.  Okay.
20            And they said, on page 64 of Exhibit 7 --
21       A.    All right.
22       Q.    -- according to Mr. -- this is the bottom
23  paragraph on page --
24       A.    You're talking about --
25       Q.    -- 64 --
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1      A.   -- the interview with --

2      Q.   -- of Exhibit 7.

3      A.   Are you speaking about the interview with

4  White?

5      Q.   Yes.

6      A.   Okay.

7      Q.   Same interview.

8          And he descri- -- White explains buying a

9  "couple salt blocks," and then "Tom drove in big

10 pasture."  Do you see where I'm referencing, sir?

11     A.   Yes.

12     Q.   "Took salt blocks into woods, came back.

13 No shooting by either of us."  Do you see that?

14     A.   Yes.

15     Q.   All right.  So during your interview

16 with -- with James White, he said that he wasn't

17 shooting with -- with Tom Bledsoe; right?

18     A.   Right.

19     Q.   Okay.  If you'd turn to page 66 of

20 Exhibit 7.

21     A.   Okay.

22     Q.   All right.  Do you know what these notes

23 refer to when you have the list of 1 through 9 and

24 the names next to it?

25     A.   I have no idea at this point.



8700 Monrovia, Suite 310          (913) 825-2510
Lenexa, Kansas 66215-3500         Fax (913) 825-2530
www.cornerstonekc.net            office@cornerstonekc.net

Cornerstone
Court Reporting Company LLC

James W. Woods - 02/02/2023

1      Q.   You have "FBI - Behavioral" -- "Behavior

2   Science."  Do you know what that refers to?

3      A.   No.

4      Q.   Have you ever consulted the FBI before on

5   a case?

6      A.   No.

7      Q.   Do you know they have a behavioral

8   sciences division to help profile criminals?

9      A.   I'm aware of that.

10      Q.   But you've never contacted them for help?

11      A.   No.

12      Q.   All right.  There's a reference in the

13   middle of the page on the right-hand side of that

14   same page 66.  Do you see in that little box you've

15   drawn it says "Guy in Dodge to" something, and then

16   is that "prison"?

17      A.   Which box are you referring to?  There are

18   several boxes on there.

19      Q.   It's true.  You see the one -- so there's

20   the top portion, and then there's a line through it.

21   And then it says "LWR - 287."

22      A.   "LWR - 287."  Yes, I see that now.  I have

23   no idea what that refers to.

24      Q.   I'm not asking, sir.  That's just a place

25   mark.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1            So then if you go to the right of that.

2        A.   Okay.

3        Q.   Okay?  And you see where it says "Guy in

4    Dodge"?

5        A.   Right.

6        Q.   And it says "Guy in Dodge to" -- I don't

7    know -- return, or "Ret," and then dash.  Is that

8    "prison" right --

9        A.   Looks --

10       Q.   -- next to it?

11       A.   Looks like it, yes.

12       Q.   And, then, can you read what's below

13   "prison"?

14       A.   "Daughter knew Arfmann sex - Bledsoe

15   video."

16       Q.   Do you know what that's referring to?

17       A.   At this point of the game, no, sir.

18       Q.   All right.

19            MR. QUALSETH:  We've been going for about

20   an hour, Russell.  Is this a good time for a break?

21            MR. AINSWORTH:  It is, actually.

22            MR. QUALSETH:  All right.

23            MR. AINSWORTH:  Let's do that.

24            MR. QUALSETH:  Okay.

25            THE REPORTER:  All right.  We'll be off



 1    the record at 2:33 p.m.

 2            (A recess was taken.)

 3            THE REPORTER:  Okay.  We're back on the

 4    record at 2:42 p.m.

 5        Q.    (By Mr. Ainsworth)  All right.  If you'd

 6    take a look at Exhibit 7, page 50.

 7        A.    Say number again.

 8        Q.    Exhibit 7, page 5-0.

 9        A.    5-0.  Okay.

10            Okay.

11        Q.    All right.  You see, towards the -- the

12    bottom half of the page, there's a reference to

13    November 15, 1999, "Hayes, Big Floyd, Cathy."  Do

14    you see that?

15        A.    Yes.

16        Q.    And then it says "Little Floyd - to folks.

17    Two people shooting tin cans.  Ricochet hit Camille.

18    Shot more so wouldn't suffer.  Knew Tom had gun,

19    protection home from work."  Do you see that?

20        A.    Yes.

21        Q.    All right.  So is this a meeting you had

22    with Hayes, Big Floyd -- referring to Floyd L.

23    Bledsoe -- and Cathy, Floyd L. Bledsoe's wife?

24        A.    Well, apparently so, yes.

25        Q.    And then it says "Flashlight.  TV little.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

 1   House keys.  Checkbook.  Dad took from Tom's truck
 2   Monday or Tuesday."  Do you see that?
 3        A.   Yes.
 4        Q.   Then it says "Saturday - L." -- "a.m. -
 5   Little Floyd called folks - Camille gone.  Seen,"
 6   question mark.  "C might call.  M and D" -- Mom and
 7   Dad -- something "never called."
 8        A.   "Has never called."
 9        Q.   "Has never called."
10             All right.  Do you know what "Two people
11   shooting tin cans.  Ricochet hit Camille.  Shot more
12   so wouldn't suffer" refers to?
13        A.   I have no idea.
14        Q.   Any report we could reference that would
15   tell us what you meant by that?
16        A.   Well, I'm sure there might be something
17   somewhere.
18        Q.   Why are you sure that there might be
19   something somewhere?
20        A.   Well, I would have probably generated a
21   report.
22        Q.   If you had an interview with, you know,
23   people talking about how Camille got shot?
24        A.   Yes.
25        Q.   And taking items from Tom's truck?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1        A.    Yes.

2        Q.    That's the kind of stuff that should be

3    documented; right?

4        A.    Correct.

5        Q.    All right.  Let's go on.  Well, let me ask

6    you:  Did anyone tell you, during the course of your

7    investigation, that "Tom claimed he tried to have

8    sex with the victim in his truck.  She laughed.  He

9    shot her"?

