# EXHIBIT 16

STATE OF KANSAS. JEFFERSON COUNTY FILED
AUG 4 3 25 PM '00
CLERK OF DIST COURT



IN THE DISTRICT COURT OF JEFFERSON COUNTY, KANSAS

STATE OF KANSAS, Plaintiff,

vs. Case No. 99CR325

FLOYD SCOTT BLEDSOE, Defendant.

**TRANSCRIPT OF JURY TRIAL**
(Testimony)

**VOLUME THREE**

April 26, 2000

BEFORE

HONORABLE GARY L. NAFZIGER,
District Judge,
and a Jury of 12

Courthouse
Oskaloosa, Kansas

ORIGINAL

APPEARANCES

The Plaintiff appears by Mr. Jim Vanderbilt, County Attorney, Courthouse, Oskaloosa, Kansas, 66066.

The Defendant appears in person and by his counsel, Mr. John R. Kurth, Attorney at Law, Garrity, Kuckelman & Kurth, 701 Kansas Avenue, Atchison, Kansas, 66002.

2/2/23 MAM
EXHIBIT
50
exhibitsticker.com

# I N D E X


State rests.......................................561
Motion to acquit..................................561


## W I T N E S S E S


| FOR THE PLAINTIFF: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Erik K. Mitchell | 416 | 437 | 441 | |
| Floyd L. Bledsoe | | | 442 | |
| Catherine Bledsoe | 444 | 453 | | |
| Louis E. Gamble | 456 | | | |
| Roy Dunnaway | 458 | 472 | 478 | |
| Jim Woods | 481 | 507 | 511 | 512 |
| Kevin S. Feleay | 513 | 518 | 521 | |
| Donald Bolinger | 522 | | | |
| Roy Dunnaway | | | 524 | 526 |
| James R. Bolinger | 528 | 537 | 539 | |
| Thomas E. Bledsoe | | | 556 | |
| **FOR THE DEFENDANT:** | | | | |
| Dan Ward | 545 | | | |
| Karen Edmonds | 549 | | | |
| Rebecca Wheatley | 564 | 566 | | |
| Annette McNary | 569 | | | |


## E X H I B I T S


| State's No. | Offered | Received |
|---|---|---|
| 25 | 486 | 486 |
| 28 & 29 | 502 | 502 |
| 30 | 506 | 506 |
| 35 & 36 | 487 | 487 |
| 37 | 491 | 491 |
| 38 | 492 | 492 |
| 39 | 499 | 499 |
| 40 | 423 | 423 |
| 41 | 426 | 426 |
| 42 & 43 | 501 | 501 |
| 44 | 498 | 498 |
| 50 & 51 | 500 | 500 |
| **Defense No.** | | |
| U | 520 | 521 |
| AA | 527 | 527 |

you very much.

(The witness left the stand.)

THE COURT: Call your next witness.

MR. VANDERBILT: State calls Senior Special Agent Jim Woods.

Agent Woods is gathering up an armload of evidence.

JIM WOODS,

called as a witness on behalf of the State, having been first duly sworn by the reporter, testified under oath as follows:

DIRECT EXAMINATION

By Mr. Vanderbilt:

Q. What's your full name?

A. Jim Woods.

Q. And how are you employed?

A. Senior special agent with the Kansas Bureau of Investigation.

Q. How long have you been with the K.B.I.?

A. Thirty years and two weeks.

Q. Thirty years and two weeks?

A. Uh-huh.

Q. What did you do before that?

A. Deputy sheriff in Douglas County, Kansas.

Q. How long have you been a law enforcement officer?

Q. The cab of the truck?

A. Yes.

Q. Was there any indication that there was any blood or any kind of blood residue on the truck?

A. No. I found no, nothing that looked like blood, and the truck didn't appear like it had been cleaned recently either.

Q. When you were watching Senior Special George Johnson's interview of Tom Bledsoe Tom said something to the effect that "I shot her." Is that correct?

A. Something in that line. I can't recall just exactly how it went right at this time. It was something, either "I shot her" or "I killed her." I --

Q. George Johnson immediately followed that up with you didn't believe that he was telling the truth?

A. Yes, sir.

Q. And went on to interview him?

A. Yes.

Q. Did Tom go on from there to indicate that he hadn't, that he was just scared and explain what really happened?

A. Yes.

MR. VANDERBILT: I have nothing further.

