# EXHIBIT 18

2/21/2023 1

## ROBERT L. POPPA

```
 1    .

 2              IN THE UNITED STATES DISTRICT COURT

 3                FOR THE DISTRICT OF KANSAS

 4    .

 5    .

 6    FLOYD BLEDSOE,

 7          Plaintiff,

 8    .

 9       vs.                    Case No. 2:16 CV 02296

10    .

11    JEFFERSON COUNTY, KS, et al.,

12          Defendants.

13    .

14    .

15                      DEPOSITION OF

16                  ROBERT L. POPPA,

17    taken on behalf of the Plaintiff, pursuant to

18    Amended Notice of Deposition, beginning at 9:35

19    a.m. on the 21st day of February, 2023, at the

20    offices of Appino & Biggs Reporting Service, 5111

21    S.W. 21st Street, in the City of Topeka, County of

22    Shawnee, and State of Kansas, before Barbara J.

23    Hoskinson, Certified Court Reporter, Kansas

24    License No. 0434 and Missouri License No. 999.

25    .
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# ROBERT L. POPPA

```
 1                          APPEARANCES

 2    .

 3    .

 4   ON BEHALF OF THE PLAINTIFF:

 5    .

 6        Ms. Ruth Brown (video conference)

 7        Loevy & Loevy

 8        311 N. Aberdeen St. 3rd Floor

 9        Chicago, Illinois, 60607

10        312-243-5900

11        ruth@loevy.com

12    .

13    .

14   ON BEHALF OF THE DEFENDANTS FROST, CARRENO,

15   HERRIG, POPPA & JEFFERSON COUNTY:

16    .

17        Mr. Eric Turner

18        Foulston Siefkin, LLP

19        7500 College Boulevard, Suite 1400

20        Overland Park, Kansas, 66210

21        913-498-2100

22        eturner@foulston.com

23    .

24    .

25    .
```



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# ROBERT L. POPPA

1        Mr. Michael J. Norton

2        Foulston Siefkin, LLP

3        1551 N. Waterfront Pkwy, Suite 100

4        Wichita, Kansas, 67206

5        316-267-6371

6        mnorton@foulston.com

7    .

8    .

9    ON BEHALF OF THE DEFENDANT VANDERBILT:

10   .

11       Mr. Patric S. Linden

12       Case Linden, PC

13       2600 Grand Blvd., Suite 300

14       Kansas City, Missouri, 64108

15       816-979-1500

16       patric.linden@caselinden.com

17   .

18   .

19   .

20   .

21   .

22   .

23   .

24   .

25   .



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ROBERT L. POPPA

```
 1   ON BEHALF OF DEFENDANTS MORGAN, WOODS,

 2   JOHNSON ESTATE:

 3   .

 4        Mr. Shon D. Qualseth

 5        Assistant Attorney General

 6        120 SW 10th Ave, 2nd Floor

 7        Topeka, Kansas, 66612

 8        785-368-8424

 9        shon.qualseth@ag.ks.gov

10   .

11   .

12   ALSO PRESENT:

13   .

14        Mr. Michael Hayes (video conference)

15   .   Mr. Brett Knapp Videographer

16   .

17   .

18   .

19   .

20   .

21   .

22   .

23   .

24   .

25   .
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# ROBERT L. POPPA

```
 1                           INDEX
 2      .
 3      .
 4    Certificate---------------------------- 199
 5      .
 6      .
 7                          WITNESS
 8    ON BEHALF OF PLAINTIFF:                  PAGE
 9    ROBERT L. POPPA
10    Direct-Examination by Ms. Brown          8
11      .
12      .
13                         EXHIBITS
14    DEPO EXHIBIT NO.:                       MARKED
15    No 10   Carreno 45-page report           7
16    No 71   11-7-99 Carreno notes            7
17    No 72   11-8-99 Narr. Report-Frost       7
18    No 100  11-7-99 Supp. Report-Poppa       7
19    No 101  Poppa reports & notes            7
20    No 103  11-6-99 Buford report            7
21    No 105  KS Standard Offense Report       7
22    No 106  11-10-99 notes-Floyd interview   7
23    No 107  11-14-99 Narr. Report-Frost      7
24    No 108  Supp. Report-Poppa re:
25           residence search warrant          7
```



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# ROBERT L. POPPA

1    No 110 11-8-99 Evidence Custody Receipt          7
2    No 111  Autopsy Report                           7
3    No 113  11-10-99 notes re: Property search        7
4    No 114  11-10-99 Evidence Custody Receipt         7
5    No 117  11-15-99 notes re: Zule search            7
6    No 118  DLs & Tags records search                 7
7    .
8    .
9    .
10    .
11    .
12    .
13    .
14    .
15    .
16    .
17    .
18    .
19    .
20    .
21    .
22    .
23    .
24    .
25    .


5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604          Suite 101               Suite 305
785-273-3063          Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131          316-201-1612
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

ROBERT L. POPPA

```
 1            (THEREUPON, Deposition Exhibits No 10,
 2   No 71, No 72, No 100, No 101, No 103, No 105,
 3   No 106, No 107, No 108, No 110, No 111, No 113,
 4   No 114, No 117, No 118 were marked for
 5   identification.)
 6            THE VIDEOGRAPHER:  Today is the 21st day
 7   of February, 2023, and the time is approximately
 8   9:34 a.m.  This is the deposition of Robert Poppa
 9   in the matter of Floyd Bledsoe vs. Jefferson
10   County, Kansas, et al., Case No. 2:16 CV 02296.
11   Would counsel please state your appearance for the
12   record.
13            MS. BROWN:  Good morning.  My name is
14   Ruth Brown and I'm counsel for the plaintiff,
15   Floyd Bledsoe.
16            MR. TURNER:  Eric Turner here with
17   Michael Norton and we represent Robert Poppa the,
18   witness today, Sheriff Jeff Herrig in his
19   individual official capacity, Randy Carreno, Troy
20   Frost and Board of County Commissioners for
21   Jefferson County.
22            MR. LINDEN:  Patric Linden on behalf of
23   defendant Jim Vanderbilt.
24            MR. QUALSETH:  Shon Qualseth, counsel for
25   Jim Woods, Terry Morgan and the Estate of George
```



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

**ROBERT L. POPPA**

1   Johnson.

2            MS. BROWN:  And I'd also just like to

3   note for the record that defendant Michael Hayes

4   is observing without counsel based on email

5   notification provided in advance of the

6   deposition.

7                         ROBERT L. POPPA,

8   called as a witness on behalf of the Plaintiff,

9   was sworn and testified as follows:

10   DIRECT-EXAMINATION

11   BY MS. BROWN:

12       **Q.    Okay, good morning, sir.  Again, my name**

13   **is Ruth Brown and I'm an attorney for the**

14   **plaintiff, Floyd Bledsoe.  Can you hear me all**

15   **right?**

16       A.    Yes.

17       **Q.    Okay, great.  Can you please state and**

18   **spell your name for the court reporter, please.**

19       A.    My name's Robert L. Poppa.  Last name is

20   P-O-P-P-A.

21       **Q.    And have you ever sat for a deposition**

22   **before?**

23       A.    I have, but it's been years ago.  I can't

24   remember exactly when.

25       **Q.    Okay, was that a case in which you had**



### ROBERT L. POPPA

1    been sued?

2        A.    No.

3        Q.    Okay, but you were, you were in a

4    situation like this where there was a court

5    reporter taking your testimony and different

6    attorneys were asking you questions?

7        A.    Yes.

8        Q.    Okay.  So, even though you've been

9    through that process it's a while ago so I'm going

10   to begin by just going over the ground rules for

11   the deposition, okay?

12       A.    Okay.

13       Q.    Okay.  So, first of all, there's a court

14   reporter who is taking down all of my questions

15   and your answers.  Do you understand that?

16       A.    Yes.

17       Q.    Okay, and the court reporter can't take

18   down like uh-huhs or huh-uhs or head nods so I'd

19   ask you to do your best to give a verbal response

20   to my questions, okay?

21       A.    Okay.

22       Q.    And if you and I were having a

23   conversation we might naturally talk over one

24   another a little bit because we anticipate where

25   the other one was going, but that makes life very

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

2/21/2023                                                                10

**ROBERT L. POPPA**

1  difficult for the court reporter, so, what I'm

2  going to ask you to do is wait until I finish my

3  question before you begin your answer, okay?

4       A.    Okay.

5       Q.    And I will do my best to let you finish

6  your answer before beginning my next question,

7  okay?

8       A.    Okay.

9       Q.    If at any time you don't understand one

10  of my questions or you didn't hear it or you need

11  me to repeat it or rephrase it, please let me know

12  and I'm happy to do that, okay?

13       A.    Okay.

14       Q.    On the flip side, if you answer one of my

15  questions I will assume that you've understood it

16  as posed, fair?

17       A.    Fair.

18       Q.    Okay.  If at any time you remember

19  information that's responsive to one of my earlier

20  questions and you'd like to supplement your

21  answers that's fine, just let me know and I'm

22  happy to give you an opportunity to do that, okay?

23       A.    Okay.

24       Q.    If you don't do so I will understand that

25  the answers that you've previously given are

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ROBERT L. POPPA

1  complete to the best of your ability, fair?

2      A.    Fair.

3      Q.    Okay.  You understand that you'll be

4  giving sworn testimony under oath today?

5      A.    Yes.

6      Q.    Is there any reason you can't testify

7  truthfully and accurately today?

8      A.    No.

9      Q.    Are you on any medications that would

10  impact your ability to testify truthfully and

11  completely today?

12      A.    No.

13      Q.    Okay.  Do you have any conditions such as

14  fatigue or stress that would impact your ability

15  to testify truthfully and accurately today?

16      A.    No.

17      Q.    Okay.  If you need to take a break at any

18  time during this deposition please just let me

19  know and I'm happy to give you a chance to do

20  that, okay?

21      A.    Okay.

22      Q.    The only thing that I ask is that you

23  finish answering any pending question before we

24  begin the break, okay?

25      A.    Okay.



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1        Q.   All right.  Have you reviewed any of the

2    complaint in this lawsuit?

3        A.   I'm not sure if I have.

4             MR. TURNER:  You mean of the plaintiff

5    for purposes of the lawsuit?

6        BY MS. BROWN:

7        Q.   Have you ever reviewed the, you know, the

8    document that lays out plaintiff Floyd Bledsoe's

9    allegations for why he's suing the defendants in

10   this case?

11       A.   I believe I have.  I don't remember.  I

12   don't know.

13       Q.   Okay.  But you understand that this is a

14   lawsuit arising from a conviction of the

15   plaintiff, Floyd Bledsoe, for a murder that he

16   alleges he did not commit, right?

17       A.   Yes.

18       Q.   Okay, and do you know the name of the

19   victim who was killed?

20       A.   Camille Arfmann.

21       Q.   Okay, and prior to the filing of this

22   lawsuit were you aware that Floyd was convicted

23   for the murder of Camille Arfmann back in 2000?

24       A.   Yes.

25       Q.   Did you attend his trial in 2000?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

```
 1        A.    Yes.
 2        Q.    Okay, and prior to the filing of this
 3  lawsuit were you aware that DNA testing in around,
 4  you know, the 2014-2015 time frame implicated Tom
 5  as the source of bodily fluids from the victim's
 6  vagina?
 7        A.    No, not until just recently.
 8        Q.    Okay, and I'm not -- I don't want you to
 9  tell me any of your communications with your
10  counsel, but outside of communications with your
11  counsel did you learn that DNA testing from bodily
12  fluids from the victim's vagina matched with Tom
13  and excluded Floyd?
14        A.    Just on our immediate sheriff's office
15  when the sheriff mentioned it.
16        Q.    Okay, and when was that?
17        THE WITNESS:  When was our last meeting?
18        MR. TURNER:  I can't answer for you.
19        THE WITNESS:  Oh, I'm sorry.
20        MR. NORTON:  Are you asking about
21  meetings with us at the sheriff's office?
22        A.    Yes, it's been --
23        MR. NORTON:  Hang on.
24  BY MS. BROWN:
25        Q.    I'm sorry, are you talking about a
```



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

1  meeting with your attorneys or a meeting -- were

2  attorneys present at that meeting that you're

3  talking about?

4      A.   Yes.

5      Q.   Okay.  Anyone else present besides

6  defendants in this case and attorneys?

7      A.   No.

8      Q.   Okay.  All right, prior to the filing of

9  this lawsuit were you aware that Tom Bledsoe had

10 committed suicide and confessed in a suicide note

11 to having killed Camille Arfmann?

12     A.   Yes, that's what I've heard.

13     Q.   Okay, and how did you become aware of

14 that suicide?

15     A.   I believe from somebody at the office.

16     Q.   Okay, who at the office?

17     A.   I don't remember who told me.

18     Q.   What was your reaction to learning that

19 news?

20     A.   I'm not sure what it was.

21     Q.   Okay, you don't recall having any

22 particular reaction?

23     A.   No, I don't.

24     Q.   Okay.  Are you aware that Floyd Bledsoe's

25 conviction was overturned by a court?


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

### ROBERT L. POPPA

```
 1      A.   Yes.
 2      Q.   Okay, and are you aware that Floyd
 3  Bledsoe has received a Certificate of Innocence?
 4      A.   He's received a what?
 5      Q.   A Certificate of Innocence.
 6      A.   Not till just now.
 7      Q.   Okay.  What did you do to prepare for
 8  this deposition?
 9      A.   I met with my attorneys.
10      Q.   Okay, and without telling me the
11  substance of those conversations with your
12  attorney how many times did you meet with your
13  attorney to prepare for this deposition?
14      A.   Twice, I believe.
15      Q.   Twice, okay, and when was the earliest
16  meeting?
17      A.   Trying to remember.  Been two weeks ago I
18  guess, I'm not -- I don't remember.
19      Q.   Okay.  A few weeks ago?
20      A.   Yeah, I don't remember the exact -- the
21  exact date.
22      Q.   Okay, but just approximately a few weeks
23  ago, is that right?
24      A.   Yes.
25      Q.   Okay, and about how long did that meeting
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### ROBERT L. POPPA

1  last?

2       A.   I'm not sure.  Don't remember.

3       Q.   **Can you give us any sort of a ballpark**

4  **estimate?**

5       A.   An hour or so, maybe more.

6       Q.   **Okay, and when was the most recent --**

7  **scratch that.  When was the second meeting that**

8  **you had with your attorneys to prepare for this**

9  **deposition?**

10      A.   At the sheriff's office.

11      Q.   **Okay, and when did that occur?**

12      A.   Two, three weeks ago, I believe.

13      Q.   **Okay.  So, was there one meeting or two**

14  **meetings?**

15      A.   I believe there was a couple meetings.

16      Q.   **Got it, but they both happened a few**

17  **weeks ago, is that right?**

18      A.   Right.  I'm not exactly sure, ma'am.

19      Q.   **Okay, I understand.  All right, did you**

20  **bring any documents with you today for the**

21  **deposition?**

22      A.   Just what the attorneys gave me to look

23  through.

24      Q.   **Okay, and did they give you -- can you**

25  **hold that up for us what you were pointing at?**



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## ROBERT L. POPPA

1       A.    (Witness complies.)

2       Q.    Okay.  So, that's a binder of documents

3   from this case that your attorneys gave you to

4   prepare for the deposition?

5       A.    Yes.

6       Q.    Okay, and can you take me through what's

7   in that binder?

8       A.    I have my testimony during the trial from

9   the court reporter, then I have my, my notes and

10  reports that I had written.

11      Q.    Anything else?

12      A.    No, other than some pictures, couple

13  pictures, one of the car hood of Floyd's -- trunk

14  hood of Floyd's vehicle and then a picture of him

15  wearing a woman's gown, of Tom -- of Floyd wearing

16  a woman's gown.

17      Q.    Okay.  Did you look at any other

18  photographs other than the two that you just

19  described in order to prepare for this deposition?

20      A.    No, I haven't seen any photographs taken.

21      Q.    Okay.  Did you review any deposition

22  testimony from any other defendants in this case?

23      A.    No.

24      Q.    Did you watch any video or audio

25  recordings to prepare for the deposition?



## ROBERT L. POPPA

1        A.    I watched one of me interviewing Floyd.

2        Q.    Okay.  Did you review any other materials

3   to prepare for this deposition other than what

4   you've described?

5        A.    No.

6        Q.    Okay.  Do you feel that you're prepared

7   to answer questions about this case based on the

8   review that you've conducted?

9        A.    I'll do my best.

10       Q.    Are there any documents that you wanted

11  to review but didn't have an opportunity to review

12  before the deposition?

13       A.    Not that I'm aware of.

14       Q.    Is there anything that you wanted to do

15  to help you prepare for the deposition but didn't

16  have an opportunity to do?

17       A.    No.

18       Q.    Okay.  Are you a high school graduate?

19       A.    GED.

20       Q.    Okay, when did you get your GED?

21       A.    When I was in the army, 1977, I believe,

22  when I was stationed in Hawaii.

23       Q.    Okay, and have you obtained any education

24  beyond the GED?

25       A.    Other than law enforcement education, no.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

19

ROBERT L. POPPA

1        Q.    Okay.  So, you haven't attended any post

2   secondary educational institutions, correct?

3        A.    That's correct.

4        Q.    Okay.  You served in the military, is

5   that right?

6        A.    Yes.

7        Q.    Can you describe what service you had in

8   the military?

9        A.    I was in the United States Army.  I was a

10   welder and a metalworker and a recovery

11   specialist.

12        Q.    Okay, and what time frame were you in the

13   army?

14        A.    From 1975 to 1978.

15        Q.    Were you ever deployed abroad?

16        A.    Excuse me?

17        Q.    Were you ever deployed abroad?

18        A.    No.

19        Q.    Did you get any law enforcement training

20   while you were in the military?

21        A.    No.

22        Q.    Do you have any family members who are in

23   law enforcement?

24        A.    My cousin, Judy, was a sergeant on the

25   Metro Oregon Police Department, she died of cancer

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# ROBERT L. POPPA

1    quite a few years ago.

2         Q.    Okay.  No other --

3         A.    Other than that, no.

4         Q.    Okay.  Okay, you have been a law

5    enforcement officer since 1982, is that right?

6         A.    Yes.  Then I took three years off when I

7    got married and moved to St. Joe, Missouri.

8         Q.    What did you do during those three years

9    off?

10        A.    I was a maintenance man at the elementary

11   school.

12        Q.    Okay, and are you still employed as a law

13   enforcement officer?

14        A.    Yes.  I work part-time at the Oskaloosa

15   Police Department.

16        Q.    Okay.  I'd like to just get more

17   information about your law enforcement career, so,

18   let's begin with 1982 when you became a law

19   enforcement officer.  What was the first police

20   department that you worked at?

21        A.    Horton Police Department.

22        Q.    Okay, and how long did you work at the

23   Horton Police Department?

24        A.    I believe about a year and a half.

25        Q.    Okay, and what was your title or position

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

# ROBERT L. POPPA

 1    there?

 2         A.    When I left I was assistant chief.

 3         Q.    Okay, how many officers were there at the

 4    Horton Police Department?

 5         A.    There were four.

 6         Q.    There were four, so, where was the

 7    assistant chief in the hierarchy there?

 8         A.    I would have been just right under the

 9    chief, second in charge.

10         Q.    Okay.  So, did you -- by the time you

11    left the Horton Police Department were you

12    supervising any officers underneath you?

13         A.    Just, just the two.

14         Q.    Okay, and let's see, did you conduct any

15    homicide investigations while working at the

16    Horton Police Department?

17         A.    No.

18         Q.    Okay.  Did you conduct any violent crime

19    investigations while working at the Horton Police

20    Department?

21         A.    No.

22         Q.    Okay, why did you leave the Horton Police

23    Department?

24         A.    My -- it was a small town, there was no

25    work there for my wife and I was offered a job at


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

## ROBERT L. POPPA

1    the Pratt Police Department, so, we moved there.

2         **Q.    Okay, and approximately when did you**

3    **begin working at the Pratt Police Department?**

4         A.    It's been in the latter part of '83.

5         **Q.    Okay, and how long were you working at**

6    **the Pratt Police Department?**

7         A.    Until 1988.

8         **Q.    And was that a full-time job?**

9         A.    Yes.

10        **Q.    And what positions did you hold at the**

11   **Pratt Police Department?**

12        A.    I was a patrolman, street, cop.

13        **Q.    Okay, you were in uniform?**

14        A.    Yes.  Yes.

15        **Q.    Okay.  Did you conduct any violent crime**

16   **investigations while at the Pratt Police**

17   **Department?**

18        A.    No.

19        **Q.    About how many officers did the Pratt**

20   **Police Department have in the time frame that you**

21   **were working there?**

22        A.    Oh, gosh, I'm not sure.  Probably eight

23   of us, I believe.  It's a small town.

24        **Q.    Got it, thanks.  Okay, and after -- when**

25   **you left the Pratt Police Department why did you**



5111 SW 21st Street      6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604         Suite 101                 Suite 305
785-273-3063             Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com      913-383-1131              316-201-1612

### ROBERT L. POPPA

```
1   leave that department?

2       A.   My wife filed for divorce.

3       Q.   Okay, and how did that impact your

4   employment?  Were you moving?

5       A.   I stayed a couple months and then I

6   resigned, moved back home.

7       Q.   Okay.

8       A.   To Missouri.

9       Q.   Oh, okay.  And is that the time period

10  that you were off for three years working at a

11  school?

12      A.   No.

13      Q.   Oh, okay.  So, what did you do for

14  employment after you left the Pratt Police

15  Department?

16      A.   I worked at Eveready part-time and then

17  Lamar Shoemaker, who's now state fire marshal,

18  told me they had a job in Jackson County for a

19  drug agent, so, I went there and applied.

20      Q.   Was that the Jackson County Sheriff's

21  Office?

22      A.   Yes.

23      Q.   Okay, when did you begin your employment

24  with the Jackson County Sheriff's Office?

25      A.   Been in 1988.
```


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ROBERT L. POPPA

1        Q.    And how long were you working there?

2        A.    I believe until around '91.

3        Q.    Okay, and was that a full-time

4   employment?

5        A.    Yes.

6        Q.    Okay.  Did you say you were a drug

7   officer there?

8        A.    Yes.  I worked under a drug grant out of

9   the governor's office.

10       Q.    Okay, and were you working as a, you

11   know, I guess a detective or some other kind of

12   role?

13       A.    Not till the grant ran out eight months

14   later.

15       Q.    Okay.  So, what were your

16   responsibilities as a drug officer?

17       A.    I went out --

18       Q.    I think that's probably not the right

19   name.  What was the name of the position that you

20   had --

21       A.    I was a, I was a special narcotics

22   investigator.

23       Q.    Okay, and can you describe your

24   responsibilities as a special narcotics

25   investigator for the Jackson County Sheriff's



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604         Suite 101                Suite 305
785-273-3063             Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com      913-383-1131             316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## ROBERT L. POPPA

1    Office?

2         A.    Went out and checked any complaints we

3    had on drug fields.   Anybody that was brought in

4    with drugs I would question them and try to get

5    confessions as far as search warrants and such.

6         Q.    Okay, did you have training by that point

7    in interrogations of criminal suspects?

8         A.    No.

9         Q.    Okay.   Were you investigating violent

10   crimes in that role?

11        A.    No.   Just drugs at that time.

12        Q.    Okay, and approximately eight months

13   later you became a detective with the Jackson

14   County Sheriff's Office, is that right?

15        A.    Yes, that's correct.

16        Q.    Okay, and what were your responsibilities

17   as a detective there?

18        A.    I worked burglaries, thefts, assisted the

19   sheriff in child abuse cases, he normally took the

20   lead in that.   It was also a small department.

21   Just anything that we got a call on that they

22   needed a detective to look into instead of a

23   patrolman.

24        Q.    Okay, and did you have -- had you gone to

25   some sort of detective training by that point?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

```
 1      A.   No.

 2      Q.   Okay.  Did you investigate violent crimes

 3   while you were with the Jackson County Sheriff's

 4   Office?

 5      A.   I don't remember.  If we had one I'm

 6   probably sure I would have.

 7      Q.   Okay.  As you sit here today you don't

 8   remember the details of any violent crimes that

 9   you may have investigated at the Jackson County

10   Sheriff's Office, is that right?

11      A.   Other than a drug case or two, no.

12      Q.   Okay.  All right, after the Jackson

13   County Sheriff's Office -- what time -- when did

14   you finish your employment with the Jackson County

15   Sheriff's Office?

16      A.   I believe it was in '91.  Me and my new

17   wife moved to St. Joe.  She was a teacher there.

18      Q.   Okay, and at the time you left the

19   Jackson County Sheriff's Office you were still in

20   that detective role, correct?

