# EXHIBIT 22

# JOEL RANDY CARRENO

1   .

2               IN THE UNITED STATES DISTRICT COURT

3                 FOR THE DISTRICT OF KANSAS

4   .

5   .

6   FLOYD BLEDSOE,

7           Plaintiff,

8   .

9       vs.                    Case No. 2:16 CV 02296

10   .

11   JEFFERSON COUNTY, KS.,

12   et al.,

13           Defendants.

14   .

15   .

16              VIDEOTAPED DEPOSITION OF

17                 JOEL RANDY CARRENO,

18   taken on behalf of the Plaintiff, pursuant to

19   Notice to Take Deposition, beginning at 9:35 a.m.

20   on the 1st of February, 2023, at the office Appino

21   & Biggs Reporting Service, Inc., in the City of

22   Topeka, County of Shawnee, and State of Kansas,

23   before Douglas R. Stone, RPR, Kansas CCR No. 1518,

24   Missouri CCR No. 1035.

25   .



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

**JOEL RANDY CARRENO**

```
 1                          APPEARANCES
 2    .
 3    .
 4   ON BEHALF OF THE PLAINTIFF:
 5    .
 6        Mr. Russell Ainsworth (Via teleconference)
 7        Ms. Ruth Brown (Via teleconference)
 8        Loevy & Loevy
 9        311 N. Aberdeen Street, 3rd Floor
10        Chicago, Illinois 60607
11        312-243-5900
12        russell@loevy.com
13        ruth@loevy.com
14    .
15    .
16   ON BEHALF OF DEFENDANTS JEFFERSON COUNTY,
17   KANSAS, RANDY CARRENO, TROY FROST,
18   ROBERT POPPA, AND JEFFREY HERRIG:
19    .
20        Mr. Michael J. Norton
21        Foulston, Siefkin, L.L.P.
22        1551 N. Waterfront parkway, Suite 100
23        Wichita, Kansas 67206
24        316-267-6371
25        mnorton@foulston.com
```



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# JOEL RANDY CARRENO

 1      Mr. Eric Turner

 2      Foulston Siefkin, L.L.P.

 3      7500 College Blvd., Suite 1400

 4      Overland Park, Kansas 66210

 5      913-498-2100

 6      eturner@foulston.com

 7  .

 8  .

 9  ON BEHALF OF DEFENDANTS KANSAS BUREAU

10  OF INVESTIGATIONS, JAMES WOODS,

11  TERRY MORGAN, ESTATE OF GEORGE JOHNSON:

12  .

13      Mr. Shon D. Qualseth

14      Attorney General's Office

15      120 Southwest 10th Avenue

16      Memorial Building, Room 200

17      Topeka, Kansas 66612

18      785-296-2215

19      shon.qualseth@ag.ks.gov

20  .

21  .

22  .

23  .

24  .

25  .

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# JOEL RANDY CARRENO

1  ON BEHALF OF DEFENDANT MICHAEL HAYES:

2  .

3       Mr. Vincent M. Cox (Via teleconference)

4       Cavanaugh, Biggs & Lemon, P.A.

5       3200 S.W. Huntoon

6       Topeka, Kansas 66604

7       785-440-4000

8       vcox@cavlem.com

9  .

10  .

11  ON BEHALF OF DEFENDANT JAMES VANDERBILT:

12  .

13       Mr. Patric S. Linden

14       Case Linden, P.C.

15       2600 Grand Blvd., Suite 300

16       Kansas City, Missouri 64108

17       816-979-1500

18       patric.linden@caselinden.com

19  .

20  .

21  ALSO PRESENT:

22       Ms. DeeDee Wynn (Via teleconference)

23       Ms. Maria Makarn (Via teleconference)

24       Mr. Michael Hayes (Via teleconference)

25       Mr. Brett Knapp, Videographer



5111 SW 21st Street       6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604          Suite 101                 Suite 305
785-273-3063              Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com       913-383-1131              316-201-1612

## JOEL RANDY CARRENO

```
1                              INDEX
2    .
3    .
4    Certificate ----------------------------- 275
5    .
6    .
7                             WITNESS
8    ON BEHALF OF THE PLAINTIFF:              PAGE
9    JOEL RANDY CARRENO
10   Direct-Examination by Mr. Ainsworth      7
11   .
12   .
13                            EXHIBITS
14   DEPOSITION EXHIBIT NO.:                  MARKED
15   No 1  Mr. Carreno's Trial Testimony      8
16   No 5  Field Notes                        8
17   No 8  George Johnson's Notes of
18        His Conversation With Tom Bledsoe
19        During Polygraph                    8
20   No 10  Report By Mr. Carreno             8
21   No 40  Bio For Randy Carreno            8
22   No 47  Training Records For Mr. Carreno  8
23   .
24   .
25   .
```



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1          THE VIDEOGRAPHER:  Today is the 1st day
2     of February 2023 and the time is approximately
3     9:35 a.m.  We are here at Appino & Biggs Reporting
4     Service to take the deposition of Randy Carreno in
5     the matter of Floyd Bledsoe versus Jefferson
6     County, Kansas, et al., case number 2:16 CV 02296.
7     Would counsel please state your appearance for the
8     record.
9          MR. AINSWORTH:  This is Russell Ainsworth
10    appearing remotely on behalf of plaintiff.  And
11    I'm joined by Ruth Brown and DeeDee Wynn.
12         MR. NORTON:  And this is Michael Norton
13    and Eric Turner appearing in person on behalf of
14    the defendants on the Board of County
15    Commissioners of the County of Jefferson County,
16    Kansas, Randy Carreno, Troy Frost, Robert Poppa,
17    and Sheriff Jeffrey Herrig.
18         MR. QUALSETH:  Shon Qualseth in person on
19    behalf of KBI, defendants Jim Woods, Terry Morgan,
20    and the Estate of George Johnson.
21         MR. LINDEN:  Patric Linden, appearing in
22    person on behalf of defendant James Vanderbilt.
23         MR. COX:  Vincent Cox appearing for
24    defendant Michael Hayes.  Mr. Hayes also appears.
25    We are both appearing remotely.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1                    JOEL RANDY CARRENO,

2   called as a witness on behalf of the Plaintiff,

3   was sworn and testified as follows:

4            (THEREUPON, Carreno Deposition Exhibit

5   No 1, No 5, No 8, No 10, No 40 and No 47 were

6   marked for identification.)

7       DIRECT-EXAMINATION

8       BY MR. AINSWORTH:

9       Q.   **Good morning, sir.**

10      A.   Good morning.

11      Q.   **Would you please state and spell your**

12  **name for the record?**

13      A.   It's Joel R. Carreno, C-A-R-R-E-N-O.

14      Q.   **And what does the R stand for?**

15      A.   Randy.

16      Q.   **And, sir, have you been deposed before?**

17      A.   Yes.

18      Q.   **On how many occasions?**

19      A.   On one.

20      Q.   **And when was that?  When were you**

21  **previously deposed?**

22      A.   I'm not -- I'm not sure on the exact date

23  or year, but I'm thinking 1994, 1995.  But I'm not

24  a hundred percent sure on that.

25      Q.   **Okay.  Because it's been a while can I**



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

1   just go over some of the ground rules with you?

2       A.    Sure.

3       Q.    First thing we ask you to do is to answer

4   my questions with a verbal yes or no if the

5   question calls for it and not relying on a nod of

6   the head, okay?

7       A.    Yes.

8       Q.    The next thing I'm going to ask you to do

9   is to wait until I'm done with my question, even

10  if you know what it is, so that the court reporter

11  can take down your answer, okay?

12      A.    Yes.

13      Q.    And I'll try and do the same for you

14  which is to wait until you're done with your

15  answer before I begin my next question, so we make

16  life easier for the court reporter, okay?

17      A.    Yes.

18      Q.    If you don't understand any of my

19  questions please ask me to rephrase, reask, or in

20  some way indicate to me that you do not understand

21  my question, okay?

22      A.    Yes.

23      Q.    The flip side of that is if you answer my

24  question I'll assume that you understood my

25  question as I -- as I phrased it, okay?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**JOEL RANDY CARRENO**

1     A.    Yes.

2     Q.    Do you have any medical conditions or are

3  you on any medication that would affect your

4  ability to testify truthfully and accurately here

5  today?

6     A.    No.

7     Q.    Is there anything else such as fatigue or

8  stress or anything else or illness that might

9  affect your ability to testify truthfully and

10  accurately here today?

11     A.    No.

12     Q.    When you were deposed back in the mid

13  '90s or thereabouts what was that in connection

14  to?  Why were you deposed?

15     A.    It was in regard to an incident that had

16  occurred with a subject that was reported

17  trespassing on private property, and myself, a

18  trooper, and a city officer from the City of Perry

19  responded to that call, and we had contact with

20  him out on Highway 24 in Jefferson County.

21     During that contact the subject went for the

22  trooper's gun, and I was standing -- I recall

23  standing on the right side of the subject, and the

24  trooper was behind the subject, and the city

25  officer was to the left of the subject.  And he



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1    had yelled -- the officer yelled that he's going

2    for the gun -- with a gun, which would have been

3    the trooper's gun.  And at that time I struck the

4    subject -- my intent was to make contact with him

5    on his right side of his shoulder and that did not

6    happen.  He had an injury to the back of his

7    head, and it was from that that I was deposed.

8         **Q.   When you say the subject had an injury to**

9    **the back of his head, do you mean as a result of**

10   **what happened or is that a preexisting injury**

11   **you're referring to?**

12        A.   Repeat that question, please.

13        **Q.   Sure.  You referenced the subject having**

14   **an injury to the back of his head.  Do you**

15   **remember that?**

16        A.   Correct.

17        **Q.   Are you saying that you caused that**

18   **injury or is that an injury that he already had?**

19        A.   It was an injury from my flashlight that

20   I had in my hand that I used when the officer

21   yelled out he's going for the gun.

22        **Q.   All right.  So you struck the subject in**

23   **the back of the head with your flashlight, is that**

24   **right?**

25        A.   That is correct.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

```
 1        Q.   And then were you sued as a result of
 2   that?
 3        A.   Yes.  We -- yes.
 4        Q.   And what was the result of that lawsuit?
 5        A.   I don't recall.
 6        Q.   Did it go to trial?
 7        A.   I don't -- I don't think it did.  I -- I
 8   don't recall.
 9        Q.   Have you ever been to trial as a
10   defendant in a lawsuit?
11        A.   I'm sorry?
12        Q.   Have you ever been to trial as a
13   defendant in a lawsuit?
14        A.   I believe on this case right here.  I was
15   subpoenaed.
16        Q.   Okay.  And my question is, have you
17   appeared in court as a defendant -- as a defendant
18   to a lawsuit at a trial with a jury?
19        A.   As a defendant?  Yes.
20        Q.   Yes, sir.  All right.
21        A.   I don't -- I don't recall.
22        Q.   Are you saying, yes, you did appear as a
23   defendant or you don't remember?
24        A.   I don't remember.  I'm sorry.
25        Q.   Why did you -- you said yes initially.
```



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1   **Why did you say yes initially?**

2          A.    On this case right here.  I really --

3          **Q.    And --**

4          MR. NORTON:  Russell, this is -- this is

5   Michael.  I'm getting my Zoom set up.  Do you

6   mind if I -- just tell real quick, because I think

7   he's misunderstanding it?  And I -- I promise I'm

8   not going to interrupt you much but I thought just

9   at the introduction this may be helpful, but I'll

10  do whatever you want to do.

11          MR. AINSWORTH:  That's okay.

12  BY MR. AINSWORTH:

13         **Q.    So you thought that in connection with**

14  **this case this is a court proceeding.  Is that**

15  **what you're saying?**

16         A.    Yes.  It's my belief that I was

17  subpoenaed by -- I'm not for sure -- sir, I'm not

18  for sure.  I'm not for sure.

19         **Q.    And when was that when you believe you**

20  **were subpoenaed?**

21         A.    It would have been during the trial of

22  this case right here.

23         **Q.    Okay.  So you're talking about the trial**

24  **of Floyd S. Bledsoe back in 2000?**

25         A.    It would have been this trial.  Yes.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1      Q.    Okay.  Are you retired, sir?

2      A.    No.

3      Q.    All right.  What's your current

4   employment?

5      A.    With the Jefferson County Sheriff's

6   Office.

7      Q.    And what's your position with the

8   Jefferson County Sheriff's Office?

9      A.    I'm a captain with the sheriff's

10  department, and I am in charge of -- I'm in charge

11  of civil process, the SROs, the news media, and

12  the sheriff cells.

13     Q.    I'm sorry.  What was the last thing?

14     A.    Sheriff cells.

15     Q.    What is that?

16     A.    That is when a mortgage company

17  forecloses on property.

18     Q.    All right.  And when you say the SROs,

19  are you referring to single room occupancy?

20     A.    No.

21     Q.    What are you referring to?

22     A.    School resource officers.

23     Q.    Okay.  Thank you for the clarification.

24  And what's -- what do you refer to when you say

25  civil process?



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1     A.    The Sheriff's department receives

2  numerous civil processes where somebody is being

3  sued.  My job is to enter that into the computer,

4  and then from that -- from that point I'm in

5  charge of the civil process server, and my job

6  there is to make sure the civil process gets

7  served.

8     Q.    **Are you a high school graduate?**

9     A.    I obtained my GED, and then --

10     Q.    **How far did you go in high school?**

11     A.    My senior year, the beginning of the

12  second semester.

13     Q.    **Did you ever serve in the military?**

14     A.    No.

15     Q.    **What year was it when you left high**

16  **school?**

17     A.    1972.

18     Q.    **All right.  And what was your first job**

19  **in law enforcement?**

20     A.    It would have been a road deputy for the

21  sheriff's department.

22     Q.    **Which department?**

23     A.    For the sheriff's department.  But prior

24  to I being employed by the sheriff's department I

25  worked for a very short period of time for the



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                 Suite 305
785-273-3063           Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com         913-383-1131              316-201-1612

## JOEL RANDY CARRENO

1    Meriden Police Department.

2         Q.   Okay.  And that's what I was getting at.

3    So you -- you worked for about half a year for

4    the Meriden Police Department, is that right?

5         A.   I don't recall how long, but a short

6    period of time, yes.

7         Q.   Less than a year?

8         A.   I don't remember.

9         Q.   Okay.  When did you work for the Meriden

10   Police Department?

11        A.   It would have been in 1989.

12        Q.   So what -- tell us what full-time

13   employment you had from 1972 to 1989?

14        A.   I worked as a -- in construction during

15   that whole period of time.

16        Q.   Okay.  What kind of construction did you

17   do?

18        A.   Finishing drywall.  I was the supervisor

19   that worked for a company that traveled the

20   country working on renovating historical sites

21   throughout the country.

22        Q.   All right.  And so this is residential

23   stuff?

24        A.   No.  No.

25        Q.   No.



### JOEL RANDY CARRENO

1      A.    Historical sites.

2      Q.    All right.  Great.  Got it.  All right.

3  And so why did you want to become a police

4  officer?

5      A.    I don't know.  I -- I met this trooper

6  and I started riding around with him, and I had an

7  opportunity to become a police officer and I took

8  advantage of that opportunity.

9      Q.    How did you get the opportunity -- excuse

10  me, sir.  How did you get the opportunity to

11  become a police officer?

12      A.    I was up at the sheriff's department

13  quite a bit during that period of time and from

14  that I had a lot of interaction with -- with

15  police officers, and it was from that that I

16  wanted to become a police officer.

17      Q.    And you're referring to the Jefferson

18  County Sheriff's Office, is that right?

19      A.    I'm sorry?

20      Q.    Are you referring to the Jefferson County

21  police -- sheriff's office?

22      A.    Yes.

23      Q.    Have you ever been arrested?

24      A.    No.

25      Q.    Have you ever been charged with a crime?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1     A.    No.

2     Q.    Okay.  And so when you say the

3   opportunity arose was that opportunity that you

4   you're referring to with the Meriden Police

5   Department?

6     A.    Yes.

7     Q.    And how did you get that opportunity to

8   be a member of the Meriden police -- police

9   department?

10    A.    I know that the police chief for Meriden

11  worked for the sheriff's department during that

12  time, and I became friends with him.

13    Q.    Okay.  When you joined the Meriden Police

14  Department did you attend an academy?

15    A.    No.  No -- let me -- no.  I did a part-

16  time academy.

17    Q.    Where was that academy?

18    A.    In Topeka.

19    Q.    How long did you attend that academy

20  part-time?

21    A.    I don't recall.

22    Q.    Did you join the Meriden Police

23  Department after -- did you complete -- well,

24  strike that.

25    Did you complete your time at the academy in



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

## JOEL RANDY CARRENO

1    Topeka?

2         A.    Yes.

3         Q.    And then were you -- did you have a full-

4    time position with Meriden?

5         A.    No.

6         Q.    Were you a sworn officer?

7         A.    Yes.

8         Q.    And so did you carry a firearm?

9         A.    Yes.

10         Q.    And you had police powers?

11         A.    Yes.

12         Q.    When you were working part time for

13    Meriden how many hours were you working a week,

14    approximately?

15         A.    I -- I don't recall.

16         Q.    Do you know if it was more or less -- go

17    ahead.

18         A.    I -- I don't recall.

19         Q.    Was it more or less than 20 hours a week?

20         A.    Sir, I don't recall how many hours.

21         Q.    Okay.  When you worked for Meriden were

22    you working in a -- in a marked squad car on

23    patrol?

24         A.    Yes.

25         Q.    Did you have any duties with Meriden



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604                Suite 101                    Suite 305
785-273-3063              Overland Park, KS 66212         Wichita, KS 67202
www.appinobiggs.com           913-383-1131                316-201-1612

## JOEL RANDY CARRENO

1   other than working in a marked squad car on

2   patrol?

3       A.    No.

4       Q.    Okay.  And so after a brief stint with

5   Meriden you left Meriden, and where did you go?

6       A.    To the Jefferson County Sheriff's

7   Department.

8       Q.    Why did you join the Jefferson County

9   Sheriff's Department?

10      A.    It provided me an opportunity to have a

11  full-time employment as a law enforcement officer.

12      Q.    When you joined Jefferson County did you

13  attend an academy?

14      A.    Yes.

15      Q.    Which academy did you attend?

16      A.    Lawrence Police Department.

17      Q.    And how long did you attend that academy

18  in Lawrence?

19      A.    16 weeks.

20      Q.    And upon completion of your time in the

21  Lawrence Police Department did you join the

22  Jefferson County Sheriff's Office as a police

23  officer?

24      A.    I was sponsored by the sheriff's

25  department.  I was already employed by them before



5111 SW 21st Street       6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604          Suite 101                Suite 305
785-273-3063              Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com       913-383-1131             316-201-1612

### JOEL RANDY CARRENO

1    I went to the academy.

2         Q.    All right.   What was your first position

3    with the Jefferson County Sheriff's Office after

4    you left the Lawrence training academy?

5         A.    A road deputy.

6         Q.    And for how long were you a road deputy

7    with the Jefferson County Sheriff's Office?

8         A.    For about three years.

9         Q.    And when you say you were a road deputy,

10   were you patrolling in a marked squad car in

11   uniform for that time?

12        A.    Yes.

13        Q.    And what were your duties as a road

14   deputy?

15        A.    Responding to calls.   That was my primary

16   duties.

17        Q.    How did your duties change after three

18   years as a road deputy?

19        A.    I'm sorry?

20        Q.    How did your duties change after you were

21   a road deputy for three years?

22        A.    I went to the detective division.

23        Q.    Did you have to apply to be a member of

24   the detective division?

25        A.    No.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**JOEL RANDY CARRENO**

1      Q.    How was it that you were assigned to the

2  detective -- detective division, if you know?

3      A.    Through the -- the sheriff.

4      Q.    And how were you notified that you were

5  going to join the detective division?

6      A.    I don't recall.

7      Q.    What were your duties when you first

8  joined the detective division?

9      A.    Was to investigate reported crimes,

10  incidences.

11      Q.    When you worked for the detective

12  division did you wear a uniform?

13      A.    No.

14      Q.    What was your typical dress?

15      A.    A nice shirt and nice pants.

16      Q.    Okay.  How long did you remain a member

17  of the detective division?

18      A.    I don't know.  I -- I'd only be guessing,

19  sir.  I don't know.

20      Q.    What was your next position with the --

21  within the Jefferson County Sheriff's Office after

22  you were -- after you made detective?

23      A.    The position that I'm currently in.

24      Q.    All right.  And you made captain -- was

25  it in 2008 or so?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063            Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

## JOEL RANDY CARRENO

1    A.    I don't know if that's the year but, yes,

2  I did.

3    Q.    All right.  You made captain after the

4  Bledsoe trial, right?

5    A.    I don't recall.

6    Q.    Have you held any other positions within

7  the Jefferson County Sheriff's Office other than

8  road deputy, detective, and captain?

9    A.    No.  I -- and I want to make sure this is

10  understood.  In what I'm doing now I've been doing

11  for a while.  I have the title of a captain but

12  it involves various different things for the

13  sheriff's department that needs to be done, so.

14    Q.    Do you have any plans to retire?

15    A.    No.

16    Q.    Do you have any post-high school

17  educational experience?

18    A.    Very limited, yes.

19    Q.    What post-high school education

20  experience do you have?

21    A.    I have just a few college hours with

22  Barton County Community College.

23    Q.    How did you obtain those hours?

24    A.    They were hours that -- oh, I don't

25  recall how they phrased it.  There was a program



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

2/1/2023

23

## JOEL RANDY CARRENO

1  back then to where you could accumulate hours for

2  your experience -- for your work experience.

3      Q.   **And so is it fair to say that you -- you**

4  **-- based on your work experience that entitled you**

5  **to some credits but you weren't taking classes at**

6  **the Barton County Community College, is that**

7  **correct?**

8      A.   Yes.

9      Q.   **All right.  And I take it you don't --**

10  **you didn't receive a degree from any post-high**

11  **school educational institution, correct?**

12      A.   No.

13      Q.   **When you became a detective did you**

14  **receive any additional training?**

15      A.   Yes.

16      Q.   **What additional training did you receive**

17  **when you became detective?**

18      A.   I know that I was sent to training

19  pertaining to interviewing.

20      Q.   **Where was that training on interviewing?**

21      A.   I don't recall.

22      Q.   **Was it outside your department?**

23      A.   Oh.  Yes.

24      Q.   **Was it outside your state?**

25      A.   I don't believe so.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1      Q.    Have you ever gone -- have you ever left

2   Kansas for training?

3      A.    Yes.

4      Q.    Where did you go when you left Kansas for

5   training?

6      A.    I went to Oklahoma City.

7      Q.    Why did you go to Oklahoma City?

8      A.    It was a training that was being put on

9   by a supervisor from the New York City Police

10  Department that I had interest in.

11     Q.    Do you recall going to a training called

12  The Kinesic Interview and Interrogation in Topeka?

13     A.    Not in Topeka.  No.

14     Q.    Where do you recall that occurring?

15     A.    The certification for that was in

16  Bentonville, Arkansas, and then the

17  recertification was in Branson, Missouri.

18     Q.    And was that a 24-hour -- sorry.  Excuse

19  me.  Yeah.  Class that consumed 24 hours or was

20  that longer?

21     A.    In Bentonville?

22     Q.    The -- the Kinesic, spelled, K-I-N-E-S-I-

23  C, interview and interrogation?

24     A.    The training that I went to in

25  Bentonville, I recall it being more than three



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

25

**JOEL RANDY CARRENO**

1   days.  The recertification in Branson, Missouri

2   would have been three days.  Two or three days.

3        Q.   All right.  Give me one second, sir.

4        MR. AINSWORTH:  Well, Brett, could you

5   please hand the witness -- it's the second to last

6   exhibit for some reason.  It's Exhibit 47.  And

7   let me give everybody the Bates number -- the

8   Bates numbers on these -- on this document,

9   Exhibit 47, is KS CPOST 5 through KS CPOST 32.

10  These are the training records for the witness,

11  and I'll -- I'll put them on the screen so that

12  people can access them.

13       BY MR. AINSWORTH:

14       Q.   All right, sir.  So I'm showing you what

15  we've marked as Exhibit No. 47.  I just want to

16  go down to page 3 of this document.  There's been

17  reference to a training in Bentonville, Arkansas

18  for a computer voice stress analysis.  Do you see

19  that?

20       A.   Yes.

21       Q.   All right.  Is that the training you're

22  referring to in Bentonville?

23       A.   Yes.

24       Q.   Okay.  And that was -- and then if you go

25  to the previous page, page 2, of Exhibit 47.  The



5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

## JOEL RANDY CARRENO

1    first entry under 1994 there's a reference to

2    kinesic interview and interrogation in Topeka on

3    January 7th, 1994.  Do you see that, sir?

4         A.   Yes.

5         Q.   And that was a training that consumed 24

6    hours, is that right, or --

7         A.   Yes.

8         Q.   -- three eight-hour days?

9         A.   Yes.

10        Q.   Does that refresh your recollection that

11   you received the training on kinesic interview and

12   interrogation in Topeka?

13        A.   Yes.

14        Q.   When you were trained on interviews and

15   interrogations back in 1994 did they reference the

16   Reid method of interrogation?

17        A.   I don't recall.

18        Q.   Have you ever been trained on the Reid

19   method of interrogation?

20        A.   Yes.

21        Q.   Where were you trained on the Reid method

22   of interrogation?

23        A.   I don't recall.

24        Q.   Okay.  Was it while you were a detective?

25        A.   Yes.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

# JOEL RANDY CARRENO

1     Q.    And where did you receive the Reid

2   training?

3     A.    I -- I don't remember.

4     Q.    Take a look at page 3 of Exhibit 47.

5   Under 1997 there is a reference to you receiving

6   advanced Kinesic interrogation techniques, phase

7   two.  Do you see that?

8     A.    Yes.

9     Q.    Do you recall that 16-hour training in --

10   in Lawrence?

11     A.    I do not.

12     Q.    Okay.  Is it fair to say that you recall

13   being trained on interrogation and interviewing

14   techniques, you just don't remember exactly when

15   you received that training or where?

16     A.    Yes.

17     Q.    All right.  And how were you trained to

18   conduct interrogations?

19     A.    That's a pretty broad question.  I don't

20   know how to respond to that.

21     Q.    Sure.  Okay.  So let's take a step at a

22   time.  Were you trained that there's a difference

23   between interviews and interrogations?

24     A.    Yes.

25     Q.    What was your -- what were you trained on

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**JOEL RANDY CARRENO**

1    **the difference between interviews and**

2    **interrogations?**

3         A.    Interviewing as I was taught was one-on-

4    one.  Not accusing anybody of anything, just

5    obtaining information.  An interrogation was a

6    direct -- a very direct interview to where the

7    accusations was presented to the person that you

8    were interviewing.

9         **Q.    Were you trained that you were supposed**

10   **to interrogate someone only if you had a belief**

11   **that the person was guilty?**

12        A.    I'm sorry?

13        **Q.    Were you trained that you were supposed**

14   **to only interrogate somebody if you believed that**

15   **the person was guilty?**

16        A.    No.

17        **Q.    What was your training on when you were**

18   **supposed to conduct an interview and when you were**

19   **supposed to conduct an interrogation?**

20        A.    The difference would be that when you

21   have general information, and when you felt or

22   what I felt was needed information, that was the

23   interview portion of that investigation.  When I

24   took it a step further, those -- the interrogation

25   part, and what it meant to me was that further

## JOEL RANDY CARRENO

1    information needed to be obtained.

2          Q.    Because you believe the person was

3    withholding information?

4          A.    It was because I needed more information

5    to find out.

6          Q.    Well, I guess, you know, when you're

7    conducting an interview with a witness sometimes

8    you might ask follow-up questions, right?

9          A.    Correct.

10         Q.    Because you want to clarify a point or

11   find out information the witness might have,

12   right?

13         A.    Correct.

14         Q.    And you don't use interrogation

15   techniques when you're just trying to follow-up on

16   information with the witness, right?

17         A.    That would be fair.  Yes.

18         Q.    And so is it fair to say that you only

19   use interrogation techniques when you think that

20   the witness isn't willing to provide the

21   information that you're trying to find out?

22         A.    When you say techniques, I'm not for sure

23   what you mean.  But my response to that is that I

24   would approach an interrogation differently than

25   that of an interview.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1      Q.   How did you approach an interrogation

2   differently from an interview?

3      A.   It depends on what type of information I

4   had to present to that person.

5      Q.   And how does the type of information that

6   you have dictate the difference in approach

7   between an interrogation and an interview?

8      A.   An interview is -- is a lot more informal

9   to where an interrogation for myself is I have

10  something and I need to talk to you about.

11  Something pertaining to the investigation.

12     Q.   I guess I'm a little confused because --

13  and let me just lay out my confusion and I'll ask

14  if you can clarify it.

15     It seems like when you're talking to a

16  witness there is a specific point, oftentimes,

17  that you want to talk to the witness about, such

18  as did you see anything happen at about seven

19  o'clock on the night in question, or do you know

20  this person, or can you tell me about your co-

21  worker.  And so I'm confused as to, you know, when

22  you say you have something specific to speak with

23  a -- when you're conducting an interrogation.

24  What do you mean?

25     A.   On the interrogation part it would be



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

1  that I gathered, I obtained additional information

2  either from the suspect or the person I'm talking

3  to or from an outside source, and I needed to get

4  better clarification.

5      **Q.   And when you're conducting an**

6  **interrogation why don't you just do it the same as**

7  **an interview and just ask the person what they**

8  **have to tell you?**

9      A.   I wasn't trained that way, and I -- I

10 just -- I can't see myself just going into a --

11 an interrogation without an interview.

12     **Q.   Okay.  And so how were you trained to**

13 **conduct interrogations to try and get the truth**

14 **from somebody who you believed was withholding**

15 **information from the police?**

16     A.   To be very direct with the information

17 that I had.

18     **Q.   You mean confronting the person with the**

19 **information that you have?**

20     A.   Yes.

21     **Q.   And any -- what other techniques were you**

22 **trained to use other than confronting the person**

23 **with the information that you had during an**

24 **interrogation?**

25     A.   Could you ask me that question again,



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

**JOEL RANDY CARRENO**

1   please?

2        Q.   Sure.  During -- you've told us that one

3   technique you were trained to use during

4   interrogations was to be very direct with the

5   person and bring up the information that you had

6   against them.  What other techniques were you

7   trained to use during interrogations?

8        A.   I -- I don't know how to respond to that

9   question.  It -- it's a one-on-one interview or

10  contact.  I'm not quite for sure exactly what

11  you're asking.

12       Q.   Sure.  I appreciate you letting me

13  clarify.  So when you were trained on how to

14  conduct interrogations were you trained to build a

15  rapport with the subject?

16       A.   Yes.

17       Q.   All right.  Were you trained to offer

18  reasons for why they may have committed the crime

19  that might be less shaming or more understandable?

20       A.   Yes.

21       Q.   And so an example of that would be you

22  probably didn't mean to do it, it may have been an

23  accident or something like that, is that correct?

24       A.   That would be correct.

25       Q.   Were you trained to yell at suspects

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street         6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604            Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com         913-383-1131              316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## JOEL RANDY CARRENO

1   during interrogations?

2        A.   No.

3        Q.   Were you trained to swear at suspects

4   during --

5        A.   No.

6        Q.   -- interrogations?

7        A.   No.

8        Q.   Were you trained to tell suspects that

9   they would be spending time in prison?

10       A.   No.

11       Q.   Why -- why weren't you trained -- if you

12   know, why weren't you trained that -- to tell

13   suspects that they're going to be spending time in

14   prison?

15       A.   Why wasn't I trained?

16       Q.   Yeah.  Or -- or -- well, strike that.

17   Let me ask it a different way.

18       Were you told that you're not supposed to

19   tell people that they were -- that they'd be

20   spending time in prison because that might be

21   viewed as a threat by the subject?

22       A.   No.

23       Q.   Okay.  You just knew that you weren't

24   supposed to bring up the fact that they'd be

25   spending time in prison, right?



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

1          MR. NORTON:  Object to the form of the

2     question.  You can answer if you can.

3          A.   Ask me again, please.

4          BY MR. AINSWORTH:

5          **Q.   Sure.  You just knew from attending the**

6     **trainings that you weren't supposed to bring up**

7     **the fact that the subject would be spending time**

8     **in prison.**

9          MR. NORTON:  Same objection.

10         A.   I was never trained one way or another on

11    -- on that right there, that you do or you don't.

12         MR. AINSWORTH:  Okay.  Brett, would you

13    please hand the witness Exhibit No. 40?  And this

14    is -- for everybody else I'm going to read off the

15    -- and Brett, just yell at me if I'm talking when

16    you need to be -- or maybe just tell me when to

17    go --

18         THE VIDEOGRAPHER:  You're fine.

19         MR. AINSWORTH:  Let me read the Bates

20    numbers and then tell me when you're ready.  So

21    the Bates numbers for everybody, that is JC 20853

22    through JC 20854.  And I'll display it on the

23    screen.

24         BY MR. AINSWORTH:

25         **Q.   All right.  Sir, take a look at Exhibit**



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1   40.   This is titled Bio for Captain Randy Carreno,

2   Jefferson County.  Do you see that?

3      A.   Yes.

4      Q.   All right.  Did you prepare this bio,

5   sir?

6      A.   No.

7      Q.   Do you know who did?

8      A.   No.

9      Q.   Last sentence of the first paragraph says

10  that Randy has a lot of pride in his children and

11  will share with you when asked.  Is that true?

12     A.   Yes.

13     Q.   All right.  All right.  Here it says that

14  Randy attended the Lawrence, Kansas basic law

15  enforcement training academy, attended it on April

16  27th, 1991.  Is that true?

17     A.   That sounds correct.

18     Q.   Says on September 23rd, 1994, Randy was

19  promoted to detective at the sheriff's office --

20  sheriff's office, is that correct?

21     A.   '94.  I was thinking it was '93.  But,

22  yeah, that sounds correct.

23     Q.   Okay.  All right.  And then so now we're

24  on page 2 of Exhibit 4.  There's a paragraph that

25  reads, if Captain Carreno had to choose the

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604                  Suite 101                   Suite 305
785-273-3063              Overland Park, KS 66212        Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

### JOEL RANDY CARRENO

1   favorite part of his job he would say interviewing
2   suspects.  If you asked Captain Carreno why he
3   chooses interviewing he will tell you there is no
4   better feeling than getting a confession out of a
5   bad guy.  Is that true, sir?
6        A.   Yes.
7        Q.   It says, Randy has a unique technique of
8   interviewing suspects.  What is that technique you
9   asked?  And it says, he is nice to them and he
10  treats them respectfully.  Randy will tell you,
11  you will get more answers out of someone by being
12  nice to them then by going in with the big bad
13  attitude and trying to force them to talk.  Do you
14  see that, sir?
15       A.   Yes.
16       Q.   Is that true you?  You believe you get
17  more answers out of someone by being nice to them
18  than -- than by going in with a big bad attitude
19  and trying to force them to talk?
20       A.   Yes.
21       Q.   All right.  And so is that your unique
22  technique of interviewing suspects, to be nice to
23  suspects and treat them respectfully?
24       A.   Yes.
25       Q.   Did you ever treat suspects



1   disrespectfully?

2        A.   Yes.

3        Q.   Why?

4        A.   Not getting the results that I felt that

5   we needed.

6        Q.   All right.  Exhibit 40, page 2 continues

7   by reading -- by stating, Randy has solved

8   numerous cases over the last 20 years as a

9   detective.  Randy has been involved in every

10  homicide investigation with the exception of one.

11  Every homicide investigation which Randy has been

12  involved had a conviction served on the suspect.

