# EXHIBIT 23

# *SOS POLYGRAPH SERVICES, INC.*
*Polygraph Testing, Consulting, Training Seminars*

April 23, 2023

Attorney Ruth Brown
Loevy & Loevy
311 N. Aberdeen Street, 3rd Floor
Chicago, IL 60607

Re: Bledsoe v. Jefferson County, et al

Dear Ruth:

As per your request, I have reviewed the following materials sent to me in order to render a professional opinion regarding the Floyd S. Bledsoe case.

<u>Materials Reviewed</u>

Document #1- Report by Agent Johnson on Polygraph Examination of Tom Bledsoe dated November 12, 1999 (JC 3883-3885)

Document #2- Rights Waiver Polygraph Examination Statement of Consent dated November 12, 1999 for Tom Bledsoe, signed by attorney Mike Hayes (JC 3886)

Document #3- Administrative Page for Polygraph Examination of Tom Bledsoe dated November 12, 1999 (JC 3887)

Document #4- Report by Agent Johnson on Polygraph Examination of Floyd S. Bledsoe dated November 12, 1999 (JC 3888-3890)

Document #5- Rights Waiver Polygraph Examination Statement of Consent dated November 12, 1999 for Floyd S. Bledsoe (JC 3891)

Document #6- Administrative Page for Polygraph Examination of Floyd S. Bledsoe dated November 12, 1999 (JC 3892)

Document #7- Training Materials for George Johnson (KSCPOST 120-128)

Document #8- Agent Johnson Polygraph Envelope Part 1 for Polygraph of Floyd S. Bledsoe (KBI Subpoena 1530-1560), containing statement of consent, investigation report of Agent Johnson, examination score sheet of Agent Butler, polygraph charts for Floyd Bledsoe, dated November 12, 1999, and report of Roger Butler.

Attorney Ruth Brown
Re: Floyd Bledsoe
Page 2 of 17
April 23, 2023

Document #9- Agent Johnson Polygraph Envelope Part 2 for Polygraph of Floyd S. Bledsoe (KBI Subpoena 1561-1587), containing rights waiver for Floyd Bledsoe, background information sheet for Floyd Bledsoe dated November 12, 1999, handwritten notes, handwritten list of examination questions, and polygraph charts for Floyd Bledsoe.

Document #10- Agent Johnson Polygraph Envelope Part 1 for Polygraph of Tom Bledsoe (KBI Subpoena 1588-1624), containing December 2, 2015 email from Agent Rick Atteberry, affidavit of custodian of records Jane Nohr, rights waiver for Tom Bledsoe, investigation report of Agent Johnson, examination score sheet of Agent Butler, Report of Agent Butler dated December 17, 2015, and polygraph charts for Tom Bledsoe.

Document #11- Agent Johnson Polygraph Envelope Part 2 for Polygraph of Tom Bledsoe (KBI Subpoena 1625-1655), containing background information sheet for Tom Bledsoe dated November 12, 1999, handwritten list of examination questions, rights waiver for Tom Bledsoe, handwritten notes, investigation report of Agent Johnson, rights waiver for Tom Bledsoe, and polygraph charts for Tom Bledsoe.

Document #12- Letter from Linda Duran attaching two pages of handwritten notes regarding polygraph questions for Tom Bledsoe and Floyd S. Bledsoe (Plaintiff FB10618-10620)

Document #13- Polygraph materials from polygraphs conducted by Agent Johnson in 30 cases between July 1, 1998 and December 31, 1999, that were selected and sent by the Kansas Bureau of Investigation (KBI Subpoena 6688-7756)

Document #14- April 13, 2023 Affidavit of Christine Hamman, Kansas Bureau of Investigation records custodian, regarding random selection process utilized by Kansas Bureau of Investigation to select 30 cases with Agent Johnson polygraphs (KBI Subpoena 7757-7758).

