# EXHIBIT 27

# David L Harvey, MPA
## Criminal Justice Consultant

Russell Ainsworth
Loevy & Loevy
311 N. Aberdeen St, 3rd Floor
Chicago, IL 60607

Re: Floyd S. Bledsoe v Jim Woods; Terry Morgan; Michael Hayes; Jeffrey Herrig, in his individual and official capacity; and unknown officers of the Kansas Bureau of Investigation

In response to your request, I understand that I have been retained to offer my expert opinions pursuant to Rule 26 (a)(2) (B) of the Federal Rules of Civil Procedure. I submit this report at the request of the Plaintiff.

## Qualifications of the Expert

I am an Assistant Adjunct Professor at Madonna University, Livonia Michigan in the Criminal Justice Department. I currently teach in the Graduate and Undergraduate levels with courses to include Advanced Criminal Justice Administration and Juvenile Justice. I have previously taught criminal Investigations, report writing and others over the past 20 years. I am a retired law enforcement officer, Police Chief, and in-service trainer with specialties in firearms, ethics, criminal investigations, juvenile justice, report writing, and police administration, among others. I am also the former Executive Director of the Michigan Commission on Law Enforcement Standards (MCOLES) and oversaw the selection and licensing of all police officers in the State of Michigan which included oversight of all twenty police academies in the State. My expertise is outlined in my curriculum vitae, which is attached as Appendix A.

I have experience as a criminal investigator in both the military and civilian law enforcement. I have graduated from the US Army Military Police Investigations school. I graduated from several criminal investigation schools as a civilian law enforcement officer and was trained as a crime scene evidence technician. I conducted investigations as a Military Police Investigator from 1978-1980 with responsibilities for all violations of the Uniform Code of Military Justice as well as local criminal codes. These investigations included assaults and serious assaults in conjunction with the Criminal Investigations Division. As a civilian law enforcement detective I had responsibilities for all violations of Laws and Ordinances in the State of Michigan and City of Garden City Mi. These investigations included Homicides and felonious assaults.

## Methodology

Based on my education, training, and experience, I review the materials provided to me and evaluate the investigation against the standard techniques for police investigations in 1999; i.e., how reasonably trained officers would have conducted this case using generally accepted approaches to criminal investigations.  I also consider the written policies and procedures of the applicable police department and relevant testimony about training.

# David L Harvey, MPA
## Criminal Justice Consultant

**Materials Reviewed**
Complaint
Depositions;
        James Woods
        Randy Carreno
        Jim Vanderbilt
        Troy Frost
Preliminary Hearing Transcript
Bledsoe Criminal Trial Transcript
KBI Reports
KBI Field Notes
Jefferson County Sheriff's Reports
Jefferson County Field Notes
Tom Bledsoe Suicide notes
Telephone contact log
Johnson polygraph notes
Tom Bledsoe interrogation reports and videos
Floyd S Bledsoe Interrogation reports and videos
IACP criminal Investigations ISBN 0-8403-7933-1

**Factual Background**

On November 5th, 1999 Robin Meyer arrived at the residence of Zetta Camille Arfmann to pick her up to travel to Oskaloosa to eat. Robin knocked on the door and after getting no answer, she stepped inside and found Zetta to not be present. Myer reported this to Floyd S Bledsoe. At 12:50 am on 11-6-99 Heidi Bledsoe had contact with Deputy Mark Doud to report Zetta, who is her sister ,missing. Heide stated that Zetta lives with her and her husband, Floyd Bledsoe. She stated that Zetta attended Oskaloosa school and rode the bus to and from school. Heidi stated that Zetta was scheduled to attend services at the Countryside Baptist church after school on November 5th but failed to arrive at the church. (Deputy Doud field notes pg. 1)

 On 11-6-99 Detective Sergeant Randy Carrreno had contact with Sgt Robert Poppa about Zetta being reported missing. Sgt. Poppa also stated that Floyd S. Bledsoe contacted him the morning of November 6th at Caseys General store in Oskaloosa. He stated that Floyd expressed concerns that Zetta could have been abducted from their residence. (Carreno report page 1-2.)

On 11-6-99 D/Sgt Carreno interviewed Floyd S. Bledsoe at his residence. Floyd stated that Zetta is the sister of his wife, Heidi Bledsoe, and that Zetta had been missing since last night.

# David L Harvey, MPA
## Criminal Justice Consultant

Floyd stated that Zetta never arrived at Church and didn't return home or go to her Mother's residence on Friday night.  Floyd stated that Zetta wasn't the type of person who would leave the residence without telling anyone.  Floyd stated that he had talked to Zetta's best friend, Robin Meyer who would occasionally pick up Zetta to go to Oskaloosa to eat.

