# EXHIBIT 39

2/20/2023 **TROY FROST** 1

1  .

2              IN THE UNITED STATES DISTRICT COURT

3                  FOR THE DISTRICT OF KANSAS

4  .

5  .

6  FLOYD BLEDSOE,

7          Plaintiff,

8  .

9      vs.                    Case No. 2:16 CV 02296

10  .

11  JEFFERSON COUNTY, KS, et al.,

12          Defendants.

13  .

14  .

15                      DEPOSITION OF

16                      TROY FROST,

17  taken on behalf of the Plaintiff, pursuant to

18  Amended Notice of Deposition, beginning at 9:35

19  a.m. on the 20th day of February, 2023, at the

20  offices of Appino & Biggs Reporting Service, 5111

21  S.W. 21st Street, in the City of Topeka, County of

22  Shawnee, and State of Kansas, before Barbara J.

23  Hoskinson, Certified Court Reporter, Kansas

24  License No. 0434 and Missouri License No. 999.

25  .



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

```
 1                           APPEARANCES

 2    .

 3    .

 4  ON BEHALF OF THE PLAINTIFF:

 5    .

 6        Mr. Russell Ainsworth (video conference)

 7        Ms. Ruth Brown (video conference)

 8        Loevy & Loevy

 9        311 N. Aberdeen St., 3rd Floor

10        Chicago, Illinois, 60607

11        312-243-5900

12        russell@loevy.com

13        ruth@loevy.com

14    .

15    .

16  ON BEHALF OF THE DEFENDANTS FROST, CARRENO,

17  HERRIG, POPPA & JEFFERSON COUNTY:

18    .

19        Mr. Eric Turner

20        Foulston Siefkin, LLP

21        7500 College Boulevard, Suite 1400

22        Overland Park, Kansas, 66210

23        913-498-2100

24        eturner@foulston.com

25    .
```



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# TROY FROST

1        Mr. Michael J. Norton

2        Foulston Siefkin, LLP

3        1551 N. Waterfront Pkwy, Suite 100

4        Wichita, Kansas, 67206

5        316-267-6371

6        mnorton@foulston.com

7    .

8    .

9    ON BEHALF OF THE DEFENDANT VANDERBILT:

10   .

11       Mr. Patric S. Linden

12       Case Linden, PC

13       2600 Grand Blvd., Suite 300

14       Kansas City, Missouri, 64108

15       816-979-1500

16       patric.linden@caselinden.com

17   .

18   .

19   .

20   .

21   .

22   .

23   .

24   .

25   .



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# TROY FROST

```
 1   ON BEHALF OF DEFENDANTS MORGAN, WOODS,

 2   JOHNSON ESTATE:

 3   .

 4         Mr. Shon Qualseth

 5         Assistant Attorney General

 6         120 SW 10th Ave, 2nd Floor

 7         Topeka, Kansas, 66612

 8         785-368-8424

 9         shon.qualseth@ag.ks.gov

10   .

11   .

12   ALSO PRESENT:

13   .

14         Mr. Michael Hayes (video conference)

15   .

16   .

17   .

18   .

19   .

20   .

21   .

22   .

23   .

24   .

25   .
```



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

```
 1                          INDEX

 2    .

 3    .

 4    Certificate------------------------------ 223

 5    .

 6    .

 7                         WITNESS

 8    ON BEHALF OF PLAINTIFF:                    PAGE

 9    TROY FROST

10    Direct-Examination by Mr. Ainsworth        8

11    Cross-Examination by Mr. Turner            217

12    .

13    .

14                         EXHIBITS

15    DEPO EXHIBIT NO.:                          MARKED

16    No 71  11-7-99 Carreno notes               7

17    No 72  11-8-99 Narr. Report-Frost          7

18    No 73  11-9-99 handwritten notes of

19         Floyd interview                       44

20    No 75  11-10-99 handwritten notes          66

21    No 77  11-10-99 note re: Winchester

22         Hardware                              7

23    No 78  11-10-99 Narr. Report-Frost         7

24    No 80  11-13-99 Narr. Report-Frost         7

25    No 81  Affidavit & App for Search          7
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

1        Warrant-Chevy Nova                          7

2   No 82  Affidavit & App for Search

3        Warrant-Residence                           7

4   No 85  Evidence Custody Receipt 11-14-99         7

5   No 86  11-14-99 Narr. Report-Frost              7

6   No 87  11-15-99 Narr. Report-Frost              7

7   No 88  11-15-99 Narr. Report-Frost              7

8        re: McClung                                 7

9   No 89  11-16-99 Narr. Report-Frost              7

10        re:  Holly Brown                           7

11  No 90  11-16-99 Narr. Report-Frost              7

12        re:  Lynn Brown                            7

13  No 91  11-16-99 Narr. Report-Frost              7

14        re:  Scott Harries                         7

15  No 92  Preliminary Hearing Transcript

16        excerpt                                    7

17  No 96  Jury Trial transcript excerpt            7

18  No 97  11-10-99 notes re: Zule                 153

19  No 98  11-12-99 notes re: Floyd

20        interrogation                           209

21   .

22   .

23   .

24   .

25   .

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street, Topeka, KS 66604, 785-273-3063, www.appinobiggs.com
6420 W. 95th Street, Suite 101, Overland Park, KS 66212, 913-383-1131
800 E. 1st Street, Suite 305, Wichita, KS 67202, 316-201-1612

2/20/2023                                                                    7

**TROY FROST**

1          (THEREUPON, Deposition Exhibit No 71,

2    No 72, No 77, No 78, No 80, No 81, No 82, No 85,

3    No 86, No 87, No 88, No 89, No 90, No 91, No 92,

4    and No 96 were marked for identification.)

5          THE VIDEOGRAPHER:  Today is the 20th day

6    of February, 2023, and the time is approximately

7    9:35 a.m. central.  We are here for the deposition

8    of Troy Frost in the matter of Floyd Bledsoe vs.

9    Jefferson County, Kansas, et al., Case No. 2:16 CV

10   02296.  Would counsel please state your appearance

11   for the record.

12         MR. AINSWORTH:  This is Russell Ainsworth

13   and Ruth Brown appearing on behalf of the

14   plaintiffs.

15         MR. TURNER:  Eric Turner and Michael

16   Norton appearing on behalf of the defendants Troy

17   Frost, Randy Carreno, Jeff Herrig, Robert Poppa,

18   Board of County Commissioners of Jefferson County

19   and Sheriff Herrig in his official capacity.

20         MR. LINDEN:  Patric Linden on behalf of

21   defendant Jim Vanderbilt.

22         MR. QUALSETH:  Shon Qualseth for Terry

23   Morgan, Jim Woods, and the estate of George

24   Johnson.

25                        TROY FROST,



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1    called as a witness on behalf of the Plaintiff,

2    was sworn and testified as follows:

3       DIRECT-EXAMINATION

4       BY MR. AINSWORTH:

5       Q.    Sir, would you please state and spell

6    your name for the record.

7       A.    Sure.  My name is Troy Frost.  It's going

8    to be Troy, T-R-O-Y, Frost, F-R-O-S-T.

9       Q.    Have you ever given a deposition before?

10      A.    Never, sir.

11      Q.    All right, so, I'm going to go over some

12   of the ground rules.  Is that okay?

13      A.    Yes, sir.

14      Q.    Just like when you're in court I'm going

15   to ask you to answer my questions with yes or no

16   if the question calls for it, but in some way

17   you're giving me a verbal answer to the question,

18   okay?

19      A.    Okay.

20      Q.    I'll ask you to wait until I'm done with

21   my question before you begin your answer, all

22   right?

23      A.    Okay.

24      Q.    And I'll try and do the same with you,

25   that is to wait till you're done with your answer



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063          Overland Park, KS 66212        Wichita, KS 67202
www.appinobiggs.com        913-383-1131             316-201-1612

## TROY FROST

1    before I give my next question so we're not

2    talking at the same time making it difficult for

3    the court reporter, okay?

4         A.   Yes, sir.

5         Q.   If you don't understand any of my

6    questions please ask me to rephrase the question,

7    re-ask the question or in some way indicate to me

8    that you do not understand my question, okay?

9         A.   Yes, sir.

10        Q.   The flip side of that is if you answer my

11   question I'll assume that you've understood my

12   question as I've posed it, fair?

13        A.   Yes, sir.

14        Q.   Do you have any medical issues or are you

15   on any medication that would affect your ability

16   to testify truthfully and accurately here today?

17        A.   No, sir.

18        Q.   Is there any other issue affecting you

19   such as stress, fatigue, illness that would affect

20   your ability to give truthful and accurate

21   testimony today?

22        A.   No, sir.

23        Q.   If you need a break any time just let us

24   know.  All that we ask is that you answer the

25   question that is pending before you take a break,

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

**TROY FROST**

1   **okay?**

2        A.    Okay.

3        **Q.    Are you currently employed?**

4        A.    No, sir.

5        **Q.    Are you retired?**

6        A.    Yes, sir.

7        **Q.    Where did you retire from?**

8        A.    Retired from the Jefferson County

9   Sheriff's Department.

10       **Q.    When did you retire?**

11       A.    Would have been March 1st of 2022.

12       **Q.    How long did you work for Jefferson**

13  **County?**

14       A.    Oh, 33 years.

15       **Q.    Do you have any plans for any other**

16  **employment?**

17       A.    Yes, sir, I do.

18       **Q.    What are your -- what are your plans for**

19  **future employment?**

20       A.    I don't want to do no law enforcement,

21  so, it's going to be -- I'd like to work in the,

22  a Coop.

23       **Q.    And what would you be doing at the Coop?**

24       A.    I don't -- whatever they want me to do.

25  I mean, I haven't, I haven't -- you know, I'm just

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## TROY FROST

1   kind of enjoying my retirement right now, but I

2   want to do something totally different.  Might be

3   Coop, might be just anywhere else but law

4   enforcement.

5        Q.   Why don't you want to be in law

6   enforcement anymore?

7        A.   It's, it takes a toll on you after 33

8   years, so, it's, you know, it's time for me to

9   take a break, enjoy my kids, my family, and I

10  missed out on a lot in the beginning, so, it's,

11  you know, it's time for me just to, just to kind

12  of enjoy my family really.

13       Q.   Being a police officer is a hard job,

14  right?

15       A.   Yes, sir.

16       Q.   Were you a police officer anywhere other

17  than Jefferson County?

18            MR. TURNER:  Object to form.  Go ahead

19  and answer.

20       A.   Yes, I was.

21  BY MR. AINSWORTH:

22       Q.   All right.  Well, are you a high school

23  graduate, sir?

24       A.   Yes, sir.

25       Q.   When did you graduate high school?



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## TROY FROST

1        A.    1986.

2        Q.    **And where did you graduate high school**

3    **from?**

4        A.    Jefferson County North in Winchester,

5    Kansas.

6        Q.    **Do you have any post high school**

7    **educational experience?**

8        A.    Yes, sir.  I played community college

9    football for Highland Community College.  Got a

10    scholarship to play football there, so, I went

11    there and played football for a year.

12        Q.    **What position did you play?**

13        A.    Defensive back.

14        Q.    **And did you get a degree or certificate**

15    **from Highland?**

16        A.    No.  After the year I wasn't going to get

17    my scholarship for the second year so then I got

18    out.

19        Q.    **Do you have any other post high school**

20    **educational experience apart from Highland?**

21        A.    No.  Joined the military.  Was in the

22    military for eight years.

23        Q.    **Was that eight years active duty?**

24        A.    No.  I was Army National Guard for eight

25    years.  Never got deployed.  Was going to get



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### TROY FROST

1  deployed in Desert Storm, but we ended up not

2  going.

3      **Q.   So, am I correct you enlisted with the**

4  **National Guard?**

5      A.   Yes.

6      **Q.   And in the army, is that right?**

7      A.   Yes, sir.

8      **Q.   And, but you were never promoted to**

9  **active duty, correct?**

10      A.   No.

11      **Q.   What was your job with the National**

12  **Guard?**

13      A.   I was a tank driver.  I drove the eight

14  inch Howitzer tanks, and I was a radio operator.

15      **Q.   Did you ever serve overseas while you**

16  **were with the National Guard?**

17      A.   No, sir.

18      **Q.   When were you with the National Guard?**

19      A.   Would have been from 1987 to 1995, I

20  believe, if my memory serves me right.

21      **Q.   Sir, after you left Highland what full-**

22  **time employment did you have?**

23      A.   Usually what I would do is I would work

24  for my dad during the summertime and then I did

25  some landscaping jobs also, so, just kind of



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

<strong>TROY FROST</strong>

1    during the summer work and then during the

2    wintertime I worked for my dad, so --

3         **Q.    What work did you do for your dad?**

4         A.    He owned two typewriter businesses, one

5    in Atchison and one in Topeka, one called Capital

6    City Office Machines and the other one called

7    Atchison Office Machines, and I'd help him during

8    the summertime, go pick up -- you know, when

9    schools were closed they needed all their

10   typewriters cleaned and all that, and fixed so

11   then I'd help him go do that and helped him clean

12   them and, so.

13        **Q.    So, was it a service job servicing the**

14   **typewriters?**

15        A.    Yes, sir.

16        **Q.    What other full-time employment did you**

17   **have after you left Highland Community College?**

18        A.    I believe I worked at Atchison Casting in

19   Atchison, also.  I don't know how long I was

20   there, though, 'cause they -- I got laid off, so,

21   I don't -- maybe a couple -- maybe a year or two,

22   maybe.  I don't know.  That's a long time ago.

23        **Q.    When were you hired by Jefferson County**

24   **as a deputy?**

25        A.    February of 1990.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1          Q.    Okay, so, before you were hired by

2     Jefferson County did you have any other full-time

3     employment other than that which you've told us

4     here today?

5          A.    Not that I can think of, no, sir.

6          Q.    Did you have any jobs in law enforcement

7     other than working for Jefferson County?

8          A.    Yes.  I've worked -- I was chief of

9     police in Nortonville, Kansas.  I worked for,

10    part-time for Meriden Police Department.  I worked

11    part-time for the Ozawkie Police Department.  I

12    believe that was it part-time wise.

13         Q.    When did you work for Meriden?

14         A.    Oh.  Could have been '90-'91 but I can't

15    -- I don't know off the top of my head the dates.

16         Q.    Were you, were you working at Jefferson

17    County at the time?

18         A.    Yes.  Lot of us had part-time jobs with

19    the cities.

20         Q.    And why was that?

21         A.    Just because it was more -- make more

22    money.  I mean, working for the county and then

23    you got to work for the city, so, it's like, you

24    know, so, just having some extra cash.

25         Q.    How long did you work for Meriden?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1      A.    Oh, probably just a couple years.

2      **Q.    Why do you say probably just a couple**

3   **years?**

4      A.    I can't remember exactly how long.

5      **Q.    Why did you stop working for Meriden?**

6      A.    I think I just decided that it was time

7   to stop working for Meriden, just stay with the

8   county.  I already worked for Meriden and then I

9   worked as the chief of police in Nortonville and a

10  police officer again, so, it was probably just way

11  too much.

12     **Q.    Well, when did you work for Ozawkie?**

13     A.    That probably would have been around the

14  same time, also.

15     **Q.    Were you working for Ozawkie at the same**

16  **time you were working for Meriden and Jefferson**

17  **County?**

18     A.    I believe so, yes, sir.

19     **Q.    Then when were you the chief of police in**

20  **Nortonville?**

21     A.    I do not know the exact dates of that,

22  sir.

23     **Q.    What decade?**

24     A.    Oh.  2000s probably, somewhere in there.

25  Then I was over --



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

**TROY FROST**

1        Q.   Was that a part-time -- was that a part-
2    time position?

3        A.   Yes, sir.

4        Q.   And when you were working for Nortonville
5    how many police officers did Nortonville have?

6        A.   There was me and another guy, so, just
7    two of us.

8        Q.   And, so, you were the chief.  What was
9    the other guy?

10       A.   Assistant.

11       Q.   So, you're a chief of police and
12   assistant chief of police?

13       A.   Yes, sir.

14       Q.   All right.  Nortonville is not a very big
15   community, is that correct?

16       A.   No, it's not big at all, no, sir.

17       Q.   How many people in Nortonville?

18       A.   Probably a hundred, give or take, now.  I
19   don't know back then, but --

20       Q.   Was it about the same size back then?

21       A.   Yeah.  I mean, it -- we're more of a
22   senior community so it's, you know, we're born and
23   raised there, you know everybody and, so, back
24   then, yeah, but now you just -- so.

25       Q.   How long did you work for Nortonville?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1       A.   Quite a -- I mean, it was probably maybe

2   ten years.

3       Q.   **Why did you leave Nortonville?**

4       A.   Just the same thing.  The city council

5   was, didn't think they needed a police department

6   so I thought, well, if you don't need a police

7   department then I'll just resign, so, I resigned

8   and then I -- when it was time for election for

9   city council I was on the city council for 15

10  years.

11      Q.   **So, were you on the city council when you**

12  **were chief?**

13      A.   Oh, no, no.

14      Q.   **Okay.  Does Nortonville have a police**

15  **department currently?**

16      A.   Yes, sir.

17      Q.   **All right, and that happened after you**

18  **resigned?**

19      A.   Oh, yeah.

20      Q.   **Strike that.  Did they ever go without**

21  **having a police department?**

22      A.   I don't know how long they went without.

23  I don't think they went very long.  I don't know

24  how long without.

25      Q.   **While you were at Nortonville did you**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

```
 1   investigate any violent crimes?

 2        A.   I don't recall working violent crimes,

 3   no, sir.  I don't remember.

 4        Q.   Not that -- not that much violent crime

 5   in Nortonville, fair to say?

 6        A.   Well, I mean, you know, I can't say from

 7   one day it might, there might not be and then the

 8   next day something happens where it is, so, I

 9   really don't want to -- you know.

10        Q.   And that's what I'm asking.

11        A.   Yeah, I just -- during that time it was

12   probably not, no.

13        Q.   And that's because you don't remember

14   investigating any violent crimes while you were

15   the chief of police in Nortonville, right?

16        A.   Yes, sir.

17        Q.   And if there was a violent crime in

18   Nortonville you would have been involved because

19   there's only two officers in Nortonville, right?

20        A.   That or we would have called the county

21   to come assist us.

22        Q.   All right.  When you were hired by

23   Jefferson County -- oh, wait, strike that.  Why

24   did you leave Ozawkie?

25        A.   I think at the time the chief was
```

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## TROY FROST

1   resigning and so I just thought, well, if the

2   chief was going to go then I'll just go, too.

3   They hadn't had a police department for quite some

4   time, so, it wasn't -- (incomplete)

5       Q.   When you were hired by Jefferson County

6   did you attend a police academy?

7       A.   Yes, sir.

8       Q.   What academy did you attend?

9       A.   Kansas Law Enforcement Training Center.

10      Q.   Was that 320 hours?

11      A.   Yes, sir.  Eight weeks.

12      Q.   So, you covered report writing in that

13  training?

14      A.   Yes, sir.

15      Q.   You covered probable cause, correct?

16      A.   Yes, sir.

17      Q.   You were trained on evidence

18  preservation, right?

19      A.   Yes, sir.

20      Q.   And you're trained that your reports as a

21  police officer were important for several reasons,

22  is that right?

23      A.   Yes, sir.

24      Q.   And you're trained that one of the

25  reasons why your police reports are important is

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                 Suite 305
785-273-3063          Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com        913-383-1131             316-201-1612

**TROY FROST**

1    because it serves as an aid to your memory and

2    that you might have to testify some months or

3    years later about events that occurred before and

4    your report would assist you to recall the events,

5    right?

6         A.   Yes, sir.

7         Q.   You were also trained that your reports

8    would be provided to the prosecution and the

9    criminal defendant in the criminal prosecution and

10   they would be used and relied upon by the

11   prosecution and the criminal defense to either

12   prosecute or defend the action, right?

13        A.   Yes, sir.

14        Q.   And you're trained that your reports

15   would be -- that your fellow police officers might

16   rely on your reports to know what had happened in

17   an investigation, what was yet to be done, and

18   what might -- what other leads might need to be

19   followed up on, right?

20             MR. TURNER:  Object to form.  You can

21   answer.

22        BY MR. AINSWORTH:

23        Q.   You can answer, sir.

24        A.   Yes, that would be, would be correct.

25        Q.   And just to like make it a little more

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

2/20/2023                                                                                    22

**TROY FROST**

1  basic, you knew and were trained that your fellow
2  officers would rely on your police reports to be
3  an accurate record of what happened, right?
4        A.   Yes, sir.
5        Q.   And how did it work in Jefferson County
6  in the year 1999?  Would you type your own
7  reports?
8        A.   Yes, sir.
9        Q.   And in 1999 where would you keep your
10 field notes while you were running an
11 investigation?
12       A.   Usually what I would do is that I would
13 just have my tablet and I would make my field
14 notes and have it in my tablet right there with
15 me.
16       Q.   When you say tablet what are you
17 referring to?
18       A.   Just like a notebook, piece of paper.
19       Q.   Would it be a folder, a manila folder, or
20 what would it look like?
21       A.   No, just a -- you know, like my notes
22 that we have, just a yellow notebook sheet and
23 just make notes, make my notes on it.
24       Q.   Like on a legal pad?
25       A.   Yeah.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## TROY FROST

1    Q.    Okay.  So, you would, you would take

2    handwritten notes on the pad of paper, right?

3    A.    Yes, sir.

4    Q.    And would you keep a separate pad of

5    paper for each investigation or would all the, you

6    know, all of your notes be interspersed for the

7    different cases?

8    A.    One case or different cases?

9    Q.    Well, that's what I'm trying to find out.

10   So, for example, for the Arfmann homicide

11   investigation you had a pad of paper that you were

12   taking notes on, right?

13   A.    Yes, sir.

14   Q.    Was it just one pad or was it more than

15   one pad?

16   A.    It would be one pad as a running notes.

17   Q.    And during the course of the Arfmann

18   homicide investigation if you had happened to be

19   working on a different case would you start a new

20   pad or would you include notes from another case

21   on that same pad of paper?

22   A.    It would be a whole different pad of

23   paper.

24   Q.    All right.  So, if you wanted to refer to

25   your notes for the Arfmann homicide investigation



5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

## TROY FROST

1   you would look to that one pad of paper that you

2   have, right?

3        A.   Yes, sir.

4        Q.   And then would you -- how would you

5   determine which of the notes that you were taking

6   should be preserved?

7        A.   What do you mean by preserved?

8        Q.   Thank you for asking me to clarify.  So,

9   your typewritten reports would go into a file, is

10  that right?

11       A.   Yes, sir.

12       Q.   Can you tell me how in 1999 your

13  typewritten reports would make it into the file?

14       A.   Typing up my reports, I get my report

15  typed up, I turn it in and it would go into the

16  file.

17       Q.   All right, where would you turn it in?

18       A.   Into -- back in '99 I -- records clerk.

19       Q.   And then the records clerk would make

20  sure that the report that you, the typewritten

21  report that you turned in would go into the

22  official file, is that right?

23       A.   Yes, sir.

24       Q.   Ever have a problem with your reports not

25  making it into the official file?



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