10        A.    I don't recall.

11        Q.    Did you learn that Tom Bledsoe confessed

12    to killing Camille Arfmann during his polygraph with

13    George Johnson on November 12th, 1999?

14        A.    I don't recall.

15              MR. QUALSETH:  Object to the form.

16              MR. LINDEN:  Join.

17              MR. AINSWORTH:  What's wrong with the

18    form?  Well, that's okay.

19              MR. QUALSETH:  Do you really want to know?

20              MR. AINSWORTH:  I do, actually.

21              MR. QUALSETH:  You presumed facts not in

22    evidence:  When "did you learn?"  I just didn't like

23    the wording.

24              MR. AINSWORTH:  Okay.  That -- that's --

25    it's fair.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

 1            MR. QUALSETH:  It's like "When did you
 2    stop beating your wife?" kind of thing.
 3            MR. AINSWORTH:  Well ...
 4        Q.  (By Mr. Ainsworth)  Well, let's -- let me
 5    pull up ...
 6            MR. AINSWORTH:  We're going to have to
 7    re-mark this, but --
 8            Myles, could you pull out Exhibit 8, and
 9    we'll re-mark it as 51.
10            (Exhibit No. 51 was marked for
11    identification.)
12            THE REPORTER:  One moment.
13            MR. AINSWORTH:  Sure.
14            Are you ready?
15            THE REPORTER:  We're ready.
16            MR. AINSWORTH:  Okay.  I'm sorry.
17        Q.  (By Mr. Ainsworth)  All right.  So I'm
18    showing you what we marked as Exhibit 51.  This is a
19    conversation between you and a lab analyst at the --
20    at the lab; correct?
21        A.  I don't know.
22        Q.  Are you aware that the lab analysts take
23    notes of their conversations with detectives?
24        A.  No.
25        Q.  All right.  So you didn't know that your

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1   conversation would be recorded; right?
 2        A.   No.
 3        Q.   That's correct?
 4        A.   Yes.
 5        Q.   All right.  So this is -- it says there's
 6   a -- I've forgotten Mary's last name.  It says
 7   "Agency Contact:  Jim Woods."  That's you; right?
 8        A.   Yes.
 9        Q.   And then there's a reference on
10   November 22nd, and you see, fifth line down, it says
11   "Tom claimed he tried to have sex with her in truck.
12   She laughed.  He shot her."  Do you see that, sir?
13        A.   I do.
14        Q.   All right.  Did you tell anyone from the
15   lab that "Tom claimed he tried to have sex with
16   her" -- with the victim in his truck -- "She
17   laughed.  He shot her"?
18        A.   That would have nothing to do with their
19   lab exams, if I did say it.
20        Q.   Okay.  Well, I'm just -- I'm just trying
21   to find out if you told her that.
22        A.   I would have to say no.
23        Q.   Why do you say "no"?
24        A.   It has nothing to do with her exams.
25        Q.   Sometimes analysts look -- you know, want
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1    to know about how the crime committed [sic] so they

2    know what to look for; right?

3              MR. QUALSETH:  Object to the form.

4              Do you remember the question?

5              THE WITNESS:  I don't know what he wants

6    to know.

7              MR. QUALSETH:  He wanted to know -- well,

8    I'm not going to coach you.  Go ahead.

9              MR. AINSWORTH:  I appreciate that.

10             MR. QUALSETH:  I'd like to, though.

11        Q.   (By Mr. Ainsworth)  I just want to know,

12   sir, are you saying -- are you saying you did not

13   tell the lab analyst, "Tom claimed he tried to have

14   sex with her in the truck.  She laughed.  He shot

15   her"?

16        A.   I would have to say, no, I did not tell

17   her that.

18        Q.   Well, why do you -- why do you say you

19   didn't tell her that?

20        A.   Had nothing --

21        Q.   Well --

22        A.   -- to do with her exam.

23        Q.   -- actually, let me keep reading -- let me

24   keep reading, and we'll see what you have to say.

25             It says -- it then says "Tom came in with

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1  attorney after looking for girl all weekend.  He,"
 2  meaning Tom, "knew where she was," and then there's,
 3  quote, "something happened to her," dot, dot, dot,
 4  end quotes.  "Took police to Floyd, Sr., to trash
 5  dump" -- "dump site (ditch).  Started digging under
 6  plywood, 12 inches dirt.  Shirt/bra pulled up.  Two
 7  gunshot wound chest, left arm, head, breast (left).
 8  (Four shots)," question mark.  "Not killed there,
 9  through Tom's attorney."  Do you see that?
10       A.   I see it, yes.
11       Q.   (Inaudible.)
12            THE REPORTER:  You cut out.
13            (Technical issue.  Discussion off record.)
14       Q.   (By Mr. Ainsworth)  See where it says "Not
15  killed there, through Tom's attorney"?
16            MR. QUALSETH:  Do you see that is --
17       A.   Yeah.
18            MR. QUALSETH:  -- what he's asking.
19       A.   Yeah, I see it.
20       Q.   (By Mr. Ainsworth)  Okay.  "Tried to
21  locate crime scene.  Tom passed.  Tom says he killed
22  her.  Floyd flunked.  Floyd told him, 'They had
23  killed her accidentally,' recanted.  Recovered three
24  shell casings, three bullets.  May have been there
25  where she was killed."  Do you see that, sir?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

 1      A.   Yes, I do.

 2      Q.   All right, sir.  So are you saying that

 3 nobody told the analyst this, and she just made it

 4 up?

 5      A.   Apparently somebody told her this -- or

 6 him, whichever the examiner was.  This was basically

 7 a synopsis of the case.

 8      Q.   Okay.  And so you were aware that "Tom

 9 claimed he tried to have sex with the victim in his

10 truck.  She laughed, and he shot her"?

11      A.   I have heard that statement from you, yes.

12      Q.   Well, no.  I mean during the

13 investigation, sir --

14      A.   I don't remember --

15      Q.   -- you -- you learned --

16      A.   -- that, no.

17      Q.   Okay.  If you learned that "Tom claimed he

18 tried to have sex with the victim in his truck.  She

19 laughed.  He shot her," that's something that should

20 have been documented in a report and shared with the

21 prosecutor; right?