MR. KURTH: No questions, Judge.

THE COURT: You may step down, Sheriff. Thank

you very much.

(The witness left the stand.)

THE COURT: Call your next witness.

MR. VANDERBILT: State calls Senior Special Agent Jim Woods.

Agent Woods is gathering up an armload of evidence.

JIM WOODS,

called as a witness on behalf of the State, having been first duly sworn by the reporter, testified under oath as follows:

DIRECT EXAMINATION

By Mr. Vanderbilt:

Q. What's your full name?

A. Jim Woods.

Q. And how are you employed?

A. Senior special agent with the Kansas Bureau of Investigation.

Q. How long have you been with the K.B.I.?

A. Thirty years and two weeks.

Q. Thirty years and two weeks?

A. Uh-huh.

Q. What did you do before that?

A. Deputy sheriff in Douglas County, Kansas.

Q. How long have you been a law enforcement officer?

A. Since 1963.
Q. Thirty-eight years, 37 years?
A. Close.
Q. You were involved in the, you were involved in the investigation of the murder of Camille Arfmann. Is that correct?
A. Correct.
Q. You were the officer in charge as far as the Kansas Bureau of Investigation was concerned. Is that correct?
A. Correct.
Q. You participated in the gathering of evidence and having the analysis presented by the Kansas Bureau of Investigation?
A. Correct.
Q. On November 7th, Sunday, November 7th, 1999, you were present when the body was being uncovered at the burial site?
A. Yes, that's correct.
Q. The procedure for uncovering that body, did you see anything wrong with the way it was being done?
A. No, I did not.
Q. Were you helping to make sure that that occurred properly?
A. Yes.

Q. You were there when the body was pulled up, put in a body bag and pulled up?
A. That's correct.
Q. And you were there when a search warrant was executed and the three bullets were recovered from the dirt and the three casings were recovered at the scene?
A. That's correct.
Q. What day was that?
A. Would have been the 14th of November, 1999.
Q. Week later?
A. Yes.
Q. A week later?
A. That's correct.
Q. So if the sheriff would have testified that it happened that Monday he would have been off a little bit. Is that right?
A. If what had happened that Monday?
Q. If the sheriff had testified that the bullets were recovered the next day or that same day, casings?
A. That would be incorrect according to my records.
Q. You were there and you know --
A. Yes, sir.
Q. -- the casings were recovered the same time as the bullets; right?
A. That's correct.

Q. You were in fact practically sitting on them when you found them, is that --
A. Leaning on them, yes.
Q. Can you describe -- well, first of all, did you bring the casings with you today?
A. Yes, sir.
MR. VANDERBILT: May I approach?
THE COURT: You may.
Q. (By Mr. Vanderbilt) Agent Woods, you've handed me a brown paper sack with an Evidence Custody Receipt on it, blue tape and red tape. Does this indicate that it's been tested by various forensic scientists and forensic biologists and then resealed?
A. Yes, sir, that would be correct. They reseal them after they have conducted their exams.
Q. And it was sealed by the Sheriff's Department as it was presented to the K.B.I.?
A. Originally, yes, it would have been sealed by the sheriff.
Q. In order to prevent any kind of tampering or anything so that you can say that it hasn't been tampered with. Is that correct?
A. That's correct.
Q. Has there been any indication based on the way the evidence has been handled that it's been mishandled or

tampered with?

A. Not anything that I've seen.

Q. Up until this point?

A. Pardon?

Q. Do you have forensic scientist T.L. Price's lab results with you today, Mr. Woods?

A. Yes, sir, I do.

MR. VANDERBILT: May I approach again, Your Honor?

THE COURT: You may.

A. That's one (indicating). Mr. Vanderbilt, here's one without all the other attachments to it.

Q. That's in fact the original?

A. Appears to be, yes.

THE COURT: Approach the bench, please, gentlemen.

(Off the record at the bench between the Court and counsel out of the hearing of the jury and the reporter.)

Q. State's Exhibit No. 25 is the lab report prepared by T.L. Price, is that correct, after he examined the evidence that you have in your hand?

A. Yes, Price's report deals with this evidence plus other evidence.

MR. VANDERBILT: I'd move to have State's Exhibit

No. 25 admitted into evidence.