21      A.   Yes.

22      Q.   And why did you leave the Jackson County

23   Sheriff's Office?

24      A.   My wife was driving 75 miles one way to

25   work every day and it was wearing her out, so, I
```



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063            Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1    told her I'd try to find a job up in St. Joe

2    where she was working.

3        **Q.   Okay, and what was the next employment**

4    **that you had after the Jackson County Sheriff's**

5    **Office?**

6        A.   Then I worked for Xavier Catholic Church

7    as a maintenance man.

8        **Q.   Okay, and how long were you doing that**

9    **for?**

10       A.   Not very long.  Probably about six months

11   or so.

12       **Q.   Okay, after that where did you work?**

13       A.   Payless Cashways selling lumber in St.

14   Joe.

15       **Q.   Okay.  After that where did you work?**

16       A.   Jefferson County Sheriff's Office, 1994.

17       **Q.   Okay.  So, in 1994 you began your**

18   **employment with the Jefferson County Sheriff**

19   **Department, is that right?**

20       A.   Yes.

21       **Q.   And when did you leave your employment**

22   **with Jefferson County?**

23       A.   In 2020 -- or I'm sorry, 2020.

24       **Q.   2020, okay.  So, can you just take me**

25   **through your positions and the approximate years**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

# ROBERT L. POPPA

1    in which you held them beginning in 1994 when you

2    began working for the Jefferson County Sheriff's

3    Department and ending in 2020?

4        A.    Okay.  I was patrolman starting out and

5    then I was promoted to sergeant and then I was

6    promoted to a lieutenant and then my, on my

7    retirement, day that I retired they made me a

8    captain on my last day.

9        Q.    Did they make you a captain so that you

10   would get a better retirement package?

11       A.    No, it didn't affect anything.  I'm not

12   sure why, why they did it.

13       Q.    Just a nice gesture?

14       A.    I guess, yes.

15       Q.    Okay.  All right, then in 1999 when the

16   Camille Arfmann homicide investigation was

17   happening what was your position at that point?

18       A.    I was a sergeant.

19       Q.    Okay, and what were your responsibilities

20   as a sergeant?

21       A.    I was a street patrol sergeant.  My

22   responsibilities were burglaries, domestics,

23   fights.  Any call that dispatch would give us we'd

24   respond to it.

25       Q.    Okay, and as a sergeant at the Jefferson

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# ROBERT L. POPPA

1   County Sheriff's Department in the 1999 time frame

2   who did you supervise?

3       A.   I would have supervised the deputies that

4   were below me in rank.

5       Q.   Okay, and who was your immediate

6   supervisor?

7       A.   Lieutenant Jones, Rick Jones.

8       Q.   Okay.  And after -- you said after you

9   retired from the Jefferson County Sheriff's

10  Department you had additional employment, correct?

11      A.   Correct.

12      Q.   And where did you work?

13      A.   I'm the assistant chief of Oskaloosa

14  Police Department.  I work 16 hours a week.

15      Q.   Okay, how many officers are in that

16  department?

17      A.   The chief, myself, and we're training two

18  part-time officers right now.

19      Q.   Okay, and what are your responsibilities

20  in that role?

21      A.   Pretty much the same as it was in the

22  sheriff's office when I was a patrolman.  Traffic,

23  domestics, any call that we get -- burglaries and

24  such.

25      Q.   Okay.  Other than what you've already

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### ROBERT L. POPPA

1   testified to, have you worked for any other law

2   enforcement entities during your career?

3        A.    No.

4        Q.    Okay, have you ever attended a police

5   academy?

6        A.    Yes.

7        Q.    And when was that?

8        A.    1982.

9        Q.    Okay, how -- approximately how many weeks

10  was that training academy?

11       A.    It was five weeks.

12       Q.    Okay, and did you receive additional

13  training each year of your employment as a police

14  officer?

15       A.    Yes, 40 hours of training a year is

16  what's required by Kansas law, by the academy.

17       Q.    Okay, and did you ever go to detective

18  school or sergeant school?

19       A.    No.

20       Q.    Okay.  So, as of 1999 when the Arfmann

21  investigation was going on you had been a police

22  officer for over 15 years, right?

23       A.    Yes.

24       Q.    Okay, and as of 1999 had you been trained

25  in the investigation of homicides?



Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

1      A.    I'd been to classes on homicides.  I'd

2   never actually worked one.

3      Q.    Okay.  So, the Arfmann homicide was your

4   first homicide investigation?

5      A.    Yes.

6      Q.    Okay, and since the Arfmann homicide

7   investigation have you worked on any other murder

8   investigations?

9      A.    No.

10      Q.    Okay.  So, that was your one and only

11   murder investigation during your career, correct?

12      A.    Yes.

13      Q.    Okay.  As of 1999 you had been trained on

14   evidence collection, right?

15      A.    Yes.

16      Q.    Okay, and you had been trained on report

17   writing, right?

18      A.    I'd had classes, yes.

19      Q.    Okay, so, you were trained that police

20   reports were supposed to be accurate and thorough,

21   correct?

22      A.    Yes.

23      Q.    And you were trained that police reports

24   were supposed to contain all of the important

25   information in the investigation, including

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                 Suite 305
785-273-3063            Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com         913-383-1131             316-201-1612

### ROBERT L. POPPA

1  evidence that pointed towards the police suspect

2  and evidence that pointed away from the police

3  suspect, correct?

4       A.   I would say correct, yes.

5       Q.   Okay.  And you knew that other police

6  officers would rely on your police reports in

7  order to further the investigation, right?

8       A.   Yes.

9       Q.   And as of 1999 you understood that the

10 prosecutor would rely on your police reports

11 during the course of the prosecution, correct?

12      A.   Yes.

13      Q.   And you also knew that defense attorneys

14 would rely on your police reports in order to

15 defend the suspect, correct?

16      A.   Yes.

17      Q.   And, so, you took care to document all of

18 your investigative steps accurately and

19 thoroughly, correct?

20      A.   Yes.

21      Q.   Okay.  All right, let's take a look at

22 what has been previously marked as Exhibit 100.

23           MR. TURNER:  I'm going to have him go

24 ahead and read that real quick before you ask

25 questions if that's okay.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1        BY MS. BROWN:

2        Q.   You know what, I'll let him know where to

3   look.  I'm going to put it up on the screen and

4   I'll direct you, okay, and you can look at your

5   paper copy.  Just give me a second.  Okay, Officer

6   Poppa, can you see this document that's been

7   marked Exhibit 100?

8        A.   Yes.

9        Q.   Okay, and just for the record this has

10   been Bates-stamped JC2003 to JC2008, okay?

11        A.   Okay.

12        Q.   Officer Poppa, can you tell us -- do you

13   recognize this document?

14        A.   Yes.

15        Q.   Okay, what is it?

16        A.   It's a document that I typed reference

17   the case.

18        Q.   Okay, so, it's one of your police reports

19   for the case, right?

20        A.   Yes.

21        Q.   Okay, and do you see at the top at the

22   very first paragraph it says, "On 11-06-99 at 0050

23   hours Heidi Bledsoe, sister of Zetta Camille

24   Arfmann, reported to Deputy Mark Doud that her

25   sister was not at home and no one had seen her

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

# ROBERT L. POPPA

1   since she got off the bus at 1630 hours 11-5-99."

2   Do you see that?

3        A.   Yes.

4        Q.   Okay, and, so, is that consistent with

5   your recollection that Heidi Bledsoe reported that

6   her sister was missing around, you know, 0050

7   hours on November 6th?

8        A.   Yes.

9        Q.   Okay, and if we keep going to the second

10   paragraph it reads, "On 11-6-99 at approximately

11   750 hours this officer was inside the Oskaloosa

12   Casey's store when Floyd Bledsoe said he had a

13   question to ask me.  I said okay, what is it.  My

14   wife, Heidi, reported her sister, Zetta Camille

15   Arfmann, missing and nobody came out to the house

16   to check it out.  I said what do you mean?  He

17   said she went to the LEC to report that Camille

18   hasn't been seen since Friday at 4:30 p.m.  I said

19   do you think she's been kidnapped and he said

20   yes."  Did I read that correctly?

21        A.   Yes.

22        Q.   Okay, and LEC is the Law Enforcement

23   Center, right?

24        A.   Yes.

25        Q.   Okay, and what you were describing there

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

# ROBERT L. POPPA

1  was that on November 6th at around 7:50 a.m. you

2  encountered Floyd Bledsoe at Casey's General Store

3  and he pressed you about, you know, why nobody had

4  come to check in about Camille Arfmann, is that

5  right?

6       A.   Yes, he came up to me when I was checking

7  out.

8       Q.   Okay.  So, you weren't on duty at the

9  time, is that right?

10      A.   Not yet.  I was getting ready to go on

11 duty.

12      Q.   Got it.  Okay, and during that

13 interaction with Floyd Bledsoe you asked him words

14 to the effect of do you think Camille has been

15 kidnapped and he said yes, right?

16      A.   Yes.

17      Q.   Okay, let's look at that third paragraph

18 that says, "I then followed Floyd to the trailer

19 where Camille was staying at, 15200 Fairview Road.

20 I spoke with her mother, her sister Heidi, and

21 other family members.  They all agreed that it was

22 not like Camille to just take off.  She's a quiet

23 girl, did not have a lot of friends and did not

24 have a boyfriend.  They said she would come home

25 after school, do her homework and go to church at



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604         Suite 101               Suite 305
785-273-3063             Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com      913-383-1131            316-201-1612

### ROBERT L. POPPA

1   Rose and Jim Bolinger's.  The family had already

2   spoken with the Bolingers and said she wasn't

3   there.  Camille's school books and coat were on

4   the living room couch."  So, is it correct that

5   you, you -- after speaking with Floyd at the

6   Casey's General Store you followed Floyd to the

7   trailer where he lived with his wife, his sons and

8   with Camille as well?

9        A.   Yes.

10       Q.   Okay, and after speaking -- well, let's

11   keep reading here.  Okay, let's -- I'm directing

12   you to the second page here.  In the middle of

13   this first paragraph do you see where it says,

14   "After speaking with the family I went back to the

15   911 -- I went back to 911 office and called Deputy

16   Heather Kyle to get a K9."  Do you see that?

17       A.   I'm looking for it.  Yes, I see it now.

18       Q.   Okay.  So, after speaking with Camille's

19   family members at the trailer on November 6 you

20   remained concerned that Camille was missing and,

21   so, you called Deputy Kyle to get a K9 officer to

22   conduct a search, is that right?

23       A.   Yes.

24       Q.   Okay.  Okay, continuing on here it says,

25   "Deputy Kyle advised me that Deputy Chartier took



## ROBERT L. POPPA

1  a call Friday at 1902 hours on Wild Horse Road of

2  a woman screaming, please don't hurt me, somebody

3  help me.  I checked in on the report and called

4  Deputy Chartier, Deputy Wayne Buford, Deputy Kyle,

5  Sheriff Dunnaway, Deputy Chartier, Undersheriff

6  Jeff Herrig."  So, does that -- so, you -- after,

7  after learning this information you called

8  Undersheriff Herrig and other sheriff department

9  officers and arranged to conduct a K9 search for

10  Camille, is that right?

11      A.   After learning about the woman screaming

12  I called Roy Dunnaway, told him I felt something

13  was wrong and I believe he got hold of the other

14  officers.

15      Q.   Okay, got it.  Okay, and why did, why did

16  you check in with Roy Dunnaway in particular?

17      A.   He's the sheriff.

18      Q.   Okay.  Okay, on November 6th, that day,

19  you had learned that Camille's bus driver, who was

20  named Dorothy McClung, would have information that

21  could help identify the time that Camille went

22  missing, is that right?

23      A.   Yes.

24      Q.   Okay, so, on November 7th you interviewed

25  Dorothy McClung, the bus driver, and she told you



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## ROBERT L. POPPA

1    that she had dropped Camille off at her trailer at

2    approximately 4:20 p.m., right?

3        A.    Yes.

4        Q.    Okay, and you documented the interview

5    with Dorothy McClung in the police report,

6    correct?

7        A.    Yes, I believe I have.

8        Q.    Okay, so, 4:20 was the last time that

9    Camille had been seen alive before her

10   disappearance, is that right?

11       A.    Yes.

12       Q.    Okay, and then you also interviewed Robin

13   Meyer on November 7th and Robin Meyer told you

14   that she stopped by Camille's trailer at 5 p.m. on

15   November 5th and Camille was not there, right?

16       A.    Yes, I remember that.

17       Q.    Okay, so, putting together the bus

18   driver's statement and Robin Meyer's statement

19   your investigation identified a window between

20   4:20 and 5 p.m. on November 5th in which Camille

21   was believed to have gone missing, correct?

22       A.    I would say so, yes.

23       Q.    Okay.  And you also heard on November 7th

24   that there had been a call from a Colonel Knoebel

25   about a woman screaming while Colonel Knoebel was

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

1   deer hunting around, on Wild Horse Road, right?

2       A.   Right, yes.

3       Q.   Okay, and, so, you ended up getting a

4   Bloodhound to search the area -- or sorry, scratch

5   that.  You ended up getting a Bloodhound to

6   conduct searches on November 7 of 1999, right?

7       A.   Yes.

8       Q.   And the name of the K9 handler that you

9   worked with was Wayne Buford?

10      A.   Yes.

11      Q.   Okay.  Had you worked with Wayne Buford

12  before?

13      A.   No.

14      Q.   Okay, let's take a look at Exhibit 103.

15           MR. TURNER:  You don't have it yet.

16           THE WITNESS:  Oh, okay.

17  BY MS. BROWN:

18      Q.   If you could get that from the court

19  reporter and I will put it on the screen and we'll

20  go from there.  Okay, and just for the record,

21  this is -- this exhibit has been previously marked

22  103.  It's Bates-stamped JC17467 to 17470.  Okay,

23  and Officer Poppa, have you seen this report by

24  Wayne Buford before about his searches on November

25  6th of 1999?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### ROBERT L. POPPA

1     A.   No.

2     Q.   Okay.  All right, let's go down to the

3   bottom of the first page of this exhibit, so,

4   there's a narrative there and it says, "Contacted

5   Jefferson County dispatcher after hearing radio

6   traffic in regards to a search for a missing

7   person.  Offered assistance with Bloodhounds and

8   was advised to proceed to Jefferson County to

9   assist" --

10          THE REPORTER:  Can you go a little bit

11   slower, please?

12          MS. BROWN:  Sure.  Thank you for that

13   instruction, I'm happy to do that.  So, I'll begin

14   again.

15     BY MS. BROWN:

16     Q.   Do you see at the bottom of the page

17   there's a narrative that begins, "Contacted

18   Jefferson County dispatcher after hearing radio

19   traffic in regards to a search, to search for

20   missing person.  Offered assistance of Bloodhound

21   and was advised to proceed to Jefferson County to

22   assist.  Made initial contact with Sheriff Roy

23   Dunnaway and with Sergeant Robert Poppa at 9707

24   Wild Horse Road, McLouth, Kansas.  I was briefed

25   by both the sheriff and Sergeant Poppa."  Do you

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

```
 1   see that?

 2       A.   Yes.

 3       Q.   Okay.  Just continuing on it says, "The

 4   location on Wild Horse Road was where a hunter the

 5   previous evening had heard a woman screaming.  It

 6   was unknown if it was related to the missing

 7   juvenile."  Do you see that?

 8       A.   I don't see that.  Is it on the same

 9   page?

10       Q.   Yeah, I just continued where I left off.

11       A.   Okay.  Yes, I see it now.

12       Q.   Okay.  So, is it correct that you and

13   Sheriff Dunnaway briefed this K9 handler, Wayne

14   Buford, on November 7th?

15       A.   I don't remember it, but if he says we

16   did then we did.

17       Q.   Okay.  You don't have any -- you don't

18   have any reason to doubt what he wrote in his

19   report, do you?

20       A.   No.

21       Q.   Okay, and fair to say that at the time

22   that you began the search with Wayne Buford it was

23   unknown if the hunter hearing screams was related

24   at all to Camille Arfmann's disappearance,

25   correct?
```



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ROBERT L. POPPA

1        A.    That is correct.

2        Q.    Okay, and that's been -- either you or

3    Sheriff Dunnaway told Wayne Buford that it was

4    unknown if the screams that had been heard on Wild

5    Horse Road were related to Camille disappearance,

6    correct?

7        A.    I don't remember, I'm sorry.

8            MS. BROWN:  I'm sorry, can we take a five

9    minute break?

10           THE VIDEOGRAPHER:  Stand by.  Time is

11   approximately 12:17 a.m., we're going off the

12   record -- 10:17 a.m.

13           (THEREUPON, a recess was taken.)

14           THE VIDEOGRAPHER:  Time is approximately

15   10:21 a.m., we're back on the record.

16       BY MS. BROWN:

17       Q.    Let's take a look again at Exhibit 103.

18   Can you see that, Officer Poppa?

19       A.    Yes.

20       Q.    Okay.  Okay, so, just reviewing that

21   first paragraph of the narrative that we looked at

22   before, is it correct to say that you and

23   Dunnaway, you know, initially met with Wayne

24   Buford at the 9707 Wild Horse Road location in

25   McLouth?



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## ROBERT L. POPPA

1  A. Yes.

2  Q. Okay, but you didn't begin the, the K9

3 work at Wild Horse Road, right?  You first went to

4 Camille's trailer?

5  A. Yes.

6  Q. Okay, and at the trailer you collected

7 items for the Bloodhound to smell that belonged to

8 Camille, including a pillow case and one of

9 Camille's shirts, right?

10  A. Yes.

11  Q. Okay, and you -- after the Bloodhound had

12 been trained on Camille's scent you followed the

13 Bloodhound and you ended up at the high school, is

14 that right?

15  A. Yes.

16  Q. Okay, let's take a look at the bottom of

17 the second page of this exhibit here.  Okay, and

18 just beginning about five lines from the bottom

19 there it says, "We then met up with Sergeant Poppa

20 and a school official identified as the middle

21 school principal.  We asked if he could determine

22 the locker of the missing juvenile and explained

23 the circumstances.  He went to his office and to

24 his computer and determined the locker as number

25 120.  We went down the hallway towards the locker

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street  6420 W. 95th Street  800 E. 1st Street
Topeka, KS 66604  Suite 101  Suite 305
785-273-3063  Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com  913-383-1131  316-201-1612

## ROBERT L. POPPA

1    and Sergeant Poppa was to open it to see if we

2    could determine any additional information as to

3    the whereabouts of the juvenile.  In the process

4    of doing this Barney went off and nosed the exact

5    locker to give a positive indication of owner of

6    the locker as the missing juvenile."  Do you see

7    that?

8         A.   Yes.

9         Q.   Okay, and, so, based on smell the

10   Bloodhound was able to identify Camille's locker

11   at the high school, right?

12        A.   Yes.

13        Q.   All right, let's go down to page 3.

14   Okay, so, in the middle of the fourth paragraph,

15   fourth full paragraph from the top do you see

16   where it says, "We returned to the mobile home

17   park known as Monroe Trailer Park and went to the

18   entrance?"

19        A.   Okay, I see it now.

20        Q.   Okay.  "So, we returned to the mobile

21   home park known as the Monroe Trailer Park and

22   went to the entrance.  I unloaded Barney and told

23   him to go to work.  He proceeded around the

24   trailer park and showed a lot of interest in Lot G

25   which is on the southwest corner of the park.  He



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

### ROBERT L. POPPA

```
 1   also showed a lot of interest in a small travel
 2   trailer also at Lot G."  So, is it correct to say
 3   that the Bloodhound showed interest in the Monroe
 4   Trailer Park where Camille had lived?
 5        A.    If that's what he said, yes.
 6        Q.    Okay.  All right.  Okay, going up to the
 7   first full paragraph on the same page, do you see
 8   where it says, "We then exited the building and
 9   discussed how to proceed when Sheriff Roy Dunnaway
10   drove up.  We discussed the track so far and he
11   requested that we return to the residence on
12   Fairview and pick up our vehicles and then return
13   to the location of Wild Horse Road to check if the
14   woman screaming on November 10th of -- excuse me,
15   November 5th of 1999 was related.  We discontinued
16   the search at approximately 1330 hours at the
17   school location."  Do you see that?
18        A.    Yes.
19        Q.    Okay, and, so, while you were with the
20   Bloodhound at the high school Roy Dunnaway drove
21   up and asked you to return to the trailer and then
22   head to Wild Horse Road to see if the woman
23   screaming was related to Arfmann's disappearance,
24   right?
25        A.    Yes.
```



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

## ROBERT L. POPPA

1       Q.    Okay.   Continuing on to the next

2  paragraph there it says, "I left Barney harnessed

3  up and we returned to the area on Wild Horse Road.

4  At that location was the hunter that had heard the

5  woman screaming.   We had the hunter take us to the

6  area where he had heard the woman.   Barney showed

7  no interest in that area that would lead me to

8  believe -- lead me to believe that the screaming

9  was related."   Do you see that?

10      A.    Yes.

11      Q.    Okay.   So the hunter who took, who had

12  heard the screaming woman took you to the area

13  where he had thought he had heard that woman,

14  right?

15      A.    Yes.

16      Q.    Okay, and that was at 9707 Wild Horse

17  Road, correct?

18      A.    Yes.

19      Q.    And the Bloodhound explored that area of

20  9707 Wild Horse Road but did not show any

21  interest, meaning Bloodhound didn't indicate that

22  it smelled Camille's scent there, correct?

23      A.    Yes.

24      Q.    Okay.   So, the Bloodhound search did not

25  provide any connection between the scream and



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1   Camille Arfmann's disappearance, right?

2        A.    Right.

3        Q.    Okay.  Did you also search, you know,

4   just visually search the area of 9707 Wild Horse

5   Road with the Bloodhound?

6        A.    I don't remember.

7        Q.    Okay.  All right, let's take a look at

8   the bottom of this same page here.  Okay, so,

9   after you went to Wild Horse Road you then went to

10  the mobile, the Monroe Trailer Park, correct?

11       A.    Yes.

12       Q.    Okay, and while you were at the mobile

13  trailer park you determined that -- or it was

14  determined that Camille had resided at the Monroe

15  Trailer Park at some point, correct?

16       A.    I'm not sure.  I'm not sure.  If it's in

17  my report then I would say yes, but I don't

18  remember.

19       Q.    Okay.  We'll take a look at your report

20  in a sec.  Okay.  Do you see at the bottom of the

21  -- that large paragraph on page 3 of this exhibit

22  it says, "We continued to work the park for a

23  while and then discussed the case further along

24  with the sheriff and a detective from the

25  department.  The search was discontinued around

Appino & Biggs Reporting Service, Inc.   TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street   6420 W. 95th Street   800 E. 1st Street
Topeka, KS 66604      Suite 101            Suite 305
785-273-3063          Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com   913-383-1131         316-201-1612

## ROBERT L. POPPA

1    1700 hours."  Do you see that?

2         A.    Yes.

3         Q.    Okay.  So, is it correct that before you

4    discontinued the search you updated Sheriff

5    Dunnaway on the results of the search so far?

6         A.    I'm sure we did.

7         Q.    Okay, and why do you say you're sure you

8    did?

9         A.    We reported everything we did to Sheriff

10   Dunnaway.

11        Q.    Okay.  So, you would have checked with

12   him before stopping the search, is that right?

13        A.    That I'm not sure of.

14        Q.    Okay.  You would have updated him on the

15   results of the search then, correct?

16        A.    Yes.  Yes.

17        Q.    Okay.  Would you also have updated

18   Detective Carreno on the search?

19        A.    I'm not sure.

20        Q.    Okay.  All right, let's take a look at

21   another exhibit, which is Exhibit 101.  And for

22   the record, this is the exhibit that's been marked

23   101 and it's Bates-stamped JC4989 to JC5089.  It's

24   about a hundred pages long.  Do you have that in

25   front of you, Officer Poppa?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## ROBERT L. POPPA

1      A.    Yes.

2      Q.    Okay, and I'll represent to you that this

3 is an exhibit of about a hundred pages that begins

4 with a folder with your name on it and contains

5 material pertinent to your work on the Arfmann

6 investigation.  Can you just take a look at it and

7 let me know if you're familiar with this

8 particular folder?

9      A.    Yes, I am.

10     Q.    Okay, what is it?

11     A.    It's a folder of copies of some of my

12 statements, reports, and notes.

13     Q.    Okay, and was this a folder that you

14 maintained at the Jefferson County Police

15 Department in the 1999 time frame?

16     A.    Would have been in records department.

17     Q.    Okay, and, so, how did it work in the

18 records department in terms of -- you know, how

19 did they get this folder that had your materials

20 in it?

21     A.    When we do a report we drop it in a box

22 as a case summary and such and then captain would

23 pick it up and take it over to records or someone

24 from records.

25     Q.    Okay, and someone from records would

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### ROBERT L. POPPA

```
 1   classify it as, you know, relating to your
 2   particular work on the case and put it in a folder
 3   with your name on it?
 4        A.   My name would be on it if it was in the
 5   box.
 6        Q.   Oh, okay.  So, any time you put any, you
 7   put some of your work product from your
 8   investigations into the box for the records clerk
 9   it would have your name on it, is that right?
10        A.   Yes.
11        Q.   Okay.  All right, let's turn to the page
12   in this exhibit that's marked JC4998.  Do you see
13   the page numbers at the bottom?
14        A.   Yes.
15        Q.   We're looking for 4998 and I'll put it on
16   the screen for you as well.
17        A.   Okay.
18        Q.   Okay, are you familiar with this map?
19        A.   Yes.
20        Q.   Okay, can you explain the circumstances
21   of how this map was created?
22        A.   I have no idea who created this map.
23        Q.   Okay, but you had access to it as part of
24   your investigation, is that right?
25        A.   This is the first time when you gave me
```

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

2/21/2023                                                                   51

## ROBERT L. POPPA

1   this copy to look at that I've seen this map.

2       Q.   Oh, okay.  This is your first time seeing

3   it, okay?

4       A.   Right, that I remember.

5       Q.   Okay, and, so, do you know who asked for

6   it to be created?

7       A.   Excuse me?

8       Q.   Do you know who asked for this map to be

9   created?

10      A.   No.

11      Q.   Okay.  Wild Horse -- 9707 Wild Horse Road

12  was about two miles from the trailer that Camille

13  Arfmann disappeared from on November 5th, right?

14      A.   I would say at least, yes.

15      Q.   Okay.  Did you consider Camille's trailer

16  to be near enough to 9707 Wild Horse Road that the

17  screams the hunter heard could have been connected

18  to, you know, her screaming around the area of the

19  trailer?

20      A.   I thought it was possible.

21      Q.   Okay.  Do you recall that on the evening

22  of November 7th Tom Bledsoe turned himself in for

23  Camille Arfmann's murder?

24           MR. TURNER:  Object to form.  You can

25  answer.



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604          Suite 101              Suite 305
785-273-3063          Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com       913-383-1131           316-201-1612

### ROBERT L. POPPA