13  Randy has been involved in many investigations,

14  conducting several investigations for this agency

15  and other agencies requesting assistance.

16  Investigations such as homicide, sexual abuse,

17  cases, burglaries, and the list goes on.

18        Then it says at the last paragraph there,

19  Randy served as captain of detectives and patrol

20  from April 2003 to April 2008.  Randy currently

21  serves as captain of patrol.  Do you see that?

22        A.   Yes.  Yes.

23        Q.   All right.  So is it fair that you

24  attained your current position as captain of

25  patrol in April 2008 -- or -- strike that.  I

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**JOEL RANDY CARRENO**

1   screwed that up.  Are you still captain of patrol?

2       A.   No.

3       Q.   All right.  When did you stop being

4   captain of patrol?

5       A.   I don't recall the year.

6       Q.   How long ago was it?

7       A.   I don't recall the year.

8       Q.   All right.  I know you don't understand

9   and recall the year, but approximately how many

10  years ago was it?

11      A.   Approximately 15 years ago.

12      Q.   Why did you stop being captain of patrol?

13      A.   I was moved -- I was moved from that

14  position up to my current position by way as the

15  sheriff.

16      Q.   And why were you moved to your current

17  position from captain of patrol?

18      A.   I -- I don't -- I don't know.

19      Q.   Did your pay change when you changed

20  positions?

21      A.   I don't recall.

22      Q.   Why did you stop being captain of

23  detectives in approximately April of 2008?

24      A.   Your question again?

25      Q.   Why did you stop -- well, you say in the



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604              Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

```
 1   last paragraph of Exhibit 40, page 2, it says

 2   Randy served as captain of detectives of patrol

 3   from April 2003 to April 2008.  Do you see that?

 4        A.   Yes.

 5        Q.   And then it says you currently serve as

 6   captain of patrol.  So my question is, why did you

 7   stop being captain of detectives?

 8        A.   I was reassigned to another position --

 9   to my current position.

10        Q.   Why were you reassigned from captain of

11   detectives and patrol to captain of patrol?

12        A.   That question would have to be answered

13   by my supervisor.

14        Q.   Was it a demotion to be -- stop being

15   captain of detectives and patrol and just be

16   captain of patrol?

17        A.   No.

18        Q.   This states that -- this meaning Exhibit

19   40.  States that every homicide investigation in

20   which Randy's been involved had a conviction

21   served on the suspect.  Did that -- is that true?

22             MR. NORTON:  Object to the form of the

23   question.  If I make a point objection you can

24   continue to answer.

25             THE WITNESS:  Yeah.  I'm trying to -- I'm
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**JOEL RANDY CARRENO**

1   not sure.

2        BY MR. AINSWORTH:

3        **Q.   All right, sir.  Well, how many homicide**

4   **investigations have you been involved in?**

5        A.   I don't know the exact number.

6        **Q.   All right.  Is it more than ten?**

7        A.   It would be right around ten.

8        **Q.   Okay.  Back in 1999 there were two**

9   **homicides that year in Jefferson County, is that**

10  **right?**

11       A.   Yes.

12       **Q.   Before 1999 had you investigated any**

13  **homicides as a detective?**

14       A.   I'm not for sure.

15       **Q.   What was the other homicide in 1999 that**

16  **was being investigated at the same time as the**

17  **Arfmann homicide?**

18       A.   A gentleman by the name of Clarence

19  Rinke.

20       **Q.   Was that murder solved, the Rinke**

21  **homicide?**

22       A.   Yes.

23            THE REPORTER:  I'm sorry.  Repeat that.

24  Was that what again?  I couldn't understand you.

25            MR. AINSWORTH:  I'm sorry, sir.  I asked



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1  whether that murder was solved, the Rinke homicide

2  in referring to the -- the second homicide in --

3  in 1999 Jefferson County.

4      BY MR. AINSWORTH:

5      Q.   What was the first homicide that you

6  worked on?

7      A.   I -- I don't recall.

8      Q.   And -- what was Clarence's last name?  I

9  may have misheard you.

10     A.   Rinke, R-I-N-K-E.

11     Q.   Okay.  Was the Rinke homicide the first

12  homicide that you worked on as a detective?

13     A.   I -- I don't recall.

14     Q.   Did you work on any homicides as a patrol

15  officer either in Meriden or Jefferson County?

16     A.   I don't recall.

17     Q.   When you were a detective did you

18  supervise anyone before you became captain?

19     A.   I'm not for sure.  I believe that the

20  investigators -- we -- we as investigators had the

21  same rank.

22     Q.   Who was your supervisor in 1999?

23     A.   It would have been Captain Orin Turner.

24     Q.   And then did Turner report to Harrig?

25     A.   I -- I don't know that for -- I don't



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

**JOEL RANDY CARRENO**

```
 1   know.
 2        Q.    Dunnaway was your sheriff in 1999, right?
 3        A.    Correct.
 4        Q.    He made you a detective, is that right?
 5        A.    Correct.  Yes.
 6        Q.    Was Dunnaway a sheriff who left the
 7   policing to other people or would he get
 8   personally involved?
 9        A.    Both.
10        Q.    All right.  In 1999 you videotaped your
11   interrogations of suspects, is that right?
12        A.    Yes.
13        Q.    And that was the practice of the
14   Jefferson County Sheriff's Office was to videotape
15   all suspect -- all interrogations or interviews
16   with suspects, right?
17        A.    Ask me that question again, if you would.
18        Q.    Sure.  In 1999 it was the practice of the
19   Jefferson County Sheriff's Office to videotape all
20   interrogations or interviews with suspects, right?
21        A.    Yes.
22        Q.    When you're a police officer -- sometimes
23   people lie to police officers, right?
24        A.    Yes.
25        Q.    And I should say sometimes people give
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1  false information to police officers, right?

2      A.   Yes.

3      Q.   Okay.  And sometimes it's just a -- a

4  lack of memory, right, somebody might remember

5  something wrong, correct?

6      A.   Could be.

7      Q.   Or it might be a deliberate effort to

8  mislead the police, right?

9      A.   Yes.

10     Q.   And so part of your job as a detective is

11  to look for inconsistencies of what people are

12  telling you and then try and determine whether

13  those inconsistencies are a mistake or a

14  deliberate effort to mislead the police, right?

15     A.   That would be fair.

16     Q.   Because you're trying to get to the truth

17  of what happened, right?

18     A.   Correct.

19     Q.   And so it's important for you as a

20  detective to be aware of what's going on in the

21  investigation so you can tell whether somebody's

22  given you inconsistent information, right?

23     A.   Yes.

24     Q.   And it's also important for you as a

25  detective to document what people are -- are



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1  telling you so that you can later look back to

2  find out what they had said before, right?

3      A.    Yes.

4      Q.    And you were aware back in 1999 that your

5  police reports would be -- would help your fellow

6  detectives and supervisors be able to continue

7  their investigations, right?

8      A.    My response to that question is that my

9  reports that I generated in 1999 was going to be

10 sent to the county attorney for review.  I don't

11 -- as I'm sitting here right now I don't recall,

12 to my knowledge, of any other officer or officers

13 reading my report.

14     Q.    Well, back in 1999 did you have a file

15 for cases that you're investigating?

16     A.    There was a file, yes.

17     Q.    What do you call that file?

18     A.    The master file of the investigation

19 itself.

20     Q.    And so, for example, if you -- if it's

21 the Arfmann case would you call it the Arfmann

22 master file?

23     A.    I don't know what they -- what they

24 called it.

25     Q.    What did you call it?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

2/1/2023                                                                45

**JOEL RANDY CARRENO**

1          A.   I -- I don't recall.

2               MR. AINSWORTH:  And, everyone, just for

3     the record, we're joined by Maria Makarn who's

4     another newly hired associate at our firm just

5     listening in to the deposition for observation.

6     This is our own -- training exercises.

7          BY MR. AINSWORTH:

8          **Q.   All right.  So how would you keep**

9     **apprised -- well, strike that.**

10         **Sometimes as a detective you would**

11    **investigate a case in conjunction with other**

12    **detectives, right?**

13         A.   Correct.

14         **Q.   And if it was a big case you might have**

15    **multiple detectives working together, right?**

16         A.   On this case here we had all the

17    detectives working on the investigation.

18         **Q.   And so how would you keep apprised in**

19    **1999 of the activities of your fellow detectives**

20    **when you are working a case?**

21         A.   Are you referring to this case right

22    here?

23         **Q.   Any case in 1999.**

24         A.   And your question again is what?

25         **Q.   How would you keep yourself apprised of**



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**JOEL RANDY CARRENO**

1    what was going on by or -- or what activities your
2    fellow detectives were conducting while you were
3    working the same investigation?
4        A.   That depends on the size of the
5    investigation itself.
6        Q.   Well, how about the Arfmann homicide
7    investigation where all of the detectives were
8    involved?  How would you keep yourself apprised of
9    what your fellow detectives were doing?
10       A.   I did not read any of their reports.
11   Through verbal communication.
12       Q.   So you would have case meetings, is that
13   right?
14       A.   I don't -- what's your definition of
15   meetings.  We had gatherings, interactions.
16       Q.   Okay.  Would you sometimes have multiple
17   people meet to discuss a case?
18       A.   If you're referring to this case right
19   here the closest that I could come to to answer
20   your question is I conducted -- if I conduct --
21   well, I did conduct several interviews and at
22   times they were being watched by officers, and
23   then after the interview there would be that
24   interaction of what just took place.  But as far
25   as a formal meeting, I don't recall that happening

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### JOEL RANDY CARRENO

1  here.

2  **Q.    Was there a reason why you didn't --**

3  **like, do you specifically recall you did not meet**

4  **as a group to talk about the investigation?**

5  A.    Other than post interview we did.  I

6  played a very, very small part in this

7  investigation, and with that being said, I did

8  what I did.  Were there any meetings with fellow

9  officers in regard to the investigation?  To the

10  best -- well, I know that after interviews, and

11  I'm not saying all of them, but there were times

12  after interviews in which we would talk about it

13  in the conference room.

14  **Q.    All right.  And when you would talk about**

15  **the interviews in the conference room you would --**

16  **you would catch each other up on what was going on**

17  **in the investigation, is that fair to say?**

18  A.    No.  No.

19  **Q.    Why would you -- tell us, why wouldn't**

20  **you share with your fellow detectives what was**

21  **going on in the investigation that you had**

22  **uncovered?**

23  A.    I -- it's well-documented what I

24  participated in, in the majority of my involvement

25  in this investigation, was that of interviewing



Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**JOEL RANDY CARRENO**

1   people.

2        Q.   **And so you would make your reports**

3   **available to your fellow detectives to read so**

4   **that they could find out what you were doing?**

5        A.   No.  I don't ever recall handing somebody

6   a report of mine where they could review.  That

7   wasn't my practice.

8        Q.   **Sure.  How would you keep your fellow**

9   **detectives up to date on what you were doing in**

10  **the investigation while it was going on?  And I'm**

11  **talking about the Arfmann homicide investigation.**

12       A.   Ask me that question again, please.

13       Q.   **Sure.  During the Arfmann homicide**

14  **investigation how would you keep your fellow**

15  **detectives up to date on what was going on in the**

16  **investigation?**

17       A.   My response to that would be that on

18  search warrants for that were conducted by myself

19  and other deputies.  They would already have that

20  knowledge at that time.  And I go back and state

21  this again about the interviews.  I know that

22  there were times in which they were being watched

23  by fellow officers, and that upon completion of

24  that interview I would go into the conference room

25  and discuss what was the outcome of the -- or the



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### JOEL RANDY CARRENO

1  content of the interview itself.

2      Q.   And you would not discuss other aspects

3  of the investigation, you would just talk about

4  the interview you had just conducted.  Is that

5  what you're saying?

6      A.   Yes -- no.  I -- I'm sure -- and I don't

7  recall during the course of this investigation

8  there were statements made to me in regard to the

9  investigation itself.

10     Q.   Why do you say you played a small part in

11  the investigation?

12     A.   Because I know that I did.  There was so

13  many things -- so many events, and I'm going to

14  call them leads, that needed to be investigated.

15  The biggest part that I played in this

16  investigation was doing the interviews.  I wasn't

17  out for the most part in the fields -- in the

18  field doing legwork, and there was a lot of that

19  that was conducted.

20     Q.   Where was the master file kept for the

21  Arfmann homicide?

22     A.   The procedure was within the records

23  room, yes.

24     Q.   Okay.  And so when you would complete the

25  report would you place your report in the master



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604              Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1  file or where would it go?

2      A.    No.  It would be turned in, and then I

3  would turn in my reports to the record clerk or

4  clerks, and then from there they would put it in

5  the master file.

6      Q.    Would you ensure that your reports made

7  it to the county attorney?

8      A.    That was -- I -- my response to that is,

9  I did what I just stated that I did.  That was my

10 procedure.  And the records clerks would

11 disseminate that information to the county

12 attorney.

13     Q.    All right.  And did any of your reports

14 in the entire time you were a detective at

15 Jefferson County when you put it into the bin for

16 the records clerk, did any of those reports ever

17 not make it to the county attorney to your

18 knowledge?

19     A.    Not -- not that I'm aware of.

20     Q.    All right.  So every time you created a

21 report it would make it into the file and go to

22 the county attorney, is that right?

23     A.    Ask that question again.

24     Q.    Sure.  Every time you completed a report

25 it would make its way to the file and go to the



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604              Suite 101                    Suite 305
785-273-3063                  Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com           913-383-1131                  316-201-1612

## JOEL RANDY CARRENO

1  county attorney, is that right?

2          MR. LINDEN:   Objection.   Foundation.

3          MR. NORTON:   Object to the form.

4  A.   Every time I completed a report it was

5  turned into the records clerk.

6  BY MR. AINSWORTH:

7  **Q.   And it would make its way to the -- well,**

8  **let me ask it a different way.   Did you ever have**

9  **any indication that the records clerks were**

10 **preventing files from being produced to the county**

11 **attorney?**

12         MR. LINDEN:   Objection.   Form.

13 Foundation.

14 A.   No.

15 BY MR. AINSWORTH:

16 **Q.   What's a field note?**

17 A.   A field note is my documentation

18 providing information for myself to aid me to --

19 to aid me to completing a report.

20 **Q.   And during the Arfmann homicide**

21 **investigation where did you keep your field notes?**

22 A.   I don't -- I don't recall.   I know my

23 field notes are turned into the record clerk or

24 clerks.   I don't know if I made a copy of them or

25 not.



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

2/1/2023                                                    52

**JOEL RANDY CARRENO**

1      Q.   All right.  And so would you keep your

2  field notes, and then at the end of the

3  investigation turn them into the record clerk, or

4  would you turn them in as you're completing them?

5      A.   As I completed them.

6      Q.   Okay.  If you wanted to look at the

7  master file to see what was going on in the

8  investigation could you go in the master file and

9  review the file?

10      A.   I had no need to or no want to.  Could I

11  have done that?  I don't know.  I didn't have any

12  need to.

13      Q.   Had you ever reviewed a master file to

14  see what was in there?

15      A.   I'm sure that I have.

16      Q.   You just don't recall doing it?

17      A.   No.

18      Q.   That's correct?

19      A.   Yeah.  That is correct.

20      Q.   And so you would keep copies of the

21  reports and documents you would give to the

22  records clerk so you could have your own copy of

23  what was going on in the case?

24           MR. NORTON:  Object to form, and

25  misstates.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

# JOEL RANDY CARRENO

1    A.    Would you ask me that question again,

2   please.

3         MR. AINSWORTH:   Sure.

4    BY MR. AINSWORTH:

5    **Q.    Sure.   Would you keep copies of the**

6   **reports that you would submit to the records clerk**

7   **and the field notes that you would submit?**

8    A.    That would not be uncommon, but I did not

9   do that 100 percent of the time.

10    **Q.    And you would keep copies so that you**

11   **could have your reports and notes to refer to as**

12   **you're conducting your investigation, is that**

13   **right?**

14    A.    That could be fair.

15    **Q.    Were you supposed to date your reports so**

16   **people could tell when they were compiled?**

17    A.    We had a dissemination sheet that was

18   filled out.   And I want to make sure that we had

19   'em -- I'm not for sure if we had 'em in 1999.   I

20   -- I don't recall how we tracked or how I would

21   track that information that you're referring to.

22    **Q.    What did you do to prepare for this**

23   **deposition?**

24    A.    I watched the videos of the subjects that

25   I interviewed, I reviewed the information that I



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1  had, and I -- and spent time alone just trying to
2  think of things to help I to remember what
3  happened.
4       Q.   When you say you reviewed info that you
5  had, what information did you review apart from
6  the videos of the interviews you conducted?
7       A.   I had at my residence copies of reports.
8  Not complete copies, but I went through that
9  documentation to help me recall situations in
10 which I was involved in.
11      Q.   Were those typewritten reports?
12      A.   I'm sorry.
13      Q.   Were those reports that you're referring
14 to at your residence, were they typewritten?
15      A.   Yeah.  It was primarily my narrative
16 pertaining to the investigation.
17      Q.   Did you have any field notes in your
18 residence?
19           MR. NORTON:  Object to form of the
20 question.
21      A.   No.
22 BY MR. AINSWORTH:
23      Q.   Okay.  Did you have any reports from the
24 KBI in your file that you had at your residence?
25      A.   No.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604                 Suite 101                   Suite 305
785-273-3063              Overland Park, KS 66212          Wichita, KS 67202
www.appinobiggs.com          913-383-1131                  316-201-1612

**JOEL RANDY CARRENO**

1      **Q.    When you referred to that -- the**
2  **documents you had in your residence was this --**
3  **were these documents that you had retained since**
4  **1999?**
5      A.    No.   The majority of them were
6  documentations that I had received from my
7  attorney in regard to this lawsuit.
8      **Q.    Okay.**
9         MR. NORTON:   Russell, if I may interject.
10  The camera's not showing you it, but if you were
11  here you would see a notebook in front of him that
12  has the documents that he was provided to prepare
13  for the deposition.
14         MR. AINSWORTH:   I appreciate that.
15  BY MR. AINSWORTH:
16      **Q.    Mr. Carreno, would you mind referring to**
17  **the notebook of documents and just telling us**
18  **what's in there?**
19      A.    Okay.   It's broken down into different
20  sections.   Excuse me.   The tabs represent the
21  preliminary hearing which is my testimony.
22      **Q.    Okay.   Your testimony at the preliminary**
23  **hearing.   Okay.**
24      A.    The trial, field notes, and reports.
25      **Q.    Okay.   So did you review your transcript**



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1    -- the transcript of your testimony at the

2    preliminary hearing?

3        A.   Yes.

4        Q.   Did you review your -- the transcript of

5    your testimony at trial?

6        A.   Yes.  I've been all through this

7    notebook.

8        Q.   Okay.  How much time did you spend

9    reviewing the notebook?

10       A.   Multiple, multiple hours.  A lot of the

11   -- not a lot.  Contents of this right here pertain

12   to interviews that I conducted, and I believe it

13   was -- and I'm going to say that 32 to 40 hours of

14   just interviews.  So I -- and I went through all

15   of them.  I read what's in this notebook to help

16   me better recall what occurred and my involvement

17   in this full investigation.

18            MR. NORTON:  He'd like to take a break.

19   We've been going a little over an hour.

20            MR. AINSWORTH:  Of course.  Yeah.

21            THE VIDEOGRAPHER:  Time is approximately

22   10:52 a.m., we're going off the record.

23            (THEREUPON, a recess was taken.)

24            THE VIDEOGRAPHER:  Time is approximately

25   11:02 a.m., we're back on the record.



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604         Suite 101                Suite 305
785-273-3063             Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com      913-383-1131             316-201-1612

## JOEL RANDY CARRENO

```
 1        BY MR. AINSWORTH:
 2            Q.   All right.  Sir, did you speak to anyone
 3    on the break?
 4            A.   Yes.  My attorney.
 5            Q.   And did you speak to anyone other than
 6    your attorney?
 7            A.   No.  My attorneys.  Eric came out.
 8                 MR. NORTON:  That's all you have to say.
 9                 THE WITNESS:  Okay.
10        BY MR. AINSWORTH:
11            Q.   Well, when you say attorneys who did you
12    speak to?  And I'm not asking at this point for
13    what you said.  Just who?
14            A.   My two attorneys here, Mike and Eric.
15            Q.   Okay.  All right.  Sir, when you reviewed
16    your preliminary -- the transcript of your
17    testimony at the preliminary hearing were there
18    any errors or was there anything that you thought
19    was wrong in that transcript?
20            A.   No.  I -- no.
21            Q.   What about your -- after your review of
22    your testimony at the trial did you see any errors
23    or anything wrong in that transcript?
24            A.   No.
25            Q.   And was there anything in either
```



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

## JOEL RANDY CARRENO

1   **transcript that now you realize you had made a**

2   **mistake or said something wrong?**

3       A.   No.

4       **Q.   All right.  After your review of the**

5   **notebook that's in front of you is there any --**

6            MR. NORTON:  Your frozen, Russell.  We

7   can't hear you.

8            THE VIDEOGRAPHER:  The whole call just

9   froze.  Are you guys --

10           MR. AINSWORTH:  I'm sorry if we froze.

11  That was on my -- can I ask the question again?

12           MR. NORTON:  Yeah.  We lost you and it

13  was silent for about a minute or so.

14           MR. AINSWORTH:  Yeah.  I was not lost in

15  thought, I was praying to the internet gods.

16       BY MR. AINSWORTH:

17       **Q.   Okay.  So was there -- after your review**

18  **of the notebook in front of you was there anything**

19  **in the investigation of the Arfmann homicide that**

20  **you now think should have been done differently?**

21       A.   Yes.

22       **Q.   What's that?**

23       A.   One of the things that I wished that we

24  had done, and I -- I'm sure that it was not, but

25  the duct tape that Floyd purchased at the

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**JOEL RANDY CARRENO**

1    Winchester hardware store, and he took it back to

2    his employer.  I always wondered if -- when he

3    took that roll of duct tape back was it a full

4    roll.

5         Q.   So you think you should have recovered

6    the duct tape, is that right?

7         A.   Looking back, I don't know about

8    recovery, but verified it.

9         Q.   Asking Richard Zule if it was a full

10   roll?

11        A.   Correct.

12        Q.   Okay.  Anything else that after you --

13   upon your review of the file that you think could

14   have been done or should have been done

15   differently?

16        A.   Are you asking me on my part?

17        Q.   Any aspect of the investigation of which

18   you're aware.

19        A.   Probably myself, not working hard enough

20   to get a confession.

21        Q.   You think you should have worked harder

22   to get a confession?

23        A.   I didn't get a confession.

24        Q.   From whom?

25        A.   From anybody.  I -- I don't -- from

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**JOEL RANDY CARRENO**

1    anybody.

2        Q.   **What do you think you should have done**

3    **differently to get a confession?**

4        A.   I don't know.  I don't know.  The only

5    thing that I know is that I did not get one.

6        Q.   **Anything else you think should have been**

7    **done differently or should have been done that**

8    **wasn't done in the Arfmann investigation?**

9        A.   Yes.  The other thing would be there was

10   a shovel out at -- out at the burial site.  It was

11   the home, a barbed wire fence, and then the grave

12   site -- the burial site.  And I recall a shovel

13   being leaned up against the barbed wire fence that

14   separated the house from the burial site, and I

15   don't know if it's -- if it was ever collected,

16   but I just felt like that shovel played a part in

17   Camille being buried.

18       Q.   **And you -- you observed the shovel there**

19   **when you were there the early morning hours of**

20   **November 8th, 1999, is that correct -- 1999, is**

21   **that correct?**

22       A.   I don't know what day it was.  I don't

23   know the exact date.

24       Q.   **Was it there -- was the shovel there on**

25   **the 14th when you went back to the scene to**

 Reporting
Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

2/1/2023                                                                         61

**JOEL RANDY CARRENO**

1    collect evidence?

2         A.    I don't recall.

3         Q.    **So the shovel might have been there on**

4    **November 14th, 1999, when you went back to collect**

5    **evidence; is that correct?**

6         A.    Again, I don't recall.

7         Q.    **Did you go to the scene more than twice**

8    **the first time?  The grave site, the first time**

9    **being the early morning hours of November 8th and**

10   **the second time being November 14th?**

11        A.    I don't believe so.

12        Q.    **So the shovel was there on one of those**

13   **two occasions or maybe both, is that right?**

14        A.    That -- that would be correct.

15        Q.    **Okay.  What was Special Agent Woods' role**

16   **in the Arfmann homicide investigation?**

17        A.    They were the assistant agency to the

18   sheriff's department.  His role?  I know that he

19   was out in the field at various times.  His

20   primary role was -- he and Sheriff Dunnaway worked

21   side by side even though the investigation

22   belonged to the sheriff's department.  And that of

23   the sheriff, Jim -- Mr. Woods, Jim, was, as I

24   recall, the closest officer to the sheriff than

25   anybody else.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

62

## JOEL RANDY CARRENO

1    Q.    All right.  So the sheriff was running

2  the investigation for Jefferson County, is that

3  correct?

4    A.    He was in charge of it, yes.

5    Q.    And Woods was in charge of the

6  investigation for KBI, is that right?

7    A.    As I remember.  Yes.

8    Q.    And so sometimes you would take direction

9  from Dunnason -- from Sheriff Dunnaway, and

10  sometimes you would take direction from Special

11  Agent Woods, is that correct?

12    A.    That would be fair.

13    Q.    And so both Special Agent Woods and

14  Sheriff Dunnaway were running the investigation,

15  is that -- is that correct?

16    A.    The way I viewed it they were the

17  officers in charge of the investigation.

18    Q.    So you kept your sheriff apprised of what

19  was going on in the investigation, correct?

20    A.    I had to have, yes.

21    Q.    Because he was in charge of the

22  investigation and the only way he could be in

23  charge is if he knew what was going on, right?

24    A.    That would be fair.

25    Q.    Sheriff Dunnaway would observe your



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1  interviews and interrogations when they're done at

2  the law enforcement center, correct?

3       A.   Are you talking about the reports of?

4       Q.   I mean the actual interrogations that you

5  conducted on the Arfmann homicide investigation.

6            MR. NORTON:  Object to form.  Would you

7  mind re-asking that, Russell?

8            MR. AINSWORTH:  Certainly.

9  BY MR. AINSWORTH:

10      Q.   Sheriff Dunnaway would observe the

11  interviews and interrogations that you conducted

12  at the law enforcement center on the Arfmann

13  homicide case, right?

14      A.   I know that there were times in which he

15  was present and I don't know that he was -- I

16  don't recall if he was hearing all of my

17  interviews, but there were times in which he would

18  watch interviews that I conducted.

19      Q.   And then Sheriff Dunnaway would be one of

20  the people that you would kind of debrief with at

21  the conclusion of an interrogation when you're

22  talking with the other people about what happened,

23  is that right?

24      A.   If he was not watching the video itself

25  I'm sure that I did.



## JOEL RANDY CARRENO

1      Q.    You're sure that you talked to Sheriff

2   Dunnaway about each interrogation that you

3   conducted?

4      A.    No.   What I said, and I'm sorry, is that

5   on the interviews that I conducted that was being

6   watched, I don't recall -- I mean, he knew what

7   was -- what was known through the interview.   Now,

8   the ones in which he did not participate in a

9   manner of watching, umm, I -- I don't recall, but

10  just common sense would say, yes, I informed the

11  sheriff.

12     Q.    Because that was your duty was to keep

13  the sheriff informed of everything that was going

14  on in this investigation that he was running,

15  right?

16     A.    That's correct.

17     Q.    Back in 1999 when you conducted a search

18  you would document that you conducted a search,

19  right?

20     A.    Correct.

21     Q.    And that was the practice in Jefferson

22  County Sheriff's Office, if you conducted a search

23  you would document that, you know, what had been

24  searched, when it was searched, and if anything

25  was found to document what was recovered, is that

## JOEL RANDY CARRENO

1  right?

2      A.   That documentation would be -- would have

3  been made through a KBI evidence custody receipt.

4      Q.   And if you conducted a search and didn't

5  find anything you would just make a report saying

6  this was searched, this is when it was searched,

7  this is who searched it, and nothing was found,

8  right?

9      A.   And you're talking about this

10 investigation right here?  Okay.

11     Q.   No.  I'm just talking about the practice

12 in 1999 in Jefferson County.

13     A.   You would return the search warrant with

14 documentation showing what was found or what

15 wasn't found.

16     Q.   And if it was done via consent to search

17 you would just indicate, you know, what was --

18 what was found or nothing was found, right?

19     A.   It would be documentation if nothing was

20 found, and going back to the KBI evidence custody

21 receipt would support that of items that were

22 found.

23     Q.   And if you did conduct a search incident

24 to arrest you would note in some report what had

25 been -- what you had searched, right?



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1      A.    Yes.

2      Q.    So, like, if you arrested somebody for a

3  DUI and you searched their vehicle you would note

4  that you searched their vehicle, right?

5      A.    Correct.

6      Q.    All right.  In 1999 you knew that

7  polygraph results were not admissible in court,

8  right?

9      A.    Correct.

10     Q.    What was your understanding of why

11  polygraph results were not admissible in court?

12     A.    I don't think that they scientifically

13  have been proven thus allow -- allowing the

14  results inquiry.

15     Q.    Because they -- they haven't been

16  validated scientifically to actually be able to

17  tell whether somebody's telling the truth or

18  telling a lie?

19          MR. NORTON:  Object to form.

20     A.    That's my understanding.  That's correct.

21  BY MR. AINSWORTH:

22     Q.    And that was your understanding -- sorry.

23  Go ahead.  I didn't mean to cut you off?

24     A.    It was my -- it is my I understanding, it

25  was my understanding that they could be used.  The



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1  results of the test could be used in civil

2  litigation.

3      **Q.   In civil litigation?**

4      A.   That's my belief.  Yes.

5      **Q.   What's that belief based on?**

6      A.   I can't -- I don't recall.  I just -- I

7  don't remember.

8      **Q.   All right.  And you've never actually**

9  **seen a polygraph result used in civil litigation?**

10     A.   I have not.

11     **Q.   Okay.  Sir, I'm going to -- let's take a**

12 **look at Exhibit 10 which is your big 25-page**

13 **report.  And so it's Bates numbered JC 2009**

14 **through JC 2053.  When you get that in front of**

15 **you I'm going to bring it up on the screen so we**

16 **can all look at the same thing.**

17     **All right, sir, so Exhibit 10, this is a**

18 **report that you prepared, correct?**

19     A.   Correct.

20     **Q.   Did anyone assist you in preparing this**

21 **report or is that all your writing?**

22     A.   That's -- that's mine.

23     **Q.   Okay.  And so the last page of the**

24 **exhibit has a date of December 13th, 1999.  Do you**

25 **see that?  Do you need me to make it bigger or --**



5111 SW 21st Street       6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604          Suite 101                Suite 305
785-273-3063              Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com       913-383-1131             316-201-1612

## JOEL RANDY CARRENO

1      A.   No, no.  You're fine.  You're talking

2   about the third paragraph?

3           MR. NORTON:  At the very bottom.

4           THE WITNESS:  Very bottom.

5   BY MR. AINSWORTH:

6      **Q.   Sir, if you could look at the hardcopy in**

7   **front of you, Exhibit 10, if you'd like.  But it's**

8   **the last page that says JRC 061.  And that's your**

9   **initials and your badge number, right?**

10     A.   That would be correct.

11     **Q.   And then it says 12/13/99.  Do you see**

12  **that?**

13     A.   Yes.

14     **Q.   Okay.  And so what does that 12/13/99**

15  **refer to?**

16     A.   The way that I do my reports is that was

17  indicating the end of that report showing I

18  generated it and the date in which it was

19  generated.

20     **Q.   Thank you.  And by the way, sir, was**

21  **there anything that you wanted to review in**

22  **preparation for this deposition but didn't have**

23  **the opportunity to?**

24     A.   No.  I -- there's a vast amount of

25  information right here.  I did my best to do my



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604         Suite 101                Suite 305
785-273-3063             Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com      913-383-1131             316-201-1612

## JOEL RANDY CARRENO

1   best to gain as much knowledge as I possibly could

2   to be prepared for this.

3        Q.   Do you feel you're adequately prepared to

4   give a deposition on this case today?

5        A.   Depends on the questions that you ask.

6        Q.   Well, is there anything that you feel

7   ill-prepared to answer?

8        A.   If I do I know that it can be supported

9   with the documentation which I have.

10       Q.   Because documentation is very important

11  to a police officer's job, is that right?

12       A.   That is correct.

13       Q.   All right.  Have you heard the phrase if

14  it's not written down it didn't happen?

15       A.   Yes.

16       Q.   Is that how you were trained, sir?

17       A.   I wasn't trained that way.  I just --

18  it's my practice.

19       Q.   So your practice was to document the

20  steps that you took in an investigation, right?

21       A.   To the best of my ability.  Yes.

22       Q.   And, you know, it's -- I'm going to stop

23  sharing for just a second.  It's a difficult job

24  to be a police officer where you're trying to

25  document everything but not to spend, you know, a



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## JOEL RANDY CARRENO

1  lifetime transcribing everything that you observed

2  that might be of relevance, right?

3       A.    That's correct.

4       Q.    So you try and document the relevant

5  aspects of an investigation, right?

6       A.    As much information that -- that I can --

7  that I have.

8       Q.    And you try and be comprehensive because

9  sometimes it's not always clear what's relevant

10  and what's not relevant, right?

11      A.    For myself, yes, to make proper

12  documentation.

13      Q.    And it's very important in an

14  investigation to document the steps that first

15  leads a police officer to believe a suspect is the

16  suspect in a case, right?

17      A.    Yes.

18      Q.    And that's so that somebody looking at

19  the case file later on can look at the steps of

20  exactly how a suspect would first identify the

21  investigation into the subject?

22            MR. NORTON:  Russell, you cut out there

23  for a second.  It kind of bonged real quick.

24            MR. AINSWORTH:  I -- I appreciate you

25  alerting me.



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

**JOEL RANDY CARRENO**

1    BY MR. AINSWORTH:

2         Q.    And it's important because that way

3    somebody looking at the file can see exactly how a

4    suspect became a suspect in the investigation,

5    correct?

6         A.    You're using the word suspect.  A person

7    of interest would be my terminology.

8         Q.    Thank you.  So it's important to document

9    how a person becomes a person of interest in an

10   investigation, right?

11        A.    That's correct.

12        Q.    And you want to document each step along

13   the way of how a person became -- becomes

14   identified as a person of interest and then how

15   you build the case against them, right?

16        A.    You do the best that you can.  I -- I do

17   the best that I can.  Do I cover it all 100

18   percent?  No.  No.  I can't do that.

19        Q.    Right, but you try and identify each --

20   each step that was used to identify a person as a

21   person of interest, right?

22        A.    That would be fair.

23        Q.    Okay.  I'm just going to go back to

24   Exhibit 10.  So did you -- did you create this

25   report all in one sitting or did you, you know,



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604                Suite 101                    Suite 305
785-273-3063            Overland Park, KS 66212          Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

## JOEL RANDY CARRENO

1    type part of it and then conduct one investigation

2    and then come back to it and add to it?

3         A.    I don't recall.

4         Q.    What was your practice?  Would you create

5    a 45-page report at the end -- end of the

6    investigation or would you do it as you compiled

7    the information along the way?

8         A.    I don't know.  In regard to this

9    narrative right here, I --

10        Q.    No.  I'm asking about your practice back

11   in 1999.  What was your practice back in 1999?

12   Would you --

13        A.    Well, if it --

14             MR. NORTON:  Hang on.  He didn't finish

15   his question.