Document #15- Video of November 12, 1999 Interrogation of Floyd S. Bledsoe (JC 21978)

Document #16- Deposition of Jim Vanderbilt, May 19, 2003

Document #17- Deposition of Troy Frost, February 20, 2023

Document #18- 45-Page Report of Randy Carreno on Arfmann Homicide Investigation (KBI Subpoena 2286-2330)

Document #19 – Trial Testimony of Jim Woods, April 26, 2000

Attorney Ruth Brown
Re:  Floyd Bledsoe
Page 3 of 17
April 23, 2023

**<u>Professional Opinion Regarding Polygraph Examination Administered to Floyd Bledsoe:</u>**

<u>Testing Technique and Format:</u>

The widely accepted polygraph technique and format is a technique known the Modified General Question Technique (MGQT). The technique has been researched and accepted as a valid technique by the American Polygraph Association as well as the American Association of Police Polygraphists. This polygraph technique follows a best practices concept that has been used for over 50 years.

The technique used in the examinations by Agent Johnson of Floyd S. Bledsoe and Thomas Bledsoe follows the Standards of Practice set forth by the American Polygraph Association as well as the American Association of Police Polygraphists for conducting the pre-test interview, in-test phase of collecting the polygraph tracings as well as any post-test discussions.

<u>Question Formulation</u>

Both the relevant and the comparison questions formulated by Agent Johnson were based on the pre-test interview conducted with Floyd Bledsoe and Thomas Bledsoe. Those relevant and comparison questions met the standards of practice for question formulation.

However, the polygraph examination administered to Floyd Bledsoe on November 12, 1999, administered by Agent Johnson had five (5) relevant questions which does not conform to the MGQT format, which was researched, and did not follow established standards set forth by the polygraph profession. Agent Johnson asked a fifth relevant question which is highly suspect since there is no known research for this type of technique to be used, either in 1999 or today.  The use of five questions is not only a technique unsupported by research, but also makes it more likely that a test subject will fail the test.

After examining 30 random polygraph cases submitted by the Kansas Bureau of Investigation regarding polygraph examinations conducted by Agent Johnson in 1998 and 1999, it was revealed that Agent Johnson did not ask a fifth relevant questions on any of those 30 cases. It is highly suspicious that Agent Johnson decided to ask a fifth relevant question on Floyd's exam and suggests that Agent Johnson was purposefully departing from his typical, accepted methodology during Floyd's polygraph. It should also be noted that Agent Johnson asked Tom Bledsoe only four relevant questions.

Regarding Floyd Bledsoe's polygraph questions, it is the opinion of this expert that Relevant Question #3 (Do you know for sure who shot Zetta Arfmann, between 5 and 8 November, 1999, was not appropriate for his exam since, by November 12, Tom Bledsoe

Attorney Ruth Brown
Re: Floyd Bledsoe
Page 4 of 17
April 23, 2023

had already turned himself in for Camille's murder and been arrested for murder, thus Floyd S. Bledsoe was aware that Thomas appeared to be the person who shot Camille. This situation could have caused Floyd to have reactions to that particular question since he had strong suspicions about Tom. When faced with this sort of ambiguity raised by a relevant question, polygraph examiners are trained to re-word the question to avoid the ambiguity, and polygraph examiners are trained to explore the answers to relevant questions in the pre-test interview to avoid this exact scenario.

On page KBI Subpoena 1595 of the report generated by Agent Roger Butler for Tom Bledsoe's polygraph, it states that Relevant Question #3 was not appropriate due to extremely strong suspicion of brother. I agree with that conclusion.

On page KBI Subpoena 1534 of the examination report generated by Agent Roger Butler for Floyd Bledsoe's polygraph, Butler states: "Floyd made pretest comments that Thomas was involved. RQ#3 invalid." I agree with that conclusion.

However, I disagree with Butler that there is any evidence that, as Butler stated in his final report, "it is likely that SA Johnson clarified the question with Floyd and defined it as having actually seen or having other evidence or information that provided Floyd with indisputable information as to the identity of the killer." JC 2491. There is no support provided for that speculation. To the contrary, during the video of the many hours of post-test interrogation by Johnson of Floyd S. Bledsoe on November 12, although Agent Johnson discusses the polygraph examination and results with Floyd and Detective Carreno on many occasions during that lengthy interrogation, Johnson does not reference having given Floyd any such clarification.