Detective Sgt. Carreno interviewed Robin Meyer who stated she was at Zetta's residence at between 5:00-5:15 pm on Friday.  She stated that she walked in and yelled for Zetta and saw Zetta's school bag and coat on the couch in the living room.  She stated that she did not get a response and was in the residence approximately 2 minutes then leaving assuming Zetta was with her mother.  (Carreno report Pg 3).

On November 7th 1999 Tom Bledsoe left two messages on the telephone recorder of James R Bolinger. The telephone messages stated that he knew where Camille was at, that he was going to turn himself into the police. Tom also stated that he knew he would have to pay for the rest of his life.  Tom asked to be forgiven and wished he could turn the clock back but knew he couldn't.

Deputy Heather Kyle responded to the residence of Tom Bolinger to gather his information and tape the recorded messages.  (Kyle Report)

On 11-8-1999 Tom Bledsoe and his attorney, Mike Hayes, led officers to Zetta's body which was buried in an open field behind Tom's house. (Carreno Report pg. 9).   Tom Bledsoe is arrested after returning to the Sheriff's department with Hayes.

Zetta's body was located and removed from the scene.  An autopsy revealed that Zetta died as a result of multiple gunshot wounds (Eric K Mitchell, MD report 11-8-1999).

Numerous items of evidence were taken from the scene.  Eventually a list of evidence was sent to the KBI lab for testing.  Later a memo was sent for the lab to disregard all previous memos on which items to test and to only test the new list.  Missing from the new list to test is a black shirt located at the burial scene with no explanation.  (Jefferson County memo to KBI -Lab with No date.  SA Woods report states the memo was delivered 12/2/99)

Special Agent Woods of the Kansas Bureau of Investigation was assigned to the investigation.  By his testimony he was involved in all aspects of the investigation.  Woods was present when Tom Bledsoe and his attorney arrived at the Sheriff's office and at the burial site of the victim.  He testified in his deposition that this was the only time that he witnessed the suspect being with the police then being driven to the crime scene then driven back to the sheriff's department before being arrested. (Woods Deposition pg. 112) Woods was also involved at the burial scene and present when evidence was collected specifically a black shirt containing the words Countryside Baptist church.  He testified that he did not know why the shirt was not sent to the lab for testing. (Woods Dep. pg. 149)


On 11/8/99 SA Morgan of the KBI interviewed Floyd at the Sheriff's office.  Floyd detailed his activities during that day beginning with getting Camille up for school.  He states that at approximately 4:00 Pm

# David L Harvey, MPA
## Criminal Justice Consultant

he left for the hardware store to get Duct tape for Richard Zule who owns the Dairy where Floyd works. At approximately 4:15 Floyd stated that he saw Camille's bus turning west onto Fairview Rd.  After arriving at the hardware store he purchased the duct tape and sweat shirt for himself.  He arrived back at the Dairy at 4:45to 4:50 pm Morgan report (11/8/99).  The time on a receipt from the purchase Floyd made was 5:30 and later the register clock was found to be 57 minutes fast due to not being changed for daylight savings time and the actual time was 4:33. That leaves 12 minutes for Floyd to travel home, abduct Camille, rape her, murder her and dispose of her body then return to work.  Detective Carreno even questioned this time in his deposition ( pg. 238) Although Carreno never discusses this with the Prosecutor or follows up as to how this could have happened in that time frame or determine that it could not have been possible. Morgan later documented the travel time from the hardware store to Floyd's home to Zule's dairy farm as being 21 minutes, or 24 minutes if 3 minutes were spent at Floyd's home.

Search Warrants are conducted at Floyd's house and vehicle.  No immediate searches are made at Tom's residence or vehicle until after he is released from custody after the focus changes to Floyd.

Focus shifts to Floyd S Bledsoe and there is no indication of exactly what transpired other than Tom changing his story that shifted the focus to Floyd S Bledsoe.  Certainly a trained investigator would have to consider the new story as any statement made by the defendant.  However an in-depth investigation would then be made into the new statement to verify it.   There is no attempt to verify the story of Tom implicating his brother.

The result of the investigation resulted in three counts, Murder in the 1st degree, Aggravated Kidnapping and Aggravated Indecent Liberties With a Child.  On November 29, 1999 a Preliminary hearing was held on all three counts.  District Magistrate Judge Dennis L Reiling of the Second Judicial District, Jefferson County bound Floyd S Bledsoe over on all three counts.

On April 4, 2000, a jury trial was held on all three counts and the Jury found Floyd S Bledsoe guilty on all three.  Floyd S Bledsoe was subsequently sentenced to life in prison for the murder and 16 additional years for the two other counts.