```
 1        A.    No, sir.
 2        Q.    That record clerk was good at their job,
 3   right?
 4        A.    Yes, sir.
 5        Q.    All right, and, so, would your -- would
 6   you keep your notes and not turn those into the
 7   official file or how would that work with respect
 8   to your notes?
 9        A.    When I would write a report, I'm done
10   with that report, my notes would go into that
11   report, also.
12        Q.    Okay.  So, alongside your report you
13   would attach the notes that accompanied that
14   report, right?
15        A.    Yes, sir.
16        Q.    If you were taking notes and then it
17   turned out that the notes you took weren't
18   relevant or weren't needed and so you didn't
19   create the report regarding those notes, what
20   would happen to those notes?
21        A.    I would just leave them.  If I've turned
22   them in then that's where they're at, they'd stay
23   there.
24        Q.    And what if you didn't turn them in?
25        A.    Oh, I'd turn them in, my notes in.
```

**Appino & Biggs** Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

2/20/2023                                                                                    26

**TROY FROST**

1      Q.   So, you understood it was important to
2   turn in your notes and have them so that they
3   could be part of the official file that would be
4   available to the prosecution and the criminal
5   defendant, right?
6      A.   Yes, sir.
7      Q.   Would you turn in your notes in the same
8   way that you would turn in your typewritten
9   reports?
10     A.   Yes.
11     Q.   So, they'd go in the bin for the records
12   clerk?
13     A.   Yes, sir.
14     Q.   And in your training you were trained to
15   be accurate in your police reports, right?
16     A.   Yes, sir.
17     Q.   And you were trained to be thorough in
18   your police reports, right?
19     A.   Yes, sir.
20     Q.   Were you trained in interrogations?
21     A.   Yes, sir, I was.
22     Q.   Where were you trained in interrogations?
23     A.   I'd have to go back and -- I'd have to
24   have something as far as training when I went to
25   the interview -- I don't know the exact name,

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1   dates for that.

2        Q.   Sure, and I'm not looking -- so, let's

3   start with when you attended that academy when you

4   were hired at Jefferson County.  Did they train

5   you on how to conduct interrogations?

6        A.   I believe they touched base on that, yes.

7        Q.   Did you receive any training after you

8   left the academy regarding how to conduct

9   interrogations?

10        A.   Yes, sir.  I just don't know when that

11   was.

12        Q.   Do you know where it was?

13        A.   I don't recall when or where it was, no.

14        Q.   Was the training that you're trying to

15   recall, was that in Jefferson, within Jefferson

16   County or did you have to go outside Jefferson

17   County for that training?

18        A.   It would have to be outside Jefferson

19   County for that training probably.

20        Q.   Okay.

21        A.   I'm sorry, I just don't remember when.

22        Q.   That's all right.  I'm trying to see if I

23   can't find out myself.  Okay, and apart -- and how

24   long was that training that you attended outside

25   of Jefferson County?



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1       A.   Maybe -- I don't know how long it would

2   have been.  I don't remember -- I said that, I

3   don't -- (incomplete)

4       **Q.   Sure.  Was it --**

5       A.   Maybe two days, I don't know.

6       **Q.   Was it more than a week?**

7       A.   More than a week?

8       **Q.   Yeah, was it more than a week?**

9       A.   I don't think it would be more than a

10  week, no.  Maybe at least two, three days, maybe.

11  Depended on the training.

12      **Q.   All right.  What's the difference between**

13  **an interrogation and a interview?**

14      A.   An interview for me is going in and

15  talking to somebody in the interview room about,

16  you know, what do they know, what did they hear.

17  If that person was to then say, or say that they,

18  you know, committed a crime or that they know,

19  then that's when I would stop the interrogation

20  and begin with reading the Miranda and then I

21  would ask questions about what they -- I would --

22  if they start saying something in an interview

23  that could lead them to, you know, they need an

24  attorney, that's when it's time to stop and say,

25  hey, look, you know, I'm going to read you your

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604                 Suite 101                   Suite 305
785-273-3063              Overland Park, KS 66212        Wichita, KS 67202
www.appinobiggs.com           913-383-1131                316-201-1612

**TROY FROST**

1  rights and then if you want to talk about what you

2  just started to talk about, then I'll ask you

3  those questions.

4        **Q.   All right, so, one difference between an**

5  **interview and an interrogation is that in an**

6  **interrogation you Mirandize the subject and you**

7  **don't necessarily do that in an interview unless**

8  **they would start implicating themselves --**

9        A.   Right.

10       **Q.   -- is that fair to say?**

11       A.   Yes, sir.

12       **Q.   What other differences are there between**

13  **interviews and interrogations?**

14       A.   Other differences as in?

15       **Q.   Well, let me -- were you trained in any**

16  **interrogation techniques?**

17       A.   Yes, sir.

18       **Q.   Was one of the interrogation techniques**

19  **that you were trained in was minimization, or that**

20  **is suggesting that there is a benign reason for**

21  **why the person committed the crime that wouldn't**

22  **sound so bad?**

23       A.   Yes, sir.

24       **Q.   And is that a technique that you would**

25  **use in interrogations?**



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1      A.    Yes, sir.

2      Q.    **But you wouldn't necessarily -- well, I**

3  **guess I should ask.  Would you use a minimization**

4  **technique in an interview?**

5      A.    I don't believe I would, no.

6      Q.    **What other interrogation techniques were**

7  **you trained in?**

8      A.    You know, body language.  I, you know, I

9  -- it's just  -- it's kind of -- it -- I, I, I

10  don't know -- I can't -- I -- (incomplete)

11      Q.    **All right, were you trained to create**

12  **empathy -- or sorry, strike that.  Were you**

13  **trained to create a rapport between you and the**

14  **subject during the interrogation?**

15      A.    Yes.

16      Q.    **Can you tell us what positions you held**

17  **during your career with Jefferson County?**

18      A.    When I first started at the Jefferson

19  County Sheriff's Department I worked in the jail

20  and then I went from the jail to on the road as a

21  road deputy and then from a road deputy to a

22  detective and then from detective I was detective

23  sergeant.

24      Q.    **Okay, so, when did you make detective?**

25      A.    It would have been in '99, I believe, but

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# TROY FROST

1   I don't know a month.

2      Q.   When did you start going on the road as a

3   road, road deputy?

4      A.   I believe in '94 maybe.

5      Q.   And when did you make detective sergeant?

6      A.   Oh, when did I make detective sergeant?

7   Shoot, I don't know when I made detective

8   sergeant.  I didn't even think about detective

9   sergeant.  I don't know.

10     Q.   And I'm sorry, it's my fault that the

11  feed kind of cut out there for a second, but am I

12  correct the only positions you held with Jefferson

13  County were working for the jail, working as a

14  road deputy, working as a detective and working as

15  a detective sergeant?

16     A.   Yes, sir.

17     Q.   When you retired from Jefferson County

18  were you a detective sergeant?

19     A.   Yes, sir.

20     Q.   To become a detective what did you have

21  to do?

22     A.   Well, I mean, you have to, you know, you

23  got to go out and investigate crimes.  You have to

24  go out and talk to people.  You have to, you

25  know, have good rapport with people and good, you

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**TROY FROST**

1  know, communication skills and, you know, just do

2  a good job, do your follow-up, do what you're

3  supposed to do.

4      Q.   Did you have to take a test to become a

5  detective?

6      A.   No, sir.

7      Q.   How did you apply to become a detective,

8  or did you apply?

9      A.   I didn't apply, no.

10     Q.   How did it happen that you became a

11  detective with Jefferson County?

12     A.   They just asked me if I wanted to be a

13  detective and I was like, yeah.

14     Q.   Who is they?

15     A.   Well, it probably would be the sheriff.

16     Q.   Roy Dunnaway?

17     A.   Yes, sir.

18     Q.   Did you attend his funeral?

19     A.   Yes, sir.

20     Q.   Were you ever a member of Countryside

21  Baptist Church?

22     A.   No, sir.

23     Q.   You ever attend that church?

24     A.   No, sir.

25     Q.   Do you know anyone who does or did?

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street         6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

### TROY FROST

1       A.    I don't, no, sir.

2       Q.    **And how did you become a detective**

3  **sergeant?**

4       A.    I -- off the top of my head, sir, I don't

5  know as far as being promoted to detective

6  sergeant.  I think that was just part of, you

7  know, being there for so long and I don't know.

8       Q.    **Did you ever have to take a test to**

9  **become a sergeant?**

10      A.    No, sir.

11      Q.    **Do they have civil service ranks in the**

12 **Jefferson County Sheriff's Office?**

13      A.    No, sir.

14      Q.    **Did you apply to become a sergeant?**

15      A.    I didn't apply.  We don't apply for, for

16 that.

17      Q.    **Who made you a sergeant?**

18      A.    Probably would have been the sheriff.

19      Q.    **Who was the sheriff at the time?**

20      A.    I knew you was going to ask me that.  I

21 don't know if Sheriff Herrig was the sheriff at

22 the time or Sheriff Dunnaway.  I don't know.

23      Q.    **In 1999 who was the sergeant of**

24 **detectives?**

25      A.    In 1999 the sergeant of detectives would

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

**TROY FROST**

1    have been Detective Carreno, Detective Sergeant

2    Carreno.

3         Q.   And, so, you reported to Carreno?

4         A.   Yes, sir.

5         Q.   In 1999 I mean?

6         A.   Yes, sir.

7         Q.   He was your father-in-law, is that right?

8         A.   Yes, sir.

9         Q.   When did he become your father-in-law?

10        A.   Let's see.  '92 maybe.

11        Q.   And I understand you got divorced at some

12    point, is that right?

13        A.   Yeah.  15 years later I got divorced, so,

14    whenever we were married, I don't know when that

15    was.

16        Q.   So, does 1992 to 2007 sound about right?

17        A.   Yes, sir.

18        Q.   Did you ever have a falling out with

19    defendant Carreno?

20        A.   Oh, no.  None at all.

21        Q.   All right.  So, the two of you still get

22    along?

23        A.   Oh, yes.  Yes, sir.

24        Q.   How often do you see defendant Carreno?

25        A.   The only time I really see, I call him



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1   Captain Carreno is I had a VIN inspection I had to

2   do and that was probably a month ago and I saw

3   him, but other than that I don't, I don't see him.

4        **Q.    What kind of inspection?**

5        A.    It was a VIN inspection for my vehicle,

6   so, but other than that I don't -- I haven't seen

7   him, so.

8        **Q.    And how did it come up that you saw**

9   **Captain Carreno during the VIN inspection?**

10       A.    Oh, I was in the office getting my VIN

11  inspection so I thought I would, you know, say hi

12  to the other guys, so.

13       **Q.    When you saw Captain Carreno did you talk**

14  **about this case at all when you saw him about a**

15  **month ago?**

16       A.    Oh, no, huh-uh.  No.

17       **Q.    When you got sued in this case did you**

18  **reach out to anybody?**

19       A.    No, sir.

20       **Q.    Did you talk to any of the, you know, the**

21  **people that you investigated this case with to see**

22  **if they got sued?**

23       A.    Oh, no.  No, sir.

24       **Q.    Why not?**

25       A.    To me it's not any of their business,

**Appino & Biggs** Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1  it's my business, and I'm not going to include

2  them in the thing, no.

3      **Q.   When was the last time you talked to**

4  **defendant Poppa?**

5      A.   Last time I talked to -- and I call him

6  Lieutenant Poppa -- but I saw him Saturday and I

7  said hi.  That was it.

8      **Q.   How did you run into him on Saturday?**

9      A.   I saw him at our attorney's office.  As I

10  was walking out, he was walking in and I said hi,

11  and that was it.

12      **Q.   All right.  Did you talk about the case**

13  **at all with him?**

14      A.   Oh, no, huh-uh.  No.

15      **Q.   When was the last time before Saturday**

16  **that you'd seen defendant Poppa?**

17      A.   I seen him at the gas station, said hi,

18  how you doing.  I don't -- you know, we don't

19  really hang out or nothing.  It was just I saw

20  him getting gas and that was it.

21      **Q.   When was the last time you saw Sheriff**

22  **Herrig?**

23      A.   Oh, I probably saw Sheriff Herrig

24  probably maybe two, three weeks ago.

25      **Q.   How did it come up that you saw Herrig**

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1    **two to three weeks ago?**

2         A.   My son and his grandson wrestle and I saw

3    him at a wrestling meet.

4         Q.   **Did you talk about the case, the Bledsoe**

5    **case?**

6         A.   No, sir, huh-uh.

7         Q.   **Do you know Mike Hayes?**

8         A.   Yes, I know Mike Hayes.

9         Q.   **How do you know Mike Hayes?**

10        A.   When I first started out Mike Hayes was a

11   defense attorney and, so, I was well aware of Mr.

12   Hayes as being a defense attorney, and then as --

13   I'm sorry, go ahead, sir.

14        Q.   **Please continue, I cut you off.**

15        A.   And then through the years knowing Mike

16   as the, you know, prosecutor and defense attorney.

17        Q.   **Why do you say that you're well aware of**

18   **him as a defense attorney?**

19        A.   Just because I, you know, with the cases

20   that I've had and him being a defense attorney for

21   those and, you know, so, just -- (incomplete)

22        Q.   **And, so, you got to know from experience**

23   **that if you left holes in your police reports a**

24   **defense attorney might try to make it seem that**

25   **your investigation was not credible by pointing**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION
5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com
6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131
800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# TROY FROST

1   out those holes, right?

2        A.   Yes, sir.

3        Q.   And, so, you as a detective would try to

4   document the steps that you took in an

5   investigation so it was clear to anybody what

6   happened from the time of the crime to the time

7   that you identify your suspect, right?

8        A.   Yes, sir.

9        Q.   Because if you leave out steps in your

10  investigation then that might suggest to a defense

11  attorney that this investigation was done

12  improperly in some way, right?

13           MR. TURNER:   Object to form.

14       A.   Can you ask the question again, please?

15  BY MR. AINSWORTH:

16       Q.   Sure.   So, what I mean by documenting the

17  steps of the investigation is that to take as an

18  example, one step of an investigation is if you

19  conduct the search of a suspect's residence you

20  should document that you conducted that search,

21  right?

22       A.   Yes, sir.

23       Q.   So everybody knows, you know, what was

24  searched and who searched it and when it was

25  searched, right?



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## TROY FROST

1      A.    Yes, sir.

2      Q.    Likewise, if you search a suspect's car

3    you should document the fact that a search was

4    conducted, what was searched and who searched it

5    and when they searched it, right?

6      A.    Yes, sir.

7      Q.    And, so, if it comes out that, you know,

8    an item was searched or a vehicle was searched but

9    there's no documentation for it, then that in your

10   experience might be something that a defense

11   attorney could exploit or try to exploit as a hole

12   in the police case to suggest that the criminal

13   investigation was done improperly, right?

14          MR. TURNER:   Object to form.

15     A.    I would say yes, probably so.

16   BY MR. AINSWORTH:

17     Q.    All right.  So, in any event, what did

18   you do to prepare for this deposition?

19     A.    I went over these notes and reports and

20   video that I received from my attorneys the best

21   that I could.

22     Q.    Umm.  So, you reviewed -- and you're

23   referring to a binder that's in front of you, is

24   that right?

25     A.    Yes, sir.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1    Q.    Can you show it up to the camera so we
2    can look and see what you're referencing?
3    A.    (Witness complies.)
4    Q.    All right.  So, you've got a binder there
5    and hang onto that.  Is it your understanding that
6    that binder contains all the reports that you
7    filed and all of the notes that you took?
8    A.    Yes, sir.
9    Q.    Are there other portions of -- well, does
10   your binder have Bates numbers in the bottom of
11   it?
12   A.    Yeah, they have numbers on the bottoms of
13   them.
14   Q.    For your notes is it Bates-numbered
15   JC4812 through 4988?
16   A.    Four what?
17   Q.    4812 through 4988.
18   A.    I don't know -- I don't know if I have
19   that.  Four eight --
20   Q.    Excuse me?  You know what, you know what,
21   sir, that's okay --
22   A.    I'm sorry, I'm trying to find it here for
23   you.
24   Q.    Yeah, that's all right.  Perhaps during a
25   break your counsel can just note the Bates numbers



**TROY FROST**

1  that are in the binder and that way you don't have

2  to concern yourself with it.  Let me just try it

3  this way.  Did you review any testimony, any

4  transcripts of testimony in preparation for this

5  deposition?

6       A.   Yes, I did.  I watched the video of

7  Captain Carreno and Floyd.

8       Q.   Okay, did you -- but did you read any

9  transcripts --

10      A.   Oh.

11      Q.   -- in preparation for this deposition?

12      A.   Yes.  I read my transcript from my

13  preliminary hearing and my trial, but I did not

14  read everything.

15      Q.   Okay.  You didn't read all of your

16  testimony you mean?

17      A.   No, sir.

18      Q.   Did you read the testimony from anyone

19  else?

20      A.   No, sir.

21      Q.   Anyone else's -- okay.  So, you read

22  nobody else's testimony, right?

23      A.   No, sir.

24      Q.   That's correct?

25      A.   Yes, sir, that's correct.  Sorry.

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## TROY FROST

1      Q.    When you say you reviewed the video

2    between Carreno and Floyd, do you know what date

3    that video was from?

4      A.    I believe it was the 12th into the 13th

5    of November.

6      Q.    Did you see yourself on that video?

7      A.    Yes, sir, I did.

8      Q.    And did you see -- did you review the

9    portion of the video in which you are interacting

10   with Floyd?

11     A.    Yes, sir, I did.

12     Q.    And did you watch the video to the end of

13   your interaction with Floyd?

14     A.    Yes, sir.

15     Q.    So, the video captures the entirety of

16   your inter, your interactions with Floyd in the

17   interview room, right?

18           MR. TURNER:  Object to form.

19     A.    I watched the video with me and Floyd,

20   yes.

21   BY MR. AINSWORTH:

22     Q.    And how did that video end?

23     A.    It just cut out.

24     Q.    It just cut out, meaning you were still

25   talking to Floyd and then there's no more video?



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1        A.    Right.   Whenever the video ran out, I

2   mean, I don't --

3        Q.    **Do you know why that happened?**

4        A.    No, sir, I do not.   I don't.

5        Q.    **That's not supposed to happen, right?**

6              MR. TURNER:   Object to form.

7        A.    It's not supposed to happen, right.

8   BY MR. AINSWORTH:

9        Q.    **When you conduct interrogation or**

10  **interviews with suspects in 1999 you were supposed**

11  **to video record the entirety of those**

12  **interrogations, right?**

13       A.    Yes, sir.

14       Q.    **Was there any time limit on how long you**

15  **could video record in those rooms?**

16       A.    I do not know if there was a time limit

17  on the videos or -- no, I don't know.

18       Q.    **You had -- did you watch any of the video**

19  **from the night of November 9th, 1999, to November**

20  **10th of the interrogation with Floyd?**

21       A.    No, sir.

22       Q.    **Were you part of -- did you interview**

23  **Floyd on November 9th to the 10th?**

24       A.    I don't believe so, no.

25       Q.    **Was there another Troy working at**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## TROY FROST

1  Jefferson County in that time period?

2      A.   No, unless -- I mean, I don't know.   I

3  mean, there was no other Troy working, so, I --

4  (incomplete)

5      Q.   One second, I got -- let's take a look at

6  Exhibit 73.  The court reporter has a copy of it

7  for you, I believe.

8          MR. TURNER:  He said he sent it Friday.

9          THE VIDEOGRAPHER:  I didn't get that e-

10  mail.

11          MR. AINSWORTH:  Sorry, that was sent on

12  Friday.

13          THE VIDEOGRAPHER:  Yeah, I didn't receive

14  that email.

15          MR. AINSWORTH:  Huh, let me --

16          THE VIDEOGRAPHER:  You want to go off the

17  record real quick?

18          MR. AINSWORTH:  Sure, let's go off the

19  record.

20          THE VIDEOGRAPHER:  All right, time is

21  approximately 10:26 a.m. central, we're going off

22  the record.

23          (THEREUPON, a recess was taken;

24  WHEREUPON, Deposition Exhibit No 73 was marked for

25  identification.)



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063          Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com           913-383-1131             316-201-1612

## TROY FROST

1          THE VIDEOGRAPHER:  Time is approximately

2    10:37 a.m. central, we're back on the record.

3          BY MR. AINSWORTH:

4          Q.    All right, I'm going to ask you to take a

5    look at what we've previously marked as Exhibit

6    73.  Do you have that in front of you?

7          A.    Yes, sir, I do.

8          Q.    Okay.  So, Exhibit 73 is Bates-numbered

9    JC1556 through JC1567, and if you're looking at

10   the first page of Exhibit 73 that's not your

11   handwriting, correct?

12         A.    No, that's not, sir.

13         Q.    And it indicates an interview or

14   reinterview of Floyd S. Bledsoe by Carreno and

15   Senior Special Agent Morgan.  Do you see that at

16   the top?

17         A.    Yes, sir.

18         Q.    All right, then if you'd turn to page 8

19   of Exhibit 73.

20         A.    Yes, sir, right.

21         Q.    See then about halfway down the page on

22   the left-hand side there's a notation of 2332

23   hours, JRC61 --

24         A.    Yes, sir.

25         Q.    -- that looks like Carreno's initials and

## TROY FROST

```
1   handwriting, right --

2        A.    Yes, sir.

3        Q.    -- at the bottom of the page?  Okay.  And

4   then we continue going on, I think it's the last

5   page of Exhibit 73 and it says returned at 0100

6   hours, number 64 taken notes.  You see that?

7        A.    Yes, sir.

8        Q.    That's Vernon is 64, right?

9        A.    Yes, sir.

10        Q.    And that says 020 -- 0226 hours restart

11   and then it says finish time question mark, get

12   from Troy, 0358 question mark question mark.  You

13   see that?

14        A.    Yes, sir.

15        Q.    All right.  Did you sit in on the end of

16   Floyd Bledsoe's, Floyd S. Bledsoe's interrogation

17   on the night of the 9th through the 10th?

18        A.    Umm.  I do not remember if I was -- I

19   don't know if I was or not.  I mean, I can't -- I

20   don't have nothing to --

21        Q.    All right.  When you prepared for this

22   deposition how much of the binder in front of you

23   did you review?

24        A.    I reviewed as much as I could in the

25   binder.
```



**TROY FROST**

1        Q.   And, so, what portions of the binder did
2   you review?
3        A.   Well, I went through most of it.  I just
4   did not read my entire preliminary hearing or my
5   trial transcript.
6        Q.   Was there a reason why you didn't review
7   your entire preliminary hearing or trial
8   transcript?
9        A.   I tried to, but it was trying to read the
10  trial transcripts to my kids running all over to
11  stop and do that and then from, you know, going
12  back to the preliminary or trial, trying to do
13  that and then back to my four and five-year-olds
14  running around causing hate and discontent I just
15  didn't get time to.
16       Q.   Did you review your typewritten reports
17  in this case?
18       A.   Yes, sir.
19       Q.   Did you review your field notes in this
20  case?
21       A.   Yes, sir, I did.
22       Q.   Did you review anyone else's field notes
23  in this case?
24       A.   No, I did not.
25       Q.   Did you review anyone else's typewritten

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1  reports in this case?

2      A.   No, sir.

3      Q.   **Was there anything that you wanted to**

4  **review in preparation for this deposition but**

5  **didn't have the opportunity to?**

6      A.   What I wanted to do the most was go over

7  my preliminary hearing and my trial is what I

8  wanted to do the most.  You know, I've went

9  through my reports, but that was the most I wanted

10 to do.

11     Q.   **Okay.  Did you want to review your prior**

12 **testimony more than you wanted to review your**

13 **reports?**

14     A.   Yes, sir.

15     Q.   **Can you tell us why you reviewed all of**

16 **your reports but not all of your testimony if you**

17 **wanted to review your testimony more than you**

18 **wanted to review your reports?**

19     A.   Well, it's a lot easier on the

20 preliminary and the trial -- or my notes and

21 reports aren't really that long, some of them, and

22 so I could read those pretty fast; but on the

23 prelim and trial, trying to read them and you just

24 -- I just get distracted and I can't finish what I

25 wanted to -- you know, some of them were easier to

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### TROY FROST

```
1   read on my, on my reports than it was the
2   transcripts.
3        Q.   In reviewing your prior reports and field
4   notes on the Arfmann homicide investigation was
5   there anything that you noticed should have been
6   done differently or should have been done if it
7   wasn't done?
8        A.   Umm.  I -- I wish I would have wrote my
9   notes a little better.  I mean --
10       Q.   What about your notes --
11       A.   -- I mean, you know, when you look at
12  1999 compared to, you know, a year ago notes, they
13  look totally different as far as more -- you know,
14  I just wished I would have wrote more, better
15  notes, I mean; but that's part of the job is you
16  learn as you go and, you know, taking notes and
17  making sure you're writing, you know, times and
18  dates and names and that's what I wish I would
19  have done a lot better on.
20       Q.   How did you learn that Tom had killed
21  himself?
22       A.   I don't quite remember who told me that
23  Tom had killed himself, but that we needed to go
24  get the video and the suicide note and, so, I went
25  and did that.
```



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## TROY FROST

1      Q.    Who went and did that?

2      A.    I did.

3      Q.    You did, all right.  So, you -- you

4   obtained the suicide note?

5      A.    Yes, sir.

6      Q.    Where did you obtain that note from?

7      A.    It would have been from Bonner Springs

8   Police Department.

9      Q.    Who directed you to obtain that suicide

10  note?

11     A.    See, that's what I don't, I can't recall

12  who exactly told me to go down and do that.

13     Q.    And did you read the suicide note when

14  you received it?

15     A.    I don't believe I did, no.

16     Q.    Were you curious why Tom had killed

17  himself?

18     A.    Well, yeah, I mean, you're, you're

19  curious, you know, as to why people do stuff like

20  that.

21     Q.    Were you aware that, you know, shortly

22  before Tom killed himself new DNA results were

23  reported in the media suggesting that Tom was

24  implicated in the Arfmann homicide?

25     A.    Yeah, I did not know that.



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## TROY FROST

1        Q.    When did you learn there's a link between

2   the DNA results and Tom's suicide?

3        A.    I -- I don't know how long it was before

4   I, you know, realized that.  I don't know.

5        Q.    Well, what steps did you take in the

6   reinvest -- with regard to any reinvestigation

7   that was conducted into the Arfmann homicide 2015-

8   2016 time frame?

9        A.    I wasn't involved in the reinvestigation

10  of that, no.

11       Q.    So, but you obtained the suicide notes

12  from Tom, right?

13       A.    Right.  Oh -- I'm trying to figure out

14  what you're, if you're talking about Tom's

15  involvement with that, you know, his suicide and

16  all that, that's what I was trying to figure out

17  because I go and get the suicide note, video, I

18  bring it back.  It was read -- the suicide note

19  was read, but I don't know if Captain Vernon -- I

20  remember going out and trying to find the bullet

21  that Tom had said something about in his suicide

22  note, but I don't remember anything else.

23       Q.    When you were looking for the bullet

24  casing that was referenced in the suicide note did

25  you use a metal detector?



Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### TROY FROST

```
 1        A.    I believe we had a guy out there, yes,
 2   with a metal detector.
 3        Q.    And were you present when the nine
 4   millimeter bullet casing was recovered?
 5        A.    Yes, sir.
 6        Q.    And, so, you read the suicide note before
 7   the bullet casing was recovered, right?
 8        A.    Yes.
 9        Q.    When you read the suicide note were you
10   surprised?
11        A.    Well, yeah, I mean, you're surprised.
12        Q.    Did you have any feeling that you might
13   have gotten the wrong guy; that maybe it wasn't
14   Floyd after all but that it was Tom who committed
15   this crime?
16             MR. TURNER:  Object to form.
17             MR. LINDEN:  Join.
18        A.    Well, you think that after reading the
19   suicide note.
20        BY MR. AINSWORTH:
21        Q.    Do you have any evidence to suggest that
22   it wasn't Tom who committed the Arfmann murder?
23        A.    I do not, no.
24        Q.    Do you have any evidence to suggest that
25   it was Floyd who committed the Arfmann murder?
```



# TROY FROST

1     A.    Not that I know of.

2     Q.    **All right.  Do you feel that you're**

3  **prepared to give a deposition in this case?**

4     A.    Yes, sir.

5     Q.    **Apart from recovering the suicide note**

6  **and being present when the bullet casing was**

7  **recovered, did you take any other steps to**

8  **investigate either Tom's suicide or the Arfmann**

9  **homicide in 2015-2016?**

10    A.    No.  The only thing I did was went and

11 got the suicide note, the video, went out and

12 helped try to find the bullet, the shell casing.

13 Not that I remember I did anything else or not.

14    Q.    **What video are you referencing?**

15    A.    The what?  Oh, I'm referencing the video

16 from Wal-Mart parking lot, Bonner Springs, Kansas.

17    Q.    **And why did you obtain that video?**

18    A.    Well, it just shows that Tom's car is

19 parked in the parking lot.

20    Q.    **Does it show how long Tom's car was**

21 **parked in the parking lot?**

22    A.    I'm sure it does.  I didn't, I didn't

23 watch the video, so, but I'm sure it would say how

24 long the vehicle sat there.

25    Q.    **At whose direction did you go to obtain**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604             Suite 101                Suite 305
785-273-3063          Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131            316-201-1612

**TROY FROST**

1   the video?

2        A.   I do not remember who told me to go get

3   the video and the note.  I don't remember who

4   asked me to go do it.

5        **Q.   So, before you went looking for the**

6   **bullet you had an idea of where the bullet should**

7   **be found -- sorry, strike that.  Before you**

8   **obtained the casing you had an idea of where the**

9   **casing should be found based on Tom's suicide**

10  **note, right?**

11       A.   Yes, sir.

12       **Q.   And, so, describe for us the process that**

13  **you went through to try and recover that casing.**

14       A.   I wasn't in charge of going out there to

15  find the casing, but we went out there and took a

16  guy out there that had a metal detector, kind of

17  walked like fire line, police line, you know, and

18  they found the shell casing.

19       **Q.   Who was in charge of that search?**

20       A.   I believe Captain Vernon was in charge of

21  it, I believe, if I remember right.

22       **Q.   Was it the gentleman with the metal**

23  **detector who first alerted you to where the casing**

24  **might be?**

25       A.   I believe so, yes.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## TROY FROST

1      Q.   And then did you guys dig in the debris
2  and undergrowth to try and see if you could find
3  the casing?
4      A.   Yes.
5      Q.   What did you use to dig with?
6      A.   I do not remember what we used, or even
7  who --
8      Q.   Did you --
9      A.   -- even who did it, I don't.
10     Q.   Did you use a tool or did you just use
11 your hands?
12     A.   I can't remember.
13     Q.   What did you think when the casing was
14 recovered in the approximate location that Tom's
15 suicide note said it would be?
16     A.    It was just, you know, it was just like
17 it's here, you know.
18     Q.   Am I correct that there is, there were no
19 indications of digging in the spot where the
20 casing was found before you guys started digging
21 for it?
22     A.   Oh, no, there wasn't no prior digging
23 before we -- huh-uh, no.
24     Q.   And, so, it didn't appear like somebody
25 had recently placed the casing in that location,

# TROY FROST

1   is that correct?

2        A.    That's correct.

3        Q.    It was covered by some degree of debris,

4   is that right?

5        A.    I don't know about debris, but grass, I

6   mean, so, yeah.

7        Q.    Was it underneath the surface of the

8   ground?  Like, did you have to dig up dirt to get

9   to it?

10       A.    I don't know if they had to dig up dirt

11  to get to it or move some grass around to get to

12  it.  I don't remember.

13       Q.    So, did you guys have a meeting after you

14  recovered the casing?

15       A.    I don't remember if we had a meeting or

16  not.

17       Q.    Well, were you present for any meetings

18  discussing the topic of whether Floyd or Tom might

19  be guilty of the murder in the 2015-2016 time

20  frame?

21       A.    I'm sure there was a meeting, but I don't

22  -- I mean, I don't remember -- I'm sure there

23  probably was a meeting, but I don't remember

24  anything about that.

25       Q.    Did you express any thoughts about



5111 SW 21st Street        6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604           Suite 101                Suite 305
785-273-3063               Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com        913-383-1131             316-201-1612

**TROY FROST**