22      A.   Correct.

23           MR. QUALSETH:  Object to the form.

24           MR. LINDEN:  Join.

25      Q.   (By Mr. Ainsworth)  And if Tom stated,

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    "Something happened to her" in quotes, that's

2    something that should have been documented and

3    sent -- and put in a report and sent to the

4    prosecutor; right?

5            MR. QUALSETH:  Object to the form.

6            MR. LINDEN:  Join.

7        A.   Depending on who received that

8    information.

9        Q.   (By Mr. Ainsworth)  If it was a law

10   enforcement officer, that information should have

11   been documented in a report and sent to the

12   prosecutor; right?

13           MR. QUALSETH:  Object to the form.

14           MR. LINDEN:  Join.

15       A.   Again, depending on where the information

16   came from.

17       Q.   (By Mr. Ainsworth)  Well, if it was a

18   quote attributed to Tom, that's a statement that

19   should have been documented in a report and sent to

20   the prosecutor; right?

21           MR. QUALSETH:  Object to the form.

22           MR. LINDEN:  Join.

23       A.   Again, depending on where the information

24   came from.

25       Q.   (By Mr. Ainsworth)  Hang on.  You're

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   saying that if -- if somebody told you that Tom told

2   them something -- Tom said something happened to

3   her, referring to the victim, you think that's not a

4   statement that should be documented and sent to the

5   prosecutor?

6          MR. QUALSETH:  Object to the form.  I'm

7   not sure I understand your question.  I'll -- so

8   I'll just say compound.

9          MR. LINDEN:  I'll also join in the

10  objections.

11         Q.   (By Mr. Ainsworth)  You can answer.

12         A.   I don't know how to answer it.  You got me

13  so messed up, I don't know.

14         Q.   Sure.  Well, let's talk about it.  So it

15  says --

16         A.   All right.  Let me -- let me clarify this.

17  You're saying that I should have reported that Tom

18  said, "Something happened to her."  Where did I get

19  the information?

20         Q.   I'm not saying that at all, sir.  I'm not

21  suggesting that you should have done it.  I'm just

22  saying a law enforcement officer should have

23  documented Tom saying, "Something happened to her,"

24  if there's a quote from Tom saying, "Something

25  happened to her."

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

 1       A.    Depending on where they got the
 2   information.
 3       Q.    And why would the locat- -- why would the
 4   source of the information determine whether it
 5   should be documented in a report and turned over to
 6   the prosecutor?
 7       A.    Again, depending on the source of the
 8   statement.
 9       Q.    Why would that matter?
10       A.    Whether or not it was viable or not.
11       Q.    Okay.  So when you say "viable," you mean
12   if somebody was just spouting off, and it didn't
13   make any sense?
14       A.    If it came out of a coffee shop.
15       Q.    Okay.  If it came out of a coffee shop,
16   you would then talk to the people in the coffee shop
17   to find out who made the statement; right?
18       A.    Correct.
19       Q.    Yeah.  And so if you told the analyst, in
20   quotes, "Something happened to her," attributing it
21   to Tom, then that's something that should have been
22   documented; right?
23            MR. QUALSETH:  Object to the form.
24            MR. LINDEN:  Join.
25       A.    Again, depending on the source of the



8700 Monrovia, Suite 310                    (913) 825-2510
Lenexa, Kansas 66215-3500                   Fax (913) 825-2530
www.cornerstonekc.net                       office@cornerstonekc.net

James W. Woods - 02/02/2023

1    information.

2         Q.   (By Mr. Ainsworth)  Well, how about the

3    statement from Tom's attorney, Mike Hayes, that the

4    victim was "not killed there"?  Should that have

5    been documented in a report?

6              MR. QUALSETH:  Object to the form.

7              MR. COX:  Join.

8         A.   The victim was not what?

9         Q.   (By Mr. Ainsworth)  "Not killed there."

10             That's a long pause, Mr. Woods.

11        A.   I'm contemplating an answer that I don't

12   know what you're talking about.

13        Q.   What's confusing about my question, sir?

14        A.   Well, you've asked so many and not

15   answered one yet; so what do you want to know?

16        Q.   Well, let me -- let me -- let me see if I

17   can help you out.  I'm simply asking, if Tom's

18   attorney told you that the victim was not killed at

19   the location she was found, you should have

20   documented that fact in a report that was sent to

21   the prosecutor; correct?

22        A.   Correct.

23        Q.   If you learned that Tom said, during the

24   polygraph exam, that he said he killed the victim,

25   you should have documented -- or -- well, strike

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

 1    that.

 2            If law enforcement learned, during the

 3    polygraph exam, Tom said he killed the victim, that

 4    should have been documented in a report and sent to

 5    the prosecutor --

 6            MR. TURNER:  Object to form.

 7        Q.  (By Mr. Ainsworth)  -- correct?

 8            MR. QUALSETH:  Same --

 9            MR. LINDEN:  Join.

10            MR. QUALSETH:  -- objection.

11            MR. LINDEN:  I also join.

12        A.  It would have been reflected in the

13    examiner's report.

14        Q.  (By Mr. Ainsworth)  Right.  So it -- which

15    would -- in a written report that would be sent to

16    the prosecutor; correct?

17        A.  I can't speak for the examiner.

18        Q.  Is there any law enforcement reason not to

19    document the fact that Tom is saying, during a

20    polygraph exam on November 12, "I killed the

21    victim"?

22            MR. TURNER:  Object to form.

23            MR. LINDEN:  Join.

24        A.  I can't speak for the examiner.

25        Q.  (By Mr. Ainsworth)  I'm not asking you to

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    speak for the examiner.  I'm asking you, from your

2    law enforcement perspective for 30 years -- shoot,

3    you know, over 35 years of law enforcement

4    experience, if somebody confesses to a homicide

5    during a polygraph exam, that's a fact that should

6    be documented, put in a report, and submitted to the

7    prosecutor; right?