MR. KURTH: No objection, Judge.

THE COURT: It's admitted and received.

Q. (By Mr. Vanderbilt) State's Exhibit 25 refers to page 2, page 3, page 4, page 11, page 12, page 13, and page 16 of Evidence Custody Receipts. Is that correct?

A. Yes, sir.

Q. And then it refers to Q1, Q2, Q5, 6, 7, 8, 9, 10 and 11 and Q1. Is that correct?

A. That is correct.

Q. Do you have pages, those pages it's referring to of Evidence Custody Receipts?

A. Yes, sir. Okay.

Q. Do you have those?

A. Yes, sir.

MR. VANDERBILT: May I approach again?

THE COURT: You may.

MR. VANDERBILT: Move to have --

Q. (By Mr. Vanderbilt) First of all, I've handed you what's been marked State's Exhibit No. 35. Those are the Evidence Custody Receipts that I asked for tying the evidence to what's been, to the reports?

A. Yes, sir, these reflect the items that Mr. Price examined at the laboratory.

MR. VANDERBILT: I'd move to have State's Exhibit

35 admitted into evidence.

MR. KURTH: No objection, Judge.

THE COURT: They're admitted.

MR. VANDERBILT: May I approach one more time?

THE COURT: You may.

Q. (By Mr. Vanderbilt) You have what's been marked State's Exhibit No. 36. That's the original bag with the, most of the contents in it?

A. Correct.

MR. VANDERBILT: Move to have State's Exhibit 36 admitted into evidence.

MR. KURTH: No objection, Judge.

THE COURT: It's admitted.

Q. (By Mr. Vanderbilt) Going, referring to the report, would that report indicate that the bullets that had been found in the body beneath where Camille was found -- underneath the body there were three bullets found. Is that correct?

A. Actually two complete bullets, a bullet minus the jacket, and then a separate item which was the jacket believed to have come from that bullet, so there was a total of four items recovered under where the body had laid.

Q. You were there when it was recovered?

A. Yes, sir.

Q. You knew that they come from the dirt underneath the body?
A. That's correct.
Q. And they were sent to the lab?
A. That's correct.
Q. Was agent or forensic scientist T.L. Price able to determine whether or not they had been fired from State's Exhibit No. 2, Tom's gun?
A. Mr. Price indicated that they were similar, however, they lacked sufficient matching detail to make a positive identification, so he was not able to positively say they would match.
Q. They were similar but he couldn't tie them to the gun?
A. No, sir.
Q. In State's Exhibit No. 36 there are three casings that you recovered from up on the bank. Is that correct?
A. Correct. Actually they were recovered by Detective Carreno.
Q. That you had found?
A. Yes, I leaned on them.
Q. Were they in a position where they would have came to rest if the gun was fired up on the bank somewhere?
A. Anywhere in the vicinity of the bank they could have landed where they were recovered.
Q. Those would be referred to as Q9, 10, and 11?

A. Yes, sir, that's correct, 9, 10, and 11.

Q. On second page of T.L. Price's lab results T.L. Price identified those three cartridges as having been fired through State's Exhibit No. 2, Tom's gun. Is that correct?

A. The three fired Winchester nine-millimeter cases, 9, 10, and 11, were identified as having been fired in the Bryco Arms nine-millimeter. Yes, there was a positive identification made.

Q. Summarize all that. The bullets, the casings that were fired and landed on the ground were fired from Tom's gun?

A. That's correct.

Q. The bullet that was recovered from the body that Camille Arfmann had in her head, did he examine that?

A. Yes, sir, he did.

Q. Are the results of that examination in his report?

A. His report, it's item Q2.

Q. What does it indicate that --

A. That item Q2 is consistent in design and construction with a Winchester silver tip bullet, it exhibited similar characteristics to the test fires from the weapon in question, however, due to the damage to this particular bullet he was not able to make a positive identification and his report reflects that the

examination was inconclusive.

MR. VANDERBILT: May I approach?

THE COURT: You may.

Q. (By Mr. Vanderbilt) I've handed you what's been marked State's Exhibit No. 4 those are the two Winchester silver point hollow tips that were brought in by Tom's dad after he explained that those were the two bullets that came out of the magazine of Tom's gun. Those are Winchester silver tip hollow points?