```
1       A.    Oh, okay.
2             MR. TURNER:  I think you said November
3   2nd is what I heard.
4       A.    Could you repeat that ma'am?  I didn't --
5       BY MS. BROWN:
6       Q.    Thank you, yes.  On the evening of
7   November 7th Tom Bledsoe turned himself in for the
8   murder of Camille Arfmann, right?
9       A.    The date that I remember when he came in,
10  it was my case.
11      Q.    I'm sorry, can you repeat that answer?
12      A.    I said I don't remember the date, but I
13  remember when he came to the Law Enforcement
14  Center with my case.
15      Q.    Oh, okay, got it.  Okay, and do you
16  remember that that was the same evening that you
17  had finished the Bloodhound searches?
18      A.    I really don't remember, ma'am.  I'm not
19  sure --
20      Q.    I'm sorry?
21      A.    I don't remember the date.
22      Q.    You don't remember the date, okay.  All
23  right, let's take a look at Exhibit 100 for a
24  second.
25            THE WITNESS:  Is this 100?
```



5111 SW 21st Street        6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063           Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com         913-383-1131            316-201-1612

## ROBERT L. POPPA

1          MR. TURNER:   Yeah.

2      A.   Okay.

3      BY MS. BROWN:

4      Q.   Okay, and this is your report from,

5  describing the events of November 6th and November

6  7th of 1999, right?

7      A.   Yes.

8      Q.   Okay, and if you scroll down, let's see

9  here.  Trying to find the date for you.  So, if

10  you review this report at pages 2006 to 2007, can

11  you review that and let me know if you can figure

12  out that -- if you agree with me that the day

13  that Tom Bledsoe turned himself in for Camille

14  Arfmann's murder was the evening of November 7?

15      A.   Yes, I'll look.  I don't see -- I see the

16  date November 7th when we searched around

17  Oskaloosa area some more and found -- with

18  reference to the screams.  And then I went home

19  and laid down at 9:30 p.m. and came back at 11:00

20  p.m. when Roy Dunnaway had called me, but I'm not

21  sure what time, if it was after midnight or not,

22  what time he walked in with Mike Hayes.

23      Q.   Okay, got it.  So, be fair to say that it

24  was, you know, either the late evening on November

25  7th or the early morning of November 8th that Tom



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## ROBERT L. POPPA

1    walked in with Mike Hayes?

2         A.    That's possible, yes.

3         Q.    Okay.  Is there any other time frame that

4    it could have been at?

5         A.    I don't know.  By reading my report it

6    doesn't tell the time that he came in or the date

7    that I can see.

8         Q.    Okay.  When, when Tom Bledsoe came in

9    with Mike Hayes Tom revealed that Camille's body

10   had been buried in the dump behind the house where

11   Tom lived, right?

12        A.    I don't, I don't know who told Roy

13   Dunnaway that.  I didn't hear Tom say that.

14        Q.    Okay.

15        A.    I wasn't there for that.

16        Q.    Okay.  So, you, you weren't there for

17   the, for Tom's, any statements made by Tom or Mike

18   Hayes to Roy Dunnaway, is that right?

19        A.    I might have been in the office, but I

20   didn't hear him.  I wasn't with them when they

21   said that.  Roy went out in the hallway and met

22   Mike when Tom and Mike came down the hallway from

23   the conference room.

24        Q.    Okay, can you explain that again?

25        A.    Roy Dunnaway went out in the hallway and

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

## ROBERT L. POPPA

1  met Mike Hayes and Tom when they were coming down

2  the hallway just before you get to the conference

3  room.

4       Q.   Okay, and you were in the conference room

5  at that time, is that right?

6       A.   Yes.

7       Q.   And you were not in the hallway during

8  the meeting between Sheriff Dunnaway and Tom

9  Bledsoe in that case, is that right?

10      A.   Right.  I'm not sure where they went from

11  there, if they came into the conference room or

12  into the interview room, I don't remember.

13      Q.   Okay, but at some point in the evening of

14  November 9th -- excuse me -- at some point in the

15  late hours of November 7th or the early hours of

16  November 8th you learned that Camille's body was

17  in the dump behind the house where Tom lived,

18  right?

19      A.   Yes.  Captain Carreno -- yes, I did.

20      Q.   Okay, you learned that from Captain

21  Carreno?

22      A.   I believe I learned that from Roy.

23      Q.   Okay, and when you learned that were you

24  in the conference room?

25      A.   I'm sure I was.

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604             Suite 101                 Suite 305
785-273-3063                 Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

## ROBERT L. POPPA

1    Q.    Okay, and do you recall that when Camille

2    was dug up out of the ground she had drag marks

3    on her back?

4    A.    I don't remember.  I dug her up, but I

5    don't remember.  Me and Troy Frost.

6    Q.    Okay.  Did you ever ask for the

7    Bloodhound to be used to investigate the area

8    around where Camille's body was found?

9    A.    No.  I wasn't in charge.

10    Q.    Okay, who was in charge?

11    A.    Roy Dunnaway.

12    Q.    Okay.  Did you ever use the Bloodhound to

13    search Tom's house for Camille's scent?

14    A.    I've never been at Tom's house.

15    Q.    Okay.  So, you didn't use the Bloodhound

16    to search Tom's house, right?

17    A.    I didn't, no.

18    Q.    Okay, and someone -- that would have been

19    a decision of Sheriff Dunnaway, is that correct?

20    A.    Yes.

21    Q.    Okay.  So, to your knowledge, the

22    Bloodhound was never taken to search Tom's bedroom

23    or Tom's house, is that right?

24    A.    Not that I'm aware.

25    Q.    Okay.  Do you know why those searches

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**ROBERT L. POPPA**

1     were not undertaken?

2          A.    I have no idea.

3          Q.    Okay.  And you were not in charge of the

4     Camille Arfmann investigation, is that right?

5          A.    That is correct.

6          Q.    You were not deciding what leads were

7     going to be followed, correct?

8          A.    That is correct.

9          Q.    And you were not deciding what searches

10    were going to be done, correct?

11         A.    That's correct.

12         Q.    Okay, that was a decision -- those were

13    decisions made by Roy Dunnaway and perhaps

14    Detective Carreno and KBI Agent Morgan, right?

15         A.    Yes.

16         Q.    But not by yourself, correct?

17         A.    Excuse me?

18         Q.    But not yourself, correct?

19         A.    No, not myself, no.

20         Q.    Okay.  Just based on your years of law

21    enforcement expertise do you think it would have

22    been a good idea to have the Bloodhound search the

23    area behind, the area where Camille's body had

24    been found if there were drag marks found on her

25    body meaning that she had been dragged before

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

ROBERT L. POPPA

1   being buried in the ditch?

2        A.   I don't know of that.

3        Q.   Well, you know, a Bloodhound would, would

4   be able to smell the trail -- that if Camille's

5   body had been dragged to the burial place the

6   Bloodhound would be the right investigative

7   technique to figure out where the body had been

8   dragged from, correct?

9             MR. QUALSETH:   Object to the form.

10        A.   I'm sorry, what --

11             MR. QUALSETH:   You can go ahead.

12   BY MS. BROWN:

13        Q.   You can go ahead and answer.

14        A.   Oh, I'm sorry.  I'm not an expert on

15   Bloodhounds and dogs, so, I'm not really sure.

16   That would probably be a question you should ask a

17   dog handler.  I really don't know.

18        Q.   Okay.  Okay, now, 9707 Wild Horse Road,

19   that was more than a mile away from the Zule Dairy

20   where Floyd worked, correct?

21        A.   Yes.

22        Q.   Okay, was it about something like two

23   miles away from the Zule Dairy, does that sound

24   right?

25        A.   I'm really not sure.  Don't have a map or

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### ROBERT L. POPPA

1   anything to show me.  I'm not really sure how far

2   that was.  I know it's in that area.

3       Q.   Okay.  So, your recollection is it was

4   more than a mile away from the Zule -- scratch

5   that.  Your recollection is that 9707 Wild Horse

6   Road was more than a mile away from the Zule Dairy

7   but you can't say exactly the distance that it

8   was, correct?

9       A.   Yes.

10      Q.   Okay, and fair to say that there were a

11  number of homes and businesses within a mile of

12  9707 Wild Horse Road besides the Zule Dairy?

13      A.   I know there were homes.  I'm not sure

14  about businesses.

15      Q.   Okay, and when you took the Bloodhound to

16  9707 Wild Horse Road you didn't think to search at

17  the Zule Dairy in particular, right?

18      A.   No, I didn't.

19      Q.   Was the Bloodhound ever taken to search

20  Zule Dairy, to your knowledge?

21      A.   Not to my knowledge.

22      Q.   Okay.  All right, looking at Exhibit 100,

23  we're going to look at the top of the fourth page

24  of this exhibit.

25      A.   Here?  (Indicating)



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### ROBERT L. POPPA

1       Q.    Are you there?

2       A.    I think so.

3       Q.    Okay.  So --

4       A.    Yes.

5       Q.    Beginning on the second sentence at the

6   top of page 4 it says, "I've also called Darwin

7   Palmer II, friend of Camille's, and he has not

8   seen her.  Darwin knew of no boyfriends that

9   Camille might have.  I spoke with Nicole Transier.

10  She has not seen Camille and said she knew of no

11  boyfriend Camille might have.  Said that Camille

12  was a quiet person, did not talk a lot.  I spoke

13  with Sarah Monthey.  She said that Camille had no

14  boyfriends, that she was quiet when around a lot

15  of people, but talked a lot when around two or

16  three people."  Do you see that from your report?

17      A.    Yes.

18      Q.    Okay, and, so, on November 7th before

19  Camille's body was found you interviewed several

20  of Camille's friends regarding Camille's nature,

21  correct?

22      A.    Before the body was found?

23      Q.    Yes.

24      A.    Yes, that is correct.

25      Q.    Okay.  And you inquired of these friends

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## ROBERT L. POPPA

```
 1   of Camille's what her temperament was like and
 2   whether she was quiet, right?
 3        A.   No, they just said that.
 4        Q.   They volunteered it to you?
 5        A.   Right, right.  I was just trying to --
 6        Q.   Okay, and you thought it was significant
 7   so you wrote it down, right?
 8        A.   Yes.
 9        Q.   Okay.  And did you interview Camille's
10   friends regarding whether Camille had a boyfriend?
11        A.   I don't remember if I did.
12        Q.   Okay, but they each told you that Camille
13   -- each of these three friends told you that
14   Camille had no boyfriend and you wrote that down
15   in your report because you found it significant,
16   correct?
17        A.   Yes.
18        Q.   Okay, and was the reason that you noted
19   that Camille's friends were saying that she had no
20   boyfriend and was quiet, was that -- did that make
21   it more likely in your mind that she had been
22   kidnapped as opposed to voluntarily run off with
23   somebody?
24        A.   I would say yes.
25        Q.   Okay.  So, you were concerned after these
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

1    interviews that Camille was possibly in danger,

2    right?

3         A.    Yes.

4         Q.    And you were concerned that maybe she'd

5    been taken somewhere against her will, right?

6         A.    Yes, possible.

7         Q.    And you were concerned that maybe she'd

8    even been kidnapped or abducted, right?

9         A.    Yes.

10        Q.    Okay.  Of all the officers that were

11   conducting the investigation into the Arfmann

12   homicide, is it fair to say that you had the best

13   relationship with Floyd at the time of this

14   investigation?

15        A.    I would say yes.

16        Q.    Okay, and why was that?

17        A.    I'm the first one he met with and went to

18   his house and was trying to help him find her.

19        Q.    Okay.  Let's take a look at Exhibit 10.

20   Let me know when you've got that in front of you.

21        A.    Okay.  I have it.

22        Q.    Okay, and do you recognize this as Randy

23   Carreno's 45-page report on the Arfmann

24   investigation?

25        A.    Yes, it says it's his.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### ROBERT L. POPPA

1       Q.    Okay.  Had you seen this report prior to
2   your deposition today?

3       A.    Never.

4       Q.    Okay.  Can you see it on my screen right
5   now?  Do I have the right one up, can you see
6   that?

7       A.    Yes.

8       Q.    Okay.  So, let's take a look at page 23
9   of this exhibit.  Oh, and I'm sorry, for the
10  record, this is the document that's been
11  previously marked KBI subpoena 2286 to KBI
12  subpoena 2330.  Okay, and I'm going to ask you to
13  go to page 23 of that exhibit.

14      A.    Okay.

15      Q.    Towards the bottom.

16      A.    Okay.

17      Q.    Okay, and these are notes from Randy
18  Carreno describing an interview that he had with
19  Floyd Bledsoe and do you see where it says towards
20  the bottom, "Floyd Bledsoe stated he wanted
21  Sergeant Poppa in the interview room?"

22      A.    Yes, I see that.

23      Q.    Okay, and do you recall learning during
24  the investigation that Floyd specifically asked
25  for you while he was being interrogated on



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## ROBERT L. POPPA

1   November 12th by Randy Carreno?

2          MR. TURNER:  Object to form.

3      A.    I was never told that.

4      BY MS. BROWN:

5      Q.    Okay.  Any reason to doubt Randy

6   Carreno's documentation that Floyd asked for you

7   during an interview?

8      A.    No.

9      Q.    Okay.  So, is it fair to say that around

10  the time of the Arfmann investigation Floyd saw

11  you as being, you know, the officer that was most

12  on his side?

13     A.    I'm not sure what he was thinking, but

14  could be.

15     Q.    Okay.  You know, it was your

16  understanding that you were the officer that he

17  most trusted in the department, is that fair to

18  say?

19     A.    Evidently so.

20     Q.    Okay, and did you provide Floyd with

21  occasional updates on the investigation as it was

22  progressing back in 1999?

23     A.    When I had him -- we were looking for her

24  he wanted to know if we'd found her.  You know,

25  other than that, no.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1111

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ROBERT L. POPPA

1      Q.    All right.  Well, let's take a look at

2   page 22 at the top here.

3      A.    The top, okay.

4      Q.    Okay, do you see the first sentence, "I

5   asked Floyd Bledsoe if he knew what type of items

6   had been placed on top of the burial site.  Floyd

7   S. Bledsoe stated he only, he only, the only

8   things he knew is what Sergeant Poppa had told

9   him."  Do you see that.

10      A.    Yes.

11      Q.    Okay, so, you occasionally provided Floyd

12   Bledsoe with updates on the investigation, right?

13      A.    I might have told him that when I

14   interviewed him.

15      Q.    What do you mean?

16      A.    When I interviewed him I talked --

17      Q.    When you interviewed him -- so you might

18   have given him pieces of information about the

19   investigation while you were interviewing him, is

20   that right?

21      A.    Yes.  The only video interview I did with

22   him when I read him his Miranda I told him about

23   the burial site.

24      Q.    Okay.  Okay, and was that part of your

25   law enforcement technique that you were, you know,

Appino Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1  you would share occasional updates with Floyd
2  about the investigation when appropriate in order
3  to gain his trust?
4      A.    No.  I was telling him that she didn't
5  deserve to be put in a hole in the ground with a
6  bunch of trash throwed on top of her.
7      Q.    Okay, so, you were updating him on where
8  she'd been found as part of your interrogation, is
9  that right?
10     A.    I was telling him that hoping that he
11 would feel bad about it and confess.
12     Q.    Okay.  All right, let's go back to the
13 evening when Tom and Mike Hayes first came to the
14 Law Enforcement Center.  Actually scratch that.
15 Back in November 1999 how far did you live from
16 the Jefferson County Law Enforcement Center?
17     A.    I lived in Valley Falls, 18 miles.
18     Q.    Okay, and how long would it take you to
19 get to work from your house?
20     A.    15, 20 minutes, I'm sure.
21     Q.    Okay, so, from your house to the Law
22 Enforcement Center was about 15 to 20 minutes?
23     A.    Yes.
24     Q.    Okay.  All right, so, on November 7th
25 sometime late that evening but before 11 p.m. you



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

67

### ROBERT L. POPPA

1   received a call from Sheriff Dunnaway telling you

2   that Camille had been murdered, right?

3       A.   Yes.

4       Q.   And you went to the Law Enforcement

5   Center and had a briefing from Sheriff Dunnaway,

6   right?

7       A.   Yes.

8       Q.   Okay.  So, you talked to Sheriff Dunnaway

9   first in a phone call and then a briefing at the

10  Law Enforcement Center, correct?

11      A.   I'm sure I did, yes.

12      Q.   Okay, and which one was longer or more

13  extensive, the phone call or the briefing?

14      A.   Phone call wasn't very long.

15      Q.   The phone call was short?

16      A.   Right.

17      Q.   Wasn't very long, and the briefing?

18      A.   I would say so.

19      Q.   Okay, the briefing was the one that was

20  more substantial and full of information, correct?

21      A.   Yes.

22      Q.   Okay.  About how long did the briefing

23  last, just as a ballpark estimate?

24      A.   Ma'am, I have no idea how long we talked

25  about it.



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

1    Q.    Okay.   Do you remember if it was more or

2  less than 15 minutes?

3    A.    I'm sure it was.

4    Q.    You think it was more than 15 minutes or

5  less than 15 minutes?

6    A.    I'm sure, I'm sure it was probably more

7  than 15 minutes.

8    Q.    Okay, so, it was greater than 15 minutes,

9  all right.  You think it was -- are you pretty

10  confident it was more than half an hour?

11    A.    That I'm not sure.

12    Q.    Okay.  Okay, but you're pretty confident

13  it was longer than 15 minutes, right?

14    A.    I'm sure it was, yes.

15    Q.    Okay.  All right, let's take a look at

16  Exhibit 71 and just for the record this is the

17  document that's been previously marked JC1545.  Do

18  you see that in front of you?

19    A.    Yes.

20    Q.    Okay, why don't you take a minute and

21  review that and let me know when you're done.

22    A.    Okay.  Okay.

23    Q.    Okay, so, do you see where it says at the

24  top 11-7-99 and then it says 2338 hours?

25    A.    Yes.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1      Q.    And then below that it says 1138 hours?

2      A.    Yes.

3      Q.    Okay, and then it says continuing down a

4   bit it says, "On arrival on number 30 met with

5   reporting officer outside of LEC and advised Tom

6   Bledsoe currently has admitted to being involved.

7   Number 30 advised victim was in a field with a

8   bullet to the head."  Do you see that?

9      A.    Yes.

10     Q.    Okay, and number 30 was Sheriff Dunnaway,

11   right?

12     A.    Yes.

13     Q.    Okay, what was your number at the time?

14     A.    46.

15     Q.    Okay.  So, there's a list of people who

16   were in the conference, present in the conference

17   room for this communication, correct?

18     A.    Yes.

19     Q.    And that included yourself, correct?

20     A.    Yes.

21     Q.    So, by 11:30 p.m. on November 7th you

22   were at the Law Enforcement Center in the

23   conference room, correct?

24     A.    Yes.

25     Q.    Okay, so, on November 7th Tom had

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### ROBERT L. POPPA

```
 1   admitted -- by 11:38 p.m. Tom had admitted he was
 2   involved in Camille being in a field with a bullet
 3   to the head, correct?
 4        A.   I would say he had to of.  I wouldn't
 5   have -- Roy wouldn't have known without that.
 6        Q.   Okay, and so, that was part of the
 7   briefing on November 7th, is that right?
 8        A.   Yes, could have been.
 9        Q.   Okay, you don't have any reason to doubt
10   that it was, right?
11        A.   No.
12        Q.   Okay, and I'll represent to you that the
13   reporting officer here is Carreno, correct -- I'm
14   sorry.  I'll just represent that to you.  Do you
15   have any reason to doubt Carreno's notation about
16   this, you know, the information that was known at
17   1138 hours?
18        A.   No.
19        Q.   Okay.  All right, on the night of
20   November 7th Sheriff Dunnaway told you about the
21   answering machine messages that Tom had left on
22   Jim Bolinger's answering machine, right?
23        A.   I don't remember that.
24        Q.   Do you remember knowing about those
25   answering machine messages at the Law Enforcement
```



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### ROBERT L. POPPA

1    Center that evening?

2        A.    No.   No, I do not.

3        Q.    So, when did you, when did you first

4    learn about Tom Bledsoe's answering machine

5    messages?

6        A.    I don't know if I knew about them.

7        Q.    Okay, as you sit here today do you

8    remember that Tom made two phone calls to Jim

9    Bolinger where he left messages, you know,

10   indicating that he was sorry for what he'd done

11   and he would pay for the rest of his life for

12   what he had done?

13       A.    No.

14       Q.    Okay.   You have no awareness of those

15   answering machine messages as you sit here today?

16       A.    Is Jim Bolinger the preacher?

17       Q.    Yes.

18       A.    I remember him talking about him talking

19   to the preacher, but I'm not sure what was said.

20       Q.    Okay.   Okay.   During this briefing in the

21   conference room on the night of November 7th

22   Dunnaway told you that Tom Bledsoe had turned

23   himself in for the murder of Camille, right?

24       A.    I was there when Mike Hayes came in with

25   him.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

2/21/2023                                                                                72

### ROBERT L. POPPA

1     Q.    Okay.  But all these law enforcement

2  officers were already assembled at the Law

3  Enforcement Center, including yourself, at the

4  time that Tom and Mike Hayes came in, right?

5     A.    Yes, I'm sure, uh-huh.

6     Q.    And you would have been -- Sheriff

7  Dunnaway had called you on the phone and told you

8  to come in, right?

9     A.    Yes.

10     Q.    And he told you that Camille had been

11  murdered, correct?

12     A.    Yes.

13     Q.    And he told you that Tom had admitted to

14  having been involved in Camille's murder and was

15  planning to come into the Law Enforcement Center,

16  correct?

17     A.    That is not correct.

18     Q.    That's not correct?

19     A.    No.  I was standing in the conference

20  room when Mike and Tom came down the hallway and I

21  heard Roy yell, did he kill that girl, and

22  immediately went out into the hallway to confront

23  Mike and he was mad.

24     Q.    Okay, and what did -- what did you hear

25  Mike say back to Sheriff Dunnaway?



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ROBERT L. POPPA

1          MR. TURNER:  Object to form.

2     A.    The sheriff said that to Mike Hayes.

3     BY MS. BROWN:

4     **Q.    Sheriff said that to Mike Hayes, okay.**

5     A.    Yes.

6     **Q.    Okay and, what was said next?**

7     A.    Excuse me?

8     **Q.    What happened next?**

9     A.    I really don't remember.  I just know

10    that he was mad.  He went out and started yelling

11    at Mike Hayes, is this -- did you kill that girl,

12    and I do remember that 'cause he was mad and

13    yelling and I don't, I don't remember if they came

14    in the conference room or they went into the

15    evidence -- the interview room, I'm not sure.

16    **Q.    Okay, and that was Sheriff Dunnaway, Tom**

17    **Bledsoe and Mike Hayes, correct?**

18    A.    Yes.

19    **Q.    Okay.  Was Jim Vanderbilt in the**

20    **conference room with you?**

21    A.    The notes here said he was, but I don't

22    remember -- I really don't remember who was in the

23    conference room, to tell you the truth.  It's been

24    too long.

25    **Q.    You don't remember Vanderbilt being in**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

ROBERT L. POPPA

1   the hallway during that altercation between

2   Sheriff Dunnaway and Mike Hayes and Tom Bledsoe,

3   do you?

4        A.   No, ma'am, I do not.

5        Q.   Okay, so, during this -- by 1138 hours

6   when you were at the conference room and you had

7   been briefed on the investigation so far, fair to

8   say that you had been briefed that Tom Bledsoe had

9   admitted to being involved?

10       A.   Yes, I'm sure I was.

11       Q.   Okay, and you had been advised during the

12  briefing that the victim was in a field with a

13  bullet to the head, correct?

14       A.   I believe so.

15       Q.   Okay, and that was from -- the briefing

16  was by Sheriff Dunnaway, correct?

17       A.   I'm sure, yes.

18       Q.   Okay, and that had occurred by 1138

19  hours, correct?

20       A.   What had?  That he had told me this, is

21  that what you're saying?

22       Q.   Yes.

23       A.   Yes, yes.

24       Q.   Did you ask any questions during the

25  briefing?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1     A.    To who?

2     Q.    **To Sheriff Dunnaway or any other law**

3  **enforcement officers.**

4     A.    I may have, but I don't remember what

5  they would have been.

6     Q.    Okay.  Did you ask any questions to Mike

7  Hayes or Tom Bledsoe?

8     A.    No, I would not have talked to them.

9     Q.    **You were never in the same room as Tom**

10 **Bledsoe and Mike Hayes on, at the Law Enforcement**

11 **Center on the evening of November 7th?**

12    A.    Not that I remember.

13    Q.    **Did you take notes, your own notes on the**

14 **briefing?**

15    A.    No.

16    Q.    **Why is that?**

17    A.    It was just a briefing.  I was talking

18 about the case.

19    Q.    **Okay, and you figured somebody else was**

20 **documenting the important events of that evening,**

21 **correct?**

22    A.    I would have thought so.

23    Q.    **Okay.  When you arrived at the Law**

24 **Enforcement Center Roy Dunnaway, Jim Woods, Jim**

25 **Vanderbilt, Mike Hayes were already present,**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

2/21/2023                                                                          76

### ROBERT L. POPPA

1    correct?