16             THE WITNESS:  I'm sorry.

17             MR. NORTON:  He froze again.  Russell,

18   are you there?  And for the record, our Zoom is

19   frozen again.

20             THE VIDEOGRAPHER:  Is it frozen on all

21   your guys' screens, too?

22             MR. NORTON:  Yeah.

23             THE VIDEOGRAPHER:  Okay.

24             (THEREUPON, a discussion was had off the

25   record.)



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                 Suite 305
785-273-3063           Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com         913-383-1131            316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

**JOEL RANDY CARRENO**

1       BY MR. AINSWORTH:

2            Q.   So I -- did you hear my last question,

3       sir?

4            A.   No.

5            Q.   -- an answer.

6            A.   No.  I did not.

7            Q.   Okay.  I thought that I -- well, let me

8       -- let me move to page 4 of Exhibit 10 --

9       actually, let's -- let's first talk about the

10      first page.

11           In this report it says on November 6th, 1999,

12      at 1140 hours I arrived at 15200 Fairview Road in

13      Oskaloosa.  Do you see that?

14           A.   Yes.

15           Q.   And that's Floyd -- Floyd S. Bledsoe's

16      house, right.

17           A.   Correct.

18           Q.   Okay.  And so according to your report

19      you remained at Floyd S. Bledsoe's house with him

20      until -- moving to page 3 of Exhibit 10.  Well,

21      you -- you concluded your contact with Floyd S.

22      Bledsoe at 11:53.  Do you see that on page 3?

23           A.   Yes, I do.

24           Q.   And then you remained at the Bledsoe

25      residence until, on page 4, you reference that you



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

# JOEL RANDY CARRENO

1    -- you say on November 6th, 1999, at 1217 hours I
2    left this location to make telephone contact with
3    Zetta's friends, and also to locate Billie
4    Summerfield.  Do you see that?
5         A.    Yes.
6         Q.    So on November 6th you were with Floyd S.
7    Bledsoe at his home from 11:40 a.m. until 12:17
8    p.m., is that right?
9         A.    Yes.
10        Q.    And then you leave and you return.
11   Flipping over to page 7 of Exhibit 10.  It states
12   in the top paragraph there on November 6th 1999,
13   at -- at 1348 hours, I returned to Heidi and Floyd
14   Bledsoe's residence.  Do you see that?
15        A.    Yes.
16        Q.    So you returned at 1:48 p.m., correct?
17        A.    Correct.
18        Q.    And you state that during the interview
19   Jim Penry arrived at your location?
20        A.    Correct.
21        Q.    All right.  So -- and then you indicate
22   further down the middle of the page, there's a
23   paragraph that reads, during this time,
24   parentheses, 1405 hours, slash 2:05 p.m., end
25   parentheses, that Jim Penry arrived at our



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### JOEL RANDY CARRENO

1    location.  Do you see that?

2        A.    Yes.

3        Q.    And so then Floyd Bledsoe and Jim Penry

4    went with you to go check out a lead, right?

5        A.    Correct.

6        Q.    And then Floyd remained with you until

7    about 5:30 p.m. when you returned him to his home,

8    right?

9        A.    That would be correct.

10       Q.    So it's actually 5:35 p.m. as indicated

11   on page 8 of Exhibit 10 where it says I returned

12   Floyd S. Bledsoe back to his residence trailer at

13   approximately 1735 hours.  Right?

14       A.    Yes.

15       Q.    So you knew on November 6th that you were

16   with Floyd from 11:40 a.m. to 12:17 p.m., and then

17   again from 1:48 p.m. until 5:35 p.m., right?

18       A.    Correct.

19       Q.    And then on -- page 8 of Exhibit 10 you

20   indicate that you received a page at about ten

21   o'clock from correctional officer Richard Parnell,

22   right?

23       A.    Correct.

24       Q.    And that Parnell requested your presence

25   at the Jefferson County -- I'm sorry.  At that



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**JOEL RANDY CARRENO**

1  time Dunnaway's requesting your presence at the

2  Jefferson County sheriff's law enforcement center,

3  right?

4       A.   Correct.

5       Q.   And how was that communicated to you?

6  Was it done orally, was it done by text?  How was

7  that communicated to you?

8       A.   The communication that I had with

9  Parnell?

10      Q.   Yes.

11      A.   It states here that I received a page.

12      Q.   All right.  And so how did you -- and did

13 the page say Sheriff Dunnaway was requesting your

14 presence at the LEC?

15      A.   I'm not for sure.

16      Q.   Did you have a device that -- where you

17 could receive a page with, you know, a written

18 communication as opposed to a telephone number to

19 call?

20      A.   I don't recall.

21      Q.   Did you have a pager in 1999?

22      A.   Yes.

23      Q.   All right.  And how did the pager work?

24      A.   I don't -- I don't recall at all ever

25 receiving text type messages.  It was a call-back



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**JOEL RANDY CARRENO**

1   number, as I recall.

2       Q.    Did you know -- you never responded to

3   the law enforcement center, right?

4       A.    Correct.

5       Q.    How far away from the law enforcement

6   center did you live in 1999?

7       A.    That I lived?

8       Q.    Yeah.

9       A.    11, 10, 12 miles.

10      Q.    So how long would it take you to get

11  there on a Sunday night?

12      A.    10, 12 minutes.

13      Q.    It says -- and, so, what did you do when

14  you received that page?

15      A.    I responded and met with Sheriff

16  Dunnaway.

17      Q.    And how long did it take you to get to

18  the law enforcement center?

19      A.    From -- from my house, from my residence?

20      Q.    Yeah.

21      A.    About -- I don't recall.  12, 15 minutes.

22      Q.    Okay.  And you knew that Dunnaway wanted

23  you there as soon as possible, right?  See where

24  it says Sheriff Dunnaway was requesting my

25  presence at the Jefferson County Sheriff's law

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

**JOEL RANDY CARRENO**

1   enforcement center as soon as possible?

2        A.    Correct.

3        Q.    So it says that you arrived at 2338

4   hours, do you see that?

5        A.    Correct.

6        Q.    Why did it take you over an hour and a

7   half to respond when your sheriff was asking for

8   you as soon as possible and you're ten to 15

9   minutes away?

10       A.    I -- I don't recall.

11       Q.    Was there anything that you were doing in

12  that hour and a half time apart from responding to

13  the law enforcement center?

14       A.    I -- I don't recall.

15       Q.    All right.  Here you say that in your

16  report, you state Sheriff Dunnaway stated that he

17  had information that Thomas Tom Bledsoe knew about

18  Zetta's disappearance.  Sheriff Dunnaway stated

19  that Zetta was dead and Tom Bledsoe knew where

20  Zetta was buried.  Sheriff Dunnaway stated that

21  Tom Bledsoe was currently with his attorney, Mike

22  Hayes, inside the law enforcement center.  Do you

23  see that, sir?

24       A.    Yes.

25       Q.    Did Dunnaway tell you anything other than

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**JOEL RANDY CARRENO**

1  what's typed here during that conversation that

2  you had with him in the parking lot?

3       A.   Your question again, please?

4       Q.   Yes.  You had this conversation with

5  Sheriff Dunnaway in the parking lot.  Did Dunnaway

6  tell you anything other than what you typed here

7  in your report during that conversation?

8       A.   I don't recall.

9       Q.   All right.  Did Sheriff Dunnaway tell you

10 that Tom Bledsoe had admitted involvement in

11 Arfmann's death?

12      A.   During that period of time there was

13 information gathered that Tom left a couple of

14 voice messages -- telephone voice messages to a

15 church member.

16      Q.   Let me try my question again because I'm

17 not sure if you're mishearing me.  But my question

18 is, did Sheriff Dunnaway tell you that Tom Bledsoe

19 had admitted his involvement in Arfmann's death?

20      A.   At that particular time, I don't recall.

21 But I know that we had a conversation in which

22 what you're talking about was made present.

23      Q.   So Dunnaway told you that Tom Bledsoe had

24 admitted his involvement in Arfmann's death,

25 right?



5111 SW 21st Street        6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604              Suite 101               Suite 305
785-273-3063           Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131           316-201-1612

2/1/2023                                                      80

**JOEL RANDY CARRENO**

1        A.   At some point in time -- oh, I'm sorry.

2        **Q.   That's correct?**

3        A.   No.  I -- I thought -- I didn't know you

4    were -- you were done.  Your question being what

5    again, please?

6        **Q.   Sure.  Dunnaway told you that Tom Bledsoe**

7    **admitted his involvement in Arfmann's death,**

8    **correct?**

9        A.   That is correct.

10       **Q.   And he did that on November 7th, 1999,**

11   **right?**

12       A.   I don't recall.  That's where the

13   telephone answering machine comes into play.

14   That --

15       **Q.   Okay.**

16       A.   -- Tom had made two telephone calls to a

17   church member, and it was -- it was made aware to

18   us, that those two telephone voice messages was

19   known to us.

20       **Q.   All right.  And Sheriff Dunnaway told you**

21   **that Arfmann was in a field with a bullet through**

22   **her head, right?**

23       A.   What I recall is that the sheriff was

24   really upset, and he had conversation with Mike

25   Hayes telling Mike Hayes if you know where she's



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

1    at you better damn well tell me right now.  I
2    remember that.  And I wasn't present -- I don't
3    recall being present for that conversation, but I
4    know that the sheriff relayed that information to
5    me.
6         Q.   Okay.  And in that same conversation
7    outside the law enforcement center Dunnaway told
8    you that Arfmann was in a field with a bullet
9    through her head, right?
10        A.   I know that I had conversation with
11   Sheriff Dunnaway outside of the law enforcement
12   center, and I believe -- that makes sense that he
13   would have told me that during that period of
14   time.
15        Q.   Okay.  Let's take a look at Exhibit 5.
16   Exhibit 5 is a large collection of field notes and
17   I'm gonna turn your attention to --
18             MR. NORTON:  Russell, can you hang on for
19   a second?  We don't have it yet.
20             MR. AINSWORTH:  Okay.
21             MR. NORTON:  Okay.  Go ahead.
22             MR. AINSWORTH:  Sure.
23        BY MR. AINSWORTH:
24        Q.   I'm just going to direct your attention
25   to page 18 of Exhibit 5, and the Bates number on



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### JOEL RANDY CARRENO

1    it is JC 001645.  All right.  This page, sir, is

2    this your handwriting?

3         A.    Page of reference is what?

4         Q.    Page 18.  I'm sorry.

5         A.    Okay.

6         Q.    Of Exhibit 5.

7         A.    Yes, that is.

8         Q.    All right.  It says at the top 11/7/99,

9    2338 hours.  That's the time you arrived at the

10   law enforcement center, correct?

11        A.    That's what it indicates, yes.

12        Q.    And it says 1023.  Tell us what 1023

13   means?

14        A.    It would be at 11:23 p.m.

15        Q.    No, sir.  You see where it says afternoon

16   11:38 hours it says 1023?

17        A.    Oh, I'm sorry.

18        Q.    What's that code for?

19        A.    That's a code for arrived.  Arrived.

20        Q.    So your notes -- you noted that you

21   arrived at the law enforcement center at 1023 per,

22   and no. 30 is Dunnaway, right?

23        A.    That is correct.

24        Q.    And page received from Richard Parnell.

25   Correct?


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**JOEL RANDY CARRENO**

1      A.    Yes.

2      Q.    And then you write, on arrival no. 30,

3   meaning Dunnaway, met with RO.  And that refers to

4   you, correct?

5      A.    Correct.

6      Q.    So Dunnaway met with you outside of law

7   enforcement center and advised Tom Bledsoe

8   currently had admitted to being involved.

9   Dunnaway advised victim was in the field with the

10  bullet to the head, correct?

11     A.    Correct.

12     Q.    And then you documented that there was a

13  conference room in which Mike Hayes -- CA number

14  one, is Vanderbilt, right?

15     A.    Correct.

16     Q.    Dunnaway.  Who is 655?

17     A.    I believe it's Jim Woods.

18     Q.    And then 46 is Poppa, correct?

19     A.    Correct.

20     Q.    44 was Heather Kyle, right?

21     A.    Correct.

22     Q.    And who's 42?  Is that Parnell?

23     A.    No.  It would have been a deputy.  I

24  don't know.

25     Q.    Okay.  Parnell worked at the corrections

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**JOEL RANDY CARRENO**

1    **division, right?**

2        A.    Correct.

3        **Q.    All right.  And so when you arrived --**

4    **when you -- after you talked to Dunnaway you went**

5    **inside, there's a conference room, and were you**

6    **also present in the -- would you join the people**

7    **in the conference room?**

8        A.    I -- I'm sure that I did based on my

9    documentation.

10       **Q.    All right.  And so it was you, Mike**

11   **Hayes, Sergeant Poppa, Jim Woods, and county**

12   **attorney Vanderbilt, Dunnaway, Heather Kyle, and**

13   **another deputy.  And so tell us, what**

14   **conversations did you have with Mike Hayes and the**

15   **other officers at that time?**

16       A.    I was way more that of a listener than

17   anything else.  I don't recall engaging in any

18   conversation with anybody.  I was just listening

19   to the information that was being provided to us.

20       **Q.    Sure.  So what information was being**

21   **provided to you?**

22       A.    That this is what I was referring to

23   earlier about the sheriff being upset.  That we

24   had information -- we received information of

25   Camille's whereabouts.



## JOEL RANDY CARRENO

1      Q.   And you would learn that information in
2  the parking lot when you talked to Sheriff
3  Dunnaway, right?
4      A.   It was very -- in the parking lot the
5  sheriff told me what ended up being discussed in
6  here.  But my contact with the sheriff in the
7  parking lot wasn't as detailed as what was
8  presented in the conference room.  As I entered
9  the conference room the knowledge that I had, as I
10  recall, is that we knew where Camilla was at.
11      Q.   And so where would I look to find --
12  well, you -- you mentioned that there's more
13  detailed information provided in the conference
14  room, right?
15      A.   Yes.  Over and above what the sheriff
16  stated to me out in the parking lot.  How much
17  more --
18      Q.   Right.
19      A.   -- I don't know.
20      Q.   All right.
21      A.   But we gained information on where to
22  find Camille.
23      Q.   Right.  Okay.  So you left the law
24  enforcement center looking -- turning back to
25  Exhibit 10.  So this is your report.  Page 9



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1   states, we left the law enforcement center at

2   12:39 a.m., right?

3        A.    Correct.

4        Q.    And so you're in that conference room to

5   close to an hour with Mike Hayes, right?

6        A.    I -- that would not be a fair statement.

7        Q.    Why is that?

8        A.    I don't know that Mike Hayes was in the

9   conference room to where we were at, minus the

10  sheriff.

11       Q.    What do you mean minus the sheriff?

12       A.    I can recall that there was a meeting

13  between the sheriff and Mike Hayes, in which I

14  know that I was waiting in the conference room to

15  find out more information, but Mike Hayes was not

16  in the room that I was in for an hour.

17       Q.    Okay.  And so Dunnaway and Hayes stepped

18  out and had a conversation, and you were awaiting

19  in the conference room for Dunnaway to come back

20  and report to you the information he learned from

21  Mike Hayes, is that right?

22       A.    Yes.

23       Q.    And so then did Dunnaway return to the

24  conference room and alert you to what he had

25  learned from Mike Hayes?



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1    A.   I don't know that he gave me, us, the

2  information on what he had received from Mike

3  Hayes, but I -- I know and I recall he saying this

4  is where we're going to go, this is where Camille

5  is buried.

6    **Q.   On page 8 of Exhibit 10, your report, you**

7  **write -- and this is towards the bottom of the**

8  **page.  Well, kind of the middle.  The paragraph I**

9  **read to you earlier where it -- talking about**

10  **meeting Sheriff Dunnaway in the parking lot.  Do**

11  **you see that paragraph?**

12    A.   Correct.

13    **Q.   And then you wrote, see Sheriff**

14  **Dunnaway's report.  Right?**

15    A.   Correct.

16    **Q.   And you wrote see sheriff Dunnaway's**

17  **report because Dunnaway was creating a report**

18  **regarding his interactions with Tom Bledsoe and**

19  **Mike Hayes and are reporting exactly what they**

20  **told him, right?**

21    A.   That documentation was documented in the

22  manner that -- and I don't know if Sheriff

23  Dunnaway did generate a report, and I was going

24  off the assumption that he would based on his

25  contact with Mike Hayes.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063           Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com           913-383-1131            316-201-1612

**JOEL RANDY CARRENO**

1         Q.   And so because Dunnaway was the only one
2    who was in that conversation with Mike Hayes you
3    assume that he would be creating a report
4    documenting what happened between him and Mike
5    Hayes, right?
6         A.   I don't know for sure that it was only
7    Mike Hayes and Sheriff Dunnaway in that office
8    talking.  I don't know if there was a third
9    person.  I know I wasn't in there.
10        Q.   All right.  So might have been another
11   police officer present with Dunnaway and Mike
12   Hayes when they had their conversation, right?
13        A.   I -- I don't know.  I don't know who was
14   in there.
15        Q.   All right.  You just know that Dunnaway
16   and Mike Hayes stepped out, had a conversation,
17   and you don't know what was said during that
18   conversation, right?
19        A.   That is correct.
20        Q.   And you assumed based on what you
21   observed that Sheriff Dunnaway would be creating a
22   report about his contact with Mike Hayes and Tom
23   Bledsoe the night of November 7th, 1999, right?
24        A.   Correct.
25        Q.   And you've never seen such a report, is

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1   that correct?

2        A.   I have not.  No.

3        Q.   Did you ever look for that report?

4        A.   No.

5        Q.   How did you know that -- you know, you

6   referenced I don't know that the -- or you said I

7   don't know if that report was ever created, or

8   something to that effect.  And -- and what

9   indicated to you that there might not be a report

10  from Sheriff Dunnaway on November 7th?

11       A.   I never knew that --

12            MR. NORTON:  Object to form.  Go ahead.

13            THE WITNESS: -- might not be.  When

14  something like that takes place it would have to

15  be not only an assumption but a very strong

16  assumption that that needed to be documented.  So

17  at the time that I generated my report it was with

18  the thought of surely there's some type of

19  documentation to the conversation between Mike

20  Hayes and Sheriff Dunnaway.  Did I ever go back

21  and look to see if there was one generated, no.

22       BY MR. AINSWORTH:

23       Q.   Why did --

24            MR. NORTON:  Let the record reflect that

25  the Zoom has frozen again so we cannot hear



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

2/1/2023

**90**

### JOEL RANDY CARRENO

1   plaintiff's counsel.

2          THE VIDEOGRAPHER:  Russell, do you have

3   us back?

4          MR. AINSWORTH:  I do.  I might have to

5   change locations if this keeps happening.

6      BY MR. AINSWORTH:

7      **Q.  But why did you have a strong assumption**

8   **that Sheriff Dunnaway would be creating a report?**

9      A.   That information would be very, very

10  important, and it was the beginning of that phase

11  of the investigation that somebody, and somebody

12  would have been Sheriff Dunnaway, was told of the

13  location in which she was buried.

14     **Q.   And information about Tom's involvement**

15  **in the murder, right?**

16     A.   I don't know about that.  I -- if you are

17  talking about this meeting between Mike and

18  sheriff -- I -- I don't know about that.

19     **Q.   All you know is that Dunnaway told you**

20  **that Tom had admitted involvement, right?**

21     A.   Involvement, I don't recall.  Location,

22  yes, I do recall.

23     **Q.   Well, let's take a look back at Exhibit**

24  **5, page 18.  And you -- you wrote in your**

25  **handwriting that Dunnaway advised Tom Bledsoe**



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1    **currently has admitted to being involved.  Do you**
2    **see that?**
3        A.    Correct -- no.  Wait a minute.  I don't
4    see that.  Page 18?
5        **Q.    Yeah.  So let's get on the same page.  So**
6    **Exhibit 5, your field note -- sorry -- field**
7    **notes, page 18.  Tell me when you have it in front**
8    **of you.**
9            THE WITNESS:  Oh, sorry.  I -- I do.
10    BY MR. AINSWORTH:
11        **Q.    Okay.  And so Dunnaway advised you that**
12    **Tom Bledsoe currently had admitted to being**
13    **involved, right?**
14        A.    That's my documentation, yes.
15        **Q.    So any statements made on November 7th,**
16    **2000 -- 1999, regarding Tom Bledsoe's admission to**
17    **being involved -- should have been documented in a**
18    **report, right?**
19            MR. NORTON:  I -- hang on.  Russell,
20    you're going to have to ask that again it bonged
21    right in the middle of whether you were saying
22    should or shouldn't or whatnot.  So hard to know
23    what you were saying.
24            MR. AINSWORTH:  Yep.
25        BY MR. AINSWORTH:



**JOEL RANDY CARRENO**

1          Q.     Any statements from Tom Bledsoe regarding

2     him admitting to being involved in the murder on

3     November 7th, 1999, should have been documented,

4     correct?

5          A.     Yes.

6          Q.     And they should have been documented by

7     Sheriff Dunnaway, right?

8          A.     That was my thought, my feeling.  Yes.

9          Q.     I'm going to go back to Exhibit 10,

10    because you reference the phone messages that Tom

11    left.  And you reproduced them in your report,

12    correct?

13         A.     Yes.

14         Q.     So the first one says, hi, Jim, this is

15    Tom.  I wanted you to be the first to know I know

16    I lied to you, I know where Camille is.  And when

17    you get this message I'm going to turn myself into

18    the police.  Went through I said.  I wished I

19    never did it.  I heard the church, I heard god,

20    most of all I let everyone down.  All I can say is

21    I'm sorry, I'll pay for the rest of my life for

22    what I've done.  All I can ask is for the church

23    to remain strong.  Please, forgive me.  As a

24    favor, please remember my mom and dad.  Help them

25    when they go through, help with pain, I'm about



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**JOEL RANDY CARRENO**

1  to.  Thank you, Jim.  Did I read that correctly?

2       A.   Correct.  Yes, you did.

3       Q.   And so Tom left a message to Jim Bolinger

4  admitting that he had -- that he'll pay for the

5  rest of his life for what he's done and

6  essentially admitting to the murder of Camille

7  Arfmann, is that right?

8            MR. NORTON:  Object to form.

9            MR. LINDEN:  Join.

10      A.   The way that I read it was he admitted

11 that he had done something wrong.  No time -- no

12 time during my investigation -- my part of the

13 investigation did anybody say I murdered or hurt

14 Camille.  This was the beginning of -- and I don't

15 know how to state this.  This was the beginning

16 for me in doing what I had done to -- I want to

17 use the word confusing parts of my investigation

18 with -- with Tom and Floyd.  I was getting

19 different stories from them throughout my contact

20 with them.

21      Q.   Okay.  So, I mean, the only time that

22 anyone told you -- well, no -- strike that.  So

23 when you're conducting an investigation, you know,

24 language matters, right?

25      A.   Yes.


5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604            Suite 101               Suite 305
785-273-3063          Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com      913-383-1131            316-201-1612

**JOEL RANDY CARRENO**

1        Q.    There's a difference between what Tom
2    said in the first message left on Jim Bolinger's
3    answering machine and Tom saying I killed Camille
4    Arfmann, right?
5        A.    Correct.
6        Q.    And so you would want to know exactly
7    what Tom said when he admitted involvement in the
8    murder, right?
9        A.    Yes.
10        Q.    And then in the second message on Exhibit
11    10, page 9, you reproduced that one as well and it
12    says, hi, Jim, me again Tom.   Please help mom and
13    dad through this right now.   They're disappointed.
14    I know that the church will be, too.   All I can
15    ask forgive me for what I've done and I will pay
16    for it for the rest of my life.   I wanted to tell
17    you in front of the church but I didn't have
18    enough guts.   I'm sorry.   I don't know what went
19    through my mind.   Right now you're probably pretty
20    shocked.   I wish I could turn the clock back but I
21    can't.   I made my choice -- choice.   I wish I
22    didn't.   I'm sorry.   Bye.   Did I read that
23    accurately?
24        A.    Yes.
25        Q.    All right.   So is -- having heard those



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

1   messages and learning at the law enforcement

2   center that Tom was admitting involvement and knew

3   where the victim was and that the victim was in a

4   field with a bullet to the head.  Those all

5   indicated to you as a detective that Tom was

6   admitting he had killed Camille Arfmann, right?

7        A.   No.  No.  What it indicated to me was

8   that he definitely was a strong person of

9   interest.

10       Q.   All right.  So you -- go ahead.

11       A.   No.  Go ahead.  It was somebody I needed

12  to talk to.

13       Q.   Sure.

14       A.   Go ahead.

15       Q.   So you didn't take Tom saying I will pay

16  for the rest of my miserable life for what I have

17  done, I wish I could turn the clock back but I

18  can't, I made my choice, and then telling Sheriff

19  Dunnaway that he was involved in her murder, that

20  she had a bullet through her head and that she was

21  in -- buried in the field behind his house.  That

22  did not add up to you to be a confession that Tom

23  had murdered Camille Arfmann, is that what you're

24  saying?

25       A.   No.  It's something that you stated that

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# JOEL RANDY CARRENO

1    he stated as I heard it that Tom told Sheriff

2    Dunnaway that he was involved in a homicide.  Did

3    I hear that right?

4         **Q.   Yeah.   That Tom had admitted involvement.**

5    **Yes?**

6         A.   Oh.

7         MR. NORTON:  Wait.  Object to the form

8    because that's not what the question was.  That's

9    not how you're phrasing the question.

10        BY MR. AINSWORTH:

11        **Q.   Yeah.   That Tom had admitted involvement**

12   **to Sheriff Dunnaway?**

13        MR. NORTON:  No.  You said involvement in

14   the murder to Sheriff Dunnaway was -- was your

15   question.

16        MR. AINSWORTH:  Yes.

17        MR. NORTON:  And those are different

18   things.

19        MR. AINSWORTH:  Well, let me -- let me

20   clarify.

21        BY MR. AINSWORTH:

22        **Q.   When Sheriff Dunnaway told you that Tom**

23   **had admitted involvement, what did you think he**

24   **meant?**

25        A.   That he was involved.  That he, number

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1  one, had information that I wanted to get, obtain

2  from him.  And what level of involvement, I didn't

3  know.

4        Q.   But involved in what, sir?

5        A.   The investigation into the disappearance

6  of Camille.

7        Q.   You thought he was saying he was involved

8  in the investigation of Camille, that he was going

9  to help, like, be a -- a deputy?

10       A.   No.  That right there indicated to me

11 that he did something wrong, and he documents he's

12 going to pay for it for the rest of his life.  But

13 he never defined what it was that he did.  But yet

14 when Mike Hayes made contact with the sheriff the

15 information -- that information was gained to

16 where knowledge became known to where the grave

17 site was.

18       Q.   Yeah.  But I'm -- I'm asking you and I'm

19 showing you Exhibit 5 again, page 18.  When

20 Sheriff Dunnaway told you that Tom Bledsoe

21 currently had admitted to being involved what did

22 you think Tom Bledsoe had admitted to being

23 involved in?

24       A.   Knowledge, at the very least.

25       Q.   Of what subject, sir?



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1      A.    Of the death of Camille.

2      Q.    **All right.  So you assumed that Sheriff**

3  **Dunnaway was saying Tom Bledsoe currently had**

4  **admitted to being involved in the death of**

5  **Camille, right?**

6      A.    No.  What I am saying is that on November

7  the 7th Sheriff Dunnaway advised me that he knew

8  where she had been buried.

9      Q.    **That's one of the things Sheriff Dunnaway**

10 **told you.  Sheriff Dunnaway also told you that Tom**

11 **Bledsoe currently admitted to being involved,**

12 **right?**

13     A.    Yes.

14     Q.    **And I just want to make this -- because**

15 **I'm going ask you again at trial so I want to make**

16 **sure, you know, that we're -- we're getting the --**

17 **you know, what your position is on this.**

18     **Are you saying that when you wrote Tom**

19 **Bledsoe currently had admitted to being involved,**

20 **you did not mean Tom Bledsoe currently had**

21 **admitted to being involved in Camille's death?**

22     A.    The word involved that I used on my -- to

23 generate my field notes does not reflect nor did I

24 know on what level of involvement that he was

25 pertaining to her disappearance.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**JOEL RANDY CARRENO**

1      Q.   And, you know, I -- you can answer
2   however you want, but I'm just trying to find out
3   was it your belief when you wrote this note that
4   Tom Bledsoe apparently had admitted to being
5   involved in Camille's death.  Now, I'm not talking
6   about the level of involvement.  I'm just saying
7   was it your belief that Tom Bledsoe currently had
8   admitted to being involved in Camille's death?
9      A.   I know what you're asking, I understand
10  what you're asking, and I'm looking at my field
11  notes.  I knew that Tom Bledsoe needed to be
12  interviewed.  I knew that.  That's my handwriting
13  pertaining to my documentation.  I -- I don't know
14  how to respond to that.  And the word that I'm
15  getting tied up on is admitted.  Did Sheriff
16  Dunnaway tell me that Tom had admitted, I don't
17  know.  Those are my words.  I don't know.  I don't
18  recall.
19     Q.   You're confused by what you meant by the
20  word -- by the phrase Tom Bledsoe currently had
21  admitted.  You don't know what you meant by
22  admitted?
23     A.   There's -- there's two parts to this, as
24  I see it okay as I see it.  The first part was
25  that he provided information to where she was

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## JOEL RANDY CARRENO

1    located.  The second part to this is his

2    involvement.  As I sit here today I cannot tell

3    you nor can I recall the reason why that

4    documentation is as it stands.

5        Q.   Well, there's a third piece of

6    information that Sheriff Dunnaway told you and

7    that's the part about the bullet to the head of

8    the victim, right?  Dunnaway also told you that.

9    So Dunnaway told you that Tom knew who the victim

10   was.

11       A.   Correct.

12       Q.   Knew she was dead with a bullet to her

13   head --

14       A.   Correct.

15       Q.   -- and admitted to being involved, right?

16       A.   That -- that -- yes.  That would be

17   correct.

18       Q.   And so are you trying to tell us that you

19   were unclear about whether Tom Bledsoe was

20   admitting to being involved and the fact that

21   Camille was dead in a field with a bullet to the

22   head?

23       A.   Your question again, please.

24       Q.   Sure.  Are you telling us that you are

25   confused about whether Tom Bledsoe was admitted --



## JOEL RANDY CARRENO

1  had admitted to being involved in Camille Arfmann
2  being in a field with a bullet to the head?
3        A.   No.  My -- my field notes represent
4  exactly what I documented.
5        Q.   Okay.  So you understood that Tom Bledsoe
6  was being -- had admitted to being involved in
7  Arfmann's murder, right?
8        A.   That would be correct.
9        Q.   Okay.  So let's go to page 9 of Exhibit
10  10.  You documented responding to the crime scene
11  and arriving there at 12:51 a.m. on November 8th,
12  right?
13        A.   Correct.
14        Q.   And so you document where the body was
15  discovered, right?
16        A.   Correct.
17        Q.   And you describe the crime scene as being
18  an open ditch area.  Do you see that on page 9?
19        A.   Correct.
20        Q.   You explain how the body was buried and
21  covered with dirt, trash, and several pieces of
22  plywood --
23        A.   Correct.
24        Q.   -- right?  And so Troy Frost and Sergeant
25  Poppa were at the scene and they both started --



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                  316-201-1612

**JOEL RANDY CARRENO**

1  they both uncovered -- they both moved the trash

2  and plywood and debris to expose the grave, right?

3      A.    Correct.

4      Q.    And then Frost and Poppa had to dig with

5  their hands in the dirt to expose the victim's

6  body, right?

7      A.    That's correct.

8      Q.    And so you -- you had to do quite a bit

9  of digging to find out that the victim had been

10  shot in the head, right?

11     A.    What's your definition of quite a bit?

12     Q.    All right.  Fair.  Fair.  But you had to

13  move all the plywood off the victim which took

14  about 20 minutes, and then digging in the ground

15  through eight to ten inches of dirt to expose the

16  victim's head so you could see she was shot in the

17  head?

18     A.    That is correct.  She wasn't buried very

19  deep.

20     Q.    Right.  But eight to ten inches you had

21  to dig in order to discover her -- her head,

22  right?

23     A.    Yes.

24     Q.    You photographed what was going on,

25  right?



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604             Suite 101                Suite 305
785-273-3063         Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com       913-383-1131           316-201-1612

### JOEL RANDY CARRENO

1    A.    Yes.  I did.

2    **Q.    And at the law enforcement center you**

3 **learned that Mike Hayes had the murder weapon,**

4 **right?**

5    A.    It became known that he had a nine

6 millimeter handgun that was the same -- same

7 caliber as the handgun that was used to commit

8 that -- to do the shooting.  Did he tell me

9 directly, no.

10   **Q.    No.  And you didn't get the forensics**

11 **back until later but, you know, the night that he**

12 **discovered the body you learned that Mike Hayes**

13 **had the gun that was used in the crime, right?**

14   A.    I was told Mike Hayes brought to the

15 sheriff's department a nine millimeter handgun

16 that belonged to Tom Woods.

17   **Q.    And so at the sheriff's office you then**

18 **had Mike Hayes turn the gun over, right?**

19   A.    Repeat that, please.

20   **Q.    Sure.  At the sheriff's office you know**

21 **Mike Hayes has the gun in his hands that killed**

22 **Camille Arfmann.  You wanted to recover that gun,**

23 **right?**

24   A.    We wanted to recover that gun.

25   **Q.    Yeah.  All -- every police officer in**



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                  316-201-1612

## JOEL RANDY CARRENO

1   that building at the law enforcement center wanted

2   to recover the murder weapon, right?

3        A.   Yeah.  Just not me.  Yes, we.

4        Q.   And so while you were at the sheriff's,

5   the law enforcement center, did you recover the

6   gun?

7        A.   To the best of my memory Mike Hayes

8   brought -- provided the nine millimeter -- a nine

9   millimeter handgun to the sheriff's office.  I

10  don't know who he gave it to.  I don't recall who

11  he gave it to.

12       Q.   Okay.  Do you remember photographing that

13  gun at the scene of the grave site?

14       A.   I don't recall the gun ever being at the

15  grave site.

16       Q.   Because that doesn't make any sense.  If

17  the gun was at the sheriff's office, the law

18  enforcement center, why would you recover the gun

19  at the grave site, right?

20       A.   Yeah.  That doesn't make sense.

21       Q.   All right.  Let's take a look at Exhibit

22  5, page 23.  All right.  This says -- and the

23  Bates number on the page is -- is JC 18478.  All

24  right.  It says November 8th, 1999, one model

25  Jennings nine millimeter semiautomatic unloaded --

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**JOEL RANDY CARRENO**

1  given to this officer, Sergeant Robert L. Poppa,

2  by attorney Michael L. Hayes on November 8, 1999,

3  1:44 a.m.  do you see that, sir?

4      A.   Yes.

5      Q.   And you were at the crime scene at 12:51

6  a.m., right?

7      A.   Yes.

8      Q.   You had been at the crime scene for

9  almost an hour before recovering the weapon,

10 right?

11     A.   Okay.  This is not my documentation.

12     Q.   Oh, that's -- that's a very good

13 clarification and I should have been more precise

14 in my question.  I'm sorry.

15     The gun was not recovered until almost a hour

16 after you were at the crime scene, right?

17     A.   I -- I don't recall.

18     Q.   Well, based on the documentation in front

19 of you the gun was not recovered until you had

20 been at the crime scene for almost an hour, right?

21     MR. NORTON:  Object to the form.

22     A.   If what Sergeant Poppa documented is

23 correct, and I don't know that it is, and I don't

24 know if it's not.  You would be correct in stating

25 what you just stated.