On page KBI Subpoena 1534 of the report generated by Agent Roger Butler, with assistance of Rick Atteberry, it states that Butler was not sure about the basis for RQ# 9 to Floyd Bledsoe. Specifically, Butler states:

> Based on the review of the case facts, as summarized in the reports from SA Johnson, the issue of transporting Zetta Arfmann at the time she was hot was not brought into question during the investigation, which raised the question as to the purpose of that particular question. There may have been some information provided to SA Johnson during the pre-test interview or in other sources in the investigation that was the basis of that question that is unknown to SA Atteberry and SA Butler. The question is not necessarily an inappropriate question and does not invalidate the test; there was just some question as to the background of the question.

I agree with this concern raised by Agent Butler. I would not expect to see such a question unless there was information in the investigation that the victim had been transported at

Attorney Ruth Brown
Re:  Floyd Bledsoe
Page 5 of 17
April 23, 2023

the time she was shot. The source of the information that led to this question was not identified in Agent Johnson's report, or in Agent Butler's report.

Scoring Technique

Agent Johnson, the original examiner used a scoring technique known as the Numerical Scoring Technique. The Numerical Scoring format used by Agent Johnson meets the standards of practice set forth by the polygraph industry. The premises of the scoring technique assigns a value of +1, 0, -1 depending on which question has the most physiological responses, the comparison question or the relevant question. After assigning a numerical value to each of the questions at each of the three charts collected, a cumulative overall score is assigned as a final "spot" score.
.
**The scoring rules that are applied and followed by the polygraph industry are spelled out below:**

Questions in positions C1 are compared to R1, R2 or R3.
Questions in positions C2 compared to R3 or R4.
Mixed question tests, the first CQ question is compared to the 1st, 2nd or 3rd RQ; the 2nd CQ is compared to the 3rd RQ and the 4th CQ.

**Deception Indicated**.

To render an opinion that the examinee is deceptive on a MGQT, the score must be minus three (-3) or more in any overall vertical spot.

**No Deception Indicated**.

To render an opinion of non-deception, there must be a plus one (+3) or greater in every overall spot.

**No Opinion**. If the results are not rendered as Deception Indicated or No Deception Indicated, it is No Opinion.

Scoring of Tom's Polygraph

The undersigned expert reviewed the 20 pages of the raw physiological data polygraph charts conducted on Tom Bledsoe.

I fully agree with the opinions expressed by Agents Butler and Atteberry that:

Attorney Ruth Brown
Re:  Floyd Bledsoe
Page 6 of 17
April 23, 2023

>A numerical evaluation of Thomas' polygraph charts by SA Atteberry and SA Butler, utilizing the scoring procedures accepted at the time the examination was conducted in 1999, and the current established scoring standards, did not support the opinion of truthfulness reported by SA Johnson and resulted in a consensus that the charts indicated deception and that Thomas was not truthful when answering one or more of the relevant questions.

On Agent Butler's examination score sheet, the final opinion of "DI" (deception indicated) was circled by Agent Butler and the total score was marked as -11 to -12. [It should be noted that Agent Butler improperly scored the charts by adding the total scores horizontally which is not how a MGQT test is scored. The MGQT is scored only vertically, and the overall decision is based on the total spot score. However, this did not impact the overall results because the total spot score was greater than a minus 3 or more at any given spot. The total spot score for Thomas had a minus 3 or more on all four of his spot totals.

As a polygraph expert using a widely accepted numerical scoring evaluation, Agent Johnson reported that Thomas Bledsoe was being Truthful, but in fact the polygraph charts should have been reported as being Deceptive. The reactions present on the charts clearly, and obviously, showed more reaction on the CQ's than the RQ's, thus explaining this expert's opinion that Thomas Bledsoe's test should have been reported as Deceptive. It is unknown as to why SA Johnson incorrectly scored the charts. As indicated, Thomas had a minus 3 or more on <u>all four</u> of his spot totals, and so it would have been obvious to any competent polygrapher in 1999 that this test would be considered a fail.