In 2015 after Floyd S Bledsoe had requested further DNA testing it was determined that Tom Bledsoe was the likely source of the semen found on a vaginal swab from the victim and excluded Floyd S Bledsoe.

On December 15, 2015, the court vacated Floyd S Bledsoe's conviction and the Jefferson County Attorney dismissed the charges.

### Tom's  confession and suicide

After DNA testing exonerated Floyd S. Bledsoe, Tom Bledsoe committed suicide.  Hand written notes were left.  The notes state that Tom sent an innocent man to Prison.  The Jefferson County Police and County Attorney Jim Vanderbelt made him do it.  The notes state he was told by Vanderbilt to keep his

David L Harvey, MPA
Criminal Justice Consultant

mouth shut.  He states that he had sex with and killed Camille on November 5, 1999.  The note details the events leading up to Camille's death, including where a missing fourth bullet casing could be found, and ends by stating the Floyd S Bledsoe is innocent and Thomas E Bledsoe is guilty.

**Deviations from Standard Police Practices**

1. No follow up on Tom's changed story to determine validity.  An experienced investigator would know that persons charged with crimes could try to place the responsibility on others to save themselves from prosecution.  In this case Tom Bledsoe admitted to knowing where Camille's body was, apologized for his involvement, confessed this on 4 occasions to a person he attended church, his parents and the police, his attorney produced the murder weapon which had been purchased by Tom and Tom led the police to Camille's body.  Tom was placed under arrest as he should have been, but soon after changed his story and implicated his brother.  Certainly, an investigation into his story should have been initiated as it relates to his brother, however, good investigative technique would have been to first to determine the truthfulness of Tom's changed statement.  Nothing was begun in this regard and an immediate investigation began into Floyd S. Bledsoe.  Investigators working homicide cases in 1999 knew that people facing incarceration (especially for murder, and especially when they have confessed to the crime) have a strong incentive to provide information to law enforcement in hopes that they would have the charges against themselves dismissed or reduced. This potential benefit presented very strong motivation, because no amount of money could buy the ability to have criminal charges dismissed. Investigators, therefore, knew that the incentive to obtain leniency on pending charges made information from incarcerated people potentially unreliable, and thus corroboration is critical to determine the reliability of any information provided.

2. Given this, I would expect the detectives investigating the Arfmann homicide to take the following steps to assess the reliability of Tom's assertion that Floyd confessed to him:
   a. Determine how Floyd could have known where Tom's gun was located in order to take it and put it back without Tom knowing.  A trained investigator would have challenged Tom on how Floyd could have known that weapon was behind his driver's seat. Inquired as to if he leaves his vehicle unlocked regularly and whether there were any signs of a break in, and determined if he had had any conversations with Floyd about where he keeps his guns.
   b. Question Tom about when and where he encountered Floyd to hear his confession. When Floyd asked Tom the rather obvious question when the roadside encounter happened, Detective Carreno's response was to say "who gives a shit what time it happened." That would be the exact opposite reaction of any detective who was seeking to determine the reliability of Tom's statement and to determine the truth.
   c. Not tell Tom when Detective Carreno was with Floyd when determining when the roadside encounter happened. According to Carreno's trial testimony, he "helped" Tom remember when the encounter happened by telling him when he was with Floyd on

# David L Harvey, MPA
## Criminal Justice Consultant

Saturday, November 6. A detective would know not to feed information to Tom that might help him find a time that did not conflict with when Floyd was with Carreno. Detectives are trained and know from experience that they should hold back non-public information known to the police when interviewing suspects and witnesses. That way, the detective is trained to compare the information provided by the suspect with the information known to the police. If the police tell the suspect the information, it defeats the purpose of trying to assess the reliability of the information provided by the suspect.

d. Determine how Tom's description of when the roadside encounter changed from after 2 pm (as stated to Johnson during the polygraph) to between 1:30 and 2 (as stated during Floyd's interrogation on November 12), to between noon and 1.

e. Interview Tom extensively. The only interview conducted of Tom before he was released from jail was apparently performed by KBI agent Johnson. I would have expected that detectives assigned to the case would have interviewed Tom as well, and to record that interview, so as to explore Tom's story with him. Detectives assigned to the case should have been the ones to interview Tom because they would have the most information about the case, which is important when interviewing a suspect in a homicide because only the detectives assigned to the case have the knowledge to effectively conduct an interrogation. Furthermore, if Tom refused to be interviewed, Detectives are trained to document that refusal and how it was communicated (such as whether the suspect invoked his right to silence or counsel or simply refused to speak).