```
 1   whether Tom or Floyd might be guilty?
 2        A.   Did I or can you rephrase or --
 3        Q.   Did you -- sure.  Did you express any
 4   thoughts or opinions or beliefs about whether Tom
 5   or Floyd was guilty in the 2015-2016 time period?
 6        A.   Not that I can remember.
 7        Q.   And in 2015-2016 after the bullet casing
 8   was recovered did you have any belief as to
 9   whether Tom or Floyd was guilty of the Arfmann
10   murder?
11        A.   No.  I just know that we needed to figure
12   out, you know, what's going on or what's the, what
13   happened.
14        Q.   So, are you saying as you sit here today
15   you still have no idea which brother it was who
16   killed Camille Arfmann?
17        A.   As I sit here today I don't know.
18        Q.   Do you have a belief as to who is more
19   likely to have committed the murder, either Tom or
20   Floyd?
21        A.   No, I do not have a belief.
22        Q.   Do you think back in 1999 there was
23   probable cause to arrest Tom for the Arfmann
24   murder?
25        A.   I don't know who arrested Tom or what the
```

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1    probable cause was.

2        Q.   All right.  Let's take a look at Exhibit

3    71.  Should be there with you.  You recognize

4    Carreno's handwriting on that page?

5        A.   Yes, sir.

6        Q.   Okay.  So, it's dated November 7th, 1999,

7    and I'm just going to orient you in time.

8    November 7th is the evening when Tom turned

9    himself into the police.  Do you understand that?

10       A.   Yes, sir.

11       Q.   All right, and it's got a -- it says 2338

12   hours or 11:38 p.m., right?

13       A.   Yes, sir.

14       Q.   And it says on the second paragraph, on

15   arrival number 30.  Number 30 is Sheriff Dunnaway,

16   right?

17       A.   Yes, sir.

18       Q.   Or was back in 1999, right?

19       A.   Yes, sir.

20       Q.   All right.  It says, "On arrival Sheriff

21   Dunnaway met with the reporting officer."  The

22   reporting officer is Carreno, right?

23       A.   Yes, sir.

24       Q.   All right, so, "On arrival Dunnaway met

25   with Carreno outside of Law Enforcement Center and



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**TROY FROST**

1    advised Tom Bledsoe currently had admitted to

2    being involved.  Dunnaway advised victim was in a

3    field with a bullet to the head."  Do you see

4    that, sir?

5         A.   Yes, sir.

6         Q.   So, back on November -- and the body

7    wasn't recovered until the early morning hours of

8    November 8 when you arrived on scene, right?

9         A.   Yes, sir.

10        Q.   All right, so, on November 7th Tom was

11   admitting to being involved in the victim being in

12   a field with a bullet to the head, right?

13        A.   Yes, sir.

14        Q.   All right.  Let's take a look at what we

15   marked as Exhibit 72.  Do you have that in front

16   of you, sir?

17        A.   Yes, sir.

18        Q.   All right.  Exhibit 72 is a typed report

19   that you compiled, right?

20        A.   Yes, sir.

21        Q.   So, at the top it says date, November 29,

22   1999.  What does that date refer to?

23        A.   The date that this report was -- well, I

24   mean, it was the date on the narrative report.

25        Q.   And what does that date refer to?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1    A.    I do not know.  It should have been
2    November 8th.
3    **Q.    Is that the date that the report was**
4    **typed?**
5    A.    Well, could have been.  I don't know.
6    **Q.    If you typed your report on, say,**
7    **November 10th referring to events that occurred on**
8    **November 8th would you put the date at the top as**
9    **being November 8th or November 10th?**
10   A.    Well, I would have put November 8th, but
11   obviously I messed the date up and it should have
12   been November 8th of '99.
13   **Q.    So, is that a typo --**
14   A.    I would say.
15   **Q.    -- on the date?**
16   A.    Yes, sir.
17   **Q.    So, this report was typed on the 8th**
18   **regarding things that happened on the 8th, is that**
19   **right?**
20   A.    Yes, sir.
21   **Q.    Okay.  All right, so, it says, November**
22   **8, 1999, at approximately 0150 hours, that's 1:50**
23   **in the morning, right?**
24   A.    Yes, sir.
25   **Q.    And, so, you refer to Corporal Parnell**



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1   calling you while you were at home.  So, you were

2   off duty at that time, is that right?

3        A.   Yes, sir.

4        Q.   And Corporal Parnell wouldn't tell you

5   what was going on or why, right?

6        A.   Right.

7        Q.   Just told you to go to a location?

8        A.   Yes, sir.

9        Q.   Why did you call the sheriff on the

10  phone?

11       A.   Called him to find out what was going on

12  beings Corporal Parnell wasn't going to tell me,

13  so.

14       Q.   All right, did you have a car phone at

15  the time or how did you make that call?  Cell

16  phone, I mean?

17       A.   I don't know if we had the old bag phones

18  or not.  Can't remember.

19       Q.   In any event, the sheriff told you that

20  the missing girl was found dead and she was in the

21  ditch in a pasture, is that right?

22       A.   Yes, sir.

23       Q.   And then you followed Sheriff Dunnaway to

24  where the body was located, right?

25       A.   Yes, sir.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

# TROY FROST

1    Q.   And, so, you have a reference to 0208,

2    so, at 2:08 in the morning you arrived at the

3    scene in the ditch, is that right?

4    A.   Yes, sir.

5    Q.   And your report states, "I arrived at the

6    scene and I was told that Tom Bledsoe had shown

7    the way to the body and that his attorney, Mike

8    Hayes, was with him."  Do you see that?

9    A.   Yes, sir.

10   Q.   And, so, you weren't present when Tom

11   Bledsoe showed the way to the body, right?

12   A.   No, sir.

13   Q.   But other officers explained to you that

14   Tom Bledsoe had shown the way to the body, right?

15   A.   Yes, sir.

16   Q.   Did you ever hear any information

17   inconsistent with that fact that someone other

18   than Tom Bledsoe had shown the way to the body?

19   A.   No, sir.

20   Q.   And then in your report you document what

21   you observed.  You write, "I saw Tom sitting in a

22   vehicle and Mike Hayes was at the scene."  You see

23   that there?

24   A.   Yes, sir.

25   Q.   Did you see Tom sitting in a vehicle?

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# TROY FROST

```
 1        A.    Yes, sir.
 2        Q.    And it was a civilian vehicle that he was
 3   sitting in, is that right?
 4        A.    I believe so.  I didn't put down the
 5   vehicle that he was sitting in.
 6        Q.    Then you document that Sergeant Poppa,
 7   Deputy Gunckle, Special Agent Jim Woods, Detective
 8   Carreno, Corporal Parnell and Correctional Officer
 9   McCarty were present, right?
10        A.    Yes, sir.
11        Q.    And then you and Sergeant Poppa started
12   removing the paneling and plywood and the trash
13   that was piled on top, right?
14        A.    Yes, sir.
15        Q.    And then there was a mound of dirt
16   underneath the last piece of plywood, right?
17        A.    Yes, sir.
18        Q.    And you and Sergeant Poppa were digging
19   by hand, right?
20        A.    Yes, sir.
21        Q.    Were there marks of recent digging on
22   the, at the scene of the burial site?
23        A.    I believe I put in here that I saw the
24   shovel marks.
25        Q.    Did you look to see if there was a shovel
```

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1  nearby the scene of the crime, the scene of the

2  burial, I should say.?

3        A.    I don't -- no, I don't believe I did.

4        Q.    Did you look for a shovel?

5        A.    I don't believe I looked for a shovel,

6  no.  Not that I can remember.

7        Q.    Am I correct that one reason why you'd

8  want to look for a shovel is to see if you might

9  be able to get forensic evidence such as

10 fingerprints or blood evidence from the shovel

11 that was used to bury a 14-year-old girl who was

12 shot four times?

13       A.    Yes, sir.

14       Q.    And you understood that Tom's story was

15 that Floyd had -- well, we'll strike that.  We'll

16 get to that.  Let's stick to this report, Exhibit

17 72.  All right, so, you document the recovery of

18 the victim's body from the ditch, right?

19       A.    Yes, sir.

20       Q.    And then you document what the victim was

21 wearing at the time her body was recovered, right?

22       A.    Yes, sir.

23       Q.    And you took a Polaroid of some of the

24 injuries to the victim, right?

25       A.    Yes, sir.



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

**TROY FROST**

1          Q.    Did you have a Polaroid camera assigned

2     to you or how did you get the Polaroid?

3          A.    We had the Polaroid camera assigned to us

4     -- well, yeah, assigned to us.

5          Q.    So, what does that mean?   That you

6     carried it in your police vehicle at all times or

7     how did you get access to the Polaroid camera?

8              MR. TURNER:   Object to the form.

9          A.    Yeah.   I mean, we have a camera with us.

10    BY MR. AINSWORTH:

11         Q.    All right.   Then, so, the exhibit has

12    four pages but your report ends at the end of the

13    third page, is that fair to say?

14         A.    Yes, sir.

15         Q.    All right.   So, as of November 8th you

16    knew that Tom Bledsoe had admitted involvement,

17    shown police where the body was, told police that

18    the body had a bullet in the head, and provided

19    the murder weapon, his own gun, to the police, is

20    that right?

21             MR. TURNER:   Object to form.

22             MR. LINDEN:   Join.

23         A.    Yes, sir, that's right.

24    BY MR. AINSWORTH:

25         Q.    And, so, in the week that followed, so,

**TROY FROST**

1    between November 8th and November 12th did you

2    ever have any -- did you ever have any indication

3    that someone other than Tom had committed the

4    murder?

5         A.    No, sir.

6              (THEREUPON, Deposition Exhibit No 75 was

7    marked for identification.)

8         BY MR. AINSWORTH:

9         Q.    All right.  I want to show you what we've

10   marked as Exhibit 75.  Actually, I'm sorry, before

11   I have you look at that can I just ask you -- if

12   you wouldn't mind putting down Exhibit 75.  You

13   understood that the victim lived at Floyd's

14   trailer, Little Floyd's trailer and had been

15   transported from Little Floyd's home on that

16   Friday after school to the place where she was

17   buried, right?

18        A.    I don't know if she was transported from

19   there to where she was buried.  I mean, I don't

20   know.

21        Q.    Sure, okay.  Well, let me put it this

22   way:  Your understanding was that Camille, the

23   victim, got off the bus sometime around 4:20 in

24   the afternoon after school, right?

25        A.    Uh-huh.



**TROY FROST**

1    Q.    Is that a yes?

2    A.    Yes, sir.  I'm sorry.

3    Q.    And then sometime around 5 o'clock a

4  friend stopped by and she wasn't at the trailer,

5  right?

6    A.    Yes, sir.

7    Q.    And, so, your investigation focused on

8  that time period between 4:20 and 5 o'clock as the

9  period when she was likely to have been abducted

10  from Floyd's house by someone, right?

11         MR. TURNER:  Object to form.

12         MR. LINDEN:  Join.

13    A.    I guess I would say yeah, yes.

14  BY MR. AINSWORTH:

15    Q.    Yeah.  I mean, that made sense.  Like,

16  she was last seen around 4:20 by the bus driver

17  and then somebody came to the house around 5:00

18  and she wasn't there and that seemed to be the

19  period of time when the victim had gone missing,

20  right?

21    A.    Yes, sir.

22    Q.    All right.  So, then you understood that

23  the victim's body was recovered some distance away

24  behind Tom's house, right?

25         MR. TURNER:  Object to form.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                Suite 305
785-273-3063          Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131           316-201-1612

### TROY FROST

1      A.   Well, I think it was -- wasn't that Tom's

2   parents' house?

3      BY MR. AINSWORTH:

4      **Q.   Was Tom living there?**

5      A.   I think Tom was living there, yes.

6      **Q.   All right.  So --**

7      A.   At the time, yeah.

8      **Q.   Yeah.  So, if you were going to Tom's**

9   **house where would you go?**

10          MR. TURNER:  Object to form.

11     A.   Yeah.  No, no, yeah, I mean, yes.  No,

12   I --

13     BY MR. AINSWORTH:

14     **Q.   Yeah, I understand Tom did not have legal**

15   **ownership of the house, but Tom lived there,**

16   **right?**

17     A.   Yes.

18     **Q.   All right.  So, in any event, the victim**

19   **somehow made it from Floyd's trailer to the ditch**

20   **behind Tom's house, right?**

21          MR. TURNER:  Object to form.

22     A.   Yes, sir.

23     BY MR. AINSWORTH:

24     **Q.   And, so, as a police detective you would**

25   **want to know how she was transported from Floyd's**



5111 SW 21st Street          6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604             Suite 101                   Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

### TROY FROST

1  trailer to the ditch behind Tom's house, right?

2          MR. TURNER:  Object to form.

3      A.   Yes, sir.

4      BY MR. AINSWORTH:

5      Q.   And, so, one of the things that you would

6  want to know was whether the victim was

7  transported in Tom's truck, right?

8      A.   Yes, sir.

9      Q.   And, so, as a -- were you a good

10  detective, sir?

11      A.   Yes, sir.

12      Q.   So, as a good detective, a good thing, a

13  good investigative step to do would be to search

14  Tom's truck to look for trace evidence that might

15  indicate that the victim was in his truck, right?

16      A.   That's correct.

17      Q.   And, so, you could look for fingerprints

18  in the truck, right?

19      A.   Yes, sir.

20      Q.   You could look for hairs in the truck,

21  right?

22      A.   Yes, sir.

23      Q.   And you could look for blood or other

24  bodily fluid evidence, right?

25      A.   Yes, sir.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063            Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

**TROY FROST**

1      Q.    Did anybody search the truck, Tom's
2      truck?

3      A.    Not to my knowledge, no, but --

4      Q.    Why wasn't that done?

5      A.    I do not know.

6      Q.    Somebody should have searched Tom's
7      truck, right?

8      A.    Somebody should have searched Tom's
9      truck, yes.

10     Q.    And if the victim was discovered in a
11     ditch behind Tom's house a logical investigative
12     step would be to search Tom's house to see if
13     there was any evidence that might link Tom to the
14     crime, right?

15          MR. TURNER:  Object to form.

16     A.    That is correct.

17     BY MR. AINSWORTH:

18     Q.    And you want to search Tom's house as
19     soon as possible in relation to the discovery of
20     the body so that there's no opportunity to, for
21     evidence to be either intentionally or
22     unintentionally moved or destroyed, right?

23          MR. TURNER:  Object to form.

24     A.    Yes, sir.

25     BY MR. AINSWORTH:



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604         Suite 101                Suite 305
785-273-3063             Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com      913-383-1131             316-201-1612

### TROY FROST

1       Q.   And, so, best case scenario you search
2  Tom's house on November 8th, the same day the body
3  is recovered, right?
4            MR. TURNER:  Object to form.
5       A.   Who searched Tom's -- what was your
6  question?
7       BY MR. AINSWORTH:
8       Q.   Sure.  Under proper police procedure
9  Tom's house should have been searched on November
10  8th, right?
11           MR. TURNER:  Object to form.
12      A.   It -- yeah, it should have been searched.
13      BY MR. AINSWORTH:
14      Q.   And when you're conducting a search of a
15  suspect's residence you don't just search the
16  suspect's bedroom, you search all areas that the
17  suspect has access to in the house, right?
18      A.   Yes, sir.
19           MR. NORTON:  Can we take a break, please?
20           MR. AINSWORTH:  That's how you're --
21           MR. NORTON:  We're taking a break.
22           MR. AINSWORTH:  Who's calling for a
23  break?
24           MR. NORTON:  Michael Norton.  There's not
25  a question --



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### TROY FROST

```
 1             MR. AINSWORTH:  Five minutes.
 2             MR. NORTON:  Yeah, five minutes is fine.
 3             THE VIDEOGRAPHER:  Time is approximately
 4   11:15 a.m. central, we're going off the record.
 5             (THEREUPON, a recess was taken.) 1:28:58-
 6   1:29:01
 7             THE VIDEOGRAPHER:  Time is approximately
 8   11:25 a.m. central, we're back on the record.
 9        BY MR. AINSWORTH:
10        Q.   All right, sir, I think you've previously
11   been handed Exhibit 73.  Can you take a look at
12   that one?
13        A.   73 or 75?
14        Q.   73.
15        A.   Oh, got it.
16        Q.   All right, and you see that it refers to
17   a start time on November 9th at 8 p.m.?
18        A.   Yes, sir.
19        Q.   And, so, November 9th is the day after
20   Camille's body was recovered, right?
21        A.   Yes, sir.
22        Q.   And then taking a look at Exhibit 75,
23   this is a -- date at the top, November 10th.  Do
24   you have Exhibit 75 in front of you?
25        A.   Yes, sir, I do.
```



Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1          Q.   All right, so, on the first page of

2     Exhibit 75 it says, it's dated November 10th,

3     1999, at 0227 hours.  You see that?

4          A.   Yes, sir.

5          Q.   All right, so, this is 2:27 in the

6     morning on November 10th, a continuation of the

7     interrogation of Floyd S. Bledsoe that started at

8     8 p.m. on November 9th.  Do you see that?

9          A.   Yes, sir.

10         Q.   Okay.  I'm going to -- the handwriting on

11    Exhibit 75, is that Kirk Vernon's?

12         A.   Exhibit 75?

13         Q.   Yes.

14         A.   No, it's my handwriting.

15         Q.   Your handwriting, okay.  So, this is your

16    note of the interrogation of Floyd Bledsoe, right?

17         A.   Yes.

18         Q.   All right.  So, can you tell us why were

19    you interrogating Floyd Bledsoe the day after the

20    victim's body was found behind Tom's house after

21    Tom led investigators to the body after telling

22    investigators that he was involved in her murder

23    and giving them the murder weapon, which was his

24    own gun?

25         A.   I do not know.  I was just taking the

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### TROY FROST

1   notes.

2       Q.   Okay.  So, you -- do you have any reason

3   to suspect Floyd Bledsoe at this time?

4       A.   I do not know what all information was

5   provided.  I just took the notes on the phone.

6       Q.   All right.  Who was conducting the

7   interrogation of Floyd Bledsoe the night of

8   November 9th to the 10th?

9       A.   That would be, according to Exhibit 73,

10  Detective Sergeant Randy Carreno.

11      Q.   All right, and, so, let's just go through

12  Exhibit 75.  On the first page there's a note, the

13  second paragraph, Sunday -- or does this mean that

14  Floyd was asked on Sunday do he have any contact

15  with Tom?  No, none.  You see that?

16      A.   Yes, sir.

17      Q.   So, you guys were asking if Tom had --

18  Floyd had contact with Tom Bledsoe on Sunday, you

19  see that?

20      A.   Yes, I do see it, sir.

21      Q.   Do you know why you were asking Floyd if

22  he had contact with Tom on Sunday?

23      A.   I wasn't asking anything.  I was just

24  taking notes.

25      Q.   Do you remember this?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**TROY FROST**

1       A.    I don't remember that, no.

2       Q.    **So, how do you know that you were just**

3    **taking notes and somebody else was asking the**

4    **questions?**

5       A.    Well, this is my handwriting, all of this

6    was my handwriting, but I wasn't talking to Floyd.

7       Q.    **How do you know you weren't talking to**

8    **Floyd?**

9       A.    That I know of, unless you have something

10   saying I was, but I don't -- these are my notes.

11      Q.    **Do you have anything saying that you**

12   **weren't talking to Floyd during this interrogation**

13   **in, from 2:27 a.m. on November 10th?**

14      A.    No, I don't.

15      Q.    **All right, let's -- going down -- Floyd's**

16   **being asked, it's about like six paragraphs down,**

17   **"Did you have sexual intercourse with Camille?**

18   **No."  Do you see that?**

19      A.    Yes, sir, I see it.

20      Q.    **Why was Floyd being asked about if he had**

21   **sex with the victim at 2:30 in the morning the day**

22   **after Tom turned himself in for Camille's murder?**

23      A.    I don't know why he was being asked that.

24   I don't know.

25      Q.    **And, so -- sorry, I don't mean to**

Appino & Biggs Reporting Service, Inc.    TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## TROY FROST

1    interrupt, go ahead.

2        A.    That's fine.  No, I don't know why he was

3    being asked that.  I -- (incomplete)

4        Q.    Well, let's take your 33 years of law

5    enforcement experience.  Knowing the facts that

6    you know, do you have any idea for any legitimate

7    purpose in asking Floyd Bledsoe the morning of

8    November 10th, 1999, if he had sex with Camille

9    the day after Floyd -- or the day after Tom turned

10   himself in for Camille's murder and showed

11   investigators where the body was?

12           MR. QUALSETH:  Object to the form.

13       A.    Can you reask the question, please?

14   BY MR. AINSWORTH:

15       Q.    Of course.  Based on your 33 years of law

16   enforcement experience, do you have any legitimate

17   justification, to your knowledge, for asking Floyd

18   if he had sex with Camille at 2:30 in the morning

19   the day after Tom turns himself in for Camille's

20   murder and shows police where the body is and

21   gives them the murder weapon, his own gun?

22           MR. QUALSETH:  Same objection.

23           MR. TURNER:  Join.

24           MR. LINDEN:  Join.

25       A.    No, I do not.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## TROY FROST

1    BY MR. AINSWORTH:

2        Q.    All right, if you look at the bottom of

3    page 1 of Exhibit 75, can you read what's written

4    there?

5        A.    Says, "What are you -- what you are

6    representing you and Camille and are trying to

7    provide Camille the best but it goes further than

8    that."

9        Q.    And then it says okay.  Does that mean

10   Floyd just said okay?

11       A.    I would guess so.

12       Q.    Well, I'm trying to decipher your notes

13   so --

14       A.    I know, yeah.

15       Q.    -- can you tell us?

16       A.    No, I don't -- I don't know if that's an

17   okay from Floyd or not.

18       Q.    On page 2 of Exhibit 75 it states, "If

19   conditions were different he would be with Camille

20   but he is married."  Do you see that?

21       A.    Yes, sir.

22       Q.    What does that refer to?

23       A.    I believe that's referred to Floyd.

24       Q.    Floyd saying that if conditions were

25   different he'd be with Camille but he's married?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

1      A.   Yes, sir.

2      Q.   And then it says "never had a thought."

3  What does that refer to?

4      A.   Him being asked never had a thought.

5  He'd say no.

6      Q.   Means he's never had a thought about

7  sexual contact with Camille?

8      A.   I -- my notes -- I mean, that's just what

9  it says.

10      Q.   On page 3, I mean, Floyd's being

11  repeatedly asked about whether he was sexually

12  aroused wrestling with Camille.  Do you see that?

13      A.   Yes.

14      Q.   Can you explain why Floyd was being asked

15  about whether he got sexually aroused while

16  wrestling with Camille in the early morning hours

17  of November 10th, 1999?

18      A.   I do not know why he was being asked

19  that.

20      Q.   Then at the bottom it says, "no way she

21  would know what his penis looks like."  Do you see

22  that?

23      A.   Yes.

24      Q.   All right.  So, Floyd is telling you

25  there's no way Camille would know what his penis



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**TROY FROST**

1 looks like, right?

2  A. Right.  That's what he's saying to

3 whoever is interviewing him, he's being

4 interviewed.

5  Q. In your presence, right?

6  A. Right.

7  Q. Can you tell us why Floyd was being asked

8 if Camille knows what his penis looks like?

9  A. No, sir.

10  Q. Floyd answered all of your questions,

11 right?

12  MR. TURNER:  Object to form.

13  A. He answered all the questions that were

14 being asked of him by somebody else, not me.

15  BY MR. AINSWORTH:

16  Q. Okay, and Floyd agreed to stay from 8

17 p.m. on November 9th until 4:00 in the morning on

18 November 10th to answer whatever questions you

19 guys had, including if Camille knew what his penis

20 looked like, right?

21  A. Yes, sir.

22  Q. Did the questions about whether Camille

23 knew what Floyd's penis looked like further the

24 investigation into Camille's murder in any way?

25  A. I do not know if it did or not.



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1        Q.   And then it says, "never breasts never

2   vagina, never butt," meaning Floyd never touched

3   the victim's breasts, vagina or butt, right?

4        A.   Yes, sir.

5        Q.   All right, on page 4 of Exhibit 75 the

6   second or third paragraph down, actually second

7   paragraph down it says, "Friday, do you remember

8   returning back to your trailer?  No way on

9   Fairview Road."  Do you see that?

10       A.   Yes, sir.

11       Q.   So, Floyd is saying no way did I go back

12   to my trailer after I went to the hardware store

13   on Friday, right?

14       A.   Yes, sir.

15       Q.   And then -- and, so, as of November 10th

16   you knew the significance of whether or not Floyd

17   went back to the trailer after the hardware store,

18   right?

19       A.   Yes, sir.

20       Q.   All right, and then the next paragraph

21   down it says, "Friday did not see Camille all day

22   long except seeing the school bus."  Do you see

23   that?

24       A.   Yes, sir.

25       Q.   And then it says, "did not see her on

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1    that school bus."  Do you see that?

2        A.    Yes, sir.

3        Q.    And, so, Floyd is telling you that he

4    didn't see the victim all day on Friday except he

5    saw her school bus, but he didn't see her on that

6    school bus, right?

7        A.    Right.

8        Q.    All right, and then it says, "Sunday I

9    didn't talk to Tom, I was with Sergeant Poppa."

10   You see that?

11       A.    Yes, sir.

12       Q.    And, so, again Floyd is being asked

13   whether he talked to Tom on Sunday, right?

14       A.    Yes.

15       Q.    Did you know on November 9th or the

16   morning of the 10th that there was some suggestion

17   that Tom -- that Floyd had told Tom about the

18   murder?

19       A.    No, sir.

20       Q.    You didn't know that, correct?

21       A.    No.

22       Q.    That's correct?

23       A.    Yes, sir.  That I remember, no.

24       Q.    All right.  How did you learn that there

25   was some indication that Tom was accusing Floyd of

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1  having committed the murder and telling him about
2  it?
3       A.   I don't know.
4       Q.   Okay.  So, going on on page 4 of Exhibit
5  75 it says two paragraphs down, you see where it
6  says "no contact with brother at all -- with
7  brother at all over weekend?"
8       A.   Yes, sir, I see that.
9       Q.   Okay.  So, Floyd is saying he didn't have
10 any contact with his brother, Tom, at all that
11 weekend, right?
12      A.   Yes, sir.
13      Q.   All right.  Then on page 5, the third
14 paragraph down -- actually the first paragraph,
15 "Floyd sighing, crossing arms."  Why did you note
16 that?
17      A.   I just noted it.
18      Q.   You were given some training about body
19 language, right?
20      A.   Right.
21      Q.   What training did you receive about body
22 language?
23      A.   Just that if they're sighing or crossing
24 their arms or sweat, you know, sweating, dry
25 mouth, you know.  I mean, just kind of -- so it's

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

### TROY FROST

1   always nice just to make a note of it.

2          Q.   Well, what does that indicate if

3   somebody's sighing, crossing their arms or have a

4   dry mouth?

5          A.   It could indicate a lot of things.  I

6   mean, you know, I just make note of it just to

7   throw it in there.

8          Q.   Well, what were you trained?

9          A.   I'm sorry, what was that?

10         Q.   What were you trained about body language

11   and what to pay attention to?

12         A.   Right, just to watch the body language,

13   their arms, their, you know, the way they're

14   sitting, you know.  Are they, you know -- just

15   different things.

16         Q.   All right.  So, let me just -- and, so,

17   were you trained at all about what it means when

18   people, you know, express body language like what

19   you've referenced?

20         A.   Yes, but, you know, it's just a note, you

21   know.

22         Q.   What were you trained?

23         A.   In watching peoples' body language, if

24   that's what you're asking.

25         Q.   And what were you -- yeah, and what were

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### TROY FROST

1  you told during your training that the body

2  language means?

3      A.    That different things mean different -- I

4  mean, it could mean different things for different

5  people.  Floyd sighing, crossing his arms, you

6  know, sounds like he's tired, wants to be done,

7  don't like the questions, you know.

8      Q.    Fair to say at 3:00 in the morning and

9  Floyd's been there for seven hours it would be

10 reasonable for him to be irritated at the police

11 asking him questions about whether he had sex with

12 the victim or showed her his penis, right?

13     A.    Right.

14     Q.    If there's no basis for the police to

15 suspect Floyd and his brother has, you know,

16 admitted involvement in the murder, showed the

17 police where the body was and provided the murder

18 weapon to the police, his own gun, it would be

19 reasonable to, for Floyd to tell you guys after

20 seven hours of interrogation to go F yourselves,

21 right?

22          MR. QUALSETH:  Object to the form.

23     A.    I mean, yeah.

24 BY MR. AINSWORTH:

25     Q.    But Floyd was respectful, right?



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

## TROY FROST

1        A.    Yes, he was.

2        Q.    **He answered all your questions, correct?**

3              MR. TURNER:  Object to the form.

4        A.    He answered the questions.

5        BY MR. AINSWORTH:

6        Q.    **All right, and then going back to page 5**

7    **of Exhibit 75, it says, "You're going to be that**

8    **person charged," and then, "How I was at work, or**

9    **how?  I was at work."  Do you see that?**

10       A.    Yes, yes, sir.

11       Q.    **And so, Floyd is being asked -- well,**

12   **Floyd is saying he was at work, right?**

13       A.    Yes, sir.

14       Q.    **And what does you're going to be that**

15   **person charged mean?**

16       A.    It means that you're going to be that

17   person charged.

18       Q.    **Okay, so, you guys were talking to Floyd**

19   **about him being charged with murder, right?**

20             MR. TURNER:  Object to form.

21       A.    I wasn't talking to Floyd about that.

22       BY MR. AINSWORTH:

23       Q.    **Let me rephrase.**

24       A.    Okay.

25       Q.    **So, during the interrogation where you**



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604           Suite 101              Suite 305
785-273-3063          Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com       913-383-1131           316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

**TROY FROST**

1    were present Floyd was being told he was going to

2    be charged with Camille's murder, right?

3           MR. TURNER:  Object to the form.

4       A.   Right.

5    BY MR. AINSWORTH:

6       Q.   And Floyd was saying, how can I be

7    charged, I was at work, right?

8       A.   Yes.

9       Q.   And in this interrogation there's a

10   reference that Floyd is talking about seeing blood

11   on, on truck, you see that there?

12      A.   Yes, sir.

13      Q.   And that references Floyd telling the

14   police that he may have seen blood on Floyd -- on

15   Tom's truck, right?

16      A.   I don't know.  It just says saw blood in

17   truck.

18      Q.   Right.  If Floyd was telling you that he

19   may have seen blood on Tom's truck that's another

20   reason why police should be searching Tom's truck,

21   right?

22          MR. TURNER:  Object to the form.

23      A.   I don't know.  I mean, I -- you know,

24   it's -- (incomplete)

25          BY MR. AINSWORTH:



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1        Q.   You don't know.  Well, let me, let me ask
2    you this way:  Are you telling us that if a
3    suspect in a homicide who has provided the police
4    with the murder weapon, led police to where a 14-
5    year-old girl has been shot to death and admits
6    involvement and you learn that there might be
7    blood on the suspect's truck, are you telling us
8    that you would not search that truck?
9        A.   I'm telling you that it wouldn't be -- I
10    wouldn't -- it wouldn't be up to me whether the
11    truck was searched or not.  I mean, it's -- I
12    don't know if the truck was, wasn't, I don't have
13    a clue.
14        Q.   Oh, sure, that would be a fine answer if
15    I asked you, Mr. Frost, did you search the truck
16    or Mr. Frost, was that your decision to search the
17    truck.  I'm not asking that.  I'm saying, sitting
18    here now with your 33 years of law enforcement
19    experience if you have a suspect in a homicide who
20    admits involvement in the death of a 14-year-old
21    girl, shows police where she's buried behind his
22    house, and provides the police with the murder
23    weapon, which is his own gun, and you learn that
24    there might be blood on that suspect's truck, do
25    you search the truck?



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

### TROY FROST

```
1        A.    Yes, the truck should be searched.
2        Q.    All right, and, so, then -- and Floyd is
3   the one saying that he saw blood in the truck, on
4   the truck, or may have seen blood on the truck,
5   right?
6        A.    Yes, sir.
7        Q.    And says, "Will you go out with me, I
8   will show you."  You see that?
9        A.    Yes, sir.
10       Q.    And, so, Floyd is saying he'll show
11  police what he saw in Tom's truck, right?
12       A.    Yes.
13       Q.    And then he's told no, right?
14       A.    Yes.
15       Q.    All right, and then it says, "That's what
16  I seen, glanced and seen it and got sick and
17  thought it could be, it could of belonged to
18  Camille."  Do you see that?
19       A.    Yes, sir.
20       Q.    And then it says, "Sergeant Poppa said
21  Tom admitted to killing Camille."  You see that?
22       A.    Yes, sir.
23       Q.    And, so, Floyd is telling you that
24  Sergeant Poppa told him Tom admitted to killing
25  Camille, right?
```



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

```
1        A.    Yes.