8             MR. LINDEN:  Object to form.

9             MR. QUALSETH:  Same objection.

10            MR. TURNER:  Join.

11       A.   That is the polygraph examiner's job to

12    do, not mine.

13       Q.   (By Mr. Ainsworth)  I'm not asking whose

14    job it is.  I'm just saying that it should be

15    documented and should be submitted to the

16    prosecutor; right?

17       A.   I'm not speaking for the polygraph

18    examiner.

19       Q.   I'm not asking you to speak for the

20    polygraph examiner.

21       A.   You're asking --

22       Q.   I'm saying --

23       A.   -- me to draw a conclusion.

24       Q.   -- any law --

25            MR. QUALSETH:  Listen -- listen to the

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1   question.
 2           Hold on.  Hold on.
 3           Jim, listen to the question.  Okay?
 4      Q.   (By Mr. Ainsworth)  I'm simply asking you,
 5   sir, if you're conducting a homicide investigation
 6   and one of your suspects says, "I killed her," that
 7   is a fact that should be documented and sent to the
 8   prosecutor; right?
 9           MR. TURNER:  Object to form.
10           MR. LINDEN:  Join.
11      A.   Correct.
12      Q.   (By Mr. Ainsworth)  Do you -- strike that.
13           Do you know why the time line that was
14   provided to you by Mike Hayes was not documented in
15   the report?
16           MR. COX:  Object to form.
17           MR. QUALSETH:  Same objection.
18           MR. TURNER:  Join.
19           MR. LINDEN:  I join as well.
20      A.   I don't know that it wasn't.
21      Q.   (By Mr. Ainsworth)  Okay.  At -- in some
22   shape or form, it should have been documented in a
23   report and provided to the prosecutor; right?
24      A.   Yes.
25      Q.   Do you know why the statements about Tom
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1   saying he tried to have sex with the victim in her
 2   truck -- "in his truck.  She laughed, and he shot
 3   her" are not documented in any report?
 4              MR. QUALSETH:  Object to the form.
 5              MR. TURNER:  Join.
 6              MR. LINDEN:  I join as well.
 7        A.   I don't have a clue.
 8        Q.   (By Mr. Ainsworth)  Do you know why a
 9   statement from Tom's attorney that the victim was
10   "not killed where she was found" was not documented
11   in a report?
12        A.   I don't know.
13              MR. COX:  Object to form.
14              MR. QUALSETH:  Object to the form.
15              MR. TURNER:  Join.
16              MR. LINDEN:  I join as well.
17        Q.   (By Mr. Ainsworth)  Do you know why the
18   statement from Mike Hayes that the victim was
19   transported in the -- in the truck while still
20   alive -- why that was not documented and sent to the
21   prosecutor?
22              MR. QUALSETH:  Object to form.
23              MR. COX:  Object to form.
24              MR. LINDEN:  I join as well.
25              MR. TURNER:  Join.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1      A.   I'm assuming it was.

2      Q.   (By Mr. Ainsworth)  Because that's the

3 thing -- that's the kind of thing that should be

4 documented and sent to the prosecutor; right?

5      A.   Correct.

6      Q.   And the statement that the -- that the --

7 that "The suspect, Tom, was afraid victim would

8 accuse him of trying to have sex with her" -- that's

9 the statement that should have been documented and

10 sent to the prosecutor; right?

11      A.   Correct.

12           MR. QUALSETH:  Object to the form.

13           MR. LINDEN:  Join.

14           MR. TURNER:  Join.

15      Q.   (By Mr. Ainsworth)  Let me show you

16 Exhibit 7 again -- or I'm going to ask you to turn

17 to page 85 of Exhibit 7.

18      A.   Okay.

19      Q.   All right.  On page 85 of Exhibit 7, it

20 refers to what appears to be jury deliberations.  On

21 "Thursday, eight guilty, four not guilty, one -

22 strong - shouting match."  Do you see that?

23      A.   Well, it might be "shooting match."

24      Q.   Might be "shooting match."

25           Seems like "shouting match," but, in any

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1   event, it's either a "shooting" or a "shouting
 2   match"; right?
 3        A.   Right.
 4        Q.   And then it says "Hung - Thursday," and
 5   then "Friday - Talk lesser crimes.  One female
 6   relied on law enforcement experience."  Then it says
 7   "Only got part - people.  Tom - no - totally.  Dad -
 8   maybe."
 9             And then it says "Interview psych with
10   two-year-old.  Definitely not taking stand.
11   Pooh-pooh - Time line - Defendant.  Floyd" -- do you
12   know what that middle word says?
13        A.   I have no idea.
14        Q.   Seems like "four hours" after that.
15             And then it says "CA," for county
16   attorney.  Do you know what it says next to "county
17   attorney"?
18        A.   I think you know what it says.
19        Q.   Does it say "unprepared"?
20        A.   That's the way I would --
21        Q.   Right.
22        A.   -- read it.
23        Q.   All right.  And that's your writing?
24        A.   Uh-huh.
25        Q.   And then there's a reference on the
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1  right-hand side of the page, in the middle, to "Tom

2  shovel by fence."

3       A.   Yes.

4       Q.   Do you see that?

5       A.   Uh-huh.

6       Q.   Do you know what that's referring to?

7       A.   I have no idea.

8       Q.   Did you know that Tom's jury went out on a

9  Thursday and came back on a Friday morning?

10            MR. QUALSETH:  Object to the form.  Do you

11  mean Floyd's?

12            MR. AINSWORTH:  Oh, I'm so sorry.  You're

13  right.  Thank you for the clarification.

14       Q.   (By Mr. Ainsworth)  Do you know that

15  Floyd's jury went out on a Thursday and came back on

16  a -- and deliberated Thursday and then came back

17  Friday morning and reached a verdict?

18       A.   I don't know that for a fact, no.

19       Q.   How did you -- how did you learn this

20  information about the jury composition of, you know,

21  who is for and against and what was going on in the

22  jury room?

23       A.   I don't know.

24       Q.   In any case, have you ever investigated,

25  you know, the inner workings of how a jury reached

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company llc

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

 1   their verdict?