A. Yes, sir, they are.

Q. You've had enough experience with firearms where you can look at them and tell that, can't you?

A. That's correct.

Q. Do you have the bullets that were recovered from Tom Bledsoe's bedroom, Winchester silver tipped hollow points?

A. I believe so. Yes, sir, I have them.

MR. VANDERBILT: May I approach?

THE COURT: You may.

Q. (By Mr. Vanderbilt) Agent Woods, you have State's Exhibit 37. Is that the box of 33 Winchester silver tips hollow points recovered by law enforcement officers from Tom Bledsoe's room?

A. Well, there are 31 in the box. Receipt reflects 33.

Q. Were they recovered at the same time that the other

two from Floyd were?

A. I believe they were recovered on different occasions, sir.

Q. Were there two of those taken out and fired by T.L. Price?

A. That's a possibility, yes.

MR. VANDERBILT: I'd move to have State's Exhibit 37 admitted in evidence as 31 bullets.

MR. KURTH: That's fine, Judge.

MR. VANDERBILT: The box of 31.

THE COURT: They're admitted.

Q. (By Mr. Vanderbilt) Do you have the receipt that was collected where Tom Bledsoe had purchased box of 50 nine-millimeter bullets and a box of .30-.30 shells?

A. Yes, sir, I do.

MR. VANDERBILT: May I approach?

THE COURT: You may.

Q. (By Mr. Vanderbilt) You have what's been marked State's Exhibit No. 38. Is that the receipt that Tom Bledsoe received when he purchased ammunition at Rusty's on November 5th, 1999?

A. I received the receipt from Michael Hayes on the 15th of November. He indicated he had received it from Tom Bledsoe, reflects, the receipt reflects November the 5th, 1999, at 4:30 for two boxes of ammunition.

MR. KURTH: I'll stipulate it's the receipt, Judge.

MR. VANDERBILT: We move to admit State's Exhibit No. 38.

THE COURT: Are they both the same exhibit? 38? Oh, that's -- okay, that's the receipt?

A. Yes.

THE COURT: It's admitted and received.

Q. (By Mr. Vanderbilt) Spend a little bit of time on that receipt. You have --

MR. VANDERBILT: May I publish the receipt, Your Honor?

(State's Exhibit 38 was passed to the jury.)

Q. Do you have a copy of this, copy?

A. Copy, yes.

Q. You, Agent Woods, you conducted an investigation regarding the receipt at Rusty's. Is that correct?

A. Yes, I did.

Q. Trying to determine whether or not the date and the time, more specific the time on the receipt, was accurate. Is that correct?

A. That's correct.

Q. What time does the receipt show that the, it was printed?

A. 4:30.

Q. And the date is on November 5th, 1999?
A. 11-5 of '99, yes.
Q. Did you contact Rusty's, someone at Rusty's?
A. Yes, sir, I did.
Q. Regarding the time?
A. Regarding the, the purchase, the receipt, the clerk, any information they could provide about the sale.
Q. Who did you speak to specifically about the time on the receipt? Was it Kevin Feleay?
A. Spoke with Kevin Feleay, a Warren Tandoc, and a third individual whose name I'm not able to find.

MR. KURTH: Mr. Soden?

A. Pardon?

MR. KURTH: Mr. Soden?

A. That's possible, yes.
Q. (By Mr. Vanderbilt) Did you speak to them on 11, November 16th, 1999?
A. Believe I did two of them on the 16th, somebody else, the other person I think was on a different date, maybe the same date, I don't recall.
Q. Based on your investigation, did you determine that on November 5th, 1999, the register that put that receipt out, the time was accurate?
A. The manager indicated that it was relatively accurate. He could not guarantee that it was 100 percent.

Q. And that later, sometime after closing on Sunday 11-15, the receipts, time had gone off, were inaccurate by an hour?

A. Something, he was unable to articulate exactly what but something had gone haywire in their system but it only affected the one cash register and did not affect all three of the registers in the store.

Q. Based on your investigation, the time that the, is indicated on the receipt is accurate?

A. Relatively, that was his opinion, yes, the date and the time would be, would be relatively accurate at that -- at the time of the purchase on the 5th of November.