2         A.    I remember me, Roy, then Mike Hayes and

3    Tom coming in.   Whoever else was in the conference

4    room, ma'am, I cannot remember.

5         Q.    Okay, let's take a look at Exhibit 100.

6         A.    Okay.

7         Q.    Okay, and go down to the page that's

8    marked JC2006.

9         A.    Okay.

10        Q.    Can you see that on my screen as well?

11        A.    Yes.

12        Q.    Okay, do you see the very last two

13   sentences there?   It says, "I can't remember the

14   exact time Sheriff Dunnaway called me, I know it

15   was before 11 p.m., and told me that Camille had

16   been murdered.   I went to the Law Enforcement

17   Center.   Sheriff Dunnaway, KBI agent Jim Woods,

18   Jim Vanderbilt, attorney Mike Hayes were present."

19   Do you see that?

20        A.    Yes.

21        Q.    Okay, and so does that refresh your

22   recollection that when you got to the Law

23   Enforcement Center Dunnaway, Woods, Vanderbilt and

24   Hayes were already present?

25        A.    If that's what I wrote in my report then

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# ROBERT L. POPPA

1    it would be correct.

2        Q.    Okay.  Did anyone else present

3    information at the briefing other than Sheriff

4    Dunnaway?

5        A.    Excuse me?  I'm sorry, I didn't hear you.

6        Q.    At the briefing that took place in the

7    Law Enforcement Center on the night of November

8    7th did anyone else present information other than

9    Sheriff Dunnaway?

10       A.    I don't recall.  I don't remember.

11       Q.    Okay, you don't recall one way or

12   another?

13       A.    Excuse me?

14       Q.    You don't recall one way or another

15   whether or not anyone else other than Sheriff

16   Dunnaway presented information during the

17   briefing?

18       A.    Right.  I have no idea who did.

19       Q.    Okay.  After receiving the briefing from

20   Sheriff Dunnaway you remained at the Law

21   Enforcement Center for some time before heading to

22   the dump behind Tom's house, right?

23       A.    Yes.

24       Q.    Okay, what did you do during that time?

25       A.    The time that I was there at the LEC, Law

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

1    Enforcement Center?

2         Q.    Yes.

3         A.    Ma'am, I don't remember.

4         Q.    Okay.  Were you just in the conference

5    room with a, you know, group of law enforcement

6    officers?

7         A.    I'm sure I -- yes, I was there.

8         Q.    Okay, and where was Roy Dunnaway during

9    that time?

10        A.    I'm not, I'm not sure.

11        Q.    Okay, where was Tom Bledsoe?

12        A.    I'm not sure.  I'm not sure --

13        Q.    Where was --

14        A.    I'm not sure if he went into the

15   interview room when he came down the hallway or

16   into the conference room, I don't remember.

17        Q.    Okay.  So, it's possible that Tom and

18   Mike Hayes and Sheriff Dunnaway went into an

19   interview room and an interview was conducted that

20   you were not part of, correct?

21        A.    No, I don't know if Roy would be the one

22   interviewing Tom.  Only one I saw interviewing Tom

23   was Randy Carreno.

24        Q.    Okay.  Okay, so, is it possible that

25   Randy Carreno was interviewing Tom and Mike Hayes



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1   at the conference center on November 7th?

2       A.   I'm not sure what day it was, but I know

3   that Randy did interview him with Mike Hayes

4   'cause I walked in and saw it on the TV camera in

5   the conference room.  There's a camera inside the

6   interview room and there's a TV inside the

7   conference room where you can watch the interview.

8       Q.   Okay.  So, you observed through a video

9   feed an interview that Randy Carreno was carrying

10  out of Tom Bledsoe, is that correct?

11      A.   Yes.

12      Q.   Okay.  Can you orient me in time to when

13  that interview was occurring?  Was it the night of

14  November 7th or was it, you know, a few days

15  after?  When was that?

16      A.   I, I really don't remember which day it

17  was.  It should be in Randy's report I would

18  think.

19      Q.   Okay.  But it was within -- fair to say

20  it was within a, you know, couple days of November

21  7th?

22           MR. TURNER:  Object to form.

23      A.   I'm not sure what day it was on, ma'am.

24  BY MS. BROWN:

25      Q.   Well, was it weeks later?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

2/21/2023                                                              80

## ROBERT L. POPPA

1      A.   No, I believe it was the day he came in.

2      **Q.   Okay.**

3      A.   When Mike brought him in.

4      **Q.   Okay, and, so, there was a video feed on**

5   **you could see an interview and what do you recall**

6   **Tom Bledsoe saying during that interview?**

7      A.   The only thing I remember Tom saying to

8   Randy was that he had had sex with the family dog

9   and Mike Hayes looking up at the camera like he

10  was looking at us and that's pretty much all I

11  really watched of it.

12     **Q.   Okay.  Do you recall Tom being questioned**

13  **by Randy Carreno about, you know, the murder of**

14  **Camille?**

15     A.   I'm sure that's why he was in there, yes,

16  I know.

17     **Q.   Okay, so, that was the substance of the**

18  **interview, you just don't remember the details --**

19     A.   Yes.

20     **Q.   -- fair to say?**

21     A.   Yes.

22     **Q.   Okay, and can you give us just a ballpark**

23  **estimate, I know it's not going to be exact after**

24  **all these years, but just a ballpark estimate of**

25  **how long this interview occurred that you remember**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1   seeing?

2       A.   I, I have no idea how long Randy was in

3   there.  It should be on the tape or in his report

4   how long he -- when he started, when he quit.

5       Q.   **Okay.  And can you explain to me how the**

6   **video feed works?  Is it, you know, were there**

7   **multiple interview rooms and law enforcement**

8   **officers in one room could watch the video of an**

9   **interview happening in another room?**

10      A.   We only had one interview room at the

11  sheriff's office at the time and it was, it was

12  right off -- the interview room was the conference

13  room.

14      Q.   **So, the interview room was the conference**

15  **room; that's the room that had the video camera in**

16  **it, is that correct?**

17      A.   Interview room and the conference room

18  were in the same building but separate rooms, yes.

19      Q.   **Oh, okay.  So, the interview room is the**

20  **one that had the video camera in it, but you could**

21  **watch the video feed from the conference room?**

22      A.   Yes, that's correct.

23      Q.   **Okay, got it, and if you were watching**

24  **the video feed from the conference room that meant**

25  **that the interview was being recorded in the**



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604            Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

## ROBERT L. POPPA

 1    interview room, correct?

 2         A.    Yes.

 3         Q.    Okay, and was it generally the

 4    responsibility of the officer who was conducting

 5    the interview to make sure that the video

 6    recordings were preserved for the investigative

 7    file?

 8         A.    Yes, I'd say so.

 9         Q.    Okay.  So, when you carried out

10    interviews or interrogations of suspects that were

11    video recorded you made sure to collect the video

12    recording and put it into evidence, correct?

13         A.    I would think I would've if I was given

14    that opportunity.

15         Q.    Okay, and in fact you've seen the

16    recording of your interview with Floyd Bledsoe on

17    November 13th, correct?

18         A.    Yes.

19         Q.    And it was you who made sure that that

20    recording ended up being preserved, correct?

21         A.    Yes.

22         Q.    Okay.  So, is that your understanding of

23    the policy of and practice of the Jefferson County

24    Police Department back in 1999 that the person who

25    was leading the interrogation of the suspect would

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

## ROBERT L. POPPA

1   ensure that the video recording was collected

2   after the end of the interview?

3        A.   Yes.

4        Q.   Okay.  All right, let's take a look at

5   Exhibit 10, which is the Carreno police report.

6        A.   Okay.

7        Q.   Okay, and I'd like you to direct your

8   attention to page 9 of that report.

9        A.   Okay.

10       Q.   I'm sorry, page 8 in the middle.

11       A.   Okay.  Where at on the page, sorry?

12       Q.   Yes, let me on the --

13       A.   Okay.

14       Q.   Do you see there's a paragraph that

15   begins, towards the middle of page 8 that begins

16   with "On November 7th, 1999, at approximately 2338

17   hours I arrived at the Jefferson County Sheriff's

18   Law Enforcement Center and met with Sheriff

19   Dunnaway in the parking lot."  Do you see that?

20       A.   Yes.

21       Q.   Okay.  Randy Carreno writes in his

22   report, "Sheriff Dunnaway stated he has

23   information that Thomas (Tom) Bledsoe knew about

24   Zetta's disappearance.  Sheriff Dunnaway stated

25   that Zetta was dead and Tom Bledsoe knew where

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ROBERT L. POPPA

1    Zetta was buried.  Sheriff Dunnaway stated that
2    Tom Bledsoe was currently with his attorney Mike
3    Hayes inside the Law Enforcement Center.  See
4    Sheriff Dunnaway's report."  Do you see that?
5         A.    Yes.
6         Q.    Okay.  So, Sheriff Dunnaway created a
7    police report regarding the events on the evening
8    of November 7th, right?
9         A.    That's what this says.
10        Q.    Okay, and do you have any reason to doubt
11   what this says here in Randy Carreno's report?
12        A.    No.
13        Q.    Okay.  Do you know where that report can
14   be found?
15        A.    I would say records department.
16        Q.    Okay, have you ever seen Sheriff
17   Dunnaway's report about the events of the night of
18   November 7th, 1999?
19        A.    No.
20        Q.    Okay.  Do you know what it said?
21        A.    No.
22        Q.    Okay, but you would expect that he
23   created a report about the information that he
24   learned on November 7th of 1999, right?
25        A.    I would think he would.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ROBERT L. POPPA

1      Q.    Okay, and you have no doubt, no reason to

2  doubt that he, he did create such a report, right?

3      A.    If Randy says he did I would have to say

4  yes, he created it.

5      Q.    Okay.  Let's go down to page 9.

6      A.    Okay.

7      Q.    Actually let's read these telephone

8  messages at the top of page 9 and I want to see

9  if it refreshes your recollection about having

10  heard about these messages in 1999.  So, do you

11  see where it says in Randy Carreno's report,

12  "Telephone messages left on Joe Bolinger's

13  answering machine from Tom Bledsoe.  Hi, Jim, this

14  is Tom.  I wanted you to be the first to know, I

15  know I lied to you.  I know where Camille is and

16  when you get this message I'm going to turn myself

17  into the police.  Dot dot dot went through dot dot

18  dot I said I wished I never did it.  I hurt the

19  church, I hurt God, most of all I let everyone

20  down.  All I can say is I'm sorry.  I'll pay for

21  the rest of my life for what I've done.  All I

22  can ask is for the church to remain strong.

23  Please forgive me.  As a favor please remember my

24  mom and dad.  Help them when they go through dot

25  dot dot help with pain dot dot dot I'm about to



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

### ROBERT L. POPPA

1    dot dot dot, thank you, Jim."  Did I read that

2    correctly?

3         A.    Yes.

4         Q.    Okay, do you see there was another

5    message that's transcribed there that says, "Hi,

6    Jim, me again, Tom.  Please help mom and dad

7    through this.  Right now they're disappointed.  I

8    know that the church will be, too.  All I can ask

9    -- forgive me for what I've done and I will pay

10   for it for the rest of my life.  I wanted to tell

11   you in front of the church but I didn't have

12   enough guts.  I'm sorry.  I don't know what went

13   through my mind.  Right now you're probably pretty

14   shocked.  I wish I could turn the clock back but

15   I can't.  I made my choice.  I wish I didn't.

16   I'm sorry, bye."  Do you see that?

17        A.    Yes.

18        Q.    Okay, does this refresh your recollection

19   that Tom Bledsoe left these answering machine

20   messages on Jim Bolinger's answering machine and

21   that you learned about them back on November 7th

22   of 1999?

23        A.    I don't remember these messages.

24        Q.    Okay.  What's your reaction to reading

25   the messages?



## ROBERT L. POPPA

1     A.   Sounds like he was confessing to the

2   preacher.

3     Q.   **Sounds like he was confessing to murder,**

4   **right?**

5     A.   Yes.

6     Q.   **Okay.  Okay, continuing down on the next**

7   **line do you see where it says, "On November 8th,**

8   **1999, at 0039 hours Tom Bledsoe and his attorney,**

9   **Mike Hayes, led officers to Zetta's buried body.**

10  **I arrived at the crime scene at 0051 hours."  Do**

11  **you see that?**

12    A.   Yes.

13    Q.   **Okay, so, is it right that around 12:39**

14  **a.m. on the morning of November 8th you left with**

15  **other officers to go to the site where Camille's**

16  **body was discovered?**

17    A.   Yes.

18    Q.   **Okay.  Do you recall anything you did**

19  **between your arrival at the Law Enforcement Center**

20  **before 11 p.m. on November 7th and your departure**

21  **from the Law Enforcement Center around 12:39 a.m.**

22  **on the morning of November 8th other than what**

23  **you've already described today?**

24    A.   No.

25    Q.   **Okay, when you left the Law Enforcement**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1    Center on the early morning of November 8th you

2    and other law enforcement officers followed behind

3    a car that had Mike Hayes and Tom Bledsoe in it

4    together, right?

5         A.    Yes.

6         Q.    Okay, and there were no law enforcement

7    officers in the car with Mike Hayes and Tom

8    Bledsoe, right?

9         A.    That is correct.

10        Q.    So, the two of them were on their own and

11   then there were other police vehicles following

12   them, is that right?

13        A.    Yes.

14        Q.    Okay.  So, Tom Bledsoe had not been taken

15   into custody at the Law Enforcement Center the

16   night of November 7th, right?

17        A.    I would have to say evidently not if he

18   was with Mike.

19        Q.    He was driving freely with Mike at that

20   time, right?

21        A.    Yeah, he was riding with Mike, I believe.

22        Q.    There was no police escort in the vehicle

23   with Tom and Mike Hayes?

24        A.    No.  We were all behind him.

25        Q.    And were you all in one car together?



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

### ROBERT L. POPPA

1       A.    No, different units.

2       **Q.    Okay.   About how many officers were you?**

3       A.    I'm not exactly sure.   I know myself and

4    Troy Frost.   I'm not exactly sure who all else was

5    there.

6       **Q.    Okay.**

7            MR. TURNER:   Ruth, how about we take a

8    break?   It's been about an hour since our last

9    one.

10           MS. BROWN:   Yeah let's do that.   Can we

11   take a ten minute break?

12           MR. TURNER:   Sure.

13           THE VIDEOGRAPHER:   Time is approximately

14   11:25 a.m., we're going off the record.

15           (THEREUPON, a recess was taken.)

16           THE VIDEOGRAPHER:   Time is approximately

17   11:41 a.m., we're back on the record.

18       BY MS. BROWN:

19       **Q.    Okay.   And back in the 1999 time frame,**

20   **Officer Poppa, did you supervise an officer by the**

21   **name of Officer Doud?**

22       A.    Yes.

23       **Q.    Okay, and were you Officer Doud's direct**

24   **supervisor?**

25       A.    Yes.



5111 SW 21st Street        6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604           Suite 101                Suite 305
785-273-3063               Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com        913-383-1131             316-201-1612

## ROBERT L. POPPA

1      Q.    Okay.   What was Officer Doud's position
2  at the time?

3      A.    Officer Doud's position?   He was a
4  patrolman.

5      Q.    Okay.   Okay, I have another question.
6  So, when Floyd -- when Heidi reported Camille
7  missing and then you encountered Floyd at Casey's
8  and he asked you questions about wanting to have
9  an investigation, at that time were you kind of
10  considered the lead on the investigation 'cause it
11  was a missing persons investigation?

12      A.    No.   I was just trying to find out who
13  actually took the report.   He would have been the
14  lead officer and then once it comes to maybe a
15  possible kidnapping, whatever, detective division
16  would take that over.

17      Q.    Okay.   So, Officer Doud was initially
18  responsible but very quickly it became like a more
19  serious investigation and detective division took
20  over --

21      A.    Yes.

22      Q.    -- is that right?

23      A.    Yes, yes.

24      Q.    Okay, and, so, in that initial let's say
25  half a day where there was not yet an indication



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1    that there was a violent crime Officer Doud was

2    kind of the reporting officer, you were his direct

3    supervisor and you reported everything to Sheriff

4    Dunnaway?

5         A.    Yes.

6         Q.    Do I have that right?

7         A.    Yes.

8         Q.    Okay.  Let's take a look at Exhibit 105.

9    Oh, and actually before we do, when, when it

10   became evident that the investigation was going to

11   implicate a kidnapping or something more serious

12   like a violent crime, the detective that was

13   assigned to the case was Randy Carreno, correct?

14        A.    Yes.

15        Q.    And Randy Carreno reported directly to

16   Sheriff Dunnaway, correct?

17        A.    Yes.

18        Q.    Okay, and KBI agent Jim Woods was also

19   co-leading the investigation, correct?

20        A.    Yes.

21        Q.    Okay.  Okay, let's take a look at Exhibit

22   105.  For the record it's been Bates marked JC3660

23   to JC3661.  Are you familiar with this kind of

24   report?

25        A.    This would be the first report I've seen

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

## ROBERT L. POPPA

1    of murder in the first degree.

2        Q.    What do you mean by that?

3        A.    Well, the crime on the report shows

4    murder in the first degree --

5        Q.    Okay.

6        A.    -- rather, rather than a missing person.

7        Q.    Got it, yes.  Okay, if you look at the

8    bottom, this report was -- the reporting officer

9    here was Doud, correct?

10       A.    Yes.

11       Q.    Okay.  So, fair to say that this is a

12   report that Officer Doud created around the time

13   of the transition between when he was the

14   reporting officer and it was kind of transitioned

15   to the detective division --

16       A.    Right.

17       Q.    -- Randy Carreno, correct?

18       A.    Yes.

19       Q.    Okay, and did Doud, Officer Doud turn

20   this report in to you for approval before

21   submitting it?

22       A.    No.

23       Q.    Okay.  Do you see on the first page here

24   Doud has the victim listed as Zetta Camille

25   Arfmann?



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

ROBERT L. POPPA

```
1        A.    Yes.

2        Q.    Again on the second page Tom Bledsoe is

3   listed as the only suspect, correct?

4        A.    Yes.

5        Q.    Okay, and at the bottom of the second

6   page there is a notation about Tom Bledsoe's 9mm

7   Jennings handgun.  Do you see that?

8        A.    Yes.

9        Q.    Okay, and if you look up at the first

10  page there's a place for checking boxes for type

11  of force and weapon, do you see that?

12       A.    Yes.

13       Q.    Okay, and the box for firearm is checked

14  affirmatively, is that right?

15       A.    Yes.

16       Q.    Okay, and what does that signify to you?

17       A.    That the weapon used was a firearm.

18       Q.    Yes.  So, there was some indication at

19  that point that the weapon used was a firearm,

20  correct?

21       A.    Yes.

22       Q.    Okay.  And do you see that the box for

23  knife/cut instrument is also checked

24  affirmatively?

25       A.    Yes.
```



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ROBERT L. POPPA

1      Q.   Okay.  And does that signify to you that

2   there was some indication in the investigation

3   that a knife or a cut instrument had been used in

4   the commission of the crime?

5      A.   I don't know of any knife being used in

6   the crime, but it's checked, so, I don't know what

7   they mean by that.

8      Q.   Okay.  Do you think -- do you have any

9   reason to doubt that Officer Doud, you know,

10  correctly reported that there was information that

11  a knife or a cut instrument, you know, had some

12  involvement in the crime at that point in the

13  investigation?

14          MR. QUALSETH:  Object to the form.

15     A.   No.  He would have told the truth.

16  BY MS. BROWN:

17     Q.   Okay.  So, he must have had some sort of

18  information indicating that a knife or a cut

19  instrument had been used in the crime in order to

20  check this box, correct?

21          MR. QUALSETH:  Same objection.

22          MR. LINDEN:  Join.

23     A.   Yes.

24  BY MS. BROWN:

25     Q.   Okay, and whatever information there was

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

### ROBERT L. POPPA

1   about involvement of a knife or a cut instrument

2   in the crime as of November 8th when this report

3   was prepared, that would have had to come from Tom

4   Bledsoe or Mike Hayes, correct?

5       A.   I don't know who told him that.

6       Q.   Okay.  You don't think he made it up,

7   though, right?

8       A.   No, he wouldn't make it up.

9       Q.   Okay.  Was there any, ever any

10  investigation to your knowledge conducted into

11  whether Tom had a knife or a cut instrument that

12  might have been used in connection with the crime

13  against Camille?

14      A.   Not that I know of.

15      Q.   Who would have been responsible for

16  assigning an officer to investigate whether Tom

17  had a knife that might have been used in

18  connection with a crime against Camille?

19      A.   Would have been the, I would say be the

20  detective division or Roy Dunnaway.

21      Q.   Okay.  So, would it have been Roy

22  Dunnaway, Randy Carreno and Jim Woods?

23      A.   I'm not sure Jim would have told him to

24  do that, but it would have been Roy or Randy I

25  would think.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

ROBERT L. POPPA

1        Q.    Okay, Roy or Randy --

2        A.    Yes.

3        Q.    -- Roy Dunnaway -- okay.  All right,

4   let's take a look at Exhibit 106 and for the

5   record this has been previously marked JC4930 to

6   JC4937.  Okay, and just to orient you, Officer

7   Poppa, I'll represent to you that these are Troy

8   Frost's field notes from an interview with Floyd

9   Bledsoe that began on November 9th and concluded

10  in the early hours of November 10th, okay?

11       A.    Okay.

12       Q.    And these are actually his notes about

13  the portion of the interview that occurred on the

14  morning of November 10th of 1999, okay?

15       A.    Of a what, I'm sorry?

16       Q.    November 10th of '1999.

17       A.    But the report's of what?  You said

18  something before that.

19       Q.    Oh, yes.  So, this is the portion of Troy

20  Bled -- Troy Frost's field notes that record the

21  interview of Floyd Bledsoe on the morning of

22  November 10th.

23       A.    Okay.

24       Q.    Okay?  And I want you to -- I want to

25  take you to the page that's marked at the bottom

Appino Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

**ROBERT L. POPPA**

1   4934.

2        A.   Okay.  Okay.

3        Q.   Okay, and, so, Troy Frost is taking notes

4   on an interview with Floyd Bledsoe and he writes,

5   "That's what I seen, glances in seen it, got sick,

6   and" -- I can't read that part -- "could of

7   belonged to Camille.  Sergeant Poppa said Tom

8   admitted to killing Camille."  Do you see that?

9        A.   Yes.

10       Q.   Okay.  So, fair to say that by November

11  10th in the morning you had heard that Tom had

12  admitted to killing Camille?

13       A.   Somebody would have told me that, yes, by

14  then.

15       Q.   Okay, and you don't have any reason to

16  doubt that you said before the morning of November

17  10th that Tom had admitted to killing Camille,

18  correct?

19       A.   Correct.

20       Q.   Okay, and that was information that you

21  would have received from Sheriff Dunnaway,

22  correct?