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1     BY MR. AINSWORTH:

2         Q.   And do you know why, if the documentation

3     is correct, why the gun wasn't recovered until

4     almost an hour after you guys were at the scene of

5     the murder?

6              MR. NORTON:   Object to the form.

7         A.   I -- I don't know.  To the best of my

8     memory Mike Hayes brought a nine millimeter

9     handgun to the sheriff's office.  So to the best

10    of my memory, you know, what I'm hearing you say,

11    that out at the crime scene that Michael Hayes

12    gave somebody a nine millimeter handgun, and if

13    that should be the truth I don't recall that at

14    all.

15    BY MR. AINSWORTH:

16        Q.   I'm not asking if you recall.  I'm just

17    saying, do you have any explanation for if the

18    report is true -- well, strike that.

19    Do you -- do you know Sergeant Poppa to, you

20    know, write false police reports and, you know --

21        A.   No.

22        Q.   -- say things that didn't happen?

23        A.   No.

24        Q.   So do you think the report at Exhibit 5,

25    page 23, is reliable?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

```
 1        A.    Yes.
 2        Q.    And so do you have any -- I just want to
 3   know if you have any explanation for why the
 4   murder weapon was not recovered until you were at
 5   the crime scene for almost an hour.
 6        A.    I do not.  I don't know.  I don't know.
 7        Q.    Okay.  Moving back to your report.  I
 8   want to go back to page 8 of your report, Exhibit
 9   10, and ask you why did you type in your report
10   the information in your notes that you had learned
11   from Sheriff Dunnaway that Tom Bledsoe had
12   admitted involvement in -- and knew that she was
13   in a field with the bullet to the head?  Why did
14   you instead write Tom Bledsoe knew about Zetta's
15   disappearance and that he knew where Zetta was
16   buried?
17        A.    That was my documentation at the time.  I
18   -- why did I not put everything that was in my
19   field notes, I don't have a response for that.
20        Q.    And I'm not asking you why didn't you put
21   everything in your field notes.  Because, you
22   know, as we've talked about before it's hard to
23   document everything, but we also talked about how
24   language matters.  And the most important facts
25   that you learned was that Tom was admitting
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### JOEL RANDY CARRENO

 1   involvement that she was in a field with a bullet

 2   through her head, and the only way that Tom knew

 3   where she was would have it into your report, why

 4   didn't you include the information about Tom

 5   admitting involvement in Camille's murder and that

 6   -- that she had a bullet through her head.

 7        A.   I -- I don't know.  I don't know.

 8        Q.   Because -- you know, I guess, you know,

 9   reading this it might appear that you're trying to

10   minimize Tom Bledsoe's involvement.  Was that your

11   purpose in creating your report at page 8?

12        A.   It needs to be understood that that is

13   totally incorrect.  Totally incorrect.  So my

14   response is no.

15        Q.   Okay.  Going on to page 9 of the report.

16   You were at the crime scene until -- sorry.  Page

17   10 of your report.  Exhibit 10.  You were there

18   until 5:47 a.m., right?

19        A.   What paragraph are you on, sir, on page

20   10?

21        Q.   On page 10, the sixth paragraph.  It says

22   on November 8, 1999, at 5:47 hours you exited from

23   the crime scene?

24        A.   That is correct.

25        Q.   All right.  So at that point you've been



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604                  Suite 101                   Suite 305
785-273-3063              Overland Park, KS 66212         Wichita, KS 67202
www.appinobiggs.com           913-383-1131                 316-201-1612

# JOEL RANDY CARRENO

1   a detective for at least five years, right?

2       A.   Yes.

3       Q.   **Were you a good detective?**

4       A.   I felt comfortable in doing what I --

5   what I was doing.

6       Q.   **Okay.  Well, did you feel you were a good**

7   **detective?**

8            MR. QUALSETH:  Objection.  Asked and

9   answered.

10      A.   My response would have to be the same.  I

11  felt comfortable in doing my job.

12  BY MR. AINSWORTH:

13      Q.   **And if you felt that your -- you weren't**

14  **up to the task of investigating you would have**

15  **sought training to get yourself up to task, right?**

16      A.   To seek training.  I -- I never had those

17  thoughts.

18      Q.   **All right.  Well, let's take ourselves**

19  **back to the early morning hours of November 8,**

20  **1999.**

21      **You knew at the time that Camille Arfmann had**

22  **last been seen being dropped off at her home at**

23  **Floyd S. Bledsoe's trailer by the bus driver,**

24  **right?**

25      A.   That is correct.



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604              Suite 101                 Suite 305
785-273-3063           Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com         913-383-1131            316-201-1612

### JOEL RANDY CARRENO

1      Q.    And you knew that she ended up some miles
2   away buried in a garbage ditch on Tom Bledsoe's
3   property, right?
4      A.    Correct.
5      Q.    You wanted to know how Camille Arfmann
6   had traveled from Floyd L. Bledsoe's home to the
7   ditch, right?
8      A.    That was one of the things that we wanted
9   to know.   Yes.
10     Q.    And so one of the things that you wanted
11  to do was examine Tom Bledsoe's truck to find out
12  whether or not Tom Bledsoe had transported the
13  victim in his truck to the scene of her grave,
14  right?
15     A.    That sounds right.   Yes.   I don't -- I
16  don't recall, but that sounds right.
17     Q.    Well, I mean, whether or not it sounds
18  right, I'm just saying sitting here today in 2023
19  absolutely you should have examined Tom's truck on
20  November 8th to see if there was any trace
21  evidence that could be recovered from it tying Tom
22  to Camille Arfmann's murder, right?
23     A.    That -- that would be correct.
24     Q.    All right.   I take it that you would
25  agree with me that there's no report documenting



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

# JOEL RANDY CARRENO

1   any search of Tom's truck, right?

2       A.   Not that I'm aware of.

3       Q.   And you're not aware of anyone searching

4   Tom's truck, right?

5       A.   I -- I don't recall.

6            MR. NORTON:  We've been going for about

7   another hour to hour and a half so let's take a

8   short break.

9            MR. AINSWORTH:  Sure.  Let's take five

10  minutes and come back.

11           THE VIDEOGRAPHER:  Time is approximately

12  12:24 p.m., we're going off the record.

13           (THEREUPON, a recess was taken.)

14           THE VIDEOGRAPHER:  Time is approximately

15  1:05 p.m., we're back on the record.

16      BY MR. AINSWORTH:

17      Q.   All right.  Mr. Carreno, did you get

18  something to eat?

19      A.   Yes.

20      Q.   Good.  And I should have said this at the

21  beginning of the deposition, but if you need a

22  break at any time just let us know.  All that I

23  ask is that you answer any question that's pending

24  before you take a break, okay?

25      A.   Yes.



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

### JOEL RANDY CARRENO

1      Q.   So if you're feeling fatigued or if

2  there's anything you need to attend to I want you

3  to let us know rather than soldiering on because I

4  don't want to, you know, later on hear that you

5  said something because you were tired or something

6  like that, got it?

7      A.   Yes.

8      Q.   Okay.  So on the night of November 7th,

9  1999, you wanted to interview Tom Bledsoe, right?

10     A.   Yes.

11     Q.   Did you make any efforts to interview Tom

12  Bledsoe?

13     A.   I'm sorry.

14     Q.   Did you make any efforts to interview Tom

15  Bledsoe on November 9th -- or November 7th.  I'm

16  -- my apologies.

17     A.   I -- I don't recall on the exact date in

18  which I initially interviewed Tom Bledsoe.  It's

19  documented.  I just don't --

20     Q.   Well, did you interview him the night of

21  November 7th to the morning of November 8th?

22     A.   I believe that that would be correct.

23     Q.   All right.  And what did Tom tell you

24  when you interviewed him on the night of November

25  7th into the morning of November 8th?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                   Suite 305
785-273-3063            Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com         913-383-1131              316-201-1612

## JOEL RANDY CARRENO

1      A.   Tom was a very, very, very hard person

2   for me to interview, and the reason why -- he was

3   extremely hard.  I never -- in interviewing him he

4   never showed any type of emotion.  He just sat

5   there like a rock, if that's fair to say, and

6   answered my questions.  He didn't show any

7   emotion, he didn't move.  He just sat there.  So

8   it was a hard interview for me.

9      Q.   All right.  What did Tom tell you the

10  night of November 7th into the morning hours of

11  November 8th?

12           MR. TURNER:  Object to form.

13      A.   I don't want to get my interviews mixed

14  up here.

15      BY MR. AINSWORTH:

16      Q.   So tell us what you're looking at.

17      A.   I'm looking at what I was provided this

18  morning.  Confidential --

19           MR. NORTON:  Exhibit number on the front.

20           THE WITNESS:  I'm sorry.

21           MR. NORTON:  Look at the front page.

22           THE WITNESS:  It's going to be Exhibit 10

23  at 001.

24      BY MR. AINSWORTH:

25      Q.   And so you're referring to your report,



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604                 Suite 101                  Suite 305
785-273-3063             Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com           913-383-1131             316-201-1612

## JOEL RANDY CARRENO

1   sir?

2        A.   Yes.

3        Q.   Well, let me -- let me -- let me pause

4   you there because I can tell you there's no

5   indication in your report that you interviewed Tom

6   Bledsoe on the night of November 7th into the

7   morning hours of November 8th.  And so my question

8   for you is, did you interview him on the night of

9   November 7th into the early morning hours November

10  8th?

11       A.   No.

12       Q.   Why do you say that?

13       A.   If -- if it is not in my narrative -- no.

14  I know I didn't.

15       Q.   All right.  So if you didn't write it

16  down then it didn't happen?

17       A.   If it did happen I -- I would have

18  documented that.

19       Q.   All right.  Like if you had searched or

20  if anyone had searched Tom's truck on November 8th

21  or November 19th that would have been documented,

22  right?

23            MR. NORTON:  Object to form.

24       A.   Yes.

25            BY MR. AINSWORTH:



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

1    Q.   Okay.  So my question is, did you make

2  any efforts to interview Tom Bledsoe on the -- on

3  the night of November 8th or the early morning

4  hours -- sorry.  The night of November 7th or the

5  early morning hours of November 8th.

6    A.   My initial contact with Tom Bledsoe was

7  on --

8    Q.   I'm not asking you for your initial

9  contact with him.

10   A.   I'm sorry.  I'm sorry.

11   Q.   I'm just asking, did you make any efforts

12 to interview Tom Bledsoe the night of November 7th

13 through the early morning hours of November 8th?

14   A.   I -- no.  I don't recollect.

15   Q.   Why not?

16        MR. NORTON:  He hadn't finished his

17 answer, Russell.

18        MR. AINSWORTH: Sure.

19 BY MR. AINSWORTH:

20   Q.   Why not?  Why didn't you make any efforts

21 to interview Tom Bledsoe that night?

22        MR. NORTON:  Hang on.  Mr. Court reporter

23 did you get the -- the end of his answer?

24        THE REPORTER:  After I -- sorry.  I --

25 no.  I don't recollect.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

1          MR. NORTON:  Okay.  You had started
2    asking your question before he finished, Russell.
3          THE WITNESS:  Okay.  To make sure that
4    I'm sure of your question would you repeat that,
5    please?
6          BY MR. AINSWORTH:
7          Q.   **Why didn't you try to interview Tom the**
8    **night of November 7th through to the early morning**
9    **hours of November 8th?**
10         A.   I -- for myself, I don't know.  I -- I
11   don't recall.
12         Q.   **All right.  So when you find Camille**
13   **Arfmann in the field with a bullet in her head as**
14   **Tom described do you then arrest Tom?**
15         A.   I don't know what date Tom was arrested,
16   but it would have been right after that that he --
17   that Tom was arrested.
18         MR. NORTON:  Listen to his question.
19         THE WITNESS:  Okay.  I'm sorry.  Go
20   ahead.
21         BY MR. AINSWORTH:
22         Q.   **Why did you wait until after discovering**
23   **the body to arrest Tom?**
24         A.   Okay.  The decision to arrest Tom was not
25   my decision, number one.  That decision was made



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1   by the county attorney, so I can't answer that for
2   the county attorney.
3        **Q.    Okay.  Did you think that Tom should be**
4   **arrested?**
5            MR. NORTON:  Object to form.
6        A.   My -- my stance then is as it is today.
7   Let me back up.  On what day are you referring to?
8        BY MR. AINSWORTH:
9        **Q.    The night of November 7th into the early**
10  **morning hours of November 8th.**
11       A.   And then your question to me is?
12       **Q.    Did you think that Tom Bledsoe should be**
13  **-- should have been arrested?**
14       A.   He provided this information that he did
15  on the telephone conversation with Jim.  That's a
16  tough question from I to answer.  Do I think -- on
17  that night, as through the whole investigation, I
18  -- I -- I don't know.  I don't know.  I don't
19  know.
20       **Q.    So you're not sure whether there was**
21  **probable cause to arrest Tom when he showed up at**
22  **the law enforcement center with his attorney**
23  **carrying the gun which was his gun, said to have**
24  **killed the victim, he knew where the victim was**
25  **buried, knew that she'd been shot in the head, and**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                 Suite 305
785-273-3063           Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

2/1/2023                                                                    118

### JOEL RANDY CARRENO

1    admitted involvement, and you you're not sure that

2    amounts to probable cause.  Is that fair to say?

3              MR. NORTON:  Object to form.

4              MR. COX:  Object to form.

5              MR. LINDEN:  Join.

6         A.   Based on what I recall he had the

7    information which you just stated that he provided

8    to law enforcement, and as I sit here now I don't

9    think it would have been any different now than

10   what it was back then, even though he provided the

11   information which he did, was that probable cause

12   to arrest him for murder.  That wasn't my

13   decision.  I -- I don't know how to respond to

14   that.

15        BY MR. AINSWORTH:

16        Q.   All right.  So you don't know, right?

17        A.   I don't know.

18        Q.   Okay.  And so were you okay with Tom

19   leaving the scene of the crime -- the scene of the

20   crime not in police custody?

21        A.   Was I okay with it?

22        Q.   Yeah.

23             MR. NORTON:  Object to form.

24        A.   I -- I don't recall how I felt then about

25   that.  And --



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**119**

## JOEL RANDY CARRENO

1      BY MR. AINSWORTH:

2          **Q.   You know that -- sorry.  Continue.**

3              MR. NORTON:  He's still answering.

4              THE WITNESS:  I think I already stated

5      this but I want to make sure that I'm perfectly

6      clear.  You know, you have me, as -- as I hear

7      this, as being involved in this investigation

8      knowing everything.  And the truth of the matter

9      is I was just involved in a very, very small

10     portion of this.

11         BY MR. AINSWORTH:

12         **Q.   And I understand that you're saying you**

13     **were involved in a very small portion.  But you**

14     **were at the crime scene the night that the body**

15     **was discovered, right?**

16         A.   That is correct.

17         **Q.   And you know that Tom Bledsoe drove off**

18     **with Michael Hayes right, from the crime seen?**

19         A.   No.

20             MR. TURNER:  Object to form.

21             MR. LINDEN:  Join.

22             THE WITNESS:  I don't recall that.

23         BY MR. AINSWORTH:

24         **Q.   That wouldn't be proper if Tom -- Tom**

25     **Bledsoe drove away from the scene of the crime not**



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

```
1   in police custody, right?

2           MR. COX:  Object to form.

3           MR. NORTON:  Same.

4           MR. LINDEN:  Join.

5           THE WITNESS:  You know, my response is

6   going to be based on my knowledge.  I -- I didn't

7   have that much knowledge to make that type of a

8   determination.

9       BY MR. AINSWORTH:

10      Q.   Okay.  Where was Tom while you were at

11  the crime scene?

12          MR. NORTON:  Object to form.

13      BY MR. AINSWORTH:

14      Q.   I mean, the early morning hours of

15  November 8th.

16      A.   I don't recall.

17      Q.   Was he walking around at all?

18      A.   If you're asking me if Tom was present

19  when we went to the gravesite and she was dug up,

20  I don't recall if he was present or not.  I -- I

21  don't know.  I don't know.