**POLYGRAPH SCORE SHEET – Thomas Bledsoe**

**CHART 1**

|        | 3  | 5  | 8  | 9  |   |
|--------|----|----|----|----|---|
| Pneumo | +1 | -1 | +1 | -1 |   |
| GSR    | -1 | -1 | -1 | -1 |   |
| Cardio | -1 | -1 | -1 | -1 |   |

| Total chart score | -1 | -3 | -1 | -3 |   |
|-------------------|----|----|----|----|---|

**CHART 2**

|        | 3  | 5  | 8  | 9  |   |
|--------|----|----|----|----|---|
| Pneumo | -1 | 0  | -1 | -1 |   |
| GSR    | -1 | -1 | -1 | -1 |   |
| Cardio | -1 | -1 | +1 | +1 |   |

| Total chart score | -3 | -2 | -1 | -1 |   |
|-------------------|----|----|----|----|---|

**CHART 3**

|        | 3  | 5  | 8  | 9  |   |
|--------|----|----|----|----|---|
| Pneumo | -1 | -1 | -1 | -1 |   |
| GSR    | -1 | -1 | -1 | -1 |   |
| Cardio | -1 | -1 | -1 | +1 |   |

| Total chart score | -3 | -3 | -3 | -1 |   |
|---|---|---|---|---|---|

| SPOT TOTALS | -7 | -8 | -5 | -5 |   |
|---|---|---|---|---|---|

Deception indicated — XX

No deception indicated — ☐

No opinion — ☐

## Scoring of Floyd's Polygraph

The undersigned expert reviewed the 11 pages of the raw physiological data polygraph charts conducted on Floyd S. Bledsoe. As a polygraph expert using a widely accepted numerical scoring evaluation, it was the opinion of Agent Johnson that Floyd S. Bledsoe was showing deception but in fact the polygraph charts should have been reported as being No Opinion.

The basis of the No Opinion is due to the following scores:

**POLYGRAPH SCORE SHEET – Floyd Bledsoe**

**CHART 1**

|        | 3  | 5  | 8  | 9  | 11 |
|--------|----|----|----|----|----|
| Pneumo | +1 | -1 | +1 | +1 | +1 |
| GSR    | -1 | -1 | -1 | +1 | +1 |
| Cardio | +1 | +1 | +1 | +1 | +1 |

| Total chart score | +1 | -1 | +1 | +3 | +3 |
|---|---|---|---|---|---|

Attorney Ruth Brown
Re:  Floyd Bledsoe
Page 8 of 17
April 23, 2023

**CHART 2**

|        | 3  | 5  | 8  | 9  | 11 |
|--------|----|----|----|----|----|
| Pneumo | +1 | 0  | 0  | 0  | -1 |
| GSR    | 0  | +1 | -1 | -1 | -1 |
| Cardio | 0  | +1 | 0  | +1 | -1 |

| Total chart score | +1 | +2 | -1 | 0 | -3 |
|---|---|---|---|---|---|

**CHART 3**

|        | 3  | 5  | 8  | 9  | 11 |
|--------|----|----|----|----|----|
| Pneumo | 0  | +1 | 0  | 0  | 0  |
| GSR    | +1 | -1 | -1 | +1 | -1 |
| Cardio | -1 | +1 | -1 | -1 | -1 |

| Total chart score | 0 | +1 | -2 | 0 | -2 |
|---|---|---|---|---|---|

| SPOT TOTALS | +2 | +2 | -2 | +3 | -2 |
|---|---|---|---|---|---|

Deception indicated
No deception indicated
No opinion  x

In Agent Butler's examination of these results (KBI Subpoena 1534), the final opinion of "INC" (inconclusive) was circled by Agent Butler and the total score was marked as -3 to -5.  I agree with Agent Butler's opinion that the results were inconclusive.  [As noted above, Agent Butler improperly scored the charts by adding the total scores horizontally which is not how a MGQT test is scored. The MGQT is scored only vertically, and the overall decision is based on the total spot score. However, this did not impact the overall scoring decision.]

Agent Butler also stated that he was not familiar with a technique that allowed 3 relevant questions to be asked in a row. KBI Subpoena 1534. I agree with Agent Butler that there is not a technique that has been validated which allows for 3 relevant questions to be asked. It is unclear why Agent Johnson constructed the test in this manner.