f. Interview Tom on November 14; according to the field notes, Tom's attorney Mike Hayes consented to an additional interview of Tom on November 14. A reasonably trained detective would have jumped at the opportunity to question Tom further about his story, including about why Tom told law enforcement that Arfmann was dead and where she was buried when, according to Tom's initial story, Floyd had threatened him to not tell what happened.

g. Preserve Tom's recorded interview conducted on November 12. The interview was apparently captured on video, because there is testimony from a number of people who watched the interview from the conference room of the law enforcement center. No recording of that interview, however, exists. The interview should have been recorded and the recording preserved, consistent with the policy for the Jefferson County Sheriff's Department.

h. Determine whether Tom's statements about what he learned during the roadside encounter with Floyd accounted for the information that Tom and/or his attorney provided to police the night that Tom turned himself in. According to Johnson's notes from the polygraph, Tom stated that he "believes Floyd Bledsoe probably shot the victim, based on actions, what said and what wasn't answered." This information contradicts Tom's report the night of November 7 when he informed police that the victim had been shot in the head. I would expect detectives to follow up on how Tom knew that the victim had been shot in the head based on his conversation with Floyd.

## David L Harvey, MPA
## Criminal Justice Consultant

3. Tom should have been placed under arrest at the Jefferson County Sheriff's Department and transported to the scene by the Police.  Instead, he was allowed to ride with his attorney in a separate vehicle.  Basic investigative police practices would do this to prevent Tom from fleeing or possibly tampering with evidence.  There is later testimony that the Attorney, Mike Hayes, was a well-respected and liked attorney by the Police.  This relationship in no way justifies the mishandling of a defendant and potential evidence.

4. Additionally, the defendant was transported back to the Sheriff's office by his attorney.  Again the defendant should have been placed under arrest at the scene after the police located the body of the victim and the Defendant's attorney turned over the murder weapon.  I can find no reason that a well-trained police officer let lone investigators from two different agencies who were at the scene would allow this to occur and risk losing evidence or possibly allow for the escape of the defendant.

5. Hayes accompanying the Sheriff to Floyd L Bledsoe's home to confiscate his weapons.  Hayes is the Court Appointed Attorney for Tom Bledsoe and is involved in the police investigation acting in the capacity of an investigator and not just on behalf of his client. This is contrary to any standard policing protocol. Detectives take pains to ensure that their investigations are objective and unbiased. Allowing Hayes to be present for the carrying out of a search of a suspect's home might give the appearance that Hayes is influencing the investigation, which is something detectives would take pains to avoid. Moreover, detectives cannot know what they might find when they search a home; revealing the evidence to a suspect's attorney would be counter to accepted police practices. Detectives want to control the information transmitted to suspects; having the suspect's attorney present would defeat that purpose. In addition, police are trained in proper evidence collection and handling procedures; allowing third parties to collect evidence is contrary to standard police procedure.

6. Attorney Hayes acting as an investigator is very troubling.  Not only is he allowed to assist in the confiscation of possible evidence, he is allowed into the interrogation of Floyd S Bledsoe along with his client, Tom Bledsoe.  Hayes is also allowed to take over the interrogation from the detectives.  Hayes is the attorney representing Tom Bledsoe who was the initial suspect in this case.  There exists no training and or procedure that allows for a suspects attorney to not only be present but take over the interrogation of another suspect.  This is a definite conflict of interest for Hayes as well as the detectives.

7. Search Warrant affidavits were incorrect.  Detective Frost provided an affidavit that stated the victim was abducted between 4:20 pm and 5:00 pm which is close to correct (the actual end time was between 5 and 5:15 pm according to Myers).  However, he states that Floyd S. Bledsoe left the hardware store at approximately 4:20 and arrived at work at the dairy farm at 5:00 pm. That information was not correct as Floyd left the hardware store between 4:30 to 4:35 pm (according to Frost's own testimony) and arrived at work between 4:45 and 4:50.  Richard Zule who owns the Dairy Farm stated Floyd returned from the hardware store at 4:45. Sherri Zule stated that Floyd was gone approximately 40-50 minutes after leaving the farm at 4:00 pm. ( Morgan Report November 10th.)  The false information about Floyd's activities happened to coincide with the window of time presented to the judge as the time the victim was abducted

Municipal Accountability Consultants
PO Box 2020, Howell Mi. 48844
dave@macexpertllc.com

## David L Harvey, MPA
## Criminal Justice Consultant

(4:20 pm to 5 pm). A detective is trained to be accurate in providing information to a judge in a search warrant, because he or she knows that a judge will act on the information provided. According to the record, Detective Frost and CA Vanderbilt spent several hours compiling the affidavit, so the errors are not the result of being rushed. Further, detectives are trained to provide a complete factual record of the evidence when a judge is being asked to sign a search warrant. Detective Frost should have included all information about Tom's confessions on a tape recording, to his parents, the police, and during a subsequent polygraph.  Also there was no mention of the fact that Tom owned and produced the murder weapon and that the victim was buried behind the house where he lived.  These facts should have also been included.