2        Q.    Then at the bottom of page 5 of Exhibit 9

3   -- Exhibit, sorry, 75, can you read what it says

4   where "hurts for Camille" or what does that phrase

5   read?

6        A.    I do not know.   Hurts -- yeah, I --

7   (incomplete)

8        Q.    Says, "Sees brother, older brother" and

9   then what's the next word?

10       A.    Looks like Clayton.

11       Q.    Been here?

12       A.    Yeah, been home, been here.   Yeah, looks

13  like here.

14       Q.    All right, hang on a second.   Okay.

15  Sorry, my screen froze up again, get back into it.

16  All right, so, there's a reference says, "if I

17  seen him probably wouldn't, 99 percent wouldn't."

18  Do you know what that refers to?

19       A.    No, sir.

20       Q.    And then it said Floyd, "It says Floyd

21  said where it happened at?   Yes and why."   Do you

22  know what that refers to?

23       A.    No, sir, I don't.

24       Q.    All right, but fair to say that Floyd did

25  not implicate himself in the Arfmann homicide in
```

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1    any way during this conversation with him, right?

2        A.    Not during the -- yeah, yes.

3        Q.    All right.  Go on to page 6.  Now Floyd

4    is being told you were involved in Camille's

5    death, right?

6        A.    Yes, sir.

7        Q.    And Floyd says that he feels shocked and

8    scared.  How could I be involved, right?

9        A.    Yes, sir.

10       Q.    Floyd says, "I had no involvement

11   whatsoever, please believe me."  Right?

12       A.    Yes, sir.

13       Q.    So, Floyd is asking you to believe him

14   that he had no involvement whatsoever, right?

15       A.    Yes.

16       Q.    Then he -- then you guys -- Carreno is

17   then asking Floyd whether he was asked to assist

18   in Camille's death, right?

19       A.    Yes.

20       Q.    What does bumper mean, or is that what

21   that reads?  What is that next word?

22       A.    I think it says burped.

23       Q.    It says just burped?

24       A.    I can't read it.  That's what it says,

25   looks like to me, but --



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1      Q.    I see the B the U the M --

2      A.    R-P-E-D.

3      Q.    And then what comes after burped?

4      A.    "Can't say no to people."

5      Q.    I'm sorry, but it's burp and then there

6    looks to be an E and then another letter after

7    burp.

8      A.    Yeah, B-U-R-P-E-D.  That's what it looks

9    like, but I can't --

10     Q.    Oh, burped?

11     A.    Yes.

12     Q.    Like somebody had burped?

13     A.    Right.

14     Q.    Do you know what that refers to?

15     A.    No.  I just -- (incomplete)

16     Q.    Then it says, "I had nothing to do with

17   Camille's death or her missing, never asked to

18   help."  Do you see that?

19     A.    Yes, sir.

20     Q.    Floyd's saying he didn't have anything to

21   do with her death or her going missing or helping

22   anyone else do it, right?

23     A.    Yes.

24     Q.    And then Floyd's saying that he can't see

25   Tom pulling the trigger, right?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### TROY FROST

1      A.   Yes, I see that.

2      Q.   So, in his interrogation Tom's -- strike

3  that.   In his interrogation Floyd is not trying to

4  put this on Tom, right?

5      A.   Right.

6      Q.   He's not saying Tom's the one who did it,

7  you know, go get Tom, right?

8      A.   Right.

9      Q.   He's saying doesn't make sense to me, I

10 can't see Tom pull the trigger, right?

11     A.   Yes, sir.

12     Q.   And then at the bottom it says, "I never

13 once told her I was upset."  You see that?

14     A.   Yes, sir, I see that.

15     Q.   Is that in relation to Carreno telling

16 Floyd that he was upset with her and he got, and

17 it escalated or something like that?

18     A.   I don't know if that's what that refers

19 to.

20     Q.   All right.  Page 7 of Exhibit 75.  Do you

21 know what it says at the very top of the page?

22     A.   No, I don't.

23     Q.   In any event, the second line says, this

24 is Floyd saying "I was no way involved in this, no

25 way at all."  Is that right?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131                316-201-1612

## TROY FROST

1        A.    Yes.

2        Q.    Then it says, "I loved her, I do care."

3    Do you see that?

4        A.    Yes, sir.

5        Q.    Was Carreno asking Floyd whether he cared

6    that Camille was dead?

7        A.    I do not know what he was asking.  I

8    don't remember what the -- (incomplete)

9        Q.    It says, "Yes, shed tears for Camille

10   'cause I cared for her.  I still care for her and

11   always will."  You see that?

12       A.    Yes, sir.

13       Q.    So, Floyd is, you know -- you don't know

14   what the question is, but Floyd is confirming that

15   yes, he did care for Camille and he did shed tears

16   for her. 2:00:25  You see that there?

17       A.    Yes, sir.

18       Q.    And, so, was Floyd being asked to confirm

19   or in some way indicate that he did in fact feel

20   bad about her death, Camille's death?

21       A.    Can you ask me that question again?

22       Q.    Sure.  Let's read the next line.  What

23   does that next line say?

24       A.    Is that the "not happy that Camille's

25   dead?"



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604                 Suite 101                    Suite 305
785-273-3063             Overland Park, KS 66212         Wichita, KS 67202
www.appinobiggs.com           913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

**TROY FROST**

1       Q.    Yeah.   Why on earth were you asking Floyd

2   -- strike that.   Why on earth was Carreno asking

3   Floyd whether he was happy that Camille, the 14-

4   year-old girl, was dead?

5            MR. QUALSETH:   Object to the form.

6       A.    I don't know what question was being

7   asked.

8       BY MR. AINSWORTH:

9       Q.    You just know that Tom -- that Floyd had

10  to say I'm not happy that Camille is dead?

11      A.    Right.

12      Q.    So, you know, it looks like you've got

13  Tom in custody, Tom charged with murder, Tom's

14  weapon as the murder weapon, Tom shows you where

15  the body is buried, Tom admits involvement, and

16  yet you're interrogating Floyd and I'm trying to

17  find out, you know, 'cause I'll ask you at trial,

18  but do you have any explanation whatsoever why

19  you're interrogating Floyd in the early morning

20  hours of November 10th?

21           MR. TURNER:   Object to form.

22      A.    Well, I wasn't interrogating Floyd and I

23  don't know.

24      BY MR. AINSWORTH:

25      Q.    You were in the room while Floyd was



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1   being interrogated on November 10th, right?

2          MR. TURNER:  Object to form.

3      A.   I was in a room, yes.

4      BY MR. AINSWORTH:

5      Q.   In the room, right?

6      A.   I don't know if I was in the room.  I

7   don't remember if I was or not.  Is there, is

8   there something --

9      Q.   Do you think you might have been --

10  sorry, I cut you off.  Please continue your

11  answer.

12     A.   I was just saying if there was something,

13  video or something where I was in the room, but I

14  don't -- I can't recall whether I -- I know I was

15  just taking notes.

16     Q.   Do you know why there's no video for this

17  interaction between Floyd and whoever is asking

18  the questions?

19     A.   No, I do not.

20     Q.   There should be video -- and I'll tell

21  you that there's video from 8 p.m. until about 1

22  a.m. of Floyd's interaction with his interrogator.

23  And, so, well, if we have video of Floyd's

24  interrogation from 8 p.m. until 1 a.m. we should

25  have it until the end of his interrogation, right?

**TROY FROST**

1      A.    Should, yes.

2      Q.    And then flipping back to Exhibit 73, the

3  first page of Exhibit 73, can you tell us why

4  Floyd is being read his rights, his Miranda rights

5  at the initiation of his interrogation at 8 p.m.

6  on November 9th?

7      A.    No, sir.

8      Q.    That seems wrong to you as a law

9  enforcement officer, right, that Floyd would be

10  given his Miranda rights when you have Tom charged

11  with the murder, Tom admitting involvement, Tom

12  providing the murder weapon and there being no

13  evidence to suspect Floyd in the murder, right?

14          MR. QUALSETH:  Object to the form.

15      A.    I don't know all the facts, so, I do not

16  know.

17          BY MR. AINSWORTH:

18      Q.    Okay.  So you think that there might be

19  facts that would support the provision of Miranda

20  rights to Floyd at 8 p.m. on November 9th, right?

21      A.    Again, sir, I don't know.

22      Q.    Well, no, I'm just saying, you know, if

23  -- let me ask you this way:  If there was -- if

24  there were facts that would suggest that Floyd was

25  guilty known to the police as of 8 p.m. on



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## TROY FROST

1    November 9th those should be documented, right?

2         A.    Should be documented, yes.

3         Q.    'Cause otherwise it looks like the police

4    are interrogating somebody for no apparent reason,

5    right?

6              MR. TURNER:   Object to form.

7         A.    Again, I do not know what the, the facts

8    were at that time.

9         BY MR. AINSWORTH:

10        Q.    I'm not asking you what the facts are.

11   I'm just saying you know as an experienced law

12   enforcement officer that unless you document the

13   facts known to police to suspect somebody of a

14   crime and you start interrogating the person, some

15   needle nose criminal defense attorney is going to

16   be, you know, saying hey, Detective, you know,

17   you're just interrogating this guy's not, this guy

18   without any cause, right?

19             MR. TURNER:   Object to form, asked and

20   answered.  You can answer or not.

21        A.    I -- again, I don't know.

22        BY MR. AINSWORTH:

23        Q.    Well, let me take the needle nose out of

24   it and see if I can ask it this way, sir:  You're

25   supposed -- if you have a suspect you are supposed



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604               Suite 101                Suite 305
785-273-3063           Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131            316-201-1612

**TROY FROST**

1   to document the reasons why that person is a

2   suspect, right?

3        A.   Yes, you would.

4        Q.   And if you provide somebody with their

5   Miranda rights that means that that person is a

6   suspect, right?

7             MR. TURNER:   Object to the form.

8        A.   Could be, yes, sir.

9   BY MR. AINSWORTH:

10       Q.   Well, I mean, you don't provide your, the

11  Miranda rights to somebody unless you suspect them

12  of being, of having something to do with a crime,

13  right?

14       A.   Right.

15       Q.   And, so, if there was any basis to

16  suspect Floyd S. Bledsoe of the Arfmann homicide

17  those facts should have been documented as of, you

18  know, what the police knew as of 8 p.m. on

19  November 9th, right?

20       A.   Again, I don't know what the facts were

21  -- I mean, I just have what I have.  I don't, I

22  don't know.

23       Q.   Okay, you're focused on what you knew and

24  what you did and here I'm asking you,

25  understanding that you were not in charge of this

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1    **investigation, I'm just saying that as a law**
2    **enforcement officer you would agree with me that**
3    **any facts known to the police as of November 9th,**
4    **1999, 8 p.m., should have been documented in some**
5    **way or fashion that led the police to suspect**
6    **Floyd of this murder, right?**
7         A.   I mean, I don't know if they were or
8    weren't.
9         **Q.   That would be a good answer if I said,**
10   **hey, Mr. Frost, do you know if the facts are**
11   **documented.  I'm not asking that.  I'm just saying**
12   **is it true that police should have documented any**
13   **facts known to them to suspect Floyd S. Bledsoe as**
14   **of what the police knew as of November 9th at 8**
15   **p.m.?**
16              MR. TURNER:  Object to form.
17        A.   I would suppose that there would be some
18   type of documentation.
19   BY MR. AINSWORTH:
20        **Q.   And why would you suppose that?**
21        A.   There'd be some type of documentation
22   somewhere saying that.
23        **Q.   Yeah, 'cause you would expect that there**
24   **would be some type of documentation listing why**
25   **the police suspected Floyd S. Bledsoe as of**

**Appino & Biggs** Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1    November 9th at 8 p.m., right?

2         A.   Right.

3         Q.   All right.  So then turning to your notes

4    in Exhibit 75.

5              MR. TURNER:  Do you have a page number?

6              MR. AINSWORTH:  Yeah, we're on page 7 of

7    75.

8         BY MR. AINSWORTH:

9         Q.   And Floyd is saying, "I didn't do it the

10   first time.  I am shocked I have to sit here till

11   2 to 3 in the morning about this."  Right?

12        A.   Yes, sir.

13        Q.   That's what Floyd's telling you --

14             MR. TURNER:  Object to form.

15        Q.   -- or that's what Floyd is saying?

16        A.   That's what Floyd is saying, yes.

17        Q.   Says, "I didn't kill Camille, I didn't

18   touch her, I didn't have contact with Tom."  You

19   see that?

20        A.   Yes, sir.

21        Q.   And, so, Floyd is still being asked

22   whether he killed Camille, whether he touched

23   Camille, and whether he had contact with Tom,

24   right?

25             A.   Again, I don't know what the question

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**TROY FROST**

1   was.

2        Q.   Well, you do know that that's what Floyd

3   is saying in response to something, that he didn't

4   kill Camille, he didn't touch her and he didn't

5   have contact with Tom, right?

6        A.   Yes, sir.

7        Q.   And then Floyd is saying, "I did not kill

8   Camille on Friday, Saturday, or Sunday, nor do I

9   know who did kill her.  I am 23.  How old are

10  you?  You see that?

11       A.   Yes, sir.

12       Q.   So, these are -- this is what Floyd is

13  saying during his interrogation, that he didn't

14  kill Camille on any day and he doesn't know who

15  killed her, right?

16       A.   Yes, sir.

17       Q.   And, so, again Floyd is not saying it was

18  Tom who did it, right?

19       A.   Right.

20       Q.   He's saying, I have no idea who killed

21  her?

22       A.   Yes.

23       Q.   And then at the bottom of the page do you

24  see where it says "full complete roll of duct tape

25  question mark.  Answer yes?"



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**TROY FROST**

1       A.    Yes, I see that, sir.

2       Q.    And, so, Floyd was being asked if he gave

3   Richard Zule, his employer, a full complete roll

4   of duct tape?

5       A.    I don't know what that question would've

6   been.

7       Q.    Well, you know that Floyd bought a roll

8   of duct tape from the hardware store on Friday

9   afternoon, right?

10      A.    Yes, sir.

11      Q.    Friday meaning November 5th, the time

12  that the victim went missing, right?

13      A.    Yes, sir.

14      Q.    And in your notes it says "did not use it

15  on Camille," right?

16      A.    Yes.

17      Q.    So, Floyd is having to say he did not use

18  the duct tape on Camille, right?

19      A.    Yes, sir.

20      Q.    Going on to page 8.  Says, "Didn't want

21  relationship to be more than it was." Do you see

22  that?

23      A.    Yes, sir.

24      Q.    And, so, Floyd is telling, is saying that

25  he didn't want his relationship with Camille to be



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1   more than it was, right?

2        A.    Right.

3        Q.    And then Floyd's last words to the police

4   on November 10th, 1999, at 3:58 in the morning was

5   "trust me, please?"

6              MR. TURNER:   Object to form.

7        A.    That's -- yes, that's what it says here.

8        BY MR. AINSWORTH:

9        Q.    And then on page 9 of Exhibit 75 you took

10  Polaroids of Floyd Bledsoe or Polaroids of Floyd

11  Bledsoe were taken, you see that?

12       A.    Yes, sir.

13       Q.    Did you take the Polaroids?

14       A.    I don't know if I did or not.  I can't

15  remember, sir.

16       Q.    I'll grab those in a break and see if we

17  can't jog your memory.

18       A.    Yeah.

19       Q.    And, so, you would watch the

20  interrogations that were going on in this case

21  from a video feed, is that right?

22       A.    Yes, sir.

23       Q.    And you knew that if a, if a suspect made

24  an admission that he committed a crime that was

25  something that you as a police officer should

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

1    document, right?

2         A.    Yes.

3         Q.    You watched the -- well, how much of the

4    video from the interview with Floyd on November

5    12th to the 13th did you watch?

6         A.    I watched a portion of it before I came

7    in.

8         Q.    And, so, you saw when you first enter the

9    room, you're already in the room before Floyd

10   enters, right?

11        A.    Yes.

12        Q.    And, so, it's not the fact that you came

13   into the room while Floyd was in there to see if

14   he needed something from outside the room, 'cause

15   when you came in the room he wasn't in the room,

16   he was already outside the room, right?

17        A.    Right, yeah.

18        Q.    How long did you interrogate Floyd the

19   night of November 12th into the morning of the

20   13th?

21             MR. TURNER:    Object to the form.

22        A.    I don't -- maybe hour and a half, two

23   hours that I talked to him.

24        BY MR. AINSWORTH:

25        Q.    Well, how long were you continuing to



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

1   interrogate Floyd after the video stopped?

2        A.   I do not know.

3        Q.   You were telling Floyd that he needed to

4   tell Camille's story, right?

5        A.   Yes, sir.

6        Q.   You said that a number of times, right?

7        A.   Yes, sir.

8        Q.   And a number of times you were telling

9   him to say that he loved her, right?

10       A.   Yes, sir.

11       Q.   Why were you telling Floyd that he needed

12  to tell Camille's story?

13       A.   So, you know, if he knew something, you

14  know, tell it, what happened, for her.

15       Q.   Did you have any reason to believe that

16  Floyd knew something?

17       A.   I didn't know.  That's why I was asking

18  him, you know, if you know something tell her

19  story.

20       Q.   Well, you told him that he had to bury

21  the victim because he was being made to, right?

22       A.   Yes.

23       Q.   You had no basis to believe that Floyd

24  had, you know, buried the victim or had to bury

25  the victim, right?



**TROY FROST**