 2       A.   I have interviewed jurors in the past,

 3   yes.

 4       Q.   Did you interview any jurors for this

 5   case?

 6       A.   I don't recall.

 7       Q.   If you interviewed a jury for this case,

 8   there should be some documentation of that fact;

 9   right?

10       A.   Possibly.

11       Q.   Well, I mean, if you're doing it for the

12   case and you're talking to a witness or a juror, you

13   should let people know that you're doing it; right?

14       A.   The case would have had to been resolved

15   before I could talk to a juror.

16       Q.   So if you conducted an investigation after

17   this case was over, you could have -- you could have

18   done investigation and not documented it?

19       A.   Possibly.

20       Q.   In 2015 or 2016, did you talk to Special

21   Agent Morgan about whether you'd participate in the

22   reinvestigation of this case?

23       A.   I would have no clue whether I talked to

24   him or not on those dates.

25       Q.   Because you're saying you don't remember

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
1  this case at all; right?
2      A.   I didn't till I was contacted by my
3  attorney.
4      Q.   All right.  And so you wouldn't have had
5  any problem in 2015 or 2016 if the reinvestigators
6  of this case reached out to you and -- and talked to
7  you about it.  You would have talked to them; right?
8      A.   Was there a reinvestigation?
9      Q.   And you would have no reason to tell Terry
10 Morgan, "I don't want to have anything to do with
11 this, and I refuse" and get mad about it; right?
12     A.   I don't know.
13     Q.   You might have?
14     A.   I don't know.
15     Q.   Tell me, Mr. Woods, why would you have any
16 reason to get mad about a case you don't even
17 remember?
18     A.   I don't know.
19     Q.   Did you not like Terry Morgan?
20     A.   I don't dislike him, no.
21     Q.   All right.  So you don't have a personal
22 problem with Terry Morgan; right?
23     A.   No, I do not.
24     Q.   So if Terry Morgan talked to you about,
25 you know, the reinvestigation of this case, the fact
```



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    alone that Terry Morgan bring it up wouldn't cause

2    you to get upset; right?

3        A.   No.

4        Q.   Do you remember getting upset at Terry

5    Morgan when he tried to talk to you about this case

6    and say that there was a reinvestigation going on?

7        A.   No, I do not.

8        Q.   Because you don't remember this case

9    whatsoever; right?

10       A.   I didn't until my attorney contacted me.

11   ████████████████████████████████████

12   ██████████████████████████████████████████

13   ██████████████████████████████████████████

14   ██████████████

15       ██████

16   ████████████████████████████

17       ██████

18   ██████████████████████████

19   ████████████████

20       ████████████████████████

21   ██████████████████████████████████████████

22   ██████████████████████████

23       ████████████████████

24   ██████████████

25       ████████████████████████████

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1 ██████████████

2 ████████████████████

3 ████████████████████████

4 ████████████

5      Q.    All right.  I screwed up earlier.  Did you

6 have any conversations with Kirk Vernon about the

7 reinvestigation?  Not Morgan.  I -- I mixed the

8 names up.

9      A.    There's a big difference there.

10     Q.    Yeah.

11     A.    Not that I can recall, no.

12     Q.    How do you feel about Kirk Vernon?

13     A.    He's deputy sheriff in Jeff County.

14     Q.    All right.  So you don't have any

15 animosity towards him?

16     A.    No.

17     Q.    Any reason why you would get upset in

18 talking with him about the reinvestigation of this

19 case?

20          MR. QUALSETH:  Object to the form.

21     A.    I don't believe I did.

22     Q.    (By Mr. Ainsworth)  Okay.  Because you --

23 you have no reason to get upset about this case --

24     A.    No.

25     Q.    -- right?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods – 02/02/2023

```
1        A.   No, no.

2        Q.   That's correct?

3        A.   Yes, it's correct.

4        Q.   Because you don't remember this case;

5   right?

6        A.   No.

7        Q.   That's correct?

8        A.   Not -- not until it was brought to my

9   attention, no.

10       Q.   All right.  So back in the time of 2015,

11  2016, you didn't even remember the case; so you had

12  no reason to get upset about it; right?

13       A.   No, sir.  I've already told you that.

14       Q.   Did you tell Terry Morgan that you called

15  Vernon, and you chewed his ass out or something to

16  that effect?

17       A.   Not that I recall.

18       Q.   Did you call Vernon complaining that he

19  (indiscernible) mischaracterizing the stop order to

20  stop testing?

21       A.   Try that one again.

22       Q.   Sure.  Did you call Vernon and complain to

23  him that he was mischaracterizing the stop order in

24  the case?

25       A.   I don't believe so.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1      Q.   Any reason why you would be upset about

2  how he was characterizing the -- the stop order to

3  not conduct DNA testing?

4      A.   He was not involved in the stop order.

5      Q.   Right.  But I mean in the reinvestigation.

6           So in the 2015, 2016 time period, did you

7  have any reason to contact Vernon and complain to

8  him that he was mischaracterizing the stop order?

9      A.   I have no clue what you're talking about.

10     Q.   All right.  Because it would be kind of

11 odd, if you remembered this case in 2015, 2016, to

12 specifically complain to Kirk Vernon about it, and

13 then in 2023, when you're asked, you got no memory

14 of the case; right?

15          MR. QUALSETH:  Object to the form.

16     A.   You said I called him in 2015 and '16.  I

17 didn't admit to calling him at all.  No.

18     Q.   (By Mr. Ainsworth)  Right.  Because you

19 don't think that happened; right?

20     A.   Not that I remember, no.

21     Q.   Any reason why Kirk Vernon would lie about

22 it?

23          MR. QUALSETH:  Object to the form.

24          MR. TURNER:  Join.

25          MR. LINDEN:  Join.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1       A.   I cannot speak for Vernon's -- what goes

2    on in his head.

3       Q.   (By Mr. Ainsworth)  All right.  Do you

4    recall that there were no fingerprints on the gun

5    that you recovered from -- or not -- strike that.