Q. Anyone remember Tom Bledsoe being at the Rusty's sporting goods store on November 5th?

A. Not specifically. Apparently he frequented their store on prior occasions. Exactly anybody to say that he was positively there, no, I was not able to find any of the, the clerks or management that could say positively that he was there. They thought so but were not positive.

Q. Are you aware that Tom Bledsoe said that he made a phone call from the parking lot of Rusty's shortly after he left the store?

A. Yes, sir.

Q. Were the telephone records received, subpoenaed and received?

A. Yes, sir, they were.

Q. Defendant's Exhibit 2 is a copy of those records that's been previously admitted. You actually live in Lawrence, don't you, Mr. Woods, Agent Woods?

A. I'm sorry?

Q. You live in Lawrence?

A. Yes, sir.

Q. Lived there for quite awhile?

A. Yes, sir.

Q. First of all, does State's, or Defense Exhibit No. 2 indicate that that phone call, that a phone call was made from Tom's cell phone to his parents' house at four, around 4:30 on November 5th, 4:30 P.M.?

A. Yes. The last call on the bill reflects November the 5th, 1999, 4:25 P.M., city called was Oskaloosa, the number was 863-2187, and was made from a cell phone number 331-6445.

Q. If you left the parking lot at 4:30 P.M. on November 5th approximately how long do you believe it would take to get to his parents' residence at 11477 Osage on a Friday afternoon?

A. In excess of 30 minutes.

Q. In excess of 30 minutes? Is that a minimum time,

then?
A. I would think so for, for 4:30 in the afternoon in Lawrence traffic.
Q. How many miles is it from Lawrence to Oskaloosa?
A. I don't know that I can tell you. I drive it every day and don't, I can't even tell you what the sign says it is.
Q. You participated in the investigation the entire time, is that correct?
A. Yes, sir, start to finish. Well, --
Q. Is there any, have you had any occasion or any information inconsistent with the fact that Tom Bledsoe was at Rusty's at 4:30?
A. No, sir.
Q. Did you check to find out whether or not Tom went to work on November 6th?
A. November the 6th? Yes, sir, in contacting the individual who's in charge of the security firm at the Farmers Coop plant east of Lawrence on K-10 his records indicated that Tom worked November the 6th from 3:00 P.M. to 11:00 P.M.
Q. 3:00 P.M. --
A. He had verified through another employee that Tom Bledsoe had been there.
Q. So he had gone to work and --

A. On November the 6th, yes.
Q. As he had indicated?
A. That's correct.
Q. Going back to on November 5th, the bullets that he had purchased that day, have you recovered those bullets, the nine-millimeter and the .30-.30s?
A. Yes.

MR. VANDERBILT: May I approach?

THE COURT: You may.

Approach the bench, gentlemen, please.

(Off the record at the bench between the Court and counsel out of the hearing of the jury and the reporter.)

THE COURT: Ladies and gentlemen of the jury, we're going to break early for lunch. That will give the State the opportunity to get their evidence organized and get it marked so it will be ready to go when we come back. Please be back here at a quarter till 1:00, that will give you just a little over an hour, and we'll continue again with the trial of the case. Thank you very much.

(A lunch recess was taken.)

THE COURT: We're back on the record. Jury's present. We're ready to proceed with the State's continuing direct examination of Agent Woods. You may

proceed, Mr. Vanderbilt.

Q. (By Mr. Vanderbilt) Agent Woods, earlier this morning we were discussing some of the bullets and the fragments that had been tested. Do you have State's Exhibit 25 there, T.L. Price's report?

A. Yes, sir, I do have.

Q. Does it indicate that one of the bullet fragments had been tested and compared to Tom's gun and had indicated that it had come from Tom's gun?

A. It did.

Q. Which one is that?

A. That's item Q1 on page 3.

Q. And is that marked State's Exhibit 44? Be down at your feet.

THE REPORTER: Talk a little louder, Mr. Vanderbilt.

A. Yes, it is marked State's Exhibit 44.

MR. VANDERBILT: Move to admit State's Exhibit No. 44.

MR. KURTH: No objection, Judge.

THE COURT: It's admitted and received.

Q. (By Mr. Vanderbilt) Law enforcement officers recovered the box of bullets that Tom had purchased earlier that, on November 5th, 1999. Is that correct?