23       A.   Him or one of his detectives.

24       Q.   Okay, so, probably Sheriff Dunnaway or

25  Randy Carreno?


5111 SW 21st Street        6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604           Suite 101                Suite 305
785-273-3063               Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com        913-383-1131             316-201-1612

ROBERT L. POPPA

```
1        A.    Could be.

2        Q.    Okay, who else could it have been?

3        A.    I'm not sure.  Had to be Roy or one of

4   his detectives that told me that.

5        Q.    Okay.

6        A.    Whoever talked to Tom.

7        Q.    Okay.  Okay, on the night of November 7th

8   and into the early morning hours of November 8th

9   you were first at the Law Enforcement Center

10  getting a briefing from Sheriff Dunnaway and then

11  you and other officers followed Tom Bledsoe and

12  Mike Hayes to the field behind the house where Tom

13  lived, right?

14       A.    Yes.

15       Q.    Okay, and let's take a look at Exhibit

16  72.  And for the record this has been previously

17  marked as Exhibit 2, it's Bates-stamped KBI

18  subpoena 2646 to 2649, okay, and I'll represent to

19  you that this is a report prepared by Officer

20  Frost --

21       A.    Okay.

22       Q.    -- regarding the homicide investigation,

23  okay?

24       A.    Okay.

25       Q.    All right, let's take a look at the
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

1    bottom of page 1.  Do you see where it says

2    November 8th, 1999, at approximately 0208 hours,

3    do you see that?

4         A.   Yes.

5         Q.   Okay, then it says, "I, meaning Troy

6    Frost, arrived at the scene.  I was told that Tom

7    Bledsoe had shown the way to the body and that his

8    attorney, Mike Hayes, was with him.  I saw Tom

9    sitting in a vehicle and Mike Hayes was at the

10   scene.  There were other officers there such as

11   Poppa, Jefferson County Sheriff's Office, Deputy

12   Gunckle, Jefferson County Sheriff's Office, and

13   Special Agent Jim Woods with the Kansas Bureau of

14   Investigation and Detective Carreno.  And it goes

15   on."  Do you see that?

16        A.   Yes.

17        Q.   Okay, so, you were present at the scene

18   where Camille's body was found when Tom showed the

19   way to the body, correct?

20        A.   That is correct.

21        Q.   And you and Troy Frost knew where to dig

22   because Tom showed the way to the body, correct?

23        A.   Yeah -- well, we searched for it.  He

24   said it was in the pile and we looked for it,

25   started moving things and that's when I noticed

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## ROBERT L. POPPA

1   her foot sticking up out of the, the dirt.

2       Q.   Okay, and you had to lift a lot of layers

3   of plywood first before you were able to see the

4   foot, right?

5       A.   Yes, lot of trash, yes, piled on top of

6   her.

7       Q.   Okay.  And it was Tom that indicated

8   where the body was found, right -- where the body

9   would be, right?

10      A.   I don't believe he pointed out the exact

11  location.  Said it was in the, in the trash pile

12  which was like a ravine ditch full of trash.

13      Q.   Okay.  He didn't indicate where, where in

14  the ravine it was?  Like, you had to search the

15  entire ditch or were you provided with some

16  information that would help you pinpoint the

17  location of where Camille's body was?

18      A.   I don't, I don't remember, but we were

19  searching for the body, so, I'm not sure that he

20  would have showed us exactly where it was or we'd

21  have been doing that.

22      Q.   Okay, but you don't remember one way or

23  another?

24      A.   No, ma'am.

25      Q.   All right, let's take a look at Exhibit

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### ROBERT L. POPPA

1    101, and I'd like to direct your attention to page

2    4997.  Let me know when you're there.

3         A.   Okay, I'm there.

4         Q.   Okay.  So, this is a -- this page

5    reflects a log from you of photographs that were

6    taken of a gun, correct?

7         A.   Yes.

8         Q.   Okay, if you scroll down in the file a

9    little bit further, let's see where it is.  You

10   were, you were in charge of logging photographs

11   that were taken by Jefferson County police

12   officers at the -- on November 8th at the scene,

13   correct?

14        A.   I must've been, yes.  I did this log.

15        Q.   There we go.  Let's go down to page 5037.

16        A.   Sorry, my fingers don't --

17        Q.   No problem.  I'm at 5037.  Let me know

18   when you get there.

19        A.   Okay.  I'm there.

20        Q.   Okay, this is your handwriting, right?

21        A.   Yes.

22        Q.   Okay, and is this just another example of

23   a log that you created of photographs that were

24   being taken on November 8th at the site where

25   Camille's body was found?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### ROBERT L. POPPA

1       A.    Yes.

2       **Q.    Okay.**

3       A.    Wait a minute.  This is, this is a log of

4  the search of the car.

5       **Q.    Oh, thanks.**

6       A.    Yeah, I'm sorry.

7       **Q.    No, you're right.  I didn't have the**

8  **right page references available.  All right,**

9  **that's okay, we can move on.  Thanks for that**

10 **correction.  Okay, so, let's go back to Exhibit**

11 **100 at page 5 of the exhibit.**

12      A.    Okay.

13      **Q.    Okay, do you see the underlined text**

14 **there?  It says, "At 1:44 a.m. Attorney Michael**

15 **Hayes handed me a Jennings 9mm semi automatic**

16 **stainless with black grips, serial number 1375571,**

17 **Bryco Arms Costa Mesa, CA, U.S.A. handgun in a**

18 **white plastic bag which also contained a piece of**

19 **white paper towel."  Do you see that?**

20      A.    Yes.

21      **Q.    Okay, and, so, on the morning of November**

22 **8th outside of Tom's house you received Tom's 9mm**

23 **Jennings handgun from Mike Hayes in a white**

24 **plastic bag, is that correct?**

25           MR. TURNER:  Object to form.



5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

# ROBERT L. POPPA

```
1       A.    At the burial site.

2       BY MS. BROWN:

3       Q.    Okay.  So, on the morning of November 8th

4  at the burial site, which was located outside of

5  Tom's house, at 1:44 a.m. you received Tom's gun

6  from Mike Hayes in a white plastic bag, correct?

7       A.    That's correct.

8       Q.    Okay, and when you received that gun from

9  Mike Hayes you took the gun into evidence and you

10 documented that you were doing so, right?

11      A.    Yes.

12      Q.    Okay, and let's take a look at one,

13 Exhibit 110.  For the record, this has been marked

14 JC3765 to 3766.  Is this the evidence custody

15 receipt that you prepared when you collected Tom's

16 Jennings 9mm gun?

17      A.    Yes.

18      Q.    Okay, and this is your handwriting on the

19 evidence receipt, correct?

20      A.    Yes.

21      Q.    And it was your understanding when you

22 received the gun that you were receiving Tom's gun

23 that had been disclosed as being used in the

24 crime, correct?

25      A.    That is correct.
```



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604               Suite 101                 Suite 305
785-273-3063           Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com         913-383-1131              316-201-1612

### ROBERT L. POPPA

1      Q.    And that's information that you learned

2   from Sheriff Dunnaway prior to receiving the gun

3   from Mike Hayes, right?

4      A.    Yes.

5      Q.    And Dunnaway had informed you that he had

6   information that Tom's gun had been used in the

7   crime back at the Law Enforcement Center briefing,

8   correct?

9      A.    I'm not sure what he informed me at the

10  Law Enforcement Center.  I do know he told me that

11  Mike Hayes was going to be bringing me the gun,

12  handing me the gun at the burial site and to

13  collect it.

14     Q.    Okay, and where, where were you and

15  Sheriff Dunnaway when you had that conversation?

16     A.    I'm not, I'm not sure.

17     Q.    Okay.  Could it have been back at the Law

18  Enforcement Center?

19     A.    It could have been there or on my way

20  there, I'm not, I'm not sure.

21     Q.    Okay.  All right, Hayes had the gun back

22  at the Law Enforcement Center before the officers,

23  before you and the other officers left for the

24  burial site, right?

25     A.    He must have.  I wasn't told about it

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ROBERT L. POPPA

1    until we got at the burial site -- until he told
2    me to get it from him at the burial site 'cause
3    he didn't -- we followed him out there to the
4    burial site from the LEC, so, he must have had it
5    with him.
6        Q.   Okay, sorry to interrupt.  So, he must
7    have had it with him because you followed him in
8    the car and at the burial site --
9        A.   Right.
10       Q.   -- encountered him and he had it,
11   correct?
12       A.   Yeah, that's correct.
13       Q.   Okay.  Why did officers not take Tom's
14   gun into evidence at the Law Enforcement Center
15   before heading to the burial site?
16       A.   I have no idea.
17       Q.   When did you first learn that Tom's gun
18   was going to be turned over for evidence
19   collection?
20       A.   When Roy told me to get it from him at
21   the burial site.  I'm not sure if I was on the
22   way or already there.  I'm not sure.
23       Q.   Okay.  So, you don't remember where you
24   were at the time that you learned that Tom's gun
25   was going to be turned over, fair to say?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

2/21/2023                                                        106

## ROBERT L. POPPA

1       A.    Yes.

2       Q.    Okay.  Could have been at the burial

3  site, could have been at the car on the way over,

4  could have also been at the Law Enforcement

5  Center, correct?

6       A.    Could have been, I'm not sure.

7       Q.    Okay.  I know it's been a long time.

8       A.    Yeah.

9       Q.    Okay.  On Exhibit 110 on the right-hand

10 side here, is this your handwriting requesting

11 examination --

12      A.    Yes.

13      Q.    -- where it has ballistics, blood

14 spatter, what does that say, drug fire?

15      A.    I think -- I really don't know, tell you

16 the truth.

17      Q.    Okay, so, you were -- was it your

18 decision to request testing of this firearm and

19 put that on the evidence custody receipt or is

20 that information that you got from somewhere else?

21      A.    I was probably told to put that down per

22 that's what they wanted to test for.

23      Q.    Okay, so, just as an experienced law

24 enforcement officer, you know, you wanted the gun

25 tested because you had learned by the time you

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

ROBERT L. POPPA

```
 1   prepared this report that the, the gun had, you
 2   know, possibly been used in commission of a crime,
 3   right?
 4        A.   Yes.
 5        Q.   Okay.  You executed a search of Floyd's
 6   house, correct?
 7        A.   I was there.  I'm not sure who did the
 8   search warrant or if there was one, I'm not sure.
 9        Q.   Okay.  You participated in a search of
10   Floyd's house, right?
11        A.   Yes.
12        Q.   Okay.  Someone else prepared the search
13   warrant, but then you were assigned to
14   participate, correct?
15        A.   Yes.  I'm not sure if they did the search
16   warrant or they got permission, I'm not sure.  I
17   haven't seen it.
18        Q.   Okay.  Fair to say that you were in
19   charge of executing the search of Floyd's trailer?
20        A.   No, I would not have been.
21        Q.   Why not?
22        A.   Every search warrant we take a full
23   uniformed officer.  I wouldn't have typed up the
24   search warrant, it would have been the detective.
25        Q.   Okay, what do you mean you took a full
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

2/21/2023                                                                                                  108

### ROBERT L. POPPA

1   uniformed officer, what does that mean?

2      A.    Every search we do on a search warrant we

3   take a full uniformed officer with the detective,

4   just in case somebody gets shot, he can't say it

5   wasn't a -- he didn't know they were cops.

6      Q.    Okay, all right.  Let's take a look at

7   page 107 -- Exhibit 107, which has been marked

8   previously JC2134 to JC2136.  Actually before you

9   read that, do you remember who instructed you to

10  carry out the search of Floyd's house?

11     A.    It would have been who was in charge of

12  the search warrant.

13     Q.    Okay, and you don't remember who that was

14  as you sit here today?

15     A.    Well, here, here it says Officer Troy

16  Frost on this subject search warrants, but I don't

17  know who it would have been.

18     Q.    Okay.  It could have been Troy Frost,

19  right?

20     A.    It could have been.  Whoever got the

21  search warrant would have been the one in charge

22  of the search.

23     Q.    Okay.  All right, in this case I'll

24  represent to you that it was Detective Troy Frost

25  who was on the search warrant, so, does that



Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

1    indicate to you that he was in charge of the

2    search?

3         A.    Yes.

4         Q.    Okay, and he would have been the one who

5    requested that you execute the search, correct?

6         A.    Yes.   I'd been assisting, yes.

7         Q.    Okay.   And you didn't make the decision

8    about what, you know, whether or not to conduct

9    the search; you were simply executing the search,

10   is that right?

11        A.    That's correct.

12        Q.    Okay.   Now, let's take a look at the

13   middle of this first page.   Do you see where it

14   says, "All went to the trailer, Sergeant Poppa was

15   in charge of that search warrant?"

16        A.    Where do you see that?   Oh.   I don't know

17   why it would say that.   Guess he thought I was.

18        Q.    Okay.   So, Troy Frost thought that you

19   were in charge of the search warrant --

20        A.    Evidently.

21        Q.    -- the execution of the search of Floyd's

22   house, right?

23        A.    Evidently he did.

24        Q.    Okay, but you -- do you disagree?

25        A.    I would say whoever did the search

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ROBERT L. POPPA

1    warrant would be in charge of the search.  Troy

2    Frost was a detective.  He was higher than me in

3    rank on the case.

4        Q.   Okay, and, so, the, the November 14th of

5    1999 at approximately 8 o'clock you showed up at

6    the Law Enforcement Center along with Deputy Kyle,

7    Undersheriff Herrig, Deputy Jason Boyer, Deputy

8    Kevin Kufahl, Deputy Mark Doud, Randy Carreno, Roy

9    Dunnaway, Troy Frost, Dan Ward, Trooper Dennis

10   Tate, Detective Kirk Vernon, Special Agent Jim

11   Woods, is that correct?

12       A.   I'm sorry, I missed the first part of

13   that, of the question.

14       Q.   Sure.  On November 14th of 1999 at

15   approximately 8 a.m. you showed up at the Law

16   Enforcement Center to carry out search warrants

17   along with the list of names I just read, correct?

18       A.   I don't remember doing that, but if it's

19   in a report I did.

20       Q.   Okay.  You don't dispute what's in this

21   report, do you?

22       A.   No.

23       Q.   Okay.  All right, let's look at Exhibit

24   108 and for the record this has been previously

25   marked JC15367 and this is a one-page report



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604          Suite 101                Suite 305
785-273-3063             Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com      913-383-1131             316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

### ROBERT L. POPPA

1   signed by yourself.  Do you see that?

2        A.   Yes.

3        Q.   Okay, and it's a report about the search

4   warrant at Floyd's house, correct?

5        A.   Yes.

6        Q.   Okay, and in your report you listed the

7   officers who participated in the search, right?

8        A.   Yes.

9        Q.   And those officers in addition to

10  yourself were Detective Kirk Vernon, Deputy Mark

11  Doud, Sergeant Robert -- yourself Deputy Heather

12  Kyle, Detective Dan Ward, Jim Vanderbilt, Roy

13  Dunnaway, Troy Frost and Jim Woods, correct?

14       A.   Correct.

15       Q.   Okay.  Can you tell here what time the

16  search began?  Can you tell from your report what

17  time the search began and what time it ended?

18       A.   Says I received it at 8:30 a.m. on the

19  14th and I'm not sure who handed it to me.  Said

20  the search started at 9:08 a.m. and the search

21  ended at 12:51 p.m.

22       Q.   Okay.  So, the search began at 9:08 a.m.

23  on November 14th and it didn't conclude until

24  12:51 p.m., correct?

25       A.   That is correct.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604                 Suite 101                    Suite 305
785-273-3063            Overland Park, KS 66212        Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

## ROBERT L. POPPA

1    Q.    And during that time there were about

2    eight officers plus Jim Vanderbilt searching

3    Floyd's trailer, correct?

4         MR. LINDEN:  Object to form.

5    A.    I don't know who was actually doing the

6    searching, but they were there.

7    BY MS. BROWN:

8    Q.    Okay.  During the course of the search

9    there were at least eight officers there, correct?

10   A.    Yes.

11   Q.    And the search took over 3.5 hours to

12   complete, correct?

13   A.    Yes.

14   Q.    During the search your team collected 21

15   exhibits of evidence, is that right?  Let me see

16   if I can direct you to the right spot.  Oh, yeah,

17   do you see that on your report --

18   A.    Yes.

19   Q.    -- during the search 21 exhibits of

20   evidence were collected?

21   A.    Yes.

22   Q.    That's accurate, correct?

23   A.    Yes.

24   Q.    And 34 photographs were taken during the

25   search, correct?


5111 SW 21st Street       6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604          Suite 101                 Suite 305
785-273-3063              Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com       913-383-1131              316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## ROBERT L. POPPA

1      A.    Yes.

2      Q.    Let's look at Exhibit 101 and we're going

3  to go to 5041.

4      A.    Okay.

5      Q.    Okay, and this is a photo log of the

6  search of Floyd's residence on November 14th of

7  1999, correct?

8      A.    Yes.

9      Q.    Okay, so, fair to say that during the

10 search warrant, the execution of the search of

11 Floyd's trailer that you participated in every

12 room in Floyd's house was searched for evidence

13 that could connect him with the murder?

14     A.    I would say so, yes.

15     Q.    Okay.  So, the kids' bedroom was

16 searched, right?

17     A.    Yes.

18     Q.    The bathroom was searched?

19     A.    Yes.

20     Q.    The hallway was searched?

21     A.    Yes.

22     Q.    Camille's room was searched?

23     A.    Yes.

24     Q.    The north and south hallway closets were

25 searched?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1      A.    Yes.

2      Q.    The living room was searched?

3      A.    Yes.

4      Q.    The kitchen was searched?

5      A.    Yes.

6      Q.    The hallway south of the kitchen was

7  searched?

8      A.    Yes.

9      Q.    The master bedroom was searched?

10     A.    Yes.

11     Q.    And then the area outside of the trailer

12  in every direction, north, south, east and west

13  was searched as well, correct?

14     A.    Yes.

15     Q.    And you also searched in Floyd's trash,

16  correct?

17     A.    It doesn't say on here.

18     Q.    Do you recall?  I can show you an exhibit

19  if that would be helpful to refresh your

20  recollection.

21     A.    I know that we looked in the burn pile

22  stuff and the well, but I'm not sure what day that

23  was on.

24     Q.    Let's take a look at Exhibit 107.  Do you

25  see that?


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

```
 1        A.    Okay.

 2        Q.    All right, on the second page of the

 3   exhibit, which is JC2135, towards the top do you

 4   see that Frost has noted here, "I, meaning Frost,

 5   went to the trailer, stayed outside mostly

 6   searching in the woods and in the trash barrel

 7   around the trailer.  In the trash barrel was part

 8   of a envelope and on the envelope it said open

 9   second."  Do you see that?

10        A.    No.

11        Q.    Are you on Exhibit 107, the second page

12   of Exhibit 107?

13        A.    I'm on 107.  Is it --

14              MR. TURNER:  It's up here.  (Indicating)

15   BY MS. BROWN:

16        Q.    On page 2 of 107?

17        A.    In the trash barrel was part of an

18   envelope, is that the section?

19        Q.    Yeah.  Yes.

20        A.    Okay.

21        Q.    Okay, so, reading that section, does that

22   refresh your recollection that Floyd's trash was

23   searched as part of the execution of the search

24   warrant on November 14th of 1999?

25        A.    I would have to say yes, trash barrel
```



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604            Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

ROBERT L. POPPA

```
 1   would be outside.
 2        Q.    Okay.  And no search was done, to your
 3   knowledge, like this of Tom's house, correct?
 4        A.    I don't know of any search being done at
 5   Tom's house.
 6        Q.    Okay.  Any idea why Tom's house was not
 7   subjected to the same degree of scrutiny as
 8   Floyd's house?
 9        A.    No, ma'am.
10        Q.    Okay.  Do you have any explanation for
11   why Tom's house was not searched in the same
12   manner as Floyd's house?
13        A.    I really have no idea.
14        Q.    Okay, and just based on your own law
15   enforcement -- I'm sorry, were you done?
16        A.    Yes.
17        Q.    Okay.  Based on your law enforcement
18   experience, Tom's house should have been searched
19   in the same thorough manner in which you searched
20   Floyd's house, right?
21        A.    I guess it would depend whether they
22   thought he was the suspect.
23        Q.    Well, you know, by November 14th he had
24   turned himself in for the crime and handed over
25   the gun, the victim was found buried behind the
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## ROBERT L. POPPA

1  house where he lived, and he had admitted

2  involvement in, in the crime, correct?

3       A.   Yes, at first, yes, I heard.

4       Q.   Okay, and he had left those answering

5  machine messages that we'd read earlier --

6       A.   Right.

7       Q.   -- that amounted to a confession for

8  murder, right?

9       A.   Right.

10      Q.   Okay, and at some point he started saying

11 that Floyd did it, right?

12      A.   He must've.  Floyd was charged with it.

13      Q.   But Floyd denied involvement in Camille's

14 death, right?

15      A.   He did to me, yes.

16      Q.   Okay.  So, based on your law enforcement

17 experience, given those circumstances, Tom's house

18 should have been searched in a thorough manner

19 just like Floyd's house, right?

20      A.   Possible, if they thought they had enough

21 evidence to search it.

22      Q.   Okay, and would you agree with me that

23 confessing to murder on answering machine

24 messages, turning yourself in for a crime, handing

25 over the murder weapon which is your gun, and

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street     6420 W. 95th Street     800 E. 1st Street
Topeka, KS 66604        Suite 101               Suite 305
785-273-3063            Overland Park, KS 66212 Wichita, KS 67202
www.appinobiggs.com     913-383-1131            316-201-1612

## ROBERT L. POPPA

1  identifying the location of the body of the victim

2  who's buried behind the house where you live,

3  that's enough evidence to get a search warrant to

4  search your house, right?

5       A.   Well, I'm not sure of all the

6  investigation that went into interviews with Tom,

7  what he had told them that would make them think

8  they should search it.  I'm not sure, ma'am.  That

9  would be a question maybe Randy Carreno or

10  somebody could answer, I guess.

11      Q.   Okay.  So, in order to answer the

12  question of whether Tom's house should have been

13  searched you would want to know what Tom had said

14  during interviews between when he turned himself

15  in and November 14th of 1999, is that right?

16           MR. TURNER:  Object to form.

17      A.   I'd want to see all the evidence.  I

18  haven't seen all the evidence or heard all the

19  testimony to make the decision whether a search

20  warrant was warranted or not, but Randy Carreno

21  would have been the one interviewing Tom that

22  would know that.

23      BY MS. BROWN:

24      Q.   Okay.  Let's take a look at Exhibit 108

25  again.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                  316-201-1612

## ROBERT L. POPPA

```
 1        A.    Okay.
 2        Q.    Okay, do you see the date at the top of
 3   the report?
 4        A.    Yes.
 5        Q.    Okay, do you see where it says 1-19-2000,
 6   time 1743?
 7        A.    That would have been the date the report
 8   was typed, I believe.
 9        Q.    Okay, and that was the date the report
10   was typed by yourself, correct?
11        A.    Or was printed.  Could have been when
12   it's printed.  I'm not sure.  I don't know why
13   that would read 1-19 of 2000.
14        Q.    Okay.
15        A.    That's a ways off from when this
16   happened, so, I'm not sure how that got that way.
17        Q.    Okay.  You also participated in the
18   search of Floyd's car on November 14th in addition
19   to searching his trailer, correct?
20        A.    Right.
21        Q.    And were you supervising that search?
22        A.    I don't remember.
23        Q.    Okay, is it the same as the search of the
24   trailer, you know, your recollection is whoever
25   signed the search warrant would have been in
```



5111 SW 21st Street          6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604             Suite 101                 Suite 305
785-273-3063                 Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

### ROBERT L. POPPA

1  charge of the search?

2      A.   I would say the person who wrote the

3  search warrant would be in charge of the search,

4  in my opinion.

5      Q.   Okay.  And Troy Frost at that time was a

6  detective that was senior to you, is that right?

7      A.   Yes.  Once a case is given to the

8  detectives from road patrol they are in charge of

9  that case.

10     Q.   Okay.  Let's take a look at Exhibit 107.

11 This is Troy Frost's report again about the

12 search.  Do you see in the middle of the page --

13 let me know when you're there.

14     A.   Okay, I'm there.

15     Q.   The second page of Exhibit 107.

16     A.   Okay.

17     Q.   Do you see where it says November 14th,

18 1999, at approximately 1353?

19     A.   I guess I don't.  Can you point it out to

20 me or --

21     Q.   Yeah, it's in the middle of -- are you

22 looking at Exhibit 107 at page 2?

23     A.   Okay.

24     Q.   Okay, in the middle of that second page

25 there's, there's some headings of times, do you



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

### ROBERT L. POPPA

1    see that?

2        A.    Okay.

3        Q.    And one of those is 1353?

4        A.    Yes, I see that.

5        Q.    Okay.  I'm wondering from reviewing this

6    report if you can identify for me, you know, when

7    the search of the vehicle began and when it

8    concluded?

9        A.    The way this is written it's kind of hard

10   to tell.

11       Q.    Well, it looks to me that it began at

12   1353 and it ended at 1521 on November 14th of

13   1999.  Do you disagree with that?

14       A.    I would have to say that may be what that

15   means.  He didn't put on here end of search, which

16   you normally would.  Just like at the top he

17   should have put search began, but I guess that's

18   what he meant, yeah, 15 --

19       Q.    Okay.  He wrote, you know, we went to the

20   evidence barn to do the search warrant of the

21   vehicle.  That's the only reason you were in the

22   evidence barn, right?

23       A.    Yes, that's correct.

24       Q.    Okay.  So, you arrived at the evidence

25   barn 1353 and you left at 1521, right?



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## ROBERT L. POPPA

1    A.   Yes, yes, I -- yes, that's correct, I see

2    it now.

3    **Q.   Okay.  So, and there were multiple**

4    **officers involved in the search of the vehicle,**

5    **correct?**

6    A.   I'm not exactly sure who all was

7    involved.  If I had a copy of the search warrant

8    I could tell you, their names should be on it.

9    **Q.   Okay.  It took about an hour and a half**

10   **to search for, search Floyd's car, right?**

11   A.   Yes.

12   **Q.   And it was checked for blood and semen,**

13   **right?**

14   A.   Says here that Dan Ward from Lawrence PD

15   checked for blood and semen.

16   **Q.   Yes.  So, the car was checked for blood**

17   **and semen, right?**

18   A.   Yes, yes, that's correct.

19   **Q.   And it was checked for all manner of**

20   **evidence, correct?**

21   A.   Any evidence that may have pointed toward

22   the crime that he'd, saying he had committed a

23   crime or had her in the car, yes.

24   **Q.   Okay.  And, you know, took an hour and a**

25   **half to complete the search, so it was a pretty**

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

2/21/2023                                                                123

## ROBERT L. POPPA

1    comprehensive search, fair to say?

2        A.    Yes.

3        Q.    Okay, and the trunk of the car was taken

4    off the car to assist in the search, right?

5        A.    Yes.

6        Q.    Okay.  Do you -- did you ever learn at

7    any time that Tom's car was searched in any way in

8    connection with the Arfmann homicide

9    investigation?

10       A.    Not that I know of.

11       Q.    Okay.  Do you have any explanation for

12   why Tom's truck was not searched in the same way

13   that Floyd's car was?

14       A.    The only thing I can think of is they

15   didn't -- ruled him out as a suspect, that's the

16   only thing I could think of.  I don't know why.

17       Q.    That Tom had been ruled out as a suspect?

18       A.    I would have to say so, that's why they

19   didn't search it, I guess.  I don't know.

20       Q.    And do you have any information as you

21   sit here today that would have excluded Tom as a

22   suspect from the crime?

23       A.    No, I have no idea why they made that

24   decision.

25       Q.    Okay, and knowing now that Tom had

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**ROBERT L. POPPA**

1    committed suicide and confessed in his suicide
2    note saying he committed the crime, do you think
3    it was the right decision not to search his car?
4        A.   I don't know if they -- I really don't
5    know.  Probably should have searched it, but I'm
6    not sure what information they had or why they
7    didn't.  You know, I wasn't in charge of that.
8        Q.   Uh-huh, okay.  So, probably they should
9    have searched it, but you weren't the one making
10   decisions, fair to say?
11       A.   Yes, ma'am.
12       Q.   In addition to searching Floyd's trailer
13   and Floyd's car on November 14th did you also
14   participate in a search of the burial site?
15       A.   Where the girl was.
16       Q.   Yeah.
17       A.   Yes, I helped dig her up.
18       Q.   Okay, yes, and let me clarify.  What I
19   mean is on November 14th, so, after her -- you
20   know, a week after her body had been found and you
21   were executing the searches of Floyd's trailer and
22   Floyd's car did you also participate in a search
23   on November 14th of the burial site?
24       A.   I don't remember.
25       Q.   Can't remember, okay.



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

ROBERT L. POPPA

```
1        A.    No, ma'am.