22      Q.   Let me go back to your report, Exhibit

23  10, and I direct you to page 11.  This is later in

24  the day on November 8th.  The second to the last

25  paragraph on that page is on November 8th, 1999,
```



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1    at 11:55 hours.  Do you see that?

2        A.   We are at Exhibit No. 10, correct?

3        Q.   **Yes.  Your report.**

4        A.   Page number.

5        Q.   **Page 11.**

6        A.   I'm sorry.  Okay.

7        Q.   **Second to last paragraph on that page**

8    **where it begins on November 8, 1999, at 11:55**

9    **hours.  Do you see that?**

10       A.   Yes.

11       Q.   **And it says that Floyd S. Bledsoe agreed**

12   **to come to the Jefferson County law enforcement**

13   **for an interview.  Do you see that?**

14       A.   Yes.

15       Q.   **Did this interview that you had with**

16   **Floyd that is here, did this occur over the phone?**

17       A.   I never -- I never interviewed --

18   interviewed either one of them without it being

19   videotaped at the law enforcement center.

20       Q.   **Okay.  But -- well, the entirety of this**

21   **interview occurs in one paragraph or the**

22   **documentation of your interview with Floyd S.**

23   **Bledsoe occurs in one paragraph here.**

24            MR. TURNER:  Object to form.

25            BY MR. AINSWORTH:



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1    Q.   I asked -- I asked Floyd S. Bledsoe if he
2    had knowledge of the color of Tom's Bledsoe's
3    truck.  Floyd S. Bledsoe stated he was sure the
4    truck was black.  Floyd S. Bledsoe told me that
5    members from different television stations were
6    continuously driving by his residence.
7    A.   I recall that.  Yes.
8    Q.   Okay.  Was that conversation with Tom
9    over the phone?
10   A.   That was telephone contact I had with
11   Floyd.
12   Q.   Yes.  And was that -- so what I'm trying
13   to find out is simply -- my understanding of this
14   -- of your report is that you had that
15   conversation with Floyd over the phone, and during
16   that phone call Floyd Bledsoe -- Floyd S. Bledsoe
17   agreed to come to the law enforcement center for
18   an interview at some future time, is that right?
19   A.   Correct.
20   Q.   Okay.  And then moving on to page 13 of
21   your report, Exhibit 10.  The second to last
22   paragraph on that page begins on November 9, 1999,
23   at 11:12 hours.  Do you see that?
24   A.   Yes.
25   Q.   So this is the day after the body's



5111 SW 21st Street            6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604               Suite 101                    Suite 305
785-273-3063                   Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com            913-383-1131                  316-201-1612

### JOEL RANDY CARRENO

1    discovered, right?

2        A.    Correct.

3        Q.    And it says I had telephone contact with

4    Trudy Erhardt.  Trudy Erhardt stated her daughter

5    Kelly Erhardt attended Jefferson County North High

6    School.  Kelly Erhardt heard from a third party,

7    Brittany, last name unknown, that said Zetta had

8    hold Brittany, last name unknown, that Tom Bledsoe

9    told Brett -- told Zetta that if she, Zetta,

10   didn't give him what he wanted that he would kill

11   her.  Do you see that, sir?

12       A.    Yes.

13       Q.    So you learn that information the morning

14   of November 9th, 1999, correct?

15       A.    Correct.

16       Q.    All right.  And then going on to page 14.

17   The last paragraph on that page says on November

18   9th, 1999, at 2000 hours KBI Special Agent Morgan

19   and I interviewed Floyd S. Bledsoe.  The interview

20   was at the Jefferson County sheriff's law

21   enforcement center.  The interview was videotaped.

22   Do you see that?

23       A.    Yes.

24       Q.    So you interviewed Floyd the day after

25   Camille was discovered dead, right?



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1      A.   Correct.

2      **Q.   Why did you want to interview Floyd S.**

3   **Bledsoe?**

4      A.   To ascertain any information that he

5   might have had pertaining to the investigation

6   itself.

7      **Q.   All right.  At this point are you**

8   **treating him like a witness who, you know, might**

9   **have information that would be helpful to your**

10  **investigation or are you treating him as a person**

11  **of interest who you're -- you know, think is**

12  **withholding information and you want to**

13  **interrogate him to try to get to the truth?**

14      MR. NORTON:  Object to the form of the

15  question.

16      A.   I didn't know what I had with Floyd.

17      BY MR. AINSWORTH:

18      **Q.   Well, when you went into the interview**

19  **what -- what did you -- how -- how -- what was**

20  **your goal in the interview?**

21      A.   The bottom goal was to find out what

22  information he had and his activity on November

23  the 5th.

24      **Q.   Why did you want to know Floyd S.**

25  **Bledsoe's activity on November 5th?**



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

# JOEL RANDY CARRENO

1   A.   I -- I don't recall.  I don't recall what
2   lead, if I even had a lead, to facilitate this --
3   this interview here.
4        Q.   Well, help me understand because at this
5   point Tom has been arrested and charged with
6   murder, right?
7        A.   Correct.
8        Q.   Tom has provided the murder weapon for
9   Camille's death which was his own gun, right?
10       A.   There was a gun provided.  Yes.
11       Q.   That was the murder weapon, right, or
12  stated to be the murder weapon, right?
13       A.   It -- yeah.  Yes.
14       Q.   And Tom knew where the victim was buried,
15  right?
16       A.   Correct.
17       Q.   Knew that she was buried, that she had a
18  hole in her head -- a bullet hole in her head,
19  which turned out to be true, right?
20       A.   Correct.
21       Q.   And had admitted his involvement in her
22  death, right?
23            MR. TURNER:  Object to form.
24            MR. LINDEN:  Join.
25       A.   My response to that would be your last

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

**JOEL RANDY CARRENO**

1   statement indirectly, yes.  To have that type of

2   information it would appear that Tom Bledsoe knew

3   something that either he himself only knew or he

4   and another person, yes.

5        BY MR. AINSWORTH:

6        **Q.   Well, not only that -- I mean, we went**

7   **over this.  But, you know, I'm showing you again**

8   **Exhibit 5 page 18 your handwriting, Tom Bledsoe**

9   **currently had admitted to being involved, and you**

10  **told me earlier he admitted to being involved in**

11  **-- in Arfmann -- Arfmann being dead with a bullet**

12  **to the head, right?**

13          MR. NORTON:  Object to form.

14          MR. LINDEN:  Join.

15       A.   I believe, I don't know this for sure,

16  but Tom had provided me -- and again Tom was

17  really hard for me to interview, difficult to

18  interview.  Tom had provided me information

19  pertaining to meeting Floyd out on a county road,

20  and it was at that time, allegedly, Floyd told Tom

21  that he, being Floyd, had shot and killed Camille.

22  And then --

23       BY MR. AINSWORTH:

24       **Q.   Okay.  I -- I'm sorry.  Go ahead.**

25       A.   No.  Go ahead.  All right.  I'll continue

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**JOEL RANDY CARRENO**

1  if you don't mind.

2      The times in which Tom provided me in which

3  this encounter between Tom and Floyd was to have

4  occurred, that was -- it didn't make any sense to

5  me.  Tom was scheduled to go to work at three

6  o'clock that afternoon and he told me his events

7  after meeting with -- allegedly meeting with

8  Floyd.  I was with Floyd on the day in which Tom

9  was saying that contact between he and his brother

10 happened, and I couldn't get it pinned down

11 timewise in what Tom was telling me to what I had

12 in my notes, my field notes.  It didn't -- it did

13 not add up for me.  And -- and what Tom stated and

14 what I had documented time-wise, after I let Floyd

15 out of the vehicle back at his residence, if what

16 Tom was saying was the truth Floyd would had to

17 have jumped in his vehicle right after I left and

18 went down that county road.  So I always

19 questioned it -- timewise, it just didn't make

20 sense.

21     Q.   Okay.  Well, let's stick to the questions

22 one at a time.  My question currently is -- I

23 don't know if you were going back on what you said

24 earlier.  I understood you to say earlier that

25 where you wrote Tom Bledsoe currently had admitted

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### JOEL RANDY CARRENO

1   to being involved, that meant you were referring

2   to Tom Bledsoe current had admitted to being

3   involved in Camille's murder, right --

4              MR. TURNER:  Object to form.

5      A.    To have a knowledge, yes.  Involved, no.

6   BY MR. AINSWORTH:

7      Q.    And that he admitted to being involved,

8   right?

9              MR. TURNER:  Object to form.

10             MR. NORTON:  Join.

11             MR. COX:  Join.

12     A.    I never received a confession or that of

13  a statement from either Tom or Floyd that they

14  were --

15  BY MR. AINSWORTH:

16     Q.    If you --

17     A.    Go ahead.

18     Q.    I don't mean to interrupt you.  I -- I do

19  apologize, Mr. Carreno.  I said at the beginning I

20  wouldn't do that and I intend not to in this

21  deposition.  But I -- I'm -- I'm not asking you

22  questions like did Tom confess to you or did Floyd

23  confess to you, because that would have been a

24  perfectly good answer to such a question.

25             I'm simply saying -- I'm showing you Exhibit



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1   **5, page 18.  You wrote, Tom Bledsoe currently had**

2   **-- has admitted to being involved.**

3        **Earlier in this same deposition you told me**

4   **that meant Tom Bledsoe currently admitted to being**

5   **involved in Camille's murder.  And are you trying**

6   **to go back on that and say that's not what that**

7   **means --**

8           MR. NORTON:  Object --

9   BY MR. AINSWORTH:

10   **Q.    -- or are you saying --**

11          MR. NORTON:  No.

12   BY MR. AINSWORTH:

13   **Q.    -- that is what it means?**

14          MR. NORTON:  Objection.  And I'm going to

15   instruct the witness not to answer that question

16   because it is absolutely incorrect statement of

17   what his testimony is.  It's a misrepresentation

18   to state that see said that.  It's harassing at

19   this point.  If you think that's what he said it's

20   on the record and you've already got an answer to

21   the question.  But at this point it's -- you're

22   harassing the witness.

23          MR. AINSWORTH:  Well, then bring a motion

24   because I have exactly --

25          BY MR. AINSWORTH:


5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### JOEL RANDY CARRENO

1      Q.   This is what you said.   Please answer the
2   question, sir -- or let me -- let me -- let me
3   strike that and ask you this, sir.
4      You knew when you -- when you interviewed
5   Floyd on March -- November 9th you knew that Tom
6   Bledsoe had admitted to being involved in
7   Camille's murder, you knew that he knew where her
8   body was buried, and you knew she was buried in
9   the field with a bullet through her head, right?
10     A.   Correct.
11     Q.   And you knew that he had -- he and his
12  lawyer had brought what they said was the murder
13  weapon which was Tom's own gun to the scene,
14  right?
15     A.   I don't know if they brought it to the
16  scene or to the sheriff's office.
17     Q.   Okay.   Let me -- let me -- Tom turned
18  over what he said was the murder -- Tom and his
19  lawyer turned over what they said was the murder
20  weapon which happened to be Tom's gun, right?
21     A.   That is correct.
22     Q.   Okay.   And so I'm trying to find out,
23  given that you got Tom Bledsoe in jail charged
24  with murder, why you're questioning Floyd to find
25  out where he was on Friday November 5th when



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

1  you're interviewing Floyd on November 9th?

2      A.   I didn't know at that time whether or not

3  it was one person involved, two, in my opinion

4  maybe three.  So I wanted to find out from Floyd

5  where he was at to obtain information from him.

6      Q.   What gave you any -- any indication that

7  Floyd had any involvement whatsoever in Camille's

8  death as of -- and -- and we'll -- strike that.

9      Because you gave me that litany of

10  information that Tom provided you about, you know,

11  Floyd having the roadside encounter.  When did Tom

12  tell you about the roadside encounter?

13      A.   When did he tell me?

14      Q.   Yeah.

15      A.   I believe that was on the first interview

16  that I conducted with Tom.

17      Q.   All right.  Your first documented

18  interview with Tom happened on November 24th,

19  1999.  Does that make sense to you?

20      A.   You say November 24th?

21      Q.   November 24th.  Yeah.  Go all the way to

22  page 37 of Exhibit 10 to see the reference at the

23  very bottom of that page.

24      If you interviewed Tom Bledsoe before

25  November 24th, 1999, you should have documented



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

# JOEL RANDY CARRENO

1    that -- that interview, right?

2        A.    Correct.

3        Q.    All right.  So my question to you is,

4    sir, why did you have any inkling that Floyd had

5    anything to do with Camille's death when you

6    talked to him the morning of November 9th -- or

7    no.  Sorry.  Not the morning of November 9th.  The

8    evening of November 9th at eight p.m.?

9        A.    I don't know why.  I can't give you a

10   correct answer or even a incorrect answer on why I

11   conducted that other than to obtain information

12   from Tom -- or from Floyd.

13       Q.    Okay.  How long was your -- did you

14   interview Floyd on November 9th or did you

15   interrogate him?

16             THE WITNESS:  Can I explain to him

17   what --

18             MR. NORTON:  Just answer his question.

19             THE WITNESS:  Can I explain to him

20   interrogation?

21             MR. NORTON:  Answer his question.

22             MR. AINSWORTH:  Just -- just talk to me,

23   sir.

24             THE WITNESS:  Okay.  You have used the

25   word interrogation a lot.  For myself I don't



5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

## JOEL RANDY CARRENO

1   interrogate people.  I interview people.  And I
2   back that up by stating this, my father was a
3   prisoner of war in the second world war and he was
4   in a German -- he was in a German prison camp shot
5   three different times.  He was, and his friends --
6   his Jewish friends were taken out to a mass grave.
7   And it was a German officer that came up to my dad
8   when he was in line to be shot, and that German
9   officer pulled his tote tag and see to where it
10  represented catholic.  But that German officer
11  made my dad stand there and watch as his buddies
12  were shot and killed.  So when you use the word
13  interrogation and you can ask anybody I know, my
14  father was interrogated by the Germans.
15       I don't -- I don't -- it's hard for I when I
16  hear that.  I -- I just don't like the word
17  interrogation when it comes to anything that I'm
18  involved in.  I interview people.  And that really
19  bothers me when I hear the word interrogation.  My
20  father was interrogated by the Germans.  I don't
21  practice of what happened with my father by the
22  Germans in relationship to my work.  So, yes, that
23  -- that really, really bothers me.  And I
24  understand the reason why you're asking what you
25  you're asking.  I interview people.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604              Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                  316-201-1612

## JOEL RANDY CARRENO

1     BY MR. AINSWORTH:

2        **Q.   All right.  Well, earlier in this**

3     **deposition you explained to me the difference**

4     **between an interview and a interrogation in the**

5     **police practice.  Do you recall that testimony?**

6        A.   I -- no.  But --

7        **Q.   From this morning?**

8             MR. NORTON:  Your question was about

9     training not specific to him.

10       A.   Trainings that I've been through.  We --

11    you're talking about interviews and interrogation.

12    I just -- it's too hard for me to -- and I'll

13    answer your questions if you want to continue to

14    use interrogation.  I just, myself, no.

15            MR. AINSWORTH:  So, Mr. Norton, we're not

16    going to do that.  We're not going to have

17    speaking objections where you try and explain

18    things for the witness.  This witness is perfectly

19    capable of answering and testifying.  We're not

20    going to do that.  So -- but I'll move on because

21    I think things get heated and I do, you know,

22    myself from time to time.  But here's --

23            MR. NORTON:  Whoa, whoa, whoa.  Just for

24    the record, no one is heated in this room, so

25    don't give the indication that anyone is heated or

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1  raising voices or anything of that nature when we

2  look at the -- at the records.  Just -- just to

3  clarify.

4          MR. AINSWORTH:  Fair.

5      BY MR. AINSWORTH:

6      **Q.   So, Mr. Carreno, and only Mr. Carreno,**

7  **you explained to me that -- how you conduct**

8  **interrogations, right, and how you use a direct**

9  **style and you confront people with, you know,**

10 **facts of the case, right?  Do you remember that?**

11         MR. NORTON:  Object to the form.

12     A.   I recall you asking me questions this

13 morning in regard to interviews and

14 interrogations.

15     BY MR. AINSWORTH:

16     **Q.   Okay.  So let me ask it this way.  When**

17 **you questioned Floyd Bledsoe on November 9th 1999,**

18 **were you confronting him with facts and trying to**

19 **get him to confess or were you just asking him**

20 **open ended questions about what happened?**

21     A.   Not about what happened.  It was in

22 regard to his activity on Saturday.  I can tell

23 I'm not answering your question.  I --

24     **Q.   Why did you want to know what he was**

25 **doing on Saturday?**



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

2/1/2023                                                                    136

## JOEL RANDY CARRENO

1      A.    I don't know when it was that I

2  interviewed Tom, but --

3      Q.    **Well, again, if you look at -- sorry.  Go**

4  **ahead.**

5      A.    On that Saturday Floyd spent a vast

6  amount of time with me in my patrol vehicle.  My

7  interest was what he had done on Friday the day

8  before.

9      Q.    **Okay.  So when you were questioning Floyd**

10 **about what he was doing on Friday November 5th**

11 **were you using a direct style questioning where**

12 **you would confront him with the information you**

13 **had or were you just asking open-ended questions**

14 **trying to find out what he knew?**

15     A.    That would be fair.  Open-ended

16 questions.

17     Q.    **Because you had no reason to treat Floyd**

18 **like a person of interest on November 5th --**

19 **November 9th, 1999, correct?**

20     A.    I didn't know what I had and who I had.

21 I just knew that I had to obtain as much

22 information from whoever, and to this day I -- my

23 feelings and my thoughts haven't changed.

24     Q.    **All right.  But my question is, did you**

25 **have any reason to believe that Floyd was a person**



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604            Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**137**

### JOEL RANDY CARRENO

1   **of interest in your investigation into the death**

2   **of Camille Arfmann for which Tom Bledsoe had been**

3   **charged with murder?**

4        A.   Well, something that didn't make sense to

5   me -- yes, to respond to your question.  What

6   didn't make sense to me was that it was reported

7   that Camille got off of the school bus, went

8   inside the trailer, and she had left her book bag,

9   a brownie, and a book or some books on the couch.

10  Which told me that she felt -- whoever picked her

11  up told me that she was comfortable with going

12  with whoever in the heck she went with.  It just

13  didn't make sense to me.  Why would you -- you

14  wouldn't leave that, I wouldn't think, if it was

15  somebody you didn't know.  And Floyd had talked

16  about that he would periodically a couple, three

17  -- couple times a week go pick up Camille after

18  school and take her in town to get her a drink or

19  something to eat.

20       But going back to what I just stated about

21  the brownie and coat and a backpack.  It wasn't

22  like somebody came in and, in my opinion and my

23  thoughts, abducted here.  Somebody showed up that

24  she knew, that she knew, and left with him.  If

25  that answered your question.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1    Q.   It does.  So as an experienced detective
2  it seems to you, based on the crime scene facts,
3  that it was Camille went with somebody she knew
4  such as a family member, right?
5    A.   Not as family member.  I'm saying
6  somebody that she knew.
7    Q.   Right.  Somebody that she knew like a
8  family member, right?  Because you know your
9  family members, right?
10   A.   That could have been a family member.
11  Yes.
12   Q.   Okay.  So when you're looking at the
13  evidence you knew that Tom was related to Camille,
14  right?
15   A.   Yes.
16   Q.   She was his -- she was the victim's
17  brother-in-law, right?
18   A.   Correct.
19   Q.   All right.  So I'm still trying to find
20  out if you had any reason to believe that Floyd
21  had anything to do with this murder when you
22  questioned Floyd the night of November 9th?
23   A.   No.
24   Q.   Okay.  So I'm going to -- let's take a
25  look at Exhibit 5 which are your field notes, and



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

**JOEL RANDY CARRENO**

1   I want to share the screen.  Let's turn to page 47

2   of the -- those field notes.

3         MR. AINSWORTH:  And so for everybody

4   watching and everybody else let me give you the

5   Bates numbers.  Page -- Exhibit 5, page 47, is

6   Bates number JC 1556.  And so I'm going to take a

7   look at this page and the next ten pages following

8   which are all sequentially numbered.

9   BY MR. AINSWORTH:

10        Q.   Is this your handwriting, sir?

11        A.   No.  This one's -- no.

12        Q.   And is this Morgan's handwriting?

13        A.   That would be correct.

14        Q.   Okay.  So shows the start time of eight

15   o'clock on November 9th '99 -- 1999.  That's

16   consistent with your report saying it was eight

17   o'clock when you interviewed Floyd, right?

18        A.   Correct.

19        Q.   Why did you advise him of -- why did you

20   advise Floyd S. Bledsoe of his Miranda rights?

21        A.   That is a very, very common practice for

22   myself is to when I take someone in that interview

23   room, way more times than not, I want to provide

24   that person with their rights provided.

25        Q.   All right.  Did you provide Billie

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1  Summerville with his Miranda rights?

2      A.   I -- I don't recall, but I -- I don't

3  recall, but it would be documented.

4      Q.   Did you -- during your entire

5  investigation of the Arfmann murder did you

6  provide anyone else with their Miranda rights?

7      A.   Yes.  Tom.

8      Q.   Anyone else that you provided with

9  Miranda rights?

10     A.   I would have to go back and look, and if

11 there was it would have been Billie Summerville.

12     Q.   Well, I mean, I'm looking at Billie's

13 interview.  I'll show it to you as Exhibit 10,

14 page 35.  It doesn't indicate that you provided

15 him his Miranda rights, correct?  At least not on

16 page 35.

17          MR. NORTON:  You said Exhibit 10,

18 Russell?  He's looking for the document.

19          MR. AINSWORTH:  Exhibit 10, page 35.

20          THE WITNESS:  Thank you.

21          MR. NORTON:  Which paragraph, Russell?

22          MR. AINSWORTH:  Where it says on November

23 18, 1999, I re-interviewed Billie -- Billie

24 Summerville.

25          THE WITNESS:  I don't see any



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604           Suite 101              Suite 305
785-273-3063           Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131          316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

### JOEL RANDY CARRENO

1    documentation pertaining to I providing Billie

2    with his Miranda rights.

3         BY MR. AINSWORTH:

4         Q.    And if he was provided his Miranda rights

5    you would document that, right?

6         A.    I -- I would hope so.  Yes.

7         Q.    Yeah.  And if you look at page 29 of

8    Exhibit 10.  You interview Gary Bledsoe, II, you

9    indicate that you provided him with his Miranda

10   rights, right?

11        A.    No.  Gary, no.  I know I did not on Gary.

12        Q.    So the only people you Mirandized in your

13   investigation were Floyd and Tom, is that fair to

14   say?

15        A.    That -- yes.

16        Q.    All right.  Well, going to Exhibit 5,

17   page 47.  You questioned Floyd about his

18   whereabouts, right?

19        A.    Correct.

20        Q.    You go forward two pages to Exhibit 5 at

21   49 which is Bates numbered 1 -- JC 1558.  Floyd

22   tells you about the trip to Winchester hardware

23   store, right?

24        A.    Correct.

25        Q.    And Floyd says he drove the green

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

## JOEL RANDY CARRENO

1  Chevrolet pickup truck to the hardware store

2  right?

3          A.    Correct.

4          Q.    So he's not driving his own car, right?

5          A.    That is Floyd's vehicle.

6          Q.    Well, Floyd had a Chevy Nova, the green

7  Chevy Nova, right?

8          A.    Correct.

9          Q.    Not an old green Chevrolet pickup truck

10  from the farm, right?

11          A.    Okay.  You're right.  You're right, yeah.

12          Q.    So if Floyd was abducting Camille on his

13  trip to the hardware store he would have been

14  doing it with somebody else's truck, right?

15          A.    I don't know.

16          Q.    Well, I mean, he's -- well, that's true,

17  you don't know.  But based on what Floyd is

18  telling you in this interview is that Floyd is

19  telling you he drove the green Chevrolet pickup

20  truck to the hardware store, right?

21          A.    Correct.

22          Q.    And you can verify that by talking to

23  Richard Zule what vehicle that Floyd takes to the

24  hardware store if he knows, right?

25          A.    Correct.



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**JOEL RANDY CARRENO**

1        Q.    You know, at this point as a police

2   officer you're thinking, like, okay Floyd was in

3   somebody else's truck on a trip to the hardware

4   store, right?

5              MR. NORTON:   Object to form.

6   BY MR. AINSWORTH:

7        Q.    And it's not a Maserati, right?

8        A.    No.

9        Q.    Okay.   Going on to the next page which is

10  page JC 1559 or page 40 of Exhibit 5.   Floyd talks

11  about what he does at the hardware store, right?

12       A.    Correct.

13       Q.    According to Floyd he gets there around

14  4:20, he walks in, talks to the female owner Gigi,

15  he asks for duct tape, he got white duct tape.

16  The owner told him how to fix the downspout.   He

17  saw the shirts on the wall.   Floyd had asked her

18  about cow designs and a jacket for Richard.   Got a

19  price quote.   Saw hats.   Billie Summerville walked

20  in.   Billie asked about some lag bolts, then some

21  shirts, and then Floyd says he talked to Billie

22  for about five minutes, and talked about Floyd

23  separating from Heidi.   Then Floyd asked about the

24  sweatshirts.   Floyd paid for duct tape and his

25  shirt because he bought a sweatshirt there, right?

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street      6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604         Suite 101                 Suite 305
785-273-3063             Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com      913-383-1131              316-201-1612

## JOEL RANDY CARRENO

1  A.   A shirt, yes.  T-shirt, sweatshirt, I
2  don't recall.

3  Q.   Well, you remember him wearing the
4  sweatshirt when you saw him on Saturday?

5  A.   I -- I don't recall.

6  Q.   All right.  Well, I'll refresh your
7  memory, but we'll get to that in a little bit.
8  And remember that Floyd made two different
9  transactions to pay for the shirt -- or the
10  sweatshirt and to pay for the duct tape?

11  A.   Correct.

12  Q.   And then Floyd says he returned about
13  4:50 p.m.?

14  A.   Yes.

15  Q.   Do I see that?

16  A.   Yes.

17  Q.   And Richard Zule said where'd you go,
18  Kansas City.  Right?

19  A.   Correct.

20  Q.   And Floyd told you that, right?

21  A.   Correct.

22  Q.   And Floyd describes the other things he
23  did that evening at the farm.

24  On page 52 Floyd said he left.  Exhibit 5 and
25  52.  Floyd says is that 11:50 p.m. we left to go



### JOEL RANDY CARRENO

1   home, describes what happened when he got home.

2   He continues describing, you know, in detail

3   everything he did to try and find Camille that

4   night with Heidi.  Says 2:30 in the morning --

5   this is now on page 54 of Exhibit 5.  2:30 in the

6   morning on Saturday -- now the Saturday, he took

7   the kids back to Brandi, the babysitter, right?

8        A.   Correct.

9        Q.   And this is now 11:32 p.m.  Do you see

10  that?

11       A.   Correct.

12       Q.   And JRC 61, that's you, right?

13       A.   Correct.

14       Q.   And so you took over writing notes at

15  this point, right?

16            MR. TURNER:  Object to form.

17       BY MR. AINSWORTH:

18       Q.   Is that correct?

19       A.   It -- it appears to be so.  Yes.

20       Q.   You see how the handwriting changes on

21  page 54 of Exhibit 5 and you -- you now have your

22  initials, and you note the time and now appears to

23  be in your handwriting?

24       A.   Correct.

25       Q.   Okay.  So we are now in an interview that

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1    started at eight o'clock at night, it's now 11:30,

2    and you're still going through in detail what

3    Floyd did on Friday, November 5th, right?

4         A.   Correct.

5         Q.   You've made it up to 2:30 in the morning

6    that Friday night into Saturday morning and you

7    keep questioning Floyd, right?

8         A.   Correct.

9         Q.   And he answers everything you ask him,

10   right?

11        A.   Yes.

12        Q.   All right.  Now, on page 57 of Exhibit 5,

13   we're on to Saturday, November 6th.  And Floyd

14   talks about Jim Penry arriving and his

15   conversation with Jim Penry.  Do you see that?

16        A.   Yes.

17        Q.   And Floyd told you that he wanted to

18   search near Wild Horse Road, right?

19        A.   Yes.

20        Q.   Because there was report a subject

21   hearing a female screaming on Friday night,

22   correct?

23        A.   Correct.

24        Q.   And who is the person who heard the

25   subject screaming -- female screaming on Friday



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**JOEL RANDY CARRENO**

1    night near Wild Horse Road?

2         A.   I'd have to look it up, but he was a

3    colonel in the service.

4         Q.   So Floyd is saying there's a colonel who

5    heard a person screaming out by Wild Horse Road,

6    we should search there, and Floyd was out by Wild

7    Horse Road trying to find if there was somebody

8    screaming out by that location, right?

9              MR. TURNER:   Object to form.

10        A.   Yes.

11        BY MR. AINSWORTH:

12        Q.   And your officers confirmed that people

13   saw him on Wild Horse Road, because he was

14   knocking on their doors and asking them if they

15   had seen Camille, right?

16        A.   Correct.

17        Q.   And he talks about searching out -- well,

18   then go on to the next page of Exhibit 5 which is

19   page 58.  You have an asterisk here, it says the

20   review of Floyd's notes, TJ -- I think it's

21   actually Hawk, but you wrote Husks, drives an

22   orange truck, and Josh Gallagher drives a black

23   Mazda.  Do you recall asking about that?

24        A.   I don't recall.

25        Q.   Up to this point and -- you know, when I



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

# JOEL RANDY CARRENO

1   say this point I guess I'll refer to the taking a

2   break at 12:33 a.m. on now November 10th.  Who was

3   conducting the interview of Floyd Bledsoe?  Was it

4   you or Morgan or you guys together?

5        A.   We were in the room together.  And I know

6   that Agent Morgan was the one that had direct

7   contact with Floyd.  And then if I recall

8   correctly, I started to interview Floyd but I

9   don't remember -- I don't recall.

10       Q.   And so were you switching off who is

11  taking notes because your hand was getting tired?

12       A.   Would you repeat that, please?

13       Q.   Well, let me -- let me scroll down on

14  page 58 of Exhibit 5.  You've got a return at one

15  a.m.  No. 64 taking notes.  The 64 is Vernon, is

16  that right?

17       A.   That is correct.

18       Q.   Okay.  So you now have the third person

19  taking notes, and I'm asking you was that because

20  your hand was getting tired from writing so much

21  during this questioning of Floyd Bledsoe?

22       A.   I -- I don't know.

23       Q.   Well, you -- you take a break for the

24  first time at 12:33 a.m. after four hours of

25  continuous questioning of Floyd Bledsoe.  Why did

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**JOEL RANDY CARRENO**

1   you keep going?

2       A.   I don't know why that interview took the

3   time that it did.   I don't recall.

4       Q.   **What unanswered questions did you have**

5   **after questioning Floyd for four and a half hours**

6   **about his activities on Friday and Saturday, the**

7   **weekend that Camille was murdered?**

8       A.   I don't recall.

9       Q.   **All right.   Let's take a look at page 64**

10  **of Exhibit 5.   This is Bates numbered 4930.   JC**

11  **4930.   And I guess we should just flip back to**

12  **page 58 of Exhibit 5 just to show you start back**

13  **up at 2:26 in the morning, right, according to**

14  **your notes?**

15      A.   According to my notes, yes.

16      Q.   **And then on page 64 of Exhibit 5 we have**

17  **a field note that shows somebody in different**

18  **handwriting starting up at 2:27 on November 10th,**

19  **1999, interview of Floyd Bledsoe.   Do you see**

20  **that?**

21      A.   Yes.

22      Q.   **All right.   Let's -- and so I just want**

23  **to ask you, sir.   At this point after questioning**

24  **Floyd for the four and a half hours the night of**

25  **November 9th did you have any reason based on his**

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

1   responses to believe that Floyd was lying to you

2   and had really in fact murdered Camille and was

3   giving you that indication?

4       A.   I -- I had no -- I didn't know if he was

5   involved in her homicide.

6       Q.   All right.  Well, I'm showing you, again,

7   Exhibit 5.  Let's go to page 66.  This is Bates

8   numbered JC 4932.  One page too far.  No.  I was

9   right.  67.  There's a question.  Friday, do you

10   remember returning back to your trailer no way on

11   Fairview Road.  Friday did not see Camille all day

12   long except seeing the school bus.  Did not see

13   her on that school bus.  So he's still answering

14   questions about seeing Camille.  Sunday, I didn't

15   talk to Tom, I was with Sergeant Poppa.  No

16   contact with Tom at all Sunday.  Why were you

17   asking him about contact with Tom on Friday?

18          MR. TURNER:  Object to form.

19       A.   That documentation there represents to me

20   that that was made by Troy Frost, and I was never

21   in the interview room when Troy talked to Floyd.

22   BY MR. AINSWORTH:

23       Q.   Why did you leave?

24       A.   I -- I don't recall.

25       Q.   Were you watching while Troy was



5111 SW 21st Street    6420 W. 95th Street    800 E. 1st Street
Topeka, KS 66604    Suite 101    Suite 305
785-273-3063    Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com    913-383-1131    316-201-1612

### JOEL RANDY CARRENO

1   interrogating Floyd?

2         A.   I don't recall.

3         Q.   Did you switch interrogators because you

4   guys -- you and Morgan got tired?

5         A.   I -- because we got tired?

6         Q.   Yeah.

7         A.   I -- I'd have to respond, I -- I don't

8   know.  I -- I don't know.

9         Q.   Well, why -- why did you stop questioning

10  Floyd?

11        A.   I don't -- I don't recall.

12        Q.   Do you know why Floyd was being asked if

13  he had contact with his brother over the weekend?

14        A.   Troy would have to answer that.

15        Q.   And so Floyd -- this is page 69 of

16  Exhibit 5.  Says you were involved in Camille's

17  death.  Did you accuse Floyd of being involved in

18  Camille's death on -- on November 11th?

19             MR. TURNER:  Object to form.

20  BY MR. AINSWORTH:

21        Q.   Or sorry.  November 10th.  My apologies.

22        A.   First of all, what's up on the screen is

23  not my -- is not my writing.  But to answer your

24  question, did I ever accuse Floyd?

25        Q.   That's not my question.



5111 SW 21st Street        6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604           Suite 101                   Suite 305
785-273-3063               Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com        913-383-1131                316-201-1612

### JOEL RANDY CARRENO

1        A.    Oh, sorry.

2        Q.    And thank you for clarifying.  My

3    question is, the night of November 11th --

4    November 9th to the morning of November 10th did

5    you accuse Floyd of being involved in Camille's

6    death?

7        A.    Not directly that I can recall.  I was

8    interested in -- he was still within the

9    investigation to try to find answers to Camille's

10   death.

11       Q.    So I'm on page 70 of Exhibit 5.  Floyd is

12   saying he's not happy that Camille's dead.  I

13   didn't do it the first time.  I am shocked I have

14   to sit here 'till two to three in the morning

15   about this.  I didn't kill Camille.  I didn't

16   touch her.  I didn't have contact with Tom.  And

17   so looking at this, sir, and understanding that

18   you were not in the interrogation room at this

19   point, do you have any idea why officers were

20   questioning Floyd about contact with Tom?

21       A.    No.  I do not.

22       Q.    Were -- well, strike that.  Floyd asks

23   about whether he had a complete roll of duct tape,

24   and he said his -- yes, did not use it on Camille.

25   Do you see that?



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1    A.    Yes.

2    Q.    All right.  And then the interrogation

3  finally ends at 3:58 in the morning.  Do you see

4  that?

5    A.    Yes.

6    Q.    So Floyd is at the law enforcement center

7  voluntarily for eight hours answering questions

8  about Camille's death, right?

9    A.    Correct.

10    Q.    And you have no reason at this point to

11  believe that Floyd is a person of interest in any

12  way, right?

13    A.    I didn't know -- I didn't know what I

14  wanted to know to be able to -- I just didn't

15  know.  I had limited information to where the

16  stories went back and forth, so he would have been

17  a person of interest.  And I'm not saying a

18  suspect, but a person of interest that provides

19  information.

20    Q.    Well, there's a difference between person

21  of interest and suspect?

22    A.    Absolutely.

23    Q.    Then what's the difference between a

24  person of interest and a suspect?

25    A.    For myself -- a person of interest is



## JOEL RANDY CARRENO

1    somebody that might have information, and a

2    suspect in my mind that might have information.

3    And a suspect would be somebody in which I knew or

4    felt definitely had direct knowledge of the event.

5         **Q.   All right.  So you're saying that Floyd**

6    **was a person of interest in the death of Camille**

7    **Arfmann the night of November 9th, the day after**

8    **Tom Bledsoe was arrested after providing the gun**

9    **that shot her, leading you to where she was buried**

10   **on Tom's property after admitting involvement, and**

11   **knowing that she was shot with a bullet to her**

12   **head?**

13              MR. COX:  Object to form.

14              MR. LINDEN:  Join.

15        BY MR. AINSWORTH:

16        **Q.   Did I get that right?**

17        A.   I think -- no.  I don't think.  I know --

18   you know, when I talk about a person of interest

19   it's a person that I need to stay in contact with

20   to obtain information.  And I think you're taking

21   it, and I'm not speaking for you, but a person of

22   interest as being a suspect.  I wasn't -- I felt

23   that Tom had information that could help with the

24   investigation.

25        **Q.   And you just said Tom, but you're**



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

1   referring to Floyd, right?

2       A.   Oh, I'm sorry.  Yeah.

3       **Q.   That's okay.  I do that.**

4            MR. NORTON:  Let's take a short break, if

5   that's all right.  I think we've been going for

6   about an hour since we came back on the record.

7   Take five.

8            MR. AINSWORTH:  Sure.

9            THE VIDEOGRAPHER:  Time is approximately

10  2:16 p.m., we're going off the record.

11           (THEREUPON, a recess was taken.)

12           THE VIDEOGRAPHER:  Time is approximately

13  2:26 p.m., we are back on the record.

14  BY MR. AINSWORTH:

15      **Q.   Okay.  In your career as a detective**

16  **you've dealt with jailhouse informants, right?**

17      A.   Yes.

18      **Q.   And it's not really a most accurate term**

19  **because sometimes they're not informing on anyone,**

20  **they're just making up stuff, right?**

21      A.   That can be correct.  Yes.

22      **Q.   And you're aware that when people are**

23  **accused of crimes sometimes they look to get a**

24  **deal on their situation by pointing the finger at**

25  **somebody else, right?**



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**156**

## JOEL RANDY CARRENO

1        A.    At times, yes.

2        Q.    And no matter how rich you are if you've

3    got a criminal charge against you, you can't buy

4    your way out of that charge, right?

5        A.    Correct.

6        Q.    You can't -- you have $5,000 and have a

7    -- a DUI go away, right?

8        A.    No.

9        Q.    And so, you know, the ability to walk out

10   of jail is something that money literally can't

11   buy, right?

12       A.    Correct.

13       Q.    So you know from your career then, when

14   people who are facing criminal charges are giving

15   you information, to view it with several grains of

16   salt, right?

17       A.    Repeat that if you would, please.

18       Q.    Of course.  When a person who's facing

19   criminal charges of their own is giving you

20   information in a criminal case you know to take

21   that with several grains of salt, right?

22       A.    Correct.

23       Q.    You've had people come to you and try to

24   tell you stories to try and get out of trouble

25   they got themselves into, right?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**JOEL RANDY CARRENO**

1        A.    I'm familiar with that.  Yes.

2        Q.    And you were familiar with that

3   phenomenon back in 1989, right?

4        A.    I -- I don't recall.

5        Q.    You don't remember exactly what time you

6   got familiar with how people in jail might lie to

7   get their way out, is that what you're saying?

8        A.    I -- I agree with that.  Yes.

9        Q.    But if your -- in your line of work it's

10  your job to know that, you know, people who are

11  facing charges might lie to get themselves out of

12  prison, right?

13       A.    Yes.

14       Q.    Okay.  I'm just going to take you back to

15  Exhibit 5 for a brief moment because I want to

16  take you to page 53.  This is -- all right.  53.

17  This is still Morgan's notes in that portion of

18  the interview.  This is page JC 1562.

19       And so that night Floyd is talking about

20  trying to find Camille at home.  They look at the

21  couch.  Heidi made the statement that her bookbag

22  is there.  Floyd said let's go pick up the boys.

23  Heidi said you pick them up.  Heidi wanted to stay

24  with her mother in case Camille came back, and

25  that Floyd left and went to the babysitter Brandi

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1    Wampler, right?

2          A.    Correct.

3          Q.    And Floyd doesn't give you a time on

4    exactly when it was that he went to the

5    babysitter, right?

6          A.    I -- I don't recall.

7          Q.    Well, there's none listed here at least,

8    right?

9          A.    I don't recall.

10         Q.    Well, taking a look at Exhibit 5, page

11   53, there's no exact time listed for when he went

12   to the babysitter Brandi Wampler, right?  I can

13   make it -- scroll up so you can see.

14         A.    I would agree.

15         Q.    All right.  And then scrolling down.  The

16   time that Floyd does give is that -- and Floyd

17   went home, they're looking around.  Scott Harris

18   shows up.  Floyd didn't have a flashlight.  This

19   time it says 12:30 to one a.m.  So it says Robin

20   showed up about this time around one a.m.,

21   sometime in 12 -- between 12:30 and one a.m. Floyd

22   is describing the events occurring at his home.

23   Do you see that?

24         A.    That's what it indicates, yes.

25         Q.    All right.  And the reason I bring this

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1  up is because then switching to Exhibit 10, I got

2  to move us to -- which is your report.  I got to

3  move us back to page 19.

4       You state that you received a call from

5  Brandi Wampler on November 10th.  Do you see that

6  in the -- is that the fourth paragraph on page 19?

7       A.   Yes.

8       Q.   And just to orient us in time.  Floyd has

9  just spent until four in the morning at the police

10 station being interrogated about where he was the

11 night on the 5th, and the night of the 5th and on

12 the 6th, and being accused of having something to

13 do with Camille's death, right?

14           MR. TURNER:  Object to form.

15      A.   He was never accused --

16 BY MR. AINSWORTH:

17      Q.   Well, we saw -- so we saw the notes from

18 Frost and Vernon's interview where Frost notes,

19 you know, you had something to do with her murder,

20 and Floyd says, no, I did not.  And it's actually

21 repeated in there where he's accused of having

22 something to do with her murder.

23      A.   Troy and Curt would have to answer to you

24 in regard to that I never came out and accused

25 him.



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

## JOEL RANDY CARRENO

1          Q.   All right.  You then state that Brandi

2     Wampler -- and I'm on Exhibit 10, page 19, stated

3     that Floyd S. Bledsoe had made contact with her.

4     Brandi Wampler stated that Floyd S. Bledsoe wanted

5     her to change her story that she told law

6     enforcement in reference to the time that he,

7     Floyd, brought his children to her residence in

8     the early morning hours of November 9th --

9     November 6th, 1999.  Do you see that?

10         A.   Yes.

11         Q.   And so then you got a statement from

12    Brandi Wampler, right?

13         A.   Correct.

14         Q.   And so her statement will tell us how

15    that Floyd wanted her to change her story that she

16    told law enforcement in reference to the time that

17    Floyd brought his children to her residence,

18    right?

19         A.   Correct.

20         Q.   All right.  And so let's read Brandi's

21    statement which you have conveniently reproduced

22    in your report.

23         It says when Floyd picked the boys up at 8:45

24    a.m. he said he was going to see if his mom would

25    watch the boys because I couldn't.  Instead of

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                     Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                  316-201-1612

### JOEL RANDY CARRENO

1   Floyd taking them out there to his moms Heidi was
2   supposedly -- Heidi supposedly took them out there
3   and Cody did not want to stay, so he went home
4   with Heidi.  Heidi was not sure what time she took
5   him over there.  Rose Bolinger had went over to
6   Floyd and Heidi's around 11 a.m. and Cody was
7   there but Christian wasn't, they said.  He
8   Christian was at Catheryn and Floyd Bledsoe's.
9        Today, November 10th, 1999, Floyd was asking
10  me questions like what time did he get here Friday
11  night.  I told him it was 12:45 a.m.  He said, are
12  you sure.  I could have thought it was 11:30 p.m.,
13  I mean, 12:30 a.m.  When I told him that Richard
14  said he got off at 11:30 he said I did not leave
15  until ten til 12, 10:50 p.m.  I told him that
16  Heidi's mom and Tammy came over here about 12:30
17  p.m. because Jeff and I couldn't figure out who
18  was knocking at the door, and Tammy wanted to know
19  if we had seen Camille.  Then Tammy asked if the
20  boys were still here and I said yes.  Floyd then
21  showed up at 12:45 to get them.  He also tried to
22  tell me it wasn't that late because Heidi and
23  Scott were just getting home.  He also forgot he
24  was out at the house before he came to pick them
25  up, because when I asked him for the money he said



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**162**

**JOEL RANDY CARRENO**

1  it was home because he didn't want to lose it at

2  work.  I had told him I knew it was 12:45 a.m.

3  because he had brought them back to me at 2:45

4  a.m., two hours later.  Did I read that

5  accurately?

6        A.   Yes.

7        Q.   And so can you agree with me that Brandi

8  Wampler doesn't say that Floyd wanted her to

9  change her story?

10        A.   Would you ask me that question again?

11        Q.   Sure.  Well, I'll ask it this way.  Where

12  on here does Floyd -- does Brandi say that Floyd

13  wanted her to change her -- her story?

14        A.   There's no place, he just wanted to get

15  the times right as I took it.

16        Q.   And he'd just been interrogated the night

17  before about exactly where he was and when, right?

18             MR. TURNER:  Object to form.

19        A.   Would you repeat that question?

20  BY MR. AINSWORTH:

21        Q.   Sure.  He'd just been interrogated the

22  night before about exactly where he was and when,

23  right?

24        A.   He was interviewed in regard to that,

25  yes.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604               Suite 101                     Suite 305
785-273-3063              Overland Park, KS 66212          Wichita, KS 67202
www.appinobiggs.com           913-383-1131                  316-201-1612

**JOEL RANDY CARRENO**

1    Q.   For four and a half hours he was

2  questioned about where he was over the space --

3  span of two days, right?

4    A.   Correct.

5    Q.   And Floyd was saying pretty much the same

6  thing that Brandi was thinking.  He told you that

7  he went to Brandi's house and he returned sometime

8  between 12:30 and one o'clock, and Brandi is

9  saying it was 12:45, right?

10   A.   If I remember correctly that would be

11 correct.

12   Q.   And he said -- going back to page 18 of

13 your report, that -- yeah.  That Floyd said at

14 approximately 2:30 a.m. he took his sons back to

15 Brandi Wampler's residence, and she said he came

16 back to Brandi Wampler's residence at 2:45 a.m.,

17 right?

18   A.   Correct.  Yes.

19   Q.   And she said it was two hours after he'd

20 been there the first time, and he said -- well --

21 strike that.

22   So Floyd and Brandi's times are pretty

23 consistent with one another, right?

24   A.   Yes.

25   Q.   All right.  And so let me pause here and



## JOEL RANDY CARRENO

1   just ask you.  Sorry.  Showing you again Exhibit

2   10, page 19, at the bottom.  Sorry.  I want to go

3   to page -- I'm trying to find where I can show you

4   what -- what date you were on.  I guess it would

5   have to start on 19.

6        All right.  So there's a reference to

7   November 10th at 3:10 p.m. you had contact with

8   Gary Bledsoe.  Do you see that?

9        A.    Uh-huh.  Yes, that would have been the

10  father of the two boys.

11       Q.    Okay.  And on Exhibit 10, page 20, Gary

12  Bledsoe confirmed that he had had a conversation

13  in the past with Floyd S. Bledsoe about having

14  pump -- pumping well filled, right?

15       A.    Correct.

16       Q.    And you knew that the victim wasn't

17  buried in the pumping well, right?

18       A.    That is correct.

19       Q.    Because the victim had been found in the

20  garbage ditch behind Tom's house, right?

21       A.    Correct.

22       Q.    All right.  So this is -- it appears to

23  be still on November 10th.  I don't see new day.

24  You then say you left this area at 4:26 p.m., and

25  you said Floyd -- Floyd S. Bledsoe made contact



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1   with me as I was leaving the property.  Floyd

2   Bledsoe stated to me again that he had nothing to

3   do with Zetta's death.  I asked Floyd S. Bledsoe

4   if he would be willing to take a polygraph test to

5   indicate such.  Floyd asked Bledsoe -- stated,

6   yes.  I asked Floyd S. Bledsoe if he would follow

7   me to the Jefferson County Sheriff's law

8   enforcement center.  I told Floyd S. Bledsoe on

9   our arrival I would confirm a time and place that

10  he could take the polygraph test.

11        Floyd S. Bledsoe met with me at 4:54 p.m., in

12  the east parking lot at the Jefferson County

13  Sheriff's law enforcement center.  Floyd S.

14  Bledsoe agreed to take a polygraph test on Friday

15  November 12th, 1999, at the law enforcement

16  center.  Do you see that, sir?

17        A.   Yes.

18        Q.   All right.  So as of November 12, 1999 --

19  well, actually, as of -- so when you -- when you

20  made the arrangements for Floyd to take the

21  polygraph test do you have any basis to suspect

22  Floyd had something to do with Camille's murder?

23        A.   I did not make the arrangements.  I

24  passed along information pertaining to that, that

25  Floyd was willing to take the polygraph.  And what

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### JOEL RANDY CARRENO

1  led up to that on that day, I was out on his

2  property where he lived and there was another --

3  there was another well -- he had a well, a dry

4  well.  And inside that well there was a pair of

5  cut up blue jeans with some type of red substance

6  on it.  And my thought during that period of time,

7  it did not look right.  It didn't look right to

8  me.  And that's the reason why I asked Floyd if he

9  would take a polygraph.

10      Q.   Why were you looking in the well?

11      A.   Because it was present.  It was right

12  there.

13      Q.   Why were you searching the well?

14      A.   We had -- I didn't search the well.  That

15  needs to be understood.  On that property walking

16  around there's the well.  There's no searching.

17  There it is.  Everything's in plain view.  It was

18  not that deep of a dry well.

19      Q.   All right.  So you didn't go to the area

20  specifically to look in the well?

21      A.   No.

22      Q.   Are you saying you just happened to be

23  there?

24      A.   That is -- that is correct.  That I was

25  there.



5111 SW 21st Street       6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604          Suite 101                 Suite 305
785-273-3063              Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com       913-383-1131              316-201-1612

## JOEL RANDY CARRENO

1      Q.   So was this something by happenstance?

2      A.   I'm sorry.

3      Q.   It was just by happenstance that you

4  happened to be at the well to look for the jeans,

5  is that right?

6           MR. NORTON:   Object to form.

7      A.   My response to that is I don't recall if

8  on that day that I viewed what I did, if that was

9  pursuant to Gary Bledsoe, Sr. giving us consent to

10  search of his property only out there.  I don't

11  recall if it was the same day.

12           BY MR. AINSWORTH:

13      Q.   Well, let's take a look at your report.

14  So looking at page 20 of Exhibit 10.  See where it

15  says Gary D. Bledsoe provided us with written

16  consent to search the above listed property for

17  any evidence regarding the investigation.

18  Sergeant Poppa and I searched the pumping well

19  located at 5200 Fairview Road.  That's Floyd

20  Bledsoe -- Floyd S. Bledsoe's address, right?

21      A.   Floyd, yes.

22      Q.   The pumping well was located

23  approximately 140 feet northeast of Floyd and

24  Heidi's trailer, right?

25      A.   Correct.



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**JOEL RANDY CARRENO**

1      Q.    So you had to walk, what, a half a

2  football field to get there?

3      A.    Yes.

4      Q.    You had a camera with you to photograph

5  the evidence, right?

6      A.    It appears so.  Yes.

7      Q.    So I got to ask.  Why were you wanting to

8  search the well on November 10th, 1999 --

9      A.    That --

10     Q.    -- at Floyd Bledsoe's house?

11     A.    That area in which Floyd lived and the

12  property owned by his father, I don't know how --

13  how much land there was, but it wasn't just like

14  walking into a neighborhood and you have one lot.

15  So that well was in the area in which we were

16  searching.

17     Q.    So let me ask it this way.  Why were you

18  searching the well at Floyd Bledsoe's house 50

19  yards from his house rather than, say, Tom

20  Bledsoe's bedroom?

21          MR. NORTON:  Object to form.

22     A.    I don't -- I don't -- I don't know.  I

23  don't recall.

24     BY MR. AINSWORTH:

25     Q.    Were you doing a competent investigation

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## JOEL RANDY CARRENO

1   of the Camille Arfmann murder?

2       A.   You know, I can look back today -- I can

3   look back five years ago and know that things

4   should have been done differently.  There were

5   things that could have been done differently.

6       Q.   Were you conducting a competent

7   investigation of the Arfmann homicide?

8       A.   At the time, you know, my response is

9   yes.

10      Q.   Well, how about now?  Do you think you

11  were conducting a competent investigation of the

12  Arfmann homicide?

13      A.   Today?

14      Q.   Yes.

15           MR. TURNER:  Object to form.

16      A.   Ask me that question again, if you would,

17  please.

18           BY MR. AINSWORTH:

19      Q.   Sure.  Today, looking back, do you think

20  you were conducting a competent investigation of

21  the Arfmann homicide back in 1999?

22           MR. NORTON:  Same objection.

23      A.   I can sit here today -- you always look

24  back and you always -- I -- I'll speak for myself.

25  Could we have done this, could we have done that.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063            Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com         913-383-1131              316-201-1612

## JOEL RANDY CARRENO