Attorney Ruth Brown
Re: Floyd Bledsoe
Page 9 of 17
April 23, 2023

## Review of Sample of Polygraphs by Agent Johnson

This expert reviewed training records for Johnson and saw that he had received appropriate and sufficient training in polygraphs as of 1999 in order to know how to structure and score a polygraph correctly. After examining 30 random polygraph cases submitted by the Kansas Bureau of Investigation regarding polygraph examinations conducted by Agent Johnson in 1998 and 1999, this expert agreed that Agent Johnson generally used properly constructed relevant and comparison questions in other cases. This expert agreed with the overall scoring decisions made by Agent Johnson in nearly all (27 of 30) of the cases, and generally found Agent Johnson to generally be a competent polygraph examiner in nearly all other cases. It is unclear to this expert why Agent Johnson departed from his training and expertise when conducting and scoring the polygraph examinations in this case.

## Post-Test Interview of Tom Bledsoe

In the report of Agent Butler, he correctly notes that Agent Johnson did not report the ending time of Tom Bledsoe's polygraph examination:

> There is no Indication that SA Johnson conducted any post-chart interviews and it is likely Thomas' examination concluded shortly after 1:53 P.M. however SA Johnson does not report the ending time. The examination of Floyd Scott Edward Bledsoe began at approximately 3:03 P.M. and SA JOHNSON marked the last chart as being collected at approximately 4:49 P.M.

I agree with Agent Butler that it is notable that Agent Johnson did not report the ending time of Tom Bledsoe's polygraph, which is contrary to standard practice in documenting polygraph examinations currently and back in 1999. However, I disagree with Agent Butler that there is any evidence that "it is likely Thomas' examination concluded shortly after 1:53 P.M. because Butler does not identify any evidence in support of his speculation, nor have I been presented with any such evidence.

I have reviewed prosecutor Jim Vanderbilt's deposition testimony that:

> Whatever it was, and he didn't say what you said he said, it was a real, it was a real frustrating thing for me, because Agent Johnson, as a result of the polygraph, explained to Tom that he knew he was lying, immediately we said that, and Agent Johnson said, "I can prove you're lying," and I thought that was not the appropriate way to handle it. To me it was like [Tom] was trying to speak out and give possibly more information but he was cut off by Agent George Johnson, and later [Johnson] justified his position indicating that the polygraph test was

>conclusive that Tom didn't have anything to do with what was going on, that he wasn't being deceitful when he said he didn't have anything to do with it, and so he's one of the best polygraph operators in the state of Kansas, just, I couldn't argue with him because I don't know jack about polygraphs or how to conduct them.

Vanderbilt Deposition, May 9, 2003, page 5. Troy Frost's deposition testimony also indicates that Tom made an admission during the post-polygraph interview. Frost Deposition, pages 123, 106-108.

In addition, Senior Special Agent Jim Woods testified at Floyd S. Bledsoe's trial that during Senior Special Agent Johnson's interview of Tom Bledsoe, Tom said "either 'I shot her' or 'I killed her.'" According to Defendant Woods, Johnson immediately followed up by telling Tom that the police didn't believe he was telling the truth. (JC 0000553).

If credited, this testimony suggests extremely problematic conduct by Agent Johnson for two reasons. First, generally accepted practices in 1999 and today for documenting admissions during polygraph examinations or interviews require polygraph examiners to document such admissions in their police reports, and carefully note the exact language used to the extent possible, and certainly not to omit admissions by suspects from the reports. There is no mention in Agent Johnson's report on the polygraph examination of Tom Bledsoe of any such admission, let alone the specific language used, as would be expected of a seasoned polygraph examiner such as Agent Johnson. Second, generally accepted practices in 1999 for conducting polygraph interviews would not support allowing a polygraph examiner to cut off a suspect that is providing an admission and instruct the suspect that they are lying instead of drawing out more information from the suspect, that could be used in the investigation. If such a technique was used for some legitimate reason, at a minimum, I would expect the polygrapher examiner to document the exchange, and explain the basis, if any, for cutting off the suspect from making admissions.

Interrogation Conduct

It is unknown if Agent Johnson conducted the pre-test interview and the in-test phase of the polygraph examinations of Tom and Floyd Bledsoe in a professional and ethical manner since there is no video or audio regarding the pre-test and the in-test phase of the exam. It is very questionable as to why there is no audio or video of the pre-test and the in-test phase of the exam, while there is a video of the post-polygraph interrogation on November 12 of Floyd S. Bledsoe in which Johnson participates.