8. All evidence should be evaluated for forensic examination.  Both Special Agent Woods and Detective Carreno agreed in their respective Deposition that the shirt found next to the victim that was taken from the scene and placed in evidence should have been sent to the lab for testing for DNA.  Neither can explain why the shirt was on the original list of items sent to the lab was to be tested then a follow up memo to the lab requested all previous requests for testing be cancelled and only test the new list which did not contain the shirt.  This would be a serious deviation in investigative practice as the shirt did not appear to belong to the victim and the likelihood of this either belonging to or having been handled by the killer is very high. If the investigators were truly uncertain about Tom's guilt, testing the Countryside Baptist Church shirt (which was the church that Tom belonged to) could have provided forensic evidence to help answer the question.

9. Tom was interviewed and there is no recording of his initial interview as well as his changed statement which caused the focus to shift to Floyd.  Police practice in 1999 as it is today requires that the confession be recorded in some manner whether written, audio , video or a combination  (IACP Criminal Investigation pg. 114).

10. Senior Special Agent Woods received a host of relevant information documented in his field notes that was never turned over to the prosecution or the defense. Police officers are trained that all relevant evidence, regardless which side it might support, must be preserved and made available to the prosecution and the defense in any subsequent prosecution. Woods testified that he knew his notes would not be turned over to the prosecution or the defense, and that it was his responsibility to document information he learned during the investigation in a formal report in order for the information to be available to others. Given those constraints, a detective with Woods' experience and training would have ensured that the following information was documented in a formal report and preserved for use by the prosecution and the defense: the timeline attributed to Mike Hayes that purports to account for Tom's whereabouts the weekend of the murder, including that Tom was at Rusty's Outdoor Sports in Lawrence at 3:40 pm and that he was home in Oskaloosa between 4:40 and 4:45 pm (Exhibit 135); information that Tom had claimed he tried to have sex with the victim in his truck, she laughed and he shot her, and that the victim was not killed where she was buried per Tom's attorney, and that Tom confessed during the polygraph examination (exhibit 8); information that Tom's truck was used to transport the victim while she was alive, and that there was some type of romance between Arfmann and Tom, and that Tom was afraid that the victim would accuse him of trying to have

Municipal Accountability Consultants
PO Box 2020, Howell Mi. 48844
dave@macexpertllc.com

# David L Harvey, MPA
## Criminal Justice Consultant

sex with her (Exhibit 133); as well as the information a ricochet hitting Arfmann and then she was shot more so she wouldn't suffer. (Exhibit 134). All of this information should have absolutely been documented in an official report and followed up on as a bare minimum of what a detective would do to investigate this homicide.

11. Likewise, Special Agent Johnson received information contained in his field notes of his interview with Tom that are not contained in his official report. In his field notes, Johnson reported that Tom was at home until about 2 p.m. on Saturday, November 6, and then left for work and was stopped by Floyd along the road to work. But Johnson's report was silent about when the roadside encounter occurred. Standard police procedure indicates that if a homicide suspect tells police that they actually learned about the homicide from someone else, police should document when that conversation occurred. This would have been critical information to police investigators, because Floyd was with Detective Carreno after 2 p.m. on that Saturday.

12. The information in Woods' notes from Mike Hayes stating that Tom left Rusty's Outdoor Sports at 3:40 pm and returned to Oskaloosa at 4:40 or 4:45 pm would have been apparent to Woods that it was extremely important information to the investigation. This would have placed Tom in position to have abducted Arfmann in the 4:20 to 5:00-5:15 timeframe in which she went missing. This information should have been shared with other investigators on the team, particularly Detective Carreno, who interrogated Tom. Had the information been shared with Carreno, I would have expected that the discrepancy about when Tom left Lawrence and arrived in Oskaloosa would have been explored with Tom during his interrogations.

13. When detectives learned that part of Tom's alibi was that he went to the Oskaloosa bank Friday afternoon, they should have obtained records from the bank to establish if Tom went to that bank on November 5 and, if so, when he was there.

14. At the scene of the murder, officers should have looked to locate anything that might have been used to bury the victim. When Tom referenced a shovel being at the burial site, detectives should have attempted to inventory that shovel so that it could be subjected to forensic testing. The failure to conduct any investigation to find the shovel was contrary to what detectives commonly do during a homicide investigation.