```
 1        A.    Right.
 2        Q.    Why were you telling him that he had to
 3   bury the victim?
 4        A.    I told him that in case somebody was
 5   making him bury the, bury her, you know, he didn't
 6   want to.  You know, tell her story --
 7        Q.    Well, let me --
 8        A.    -- that was my whole basis.
 9        Q.    Let me -- yeah.  You watched Tom's
10   interview with George Johnson, right?
11        A.    No, I haven't watched that.
12        Q.    Sorry.  You watched it when it was
13   happening, right?
14        A.    I don't recall if I was there or not.  I
15   can't remember.
16        Q.    Well, remember when Tom said -- when Tom
17   confessed to George Johnson that he committed the
18   murder?
19        A.    I don't remember that.
20        Q.    All right.  Hang on.  All right, let's
21   show you what's been marked as Exhibit 96.  All
22   right, sir, showing you the first page of Exhibit
23   96.  I'll represent to you that this is a portion
24   of the trial testimony.  And it's the portion that
25   you provided at trial.  I'm going to ask you to
```



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## TROY FROST

1    turn to page 12 of Exhibit 96 and I'm going to

2    read to you lines 6 through 14.  Question:  You

3    observed an interview between -- sorry, let me

4    start up at line 2.  "And you were also present

5    when Tom Bledsoe was interviewed, were you not?

6    You observed the interview?  Answer: I observed

7    some of it, yes.  Question: You observed an

8    interview between himself and Special Agent

9    Johnson of the Kansas Bureau of Investigation, is

10   that correct?  Answer:  Yes, sir.  Question:  You

11   heard Tom Bledsoe tell him that he killed Camille,

12   didn't you?  Answer: Yes, sir.  Question:  Said I

13   did it, I killed her.  Is that correct?  Answer:

14   Yes."  Were you asked those questions and did you

15   give those answers?

16        A.    Yes, sir, I did.

17        Q.    Okay.  So, you, you weren't in the room

18   with Tom and Special Agent Johnson, correct?

19        A.    That I was in the room?

20        Q.    You were not in the room, right?

21        A.    Okay.  Right.

22        Q.    You were observing on a video feed,

23   correct?

24        A.    Yes.

25        Q.    And, so, because there's a -- because



5111 SW 21st Street        6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604           Suite 101                   Suite 305
785-273-3063               Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com        913-383-1131                316-201-1612

### TROY FROST

1  you're watching on a video feed there should be

2  video of the interview between Johnson and Tom

3  Bledsoe, right?

4      A.   Should be, yes.

5      Q.   I mean, video was being recorded, you

6  were watching that video, and, so, that video

7  should exist, right?

8      A.   Yes, sir.

9      Q.   All right.  Did you document that Tom

10  confessed to Johnson that he committed -- that he

11  killed the victim?

12      A.   I do not believe I documented that, no.

13      Q.   You left that to Special Agent Johnson to

14  document 'cause it was his interview, is that

15  right?

16      A.   Yes, sir.

17      Q.   So, you expected that Special Agent

18  Johnson would document the fact that Tom confessed

19  to murder during his interview with him?

20      A.   Yes, sir.

21      Q.   All right.  Showing -- turning back to

22  that same Exhibit 96, your trial testimony.

23      A.   Okay.

24      Q.   All right, so, going to page 10 of

25  Exhibit 96, line 3 on page 10.  "Question: So, and



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**TROY FROST**

1    how long were you with Floyd?  Answer:  I started
2    approximately like I'm going to say approximately
3    9:30, I think it was 9:28 we started, I went in
4    there.  Question: P.M.?  Answer: Yeah, P.M. and
5    that was a little after 1 a. m. on the 13th.  So,
6    three and a half hours?  Answer:  About three and
7    a half hours."  Were you asked those questions and
8    gave those answers, sir?
9         A.   Yes, sir.
10        Q.   All right.  So, you agree that you
11   interrogated Floyd for about three and a half
12   hours the night of the 12th into the morning of
13   the 13th?
14        A.   Yes, I spoke with him for three and a
15   half hours.
16        Q.   When you viewed the video footage in
17   preparation for this deposition you watched it
18   starting a little before you appeared on the
19   video, correct?
20        A.   Yes, sir.
21        Q.   And then did you watch it all the way to
22   the end of the video?
23        A.   Yes, sir, I did.
24        Q.   And, and we can agree that at no portion
25   of that videotaped interview did Floyd ever

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

1   **suggest that he went to his trailer after going to**

2   **the hardware store, right?**

3         A.    He did at one point say that he went,

4   went to his trailer, and then denied it.

5         **Q.    Okay.  When you were interrogating Floyd**

6   **there's some things that you were looking out for,**

7   **right?**

8         A.    Looking out for?

9         **Q.    Yeah, let me explain what I mean.  So,**

10  **you were looking to see if Floyd would confess to**

11  **the murder, right?**

12        A.    Right.

13        **Q.    You were looking to see if Floyd would**

14  **admit that he desired a sexual relationship with**

15  **the victim, right?**

16        A.    I don't know if I was looking for that,

17  no.

18        **Q.    Okay, but you wanted to know if Floyd**

19  **would admit involvement in her, in her homicide,**

20  **right?**

21        A.    If he knew something about that, yes.

22        **Q.    If Floyd would admit to confessing to**

23  **Tom, right?  That was something you were looking**

24  **for?**

25        A.    Can you give me that question again, sir?

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### TROY FROST

1    Q.   Sure.   You were looking to see if Floyd
2  would admit to confessing to Tom the weekend after
3  the victim was killed?

4    A.   I can't remember if that was -- was that
5  in the interview or was that --

6    Q.   You don't recall that?

7    A.   Yeah.

8    Q.   But you were certainly looking to see if
9  Floyd put himself near the scene of the abduction,
10 you know, his house, after he left the Winchester
11 Hardware Store, right?

12           MR. TURNER:   Object to form.

13           MR. LINDEN:   Join.

14 A.   Yes, sir.

15 BY MR. AINSWORTH:

16    Q.   Because you know from the prior interview
17 he was being asked on the morning of the 10th
18 whether he went home after he went to the hardware
19 store, right?

20    A.   Right.

21    Q.   And you knew that Floyd was denying
22 having gone home after the hardware store and
23 saying he went straight to the dairy, right?

24    A.   Yes, sir.

25    Q.   And, so, if Floyd mentioned anything

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### TROY FROST

1   **about going to his trailer after going to the**

2   **hardware store that would be something that would**

3   **go on your radar and you would remember, right?**

4       A.   I remember him saying he left the

5   hardware store and went to his trailer but backed

6   out and went to the farm -- went to work, but --

7       **Q.   And you were, you were focused on, you**

8   **know, whether Floyd was going to admit going to**

9   **the trailer, right?**

10      A.   I'm sorry, say that again.

11      **Q.   One of the things you were focused on was**

12  **whether Floyd would admit going to the trailer**

13  **after the hardware store, right?**

14      A.   I don't know if I was focused on that,

15  no.

16      **Q.   All right, but you wanted to know if he,**

17  **if Floyd would admit going to the trailer after**

18  **the hardware store, right?**

19      A.   I mean, I just asked him and I guess I'm

20  not quite too sure what your question is, I mean.

21      **Q.   Well, in your interrogation of Floyd you**

22  **then brought up to him that he said he went to**

23  **his trailer to try to get him to explain why he**

24  **went to his trailer, right?**

25      A.   Right.



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604         Suite 101                Suite 305
785-273-3063             Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com      913-383-1131             316-201-1612

**TROY FROST**

1    Q.   So, you asked him -- well, a logical

2  question as a police investigator if Floyd says he

3  went to his trailer after the hardware store would

4  be, why did you go to the trailer after the

5  hardware store, Tom -- or Floyd -- strike that.  A

6  logical question as a police investigator after

7  Floyd tells you that he went to his trailer would

8  be why did you go back to your trailer after the

9  hardware store, Floyd, right?

10    A.   Yes, sir.

11    Q.   And you'd want to know why he went there,

12  what he did while he was there, right?

13    A.   Yes, you would want to know that.

14    Q.   Yeah, and, so, in order to get at why he

15  went there you would ask him questions surrounding

16  the trailer saying, you know, you told me that you

17  went to the trailer, so, I want to know why you

18  went to the trailer.  Did you see the victim at

19  the trailer?  Did you go inside the trailer?

20  Right?

21    A.   Yes, that would be questions asked.

22    Q.   Right.  And in your review of the

23  videotape you didn't ask any of those questions,

24  correct?

25    A.   No, sir.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### TROY FROST

1     Q.    That's correct?

2     A.    Yes, sir.

3     Q.    And in the video that you watched at no

4     point does Floyd say that he went to the trailer?

5     A.    You can't hear him on the video.  That's

6     what's so terrible.

7     Q.    All right.

8     A.    You can't --

9     Q.    So --

10    A.    You know, he says it one time and then

11    denies it the rest, so, it's, you know, I never

12    said that, and so, I just left it -- I just left

13    it at that.

14    Q.    You left what at what?

15    A.    When, when I asked Floyd about going to

16    the trailer, him going to the trailer, him saying

17    he went to the trailer he denied it, so, there was

18    no any -- no use to going any further with it.

19    He denies going, so -- (incomplete).

20    Q.    Let's break that down.  How did he deny

21    going to the trailer?

22    A.    After I asked him about going to the

23    trailer.  He said that he thought he was going to

24    -- he thought he would go to the trailer but

25    didn't, just denying what he just said, so.



5111 SW 21st Street            6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063                  Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

**TROY FROST**

1      Q.   So then you as a law enforcement officer

2  investigating a homicide, you followed up with

3  Floyd to find out why he said he was, he was at

4  his trailer, right?

5      A.   Right.

6      Q.   And you asked him -- how many times did

7  you ask him about his statement that he went to

8  the trailer?

9      A.   I think I only asked him once 'cause he

10 just denied it, so, I didn't push it.

11     Q.   Well, you were pushing him about whether

12 he, you know, buried the victim, right?

13     A.   Right.

14     Q.   You were pushing him about having to tell

15 Camille's story, right?

16     A.   Right.

17     Q.   You told him he could only go to see the

18 victim's body if he had a clear conscience and

19 told her story, right?

20     A.   Yes, sir.

21     Q.   And he was denying the entire time that

22 he had any involvement in that, right?

23     A.   Yes, sir.

24     Q.   So why did you stop asking him after one

25 question about his stop at the trailer?



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

## TROY FROST

1    A.    I just didn't ask him any more about it.

2    Q.    I understand you're saying you didn't ask

3    him any more about that.  What I'm trying to find

4    out is why.  Why didn't you ask him?

5    A.    I just didn't feel like I needed to ask

6    him again.  He'd already denied it, why ask him

7    any more about it, that question.

8    Q.    In an interrogation one of your

9    techniques that you use is to see if the suspect

10   will admit to some piece of the crime and then use

11   that piece to build upon to get them to implicate

12   themselves fully in a crime, right?

13   A.    Yes, sir.

14   Q.    It's a common technique, right?

15   A.    Yes, sir.

16   Q.    And, so, tell us, what is the only piece

17   of information that Floyd admitted involvement in

18   surrounding Camille Arfmann's homicide to you?

19   A.    That he went to the trailer, backed out,

20   and went to work.

21   Q.    So, the only piece of inculpatory

22   evidence that Floyd gave you during your three and

23   a half hour interrogation was the fact that Floyd

24   went to the trailer and you didn't conduct any

25   follow-up on Floyd's admission, is that what

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

1    you're telling us?

2         A.   I don't -- yeah.  Didn't ask him about

3    it.

4         Q.   Why wouldn't you -- once Floyd now gives

5    you this piece, the only piece that you have to

6    then suggest that while he was at the trailer

7    maybe he stopped in, maybe he saw her and got

8    scared, maybe something happened, why wouldn't you

9    use the only piece of inculpatory evidence that

10   Floyd gave you?

11             MR. QUALSETH:  Object to the form.

12        A.   I do not know why I didn't.

13   BY MR. AINSWORTH:

14        Q.   It doesn't make any sense to you as a law

15   enforcement officer, does it, that a suspect in a

16   homicide would confess to something and then you

17   just wouldn't follow up on it, right?

18             MR. TURNER:  Object to the form.

19        A.   Yeah, I never followed up.  Should've,

20   but I didn't.

21   BY MR. AINSWORTH:

22        Q.   If Floyd had in fact actually told you

23   that he went to the trailer after the hardware

24   store during the time the victim was abducted you

25   should have followed up on that, right?



**TROY FROST**

1        A.    Should have, yes.

2        **Q.    And you should have followed up**

3   **repeatedly to find out why he said that, what**

4   **happened when he was at the, at the trailer,**

5   **right?**

6        A.    Yes, sir.

7        **Q.    Well, at least you documented it**

8   **somewhere, right?**

9        A.    Yes, sir.

10       **Q.    Where did you document it?**

11       A.    It's in my preliminary hearing

12   transcript, my trial transcript.

13       **Q.    So, where did you write it down?**

14       A.    I don't know if it's written down.

15       **Q.    I'll give you a hint.**

16       A.    Okay.

17       **Q.    I haven't seen it.**

18       A.    Okay.

19       **Q.    Did you see it?**

20       A.    I haven't seen it except for my

21   testimony.

22       **Q.    You and I can agree that if Floyd Bledsoe**

23   **actually told you that he went to the trailer**

24   **after going to the hardware store that's a fact**

25   **that should have been documented in a police**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### TROY FROST

1    report, right?

2         MR. TURNER:  Object to form.

3    A.   Yes, sir.

4    BY MR. AINSWORTH:

5    Q.   And at the very least in a field note,

6    right?

7    A.   Yes, sir.

8    Q.   All right.  When you were viewing the

9    video of your interrogation with Floyd could you

10   tell at what point it was where Floyd made the

11   inaudible statement that he went to the trailer

12   after the hardware store?

13        MR. TURNER:  Object to form.

14   A.   No, I cannot, 'cause sometimes you just

15   can't hear him and then the audio you just can't

16   hear.

17   BY MR. AINSWORTH:

18   Q.   Right.  Umm.  Did you hear yourself

19   asking your one follow-up question about the

20   trailer to Floyd?

21   A.   No, I don't.

22   Q.   Because, you know, I could hear your

23   voice throughout the video and you could hear

24   yourself, right?

25   A.   Yes.



5111 SW 21st Street     6420 W. 95th Street     800 E. 1st Street
Topeka, KS 66604        Suite 101               Suite 305
785-273-3063            Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com     913-383-1131            316-201-1612

**TROY FROST**

1      **Q.   Did you ever ask him about the trailer**
2   **during the video interrogation that you reviewed?**
3      A.   Not that I can remember.  I don't
4   remember.  I'd have to go back --
5      **Q.   And, so, are you saying that you didn't**
6   **ask any follow-up questions at all when Floyd made**
7   **the comment that he stopped by the trailer after**
8   **the hardware store?**
9           MR. TURNER:  Object to the form.
10      A.   I do not remember if I did or didn't.
11      BY MR. AINSWORTH:
12      **Q.   Well, I mean, based on your review of the**
13   **video did you ask any questions at all about the**
14   **statement about the trailer, or Floyd going to the**
15   **trailer after the hardware store?**
16      A.   I can't remember off the top of my head,
17   sir, I can't.
18      **Q.   Well, I'm not asking for it off the top**
19   **of your head.  Based on your review of the video,**
20   **did you ask any questions whatsoever about the,**
21   **about the trailer?**
22      A.   I don't know unless I go back and look at
23   it again, you know, go through it again.
24           MR. TURNER:  Russell, it's 12:30.  Can we
25   do a lunch break here?



5111 SW 21st Street       6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604          Suite 101                 Suite 305
785-273-3063              Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com       913-383-1131              316-201-1612

**TROY FROST**

1    MR. AINSWORTH:  We can.  How much time
2    would you like?
3    MR. NORTON:  How much time do you have
4    left?
5    MR. AINSWORTH:  You know, I mean, I got
6    certainly at least an hour.  I've got one to two
7    hours, probably closer to two than one.
8    MR. NORTON:  30 minutes sound okay?
9    MR. AINSWORTH:  Sounds fine to me.
10   THE VIDEOGRAPHER:  All right, I'll take
11   us off.  Time is approximately 12:35 p.m. central,
12   we're going off the record.
13   (THEREUPON, a recess was taken.)
14   THE VIDEOGRAPHER:  Time is approximately
15   1:08 p.m. central, we're back on the record.
16   BY MR. AINSWORTH:
17   Q.    All right, Sergeant, I assume you had
18   some lunch?
19   A.    Yes, sir.
20   Q.    And, so, you're feeling good, there's no
21   reason why you can't give accurate and truthful
22   testimony here this afternoon?
23   A.    No, sir.
24   Q.    Okay.  But if, you know, again, if
25   something comes up where you're not feeling good



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**122**

# TROY FROST

1  or you feel fatigued just, you let me know, all

2  right?

3       A.    Thank you.

4       Q.    So, I want to go back to your

5  interrogation with Floyd Bledsoe on the 12th.  How

6  did you come to be in the room with Floyd?

7       A.    If I remember right, they were coming in,

8  going out, asked me to go in and, so, I went in

9  the interview room.  I don't know who told me to

10 go in, but -- (incomplete).

11      Q.    All right, and I guess that was going to

12 be my next question, but you don't remember who

13 told you to go into the interview room?

14      A.    No, I don't.

15      Q.    But you went in to interrogate Tom (sic)

16 to find out if he might provide you with

17 information about the murder?

18           MR. TURNER:  Object to form.

19 BY MR. AINSWORTH:

20      Q.    Right?

21           MR. TURNER:  Russell, you said Tom.

22 BY MR. AINSWORTH:

23      Q.    Did I say Tom?  I said Tom.  You went

24 into the room to interrogate Floyd to see if he

25 might give you some information about the murder,

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1   is that correct?

2       A.   Yes.

3       Q.   And I guess, you know, one question I

4   have is why did you interrogate Floyd and not Tom?

5       A.   And I would say I have no idea.

6       Q.   Did anyone from the Jefferson County

7   Sheriff's Office interrogate Tom the week of, you

8   know, that the body was recovered?

9       A.   I do not know.

10      Q.   I will represent to you that I've, you

11  know, looked at these records and I see no

12  indication of anybody interrogating Tom from the

13  Jefferson County Sheriff's Office the week of

14  November 7th and I guess my question to you is, we

15  know that Special Agent Johnson administered a

16  polygraph exam to Tom, right?

17      A.   Right.

18      Q.   And then Special Agent Johnson

19  interviewed Tom and you observed a portion of that

20  interview, right?

21      A.   Yes, sir.

22      Q.   And in the portion of the interview with

23  Special Agent Johnson that you observed Tom

24  confessed to the murder, right?

25      A.   Yes, sir.



## TROY FROST

1          Q.    And then does anybody else interrogate

2     Tom on November 12th, 1999?

3          A.    Tom or -- you talking about Tom?

4          Q.    Tom.  Talking about Tom.

5          A.    I do not know.  Don't know.

6          Q.    Do you know in which room Tom was given

7     the polygraph by Special Agent Johnson?

8          A.    No, I don't.

9          Q.    But for you to be able to observe the

10    interview with Tom by Special Agent Johnson it had

11    to be one of the interview rooms hooked up with a

12    camera, is that right?

13         A.    Yes, sir.

14         Q.    Is it true that back in 1999 Jefferson

15    County didn't have any rooms where you could

16    observe by watching through a window or something

17    like that, is that correct?

18         A.    Yes, sir, that's correct.

19         Q.    Who was responsible for making sure that

20    the videos of, you know, interviews or

21    interrogations are recovered and, you know, placed

22    in a file?

23         A.    I do not know who was in charge at the

24    time of those.  I don't.

25         Q.    Well, if you were conducting an

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## TROY FROST

1    **investigation as the key, you know, as the lead**

2    **detective in 1999 whose responsibility would it be**

3    **to ensure that the video recording of an**

4    **interrogation was retained?**

5         A.    I would think that the person giving the

6    interview would make sure that his interview is

7    put into evidence.

8         Q.    **Is that what you would do?**

9         A.    That's what I would do.

10        Q.    **How would you do that?  How would you**

11   **preserve the video of an interrogation you were**

12   **conducting?**

13        A.    If I'm conducting an interview and I

14   finished my interview I would take that, back then

15   it's a VHS tape -- take that VHS tape and put it

16   into evidence.

17        Q.    **All right.  So, and where was the VHS**

18   **tape located, you know, where you got it from?**

19        A.    Would be -- gee, at that time it would be

20   underneath the TV.  You know --

21        Q.    **Where would the TV --**

22        A.    -- like a cabinet type thing, you know,

23   setting on a cabinet and TV's on top and video's

24   on the bottom type deal.  I mean, that's what I

25   would do, but I don't remember who was in charge



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131                316-201-1612

**TROY FROST**

1    of that back then.

2        Q.    **Where would the VHS cabinet be located?**

3        A.    VHS cabinet would be located on the

4    southwest wall by the door.

5        Q.    **Inside the interview room?**

6        A.    No, no, it would be inside the conference

7    room.

8        Q.    **I see.**

9        A.    Yeah.

10       Q.    **And were there more than one interview**

11   **rooms that were hooked up with video recording or**

12   **just one?**

13       A.    Just one, sir.

14       Q.    **Okay.  All right, so, having graduated**

15   **high school in 1986 you're familiar with VHS,**

16   **right?**

17       A.    Yes, sir.

18       Q.    **And you used to record, you know, shows**

19   **or TV programs for yourself on VHS, right?**

20       A.    Yes, sir.

21       Q.    **And there were different kinds of**

22   **recording settings you could do that was either a**

23   **two-hour or a four-hour, or a  six-hour and if you**

24   **got a special tape you got -- you could get up to**

25   **eight hours of extended viewing, right?**

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1    A.   Yes, sir.  You're going way back, too.

2  That was a long time ago.

3    Q.   It was, and -- but you recall that like

4  videotapes would have different lengths of time,

5  right?

6    A.   Yes, sir.  Yes, sir.

7    Q.   If you wanted to record something for

8  longer than that you had to switch tapes, right?

9    A.   Uh-huh.  Yes, sir.

10    Q.   So, sometimes you went to the video store

11  and if you rented a very long movie, Gone With the

12  Wind might have, be on two VHS tapes, right?

13    A.   Part one and part two.

14    Q.   Yeah, and you'd have to physically get up

15  and switch tapes in the midst of watching, right?

16    A.   Yes.

17    Q.   And, so, you understood that if you're

18  recording a, an interrogation on a video there is

19  a finite amount of tape on that VHS cassette,

20  right?

21    A.   Yes, sir.

22    Q.   And, so, had you ever had a situation

23  where an interrogation went so long that it went,

24  it used up the entire tape and you had to get

25  another tape?



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1    A.    Probably so.  Switch them out.

2    **Q.    Well, has that happened?**

3    A.    I'm going to say it's probably happened

4    with me, yes.  I just don't remember when.  I'm

5    sure it probably did, though.

6    **Q.    And, so, how would you know to switch out**

7    **the tape and start a new one?**

8    A.    I would make sure that I knew how much

9    tape I would have left and then go out, switch it.

10    **Q.    And how long were those VHS -- how long**

11    **could those VHS tapes record back in 1999?**

12    A.    And, you know, to be honest with you, I

13    didn't really mess with stuff like that 'cause I'm

14    not really that up on electronics type of thing,

15    so, I do not know.

16    **Q.    Right.  Well, then how would you know how**

17    **much tape you had left if you didn't know how much**

18    **tape there was to begin with?**

19    A.    Well, for me I would just switch it out

20    before even it's -- I'd put in a whole new one.

21    I wouldn't even wait, you know what I mean?

22    **Q.    So, if you took a break you would then**

23    **switch out a new tape --**

24    A.    Yes.

25    **Q.    -- so you'd be sure?**


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1    A.   Yeah.  That way I don't have to worry

2  about it.

3    **Q.   Did you do that for this interrogation of**

4  **Floyd Bledsoe, did you switch out and start a new**

5  **tape?**

6    A.   I was not in charge of none of that so I

7  have no idea.

8    **Q.   Did you ask anyone else to?**

9    A.   Not to my knowledge.

10    **Q.   Was there a separate audio recording**

11  **within the interview room apart from the video**

12  **recording?**

13    A.   I believe there -- well, the audio and

14  video should have went together.

15    **Q.   So, it would all be recorded on the same**

16  **VHS cassette, right?**

17    A.   Right.

18    **Q.   And did you review any -- have I asked**

19  **this already, did you review any audio recordings**

20  **in preparation for this deposition?**

21    A.   Yes.  Yes, I did, sir.

22    **Q.   Was that separate from the video?**

23    A.   Yes, sir.

24    **Q.   All right, and you, on those audio**

25  **recordings, what were those audio recordings of?**



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                 Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

### TROY FROST

1    A.   Well, to be honest, I couldn't even

2  hardly understand any of the audio it was so

3  distorted.  I could just pick up bits and pieces

4  and that was it and I, I couldn't even really

5  hardly listen to it.

6    Q.   **Was your voice on those audio recordings**

7  **that you listened to?**

8    A.   At different times, yes, but I couldn't

9  hear --

10   Q.   **And was it --**

11   A.   I'm sorry, go ahead.

12   Q.   **Was any other person's voice on those**

13 **audio recordings?**

14   A.   Like I said before, me trying to listen

15 to them with the distortion, I could pick up my

16 voice but I don't know if there was anybody else's

17 voice on there.

18   Q.   **All right, and did you listen to all**

19 **those audio recordings or did you get frustrated**

20 **and just quit?**

21   A.   I tried listening to all of them, but --

22 (incomplete)

23   Q.   **And on those audio recordings did you**

24 **hear at any point you talking about a trailer or**

25 **going to a trailer with Floyd?**



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604            Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

**TROY FROST**

1        A.    Like I said, they're so distorted that I

2    can't, you can't pick up anything.   I mean, I can

3    hear my -- I could hear a bit of me saying

4    something and then it's distorted or mumbling, or,

5    you know, you can't hear nothing.   It was --

6    they're -- (incomplete)

7        **Q.    Well, and my question is did you hear**

8    **yourself talking about Floyd going to a trailer at**

9    **any point on those recordings?**

10       A.    Oh, no, sir, I did not.

11       **Q.    All right.   How did your interrogation**

12   **with Floyd end?**

13       A.    I do not remember how it ended.

14       **Q.    All right.   In any event, when you were**

15   **talking to Floyd the night of November 12th he was**

16   **not free to leave, right?**

17       A.    Right.

18       **Q.    You brought him to the jail at the end of**

19   **that interview, right?**

20       A.    I don't know if I did or not.

21       **Q.    Okay.   Well, someone brought him to the**

22   **jail at the end of that interview, right?**

23       A.    Somebody did, but I don't know who.

24       **Q.    How do you know that Floyd was not free**

25   **to leave during your interrogation of him the**

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

# TROY FROST

1  night of November 12th?

2      A.   Well, I mean, the door was open, wasn't

3  shut, but, you know, I -- I don't know.  I guess

4  I just -- I don't know.

5      Q.   Did you have any problem at 1 a.m. when

6  -- approximately 1 a.m. when your interrogation of

7  Floyd ended and he got booked into the county jail

8  and you went home to sleep in your bed?  Did that

9  cause any problems for you?

10     A.   Not that I remember.

11     Q.   You sleep okay that night that Floyd went

12 to county jail to spend the night and you went

13 home to sleep in your bed?

14     A.   You know, I wish I could remember, but I

15 don't remember how I slept that night.

16     Q.   All right.  Nothing upsetting to you that

17 you recall happening, right?

18     A.   Not that I can recall.

19     Q.   Did you say to any supervisor, so, either

20 Carreno, Dunnaway, Herrig, Woods, anybody in

21 control, or Vanderbilt, and say, gee, you know,

22 I'm not sure why we're arresting Floyd and letting

23 Tom go?  Did you say that to anyone?

24          MR. LINDEN:  Object to form.

25     A.   Not that I know of, sir, no.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**TROY FROST**

1    BY MR. AINSWORTH:

2        Q.    **Were you wondering why you guys were**

3    **releasing Tom and booking Floyd for the murder?**

4        A.    I -- I have no idea.  I mean, I don't

5    know.

6        Q.    **Did you have -- were there any**

7    **discussions that you were present for among --**

8    **well, strike that.  You would hold meetings at the**

9    **end of interrogations or interviews when you guys**

10   **were observing so you could talk about the case,**

11   **right?**

12       A.    I mean, I don't know if we did or not.  I

13   can't -- I don't know.  But, I'm sure there was

14   probably a meeting, but I have no idea.

15       Q.    **Why are you sure there was probably a**

16   **meeting?**

17       A.    I mean, like you just said, you know,

18   there's always a meeting after an interview or

19   what's next, but I don't know -- I don't remember.

20       Q.    **Okay.  So, it was the practice to have a**

21   **meeting at the end of an interrogation, but you**

22   **just don't remember whether or not that occurred**

23   **in this case, is that right?**

24       A.    Is that right.

25       Q.    **So, let me just, you know, hone in on the**

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# TROY FROST

1   conclusion of Tom's interview with Special Agent

2   Johnson in which Tom confessed to murder.  Did you

3   have any -- did you have a conference with the

4   other investigators and County Attorney Vanderbilt

5   at the conclusion of that interview with Tom?

6       A.   I don't know if there was or not.  I

7   don't remember.

8       Q.   But you guys had the opportunity to talk

9   amongst yourselves after Tom's interview ended and

10  before Floyd was interrogated by you, right?

11      A.   Right.

12      Q.   What -- what were your instructions when

13  you went in to go interrogate Floyd the night of

14  November 12th?

15      A.   I don't believe I had any instructions.

16  If they needed something, you know, I don't -- I

17  don't recall any instructions.

18      Q.   You were just trying to see if you could

19  get a confession?

20      A.   No.  I mean, I just went in there and

21  started talking to him.  I wasn't -- (incomplete)

22      Q.   Are you done with your answer?

23      A.   Yes, sir.

24      Q.   Well, you and I have both watched that

25  video and, you know, you were not just chatting



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063           Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131             316-201-1612

**TROY FROST**

1  with him, you were telling Floyd it wasn't his

2  fault, right?

3       A.   Yes, sir.

4       Q.   You told Floyd -- when he asked to see

5  Camille you told her that he can see her if he

6  can tell her that he told her story, right?

7       A.   Yes, sir.

8       Q.   You told Floyd that Camille knows as well

9  as you, Frost, knew that Floyd knows what happened

10  to Camille, right?

11       A.   I don't.

12       Q.   You told Floyd that Camille wants him to

13  clear his conscience, right?

14       A.   Yes, sir.

15       Q.   You told Floyd that you don't like being

16  lied to, right?

17       A.   Right.

18       Q.   You told Floyd that Camille doesn't like

19  being lied to -- or actually strike that.  You

20  asked Floyd how Camille would feel about being

21  lied to?

22       A.   Right, yeah.

23       Q.   You were -- in what you were saying to

24  Floyd you were trying to get him to admit some

25  type of involvement in the crime, right?



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### TROY FROST

1      A.    Right.

2      Q.    **And, so, it wasn't like a conversation**

3  **that you might have with a friend of yours where**

4  **you're just chatting back and forth, right?**

5      A.    Right.

6      Q.    **And, so, nobody told you to interrogate**

7  **Floyd, you just decided to do so of your own**

8  **volition, is that correct?**

9      A.    Yes, sir.

10     Q.    **And, so, I'm going to come back to why**

11  **didn't you decide to interrogate Tom instead of**

12  **Floyd?**

13     A.    I was -- I don't know.  I was never asked

14  to.

15     Q.    **Well, no one asked you to interrogate**

16  **Floyd, right?**

17     A.    Right.  No, they asked me to go in the

18  interview room, but I never -- I didn't go talk to

19  Floyd -- or Tom, sorry.

20     Q.    **And what did they say to you when they**

21  **asked you to go into the interview room with**

22  **Floyd?**

23     A.    I don't recall exactly what they said.

24     Q.    **Were they trying to switch horses and see**

25  **if you might have better luck than Randy?**



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1        A.    I don't know.

2        Q.    **Well, Tom was willing to talk to law**

3   **enforcement on November 12th.  You know, he gave a**

4   **polygraph to Agent Johnson and answered Johnson's**

5   **questions, right?**

6        A.    Yes, sir.

7        Q.    **There was nothing preventing you from**

8   **questioning Tom on November 12th, is that right?**

9        A.    I don't believe there was anything

10   preventing me from talking to him, no.

11        Q.    **And, so, I'm just -- you know, from an**

12   **outsider's perspective maybe I'm missing**

13   **something, so that's why I'm asking you 'cause you**

14   **were there and I wasn't.  So, from an outsider's**

15   **perspective it seems like it might have been**

16   **beneficial to have the Jefferson County officer**

17   **interrogate Tom on the 12th to find out if he did**

18   **it or if he's telling the truth about Floyd saying**

19   **that he did it.  Would you agree with that?**

20        A.    I -- I don't know.  I mean, as far as

21   interviewing people, I mean, I, I don't know.  You

22   know, they had Special Agent Johnson talking to

23   Tom.  I don't know, you know -- they should have

24   had somebody -- I mean, I don't know.

25        Q.    **So, you were a detective or a detective**



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### TROY FROST

1   sergeant for 23 years and you're telling us that

2   you don't know if it would have been a good idea

3   to interrogate Tom on November 12th by a Jefferson

4   County officer who'd been running the case to see

5   if Tom blamed -- you know, if you might be able

6   to discover whether Tom's being truthful or not?

7           MR. TURNER:  Object to the form.

8       A.   No, I'm not saying that, no, not at all.

9   I'm just saying that, you know, I mean, not to my

10  knowledge did anybody talk to him from the

11  Jefferson County Sheriff's Department that day.

12       BY MR. AINSWORTH:

13       Q.   Yeah, I'm not asking you whether anyone

14  from the Jefferson County's Sheriff Office did

15  talk to him.  My question's a little bit different

16  which is, you know, as a detective with 23 years

17  of detective or detective sergeant experience do

18  you think it would have been a good idea to have

19  somebody running the case from Jefferson County to

20  interrogate Tom to find out if he was being

21  truthful on November 12th?

22       A.   Yes.

23       Q.   'Cause Johnson was just the polygraph

24  guy, he hadn't been working the case, right?

25       A.   Right.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### TROY FROST

1      Q.    Have you read some of the media reports
2  about this case?
3      A.    No, I haven't.
4      Q.    Have you seen it on TV?
5      A.    Not that I can remember seeing it.  I
6  don't -- I don't read them and I don't -- so, I
7  -- not that I know.
8      Q.    Do you really think that it's odd that
9  Tom, who confesses to the murder, who also admits
10  involvement the night that he turns himself in,
11  tells his pastor that he's done something he'll
12  have to live with for the rest of his life,
13  provides the murder weapon to the police, shows
14  the police where 14-year-old girl is buried behind
15  his own house and then is released within five
16  days -- does that seem odd to you?
17          MR. TURNER:  Object to the form.
18          MR. LINDEN:  Join.
19  BY MR. AINSWORTH:
20      Q.    Without ever being interrogated by the,
21  by the agency running the investigation?
22      A.    You know, it's not up to me what occurs
23  or what happens.
24      Q.    Right.
25      A.    I don't -- I mean, it's not, it's not up

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1    to me.

2           Q.    It wasn't your decision, correct?

3           A.    Correct.

4           Q.    Right.  I'm just asking you from 33 years

5    of law enforcement experience was it odd to you

6    that that's what happened, that within five days a

7    guy who admitted involvement, provided the murder

8    weapon, 14-year-old girl shot to death, buried in

9    a ditch behind the suspect's house, and then he

10   confesses again on the 12th and the day he

11   confesses again he's released without ever being

12   interrogated by the investigating agency, does

13   that sound odd to you?

14          MR. LINDEN:  Object to form.

15          MR. TURNER:  Join.

16          A.    You know, I don't know all the facts, so,

17   I do not know.  I mean, it's -- you know, it's

18   like I said before, that's not up to me.  I don't

19   know the situation.  I don't know nothing about

20   that.

21          BY MR. AINSWORTH:

22          Q.    All right, and you don't know all the

23   facts, but you do know the facts that I provided.

24   So, let me, let me maybe ask it this way.  You

25   would want to know as a law enforcement officer


5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1   the reason why Tom was being released five days

2   after he admitted involvement, led investigators

3   to the place where a 14-year-old girl had been

4   shot to death and buried behind his house and he

5   confessed again on the 12th, right?  You would

6   want to know why that person was being released,

7   right?

8        A.   Right.

9        Q.   So, where would we look to find out why

10  Tom was released on November 12th?

11       A.   I do not know where you would look.  I do

12  not know.

13       Q.   Who would we ask?

14       A.   I don't know who we would ask.  I don't

15  know.

16       Q.   All right, let me switch gears and I'm

17  going to show you Exhibit 77.  Now, you got that

18  in front of you, sir?

19       A.   Oh, yes, sir, I do.

20       Q.   Okay, thank you.

21       A.   Got it.

22       Q.   This is your handwriting, correct?

23       A.   Yes, sir.

24       Q.   All right, so, on November 10th, 1999, at

25  -- well, these are your notes from a visit to the



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### TROY FROST

1    Winchester Hardware Store on November 10th, 1999,

2    at 10:27 a.m., right?

3         A.   Yes, sir.

4         Q.   All right.  So, let me just see if I can

5    read this accurately.  It says, "Floyd was here

6    Friday afternoon after lunch, got some duct tape

7    and paid cash for duct tape.  Trying to repair

8    pipe jam to drain pipes together."  Is that right?

9         A.   That's what it looks like, yes, sir.

10        Q.   Oh, sorry, I think it's -- well, in any

11   event, let me -- let me go down to the second

12   page of Exhibit 77.  This is an interview that you

13   conducted with Karen Edmonds, right?

14        A.   Yes, sir.

15        Q.   And you conducted that interview with

16   Karen Edmonds at the Winchester Hardware Store,

17   right?

18        A.   Yes, sir.

19        Q.   And, so, and Karen Edmonds, who was she?

20        A.   Karen Edmonds ran the Winchester Hardware

21   Store.

22        Q.   All right.  So, she told you that Floyd

23   was present at her hardware store, the Winchester

24   Hardware Store, on Friday afternoon, right?

25        A.   Yes, sir.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1      Q.   She told you that Floyd bought some duct
2  tape, right?
3      A.   Yep.  Yes, sir.  Sorry.
4      Q.   That's all right, and that Floyd told
5  Karen that he was, he needed the duct tape to try
6  and repair a jam to a drain pipe, right?
7      A.   Yes, sir.
8      Q.   And Karen told you also that Floyd was
9  asking about making a jacket embroidered with the
10  Zule Dairy logo for Christmas, is that right?
11      A.   Yes, sir.
12      Q.   And that she was telling him that the
13  jackets were back ordered, right?
14      A.   Yes, sir.
15      Q.   And Karen told you that Floyd was at her
16  hardware store for 15 or 20 minutes or more,
17  right?
18      A.   Yes, sir.
19      Q.   And Karen also told you that Floyd bought
20  a sweatshirt and said it was something to wear for
21  milking and the sweatshirt was black or dark blue,
22  right?
23      A.   Yes, sir.
24      Q.   So, Floyd, he paid for the duct tape,
25  which was six dollars or a little more, right?

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

1          A.    Yes, sir.

2          Q.    And again, this is what Karen's telling

3    you, correct?

4          A.    Yes, sir.

5          Q.    And then Karen is telling you that Floyd

6    bought a sweatshirt for a little more than four

7    dollars, right?

8          A.    Yes, sir.

9          Q.    So, he -- Karen's telling you that he did

10   two separate transactions, one for the duct tape

11   and then separately he bought the sweatshirt,

12   right?

13         A.    Yes, sir.

14         Q.    And that Karen said she gave Floyd a

15   receipt for the duct tape, right?

16         A.    Yes, sir.

17         Q.    And do you recall Karen telling you that

18   after the purchase of the duct tape Floyd then

19   started talking about the embroidery of the Zule

20   on the jacket for the Zule Dairy and that stuff,

21   and then made the separate sweatshirt transaction

22   some 10 or 15 minutes later?

23         A.    Not that I can remember, sir.

24         Q.    All right.  Let's take a look at what

25   we've marked as Exhibit 92.  All right, let's look


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

**TROY FROST**

1    at -- okay, well, first Exhibit 92, shoot, I

2    should show it on the screen.  This is a copy of

3    an excerpt of the preliminary hearing and Exhibit

4    92 contains your testimony, I think, and, so, I'm

5    going to direct your attention to page 10 of

6    Exhibit 92.  Go down to the bottom of the page.

7    Well, why don't we just start at line 14 on page

8    10 to give us some context.  And, so, were you

9    asked these questions and did you give these

10   answers:  "Question:  And you spoke with Ms.

11   Edmonds, did you not, at Winchester Hardware?

12   Answer: Yes, sir.  Question:  And you had found

13   that Mr. Bledsoe was there on the 5th, isn't that

14   correct?  Answer:  Yes, sir.  Question:  Okay, and

15   on the 5th he was there buying duct tape at

16   approximately 4:20, correct?  Answer: Yes, sir.

17   Question:  And speaking with Ms. Edmonds he

18   remained there and spoke with her about a couple

19   of other things?  Answer: Right.  Question: Right?

20   Answer: Yes, sir.  Question:  An embroidery on his

21   jacket and then bought a sweatshirt, correct?

22   Answer: Yes, sir.  Question:  So, do you know what

23   time he left?  Answer: It says, it said he was

24   there maybe 10, 15 minutes and then left, so,

25   4:30, five maybe."  So, I think -- and here your

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1   answer, I think you meant not 5 o'clock, but 4:30

2   or 4:35, is that right?

3        A.   I mean, it says 4:30 or five maybe.  I

4   don't -- (incomplete)

5        Q.   And that's what I wanted to clarify with

6   your answer there.  It looks to me if Floyd bought

7   the duct tape at approximately 4:20 and then your

8   answer on page 11 of Exhibit 92 is that it said

9   he was there maybe 10, 15 minutes and then left,

10  10, 15 minutes after 4:20 would be either 4:30 or

11  4:35, right?

12       A.   Right.

13       Q.   So, where you say 4:30 or five, you mean

14  4:30 or 4:35, is that correct?

15       A.   I'm just going by what it says on here.

16  Says five maybe.  I mean, yeah, I mean, 10, 15

17  minutes after 4:30 it'd be what, 4:40, 4:45.

18       Q.   No, 10 to 15 minutes after 4:20, right?

19  Let me just go back to page 10 of Exhibit 92.

20       A.   I'm sorry.

21       Q.   You see line 20?

22       A.   Yes, I see that.

23       Q.   Says he was there buying duct tape at

24  approximately 4:20?

25       A.   Yes, sir.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                  316-201-1612

### TROY FROST

1      Q.    And then you learned from Ms. Edmonds

2   that he remained there and spoke about a couple of

3   other things?

4      A.    Yes.

5      Q.    And then he was there maybe 10 to 15

6   minutes after buying the duct tape and left around

7   4:30, 4:35, is that right?

8            MR. TURNER:   Object to form.

9      A.    Yeah, I just don't know why it says 4:30

10  or 5:00 maybe on my -- (incomplete)

11  BY MR. AINSWORTH:

12     Q.    I think -- well, I'll suggest an

13  explanation and tell me if this sounds right.   I

14  think you said then left, so, 4:30 and then you

15  said the number five maybe, so, saying 4:30, five,

16  maybe, and the court reporter interpreted you

17  saying 4:30 or 5 o'clock, although I can't tell

18  from the transcript, but it doesn't appear you

19  said 5 o'clock 'cause 5 o'clock doesn't make sense

20  if it was 10 to 15 minutes after 4:20.   You know

21  what I mean?

22     A.    Oh, yeah, I know what you're meaning -- I

23  know what you mean.

24     Q.    So, the court reporter might have just,

25  when you said five made it five colon zero zero



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1   when you were just saying the number five meaning
2   4:30, 4:35 maybe.  Does that sound right to you?
3        A.   That sounds reasonable, yes.
4        Q.   In any event, does that refresh your
5   recollection that Karen Edmonds told you that
6   after Floyd purchased the duct tape he then talked
7   to her about embroidering the jacket and getting
8   -- and buying the sweatshirt and then left --
9        A.   Yes, sir.
10        Q.   -- somewhere around 4:30, 4:35?
11        A.   Yes, sir.
12        Q.   All right.  And then I want to show you
13   what we previously marked Exhibit 78.  All right.
14   So, this is a report that you typed, is that
15   right?
16        A.   Yes, sir.
17        Q.   Exhibit 78.  It also has a November 29th
18   date at the top line, do you see that?
19        A.   Yes, sir, I do.
20        Q.   And I'll tell you that in all of your
21   typewritten reports in this case they appear to
22   all have been typed on -- or dated November 29th,
23   1999.
24        A.   Right.
25        Q.   And I'm going to ask you, does that

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## TROY FROST

1  suggest that you typed them all up on one day and

2  then indicated in the body of the report what time

3  the various activities took place?

4      A.   No.  Like I said before, it should have

5  been the date that I went there.

6      Q.   So, you're saying that it was another

7  typo on this report, too, that you accidentally

8  wrote, typed November 29th when you typed this

9  report on November 10?

10     A.   Yes, sir.

11     Q.   And you did that for each and every --

12  sorry.  And you did that for each and every report

13  that you filed in this case is you mistyped

14  November 29th?

15     A.   Yes.

16     Q.   Is that right?

17     A.   Yes, sir.  The dates are, the date's all

18  messed up.

19     Q.   And, so, you're saying that these reports

20  were not typed on November 29th, 1999?

21     A.   Right.

22     Q.   Correct?

23     A.   Yes, sir.

24     Q.   So, this report would have been typed on

25  November 10th, 1999?



5111 SW 21st Street        6420 W. 95th Street         800 E. 1st Street
Topeka, KS 66604            Suite 101                   Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

# TROY FROST

1        A.    Yes, sir.

2        Q.    Okay.  All right, so, you report in

3  Exhibit 78 that you went to the Winchester

4  Hardware Store and you spoke with Karen Edmonds,

5  correct?

6        A.    Yes, sir.

7        Q.    And according to your report you said

8  that Karen told you, she remembered -- Karen,

9  Karen remembered Floyd coming in and he paid cash

10 for some duct tape, right?

11       A.    Yes, sir.

12       Q.    And you reported that Karen told you

13 Floyd said he was trying to repair some drain pipe

14 and they were going to jam the drain pipe together

15 and use some duct tape to do it, right?

16       A.    Yes, sir.

17       Q.    And Karen told you that Floyd had asked

18 her about making a jacket with Zule Dairy on it

19 and she told him the jackets were back ordered and

20 it would be two weeks, right?

21       A.    Yes, sir.

22       Q.    And then Karen told you that Floyd saw

23 the sweatshirts they had and bought a sweatshirt

24 for milking cows, right?

25       A.    Yes, sir.



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

**TROY FROST**

1      Q.   And then Karen said the duct tape was

2 6.29 to 6.39, right?

3      A.   Yes, sir.

4      Q.   And that then he bought the sweatshirt,

5 meaning after the duct tape Floyd bought the

6 sweatshirt, right?

7      A.   Yes, sir.

8      Q.   And Karen said she gave Floyd a receipt

9 for the duct tape, right?

10     A.   Yes, sir.

11     Q.   And then you left the hardware store

12 around 10:52, is that right?

13     A.   Yes, sir.

14     Q.   All right, and then you came back at 2:07

15 to ask her about Billie Summerville, right?

16     A.   Yes, sir.

17     Q.   And then actually this was a phone call,

18 right, the 2:07 one?

19     A.   Yes, it was.

20     Q.   And then there's a reference to November

21 16th, 1999, see that?

22     A.   Yes, sir.

23     Q.   And you went to the Winchester Hardware

24 Store and asked about their cash register, if it

25 had been changed to daylight savings, right?

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street       6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063          Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com         913-383-1131              316-201-1612

**TROY FROST**

1        A.    Yes, sir.

2        Q.    And they said no, it hadn't, right?

3        A.    Right.

4        Q.    So, the receipts were about an hour fast,

5   right?

6        A.    Yes, sir.

7        Q.    You recorded how fast the register was,

8   right?

9        A.    Time wise?

10       Q.    **Yes.**

11       A.    Yes.

12       Q.    You -- they gave you a receipt that said

13   12:48 and your watch said 11:51 so that means the

14   register was 57 minutes fast, right?

15       A.    Yes, sir.

16       Q.    And so that means if Floyd had a receipt

17   for 5:20 p.m. that receipt would actually be for

18   5:20 -- sorry, 4:23 p.m., right?

19       A.    Yes, sir.

20       Q.    And this always throws me off, but like

21   if it was an hour fast it would be -- you would

22   go back an hour, 4:20, but because it's only 57

23   minutes fast that means you then have to then go

24   three minutes ahead to 4:23, right?

25       A.    Yes, sir.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## TROY FROST

1      Q.   Okay.  Let me -- I want to show you

2  something but I don't think I have it in hard

3  copy.  It's not long, but I just want to make

4  sure I got this, the right author of this report.

5  Okay, I'm going to show you one of Special Agent

6  Morgan's reports.  Let's mark this as exhibit

7  number -- one second -- Exhibit 97.

8           (THEREUPON, Deposition Exhibit No 97 was

9  marked for identification.)

10      BY MR. AINSWORTH:

11      Q.   Okay, so this is an interview that

12  Special Agent Morgan conducted with Richard Zule

13  on the afternoon of November 10th.  Do you see

14  that, sir?

15      A.   Yes.

16      Q.   And Richard Zule was Floyd's employer,

17  right?

18      A.   Yes, sir.

19      Q.   Okay, so, on the second page of Exhibit

20  97 there's a reference, "4 p.m. Richard told Floyd

21  to go to Winchester Hardware and get a roll of

22  duct tape.  Richard gave him a 50 dollar bill.

23  Floyd got back around 4:45 p.m., duct tape still

24  in package.  He drove the green '69 Chevy pickup.

25  Richard said, it took you long enough and then it



5111 SW 21st Street          6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604                  Suite 101                Suite 305
785-273-3063              Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com            913-383-1131            316-201-1612

1    says KC."  Do you see that, sir?

2         A.    Yes, sir, I do.

3         Q.    All right.  So, according to Floyd's

4    employer there, Floyd got back around 4:45 p.m.,

5    right?

6         A.    Yes, sir.

7         Q.    Now I want to show you what we've

8    previously marked as Exhibit 64.  This is a KBI

9    report by Special Agent Morgan that explains you

10   on the screen.  This is regarding driving time

11   from Winchester Hardware Store to Floyd S.

12   Bledsoe's residence to Zule's east farm in

13   Leavenworth County, Kansas.  Do you see that?  So,

14   this is a report regarding Special Agent Morgan

15   driving his state vehicle from the hardware store

16   to the trailer then to Zule's farm, okay?

17        A.    I don't know.

18        Q.    And, so --

19             MR. TURNER:  Can you see that?

20        A.    Yeah.

21   BY MR. AINSWORTH:

22        Q.    And, so, Morgan gives some drive times

23   here.  Leaving the hardware store at 3:40, took

24   him seven minutes to get to Floyd's trailer.  He

25   stayed at Floyd's trailer for three minutes and



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063          Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131             316-201-1612

**TROY FROST**

1   then arrived at Zule's farm at 4:04 p.m.  So,

2   including a three minute stop at Floyd's trailer

3   it took him 24 minutes to go from the hardware

4   store to Floyd's house and then to Zule's farm,

5   right?

6       A.   Yes, sir.

7       Q.   And, so, if Floyd left the hardware store

8   at 4:30 he would get back to Zule's farm at 4:54,

9   right?

10      A.   Yes.

11      Q.   Twenty-four minutes?  And if he left the

12  hardware store at 4:35 he would get back to Zule's

13  farm at 4:59 if he traveled this route, right?

14      A.   Yes.

15      Q.   But Zule reported that Floyd got back at

16  4:45 p.m. and, so, my question for you is was

17  there a way for Floyd to leave the hardware store

18  at 4:30 or 4:35, go to his trailer, abduct the

19  victim and make it to Zule's farm by 4:45?

20           MR. TURNER:  Object to form.

21           MR. LINDEN:  Join.

22      A.   I do not know if there's a way.

23  BY MR. AINSWORTH:

24      Q.   Okay.  There, there -- you know, if that

25  1969 pickup truck happens to have a Porsche engine



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**156**

## TROY FROST