6            Do you recall that there are no

7    fingerprints on the gun that Mike Hayes brought to

8    the police station the night of November 7th?

9       A.   I don't recall.

10      Q.   All right.  Would you take a look at -- I

11   believe we marked it as Exhibit 49.  It's your trial

12   testimony.  But I might have the number wrong on

13   that one.

14      A.   Yes, I have it.

15           THE REPORTER:  Hold --

16           THE WITNESS:  Oh.  Okay.

17           THE REPORTER:  I handed him Exhibit --

18      Q.   (By Mr. Ainsworth)  Okay.

19           THE REPORTER:  I handed him Exhibit 49,

20   but now I'm looking at Exhibit 50, and it says it's

21   the "Transcript Of Jury Trial."  Is that the one you

22   want?

23           MR. AINSWORTH:  I mixed them up.  Sorry.

24   Yes, please.  Exhibit 50.

25           THE WITNESS:  Trade you.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1              THE REPORTER:  (Hands document.)
 2              THE WITNESS:  You ready?
 3         Q.   (By Mr. Ainsworth)  All right.  I'm ready.
 4    I'm going to --
 5         A.   No.  I was making sure he was ready.
 6         Q.   Oh, good.  He is the most important person
 7    in this room, because without him, none of this
 8    matters.
 9         A.   Right.
10         Q.   All right.  So showing you Exhibit 50, if
11    you'd turn to page 496 in the top.
12         A.   All right.
13         Q.   And line 8, you were asked the question
14    "You participated in the investigation the entire
15    time; is that correct?"
16         A.   Where are --
17         Q.   And you answered --
18         A.   What line are you on?
19         Q.   Line 8, sir.
20         A.   Okay.
21         Q.   You were asked the question "You
22    participated in the investigation the entire time;
23    is that correct?"
24              And the answer was, "Yes, sir.  Start to
25    finish.  Well --"
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1               Were you asked that question?  Did you
 2    give that answer?
 3         A.    Apparently I did.  The recorder recorded
 4    it as such.
 5         Q.    All right.  And was that true?  You
 6    were -- you participated in the investigation the
 7    entire time from start to finish?
 8         A.    Yes.
 9         Q.    All right.  And then you were asked, at
10    line 11, "Is there any -- have you had any occasion
11    or any information inconsistent with the fact that
12    Tom Bledsoe was at Rusty's at 4:30?"
13               And your answer was, "No, sir."
14               Were you asked that question?  Did you
15    give that answer?
16         A.    Yes.
17         Q.    And was that true, sir?
18         A.    Depends on which register you want to
19    believe.
20         Q.    Well, not jut the register, sir; right?
21         A.    That's the only proof there would be.
22         Q.    Well, what about the time line that was
23    provided to you, sir, saying that Tom was at Rusty's
24    at 3:40 and got home around 4:40?
25               MR. TURNER:  Object to form.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1        A.    I don't recall or I can't tell you who

2   initiated that time line or where it came from.

3        Q.    (By Mr. Ainsworth)  All right.  But you

4   did have information inconsistent with the fact that

5   Tom Bledsoe was at Rusty's at 4:30; right?

6             MR. TURNER:  Object to form.

7             MR. LINDEN:  Join.

8        A.    Tom was at Rusty's at some time in that

9   afternoon.  I can't tell you what time it was

10  exactly.

11       Q.    (By Mr. Ainsworth)  Yeah, I -- it's not my

12  question, sir.  I'm simply saying you had

13  information that was inconsistent with the fact that

14  Tom Bledsoe was at Rusty's at 4:30; right?

15            MR. TURNER:  Object to form.

16            MR. QUALSETH:  Same objection.

17            MR. LINDEN:  I'll join as well.

18       Q.    (By Mr. Ainsworth)  Looking at the

19  transcript's not going to help you, sir.  Can you

20  answer my question.

21       A.    I'll tell you that he was at Rusty's

22  sometime in that afternoon is the best I can tell

23  you at this point.

24       Q.    That -- that would be a great answer if I

25  asked you, "When was Tom Bledsoe at Rusty's?"  It's

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1    not my question.
 2            My question is you had some information
 3    inconsistent with the fact that Tom Bledsoe was at
 4    Rusty's at 4:30; correct?
 5            MR. TURNER:  Object to form.
 6            MR. LINDEN:  Join.
 7        A.   No.
 8        Q.   (By Mr. Ainsworth)  You wrote in your
 9    notes that Tom Bledsoe was at Rusty's at 3:40 in the
10    afternoon; right?
11        A.   If that's what the notes show.
12        Q.   You want to see it?  Page -- Exhibit 7,
13    page 30.  Here, I'll show you.  "3:40 p.m. - Rusty's
14    Sports - Lawrence" --
15        A.   Again --
16        Q.   -- "Waited on by Mike."
17        A.   Go ahead.
18        Q.   Yeah.  You see that there, sir?
19        A.   I see it.  I don't know where it came
20    from, though.
21        Q.   Yeah.  I didn't ask you where it came
22    from.  I just said you had information inconsistent
23    with Tom being in Lawrence at Rusty's at 4:30;
24    right?
25            MR. TURNER:  Object to form.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1         MR. LINDEN:  Join.

2     A.    Putting it that way, yes.

3     Q.    (By Mr. Ainsworth)  All right, sir.

4         MR. AINSWORTH:  Let's take a break.  I'm

5  going to -- you know, I'm getting towards the end of

6  my examination, but I need a little time to go over

7  my notes.  I'm not done, but I just want to look

8  over stuff.

9         MR. QUALSETH:  Fair enough.

10        MR. AINSWORTH:   Thank you.

11        THE REPORTER:  Okay.  We'll go off the

12  record at 3:32 p.m.

13        (A recess was taken.)

14        THE REPORTER:  All right.  We are back on

15  the record at 3:44 p.m.

16    Q.    (By Mr. Ainsworth)  All right.  As

17  promised, I don't have much more for you, but I just

18  want to show you Exhibit 7 again.  That's your field

19  notes.  If you'd -- you can look at the paper copy

20  or look at the screen.  I'm going to direct you to

21  page 87 of that; so almost all the way to the end.