A. Two boxes.

Q. Two boxes of bullets. One of them was a box of nine millimeters?

A. Yes, sir.

Q. Do you have what's marked State's Exhibit No. 39?

A. Yes, sir, they are.

Q. Is that the box of bullets which were recovered purported to be those bullets?

A. Yes.

MR. VANDERBILT: Move to admit State's Exhibit No. 39.

MR. KURTH: No objection, Judge.

THE COURT: They're admitted.

Q. (By Mr. Vanderbilt) Law enforcement officers recovered a box of .30-.30 ammunition which was supposed to have been purchased at the same time. Is that correct?

A. That's correct.

Q. You have that box of bullets purported to be the ones bought by Tom at Rusty's --

A. Yes, sir, I do.

Q. -- on November 5th? They're marked State's Exhibit No. 40. Is that correct?

A. That's correct.

MR. VANDERBILT: Move to admit State's Exhibit No. 40 (50).

MR. KURTH: No objection, Judge.

THE COURT: Admitted.

Q. (By Mr. Vanderbilt) Tom's gun came in a box that was recovered from his bedroom by law enforcement officers. Is that correct?

A. That's correct.

Q. That's marked State's Exhibit No. 41?

A. That's correct.

MR. VANDERBILT: Move to admit State's Exhibit No. 41 (51).

MR. KURTH: No objection, Judge.

THE COURT: They're admitted.

THE REPORTER: I think we have a couple of duplicates on numbers.

MR. VANDERBILT: The box of .30-.30s, you want to remark that?

THE REPORTER: We already had a 40 and a 41. So how do you want them marked?

MR. VANDERBILT: 50 and 51.

(State's Exhibits 50 & 51 were marked for identification.)

Q. (By Mr. Vanderbilt) Miss Paxton, forensic scientist, did a report on some of the evidence. Is that correct?

A. Yes, sir.

Q. And what, what did she test?

A. Miss Paxton tested, did a blood screen on a blood sample from the victim.

Q. Camille Arfmann?

A. That's correct.

Q. And that's marked State's Exhibit 42. Is that correct?

A. Correct.

MR. VANDERBILT: Move to admit State's Exhibit 42.

MR. KURTH: No objection, Judge.

THE COURT: Admitted.

Q. (By Mr. Vanderbilt) You received a copy of some of the duplicates of Thomas Edward Bledsoe's checkbooks. Is that correct?

A. Yes, sir.

Q. You've marked, that's marked State's Exhibit No. 43?

A. That is correct.

MR. VANDERBILT: Move to admit State's Exhibit 43.

MR. KURTH: No objection, Judge.

THE COURT: Admitted.

Q. (By Mr. Vanderbilt) The gun and other items had been submitted to Kansas Bureau of Investigation for fingerprint analysis. Is that correct?

A. That's correct.

Q. That analysis was prepared by and performed by John Horn; --

A. Correct.

Q. -- is that correct? He has a report that's marked State's Exhibit No. 28. Is that correct?

A. Actually State's Exhibit 28 is two reports.

Q. Two reports?

A. Correct.

MR. VANDERBILT: Move to have State's Exhibit No. 28 admitted as two of John Horn's reports.

MR. KURTH: No objection, Judge.

THE COURT: It's admitted.

Q. (By Mr. Vanderbilt) Christina Stapleton also prepared lab results during this investigation?

A. Correct.

Q. And what did she examine?

A. She examined blood and vitreous fluid.

Q. That's marked State's Exhibit No. 29. Is that correct?

A. That's correct.

MR. VANDERBILT: Move to admit State's Exhibit No. 29.

MR. KURTH: No objection, Judge.

THE COURT: It's admitted.

Q. (By Mr. Vanderbilt) Mary Koch prepared a report. Is that correct?
A. Actually Mary Koch prepared two reports.
Q. Two reports?
A. Yes, sir.
Q. They're stapled together and marked State's Exhibit No. 26?
A. That is correct.
MR. VANDERBILT: Move to admit State's Exhibit No. 26.
MR. KURTH: No objection, Judge.
THE COURT: It's admitted.
MR. VANDERBILT: T.L. Price has prepared the reports that you've been testifying to, I don't remember if they have been moved and admitted, but I would move to admit them at this point.
MR. KURTH: No objection.
THE COURT: Are they marked?
A. State's 25.
MR. VANDERBILT: 25, yes.
THE COURT: Okay, they're admitted and received.
Q. (By Mr. Vanderbilt) Agent Woods, would you refer to Exhibit No. 26. Mary Koch prepared two reports. Is that correct?
A. That is correct.