2        Q.    Okay.  Back to the night of November --

3   excuse me, the morning of November 8th of 1999, at

4   some point before Camille's body was removed from

5   the ground a coroner by the name of Doctor

6   Mitchell arrived, is that correct?

7        A.    Yes.

8        Q.    Okay, and you spoke with him that

9   morning, right?

10       A.    I'm sure I spoke with him, yes.

11       Q.    Okay.  He was given a briefing with some

12  initial information when he arrived, right?

13       A.    I'm not sure who briefed him.  It wasn't

14  me.  We guarded the scene until the coroner got

15  there.

16       Q.    Can you say that again?

17       A.    I'm not sure who briefed Mr. Mitchell or

18  who called him, but we guarded the scene until the

19  coroner gets there.  We never move a body unless

20  the coroner looks at it.

21       Q.    Got it.  Okay, and fair to say that

22  someone would have given Doctor Mitchell a

23  briefing when he arrived with initial information

24  about the investigation, is that right?

25       A.    Oh, yes.  I think he would have demanded
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

# ROBERT L. POPPA

1   it.

2        Q.   Okay, and do you recall whether it was

3   you who gave him that briefing or someone else?

4        A.   It wasn't me.  I didn't call him to the

5   scene.  Whoever called him on the phone would have

6   briefed him.

7        Q.   He would have gotten briefed on the phone

8   before he arrived?

9        A.   Yes.

10       Q.   Okay, and he also would have been briefed

11  -- do you think he also would have been briefed

12  immediately upon his arrival as well?

13       A.   I'm sure.  I'm not sure who did that.

14       Q.   Okay.  Could have been you, could have

15  been someone else?

16       A.   Could have been, yes.

17       Q.   Okay.  Let's take a look at his autopsy

18  report, which is Exhibit 111.  And for the record,

19  this has been Bates marked JC4748 to JC4758.

20  Okay, and I'll represent to you that this is

21  Doctor Mitchell's autopsy report for Camille

22  Arfmann's body, okay?

23       A.   Okay.

24       Q.   Okay, do you see at the top of the second

25  page Doctor Mitchell has a listing of some initial



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## ROBERT L. POPPA

1    information that he received from sheriff's

2    investigators?

3        A.    Yes.

4        Q.    Okay.  So, sheriff's investigators

5    indicated that Camille had disappeared after

6    coming home from school.  A law enforcement search

7    had failed to find her.  She was found after law

8    enforcement was contacted and given information as

9    to her whereabouts, you see that?

10       A.    Yes.

11       Q.    Okay, so, a sheriff's investigator,

12   possibly yourself or someone else, gave initial

13   briefing to Doctor Mitchell about the

14   investigation, is that fair to say?

15       A.    Wouldn't have been me.  It was somebody

16   else.

17       Q.    Okay, any idea who it might have been?

18       A.    I would have to guess one of the

19   detectives or Sheriff Dunnaway.

20       Q.    Okay, so, Dunnaway, Carreno, or another

21   one of the detectives?

22       A.    Yes, they would have called, called the

23   coroner.

24       Q.    Okay.  If we look -- if we scroll down

25   to, let's see, page 9 of this report, and if



## ROBERT L. POPPA

1  you'll look at the screen for a second you'll see

2  my highlighted section there.

3       A.   Okay, I got it.

4       Q.   Do you see that?

5       A.   Yes.

6       Q.   All right, do you see where it says, "The

7  initial information indicated the possibility of

8  an attempted sexual adventure by the perpetrator.

9  The suspect was then believed to have shot the

10  decedent possibly more than once." Do you see

11  that?

12       A.   Yes.

13       Q.   Okay.  So, Mitchell was given initial

14  information during, you know, initial briefing by

15  Jefferson County officers that there was the

16  possibility of an attempted sexual adventure,

17  correct?

18       A.   It could have been.  Since her, her bra

19  was pulled up when she was found it could have

20  been.  Somebody could have told him that or he

21  came across that himself, I don't know.

22       Q.   Okay.  So, you don't know what he's

23  referring to here when he wrote that the initial

24  information indicated the possibility of an

25  attempted sexual adventure by the perpetrator?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### ROBERT L. POPPA

1      A.   I'm not, I'm not sure if he found that

2   out on his own or he was told that, I'm not sure.

3   I've never, I've never seen this report.

4      **Q.   Okay.  Okay.  Did you learn in your**

5   **briefing from Sheriff Dunnaway on the night of**

6   **November 7th that there was a possibility of a**

7   **sexual crime of Camille?**

8      A.   No, not that I can recall.

9      **Q.   Okay.  Okay, after Doctor Mitchell**

10  **received, you know, an initial information about**

11  **the investigation he went to the ditch where you**

12  **and Troy Frost had begun to unearth Camille's**

13  **body, is that right?**

14     A.   Yes.

15     **Q.   And he climbed down into the ditch with**

16  **you, right?**

17     A.   Right.

18     **Q.   And you worked to uncover Camille's body**

19  **and you and Mitchell lifted her out and put her in**

20  **a body bag, is that right?**

21     A.   It's I believe me, Mitchell and Mr.

22  Barnett, the funeral, guy from the funeral home

23  put her in the bag.

24          MS. BROWN:  Okay.  All right, let's take

25  a look at Exhibit 113.  Actually, you know what,

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

1    I'm sort of at a good stopping point.  It's 12:35.

2    How do people feel about taking a lunch break?

3              MR. QUALSETH:  I'm in favor.

4              MR. NORTON:  Ruth, what are you thinking

5    as far as the afternoon?  A few hours or an hour?

6    Not holding you to it, just curious.

7              MS. BROWN:  Yeah, I'm terrible at

8    predicting.  I think maybe, I would guess maybe

9    two more hours, maybe a little more.

10             MR. NORTON:  Okay.

11             MS. BROWN:  But I'm terrible at

12   predicting.

13             MR. NORTON:  Yeah, I understand.  Let's

14   go ahead and take lunch.  What do you guys think,

15   30 minutes again?  Ruth, is that --

16             MS. BROWN:  Sounds good.  Yeah, that

17   works for me.  So, let's come back at 1:05.

18             THE VIDEOGRAPHER:  Time is approximately

19   12:35 p.m., we're going off the record.

20             (THEREUPON, a recess was taken for

21   lunch.)

22             THE VIDEOGRAPHER:  Time is approximately

23   1:13 p.m., we're back on the record.

24        BY MS. BROWN:

25        Q.   Okay, Officer Poppa, at one point during


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

```
 1   the Arfmann homicide investigation you
 2   investigated a pumping well, is that right?
 3        A.   A well?
 4        Q.   Yes.
 5        A.   At, I believe it was at Floyd's house,
 6   trailer house.
 7        Q.   Okay, and did you look at the well -- did
 8   you investigate the well at Detective Carreno's
 9   direction?
10        A.   I really don't remember.  I believe we
11   were just looking during the search and looked in
12   it 'cause we found it.  I'm not sure if anybody
13   was given a direction to do it or not.
14        Q.   Okay.  Let's take a look at Exhibit 10.
15   Actually why don't we start with -- sorry, let's
16   start with your report which I believe is 113.
17   So, let's take a look at Exhibit 113 and then
18   after that we're going to look at 110.
19        A.   Okay.
20        Q.   Okay, so, for the record, Exhibit 113 has
21   been Bates-stamped JC2105 to 2106 and do you
22   recognize this exhibit?
23        A.   Yes.
24        Q.   Okay, what is it?
25        A.   This would be my report.
```

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

132

### ROBERT L. POPPA

1      Q.    Okay, this is your handwriting, correct?

2      A.    Yes.

3      Q.    Okay, why don't you take a minute to

4   review it and let me know when you're done.

5      A.    Okay.  Okay, I'm done.

6      Q.    Okay.  Great.  Now, let's also take a

7   look at Exhibit 10 which is Randy Carreno's report

8   and I'd like to direct your attention to page 19.

9      A.    Okay.

10      Q.    Okay, towards the bottom of page 19, let

11   me know when you're there.

12      A.    I'm there.

13      Q.    Okay, do you see towards the bottom,

14   second paragraph from the bottom it says, "On

15   November 10th, 1999, at 1510 hours Sergeant Poppa

16   and I had contact with Gary D. Bledsoe.  Gary D.

17   Bledsoe owns the properties located at 14830,

18   15200, and 15394 Fairview Road," do you see that?

19      A.    Yes.

20      Q.    Okay, then it says here that "I, meaning

21   Carreno, explained to Gary D. Bledsoe that we were

22   interested in searching the field areas and

23   pumping well that was located at 15200 Fairview

24   Road.  Gary D. Bledsoe stated he would allow the

25   search of the property but wouldn't allow the

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# ROBERT L. POPPA

```
1    search of the trailer located at 15200 Fairview
2    Road."  All right, let's stop there.  So, does
3    reviewing this report help you remember that you
4    and Randy Carreno investigated a pumping well on
5    Gary D. Bledsoe's property?
6        A.   Yes.
7        Q.   Okay.  Now, Camille's body was not
8    discovered near this well, is that right?
9        A.   That's right.
10       Q.   And when Tom Bledsoe gave an account of,
11   implicating Floyd in the murder Tom Bledsoe never
12   mentioned the well, right?
13       A.   I never talked to Tom, so, I'm not sure.
14       Q.   Yeah, but you heard generally about what
15   Tom was accusing Floyd of, right?
16       A.   Yes.
17       Q.   Okay, and in what you had heard about
18   Tom's accusations of Floyd you never heard Tom
19   say, you know, make any allegations about the
20   pumping well being involved, right?
21       A.   I never heard anybody say anything about
22   the pumping well being involved.
23       Q.   Okay, and there was no -- to your
24   knowledge, the investigation did not uncover any
25   evidence that the pumping well had anything to do
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street       6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604          Suite 101                 Suite 305
785-273-3063              Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com       913-383-1131              316-201-1612

ROBERT L. POPPA

1    with Camille's death, is that right?

2        A.    That's right.

3        Q.    Okay.  You and Randy Carreno recovered

4    three pieces of blue jean cloth in the well,

5    right?

6        A.    In the burn pile.

7        Q.    Yes, okay.

8        A.    Yes.

9        Q.    Okay, and they were partially burnt, is

10   that right?

11       A.    Yes.

12       Q.    And you've documented in the exhibit that

13   we were just looking at your search of, you know,

14   related to the pumping well, right?

15       A.    Right.

16       Q.    Okay.  And you've documented in an

17   evidence receipt the blue jean cloth that was

18   collected during the search, right?

19       A.    I'm not sure if I, I collected it or

20   Randy.  I don't remember.

21       Q.    One of the two of you would have --

22       A.    Yes.

23       Q.    -- documented --

24       A.    I'm sorry, yes.

25       Q.    Okay.  And let's read a little bit more

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ROBERT L. POPPA

1  of Randy Carreno's report here.  Okay, do you see

2  where it says, "During the search I seized three

3  partially burnt pieces of blue jean cloth?"  This

4  is towards the middle, top middle of page 20.

5           MR. TURNER:  Next page.

6      A.   Oh, I'm sorry, I'm on the wrong page.

7  Yes.

8      BY MS. BROWN:

9      Q.   Okay, so, Randy Carreno wrote in his

10  report that during the search, "I, meaning Randy

11  Carreno, seized three partially burnt pieces of

12  blue jean cloth from inside the pumping well.  The

13  items were seized and packaged as evidence to be

14  sent to the Kansas Bureau of Investigation for

15  laboratory examination.  See KBI evidence custody

16  receipt," and then it continues, "Floyd S. Bledsoe

17  arrived at his residence during the search.  I

18  advised Floyd S. Bledsoe of the purpose of the

19  search.  I told Floyd S. Bledsoe that three

20  partially burnt pieces of blue jean cloth were

21  seized from inside the pumping well." Do you see

22  that?

23      A.   Yes.

24      Q.   Okay, so, do you recall that Floyd

25  arrived in the middle of the search of this



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## ROBERT L. POPPA

1    pumping well?

2         A.    Yes.

3         Q.    Okay, and Randy Carreno asked Floyd in

4    your presence about the jean material that had

5    been found in the pumping well, right?

6         A.    I'm sure he did.

7         Q.    All right, well, let's read Randy

8    Carreno's report here.  It says Floyd Bledsoe,

9    just continuing on where we left off, "Floyd

10   Bledsoe stated the seized items were from a pair

11   of blue jeans that he had burnt.  I asked Floyd

12   Bledsoe why he would burn a pair of pants.  Floyd

13   Bledsoe stated that he had been wearing the jeans

14   approximately two weeks ago.  Floyd S. Bledsoe

15   stated that he was digging dirt and the jeans got

16   covered with the dirt.  Floyd S. Bledsoe stated

17   that the jeans were not worth keeping.  I, meaning

18   Randy Carreno, told Floyd S. Bledsoe that I'd

19   never known him to wear a decent or clean pair of

20   jeans.  Floyd S. Bledsoe started to shake and

21   appeared to start crying when he stated, you've

22   got to believe me.  I told Floyd S. Bledsoe that

23   the seized items were going to be sent to the KBI

24   for examination.  Floyd S. Bledsoe asked me again

25   to believe him and that he had the nothing to do



5111 SW 21st Street        6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604           Suite 101                Suite 305
785-273-3063               Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com        913-383-1131             316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

ROBERT L. POPPA

1   with Zetta's death."  Do you see that?

2       A.    Yes.

3       Q.    Okay.  So, fair to say that Carreno asked

4   Floyd questions about the jeans at the time that

5   Floyd arrived during the middle of this pumping

6   well search?

7       A.    Yes.

8       Q.    Okay, and you were present when Carreno

9   was asking Floyd about the jeans, correct?

10      A.    I believe I was.  I don't know if he was

11  asking in his car with the door shut or he was

12  outside the car, I don't remember, but I was there

13  when Floyd showed up.

14      Q.    Okay, and do you remember Floyd showing

15  up?

16      A.    Ma'am, I really don't.

17      Q.    Okay.  All right, fair to say that you

18  and Carreno conducted a thorough investigation of

19  the pumping well?

20      A.    Yes.

21      Q.    Okay, and you never heard about any

22  forensic evidence that connected this blue jean

23  cloth to Camille's death, right?

24      A.    Right.

25      Q.    Okay, and you didn't find any evidence

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

ROBERT L. POPPA

1    that contradicted Floyd's account of why he had

2    burned the jeans in the pumping well, right?

3        A.    Correct.

4        Q.    And you didn't find any evidence that

5    contradicted Floyd's account about when the jeans

6    had been burnt in the pumping well, right?

7        A.    Right.

8        Q.    Okay.  You also on November 10th of 1999

9    searched a large brush pile east of Floyd's

10   trailer with Randy Carreno, right?

11       A.    Right.

12       Q.    Okay, and you didn't find anything

13   incriminating in the large brush pile, correct?

14       A.    Correct.

15       Q.    Any idea why the investigative team

16   prioritized conducting a search of the pumping

17   well and the large brush pile over conducting a

18   search of Tom's car?

19            MR. TURNER:  Object to form.

20       A.    I have no idea why they made that

21   decision.

22       BY MS. BROWN:

23       Q.    Okay, any idea why the investigative team

24   prioritized conducting a search of the pumping

25   well and the large brush pile over conducting a

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### ROBERT L. POPPA

1    search of Tom's house?

2        A.    I have no idea why, ma'am, why they made

3    that decision.

4        Q.    **Okay, to your knowledge did any officers**

5    **look into whether any of Tom's clothing was**

6    **connected to Camille's death?**

7        A.    Not that I'm aware of.

8        Q.    **To your knowledge, did officers look into**

9    **whether any of Tom's trash was connected to**

10   **Camille's death?**

11       A.    Not that I know of.

12       Q.    **Do you know why the decision was made not**

13   **to search Tom's clothing and Tom's personal trash?**

14       A.    No, ma'am, I do not.

15       Q.    **Okay.  Let's take a look at Exhibit 101**

16   **and I'd like to direct your attention to page**

17   **5030.**

18       A.    5030.  Okay.

19       Q.    **Okay, and there's a note here signed by**

20   **yourself on November 18th of 1999, correct?**

21       A.    Yes.

22       Q.    **Okay, and it's a one-page handwritten**

23   **report regarding events on November 15th of 1999,**

24   **correct?**

25       A.    Correct.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

ROBERT L. POPPA

1    Q.    Okay, and so after -- do you want -- why

2  don't you take a minute and review this page and

3  let me know when you're done.

4    A.    Okay.  I'm done.

5    Q.    Okay, so, on November 15th of 1999 after

6  Floyd had been arrested you were waiting with him

7  during a court appearance and you documented a

8  conversation that you had with him, right?

9    A.    Right.

10   Q.    And during that conversation Floyd asked

11 you how many guns were found at his father's

12 house, right?

13   A.    Right.

14   Q.    And he was referring -- by his father's

15 house he was referring to the house where his

16 parents lived with Tom, right?

17   A.    Yes.

18   Q.    Okay, so, he was asking you how many guns

19 had been found at the house where Tom lived,

20 correct?

21   A.    Correct.

22   Q.    Okay, and at that time did you know

23 whether law enforcement officers had carried out a

24 search of Tom's house and inventoried the guns

25 that were present there?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

1      A.    I didn't know anything about it until he

2  asked me this --

3      Q.    **Okay, so after -- I'm sorry, please**

4  **continue.**

5      A.    About the guns.  I didn't know anything

6  about them going in there for any guns.

7      Q.    **You didn't think about them, you didn't**

8  **think about law enforcement officers searching**

9  **Tom's house for guns?**

10          MR. TURNER:  Object to form.

11     A.    No, I said I didn't know they'd gone

12  there for guns until he asked me.

13          BY MS. BROWN:

14     Q.    **Oh, I see.  Okay, and, so, are you**

15  **telling me -- as you sit here today do you know**

16  **whether or not law enforcement officers searched**

17  **Tom's house to inventory the guns that were**

18  **present there?**

19     A.    I'm not sure.  This is just what Floyd is

20  saying.  I'd have to ask Randy, I guess.  I

21  didn't know they went there to search for anything

22  or got guns from there or anything.

23     Q.    **Okay.  You didn't hear -- you don't**

24  **recall having heard during the investigation in**

25  **1999 and 2000 that law enforcement officers went**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

1  to Tom's house and inventoried the guns found

2  there, right?

3      A.   If I did, I don't remember.

4      Q.   Okay, and, so, after Floyd asked you --

5  you know, Floyd was inquiring about the guns at

6  Tom's house, did you -- did you follow up with

7  detectives such as Randy Carreno to make sure that

8  the detectives investigated what guns were present

9  at Tom's house?

10     A.   If I did I don't remember.

11     Q.   You don't remember one way or another

12 whether you did or didn't?

13     A.   I just don't remember this even happening

14 with the guns, Randy going there, so, I'm not sure

15 I talked to Randy about it or not.

16     Q.   Got it, okay.  Okay, at the court, at the

17 courthouse while you were with Floyd waiting with

18 him for a hearing Floyd asked if you were still

19 looking into the case, right?

20          MR. TURNER:  Object to form.

21     A.   Let me look real close here.  Yes, that's

22 right.

23     BY MS. BROWN:

24     Q.   Okay, so, on November 15 Floyd Bledsoe

25 asks you if law enforcement officers were still



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

ROBERT L. POPPA

1   looking into the Arfmann case, right?

2       A.    Right.

3       Q.    And you told him yes, that you were,

4   right?

5       A.    Right.

6       Q.    And he said to you, good, please keep

7   looking --

8       A.    Right.

9       Q.    -- is that right?  Okay.  All right,

10  Floyd was -- Floyd was administered a polygraph by

11  a KBI agent by the name of George Johnson on

12  November 12th, right?

13      A.    I'm not sure exactly when that was done.

14  I know he took a polygraph from a KBI agent,

15  polygraph examiner.

16      Q.    Okay, and in connection with the

17  polygraph the KBI agent interviewed -- scratch

18  that.  Okay, and Tom was also administered a

19  polygraph by a KBI agent around the time of

20  November 12th of 1999, correct?

21      A.    I knew he took one.  I don't remember

22  what day it was.  I was told Floyd and Tom took a

23  polygraph.

24      Q.    Okay, and you were not in the room during

25  the polygraph examinations of Floyd or Tom,

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