```
1   You can always Monday morning quarterback.  And if
2   you were to ask me, well, what would it have been,
3   I don't know.  I go back to duct tape.  That's
4   stands out.  But I -- I don't know.
5       BY MR. AINSWORTH:
6       Q.   Why did the duct tape stand out rather
7   than, hey, maybe we should have searched Tom
8   Bledsoe's house?
9           MR. NORTON:  Object to the form.
10      A.   Your question.
11      BY MR. AINSWORTH:
12      Q.   The question is, why did the duct tape
13  stand out in your mind as opposed to, gee, maybe
14  we should have searched Tom Bledsoe's house?
15          MR. NORTON:  Same objection.
16      A.   It was Floyd who stated that he thought
17  Camille had been abducted.  And I myself, based on
18  the timelines of everything on that day, my
19  thought -- and I remember my thought was did that
20  duct tape play a part in what Floyd called an
21  abduction.  And then your --
22      BY MR. AINSWORTH:
23      Q.   And go ahead.
24      A.   No.  No.  You asked about the search of
25  the bedroom, somebody's bedroom.
```



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**JOEL RANDY CARRENO**

1      Q.   Let me be real clear.  Why didn't you

2   search Tom Bledsoe's house by November 10th, 1999?

3      A.   Why didn't we.  Is that what you said?

4      Q.   Yeah.

5      A.   Okay.

6      Q.   Yes.

7      A.   Okay.  I -- I don't recall.

8      Q.   Homicide 101.  Like, basic investigation

9   stuff.  If you arrest somebody for murder you

10   search their vehicle and you search their home,

11   especially when a 14 year-old girl is found dead

12   on their property having been transported there,

13   right?

14      A.   Correct.

15           MR. NORTON:  Object to form.

16   BY MR. AINSWORTH:

17      Q.   Why didn't you search Tom's vehicle and

18   his house?

19      A.   Are you asking why I didn't?

20      Q.   Yes.  Why didn't you.  Yes.  You Carreno.

21   Yes.

22      A.   I'm going to tell you the reason why is

23   -- in regard to your question why didn't I.  I had

24   other assignments that I was doing, and there was

25   a vast number of people, officers involved in this



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### JOEL RANDY CARRENO

1  investigation, so I can only -- I can't tell you
2  what happened out here.  I can tell you about me.
3  And you're directing this directly at me, why
4  didn't I search that bedroom or the house.  I
5  don't know how to respond to that.  I -- it wasn't
6  my -- my duty out of all these officers for I, as
7  you put it, for I to search that house.
8       Q.   So was it Dunnaway and Woods'
9  responsibility --
10      A.   I don't know.
11      Q.   -- to search the house -- let me ask the
12  question.
13      A.   Yeah.  I'm sorry.
14      Q.   Was it Dunnaway -- was it Dunnaway and
15  Woods' responsibilities to ensure that Tom's house
16  and vehicle were searched?
17           MR. QUALSETH:  Object to the form.
18           MR. LINDEN:  Join.
19           MR. QUALSETH:  Mischaracterizes earlier
20  testimony.  Go ahead.
21      A.   Oh.  What's your question?  I'm sorry.
22  BY MR. AINSWORTH:
23      Q.   That's okay.  I'll try again and just
24  pause before -- strike that.
25           Was it Dunnaway and Woods' responsibility to

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### JOEL RANDY CARRENO

1    ensure that Tom's house and vehicle were searched?

2              MR. QUALSETH:  Same objection.

3              MR. NORTON:  Same.

4              MR. LINDEN:  Same.

5         A.    I'm going to have to respond yes.  I

6    mean, the sheriff was the sheriff.  He's the lead

7    -- the very lead.  Jim Woods was the lead for the

8    KBI agents.

9              MR. AINSWORTH:  That's all I'm looking

10   for.

11        BY MR. AINSWORTH:

12        Q.    All right.  So you -- did somebody direct

13   you to search the well at Floyd's house?

14        A.    Did somebody what?

15        Q.    Did somebody tell you to search the well

16   at Tom's house --

17        A.    No.

18        Q.    -- or Floyd's house?

19        A.    No.

20        Q.    So you chose to search the well at

21   Floyd's house?

22        A.    You have to understand, sir, that well

23   was on that property.  We searched the property.

24   Upon searching the property the -- the well was

25   there.



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604               Suite 101                 Suite 305
785-273-3063          Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131            316-201-1612

## JOEL RANDY CARRENO

1    **Q.   Where else did you search on the**
2    **property?**
3        A.   I -- I don't recall that day in which we
4    had consent to search all of the areas on that
5    property.  What stood out to me is what we're
6    talking about here, was that dry well with those
7    jeans in there.
8        **Q.   Why didn't you search the house where**
9    **Camille lived instead of the well that was 50**
10   **yards from the house?**
11       MR. TURNER:  Object to form.
12       A.   If I understand your question correctly,
13   the father, Floyd Bledsoe, owned the property.  He
14   gave us consent to search the property but not the
15   trailer.
16       BY MR. AINSWORTH:
17       **Q.   And Floyd was home, you spoke to him.**
18   **Did you ask Floyd can we please come in to search**
19   **your trailer where Camille lived to see if there's**
20   **any evidence to be found there?**
21       A.   I -- I don't recall whether we did or
22   not.
23       **Q.   Well, if you did you would have noted**
24   **that in your report, right?**
25       A.   Right.  I would believe so.  Yes.

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1      Q.   Because if Floyd said, no, don't come in
2  and search, you definitely would have reported
3  that, right?
4      A.   I would like to think so, yes.
5      Q.   Not only would you like to think so, you
6  know if in a murder investigation someone is
7  saying, no, you don't have consent to search here,
8  you would make a note of that, right?
9      A.   I would like to think so.  Yes.
10     Q.   Why would you -- why do you say I would
11 like to think so instead of, yes.  Do you -- do
12 you skip things like that in homicide
13 investigations?
14     A.   No.
15          MR. NORTON:  Object to form.
16          THE WITNESS:  I'll answer that.  And you
17 question being what?
18     BY MR. AINSWORTH:
19     Q.   My question is, do you sometimes skip --
20 mentioning when people in homicide investigations
21 don't give you consent to search areas?
22          MR. NORTON:  Hang on.  You bonged there
23 again.  Said something that started with an M,
24 but.
25     BY MR. AINSWORTH:



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

2/1/2023                                                           176

## JOEL RANDY CARRENO

1      Q.    During homicide investigations do you

2   sometimes forget to note that people refuse to

3   allow you consent to search the home where the

4   victim's abducted from?

5           MR. NORTON:   Object to form.

6      A.    You know, I have to respond, no.  I would

7   hope not.

8      BY MR. AINSWORTH:

9      Q.    All right.  So November 12th, 1999, you

10  had Floyd coming in for a polygraph exam and you

11  scheduled a time, right.

12     A.    I did not schedule the time, sir.  Floyd

13  told me that he would take a polygraph.  I passed

14  that information along.  I did not set up a

15  polygraph.

16     Q.    Who did you pass the information along

17  to?

18     A.    It would have been one of my supervisors,

19  and that would have been -- the KBI did the

20  polygraph.

21     Q.    All right.  Were you aware of a plan to

22  have both Tom and Floyd polygraphed on the 12th?

23     A.    I do not have any memory whatsoever of

24  Tom Bledsoe taking a polygraph.

25          MR. NORTON:   Listen to his questions.



Appino & Biggs Reporting Service, Inc.   TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# JOEL RANDY CARRENO

1          THE WITNESS:  Oh, I'm sorry.  Go ahead.

2     I'm sorry.

3          BY MR. AINSWORTH:

4          Q.    Were you aware of a plan that Tom and

5     Floyd were going to be given a polygraph test on

6     the same day?

7          A.    No.

8          Q.    I'm going to show you Exhibit again, your

9     report.  And this is page 21 of Exhibit 5.  So it

10    says that, you know, on the 10th you make this

11    meeting, agreement with Floyd at five -- about

12    five p.m. that he's going to come back on Friday

13    the 12th, and then the next entry in your report

14    is on the 12th you interviewed Floyd Bledsoe.

15         My question for you, sir, is what did you do

16    on the 11th?

17         A.    I -- I don't recall.

18         Q.    Did you talk to Tom on the 11th?

19         A.    Sir, I have no recollection on my

20    activities 23 years ago on November the 11th.

21         Q.    Is it possible you spoke to Tom on

22    November 11th but didn't document your interview

23    with him?

24         A.    I would like to think that, had I had

25    contact with Tom, I would have noted it somewhere.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1    Q.    You're thinking over the possibility of
2    maybe you spoke -- you had a conversation with
3    Tom?
4    A.    No.   Not at all.   I'm telling you, I
5    don't recall my activity on -- on that date in
6    question.
7    Q.    All right.   If you were having
8    conversations with Tom Bledsoe that were
9    undocumented before November 12th, 1999, that
10   would be totally wrong, right?
11   A.    Totally wrong in what manner?
12   Q.    Meaning if you're -- if you're conducting
13   an investigation and talking to Tom Bledsoe, the
14   criminal defendant, and not revealing that
15   information to Floyd Bledsoe that would be totally
16   improper, right?
17   A.    I would agree.
18   Q.    So on February 12th did you observe Tom
19   Bledsoe's polygraph exam?
20   A.    I have no memory whatsoever of Tom
21   Bledsoe taking a polygraph.
22   MR. NORTON:   Hey, Russell, I believe you
23   said February 12th.
24   MR. AINSWORTH:   Oh, I'm so sorry.   I got
25   -- I think I'm blanking on -- thank you for the



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1   clarification.

2       BY MR. AINSWORTH:

3       Q.   I meant November 12th.  Do you understand

4   that, sir?

5       A.   Yeah.  My answer is still the same.

6       Q.   And, so, are you saying you don't

7   remember appearing or you don't remember anybody

8   talking about Floyd -- about Tom having a

9   polygraph exam, or what is it you're saying when

10  you tell me that you have no memory of Tom taking

11  a polygraph?

12      A.   In regard to your question before about

13  Tom taking a polygraph.  I am advising you I don't

14  recall at all Tom taking a polygraph.  I recall

15  Floyd, but not Tom.

16      Q.   All right.  Did you talk to Tom before

17  you interviewed Floyd on November 12th, 1999?

18      A.   I don't recall if I did.

19      Q.   If you did talk to Tom before you

20  interviewed Floyd on November 12th would you have

21  documented the fact that you talked to Tom before

22  talking to Floyd?

23      A.   Yes.  And it would have been supported by

24  a -- a recording of such.

25      Q.   And -- and so if you're talking to Tom at

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

1  the law enforcement center on November 12th, then

2  you should turn on the video camera and record

3  that conversation, right?

4       A.   It would have been had it happened.  Yes.

5       Q.   You had Tom come into the interrogation

6  room and confront Floyd, right?

7       A.   Sir --

8            MR. NORTON:  Object to form.

9            THE WITNESS:  No.  What happened was I

10  was interviewing Floyd.  I was interviewing Floyd

11  and there was a knock on my door, on the interview

12  room door, and I opened it and it was Mike and

13  Tom.  I had no previous knowledge that -- I didn't

14  know who was on the other side of the door.

15       BY MR. AINSWORTH:

16       Q.   All right.  So you opened the door, and

17  then what happened?

18       A.   I'm trying to recall where these guys

19  were physically placed in that interview room.  It

20  was a table that separated both of them, and Tom

21  was closest to the door in which he entered, and

22  they had talked about one of them was lying, the

23  other one was lying.  And for myself I -- I needed

24  help at that time.  I was hoping somebody would

25  say, you know, it was me, but they were pointing

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1  fingers at each other so I didn't get the response

2  I wanted.

3       Q.   So I'm to understand that you're

4  conducting a interview with Floyd Bledsoe about a

5  homicide, right?

6       A.   Right.

7       Q.   And at this point was Tom -- Tom still

8  incarcerated in the jail on the 12th?

9       A.   I don't recall.

10      Q.   In any event, unbeknownst to you Tom and

11 Mike Hayes walked down the hall to the very

12 interrogation room where your -- where you've got

13 Floyd, right?

14      A.   Correct.

15      Q.   And then they knock on the door --

16      A.   I don't know if they did.  There was a

17 knock at the door.

18      Q.   Okay.  Somebody knocked on the door?

19      A.   Correct.

20      Q.   And you -- did you answer the door?

21      A.   I did.  Yes.

22      Q.   And who was in the -- who was in the

23 interrogation with you and Floyd at that time?

24      A.   I -- I don't recall.

25      Q.   Well, actually, do you remember Special

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

**JOEL RANDY CARRENO**

1  **Agent Johnson being present with you?**

2  A.   During that time?

3  **Q.   Yes.  At that time.**

4  A.   I think they were getting -- based on

5  what you're stating and based on what I remember

6  we are getting -- or I am getting confused with

7  the interviews.  You're talking about the

8  interview on the 12th where Mike and Tom came in,

9  then your talking about the polygraph where Mike

10  came in, is that correct?

11  **Q.   Well, let me see if I can orient you,**

12  **although it's not really worth it for question.**

13  **But after the polygraphs you conducted an**

14  **interview with Floyd, right?**

15  A.   With Floyd.  Yes.

16  **Q.   Yes.**

17  A.   Posttest interview.  Correct.

18  **Q.   And then during that interview with Floyd**

19  **Special Agent Johnson joined you in that**

20  **interview, and then Tom and Floyd -- Tom and Mike**

21  **Hayes came into the room?**

22  A.   Okay.  You said joined me.  I don't

23  recall Agent Johnson ever leaving.  I don't recall

24  he ever leaving the interview room.

25  **Q.   Let me just show you -- okay.  So Exhibit**

**JOEL RANDY CARRENO**

1  **10, page 21.  There's a reference that you**

2  **interviewed Floyd Bledsoe -- F. Bledsoe, see that?**

3  **Yes?**

4       A.    Where's that at again?

5       Q.    **Sorry.  The third paragraph on page 21 of**

6  **Exhibit 10.  I interviewed Floyd S. Bledsoe**

7  **underlined?**

8       A.    Correct.

9       Q.    **Going on to page 22 of Exhibit 10.  It**

10 **says during that time KBI Special Agent George**

11 **Johnson entered the interview room.  Do you see**

12 **that?**

13      A.    Yes.

14      Q.    **Okay.  In any event, there's a knock at**

15 **the door, you answer the door, correct?**

16      A.    Right.  But I -- I want to make sure that

17 you understand what I'm saying.  I don't recall

18 that knock on the door being the same time -- the

19 same date in which Floyd took the polygraph test.

20 I --

21      Q.    **Well, on how many occasions did Tom**

22 **confront Floyd?**

23      A.    To the best -- I don't know.  But in

24 answering that, to the best of my knowledge I want

25 to say twice, but I don't know if that's correct.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1      Q.    You're just guessing?

2      A.    It's more than a guess.  I don't know.  I

3  don't remember.  I don't remember.

4      Q.    All right.  Well, the second time that

5  Tom confronted Floyd, was that planned?

6          MR. TURNER:  Object to form.

7      A.    No.  And if it was, I had -- then no.  I

8  didn't have any knowledge of that.

9      BY MR. AINSWORTH:

10      Q.    So you're saying that on two different

11  occasions Tom confronted Floyd in -- during one of

12  your interviews with Floyd at the law enforcement

13  center without you having any knowledge that it

14  was going to happen.

15          MR. TURNER:  Object to the form.

16          MR. NORTON:  Misstates the evidence.

17      A.    I will state that I know that there was

18  one encounter to where Tom and Floyd were in the

19  same room at the same time, and during that time

20  Mike Hayes was in the interview.  Now, was that

21  the same day that there was a knock on the door, I

22  don't remember.

23      BY MR. AINSWORTH:

24      Q.    Well, in any event, when you had -- when

25  the incident where Tom and Mike Hayes were in the



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1  room with you and Floyd at the law enforcement

2  center during one of your interviews with Floyd,

3  was that planned?

4      A.   No.  No.

5      Q.   Okay.  So how did you first get alerted

6  that Tom and Mike Hayes were going to join you?

7      A.   His mere presence.

8      Q.   When you say his mere presence, you mean

9  a knock at the door and you answering?

10     A.   I don't know if I had the interview room

11 door open or closed.  But I do know this, from the

12 conference room to the interview room it's --

13 there's a door in between and it's secured.  And

14 you have to have a fob in order to enter the area

15 in which I was conducting the interview.  I don't

16 know who used their fob to let them in.

17     Q.   But because it's a secure area somebody

18 had to let Hayes into the area where you were

19 conducting the interview with Floyd, right?

20     A.   Absolutely.  Yes.

21     Q.   And to this day you don't know who it was

22 who orchestrated Hayes and Tom getting to the

23 interview room door.

24          MR. NORTON:  Object to form.

25          MR. COX:  Object to form -- or join.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1      A.    No.

2      BY MR. AINSWORTH:

3      Q.    And in your post interview, you know,

4 huddle where you guys talk about what happened

5 during the interview, you didn't ask anybody how

6 did Hayes and Tom come to be in the interview

7 room?

8      A.    No.

9      Q.    And nobody told you that they were the

10 ones who said -- sent Hayes and Tom into the

11 interview room?

12     A.    I'm going to say, no, and I don't recall.

13     Q.    Hayes used to be the prosecutor of

14 Jefferson County, is that right?

15     A.    That is correct.

16     Q.    And he was the prosecutor when you were

17 deputy there?

18     A.    Yes.

19     Q.    The prosecutor has a fob to get into the

20 building, right?

21     A.    Nuh-uh.  Well, let me back up.  The

22 prosecutor today would not have a fob.  And, no.

23 He would not have had a fob.  No.

24     Q.    All right.  And so did you have any

25 conversations with Michael Hayes before your



### JOEL RANDY CARRENO

1   interview with Floyd on November 12th about what

2   Tom's version was?

3        A.   No.   I -- I didn't need to based on the

4   fact that every time that I interviewed Tom, Mike

5   was present as his attorney.

6        Q.   I'm just going to remind you one more

7   time that as -- you know, based on your report,

8   and just only going off of your report, I don't

9   know what happened, but according to your report

10  you didn't interview Tom until November 24th the

11  day before Thanksgiving.  Okay.  Do you understand

12  that?

13       A.   I hear you.  Yes.

14       Q.   So it's possible you talked to Tom before

15  then but then that would be documented in your

16  report, and so my question is, before November

17  12th, your interview with Floyd on the afternoon

18  of November 12th, did you have any conversations

19  with Mike Hayes about what Tom was saying?

20            MR. TURNER:   Object to form.

21       A.   The only contact that I recall having

22  with Mike was either in the parking lot at the

23  sheriff's department and/or out at the crime scene

24  to where Camille was buried, and I don't recall

25  which location.  But either way, Mike wanted to



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1  look at -- my -- my clock inside of my vehicle to
2  make sure that daylight savings time had to have
3  been around the corner and just happened or
4  whatever, and I told him to get the hell away from
5  my vehicle.  So I don't know when that contact
6  was.
7       Q.   **Was it the week that Camille's body was**
8  **recovered?**
9       A.   I -- I don't recall.
10      Q.   **Was this in a different year like 1988 or**
11  **-- or 1997 or 1998?**
12      A.   I'm not for sure what you're asking, sir.
13      Q.   **I mean, the conversation you had with**
14  **Mike Hayes where he was asking to look in your**
15  **car, it was around the time of the Arfmann**
16  **homicide --**
17      A.   It was, yes.
18      Q.   **Why did you tell him to get the hell away**
19  **from your vehicle?**
20      A.   That it -- why did I tell -- because I
21  meant it.  Get the hell away from my vehicle.  I
22  know what the hell my clock says.  I don't know
23  what to you -- for you to take a look at it.  I
24  knew what it showed and it was correct.  So it
25  was, like, get the hell away from me.  I -- I

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**JOEL RANDY CARRENO**

1  don't -- I don't have to show it to you.

2      Q.   **Had you been talking about, you know, the**

3  **times that events occurred such as, you know, the**

4  **time that you were with Floyd on the Saturday,**

5  **November 6th?**

6      A.   Talking with who?

7      Q.   **With Mike Hayes.**

8      A.   Oh.  I don't recall.  I don't recall

9  having a conversation with Mike Hayes during that

10  period of time.  I don't recall.  I don't know.

11     Q.   **Well --**

12     A.   Go ahead.

13     Q.   **Did he indicate at all why he wanted to**

14  **see your car's clock to find out, you know,**

15  **whether your car was on daylight savings time?**

16     A.   He would have to answer that, but I know

17  what my assumption was, and I don't know.

18     Q.   **What was your assumption?**

19     A.   And I don't even know that that's

20  correct.  My assumption was that he wanted to make

21  sure that my documentation showing the time was

22  correct.

23     Q.   **And was your car's clock correct?**

24     A.   Yes.

25     Q.   **You seem like a guy who pays attention to**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**JOEL RANDY CARRENO**

1  the clock and makes sure it's accurate, is that

2  right?

3       A.   I try my best.

4       Q.   All right.  In any event, if you had

5  talked to Mike Hayes about statements from Tom

6  before November 12th you would have documented

7  anything that Hayes was telling you that Tom was

8  telling him, right?

9       A.   If I'm understanding your question, I

10 never had contact with Tom without Mike Hayes

11 being present.

12      Q.   Let me just clarify.  I'm asking did you

13 have any conversations with Mike Hayes without

14 Tom?  So just talking to Mike Hayes or where Mike

15 Hayes was telling you what Tom had told him?

16      A.   I -- I don't recall at all.

17      Q.   And if Mike Hayes was telling you what

18 Tom had told him you would have written that down

19 because that would have been, you know, statements

20 from Tom about the murder, right?

21      A.   That makes sense, yes.

22      Q.   All right.  In any event, did anyone talk

23 to you about what Tom -- what Tom's story was

24 before you questioned Floyd on November 12th,

25 1999?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1    A.   My response to that is no.  The story

2  that I received from Tom was the initial

3  statements that he made to me.

4    **Q.   And that was the first you learned about**

5  **the roadside meeting between Floyd and Tom was**

6  **from Tom's mouth when you talked to Tom?**

7    A.   That would be correct.

8    MR. AINSWORTH:  Okay.  I'm going to --

9  let me pull up Exhibit 8.  And so this is a new

10  exhibit.  Brett, if you would show it to the

11  witness.  And it's Bates numbered KBI subpoena

12  1628 through 1631.

13  BY MR. AINSWORTH:

14    **Q.   You got it in front of you, sir?**

15    A.   Yes.

16    **Q.   Okay.  So this is a -- these are -- I'll**

17  **represent to you these are George Johnson's notes**

18  **of his conversation with Tom Bledsoe the morning**

19  **and early afternoon of November 12, 1999, during**

20  **the polygraph.  Do you see at the top?  It says**

21  **pretest.**

22    A.   Correct.

23    **Q.   Has known victim about five to six,**

24  **presumably, years.  Knew from church.  Countryside**

25  **Baptist.  Victim's sister is married to subject's**



Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1    brother Floyd.  And I'm going to skip down to the

2    -- we can go through the -- let me skip down to

3    the part that I want to direct your attention to.

4        Here Tom is talking about his activities and

5    get to -- let me scroll.  November 5th.  Subject

6    up around eight a.m.  Left residence at 1400.

7    Went to Lawrence to pick up paycheck.  All right.

8    And then skipping down to the bottom of the page.

9    Was at church until 2130.  From church directly

10   home.  Not go by Floyd Bledsoe's residence.  At

11   home until about 1400.  1400 in layperson's time

12   is two o'clock, is that right?

13       A.   Correct.

14       Q.   Two p.m.?

15       A.   Correct.

16       Q.   All right.  Two p.m.  Went to church.

17   Floyd Bledsoe stops subject along road.  Subject

18   first learned victim missing from his dad.  Floyd

19   Bledsoe had called his dad and told dad.  Dad told

20   subject, meaning Tom.  Floyd Bledsoe told subject

21   that he knew where victim was and she was dead.

22   Subject asked Floyd Bledsoe why victim dead.

23   Floyd Bledsoe kind of shrugged shoulders, no

24   answer.  Subject asked where -- where victim was.

25   Floyd Bledsoe said -- and crossed out his trash

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604          Suite 101                  Suite 305
785-273-3063             Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com      913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1    dump by the house, and then it's written at dad's

2    house in the garbage ditch.  Said buried with

3    trash on top of her.  Said clothes shirt and bra

4    -- clothed, shirt and bra up.  Asked Bledsoe if

5    raped victim.  Floyd Bledsoe not answer.  Asked

6    Floyd Bledsoe how victim died.  Floyd Bledsoe said

7    gunshots.  Think said two to three, not sure.

8    Subject asked Floyd Bledsoe why again, not really

9    answer.  Subject also asked if Floyd Bledsoe shot

10   victim.  Floyd Bledsoe not answer, just stayed

11   quiet.  Subject believes Floyd Bledsoe probably

12   shot victim based on actions what said and what

13   wasn't answered.  Subject also asked why.  Again,

14   no answer.  Subject said had to get on to -- had

15   to get to work.

16       Event took place on a dirt road about two

17   miles from residence towards highway to Lawrence.

18       Okay.  I'm just going to stop here and --

19   according to the notes that George Johnson took on

20   November 12th, Floyd -- Tom Bledsoe is saying that

21   a roadside meeting happened after he left for work

22   at two p.m., right?

23            MR. QUALSETH:  Object to the form on many

24   grounds.

25       BY MR. AINSWORTH:



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

2/1/2023                                                                                    **194**

## JOEL RANDY CARRENO

1      Q.    Correct, sir?

2            MR. QUALSETH:   You can go ahead and

3      answer.

4      A.    No.   I want to make sure that I

5      understood your question.

6      BY MR. AINSWORTH:

7      **Q.    My question is, according to George**

8      **Johnson's notes, Tom Bledsoe said he's at home**

9      **until two o'clock, then we went to work, and Floyd**

10     **Bledsoe stopped him along the road?**

11           MR. QUALSETH:   Same objection.

12     BY MR. AINSWORTH:

13     **Q.    Right?**

14     A.    I don't know if two o'clock was accurate.

15     And this is part of the problem that I had, was

16     times.

17     **Q.    Yeah.   I'm -- I'm not asking, you know,**

18     **if this is accurate.   That would be a different**

19     **question.**

20     **I'm just saying, according to his notes,**

21     **according to George Johnson's notes, Tom is saying**

22     **that he's at home until two o'clock, and then went**

23     **to work, and Floyd Bledsoe stopped him along the**

24     **road, right?**

25     A.    That's Agent Johnson's documentation,

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street       6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604          Suite 101                 Suite 305
785-273-3063              Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com       913-383-1131              316-201-1612

## JOEL RANDY CARRENO

1   yes.

2        Q.   Correct.  So according to -- all right.

3   **When you started talking to Floyd on November**

4   **12th, 1999, had you heard from any source that the**

5   **roadside meeting happened at any time other than**

6   **after two p.m. on November 6th?**

7        A.   As I recall, Floyd -- not Floyd.  I'm

8   sorry.  Tom in his statement to me was that he

9   left around 1:45 from his parents house to go to

10  work.  On his way to work in Lawrence, Kansas he

11  stopped to get a Gut Fuel, and then he stopped at

12  Jessie Gamble's residence.  And it had something

13  to do with turkey legs.  Jessie Gamble lived south

14  of Oskaloosa.  Tom said that he got at work 15

15  minutes early and his shift started at three

16  o'clock.  And it just timewise it did not make

17  sense to me.  It didn't add up to where I could

18  believe his story about -- it was hard for I to

19  believe his story about contacted Floyd.

20       Q.   **Mr. Carreno --**

21       A.   On the county road.

22       Q.   **Are you again referring to the interview**

23  **that happened on November 24th, 1999?**

24       A.   I'm referring to information that was

25  gathered during the course of this investigation.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1   An exact date, I don't recall.

2       Q.   **You said this is what Tom told you?**

3       A.   Correct.

4       Q.   **So when did Tom tell you this?**

5       A.   It would have been -- I mean, obviously

6   during one of my interviews with Tom.

7       Q.   **And we previously established that your**

8   **first recorded interview with Tom is on November**

9   **24th, right?**

10      A.   Correct.  Yes.

11      Q.   **So I -- I'll direct your attention back**

12  **to November 12th, okay?  So I'm not asking what**

13  **happened in the future, just on November 12th,**

14  **1999.  Are we in the same place?**

15      A.   That is --

16      Q.   **Same time.**

17      A.   -- the date of the polygraphs?

18      Q.   **That's right.**

19      A.   Okay.

20      Q.   **Okay.  On the date of the polygraphs,**

21  **November 12th, had anyone told you that Tom's**

22  **roadside meeting with Floyd happened at any time**

23  **other than after two p.m.?**

24      A.   Not that I recall.

25      Q.   **Okay.  And you knew that after -- the**



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1   roadside meeting could have happened after two

2   p.m. on the Saturday because you were in a car

3   with Floyd after two p.m. on a Saturday, right?

4        A.   I question the time that was provided to

5   me by Floyd -- by Tom, and the times just did not

6   add up.

7        Q.   That's not my question.  I didn't say did

8   the times add up.  I'm just saying, after two p.m.

9   Floyd could not have been on a roadside meeting

10  with Tom because you were with Floyd, right?

11       A.   I was with Floyd -- and my notes would

12  reflect this.  I -- I took him back to his

13  residence and I believe it was around 1:30.  And

14  my thought in my mind -- if I'm not answering your

15  question, tell me.  I --

16       Q.   You're not.  Because --

17       A.   Okay.  I apologize.

18       Q.   -- that's okay.  Let me just -- you know,

19  just so we're all on the same page.  Because we --

20  we looked at this earlier.  I'll show you your

21  report again and your report on page -- sorry

22  seven.  Page 7.  You return to Floyd at 1:48 p.m.

23  correct?

24       A.   Correct.

25       Q.   And you were with him until 5:30 in the

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### JOEL RANDY CARRENO

1    afternoon.   From 1:48 p.m. to 5:30 you will agree

2    with me Tom could not be meeting Floyd on the

3    roadside because Floyd was with you, right?

4          A.    Correct.

5          Q.    Okay.   So now you interview Tom -- sorry.

6    On the 12th you interview Floyd.   And let me show

7    you that same report, Exhibit 10, page 21.   And

8    you document your interview with Floyd.   The

9    interview was videotaped.   Floyd agreed to waive

10   his Miranda rights, he agreed to talk to you

11   without a lawyer, he agreed to answer your

12   questions, right?

13         A.    Correct.

14         Q.    And it says Floyd S. Bledsoe began the

15   interview by stating he had no involvement in

16   Zetta's death.   I want you to believe me.   Floyd

17   S. Bledsoe stated that he was at work when Zetta

18   was killed.   I asked Floyd S. Bledsoe if Heidi

19   Bledsoe could have been involved in Zetta's death.

20   Floyd S. Bledsoe stated that Heidi Bledsoe was at

21   work that Friday night.   I told Floyd S. Bledsoe

22   that it is my opinion that it was he who caused

23   Zetta's death and then quickly left the county.

24   Do you see that?

25         A.    Yes.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

1      Q.   Was that true?  Was it your opinion that
2  it was Floyd who caused Zetta's death and then
3  quickly left the county?

4      A.   I didn't know at that time.  But I picked
5  up on a statement in which he made that you just
6  read that brought a lot of concern to me, when he
7  said that he was at work when Camille was shot.  I
8  remember thinking how did you -- how in the hell
9  would you know that?  So that brought -- I mean,
10 that was -- that brought concern to me.

11     Q.   All right.  Well, you knew that Camille
12 was abducted sometime after 4:20 on Friday night,
13 right?

14     A.   What I knew, that she was not at the
15 trailer where she was supposed to be.  Abducted, I
16 didn't know whether or not -- and I still don't
17 know whether or not she was abducted.

18     Q.   You don't -- do you think that Camille
19 Arfmann walked to the garbage ditch and killed
20 herself with Tom's gun?

21         MR. NORTON:  Object to form of the
22 question.  That is a argumentative and harassing
23 question.  And -- and you can go ahead and answer
24 it.  But that's just an improper question.

25         MR. AINSWORTH:  I -- I'm serious.



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

**200**

## JOEL RANDY CARRENO

1  Because the witness is telling me that he doesn't

2  believe that the victim was abducted in this case.

3  So I want to just --

4         MR. NORTON:  No.

5         MR. AINSWORTH:  -- clarify that.

6         MR. NORTON:  No.  No.

7         MR. AINSWORTH:  Let's get some

8  clarification from the witness.

9         MR. NORTON:  No-no-no.  If you're talking

10 going to talk to me then we'll -- we can talk.

11        MR. AINSWORTH:  Then let's have the

12 witness step out of the room.

13        MR. NORTON:  Okay.

14        MR. AINSWORTH:  Unless you want to --

15        MR. NORTON:  Why -- why don't you go

16 ahead and take a break.  Take five minutes, step

17 outside, get your breath.

18        MR. AINSWORTH:  But I'd like him to

19 answer the question.

20        THE WITNESS:  What's the question?

21    BY MR. AINSWORTH:

22    **Q.   The question is, do you think that**

23 **Camille Arfmann walked to the garbage ditch and**

24 **killed herself?**

25    A.   Absolutely not.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604            Suite 101                    Suite 305
785-273-3063               Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com         913-383-1131                 316-201-1612

**JOEL RANDY CARRENO**

 1           MR. NORTON:  Okay.  Now you can step out.

 2           THE REPORTER:  Are we staying on the

 3    record?

 4           MR. NORTON:  Yes.  Okay.  So the witness

 5    has -- has left the room.  And, Russell, I'm not

 6    trying to be difficult or cute, but here's the

 7    issue.  Your question was phrased as -- first of

 8    all, you were being accused in your question.  But

 9    the first question is, assuming that she was,

10    quote, abducted.  And what he said was he didn't

11    know whether she was abducted, and then you jumped

12    to, well, are you saying that she went and

13    committed -- da-da-da.  No.

14        What he had said earlier was that he believed

15    that she had left with someone that she knew.

16    That's different than being abducted.  He doesn't

17    necessarily know whether she was abducted.  I

18    think you are jumping to it's absolute that she

19    was abducted, whereas we don't necessarily know,

20    and he certainly didn't at the time know that she

21    was -- I mean, do you know something we don't?

22    What do you know that we don't?  Do you have

23    evidence that she was abducted that you not

24    disclose to us?

25           MR. AINSWORTH:  I think it's all there.



5111 SW 21st Street     6420 W. 95th Street     800 E. 1st Street
Topeka, KS 66604        Suite 101               Suite 305
785-273-3063            Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com     913-383-1131            316-201-1612

**JOEL RANDY CARRENO**

1   All right.  Let's go off the record.

2              MR. NORTON:  Hold on.  Then tell me.  I'm

3   being dead serious.

4              MR. AINSWORTH:  Well, I'm sorry.  You're

5   just going to have to read the reports.  It's all

6   there.  Let's --

7              MR. NORTON:  So your answer's no.  You

8   can't point me to it.  Okay.

9              MR. AINSWORTH:  Hold on.  My answer is

10  the information is there, so -- but I think --

11             MR. LINDEN:  I think you're confusing --

12             MR. AINSWORTH:  Let's go off the --

13             MR. LINDEN:  -- voluntarily leaving with

14  involuntarily leaving.

15             MR. NORTON:  Let the record reflect that

16  Mr. Ainsworth has just hung up or at least

17  disconnected from the Zoom as we were having that

18  conversation, and now we --

19             MR. AINSWORTH:  He didn't disconnect from

20  the Zoom.  It's time for a break.  I -- I don't

21  need to engage with you your -- I've got time on

22  the record and I'm going to preserve it for

23  questioning the witness, not discussing this

24  matter with you.

25             MR. QUALSETH:  Are we taking a break



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063            Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com         913-383-1131             316-201-1612

## JOEL RANDY CARRENO

1    then?

2              MR. AINSWORTH:  Yes.

3              THE VIDEOGRAPHER:  Time is approximately

4    3:37 p.m., we're going off the record.

5              (THEREUPON, a recess was taken.)

6              THE VIDEOGRAPHER:  Time is approximately

7    3:52 p.m., we're back on the record.

8         BY MR. AINSWORTH:

9         Q.    Do you think that Tom had something to do

10   with Camille's Arfmann's murder?

11        A.    I -- I don't know.

12        Q.    All right.  Let's take a look at Exhibit

13   5, page 80.  So that's the field notes, and the

14   Bates number on this page is JC 4947, and it goes

15   on through -- this section goes on through 4954.

16   Is this your handwriting on that page, sir?

17        A.    No.  This would be Troy Frost.

18        Q.    Okay.  So you and Frost are conducting

19   this interview with Floyd, is that correct?

20        A.    I don't recall -- I don't recall Troy and

21   I being in an interview with him at all.

22        Q.    All right.  Well, let's look at page 81

23   and see -- orient you.  It reads, nothing

24   happened, Randy.  I had no communication with her

25   except when she had to go to school.  Do you agree

Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1  with that?

2       A.   Yes.  I do.

3       Q.   All right.  So he's referring to Randy,

4  and you're the only Randy in the law enforcement

5  center, right?

6       A.   That is correct.  I'm just stating I

7  don't -- I don't recall Troy and I being in that

8  interview room at the same time.

9       Q.   All right.  Well, this is page 1 of the

10  interview at 5:20.  Says tried my best to give you

11  an opportunity to tell the truth.  We're beyond of

12  going any further.  Any questions, Floyd, help

13  yourself.  Says Floyd, Tom, your hat off.  Do you

14  know what that's referring to?

15       A.   No.  I would just be speculating.  No, I

16  don't.

17       Q.   What's your speculation?

18       A.   What's prior to that, sir?

19       Q.   Sure.

20       A.   To the best of my memory it was brought

21  up, with I knowing Floyd, that he always wore a

22  hat.  In regard to what I'm looking at right here,

23  I don't know.

24       Q.   Upset, nervous, something sitting there

25  knowing we know you shot her.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### JOEL RANDY CARRENO

1      A.    I can't --

2      Q.    Did you tell --

3      A.    No.  I'm sorry.

4      Q.    Did you tell Floyd -- did you tell Floyd

5  that you knew that he shot her, being Camille?

6      A.    Again, these are field notes from Troy

7  Frost.  And again, I do not recall being in that

8  interview room at the same time as Troy.

9      Q.    Well, we've got a videotape of the

10  encounter on -- do you think in your opinion it

11  was appropriate to tell Floyd on the afternoon of

12  November 12th of what I know right now you were

13  there when she was shot, something got out of

14  hand?

15           MR. TURNER:  Object to form.

16      A.    I would have to see it on video.  I don't

17  recall.  I'd have to see it on video, and I don't

18  believe it's in any notes that I took and/or my

19  narrative that I produced.

20      BY MR. AINSWORTH:

21      Q.    Was it appropriate to be asking Floyd on

22  November 12th questions insinuating that he killed

23  Camille from your perspective as a police officer?

24      A.    Yes.

25      Q.    Why was it appropriate to ask Floyd

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### JOEL RANDY CARRENO

1  questions insinuating his guilt?

2      A.   I wasn't insinuating his guilt.  I was

3  asking a very direct question in regard to her

4  death.  Were you involved.

5      Q.   **Was it appropriate on November 12th,**

6  **1999, to tell Floyd you choose your destiny.  I am**

7  **going home and sleeping good.**

8      A.   I'm going home and I'm going to sleep

9  good.  I know that I made that comment, but I

10 don't know -- I don't recall if it was during this

11 interview.

12     Q.   **Well, do you have any reason to doubt**

13 **Frost's notes that during the interview on**

14 **November 12th, 1999, you told Floyd you choose**

15 **your destiny.  I am going home and sleeping good?**

16     A.   Repeat your question, please.

17     Q.   **Do you have any reason to doubt Frost's**

18 **notes documenting that during the interview on**

19 **November 12th, 1999 --**

20     A.   I'm not doubting his notes.

21     Q.   **-- Floyd was -- okay.**

22     A.   So I just don't recall that.

23     Q.   **Okay.  Where did Floyd sleep the night of**

24 **November 12th, 1999?**

25     A.   I don't know.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

### JOEL RANDY CARRENO

1      Q.    Well, he was arrested on November 12th,
2  1999.  Do you remember that?
3      A.    I -- I -- my response to that is I
4  couldn't tell you when he was arrested.  If you're
5  saying that he was arrested on the 12th he was --
6  slept at the sheriff's department.
7      Q.    And you went home and you went to bed
8  that night, right?
9      A.    Yeah.  Yes.
10     Q.    Do you have any problem with Floyd being
11 locked up and spending the next decade of his life
12 being incarcerated because of in this case?
13     A.    Could you ask -- could you restate that,
14 please.
15     Q.    Sure.  Do you have any problem with Floyd
16 being locked up on February -- on November 12th,
17 1999, and remaining in incarcerated for the next
18 over decade of his life because of this case?
19     A.    My response to that question is that at
20 that point in time, including present date, I
21 don't know who -- who is involved in -- in
22 Camille's homicide, and that decision to arrest
23 Floyd was not my decision.
24     Q.    Whose decision was it?
25     A.    I -- well, I mean, I -- it would have to



**JOEL RANDY CARRENO**

1 have come from the county attorney based on the

2 information that he had.

3   **Q.   Did anyone ask the county attorney to**

4 **bring charges against Floyd?**

5   A.   I don't know.

6   **Q.   Did you have any conversations with**

7 **anyone about bringing charges against Floyd?**

8   A.   No.  Not direct or indirect.  Absolutely

9 not.

10   **Q.   Did you -- let's go to -- strike that.**

11 **Let's go to page 82 of Exhibit 5.**

12   **Says, I am telling you, my opinion is you are**

13 **going to serve time somewhere.  Do you see that?**

14   A.   Yes, I do.

15   **Q.   Do you have any problem with Floyd being**

16 **told he was going to serve time somewhere?**

17   A.   Your question again, please?  I'm sorry.

18   **Q.   Do you have any problem with Floyd being**

19 **told that he was going to serve time somewhere?**

20   A.   Number one, I -- I don't know that I was

21 the one to make these statements, all right.  But

22 to answer your question, based on the information

23 that I knew at that time and even today, I don't

24 -- I don't know how to respond to that.  I did not

25 put together the affidavit.  I was involved in



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**JOEL RANDY CARRENO**

1    none of that.

2          And your question is, did I have any

3    concerns.  I don't know.  It was presented to 12

4    people and they found him guilty.

5          **Q.    Based on the investigation that you --**

6          A.    I'm sorry?

7          **Q.    Based on the investigation you helped**

8    **conduct, right?**

9                MR. TURNER:  Object to form.

10         A.    Yes.

11         BY MR. AINSWORTH:

12         **Q.    Is your handwriting -- this is not your**

13   **handwriting, correct, on page 82 of Exhibit 5?**

14         A.    I'm having a hard time hearing you, sir,

15   and I'm sorry.

16         **Q.    All right.  It's my -- it's my fault.**

17   **I'm not sure why that is, but I'll fix it.**

18         **Is it your handwriting at all on -- on**

19   **Exhibit 5, page 82?**

20         A.    That -- that belongs to Troy Frost.  He

21   would be able to answer to that.

22         **Q.    And he's your son-in-law, right?**

23         A.    He's my ex-son-in-law.

24         **Q.    And -- and how was he originally your**

25   **son-in-law?**



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063           Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131             316-201-1612

## JOEL RANDY CARRENO

1        A.    He was married to my daughter.

2        Q.    **And for how long was he married -- when**

3    **did he stop being married to your daughter?**

4        A.    I don't know.  I'd be guessing.  I don't

5    know.

6        Q.    **More than ten years ago?**

7        A.    I don't know.

8        Q.    **More than 20 years ago?**

9        A.    I'd only be guessing, sir.  I -- I don't

10   know.

11       Q.    **Was he your son-in-law in 1999?**

12       A.    I believe so.  Yes.

13       Q.    **All right.  Is your handwriting on page**

14   **83 of Exhibit 5?**

15       A.    That's not my handwriting.

16       Q.    **What about page 84 of Exhibit 5.  Is that**

17   **your handwriting?**

18       A.    No.

19       Q.    **Page 85 of Exhibit 5, is that your**

20   **handwriting?**

21       A.    No.  And if it helps you, Troy -- Troy is

22   left-handed.

23       Q.    **All right.  And then on page 86, this is**

24   **not your handwriting, correct?**

25       A.    No.



5111 SW 21st Street            6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604                  Suite 101                   Suite 305
785-273-3063               Overland Park, KS 66212         Wichita, KS 67202
www.appinobiggs.com            913-383-1131                316-201-1612

# JOEL RANDY CARRENO

1    Q.   And just because we had a double

2  negative.  Page 86 and 87, this is not your

3  handwriting, correct?

4    A.   No.

5    Q.   No, it's not?

6    A.   No.  I'm sorry.  No.  It's not.

7    Q.   It says crying while he lies to Randy.

8  Do you know what that refers to?

9    A.   No.  I do not.

10   Q.   Okay.  Let me go back to Exhibit 10.

11 Page 21.  And so am I correct that before there's

12 a knock on the door before Mike Hayes and Tom

13 Bledsoe come into the interview room with you and

14 Floyd, you had no idea what Tom's story is, is

15 that right?

16   A.   I had to have known something, and what

17 something was, I don't -- I don't recall.  But

18 there had to be a reason for Mike and Tom to enter

19 that room, and I cannot see to where they would

20 have entered that room with I not having some

21 level of knowledge to what Tom had stated to

22 someone.

23   Q.   Can you tell -- sorry.  Can you tell us

24 how you knew what Tom's story was on November

25 12th?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### JOEL RANDY CARRENO