It is the opinion of this expert that Agent Johnson, as well as Detectives Carreno and Frost, and defense attorney Michael Hayes, engaged in an improper and coercive

Attorney Ruth Brown
Re:  Floyd Bledsoe
Page 11 of 17
April 23, 2023

interrogation technique during the interrogation of Mr. Bledsoe. The interview of Mr. Bledsoe was not conducted according to the Best Practices concept set forth by the polygraph community. It is the opinion of this expert, that the interrogation conducted by Agent Johnson on Mr. Bledsoe went transgressed the Standards of Practice set forth by the polygraph community to ensure that the interrogation was conducted properly. It is the opinion of this expert that the interrogation of Mr. Bledsoe was conducted in an unethical manner and unprofessional manner.

This examiner has reviewed the video of Mr. Bledsoe's interrogation conducted by Agent Johnson, Detectives Carreno and Frost on November 12, in which Tom Bledsoe and his attorney Michael Hayes also participated.

It is the opinion of this expert that Agent Johnson, Detectives Carreno and Frost, and defense attorney Michael Hayes did engage in an improper and coercive interrogation technique during the interrogation of Mr. Bledsoe. The interview of Mr. Bledsoe was not conducted according to the Best Practices concept set forth by the polygraph community. It is the opinion of this expert, that the interrogation conducted by Agent Johnson on Mr. Bledsoe went transgressed the Standards of Practice set forth by the polygraph community to ensure that the interrogation was conducted properly. It is the opinion of this expert that the interrogation of Mr. Bledsoe was conducted in an unethical manner and unprofessional manner. As some examples:

| | |
|---|---|
| 14:30 | Detective Carreno tells Floyd that he doesn't want to hear anymore that Floyd didn't do it.    *This statement is highly unethical.* |
| 17:30 | Detective Carreno tells Floyd that he is gonna do some time somewhere. *This statement is highly unethical.* |
| 25:00 | Detective Carreno tells Floyd that he believes that Floyd is capable of killing his own kids.   *This statement is highly unethical.* |
| 26:30 | Detective Carreno tells Floyd that is his opinion that Floyd needs psychological help.  *This statement is highly unethical.* |
| 32:05 | Agent Johnson comes back into the room. |
| 44:00 | Detective Carreno keeps telling Floyd that he doesn't want to hear his denials. Calls Floyd a coward.         *This statement is highly unethical.* |

Attorney Ruth Brown
Re:  Floyd Bledsoe
Page 12 of 17
April 23, 2023

| | |
|---|---|
| 46:00 | Agent Johnson is in the background and keeps looking at the polygraph charts and then scoring the charts.   *The polygraph charts should have been scored prior to any interrogation taking place. The fact that Agent Johnson is in the room looking and scoring the charts could be interpreted as a psychological coercion.* |
| 52:30 | Agent Johnson stands up and stands over Floyd.  *This tactic is seen as psychological coercion.* |
| 57:30 | Agent Johnson tells Floyd that if someone close to him committed the crime, then that could be the reason why Floyd failed his exam.  *Later in the interrogation, Floyd is constantly told that he was the person who shot and buried Camille.* |
| 1:19 | Agent Johnson returns to the corner and begins to play with the polygraph charts.  *This tactic is seen as psychological coercion.* |
| 1:23 | Floyd is told by Detective Carreno tells Floyd that he would take Floyd to see Camille.   *This tactic could cause an innocent person to confess to a crime that they did not commit.* |
| 1:34 | Detective Carreno tells Floyd that if he tells the truth that they can spend time with Camille.   *This tactic could cause an innocent person to confess to a crime that they did not commit.* |
| 1:40 | Detective Carreno unlocks the door and allows the attorney for Tom Bledsoe to come into the room. The attorney is allowed to interrogate Floyd.   *This tactic is highly unethical, especially in an interrogation of a suspect.* |
| 1:42 | The attorney tells Floyd that Tom passed his polygraph exam with flying colors.   *If Agent Johnson properly scored Tom's polygraph charts, this statement would not have been allowed.  This tactic could cause an innocent person to confess to a crime that they did not commit.* |
| 1:52 | The attorney forces Floyd to look at the photo of the victim.  *This tactic is highly unethical, especially in an interrogation of a suspect.* |