15. Had Floyd truly told Detective Frost that he went to his home during the timeframe that Arfmann was abducted, this would have been a huge revelation and I would have expected any detective to follow up on that information and document it thoroughly. In his interrogation of Floyd, Detective Frost was repeatedly trying to get Floyd to provide some information about the crime, and then use any admission he made to see if Floyd would implicate himself further. (Frost deposition pp. 116-117). I would expect that if Floyd had told Detective Frost that he had admitted going to the trailer during the timeframe that the victim went missing, Detective Frost would have documented that admission in a report and followed up on the admission during the interrogation to see if Floyd would implicate himself further in the crime. To, as Detective Frost testified, only ask Floyd one question about his critical admission that he was at the trailer during the time Arfmann went missing and not raise it again would go against any detective's experience and training. In my review of Frost's interrogation of Floyd, Frost repeatedly raised other issues with Floyd in an effort to get Floyd to divulge more information. There is no law

# David L Harvey, MPA
## Criminal Justice Consultant

enforcement explanation for why Frost would follow up with Floyd about everything except his supposed admission that he went to the trailer during the late afternoon on Friday, November 5.

16. When Senior Special Agent Woods discovered that a) Tom was at Rusty's Outdoor Sports at 3:40 pm; b) Tom had a receipt from Rusty's dated 11/5/99 at 4:30 pm; and c) 2 of the registers at Rusty's were running 45 minutes fast, to a detective this would have suggested the possibility that the receipt was from a register that ran 45 minutes fast, which might have corroborated Hayes' statement that Tom was at Rusty's at 3:40 pm. A detective with Senior Special Agent Woods' experience and training would have pressed for an explanation from the Rusty's employee Feleay as to why he believed the receipt from November 5 was accurate and why he believed the rear register was off because of an unexplained glitch that occurred after November 5.

17. According to Hayes, he had the murder weapon while he was at the law enforcement center. According to Woods' field notes, he knew that Hayes had the murder weapon. (Exhibit 133). That gun, however, was not obtained from Hayes until 1:44 am, an hour after police arrived at the scene of the burial site. This is a departure from common policing methods. If there was a reason that the gun could not have been inventoried sooner, that explanation should have been documented in an official report.

18. According to Detective Carreno's field note, dated November 7 at 11:38 pm, and prior to the victim's body being recovered, Sheriff Dunnaway told him that Tom Bledsoe "had admitted to being involved" and that the victim "was in a field with a bullet to the head." (Exhibit 71). This information should have been documented in an official police report, including exactly what Tom or his attorney said and how the police learned this information. Similarly, Carreno's report references a report from Dunnaway about what happened at the station the night that Tom turned himself in. Dunnaway's report apparently no longer exists and I see no record that it was ever transmitted to the prosecutor or the defense or the official file for the Arfmann homicide. This is a stark departure from standard police practices. Such a critical report should be created and preserved and its absence should have been noted and explained in the file.

19. Given that investigators believed that Arfmann moved from Floyd's trailer to the location where she was buried, investigators should have searched Tom's truck immediately upon learning that he was a suspect in her murder. This is an extremely basic step in policing. Detectives knew to do this, given how thoroughly they searched Floyd's car, and documented the results of that search. If Tom's truck had been searched, the results of the search should have been documented in an official report, regardless whether anything of evidentiary value was recovered, and what was searched and how the truck was searched should have been documented. This is especially true given that Senior Special Agent Woods learned that Tom had possibly transported the victim in his truck while she was alive, and that he may have had sex with the victim in his truck.

20. Likewise, investigators should have searched Tom's house as soon as practicable, and certainly before Tom was released from custody. Investigators are trained to search locations such as a suspect's home as soon as possible in order to preserve any evidence that might be contained in

# David L Harvey, MPA
## Criminal Justice Consultant

the location. A basic search of Tom's house should have included all areas of Tom's house, not just Tom's bedroom, and included boxes contained in the home even if they were stated to have been in the home for a long time. I know of no law enforcement reason for not searching Tom's house until after he was released from jail, and then only searching a portion of his bedroom for approximately half an hour. This is contrary to commonly accepted law enforcement procedure.

21. Detectives know from training and experience that a polygraph exam is an investigative tool, but not something that can determine guilt or innocence by itself. Even if Floyd flunked the polygraph test and Tom passed, I would expect the investigators to continue to investigate Tom's guilt.

22. Based on the evidence compiled by the Arfmann homicide investigators, no investigator would have believed there was probable cause to believe that Floyd was guilty. Investigators are trained to consider all of the evidence, both for and against the suspect's guilt. Given Floyd's alibi (that he left the hardware store at 4:30 or 4:35 pm, returned to work at 4:45 or 4:50 pm, corroborated by three witnesses and a receipt), the evidence against Tom, and the lack of corroboration for Tom's story, no reasonable police officer would have believed there was probable cause to believe Floyd committed a crime.