```
1  in it that might -- but even then there's a limit
2  to how much time you can cut down when you're
3  traveling that distance, right?
4           MR. TURNER:  Object to form.
5           MR. LINDEN:  Join.
6      A.   Right, but like I said, I don't know.
7  BY MR. AINSWORTH:
8      Q.   All right.  In any event, if -- you know,
9  I note -- and I had a question for you about your
10 report regarding your interview with Karen
11 Edmonds, Exhibit 78, so, can you grab 78?  In your
12 report you don't reference that Floyd spent 15 to
13 20 minutes or more at the hardware store as Karen
14 told you, do you?
15     A.   No, it doesn't.
16     Q.   But it was in your field notes, right?
17     A.   Yes, sir.
18     Q.   So, it wasn't like you were trying to
19 hide it, right?
20     A.   Oh, no, no, sir.
21     Q.   And so, was it just an oversight that you
22 didn't include it in your report?
23     A.   Yes, sir.
24     Q.   Okay.  And, so, you weren't trying to
25 suggest that Floyd left the hardware store at 4:20
```



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1    in your report, were you?

2         A.    No, sir.

3         Q.    Okay.  'Cause if you, you know, read your

4    report and your notes it's clear that Floyd spent,

5    you know, a fair amount of time in the hardware

6    store and left, you know, 4:30, 4:35 or somewhere

7    in that territory, right?

8         A.    Yes, sir.

9         Q.    And, so, when you're conducting criminal

10   investigations you want to be accurate, right?

11        A.    As accurate as you can, yes, sir.

12        Q.    Yeah.  Umm.  Let's take a look at, at

13   Exhibit 81.  You got -- you got Exhibit 81 in

14   front of you?

15        A.    Yes, sir.

16        Q.    All right.  So, in Exhibit 81, this is a

17   Affidavit and Application for Search Warrant,

18   correct?

19        A.    Yes, sir.

20        Q.    And, so, you know when you're filling out

21   an Affidavit and Application for Search Warrants

22   you're supposed to be accurate, correct?

23        A.    Yes, sir.

24        Q.    Was Michael Hayes around for the creation

25   of this search warrant?



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

1          A.    Not to -- not to my knowledge, no.

2          Q.    **Okay.  How long did it take you to create**

3    **this search warrant?**

4          A.    Oh, I do not know how long it took me to

5    do it.

6          Q.    **All right.  Does nine hours sound about**

7    **right?**

8          A.    I don't know how long it took me, sir.

9          Q.    **All right.  Let's take a look at Exhibit**

10   **86.  Sorry, I don't want you to look at 86.**

11   **Well, you can, but that's not the next exhibit I**

12   **want to talk to you about.  Sorry, okay, it's**

13   **Exhibit 80, my apologies.  All right, so, taking a**

14   **look at Exhibit 80 it says, November 13, 1999, at**

15   **approximately 10 a.m. -- oh, let me stop myself.**

16   **This report is also dated November 29th, 1999.**

17   **Was that also a typo?**

18         A.    Yes, sir.

19         Q.    **And, so, you had typed this report on**

20   **November 13th but you accidentally wrote in**

21   **November 29th?**

22         A.    That's -- yes, it's -- yeah.  Yes.

23         Q.    **And, so, this report was typed on**

24   **November 13th, is that right?**

25         A.    Yes, sir.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**TROY FROST**

1       Q.    Okay.   In any event, at about 10 a.m. on
2  November 13th you went to the Jefferson County
3  Sheriff's Department to meet with the county
4  attorney, Jim Vanderbilt, so you could write some
5  search warrants.   "We were writing the search
6  warrants for Floyd Bledsoe's vehicle.   The vehicle
7  was a 1974 Chevy Nova, green and white in color.
8  Search warrants for his residence and for the
9  property where the body was found were also
10  written."   Do you see that?
11      A.    Yes, sir.
12      Q.    Then it says, "Approximately 11:26 I took
13  Polaroid photos of Floyd Bledsoe's vehicle which
14  was sitting in the parking lot of the Jefferson
15  County Sheriff's Department.   We went and worked
16  on the search warrants.   They were finally
17  complete around 1947, or 45, sorry."   Was that
18  correct?
19      A.    Yes, sir.
20      Q.    So, 1945 is 7:45 in the evening, right?
21      A.    Yes, sir.
22      Q.    So, according to your report you were
23  working on the, started working on the search
24  warrants around 10 a.m. and you stopped to take
25  the photos at 11:26 and then after 11:26 until

**Appino & Biggs** Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### TROY FROST

1   1945 you were working on the search warrants,

2   right?

3         A.    Yes, sir.

4         Q.    So, it took over seven hours, is that

5   right?

6         A.    Yes, sir.

7         Q.    And, so, you were trying to be precise

8   with your search warrants?

9         A.    Yes, sir.

10        Q.    All right.  Let's turn back to Exhibit 81

11  and that's your signature on Exhibit 81, the first

12  page, is that right?

13        A.    Yes, sir.

14        Q.    And, so, you're swearing that the

15  information you're providing to the judge is

16  correct, right?

17        A.    Yes, sir.

18        Q.    'Cause you don't want to mislead a judge

19  when they're issuing search warrants, correct?

20        A.    Correct.

21        Q.    All right.  Going on to the second page

22  of Exhibit 81, you state that you've received over

23  320 hours of training in the investigation of

24  crimes and that you've participated in the

25  training of the detection and apprehension of



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### TROY FROST

1  criminals committing violent person crimes such as

2  murder.  Then you have approximately nine years of

3  law enforcement experience in Jefferson County,

4  correct?

5       A.   Yes, sir.

6       Q.   All right.  So, had you had experience

7  investigating murders prior to this case?

8       A.   No, sir.

9       Q.   This was your first time?

10      A.   Yes, sir.

11      Q.   Why did you say that you had participated

12  in the training of the detection and apprehension

13  of criminals committing violent person crimes such

14  as murder?

15      A.   It's training hour and you have to have

16  40 hours of training so, you know, we do training.

17      Q.   Okay.  So, you had training in how to

18  conduct homicide investigations, right?

19      A.   Yes, sir.

20      Q.   All right.  Okay, then on page 3 you set

21  forth the probable cause that you had to believe

22  that the items described in paragraph 3 may be

23  found at the premises described in paragraph 4.

24  This probable cause is based upon the following

25  event.  And, so, were you compiling the details

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131                316-201-1612

1    that would go into this report?

2        A.    Yes, sir.

3        Q.    Where did you get the information used to

4    complete this report?

5        A.    I don't know where I got the information.

6    I can't remember.

7        Q.    Okay, but you would have consulted either

8    your fellow officers or their police reports for

9    information that was relevant to the investigation

10   but you didn't personally conduct?

11       A.    Right, yes, sir.

12       Q.    Okay.  Did you rely on anyone other than

13   your fellow police officers and their reports for

14   compiling this report?

15       A.    No, sir.

16       Q.    Okay, and, so, Mike Hayes didn't provide

17   you with any information to include in this report

18   -- in this affidavit, right?

19       A.    No, sir.

20       Q.    That's correct?

21       A.    I'm sorry, what was your question?

22       Q.    It's a double negative so I just want to

23   make sure.  It's correct that Mike Hayes didn't

24   provide you with any information that you used for

25   this affidavit, right?



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063             Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

**TROY FROST**

1     A.   Did he?

2     Q.   He did not provide you any information?

3     A.   No, he did not.

4     Q.   Okay.  All right, so, on page 3 it

5  states, "On November 6, 1999, at approximately

6  12:50 a.m. Heidi Bledsoe met with Deputy Mark Doud

7  with the Jefferson County Sheriff's Department and

8  gave him the following information: Zetta Camille

9  Arfmann, Camille, was missing and wanted a missing

10  persons report filed.  2:  Camille is Heidi's

11  sister and lives with her and Heidi's husband,

12  Floyd S. Bledsoe."  I'm skipping the addresses.

13  "3, Camille attends the Oskaloosa High School as a

14  freshman.  3A, she rides the bus home from school

15  and usually arrives back at their residence around

16  4:20 p.m.," and then B is blank.  Do you see that

17  sir?

18     A.   Yes, sir.

19     Q.   And, so, thus far that's what you typed

20  into this affidavit, is that right?

21     A.   Yes, sir.

22     Q.   And you are the one who typed this

23  affidavit, correct?

24     A.   Yes, sir.

25     Q.   All right, and then it says "4, Camille

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TROY FROST

1 and Heidi were to attend services at the
2 Countryside Baptist Church after school on
3 November 5th, 1999," correct?
4      A.   Yes, sir.
5      Q.   And then "Camille never arrived at the
6 church," right?
7      A.   Yes, sir.
8      Q.   B says, "On November 6, 1999, an
9 extensive search for Camille began.  The Jefferson
10 County sheriff and his deputies along with
11 Leavenworth County deputies began searching the
12 eastern edge of Jefferson County and the western
13 edge of Leavenworth County."
14      A.   Yes, sir.
15      Q.   Then it says, "The Jefferson County law
16 enforcement officers were also searching the area
17 near Floyd and Heidi's residence and the City of
18 Oskaloosa.  C, on November 7th, 1999, Floyd's
19 brother, Thomas Bledsoe, called a member of his
20 church, James Bolinger, and left a message
21 containing the following information," and then
22 you included that he said, one, Camille was dead;
23 two, Tom was going to go to the police; three, he
24 wanted the church to forgive him; four, he wanted
25 the church to help his family.  Do you see that?



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

1        A.    Yes, sir.

2        Q.    Why did you include that information?

3        A.    Just so they knew what the message was

4   containing.

5        Q.    That was -- you know, statements from Tom

6   were relevant to the investigation, right?

7        A.    Yes.

8        Q.    All right, and by the way, just so we're

9   oriented in time, you're creating this affidavit

10  on the 13th, is that right?

11       A.    Yes, sir.

12       Q.    Okay.  And then under D it says, "Affiant

13  and other members of the Jefferson County

14  Sheriff's Department and KBI Senior Special Agent

15  Jim Woods were led to a field north of the Floyd's

16  father's residence," and you provide the address.

17  Do you see that there, sir?

18       A.    Yes, sir.

19       Q.    And then it says, "The law enforcement

20  officers were led to the scene by Michael C.

21  Hayes, court-appointed attorney for Tom?"

22       A.    Yes, sir.

23       Q.    "Two.  In the field on the bank of the

24  ditch used for dumping trash law enforcement

25  officers located a spot where the bank had been

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

1   caved in recently and the dirt was covered by

2   paneling, plywood and debris.  Affiant and other

3   law enforcement officers carefully removed the

4   paneling, plywood and debris exposing the fresh

5   dirt caved down from the edge of the bank.  4, a

6   portion of a tennis shoe was exposed.  5, Affiant

7   and other law enforcement officers carefully

8   removed the dirt exposing the body of Camille,"

9   and then you provide information about the

10  victim's body.  Do you see that there, sir?

11       A.   Yes, sir.

12       Q.   And, so, why are you providing details

13  about, you know, the discovery of Camille's body?

14       A.   I just wanted to make sure that

15  everything's in there, in my affidavit.

16       Q.   So, you're being complete and not

17  deceiving the court?

18       A.   Right.

19       Q.   And can we go back up on page 4 to

20  paragraph D-1.  You see that there?

21       A.   Yes, sir.

22       Q.   Why did you swear that the law

23  enforcement officers were led to the scene by

24  Michael C. Hayes?

25       A.   What was your question?



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### TROY FROST

1      Q.  Why did you swear to the court that the

2  law enforcement officers were led to the scene by

3  Michael C. Hayes?

4      A.  'Cause I wanted the court to know that.

5      Q.  All right.  Let's take a look back at --

6  sorry, I'm trying to get to the right -- I think

7  we already x'd out of it, so, would you please

8  grab Exhibit 72 which we used earlier in this

9  deposition.  All right, if you look at page 1 of

10  Exhibit 72, see the first paragraph under November

11  8, 1999, that we looked at earlier where it says

12  you arrived at the scene and you were told that

13  Tom Bledsoe had shown the way to the body?

14      A.  Yes, sir.

15      Q.  So, what happened in fact was that Tom

16  Bledsoe showed law enforcement officers to the

17  body, right?

18      MR. TURNER:  Object to form.

19      MR. LINDEN:  Join.

20      A.  Yes.

21  BY MR. AINSWORTH:

22      Q.  And, so, my question for you looking at

23  Exhibit 81, why did you say that Mike Hayes

24  brought officers to the scene of the body?

25      A.  'Cause he was with his attorney.



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604         Suite 101           Suite 305
785-273-3063      Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com      913-383-1131      316-201-1612

**TROY FROST**

1    Q.   Well, why didn't you say Tom led officers
2  to the body with his attorney?

3    A.   I was just trying to be thorough on my
4  affidavit.

5    Q.   You were trying to be thorough by leaving
6  out the part that Tom was the one who brought
7  officers to the body?  Is that correct?

8    A.   I was just trying to be thorough as far
9  as that Mr. Hayes and Tom led the officers to the
10 body.

11   Q.   Where do you say that in your affidavit
12 that Tom led the officers to the body?

13   A.   It doesn't say that.  It just says that
14 he's the court-appointed attorney for Tom.

15   Q.   And in fact it says the only person who
16 led officers to the scene was Michael C. Hayes,
17 right?

18   A.   Right.

19   Q.   And, so, my question is were you trying
20 to be thorough by leaving out the fact that Tom
21 led officers to the scene?

22   A.   Actually I should have put Tom's name in
23 there as leading the officers to the scene with
24 his attorney.

25   Q.   And were you trying to minimize Tom's

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1    involvement in this murder, or the evidence

2    against him in creating this affidavit?

3         A.   No.

4         Q.   Why did you call the field north of

5    Floyd's father's residence as opposed to the field

6    north of Tom's residence in paragraph D?  Do you

7    see that also on page 4 of Exhibit 81?

8         A.   I, I don't know.

9         Q.   So, nowhere in here, in this affidavit

10   you indicate that it was Tom's house where the

11   field abutted, right?

12        A.   What was your question?

13        Q.   Nowhere in this affidavit do you indicate

14   that it was Tom's house that the victim's body was

15   buried in the field abutting that house, right?

16        A.   Right.

17        Q.   And, so, in paragraph D you skip the part

18   that it was Tom's residence and in D-1 you skip

19   the part that it was Tom that led officers to the

20   body, right?

21        A.   Right.

22        Q.   All right, going on to page 5, paragraph

23   6, do you see that?

24        A.   Talking about --

25        Q.   At the very top of the page.

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

## TROY FROST