22        There's a reference to "Tom, September 10,

23  20-" -- "1999, tested September 21, 1999.  Didn't

24  meet standards, testing rejected."  Do you know what

25  that refers to?

James W. Woods - 02/02/2023

1      A.   Have no clue.

2           MR. QUALSETH:  I'm not seeing it on my

3    screen.  I'm going to look over your shoulder.

4           THE WITNESS:  Okay.

5           MR. QUALSETH:  And, Russell, just to let

6    you know, it's -- it -- my screen went out; so I'm

7    looking over --

8           MR. AINSWORTH:  Yeah.

9           MR. QUALSETH:  -- Jim's shoulder.  So

10   that's -- that's my shoulder there.

11          MR. AINSWORTH:  Understood.

12      Q.   (By Mr. Ainsworth)  Then I want to ask

13   you -- if you'd turn back to Exhibit 50, your -- the

14   transcript of your testimony.

15      A.   Okay.

16      Q.   And turn to page 495, your trial

17   testimony.

18      A.   Okay.

19      Q.   Tell me when you're there.

20      A.   I'm there.

21      Q.   All right.  Okay.  Looking at line 12 of

22   page 495, it reads "First of all, does State's -- or

23   Defense Exhibit No. 2 indicate that that phone

24   call -- that a phone call was made from Tom's cell

25   phone to his parents' house at 4- -- around 4:30 on

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1   November 5th, 4:30 p.m.?"
 2            Answer:  "Yes.  The last call on the bill
 3   reflects November the 5th, 1999, 4:25 p.m.  City
 4   called was Oskaloosa.  The number was 63" --
 5   "863-2187 and was made from a cell phone number,
 6   331-6445."
 7            Were you asked that question?  Did you
 8   give that answer, sir?
 9       A.   What do you want to know?
10       Q.   Whether you were asked that question, if
11   you gave -- gave that answer.
12       A.   I'm not sure I understand what you're
13   asking.
14       Q.   All I want to know is did -- at the trial,
15   were you asked that question?  Did you answer -- and
16   did you give the answer I just read?
17       A.   Yes.
18       Q.   Okay.  Some of these are easy.
19            In the investigation, should somebody have
20   asked Tom Bledsoe why he was talking -- why he
21   called his dad at 4:25 p.m.?
22            MR. QUALSETH:  Object to the form.
23            MR. TURNER:  Join.
24            MR. LINDEN:  Join.
25       A.   I don't know.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1      Q.   (By Mr. Ainsworth)  Do you ever think that

2  Tom Bledsoe might have wanted to call his dad to

3  see -- to make sure his parents' house was

4  unoccupied, if he's bringing Camille over?

5            MR. QUALSETH:  Object to the form.

6            MR. TURNER:  Join.

7            MR. LINDEN:  I join as well.

8      A.   I have no idea.

9      Q.   (By Mr. Ainsworth)  Right.  Was that

10  something you would want to know as an investigator,

11  if -- if Tom was wanting to see if his dad wasn't

12  home -- or make sure his dad wasn't home when

13  he's -- at 4:25, five minutes after Camille got off

14  the bus?

15            MR. QUALSETH:  Object to the form.

16      A.   I don't know.

17      Q.   (By Mr. Ainsworth)  You don't know if you

18  would want to know that?

19      A.   I don't know why he would have called his

20  parents.

21      Q.   Of course.  I'm not asking you why.

22  Because you can't know.  You weren't there.

23      A.   Right.

24      Q.   I'm asking you, as an investigator, would

25  you want to know from Tom why he was calling his dad

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1   at 4:25, five minutes after Camille got off the bus?
 2        A.    If she got off the bus at that time.
 3        Q.    She got off the bus at 4:20.
 4              So accepting that Camille got off the bus
 5   at 4:20 in the afternoon, would you want to know why
 6   Tom was calling his dad at 4:25 p.m.?
 7        A.    Probably, but it wasn't that important at
 8   the time.
 9        Q.    Why wasn't it important to know what Tom
10   was doing at 4:25 on the day of the murder when the
11   victim was abducted, was -- you know, was getting
12   off -- was last seen at 4:20 p.m.?
13        A.    But Tom was at Rusty's in that time frame,
14   wasn't he?
15        Q.    Well, were you there?
16        A.    Was he asked?  I don't know.
17        Q.    Right.  You had some reports saying Tom
18   was at Rusty's at 4:30 and some accounts saying that
19   Tom was at Rusty's at 3:40.
20        A.    Correct.  We don't know for sure what it
21   was.
22        Q.    So you'd want to know what -- why Tom was
23   calling his dad at 4:25, five minutes after Camille
24   got off the bus; right?
25        A.    Yes.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1     Q.   All right.  I'm going to direct you to

2  Exhibit -- back to Exhibit 7 -- oh, sorry.  There we

3  go -- page 76.  It's on the screen.

4          There's a reference to "Question Big Gary,

5  history molesting young girls."  Do you see that?

6     A.   I'm looking for 496.

7     Q.   Sorry.  Page 76.

8     A.   76.  Okay.  I was at 96.  I'm sorry.

9     Q.   Oh, I'm not in your trial testimony, sir,

10  if that's what --

11     A.   Oh.

12     Q.   -- you're looking at.

13     A.   Okay.  Where are you at?

14     Q.   I'm in your field notes, Exhibit 7,

15  page 76.

16     A.   Okay.  I --

17     Q.   Do you see where it says --

18     A.   Yes.

19     Q.   -- "Kimberley Cummings - called, half

20  sister of Gary, Jr.  Question Big Gary, history

21  molesting young girls"?  Right?

22     A.   I see that, yes.

23     Q.   If one of the reasons why you were

24  questioning Big Gary is because he's got a history

25  of molesting young girls, should that fact be

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1  disclosed?

 2       A.   If it was --

 3            MR. QUALSETH:   Object -- object to the

 4  form.