Q. And in those reports was she able to determine anything of value based on the evidence that was submitted to her?
A. Miss Koch's first report is dated the 3rd of February of 2000. She found blood, she detected acid phosphatase.
Q. Specifically the, in the undergarments, in the underwear of Camille Arfmann, you're aware that she tested those undergarments and determined that the acid phosphatase were detected in her underwear. Is that correct?
A. That's correct.
Q. You're also aware that she conducted a P-3 test which would determine whether or not it was a male acid phosphatase or female acid phosphatase. Is that correct?
A. I have been told she did, yes, sir. It's not reflected in this particular report.
Q. And you've also been made aware that the acid phosphatase in those underwear did not contain the P-3 and therefore were, the finding was that it was female acid phosphatase?
A. That's my understanding, yes, sir.
Q. And that based on her other testing, that there was no indication of any kind of male semen or other trace

evidence in her under --

A. The sexual assault kit, no seminal fluid was detected in any of the swabs that were taken from the body of the victim.

Q. Switching to John Horn's reports, State's Exhibit No. 2 is Tom Bledsoe's firearm. Did he obtain any trace evidence that would indicate that there were fingerprints on the gun?

A. No fingerprints of any value were found.

Q. On any of the evidence?

A. That Mr. Horn examined.

Q. That is the gun or the magazine?

A. The gun, shell casings, a magazine, so forth.

MR. VANDERBILT: In order to speed things along, Your Honor, the State and defense have agreed to a stipulation on the DNA evidence. The DNA evidence was examined by forensic biologist Cindy Schuler. There were a fitted sheet removed from Camille Arfmann's bed at her residence. The fitted sheet indicated that there was female DNA on the fitted sheet that was consistent with a relative of Camille Arfmann. Camille Arfmann's DNA was not found on the fitted sheet. There was a single sperm found on the fitted sheet. The DNA evidence also was found on a quilted blanket on the bed. The DNA evidence was trace

evidence from a female that was not Camille Arfmann but a close relative of Camille Arfmann.

MR. KURTH: That's correct, Judge.

MR. VANDERBILT: There was a single sperm found on each of those two items and the single sperm is not enough evidence, trace evidence to do any type of DNA analysis for a statistical evaluation, therefore DNA evidence is not available on those two single sperms.

THE COURT: This is your stipulation?

MR. KURTH: That is correct, Judge.

THE COURT: Ladies and gentlemen of the jury, this stipulation is a stipulation of fact between the State and the defense. It is designed to speed the trial along and make that information and evidence available to you. You should consider their stipulation as true and consider it along with all of the other evidence which is presented in the case. Thank you.

MR. VANDERBILT: Judge, at this point I'd move to admit the State's diagram, State's Exhibit No. 30, into evidence.

MR. KURTH: No objection, Judge.

THE COURT: It's admitted.

MR. VANDERBILT: No more questions of this witness.

THE COURT: Mr. Kurth.

MR. KURTH: Thank you, Judge.

CROSS EXAMINATION

By Mr. Kurth:

Q. Agent Woods, I'm going to jump track on you. You spoke to a Joseph Bryer, is that correct, about the purchase of the Bryco nine-millimeter?

A. Yes, sir, that's correct.

Q. And the purpose of that was to find out when Tom Bledsoe purchased that gun?

A. Correct.

Q. And as I recall, that was at a gun show in Lawrence on or about October 23rd, 1999?

A. Spoke with Mr. Bryer on the 9th day of November. He indicated that he had attended a gun show at Lawrence on the weekend of October 23rd and 24th and that during that gun show he had sold a Jennings nine-millimeter semi-automatic pistol to Thomas Edward Bledsoe of Oskaloosa, Kansas.