```
 1   correct?
 2       A.    That's correct.
 3       Q.    But you watched parts of the polygraph
 4   interviews of Floyd and Tom, correct?
 5       A.    I don't remember doing that.
 6       Q.    Okay, let's take a look at exhibit, let's
 7   see here -- it's Exhibit 123 and it's a video,
 8   sir, so, you're going to have to observe it on my
 9   screen, okay?
10       A.    Okay.
11       Q.    Just a second here.  Can you see the
12   video?
13       A.    Yes.
14       Q.    Okay.  All right, give me one second,
15   hold on.  Technical issues, I'll be right with
16   you.  Okay, I'm going to show you a clip of the
17   video and then I'll ask you some questions
18   afterwards.
19       A.    Okay.
20             THE VIDEOGRAPHER:  Ruth, are you still
21   there?  I think she froze.  I'll take us off the
22   record.  Time is approximately 1:35 p.m., we're
23   going off the record.
24             (THEREUPON, an off the record discussion
25   was held.)
```



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604         Suite 101                Suite 305
785-273-3063             Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com      913-383-1131             316-201-1612

## ROBERT L. POPPA

1        THE VIDEOGRAPHER:  Time is approximately

2    1:37 p.m., we're back on the record.

3        BY MS. BROWN:

4        **Q.   Okay, I'm showing you what's been marked**

5    **as Exhibit 123 and this is the video of your**

6    **interrogation of Floyd that you reviewed in**

7    **preparation for this deposition, correct?**

8        A.   Yes, that's my interview with Floyd.

9        **Q.   Okay.  I'm going to play a clip for you**

10   **and then ask a few questions.**

11       A.   Okay.

12            (Video clip was played.)

13       A.   I can't hear what I'm saying.

14       BY MS. BROWN:

15       **Q.   Can you see that, Officer Poppa?**

16       A.   I sound mumbled.  I can't understand what

17   I'm saying.

18            THE VIDEOGRAPHER:  You may need to turn

19   it up a little bit more.  I'll try to help on my

20   end.

21            MS. BROWN:  That would be great.  I think

22   I'm at max volume over here.  Okay, I'm going to

23   start it again.

24            (Video clip was played.)

25       BY MS. BROWN:



5111 SW 21st Street       6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604          Suite 101                Suite 305
785-273-3063              Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com       913-383-1131             316-201-1612

## ROBERT L. POPPA

1     Q.    Okay, so, when you told Floyd during this
2  recording, "I know about the polygraph, I sat here
3  and watched Tom," you know, what you meant was
4  that you had watched Tom during the polygraph
5  through the video feed, is that right?
6     A.    I'm not sure what I meant by that.  I'm
7  not sure if I meant I watched Tom at a different
8  time or I watched Tom then.
9     Q.    Okay.  You didn't directly interrogate
10 Tom at any time, did you?
11    A.    No, I did not.
12    Q.    And you were not in the room with Tom
13 when he was getting his polygraph administered,
14 right?
15    A.    Not that I believe -- that I remember.
16    Q.    Okay.  But it's possible that you watched
17 Tom during his polygraph exam through the video
18 feed, is that right?
19    A.    I'm not sure if I did or not.
20    Q.    You can't remember one way or another?
21 Maybe you did, maybe you didn't?
22    A.    I heard the results of it, but I don't
23 know if I was watching or not.
24    Q.    Okay.  So, when you said "I sat here and
25 watched Tom" to Floyd, were you being truthful?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

1      A.   Yes.

2      Q.   Okay, and what were, what were you

3 referring to?

4      A.   I watched Tom when he, when he was

5 talking to Randy Carreno and Mike Hayes and then

6 he was asked if he had sex with the family dog

7 and I might have watched some more of it, but I

8 just don't remember exactly how much more I would

9 have watched.  I'd tell you if I knew but I just

10 can't remember.

11      Q.   Okay, got it, and the interview that

12 you're talking about is one that was taken around

13 the time of November 7th to November 10th,

14 somewhere in that three-day time frame?

15           MR. TURNER:  Object to form.

16      A.   I guess.  Whenever they, Randy Carreno

17 and Mike Hayes was in there interviewing me.  I'm

18 not sure exact date.

19      BY MS. BROWN:

20      Q.   Okay.  Well, I guess what I'm wondering

21 is approximate time frame.  It was pretty soon

22 after Tom had turned himself in for the crime or

23 was it weeks later?

24      A.   I don't believe it was weeks later.  I'm

25 pretty sure -- I'm pretty sure it would have been



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

## ROBERT L. POPPA

1   soon, but it wouldn't have been weeks I wouldn't

2   think.

3        Q.   Okay, got it.  Okay, do you recall

4   whether you watched through the video feed any

5   parts of Tom's polygraph interview with George

6   Johnson?

7        A.   I really don't remember.  I'm not saying

8   I didn't.  I just don't remember.

9        Q.   Okay.  The, the interview that you recall

10  seeing parts of with Randy Carreno and Mike Hayes,

11  was that when Tom was still in custody?

12       A.   I -- I'm not sure if Tom was in custody

13  or not.  I'm not sure of the -- I'm not sure if

14  he was ever arrested.

15       Q.   Oh, okay.  So, it might have been before

16  he was even arrested, is that right?

17            MR. TURNER:  Object to the form.

18       A.   I don't recall Tom being arrested.

19       BY MS. BROWN:

20       Q.   Okay, got it.  Okay, do you recall

21  watching George -- excuse me.  Do you recall

22  watching parts of Floyd's polygraph interview with

23  the KBI agent?

24       A.   Oh, I'm sure I probably would've, but I

25  don't know if -- can't remember anything about it


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ROBERT L. POPPA

1    really.

2        Q.    Okay, and you would have watched that not

3    in, not in person in the same room with George,

4    with the KBI agent, but instead over the video

5    feed, is that right?

6        A.    Right, right.  I'm sure his attorney

7    would have been in there with George.

8        Q.    Okay, let's go look at a -- wait, whose

9    attorney would have been in there with George?

10       A.    Well, Tom's attorney.  I'm not sure about

11   Floyd, who was in there with Floyd.  If he's

12   giving the polygraph and he's the interviewer, so,

13   I'm pretty sure if Tom was on the polygraph then

14   Mike Hayes would have been with him before he'd

15   let him talk to George and take the polygraph.

16       Q.    Okay.  All right, let's take another look

17   at Exhibit 123.  I'm going to play you another

18   clip.

19       A.    Okay.

20             (Video clip was played.)

21   BY MS. BROWN:

22       Q.    Okay, so, did you hear on the recording

23   that you told Floyd "I was watching your body

24   movements in here when you were talking to him and

25   you were not telling the truth," did you hear

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### ROBERT L. POPPA

1    that?

2         A.    Yes.

3         Q.    So, did that indicate to you that you

4    must have been watching some of the video feed

5    from the KBI polygrapher's interview of Floyd?

6         A.    No.   I've had classes on body language

7    and body training of watching people that are

8    being interviewed whether they're lying or not.

9         Q.    Okay, but I guess I'm wondering when you

10   said I'm watching your body movement -- I was

11   watching your body movements in here when you were

12   talking to him --

13        A.    Right.

14        Q.    -- you were referring to when Floyd was

15   talking to the KBI agent during his polygraph,

16   right?

17        A.    I could have been.   I really don't know.

18        Q.    Let's listen to it --

19        A.    I'm not, I'm not saying I didn't.

20        Q.    Let's listen to it one more time and I

21   want you to tell me who you were talking about

22   when you said "I was watching your body movements

23   in here when you were talking to him."

24        A.    Okay.

25              (Video clip was played.)



Appino & Biggs Reporting Service, Inc.   TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

## ROBERT L. POPPA

1    A.   Can't hear all of what I'm saying.

2    BY MS. BROWN:

3    **Q.   I'm sorry, sir?**

4    A.   I couldn't hear all of what I was saying.

5    Could you repeat what I said?  I -- it sounds

6    mumbled for some reason.

7         MS. BROWN:  Got it.  Okay, let's go off

8    the record and figure out the technology here.

9         THE VIDEOGRAPHER:  Time is approximately

10   1:49 p.m., we're going off the record.

11        (THEREUPON, an off the record discussion

12   was held.)

13        THE VIDEOGRAPHER:  Time is approximately

14   1:52 p.m., we're back on the record.

15   BY MS. BROWN:

16   **Q.   Okay, let's try one more time and listen**

17   **to Exhibit 123 beginning at 9:16 and ending at**

18   **around 10:10.**

19        (Video clip was played.)

20   BY MS. BROWN:

21   **Q.   Okay, let's stop it there.  Okay, so,**

22   **Officer Poppa, were you able to hear it better**

23   **that time?**

24   A.   Yes.

25   **Q.   Okay, and does that refresh your memory**



Appino &Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### ROBERT L. POPPA

1    that you were telling -- you told Floyd that you

2    were watching his body movements when he was

3    talking to the KBI polygrapher?

4         A.    Yes.

5         Q.    Okay.  So, and you were telling the

6    truth, right?

7         A.    Yes.

8         Q.    Okay.  So, you did watch at least some of

9    George Johnson's polygraph interview of Floyd,

10   right?

11        A.    I'm going to say that's yes.

12        Q.    Okay, and you were not in the same room

13   as Floyd at the time, right?

14        A.    Right.

15        Q.    But you were watching it through a video

16   feed, right?

17        A.    Yes.

18        Q.    Meaning it was being recorded and you

19   were watching it in another room, correct?

20        A.    Yes.

21        Q.    Okay, and before I played this clip for

22   you you hadn't remembered that you had observed at

23   least part of the polygraph interview of Floyd, is

24   that right?

25        A.    Yes.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## ROBERT L. POPPA

1      Q.   And as you sit here today you also don't

2   remember whether or not you watched Tom's

3   polygraph interview of Floyd, is that right?

4      A.   I don't remember, I might have but I

5   don't remember.

6      Q.   Okay.  And if you had watched it you

7   would have been watching over the video feed,

8   right?

9      A.   Yes.

10      Q.   Okay, and let's take a look at -- let's

11   play the clip at Exhibit 123 from, beginning at

12   2:13 to 2:59.

13           (Video clip was played.)

14      A.   Okay.

15   BY MS. BROWN:

16      Q.   Okay.  So, after reviewing that, that

17   video clip does that refresh your memory that you

18   told Floyd that you knew about the polygraph and

19   you sat here and you watched Tom during his

20   polygraph interview?

21      A.   Yes.

22      Q.   Okay, and you would have watched Tom

23   during his polygraph interview on the video feed,

24   right?

25      A.   Yes.


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604            Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

### ROBERT L. POPPA

1    Q.   Meaning the interview was being recorded

2    and, so, even though you weren't in the room you

3    could watch the video feed of the recording as it

4    was playing, is that right?

5              MR. TURNER:  Object to form.

6              MR. QUALSETH:  Same objection.

7              MR. LINDEN:  I'll join.

8    A.   I'm sorry, I didn't catch what you said.

9    BY MS. BROWN:

10   Q.   Yeah, I'll repeat the question.  So, you

11   were watching on the video feed, meaning that the

12   polygraph interview was being recorded and you

13   were able to view it in another room for that

14   reason, is that right?

15             MR. TURNER:  Object to form.

16             MR. QUALSETH:  Same.

17             MR. LINDEN:  Join.

18   A.   In the conference room.

19   BY MS. BROWN:

20   Q.   Okay.  Okay, and during the polygraph

21   interview Tom provided an account claiming that

22   Floyd had confessed to the murder to Tom, right?

23   A.   I do not remember what he said to the

24   polygraph examiner exactly.

25   Q.   Okay.  Do you remember whether or not you

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## ROBERT L. POPPA

```
 1   watched Tom's account implicating Floyd to the
 2   polygraph examiner?
 3        A.    No, ma'am, I really don't.
 4        Q.    Okay.  Do you remember whether you were
 5   watching the polygraph interview at the time that
 6   after the polygraph was administered Tom confessed
 7   to having killed Camille?
 8        A.    I'm sorry, say that one more time.
 9        Q.    Yeah.  Were you watching the video feed
10   of Tom's polygraph interview when he confessed to
11   having killed Camille Arfmann?
12        A.    Not that I can recall.
13        Q.    Okay.  What -- you know, for what reason
14   were you watching portions or all of the polygraph
15   interviews of Tom and Floyd?
16        A.    Well, if I wasn't on the road taking a
17   call I probably went in to see how the case was
18   going and what was going on so I stood there and
19   watched it for a while until I got another call to
20   go back out on the street.  That's probably why I
21   didn't stay and watch the entire thing, just parts
22   of it.
23        Q.    Okay.  Did you take notes while you
24   watched Floyd and Tom's polygraph interviews?
25        A.    No, I did not.
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

2/21/2023                                                                    156

## ROBERT L. POPPA

1          Q.    Why not?

2          A.    I just walked in and started watching it.

3     I wasn't the one doing the notes on it.

4          Q.    Okay.  Did you understand that the

5     interviews were being recorded so there was no

6     need to take notes?

7                MR. TURNER:  Object to form.

8                MR. QUALSETH:  Same objection.

9                MR. LINDEN:  Join.

10         A.    I'm not sure if it was being recorded or

11    not, but it was on the video feed in the

12    conference room.

13         BY MS. BROWN:

14         Q.    Whose responsibility would it have been

15    to collect recordings of Floyd and Tom's polygraph

16    interviews?

17                MR. TURNER:  Object to form.

18                MR. QUALSETH:  Same.

19         A.    I, I'm not sure.  Be the sheriff, I

20    guess.

21         BY MS. BROWN:

22         Q.    What body movements did Floyd make during

23    this polygraph interview that you were watching

24    that indicated to you that he was not telling the

25    truth?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1        A.    I really don't remember, ma'am.

2        Q.    Okay, but you told him -- when you

3    interviewed him you told him that you had

4    concluded that his body movements indicated that

5    he was being untruthful, right?

6        A.    Yes.

7        Q.    Okay, and did you document it in a police

8    report what body movements you thought Floyd was

9    making during his polygraph interview that

10   indicated a lack of truthfulness to you?

11       A.    No, I did not.

12       Q.    And as you sit here today you don't

13   remember what they were, right?

14       A.    No, I do not.

15       Q.    Did you initially take Floyd's side over

16   Tom's side and tell other officers that you

17   thought Floyd was telling the truth instead of

18   Tom?

19            MR. TURNER:  Object to form.

20       A.    Did I take Tom's -- Floyd's side over

21   Tom's, is that what you said?  I'm sorry.

22       BY MS. BROWN:

23       Q.    Yeah, did you initially, in the beginning

24   were you kind of on Floyd's side and believing

25   Floyd as opposed to Tom?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

## ROBERT L. POPPA

1       A.   Well, I never really talked to Tom, so,
2   all's I can tell you is that I was told by the
3   sheriff and detectives that Floyd was the one that
4   killed her and I had no doubt, no reason not to
5   believe them.
6       Q.   Okay, which detectives said that?
7       A.   I'm not sure.
8       Q.   Okay, and when was that information
9   provided to you?
10      A.   It would be during the case sometime.  I
11  didn't make that decision to arrest him.
12      Q.   Got it.
13      A.   Yeah.
14      Q.   Okay, and so, let's watch a clip of
15  Exhibit 123 again and we're going to look at 10:15
16  to 11:28.
17           (Video clip was played.)
18  BY MS. BROWN:
19      Q.   Okay, and, so, when you -- when you made
20  these comments on the recording were you being
21  truthful that you put your ass on the line and
22  told other officers that Floyd was telling the
23  truth?
24      A.   Yes.
25      Q.   Can I get an audible answer, please?


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

1             MR. NORTON:  He gave one.

2      A.    Yes.

3      BY MS. BROWN:

4      Q.    I'm sorry, I can't hear you.

5      A.    Yes.

6      Q.    Okay, let me repeat my question.  So,

7      when you told Floyd that you put your ass on the

8      line and you told other officers that Floyd was

9      telling the truth you were being truthful with

10     Floyd, right?

11            MR. TURNER:  Object to form.

12     A.    Yes.

13            MS. BROWN:  Okay, I can't, I can't hear

14     any audio, Brett.

15            THE VIDEOGRAPHER:  Okay.  Can you hear us

16     now?  How about now?

17     BY MS. BROWN:

18     Q.    Let me try -- I'm going to ask the

19     question one more time and we'll see if we can

20     hear you.  So, when you told Floyd on this

21     recording that you put your ass on the line and

22     you told other officers that Floyd was telling the

23     truth you were being truthful, right?

24            MR. TURNER:  Object to form.

25     A.    Yes.


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### ROBERT L. POPPA

1          MS. BROWN:  All right, why don't we go

2    off the record.  I think we have an audio issue.

3          THE VIDEOGRAPHER:  Time is approximately

4    2:06 p.m., we're going off the record.

5          (THEREUPON, an off the record discussion

6    was held.)

7          THE VIDEOGRAPHER:  Time is approximately

8    2:07 p.m., we're back on the record.

9          BY MS. BROWN:

10         **Q.    Okay.  Officer Poppa, is it true that as**

11   **you said in the recording that we just heard that**

12   **you put your ass on the line and you told other**

13   **officers that you believed Floyd was telling the**

14   **truth?**

15         A.    Yes.

16         **Q.    Okay, and when was it that you put your**

17   **ass on the line and told other officers that Floyd**

18   **was telling the truth?**

19         A.    When I was hauling Floyd around and when

20   all this first started and then when I was told

21   that Floyd was the one that killed her and it made

22   me feel that here I'm hauling the killer around

23   and I looked like a real dumb wad now, and, so,

24   that was the whole reason I went in and talk to

25   him and interview him to see if he would talk to

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

1  me since I felt that he had put me in a bad spot

2  'cause I was told that he had killed her.

3      **Q.   Got it, and, so, at the time that you**

4  **started your November 13th interview you had**

5  **already heard from officers that you had been**

6  **essentially protecting the perpetrator instead**

7  **of --**

8      A.   Well, they didn't, they didn't tell me

9  that, no.

10     **Q.   So, what did they tell you about, before**

11 **the interview that you were just referring to?**

12     A.   What did they tell me?

13     **Q.   Yes.**

14     A.   They didn't tell me anything.  I came

15 into the office and saw Roy Dunnaway and I asked

16 him if Floyd had confessed and he said no.  I

17 said do you mind if I talk to him and he said go

18 ahead and I went in and interviewed him.

19     **Q.   Okay, and what was it that made you want**

20 **to talk to him so badly on November 13th given**

21 **that you had vouched for him earlier?**

22     A.   Well, because now I actually had believed

23 that he had done it from what I was told that he

24 was the killer.  I had no reason to doubt the

25 sheriff and anybody else that was investigating



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

1   it, so, I felt that he made me look like I was an

2   idiot hauling around the killer the whole time

3   trying to find the girl, so, I wanted to talk to

4   him see if he would confess to me, because I felt

5   that if he was going to confess to anybody it

6   should be me, the one that he made look bad, and

7   he did not confess.

8        Q.   Got it.  So, before the November 13th

9   interview you had heard from Sheriff Dunnaway that

10  Floyd was the killer, is that right?

11       A.   Yes.

12       Q.   Okay, and that's what made you feel a

13  little embarrassed, you know, feel a certain way

14  about having vouched for him earlier, is that

15  correct?

16       A.   Yes.

17       Q.   Okay.  Okay, and when did you hear that

18  from Sheriff Dunnaway?

19       A.   Ma'am, I really don't remember.

20       Q.   Okay.

21       A.   Just that he, he'd been arrested.  Of

22  course, you saw him in the orange jumpsuit, so, it

23  had to been right when they arrested him, he was

24  the one that done it, so, at that point I had no

25  reason to doubt the sheriff and others that he was

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1   the one that did it and I don't know why, I don't

2   know what the interview was with Tom to make him

3   come to that decision.

4        **Q.   Got it, okay.  All right, I want to watch**

5   **that same clip again and I'm going to ask you**

6   **questions about a different part of it, so, let's**

7   **play Exhibit 123 from 10:15 to 11:20.**

8              (Video clip was played.)

9              MS. BROWN:  Okay, let's play just a

10  little bit more.  I don't think we got to the

11  part that I needed.

12             (Video clip was played.)

13  BY MS. BROWN:

14       **Q.   Okay.  So, Officer Poppa, by the time**

15  **that you got to this part of the interview with**

16  **Floyd you had information that Tom was saying that**

17  **he had confessed to the crime because he was, he**

18  **didn't want his nephews, meaning Floyd's children,**

19  **to end up in a state home, is that right?**

20       A.   No.  That's just what I was telling him.

21       **Q.   Okay, and where did you get that**

22  **information?**

23       A.   It's just something I, I told him to see

24  if I could get him to tell me if he'd done it or

25  not, that your kid's going to end up in a home.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

2/21/2023                                                                                      164

### ROBERT L. POPPA

1   In other words, don't accuse your brother of doing

2   the crime if he didn't do it and I was just

3   trying to find out if it was, if he did it or he

4   didn't do it.  I was trying to pressure him to

5   see if he would confess, and he did not.  It's

6   just, okay.

7        **Q.   Okay, so, you said during this interview**

8   **words to the effect of that your brother is**

9   **evidently doing this for you because he doesn't**

10  **want his nephews to end up in a state home, right?**

11       A.   Right, meaning, meaning taking the blame

12  for it first.

13       **Q.   Okay, and, so, that suggests to me,**

14  **correct me if I'm wrong, that there was**

15  **information in the investigation that Tom was**

16  **evident -- was doing this, meaning taking the**

17  **blame, because he didn't want Floyd's kids to end**

18  **up in a state home, is that correct?**

19       A.   No.  Only reason he said, from what I

20  understand, that he took the blame was because

21  Floyd was going to tell on him for having sex with

22  the family dog and that's what I was told by

23  detectives.  I'm not sure which one told me that.

24       **Q.   Okay.  So, you just -- you made this one**

25  **up as part of your interrogation technique, is**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# ROBERT L. POPPA

1    that right?

2         A.    Yes.

3         Q.    Okay.  Let's take a look at -- actually

4    we'll get back to that.  Okay, so, I want to turn

5    back to Floyd's other interviews.  So, I'll

6    represent to you that Floyd Bledsoe was

7    interrogated on the night of November 9th and

8    continuing to the morning of November 10th.  You

9    did not conduct that investigation, right?

10        A.    I'm not sure who -- no, it -- no, it

11   wasn't me.  I don't know who would that be I

12   don't think.  I'm not sure, I'm not sure what

13   you're talking about really.  He was interviewed

14   all through the day until the next day.  My

15   interview wasn't that long.

16        Q.    Got it.  Okay.  So, I'm talking about a

17   few days earlier on November 9th to 10th.  So, the

18   polygraph was on November 12th.  A few days

19   earlier on November 9th and 10th, beginning in the

20   evening of the 9th and the morning of the 10th

21   Floyd Bledsoe was interrogated by officers, and my

22   question for you is were you involved in

23   questioning Floyd at that time?

24        A.    I, I don't know.  I don't remember.

25        Q.    Okay.  Did you watch any parts of that

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

## ROBERT L. POPPA

1   interrogation on the video feed while it was

2   occurring?

3        A.   I don't even remember it occurring.

4        Q.   Okay.  Did the Jefferson County --

5   scratch that.  After your November 13th interview

6   with Floyd, that lasted about an hour, right?

7        A.   I guess, yes.

8        Q.   Okay.  After that interview you briefed

9   other Jefferson County officers on what had

10  happened during the interview, right?

11       A.   I'm sure they would have been watching it

12  on the video feed when I was in the interview

13  room.

14       Q.   Why are you sure that others would have

15  been watching?

16       A.   Because Roy Dunnaway was there so I'm

17  pretty sure the rest of them were in there with

18  him.  I'm not sure who.

19       Q.   Okay.  So, after you concluded the

20  interview did you brief anyone on what had

21  happened during the interview?

22       A.   Other than he didn't confess to me; that

23  I questioned him and he did not confess.

24       Q.   Okay.  What about -- I guess what I'm

25  wondering is, you know, after these -- after the



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## ROBERT L. POPPA

1   interrogations of Floyd and Tom were happening in
2   the time frame of November 1999 were there -- did
3   the Jefferson County officers get together and
4   have a meeting after various interrogations and,
5   you know, discuss together as a team what the
6   interview had yielded?
7        A.   We got together and discussed the case as
8   it was going on.  I'm pretty sure we did.  I
9   don't know why we wouldn't.
10       Q.   Okay, and how -- can you describe to me
11  what those meetings were like?
12       A.   I really don't remember, ma'am.  It's
13  been too long ago.  I don't remember.  I'd tell
14  you if I could, but I don't remember.
15       Q.   Okay, Sheriff Dunnaway would have been at
16  those meetings, right?
17       A.   Oh, I'm sure of it.
18       Q.   Okay, and Randy Carreno would have been
19  at those meetings, too, right?
20       A.   I believe so.  He was one of the
21  interviewers, so, yes.
22       Q.   Okay.  So, you conducted your
23  interrogation of Floyd on November 13th, right?
24       A.   I believe that was the date.
25       Q.   Okay, and on November 12th, on the night

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

ROBERT L. POPPA

1  of November 12th Floyd had been interviewed by

2  other Jefferson County officers, right?

3      A.   I, I don't know.

4      Q.   Okay.

5      A.   I don't remember.

6      Q.   Okay.  All right, let's take a look at

7  Exhibit 114.

8      A.   Okay.

9      Q.   Just a second, I'm getting there.  Okay,

10  can you also see 114 on my screen here?

11      A.   I just see a line of numbers.

12      Q.   Do you see an evidence custody receipt?

13      A.   No, I do not.

14          MR. NORTON:  We see your Windows Explorer

15  open with a bunch of PDFs listed out as opposed to

16  the document itself.

17          MS. BROWN:  All right, let me try that

18  again, thanks.

19      BY MS. BROWN:

20      Q.   Okay, can you see Exhibit 114 now?

21      A.   Yes, I can see the top part of it.

22      Q.   Okay, and just for the record this is

23  marked JC3596.  Okay, why don't you take a minute

24  and review it and let me know what it is.

25      A.   Okay.  I already have.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

ROBERT L. POPPA

1       Q.   Okay, and you're familiar with this

2  document, right?

3       A.   I am now.  I didn't remember it till now

4  when I saw the sheet.

5       Q.   Okay, but this is your evidence custody

6  receipt for collection of a surveillance tape from

7  Oskaloosa High School?

8       A.   Yes.

9       Q.   And it's your handwriting, right?

10      A.   Yes.

11      Q.   And so that means that you collected this

12  piece of evidence and prepared the evidence

13  custody receipt for it, correct?  Is that correct?

14      A.   Do what?

15      Q.   My question to you is you collected a

16  surveillance tape from Oskaloosa High School,

17  correct?

18      A.   Yes, that's correct.

19      Q.   Okay, and you prepared this evidence

20  custody receipt for the surveillance tape, right?

21      A.   Yes.

22      Q.   Okay, and I guess my question for you is

23  you didn't conduct any checks -- sorry, scratch

24  that.  Did you review this surveillance video?

25      A.   I'm sure I did.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### ROBERT L. POPPA

1       Q.   Okay, and the surveillance video, you

2    know, has a, like a clock on it, a time, you

3    know, where it shows the passage of time, right?

4       A.   Yes, it should show the time and date on

5    the video.

6       Q.   Okay.  Did you conduct any checks as to

7    whether the times shown on the surveillance tape

8    was daylight savings time or central standard

9    time?

10      A.   I, I really don't remember if I did or

11   not.

12      Q.   Okay.  If you had done so you would have

13   documented that in a police report, right?

14      A.   Yes.

15      Q.   Okay, and as you sit here today you're

16   not -- you don't recall ever having checked the

17   accuracy of the times shown on the surveillance

18   tape, right?

19      A.   That is correct.

20      Q.   Okay, and you turned the surveillance

21   tape over to -- or you made the lead investigators

22   aware that you had recovered the surveillance

23   tape, right?

24      A.   Yes.

25      Q.   Okay.  Let's take a look at another

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## ROBERT L. POPPA

1   exhibit of 117 and for the record this has been

2   Bates marked KBI Exhibit 2409 to 2411.  Okay, and

3   is this a field note that you created regarding a

4   search of Richard Zule's property?

5        A.   Yes.  Yes.

6        Q.   Okay, and -- okay, and, so, beginning

7   from the back towards the bottom of the first page

8   and continuing on to the second do you see where

9   it says, "I asked Richard Zule when he would be

10  receiving the phone bill with the November 5,

11  1999, 7:15 p.m. call on it and he said November

12  28th.  I asked Richard which vehicle did Floyd

13  drive to work and he said the Chevy Nova.  Richard

14  Zule also stated he did not know how Floyd could

15  have done it because he drove Zule's pickup to the

16  hardware store."  Do you see that?

17       A.   Yes.

18       Q.   Okay.  So, is it true that Richard Zule

19  told you that he did not know how Floyd could have

20  committed the crime because Floyd had driven

21  Zule's pickup truck to the hardware store?

22       A.   Yes.

23       Q.   Okay, so, you accurately reported what

24  Richard Zule told you on November 15th, right?

25       A.   Right.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

ROBERT L. POPPA

1        Q.    Okay, and you would have passed that

2   information along to the lead investigators in the

3   Arfmann homicide investigation, correct?

4        A.    Yes.

5        Q.    Okay, let's take a look at Exhibit 118,

6   and for the record this is Bates marked JC5157 to

7   5168.  And you see on the first page of this

8   there's a folder and it says DLs, meaning driver's

9   licenses, and tags?

10       A.    Yes.

11       Q.    Okay, why don't you take a minute and

12  review these materials and I'd like you to let us

13  know which of these records checks you were

14  personally involved in.

15       A.    I would say -- that's officer 32 checked

16  that one.  I'm not sure if I did Tommie Arfmann.

17  Reference the missing person, there's four

18  officers' numbers here, unit numbers, they're not

19  mine.