```
1        A.    I don't -- I don't recall.
2        Q.    Okay.  What evidence did you have to
3   suggest that Floyd S. Bledsoe was guilty on
4   November 11 -- November 12th, 1999?
5        A.    I never had any information indicating
6   that Floyd was guilty.  I didn't know then and I
7   don't know now.  I don't know -- I don't know,
8   sir, who killed Camille Arfmann.
9        Q.    And -- and I appreciate that.  But I'm
10  just asking, did you have any evidence that
11  suggested that Floyd was guilty as of November
12  12th, 1999?
13       A.    I don't know that I -- I did not.  I
14  don't know if it was known or -- I did not have
15  any personally.  I don't know what the sheriff's
16  department as a whole had.
17       Q.    Did any other officer tell you that they
18  had information suggesting that Floyd was guilty
19  as of November 12th, 1999?
20       A.    Not that I can recall.
21       Q.    So Floyd denied having anything to do
22  with Camille's death, right?
23       A.    Yes.  Yes.
24       Q.    Okay.  I heard you.  I'm sorry.  I was
25  just going to bring up your report again, Exhibit
```



## JOEL RANDY CARRENO

1    10.

2         So on the top of page 22 of Exhibit 10

3    there's a reference to Special Agent George

4    Johnson entering the interview room, and then it

5    says KBI Special Agent Johnson asked Floyd to

6    describe Zetta, that Floyd stated Zetta had blonde

7    hair, five foot-two and weighed 110 pounds.  KBI

8    Special Agent Johnson asked Floyd if Zetta was

9    ugly.  And so Johnson is bringing up Camille's

10   appearance to Floyd, right?

11        A.    Yes.

12        Q.    And then Johnson asked Floyd if Zetta was

13   pretty, right?

14        A.    Correct.

15        Q.    And then Johnson asked Floyd about the

16   rest of Camille's figure, right?

17        A.    That's what my report indicates.  Yes.

18        Q.    So the whole conversation about Camille's

19   appearance was initiated by Johnson, right?

20        A.    Correct.  This would have been -- yes.

21   That is correct.

22        Q.    And then on November 12th, 1999, you're

23   showing pictures of Camille dead at the burial

24   site, right?

25        A.    I believe so.  Yes.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

1      Q.    Why did you make Floyd look at photos of
2  Camille as she was depicted at the burial site?
3      A.    My response to that is what I stated
4  previously.  That at that point in time to present
5  date I -- I didn't know what I had.  I didn't have
6  what I wanted, I know that.
7      Q.    And what you wanted was a confession,
8  right?
9      A.    Yeah.  That would -- that would have been
10 nice.
11     Q.    But you had no evidence to suggest that
12 Floyd was guilty, right?
13     A.    I've never said that Floyd -- no, is my
14 response.
15     Q.    That's correct.  You didn't have any
16 evidence to suggest that Floyd was guilty?
17     A.    I did not.
18     Q.    Right?
19     A.    I did not.
20     Q.    And you didn't know of any evidence to
21 suggest that Floyd was guilty when you were
22 showing him photos of his sister-in-law lying dead
23 in a grave?
24     A.    I -- I don't recall.
25     Q.    Well, can you tell us any evidence that

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1  you had to suggest that Floyd was guilty at the

2  time you were showing Floyd photos of his dead 14

3  year-old sister-in-law lying in a grave?

4      A.   You're stating that I suggested that he

5  was guilty.  I -- Floyd was a person that I knew

6  that I had to stay in contact with, as well as

7  Tom, to obtain as much information as I possibly

8  could to give me a better direction to go on who I

9  felt that I needed to focus on more than the

10 other.

11     Q.   Well, on November 12th, 1999, what did

12 you think you needed to focus on more, Floyd S.

13 Bledsoe or Tom Bledsoe?

14     A.   I didn't know.

15     Q.   So to you they were kind of equal.  Like,

16 you couldn't tell which brother was more likely to

17 be guilty, is that right?

18     A.   I would agree with that.  Yes.

19     Q.   Okay.  So looking at your report, let's

20 go on to page 23.  I told Floyd S. Bledsoe that I

21 would personally take him to the funeral home to

22 see Zetta after the public viewing.  Do you see

23 that?

24     A.   Yes.

25     Q.   Do you recall Floyd saying that he needed

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

### JOEL RANDY CARRENO

1   to go to the visitation for his dead sister-in-law

2   and that was happening that afternoon?

3       A.   I don't recall Floyd stating that.  But I

4   know that there was a conversation between he and

5   I in regard to the funeral services for Camille.

6       Q.   Did you take Floyd to the funeral home to

7   see Camille?

8       A.   No.

9       Q.   Why did you tell him that you would

10  personally take him to the funeral home to see

11  Camille after the public viewing?

12      A.   I -- I don't know why I made that

13  statement.  Looking back, I don't know why I

14  didn't take him.  I -- I would have had no

15  problems taking him to say good-bye to Camille.

16      Q.   Except instead he was booked into the

17  county jail, right?

18      A.   Yeah.  Yes.

19      Q.   You wrote in your report on page 23 of

20  Exhibit 10, I told Floyd S. Bledsoe that he knew

21  that his brother Tom Bledsoe shouldn't be in jail

22  for Zetta's murder.

23      A.   Correct.

24      Q.   Do you see that?

25      A.   Yes.



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

## JOEL RANDY CARRENO

1      Q.   Why did you tell Floyd that he knew his

2   brother Tom Bledsoe shouldn't be in jail for

3   Zetta's murder?

4      A.   I don't recall if I had something to base

5   that on or if it was a statement made by myself to

6   get a statement back.  I don't recall.

7      Q.   Did you think that Tom Bledsoe shouldn't

8   be in jail?

9      A.   Did I?

10      Q.   Yeah.  You.

11      A.   I -- I didn't know.  I was -- I didn't

12   know.  And I followed that up by saying I don't

13   know today if he should have been in jail.

14      Q.   All right.  Well, you knew that Tom was

15   refusing to speak to police, right?

16      A.   That Tom was --

17           MR. TURNER:  Object to form.

18   BY MR. AINSWORTH:

19      Q.   Yeah.

20      A.   Ask that question again, please.

21      Q.   You knew that Tom was refusing to speak

22   to the police, right?

23      A.   I had no -- I don't have any knowledge of

24   that.

25      Q.   You wrote in your report, during this

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1  time Tom Bledsoe and his attorney Mike Hayes was

2  brought into the interview room.  Do you see that?

3  I'm just asking about this one portion, sir?

4       A.   Oh, okay.  Go ahead.

5            MR. NORTON:  He asked do you see that.

6  Do you see that portion?

7            THE WITNESS:  Okay.

8       BY MR. AINSWORTH:

9       Q.   During this time Tom Bledsoe and his

10  attorney Mike Hayes was brought into the interview

11  room?

12       A.   Correct.

13       Q.   And on the previous page, page 22,

14  Exhibit 10, you said during this time KBI Special

15  Agent George Johnson entered the interview room.

16  Do you see that?

17       A.   Yes.

18       Q.   And so for George Johnson you said had

19  entered the interview room.  And for Tom and Mike

20  Hayes you said they were brought into the

21  interview room, right?

22       A.   Okay.  This is the polygraph that you're

23  referring to, the date of the polygraph?  I don't

24  recall Agent Johnson leaving the interview room

25  unless he took a short break.  I don't recall.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

## JOEL RANDY CARRENO

1    And --

2         Q.   I -- I'm not asking about Johnson

3    leaving.  I'm just talking about Johnson --

4    according to your report Johnson entered the room

5    and then Tom Bledsoe and Mike Hayes were brought

6    into the room.  There's a difference there, right?

7         A.   I don't recall George Johnson being in

8    the interview room at the same time that Mike

9    Hayes and Tom Bledsoe was.  I don't recall.

10        Q.   I -- I can appreciate that, and I know

11   you want to tell me that, and I'm just going to

12   ask you to -- I will accept that as true.  You do

13   not recall Johnson being there.  I'm not focused

14   on that.

15        I'm just saying that the language used in

16   your report, you say Johnson entered the room and

17   Mike Hayes -- Tom Bledsoe and Mike Hayes were

18   brought into the room, right?

19        A.   Correct.  Yes.

20        Q.   All right.  Well, why did you say that

21   Tom Bledsoe and Mike Hayes were brought into the

22   interview?

23        A.   I didn't invite them.  I don't know who

24   let them in.  And as I stated earlier, there is a

25   secure door between the interview room and that of

**Appino & Biggs** Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604                Suite 101                    Suite 305
785-273-3063             Overland Park, KS 66212         Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**JOEL RANDY CARRENO**

1   the conference room, so somebody -- somebody had

2   to let them in past that door for they or whoever

3   to knock on the door.

4       **Q.    Right.  But once you answered the knock**

5   **and opened the door you were the one who let Mike**

6   **and Tom into the room with you and Floyd, right?**

7       A.    That is correct.

8       **Q.    For any other investigation have you had**

9   **somebody knock on the door while you're conducting**

10  **an interrogation of a person of interest and you**

11  **just let them come on into the interview?**

12          MR. NORTON:  Object to form.

13      A.    I've had interviews to where officers had

14  knocked on the door.

15      BY MR. AINSWORTH:

16      **Q.    And that's an important clarification.**

17  **Have you ever had a civilian join or knock on the**

18  **door while you're conducting an interview of a**

19  **person of interest and you just let the civilian**

20  **come on in?**

21      A.    Not -- not that I can remember.  No.

22      **Q.    And so you saw Mike Hayes and Tom**

23  **standing on the other side of the door when you**

24  **opened the door, correct?**

25      A.    I saw Mike.  I don't recall if Tom was

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street       6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604          Suite 101                 Suite 305
785-273-3063              Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com       913-383-1131              316-201-1612

2/1/2023                                                                221

### JOEL RANDY CARRENO

1   standing out there.  He was standing behind Mike.

2      **Q.    Okay.  So you may have seen Tom, you may**

3   **not have seen Tom, is that what you're saying?**

4      A.   I don't remember seeing him out in the

5   hallway.  Mike was standing right at the doorway

6   and Tom was with him.  Tom was with him.

7      **Q.    All right.  So you saw Tom with Mike, is**

8   **that right?**

9      A.   Not -- when he knocked on the door and I

10  opened the door there was Mike Hayes.  He walked

11  in, and directly behind him was Tom.

12     **Q.    So before he walked in you opened the**

13  **door, and then did you say can I help you, or what**

14  **do you want, or I'm doing an interrogation here,**

15  **you can get out of here.  What did you say to Mike**

16  **and Tom?**

17     A.   I don't know --

18          MR. NORTON:  Object -- hang on, hang on.

19  Object to form.  Go ahead.

20          THE WITNESS:  I don't know that I said

21  anything to them in regard to what you just made

22  reference to.  I can tell you this, I -- I know

23  what my thoughts were.  I still remember that.

24          BY MR. AINSWORTH:

25     **Q.    What were your thoughts?**



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**JOEL RANDY CARRENO**

1      A.   From where I was at during the

2  investigation I was not getting anywhere or where

3  I wanted to be, And I thought -- I remember

4  thinking, well, this might be my chance to be able

5  to hear somebody say it was me.  And that didn't

6  happen.

7      **Q.   I'm -- my confusion -- and it's only on**

8  **my part, I assure you.  This isn't confusing to**

9  **you as a police officer.  But my confusion is as a**

10 **lay person is that it seems that when you've got a**

11 **person who tells you your victim is buried and on**

12 **their property, having been shot in the head with**

13 **their gun and admits involvement, what -- what**

14 **more were you looking for with regard to Tom's**

15 **culpability for the murder that you didn't have?**

16     A.   And I'm speaking for myself.  I'm not

17 speaking for anybody else.  I would have liked to

18 have had --

19          THE REPORTER:  Repeat that.  Like to have

20 had what?

21          MR. AINSWORTH:  And -- and I shot her.

22          THE WITNESS:  And I shot her.

23     BY MR. AINSWORTH:

24     **Q.   And so when you saw Tom and Mike Hayes at**

25 **the door you saw an opportunity for your**



5111 SW 21st Street       6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604          Suite 101                  Suite 305
785-273-3063              Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com       913-383-1131              316-201-1612

# JOEL RANDY CARRENO

1  investigation, right?

2      A.    That's correct.

3      Q.    Because you thought maybe I can talk to

4  Tom now.  Up to this point I haven't been able to

5  talk to Tom, maybe Tom can give me a missing piece

6  and tell me I shot her, right?

7            MR. NORTON:  Object to the form.

8      A.    My thought was -- my thought was now we

9  have the two people that I was concentrating on in

10  the same room, and in hopes that one of the two

11  would have said I shot her, that was my hope.

12  That's what I wanted.

13            BY MR. AINSWORTH:

14      Q.    And so you assumed that Tom and Mike

15  Hayes were there because they wanted to confront

16  Floyd?  Was that what you were thinking?

17      A.    That's what ended up happening.  I don't

18  know what their purpose was to come into the

19  interview room.

20      Q.    And so you asked zero questions of either

21  Mike or Tom about why they were there, how they

22  got there, or anything about their presence?

23      A.    I don't recall --

24      Q.    Right.

25      A.    -- any conversation with anybody.  I just

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1   don't recall that type of conversation.

2        Q.   So that was a security breach for them to

3   be in that location where they were, right?

4             MR. NORTON:   Object to form.

5        A.   A security breach?   I -- and I don't know

6   who let them in, but they were let in by, let's

7   just say, the sheriff.   I don't know that I could

8   constitute that as being a security breach.

9        BY MR. AINSWORTH:

10       Q.   And no law enforcement personnel was with

11  Mike Hayes when you saw him outside your door,

12  right?

13       A.   When I opened the door, that is correct.

14       Q.   Did you see any other law enforcement

15  officer, you know, at any point when the door was

16  open and Mike and Tom were coming in?

17       A.   No.   And I would not have been able to.

18       Q.   Have you viewed the tape of this portion

19  of Floyd Bledsoe's interview?

20       A.   Yeah.   I know -- yes.

21       Q.   All right.   Let's show you Exhibit 10,

22  that same page, 23.   After Tom and Mike enter the

23  interview room it says Floyd S. Bledsoe denied in

24  the presence of his brother Tom Bledsoe that they

25  had contact with him on Saturday between one and

**JOEL RANDY CARRENO**

1   1:30 hours.  Floyd S. Bledsoe stated he was with

2   neighbor Jim Penry during that time.  Do you see

3   that?

4       A.   I heard what you said.  I'm not reading

5   it here but I'm familiar with what you're saying.

6       Q.   All right.  So did you know what the heck

7   -- like, how did that come up?  There's a

8   reference to Tom having contact with Floyd between

9   one and 1:30 on Saturday?

10      A.   That's what I stated earlier, if I'm

11  understanding your question now, is the element of

12  times that I was provided with and I having a

13  problem with being with Floyd and listening to

14  Tom.  And in my mind I'm thinking this -- this

15  couldn't have happened, that meeting on -- on the

16  roadway.  If that was your question.

17      Q.   All right.  So you don't think the

18  meeting could have happened between one and 1:30,

19  is that right?

20      A.   I have a hard time -- I have a hard time

21  seeing it happening.

22      Q.   Okay.  I guess my question is, if Tom on

23  that same day was saying that the roadside

24  happened -- meeting happened after two p.m., how

25  did the meeting -- and so I'm showing you Exhibit

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### JOEL RANDY CARRENO

1    **8, bottom of page 1, and then switching back to**

2    **Exhibit 10, page 23.**

3          **How did you start talking about the meeting**

4    **happening between one and 1:30 when just a few**

5    **hours before it was the -- the roadside meeting**

6    **was happening after two p.m.?**

7          MR. QUALSETH:  Object to the form.

8          A.    For I to tell you the discrepancies

9    between the two, I can't.  What I can tell you is

10   in looking at that one o'clock to 1:30, that on

11   that day Tom Bledsoe was scheduled to be at work

12   at three o'clock and he said that he showed up 15

13   minutes early for work, and he said prior to that

14   he left Oskaloosa, he left the residence in

15   Oskaloosa that he stayed at for about 20 minutes,

16   and then prior to that he had stopped at the gas

17   station to get some fuel.  And the best that I

18   could pull it together was for he to be at work at

19   2:45 and this happened at the time in which he

20   stated, and he arriving at work 15 minutes early,

21   it didn't make sense to me.

22         **Q.    When was Tom telling you that -- this**

23   **stuff?**

24         A.    I don't know what day.  It was during one

25   of the interviews.

 Reporting Service, Inc. TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street       6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604          Suite 101                 Suite 305
785-273-3063              Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com       913-383-1131              316-201-1612

### JOEL RANDY CARRENO

1    Q.   And tell us when the first documented

2  interview between you and Tom was?

3    A.   Do I know?  I'm sorry.

4    Q.   Do you remember from -- do you remember

5  when the first documented interview between you

6  and -- and Tom was?

7    A.   Not off memory.  No.

8    Q.   How about November 24th?  Does that --

9  the day before Thanksgiving.  Does that recall to

10 mind what happened?

11   A.   It doesn't, but that's very possible.

12   Q.   Remember we looked at -- was it page 37

13 of your report, the very last paragraph on that

14 page on November 24th?

15   A.   Yes.

16   Q.   So how -- so you're telling me you had --

17 you had never spoken to Tom before he entered --

18 entered into the room with you and Floyd, right?

19       MR. TURNER:  Object to form.

20   A.   I never did.

21 BY MR. AINSWORTH:

22   Q.   And you didn't know what he was going to

23 say, right?

24   A.   I'm sorry?

25   Q.   You didn't know what he was going to say,

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1   right?

2        A.   Correct.

3        Q.   All right.  Going to page 24.  Says that

4   Floyd stated he wanted to talk to Jim Penry who

5   could verify his story, right?

6        A.   Correct.

7        Q.   You knew that -- Jim Penry --

8             THE REPORTER:  I couldn't understand your

9   question.  Start over, please.

10        BY MR. AINSWORTH:

11        Q.   You knew that Floyd had been with Jim

12   Penry on Saturday November 6th, right?

13        A.   Floyd was with me in my vehicle when we

14   had contact with an area in which Jim had reported

15   seeing a suspicious truck.

16        Q.   Go back to the bottom of 23.  There's a

17   time when Floyd wanted to talk to Tom alone, and

18   you stayed as Johnson and Mike Hayes left the

19   interview room.  Do you see that?

20        A.   Yes.

21        Q.   And then Johnson re-enters the room.  Or

22   Tom Bledsoe left and Johnson entered the interview

23   room.  Do you see that on page 24?

24        A.   Correct.

25        Q.   And then you accuse Floyd that there was

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

2/1/2023                                                                  **229**

**JOEL RANDY CARRENO**

1  a gap of 18 minutes.  Do you remember that?

2      A.   I don't know that I accused him.  Accuse

3  is not the right word.  I was trying to bring the

4  times of what they reported closer together.

5      Q.   And my apologies.  I -- I should have

6  showed you the right pages of your field notes.  I

7  had the wrong reference in my notes.

8      So looking at page 88 of Exhibit 5, which is

9  Bates numbered JC 001612.  And this is your

10 handwriting, is that right?

11     A.   That is correct.

12     Q.   And, it's your interview with Floyd,

13 right?

14     A.   Yes.

15     Q.   And then going on to page 90 of Exhibit

16 5.  Bates numbered 1614.  90 -- 91.  1615.

17         MR. NORTON:  Do you want him to look at

18 91?

19         MR. AINSWORTH:  Exhibit 5, page 91.  I'm

20 so sorry.

21         MR. NORTON:  There you go.

22 BY MR. AINSWORTH:

23     Q.   It says with an R, that stands for Randy,

24 right?  Right?

25         MR. NORTON:  He's reading it.



5111 SW 21st Street      6420 W. 95th Street     800 E. 1st Street
Topeka, KS 66604            Suite 101                Suite 305
785-273-3063         Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131           316-201-1612

## JOEL RANDY CARRENO

1        A.    I'm reading it, sir.

2              MR. AINSWORTH:   Okay.   It's the third

3  paragraph on the page.

4              THE WITNESS:   Okay.   It -- it appears

5  that, yes, R would represent myself.

6        BY MR. AINSWORTH:

7        Q.    And you said that because his mom was

8  going to see the same photo and she would

9  understand that Floyd killed her.   Do you see

10 that?

11       A.    Yes.

12       Q.    That's what you said to Floyd, right?

13       A.    Correct.

14       Q.    You told Floyd he didn't even have the

15 courtesy to cover up her body before he buried

16 her, and that mom was going to see the photo with

17 her daughter bloody and her breast exposed.   You

18 told Floyd you didn't care how you left her.   She

19 could have been one of his -- one of Floyd's

20 daughters knowing -- yeah -- one of Floyd's

21 daughters knowing that we were going to find her

22 that way.   And you -- you told him he didn't even

23 pull her shirt down.

24             Those were statements that you made to Floyd,

25 is that right?



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604               Suite 101                Suite 305
785-273-3063            Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com           913-383-1131           316-201-1612

## JOEL RANDY CARRENO

1       A.    I don't recall.  But it would be on video
2    if I did.

3       Q.    Well, do you believe your notes?

4       A.    Absolutely.

5       Q.    So you agree with me that you made those
6    statements to Floyd, right?

7       A.    Yes.  That is correct.

8       Q.    Looking at page 93 of Exhibit 5.  What do
9    you mean by Hayes addresses different issues?

10           MR. NORTON:  Where are you?

11           MR. AINSWORTH:  Sorry.  Page 93, Exhibit
12   5.  And I am the -- after the two -- first two
13   paragraphs.  There's then a -- written in it says
14   Hayes addresses different issues.

15      A.    I -- I can only speculate, and that would
16   be all from my field notes.

17   BY MR. AINSWORTH:

18      Q.    Well, what's your speculation, sir?

19      A.    That Mike Hayes, it appears here, had
20   concerns about which were my concerns, too.  Was
21   Floyd having any contact with Tom on the county
22   road on Saturday between one and 1:30.  And in
23   addition to that, allegedly, Floyd had told Tom
24   about he killing Camille.

25      Q.    Okay.  So you -- well, let me just direct

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### JOEL RANDY CARRENO

1   your attention to page 101 of Exhibit 5 and we'll

2   move things along here.

3        You then -- it says RJ leaves interview room.

4   That means -- that refers to you and George

5   Johnson, correct?

6        A.   Yes.

7        Q.   And then Detective Frost entered?

8        A.   That is correct.

9        Q.   And so you were trying to do tag team

10  interrogation on Floyd --

11       MR. NORTON:   Object to form.

12  BY MR. AINSWORTH:

13       Q.   -- having different detectives come in?

14       MR. NORTON:   Object to form.

15  A.   Tag team.   No.   We were officers that

16  were trying to obtain information.

17  BY MR. AINSWORTH:

18       Q.   You knew that Tom and Floyd didn't get

19  along, right?

20       A.   That is correct.

21       Q.   Did he have any understanding why Floyd

22  would tell Tom that he committed this murder?

23       A.   I don't know why.

24       Q.   Get back to the 18 minutes.   Why do you

25  think there were 18 minutes unaccounted for?



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1    A.   The best that I could do, and I mentioned
2  this before, was to narrow it down to where after
3  I let Floyd out of the vehicle.  He had, to the
4  best of my recollection, about 18 minutes to do
5  what Tom said that was done, and that didn't make
6  any sense to me.  I -- it -- Floyd would have had
7  to jump in his vehicle, took off, to have that
8  type of contact with Tom, and Tom telling me what
9  was allegedly said by Floyd.  I -- I just couldn't
10 bring it together.  And the best --
11    **Q.   Sorry.  We're not talking about the 18**
12 **minutes.  I mean, Floyd's time at the hardware**
13 **store.  You're accusing Floyd of -- that there are**
14 **18 minutes unaccounted for in his trip to the**
15 **hardware store?**
16    A.   He later confessed -- he initially stated
17 that when he was sent to the hardware store that
18 he never went by the trailer.  He told us what
19 direction -- he told Detective Frost what
20 direction he took.  And then as the investigation
21 continued Floyd ended up telling Detective Frost
22 that, yeah, he did stop by the trailer and pulled
23 into the driveway but never exited or had had any
24 contact with Camille.  So there's two different
25 stories that he -- he provided.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**JOEL RANDY CARRENO**

1        Q.   Well, he never said it to you, correct?

2        A.   Not --

3        Q.   He never said he went to the trailer,

4    right?  But it's still not what I'm talking about,

5    so I'm just going to show you on page -- Exhibit

6    10 when -- have to find the -- page 25 of Exhibit

7    10.

8        I told Floyd S. Bledsoe that we had a copy of

9    the hardware store's receipt that indicated what

10   time he had made a purchase.  I told Floyd S.

11   Bledsoe that we also knew the drive time from the

12   dairy to the hardware store.  I told Floyd S.

13   Bledsoe that from his own statements on his

14   activity leaving the dairy, arriving at the

15   hardware store and returning to the dairy, that

16   there was approximately 18 minutes that wasn't

17   accounted for?

18       And so I want to know what -- what is this

19   time from?  What's the 18 minutes there

20   unaccounted for?

21       A.   Well, the 18 minutes would have been

22   based off from the information that was obtained

23   when Floyd left the farm to go to the hardware

24   store and then to return, that it was 18 minutes

25   that wasn't accounted for.  And his employer even



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

## JOEL RANDY CARRENO

1    made the statement to Floyd when Floyd returned to

2    the farm, his employer asked him, what, did you go

3    to Kansas City.  So the employer himself knew or

4    felt Floyd took way too long.

5         Q.    All right.  So let's take a look at

6    Exhibit 5, page 172.  Is this your handwriting,

7    sir?

8         A.    No.

9         Q.    No.  All right.  So this was a -- a

10   reference to the Winchester hardware store, the

11   clock on the register hadn't been changed because

12   of daylight savings, and that meant that the

13   receipt said 12:48 but at the time it was 11:51.

14   And so the -- it was 57 minutes fast, right?

15        A.    Correct.

16        Q.    Let me -- I won't make you do the math.

17   Fair to say that it was -- you had a receipt from

18   the hardware store showing when Floyd purchased

19   the duct tape, right?

20        A.    There was a receipt obtained.  I don't

21   recall ever looking at the receipt.

22        Q.    All right.  And his employer said that

23   Floyd returned to the dairy at 4:45, right?

24        A.    I believe that's correct.  I believe.

25        Q.    And the victim -- and so you don't



## JOEL RANDY CARRENO

1    remember when the -- the time that was stated on

2    the receipt, right?

3         A.    No.

4         Q.    So if Floyd -- he's driving a farm truck.

5    He has to leave the hardware store after making

6    the purchase at 4:30, which is actually 4:33

7    according to the clock.  He has to stop by his

8    house, murder Camille, or abduct her in some way,

9    dump her somewhere that's not the farm truck

10   because it's not his own vehicle, go to work, and

11   arrive there by 4:45?

12        MR. TURNER:  Object to form.

13   BY MR. AINSWORTH:

14        Q.    I'm trying to find out, where is the

15   missing 18 minutes?

16        A.    It would have been instead of going east

17   -- let me back up here.  He was traveling on -- on

18   Wellman Road going south going back to his place

19   of employment.  The 18 minutes in which you're

20   referring to would have been the 18 minutes of he

21   turning west off from Wellman Road to go to his

22   trailer and then to go back to Wellman Road to go

23   back east, if that makes any sense.

24        Q.    It doesn't.  And let me just explain

25   where I'm coming from.  And you tell me as an

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**JOEL RANDY CARRENO**

1    experienced detective if I'm full of horse poop.

2    It seems to me if Camille doesn't get off the bus

3    she can't be abducted before 4:20, right?

4              MR. TURNER:  Object to form.

5    A.    That would be correct.

6    BY MR. AINSWORTH:

7    Q.    So the time period we're looking at is

8    between 4:20 and 4:45.  If Floyd has a receipt at

9    4:30, but it's actually 4:33 because the clock is

10   57 minutes fast, then he's got 12 minutes to make

11   it from the hardware store to the farm even if he

12   didn't stop to converse with people.  And so in

13   that -- at the store, if he leaves the store

14   immediately.  In that 12 minutes he has to drive

15   back to the dairy farm, which is about ten minutes

16   from the hardware store, and so that gives him two

17   minutes to stop by, kill the victim, and -- and

18   he's got to have Tom's gun, you know, with him for

19   this run.  You know, so he's not using his car.

20   He has to get the gun out of his car, supposedly

21   drives it to work with him.  Then he gets in -- in

22   the farm truck, kill or abducts Camille, hides her

23   or her body, returns to the farm by 4:45.  How --

24   how is there time for Floyd to commit that crime?

25             MR. NORTON:  I'm going to object to form


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1 of -- of the question.  And I frankly don't
2 understand the question, but go ahead.
3      A.   And what you just stated is what I was
4 levied back then during this investigation.  It
5 doesn't make sense.  That's what I'm telling you,
6 is I understand exactly what you just stated, and
7 that's exactly what the hell I was going through,
8 was confusion.
9      BY MR. AINSWORTH:
10     **Q.   It doesn't make any sense, right?**
11     A.   To me, I -- I don't know how.  I don't
12 know how.  And I'm not saying it didn't happen or
13 it did happen.  I don't know.  But you said it
14 perfectly in what --
15          MR. NORTON:  Just answer his question.
16          THE WITNESS:  Oh, okay.
17     BY MR. AINSWORTH:
18     **Q.   And you're just trying to get answers.**
19 **You're trying to get to the truth, right?**
20     A.   Correct.
21     **Q.   So when -- when Tom is talking to Floyd**
22 **in the interview room with -- in your presentation**
23 **that gives you the idea that, gee, seems like Mike**
24 **Hayes is willing to let Tom talk to police, right?**
25     A.   Yes.



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street     6420 W. 95th Street     800 E. 1st Street
Topeka, KS 66604          Suite 101               Suite 305
785-273-3063          Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com     913-383-1131           316-201-1612

**JOEL RANDY CARRENO**

1      Q.   But did you ask Mike Hayes if you could
2  interview Tom?
3      A.   I did end up interviewing him.  If you --
4  if you're asking me if I asked Mike on that day, I
5  don't know.  I don't recall.
6      Q.   Well, you didn't interview him until 12
7  days later according to you, right?  You didn't
8  interview Tom until 12 days later according to
9  you, right?
10      A.   Yes.
11      Q.   All right.  So how did it come about that
12  you were going to interview Tom at the law
13  enforcement center?
14      A.   I don't know.  I don't recall how it was
15  set up for I to interview Tom.
16      Q.   When you were questioning Floyd on
17  November 12th in the manner that you were doing it
18  were you being nice and respectful to Floyd?
19      A.   As I recall, yes.  I -- I don't recall,
20  but -- I don't recall.
21      Q.   All right.  Did anyone tell you -- well,
22  strike that.
23      Did either Detective Frost or Sheriff
24  Dunnaway tell you that Tom confessed to Special
25  Agent Johnson during his lie detector on November

Appino Biggs Reporting Service, Inc.

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

# JOEL RANDY CARRENO

1    12th, 1999?

2              MR. QUALSETH:   Object to the form.

3        A.    That Floyd did?

4              MR. AINSWORTH:   Oh.  Did I say Floyd?

5    I'm so sorry.  Thank you for the clarification.

6        BY MR. AINSWORTH:

7        Q.    Did either Detective Frost or Sheriff

8    Dunnaway tell you that Tom confessed to Special

9    Agent Johnson during his interrogation or during

10   his polygraph?

11       A.    No.  As a matter of fact, I didn't know

12   until recently that Tom, as I stated earlier, even

13   took a polygraph.

14       Q.    All right.  I want to ask you -- well --

15   the first of the well, and there's one more

16   question for you about that.  Show you Exhibit 5,

17   page 73.  This is Bates numbered JC 1531.

18       All right.  These are notes of you guys, and

19   it's you and Poppa, right?

20       A.    Correct.

21       Q.    And this is your handwriting, correct?

22       A.    Correct.

23       Q.    And while you're there you had contact

24   with Heidi and she told you the victim's bedroom

25   carpet has dark spots on the carpet.  Could it be

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1  **blood.  Right?**

2       A.   Could it have been.  I don't recall -- I

3  don't know.  I mean, it's --

4       **Q.   Well --**

5       A.   -- I don't know.

6       **Q.   But that's what's written there, right?**

7       A.   Correct.

8       **Q.   Did you ask on November 10th if you could**

9  **come inside and take a look and search the trailer**

10 **to see -- you know, where Camille lives, to see if**

11 **there's evidence of Tom abducting her?**

12      A.   At Floyd's residence, correct?

13      **Q.   Yes.**

14      A.   And your question again is what, sir?

15      **Q.   Did you ask if you could come in and**

16 **search the trailer to find out if there is any**

17 **evidence -- trace evidence that might assist your**

18 **investigation?**

19      A.   I -- I believe, and I have to -- I have

20 to say believe, because I'm not for sure that the

21 piece of carpet in which that red stain was on

22 would have been taken in the evidence.

23           MR. NORTON:  Can we take just a five-

24 minute break?  We've been going a little over on

25 hour now.



5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

### JOEL RANDY CARRENO

 1          THE VIDEOGRAPHER:  Time is approximately

 2    5:02 p.m., we're going off the record.

 3          (THEREUPON, a recess was taken.)

 4          THE VIDEOGRAPHER:  Time is approximately

 5    5:11 p.m., we're back on the record.

 6    BY MR. AINSWORTH:

 7        Q.   All right.  Mr. Carreno, I'm going direct

 8    your attention to Exhibit 5, page 206.  So this is

 9    Bates numbered 1539.  Is this your handwriting?

10        A.   Yes.

11        Q.   Do you hear me, Mr. Carreno?

12        A.   Oh, I'm sorry.  Yes.

13          MR. NORTON:  He said yes.  You must not

14    have been able to hear --

15          MR. AINSWORTH:  My apologies.

16    BY MR. AINSWORTH:

17        Q.   So let me go on to page 208.  Bates

18    number 1541.  And do you see at the bottom of that

19    page there's a reference.  Floyd told Tom not to

20    tell anyone.  If you do, I will tell them about

21    your past.  Do you see that?

22        A.   Yes.

23        Q.   So Floyd is telling Tom don't tell

24    anyone, and if you tell anyone I'm going to, you

25    know, tell what you did, right?



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# JOEL RANDY CARRENO

1      A.   Yes.

2      Q.   In your interview with Tom at no point

3 does he say Floyd told me I had to take the wrap

4 for him or else he'll tell about my past, correct?

5           MR. TURNER:  Object to form.

6      A.   Yes.

7 BY MR. AINSWORTH:

8      Q.   So did you then ask Tom if Floyd told you

9 not to tell anyone or else he'll reveal what

10 happened why did you tell the police about Camille

11 being buried in the ditch?

12     A.   I don't -- I don't understand your

13 question, sir.

14     Q.   Well, according to Tom, Floyd was saying

15 you better keep your mouth shut, right?

16     A.   Yes.

17     Q.   And then the very next day Tom, instead

18 of keeping his mouth shut, talks, right?

19     A.   Yes.

20     Q.   And so to you, as an experienced law

21 enforcement officer, that doesn't make a lot of

22 sense, right?

23     A.   It did not.  No.

24     Q.   And so did you clarify with Tom why, if

25 he was scared he had his past found if he talked,



## JOEL RANDY CARRENO

1  why did he talk in order to prevent his past from

2  coming out?

3       A.   I don't recall asking Tom that.  But what

4  I do recall is none of that made any sense to me

5  what Tom said.

6       Q.   Did you accuse Tom of, you know, killing

7  Camille in the same way that you accused Floyd of

8  killing Camille?

9       A.   I -- I don't recall.

10      Q.   Do you believe you had the same demeanor

11  with Floyd as you did with Tom?

12      A.   My response would have to be no.  And --

13  and I -- I support that by saying -- I mean, I can

14  easily answer that.

15      Q.   Please do.

16      A.   Floyd, when I talked with him, I could

17  sit -- we sat very close and he was very open with

18  his statements, and I felt very comfortable with

19  his statements.  Tom is just totally the opposite.

20  He was -- I couldn't -- he was -- I think I stated

21  earlier it was like interviewing a rock that could

22  talk.  He just -- there was nothing to him.

23      I don't want -- I want to try to explain this

24  properly here.  Two different demeanors.  Floyd

25  was a heck of a lot more open in making statements

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

### JOEL RANDY CARRENO

1    than Tom himself.  I couldn't -- I couldn't -- I
2    -- I don't even know how to explain it other than
3    interviewing the two I felt more comfortable
4    interviewing Floyd than that of Tom, if that makes
5    any sense whatsoever.
6         **Q.   And so how was your demeanor different**
7    **with Floyd as it was with Tom.**
8         A.   With Floyd?
9         **Q.   Yes.**
10        A.   I -- I don't recall.  I -- I don't
11   recall.
12        **Q.   On page 208 of Exhibit 5 you have**
13   **asterisk next to this paragraph on the top of that**
14   **page.  Do you see it?**
15        A.   Yes.
16        **Q.   And what do the asterisks indicate?**
17        A.   Absolutely nothing.  What -- what I do is
18   especially when I'm sitting close to somebody I'll
19   use -- like what you see here, I will use a letter
20   or letters that has absolutely nothing to do with
21   anything.  But I wanted them, in this case Tom, to
22   see that I was making those type of notations, if
23   that makes sense to you.  I used it for my
24   advantage, and it held no value to what was being
25   said other than I knew that he would have had to

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1  see me make notations and not knowing what they

2  stood for.

3      Q.   **What did the letters BS refer to in your**

4  **notes?**

5      A.   B what?

6      Q.   **BS?**

7      A.   S as in Sam.

8      Q.   **That's correct.**

9      A.   Okay.

10     Q.   **B as in boy, S as in Sam.**

11     A.   Same thing as I was talking about here.

12 For I, on that, BS, looking at it, and I knew that

13 they were looking at it, was I wanted to represent

14 it as bullshit.  But it held absolutely -- it

15 wasn't -- it doesn't hold any value.  It wasn't

16 like I was asking them a question and I thinking

17 that it's bullshit.

18     Q.   **All right.  I'm going to ask you to take**

19 **a look at Exhibit 1.  This is Mr. Carreno's trial**

20 **testimony.  The version I have is --**

21     MR. NORTON:  We -- I'm sorry.  Go ahead.

22 I was going to say that we have it now.  But go

23 ahead.

24     BY MR. AINSWORTH:

25     Q.   **All right.  Well, I'm looking at page**

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1    Bates numbered JC 0673.  And on -- for your

2    purposes, Mr. Carreno, it's page 18.  And this is

3    at the trial.  Were you asked the following

4    questions and you gave the following answers?

5    Page 600, line three.

6           Question, you told him that those asterisks

7    meant that you knew he was lying about it in the

8    tape, is that correct?

9           Answer, I don't know that I told them that,

10   but that was the reason for some documentation,

11   yes.  And on some of those notes and during part

12   of his story you have a B period S period circled,

13   is that correct.  Yes.  Question, does that stand

14   for Bob Smith or Billie Summerville.  Answer, no.

15   It does not.  Question, we know what that stands

16   for, don't we, without having to say it.  Answer,

17   yes, I do.

18           Were you asked those questions and did you

19   give those answers, sir?

20           A.    Yes.  I did.

21           Q.    All right.  And so did you testify at

22   trial -- and I believe this is when Mr. Vanderbilt

23   was asking the questions -- no.  Actually, it's

24   Mr. Kurth.  Sorry.  I don't want to mislead you.

25                 THE REPORTER:  Wait.  Hold on.  What was



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## JOEL RANDY CARRENO

1    that -- I couldn't understand that second name?

2            MR. AINSWORTH:  Kurth.

3            MR. TURNER:  K-U-R-T-H.

4            MR. NORTON:  JC 000673.

5            MR. QUALSETH:  Exhibit 1, or -- okay.

6    Got it.

7        BY MR. AINSWORTH:

8        Q.   So did you -- you -- you testified at

9    trial that the reason for the documentation was

10   because it meant you knew he was lying to you,

11   right?

12       A.   Correct.

13       Q.   Meaning Tom?

14       A.   Correct.

15           MR. NORTON:  Hang on.  I'm going to

16   object to the form of that question.  Your answer

17   stands.

18       BY MR. AINSWORTH:

19       Q.   And you -- and you testified at trial

20   that BS stood for bullshit, in essence, is that

21   correct?

22       A.   Correct.

23       Q.   You thought that Tom was lying to you at

24   portions of his statement, correct?

25       A.   I -- I did not know.  I didn't know and I

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1  still don't know.

2      Q.   All right.  Sir, when -- where did you

3  document that you helped Tom get his story

4  straight by telling him information about the

5  timings?

6            MR. TURNER:  Object to form.

7            MR. AINSWORTH:  Yeah.  Let me strike

8  that.  That was a terrible questions.  Started out

9  bad and just got worse.

10      BY MR. AINSWORTH:

11      Q.   Where did you document, sir, that you

12  provided Tom with information to help him?

13            MR. NORTON:  You bonged there again,

14  Russell, right at the end.

15      BY MR. AINSWORTH:

16      Q.   Where -- where do you document that you

17  provided Tom with information to help him?

18            MR. NORTON:  Object to the form of the

19  question.

20      A.   To help him what?

21      BY MR. AINSWORTH:

22      Q.   All right.  Well, let me -- let me --

23  when did you document or -- strike that.

24      Where do you document that you told Tom when

25  you were with Floyd to help him establish the time



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1    that he was with Floyd?

2          MR. TURNER:  Object to form.

3      A.   Would you please repeat that again?

4    Because I -- I'm not catching all that you're

5    saying or what you're asking.

6          MR. AINSWORTH:  Sure.  Let me show you

7    what we marked as Exhibit 1.

8      BY MR. AINSWORTH:

9      Q.   I'm going to direct your attention to

10   page 43 of the transcript which is Bates numbered

11   698, JC 698, and where you were asked the

12   following questions and you give the following

13   answers.

14        At line 11.  The second time you asked him

15   what time it was after you kind of let the cat out

16   of the bag he changed his time, did he not.  I

17   provided him with information to help him.  What

18   was the information --

19         MR. NORTON:  Hang on.

20         MR. AINSWORTH:  Answer --

21         MR. NORTON:  He's still reading.

22         THE WITNESS:  Oh, I'm sorry.

23     BY MR. AINSWORTH:

24     Q.   Letting him know that I was with Floyd.

25   Question, so you could have been with Floyd at



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1  that time.  Answer, that is correct.  Question,

2  correct, and that the time changed, is that right.

3  Answer, yes, that is correct.

4       Were you asked those questions and did you

5  give those answers, sir?

6       A.   Yes.

7       Q.   And so where did you document that you

8  helped Tom establish the time by telling him when

9  you were with Floyd to help him get his story

10  straight?

11           MR. NORTON:   Object to the form of the

12  question.

13       A.   It wasn't for I to provide for Tom with

14  information for he to get his story straight.

15  That had nothing to do with it.  What that is in

16  regard to, I wanting to know.  And I go back to

17  what I testified earlier here, the times just

18  didn't add up.  So I don't recall what I told Tom.

19  But I do know this, that I wanted information from

20  him pertaining to the times because it didn't make

21  sense to me.

22       BY MR. AINSWORTH:

23       Q.   And you're saying the times didn't make

24  sense to you because there wasn't enough time for

25  Tom to arrive at work at 2:45 in the afternoon if



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604               Suite 101                  Suite 305
785-273-3063          Overland Park, KS 66212        Wichita, KS 67202
www.appinobiggs.com          913-383-1131             316-201-1612

**252**

## JOEL RANDY CARRENO

1   the times he provided were right --

2        A.    Yeah.

3        Q.    -- is that what you were saying?

4        A.    Yes.  I don't -- I don't know how he

5   could have done that.  I don't know.

6        Q.    All right.  But at trial you said the

7   help that you provided Tom was letting him know

8   that you were with Floyd at the time that Tom was

9   saying the roadside meeting was going on --

10       A.    Yes.

11       Q.    -- right?

12       A.    Correct.

13       Q.    And that was the help that you provided

14  Floyd was to tell him, gee, I was with Floyd at

15  that time.

16       A.    Yeah.  I mean, he's telling me this

17  story.  And the best that I could put it together,

18  timewise, letting him know that I was with Floyd.

19  It was like if your times are correct and I

20  understand it properly, I was with Floyd, so how

21  in the hell could that have happened.

22       Q.    Okay.  And so when you tell a witness or

23  a suspect information that then leads the witness

24  or suspect to change, you know, a time or, you

25  know, other kind of information, do you think you

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### JOEL RANDY CARRENO

1   should document that fact?

2        A.   I -- yes.

3        Q.   All right.  And so why didn't you

4   document the fact that you provided Tom with

5   information to help him, you know, figure out what

6   time it was that he met Floyd on of the roadside?

7             MR. TURNER:  Object to form.

8        A.   I -- I don't have an answer for that.

9   But I know that in what we're talking about here

10  is something that I dealt with throughout my

11  portion of the investigation trying to get

12  clarification on that roadside, and I couldn't

13  pull it together.

14       BY MR. AINSWORTH:

15       Q.   And that was the most important aspect of

16  your investigation was when this roadside meeting

17  supposedly happened, right?

18       A.   It was very important for me to know

19  those times were correct that were provided to me.

20       Q.   Floyd told you that he sniffed the gun to

21  see if it had been fired recently, correct?

22       A.   Correct.

23       Q.   So -- and I -- I -- I hope I said Tom.

24             MR. NORTON:  Hey, Russell, could you

25  start again?  Because I think you said Floyd.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063           Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131            316-201-1612

## JOEL RANDY CARRENO

1          MR. AINSWORTH:  I think you're right.

2     BY MR. AINSWORTH:

3     Q.   Tom told you that I sniffed the gun to

4 see if it was recently fired, right?

5     A.   Correct.

6     Q.   And so that told you -- and then he told

7 you he opened the magazine to see how many bullets

8 were in the gun, is that right?

9     A.   Correct.

10     Q.   Then told you that Tom had handled the

11 gun and you suspected his fingerprints to be on

12 the gun, right?

13     A.   Say it again, please.

14     Q.   Then told you that Tom had handled the

15 gun and you would expect his fingerprints to be on

16 the gun, right?

17     A.   I don't know if I fold Tom that but, yes,

18 that would be correct.

19     Q.   And so did you ask Tom if he wiped the

20 gun free of any fingerprints?

21     A.   I don't recall.

22     Q.   Did you want to know if he wiped the gun

23 and, if so, why did he wipe the gun?

24     A.   Again, I don't recall if I asked him

25 that.  And then if I didn't, I should have.



Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### JOEL RANDY CARRENO

1        Q.    I'm sorry.  What was that last thing you

2    said?

3        A.    I said if I did not ask Tom that I should

4    have.

5        Q.    Do you have any role in deciding what

6    evidence would be tested in the case?

7        A.    The only role that I would have would be

8    evidence that I collected and filled out a KBI

9    evidence receipt to turn in as evidence.  And then

10   on that same form there is a column for request of

11   examination.  So, yes.  Now, whether or not it was

12   completed, I don't know.

13       Q.    Well, did you play any role in

14   determining what evidence -- once the evidence was

15   submitted what the lab should test and what they

16   should not test?

17       A.    No.  No.

18       Q.    So you didn't meet with Woods and

19   Vanderbilt and Dunnaway -- Dunnaway to decide what

20   evidence should be tested?

21       A.    I don't recall that at all.  I would have

22   turned it into the physical evidence office.

23       Q.    Were you keeping Vanderbilt apprised of

24   what was going on in the investigation?

25       A.    No.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1     Q.    Whose job was that?

2     A.    I don't know that it was -- I'm going to

3     back up.  I had the records -- everything.  The

4     master file was turned over to Jim Vanderbilt.  I

5     don't know what was sent over, I don't know what

6     wasn't sent over.  I -- I don't know.  But we had

7     a master file on hand.  It wasn't my job to

8     monitor anything, if that answers your question.

9     Q.    Tom didn't tell you in your interview

10    with him that Floyd told Tom that the victim was

11    shot in the head.  Did you notice that?

12          MR. TURNER:  Object to form.

13    A.    That would be correct.

14    BY MR. AINSWORTH:

15    Q.    Did you want to know how Tom knew the

16    victim was shot in the head before her body was

17    uncovered if Tom didn't tell her -- or if Floyd

18    didn't tell him?

19    A.    I would have to go back to the alleged

20    meeting on the county road between Tom and Floyd

21    to where Tom told me that Floyd said that he

22    killed her.

23    Q.    But then after you took a break in the

24    interview with Tom, then for the first time Tom

25    said that Floyd told him he shot her in the back



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1    of the head.  Do you recall that?

2         A.   I -- no.  What I recall is what I just

3    stated about the alleged conversation between the

4    two brothers on the county road that allegedly

5    happened on Saturday.

6         Q.   I want to show you Exhibit 5, page 135.

7    This is your handwriting, is that right?

8         A.   Yes, that is.

9         Q.   All right.  So it's Vanderbilt, you, and

10   Mike Hayes, and you go to Floyd Bledsoe, Sr.'s

11   house at 10:42, right?

12        A.   Time is 4:42 -- no.  Hold on.

13        Q.   Sorry.  Sorry.  You're right.

14        A.   Okay.

15        Q.   4:42.  My apologies.  And this is on

16   November 14th, 1999, correct?

17        A.   Correct.

18        Q.   And so this is after Tom was released on

19   the Friday.  So Tom's back in his house, right?

20             MR. NORTON:  Object to the form of the

21   question.

22        A.   As I'm sitting here right now, I don't

23   recall the date in which Tom was released.

24        BY MR. AINSWORTH:

25        Q.   Okay.  Well, I can pull it but let's --

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## JOEL RANDY CARRENO

1   let's put it this way.  You would rather search
2   the suspect's house before the suspect was
3   released back into the house to have an
4   opportunity to find any evidence, right?
5        A.   Correct.
6        Q.   And you collected some guns and
7   ammunition from Tom's bedroom, right?
8        A.   It was ammunition.  And --
9        Q.   Just ammunition, right?
10       A.   And --
11       Q.   -- have the 22 then?
12       A.   I'm sorry?
13       Q.   My mistake.  I think it was just
14   ammunition then.  You left -- let's -- tell us
15   what time you left Tom's.
16       A.   On this day?
17       Q.   Yeah.
18       A.   It would have been 507 hours, 5:07 p.m.
19       Q.   All right.  So you arrived at 4:42 and
20   you left at 5:07 --
21       A.   Correct.
22       Q.   -- and so you were there for 27 minutes?
23   25 minutes.
24       A.   That sounds better.  Yes.
25       Q.   Then Tom's house was searched for six

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

**JOEL RANDY CARRENO**

1   **hours, is that right -- I'm sorry.  Floyd's house**
2   **was searched for six hours, right?**
3      A.   If that's what the document shows then my
4   response is going to have to be yes.  But I do not
5   recall.  I -- I don't recall me being on that
6   property for six hours.
7      **Q.   Well, you were at the site to the -- the**
8   **burial site on the 14th, right?**
9      A.   Correct.
10      **Q.   Because you recovered the -- the**
11   **Countryside Baptist T-shirt, right?**
12      A.   It was recover -- it was recovered, yes.
13      **Q.   By you, correct?**
14      A.   I don't know if I took physical custody
15   of that shirt.
16      **Q.   In any event, the -- Tom Bledsoe was a --**
17   **a big supporter of the church, right?**
18      A.   Yes.
19      **Q.   And so you should have tested that shirt**
20   **to see if it linked Tom to Camille -- Camille's**
21   **murder, right?**
22      MR. TURNER:  Object to form.
23      A.   I don't know -- I don't know -- I don't
24   know whether or not that shirt was sent to the KBI
25   for testing.



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604         Suite 101           Suite 305
785-273-3063      Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com     913-383-1131      316-201-1612

# JOEL RANDY CARRENO

1      BY MR. AINSWORTH:

2          Q.    Well, what do you think -- as an

3      experienced law enforcement detective did you

4      think that shirt should have been tested?

5          A.    Absolutely, yes.  But again --

6          Q.    Is there any reason --

7              MR. NORTON:  He had not finished.

8      BY MR. AINSWORTH:

9          Q.    I'm not asking you -- you if it was

10     tested or not.  I understand you don't know.  Is

11     there any reason not to test the Countryside

12     Baptist T-shirt?

13         A.    No.  My opinion.  No.  It needed to be

14     tested.

15         Q.    The night of the -- when you found the

16     victim's body you -- there was evidence that the

17     victim had been dragged, right?

18         A.    That she had been what?

19         Q.    Dragged.  Right?

20         A.    I don't recall evidence out there

21     indicating that she was dragged.  I don't recall.

22         Q.    Do you remember drag marks on the

23     victim's back?

24         A.    No.

25         Q.    Your own belief was that the victim was



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## JOEL RANDY CARRENO

1    not killed at the place where she was buried

2    because there was very little blood in the -- in

3    the grave, right?

4        A.   I don't know where she was killed.

5        Q.   All right.  Did you think that she was

6    killed someplace other than the grave?

7        A.   You're asking me what I believe or what I

8    know?

9        Q.   What you believe, sir.  What you believed

10   at the time.

11       A.   I -- I didn't know where she was killed.

12       Q.   I know you don't know where she was

13   killed.  I mean, in 1999 did you believe that she

14   was killed someplace other than where her body was

15   recovered?

16       A.   Are you talking about on that day that we

17   recovered her or through the course of the

18   investigation?

19       Q.   On that day, sir.

20       A.   Ask me that question again to make sure

21   that I fully understand it.

22       Q.   That's okay, sir.  I'm going to ask you a

23   different question about your notes.  Page 130 --

24   Exhibit 5, 137.  This is Bates numbered JC 1579.

25   Is this your handwriting, sir?



Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**JOEL RANDY CARRENO**

1       A.    Yes.

2       Q.    Okay.  And so this is -- you have 0591

3   Floyd Bledsoe 1023 with law enforcement officers.

4   What does that refer to?

5       A.    That we arrived at -- on that property at

6   -- 1023 shows arrival time of which was 10:02.

7   And then it represents the three officers other

8   than myself that was there.  And then it

9   represents on 9 -- 0951 Floyd Bledsoe 1023,

10  arrived with LEO.  I don't know if that was Floyd,

11  Jr. Or Floyd, Sr.

12      Q.    Well, at this point Floyd, Jr. is in

13  jail.

14      A.    Okay.

15      Q.    So it wasn't him.

16      A.    Okay.

17      Q.    All right.  I want to ask you about --

18  third page of this document.  Can you explain what

19  these markings are?  It's actually page 139 of

20  Exhibit 5.

21      A.    It represents shell casings that was on

22  the bank.  When I say the bank, on -- on level

23  ground that were located.

24      Q.    So can you describe for us where the

25  casings were found on where the grounds were?

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### JOEL RANDY CARRENO

1    A.   I would just be guessing if I was to

2    answer that question.  I can tell you that 1509 it

3    represents casings on the bank.  At 1521, a casing

4    was found on the bank, and that there was 17

5    photographs taking on -- on the casings.  The

6    diagram that I have here shows the body inside the

7    ditch.  And then the measurements.  I can't tell

8    what my reference point was.  It starts with the

9    letter T.  I don't recall what that reference

10   point is, but it shows 70 inches and 74 inches

11   from my reference point.

12       Q.   That's where the belt was -- that's where

13   the belt -- pieces of the belt were found?

14       A.   Yeah.  Looking at it now, that would be

15   correct.

16       Q.   How many casings?

17       A.   And I don't -- I don't recall the belt.

18   I don't know who's belt it would have been.

19       Q.   You recovered a belt from the scene.  I'm

20   asking about the casings.

21       A.   Reviewing this, the only thing that I

22   could tell is at 3:09 p.m. there was a casing on

23   the bank, and at 3:21 p.m. there was casings on

24   the bank.  But I am not for sure.

25       Q.   All right, sir.  Let's turn your



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604             Suite 101                Suite 305
785-273-3063          Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com        913-383-1131            316-201-1612

## JOEL RANDY CARRENO

1  attention to page 145 of that same exhibit.  Is

2  this your handwriting?

3      A.   Yes.

4      Q.   So this is an interview with Dan Courtney

5  who says that Saturday morning around 8:20 in the

6  morning he saw somebody in that brome field north

7  of the Bledsoe residence, right?

8      A.   Correct.

9      Q.   And on the next page Dan Courtney told

10 you that the truck was black or real close to

11 being black.  Do you see that?

12     A.   Yes.

13     Q.   Who had a black truck?

14     A.   I'm sorry.

15     Q.   Who had a black truck in this

16 investigation?

17     A.   I don't --

18     Q.   Let's look at Exhibit 5, page 2.  See

19 what it says at the bottom.  Tom's vehicle, black

20 1989 Mazda truck?

21     A.   Yes.  And I don't -- that's definitely my

22 documentation.  I don't recall as I'm sitting here

23 right now that the truck that Tom had was black.

24     Q.   You then asked Floyd in his -- your only

25 question of him on the 8th was to confirm that Tom



Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street          6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604             Suite 101                Suite 305
785-273-3063                 Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com          913-383-1131             316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

### JOEL RANDY CARRENO

1    was -- Tom's truck was black, do you remember

2    that?

3         A.   No.  I do not.

4         Q.   Let me show you the reference.  A lot of

5    blacks in here.  I'll find that reference and I'll

6    show it to you.  But while I'm doing that, sir, I

7    have some questions about -- there's a chance that

8    you're going to say that as a defense of punitive

9    damages you don't have, you know, money to pay.

10   I'm going to ask you some questions about your

11   financial condition, and it shouldn't take very

12   long. ███████████████████████████████████

13       ██    ██████████████████████████

14       ██    ██████████████████████████

15       ██    ██████     ████████████████████

16       ██    ██████████████████████████████

17   ███████████████████████████████████████████

18       ██    ████████████████████    ███████████████

19   ██████████████████████████████████████████████

20   ████████████████    ████ .

21       ██    ██████████████████████

22       ██    ██████

23       ██    ████████████████████████████

24       ██    ████    ████████████

25       ██    ██████████████████████ ?



5111 SW 21st Street          6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604             Suite 101                 Suite 305
785-273-3063                 Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

# JOEL RANDY CARRENO





# JOEL RANDY CARRENO





5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO





5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1   ███████████████████████   ██████████████

2   ████████

3        ███   ████████████

4        ███   ██████

5        ███   █████████████████████

6   ████████████████████   ████████████

7   ██████████████████████████████

8   ███████████████████████████████████

9   ████████████████████████   █████

10  █████████████████████████ .

11            MR. NORTON:  Hang on.  Can I make a

12  inquiry of the time for how long we've been on the

13  record?

14            MR. AINSWORTH:  I'm almost there.

15            THE VIDEOGRAPHER:  Oh.  It's -- we've

16  been on for seven now.

17            MR. NORTON:  We just hit seven hours.

18            MR. AINSWORTH:  Oh.  Well lookie-there.

19  I don't have any questions.  Although I did find

20  the black reference and it was in my notes while I

21  was searching through.  No further questions.

22            MR. NORTON:  We will make official

23  confidential designations when we get the

24  transcript in.  But just so that -- that here with

25  regard to financial information, we'll consider

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

1  that to be confidential.  And then to the extent

2  documents identified as confidential on their face

3  or discussed then we would designate that -- those

4  portions of the testimony transcript as

5  confidential, and then we'll do official once we

6  get the transcript in.  Anyone else want to take

7  one minute to ask a question?

8          MR. QUALSETH:  I don't have any

9  questions.

10          MR. LINDEN:  I'll reserve my questions

11  for trial.

12          THE VIDEOGRAPHER:  Time is approximately

13  6:01 p.m., we're going off the record.  This

14  concludes the deposition.

15          (THEREUPON, the deposition concluded at

16  6:01 p.m.)

17  .

18  .

19  .

20  .

21  .

22  .

23  .

24  .

25  .



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

# JOEL RANDY CARRENO