Attorney Ruth Brown
Re:  Floyd Bledsoe
Page 13 of 17
April 23, 2023

| | |
|---|---|
| 1:53 | The attorney leaves the room leaving Tom, Floyd and the Detective Carreno to talk amongst each other. |
| 1:55 | Floyd offers an alibi concerning his whereabouts at the time of the shooting. *Detective Carreno ignores this statement instead of exploring the possibility of having an alibi.* |
| 2:10 | Detective Carreno again shows the photo of the victim to Floyd. *This tactic is highly unethical, especially in an interrogation of a suspect.* |
| 2:16 | Floyd requests that Detective Carreno speak with his alibi. Detective Carreno denies this request and again shows Floyd the photo of the victim. *This tactic is highly unethical, especially in an interrogation of a suspect.* |
| 2:23 | Tom Bledsoe leaves the room. |
| 2:26 | Agent Johnson comes back into the room and begins to call Floyd a "lying Son of a Bitch" and says "you call yourself a father," and asks Floyd "what the fuck did he do". Agent Johnson once again stands over Floyd and keeps walking around and behind Floyd. Agent Johnson begins to belittle Floyd. For example, Agent Johnson tells Floyd words to the effect of that his "balls . . . must be as big around as a pinhead, because you ain't got it, slick, and you call yourself a man? A man? Not in my fucking lifetime."  *This tactic is highly unethical, especially in an interrogation of a suspect.* |
| 2:35 | Agent Johnson calls Floyd "a shithead," tells him he has no dignity, and asks "do you have any balls? Anything called a man inside of you?" *This tactic is highly unethical, especially in an interrogation of a suspect.* |
| 2:39 | Agent Jonson bends down and is face to face with Floyd. *This tactic is highly unethical, especially in an interrogation of a suspect.* |
| 2:54 | Detective Carreno leans forward and is face to face with Floyd. *This tactic is highly unethical, especially in an interrogation of a suspect.* |

| | |
|---|---|
| 2:58 | Agent Johnson tells Floyd that he could prove that Floyd didn't shoot the victim. *This tactic is highly unethical, especially in an interrogation of a suspect, since Agent Johnson could prove that Floyd did not shoot Camille but yet claims that Floyd is involved in the shooting.* |
| | Johnson also berates Floyd and tells him, "you need to grow some balls, because you're down to a pinhead for balls, actually I think you have a pussy down there, no, that's an insult to the female gender." *This tactic is highly unethical, especially in an interrogation of a suspect.* |
| 3:00 | Agent Johnson tells Floyd words to the effect of that "You've lied your whole fucking life about everything, and I'll be goddamned if I want to see your two boys growing up with a low-life piece of shit, lying, pin-pointed balls person." *This tactic is highly unethical, especially in an interrogation of a suspect.* |
| 3:08 | Agent Johnson indicates that he lies under oath in court when identifying criminal defendants. *This tactic is highly unethical and is coercive, especially in an interrogation of a suspect, in that it implies to the suspect that the agent is willing to lie under oath to implicate the suspect.* |
| 3:12 | Agent Johnson tells Floyd that he doesn't deserve to have two kids. *This tactic is highly unethical, especially in an interrogation of a suspect.* |
| 3:37 | Agent Johnson stands behind Floyd with his hands on Floyd's shoulders and keeps talking to him. *This tactic is highly unethical, especially in an interrogation of a suspect.* |
| 3:42 | Agent Johnson tells Floyd that he has no business being a father. *This tactic is highly unethical, especially in an interrogation of a suspect.* |
| 4:09 | Agent Johnson skips around the rooms and then sits down. *This tactic is highly unethical, especially in an interrogation of a suspect.* |
| 4:11 | Another detective comes into the room and begins to interrogate Floyd. *After 4 hours of being interrogated, another detective comes into the room as a fresh interrogator but yet Floyd is not offered a break.* |