23. Investigators are trained and know from experience about the dangers posed by tunnel vision. Tunnel vision is a narrow focus that unduly limits the range of alternatives and often results in the elimination of other suspects who should be investigated. Tunnel vision arises from trying to make the evidence fit an investigator's theory, rather than following the evidence wherever it may lead. As a result, events that could lead to other suspects are eliminated from the officers' thinking. This problem arises most frequently when investigators label or frame a crime prematurely, based on incomplete evidence, inaccurate assumptions, faulty beliefs, or untested hypotheses. Investigators are trained to watch out for tunnel vision and avoid it.

24. One example of tunnel vision occurring in the Arfmann investigation comes from the screams heard by Colonel Knoebel. The Colonel reported that the screams came from the west side of the creek near Wildhorse Road, and that the screams came from approximately a mile away from the Zule Dairy. Investigators learned that there was a nearby house where domestic violence occurred frequently. Investigators with the training and experience of the police investigators in this case would have looked to see how far the screams were from Zule Dairy, and would have checked a map to determine the location of the Zule Dairy, and thus would have determined that the Zule Dairy was northeast of the location where the screams were heard. (Affidavit from Bussell). The fact that the investigators disregarded the distance from the Zule Dairy and the direction of the Zule Dairy suggests that the investigators were falling victim to tunnel vision – they were trying to make the facts fit their theory of the crime, rather than following the evidence wherever it might lead them. Moreover, trained investigators would have attempted to interview the occupants of the house where it was alleged that domestic violence was occurring, and documented their attempts to have such an interview and the results.

25. Yet another example of tunnel vision was Sheriff Dunnaway's investigation to determine whether Floyd might have used the Zules' black pickup truck, presumably to determine whether

# David L Harvey, MPA
## Criminal Justice Consultant

it was Floyd driving a black pickup truck seen coming out of the burial site the morning of Saturday, November 6. An alternate and much more logical lead is that it was Tom driving his own black truck out of the burial site behind his home Saturday morning. The fact that the Defendants followed the lead that Floyd might have used someone else's truck rather than consider that Tom used his own truck, suggests again that the investigators were succumbing to tunnel vision.

26. It is extremely important to document all steps that first identified a suspect in a homicide investigation. Investigators are trained and learn from experience that if there are holes in the recorded investigation, those holes might be exploited by a criminal defense attorney looking to cast doubt on the integrity of an investigation. Thus, documentation becomes the key to a sound homicide investigation. Here, Detectives subjected Floyd Bledsoe to an 8 hour interrogation on November 9, the day after Tom confessed and was arrested for killing Arfmann. Detectives did not document why Floyd was interrogated, why they were interested in him as a person of interest, and what evidence existed to suspect him of a crime. This is contrary to basic policing standards. An 8 hour interrogation is extremely lengthy. Detectives tag teamed during the interrogation, meaning they switched off detectives acting as the interrogator. Such an intensive interrogation is only conducted at the end of an investigation once sufficient evidence exists to believe that a suspect is guilty, and even then an 8 hour interrogation with multiple interrogators is extreme. Here, there is no evidence in the record to suggest that Floyd was guilty as of the time that his interrogation began at 8 pm on November 9, 1999. During Tom's polygraph, he again confessed to killing Arfmann. Inexplicably, that fact is missing from Special Agent Johnson's field notes or report regarding his interview with Tom on November 12. This is a stark departure from accepted police practices. If a suspect confesses to murder, the exact words used should be documented as best as possible. Moreover, according to CA Vanderbilt, Johnson then cut off Tom from saying more, and did not follow up. According to Woods' trial testimony, Johnson responded to Tom's confession by telling him that the police didn't believe that he killed the victim. It is completely against accepted police procedure to cut off a suspect from confessing; rather, a detective is trained to listen and encourage the suspect to say more during a confession, so as to gather information that can be used to ascertain the veracity of the confession. Moreover, a detective knows from experience that he or she should never tell a suspect that they do not believe a suspect's confession, even if that were true. Procedure dictates that a detective should nevertheless listen to the confession, and elicit information from the suspect to establish the confession's truthfulness or falsity.