```
 1        A.    Yes.  Yes, sir, I see it.
 2        Q.    It says, "Officers did not believe that
 3   gunshots were fired into Camille's body at the
 4   spot she was buried because of the lack of
 5   physical evidence."  Do you see that?
 6        A.    Yes, sir.
 7        Q.    And at the scene of the burial officers
 8   noted that there wasn't a ton of blood in the
 9   burial site suggesting that the victim was shot
10   somewhere else and then brought to the scene,
11   right?
12        A.    Yes, sir.
13        Q.    Were there any efforts to try and find
14   where the victim had actually been killed?
15        A.    I don't remember -- I don't remember.
16        Q.    Did you play any role in trying to find
17   the victim before her body was, you know,
18   discovered that weekend?
19        A.    Not that I can remember, no.
20        Q.    If you're trying to -- there's references
21   in the reports to Bloodhounds being used to try
22   and track Camille.  Are you aware of that?
23        A.    No.  I mean, I don't -- I wasn't
24   involved.
25        Q.    In your cases did you sometimes use
```

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**TROY FROST**

1    Bloodhounds to help police track people?

2         A.   Yes.

3         Q.   Was there any reason why police couldn't

4    use Bloodhounds to try and track the spot where

5    Camille had been killed?

6         A.   I, I don't know, I mean.

7         Q.   Well, on page 5 there's a paragraph F

8    that says, "On November 12th, 1999, law

9    enforcement officers interviewed Tom after he

10   waived his right to have Michael C. Hayes present

11   and his rights to remain silent with Mr. Hayes'

12   prior approval."  Do you see that?

13        A.   Yes, sir.

14        Q.   Why were you telling the court that, you

15   know, Tom was interviewed by officers on the 12th

16   after waiving his rights?

17        A.   I wanted to make sure that it was in the

18   affidavit.

19        Q.   Okay, and then under F-1 it says, "Tom

20   informed law enforcement officers that on Saturday

21   afternoon, November 6, 1999, Floyd stopped him on

22   his way to work and gave him the following

23   information:  A, Camille is dead; B, we shot her;

24   C, she is buried at the trash ditch -- she is

25   buried in the trash ditch at Dad's in a shallow

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## TROY FROST

1  grave with plywood and trash over the top."  D it

2  just says I.  Do you see that, sir?

3      A.   Yes, I see that.

4      Q.   Okay, so, umm, why did you include this

5  information about Tom, what Tom said to

6  investigators about Floyd?

7      A.   I wanted to make sure again that all this

8  information was in the affidavit.

9      Q.   Why did you want this information in the

10 affidavit?

11     A.   'Cause I wanted the judge to see

12 everything so he could see it.

13     Q.   Were you trying to provide a one-sided

14 view of what the evidence was in the case, you

15 know, intending to implicate Floyd and exculpate

16 Tom?

17     A.   No, sir.

18     Q.   Umm. And then it says, "Tom went to work,

19 came home and went to the trash ditch and

20 confirmed that Floyd was telling the truth."  Do

21 you see that?

22     A.   Yes.

23     Q.   Where in your affidavit do you mention

24 Tom confessed to killing Camille?

25     A.   I don't know.  It's not in there.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

# TROY FROST

1      Q.   That should have been in there, right,

2  the fact that Tom confessed to killing Camille,

3  right?

4      A.   Yes.

5      Q.   Where in your affidavit do you mention

6  that Camille was killed with Tom's gun which Tom

7  provided to law enforcement officers?

8      A.   Yep, that should have been in there, too.

9      Q.   That should have been in there, too, is

10  that what you said?

11      A.   Yes, sir.

12      Q.   All right.  And under E you state,

13  "Affiant has probable cause to believe the

14  following events occurred:  One, on November 5th,

15  1999, at 4:20 a.m." -- I think that's supposed to

16  be p.m., right?

17      A.   Yes, sir.

18      Q.   That's just a typo, right?

19      A.   Yes.

20      Q.   "At 4:20 p.m. Camille got off the school

21  bus and went to Floyd's house.  The school bus

22  driver remembers Camille being dropped off the bus

23  at that time and place.  2, Camille entered

24  Floyd's residence at that time.  Camille's books

25  and jacket were found on the couch with a

Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1  partially eaten brownie.  Law enforcement officers
2  were taken to the residence and investigating a
3  missing person report.  3, Floyd was at work at
4  the Zule's Dairy, on 259th Street, as a hired
5  hand.  He was at work that day and left the dairy
6  at approximately 4 p.m."  Do you see that?
7      A.   Yes, sir.
8      Q.   4, you then say "Floyd left the
9  Winchester Hardware Store at approximately 4:20
10 p.m. after purchasing a roll of duct tape.
11 Richard Zule, Floyd's boss, provided law
12 enforcement officers with the cash register
13 receipt showing the tape he brought back to
14 Richard was purchased at 5:20 p.m.  Law
15 enforcement officers confirmed that the register
16 at the Winchester Hardware Store had not been set
17 back an hour to show the correct time."  Do you
18 see that?
19     A.   Yes, sir.
20     Q.   So, you knew that as of November 13th
21 that it was an hour ahead, the register was an
22 hour ahead, right?
23     A.   Yes, sir.
24     Q.   Then in paragraph 5 it says, "After Floyd
25 left the hardware store he went home to his

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1  trailer where Camille was dropped off.  Floyd

2  admitted to Affiant on November 20th, 1999 --

3  sorry.  Floyd admitted to Affiant on November

4  12th, 1999, that he went to the trailer after the

5  hardware store.  Floyd later recanted the

6  statement and has consistently denied being there

7  in the past."  Do you see that?

8       A.   Yes, sir.

9       Q.   All right.  "Camille disappeared sometime

10  between 4:20 p.m. and approximately 5 p.m.  Law

11  enforcement officers interviewed Robin Meyers, the

12  babysitter.  She informed them that she arrived at

13  the residence between 5 p.m. and 5:30 p.m. and

14  Camille was already gone."  See that?

15       A.   Yes, sir.

16       Q.   "Heidi and Floyd both claim there's a

17  spot on the carpet in Camille's room that they

18  believe is blood.  Heidi provided the information

19  to law enforcement officers on November 12th,

20  1999.  Floyd provided the information to law

21  enforcement officers on November 13th, 1999."  Do

22  you see that, sir?

23       A.   Yes, sir.

24       Q.   "Floyd returned to the dairy at

25  approximately 5 p.m.  Richard Zule informed law



5111 SW 21st Street       6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604              Suite 101                 Suite 305
785-273-3063          Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131            316-201-1612

**TROY FROST**

1   **enforcement officers that when Floyd returned**

2   **Richard asked him what did you do, go to Kansas**

3   **City to get the tape?"  Do you see that?**

4        A.   Yes, sir.

5        **Q.   So, I've got some questions.  One is why**

6   **did you say that Floyd returned to the dairy at**

7   **approximately 5 o'clock when Richard Zule said he**

8   **returned at 4:45 p.m.?**

9        A.   I don't know.

10       MR. NORTON:   Can we take a break here,

11  Russell?

12       BY MR. AINSWORTH:

13       **Q.   Were you rounding up?**

14       A.   I don't know why I put five in there.

15       MR. AINSWORTH:   All right, well, let's

16  take a break.  How long do you need?

17       MR. NORTON:   We've been going for an hour

18  and a half, so, five, ten minutes.

19       MR. AINSWORTH:   Sure.

20       THE VIDEOGRAPHER:   Time is approximately

21  2:33 p.m. central, we're going off the record.

22       (THEREUPON, a recess was taken.)

23       THE VIDEOGRAPHER:   Time is approximately

24  2:47 p.m. central time, back on the record.

25       BY MR. AINSWORTH:



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

**TROY FROST**

1      Q.   All right, sir, taking a look back at

2 Exhibit 81, here on page 6 of that exhibit in

3 paragraph 4 you state that Floyd left the

4 Winchester Hardware Store at approximately 4:20

5 p.m.  Do you see that?

6      A.   Yes, sir.

7      Q.   Why don't you include the information of

8 Floyd then sticking around after buying the duct

9 tape and talking to the lady at the hardware store

10 and purchasing the sweatshirt and then not leaving

11 until after 4:30 p.m.?

12      A.   I don't know.

13      Q.   The reason I ask is because, you know,

14 you've got a -- in paragraph 6 on page 6 you say

15 that Camille disappeared sometime between 4:20 and

16 5 o'clock, right?

17      A.   Yes, sir.

18      Q.   That's your big window of time frame,

19 right, that you're focused on?

20      A.   Right.

21      Q.   And then you suggest to the court that

22 Floyd left the hardware store at 4:20 and didn't

23 arrive at the hardware store -- at the dairy,

24 sorry, until 5 o'clock, which would have left, you

25 know, plenty of time for Floyd to be driving



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                  316-201-1612

1    around Oskaloosa doing who knows what, right?

2         A.    Yes, sir.

3         Q.    But if Floyd leaves the hardware store

4    after 4:30 and arrives back at the dairy at 4:45,

5    then that window is, you know, so tight as to

6    preclude Floyd from having gone to his house

7    before going to the dairy, right?

8         A.    Yes, sir.

9         Q.    And, so, I guess the question is why did

10   you suggest to the court that there was plenty of

11   time for Floyd to be driving back to his trailer

12   when the evidence that you had, you know, based on

13   your investigation was that he didn't leave until,

14   the hardware store until after 4:30 and you knew

15   from Morgan that he arrived at the Zule farm by

16   4:45?

17              MR. TURNER:   Object to form.

18        A.    I do not know why.

19   BY MR. AINSWORTH:

20        Q.    The correct way to have done it would

21   have been to say that Floyd left approximately,

22   left the hardware store at approximately 4:30 or

23   4:35 and arrived back at the Zule Dairy at

24   approximately 4:45, right?

25              MR. TURNER:   Object to form.



Appino & Biggs Reporting Service, Inc.

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

1     A.    Yeah, I -- yes.

2     BY MR. AINSWORTH:

3     Q.    All right.  Was there a reason why you

4 were requiring, or requesting search warrants or a

5 search warrant for the property at Tom's dad's

6 north of, you know, the father's residence when

7 the father had signed a consent to search form

8 previously?

9     A.    Just to, you know, you do a search

10 warrant and do it right, so.

11     Q.    All right.  In that same affidavit,

12 Exhibit 81, on page, bottom of page 6, you state,

13 "Affiant believes that the evidence, fruits or

14 instrumentalities listed in paragraph 3 are

15 currently located in the 1974 green Chevrolet

16 four-door KS tag NHX317, you provide the VIN

17 number, having been used to transport the body and

18 driven by a driver that would transfer blood from

19 clothes to the vehicle."  Do you see that?

20     A.    Yes, sir.

21     Q.    And, so, if Tom's truck was believed to

22 have been used to transport the victim and driven

23 by Tom and might transfer blood from his clothes

24 to the vehicle, all of that language would apply

25 equally to Tom's truck, right?



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

## TROY FROST

1          A.    Yes.

2          Q.    All right, let's move -- I want to show

3    you Exhibit 85.  And, so, is this your handwriting

4    on Exhibit 85?

5          A.    Yes, sir, it is.

6          Q.    At least at the top?

7          A.    Yes, sir.

8          Q.    Okay, and there's a place for a suspect

9    on the form.  Do you see that?

10         A.    Yes, sir.

11         Q.    And on Exhibit 85, when do you fill in

12   the information about suspect?

13         A.    While I'm doing the evidence custody

14   receipt.

15         Q.    Okay, and, so, you fill it out at that

16   time and not earlier or later?

17         A.    No, sir.

18         Q.    Or not -- strike that -- okay.  And, so,

19   this is dated November 14, 1999, do you see that?

20         A.    Yes, sir.

21         Q.    And you have the hard copy with you as

22   well, is that right?

23         MR. TURNER:  Yes.

24         A.    Yes.  I'm sorry.

25         BY MR. AINSWORTH:



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1       Q.    I just want to make sure.  You can look
2   at the screen or the hard copy, whichever is more
3   convenient for you.  And, so, why did you say that
4   the suspect was Thomas K. Bledsoe, then above that
5   you wrote Floyd S. Bledsoe?
6             MR. TURNER:  Object to form.
7       A.    I don't remember why I did that.  I mean
8   -- (incomplete)
9       BY MR. AINSWORTH:
10      Q.    Were they both suspects at the time?
11      A.    I don't -- I would say they were both
12  suspects at the time, that's why I put both
13  suspects down.
14      Q.    Why did you think they were both
15  suspects?
16      A.    Well, I just -- that's what I'm -- that's
17  why I would put it up there.  I don't know why.
18  I just -- (incomplete)
19      Q.    Okay.  What reason did you have to
20  suspect Floyd on November 14, 1999?
21      A.    Well, based on the affidavit search
22  warrant, so.
23      Q.    What about the affidavit search warrant?
24      A.    Gave us probable cause to believe that,
25  you know, Floyd was a suspect, also.

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

1      Q.   Okay.  And what about the affidavit gave

2  you probable cause to believe that Floyd was a

3  suspect, also?

4      A.   Can you give me that question again,

5  please?

6      Q.   Sure.  What about the -- you said the

7  affidavit was what gave you probable cause and so

8  I'm asking you what about the affidavit gave you

9  probable cause to suspect Floyd Bledsoe?

10     A.   I don't -- I don't know.

11     Q.   All right.  Let me ask you about exhibit

12  -- well, before I do that.  If a witness gives

13  you a statement that implicates your suspect, can

14  you get a statement from that witness?

15     A.   Yes.

16     Q.   Can you have --

17     A.   You should --

18     Q.   -- the witness write -- excuse me?

19     A.   You should get a statement from the

20  witness.

21     Q.   So, that way -- 'cause sometimes

22  witnesses change their story over time or feel

23  bad, you know, and might not want to testify about

24  -- or might want to recant the statement they gave

25  to the police at an earlier time, right?



**TROY FROST**

1        A.    Yes, sir.

2        Q.    So, if a witness is providing you

3   information about your suspect you want to so-

4   called lock in the witness by having them write

5   out a statement in their own hand as to what

6   they're saying so you can preserve it in your

7   file, right?

8        A.    Yes, sir.

9        Q.    And you knew that back in 1999, correct?

10       A.    Yes, sir.

11       Q.    All right.  I want to show you Exhibit

12   89.  Let me know when you have it in front of

13   you.

14       A.    I do, sir.

15       Q.    Okay.  Exhibit 89 is a report that you

16   compiled or you prepared and is also dated

17   November 29, 1999.  You see that?

18       A.    Yes, sir, I do.

19       Q.    But it refers to activities taken on

20   November 16th, 1999, right?

21       A.    Yes, sir.

22       Q.    All right.  So, you spoke with Holly

23   Brown.  Do you know why you're speaking to Holly

24   Brown?

25       A.    I don't remember.



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063            Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131             316-201-1612

**TROY FROST**

1              MR. TURNER:  Take time to read that.

2         BY MR. AINSWORTH:

3         **Q.   All right.  Well, in any event, Holly**

4    **Brown, you don't give an address for her.  Do you**

5    **know why that is?**

6              MR. NORTON:  I think the witness is

7    reading the document and hadn't responded to your

8    last question.

9              MR. AINSWORTH:  Thank you for the

10   clarification then.  I'll wait.

11        BY MR. AINSWORTH:

12        **Q.   So, the pending question is do you know**

13   **why you spoke to Holly Brown?**

14        A.   Yes.

15        **Q.   Why did you speak to Holly Brown?**

16        A.   She said that a couple of days before

17   Friday Camille had got off the bus, there was a

18   green car with a white top in the driveway.

19   Camille was trying to run away from him and the

20   guy kept swerving toward her.

21        **Q.   I guess my question is do you know how**

22   **Holly Brown came to the police attention so you**

23   **would know to go speak to Holly Brown?**

24        A.   Oh, I'm sorry, sir.  No, I don't.

25        **Q.   You don't provide an address for Holly**

**TROY FROST**

1   Brown, is that -- do you know why?

2       A.   No, I do not know why, sir.

3       Q.   It makes it harder to go knock on her

4   door and ask her about this if you don't give an

5   address, right?

6       A.   Yes, sir.

7       Q.   All right.  As you said, you know, Holly

8   told you that there's a guy in a green car with a

9   white top and Camille was trying to get away from

10  him, right?

11      A.   Yes, sir.

12      Q.   And then you showed her a photo of a

13  green car with a white top and she said that was

14  the one she saw, right?

15      A.   Yes, sir.

16      Q.   All right.  And, so, what was the photo,

17  Polaroid photo that you showed her?

18      A.   Green car belonging to Floyd.

19      Q.   Okay, and, so, my question to you, sir,

20  is why didn't you have Holly write out a statement

21  saying this is what I observed and this is what I

22  told Detective Frost?

23      A.   I don't know why I didn't have her write

24  a statement.

25      Q.   I just want to scroll down to the bottom.

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

# TROY FROST

1    The second page just says end of report, right?

2        A.    Yes, sir.

3        Q.    And if you took a statement from her you

4    would then indicate in your report that you took a

5    statement, correct?

6        A.    Yes, sir.

7        Q.    Was there anything preventing you from

8    having Holly Brown write out a statement about

9    what she observed?

10       A.    Not that I can remember, sir.

11       Q.    Holly Brown didn't testify at Floyd's

12   trial, do you know that?

13       A.    No, I do not.

14       Q.    Let's take a look at Exhibit 90.  Exhibit

15   90 is another report by you.  It's short and

16   sweet.  It's also dated November 29th, 1999.  Is

17   that November 29th, 1999, also a typo?

18       A.    Yes, sir.  It's not, it's not right.

19       Q.    Well, and, so, what day did you type this

20   report?

21       A.    11-16 of '99.  I'm sorry, November 16th.

22       Q.    Does November 29th have any significance

23   to you as to a date why you would keep, you know,

24   accidentally typing it in on your reports?

25           MR. TURNER:  Object to form.



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### TROY FROST

1      A.   I do not know why it's always November

2   29th.  I do not know why.

3      BY MR. AINSWORTH:

4      Q.   All right.  You said, "I went back to

5   Holly Brown's residence and her mother, Lynn

6   Brown, was there."  And I assume based on the

7   Exhibit 89 that you went back to Holly Brown's

8   residence to show her the green Polaroid, or the

9   Polaroid photo of the green car, right?  You can

10  look back at 89 if that would help.  Exhibit 89

11  says that you went back --

12     A.   Right.

13     Q.   -- at 5:21 p.m. and, so, then at 5:21

14  p.m. you said you went back to Holly Brown's

15  residence --

16     A.   Yes, sir.

17     Q.   -- and her mom was there.

18     A.   Yes, sir.

19     Q.   And you also don't provide an address for

20  the Browns even though you referenced they have a

21  residence and do you know why that is?

22     A.   I do not know why I did not put a

23  residence in there.

24     Q.   All right.  In any event, Lynn Brown,

25  Holly's mother, tells you that there's a Sandy



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

### TROY FROST

1  Dressler told her that Tammi Dressler said Thomas

2  tried to make a move on Camille.  See that?

3      A.   Yes, sir.

4      Q.   And, so, should somebody have gone to

5  speak to Tammi Dressler?

6      A.   Yes, someone should've.

7      Q.   Umm.  Bear with me one second.  You spoke

8  to the school bus driver, right?

9      A.   Who's the school bus driver?

10     Q.   Ms. McClurg, as I recall.  Is that name

11 familiar?

12     A.   Not right off the top of my head, sir,

13 no.

14     Q.   All right, let me show you -- let me show

15 you Exhibit 88.

16          MR. TURNER:  Take your time to read that.

17     BY MR. AINSWORTH:

18     Q.   All I want is to confirm with Exhibit 88,

19 this is a report -- when was this report typed?

20     A.   November 15th.

21     Q.   Okay, despite the date of November 29th

22 at the top, is that right?

23     A.   Yes, sir.

24     Q.   Here it says she was Camille's school bus

25 driver and her name is Dorothy Sue, sorry -- I


Appino Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

### TROY FROST

1  mispronounced her name, it's McClung, M-C-L-U-N-G

2  (verbatim)?

3      A.   Yes, sir.

4      Q.   Okay, and she provides you -- she

5  provided you with her, the route that she drove

6  the school bus, right?

7      A.   Yes, sir.

8      Q.   And you accurately documented that in

9  your report, correct?

10     A.   Yes, sir.

11     Q.   All right.  And so, you don't remember --

12  is it safe to say that you don't remember speaking

13  to her but your report is an accurate depiction of

14  your interview with her?

15     A.   Yes, sir.

16     Q.   All right.  I want to show you what we've

17  marked as Exhibit 86.  We looked at this one

18  briefly when I accidently directed you to it

19  before.  All right, and when did you -- this is

20  your report, correct?

21     A.   Yes, sir, it is.

22          MR. TURNER:  Give him a minute to read

23  it, please.

24          MR. AINSWORTH:  Of course.

25     A.   All right.



5111 SW 21st Street      6420 W. 95th Street      800 E. 1st Street
Topeka, KS 66604         Suite 101                Suite 305
785-273-3063             Overland Park, KS 66212  Wichita, KS 67202
www.appinobiggs.com      913-383-1131             316-201-1612

1          MR. TURNER:  I think he's ready.

2      BY MR. AINSWORTH:

3      **Q.    Okay.  Showing you what we've marked as**

4  **Exhibit 86.  This is your report, is that right?**

5      A.    Yes, sir, it is.

6      **Q.    And on what date did you type this**

7  **report?**

8      A.    November 14th.

9      **Q.    And, so, you did not type this report on**

10  **November 29th, correct?**

11      A.    No, I did not.

12      **Q.    All right, so, you document some search**

13  **warrants that were executed and you went with**

14  **Undersheriff Herrig to search Floyd's vehicle, is**

15  **that right?**

16      A.    Yes, sir.

17      **Q.    Then on page 2 of Exhibit 86 you indicate**

18  **that you conducted -- you started your search of**

19  **the vehicle and that Dan Ward from Lawrence PD**

20  **checked for blood and semen.  You see that?**

21      A.    Yes, sir.

22      **Q.    Did he use luminal to do that?**

23      A.    I don't remember off -- I don't remember.

24      **Q.    Why did you have Dan Ward from Lawrence**

25  **PD coming to check for blood and semen in the**


Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

1    vehicle?

2        A.    Probably because they had the means of

3    doing it.

4        Q.    So, you and your -- you at Jefferson

5    County needed an outside agency to use specialized

6    equipment to look for blood and semen in a

7    location?

8        A.    Yes, sir.

9        Q.    All right, I want to show you Exhibit 87.

10   You can read this report over and let me know when

11   you're done.  It's short.

12       A.    Okay.

13       Q.    Okay, so, when did you type this report?

14       A.    November 15th, 1999.

15       Q.    The date at the top, November 29th, 1999,

16   is a typo?

17       A.    Yes, it's incorrect.

18       Q.    All right.  I'm just -- how did you come

19   to be talking to Tommie Arfmann, the mother of the

20   victim on this date?

21       A.    I don't recall, but when you read the

22   report she must have come into the Law Enforcement

23   Center wanting to talk or say something.

24       Q.    All right.  Says that Tommie told --

25   Tommie said that she was talking to Big Floyd,

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com        913-383-1131                316-201-1612

**TROY FROST**

1    that's Floyd and Tom's father, right?

2        A.   Yes, sir.

3        Q.   And Big Floyd said that Tommy didn't do

4    it and laughed.  Do you see that?

5        A.   Yes, sir.

6        Q.   Do you recall this conversation?  I'm

7    curious like how Tommie Arfmann reacted to Big

8    Floyd laughing about her daughter being murdered.

9        A.   I don't recall what the reaction was.

10       Q.   Towards the end of your report it says

11   Tommie said that Little Floyd goes deer hunting

12   and that Little Floyd would have went to Big Floyd

13   first, then Tommy, his brother.  Do you know what

14   that refers to?

15       A.   No, sir, I don't.

16       Q.   At the top where it says Tommie Arfmann

17   told me that Tom Bledsoe would protect his father

18   to the death, what did she mean by that?

19       A.   I don't know what she meant by that.

20       Q.   Did you ask her?

21       A.   No, I did not.

22       Q.   Did Tommie Arfmann's words have any

23   additional significance to you now that, you know,

24   you've seen Tom's suicide note saying that, you

25   know, in his death he said his father's DNA got on

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

**TROY FROST**

1   the victim's sock because he had sex with the

2   victim in his father's bed?

3        A.   No.  I mean, I don't -- huh-uh.

4        Q.   One exhibit to you.  One is -- let me

5   just check.  I think it's Exhibit 82 -- yeah,

6   Exhibit 82.  So, this is another search warrant

7   application and there's just -- it's pretty much

8   identical to the other one, Exhibit 81.  It just

9   has one addition on page 6 that I wanted to ask

10  you to -- ask you about.  So, if you turn to page

11  6 of Exhibit 82, the very bottom of that page

12  paragraph 9 says, "After Floyd returns home at

13  approximately 12 a.m. on November 6, 1999, he had

14  opportunity to put the body in his 1974 green

15  Chevrolet four-door, move the body from the area

16  around Floyd's residence to the trash ditch to

17  bury her."  Now, I think it might have been in

18  the other affidavit, too, but I didn't ask you

19  about it, so, I wanted to -- what made you believe

20  that when Floyd got home at midnight he had the

21  opportunity to put the victim in his car?

22       A.   I don't recall what -- I don't recall.  I

23  don't remember.

24       Q.   All right.  Well, let's take a look at

25  what we'll mark as Exhibit 91.



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### TROY FROST

1          MR. TURNER:  Take your time and read

2    that.

3          BY MR. AINSWORTH:

4          Q.   Yeah, you're welcome to read it over.

5    I'm only going to ask you about a portion of this,

6    but you can read the whole thing.  Let me know

7    when you're ready.

8          A.   Okay.

9          Q.   All right, taking a look at Exhibit 91,

10   so, this is an interview with the person who drove

11   Heidi home the night of November 7 -- November

12   5th, right?

13         A.   Yes, sir.

14         Q.   All right.  So, Scott says that he goes

15   home when Floyd pulls up, right?  I'm looking at

16   the bottom of page 1 of Exhibit 91.

17         A.   Yes.

18         Q.   And then -- and that was right around

19   midnight, correct?

20         A.   Yes, sir:

21         Q.   And Scott went home but then he came back

22   around 12:30 or 12:45 and went to Heidi's house,

23   right?

24         A.   Yes, sir.

25         Q.   And Heidi's house is also Floyd's house,

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

1   right?

2       A.   Yes, sir.

3       Q.   And according to Scott, he said that

4   Robin and Heidi, Tammi, Floyd and Tommie, meaning

5   Tommie Arfmann, were at Heidi's helping to look

6   for Camille?

7       A.   Yes, sir.

8       Q.   So, Scott kind of details his actions

9   trying to help find the victim, right?

10      A.   Yes, sir.

11      Q.   And then at 2:15 to 2:20 a.m. Scott said

12  that they went back to the trailer.  Floyd got in

13  his car and wanted to see if Gary saw any

14  suspicious vehicles that day and Scott said that

15  Floyd went and talked with Gary while Scott waited

16  out in the car.  See that?

17      A.   Yes, sir.

18      Q.   According to Scott, did he tell you that

19  Floyd had opportunities when he was not around all

20  these other people who were searching for Camille

21  at midnight and after midnight to dispose of the

22  body in his car?

23      A.   Not that I recall, no, sir.

24      Q.   Did you hear from anybody saying that,

25  you know, between the hours of, you know, midnight

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1   to 3 a.m. that Floyd was by himself or Floyd was

2   unaccounted for or Floyd was missing?

3        A.   No, sir.

4        Q.   All right.  Then I want to turn back to

5   your preliminary hearing testimony, I think it's

6   Exhibit 92, and turn to page I think it's 5.  Let

7   me know when you're --

8        A.   I'm there, sir.

9        Q.   -- on that page.  Exhibit 92, page 5.

10       A.   Yes, sir.

11       Q.   All right.  Let's start at the top of the

12   page; page 5, line 3.  "Question: Let me

13   understand, make sure I understand what you're

14   saying.  You're saying that Floyd Bledsoe told you

15   that after he went to Winchester Hardware Store he

16   had gone to his house?  Answer:  He had went to

17   the trailer.  Question:  He went to the trailer?

18   To his trailer.  Question:  On Fairview?  Yes,

19   sir.  Question:  Where, his residence?  Yes, sir.

20   Question:  And didn't go into the house?  Answer:

21   No, he just pulled in the drive, turned around and

22   left.  Question:  Did he stick with that story?

23   Answer:  No, he -- after we -- we asked him

24   again.  He denied that whole -- even before I even

25   asked him that he had denied it.  Question:  What



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604               Suite 101                    Suite 305
785-273-3063             Overland Park, KS 66212         Wichita, KS 67202
www.appinobiggs.com          913-383-1131                316-201-1612

### TROY FROST

1    do you mean by that?  Answer:  They'd asked him

2    before if he'd ever went to the trailer, you know,

3    after he left the hardware store and he said no,

4    and then when I had talked to him he said that

5    one time that he had went there and then when we

6    asked him again he said no, he didn't.  He just

7    wouldn't -- he kept denying it."  Were you asked

8    those questions and give those answers, sir?

9        A.   Yes, sir.

10        Q.   So, my question, sir, is you referred to

11    -- well, during your interrogation with Floyd

12    there was a period on the video where Randy

13    Carreno joined you, right?

14        A.   Yes, sir.

15        Q.   And the remainder of the video you were

16    alone with Floyd, right?

17        A.   Yes, sir.

18        Q.   And you say twice in your testimony here

19    that we -- so, let me -- at line 18 of page 5 --

20    we, "We'd ask him again and he denied that whole

21    -- even before I asked him that he had denied it,"

22    and then again on the bottom of page 5, line 25,

23    "that he had went there and then when we asked him

24    again he said no, he didn't, he just wouldn't --

25    kept denying it."  Do you see that, sir?



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1      A.   Yes, sir, I do.

2      Q.   And, so, is the we that you're referring

3  to yourself and Randy Carreno?

4      A.   I don't know the we.  Could be just me.

5  I mean, I --

6      Q.   Why would you refer to yourself as, as we

7  in the trial or in the preliminary hearing?

8      A.   I don't know who we is.

9      Q.   Let me get the question out 'cause I

10 think there was some cross talk and I'm sorry,

11 that was my fault, but why would you refer to

12 yourself as we during the preliminary hearing?

13     A.   Well, I don't know who we is.  I don't

14 remember who we is --

15     Q.   Do you -- do you commonly use the royal

16 we where you refer to yourself as we, like the

17 Queen of England?

18     A.   No, sir.

19     Q.   And you said we twice.  Were you -- does

20 that suggest to you that you're talking about the

21 time when Randy Carreno was in the room?

22     A.   Sir, I don't remember.

23     Q.   Okay.  Let me -- all right.  In that same

24 Exhibit 92 on page -- oh, sorry, 96, that's where

25 I was going.  I want to go to the trial



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212   Wichita, KS 67202
www.appinobiggs.com        913-383-1131             316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

### TROY FROST

1   testimony.  Page 5 of the trial testimony.  Let me

2   know when you're there.

3        A.   I'm here, sir.

4        Q.   Okay.  So, let's go to line 11.  "When

5   was that?"  You answered, "It would have been the

6   12th and later into the 13th, November.  Question:

7   1999?  Answer:  Yes, sir.  Question:  You had

8   actually followed some other interviewers, is that

9   correct?  Uh-huh, yes.  Question:  Why did you go

10  in the room?  Answer:  I went in there basically

11  to see, you know, if he needed anything, if he was

12  doing all right, you know, if he needed a break, I

13  mean that type of thing.  Question:  You actually

14  weren't scheduled to begin an interview with him,

15  were you?  Answer: No, huh-uh, wasn't."  Were you

16  asked those questions and did you give those

17  answers, sir?

18       A.   Yes, sir.

19       Q.   But we now know from reviewing the

20  videotape that you didn't go in there to see if

21  Floyd needed a break because he was already out of

22  the interview room taking a break, right?

23            MR. TURNER:  Object to form.

24       A.   He was out of the room, correct.

25       BY MR. AINSWORTH:



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1      Q.   And even before he was out of the room if

2  Floyd needed anything he could get it from the

3  detectives who were interrogating him, right?

4      A.   Yes, sir.

5      Q.   Why did you testify that you went in

6  there to see if Floyd needed anything, if he was

7  doing all right, if he needed a break?

8      A.   'Cause I walked in and asked him how he

9  was doing, if he was doing all right, checking on

10  him.

11      Q.   Right, but you then stayed for three and

12  a half hours to conduct an interrogation, so, I'm

13  just saying, like, I thought you told us here

14  today that you were there to interrogate Floyd,

15  right?  You'd been asked to go there to

16  interrogate Floyd, right?

17           MR. TURNER:  Object to form.

18      A.   I just -- I don't know.

19  BY MR. AINSWORTH:

20      Q.   You don't know what?

21      A.   I went in to check on him, see how he was

22  doing and I started talking to him.

23      Q.   For three and a half hours, right?

24      A.   Yes, sir.

25      Q.   Are you trying to suggest that you just

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

### TROY FROST

1   stopped in to say hey and then you ended up, you

2   know, spending, interrogating him and spending

3   three and a half hours with him, that that was

4   just a chance meeting?

5        A.   Like I said, I just went in to see how he

6   was doing and sat down and we started talking and

7   -- (incomplete)

8        Q.   If you went in to see how he was doing

9   why did you go into the empty room and wait for

10  Floyd?

11       A.   'Cause he was out of the room, so, when

12  he came back in I asked him how he was doing.

13       Q.   Right.  I guess my question is if you

14  wanted to know how he was doing why didn't you go

15  ask him wherever he was before returning to the

16  interrogation room to see how he was doing?

17       A.   I don't know.

18       Q.   You have trouble finding him?

19       A.   No, sir.  I don't know.  I don't know why

20  I didn't.

21       Q.   And on page 6 of Exhibit 96, line 15,

22  you're asked, "Question:  How did he describe his

23  feelings for Camille?  Answer:  He loved her a

24  lot.  Question:  That was what -- Answer:  He

25  said he loved her several different times."  Were



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063          Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com         913-383-1131             316-201-1612

### TROY FROST

1   you asked those questions or that question and did

2   you give that answer?

3        A.   Yes, sir.

4        Q.   Floyd said he loved Camille and that was

5   after you pressed him repeatedly to say that he

6   loved Camille, right?  You saw the video, right?

7        A.   Yes, I saw the video.

8        Q.   And on that video you tell Floyd, tell

9   her you love her, tell her you love her, say you

10  love her, say it.  Right?

11       A.   Yes, sir.

12            MR. TURNER:  Object to the form.

13       A.   He loved her.

14  BY MR. AINSWORTH:

15       Q.   And, so, when Floyd was saying he loved

16  Camille several different times, that was in

17  response to you cueing him to say that he loved

18  her, right?

19       A.   I believe he did love her.

20       Q.   Sure.  You believe that he loved her, but

21  in the context of the interrogation Floyd saying

22  he loved her was at your request, right?

23       A.   Yes.

24       Q.   It wasn't like he voluntarily, or he just

25  started spouting that he loved her; it was in



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604               Suite 101                    Suite 305
785-273-3063            Overland Park, KS 66212        Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

**TROY FROST**

1  response to you telling him to say that he loved

2  her, right?

3       A.   Yes.

4       Q.   If you look at the bottom of page 8 of

5  Exhibit 96, line 19.  "Question:  What do you mean

6  by holding his hands?  Answer:  We were just, we

7  -- well, when we were talking he got real

8  emotional.  Well, I was just wanting him to know

9  that I'm there for him, so, I was like holding his

10  hand, you know, letting him know that, you know,

11  it's okay, you know."  Were you asked that

12  question and did you give that answer?

13       A.   Yes.

14       Q.   All right.  At the time that you're, you

15  know, putting your hand on Floyd's shoulder and

16  being real close to him you were also telling him

17  that he buried the victim, right?

18       A.   I don't recall what was being said at the

19  time.

20       Q.   You remember telling him that he buried

21  the victim under all that plywood and trash

22  because he had to, right?

23       A.   Correct.

24       Q.   You were telling Floyd that he knows more

25  than what he's saying, right?



5111 SW 21st Street        6420 W. 95th Street       800 E. 1st Street
Topeka, KS 66604           Suite 101                 Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131              316-201-1612

**TROY FROST**

1        A.    Yes, sir.

2        Q.    That he shouldn't lie to you?

3        A.    Yes, sir.

4        Q.    Like, watching that videotape of your

5   interrogation of Floyd knowing what we know now,

6   did you feel uncomfortable watching how you were

7   speaking to Floyd and what you were saying to him?

8        A.    No, sir.

9        Q.    If you had to do it over again you would

10  have done the exact same thing?

11       A.    Yes, sir.

12       Q.    Can we take ten minutes and then come

13  back and I'm just going to look over my notes.   I

14  just have to do financials and if the witness is

15  going to talk about his family at trial ask those

16  questions, but otherwise -- why don't I just ask

17  that now, sir.   If you choose not to answer these

18  questions that's your right to do so, but if you

19  don't answer them then I'm going to ask you not to

20  testify about them at trial, all right, ask the

21  court to bar you from testifying about them at

22  trial.   It's stuff about your -- general stuff

23  about your family is all, like, so if you're going

24  to get on the stand and say I'm married, I have

25  kids, then I'd like to know now.   If you're not

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com          913-383-1131              316-201-1612

### TROY FROST

1   going to testify to that then I don't need to go

2   into any of it --

3           MR. NORTON:  Russell, this is Michael.

4   We don't know what we're going to ask him at trial

5   so ask your questions.

6       BY MR. AINSWORTH:

7   ▪    ▆▆▆▆▆▆▆▆▆  ▆▆▆▆▆▆▆▆

8   ▪    ▆▆▆▆▆▆

9   ▪    ▆▆▆▆▆▆  ▆▆▆▆▆▆▆▆▆▆▆▆

10  ▆▆▆▆▆▆▆▆

11  ▪    ▆▆▆▆▆▆▆

12  ▪    ▆▆▆▆▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆?

13  ▪    ▆▆▆▆▆

14  ▪    ▆▆▆▆▆▆▆▆▆▆

15  ▪    ▆▆▆▆▆▆▆▆▆▆▆▆

16  ▪    ▆▆▆▆▆▆▆▆▆

17  ▪    ▆▆  ▆▆▆▆▆▆▆▆▆▆

18  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

19  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

20  ▆▆▆▆▆

21  ▪    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

22  ▆▆▆▆▆▆▆▆

23  ▪    ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

24  ▆▆▆▆  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆

25  ▆▆▆▆▆▆▆▆▆▆▆



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604              Suite 101                  Suite 305
785-273-3063            Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com         913-383-1131             316-201-1612

# TROY FROST





5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# TROY FROST





Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# TROY FROST





5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

209

## TROY FROST

1        MR. AINSWORTH:  All right, why don't we

2   go off the record and stretch and then come back

3   in five minutes and tell you if I have any more

4   questions for you.

5        THE VIDEOGRAPHER:  Time is approximately

6   3:42 p.m., we're going off the record.

7        (THEREUPON, a recess was taken;

8   WHEREUPON, Deposition Exhibit No 98 was marked for

9   identification.)

10        THE VIDEOGRAPHER:  Time is approximately

11   3:54 p.m., we're back on the record.

12   BY MR. AINSWORTH:

13   **Q.   All right, sir, I found one other thing I**

14   **wanted to ask you about.  We're going to mark this**

15   **as Exhibit 98 and I'm sorry, I don't have a paper**

16   **copy for you but I just wanted to show this to**

17   **you.  Is this your handwriting, sir?**

18   A.   Yes, sir, it is.

19   **Q.   Let me tell you what this is.  This is**

20   **Bates-numbered JC4947 through JC4954 and it**

21   **appears to be notes that you were taking of Randy**

22   **Carreno's interrogation of Floyd on November 12th,**

23   **1999, beginning at 5:20 p.m., but let me ask you,**

24   **sir, is that your handwriting where it says**

25   **November 12th, 1999, 1720?**



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604           Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212    Wichita, KS 67202
www.appinobiggs.com        913-383-1131               316-201-1612

## TROY FROST

1      A.    Yes, sir, it is.

2      Q.    So, you're taking notes of an interview

3  that was occurring at 5:20 p.m. on November 12th,

4  1999?

5      A.    Yes, sir.

6      Q.    All right, and so, you're outside the

7  room taking notes, is that right?

8      A.    Yes, sir.

9      Q.    You were watching all of Floyd's

10  interrogation on the 12th, right?

11      A.    Yes, sir.

12      Q.    And then at a certain point you went in

13  to talk to Floyd, right?

14      A.    Yes, sir.

15      Q.    Take a look at page 8.  You write -- is

16  that your handwriting where it says "cried while

17  he lied to Randy, or lies to Randy?"

18      A.    It looks like my handwriting, yes.

19      Q.    And, so, you're referencing Floyd crying

20  when he's trying to protest his innocence and you

21  characterize it as cried while he lies to Randy?

22          MR. TURNER:  Object to form.

23      A.    Yeah.  I mean, that's my notes.

24  BY MR. AINSWORTH:

25      Q.    What was Floyd lying about?

Appino & Biggs Reporting Service, Inc.

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

**TROY FROST**

1      A.    I do not know, sir.

2      Q.    Why did you say that Floyd was crying

3  while he lied to Randy?

4      A.    I do not know what the question was, or I

5  do not know.

6      Q.    Randy is Randy Carreno, right?

7      A.    Yes, sir.

8      Q.    What possible basis did you have to

9  believe that Floyd was crying while he lied to

10 Randy when Floyd was being interrogated by Randy

11 Carreno?

12     A.    I do not know.

13     Q.    Do you regret writing cried while he lies

14 to Randy about Floyd?

15           MR. TURNER:  Object to form.

16     A.    No, I do not.

17     BY MR. AINSWORTH:

18     Q.    Do you believe that Floyd is innocent?

19     A.    Do I believe -- what was the question

20 again?

21     Q.    Do you believe that Floyd is innocent?

22     A.    Innocent of?

23     Q.    Camille Arfmann's murder.

24     A.    I do not know.

25     Q.    Do you know if Tom is innocent of Camille

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1   **Arfmann's murder?**

2        A.   I do not know.

3        **Q.   All right.  So, you observed Tom and Mike**

4   **Hayes enter the interrogation room with Floyd,**

5   **right?**

6        A.   Yes, sir.

7        **Q.   Umm.  And that was something that you**

8   **guys had talked about arranging to have, Tom and**

9   **Mike Hayes confront Floyd, is that right?**

10            MR. TURNER:  Object to form.

11       A.   That who talked about?

12   BY MR. AINSWORTH:

13       **Q.   You and Carreno and other members of the**

14   **investigative team.**

15       A.   I did not -- I don't -- I didn't -- I

16   don't remember anything about talking to anybody

17   about Mr. Hayes and Tom coming in to the interview

18   room.

19       **Q.   Was it a surprise to see Tom enter the**

20   **interrogation room?**

21       A.   I don't know if I was surprised or not.

22   I don't know.

23       **Q.   Do you remember when Tom first accused**

24   **Floyd inside that interrogation room and Floyd**

25   **said, "What time was it that you saw me," and**

### TROY FROST

1  Randy Carreno says, "I don't give a shit what time

2  it was."  Do you remember that happening?

3       A.   No, I do not.

4       Q.   Did you give a shit what time it was that

5  Tom and Floyd supposedly had this roadside

6  meeting?

7            MR. QUALSETH:  Object to the form.

8            MR. TURNER:  Join.

9            MR. LINDEN:  Join.

10      A.   I don't know.  I mean, I don't --

11  (incomplete)

12      BY MR. AINSWORTH:

13      Q.   Well, let me put it this way:  You've

14  dealt with so-called jailhouse informants before,

15  right?

16      A.   Yes, sir.

17      Q.   People who are facing criminal charges

18  sometimes provide credible information but

19  sometimes they're just making something up so they

20  don't have to, you know, so they might get some

21  leniency on their charges, right?

22      A.   Yes, sir.

23      Q.   And, so, when somebody's telling

24  information while they're facing criminal charges

25  you have to do whatever you can to corroborate

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

1    whatever they're telling you, right?

2        A.    Yes, sir.

3        Q.    And you have to look at their statements

4    with a heavy dose of skepticism because they're

5    trying to get, or could be trying to get leniency

6    on charges which they can't buy with money, right?

7        A.    Right.

8        Q.    And, so, if Tom Bledsoe tells you that he

9    met Floyd on the side of the road on a particular

10   weekend you'd want to know when that happened,

11   right?

12       A.    I would think that you'd want to know

13   when that happened, yes.

14       Q.    I mean, these are -- some of these are

15   real basic questions, like you'd want to know

16   where it happened, right?

17       A.    Yes, you'd want to know where it

18   happened.

19       Q.    'Cause you'd want to look for any

20   information that might help you corroborate that

21   the roadside meeting actually occurred, right?

22       A.    Yes, sir.

23       Q.    So, you would certainly want to know from

24   Tom when the roadside meeting happened so you can

25   determine if it was in a window of time where it



Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212       Wichita, KS 67202
www.appinobiggs.com          913-383-1131                  316-201-1612

### TROY FROST

1  could possibly occur, right?

2     A.   Yes, sir.

3     Q.   And if Tom tells you -- strike that.  If

4  Tom states that the time the roadside encounter

5  was after 2 p.m. on Saturday when Floyd was with

6  Randy Carreno from 1:48 until 5:30 on Saturday,

7  that'd make you look at Tom and say, hmm, maybe

8  you're not telling the truth, right?

9     A.   I don't know.  You know, I'm not going to

10 -- it's -- I don't know.  I mean --

11    Q.   You don't know?

12    A.   Yeah.  I mean, that's the -- you know, I

13 do not know, no.

14    Q.   One of my first statements in this

15 deposition was that being a police officer is a

16 hard job, right?

17    A.   Very.

18    Q.   And do you remember that?

19    A.   Very hard job.

20    Q.   Yeah, and just sometimes people give

21 police information that's not true, right?

22    A.   Yes, sir.

23    Q.   Sometimes that's an accident, they might

24 misremember something or make a mistake, right?

25    A.   Yes, sir.



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

**TROY FROST**

1        Q.   And sometimes it's a deliberate attempt

2   to impede your investigation, right?

3        A.   Could be, yes.

4        Q.   And, so, if Tom tells Luis that the

5   roadside encounter happened after 2 p.m. when

6   police know that Floyd was with Carreno after 2

7   p.m. on that Saturday, that would cause you as a

8   police officer to do further investigation to find

9   out, hmm, is Tom lying or did he just misremember

10  the time that this really important roadside

11  encounter happened, right?

12       A.   You know, I don't know 'cause I wasn't

13  there during the roadside conversation.  I mean, I

14  don't --

15       Q.   Oh, yeah, right, you weren't there.  What

16  I mean is that as a police officer, as a detective

17  you would want to know if Tom simply got the time

18  wrong or if he was lying about the encounter

19  happening after 2 p.m., right?

20       A.   Yes, sir.

21       Q.   And, so, you would investigate to

22  determine if Tom was just mistaken about the time

23  or if he was lying about the time, right?

24       A.   Yes, sir.

25       Q.   And, so, you would, you would care very

**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

1    much to know what time it was that the encounter

2    happened, right?

3              MR. TURNER:  Object to form.

4         A.   Yes.

5              MR. AINSWORTH:  All right.  I don't have

6    any further questions for this witness.

7         CROSS-EXAMINATION

8         BY MR. TURNER:

9         Q.   I just have a brief follow-up, and I'm

10   handing over Exhibit 72.  And we've talked or

11   counsel and you have talked a lot about reports

12   and the dates and as we see more and more of

13   these reports we keep seeing a date 11-29-99.  As

14   we've gone on through the day do you have an

15   explanation how that could possibly be?

16        A.   I don't have any idea why all the dates

17   on my reports are November 29th, 1999.  It had to

18   do something with the system, 'cause my reports

19   were not all written on November 29th.

20        Q.   Are you aware either then or now that

21   there's, there could have been a setting that any

22   time the document was opened or changed or printed

23   it automatically updates the date?

24        A.   There, there could have been.  You know,

25   I can't -- I don't remember, I can't remember the



5111 SW 21st Street          6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604             Suite 101                  Suite 305
785-273-3063                 Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com          913-383-1131               316-201-1612

# TROY FROST

1  system we had back then, but the dates are not

2  right.  11-29-99 on all my reports is not.

3        **Q.   In any event, you don't remember**

4  **deliberately --**

5        A.   Yeah.

6        **Q.   -- putting 11-29-99?**

7        A.   No, I don't.

8        **Q.   Or even accidentally putting it in?**

9        A.   No.  Yeah, that's just -- no, I didn't.

10            MR. TURNER:  That's all.

11            MR. QUALSETH:  No questions for the

12  State.

13            MR. LINDEN:  Defendant Vanderbilt will

14  reserve his questions for trial.

15            MR. TURNER:  He will read and sign.

16            MR. NORTON:  Russell, did you have any

17  redirect?

18            MR. AINSWORTH:  I do not, thank you.

19            MR. NORTON:  Before you go off the record

20  we do want to designate as confidential any

21  references or discussions of documents or matters

22  within documents that have been designated as

23  confidential as well as the financial information,

24  and we'll follow up within the time period

25  required or allowed by the protective order for



5111 SW 21st Street          6420 W. 95th Street          800 E. 1st Street
Topeka, KS 66604             Suite 101                    Suite 305
785-273-3063                 Overland Park, KS 66212      Wichita, KS 67202
www.appinobiggs.com          913-383-1131                 316-201-1612

# TROY FROST

1  specific designations.

2          THE VIDEOGRAPHER:  Time is approximately

3  4:06 p.m., we're going off the record.  This

4  concludes the deposition.

5          (THEREUPON, the Deposition concluded at

6  4:06 p.m.)

7  .

8  .

9                          SIGNATURE

10  .

11          The deposition of TROY FROST was taken in

12  the matter, on the date, and at the time and place

13  set out on the title page hereof.

14  .

15          It was requested that the deposition be

16  taken by the reporter and that same be reduced to

17  typewritten form.

18  .

19          It was agreed by and between counsel and

20  the parties that the deponent will read and sign

21  the transcript of said deposition.

22  .

23  .

24  .

25  .

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

**TROY FROST**

1                          AFFIDAVIT

2    .

3    STATE OF _____:

4    COUNTY/CITY OF _____:

5    .

6           Before me, this day, personally appeared,

7    TROY FROST, who, being duly sworn, states that the

8    foregoing transcript of his/her Deposition, taken

9    in the matter, on the date, and at the time and

10   place set out on the title page hereof,

11   constitutes a true and accurate transcript of said

12   deposition, along with the attached Errata Sheet,

13   if changes or corrections were made.

14   .

15           _____

16                          TROY FROST

17   .

18           SUBSCRIBED and SWORN to before me this

19   _____ day of _____, 2023 in the

20   jurisdiction aforesaid.

21   .

22   _____          _____

23   My Commission Expires          Notary Public

24   .

25   .



5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# TROY FROST

 1                    DEPOSITION ERRATA SHEET

 2      .

 3      RE:        APPINO & BIGGS REPORTING SERVICE, INC.

 4      .

 5      FILE NO.: 68323

 6      .

 7      CASE:      FLOYD BLEDSOE VS

 8                 JEFFERSON COUNTY, KANSAS, ET AL.

 9      .

10      DEPONENT: TROY FROST

11      .

12      DEPOSITION DATE: 02/20/2023

13      .

14      To the Reporter:

15      I have read the entire transcript of my Deposition

16      taken in the captioned matter or the same has been

17      read to me.  I request that the following changes

18      be entered upon the record for the reasons

19      indicated.  I have signed my name to the Errata

20      Sheet and the appropriate Certificate and

21      authorize you to attache both to the original

22      transcript.

23      .

24      .

25      .

Appino & Biggs Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612

# TROY FROST