 5            Go ahead.

 6       A.   If it was a factual statement, yes.

 7       Q.   (By Mr. Ainsworth)  Okay.  Why not just

 8  include that "I received a call from Kimberley

 9  Cummings.  She's the half sister of Gary, Jr., and

10  she reported that Big Gary has a history of

11  molesting young girls"?

12       A.   Okay.

13       Q.   Is there any reason not to document that

14  fact?

15            MR. QUALSETH:   Object to the form.

16            MR. TURNER:   Join.

17            MR. QUALSETH:   Are you questioning the way

18  he wrote his notes?

19            MR. AINSWORTH:   No.  I'm questioning --

20       Q.   (By Mr. Ainsworth)  Well, I'm saying

21  should that have been documented in a report that

22  was written up and sent to the prosecutor?

23       A.   If it checked out, yes; if it didn't check

24  out or it was just gossip or an attempt to make

25  somebody look bad, no.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods – 02/02/2023

```
 1        Q.   All right.

 2        A.   No sense ruining somebody's reputation.

 3        Q.   Sure.  Did you do anything to check out to

 4  see if Big Gary had a history of molesting young

 5  girls?

 6        A.   I did not, no.

 7        Q.   Where would we look to determine if

 8  anybody investigated to find out if Big Gary had a

 9  history of molesting young girls?

10        A.   Well, I would assume from the sheriff's

11  office.

12        Q.   All right.  Why didn't you investigate to

13  find out if Big Gary had a history of molesting

14  young girls?

15        A.   I would suspect I might have asked the

16  sheriff if he knew if that was a good -- good

17  statement.

18        Q.   I thought you told me that you didn't

19  investigate.

20        A.   I said I would have asked the sheriff if

21  he knew that Big Gary had a history of molesting

22  girls.

23        Q.   No.  Two questions ago you said you didn't

24  investigate Big Gary, and so I -- are you saying

25  that you did investigate Big Gary or you didn't?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

```
 1        A.    I don't know if I did or didn't.
 2        Q.    Okay.
 3              MR. AINSWORTH:  All right.  Those are all
 4    the questions that I have for you, sir.
 5              MR. QUALSETH:  I don't have any questions
 6    today.
 7              MR. TURNER:  I'll reserve questions for
 8    trial.
 9              MR. LINDEN:  I'll reserve my questions as
10    well.
11              MR. COX:  I will reserve mine also.
12              MR. QUALSETH:  Russell, I can't remember
13    what the agreement was yesterday, as far as the
14    confidentiality of yesterday's testimony, but my
15    understanding was that the -- any discussion of
16    confidential documents that are protected by the
17    protective order and also discuss -- discussions
18    about financial conditions and financial questions
19    regarding Mr. Woods were also deemed subject to the
20    protective order.  Is that your understanding?
21    Correct me if I'm wrong.
22              MR. AINSWORTH:  I agree.  Anything that's
23    marked "Confidential" that's discussed -- I don't
24    necessarily agree that some of the stuff that's
25    marked "Confidential" is confidential, but until
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

1    it's been designated not confidential, it's treated

2    under the terms of the protective order, which

3    includes deposition testimony.

4           MR. QUALSETH:  Fair enough.

5           MR. AINSWORTH:  But I'm -- you know, I'm

6    expecting that as -- just as -- you know, yesterday

7    the -- the understanding was that you would

8    designate what you -- the portions of the transcript

9    that you deem to be confidential, and we would go

10   from there.

11          MR. QUALSETH:  All right.

12          MR. TURNER:  And my understanding from the

13   order is that it says something about within a

14   reasonable time after receipt of the transcript.

15          MR. AINSWORTH:  Agreed.

16          THE REPORTER:  Off the record?

17          MR. QUALSETH:  Very good.  Thank you.

18          THE REPORTER:  One moment.

19          Going off the record at 3:56 p.m.

20

21

22

23

24

25

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1                CERTIFICATE OF REPORTER

2

3          I, Myles A. Megee, a Certified Court

4    Reporter of the State of Kansas, do hereby certify:

5          That prior to being examined, the witness

6    was first duly sworn;

7          That said testimony was reported by me at

8    the time and place hereinbefore stated and was

9    thereafter reduced to typewriting under my

10   direction;

11         That the foregoing transcript is a true

12   record of the testimony given by said witness;

13         That I am not a relative or employee or

14   attorney or counsel of any of the parties or a

15   relative or employee of such attorney or counsel or

16   financially interested in the action.

17         Witness my hand and seal this 9th day of

18   February, 2023.

19

20                      Myles A. Megee
                        Certified Court Reporter
21                      KS #1224, MO #540, IA #1338

22                      Myles A. Megee

23                      Myles A. Megee

24                      Certified Court Reporter

25                      State of Kansas



8700 Monrovia, Suite 310          Cornerstone          (913) 825-2510
Lenexa, Kansas 66215-3500         Court Reporting Company LLC          Fax (913) 825-2530
www.cornerstonekc.net                                          office@cornerstonekc.net

```
1                     ERRATA SHEET

2    RE:  Floyd Bledsoe v. Jefferson County, KS, et al.

3    PG/LN          Correction and Reason for Change

4    _____  _____

5    _____  _____

6    _____  _____

7    _____  _____

8    _____  _____

9    _____  _____

10   _____  _____

11   _____  _____

12   _____  _____

13   _____  _____

14   _____  _____

15   _____  _____

16   _____  _____

17   _____  _____

18   _____  _____

19   _____  _____

20   _____  _____

21   _____  _____

22

23                  _____

24                     James W. Woods

25   MAM
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1                      SIGNATURE PAGE

 2   RE:  Floyd Bledsoe v. Jefferson County, KS, et al.

 3

 4   _____ I certify that I have read my testimony and

 5        request that NO changes be made.

 6

 7   _____ I certify that I have read my testimony and

 8        request that the above changes be made.

 9

10

11

12            _____

13            James W. Woods

14

15

16            Subscribed and sworn to before me this

17   _____ day of _____, 20_____

18

19

20            _____

21            Notary Public

22            State of _____

23            County of _____

24            My commission expires _____

25   MAM
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net



8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

James W. Woods - 02/02/2023

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net