Q. And that matches -- you had the serial number off of that from his sale?

A. Correct.

Q. That matches this gun, State's Exhibit 2, would that be correct, the gun?

A. That is correct.

Q. Now, you went to Rusty's in Lawrence on the 15th or the 16th, or the 16th, excuse me, would that be correct, of November, 1999?
A. Was there on the 10th and the 16th.
Q. And on the 10th you were there for what purpose?
A. Spoke with the assistant manager, a Mr. Soden, as to whether or not he could identify a photograph of Thomas Bledsoe and provide any information on any purchases.
Q. And on the 16th you went there to check on the receipts. Is that a correct statement?
A. On the receipt and also to interview the clerk whose employee number appeared on the receipt.
Q. And at that time you spoke with Kevin Feleay. Is that correct?
A. Yes, sir.
Q. F E L E A Y?
A. Uh-huh.
Q. And you asked him prior to running any receipts if the date and time would be correct. Is that right?
A. That's correct.
Q. And he indicated that they would be correct. Is that right?
A. The date would be correct. He said give or take a few minutes on the time but a ballpark correctness on the

time, yes.

Q. And he ran three receipts for you?

A. He did.

Q. Was the date correct?

A. Two of them were.

Q. Was the time correct?

A. Two of them were.

Q. And which one was inaccurate?

A. The rear register, which is the ammunition, firearms register.

Q. Okay. Just so we're clear, in Rusty's there is a front register and a rear register; correct?

A. Two front registers, one rear register.

Q. Thank you. And the rear register, is that where the box of nine-millimeter ammunition was purchased at from Tom Bledsoe?

A. That's correct.

Q. So that was the register that was off?

A. That is correct, was off on the 16th of November.

Q. How far off was it?

A. Register printed out that it was the 15th. We ran the tape at 9:10 A.M. and the register showed a time of 2149.

Q. Which would be 9:49?

A. In the evening.

Q. In the evening. So 12 hours and 40 some minutes off?
A. Correct.
Q. Because those registers go on military time. Is that correct?
A. Yes.
Q. At 12:00 noon, then they jump to 1300, 1400?
A. I believe that's correct, yes.
Q. The receipt which you received from Mr. Hayes representing the purchase of the nine-millimeter ammo would then actually show 4:30 in the morning, 0430, is that correct?
A. Could, yes.
Q. That's the rear register?
A. That is the rear register.
Q. If it were likewise the 12 hours and 45 minutes or 40 minutes off that would be a possibility, wouldn't it?
A. Possible, yes.
Q. We don't know for sure, we can't say for sure whether it was accurate or wasn't?
A. Mr. Feleay felt that it was.
Q. Did he produce any receipts to you prior to that date that were accurate?
A. No.
Q. And in all fairness to the ladies and gentlemen of the jury and the State, we had the daylight savings time

jump, is that right, in between that time?

A. I believe we did, yes.

Q. So, Agent Woods, if that was in fact that time difference that could place Tom Bledsoe leaving Rusty's at about 3:45, couldn't it?

A. Possibly.

Q. Possibly. And from 3:45 until 4:30, that would be time enough to drive from Lawrence to here in Oskaloosa?

A. 45 minutes would be adequate I'd think, yes.

MR. KURTH: That's all I have, Judge.

REDIRECT EXAMINATION

By Mr. Vanderbilt:

Q. But in fact you know that it was right or real close to it, don't you?

A. I'm sorry?

Q. You spoke with Kevin, you -- let's tell the rest of the story. Kevin Feleay informed you that yes, the tape was inaccurate on the day you were there. Isn't that correct?

A. Yes. He found a glitch in his, in his one machine.

Q. And he went back and looked and determined that on November 5th, 1999, when Tom was there, that the tape was not inaccurate, it was close within a few minutes. Is that correct?

A. In his opinion, yes.

MR. VANDERBILT: Nothing further.

RECROSS EXAMINATION

By Mr. Kurth:

Q. Did you view the records he checked?

A. I'm sorry?

Q. Do you know what he checked, what records he checked to verify it? How'd he check it?

A. He was messing with his machine.

Q. That was it?

A. I don't know.

Q. Do you know whether he's in charge or even capable of programming the cash register?

A. He's the manager of the store. I would assume that he was.

Q. Okay. But we don't know for sure?

A. I don't know.

MR. KURTH: Okay. That's all I have, Judge.

MR. VANDERBILT: Nothing.

THE COURT: You may step down.

(The witness left the stand.)

MR. VANDERBILT: State calls Kevin Feleay.

KEVIN SCOTT FELEAY,

called as a witness on behalf of the State, having been first duly sworn by the reporter, testified under oath as