20       Q.    Can you point me to what page you're on?

21       A.    I'm on 161 right now.  161 is unit 41.

22  That was not me, and 62, page 62.

23       Q.    Wait, I'm sorry, let's stay on page 5161

24  for a second.  Where is the unit number that

25  you're looking at?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1      A.    If you look down at number 20, line 20,
2  it says unit 41.
3      **Q.    Oh, got it.   Who was unit 41?**
4      A.    I don't remember.
5      **Q.    I see, okay.**
6      A.    I don't know.   That's a long time ago.
7  When I retired that's the number I had, but I
8  didn't have it then, I had 46, so, I'm not sure.
9  Page 62, I'm not sure whose handwriting.   It says
10 15200 Fairview Road and the case number, but the
11 phone number at the top, I wrote that.
12     **Q.    Okay.**
13     A.    Then page 63 was officer number 45.
14     **Q.    Okay.**
15     A.    Page 64, I'm not sure whose handwriting
16 that is.   Says she was entered NCIC as missing.
17 It might have been Mark Doud if he was the officer
18 that entered her, I'm not sure.   I don't see a
19 number, an officer number on it.
20     **Q.    Okay.**
21     A.    And page 65, my, my number is at the top.
22 Let's see.   So, that may be mine.   It's probably
23 mine.   Then page 66, this 920 who at that time
24 would have been Tom Burns, chief of police in
25 McLouth.   He's deceased now.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

ROBERT L. POPPA

1        Q.    Okay.

2        A.    And then page 67 is Tom Burns, the man I

3    just said was deceased.  Then page 68 I don't see

4    an officer's number.  I don't -- I'm not sure on

5    that one, and that's the last page.

6        Q.    Okay.  On that last one do you recognize

7    the handwriting of the numbers at the top there

8    where it says 99005455?

9        A.    To me it, it looks like the same

10   handwriting as the one on 159, so, I'm not -- I

11   really don't.

12       Q.    Okay.  Do you know what that number

13   refers to, that 99005455?

14       A.    That's the case number.

15       Q.    Oh, okay, got it.  Okay, let's take a

16   look at 5165.

17       A.    Which one?

18       Q.    5165.

19       A.    Oh, okay.

20       Q.    Okay, this one has your number on it, 46,

21   right?

22       A.    Yes.

23       Q.    Okay, can you just describe what this

24   kind of record is?

25       A.    This is a driver's license -- wait a

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## ROBERT L. POPPA

1    minute.  I may have that wrong, hang on.  This is

2    a tag number off of a vehicle.

3         Q.    Okay.  So, it's like running a records

4    search on a particular vehicle, right?

5         A.    Yes.

6         Q.    Okay.  And here is this your handwriting

7    that a dog jumped up on this car parking lot high

8    school 11-6-99?

9         A.    I would say yes.

10        Q.    So, is this, is this a record that you

11   requested after the Bloodhounds alerted at a

12   particular car at the high school?

13        A.    I'm sorry, say that one more time.

14        Q.    Is this a records search that you

15   requested after the Bloodhound jumped up on a

16   particular car at the high school on November 6 of

17   1999?

18        A.    It would have to be, yes.

19        Q.    Okay.  So, it's just standard law

20   enforcement practice to run a records check on a

21   vehicle when there's a suspicion that the vehicle

22   may have been connected to a crime, right?

23        A.    Yes.

24        Q.    And that was true back in 1999, correct?

25        A.    Yes.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

ROBERT L. POPPA

1    Q.   Okay.  So, when you received some
2  information that this car could possibly be
3  involved you had a records check done, correct?
4    A.   Yes, yes.  I read the tag to dispatch.
5    Q.   Okay.  Let's look at 5192.  Oh, that's
6  not 5192.  Hold on.
7    A.   I'm not sure there's that many.  There's
8  not that many here.
9    Q.   Not 5192.  We're going to look for the
10  one with the Chevy Nova.  Let me know if you can
11  find that one.  That's the search on Floyd's car.
12    A.   I don't think it was in here.
13    Q.   Oh, here we go.  Okay, let's take a look
14  at --
15    A.   Oh, here it is.
16    Q.   -- 5162.  Do you see that?
17    A.   Yes.
18    Q.   Okay, and did you say that this was your
19  phone number at the top of the page?
20    A.   I wrote that phone number down, that's my
21  handwriting, and why I don't know.
22    Q.   Oh, got it.
23    A.   But the handwriting in black, that could
24  have been the dispatcher that wrote that down.
25    Q.   Okay, and do you know why -- this is,

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

1   this is a search on Floyd's Chevy Nova, correct?

2       A.   I don't know.  It was 11-6 of '99 at 0740

3   would have been the time this was ran.

4       Q.   At what time, sir?

5       A.   0740 a.m..

6       Q.   Oh, I see.  Okay, any idea why someone

7   was running a search of Floyd Bledsoe's car on

8   November 6th at 7:40 in the morning?

9       A.   I'm not, I'm not sure if we got it for

10  the search or what, I'm not sure.

11      Q.   Okay.  This was right after Floyd had

12  encountered you at Casey's and asked about, you

13  know, investigators looking into Camille being

14  missing, right?

15      A.   It could have been.  I might have ran it

16  just to have it, to show the car that he was in.

17  I'm not sure why I did it or who did it.  I'm

18  sure it's me.

19      Q.   You're sure it's you?

20      A.   I'm pretty sure.

21      Q.   Okay, and as you sit here today you can't

22  think of why you did it, is that fair to say?

23      A.   Yes.

24      Q.   Okay.  At that time on November 6th of

25  1999 at 7:40 a.m. was Floyd a suspect in Camille's



5111 SW 21st Street        6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604           Suite 101                Suite 305
785-273-3063               Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com        913-383-1131             316-201-1612

### ROBERT L. POPPA

1   disappearance?

2        A.    At the time I followed him to his

3   trailer, no.

4        **Q.    Okay.  Was there any information that**

5   **Floyd's Chevy Nova had been involved in Camille's**

6   **disappearance?**

7        A.    At the time I followed him to the

8   trailer, no.

9        **Q.    Okay.  All right, let's go to 5166.**

10  **Okay, and your signature is on this page, right?**

11       A.    Excuse me?

12       **Q.    Your signature is on this page, correct?**

13       A.    Someone put my name on it.  I don't know

14  if that's my ink or not.

15       **Q.    Oh, okay, got it.  Okay, so, this was a**

16  **search of a vehicle involved in a car stop on**

17  **November 7th at 2120 hours, correct?**

18       A.    I'm not sure if it was searched or not.

19  The chief of police in McLouth stopped it.

20       **Q.    Okay, and someone ran a records search on**

21  **this car, correct?**

22       A.    Right.

23       **Q.    Okay.  And it was put in the Arfmann**

24  **homicide investigative file, right?**

25       A.    Case number's there, yes.  I don't know

ROBERT L. POPPA

1    why, but it was.

2        Q.    Okay.  Okay, and, so, does this indicate

3    to you that, you know, there had been a car stop;

4    that there was some suspicion that it could have a

5    connection to the Arfmann homicide and, so, an

6    officer ran a records check on that particular car

7    just as a matter of law enforcement practice?

8        A.    I really hate to say they're a suspect.

9    I don't know why it was ran.

10       Q.    Okay.  Do you see any indication in this

11   folder that there was any records search on Tom's

12   truck?

13       A.    Records search?

14       Q.    Yes.

15       A.    Like a, like a tag number run is that

16   what you mean?

17       Q.    Yes.

18       A.    No, I don't see one in there.

19       Q.    Okay, and this exhibit is a folder on

20   driver's licenses and tag checks from the Arfmann

21   homicide investigation, right?

22       A.    Yes.

23       Q.    Okay.  Do you have any explanation for

24   why no records search was ever done on Tom's

25   truck?



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

# ROBERT L. POPPA

 1      A.   No, ma'am, I sure don't.

 2      Q.   Okay.  'Cause that would have been

 3  standard law enforcement practice.  If there was

 4  any indication in the investigation that Tom's

 5  truck had something to do with the crime against

 6  Camille a records check should have been run on

 7  the truck, correct?

 8      A.   Yes.

 9      Q.   Okay.  Are you aware that the Arfmann

10  investigation had continued after the year 2000 in

11  the Jefferson County Sheriff's Department?

12      A.   No, ma'am.

13      Q.   Okay.  Well, let's see, in recent years,

14  in around 2015, you were involved in finding a

15  spent cartridge at the old Bledsoe property that

16  had been identified by Tom in his suicide notes

17  after he committed suicide, right?

18      A.   Right.

19      Q.   Okay, so, in 2015 there was some

20  investigation of the Arfmann homicide by Jefferson

21  County Sheriff's Department, right?

22      A.   Right.

23      Q.   And you were involved in that, correct?

24      A.   Yes, I found the cartridge.

25      Q.   Okay.  Can you tell us how you found the

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### ROBERT L. POPPA

1   cartridge?

2       A.   Just looking for it on the ground where I

3   was told it might be in the area of the dump,

4   body site area.

5       Q.   Okay.  Other than finding that cartridge

6   casing, what other involvement did you have in

7   investigation of the Arfmann homicide after let's

8   say 2010?  From 2010 to the present?

9       A.   Just what I've done in my reports.

10      Q.   Okay, and I'm talking about the recent in

11  -- from 2010 to when you retired in 2020 what

12  investigation did you conduct regarding the

13  Arfmann murder case?

14      A.   I didn't do any investigation after the

15  trial.

16

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

ROBERT L. POPPA

1      Q.   Okay, and did you get updated on the

2  Arfmann homicide investigation through the years,

3  you know, in let's say the 2015 time frame?

4      A.   No, other than the finding the bullet

5  thing that I was asked to go out and try to find.

6  That's the last I heard of anything on it that I

7  can remember anyway.

8      Q.   Okay, and what about between let's say

9  2010 and 2015, did you have any involvement or

10  hear anything about the progress of the Arfmann

11  homicide investigation at the Jefferson County

12  Sheriff's Department?

13      A.   No, I don't remember anything like that.

14      Q.   Do you know -- I'm sorry.  I apologize,

15  didn't mean to cut you off.

16      A.   I just said I don't remember -- I don't

17  remember.

18      Q.   Okay.  At the time that you retired in

19  2020 do you know whether the Arfmann homicide

20  investigation was continuing at that time?

21      A.   No, I did not know that.

22      Q.   Okay.  All right, did you learn during

23  your investigation back in the 1999 time frame

24  that as part of Tom's alibi at the time that

25  Camille disappeared from her trailer on November

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## ROBERT L. POPPA

1   5th Tom claimed to have stopped at a bank?

2        A.   He had claimed that he had stopped at a

3   bank, is that what you said?

4        Q.   Yes.

5        A.   No.

6        Q.   Okay.  So, you're not aware of any

7   investigation that was done back in 1999 or 2000

8   to check whether -- to verify Tom's claim that he

9   went to the bank on the night that Camille

10  disappeared?

11       A.   Not that I know of or remember.

12       Q.   Okay.  Have you talked to any other --

13  well, scratch that.  Back in 1999 how was your

14  relationship with Sheriff Roy Dunnaway?

15       A.   Good.

16       Q.   He was your boss, right?

17       A.   Yes, yes.

18       Q.   Okay, and you respected him, right?

19       A.   Yes.

20       Q.   And did you follow his commands when he

21  requested something of you?

22       A.   Yes.

23       Q.   Did you socialize with Sheriff Dunnaway

24  back in the 1999-2000 time frame?

25       A.   Socialize like going to each others'

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### ROBERT L. POPPA

1  homes and stuff like that, is that what you mean?

2  No, I did not.

3      Q.   Okay.  Have you met many members of his

4  family?

5      A.   I met his wife.

6      Q.   Okay, on what occasions?

7      A.   After Roy died she had a water leak and

8  they knew I knew something about plumbing work so

9  I went down and looked at it.

10     Q.   Okay.  How was your relationship with

11  Randy Carreno back in the 1999-2000 time frame?

12     A.   It's good.

13     Q.   When did you first begin to work with

14  Carreno?

15     A.   When I started in '94.

16     Q.   Okay, and back in the 1999 time frame did

17  you and Carreno socialize outside of work?

18     A.   No, we did not.

19     Q.   Okay, was one of you considered more

20  senior at the time than the other?

21     A.   Randy would have been.

22     Q.   Okay, 'cause he was a detective, right?

23     A.   Yes.

24     Q.   Okay.

25     A.   Well, I don't know if he was -- yeah, at

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604                 Suite 101                    Suite 305
785-273-3063             Overland Park, KS 66212        Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**ROBERT L. POPPA**

1   one point he was a captain over patrol, but I

2   can't remember when that was.

3        Q.   Okay, but regardless, he was senior to

4   you, is that right?

5        A.   Yeah.  He always has been, yes.

6        Q.   Okay.  Can you describe what your

7   relationship was with Troy Frost back in the 1999-

8   2000 time frame?

9        A.   When I first started Troy Frost was a

10  patrolman and then Troy Frost was promoted to

11  detective, so, we were friends but we didn't go to

12  each other's homes or drink beers together or

13  anything like that.  Other than --

14       Q.   Back in --

15       A.   -- each other at work.

16       Q.   Okay, got it.  Back in 1999 when the

17  Arfmann homicide investigation began was Troy

18  Frost more senior than you at that time?

19       A.   Yes.  In this case he would be.

20       Q.   Okay.  What about, can you describe your

21  relationship with Mike Hayes in the 1999 to 2000

22  time frame?

23       A.   Mike -- when I worked in Jackson County

24  Mike Hayes was the county attorney for Jefferson

25  and Jackson County, so, I only know Mike Hayes



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### ROBERT L. POPPA

1   from giving him cases as a prosecutor.

2        Q.    Okay.

3        A.    We got along okay.  We did not go to each

4   other's homes or socialize.

5        Q.    Okay, but you investigated cases that

6   were prosecuted by Mike Hayes when he was the

7   Jefferson County attorney?

8        A.    Yes, uh-huh.

9        Q.    And you investigated cases that were

10  prosecuted by Mike Hayes when he was the Jackson

11  County attorney?

12       A.    Yes.

13       Q.    Okay.  All right, when is the last time

14  that you spoke with any law enforcement officers

15  about the Arfmann case other than -- outside the

16  presence of your counsel?

17       A.    It's been a long time.  Would have been

18  -- told them there'd been a lawsuit filed against

19  me and that's about all I knew to tell them

20  really.

21       Q.    Okay.  And did you talk to any of the

22  defendants in this case about the lawsuit?

23       A.    No.

24       Q.    Okay.  As you sit here today do you have

25  any regret about any of your conduct during the



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

## ROBERT L. POPPA

1   Arfmann homicide investigation?

2       A.   Oh, that's a hard question.  My only

3   regret is probably getting involved to start with.

4       Q.   **And why is that?**

5       A.   Because it come to this.

6       Q.   **Okay.  So, you have regret because of the**

7   **personal impact that the lawsuit could have on**

8   **you?**

9       A.   Yes.

10      Q.   **Do you have any regret that Floyd was**

11  **incarcerated for around 15 years for a crime that**

12  **his brother ultimately claimed responsibility for**

13  **in a suicide note?**

14      A.   Well, I don't know if Floyd did it or

15  not.  I haven't seen all the evidence or heard all

16  the evidence to make a decision whether he is

17  innocent or guilty.

18      Q.   **Have you made a decision as to whether**

19  **you think Tom is innocent or guilty?**

20      A.   No.  I believe that Tom did what he said

21  he did.

22      Q.   **What do you mean by that?**

23      A.   In the suicide note.

24      Q.   **So, you believe that Tom killed Camille**

25  **Arfmann?**



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

2/21/2023                                                              188

## ROBERT L. POPPA

 1      A.    He said he did.

 2      Q.    Okay, and you believe that's what he did,

 3   right?

 4      A.    Yes.

 5      Q.    Okay.  Do you have any concerns about the

 6   actions of any of your fellow officers during the

 7   Arfmann investigation?

 8      A.    No.  Like I said, I really wasn't the one

 9   in charge and as far as their actions go, that

10   wasn't anything I could control, so, no.

11      Q.    Do you think your fellow officers

12   conducted a fair investigation?

13      A.    As fair as they thought they were -- I

14   believe 100 percent they believed they had the

15   right man at the time they did it.

16      Q.    Okay.  So, you think that they, their

17   actions were justified by the fact that they

18   thought that Floyd was the killer, am I

19   understanding --

20      A.    Yes, I believe they believed 100 percent

21   that Floyd was the killer.

22      Q.    Okay, and they had no doubt in their mind

23   that Floyd was the killer and, so, they proceeded

24   against Floyd, fair?

25      A.    Fair.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## ROBERT L. POPPA

1    Q.   Okay.   Have you ever been disciplined by

2    any law enforcement agency?

3    A.   Oh, back in, when I was at Jackson County

4    Sheriff's Office I was chasing a guy that jumped

5    out of a -- off a stolen motorcycle and I fired a

6    warning shot in the air.  That was back in the

7    early eighties and I found out you can't do that

8    no more.  I wasn't suspended or anything, I just

9    got talked to.

10   Q.   Okay, any other discipline besides what

11   you already  testified to?

12   A.   No.

13   Q.   Any other lawsuits against you besides

14   this one?

15   A.   This is the only one.

16   MS. BROWN:  All right, let's take a break

17   and go off the record.  I think I'm very close to

18   being done but I just want to check.

19   THE VIDEOGRAPHER:  Time is approximately

20   2:54 p.m. we're going off the record.

21   (THEREUPON, a recess was taken.)

22   THE VIDEOGRAPHER:  Time is approximately

23   3:06 p.m., we're back on the record.

24   BY MS. BROWN:

25   Q.   Okay.   Officer Poppa, can you take a look

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

1    at Exhibit 101 and specifically page 5073.

2        A.    Page 5073.  Okay.

3        Q.    Can you just read -- this is your

4    handwriting, correct?

5        A.    Yes.

6        Q.    Okay, and can you read it out loud to us?

7        A.    It says at the top "salvage, JW dash and

8    then Roy dash said red car small drives white

9    truck between 4 and 7 p.m."

10       Q.    Do you know what this field note is

11   referring to?

12       A.    I have no idea what that meant.

13       Q.    All right.  Let's -- I'm going to play

14   you another piece of Exhibit 123, which is the

15   video of your interrogation of Floyd.

16       A.    Okay.

17       Q.    And I'd like to ask for the video to

18   begin at 15.30, 15 minutes and 30 seconds and

19   we'll play until there's silence.

20             (Video clip was played.)

21       A.    Don't know what that was.

22             MS. BROWN:  Okay, let's play that last

23   bit one more time so that we can hear it a little

24   bit more clearly.

25             THE VIDEOGRAPHER:  Start from 15:30?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### ROBERT L. POPPA

1        MS. BROWN:  We can start later.  Let's

2   start at 51.  51:00.

3        (Video clip was played.)

4   BY MS. BROWN:

5        Q.   Okay, let's stop there.  Officer Poppa,

6   did you hear towards the end of that video Floyd

7   said, "talk to Jim Penny, he'll prove that I was

8   there," and you responded, "Only thing I'll say is

9   that, Floyd, if you did it don't let your brother

10  take the rap and if he helped you don't let him

11  get off."  Did you hear that?

12       A.   Yes.

13       Q.   So, at the end of this interview as you

14  were leaving, just as you exited the door Floyd

15  told you to talk to Jim Penry, he would help prove

16  Floyd's alibi, right?

17       A.   Did you say Penry?

18       Q.   Yeah, I couldn't hear if it's Penny or

19  Penry, I couldn't hear.  Could you hear?

20       A.   I heard him say, yes, I think Penry, or

21  Pendry, I don't remember what he said.

22       Q.   Okay, so, he, he was asking you to talk

23  to Jim Penry, right?

24       A.   Right.

25       Q.   And, so, did you go talk to Jim Penry to

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## ROBERT L. POPPA

1    see whether he could support Floyd's alibi during

2    the time that -- well, let's scratch that.  Did

3    you go talk to Jim Penry to see whether he could

4    support Floyd's alibi?

5         A.    I -- if it's not in my report I did not.

6         Q.    Okay, did you ask anyone else to follow

7    up on that lead from Floyd?

8         A.    I don't remember.

9         Q.    Well, wouldn't you have done that?

10        A.    Would I have, would I have done that?

11   I'm sure I would have.

12        Q.    Okay.  And who would you have followed up

13   with?

14        A.    They were all watching the video, sheriff

15   and all of them heard the same thing, so, I'm not

16   sure who would have taken that up to go talk to

17   him.  Detectives I'm pretty sure whoever that

18   would be.

19        Q.    Okay.  So, the sheriff was watching at

20   the end of this interrogation and other Jefferson

21   County detectives were watching as well?

22        A.    Yes.

23        Q.    Okay, and so, when Floyd said on the

24   video, "talk to Jim Penry, he'll prove that I was

25   there," Dunnaway and other investigators heard it,

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# ROBERT L. POPPA

1  right?

2       A.   I'm sure they did.

3       Q.   Okay.  And so, since you weren't in

4  charge of the investigation you didn't necessarily

5  follow up, but it was your understanding that some

6  investigator would follow up on this lead of

7  talking to Jim Penry, right?

8       A.   I think so, yes.

9       Q.   During your -- well, scratch that.  You

10 -- in preparation for this deposition you watched

11 the entire video of your interrogation of Floyd on

12 November 13th, right?

13      A.   Yes.

14      Q.   And during your interrogation of Floyd he

15 answered every question that you had for him,

16 right?

17      A.   Yes.

18      Q.   And that was the case even though by this

19 point he had been interrogated for many hours

20 beginning on November 12th, right?

21      A.   That he had been?

22      Q.   Yes.

23      A.   I'm not sure how long he was interrogated

24 for or interviewed for, I'm not sure.

25      Q.   Okay, and during your interrogation of

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### ROBERT L. POPPA

```
 1   Floyd you accused Floyd of lying repeatedly,
 2   right?
 3        A.   Yes.
 4        Q.   And you told him that you could tell from
 5   his body language that he was lying, right?
 6        A.   Yes.
 7        Q.   And he told you over and over that he did
 8   not commit this crime and he didn't know who did,
 9   right?
10        A.   Right.
11        Q.   And he pleaded with you to believe him,
12   right?
13        A.   Yes.
14        Q.   And he never confessed to the crime,
15   correct?
16        A.   That is correct.
17             MS. BROWN:   Okay.  I have no more
18   questions.
19             MR. NORTON:   Counsel, any questions?
20             MR. LINDEN:   Vanderbilt will reserve his
21   questions for trial.
22             MR. QUALSETH:   This is Shon Qualseth.
23   I'll reserve my questions for trial as well.
24             MR. TURNER:   We'll read and sign the
25   transcript and designate portions of the
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### ROBERT L. POPPA

1    confidential as for the sections referring to

2    confidential documents.

3                    THE VIDEOGRAPHER:   Time is approximately

4    3:15 p.m., we're going off the record.   This

5    concludes the deposition.

6                    (THEREUPON, the deposition concluded at

7    3:15 p.m.)

8    .

9    .

10                                    SIGNATURE

11   .

12                The deposition of ROBERT L. POPPA was

13   taken in the matter, on the date, and at the time

14   and place set out on the title page hereof.

15   .

16                It was requested that the deposition be

17   taken by the reporter and that same be reduced to

18   typewritten form.

19   .

20                It was agreed by and between counsel and

21   the parties that the deponent will read and sign

22   the transcript of said deposition.

23   .

24   .

25   .


5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# ROBERT L. POPPA

```
 1                          AFFIDAVIT
 2      .
 3      STATE OF _____:
 4      COUNTY/CITY OF _____:
 5      .
 6           Before me, this day, personally appeared,
 7      ROBERT L. POPPA, who, being duly sworn, states
 8      that the foregoing transcript of his/her
 9      Deposition, taken in the matter, on the date, and
10      at the time and place set out on the title page
11      hereof, constitutes a true and accurate transcript
12      of said deposition, along with the attached Errata
13      Sheet, if changes or corrections were made.
14      .
15                     _____
16                          ROBERT L. POPPA
17      .
18           SUBSCRIBED and SWORN to before me this
19      _____ day of _____, 2023 in the
20      jurisdiction aforesaid.
21      .
22      _____        _____
23      My Commission Expires        Notary Public
24      .
25      .
```



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## ROBERT L. POPPA

1                    DEPOSITION ERRATA SHEET

2    .

3    RE:          APPINO & BIGGS REPORTING SERVICE, INC.

4    .

5    FILE NO.: 68324

6    .

7    CASE:       FLOYD BLEDSOE vs.

8                JEFFERSON COUNTY, KANSAS, ET AL

9    .

10   DEPONENT: ROBERT L. POPPA

11   .

12   DEPOSITION DATE: 02/21/2023

13   .

14   To the Reporter:

15   I have read the entire transcript of my Deposition

16   taken in the captioned matter or the same has been

17   read to me.  I request that the following changes

18   be entered upon the record for the reasons

19   indicated.  I have signed my name to the Errata

20   Sheet and the appropriate Certificate and

21   authorize you to attache both to the original

22   transcript.

23   .

24   .

25   .



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## ROBERT L. POPPA

```
 1   PAGE:LINE FROM       TO            REASON
 2   .
 3   .
 4   .
 5   .
 6   .
 7   .
 8   .
 9   .
10   .
11   .
12   .
13   .
14   .
15   .
16   .
17   .
18   .
19   .
20   .
21   .
22   .
23   .
24   SIGNATURE:_____ DATE:_____
25            ROBERT L. POPPA
```



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

199

# CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Barbara J. Hoskinson, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A. 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 7th day of March, 2023.

_Barbara J. Hoskinson_

Barbara J. Hoskinson, C.C.R. No. 0434



Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612