```
 1                              SIGNATURE

 2        .

 3             The deposition of JOEL RANDY CARRENO was

 4   taken in the matter, on the date, and at the time

 5   and place set out on the title page hereof.

 6        .

 7             It was requested that the deposition be

 8   taken by the reporter and that same be reduced to

 9   typewritten form.

10        .

11             It was agreed by and between counsel and

12   the parties that the deponent will read and sign

13   the transcript of said deposition.

14        .

15        .

16        .

17        .

18        .

19        .

20        .

21        .

22        .

23        .

24        .

25        .
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# JOEL RANDY CARRENO

```
 1                        AFFIDAVIT

 2    .

 3    STATE OF _____:

 4    COUNTY/CITY OF _____:

 5    .

 6            Before me, this day, personally appeared,

 7    JOEL RANDY CARRENO, who, being duly sworn, states

 8    that the foregoing transcript of his/her

 9    Deposition, taken in the matter, on the date, and

10    at the time and place set out on the title page

11    hereof, constitutes a true and accurate transcript

12    of said deposition, along with the attached Errata

13    Sheet, if changes or corrections were made.

14    .

15                  _____

16                  JOEL RANDY CARRENO

17    .

18        SUBSCRIBED and SWORN to before me this

19    _____ day of _____, 2023 in the

20    jurisdiction aforesaid.

21    .

22    _____        _____

23    My Commission Expires         Notary Public

24    .

25    .
```



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### JOEL RANDY CARRENO

1                    DEPOSITION ERRATA SHEET

2    .

3    RE:        APPINO & BIGGS REPORTING SERVICE, INC.

4    .

5    FILE NO.: 68307

6    .

7    CASE:      FLOYD BLEDSOE vs.

8               JEFFERSON COUNTY, KS, ET AL.

9    .

10   DEPONENT: JOEL RANDY CARRENO

11   .

12   DEPOSITION DATE: 2/1/2023

13   .

14   To the Reporter:

15   I have read the entire transcript of my Deposition

16   taken in the captioned matter or the same has been

17   read to me.  I request that the following changes

18   be entered upon the record for the reasons

19   indicated.  I have signed my name to the Errata

20   Sheet and the appropriate Certificate and

21   authorize you to attache both to the original

22   transcript.

23   .

24   .

25   .



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## JOEL RANDY CARRENO

```
 1    PAGE:LINE FROM        TO              REASON

 2    .

 3    .

 4    .

 5    .

 6    .

 7    .

 8    .

 9    .

10    .

11    .

12    .

13    .

14    .

15    .

16    .

17    .

18    .

19    .

20    .

21    .

22    .

23    .

24    SIGNATURE:_____ DATE:_____

25               JOEL RANDY CARRENO
```



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

275

**C E R T I F I C A T E**

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

I, Douglas Stone, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A. 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

Given under my hand and seal this 16th day of February, 2023.

Douglas Stone, C.C.R. No. 1518



**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612