Attorney Ruth Brown
Re:  Floyd Bledsoe
Page 15 of 17
April 23, 2023

| | | |
|---|---|---|
| 4:29 | | Detective Carreno comes back into the room. |
| 5:06 | | Floyd is told that he can go to Camille's visitation and see her with a clear conscience if he tells her side of the story.   *This tactic is highly unethical, especially in an interrogation of a suspect and could cause an innocent person to confess to a crime that they did not confess.* |
| 5:31 | | Floyd is told that he can see Camille and when he sees her that he can see her with a clear conscience.   *This tactic is highly unethical, especially in an interrogation of a suspect and could cause an innocent person to confess to a crime that they did not confess.* |
| 5:47 | | Another detective comes into the room with a photo of Camille. Floyd is asked if he wants to see Camille.   *This tactic is highly unethical, especially in an interrogation of a suspect.* |
| 6:05 | | Floyd is told that he can go see Camille and is promised that if he tells Camille's story then he would take Floyd down there.   *This tactic is highly unethical, especially in an interrogation of a suspect and could cause an innocent person to confess to a crime that they did not confess.* |
| 6:12 | | The video abruptly ends. |

Overall opinion regarding the video of the post-polygraph interrogation of Floyd Bledsoe on November 12:

It is the opinion of this expert that the interrogation of Floyd Bledsoe was highly unethical and could have caused an innocent person to confess to a crime that they did not commit.

Nonetheless, it was documented by this expert that Floyd made some form of a denial at least 99 times such as he was telling the truth; that he was being honest; that he didn't hurt her; that he had no knowledge of what happened to Camille; that he wasn't there; and that he didn't know what happened to Camille.

This expert observed that the interrogation of Floyd continued for many hours and then the video abruptly ended. It is unknown as to the reasons why the video was cut off. It is clearly unprofessional that the video was cut off and it is unknown what was said to Floyd regarding the shooting of Camille after that video was cut off.

## SELECTED TRAINING AND EXPERIENCE

The expert reviewing this information was trained at John E. Reid & Associates in November 1979-May 1980 and was trained how to conduct and interpret polygraph examinations. The opinion is strongly based on my experience in conducting over 25,000 polygraph exams of individuals in a variety of cases as well as the following:

Selected by the Caribbean Regional Security System to conduct 40 hours of polygraph refresher training. March 2023

Selected Subject Matter Expert-Polygraph Examiner; British National Crime Agency, provide polygraph vetting for police officers. October 2017/2018

Selected Subject Matter Expert-Polygraph Instructor; Baghdad, Iraq, providing polygraph instruction to Intelligence Officers on behalf of the US Government – Jan-April 2008

Selected Subject Matter Expert-Polygraph Examiner; Drug Enforcement Agency, Counter Narcotics Police-Afghanistan—February & March 2007

Approved Polygraph Examiner for the Georgia Department of Community Services to conduct Post Conviction Sex Offender exams.

Chairman of the Board, American Polygraph Association, September 2010-September 2011
Elected Life Member, American Polygraph Association, September 2010

President, American Polygraph Association, August 2009-September 2010

President-Elect, American Polygraph Association, August 2008-August 2009

Board of Director, American Polygraph Association, August 2000-August 2008

## POLYGRAPH TEACHING

Served as a School Director for three (3) accredited American Polygraph Association training facilities. Has also been a guest instructor for a number of other APA accredited schools. Selected Subject Matter Expert-Polygraph Instructor; Baghdad, Iraq providing polygraph instruction to Intelligence Officers on behalf of the US Government. Have taught numerous polygraph training classes for the American Polygraph Association, State Polygraph Associations as well as other professional organizations.

My curriculum vita is attached to this report.

Attorney Ruth Brown
Re:  Floyd Bledsoe
Page 17 of 17
April 23, 2023

I have testified in the following cases since 2019:
Deposition in Amor v. Cross, No. 18-CV-02523 (Northern District of Illinois)

My work in connection with this case is billed at $225/hour. The fee for any type of testimony is $1,500 per day plus travel expenses. These are my standard consulting rates at the current time.  As of the time of this report, I have worked 53 hours on the case to date.

My opinions are based on the materials above, and I reserve the right to amend my opinions as new information is brought to my attention.

Sincerely,

*Daniel E. Sosnowski*

Daniel E. Sosnowski, M.S.

DES/ms