27. The detectives used aggressive interrogation techniques with Floyd Bledsoe in an effort to get him to confess. Specifically during the 11/12/99 and 11/13/99 interrogation sessions Detectives Carreno and Frost continually explored the relationship between Floyd and Camille. This line of questioning lasted over two hours on 11/12/99 and for over 30 minutes on 11/13/99. I agree that understanding the relationship of Floyd with Camille would be important in developing a possible motive for Floyd to be the murderer, however the questioning lasted for a significant amount of time without having any other evidence of a romantic relationship between Floyd and Camille. In contrast there was already evidence that Tom Bledsoe was the person who

# David L Harvey, MPA
# Criminal Justice Consultant

killed Camille based on his confessions, providing the murder weapon and leading police to the location of the body.  Additionally, there was evidence from statements made by Tom of his sexual behavior.  Yet there was no focus on a possible relationship between Tom and Camille.  I would have expected to see as intense if not more intense interrogation of Tom in this aspect.

28. Similarly, I would expect that an investigation into the murder of a 14 year-old girl found with her breasts exposed would have included investigation to determine if there were prior reports of inappropriate sexual behavior with underage girls. On November 8, 1999, Detectives learned that the Pastor at Countryside Baptist Church, Jim Wagoneer, reported that Tom Bledsoe had been flirting with his 15 year-old niece. No follow-up was conducted to investigate that lead. I would have expected a detective assigned to the Arfmann homicide would have learned the name of the 15 year-old girl and attempted to question her, to determine if Tom had engaged in sexual misconduct with a minor previously, and if he had committed other crimes.

29. I believe that the detectives acted appropriately to investigate whether the pumping well might have some evidence relevant to the crime. That said, given that no evidence related to the crime was discovered there, and Gary Bledsoe's confirmation that he asked Floyd to have it filled, I do not believe that Floyd's desire to have the well filled suggests that Floyd was guilty of the Armfann homicide.

30. I note that County Attorney Vanderbilt referenced an attempted interview of Cody Bledsoe during the pendency of the Arfmann homicide investigation. I see no documentation of that attempted interview. Had such an interview occurred, I would expect that any detective present would have documented the interview, including listing the date, time, location, and persons present for the interview, as well as a summary of the substance of the interview. I expect this would occur even if the detective was simply witnessing the interview and not taking direct part in the interview.


**Conclusion**

**I find that The Jefferson County Detectives as well as the Kansas Bureau of Investigation failed to conduct an adequate investigation.  Specifically there was no continued investigation into Tom Bledsoe even though he confessed to his involvement with the murder of Camille on three occasions, bought the murder weapon and ammunition, supplied that weapon to the police and led police to the body of Camille.  The investigation swiftly shifted to Floyd S. Bledsoe based solely on a changed version of Tom's confession to the police which implicated his brother.  It is not that either agency did not have the expertise to investigate as they conducted a very thorough investigation into Floyd S. Bledsoe conducting search warrants of his residence and vehicle very soon after the allegation by his brother.  Intense interrogation techniques were utilized on Floyd to try and get him to confess.  There was no immediate search of Tom's residence or vehicle which allowed for the possibility of evidence being tainted.  Specifically it was believed that Camille was not murdered at the location where her body was found thus there was a strong possibility that blood or other evidence may have been discoverable depending upon how her body was conveyed.  There was no intense interrogation of**

# David L Harvey, MPA
## Criminal Justice Consultant

Tom Conducted, specifically to explore the new facts that he relayed about his brothers involvement most importantly how Floyd would even know how and where to get Toms gun and place it back after the murder.  Finally Attorney Hayes had a large involvement in the investigation being allowed to be in the interrogation of Floyd and basically take over the interrogation at one point while still the attorney for Tom.  Additionally Hayes was allowed to transport Tom in his vehicle to the burial site when proper procedure would have been for Tom to have been placed under arrest after his confessions to the Pastor , and to the police.   Also Sheriff Dunaway allowed Hayes to accompany him to the fathers residence Floyd L. Bledsoe, to confiscate his weapons.  I know of no instance where the defense attorney for one suspect would be allowed such access to the investigation of another suspect.  It would be safe to consider that the Attorney would only be working on behalf of his client and not the other defendant as well as the police and thus leaves open the accusation that the attorney manipulated and or tampered with evidence to include testimony.


_____

David L Harvey                                                          Date: April 19, 2023

# David L Harvey, MPA
## Criminal Justice Consultant

ATTESTATION

The statements made in this report are true and correct to the best of my knowledge and I offer these opinions to a reasonable degree of professional certainty. If asked to testify, I could testify consistently with the opinions offered in this report. This report is signed under penalty of perjury pursuant to 28 U.S.C. § 1746 on this 7th day of December 2022.

_____

David L Harvey                                    Date: April 19, 2023

Municipal Accountability Consultants
PO Box 2020, Howell Mi. 48844
dave@macexpertllc.com

15