```
 1    PAGE:LINE FROM          TO              REASON
 2      .
 3      .
 4      .
 5      .
 6      .
 7      .
 8      .
 9      .
10      .
11      .
12      .
13      .
14      .
15      .
16      .
17      .
18      .
19      .
20      .
21      .
22      .
23      .
24    SIGNATURE:_____ DATE:_____
25                        TROY FROST
```



5111 SW 21st Street        6420 W. 95th Street        800 E. 1st Street
Topeka, KS 66604            Suite 101                  Suite 305
785-273-3063               Overland Park, KS 66212     Wichita, KS 67202
www.appinobiggs.com         913-383-1131               316-201-1612

TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

223

# CERTIFICATE

**STATE OF KANSAS**

**COUNTY OF SHAWNEE**

    I, Barbara J. Hoskinson, a Certified Court Reporter, Commissioned as such by the Supreme Court of the State of Kansas, and authorized to take depositions and administer oaths within said State pursuant to K.S.A. 60-228, certify that the foregoing was reported by stenographic means, which matter was held on the date, and the time and place set out on the title page hereof and that the foregoing constitutes a true and accurate transcript of the same.

    I further certify that I am not related to any of the parties, nor am I an employee of or related to any of the attorneys representing the parties, and I have no financial interest in the outcome of this matter.

    Given under my hand and seal this 3rd day of March, 2023.

*Barbara J. Hoskinson*

Barbara J. Hoskinson, C.C.R. No. 0434



**Appino & Biggs** Reporting Service, Inc.
TECHNOLOGY SPECIALISTS IN TODAY'S LITIGATION

5111 SW 21st Street
Topeka, KS 66604
785-273-3063
www.appinobiggs.com

6420 W. 95th Street
Suite 101
Overland Park, KS 66212
913-383-1131

800 E. 1st Street
Suite 305
Wichita, KS 67202
316-201-1612