# EXHIBIT 40

1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF KANSAS

3

4

5

6    FLOYD BLEDSOE,

7                    Plaintiff,

8    vs.                          Case No. 2:16 CV 02296

9    JEFFERSON COUNTY, KS, et al.,

10                   Defendants.

11

12

13

14

15

16   VIDEO RECORDED DEPOSITION OF TERRY L. MORGAN,

17   a Defendant, taken on behalf of the Plaintiff,

18   pursuant to Notice, on February 13, 2023, at

19   Ramada by Wyndham Topeka, 420 Southeast Sixth

20   Street, Topeka, Kansas 66607, before

21

22                   MYLES A. MEGEE

23

24   Certified Realtime Reporter, Registered Professional

25   Reporter, Certified in Kansas, Missouri, and Iowa.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1                    APPEARANCES

 2   For the Plaintiff (via videoconference):

 3       MR. RUSSELL AINSWORTH
         LOEVY & LOEVY
 4       311 North Aberdeen Street, 3rd Floor
         Chicago, Illinois  60607
 5       russell@loevy.com
         (312) 243-5900
 6

 7   For Defendant Jefferson County, Kansas
     Board of Commissioners, Sheriff Jeff Herrig
 8   in his individual and official capacity,
     Randy Carreno, Troy Frost, and Robert Poppa:
 9
         MR. ERIC TURNER
10       FOULSTON SIEFKIN, LLP
         7500 College Boulevard, Suite 1400
11       Overland Park, Kansas  66210
         eturner@foulston.com
12       (913) 498-2100

13
     For Defendant Jim Vanderbilt:
14
         MR. PATRIC S. LINDEN
15       CASE, LINDEN, KURTZ, BUCK, PC
         2600 Grand Boulevard, Suite 300
16       Kansas City, Missouri  64108
         patric.linden@caselinden.com
17       (816) 979-1500

18
     For Defendants George Johnson, Jim Woods,
19   and Terry Morgan:

20       MR. SHON D. QUALSETH
         KANSAS ATTORNEY GENERAL'S OFFICE
21       120 Southwest 10th Avenue, 2nd Floor
         Topeka, Kansas  66612-1597
22       shon.qualseth@ag.ks.gov
         (785) 368-8424

23

24

25
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
1                 APPEARANCES (Continued)

2    For Defendant Michael Hayes:

3        (No appearance.)

4
     Also present:
5
         Mr. Michael Hayes
6

7                     TABLE OF CONTENTS

8    EXAMINATION

9    Questions By Mr. Ainsworth                         6

10

11   EXHIBITS

12   5  - Composite exhibit beginning with           83

13        handwritten notes (Bates No. JC 001524)

14   46 - Suicide notes                              189

15   53 - 11/10/99 handwritten notes                 61

16   54 - 11/29/99 Jefferson County Sheriff's        68

17        Department "Narrative Report"

18   56 - Composite exhibit beginning with           71

19        Bates No. KBI Subpoena 002217

20   57 - 11/9/99 KBI "Investigation Report" (Bates  108

21        Nos. KBI Subpoena 878 - KBI Subpoena 880)

22   58 - 11/10/99 KBI "Investigation Report" (Bates  63

23        Nos. KBI Subpoena 892 - KBI Subpoena 899)

24   60 - 11/16/99 KBI "Investigation Report" (Bates 173

25        Nos. KBI Subpoena 935 - KBI Subpoena 940)
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

TABLE OF CONTENTS (Continued)

64 – 11/17/99 KBI "Investigation Report"          75
     (Bates Nos. KBI Subpoena 954)

66 – 2/17/16 interview of retired KBI agent        49
     Terry Morgan

67 – 11/8/99 KBI "Investigation Report" (Bates     96
     Nos. KBI Subpoena 807 – KBI Subpoena 810)

68 – 11/8/99 KBI "Investigation Report" (Bates    144
     Nos. KBI Subpoena 805 – KBI Subpoena 806)

69 – 11/8/99 KBI "Investigation Report" (Bates    177
     Nos. KBI Supboena 801 – KBI Subpoena 804)

70 – "Defendant Terry Morgan's Response to        178
     Plaintiff's First Set of Interrogatories"


CERTIFICATE OF REPORTER                           207

ERRATA SHEET                                      208

SIGNATURE PAGE                                    209


Reporter's Note:  Electronic exhibits provided by
counsel were made OCR searchable (PDF), downsampled
to 600 dpi, digitally labeled if not previously
labeled, flattened, archived as original exhibits,
and provided electronically to all ordering counsel.
Processing electronic exhibits can change the file
size, resolution, and metadata of files originally
provided.
(ph) indicates a phonetic spelling.
[sic] indicates the text is as stated.
Quoted text is as stated by the speaker.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1           THE REPORTER:  Good morning.  My name is

2    Myles Megee.  I am a Kansas-certified court

3    reporter.  We are now on the record.  Today's date

4    is February 13, 2023, and the time is approximately

5    9:32 a.m.

6           This is the Zoom-recorded deposition of

7    Mr. Terry L. Morgan in the matter of Floyd Bledsoe

8    versus Jefferson County, Kansas, and others,

9    Case No. 2:16 CV 02296.  The video recording is not

10   being externally monitored or recorded by a

11   videographer.

12          Would counsel please identify yourselves

13   and whom you represent.

14          MR. AINSWORTH:  Good morning.  This is

15   Russell Ainsworth appearing on behalf of the

16   plaintiff.

17          MR. QUALSETH:  This is Shon Qualseth

18   appearing on behalf of Terry Morgan.

19          MR. TURNER:  This is Eric Turner appearing

20   on behalf of the Board of County Commissioners of

21   Jefferson County, Sheriff Jeff Herrig in his

22   official and individual capacities, Randy Carreno,

23   Troy Frost, and Robert Poppa.

24          MR. LINDEN:  Patric Linden on behalf of

25   Defendant Jim Vanderbilt.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          MR. AINSWORTH:  And please let the record

2    reflect that Michael Hayes is also attending the

3    deposition.

4                    TERRY L. MORGAN,

5    a Defendant, being first duly sworn, testified under

6    oath as follows:

7                      EXAMINATION

8    BY MR. AINSWORTH:

9        Q.   Sir, would you please state and spell your

10   name for the record.

11       A.   Terry, T-e-r-r-y, L. Morgan, M-o-r-g-a-n.

12       Q.   Have you given -- have you been deposed

13   before, sir?

14       A.   I have.

15       Q.   On how many occasions?

16       A.   Probably 10 or 12.

17       Q.   Okay.  When was the last time you were

18   deposed?

19       A.   Probably around four years ago.

20       Q.   All right.  Because it's been a while, is

21   it okay if we go over some of the ground rules?

22       A.   Sure.

23       Q.   The first thing I want to ask you to do is

24   to answer my questions out loud with a verbal "Yes"

25   or "No," if the question calls for it.  Okay?

8700 Monrovia, Suite 310                                      (913) 825-2510
Lenexa, Kansas 66215-3500                                 Fax (913) 825-2530
www.cornerstonekc.net                          office@cornerstonekc.net


Cornerstone
Court Reporting Company LLC

1       A.   Yes.

2       Q.   The next thing I'll ask you to do is to

3   pause before you begin your answer so that -- to

4   make sure I'm done with my question so we're not

5   talking at the same time.  Okay?

6       A.   Understood.

7       Q.   And I'll try and do the same with you, and

8   that is wait till your answer is done before I begin

9   my next question.  Okay?

10      A.   Yes.

11      Q.   If you don't understand my question,

12  please ask me to rephrase the question, reask the

13  question, or in some way indicate to me that you do

14  not understand my question.  All right?

15      A.   Yes.

16      Q.   The flip side of that is that if you

17  answer my question, I'll assume that you've

18  understood my question as I've posed it.  Fair?

19      A.   I understand.

20      Q.   Do you have any medical condition, or are

21  you on any medication that would affect your ability

22  to testify truthfully and accurately here today?

23      A.   I am on medication, but it will not affect

24  my ability to answer truthfully and accurately.

25      Q.   Do you have any other condition, such as

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   fatigue or stress or -- or anything that would

2   affect your ability to testify truthfully and

3   accurately here today?

4        A.   No.

5        Q.   And I don't need to know what kind of

6   medication you're on, but if you need a break to

7   take medication or if you need a break for any

8   reason, please just let us know.  All that we ask is

9   that you answer any question that's pending before

10  we break.  Okay?

11       A.   Thank you.

12       Q.   And -- and -- but, just to be clear,

13  there's nothing about the medication that you're

14  taking that would cause fatigue or, you know, the

15  ability to recall events or anything like that; is

16  that correct?

17       A.   Not to the best of my knowledge, no.

18       Q.   And "no" meaning it would not affect your

19  ability to testify; is that right?

20       A.   That is correct.

21       Q.   Thank you.

22            Are you retired, sir?

23       A.   I am.

24       Q.   How long you been retired for?

25       A.   Since January the 1st of 2020.

8700 Monrovia, Suite 310                                          (913) 825-2510
Lenexa, Kansas 66215-3500                                         Fax (913) 825-2530
www.cornerstonekc.net                                            office@cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

1      Q.    Where did you retire from?

2      A.    The Office of the Disciplinary

3   Administrator, a subdivision of the Kansas Supreme

4   Court, State of Kansas.

5      Q.    And how long did you work for the

6   disciplinary commission?

7      A.    16 years.  Correction.  I'm sorry.

8   14 years.

9      Q.    And what were your duties with the

10  disciplinary commission?

11     A.    I was a special investigator to

12  investigate cases against attorneys and/or judges.

13     Q.    Did you have any dealing with Jim

14  Vanderbilt in your role with the disciplinary

15  commission?

16     A.    I did.

17     Q.    What did you do with Jim Vanderbilt?

18     A.    There was a complaint on Mr. Vanderbilt.

19  And I was assigned the case, and I investigated is

20  it.

21     Q.    And what did you do in -- or what was the

22  complaint against Jim Vanderbilt?

23     A.    I don't remember.

24     Q.    And what did you do to investigate that

25  complaint?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1        A.   I went over and interviewed him.  He was

2   officing in Lawrence at the time.  And then I would

3   have interviewed the complainant and any witnesses.

4        Q.   And what was the conclusion of your -- or

5   did you reach a conclusion in your investigation?

6        A.   Our investigations were factual.  We

7   weren't asked for conclusions.  And I don't recall

8   what came out of the investigation.

9        Q.   Do you recall Jim Vanderbilt being

10  disbarred?

11       A.   Yes.

12       Q.   And was that as a result of the

13  investigation that you conducted?

14       A.   I don't think so.

15       Q.   This is a separate complaint?

16       A.   I think so.

17       Q.   And why do you think it was a separate

18  complaint?

19       A.   Because I don't recall the complaint that

20  I investigated as being that serious that might lead

21  up to disbarment.

22       Q.   Do you know if Jim Vanderbilt was handed

23  out any discipline as a result of the complaint that

24  you investigated?

25       A.   I do not recall.

1       Q.   How long did you interview Jim Vanderbilt

2   for?

3       A.   I don't remember.

4       Q.   When did this happen when you investigated

5   this complaint involving Jim Vanderbilt?

6       A.   It was early on when I was with the Office

7   of the Disciplinary Administrator.  Probably 2006

8   through 2008, but I'm unsure if that is correct.

9   It's just what I recall from memory.

10      Q.   That's your best estimate?

11      A.   Yes.

12      Q.   Did you remember Jim Vanderbilt from his

13  time as the Jefferson County attorney?

14      A.   Yes.

15      Q.   How did you first meet Jim Vanderbilt?

16      A.   When I investigated the complaint with the

17  Office of the Disciplinary Administrator.

18      Q.   Did you meet him when he was the county

19  attorney?

20      A.   Oh, I'm sorry.  Yes, that is correct.

21  That was before the complaint.  You are --

22      Q.   Okay.

23      A.   -- correct.

24      Q.   Did you know Jim Vanderbilt before he

25  became the county attorney?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1      A.    No.

2      Q.    Okay.  You mentioned that you had been

3  deposed between 10 and 12 times, approximately.  How

4  has it come up that you've been given depositions

5  before?

6      A.    I was deposed as a special agent with the

7  Kansas Bureau of Investigation, and I was given

8  depositions when I was an investigator with the

9  Office of the Disciplinary Administrator.

10     Q.    All right.  And those 10 to 12 times --

11  was that all concerning your activities either with

12  the -- as a senior special agent or as a special

13  agent or with the disciplinary administrator?

14     A.    That is correct.

15     Q.    Have you ever been a defendant in a

16  lawsuit?

17     A.    Yes.  The current action.

18     Q.    Apart from this case, have you ever been a

19  defendant in any lawsuit?

20     A.    Back when I was a special investigator --

21  or correct -- correction -- a military police

22  investigator, I was sued, I think around 1976, in

23  regards to an investigation.  I was sued -- all the

24  way from the president down to me.

25     Q.    What was that investigation that you

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   were -- as a result of your suit?

2       A.   It was an investigation into a -- I

3   believe it was a club on base at Ford Ord,

4   California, where the manager was the subject of the

5   investigation.

6       Q.   And what type of investigation was

7   conducted at that club?

8       A.   I don't recall.  It could have been in

9   reference to missing funds, but I'm not sure of

10  that.

11      Q.   And what was your role in the

12  investigation?

13      A.   I investigated the complaint -- or the

14  criminal case.

15      Q.   And how did you go about investigating

16  that case?

17      A.   Contacted the -- the suspect and

18  interviewed witnesses and probably reviewed

19  paperwork.

20      Q.   Did you seek charges in that case?

21  Criminal charges.

22      A.   I prepared reports, and I can't recall

23  whether -- whether or not formal charges were filed.

24      Q.   Did you make an arrest?

25      A.   I do not recall.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1        Q.   Did you investigate the case along with
2   anyone else?
3        A.   No.   To the best of my memory, I was the
4   only investigator on the case.
5        Q.   Who was the person who sued you?
6        A.   I do not recall.
7        Q.   And what was the result of the lawsuit?
8        A.   I believe it was dismissed.   I do not
9   recall any formal action against me.
10        Q.   Why do you believe it was dismissed?
11        A.   Because I did not recall any formal action
12   against me.   I don't recall being disciplined or
13   anything of that nature.
14        Q.   Do you know -- and so when you say the
15   president on down were all sued, what do you mean by
16   that?
17        A.   The president and everyone in the chain
18   all the way down through the military, and I was --
19   I think I was the last one listed in the lawsuit.
20        Q.   And how do you know the president was sued
21   as well?
22        A.   Because I remember him as being the first
23   one named in the lawsuit.
24        Q.   And which president was that?
25        A.   I don't recall.   It would have probably

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   been in 1975 or 1976, whichever president was there

2   then.

3        Q.   I guess that's what I was trying to find

4   out.  Was it Ford?  Was it Carter?

5        A.   My guess is possibly Ford, but I'm not

6   sure of that.

7        Q.   And where was that lawsuit?

8        A.   Monterey County, Fort Ord, California.

9        Q.   On any other occasions have you been the

10  defendant to a lawsuit?

11       A.   No.

12       Q.   Have you ever brought a lawsuit on your

13  own behalf?

14       A.   No, not to the best of my memory.

15       Q.   You retired from the KBI in 2004; is that

16  correct?

17       A.   That is correct.

18       Q.   Since your retirement from KBI in 2004,

19  have you had any employment other than the Office of

20  the Disciplinary Administrator?

21       A.   I did.

22       Q.   What other employment did you have?

23       A.   I was an insurance agent for AFLAC

24  insurance for two years.

25       Q.   When did you do that?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1        A.    I think from 2004 through 2006.

2        Q.    Are you a high school graduate?

3        A.    I am.

4        Q.    When did you graduate from high school?

5        A.    1972.

6        Q.    Where did you graduate from high school?

7        A.    Greeley High School, G-r-e-e-l-e-y,

8    Greeley, Kansas.

9        Q.    And you served in the military; is that

10   right?

11       A.    I did.

12       Q.    When did you serve in the military?

13       A.    I served in the United States Army from

14   1974 through 1977 as a military policeman, military

15   police investigator, and then I served the United

16   States Army Reserves from 1977 through 1988 in a

17   Special Forces Group and as a CID investigator with

18   a CID unit.

19       Q.    When you were on active duty with the

20   Army, were you ever stationed overseas?

21       A.    No.

22       Q.    And so where were you stationed when you

23   served for the Army as an active -- active duty?

24       A.    Fort Ord, California.

25       Q.    Anywhere else?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          A.    No.

2          Q.    When you served in the reserves, were you

3     ever called to active duty?

4          A.    No.

5          Q.    When you served in the reserves, did you

6     ever -- were you ever sent overseas?

7          A.    No.

8          Q.    When you became -- well, strike that.

9                When you joined the Army, can you tell us

10    how you became a military policeman.

11         A.    When I volunteered, that was the specialty

12    that I selected, and they sent me to Fort Ord,

13    California, for my duty station.

14         Q.    Why did you select military policeman to

15    be your specialty?

16         A.    I like helping people, and I thought it

17    would be a -- a good occupation and a -- you know,

18    one of honor and integrity.

19         Q.    So you wanted to be a policeman when you

20    returned to civilian life; is that right?

21         A.    Yes.  After my active --

22         Q.    And you thought --

23         A.    After my active duty was over.

24         Q.    Did you receive training to become a

25    military policeman?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1       A.   I did.

2       Q.   What training did you receive?

3       A.   I received training at Fort Gordon,

4  Georgia, in all the duties of a military policeman.

5       Q.   And what were the duties of a military

6  policeman?

7       A.   To investigate criminal acts and also to

8  conduct traffic enforcement, to conduct interviews,

9  to collect evidence, to arrest as needed.

10      Q.   Were you given a different -- additional

11 training when you became a military police

12 investigator?

13      A.   I did.  I was sent to Fort McClellan,

14 Alabama, and received training for that there.

15      Q.   Did you receive training on how to conduct

16 interrogations while you were in the military?

17      A.   Yes.

18      Q.   And what training did you receive on how

19 to conduct interrogations?

20      A.   Classes both as a military policeman and

21 as a military police investigator and then later on

22 as a CID agent.

23      Q.   And what were you -- how were you trained

24 to conduct interrogations while you were in the

25 military?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          A.    In formal classes.

2          Q.    And I understand that you took classes on

3    it.  What -- I guess what I'm trying to find out is

4    what were you told as to how to conduct

5    interrogations?

6          A.    I mean, it would either be as a suspect or

7    a witness.  And you would contact them and set up a

8    date, time, and location, and then you would

9    interview them pertaining to the crime.

10         Q.    Were you trained on any differences

11   between an interrogation and a interview?

12         A.    I don't recall.  I know the difference,

13   but I don't recall receiving the actual training

14   regarding that.

15         Q.    What is the difference between an

16   interrogation and an interview?

17         A.    Interrogation is more formal, and an

18   interview might be more of a casual interaction with

19   a suspect or witness.

20         Q.    What makes an interrogation more formal?

21         A.    More direct questions, possibly a review

22   of evidence, things of this nature.

23         Q.    When you say "possibly a review of the

24   evidence," what do you mean?

25         A.    If there's documents involved or if

Terry L. Morgan - 02/13/2023                    20

1   there's photos or possibly any other evidence in the

2   investigation.

3        Q.   And what about those documents or photos

4   or evidence?

5        A.   It varies from case to case, depending on

6   what the case is.

7        Q.   And so when you say "a review of

8   evidence," do you mean you would go through the

9   evidence with the suspect, or what are you

10  referencing?

11       A.   Could be a suspect.

12       Q.   Okay.

13       A.   Could be a witness.  It might have been

14  documents prepared by whoever I was interviewing.

15       Q.   Did you do -- on active duty, did you do

16  anything else for the Army other than serve as a

17  military police officer and a military police

18  investigator?

19       A.   No.

20       Q.   And when you were in the reserves, you

21  said you were in a Special Forces unit; is that

22  correct?

23       A.   Yes.  For a short time.

24       Q.   What was that Special Forces unit?

25       A.   I believe that was the Fifth Special

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

 1    Forces Group out of Belton, Missouri.

 2         Q.    And what were your duties with the Special

 3    Forces Group?

 4         A.    I was a clerk.

 5         Q.    And how long did you serve as a clerk for

 6    the Special Forces unit?

 7         A.    To the best of my memory, under a year.

 8         Q.    And how did you become a CID investigator

 9    for the reserves?

10         A.    There was a unit in Belton, Missouri, and

11    I transferred to -- to the CID unit.

12         Q.    Why did you transfer to the CID unit?

13         A.    Because it was criminal investigation, and

14    I enjoyed being a criminal investigator.

15         Q.    Did you receive any training when you

16    became a CID investigator?

17         A.    I did.

18         Q.    What does CID stand for?

19         A.    Criminal Investigation Division.

20         Q.    And is that part of the reserves as

21    distinct from part of the -- the active duty?

22         A.    Yes.

23         Q.    What training did you receive when you

24    became part of the CID?

25         A.    I believe that the majority of it was

1    through courses -- paper courses that we would have

2    to complete, and I think -- I believe that I

3    received some training at Belton, Missouri.

4         Q.    And how long was the training that you

5    received at Belton?

6         A.    Overall, probably a couple months.

7         Q.    Do you have any post-high school

8    educational experience?

9         A.    Do you mean college?

10        Q.    College or trade school or anything like

11   that.

12        A.    I received a bachelor in general science

13   degree from Emporia State University, a four-year

14   degree.

15        Q.    When did you receive that degree?

16        A.    Probably around 1980.

17        Q.    Did you receive -- or did you attend any

18   other post-high school educational institutions

19   other than Emporia State?

20        A.    Allen County Junior College, Iola, Kansas,

21   for my two-year degree, and also Barton County

22   Community College for law enforcement classes.

23        Q.    Any other post-high school educational

24   experience that you have?

25        A.    No.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1      Q.    Did you receive a degree from Allen

2   County?

3      A.    Two-year degree.  Associate's degree.

4      Q.    And what was that in?

5      A.    General studies, I think.

6      Q.    And what was your major at Emporia State?

7      A.    General -- general science, just

8   generalized studies.

9      Q.    Any other post-high school educational

10   institution you attended?

11      A.    No.

12      Q.    So apart from your military, you worked

13   for the KBI; correct?

14      A.    Yes.  From 1978 through 1988,

15   approximately ten years.

16      Q.    In the CID, you mean?

17      A.    No.  I thought -- I thought you said my

18   KBI experience.

19      Q.    Okay.  So you -- tell me the total -- what

20   are all the dates that you worked for the KBI?

21      A.    From 1988 through -- I worked for them ten

22   years, till '98.

23      Q.    What full-time employment did you have

24   before you joined the KBI?

25      A.    State trooper, Kansas Highway Patrol, 1977

```
 1   through 1987.
 2        Q.   Have you worked for any other law
 3   enforcement agencies other than the ones you've
 4   mentioned?
 5        A.   No.
 6        Q.   When you worked for the Kansas Highway as
 7   a -- or as a Kansas highway trooper, what were your
 8   duties?
 9        A.   Traffic enforcement, accident
10   investigation.
11        Q.   Did you patrol -- when you worked as a
12   trooper, did you patrol in uniform in a marked squad
13   car the whole time?
14        A.   I did.
15        Q.   Did you attend an academy when you were
16   hired by the Kansas Highway Patrol?
17        A.   I did.
18        Q.   What academy did you attend?
19        A.   The Kansas Highway Patrol academy in
20   Salina, Kansas.
21        Q.   Why did you leave the Kansas Highway
22   Patrol?
23        A.   The KBI offered more investigative duties,
24   and I had always enjoyed being an investigator.
25        Q.   And so I'm a little confused because
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    I thought you told me that you retired from the KBI

2    in 2004, but then you're saying that you worked for

3    them for ten years from '88 to '98.  And I'm just

4    trying to find out what -- when you worked for the

5    KBI.

6        A.    I worked for the highway patrol from 1978

7    through 1988, and then I went to work for the Kansas

8    Bureau of Investigation and worked 16 years for

9    them.

10       Q.    Okay.  So that would be -- take you to

11   2004; is that correct?

12       A.    That's correct.

13       Q.    So you did not leave the KBI in 1998; is

14   that right?

15       A.    That is correct.  I was still employed by

16   them.  That's my error.

17       Q.    That's okay.

18             So when you were hired by KBI, did you

19   attend an academy?

20       A.    I did.  In Topeka.

21       Q.    And when you graduated from your -- from

22   the academy, what was your assignment?

23       A.    Johnson County, Kansas, and surrounding

24   counties as needed.  My primary assignment was

25   Wyandotte and Johnson Counties.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                              26

1       Q.    And how long did you -- for how long were

2  you assigned with your primary assignment being

3  Wyandotte and Johnson Counties?

4       A.    Throughout my time with the KBI.

5       Q.    Did you work in Jefferson County?

6       A.    Yes.  As needed.

7       Q.    How many cases did you work in Jefferson

8  County?

9       A.    Probably two or three as an assisting

10 agent.

11      Q.    Did you work any cases as the case agent

12 in Jefferson County?

13      A.    No, not to the best of my memory.

14      Q.    How many murders did you work in Jefferson

15 County?

16      A.    One.

17      Q.    And that was the Arfmann homicide; is that

18 right?

19      A.    That is correct.

20      Q.    How many homicides did you work as the

21 case agent while you were with the KBI?

22      A.    Two, I believe, to the best of my memory.

23      Q.    And what were those two cases?

24      A.    One in Atchison County.  Take me a minute

25 to remember the name.  I don't recall the name right

8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500                               Fax (913) 825-2530
www.cornerstonekc.net           Cornerstone        office@cornerstonekc.net
                                Court Reporting Company LLC

1    now.

2        Q.   When was the Atchison County case?

3        A.   I don't remember.

4        Q.   Was it before or after the Arfmann

5    homicide?

6        A.   I believe it was after, but I'm not

7    totally sure of that.

8        Q.   Had you worked any homicide cases before

9    the Bledsoe case?

10       A.   I had worked as an assisting agent.

11       Q.   On how many cases had you worked as an

12   assisting agent -- strike that.

13            How many homicide cases had you worked as

14   an assisting agent before the Arfmann homicide,

15   which was in 1999?

16       A.   Just as a guess, probably 20, 25.

17       Q.   So you had some homicide experience by the

18   time you got to Jefferson County to work on the

19   Arfmann homicide; right?

20       A.   I did.

21       Q.   And so if you're working a homicide and

22   you arrest a suspect in the homicide, one of the

23   standard things to do is to search the suspect's

24   house; right?

25       A.   That can be done, yes.  I don't know if

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    it's done a hundred percent of the time, but that --

2    if the -- there is an indication that there's

3    evidence in the house, probably so.

4        Q.    And when you say "evidence," you know,

5    things that you might look for in a suspect's house

6    is trace evidence of the crime; right?

7        A.    Could be.

8        Q.    Like blood on the vic- -- on the suspect's

9    clothing; right?

10       A.    Yes.  If it involved an injury or death.

11       Q.    Sure.  And so if there's a shooting, you

12   know, you might look for ammunition to be able to

13   link the murder to the suspect; right?

14       A.    Yes.  That could be.

15       Q.    Another thing that you do when you arrest

16   a suspect in a homicide is to search the suspect's

17   vehicle; right?

18       A.    If there is evidence that the vehicle was

19   involved, yes, that could be the case.

20       Q.    And things you would look for in the

21   suspect's vehicle would include trace evidence;

22   right?

23       A.    Yes.

24       Q.    So you look for blood, if there's an

25   injury, or fibers, hair, fingerprints, DNA, things

1  that might be able to link your suspect to the

2  crime; correct?

3      A.   Yes.

4      Q.   When you were a -- an agent with the KBI,

5  had you worked with jailhouse informants before?

6      A.   Not very often.

7      Q.   In your training and experience, you

8  learned that sometimes people who are charged with a

9  crime might give false information to law

10  enforcement in hopes of getting a more lenient

11  treatment from the justice system; is that right?

12          MR. QUALSETH:  Object to the form.

13          THE WITNESS:  Do you still want me to

14  answer?

15          MR. QUALSETH:  Yes.

16      Q.   (By Mr. Ainsworth)  Please do.

17      A.   Yes, that can be the case.

18      Q.   And you knew that sometimes people who are

19  facing criminal charges might, you know, try and do

20  anything they could think of to get out of those

21  charges; right?

22          MR. QUALSETH:  Object to the form.

23      Q.   (By Mr. Ainsworth)  You can answer.

24      A.   Yes.

25      Q.   And just to, you know, like, clarify a

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    little bit, you knew, from experience and training

2    in 1999, that if a person who is facing criminal

3    charges was giving law enforcement information, you

4    needed to take that information with several grains

5    of salt, right, and look to corroborate it?

6        A.    Yes, you would corroborate the information

7    if possible.

8        Q.    And that's part of your job as a police

9    officer is to look for corroborating information;

10   right?

11           MR. TURNER:   Object to the form.

12       A.    Depending on the situation, yes.

13       Q.    (By Mr. Ainsworth)  Yeah.  Well, as a law

14   enforcement agent, sometimes people give false

15   information to police; right?

16           MR. QUALSETH:   Object to the form.

17       A.    Yes.

18       Q.    (By Mr. Ainsworth)  And sometimes that

19   false information was unintentionally -- or -- well,

20   strike that.

21           Sometimes the false information is a

22   deliberate effort to mislead the police; right?

23           MR. QUALSETH:   I object to the form.

24       A.    I believe that has happened, yes.

25       Q.    (By Mr. Ainsworth)  Sure.  And sometimes

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

 1   when people give, you know, false information to the

 2   police, it might be misremembering or a mistake, you

 3   know, and not an effort to mislead the police;

 4   right?

 5        MR. QUALSETH:  Object to the form.

 6        A.    Depending on the case, yes.

 7        Q.    (By Mr. Ainsworth)  And so what you try

 8   and do as a police officer is identify

 9   inconsistencies in the information people are giving

10   you and then investigate to determine if those

11   inconsistencies are the result of the -- you know, a

12   mistake or an intentional effort to deceive the

13   police.  Is that fair to say?

14        MR. QUALSETH:  Object to the form.

15        A.    To the best of your ability, to determine

16   whether it's a mistake or intentional.

17        Q.    (By Mr. Ainsworth)  And one of the things

18   that you look for is corroboration in order to

19   determine if the information you're being given is

20   reliable; right?

21        A.    If possible, yes.

22        Q.    And you knew back in 1999 that you can't

23   buy your way out of criminal charges, meaning if you

24   got criminal charges against you, you can't just,

25   you know, pay a hundred thousand dollars to make

1   them go away; right?

2          MR. QUALSETH:   Object to the form.

3      A.   I don't understand the question.

4      Q.   (By Mr. Ainsworth)   Sure.   When somebody's

5   facing criminal charges -- and let's say serious

6   criminal charges, like a homicide.

7          So if somebody's facing homicide charges,

8   they can't make the homicide charges go away by

9   paying money?   Like, you can't buy your way out of a

10  homicide charge by paying a hundred thousand

11  dollars; right?

12         MR. QUALSETH:   Same objection.

13     A.   Are you talking about a bribe?

14     Q.   (By Mr. Ainsworth)   I'm not -- well, I

15  guess it would be considered a bribe, but let me --

16  let me rephrase the question, if you don't mind.

17         My point is that you were aware in 1999

18  that if a person who is facing criminal charges was

19  given leniency in those charges in exchange for

20  information, that would be giving the person

21  something that money can't buy; right?

22         MR. QUALSETH:   Object to the form.

23     A.   I have never accepted a bribe, sir.

24     Q.   (By Mr. Ainsworth)   I'm not suggesting

25  that you would or that you have.   In fact, the

1    opposite.  What I'm saying is that if somebody's

2    facing criminal charges, they can't get out of the

3    charges but for either pleading guilty or providing

4    information to law enforcement that might gain them

5    leniency; right?

6              MR. QUALSETH:  Object to the form.

7         A.   I would have had no control over that.

8    I do not -- I do not have the -- the power or the

9    duties to decide who might not be charged as a

10   result of that.  That would be up to the --

11        Q.   (By Mr. Ainsworth)  Sure.

12        A.   -- county attorney --

13        Q.   Right.

14        A.   -- or the district attorney.

15        Q.   And so all you were concerned with was, if

16   you had a person facing criminal charges who's

17   giving you information about a case, you would look

18   at that information with skepticism and really make

19   sure you corroborate it before relying on it; right?

20        A.   You would corroborate and verify, to the

21   best of your ability.

22        Q.   And you would do that especially so if the

23   information you received was from somebody facing

24   serious criminal charges; right?

25              MR. QUALSETH:  Object to the form.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1      A.   I mean, I did my investigation, to the

2   best of my ability, in everything I ever

3   investigated.  I mean, this was --

4      Q.   (By Mr. Ainsworth)  Why is it --

5      A.   Go ahead.  I'm sorry.

6      Q.   No, no.  I didn't mean to cut you off, you

7   know.

8           Why is it important to corroborate

9   information from a jailhouse informant or somebody

10  who is facing criminal charges who is giving you

11  information about a criminal -- a different criminal

12  case?

13     A.   You always do the best investigation

14  possible.

15     Q.   Why is it the best investigation to, you

16  know, look at information from a jailhouse informant

17  as being potentially unreliable?

18     A.   That is a consideration, yes.

19     Q.   And why is it a consideration?

20     A.   Because you attempt to verify the

21  information through additional investigation to

22  determine whether or not it's truthful or false.

23     Q.   And I guess what I'm saying is, if you're

24  attempting to verify information from everybody as

25  being true or false, do you take information from

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    somebody facing criminal charges as the same as if

2    it's some information coming from a civilian on the

3    street?

4              MR. QUALSETH:   Object to the form.

5         A.   I mean, if the person is a suspect, of

6    course, that's -- it's more of a -- more serious

7    nature.

8         Q.   (By Mr. Ainsworth)  And why would it be a

9    more -- what do you mean by "more serious nature"?

10        A.   Because if they're convicted, they could

11   be facing prison time.

12        Q.   As -- so what does that tell you about

13   information coming from that person?  Is it more or

14   less likely to be reliable?

15        A.   Depends on the person.  Depends on the

16   case.

17        Q.   All right.  What are the -- were you

18   trained that people facing criminal charges might

19   not give reliable information to police officers?

20        A.   I have been told that in training in the

21   past, yes.

22        Q.   And what were you told on that topic?  How

23   were you trained?

24        A.   Formal training through the United States

25   Army and also through the highway patrol and the

```
 1   KBI.
 2        Q.   And in that training, did they explain to
 3   you why a person facing criminal charges giving
 4   information to law enforcement might not be so
 5   reliable?
 6        A.   Well, probably that they don't want to go
 7   to jail or prison, but I can't retall -- recall
 8   exactly.
 9        Q.   But is that what you learned from
10   experience, that people who were facing criminal
11   charges might give unreliable information because
12   they're trying to avoid going to jail or prison?
13        A.   Sometimes, yes.  Not all the time.
14        Q.   What's the longest interview that you've
15   ever conducted?  Either an interview or
16   interrogation.
17        A.   Probably three or four hours.
18        Q.   Why do you max out at around three to four
19   hours?
20        A.   Because that's -- to the best of my
21   memory, that's what it was.
22        Q.   Do you know in what case that was?
23        A.   No.
24        Q.   It can be tiring to conduct an interview
25   for that long -- right? -- or an interrogation?
```

1       A.    Yes.

2       Q.    Have you ever done tag team interrogations

3    where you go for three or four hours, then have

4    somebody else continue on because you got too tired?

5       A.    You mean trade off as far as being the

6    interviewer of the person?

7       Q.    I mean, you know, having somebody else

8    come into the interview room and continue the

9    interview or interrogation and you actually leaving?

10      A.    I don't recall that, to the best of my

11   memory.

12      Q.    All right.  The interviews or

13   interrogations that you conducted you would see

14   through from start to finish; is that right?

15      A.    You would take breaks both for yourself

16   and for the suspect or witness being interviewed.

17   You wouldn't go straight through.

18      Q.    Sure.  But you would -- you would be the

19   person who started the interview or interrogation,

20   and you would be the person who ended it; right?

21      A.    I've worked with other KBI agents and

22   other CID agents, whereas they ask -- might ask

23   parts of the interview if --

24      Q.    You mean where you -- you leave and they

25   continue, or what are you referring to?

Terry L. Morgan - 02/13/2023                    38

1        A.   No, you would never leave.  You might take

2   a break, whereas the suspect or witness might get a

3   drink of water or go to the bathroom, but I don't

4   recall ever leaving a interview.

5        Q.   All right.  And so that's why -- you might

6   trade off who's ask- -- who's primarily asking the

7   questions, but you would be in the interrogation

8   room from the beginning to the end, taking breaks as

9   necessary; is that right?

10       A.   That's correct.  The case agent would --

11  would ask the majority of the -- of the questions.

12       Q.   When you worked for KBI, you had field

13  notes and written reports; is that right?

14       A.   You had typed reports and written notes.

15       Q.   Okay.  Sorry.  I should have clarified

16  that.  Thank you for correcting my error.

17            Your typewritten reports would be

18  disseminated, and the reports would list to whom

19  they were being disseminated; is that right?

20       A.   That is correct.

21       Q.   And so they would go to outside agencies,

22  such as whatever law enforcement agency you're being

23  partnered with, and the county attorney; is that

24  right?

25       A.   Either the county or district attorney,

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    depending on the county.

2         Q.    Got it.   Okay.

3              So the typewritten reports would be

4    disseminated, and that would be listed at the bottom

5    of the report.   And it would typically go to

6    whatever partner law enforcement agency you're

7    working with and either the county or the district

8    attorney, depending on which county you're in; is

9    that right?

10             MR. QUALSETH:   Object to the form.

11             MR. LINDEN:   Join.

12        A.    And a copy would go to the case agent, if

13   you were assisting the case agent, in the KBI.

14        Q.    (By Mr. Ainsworth)  Okay.  So typically

15   the typewritten reports would go -- would be

16   disseminated, and you'd send a copy to the case

17   agent, if you were not the case agent, a copy to the

18   local law enforcement agency that you were

19   assisting, and a copy would go to the county or the

20   district attorney, depending on what county you were

21   in; is that right?

22             MR. QUALSETH:   Object to the form.

23             MR. LINDEN:   Join.

24        A.    Yes.

25        Q.    (By Mr. Ainsworth)  And your field notes

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1  would stay with you and not be disseminated; is that

2  right?

3      A.   That's correct.

4      Q.   And so you would be responsible for

5  ensuring, as a special agent, that the information

6  in your field notes would be transferred to your

7  typewritten reports so it could be disseminated to

8  the county or the district attorney; right?

9      A.   The field most -- field notes are to

10  refresh the investigator's mind from the actual

11  event, but in summation of what you're saying, that

12  is correct.

13      Q.   And so when you're creating your reports,

14  you might consult your field notes to refresh your

15  memory to ensure that the typewritten reports are

16  accurate; is that right?

17      A.   Yes.

18      Q.   And you were trained and you knew from

19  experience that in your typewritten reports you're

20  supposed to include the information both that's good

21  for the prosecution and the information that might

22  be good for the criminal defendant in defending

23  himself; right?

24           MR. QUALSETH:  Object to the form.

25           MR. TURNER:  Join.


Cornerstone
Court Reporting Company LLC

```
 1              MR. LINDEN:  Join.

 2         A.   My reports were factual.  My opinion did

 3    not enter into those reports.

 4         Q.   (By Mr. Ainsworth)  Right.  I -- I guess

 5    what I'm trying to get at is that, when you're

 6    writing your reports, you wouldn't just put in only

 7    the good stuff that's -- you know, the good stuff

 8    for the prosecution and bury the stuff that was good

 9    for the criminal defendant; is that right?

10              MR. QUALSETH:  Same objection.

11              MR. TURNER:  Join.

12              MR. LINDEN:  Join.

13         A.   You put in all information.  Factual --

14         Q.   (By Mr. Ainsworth)  You put in --

15         A.   -- information.

16         Q.   -- all the factual, relevant information,

17    whether it's good for the police or if it's good for

18    the defendant; right?

19         A.   That's correct.  I have no interest

20    otherwise -- or no reason do other -- to do

21    otherwise.

22         Q.   What's the Midwest Crime Conference?

23         A.   It's an organization that I was associated

24    with that was composed of states in the Midwest,

25    whereas we had a membership and would on -- put on
```

8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500                               Fax (913) 825-2530
www.cornerstonekc.com                office@cornerstonekc.net

1   annual training for membership -- members.

2       Q.    And what were the states that were

3   involved?

4       A.    Kansas -- this is going off -- Oklahoma,

5   Kansas, Missouri, Nebraska, and Colorado.   The

6   surrounding states of Kansas.

7       Q.    And what was your role with the Midwest

8   Crime Conference?

9       A.    Member.   I believe I was the treasurer,

10  vice president, and president.

11      Q.    And what years were you affiliated with

12  the Midwest Crime Conference?

13      A.    I believe it was in the '90s.   I can't

14  give you the exact dates.

15      Q.    How did you come to be a part of the --

16  either treasurer, vice president, or president of

17  the Midwest Crime Conference?

18      A.    I thought it was a good organization, and

19  I thought on -- I thought they put on good training,

20  and I thought I could be of value to the

21  organization.

22      Q.    And so what did you do for the Midwest

23  Crime Conference in the positions that you had?

24      A.    Well, as treasurer, you were responsible

25  for incoming, outgoing funds.   And then as vice

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   president and president, you are more involved with

2   setting up the training that would be in different

3   states on an annual basis, and it was law

4   enforcement training.

5           Is there anything else that you need to

6   know or you want to ask?

7       Q.   Was it an annual conference that you had,

8   or did the Midwest Crime Conference put on other

9   trainings as well?

10      A.   Annual.

11      Q.   Why did you stop being involved in the

12  Midwest Crime Conference?

13      A.   Well, I had served for several years.  And

14  basically our interest in the annual training

15  seminars had dropped, and it was eventually aban- --

16  disbanded.

17      Q.   Why did you leave the KBI?

18      A.   I had served 26 years with the State of

19  Kansas between the highway patrol and the Kansas

20  Bureau of Investigation, and I just thought it was

21  time to retire.

22      Q.   Were you ever -- were you ever disciplined

23  by the KBI?

24      A.   No, not to the best of my memory.

25      Q.   Were you ever disciplined by the Kansas

1   state troopers?

2        A.    Yes.   I was involved in an accident on

3   duty involving another KHP patrol car, and as a

4   result of that, I got a letter and, to the best of

5   my memory, three days off.

6        Q.    A three-day suspension?

7        A.    Yes.

8        Q.    And what were you alleged to have done

9   wrong in that?

10       A.    We were conducting line radar enforcement,

11  and we were one car after the other.  And the lead

12  unit had received a speeding readout on the radar.

13  And the car -- the trooper in front of me turned his

14  car, and I thought that he was going to wait until I

15  passed.  And then he turned right in front of me,

16  causing a traffic accident, and they held me

17  partially at fault for that.

18       Q.    Was anyone hurt?

19       A.    Minor injuries.  Bumps and bruises but no

20  serious injuries.

21       Q.    Any other discipline you received from the

22  Kansas Highway Patrol?

23       A.    Not to the best of my memory.

24       Q.    Were you ever disciplined by the U.S.

25  Army?



1          A.    No.

2          Q.    Did you receive any awards or

3    commendations from the United States Army that were

4    not also given to other members of your unit?

5          A.    I received the Army Medal of Commendation,

6    and I don't know if any other members of my unit

7    received that.

8          Q.    What did you receive the Commendation

9    Medal for?

10         A.    For my work as a military police

11   investigator.

12         Q.    And was there anything specific cited

13   about your work that earned you the medal?

14         A.    Just that it was good work and that I was

15   hardworking, and I contributed to the success of the

16   mission of the United States Army Military Police.

17         Q.    By being hardworking?

18         A.    Yes.

19         Q.    There wasn't a specific case referenced or

20   something like that or a specific act that you did

21   that warranted the medal --

22         A.    Not --

23         Q.    -- according to what you were told?

24         A.    Not to the best of my memory.

25         Q.    And you have an honorable discharge; is

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1   that right?
 2        A.   I did.
 3        Q.   What did you do to prepare for this
 4   deposition?
 5        A.   I reviewed copies of my reports and my
 6   notes.
 7        Q.   Did you do anything else to prepare for
 8   this deposition?
 9        A.   I met for a short time with Mr. Shon
10   Qualseth where he told me about --
11             MR. QUALSETH:  Don't --
12        Q.   (By Mr. Ainsworth)  Don't -- don't --
13   yeah.
14             THE WITNESS:  Okay.
15             MR. QUALSETH:  Don't talk about what --
16        Q.   (By Mr. Ainsworth)  We don't want to --
17             MR. QUALSETH:  -- what we talked about.
18        Q.   (By Mr. Ainsworth)  -- hear what you --
19   what he told you, and it will make him very nervous.
20             So --
21        A.   No.
22        Q.   -- I'm expressly telling you I don't want
23   to hear about your conversations with you and your
24   attorney.  I just want to know when you met with him
25   and for how long.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          A.   Last Friday for approximately one hour.

2          Q.   Did you meet with anyone else in

3     preparation for this deposition?

4          A.   I have not.

5          Q.   Did you talk to Jim Woods since his

6     deposition?

7          A.   No.

8          Q.   Are you -- did you review copies of

9     reports filed by anyone other than yourself?

10         A.   I believe there was one or two reports

11    from the Jefferson County Sheriff's Department in

12    with my reports.  And there was a copy, to the best

13    of my memory, of field notes by Randy Carreno

14    regarding a joint interview that we did.

15         Q.   Did you review all of the reports that you

16    had to review, or were there some that you just

17    didn't look at?

18         A.   I looked at everything that was provided

19    to me.

20         Q.   And did you review all of your field

21    notes?

22         A.   Yes.

23         Q.   Did you review any photographs?

24         A.   I don't recall any photographs being

25    provided --

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          Q.    Did you --

2          A.    -- to me.

3          Q.    Did you review any video or audio

4    recordings?

5          A.    No.

6          Q.    Did you review any interviews that you

7    conducted -- sorry -- did you review any videos of

8    interviews that you conducted?

9          A.    No.

10         Q.    And did you review any interviews that

11   were conducted of you?  The -- the video recording.

12         A.    No.

13         Q.    Okay.  Did you review any transcripts of

14   testimony?

15         A.    Yes.

16         Q.    What transcripts did you review?

17         A.    The trial where I was a -- was a witness

18   in reference to Floyd Bledsoe, Jr.

19         Q.    Any other transcripts that you reviewed?

20         A.    No.

21         Q.    And so I'm correct that the only

22   transcript that you reviewed was your testimony at

23   the -- at Floyd Bledsoe's trial?

24         A.    Yes.

25               MR. QUALSETH:  Russell, we've been going

1    about an hour.  Is this a good time to stop?

2              MR. AINSWORTH:  Sure.  I'm about to change

3    topics; so let's -- let's break here.

4              THE REPORTER:  One moment.

5              MR. AINSWORTH:  You want five minutes or

6    so?

7              THE REPORTER:  Okay.  Going off the record

8    at 10:31 a.m.  One moment.

9              (A recess was taken.)

10             THE REPORTER:  Okay.  We are back on the

11   record at 10:43 a.m.

12        Q.   (By Mr. Ainsworth)  All right, sir.  Was

13   there anything that you wanted to prepare in

14   preparation for this deposition but didn't have the

15   opportunity to do so?

16        A.   No.

17        Q.   Do you feel prepared to answer questions

18   in this case?

19        A.   Yes.

20        Q.   I'm going to show you what we've marked as

21   Exhibit 66.  This is a report by the Kansas Bureau

22   of Investigation regarding a -- an interview of

23   yourself that was conducted in February of 2016.

24   Let me make this a little bit bigger.

25             All right.  Can you see that, sir?

Terry L. Morgan - 02/13/2023                    50

1        A.   I can.   Thank you.

2        Q.   Okay.   So I take it you did not review

3   this report in preparation for the deposition.   Is

4   that right?

5        A.   I did not.

6        Q.   Okay.   So I'm just going to show it to

7   you.   Do you recall being interviewed?

8        A.   I do not.   But --

9        Q.   All right.

10        A.   -- I'm not disputing the report.

11        Q.   Okay.   Do you know Ronnie Burk, the

12   special agent who interviewed you?

13        A.   Not before the interview.   I had no

14   knowledge of him.

15        Q.   Do you now recall talking to Ronnie Burk

16   about this case?

17        A.   Yes.   By the contents of the report.

18        Q.   All right.   Do you mean, like, seeing this

19   now refreshes your recollection, or are you saying

20   you're just going off of what's written here?

21        A.   It refreshes my memory.

22        Q.   Okay.   It says that "Morgan recalled that

23   Woods was the KBI case agent, and Detective Randy

24   Carreno was the lead investigator with the Jefferson

25   County Sheriff's Office."   Do you recall that to be

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    correct?

2        A.   Yes, to the best of my memory.

3        Q.   So Woods was the case agent, and Carreno

4    was the lead investigator for Jefferson County;

5    right?

6        A.   Yes.

7        Q.   And you said that -- it says "Morgan said

8    that he believes that he was contacted by his

9    supervisor on November 8, 1999, to assist Woods with

10   follow-ups related to the case."  Is that correct,

11   sir?

12       A.   It would probably have been the 6th or

13   7th, because I think that the -- her disappearance

14   was on November the 5th.  The 6th was the 7th -- or

15   the 6th was Saturday, 7th was Sunday, and the 8th

16   was Monday.  And I think that at that time I would

17   have been at the Jefferson County Sheriff's

18   Department.

19       Q.   Were you involved in helping to search for

20   Camille Arfmann?

21       A.   Not to the best of my memory.

22       Q.   Were you involved in the case before her

23   body was discovered?

24       A.   Not to the best of my memory.

25       Q.   All right.  And so just to orient you in



```
 1   time, that Sunday evening, the 7th, was when Tom and
 2   Mike Hayes came to the law enforcement center and
 3   then led investigators to the body in the
 4   early-morning hours of November 8th.  Does that fit
 5   with your memory?
 6        A.   That's what I understand.
 7        Q.   Okay.  And I am asking you to -- I think
 8   that's well established, and somebody here will yell
 9   and scream at me if I'm misrepresenting, but with
10   that information, does -- does November 8th make
11   sense that you were contacted after Arfmann's body
12   was -- was recovered?
13        A.   I'm unsure if it was November the 8th, but
14   the part about being contacted after the body was
15   found, I think that is correct.
16        Q.   Okay.  In the report, it states "Morgan
17   said that one of his first assignments was to
18   conduct roadside interviews and neighborhood
19   canvasses near the location where Arfmann lived and
20   later where she was found murdered."  Do you see
21   that?
22        A.   Which paragraph is it, sir?
23        Q.   It's at the top.  It says "Morgan said
24   that one of his first assignments was to conduct
25   roadside interviews and neighborhood canvasses near
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1  the location where Arfmann lived and later where she

2  was found murdered."

3       A.   Yes.

4       Q.   And is that correct, sir?

5       A.   Yes.

6       Q.   Is that what you did?

7       A.   Yes.

8       Q.   All right.  It says "Morgan believed that

9  he was pair" -- I think it's supposed to be "paired

10  with Jefferson Sheriff's Office Detective Kirk

11  Vernon."  Is that correct?

12       A.   Yes.

13       Q.   "Before the interviews, Morgan thought

14  that he attended a morning briefing at the Jefferson

15  County Sheriff's Office on November 8, 1999."  Do

16  you recall doing that, sir?

17       A.   Yes, to the best of my memory.

18       Q.   And who was at that morning briefing

19  before you went out to talk to potential

20  witnesses --

21       A.   When --

22       Q.   -- on November 8th?

23       A.   Sure.  Jim Woods would have been there,

24  the sheriff, and members of the sheriff's department

25  and myself.

1          Q.   And the -- was the county attorney there?

2          A.   I don't -- I assume he was, but I do not

3     recall that.

4          Q.   Why do you assume that he was?

5          A.   Because he was the county attorney.

6          Q.   And so you'd expect, if there's a meeting

7     about the case, that you'd have the county attorney

8     there?

9          A.   Unless he was busy otherwhere --

10    otherwise, yes.

11         Q.   And the sheriff was Sheriff Dunnaway?

12         A.   Yes.  Sheriff Roy Dunnaway.

13         Q.   Did you know Sheriff Roy Dunnaway before

14    the Arfmann homicide investigation?

15         A.   I did.  Or I knew of him.  I can't recall

16    whether I had met him in person, but I knew of him.

17    He had been sheriff there for many years.

18              THE REPORTER:  One moment.

19              Okay.

20         Q.   (By Mr. Ainsworth)  All right.  It

21    states -- the report, Exhibit 66, states "Morgan

22    said that it was standard procedure to pair up with

23    the local agency to work leads on major cases such

24    as this."  Is that correct?

25         A.   Yes.

1          Q.     And was the Arfmann homicide a major case?

2          A.     In my opinion, yes.

3          Q.     What made it a major case?

4          A.     It was a homicide.

5          Q.     "When asked who managed the incoming

6     leads, Morgan thought that they would have been

7     assigned out by either Woods or Carreno or both."

8     Is that correct?

9          A.     Yes, to the best of my memory.

10         Q.     All right.  So you would receive leads

11    from either Woods or Carreno or both; is that right?

12              MR. TURNER:  Object to form.

13              MR. LINDEN:  Join.

14         A.     That is what is reflected in the report,

15    yes.

16         Q.     (By Mr. Ainsworth)  I understand it's

17    what's reflected in the report, but is that what you

18    recall happening?  Is that how the leads were

19    assigned out?

20         A.     To the best of my memory, yes.

21         Q.     All right.  The report continues on in the

22    next paragraph to state "When asked about subsequent

23    duties, Morgan said that he remembered conducting an

24    interview with Floyd S. Bledsoe at the Jefferson

25    County Sheriff's Office in former-sheriff Roy



1   Dunnaway's office."  Do you see that, sir?

2       A.   I do.

3       Q.   All right.  How many interviews did you

4   conduct with Floyd S. Bledsoe?

5       A.   Two, to the best of my memory.

6       Q.   Okay.  And the one that occurred in

7   Dunnaway's office was not video-recorded; is that

8   right?

9            MR. TURNER:  Object to form.

10      A.   Not to the best of my memory.

11      Q.   (By Mr. Ainsworth)  There wasn't a camera

12  set up in Sheriff Dunnaway's office; right?

13      A.   I do not recall that.

14      Q.   But in the interrogation rooms at the

15  sheriff's -- at the Jefferson County Sheriff's

16  Office, there was video cameras set up there; right?

17      A.   I don't specifically recall at Jefferson

18  County, but many of the sheriff's department

19  utilized video recordings.

20      Q.   Got it.  Okay.

21           "Morgan did not believe that F. S. Bledsoe

22  was suspected of the murder at this time."  Do you

23  see that?

24      A.   I do.

25      Q.   Is that correct, at the time that you

 1   interviewed Bledsoe in the -- in Dunnaway's office,

 2   he was -- you didn't believe he was suspected of the

 3   murder at that time?

 4           MR. TURNER:  Object to form.

 5           MR. LINDEN:  Join.

 6       A.   To the best of my emory -- memory, I had

 7   no evidence to indicate that he was a suspect in the

 8   homicide.  Or that would lead me to that conclusion,

 9   to clarify.

10       Q.   (By Mr. Ainsworth)  All right.  The report

11   states "Morgan did not recall being involved in any

12   interviews of Thomas E. Bledsoe during the

13   investigation."  Is that correct?  You weren't

14   involved in interviewing Tom Bledsoe?

15       A.   Yes, to the best of my memory.

16       Q.   And then it says "Another assignment

17   Morgan recalled was retracing and timing the path

18   that Floyd S. Bledsoe claimed to have traveled on

19   the afternoon of November 5th, 1999, when he went

20   from the Zule dairy to the Winchester Hardware store

21   and back."  Do you see that?

22       A.   I do.

23       Q.   Was that another assignment that you had

24   in the Arfmann homicide --

25       A.   Yeah.

1      Q.    -- investigation?

2      A.    Yes.

3      Q.    "Morgan said that he remembered that his

4 round-trip time was around 20 or 25 minutes, and

5 F. S. Bledsoe was reported to have taken 45 minutes

6 to go the same route."  Is that -- is that what you

7 recall happening?

8      A.    Yes.

9      Q.    "When asked about any law enforcement

10 interview of Tom E. Bledsoe, Morgan did not know if

11 an interview was conducted or why it appeared that

12 one did not occur until after his initial arrest."

13 Is that correct?

14      A.    Yes, to the best of my memory.

15      Q.    All right.  It states "Near the end of the

16 interview, Morgan stated that he did not know why a

17 search of Tom E. Bledsoe's house, which belonged to

18 Floyd L. Bledsoe, did not occur."  Do you see that?

19      A.    I do.

20      Q.    Is that correct?  You don't know why a

21 search of Tom Bledsoe's house didn't occur?

22            MR. TURNER:  Object to form.

23            MR. QUALSETH:  Same objection.

24            MR. LINDEN:  I'll join as well.

25      A.    That is correct, to the best of my memory.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

 1       Q.    (By Mr. Ainsworth)  And it says "Morgan

 2   added that the county attorney at the time, Jimmie

 3   Vanderbilt, often attended case meetings."  Was that

 4   correct?

 5             MR. LINDEN:  Object to form.

 6             MR. TURNER:  Join.

 7       A.    Yes.  To the best of my memory, he was

 8   there at times.

 9       Q.    (By Mr. Ainsworth)  All right.  And then I

10   think the rest of this exhibit is, you know --

11   there's no other text of the -- or summary of the

12   interview content.

13             In that audio recording of your interview

14   with Ronnie Burk, you said, near the beginning of

15   the interview, "You know, some stones are better

16   left unturned."

17             Why did you say that to Special Agent

18   Ronnie Burk?

19             MR. QUALSETH:  Object to the form.

20       A.    I don't know -- I don't recall saying

21   that, to the best of my memory, but if he says I

22   did --

23       Q.    (By Mr. Ainsworth)  Did you have -- well,

24   we have a recording of your interview.

25             So I guess let me -- let me ask it this

1   way:  Did you have any problem with a reinter- --

2   reinvestigation being conducted of the Arfmann

3   homicide investigation --

4        A.   No.

5        Q.   -- in the Arfmann homicide?

6        A.   No.  That was the prerogative of the KBI

7   to do that.

8        Q.   You heard from Jim Woods that he was upset

9   about the investigation; is that right?

10            MR. QUALSETH:  Object to the form.

11            MR. TURNER:  Join.

12            MR. LINDEN:  Join.

13       A.   No.  I have not talked to Jim Woods.

14       Q.   (By Mr. Ainsworth)  Well, let me -- did

15   you tell Ronnie Burk -- hang on.

16            Did you tell Ronnie Burk that you "knew

17   that Woods had called Vernon and ate his ass up

18   because you guys are doing the review"?

19       A.   I do not recall that.

20       Q.   Did you tell Ronnie Burk you told Vernon,

21   "Do your fucking job.  Fuck Jim Woods"?

22            MR. TURNER:  Object to form.

23       A.   I do not recall saying that, and I don't

24   think I would have said that about Jim Woods.

25       Q.   (By Mr. Ainsworth)  Did you have any

1   conversation with Kirk Vernon about the

2   reinvestigation?

3       A.   I don't remember that.

4       Q.   Did you have any conversation with Kirk

5   Vernon about Jim Woods?

6       A.   I do not recall that.

7       Q.   Do you have -- because we have the

8   videotape.  Do you have any explanation for why you

9   would -- you would report to Ronnie Burk that "Woods

10  called Vernon and ate his ass up" --

11           MR. TURNER:  Object to form.

12      Q.   (By Mr. Ainsworth)  -- "because you guys

13  are doing the review probably"?

14           MR. QUALSETH:  Object to the form.

15           MR. TURNER:  Join.

16           MR. LINDEN:  Join.

17      A.   I do not recall that.

18      Q.   (By Mr. Ainsworth)  Let's take a look at

19  what we'll mark as Exhibit 53.

20           I'm showing you, sir, what's been marked

21  as Exhibit 53.  This is Bates No. Jefferson --

22  JC 4701 through JC 4702, and these are not -- this

23  is not your handwriting; correct?

24      A.   That is correct.

25      Q.   All right.  This appears to be an

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    interview dated November 10th, 1999, at 10:27 a.m.

2    at Winchester Hardware store.  Do you see that

3    written on this document, Exhibit 53?

4         A.   I do.

5         Q.   It says "Floyd was here Friday afternoon

6    after lunch.  Got some duct tape and paid cash for

7    duct tape.  Trying to repair pipe jam to pipe" --

8    "to drainpipes together."  Do you see that?

9         A.   I do.

10        Q.   "Bought nothing else.  Jacket made with

11   Zule dairy.  Wanted it for Christmas.  Jackets two

12   weeks back order."  Do you see that?

13        A.   I do.

14        Q.   "Here 15 minutes or 20 minutes" -- "15

15   minutes or more, 20 minutes."  Do you see that?

16        A.   I do.

17        Q.   And then it says "Did buy sweatshirt,

18   something to wear for milking, black or dark blue."

19   Do you see that?

20        A.   I do.

21        Q.   And "Paid for duct tape.  Then bought

22   sweatshirt"; right?

23        A.   Yes.

24        Q.   So, according to the notes, the duct tape

25   was bought first, and then the sweatshirt

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    transaction took place after that; right?

2         A.   Yes.  By sequential order.

3         Q.   And it says "Then bought sweatshirt" after

4    "Paid for duct tape"; right?

5         A.   Yes.

6         Q.   "Gave him receipt for duct tape."  You see

7    that?

8         A.   I do.

9         Q.   All right.  And then you spoke to

10   Mr. Zule; is that right?

11        A.   Yes.

12        Q.   All right.  Let's take a look at what

13   we've marked as Exhibit 58.  Exhibit 58 is a report

14   Bates numbered KBI Subpoena 892 through '899.  And

15   I'm going to direct you to the first page of this

16   exhibit, Exhibit 58, and just -- and is that your

17   name in the upper right-hand corner where it's

18   typewritten "Terry Morgan"?

19        A.   Yes.

20        Q.   Would you type your own reports, or how

21   would they be created?

22        A.   I typed my own reports, and then they were

23   reviewed by the office secretary.  And if there was

24   any mistakes, she might sometimes correct it, but

25   I normally typed my own reports.  I didn't dictate,

1    I guess, is what I'm trying to say.

2           Q.   Got it.

3                To the right of "Place & Date," it says

4    "Jefferson County, Kansas," and then "November 6,

5    1999."  Do you see that?

6           A.   It's very faint, but, yes, I think so.

7           Q.   Do you know why it says "November 6th,

8    1999"?

9           A.   That would normally be the possible time

10   of the -- or the date of the crime.

11          Q.   And do you know why that date was listed

12   as the date of the crime?

13          A.   I do not recall.

14          Q.   All right.  So then in the upper left-hand

15   corner, it says "November 10th, 1999."  Does that

16   refer to the investigative activity that you're

17   reporting?

18          A.   Yes.

19          Q.   All right.  And so then it refers to an

20   interview of a Richard Zule; is that right?

21          A.   Yes.

22          Q.   And you have identifiers for him, and then

23   on page 1 of Exhibit 58, you document a summary of

24   your interview with -- with Richard Zule at his

25   home; right?

1        A.    Yes.

2        Q.    Then going on to page 2 of Exhibit 58, it

3    says "Richard Zule told Bledsoe to go to Winchester

4    Hardware store and buy a roll of duct tape.  He then

5    gave Bledsoe a $50 bill to pay for the purchase."

6    Is -- do you see that?

7        A.    I do.

8        Q.    And that's information that Richard Zule

9    told you; correct?

10        A.    Yes.

11        Q.    And, according to Richard Zule, "Bledsoe

12    left in Zule's old, green, Chevrolet pickup truck

13    and returned" -- "returned around 4:45 p.m."; right?

14        A.    That is correct.

15        Q.    And that's -- and so Zule told you that

16    Bledsoe took an old, green, Chevy pickup truck to

17    make the trip to get the duct tape; right?

18        A.    Yes.

19        Q.    So Bledsoe did not take his own car to go

20    to the hardware store; right?

21        A.    Not according to the interview of Richard

22    Zule, yes.

23        Q.    And it says "Zule made a comment about how

24    long it took Bledsoe to go and get the tape."  Do

25    you see that?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1        A.    I do.

2        Q.    And then your report states "Bledsoe then

3   commented that he had purchased a black sweatshirt

4   that he was wearing over a T-shirt with the same

5   pants and boots that he had left in."  You see that?

6        A.    I do.

7        Q.    And so Bledsoe had not changed his

8   pants -- correct? -- or his boots; right?

9        A.    According to Zule.

10       Q.    Okay.  And, according to Zule, Bledsoe was

11  wearing the sweatshirt he had purchased at the

12  hardware store; right?

13       A.    Yes.

14       Q.    And then, according to Zule -- or Zule

15  told you that -- well, the report states "Zule asked

16  for his change back, and Bledsoe gave him the change

17  and a receipt for the roll of duct tape"; right?

18       A.    Yes.

19       Q.    And that's what Richard Zule told you;

20  correct?

21       A.    Yeah.  Yes.

22       Q.    Richard Zule told you that "The duct tape

23  was still wrapped in plastic"; right?

24       A.    Yes.

25       Q.    And, you know, if we look back at

1  Exhibit 53, according to the notes, Floyd only

2  purchased one roll of duct tape; right?

3            MR. TURNER:  Object to form.

4       A.   It says "Paid for duct tape"; so I assume

5  that it was one roll.

6       Q.   (By Mr. Ainsworth)  Fair enough.

7            And your report says "He," meaning

8  Bledsoe, "also commented that he had seen Billie

9  Summerville while at the hardware store, and they

10  had talked."  Is that what Zule told you?

11      A.   Yes, as reflected in the report.

12      Q.   And then "Sherri Zule found the receipt,"

13  and then Richard gave you the receipt and you took

14  custody of the receipt; is that right?

15      A.   Yes.

16      Q.   All right.  And then scrolling down on

17  Exhibit 58, there's a copy of the receipt on page 7

18  of Exhibit 58.  Do you see that?

19      A.   I do.

20      Q.   All right.  And so it's a receipt for 6.39

21  and 6.77 with tax?  Is that right?

22      A.   From what I can tell from reviewing the

23  receipt, yes.

24      Q.   And it's got a date of November 5th, 1999,

25  written on the receipt; right?

```
 1        A.    If that's what the date is, yes.

 2        Q.    And then there's time at the bottom of

 3   17:20; correct?

 4        A.    I can only assume that's the time, but

 5   I do not know for sure.

 6        Q.    Well, you're the one who received the

 7   receipts; right?

 8        A.    That is correct.

 9        Q.    Okay.  So, then, let me show you what

10   we've marked as Exhibit 54.  Exhibit 54 is a

11   two-page document Bates numbered KBI Subpoena 2607

12   and '2608.  All right.  This is a typewritten report

13   by the Jefferson County Sheriff's Office and not by

14   you; right?

15        A.    It says by "Detective Troy Frost," yes.

16        Q.    That's right.  Okay.  And so, according to

17   the report, "Karen said the duct tape was 6.29 to

18   6.39."  That was the price, right, according to this

19   report?

20        A.    Yes.

21        Q.    And then going down to the second page of

22   Exhibit 58 -- or -- sorry -- 54 -- my apologies --

23   Detective Frost reports that, on November 16th at

24   approximately 11:49, he "went to the Winchester

25   Hardware store and asked about the cash register, if
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    it had been changed to daylight savings, and they

2    ran a receipt for me.  And it said 12:48, and my

3    watch said 11:51."  Do you see that?

4        A.   I do.

5        Q.   All right.  So, according to this report,

6    the cash register was running 57 minutes ahead;

7    right?  An hour ahead, it would have been 12:51, but

8    it was only 12:48, three minutes slow but an hour

9    fast; so 57 minutes fast?  Is that right?

10       A.   Is it 57 or 67?

11       Q.   Well, if it was 60 minutes fast, it would

12   have been 12:51; right?

13            Let me -- let me try it this way:  So the

14   watch said 11:51.  And if it was an hour fast from

15   11:51, that would be 12:51; is that correct?

16       A.   Yes.

17       Q.   And so it was actually 12:48, which is

18   three minutes slower.  So that would be 57 minutes

19   fast; right?

20       A.   Yes.

21       Q.   Okay.  So, then, if we have -- going back

22   to Exhibit 58, page 7, if we have the receipt at --

23   and 17:20 in layman's terms is 5:20 in the

24   afternoon; right?

25       A.   Yes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1         Q.   So if the register was 57 minutes fast,
 2   then that would actually be 4:23 p.m.; right?
 3              MR. QUALSETH:  Object to the form.
 4         A.   Including the three-minute various,
 5   I agree, if that was --
 6         Q.   (By Mr. Ainsworth)  Yeah.
 7         A.   -- the case.
 8         Q.   Yeah.  And then after Floyd purchased the
 9   sweatshirt at the hardware -- sorry.
10              After Floyd purchased the duct tape at the
11   hardware store, he then conducted another
12   transaction; right?
13              MR. QUALSETH:  Object to the form.
14         A.   Yes.
15         Q.   (By Mr. Ainsworth)  According to the
16   report, you know, that's what the -- the information
17   you had available to you -- well, strike that.
18              According to the report, Floyd didn't
19   leave immediately after buying the duct tape, but he
20   stayed to then purchase a sweatshirt; right?
21         A.   He purchased a -- purchased a sweatshirt,
22   yes.
23         Q.   And spent 15 to 20 minutes in the hardware
24   store; right?
25              MR. TURNER:  Object to form.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1      A.   I can't recall exactly how much time he

2  spent after the purchase of the sweatshirt.

3      Q.   (By Mr. Ainsworth)  Sure.  We don't know

4  how much time.  I just mean in total at the hardware

5  store, including the purchase of the duct tape, was

6  15 to 20 minutes; right?

7      A.   Based on the information that I'm aware

8  of, yes.

9      Q.   All right.  And then I want to show you

10 what we've marked as Exhibit 56, which are your

11 field notes.

12          So I'm going to share with you Exhibit 56.

13 This is a document that is Bates numbered KBI -- oh,

14 no.  Shoot.  I'm going to make it small just so I

15 can get the Bates numbers -- KBI Subpoena 2217 -- I

16 think this one is sequential, but I'll -- it's not

17 sequential.  Sorry.

18          So I'll direct you to the page that we're

19 going to look at in this, and I'll make it bigger.

20 I promise.

21          So looking at page -- actually, that's not

22 the right page.

23          All right.  Page 51 of Exhibit 56 is Bates

24 numbered KBI Subpoena 2110.  And let's make this

25 bigger.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1              Sir, is this your handwriting on this

2    page?

3         A.    It is.

4         Q.    All right.  And this appears to be your

5    field notes of the interview that you conducted with

6    Richard Zule on November 10th, 1999; is that

7    correct?

8         A.    Yes.

9         Q.    All right.  So I'm going to go to the next

10   page, which is KBI Subpoena 2111, or page 52 of

11   Exhibit 56.  And it says "4:00 p.m. - Richard told

12   Floyd to go to Winchester Hardware and get a roll of

13   duct tape."  Do you see that?

14        A.    I do.

15        Q.    And you wrote "Duct tape still in

16   package"; right?

17        A.    Yes.

18        Q.    "Floyd got back around 4:45 p.m."  Do you

19   see that?

20        A.    I do.

21        Q.    "He drove green" -- and then what does

22   that say?

23        A.    "'69 Chevy pickup."

24        Q.    "Green '69 Chevy pickup."  Okay.

25              So he was driving a 30-year-old Chevy

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1   pickup truck to conduct this errand; right?
 2        A.   Yes.
 3        Q.   And, according to Richard Zule, Floyd
 4   returned at 4:45; right?
 5        A.   Yes.
 6        Q.   Sorry for my delay.  I'm just making sure
 7   if there was anything else I wanted to show you on
 8   this page.
 9             (Reporter clarification.)
10        Q.   (By Mr. Ainsworth)  My apology.  I'm just
11   checking to see if there's anything else I wanted to
12   show you on this page.
13             All right.  And then -- so you learned
14   that Floyd had left at 4:00 p.m. and returned at
15   about 4:45 p.m.  Frost's investigation revealed that
16   Floyd was at the hardware store for 15 to 20
17   minutes; right?
18             MR. QUALSETH:  Object to the form.
19             MR. TURNER:  Join.
20             MR. LINDEN:  Join.
21        A.   If that's what his report reflected, yes.
22        Q.   (By Mr. Ainsworth)  And that there was a
23   receipt for the duct tape at 4:23 p.m. before the
24   sweatshirt purchase; right?
25             MR. TURNER:  Object to the form.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          A.   I don't remember.

2          Q.   (By Mr. Ainsworth)  Sure.  Let's take a

3     look at Exhibit -- oh, I think it was Exhibit 58,

4     but let me get to it.

5               Sorry.  It's Exhibit 53.  It says "Paid

6     for duct tape.  Then bought sweatshirt"; right?

7          A.   Yes.

8          Q.   All right.  So the sweatshirt transaction

9     took place after the 4:23 transaction for the duct

10    tape; right?

11              MR. TURNER:  Object to form.

12         A.   If the notes are correct, yes.

13         Q.   (By Mr. Ainsworth)  Okay.  And how did

14    it -- how did it come up that you were assigned to,

15    you know, do some investigating into the drive time

16    between the hardware store and the Zule farm?

17         A.   I thought it was a lead assigned to me,

18    from memory.

19         Q.   What was -- okay.  What was the lead that

20    was assigned to you?

21         A.   To drive -- to check the driving time in

22    reference to him buying the duct tape.

23         Q.   And what were you supposed to -- what

24    drive time were you supposed to check?

25         A.   From the hardware store back to Zule

```
 1    dairy.
 2         Q.   And why did you want to check the drive
 3    time from the hardware store to the Zule dairy?
 4              MR. QUALSETH:   Object to the form.
 5         A.   As I stated, it was a lead assigned me --
 6    to me, but probably to verify whether the time was
 7    correct.
 8         Q.   (By Mr. Ainsworth)  All right.  And what
 9    did your investigation reveal?
10         A.   Without having the report in front of me,
11    I don't remember what the actual drive time was.
12         Q.   Okay.  Let's take a look at Exhibit 54.
13    Oh, I don't want 54.  I'm sorry.  I showed you the
14    wrong -- 64.
15              Okay.  So Exhibit 64 is a one-page
16    document Bates numbered KBI Subpoena 954, and I'm
17    going to scroll up to the top of this and make it a
18    little bigger so you can see.
19              This appears to be a report that you typed
20    regarding investigation that occurred on
21    November 17th, 1999; is that right?
22         A.   Correct.
23         Q.   All right.  It says -- you know, this is
24    regarding Lead No. 17, "Driving time from Winchester
25    Hardware store to Floyd S. Bledsoe's residence to
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    Zule's east farm in Leavenworth County, Kansas."  Do

2    you see that?

3         A.   I do.

4         Q.   Okay.  So do you know why -- well, strike

5    that.

6              Let's look at the report.  It says "On

7    November 17, 1999, Senior Special Agent Terry L.

8    Morgan drove his state vehicle from the Winchester

9    Hardware store to Floyd Bledsoe's trailer house and

10   to the Zule's farm in western Leavenworth County,

11   Kansas.  The following information was derived."

12             "3:40 p.m., Left Winchester Hardware store

13   at 55 miles per hour southbound on Wellman Road,

14   then west on Fairview Road."

15             "3:47 p.m., Arrived at Floyd" -- "Arrived

16   at Floyd Bledsoe's trailer house."

17             "3:50 p.m., Left trailer house and drove

18   east on Fairview Road to 106th Street and then

19   proceeded at 50 miles per hour on gravel road."

20             "4:01 p.m., Drove by Zule's home

21   driveway."

22             "4:04 p.m., Arrived at Zule's farm in

23   Leavenworth County."

24             Do you see that?

25        A.   I do.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1      Q.   Why did you stop for three minutes at

2  Floyd Bledsoe's trailer house?

3      A.   I don't know.  I don't recall.

4      Q.   All right.  So this trip from the hardware

5  store to Floyd Bledsoe's house and then on to Zule's

6  farm took 24 minutes; right?

7      A.   Yes.

8      Q.   And so if Floyd left the hardware store,

9  I mean, really -- you know, if he's doing another

10  transaction after 4:23 -- if he leaves at 4:25 and

11  he arrives back at the farm at 4:45 p.m., he doesn't

12  have time to drive this route, right, because that

13  would only be 20 minutes, and you -- it took you 24

14  minutes?

15      A.   I drove the speed limit.  If he had

16  driven --

17      Q.   Okay.

18      A.   -- faster, he might have done it in less

19  time.

20      Q.   Okay.  And so you think that Floyd could

21  have driven the '69 green farm truck at a faster

22  speed above the posted speed limit and thus cutting

23  the drive down -- time down by how much?

24      A.   I have no idea.  Depend on how fast he

25  drove.

1          Q.   Okay.  Did you inquire about the --
2    whether the '69 pickup truck was souped up or
3    anything like that, on the farm pickup truck?
4          A.   I did not, to the best of my memory.
5          Q.   All right.  Were you working from a
6    hypothesis that Floyd had abducted Camille Arfmann
7    in the green truck?
8          A.   I don't rem- --
9               MR. QUALSETH:   Object to the form.
10              Go ahead.
11         A.   I don't recall that.
12         Q.   (By Mr. Ainsworth)  Camille Arfmann had to
13   be transported somehow from her home in Floyd and
14   Heidi's home to the burial site behind Tom's house;
15   right?
16              MR. TURNER:   Object to form.
17              MR. LINDEN:   Join.
18         A.   I assume so.
19         Q.   (By Mr. Ainsworth)  Did you and your
20   fellow investigators discuss how Camille Arfmann
21   might have been transported from the -- from her
22   home to the burial site?
23         A.   I do not recall.
24         Q.   Did Richard Zule mention any blood
25   evidence in that pickup truck?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

 1      A.    If he had, it would have been in my
 2 report.
 3      Q.    Because that's something you would have
 4 been looking out for; right?
 5      A.    Yes.  As far as evidence.
 6      Q.    Yeah.  Based on Exhibit 64, do you believe
 7 that Floyd Bledsoe had the opportunity to abduct
 8 Camille Arfmann from her home on the afternoon of
 9 November 5th, 1999, before 5:00 p.m.?
10           MR. QUALSETH:  Object to the form.
11           MR. LINDEN:  Join.
12           MR. TURNER:  Join.
13      A.    At that time, I did not think that, no.
14      Q.    (By Mr. Ainsworth)  And why did you not
15 think that at that time?
16      A.    Based on the amount of driving time and
17 his activities at the hardware store.  I mean,
18 I knew that he had driven through that area, but at
19 that time we had no information that he had stopped
20 there.  Or I didn't.  Let me clarify that.
21      Q.    All right.  I want to ask you some
22 questions about your field notes.  I'm going to show
23 you Exhibit 56 again.  And now I'm going to direct
24 you to page 5 of Exhibit 56.  This is Bates
25 numbered -- oh, there it is -- KBI Subpoena 2244.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1            All right.  So this appears to be an

2    interview that you conducted with Floyd S.

3    Bledsoe -- I -- this is on November 8th.  I just got

4    to find where it says "November 8."

5            There.  Okay.

6            Do you see that?  This is an interview for

7    an -- approximately an hour on November 8, 1999,

8    with Floyd S. Bledsoe?

9       A.   Yes.

10      Q.   Floyd was five-foot-two, 130 pounds?

11      A.   That's what he told me, yes.

12      Q.   How tall were you?

13      A.   I'm six-four and a half.

14      Q.   And back in 1999, how much, approximately,

15   did you weigh?

16      A.   Around 280.

17      Q.   All right.  Floyd told you that Tom drove

18   a black Mazda pickup truck?

19      A.   Yes.

20      Q.   All right.  And then in your notes of your

21   interview with Floyd, going on to page 6 of

22   Exhibit 56 to Floyd says "At 4:00 o'clock Floyd went

23   to Winchester Hardware store in Zule's green

24   Chevrolet truck and got some duct tape.  Floyd also

25   bought black sweatshirt for himself."  Do you see

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1  this?

2       A.   I do.

3       Q.   And, according to Floyd, he saw Camille's

4  bus around 4:15 on Wellman Road.  Do you see that?

5       A.   I do.

6       Q.   All right.  So Floyd is -- is reporting to

7  you that he was still driving at 4:15 p.m.; right?

8       A.   Yes.

9       Q.   Or thereabouts?

10       A.   Yes.

11       Q.   Going on to page 8 of Exhibit 56, you

12  wrote here "Tom" -- and sorry.  This is still the

13  continuation of your interview with Floyd S. Bledsoe

14  on November 8, 1999.

15            It says "Tom - pistol - .22-caliber (ivory

16  handle) might have been Tom's or Floyd, Sr.  No

17  shotgun or rifles."  Do you see that?

18       A.   I do.

19       Q.   So, according to Floyd, he only was aware

20  of the .22-caliber pistol; right?

21       A.   That's what he told me, according to my

22  notes, yes.

23       Q.   All right.  And then at the bottom of the

24  page -- and this is page KBI Subpoena 2247 of

25  Exhibit 56.  It says "Not involved in Camille's

1   death.  Will take a polygraph."  Do you see that?

2       A.   I do.

3       Q.   Why were you -- how did that come up, that

4   you were asking Floyd about whether he was involved

5   in Camille's death and if he'd take a polygraph, in

6   your interview on November 8th, 1999?

7       A.   Well, probably because she lived with him.

8   And then many times we would ask witnesses, our

9   suspects, if they would submit to a polygraph during

10  the interview.

11      Q.   Did you ask anyone other than Floyd to

12  submit to a polygraph?

13      A.   I don't recall.

14      Q.   Do you know of any witness other than

15  Floyd S. Bledsoe that was asked to submit to a

16  polygraph?

17      A.   Tom.

18      Q.   Well, Tom was a suspect; right?

19      A.   Right.  As far as a --

20      Q.   At the time --

21      A.   I'm sorry.  Excuse me.

22      Q.   At the time Tom took a polygraph, he was

23  charged with murder; right?

24      A.   I don't recall whether he was charged --

25  or the polygraph -- whether it was before or after.

1          Q.   Okay.  In any event, are you aware of any

2     witness other than Floyd who took a polygraph -- who

3     was asked to take a polygraph exam?

4          A.   Not by me.

5          Q.   By anyone else?  Are you aware of anyone

6     else asking a witness other than Floyd to take a

7     polygraph?

8          A.   No.

9          Q.   So let me show you a document we've

10    previously marked as Exhibit 5.  I can drop this in

11    the chat for people.  This is the exhibit we used

12    previously.  I think I have to stop -- oop, no.

13              That's loading.  It will take just a --

14    it's a larger file; so I'll give it a few seconds.

15              THE WITNESS:  Would you mind if I stand up

16    for just a minute?

17              MR. AINSWORTH:  Of course, Mr. Morgan.

18    Anytime.

19              THE WITNESS:  Thank you.

20         Q.   (By Mr. Ainsworth)  All right.  I think

21    that file is now transmitted in the chat.

22              So I'm just showing you Exhibit -- page 18

23    of Exhibit 5, which is a document Bates numbered

24    JC 1645.  And these are -- I'll represent to you

25    that these are not your notes but rather from Randy

1    Carreno.  And it says "November 7, 1999, 23:30

2    hours.  11:38 hours, 10-23 law enforcement center

3    per No. 30."

4              Number 30 was Roy Dunnaway -- right? --

5    Sheriff Dunnaway?

6         A.   I don't know.

7         Q.   Okay.  I can show you that document, if --

8    if it becomes necessary, but it says "On arrival,

9    No. 30 met with reporting officer outside of law

10   enforcement center and advised Tom Bledsoe currently

11   has admitted to being involved.  Number 30 advised

12   victim was in a field with a bullet to the head."

13   Do you see that?

14        A.   I do.  If -- if "V" means victim, yes,

15   I do.

16        Q.   Okay.  And it -- Camille Arfmann was in a

17   field with a bullet to her head; right?

18        A.   That is my understanding.

19        Q.   And she was the victim in this homicide;

20   right?

21        A.   Yes.

22        Q.   Okay.  So once Tom was arrested and

23   charged with the homicide of Camille Arfmann, did

24   you learn any information to suggest that he might

25   not have committed the murder?

1        A.    No, to the best of my memory.

2        Q.    Okay.  You interviewed Floyd S. Bledsoe

3   again the next day, on November 9th, 1999; is that

4   right?

5        A.    To the best of my memory, he was

6   reinterviewed by myself and Detective Carreno.

7        Q.    On the 9th; right?

8        A.    Yes.  The following day.

9        Q.    So the body was -- the victim's body was

10  recovered in the early-morning hours of

11  November 8th, and then on November 9th, you

12  questioned Floyd S. Bledsoe a second time; right?

13       A.    He was interviewed a second time, correct.

14       Q.    Why did you interview him a second time?

15             MR. TURNER:  Object to form.

16       Q.    (By Mr. Ainsworth)  Meaning Floyd S.

17  Bledsoe.

18       A.    I don't recall the specific reason, but

19  it's not uncommon for reinterviews, based on

20  information.  Excuse me.  I didn't mean to talk over

21  you.

22       Q.    It was my fault.  I said at the beginning

23  I would wait till you're done with your answer, and

24  I'm going to try and stick to that but I ...

25             When you interviewed Floyd S. Bledsoe the

```
 1   second time, on November 9th, 1999, did you have any
 2   reason to suspect him as being, you know, a
 3   participant in the homicide?
 4        A.   It's been 23 years since the homicide.
 5   I just don't recall.
 6        Q.   All right.  If you had any reason to
 7   suspect Floyd S. Bledsoe as of November 9th, 1999,
 8   would that reason be documented in a police report
 9   somewhere?
10             MR. QUALSETH:  Object to the form.
11        A.   I would have documented it, but I don't
12   know about the other investigators, whether they did
13   or not.
14        Q.   (By Mr. Ainsworth)  Okay.  But you would
15   expect that a police officer who is competent and
16   trained would document if they had a reason to
17   suspect Floyd S. Bledsoe as of November 9th, 1999;
18   correct?
19             MR. QUALSETH:  Object to the form.
20             MR. TURNER:  Join.
21             MR. LINDEN:  Join.
22        A.   Sir, I would have documented it.
23        Q.   (By Mr. Ainsworth)  Sure.  Do you -- well,
24   let me show you what we've marked as Exhibit 56,
25   your field notes, and turn to page 34.  This is --
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1    is this your handwriting, sir --

 2         A.   It is.

 3         Q.   -- on this page?

 4              And is this your notes of your interview

 5    with Floyd S. Bledsoe on November 9th, 1999?

 6         A.   Yes.

 7         Q.   Did you get a chance to review these notes

 8    in preparation for this deposition?

 9         A.   I did.

10         Q.   Okay.  So you started the interview with

11    Floyd S. Bledsoe at 8:00 p.m.; right?

12         A.   Yes.

13         Q.   And then at 8:05 p.m. you advised him of

14    his rights; is that right?

15              MR. TURNER:  Object to form.

16         A.   Yes.

17         Q.   (By Mr. Ainsworth)  And is that referring

18    to his Miranda rights?

19         A.   Yes.

20         Q.   Why did you advise Floyd S. Bledsoe of his

21    rights under Miranda the day after Camille's body

22    was recovered, after having been shot by Tom

23    Bledsoe, buried behind Tom Bledsoe's house, with a

24    gun -- well, strike that.  I screwed that up.  Let

25    me try that again.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          Why did you give Floyd S. Bledsoe his

2    Miranda rights on November 9th, the day after

3    Camille Arfmann had been discovered, having been

4    shot to death, buried behind Tom's house, and having

5    been shown where her body was buried by Tom and his

6    attorney and Tom's attorney had provided to law

7    enforcement Tom's gun, which was a 9-millimeter gun?

8          MR. QUALSETH:  Object to the form.

9          MR. TURNER:  Join.

10          MR. LINDEN:  Join.

11     A.    I don't recall.

12     Q.    (By Mr. Ainsworth)  Under what

13    circumstances do you provide people with an

14    advisement of their rights?

15     A.    If they're a suspect or possible suspect

16    in a criminal investigation.

17     Q.    And you want to -- as a law enforcement

18    official, you want to provide them with their rights

19    so that if they say anything that might be

20    incriminatory, you could later use that information

21    in a prosecution; right?

22     A.    Yes.

23     Q.    All right.  You then take a lot of notes

24    of your interview with Floyd; right?

25          MR. TURNER:  Object to form.

1        A.   I don't remember how many pages there are,

2   but, yes, I always took notes when I conducted

3   interviews.

4        Q.   (By Mr. Ainsworth)  All right.  And then

5   on page 37 of Exhibit 56, Floyd told you that he got

6   to the hardware store around 4:20 p.m.; right?

7             MR. TURNER:  Object to form.

8             MR. QUALSETH:  You can answer.

9        A.   Yes.

10       Q.   (By Mr. Ainsworth)  Did you ever drive

11   from the Zule farm to the hardware store to see how

12   far that distance was?

13       A.   I drove from the hardware store back to

14   Zule farm.

15       Q.   But you didn't go directly from Zule --

16   from the hardware store to Zule farm; right?

17       A.   Not according to my report.

18       Q.   Well, I mean, apart -- I guess what I'm

19   trying to find out is did you ever drive that --

20   that route to see how long it took to go directly

21   from the hardware store to the Zule farm?

22       A.   Not to the best of my memory.

23       Q.   All right.  And so you go through -- do

24   you know how long your interview with Floyd Bledsoe

25   lasted?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                    90

1              MR. TURNER:  Object to form.

2        A.    Not from memory.  It may be at the start

3    of the interview or at the end of the notes.

4        Q.    (By Mr. Ainsworth)  All right.  Well,

5    let's take a look at -- back at page -- Exhibit 5,

6    page 47.  This is just another copy of your field

7    notes; right?

8        A.    Yes.

9        Q.    All right.  And you conducted this

10   interview with Randy Carreno; right?

11       A.    Yes.

12       Q.    And so because you conducted the interview

13   with Randy Carreno, you gave him a copy of your

14   notes for this particular interview for his report?

15             MR. TURNER:  Object to form.

16       A.    If he prepared the report, that would be

17   the procedure that I normally followed.

18       Q.    (By Mr. Ainsworth)  Okay.  And so, you

19   know, taking a look at page 57 of Exhibit 5, I mean,

20   Floyd is telling you everything he did to try and

21   find Camille; right?

22             MR. QUALSETH:  Object to the form.

23             MR. TURNER:  Join.

24             MR. LINDEN:  Join.

25       A.    Those are not my notes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1      Q.   (By Mr. Ainsworth)  These are not your

2  notes at page 57.  I see.

3           So when -- okay.  So this is the last

4  page of your notes, page 54 of Exhibit 5, where it

5  gets down to -- it says "11:32 hours."  That's still

6  your handwriting; is that right?

7      A.   No, that's not --

8      Q.   Page --

9      A.   -- my handwriting.

10     Q.   Okay.  Above 11:52, that's your

11  handwriting --

12     A.   That is --

13     Q.   -- correct?

14     A.   -- correct.

15          MR. LINDEN:  Object to form.

16     Q.   (By Mr. Ainsworth)  All right.  And then

17  at 11:32, it appears Randy Carreno, JRC, takes over

18  taking notes?

19     A.   Yes.

20     Q.   And then there's a reference to a -- a

21  break at 12:33 a.m.  Do you see that?

22     A.   I do.

23     Q.   And a return at 1:00 a.m.?

24     A.   Yes.

25     Q.   Then it says No. 64, which is Kirk Vernon,

1   taking notes.  And then you see the note "2:26

2   restart"?

3         A.   I do.

4         Q.   And then of Exhibit 5, page 64, there's a

5   reference to -- it says "Floyd Bledsoe," "2:27" in

6   the morning.  Now "November 10th, 1999."  Do you see

7   that?

8         A.   I do.

9         Q.   And then this interview, according to the

10  notes on page 71 of Exhibit 5, "Done" at "3:58" in

11  the morning.  Do you see that?

12        A.   I do.

13        Q.   So this is an eight-hour interview.  Have

14  you ever been part of an eight-hour interview

15  before?

16        A.   I don't recall that.

17        Q.   Okay.  Do you recall, at about five hours

18  into the interview, Carreno and somebody else

19  continued the interview but that you were not -- no

20  longer part of the interview?

21        A.   I don't recall that.

22        Q.   It's around 1:00 in the morning?

23        A.   I don't recall that.

24        Q.   Why were you and your fellow officers

25  interviewing Floyd Bledsoe for eight hours the day

1  after Camille Arfmann's body was recovered and

2  behind Tom's house, having been shot to death with

3  Tom's gun, after Tom and his attorney led you -- led

4  investigators to her body?

5          MR. QUALSETH:  Object to the form.

6          MR. TURNER:  Join.

7          MR. LINDEN:  Join.

8      A.  I don't remember.

9      Q.  (By Mr. Ainsworth)  You would agree with

10 me that there should be some documented reason for

11 why Floyd S. Bledsoe would be any kind of a suspect

12 to be questioned for eight hours on November 9th to

13 November 10th of 1999; correct?

14         MR. QUALSETH:  Object to the form.

15         MR. TURNER:  Join.

16         MR. LINDEN:  Join.

17     A.  I don't recall.

18     Q.  (By Mr. Ainsworth)  Well, I know you don't

19 remember now, but I'm just saying, as an experienced

20 law enforcement officer with more than 26 years'

21 experience investigating crimes, if Floyd was any

22 way suspected on November 9th, 1999, the reason for

23 him being a suspect should have been documented in

24 some report; correct?

25     A.   If you're referring to me, yes.

1        Q.   I'm referring to any police officer.  Any

2   police officer who knew a reason why Floyd would be

3   a suspect on November 9th, 1999 -- that fact should

4   have been documented; right?

5             MR. QUALSETH:  Object to the form.

6             MR. TURNER:  Join.

7             MR. LINDEN:  Join.

8        A.   If it was information relevant to the

9   investigation, yes.

10       Q.   (By Mr. Ainsworth)  And the reason that

11  somebody's a suspect is relevant information to an

12  investigation; right?

13       A.   Normally, yes.

14       Q.   Is it ever not?

15       A.   There could be a time where a witness has

16  turned into a suspect in investigation.

17       Q.   Sure.  And so the information that makes

18  that person a suspect would be relevant to the

19  investigation; right?

20       A.   Yes.

21       Q.   All right.  I want to go back to

22  Exhibit 56.  These are your field notes.  And I want

23  to direct your attention to page 21 of -- I got to

24  find the beginning of this.

25             All right.  Page 20 of Exhibit 56.  This

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1  page is Bates numbered KBI Subpoena 2248.  And I'm

2  just going to ask you to take a look at the top of

3  Exhibit 56, page 20, and tell me if this is your

4  handwriting.

5      A.   It is my handwriting.

6      Q.   And does this refer -- or is -- are these

7  notes of an interview with Floyd L. Bledsoe on

8  November 8th, 1999, about a 45-minute interview of

9  him?

10      A.   According to -- to the notes, yes.

11      Q.   And were your notes accurate?

12      A.   I tried to make them as accurate as

13  possible.

14      Q.   Did you know back in 1999 that your notes

15  would be an aid to your memory?

16      A.   That's the reason you take notes.  Yes.

17      Q.   And that sometimes you don't testify about

18  a case until months or years later?

19      A.   Yes.

20      Q.   All right.  And so you tried to be

21  accurate in your notes; right?

22      A.   Yes.

23      Q.   Okay.  Look at page 21 of Exhibit 56.  All

24  right.  According to Floyd L. -- or Floyd, Sr., it

25  says "Saturday got up around 6:30 a.m. (coffee -

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    TV)."

2              "8:30 to 9:00 o'clock, Tom and Catherine

3    got up.  Tom might not have got up.  Left around

4    9:00 and went to Mother's house."  Do you see that?

5         A.   I do.

6         Q.   So Floyd L. Bledsoe told you, during this

7    interview on November 8th, 1999, that he couldn't

8    remember if he saw Tom the morning of Saturday,

9    before he left at 9:00 a.m.; right?

10        A.   According to the notes, yes.

11        Q.   All right.  And then the bottom of page 21

12   of Exhibit 56 states "Guns.  Tom owned a

13   9-millimeter pistol, gray in color.  Mike Hayes, at

14   sheriff's office, asked Floyd for the gun.  Gun was

15   on dresser in Tom's room.  Clip was in the gun.

16   Checked.  No bullets in the gun.  Didn't see any

17   bullets.  Gave it to Mike at sheriff's office.

18   First time he ever saw the gun."  Do you see that?

19        A.   I do.

20        Q.   And let me actually -- I should show you

21   your report on this particular interview.  I'm going

22   to have to drop it in the chat because I don't see

23   it listed.  This will be Exhibit 67.

24              All right.  Let me share it with you, sir.

25   What we've marked as Exhibit No. 67 is Bates

1   numbered KBI Subpoena 807 through KBI Subpoena 810.

2            All right.  So this is -- has an

3   investigation date of November 8, 1999; is that

4   correct?

5        A.   Yes.

6        Q.   And this is a report that you filed; is

7   that right?

8        A.   Yes.

9        Q.   Regarding an interview with Floyd L.

10  Bledsoe; correct?

11       A.   Correct.

12       Q.   All right.  And so that was Tom's dad;

13  right?

14       A.   Yes.

15       Q.   And so, according to your report, you

16  wrote "Tom and Catherine, his mother, both got up

17  around 9:00 a.m."  Do you see that?

18       A.   I do.

19       Q.   And you don't indicate that that was on

20  Saturday; right?

21       A.   I don't specifically say Saturday.

22       Q.   Well, I guess I'm trying to just find

23  out -- let me go back to Exhibit 56, page 21, and

24  ask you, in your notes when you talk about

25  "6:30 a.m. (coffee - TV)" and then "8:30 -

1    9:00 o'clock, Tom and Catherine got up.  Tom might

2    not have got up," that's referring to Saturday

3    morning; right?

4         A.   Yes.  The "S-a-t" would indicate Saturday.

5         Q.   All right.  And you -- on Friday, you say

6    "Floyd got up at 6:30 on Friday.  Tom was in his

7    room asleep.  He got up around 9:00 a.m.  Wife got

8    up."

9              All right.  So, in your report, this might

10   be a reference to Friday morning, "Tom and Catherine

11   both got up around 9:00 a.m."?  Do you see that?

12        A.   No, I don't think so.  I think it was -- I

13   was talking about Saturday morning.

14        Q.   Well, then, where do you -- it's all a

15   little bit confused.  Where do you report that Floyd

16   Bledsoe might not have seen Tom --

17        A.   Excuse me.

18        Q.   -- on Saturday morning?

19        A.   Sir, I got a leg cramp.  I'm sorry.

20             MR. AINSWORTH:  Oh, that's okay.  We've

21   been going for a while.  Do you want to take a

22   break?

23             MR. QUALSETH:  Yeah.  I was thinking about

24   lunch.  What are you thinking for lunch?

25             THE REPORTER:  Do you want to be off the

```
 1   record?
 2            MR. AINSWORTH:  Yeah, let's go off the
 3   record.
 4            THE REPORTER:  Okay.  We are going off the
 5   record at 12:06 a.m. -- or p.m.
 6            (A recess was taken.)
 7            THE REPORTER:  Okay.  We are back on the
 8   record at 1:03 p.m.
 9        Q.   (By Mr. Ainsworth)  All right.  Sir, did
10   you get some lunch?
11        A.   I did.  Thank you.
12        Q.   Did you talk to anyone about your
13   deposition over lunch?
14        A.   Yes.
15        Q.   With whom did you talk about your
16   deposition over lunch?
17        A.   Mr. Qualseth.
18        Q.   Who did you have lunch with?
19        A.   Mr. Qualseth.
20        Q.   Have you talked to anyone else since we
21   broke?
22        A.   No.
23        Q.   And do you have any documents with you
24   today?
25        A.   I do not.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1         Q.   All right.  I want to turn back to what we

2    previously marked as Exhibit 67, what we were

3    looking at before the break.

4              Just to reorient you, this is a report

5    that you filed regarding your interview of Floyd L.

6    Bledsoe.  Do you see that?

7         A.   I do.

8         Q.   Okay.  I'm going to go back down to page 2

9    of Exhibit 67.  And so you think that this is

10   talking about Saturday that "Tom and Catherine both

11   got up around 9:00 a.m." --

12        A.   I do.

13        Q.   -- is that right?

14             Okay.  Is there a reason why you didn't

15   include in your report the fact that Floyd L. told

16   you he wasn't sure if he saw Tom get up that

17   morning?

18        A.   No, not to the best of my memory.

19        Q.   Did you ask -- so, in your interview,

20   Floyd L. Bledsoe told you about having a

21   conversation with Mike Hayes -- well, let me just

22   read this part again.

23             "On November 8th, 1999, Mike Hayes,

24   attorney, while at the Jefferson County Sheriff's

25   County's" -- "County Sheriff's Department, asked

```
 1    Floyd L. Bledsoe to go home and bring this gun back
 2    to the sheriff's department.  He went home, found
 3    the pistol on a dresser in Tom's room, removed a
 4    magazine that was still in the pistol, checked and
 5    found no round in the gun, and brought it back to
 6    Hayes at the sheriff's office.  This was the first
 7    time that Floyd L. Bledsoe had ever seen the
 8    9-millimeter pistol."  Do you see that, sir?
 9         A.   I do.
10         Q.   So --
11         A.   Excuse me, sir.  There's a block partially
12    covering the paragraph.
13         Q.   Oh, yeah.
14         A.   I --
15         Q.   I'm sorry.
16         A.   That's all right.  I don't know what it
17    is.
18              There.
19         Q.   Yeah.
20         A.   Thank you.
21         Q.   Okay.  Better.
22              Okay.  So, in your conversation with
23    Floyd, Sr., he told you that he had a conversation
24    with Hayes about the pistol the night that, you
25    know, the body was recovered; right?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          A.   If that's correct, yes.

2          Q.   All right.  And you knew that Tom had

3    placed a call to his dad -- well, strike that.

4               You knew that Tom had called his -- a guy

5    from his church, Jim Bollinger, and left some voice

6    messages about the crime; right?

7          A.   Yes.  I don't know when I was aware of

8    that, but that is correct.

9          Q.   All right.  And you knew that Tom had also

10   called his dad in that time frame and contacted his

11   father; is that right?

12         A.   If my report reflects that, yes.

13         Q.   Well, I'm -- what I'm trying to find out

14   is -- and maybe we can go back to Exhibit 56, which

15   are your field notes.

16              So you talk about what Floyd did and

17   observed on Saturday on page 21 of Exhibit 56.  And

18   then you talk about what guns Tom had.

19              And then on page 22 of Exhibit 56, there's

20   a reference to Tom and Camille's church, Countryside

21   Baptist Church?

22         A.   Yes, sir.

23         Q.   There's a reference to, you know, "He" --

24   presumably Tom -- "never said anything about

25   Camille.  Tom having no girlfriends - never married.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

 1    No violence in the past.  No past history of mental

 2    illness, drugs, or alcohol abuse."  Do you see that?

 3         A.   I do, sir.

 4         Q.   Is there a reason why you didn't ask

 5    Floyd, Sr., any questions about what conversations

 6    he had with Tom the night of November 7th, 1999?

 7              MR. TURNER:  Object to form.

 8         A.   I do not recall a reason.

 9         Q.   (By Mr. Ainsworth)  All right.  Well,

10    turning back to your report, Exhibit 67, if you knew

11    during your conversation with Floyd, Sr., that

12    Floyd, Sr., said he was at the Johnson County

13    Sheriff's Department with Mike Hayes and Tom Bledsoe

14    at that time, did you want to know if Tom Bledsoe

15    made any statements to his dad about the crime?

16              MR. QUALSETH:  Object to the form.

17         A.   I don't recall.

18         Q.   (By Mr. Ainsworth)  Well, how about

19    sitting here now, with 26 years of law enforcement

20    experience under your belt and -- well, more than

21    that, you know, with your military background and

22    then your experience investigating for the attorney

23    administrator, do you think that you would want to

24    know if Tom's dad had any conversations with Tom,

25    when he was at the law enforcement center the night

Terry L. Morgan - 02/13/2023                    104

1    of November 7th and the early-morning hours of

2    November 8, along with Mike Hayes?

3           MR. QUALSETH:  Object to the form.

4       A.   It's something I could have asked, but, to

5    the best of my memory, I just don't recall doing

6    that.

7       Q.   (By Mr. Ainsworth)  Is there any reason

8    not to ask Floyd, Sr., about any conversations he

9    had with his son the night that Tom turned himself

10   in?

11      A.   No, not to the best of my memory.

12      Q.   All right.  So it states "At the

13   conclusion of the interview, Senior Special Agent

14   Morgan asked Floyd L. Bledsoe if he would give

15   written consent to a search of his property.

16   Bledsoe agreed and then signed the consent form

17   granting consent to a search of his property.  See

18   attached copy for full details."  Do you see that?

19      A.   I do.

20      Q.   All right.  And so going down to -- it

21   says "Consensus" -- "Consent To Search" dated

22   November 8, 1999, time 1:45 p.m.  "Location of

23   premises to be searched" -- it says "160 acres owned

24   by Floyd L. and Catherine Bledsoe at 11477 Osage

25   Road, Oskaloosa, Kansas."  Do you see that?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                    105

1          A.    I do.

2          Q.    And -- and so is that referring to the

3    property encompassing 160 acres owned by Floyd and

4    Catherine Bledsoe?

5          A.    To the best of my memory, yes.

6          Q.    Does it include the house at 11477 Osage

7    Road?

8          A.    It would include anything on the property.

9          Q.    So Floyd L. Bledsoe was giving you consent

10   to search his home; is that right?

11         A.    And property, yes.

12         Q.    That's where Tom lived; right?

13         A.    That's my understanding, yes.

14         Q.    All right.  And the only condition was

15   that Mike Hayes be present during any searches;

16   right?

17         A.    Yes.  That is written on the consent.

18         Q.    All right.  And then Floyd, Sr., signed

19   the document, Exhibit 67, page 4, at 1:51 p.m. on

20   November 8th, 1999; right?

21         A.    Yes.

22         Q.    So at that point you had full legal

23   authority to search Tom's house; right?

24               MR. TURNER:  Object to form.

25               MR. QUALSETH:  Object to form.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1              MR. LINDEN:  Join.

 2         A.   We had a consent to search property.

 3         Q.   (By Mr. Ainsworth)  And was there anything

 4    else you needed in order to search Tom's house?

 5              MR. TURNER:  Object to form.

 6              MR. QUALSETH:  Object to form --

 7              MR. LINDEN:  Join.

 8              MR. QUALSETH:  -- as well.

 9         A.   Not that I recall.

10         Q.   (By Mr. Ainsworth)  All right.  And so did

11    you then go and conduct a search on Tom's house?

12              MR. QUALSETH:  Object to form.

13              MR. TURNER:  Join.

14              MR. LINDEN:  Join.

15              MR. QUALSETH:  It's the reference to

16    "Tom's house," Russell.

17         Q.   (By Mr. Ainsworth)  You can answer.

18         A.   I don't recall in -- being involved in any

19    of the property searches except for going to Tom's

20    room, but as far as a overall search, to the best of

21    my memory, that was carried about by the sheriff's

22    department.

23         Q.   When you say "overall search," what are

24    you referring to?

25         A.   As in the 160 acres of the property.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                    107

1          Q.   I see.  When did you go to Tom's room?

2          A.   That should be documented in a report.

3          Q.   And am I correct that you only searched

4    Tom's room and nowhere else in the house in which

5    Tom lived?

6          A.   That's correct.  I was only in Tom's room.

7          Q.   Did somebody direct you to only look in

8    Tom's room and not in -- anywhere else in Tom's --

9    in the house in which Tom lived?

10         A.   I do not recall.

11         Q.   Any reason not to search in the remainder

12   of the house outside of Tom's room?

13         A.   No.  We had consent to search the

14   property, which would have included the house, but I

15   was not giving a lead assignment to do that.

16         Q.   Sorry.  I'm trying to find the right

17   report that I want to show you.  Please bear with

18   me.

19              Well, I'll find it in a break.  Looking

20   for the -- well, it's not more important.  I'll move

21   on and come back around to it.

22              All right.  So you don't -- so there was a

23   search of Tom's room that you conducted, and you

24   only searched it once; correct?

25         A.   I did not search his room.  I was --

1      Q.    Who searched his -- what were you doing in

2   his room?

3      A.    There should be a report of picking up

4   some ammunition or rounds that you should have a

5   copy of.

6      Q.    I do.  Was that -- did -- and I thought

7   that you received that evidence from Tom's dad.  Is

8   that right?

9      A.    We received some evidence from Tom's dad,

10  but I was told to go to Tom's room and retrieve

11  something.  If I could see the report, that might

12  help me refresh my memory.

13     Q.    All right.  Let me show you what we've

14  marked as Exhibit 57.

15          All right.  Exhibit 57 is Bates numbered

16  KBI Subpoena 878 through '880.  And looking at the

17  first page, you see that this is a report that you

18  filled out regarding activities on November 9th,

19  1999?

20     A.    I'm sorry.  What date did you give?

21     Q.    November 9th, 1999.

22     A.    That's correct.

23          MR. QUALSETH:  Russell, I'm going to take

24  a quick break.  I'll be right back.  Just a second.

25          MR. AINSWORTH:  Go ahead.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1              THE REPORTER:  Okay.  We will step off the
 2    record at 1:20 p.m.
 3              (A recess was taken.)
 4              THE REPORTER:  Okay.  Back on the record
 5    at 1:25 p.m.
 6         Q.   (By Mr. Ainsworth)  All right.  I'm going
 7    to show you again -- oh, boy.  Let me bring it to
 8    the front.
 9              All right.  Exhibit 57, page 1 refers
10    to -- it's regarding the "Receipt of two
11    9-millimeter Luger round" -- "Luger rounds from
12    Floyd L. Bledsoe."  And is this the report that
13    you're referring to, sir?
14         A.   Yes.
15         Q.   Okay.  So this is at 9:17 a.m. on
16    November 9th; so before you got the "Consent To
17    Search"; right?  The written "Consent To Search."
18         A.   I believe so, yes.
19         Q.   Because the "Consent To Search" that we
20    just looked at was signed in the afternoon; right?
21         A.   Okay.
22         Q.   Okay.
23         A.   Yes.
24         Q.   So you don't have to take my word for it.
25    I'll just --
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com


**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023          110

1          A.   No.  I have no reason not to believe you.

2          Q.   All right.  So this is Exhibit 67, and

3     it's signed at 1:51 -- oh, shoot.  You shouldn't

4     have believed me.  I was wrong.

5          A.   It -- it's signed --

6          Q.   This is after the --

7          A.   -- on the 8th, yeah.

8          Q.   -- signed consent form.

9          A.   Yeah.

10         Q.   Yeah.  That's why we -- it pays to check

11    our facts.  All right.

12              So the afternoon before November 9th, you

13    had the signed "Consent To Search," and so then you

14    actually received this evidence from Floyd

15    Bledsoe -- Floyd L. Bledsoe at Floyd L. Bledsoe's

16    home; is that right?

17         A.   I think it was at his home.  I didn't say

18    that in the report, but, to the best of my memory,

19    it was either at his home or at the sheriff's

20    department.  And I should have said that in the

21    report.

22         Q.   All right.  Because in -- you have some

23    field notes on this; so maybe we should look at that

24    just to make sure there's nothing we're missing.

25    I just have to find them real quick.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1              Sorry.  It's page 30 of Exhibit 56.  Let

2    me show you that.  It says "Two rounds in the gun

3    found on the dresser.  Rounds were in the magazine.

4    Rounds on a table in the front room.  Tom was having

5    a hard time dealing with his grandmother's death."

6    Do you see that?

7         A.   I do.

8         Q.   And this is 9:17 a.m. on the same date; so

9    the same date and time as your report --

10        A.   Yes.

11        Q.   -- is that right?

12        A.   Yes.

13        Q.   And just to scroll down, it says "Received

14   two 9-millimeter Winchester Luger rounds at

15   11:23 a.m.  Taken as evidence" --

16        A.   "ECR" would --

17        Q.   -- "on a" --

18        A.   Go ahead.  Sorry.

19        Q.   Is it "on a "KBI ECR," an evidence custody

20   receipt?

21        A.   That's correct.

22        Q.   All right.  So let's talk about this.

23   Does this refresh your memory as to where you were

24   when you obtained the rounds of -- the two rounds of

25   ammunition?

1        A.    No.

2        Q.    Okay.  Do you know why you have -- it's

3   related that at 9:17 two rounds -- 9:17 a.m., two

4   rounds in the gun were found on the dresser, and

5   then you say that the rounds were received at

6   11:23 a.m.?

7        A.    No.

8        Q.    Did you go into Tom's room?

9        A.    I think so, going from memory.

10       Q.    But you did not search Tom's room;

11  correct?

12       A.    No.

13       Q.    That is correct?

14       A.    That is correct, to the best of my memory.

15       Q.    What was -- what were you doing in Tom's

16  room when you were there?

17       A.    Well, I assume, from the reports, to take

18  custody of the ammunition.

19       Q.    Okay.  Going back to Exhibit 57, you have

20  an evidence custody receipt, and this is a box for

21  the victim; right?

22       A.    Are you talk- -- talking about Camille --

23  Camille Arfmann?  Yes.  It says "Victim" --

24       Q.    Yeah.

25       A.    Yes.  It says "Victim" right there.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1        Q.    And is this your handwriting?

2        A.    It is.

3        Q.    And I'm looking, for the record, at page 2

4    of Exhibit 57.  And then there's a spot for

5    "Suspect"; correct?

6        A.    Yes.

7        Q.    Do you write that down at the time that

8    you receive the evidence, or do you fill that in

9    later?  The name of the suspect.

10       A.    It would have been at the time I received

11   it if -- especially if the person transferring the

12   evidence to me signed it.  There should be a second

13   page to it.

14       Q.    Yeah.  Do you know why -- what happened in

15   those approximately two hours between the rounds

16   being found and them being received for evidence?

17       A.    No.

18       Q.    Do you have any explanation for why it

19   would say 9:17 a.m., you know, the rounds were

20   discovered, but then they were received at

21   11:23 a.m.?

22       A.    Unless 9:17 was when Floyd Bledsoe, Sr.,

23   found the rounds, and the later time of 11:23 a.m.

24   was when I received them or recovered them.

25       Q.    All right.  But if we look back at

1    Exhibit -- no -- I did it again.  Argh, I got too

2    many tabs open; so I got to close something.

3           All right.  I must have closed it.  Let

4    me -- let me pull up, again, Exhibit 67 so we can

5    just have that to look at.

6           All right.  Showing you what we marked as

7    Exhibit 67, if we scroll down to page 2, the

8    paragraph beginning "When asked by Senior Special

9    Agent Morgan" -- in this paragraph, you recount that

10   Floyd, Sr., told you that he found the pistol on a

11   dresser in Tom's room, removed a magazine that was

12   still in the pistol, checked and found no round in

13   the gun, and brought it back to Hayes at the

14   sheriff's office.  Do you see that?

15        A.   I do.

16        Q.   So, according to Floyd, Sr., he was the

17   one who, you know, put the magazine with the two

18   rounds on the dresser in the first place -- taking

19   out of the gun; right?

20        A.   Sounds logical, yes.

21        Q.   And so armed with that knowledge, from

22   your conversation with Floyd L. Bledsoe on -- this

23   is on the 8th of November -- when you were talking

24   to him on the 9th of December -- or sorry -- 9th of

25   November -- let's look at Exhibit 56, page 30.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023          115

1          And it says "Two rounds in the gun found
2   on the dresser.  Rounds were in the magazine."  So
3   they weren't loose.  They were inside the magazine;
4   right?
5          A.   According to my notes, yes.
6          Q.   So, then, I'm trying to just understand
7   why the rounds were found in the magazine -- well,
8   let me ask it this way -- or actually a different
9   question.
10          There are two rounds in the gun found on
11   the dresser.  Rounds are in the magazine, which
12   suggests to me that there are two rounds still in
13   the magazine on the dresser.  Is that a fair
14   reading?
15          A.   I think so, yes.
16          Q.   And then it says "Rounds on a table in the
17   front room."  Is that what that says?
18          A.   Yes.
19          Q.   And do you know what that's referring
20   to? because it suggests that you're referring to
21   different rounds that were found not on the dresser
22   but somewhere else.
23          A.   Yes.  According to my notes.
24          Q.   All right.  So in addition to the two
25   rounds in the gun, there were additional rounds on a

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1  table in the front room?

2       A.   According to my notes.

3       Q.   And so did you recover all of the rounds

4  or just the two found in the magazine?

5       A.   From my notes, just the two.  I do not

6  recall any additional information from memory.

7       Q.   Is there a reason why you didn't inventory

8  the magazine with the rounds?

9       A.   If memory serves me correct, Floyd

10 Bledsoe, Sr., brought the gun to Mike Hayes, and

11 I assume that it didn't have the magazine or the

12 two -- two rounds in it, but that's just from

13 memory.

14      Q.   Right.  That's what I was asking.  Is

15 there a reason -- if the gun didn't have the

16 magazine or the bullets in it, is there a reason why

17 you didn't obtain the magazine from Floyd L. Bledsoe

18 along with the two rounds?

19      A.   I don't recall.

20      Q.   All right.  Is there a reason why you

21 didn't recover the other rounds that were on a table

22 in the front room?

23      A.   I don't recall.

24      Q.   There's a reference to "Tom was having a

25 hard time dealing with his grandmother's death."

8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500                               Fax (913) 825-2530
www.cornerstonekc.net        Cornerstone        office@cornerstonekc.net
                             Court Reporting Company LLC

1    Was that Floyd L. Bledsoe telling you this?

2         A.   Yes.   I'm relatively sure of that.

3         Q.   And was Floyd L. Bledsoe telling you that

4    "Tom was having a hard time dealing with his

5    grandmother's death" as a means of explaining why he

6    might have, you know, committed this crime?

7         A.   I have no idea.

8         Q.   Well, like, that's my question to you.  Do

9    you have any explanation for why -- how this came up

10   that Floyd, Sr., told you, "Tom was having a hard

11   time dealing with his grandmother's death"?

12        A.   He would have had to volunteer the

13   information, because I wouldn't have had knowledge

14   of the grandmother's death otherwise, to the best of

15   my knowledge.

16        Q.   All right.  And so can -- you know, as an

17   investigator, does that suggest that Tom -- that

18   Floyd, Sr., is trying to give an explanation for why

19   Tom might have done something?

20             MR. QUALSETH:   Object to the form.

21             MR. TURNER:   Join.

22             MR. LINDEN:   Join.

23        A.   Not necessarily.  It could have been

24   factual information.

25        Q.   (By Mr. Ainsworth)  Well, how would it be

 1   relevant if it didn't have any explan- -- any

 2   relation to Tom, you know, committing this crime?

 3           MR. QUALSETH:  Object to the form.

 4       A.   You would have to ask Floyd Bledsoe, Sr.,

 5   that question, sir.  I don't know.

 6       Q.   (By Mr. Ainsworth)  All right.  And you

 7   were there when he told you this; right?

 8       A.   Yes.

 9       Q.   So did you ask him why he was telling you

10   that?

11       A.   I have no memory of that.

12       Q.   All right.  Did you want to know why he

13   was telling you that, you know, his son, who had

14   just turned himself in for the murder of a

15   14-year-old girl, was having a hard time dealing

16   with his grandmother's death?

17       A.   I didn't put it in my notes; so I must not

18   have asked that question.

19       Q.   Would you want to know now why Floyd, Sr.,

20   was saying that "Tom was having a hard time dealing

21   with his grandmother's death"?

22       A.   Looking back, yes, it could have been a

23   relevant question.

24       Q.   All right.  And then we have the evidence

25   custody receipt.  Is there a place where you're

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1    supposed to list on the evidence custody receipt
 2    where the evidence was obtained?
 3        A.   You can write it in -- in under "Exhibit
 4    Description."
 5        Q.   All right.  Is there a reason why you
 6    didn't, you know, take a look around Floyd L. --
 7    Floyd L. Bledsoe's house while you were there to see
 8    if there was any evidence to recover?
 9        A.   As I said, I wasn't involved in the
10    overall searches, which was done primarily by the
11    sheriff's department.  This was a lead assignment,
12    and I would have to see what the lead assignment
13    said, as far as what I was supposed to do, to
14    clarify.
15        Q.   All right.  And so this is -- looking back
16    at the first page of -- sorry -- not the first page
17    but page 30 of Exhibit 56.  This is Lead No. 35;
18    right?
19        A.   Yes.
20        Q.   All right.  Let's jump ahead to page --
21    well, this is the typed "Lead Sheet."
22             So I'm trying to find you -- let me -- let
23    me show you page 94 of Exhibit 56.  And there's a
24    reference to Lead "35, Floyd L. Bledsoe, Subject's
25    father, Morgan/Woods."  Do you see that?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                120

1        A.   I do.

2        Q.   Is there a different place that we should

3   look to find out what the lead is that you're

4   referring to here -- or that you're tracking down?

5        A.   I don't know for sure, but I assume it

6   would be the same information pertaining to Lead 35.

7        Q.   I don't know what you mean by that.  I'm

8   sorry.  I guess I'm saying is there another place

9   where there's a log sheet that has more detailed

10  information about what each lead is?

11       A.   Not that I have.

12       Q.   All right.  And so is this what you were

13  looking to reference in order to see what the lead

14  was?

15       A.   Yes.

16       Q.   Okay.  All right.  And so after having

17  obtained consent to search from Floyd L. Bledsoe,

18  you actually went to Floyd L. Bledsoe's house not to

19  conduct a search but to have Floyd L. Bledsoe give

20  you two rounds and receive them and then leave;

21  right?

22       A.   Yes.

23       Q.   Did anyone tell you, "Don't search

24  Floyd L. Bledsoe's house"?

25       A.   No.  Not to the best of my memory, no.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          Q.   Did you have any meetings about whether

2     you should search Floyd L. Bledsoe's house?

3          A.   I don't recall.

4          Q.   Did you have meetings about, you know,

5     what to do next?

6          A.   Additional lead assignments were made, as

7     you can see by the "Lead Sheet."

8          Q.   Did you observe any of the interrogations

9     or interviews that were conducted at the law

10    enforcement center?

11         A.   My own or that I participated in.

12         Q.   I mean, did you observe anyone else's, you

13    know, where you were watching while the interview or

14    interrogation was being conducted by other officers?

15         A.   No.  And as you can tell by the -- my

16    reports, I was very busy during that time period

17    outside the law enforcement center.

18         Q.   What time period?

19         A.   During the dates of the investigation that

20    I was involved in.

21         Q.   What were you doing on November 12th, the

22    day that the polygraph exams were administered, Tom

23    was released, and Floyd was arrested?

24         A.   I don't recall, unless there's a report

25    documenting my investigative activities on the 12th.

1     Q.   Yeah, I've got, you know, a list of all

2 your reports, and there's nothing from you on

3 November 12th.

4     A.   I was probably back --

5     Q.   Do you know why that is?

6     A.   -- probably back at the Overland Park

7 office, possibly typing reports.  I don't remember.

8     Q.   All right.  I thought you said you were

9 really busy during the time that the interviews were

10 being conducted.

11     A.   I was.  In Jefferson County.

12     Q.   And what were you busy doing?

13     A.   Doing investigations, interviews, as you

14 can see by my reports.

15     Q.   So what interviews were you conducting on

16 November 12th, when the interviews were being

17 conducted?

18     A.   You just said that you found no indication

19 that I was active in Jefferson County; so I must

20 have been outside the county during that date.

21     Q.   All right.  So you -- on the day of the --

22 you know, the polygraph exams and the interview of

23 Floyd Bledsoe that led to his arrest and

24 prosecution, you weren't busy that day; is that what

25 you're saying?

 1              MR. QUALSETH:  Object to the form.

 2              MR. TURNER:  Join.

 3              MR. LINDEN:  Join.

 4         A.    Unless there's an indication otherwise, I

 5    don't think I was at the law enforcement center on

 6    that date, and I would not have been in -- in the

 7    room during the polygraphs.  That's not the way it

 8    works.

 9         Q.    (By Mr. Ainsworth)  All right.  And so,

10    when you guys met as a group, you would talk about

11    what leads needed to be assigned; right?

12              MR. TURNER:  Object to form.

13              MR. LINDEN:  Join.

14         A.    We would be given our lead assignments,

15    and they're --

16         Q.    (By Mr. Ainsworth)  Right.  By Carreno and

17    Woods; right?

18              MR. TURNER:  Object to form.

19         A.    To the best of my memory, yes.  They were

20    the lead investigators on the case.

21         Q.    (By Mr. Ainsworth)  And you would share

22    information with each other about what you learned

23    in the investigation thus far; right?

24              MR. TURNER:  Object to form.

25              MR. LINDEN:  Join.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1        A.    I believe so.

2        Q.    (By Mr. Ainsworth)  And so you talked

3    about, you know, the fact that you guys now thought

4    that Floyd was implicated in the case -- or was your

5    suspect in the case and not Tom --

6        A.    I --

7        Q.    -- is that right?

8        A.    I --

9              MR. QUALSETH:  Object to the form.

10             MR. TURNER:  Join.

11             MR. LINDEN:  Join.

12       A.    I don't recall that specifically.

13       Q.    (By Mr. Ainsworth)  Well, tell us,

14   Mr. Morgan, why was Tom no longer a suspect and

15   Floyd became the suspect?

16             MR. QUALSETH:  Object to the form.

17             MR. TURNER:  Join.

18             MR. LINDEN:  Join.

19       A.    I do not recall being involved in those

20   conversations.

21       Q.    (By Mr. Ainsworth)  So you're saying, as

22   you sit here today, you have no memory of why the

23   charges against Tom were dropped and charges were

24   instead put on Floyd; is that right?

25       A.    That is correct.  I have no specific

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023          125

1    memory of why that occurred.

2         Q.   As you sit here today looking back over

3    the case file, does it seem a little odd to you

4    that, you know, the charges were dismissed against

5    Tom and brought against Floyd instead?

6              MR. LINDEN:   Object to form.

7              MR. TURNER:   Join.

8         A.   Sir, that was up to the county attorney.

9    I had no involvement in that.

10        Q.   (By Mr. Ainsworth)  Oh, I didn't ask if

11   you had involvement or whose responsibility it was.

12   I just mean, you know, you, with your over 30 years

13   of law enforcement experience, when you have one

14   person turning himself in after having left messages

15   with his -- you know, somebody from his church,

16   saying he's going to have to live with what he did

17   for the rest of his life and that he can't -- he

18   wished he could go back and take it back, but he

19   can't, he then leads police to where a 14-year-old

20   girl has been killed, communicating to them, before

21   her body is recovered, that she was shot in the

22   head, provides his own gun to the police, which was

23   the murder weapon --

24             MR. LINDEN:   How about --

25        Q.   (By Mr. Ainsworth)  -- do you think it's

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    odd that that person, within a week, is released,

2    and his brother is then charged?

3             MR. QUALSETH:  Object to the form.

4             MR. LINDEN:  Object to form.

5             MR. QUALSETH:  If you're done with your

6    question.

7         A.   Sir, I don't recall what I was thinking

8    back then, to be honest with you.

9         Q.   (By Mr. Ainsworth)  Yeah, that's fair.  I

10   don't expect you to recall what you were thinking

11   back then.  I'm talking now, because now you've got

12   over 30 years of law enforcement experience.  You've

13   got perspective.  You've got experience.  You've

14   seen so many different kinds of cases.

15            And I'm saying now, if you're looking back

16   over this case file, does it seem odd to you that,

17   when you have Tom Bledsoe come to police, turn

18   himself in after having told the -- his -- the

19   friend from church in two voice mails that he's

20   going to have to live with what he did for the rest

21   of his life and that he wishes he could go back but

22   he can't, shows the police where the 14-year-old

23   girl is buried, communicates to them that he had

24   involvement and that he knew that she was shot in

25   the head, before her body was recovered, provides

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    them with his gun, which was the murder weapon --

2    does it seem odd to you that he's then released from

3    custody within a week, and his brother is instead

4    charged with the crime?

5              MR. QUALSETH:  Object to the form.

6              MR. TURNER:  Join.

7              MR. LINDEN:  Join.

8         A.   I don't know if I would say it was odd.

9    It was important information.

10        Q.   (By Mr. Ainsworth)  What was important

11   information?

12        A.   What you just told me.

13        Q.   Yeah, that is.  But was it odd that he was

14   released within a week?

15        A.   Sir, I'm not an attorney.  I didn't know

16   the reasons he was released.

17        Q.   Well, was there ever probable cause to

18   prosecute Floyd Bledsoe for -- or arrest or

19   prosecute Floyd Bledsoe for this crime?

20             MR. QUALSETH:  Object to the form.

21             MR. LINDEN:  Join.

22             MR. TURNER:  Join.

23        A.   I don't feel that I'm qualified to answer

24   that.

25        Q.   (By Mr. Ainsworth)  So you don't know one

8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500                              Fax (913) 825-2530
www.cornerstonekc.net        Cornerstone        office@cornerstonekc.net
                             Court Reporting Company LLC

1   way or the other whether there's probable cause to

2   arrest Floyd S. Bledsoe; right?

3       A.   As I told you, I'm not an attorney.

4       Q.   All right.  Well, as a police officer, you

5   would make arrests; right?

6       A.   Yes.

7       Q.   And you were -- you knew that, as a police

8   officer, you could only arrest somebody if you had

9   probable cause; right?

10           MR. TURNER:  Object to form.

11           MR. LINDEN:  Join.

12      A.   Yes.

13      Q.   (By Mr. Ainsworth)  So as a police

14  officer, on almost a daily basis or certainly

15  weekly, you would make a determination whether

16  there's sufficient probable cause to allow you to

17  arrest somebody; right?

18           MR. TURNER:  Object to form.

19           MR. QUALSETH:  Object to the form.

20           MR. LINDEN:  Join.

21      A.   I did not make weekly arrests.  Sometimes

22  an investigation could take a month or months before

23  an arrest.

24      Q.   (By Mr. Ainsworth)  Okay.  All right.

25  But, in your career, you made a lot of arrests;

8700 Monrovia, Suite 310          (913) 825-2510
Lenexa, Kansas 66215-3500         **Cornerstone**          Fax (913) 825-2530
www.cornerstonekc.net             Court Reporting Company LLC    office@cornerstonekc.net

```
 1   right?
 2        A.   Correct.
 3        Q.   You were a good police officer; right?
 4             MR. TURNER:  Object to form.
 5        A.   I'd like to think so, yes.  I tried.
 6        Q.   (By Mr. Ainsworth)  You were -- you did
 7   your best at your job; right?
 8        A.   The best to my ability.
 9        Q.   You were productive; right?
10        A.   Yes.
11        Q.   And so on countless occasions you had to
12   determine whether there was probable cause to arrest
13   a particular person; right?
14        A.   That would -- evidence would have been
15   submitted to the district attorney or county
16   attorney for probable cause for arrest.
17        Q.   So in each and every arrest you made, you
18   always got prior approval from the county
19   attorney --
20        A.   No.
21        Q.   -- as to whether there was probable cause?
22             "No."
23        A.   No.
24        Q.   Sometimes you would make the call
25   yourself; right?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023          130

1        A.    Yes.  As a trooper, for example, for

2   driving under the influence, I would make the call

3   for the arrest at that time.

4        Q.    All right.  Was there probable cause to

5   arrest Tom Bledsoe when he came to the law

6   enforcement center to turn himself in after leaving

7   messages saying he's going to have to live with what

8   he did for the rest of his life; he wishes he could

9   turn back time, and -- but he can't, and bringing

10  his own gun, which is the murder weapon, and showing

11  investigators where the 14-year-old girl was buried,

12  having communicated to them that he had involvement

13  and that she had a bullet in her head and that she

14  was buried behind his house?

15       A.    I don't know.

16       Q.    Is there probable cause to arrest some- --

17  you don't -- so you don't know if that's probable

18  cause --

19       A.    No.

20       Q.    -- right?

21       A.    I don't.  I'm not an attorney.  That would

22  have been up to the county attorney.

23       Q.    Do you think investigators should have

24  searched Tom's -- the house in which Tom lived

25  before he was released from custody on

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   February 12th, 1990- -- sorry.  I got February in

2   the brain.  Strike that.

3            Do you think investigators should have

4   searched the house in which Tom lived before Tom was

5   released from custody on November 12th, 1999?

6            MR. TURNER:  Object to form.

7       A.   I don't know if anyone received

8   information indicating that there was evidence in

9   the house.  I am not aware of that.

10      Q.   (By Mr. Ainsworth)  Are you saying that

11  you -- that investigators should not have searched

12  the house --

13      A.   No.

14      Q.   -- the house in which Tom lived?

15      A.   I did not say that.

16      Q.   Then, answer my question.  My question is

17  simply should investigators have searched the house

18  in which Tom lived before Tom was released from

19  custody on November 12th, 1999?

20           MR. TURNER:  Object to the form.

21           MR. QUALSETH:  Object -- object to the

22  form.  I think --

23           MR. LINDEN:  Join.

24           MR. QUALSETH:  I think he answered your

25  question.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.com

1           But go ahead.

2       A.   Again, I don't have sufficient information

3   to make that determination.

4       Q.   (By Mr. Ainsworth)  Well, what more

5   information would you need to determine whether the

6   house of a murder suspect, who has just led

7   investigators to the -- a 14-year-old girl whose

8   body was buried behind the house --

9           MR. QUALSETH:  Object to the form.

10      Q.   (By Mr. Ainsworth)  What more information

11  would you need?

12          MR. TURNER:  Join.

13          MR. LINDEN:  Join.

14      A.   Factual information.

15      Q.   (By Mr. Ainsworth)  Well, how about this:

16  Do you think that a search of the house in which Tom

17  lived might show blood on some of Tom's clothing?

18      A.   I have no information, or I do not recall

19  there being information to indicate that, but other

20  members that were involved in the investigation

21  could have had that information, but I'm not aware

22  of it.

23      Q.   Well, I just want to be really clear here.

24  Sir, as an investigator with over 30 years of

25  experience, do you think that you might have found

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023          133

```
 1   clothing with blood on it inside Tom's room?
 2           MR. TURNER:  Object to the form.
 3      A.   I mean, if you're saying that was a
 4   possibility, sure, but as I said, I have no
 5   information to indicate there was evidence of that,
 6   to the best of my memory.
 7      Q.   (By Mr. Ainsworth)  Would you want to know
 8   if there is any clothing with blood on it inside the
 9   house in which Tom lived before Tom was released
10   from jail on November 12th?
11           MR. TURNER:  Object to the form.
12           MR. QUALSETH:  Object to the form.
13           MR. LINDEN:  Join.
14      A.   If there had been probable cause, yes.
15      Q.   (By Mr. Ainsworth)  All right.  Or
16   consent; right?
17      A.   Yes.
18      Q.   And so, if you had consent, you could go
19   into the house in which Tom lived and take a look
20   and see if there was any clothing that had blood on
21   it that might link Tom to the crime; right?
22      A.   As an assisting agent, if I was instructed
23   to do that via lead, yes.
24      Q.   And if you're the case agent, you would
25   definitely make sure that somebody searched the
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   house in which Tom lived before Tom was released

2   from custody; right?

3              MR. QUALSETH:  Object to the form.

4              MR. TURNER:  Join.

5              MR. LINDEN:  Join.

6        A.   That's a question for Jim Woods.

7        Q.   (By Mr. Ainsworth)  Well, no.  I'm -- I'm

8   asking you.  If you were -- it's a hypothetical.

9   You know, if you were the case agent, would you

10  want -- (inaudible) -- Tom's room to see if there

11  was any bloody clothing inside that room?

12             MR. QUALSETH:  I think you cut off,

13  Russell.  Can you repeat the question.

14       Q.   (By Mr. Ainsworth)  Sure.  If you were the

15  case agent, would you want to search Tom's room

16  before -- to see if there's any bloody clothing in

17  it before Tom was released from jail on

18  November 12th?

19             MR. TURNER:  Object to the form.

20             MR. QUALSETH:  Same objection.

21             MR. LINDEN:  Join.

22       A.   Again, it would be based on the

23  information that I had at the time and probable

24  cause.

25       Q.   (By Mr. Ainsworth)  Why are you saying

1    "probable cause"?  You got the consent.  You talked

2    to Floyd L. Bledsoe and got consent to search Tom's

3    house; right?

4         A.   That's correct.  I --

5         Q.   Okay.  So let's -- you don't need probable

6    cause; right?

7         A.   I would not do that without the consent of

8    the lead investigators.

9         Q.   Right.  Okay.  Fine.  I'm not asking you

10   what you did as the assistant.  I'm asking you --

11   well, let me -- let me put it this way, because

12   I'll -- you know, I'm going to get an answer.

13        Sir --

14        MR. QUALSETH:  I think you've gotten an

15   answer.  You just don't like it.

16        Q.   (By Mr. Ainsworth)  Would you -- is there

17   any reason not to search Tom's room to see if

18   there's any bloody clothing in it before Tom is

19   released from jail on November 12th?

20        MR. TURNER:  Object to the form.

21        A.   Sir, again, I was not in the position to

22   make that decision.

23        Q.   (By Mr. Ainsworth)  I didn't ask you if

24   you were making that decision.  That would be a

25   perfectly fine answer if I asked you, "Were you" --

1    "were you the one who made the decision?"

2              That's not my question, sir.  I'm saying

3    do you know of any reason not to search Tom's room

4    for bloody clothing or any other trace evidence

5    before Tom is released from prison -- or jail on

6    November 12th?

7              MR. TURNER:  Object to the form.

8         A.   I don't recall.

9         Q.   (By Mr. Ainsworth)  Okay.  So you don't --

10   so there may have been a reason not to search it;

11   you just don't remember now; right?

12        A.   Or I was not aware of it at the time.

13        Q.   Okay.  Based on what you know now -- all

14   right? -- is there any reason not to search Tom's

15   room before November 12th?

16        A.   I just don't recall.  And I'm being

17   honest --

18        Q.   Right.  No.

19        A.   -- with you.

20        Q.   I'm not asking you what you remember then.

21   I just -- you know, the stuff you've seen today and

22   in preparation for this deposition, the stuff of

23   which you do recall, the -- the things you know, is

24   there any reason, from your review of those

25   materials, not to search Tom's room for any blood or

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   trace evidence before Tom is released on

2   November 12th?

3           MR. TURNER:  Object to the form.

4       A.   Floyd Bledsoe, Sr., give consent to a

5   search of his property, and I relayed that

6   information back to the lead investigators.  That's

7   all I can tell you.

8       Q.   (By Mr. Ainsworth)  No, that's not, sir.

9   Because we're going to do this at trial, and so I

10  want to know now what you're going to say to these

11  questions.

12          And my question is, sir, was there any

13  reason not to -- because maybe there was a reason.

14  Maybe, you know, you had video of the inside of

15  Tom's room.  Maybe you had some other means of

16  searching Tom's room, and it had been done.

17          So I just want to know:  Was there any

18  reason not to search Tom's room before Tom was

19  released from jail on November 12th?

20          MR. TURNER:  Object to the form.

21      A.   And, sir, again, I don't recall.

22      Q.   (By Mr. Ainsworth)  Well, I'm not asking

23  you if you recall.  I'm asking you, based on what

24  you know now, you know, was there any -- you know,

25  because you can say there may be a reason.  Sure, I

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   grant you there might be a reason.  I'm trying to

2   find out if you know of a reason.  Okay?

3          So is there any reason that you know of

4   that you -- that -- why you shouldn't search Tom's

5   room for trace evidence or blood evidence before Tom

6   was released on November 12th?

7          MR. TURNER:  Object to the form.

8      A.   Not that I'm aware of.

9      Q.   (By Mr. Ainsworth)  All right.  And so as

10  a experienced homicide investigator, in this case,

11  based on what you know, would it have been a good

12  idea to search Tom's room for blood or trace

13  evidence before Tom was released on November 12th?

14         MR. TURNER:  Object to the form.

15     A.   It could have been, but that was not my

16  decision.

17     Q.   (By Mr. Ainsworth)  Understand it was not

18  your decision.  You say, "It could have been."  Why

19  do you -- why do you say, "It could have been,"

20  rather than, "Yes, as an experienced homicide

21  investigator, I would like to know whether there's

22  any blood or trace evidence in the" -- "in our

23  suspect's home before he's released from jail"?

24     A.   That's a logical point of view, but,

25  again, I don't recall any information in regards to

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                139

1    that situation.  I don't know why they didn't search
2    the room.
3         Q.   Right.  Why do you say it's "a logical
4    point of view"?
5         A.   Because it's possible there could have
6    been evidence in the room, but it's also possible
7    there was no evidence in the room.  I don't know.
8         Q.   Right.  The only way to know would be to
9    go and look; right?
10        A.   Yes.
11        Q.   All right.  Is there any reason not to --
12   based on what you know now, is there any reason not
13   to search Tom's truck before he's released from jail
14   on November 12th?
15             MR. TURNER:  Object to the form.
16        A.   Not to the best of my knowledge or memory.
17        Q.   (By Mr. Ainsworth)  Okay.  And you knew
18   that the victim had to be transported from her home
19   to the site where she was buried; right?
20        A.   Yes.  By some means.
21        Q.   And, you know, the most logical means
22   would be your suspect's truck; right?
23             MR. QUALSETH:  Object to the form.
24             MR. TURNER:  Join.
25             MR. LINDEN:  Join.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          A.   I don't know how she was transported.

2          Q.   (By Mr. Ainsworth)  Right.  You don't know

3    how; so, as a police officer, you have to play the

4    angles, see what the possibilities are; right?

5               MR. TURNER:  Object to the form.

6          A.   I know that she had to have been

7    transported.  I can tell you that.  But I don't know

8    how.

9          Q.   (By Mr. Ainsworth)  Yeah.  Right.  And so

10   because you didn't know how, you wanted to find out

11   how she was transported; right?

12         A.   Well, I'm sure it crossed my mind, but

13   that wasn't one of my lead assignments, or that

14   wasn't my job at the time.

15         Q.   Right.  But I'm not asking you was it

16   your -- your job, because we'll -- we can agree that

17   nobody searched Tom's truck; right?

18         A.   To the best of my memory, no.

19         Q.   That's correct?  Nobody searched it?

20         A.   To the best of my memory, I -- I do not --

21   I was not involved in a search of the truck -- I

22   will put it that way -- if it was searched.

23         Q.   And nobody -- and nobody told you they

24   searched Tom's truck; right?

25         A.   Not to the best of my memory.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                     141

1          Q.   Okay.  And if you had searched Tom's

2     truck, then that should have been documented; right?

3          A.   If I had searched Tom's truck, yes, I

4     would have documented it.

5          Q.   Okay.  And if -- and you would expect if

6     another -- another officer had searched Tom's truck,

7     they would have documented it; right?

8          A.   Yes.

9          Q.   All right.  And so we can also agree that

10    you were not assigned to search Tom's truck; right?

11         A.   Yes.

12         Q.   And so can we also agree that it would

13    have been a good idea for someone to have searched

14    Tom's truck, before he was released on

15    November 12th, to see if maybe that was the means

16    that your 14-year-old victim was transported from

17    her home to the ditch where she was buried after

18    being shot four times?

19              MR. TURNER:  Object to the form.

20              MR. LINDEN:  Join.

21         A.   Yes.  But, again, I don't have any

22    information as to whether the truck was searched or

23    not that I --

24         Q.   (By Mr. Ainsworth)  Right.

25         A.   -- can recall.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          Q.    Sure.   Let's turn to Exhibit 56 again, and

2     I want to go back to page 9.

3               MR. QUALSETH:   Russell, can we take a

4     break?

5               MR. AINSWORTH:   Say again.

6               MR. QUALSETH:   Mr. Morgan would like to

7     take a break.

8               MR. AINSWORTH:   Oh, you'd like a break?

9     Sure.

10              THE WITNESS:   Five-minute break?   That be

11    okay?

12              MR. AINSWORTH:   Of course, yes.

13    Absolutely.   And thank you for alerting me.

14              THE WITNESS:   Thank you.

15              MR. AINSWORTH:   And, Mr. Morgan, anytime

16    you need it, don't be shy.   You know, we can stop

17    every half-hour.   I have a bad back.   It -- it's

18    okay.

19              THE WITNESS:   Thank you, sir.

20              THE REPORTER:   We'll be off the record at

21    2:08 p.m.

22              (A recess was taken.)

23              THE REPORTER:   We are back on the record

24    at 2:12 p.m.

25          Q.   (By Mr. Ainsworth)   All right, sir.   I'm

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   going to show you, again, Exhibit 56 and direct you

2   to page 13 of 56.  This is -- this appears to be

3   your handwriting; is that right?

4        A.   That's correct.

5        Q.   And it -- this is -- documents an

6   interview that you conducted with Shane Gatewood on

7   November 8, 1999; is that right?

8        A.   Yes, sir.

9        Q.   All right.  In this -- this is -- just to

10  orient you as to who this person is, I believe this

11  was Tom's employer.  Is that right?

12       A.   Yes.  Or supervisor.

13       Q.   Yeah.  And the supervisor told you that on

14  November 5th, between 2:00 and 3:00 o'clock, Tom

15  came in and picked up his paycheck.  He was driving

16  a black Mazda pickup truck.  Let me just scroll over

17  to the side.  And it says "Will be on videotape.

18  Gatewood will hold tape."  Do you see that?

19       A.   I do.

20       Q.   And that was a smart investigative

21  question by yourself to find out if Tom could be

22  on -- captured on video -- your suspect -- at --

23  picking up his check because then that would allow

24  you to determine exactly when he was at that

25  location on Friday, the day that the victim was

1    abducted; right?

2         A.   Yes.  If the date and time stamp was

3    correct, that is correct.

4         Q.   Sure.  And so somebody should have picked

5    up the tape -- the videotape from Gatewood to

6    establish exactly when Tom was at the -- at his

7    employer, picking up his paycheck; right?

8         A.   If it was not picked up, yes.

9         Q.   Okay.  And I take it you were not assigned

10   the lead to pick up the videotape, or was that

11   your responsibility?

12        A.   No.  I was -- I'd have to go back and look

13   at the lead, but I think I was assigned to contact

14   his employer in reference to the date of

15   November 5th, 1999.

16        Q.   And so is that how it would work?  You

17   would just look at the -- you would get the lead and

18   then -- how would you -- how would you indicate that

19   there's another step to be done to pick up the

20   videotape?

21        A.   Should have been in the report.

22        Q.   Okay.  So let me show you -- actually,

23   we'll call this Exhibit 68.

24             All right.  What we've marked as

25   Exhibit 68 is a two-page document Bates numbered

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company llc

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                    145

```
1   KBI Subpoena 805 and '806.  And so this is your
2   report, sir; is that correct?
3        A.   Yes.
4        Q.   Dated November 8, 1999; right?
5        A.   Yes, sir.
6        Q.   So Exhibit 68's a summary of your
7   interview with Shane Gatewood; is that right?
8        A.   Yes.  By telephone.
9        Q.   Okay.  All right.  And it says that
10  "Gatewood thought that Tom Bledsoe might have been
11  videotaped on November 5th.  He is going to check
12  and will hold the videotape for criminal
13  investigation use, if Tom is found to be on the
14  tape.  Senior Special Agent Morgan advised Gatewood
15  that either himself or Senior Special Agent Woods
16  will" -- "would recontact him in the near future";
17  right?
18       A.   Yes, that's what it reads.
19       Q.   And so you learned that Tom might be on
20  the videotape, and you needed to follow up with --
21  or either you or Woods needed to follow up with
22  Gatewood to find out if Tom was on the video; right?
23       A.   Yes.
24       Q.   And if Tom was not on the video, according
25  to Gatewood, then that's something that should be
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1   documented; right?
 2        A.   Well, after -- after review of the video,
 3   yes.
 4        Q.   Right.  So you would get the video
 5   regardless so you could check for yourself whether
 6   it shows Tom on it; right?
 7        A.   Yes.
 8        Q.   And then you would document -- if he was
 9   there, you would document that, and if he wasn't
10   there, you would document that he wasn't there;
11   correct?
12        A.   Yes.
13        Q.   All right.  Going back to Exhibit 56, you
14   talked to a number of people who had contact with
15   Floyd S. Bledsoe over the weekend that Camille
16   was -- had gone missing; correct?
17        A.   Yes.  I interviewed witnesses.
18        Q.   And they told you that Floyd was talking
19   to them and stating that he was trying to find his
20   sister-in-law; is that right?
21        A.   If that's in a report, yes.
22        Q.   Well, I wanted to show you this from
23   Exhibit 56.  I think we looked at this "Consent To
24   Search" form previously.
25        A.   We did.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1      Q.   This is page 23 of Exhibit 56.  And then

2  going on to the next page, page 24, it says -- it

3  says "Form For Consent To Search."  What is this

4  document?  Do you know?

5      A.   It's a "Form For Consent To Search."  It's

6  self-explanatory.

7      Q.   All right.  It says -- where it says

8  "Location," it says "11477 Osage Road, area north of

9  house in brome field."

10     A.   Sir, that's not --

11     Q.   Do you see that?

12     A.   That's my -- that's not my writing.  I see

13  that, yes.

14     Q.   Oh, that's not your writing?

15     A.   No.

16     Q.   Okay.

17     A.   I did not prepare that.

18     Q.   All right.  Oh, I see.  I think this is

19  the consent that was obtained the night the body was

20  recovered.  My apologies, sir.

21          All right.  Showing you page 33 of

22  Exhibit 56.

23     A.   It's upside down.

24     Q.   I know.  I'm -- I got to fix that.  Hang

25  on.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1            Okay.  Is this your handwriting, sir?

2       A.   It is.

3       Q.   This appears to be field notes of an

4   interview with a Dick Stephens on November 9th,

5   1999; is that right?

6       A.   Yes.

7       Q.   And Mr. Stephens told you that he saw

8   Floyd S. Bledsoe talking to him about filling a well

9   in on the previous Sunday; is that right?  Although

10  I got to tell you where it was.  See where it says

11  "November 7th" in the morning?

12      A.   Yes.

13      Q.   And Floyd talked to him about filling a

14  well in; right?

15      A.   Could you move the document a little bit

16  to the right, please.  Thank you.

17      Q.   My apologies.

18      A.   Yes.

19      Q.   And Floyd said "to send Gary the bill,"

20  referring to Gary Bledsoe; is that right?

21      A.   I assume so, yes.

22      Q.   And then, according to Mr. Stephens, Floyd

23  was talking about his sister-in-law being missing.

24  She (inaudible) --

25            MR. QUALSETH:  I think you glitched out

```
 1   there, Russell.  Can you repeat the question.
 2        Q.   (By Mr. Ainsworth)  I'm sorry.  Did
 3   I screw it up?
 4            MR. QUALSETH:  Just -- it glitched out.
 5   We didn't hear the whole question.
 6        A.   Could you -- could you repeat the
 7   question.
 8        Q.   (By Mr. Ainsworth)  Of course.  And then,
 9   according to Mr. Stephens, Floyd S. Bledsoe started
10   talking about his sister-in-law being missing and
11   that she might have been seen in a black, 1990s
12   Trans Am; is that correct?
13        A.   Yes.
14        Q.   And that Floyd S. Bledsoe said he didn't
15   think police were doing enough about her being
16   missing --
17        A.   Yes.
18        Q.   -- right?
19            Okay.  Is there anything that Mr. Stephens
20   told you in your conversation with him that you
21   didn't document?
22        A.   Not to the best of my memory, no.
23   I always tried to take detailed notes.
24        Q.   Did you hear that Tom was saying that it
25   was actually Floyd who did the murder, but Floyd
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   told him about the murder and told him that if he

2   didn't -- that if he told anyone, he would -- Floyd

3   would reveal that -- you know, embarrassing things

4   about Tom?

5            MR. QUALSETH:  Object to the form.

6            MR. LINDEN:  Join.

7            MR. TURNER:  Join.

8        A.   It seems like someone mentioned that, yes.

9        Q.   (By Mr. Ainsworth)  Okay.  Did it seem odd

10   to you that if Floyd threatened somebody -- or

11   strike that.

12            Did it seem odd to you that if Floyd

13   threatened Tom not to tell and then Tom told but

14   said that he did it and not Floyd -- did that seem

15   odd to you as an investigator?

16            MR. QUALSETH:  Object to the form.

17       A.   Could you please restate the question,

18   please.

19       Q.   (By Mr. Ainsworth)  Of course.

20            So did it seem odd to you that, when

21   threatened by Floyd, you know, "Don't tell what I've

22   done, or else I'll reveal embarrassing facts about

23   you," Tom, the very next day, told police where the

24   body could be found, except he took the heat for it

25   rather than Floyd?

8700 Monrovia, Suite 310                                                        (913) 825-2510
Lenexa, Kansas 66215-3500                                                 Fax (913) 825-2530
www.cornerstonekc.net          Cornerstone          office@cornerstonekc.net
                               Court Reporting Company LLC

1           MR. TURNER:  Object to the form.

2           MR. LINDEN:  Join.

3       A.   I don't recall that at the time.

4       Q.   (By Mr. Ainsworth)  All right.  Okay.

5  So -- but I'm saying you -- I'm asking you now, you

6  know, looking back on things, if I told you that

7  Tom's story was that Floyd said, "I did the murder.

8  Don't tell anyone, or else I'm going to reveal

9  embarrassing facts about you," and then the next day

10  Tom, instead of keeping it to himself, told that the

11  murder happened, where the victim was, except said

12  that he's the one who -- or communicated that he's

13  the one who had involvement in it and hid Floyd's

14  involvement, does that make any sense to you?

15      A.   I mean, it would make sense if it was

16  based on factual evidence.

17      Q.   Well, what do you mean "It would make

18  sense if it was based on factual evidence"?

19      A.   If it was the truth.

20      Q.   Well, as an investigator, wouldn't it, you

21  know, occur to you that if Tom had been threatened

22  not to tell the secret that Floyd had, why would he

23  tell the secret that Floyd had?

24      A.   I don't know.

25      Q.   And as an investigator, you would want to

1    find out; right?

2         A.    Yes.  If I had received that information,

3    but I don't recall if I received that information.

4         Q.    Okay.  Let's take a look at Exhibit 56

5    again, page 55.

6              All right.  So on November 10th, you

7    wanted to search a 1969 Chevrolet pickup; right?

8         A.    Yes.  I asked for consent --

9         Q.    Why did you want to --

10        A.    -- to -- consent.

11        Q.    All right.  Why did you want to search a

12   1969 Chevrolet pickup?

13        A.    Because that's the vehicle that Floyd

14   Bledsoe, Jr., drove to the hardware store and back.

15        Q.    Okay.  So on November 10th, 1999, why did

16   you want to search Floyd S. Bledsoe's -- or the --

17   the truck that Floyd S. Bledsoe borrowed to go to

18   the hardware store?

19        A.    Because he had previously told us that he

20   had driven that truck.

21        Q.    And so why did you want to search the farm

22   truck?  Like, what made you think that the farm

23   truck would have had any evidence related to this

24   crime, when Tom Bledsoe was in jail and Tom Bledsoe

25   had provided the murder weapon and shown

1   investigators where the body was buried and -- and

2   communicated that she had been shot in the head,

3   before her body was discovered, and communicated

4   that he had involvement?

5            MR. QUALSETH:  Object to the form.

6       A.   You don't stop an investigation just

7   because a suspect's in jail.  You continue the

8   investigation.

9       Q.   (By Mr. Ainsworth)  Well, what -- what

10  suggests that Floyd had anything to do with this?

11      A.   He admitted that he was in the area

12  whenever she got off the school bus.

13      Q.   Well, he had a receipt at the hardware

14  store for 4:23, when she got off the bus at 4:20,

15  according to the school bus driver --

16           MR. TURNER:  Object to form.

17      Q.   (By Mr. Ainsworth)  -- so he -- he

18  couldn't have been there when she got off the bus;

19  right?

20           MR. QUALSETH:  Object to form.

21           MR. TURNER:  Join.

22           MR. LINDEN:  Join.

23      A.   We don't have a witness to when she got

24  off the bus except for the bus driver, and I wasn't

25  involved in that interview; so I can't answer your

Terry L. Morgan - 02/13/2023                    154

1    question.

2         Q.    (By Mr. Ainsworth)  So the only evidence

3    that you can think of to suggest that Floyd -- that

4    the farm truck Floyd borrowed might have something

5    to do with the crime is that Floyd passed the bus

6    while it was driving and then was at the hardware

7    store at 4:23, when the victim was being dropped off

8    at Floyd's house at 4:20; is that right?

9              MR. QUALSETH:  Object to the form.

10             MR. TURNER:  Join.

11             MR. LINDEN:  Join.

12        A.    As I previously stated, he himself said he

13   was in the area whenever she was dropped off from

14   the school bus.

15        Q.    (By Mr. Ainsworth)  When did he say that?

16        A.    When I inter- -- when he was interviewed.

17   When I interviewed him.

18        Q.    I -- I must have missed that.  I'm sorry.

19        A.    The route was not that far from his home.

20   It was in the -- the same vicinity.  In fact, he

21   said he was behind the school bus when she was going

22   home.

23        Q.    Right.  And then he went to the hardware

24   store; right?

25        A.    Well, that's according to him.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                    155

```
 1        Q.    Sure.  That's according to him.  But when
 2   you say, "according to his own statement" -- he
 3   didn't say he was in the vicinity of his home.  He
 4   said that he saw the school bus, and then he went to
 5   the hardware store.  And you were able to
 6   corroborate that by getting a receipt --
 7        A.    That's correct.
 8        Q.    -- showing that he truly was at the
 9   hardware store; right?
10        A.    That is correct.
11        Q.    All right.  So what about Floyd's
12   statements made you -- because you got to look at
13   the whole -- right? -- all of the facts in an
14   investigation; correct?
15        A.    Yes.
16        Q.    And so you have Floyd saying, "I saw the
17   school bus that my sister-in-law was on, and then
18   I went" -- "while it was driving, and then I went to
19   the hardware store."  And you corroborated that he
20   was at the hardware store.
21              And at the same time, you have Tom Bledsoe
22   in jail because he led investigators to where a
23   14-year-old girl had been murdered and buried behind
24   his house, shot in the head with his own gun, and he
25   acknowledged that she was shot in the head, before
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1   her body was recovered, and he admitted involvement.
 2           And so why did you suspect Floyd having
 3   anything to do with it?
 4           MR. QUALSETH:  Object to the form.
 5           MR. TURNER:  Join.
 6           MR. LINDEN:  Join.
 7       A.   Again, because he was in the vicinity
 8   whenever she got off the school bus.
 9       Q.   (By Mr. Ainsworth)  All right.  Did you
10   search every other person in that trailer park who
11   was in the vicinity of -- of, you know, Floyd S.
12   Bledsoe's trailer on the afternoon of November 5th?
13           MR. QUALSETH:  Object to the form.
14           MR. TURNER:  Join.
15           MR. LINDEN:  Join.
16       A.   I wasn't involved with the searches of
17   property.
18       Q.   (By Mr. Ainsworth)  Okay.  Well, you
19   were -- you got the consent from Floyd L. Bledsoe
20   and from Richard Zule; right?
21       A.   Yes.
22       Q.   Did you seek consent to search from, you
23   know, the neighbors of Floyd Bledsoe's trailer in
24   the trailer park?
25           MR. QUALSETH:  Object to the form.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          MR. TURNER:  Join.

2          MR. LINDEN:  Join.

3      A.   I did not, but I didn't, to the best of my

4  memory, contact the people in the trailers.  I did

5  interviews, but I don't know if there were -- those

6  were trailers.  I can't recall.

7      Q.   (By Mr. Ainsworth)  Okay.  Well, how about

8  the neighbors?  Whether or not they were trailers,

9  did you ask for consent to search from them?

10     A.   I don't recall.  I don't believe so, but I

11 don't -- I don't have any memory of that.

12     Q.   All right.  But we can -- fair to say that

13 the only reason to suspect Floyd is because he

14 said -- you know, according to his statement, he was

15 in the vicinity of the area when the 14-year-old

16 girl was dropped off by the school bus; right?

17         MR. QUALSETH:  Object to the form.

18         MR. TURNER:  Join.

19         MR. LINDEN:  Join.

20     A.   Well, and the fact that she lived with him

21 and his wife.

22     Q.   (By Mr. Ainsworth)  Okay.  Anything else?

23     A.   Not that I can recall.

24     Q.   And, again, if you knew other facts that

25 would lead you to suspect Floyd Bledsoe, those would

Terry L. Morgan - 02/13/2023          158

1   have been documented; correct?

2       A.   That is correct.  I had no reason not to.

3       Q.   All right.  Going back to page 54 of

4   Exhibit 56 -- I'm sorry.  I should really, just to

5   be fair, like, let you know what this is by going

6   back to page 51.

7            These are your notes of an interview with

8   Richard Zule on November 10th; right?

9       A.   Yes.

10      Q.   Okay.  And then -- so your notes of the

11  interview continue to page 54 of Exhibit 56.  And he

12  heard no screams or gunshots; right?

13      A.   That's what it says.

14      Q.   And just to be clear -- well, we'll get --

15  we'll get to that.

16           Let me show you that same exhibit, 56, on

17  page 57.  This is your interview with Sherri Zule.

18      A.   Okay.

19      Q.   Do you see that?

20      A.   I do.

21      Q.   Okay.  So turn to page 58 of the interview

22  with Sherri.  It says "Richard said milk was up

23  115 pounds that night (November 5th).  Cow gives

24  more milk the longer they go to be milked."

25      A.   Yes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1      Q.   You see that?

2      A.   I do.

3      Q.   All right.  And you -- is that you

4   starring it?

5      A.   Yes.

6      Q.   Why did you star it?

7      A.   Because it was up 115 pounds that night,

8   and she made the comment.  I thought it might be

9   important.

10      Q.   Okay.  Because it would suggest that

11   Floyd S. Bledsoe was not skimping on his duties

12   milking the cows; right?

13      A.   I don't know that.  I don't know, you

14   know, what -- the amount of milk that he got per

15   night -- or per day when he milked, but she -- she

16   volunteered that; so that's the reason that I

17   starred it.

18      Q.   Right.  You don't know how much milk he

19   got, but this suggests that Floyd was spending more

20   time milking the cows rather than less time because

21   they gave more milk than usual; right?

22      A.   Well, somebody was.  I can't -- whether --

23   recall whether he milked alone or Mr. Zule milked

24   with him, but somebody did.

25      Q.   Okay.  We can look back at Exhibit 56 for

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company llc

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    your interview with Mr. Zule.  Page 52, your

2    interview with Mr. Zule -- it says "Richard told

3    Floyd" -- "Richard told Floyd to check on cow that

4    5:10 p.m. hadn't calved.  He drove four-wheeler and

5    checked on the cow.  Still didn't have a calf.  He

6    got back around 6:10 p.m.  Floyd got cows and

7    started milking the cows.  Sherri went over around

8    7:15 and fed calves.  Usually take Floyd supper.

9    Sherri got back around 9:45 p.m.  Floyd was still

10   milking.  Floyd went to bed 10:30 p.m." --

11         A.   No.  "Richard went to bed."

12         Q.   Sorry.  "Richard went to bed 10:30 p.m."

13   And then the "Phone rang," and it was a report that

14   a "cow didn't have any milk."  And "Richard said he

15   would check her out in the morning."

16              All right.  So this indicates that Floyd

17   was milking the cows; right?

18         A.   Yes.

19         Q.   Not with Richard; right?

20         A.   Well, it doesn't say that.

21         Q.   Yeah, Richard never said he was milking

22   the cows with Floyd; correct?

23         A.   That's correct.

24         Q.   All right.  I want to move to page 62.

25   Police had a -- all right.  So this is your

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

 1    handwriting on page 62 of Exhibit 56; right?

 2         A.   It is.

 3         Q.   And this is a "Consent To Search" form; is

 4    that correct?

 5         A.   It is.

 6         Q.   And it's a "Consent To Search" form for

 7    the 80 acres just south of Wild Horse Road; right?

 8         A.   Yes.

 9         Q.   And that was because there was a colonel

10    who heard some screams out by Wild Horse Road on

11    that Friday, and police wanted to investigate;

12    right?

13         A.   To the best of my memory, yes.

14         Q.   Okay.  And so then, if we look at page 64,

15    these are interviews that you conducted with Dale

16    and Danielle Hawk; is that right?

17         A.   Yes.

18         Q.   And they reported that on November 6th,

19    that Saturday, "A Bledsoe in a green Nova stopped by

20    around 12:00, 12:30, asked if they heard anything on

21    Friday night, saw any cars.  Said he hoped they

22    found her alive, or he would have to hurt somebody.

23    Asked if the police had been out.  Dale said no.

24    Also asked if he could search their property."

25         A.   Yes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1        Q.   Do you see that?

2        A.   I do.

3        Q.   And Dale and Danielle lived by Wild

4   Horse -- or on Wild Horse Road; right?

5        A.   I believe so, but I'm not for sure.  I

6   would say they would have to be in the vicinity of

7   that.

8        Q.   Well, the address is 1030- --

9        A.   Right.

10       Q.   10365 Wild Horse Road; right?

11       A.   Yes.

12       Q.   So they reported that they lived on Wild

13   Horse Road; right?

14       A.   Yes.

15       Q.   You had no reason to doubt that; correct?

16       A.   No.

17       Q.   If you went to their house and it wasn't

18   Wild Horse Road, you know, you -- you would ask them

19   why they said they lived there, when they didn't

20   live there; right?

21       A.   Right.  I got the information from them;

22   so I think -- I believe that that is accurate, yes.

23       Q.   Okay.  So Floyd S. Bledsoe was trying to

24   see if anybody on Wild Horse Road had heard anything

25   or knew anything about the murder; right?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1        A.    Well, he asked --

2        Q.    About the --

3        A.    -- the Hawks --

4        Q.    -- (indiscernible)?

5        A.    Yes.

6              THE REPORTER:  I didn't get the end of the

7    question.

8        A.    I'm sorry.  I talked over you.  Could you

9    repeat the question, please.

10       Q.    (By Mr. Ainsworth)  I screwed up.

11   I shouldn't have -- I should have -- let me -- let

12   me withdraw it, because we'll turn to page 69 of

13   Exhibit 56.  This is your notes of an interviewed --

14   interview with Gerald Dunfield on 9872 Wild Horse

15   Road; right?

16       A.    Yes.

17       Q.    And so you were -- you were interviewing

18   people around Wild Horse Road; correct?

19       A.    Yes.

20       Q.    So let's turn to page 70 of Exhibit 56, an

21   interview with Leanna Grammer at 10215 Wild Horse

22   Road; right?

23       A.    Yes.

24       Q.    It says on "November 7th, Floyd Bledsoe

25   stopped by between noon and 2:00 o'clock in a green

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    Chevy Nova."  It says "Asked if they heard anybody

2    screaming for help.  Gave them a cell phone number

3    where he could be reached" -- "contacted.  Also

4    asked if kids had seen anything."  You see that?

5         A.   I do, sir.

6         Q.   All right.  So Floyd was trying to --

7    that's another person on Wild Horse Road that Floyd

8    was trying to see if anybody had heard any screams;

9    right?

10        A.   Yes.

11        Q.   And you go on the next page.  Phillip and

12   Brenda Shirey.  This is page 71 of Exhibit 56.

13   They're at 10138 Wild Horse Lane -- Road; right?

14        A.   Yes.

15        Q.   And so that on Sunday, November 7th, at

16   11:00 a.m., "a Floyd Bledsoe, little blond-haired

17   guy," came by.  There's a "Knock on the door.  Said

18   he was looking for the missing girl.  She is his

19   sister-in-law.  Asked her if he heard any" -- "if

20   she heard anything unusual or screaming" -- or --

21   "or see anything unusual.  Said he worked for

22   Richard Zule."  Asked about if there was a domestic

23   argument in the neighborhood.

24             And then the night -- between 12:40

25   and 12:45 a.m. on November 6th -- so this is the

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1   Friday night; right?
 2       A.   Be Saturday morning, wouldn't it, 12:40?
 3       Q.   Well, Saturday morning, but just after
 4   midnight; right?
 5       A.   Yes.
 6       Q.   "Brenda went outside, talking to Phillip
 7   on the phone.  Heard a real long, shrill scream
 8   three times" --
 9       A.   Yes.
10       Q.   -- right?
11       A.   Yes.
12       Q.   And "three times over a few minutes";
13   correct?
14       A.   Correct.
15       Q.   Going on to page 72, it says "Randy"
16   and -- I think that's Dee Turner, who lived at 10059
17   Wild Horse Road?
18       A.   Yes.
19       Q.   And officers came out with a bloodhound on
20   the 6th; right?
21       A.   That's what he said, yes.
22       Q.   And then on the 7th, at 10:00 a.m., they
23   "Saw an old, green Chevy Nova at Matt Hill's house.
24   A lady said that her son-in-law" -- "Mother of the
25   girl that was missing.  She thought her daughter
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    might have been abducted."

2         A.    Yes.

3         Q.    Then on the next page, page 73 of

4    Exhibit 56, it says "Randy found an old blouse."

5    Floyd Bledsoe asked if they heard anything.  They

6    told him about the blouse.  "Floyd then asked to use

7    their phone.  He called 911 and asked for a deputy

8    to call him back.  Floyd told deputy about the

9    house.  Deputy said it was old.  Floyd said girl is

10   wearing a short-sleeved shirt."

11            And so you were following up on places

12   where Floyd had been; is that right?

13        A.    It was a lead assignment, but yes.  He

14   had -- as indicated, he had been in contact with

15   those people.

16        Q.    And Floyd wasn't trying to, like, direct

17   attention away from Wild Horse Road; right?

18            MR. QUALSETH:  Object to the form.

19            MR. TURNER:  Join.

20            MR. LINDEN:  Join.

21        A.    I don't know.  I don't know what his

22   motive was.

23        Q.    (By Mr. Ainsworth)  Right.  Right, you

24   don't know what his motive was, but it appeared to

25   you, from Floyd being there, asking if anyone had

```
 1    heard anything on Wild Horse Road, he wasn't trying
 2    to draw attention away from Wild Horse Road; right?
 3         A.   No.  He was contacting people on Wild
 4    Horse Road, that is correct.
 5         Q.   And so then on page 75 of 56 -- this is at
 6    10561 Wild Horse Road -- you talked to a -- excuse
 7    me -- a Rebecca Coffey, and she said on Sunday, the
 8    7th, "Floyd Bledsoe stopped by in an old,
 9    white/green Chevy Nova and said his sister-in-law
10    had been abducted from his house Friday evening.  He
11    had heard that a hunter had heard 'Someone'" -- "had
12    heard 'Someone help me.  Please don't hurt me.'
13    Wanted to know if Coffey heard anything.  Glenn said
14    no.  Suggested he talk to police officer across the
15    road or his parents, James and Mary Lou Coffey,
16    across the pasture."  It says "Bledsoe never went
17    to" -- "to their house.  Bledsoe said the medic
18    wouldn't cooperate."  Says "very nervous."
19         A.   Yes.
20         Q.   Do you see that sentence?
21         A.   I do.
22         Q.   Then going on to page 78, of -- it's
23    Mrs. Zule.
24              You had an interview with Billie
25    Summerville; right?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          A.   If there's a report reflecting that, yes.

2     I just don't recall, off the top of my head.

3          Q.   Sure.  Take a look at page 86 of

4     Exhibit 56.  Do you see "Billie Summerville"?

5          A.   I do.  That's my handwriting.

6          Q.   All right.  I'm going to -- it's a long

7     interview, but there's only one part that I want to

8     ask you about.  Page 89 of 56, at the bottom of this

9     page, it says "Renee - Billie had sex with her four

10    times last summer.  She told police that she and

11    Billie had consensual sex."  Do you see that?

12         A.   I do.

13         Q.   Do you know why the police would be

14    involved in questioning Billie about sex he had with

15    Renee?

16         A.   No.

17         Q.   Do you know how old Renee was?

18         A.   No.

19         Q.   Do you have any explanation for why it

20    just says that "She told police that she and Billie

21    had consensual sex" without explaining why the

22    police were involved?

23         A.   No.

24         Q.   If there was a, you know, rape allegation

25    or -- you know, either statutory or otherwise

```
 1   against Billie Summerville, that's information that
 2   should have been revealed; right?
 3           MR. QUALSETH:  Object to the form.
 4      A.   It could be pertinent to the interview,
 5   but I don't know if that was done or if that
 6   information was revealed.
 7      Q.   (By Mr. Ainsworth)  All right.  Going on
 8   to page 114 -- so this is the -- a list of people
 9   that you spoke to, I believe.  Is that right?
10      A.   If the leads correlate with my reports,
11   yes.
12      Q.   And this is your handwriting on this page;
13   correct?
14      A.   It is.
15      Q.   All right.  So you've got "James Gardner,
16   property owner, 106th and Wild Horse, talked to
17   Little Floyd."
18           You've got another property owner on Wild
19   Horse Road "talked to Little Floyd."
20           Rebecca Coffey lives on Wild Horse Road.
21   "She and Glenn talked to Little Floyd."
22           Scrolling down.
23           "Dale and Danielle Hawk talked with Little
24   Floyd"; right?
25      A.   Yes.
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                    170

1        Q.    And they both lived on Wild Horse Road;

2    right?

3        A.    Yes.

4        Q.    "Randy Turner talked with Little Floyd,

5    lives on Wild Horse Road"; right?

6        A.    Yes.

7        Q.    Okay.  And so Floyd was saying he had

8    heard report that a woman had been heard screaming,

9    "Please help me," around Wild Horse Road, and he was

10   trying to follow up on that; right?

11       A.    I remember that information during the

12   time; so I assume that was his reason for contacting

13   the people on Wild Horse Road, but I don't know that

14   specifically.

15       Q.    Yeah, and you can't know what his real

16   reason was, but he -- he stated that he learned from

17   police that the girl was screaming out by Wild Horse

18   Road, and he's trying to find out if anyone -- if

19   there are any witnesses to it; right?

20       A.    Right.  Okay.

21       Q.    And he was calling the police from Wild

22   Horse Road to, you know, include them in his search;

23   right?

24       A.    Yes, to the best of my memory.

25       Q.    All right.  And then at page 115 of

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   Exhibit 56, we have a photocopy of a notebook.  Do

2   you know what this is?

3        A.   It's a notebook, and I remember it being

4   involved in the investigation.

5        Q.   Why was it involved in the

6   investigation -- or what's its role in the

7   investigation?

8        A.   May I see the notation in the notebook?

9        Q.   Sure.  So looking at page 116 of

10  Exhibit 56, there's some phone number -- or there's

11  some numbers written down that appear to be a phone

12  number?

13       A.   I believe that was a phone number that

14  Little Floyd give to one of the property owners on

15  Wild Hose -- Wild Horse Road.

16       Q.   Is that your handwriting on page 116 of

17  Exhibit 56?

18       A.   Are you talking about the "863-2351"?

19       Q.   Yes.

20       A.   No.

21       Q.   Do you know whose handwriting that is?

22       A.   If I remember correctly, that was a number

23  that Floyd give to one of the property owners on

24  Wild Hose -- Horse Road, and there should be a

25  report correlating that.

8700 Monrovia, Suite 310                                                  (913) 825-2510
Lenexa, Kansas 66215-3500                                             Fax (913) 825-2530
www.cornerstonekc.net                                           office@cornerstonekc.net


Cornerstone
Court Reporting Company LLC

1      Q.    And so you -- your understanding that --

2    is that this is Floyd S. Bledsoe's handwriting; is

3    that right?

4      A.    I believe so.  I would have to review the

5    report to be sure.

6      Q.    And then it says "Friday night 6:45 p.m.,

7    early Saturday 5:05 a.m., half Dunnlap's drive

8    lights on.  Screams, Shirley, 1:30 to 2:00"?

9      A.    That's not my handwriting, but that's what

10   it says.

11     Q.    Okay.  Do you know how you got possession

12   of this notebook?

13     A.    Yeah, I believe it's in a report in

14   reference to an interview that I conducted, but I

15   can't remember the name of the person, off the top

16   of my head.

17     Q.    All right.  Next page, page 118 of

18   Exhibit 56, is a reference to "Jim Gardner, KCK."

19   This is not your handwriting; right?

20     A.    That is correct.

21     Q.    Then page 119 of 56 says "Del and Danielle

22   Hawk.  Noise in brush 9:00 to 11:00 p.m. before

23   radio was on, and then she, lady, shut it off.

24   Heard in three spots to south," and a phone number?

25     A.    That's what I read, yes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

 1        Q.   And then page 120 of Exhibit 56 -- there's

 2   more writing; right?

 3        A.   Yes.

 4        Q.   And then 121 -- there's more writing on

 5   this page --

 6        A.   Yes.

 7        Q.   -- of Exhibit 56; right?

 8        A.   Yes.

 9        Q.   All right.

10             THE WITNESS:  Sir, could we please take a

11   short break?

12             MR. AINSWORTH:  Yes.

13             THE WITNESS:  Thank you.

14             THE REPORTER:  Off the record at 3:02 p.m.

15             (Discussion off the record.)

16             THE REPORTER:  We are back on the record

17   at 3:07 p.m.

18        Q.   (By Mr. Ainsworth)  All right.  I'm going

19   to show you what we previously marked as Exhibit 60,

20   6-0.  This is a document Bates numbered KBI Subpoena

21   935 through '940.  I'm going to show you page 5 of

22   Exhibit -- well, actually, let me start at the top.

23             Page 1 of Exhibit 60 -- this is a report

24   that you compiled; is that correct?

25        A.   Yes.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                    174

1          Q.    Documenting an interview you had with

2    James Gardner on November 16th, 1999; is that

3    correct?

4          A.    Yes.

5          Q.    And he told -- he told you that, on the

6    Saturday, November 6, at -- it says "approximately

7    12:30 a.m.," but I think it's supposed to be

8    12:30 p.m.

9          A.    That's correct.  That's an error on my

10   part.

11         Q.    It says "Gardner noticed someone across

12   the road talking to the neighbor just west of his

13   property.  The man then came over to where he was

14   and said his last name was Floyd Bledsoe and that a

15   girl was missing.  Bledsoe first asked if Gardner

16   had been out to his property on Friday and if he had

17   heard anything.  Gardner told him that he had not.

18   He then asked if Gardner would call either him,

19   Bledsoe, or the sheriff's department if he found a

20   shoe or anything else on his property."  Do you see

21   that?

22         A.    I do.

23         Q.    So Gardner was telling you that Bledsoe

24   told him to call the police or him if he found

25   anything, like a shoe or anything else; right?

1          A.    Yes.

2          Q.    And so Floyd wasn't trying to discourage

3     people from contacting the police if they heard

4     anything over on Wild Horse Road; right?

5               MR. QUALSETH:  Object to the form.

6               MR. TURNER:  Join.

7               MR. LINDEN:  Join.

8          A.    Not according to this report.

9          Q.    (By Mr. Ainsworth)  Okay.  And let's go

10    down to page 6 of Exhibit 60.  This is dated

11    November 16th, 1999, and the "Location of premises

12    to be searched" are "80 acres" -- I think it's

13    supposed to be "half-mile south of 106th and Wild

14    Horse Road in Jefferson County"; is that right?

15         A.    Yes.

16         Q.    And Jim Gardner is the owner of that

17    property; right?

18         A.    Yes.

19         Q.    And so Jim Gardner was the home -- the

20    owner of the land that police wanted to search to

21    see if there's any connection between what the

22    colonel heard of screams near Wild Horse Road and

23    Arfmann's disappearance; right?

24         A.    To the best of my knowledge, that is

25    correct.

Terry L. Morgan - 02/13/2023                    176

1          Q.    And Floyd was -- the day after the colonel

2     had heard those screams -- was talking to the guy

3     who owned the property, telling him to call the

4     police if he found anything; right?

5          A.    In summary, yes.

6          Q.    All right.  Going up to page 2 of

7     Exhibit 60, "He," meaning Bledsoe, "then gave

8     Gardner a page out of a notebook with his name and a

9     telephone number written on it.  Senior Special

10    Agent Morgan took the note into custody as evidence,

11    and a KBI Evidence Custody Receipt was prepared.

12    See attached copy of the evidence custody receipt

13    for full details."  Do you see that?

14         A.    I do.

15         Q.    All right.  And so now going down to

16    the -- this is the page that Floyd had given to Jim

17    Gardner; right?

18         A.    A photocopy of, yes.

19         Q.    Okay.  And then you had all those other

20    pages in your field notes from Floyd Bledsoe; right?

21    Do you recall Floyd voluntarily giving you his

22    notebook to copy when you met with him on

23    November 9th, 1999?

24         A.    I do not have memory of that.

25         Q.    All right.  Do you know how else you would

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

 1   have gotten the notes that Floyd Bledsoe was

 2   keeping?

 3              MR. TURNER:   Object to form.

 4       A.    I assume that they would have come direct

 5   from him or provided by someone related to him, but

 6   I do not have that independent memory.

 7       Q.    (By Mr. Ainsworth)  When a suspect is

 8   being interviewed by the police, you document in

 9   your field notes that they're being Mirandized;

10   right?

11       A.    If they're Mirandized, yes.

12       Q.    And if the suspect is Mirandized, do you

13   document that in your written report as well -- your

14   typewritten report?

15       A.    Should, yes.

16       Q.    And why should you?

17       A.    Because it's a part of the case.

18       Q.    Okay.  I'm going to put in the chat what

19   we'll mark as Exhibit 60 -- sorry -- 69.

20              All right.  Sorry.  I got stuck in

21   full-screen mode, and I couldn't get out.  And,

22   then, let me share with you, sir, on the screen.

23              All right.  What we've marked as

24   Exhibit 69 is a -- let's see -- it's a four-page

25   document Bates numbered KBI Subpoena 801 through

8700 Monrovia, Suite 310                                      (913) 825-2510
Lenexa, Kansas 66215-3500                                Fax (913) 825-2530
www.cornerstonekc.com                        office@cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

1    '804.  And taking it to the top of the document,

2    this appears to be a report that you compiled

3    regarding your November 8th, 1999, interview of

4    Floyd S. Bledsoe.  Is that right?

5        A.   Yes.

6        Q.   And -- oh, I see.  This is from your

7    November 8th interview.

8        A.   Yes.

9        Q.   My apologies, sir.  I have no interest in

10   that report.

11            And so I don't see any report regarding

12   your interview with Floyd Bledsoe on November 9th,

13   but there is documentation of that interview from

14   Randy Carreno in his report.  Is that why you would

15   have provided Randy Carreno with your field notes of

16   that interview?

17       A.   Yes.

18       Q.   But your other field notes you would not

19   provide because you would be making the reports on

20   those activities; is that right?

21       A.   Yes.

22       Q.   Let's show you what I'll mark as

23   Exhibit 70.  I should put it in the chat.

24            Okay.  I'm showing you what we marked as

25   Exhibit 70.  These are your responses to

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    interrogatories in this case.  And is this your

2    signature --

3          A.   It is.

4          Q.   -- on the (indiscernible) of Exhibit 70?

5          A.   Yes.

6          Q.   Okay.  And then I'm going to scroll down

7    to page 3 of Exhibit 70.

8               Interrogatory No. 5 asks you to spate --

9    "state with specificity each activity, action, or

10   investigative task that you participated in," and --

11   and "For each activity, action, or task, please

12   describe the person, if any, who assigned you each

13   activity, action, or task and then the person to

14   whom you reported for each activity, action, or

15   task."  Do you see that, sir?

16         A.   I do.

17         Q.   And you stated "See KBI file.  All my

18   actions were taken at the request of Sheriff Roy

19   Dunnaway."  Do you see that, sir?

20         A.   I do.

21         Q.   And so were all of your actions in the

22   Arfmann homicide investigation taken at the request

23   of Sheriff Roy Dunnaway?

24         A.   Sheriff Dunnaway requested, as to my

25   understanding, the assistance of the KBI, whereas

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   Jefferson County was in Jim Woods's area of
2   responsibility, and he was the case agent.  And then
3   they assigned me to assist the Jefferson County
4   Sheriff's Department in any way that was deemed
5   necessary.
6        Q.    And because it was -- Sheriff Roy Dunnaway
7   was the head of the Jefferson County Sheriff's
8   Department, did you keep Sheriff Dunnaway apprised
9   of all activities that you conducted in the
10  investigation?
11       A.    To the best of my ability.
12       Q.    And all of your actions were taken at the
13  request of Sheriff Roy Dunnaway; is that correct?
14       A.    To lead assignments, yes.
15       Q.    And explain what you mean by that.
16       A.    On my report, there is a number, a
17  numerical number, and that's the lead assignment.
18  You also have a log of all leads that were assigned
19  in the investigation, to the best of my knowledge.
20       Q.    And so Sheriff Roy Dunnaway was the one
21  who assigned you those leads?  Is that what you're
22  saying?
23       A.    I don't know whether it was him personally
24  or if it's another member of the sheriff's
25  department, but it would have been him or another

Terry L. Morgan - 02/13/2023                    181

1   member of the sheriff's department that did it.

2         Q.   So all of -- all of the leads were given

3   to you either by Sheriff Roy Dunnaway or another

4   member of the Jefferson County Sheriff's Department;

5   is that right?

6         A.   To the best of my memory.  I don't know if

7   Jim Woods assigned me any or not.  I can't recall --

8   I cannot recall.

9         Q.   Well, you told me a couple times before

10  this afternoon that Jim Woods gave you assignments.

11  Are you now saying that Jim Woods didn't give you

12  assignments?

13        A.   I'm saying I don't recall specifically.

14        Q.   But you do recall Sheriff Dunnaway giving

15  you assignments; right?

16        A.   They would have originated under his

17  authority.  Whether he did it in person or had

18  another member of his department do it, yes.

19        Q.   But it was clear to you that Sheriff

20  Dunnaway was the one who is running the

21  investigation, and he was the one who was keeping

22  himself apprised of everything that was going on;

23  right?

24        A.   Yes.  He's the sheriff.

25        Q.   All right.  Did you know Michael Hayes

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                182

```
 1  before the Arfmann homicide investigation?
 2       A.   I knew of him, that he was an attorney in
 3  Jefferson County.
 4       Q.   Did you know him to be the former
 5  prosecutor in Jefferson County or the county
 6  attorney?
 7       A.   Yes.  I had heard that before, that he was
 8  the former county --
 9       Q.   Had you worked --
10       A.   I'm sorry.  The former county --
11       Q.   Had you worked on any cases with Michael
12  Hayes when he was the county attorney?
13       A.   Not to the best of my knowledge or memory.
14       Q.   Did you ever see Michael Hayes at the law
15  enforcement center during the Arfmann homicide
16  investigation?
17       A.   I do not recall.
18       Q.   Did you ever have a meeting with other
19  members of the Arfmann homicide investigation where
20  you talked about whether Floyd should be arrested or
21  not?
22            MR. TURNER:   Object to form.
23            MR. LINDEN:   Join.
24       A.   I do not recall.
25       Q.   (By Mr. Ainsworth)  Did you ever have a
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   conversation with anyone about whether Tom should be

2   released from custody?

3       A.   I do not recall.

4       Q.   Actually, let -- let me withdraw that

5   question and ask it this way:  Did you ever have a

6   conversation with anyone about the fact that Tom had

7   been released from custody after coming to the

8   police station with the murder weapon and saying

9   he -- he had involvement in the death of the girl

10  who was buried in the lot behind his house?

11          MR. QUALSETH:  Object to the form.

12          MR. TURNER:  Join.

13          MR. LINDEN:  Join.

14      A.   I do not recall.

15      Q.   (By Mr. Ainsworth)  Have you ever talked

16  to anyone, apart from your attorneys, about the fact

17  that you had this guy who, you know, brought us the

18  murder weapon, led us to the body, told us details

19  about the crime, admitted involvement, and then was

20  released?

21      A.   I do not recall.

22      Q.   Have you ever heard of a case like this in

23  any other jurisdiction or anyplace or any conference

24  you've attended, where somebody comes to the police

25  with the murder weapon, leads the police to where

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1   the victim is buried, admits involvement, and then
 2   is released?
 3           MR. QUALSETH:  Object to the form.
 4           MR. TURNER:  Join.
 5           MR. LINDEN:  Join.
 6       A.   Not to the best of my memory, no.
 7       Q.   (By Mr. Ainsworth)  Do you have any
 8   explanation for how -- well, what evidence are you
 9   aware of that suggests that Tom is not guilty?
10       A.   I was not involved that much with Tom
11   Bledsoe; so I have very limited knowledge of his
12   activities pertaining to the investigation.
13       Q.   So you're not aware of any evidence that
14   suggests that Tom is not guilty.  Is that fair to
15   say?
16       A.   That is correct.
17       Q.   And given the whole -- you know, all of
18   your investigative activity, do you have any
19   evidence to suggest that Floyd is guilty?
20       A.   As I stated before, my reports are
21   factual.  That's -- that would be any evidence to
22   indicate guilt or innocence.
23       Q.   Well, what -- is there any evidence in
24   your reports that suggest that Floyd is guilty of
25   the murder of Camille Arfmann?
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                185

1        A.   As I stated before, I'm not an attorney,

2   and I wasn't a county attorney; so it was not my

3   position to judge guilt or innocence.  My position

4   was to report the facts as I conducted the

5   investigation.

6        Q.   Right.  I'm not asking you is Floyd

7   guilty, because you don't know if he's guilty or

8   not.  Might be guilty; might be innocent.

9             I'm asking you, based on the investigation

10  that you personally conducted, were there any facts

11  developed during your investigation that suggested

12  that Floyd was guilty of the murder of Camille

13  Arfmann?

14       A.   The fact that he admitted to being in the

15  vicinity when she got off of the school bus could be

16  a factor, when he went to get the duct tape.

17       Q.   Okay.  And not to parse hairs here, but

18  did he -- did Floyd say he was in the vicinity when

19  Camille got off the school bus?

20       A.   I believe he said he was behind the bus

21  when she was headed home.

22       Q.   Okay.  So he didn't say that she was -- he

23  was in the vicinity when Camille got off the school

24  bus; right?

25       A.   Well, the location on his route would not

Terry L. Morgan - 02/13/2023                    186

1  have been that far from the trailer house.  I'll put

2  it that way.

3      Q.   All right.  So you mean the hardware store

4  was not that far from his home; correct?

5      A.   No.  No.  I'm saying --

6          MR. TURNER:  Object to form.

7      A.     -- when he went by and saw the school bus,

8  that would not have been that far from his home,

9  where she was dropped off, is what I'm saying.

10     Q.   (By Mr. Ainsworth)  I see.  But then how

11 does -- how does he get to the hardware store to

12 make the transaction at 4:23 if he's at his house,

13 you know, minimum of seven minutes away, based on

14 your investigation, at 4:20?

15         MR. QUALSETH:  Object to the form.

16         MR. TURNER:  Join.

17         MR. LINDEN:  Join.

18     A.   Assuming the time was correct, I don't

19 know.

20     Q.   (By Mr. Ainsworth)  Okay.  But -- all

21 right.

22         So based on your personal investigation,

23 facts leading to -- or suggest that Floyd is guilty

24 of the murder of Camille Arfmann is him admitting

25 that he was in the vicinity when he saw her bus

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    headed home -- her school bus headed toward -- you
2    know, on the route home.
3              Any other facts that suggest that Floyd is
4    guilty?
5         A.    Not from my reports that I'm -- I can
6    remember.
7         Q.    Okay.  And we've gone through a number of
8    your reports today; right?
9         A.    Yes.
10        Q.    How did you learn that Tom was claiming
11   Floyd had told him about the murder during a chance
12   roadside encounter?
13        A.    I don't recall.
14        Q.    How did you learn about Tom's suicide?
15        A.    I believe I saw it online.  It was in the
16   news.
17        Q.    Did you have any reaction to Tom killing
18   himself after DNA linked him to the murder?
19        A.    I'm sorry.  I don't understand the
20   question.
21        Q.    Did you feel, you know, either surprised
22   or sorry or angry or anything like that in response
23   to learning that Tom had killed himself after DNA
24   linked him to the murders -- to the murder?
25        A.    I was surprised that he committed suicide.

8700 Monrovia, Suite 310                                    (913) 825-2510
Lenexa, Kansas 66215-3500                                   Fax (913) 825-2530
www.cornerstonekc.com                                       office@cornerstonekc.net

Cornerstone
Court Reporting Company LLC

1          Q.    And why were you surprised?

2          A.    Just that he committed suicide.

3    I mean ...

4          Q.    Looking back over your investigation, was

5    there anything that you now think you should have

6    done differently?

7          A.    In any investigation, there's always

8    things that you thought you should have done or done

9    differently, and I think any investigator would say

10   the same.  I don't think there's a perfect

11   investigation due to the human factor.

12         Q.    All right.  Well, how about in this

13   investigation?  Was there anything that you -- you

14   now, looking back, think you should have done

15   differently?

16         A.    Not off the top of my head, no.

17         Q.    Well, you know, think about it, because

18   I'm going to ask you, you know, would you have done

19   everything the exact same way if you had to do it

20   over again?

21         A.    I don't know.  If I knew now what I knew

22   back then, I assume I would have done some things

23   differently, but I can't say that I would have, you

24   know, based on being in the present time and date.

25         Q.    Have you ever seen the suicide note --

8700 Monrovia, Suite 310                                                    (913) 825-2510
Lenexa, Kansas 66215-3500                                               Fax (913) 825-2530
www.cornerstonekc.net          Cornerstone          office@cornerstonekc.net
                               Court Reporting Company LLC

1  notes that Tom left behind?

2      A.   No.

3      Q.   Well, let me show you what we've marked

4  previously as Exhibit 46.

5           And so I'll show you the first page of

6  Exhibit 46.  It says "To whomever cares," and then

7  it states "To whom this involves.  I sent a innocent

8  man to prison.  The Jefferson County police and

9  county attorney, Jim Vanderbilt, made me do it.  I

10 was told by Vanderbilt to keep my mouth shut."

11          "Now I am going to set things right.

12 I killed Camille Arfmann on November 5th, 1999.  I

13 had sex with her and killed her.  On November 5th,

14 1999, I stopped by my brother's house around 4:30 to

15 5:00 o'clock, and Camille was there.  We talked a

16 little and then went to my parents' house.  And she

17 helped me do something.  Sorry.  My mind is blank on

18 what we did.  Then we talked.  And then the

19 conversation got moved to sex, and she told me she'd

20 had sex before.  With whom, I don't know.  Then she

21 asked me, and I said no."

22          "Then it happened so fast, I don't

23 remember much.  We had sex in my parents' bed.

24 That's how my father's DNA got in her clothes.

25 Afterwards, we were leaving, and I asked her not to

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1   tell.  That's when I found out she was 14, and

2   I freaked out."

3            "So I drove up to the ditch where the

4   family dumped trash and tried to convince her not to

5   tell.  Everything was happening so fast, I couldn't

6   think."

7            "I want" -- "I went to my truck and got my

8   9-millimeter gun that was behind my seat and pushed

9   her to the ground to try to scare her, but it failed

10  when the gun went off behind her head.  It was an

11  accident.  I didn't mean to kill her."

12           "I as well might go ahead and say it.

13  I raped and murdered a 14-year-old girl.  I tried

14  telling the truth, but no one would listen.  I was

15  told to keep my mouth shut.  It tore me up doing it.

16  I would ask for forgiveness, but I know none will

17  come, not even from God."

18           "Floyd S. Bledsoe is an innocent man.

19  Thomas E. Bledsoe is the guilty one, and here is the

20  proof.  The crime scene is less than 20 yards from

21  the gravesite where I buried her.  You will find an

22  empty 9-millimeter shell no more than 20 yards of

23  the ditch."

24           Do you see that, sir?

25       A.   I do.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1        Q.   Do you know that investigators went to the
2   scene of the gravesite and looked about 20 yards off
3   of the gravesite and discovered there was a
4   9-millimeter shell buried in the debris?
5        A.   I don't remember that.
6        Q.   And I -- I mean investigators in 20- --
7   2015 and 2016 did that.  Are you aware of that?
8        A.   I remember there was some talk about it,
9   but I can't remember what it was.
10       Q.   Do you have any remorse about conducting
11   part of the investigation that led to Floyd Bledsoe
12   being charged and convicted and sentenced to prison
13   for this crime?
14       A.   If he is innocent, I'm sorry that he did
15   go to prison, but that was never my intent.  As I
16   told you, I conducted a factual investigation, you
17   know, to provide evidence to the county attorney,
18   and that was my extent of the involvement in it.  My
19   personal feelings didn't enter into it.
20       Q.   You told -- oh, what was his name?  Sorry.
21   The guy who interviewed you in 2016.  It will come
22   to me.
23       A.   Burk?
24       Q.   Burk, yes.  Special Agent Burk.
25            You told Special Agent Burk that you

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    "don't know if Carreno has been told to stay out of

2    this investigation or if he has chosen to stay out.

3    I've heard at meetings that he is not happy with new

4    investigation.  He thinks Floyd did it, was the only

5    one.  They got the case solved."

6              MR. TURNER:  Object to form.

7         Q.   (By Mr. Ainsworth)  And my question to

8    you, sir, is -- well, did you say that to Special

9    Agent Burk?

10             MR. TURNER:  Object to form.

11        A.   I have no reason to be -- I don't know why

12   he would not accurately say what I told him; so I

13   have no reason to dispute that.  I don't recall it,

14   but I do not dispute that.

15        Q.   (By Mr. Ainsworth)  And -- and just so I'm

16   not misleading you, this is not from Burk's report.

17   This is from your videotaped interview.  Do you

18   recall that your interview with him was videotaped?

19             MR. TURNER:  Object to form.

20        A.   I do not.  I'm sorry.  I just don't

21   remember that.

22        Q.   (By Mr. Ainsworth)  Okay.  So did you tell

23   Special Agent Burk that you "don't know if Carreno

24   has been told to stay out of this investigation or

25   if he has chosen to stay out"?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          MR. TURNER:  Object to form.

2      A.   I don't recall that, but if the video

3  showed that I did, then I have no reason to question

4  his report or the video.

5      Q.   (By Mr. Ainsworth)  All right.  Did you

6  tell Special Agent Burk that you've "heard at

7  meetings that he," meaning Carreno, "is not happy

8  with this new investigation"?

9          MR. TURNER:  Object to form.

10     A.   I do not recall.

11     Q.   (By Mr. Ainsworth)  What meetings were you

12 referring to when you said you've "heard at meetings

13 that he is" -- "he," meaning Carreno, "is not happy

14 with this new investigation"?

15         MR. TURNER:  Object to form.

16     A.   I do not recall.

17         MR. AINSWORTH:  Let's take a five-minute

18 break.  Is that okay?

19         THE WITNESS:  Sure.  Thank you.

20         THE REPORTER:  We'll be off the record at

21 3:41 p.m.

22         (A recess was taken.)

23         THE REPORTER:  We're back on the record at

24 3:46 p.m.

25     Q.   (By Mr. Ainsworth)  All right, sir.  I

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1   want to show you -- I'm going to play you a clip of
 2   your interview with the -- with Special Agent Burk.
 3        A.   Okay.
 4        Q.   Let me --
 5             THE REPORTER:  We're not hearing anything.
 6             THE WITNESS:  We're not seeing or hearing
 7   anything.
 8             MR. AINSWORTH:  I'm sorry.
 9             THE REPORTER:  When you share your screen,
10   you'll need to select the button at the bottom that
11   says "Share sound."
12             MR. AINSWORTH:  I thought it would play
13   through, but it didn't.  That's okay.  Let me move
14   on.
15        Q.   (By Mr. Ainsworth)  I wanted to ask you --
16   let me get to my sheet.
17             MR. AINSWORTH:  Well, actually, let me --
18   let me see if I can do this in the meantime.  I'm
19   going to put the file in the chat and see if it will
20   transmit, and we can play it for the witness there.
21             Myles, can you chat me your email address,
22   and maybe I can send it to you.
23             THE REPORTER:  Yeah.  I'm going to step
24   off for just a minute.  The time is 3:50 p.m.
25             (Discussion off the record.)
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                    195

1              THE REPORTER:  All right.  Back on the

2     record at 3:51 p.m.

3          Q.    (By Mr. Ainsworth)  Okay.  Let's try this:

4     I want to play a clip, but I would like to do it

5     through VLC.

6              All right.  Bear with me one more second.

7     Let me ...

8              Okay.  I want to -- I'm going to start

9     this around 3 minutes and 40 seconds into the

10    interview.

11             (Audio played.)

12         Q.    (By Mr. Ainsworth)  All right.  So I'm

13    pausing it at four minutes and three seconds.

14             Sir, did you hear yourself saying that you

15    heard that -- let me get to it -- "I know that Woods

16    called Vernon and ate his ass up because you guys

17    are doing the review probably.  I told Vernon, 'Do

18    your fucking job.  Fuck Jim Woods'"?

19             And so my -- did you hear yourself say

20    that, sir?

21         A.    I assume it's me.  I have no reason to

22    dispute it.  I'm surprised I would make those

23    comments, but if that's what the -- the audio

24    reflects and the interview is of me, then it must be

25    accurate.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.com

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                    196

1        Q.    Do you want to listen to it again, sir?

2        A.    Yes, please.

3        Q.    So, again, starting at right around 3- --

4   it's 3:39 on here.  Oh.  I got to share this.

5              MR. QUALSETH:  I was wondering about more

6   context or something.

7              (Audio played.)

8        Q.    (By Mr. Ainsworth)  All right, sir.  So do

9   you recognize your voice stating to Special Agent

10  Burk, "I know that Woods called Vernon and ate his

11  ass up because you guys are doing the review

12  probably.  I told Vernon, 'Do your fucking job.

13  Fuck Jim Woods'"?

14       A.    I just don't recall that, and that doesn't

15  sound like my voice, but if he said it is, I assume

16  that that is correct.

17       Q.    How did you hear that Jim Woods didn't

18  like the reinvestigation?

19             MR. TURNER:  Object to form.

20             MR. QUALSETH:  Same objection.

21             MR. LINDEN:  I'll join.

22       A.    I do not recall.  I just don't remember.

23       Q.    (By Mr. Ainsworth)  How did you know that

24  Frost is Randy Carreno's son-in-law?

25       A.    I knew that at the time of the

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1    investigation.  Someone had told me that, but I

2    can't tell you who.

3         Q.   I'm just looking if there's any other

4    clips that I wanted to play for you.

5              MR. TURNER:  Russell, would this be

6    assigned an exhibit number?

7              MR. AINSWORTH:  I think I'll just identify

8    it on the record.  This is -- from the KBI Subpoena

9    response, the video clip was from Bates No. 5411,

10   which is the Terry Morgan video interview.  And --

11             THE WITNESS:  Was it a video or audio

12   interview?

13        Q.   (By Mr. Ainsworth)  It's video, but the

14   audio -- the video isn't playing over the -- let

15   me -- let me play you the beginning of this so you

16   can, you know, be assured that it is --

17        A.   No.

18        Q.   -- in fact --

19        A.   I'll take your word --

20        Q.   -- your --

21        A.   -- for it.  I just -- it was just a

22   question that I had.

23             (Audio played.)

24        Q.   (By Mr. Ainsworth)  Starting at 30

25   seconds.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1              (Audio continues playing.)

 2         Q.   (By Mr. Ainsworth)  Let me ...

 3              (Audio continues playing.)

 4         Q.   (By Mr. Ainsworth)  I thought there were

 5    introductions at the beginning, but I couldn't hear

 6    the introductions on that video.  I know, from the

 7    content of the interview, that it is you because

 8    there's references to, you know --

 9         A.   Well, the voice --

10         Q.   -- your role --

11         A.   The voice that I heard on the audio was

12    Bill Delaney.  That was not my voice.

13         Q.   Bill Delaney?

14         A.   Yes.

15         Q.   The AG?

16         A.   No.  He was my super- -- he was my

17    supervisor at the time.

18         Q.   Oh, right, right, right.

19         A.   He's special agent in charge of the

20    Overland Park KBI office at the time.

21         Q.   Let me -- I'm going to -- let -- let me --

22    Let's just go off of the record for a second.  I'll

23    find you a clip that will identify yourself as you,

24    as it corresponds to the report that was submitted

25    of your interview.  And there's no interview of
```

1    Delaney.

2         A.    Okay.

3              MR. AINSWORTH:  But let's go off the

4    record for a second.

5              THE REPORTER:  Off the record at 4:00 p.m.

6              (Discussion off the record.)

7              THE REPORTER:  Okay.  Back on the record

8    at 4:03 p.m.

9         Q.    (By Mr. Ainsworth)  All right, sir, you

10   know, it appears to be an audio recording, because

11   I've got -- I've got no video on my end but -- and I

12   think you got a very good ear, because I think

13   Delaney is present at the very beginning.

14             But then it's clear -- and I'll play you

15   the clip from about -- starting two minutes into the

16   interview -- or not the interview but the tape.  And

17   they talk about, you know, how you did -- wrote a

18   lot of reports on this case.  And Delaney, to my

19   knowledge, wrote zero reports and didn't do any of

20   the investigation.

21             But let me -- let me play it for you

22   starting two minutes and three seconds into the

23   tape.

24             (Audio played.)

25        Q.    (By Mr. Ainsworth)  I'm just going to



1   pause it there.  Do you recognize your voice there

2   speaking?

3        A.   That's Bill Delaney.

4        Q.   The whole thing is Bill Delaney?

5        A.   Yes.  That's Bill Delaney talking.

6        Q.   All right.  Let me -- let me keep playing

7   for a little bit.  One second.

8             (Audio played.)

9        A.   Sir, that was Bill Delaney.

10            (Audio continues playing.)

11       Q.   (By Mr. Ainsworth)  All right.  I'm going

12   to pause it there.

13            So that was Mr. Delaney's voice at the

14   beginning that we heard --

15       A.   That is --

16       Q.   -- correct?

17       A.   That is correct.

18       Q.   All right.  And you've been vindicated

19   from talking about Jim Woods chewing up anybody's

20   ass or hurling expletives against him, but was that

21   your voice -- I don't know why KBI in 2016 is using

22   1980s technology, but it sounded like the worst

23   microphone I've heard in a while.

24            Was that your voice, then, answering

25   questions at the end there?

8700 Monrovia, Suite 310                                              (913) 825-2510
Lenexa, Kansas 66215-3500                                        Fax (913) 825-2530
www.cornerstonekc.com          Cornerstone          office@cornerstonekc.net
                               Court Reporting Company LLC

1      A.    It was.  It sounds --

2      Q.    Okay.

3      A.    -- like, to me, like he might have had it

4   in his pocket or something like that rather than

5   having it on the desktop.

6      Q.    It sure does.

7            And just for the record, I ended it at

8   6 minutes, 44 seconds.  And that's when your voice

9   was talking.  That's helpful.  Thank you very much

10  for clearing up that -- and I'm sorry to have misled

11  you.  I was working off a document that was

12  titled -- an audio file titled "Terry Morgan."  All

13  right, sir.

14           So if there's the chance that you might

15  testify that you -- that punitive damages should not

16  be assessed against you because your finances are

17  small, I need to ask you some questions.

18           Do you own your own home?

19     A.    I do.

20     Q.    And how much is your home worth?

21     A.    Approximately 500,000.

22     Q.    Do you have a mortgage on that home?

23     A.    No.

24     Q.    And do you have -- do you own any

25  vehicles?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1          A.   Yes.

2          Q.   What vehicles do you own?

3          A.   A 2016 Impala four-door sedan and a 2002

4     Ford F-150 pickup.

5          Q.   Do you own any stocks or bonds?

6          A.   I own, like, $800 in stocks.   No bonds.

7          Q.   Do you receive a pension?

8          A.   I do.

9          Q.   And what is your -- what's the amount of

10    your monthly pension?

11         A.   I receive two.   I receive one from the

12    Kansas Police and Fire for when I worked for the

13    highway patrol and the KBI, and I think it's around

14    $3,500 per month.

15              And then I receive a pension -- pension

16    from KPERS, the Kansas Public Employees Retirement

17    System, and I think it's around $800 per month.

18         Q.   Do you own any real -- any property other

19    than your home?

20         A.   No.

21         Q.   Do you own any recreation vehicles or

22    motorcycles?

23         A.   No.

24         Q.   Do you own any boats?

25         A.   No.

1      Q.   Do you own any bank accounts?

2      A.   Yes, I have bank accounts.

3      Q.   All right.  How many bank accounts do you

4   have?

5      A.   Three, to the best of my knowledge.

6      Q.   With which banks?

7      A.   A checking account at Commerce Bank and a

8   savings account, I believe, and then we have a

9   savings account at Community Credit Union in Johnson

10  County.

11     Q.   And what's the value of the Community

12  savings bank -- the savings account at Community

13  Credit Union?

14     A.   I don't know the value of each one.  I

15  think the total's around 7,500 to 8,000 total, last

16  I knew.

17     Q.   Do you have any retirement funds?

18     A.   I had -- I have deferred compensation

19  through the State of Kansas.

20     Q.   What's the value of the deferred

21  compensation?

22     A.   Probably around 275,000.  I haven't

23  checked it recently, but I know it's dropped

24  significantly since the stock market has been down.

25     Q.   Do you own any mutual funds?

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

1        A.    No.

2        Q.    Do you own any certificates of deposit?

3        A.    No.

4        Q.    Do you own any cryptocurrency?

5        A.    No.

6        Q.    Do you own any -- what are they called? --

7   precious metals, such as gold or --

8        A.    No.

9        Q.    -- silver or such things?

10       A.    No, sir.

11       Q.    Do you owe -- own any other item that has

12  a value of over $5,000?

13       A.    No.  Well, maybe the household furniture

14  would amount to that much, but that's about it.

15       Q.    And if there's a chance you're going to

16  testify about your family at trial, I will ask you

17  these questions now.  If you refuse -- if you choose

18  not to answer it, that's fine.  I'm just going to

19  bar you from testifying about them at trial.

20            And so they're just basic questions, like,

21  are you married?

22       A.    Yes.

23       Q.    Do you have any children?

24       A.    Yes.

25       Q.    How old are your children?

1        A.    I have two daughters.  I think one's 38,

2   and the second one is 33.

3        Q.    And what are their occupations?

4        A.    Why is this relevant?  Let me ask you

5   that.

6        Q.    It's not, but if you're going to testify

7   about your -- so I'll just tell you the questions

8   I'm going to ask you:  what their occupations are

9   and whether you have any grandchildren and, if so,

10  how many.

11       A.    Can I decline to answer that?  I see no

12  relevancy to this case.

13       Q.    Certainly.  That -- I agree with you.  And

14  so, then, I will -- then, just so you know, I'm

15  going to be -- I'll ask the Court not to let you

16  bring it up and --

17       A.    I understand.

18       Q.    -- (indiscernible).

19             Okay.  All right.

20             MR. AINSWORTH:  Then, I have no further

21  questions for Mr. Morgan.

22             THE WITNESS:  Thank you.

23             MR. AINSWORTH:  Anybody else have

24  questions?

25             MR. TURNER:  None from Jefferson County.

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

**Cornerstone**
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

Terry L. Morgan - 02/13/2023                    206

```
 1              MR. LINDEN:  Defendant Vanderbilt will
 2    reserve his questions for trial.
 3              MR. QUALSETH:  Michael, this is Shon
 4    Qualseth.  Do you have any questions?
 5              I hear none.
 6              MR. AINSWORTH:  And, Shon -- I'm sorry.  I
 7    can't hear what's going on.
 8              MR. QUALSETH:  I was asking if Mike Hayes
 9    has any questions.  I'm not even sure if he's on.
10              MR. AINSWORTH:  Oh.  All right.  Well, his
11    attorney is not present.  So --
12              MR. QUALSETH:  Very good.  We'll read and
13    sign.
14              THE REPORTER:  We'll be off the record at
15    4:16 p.m.
16
17
18
19
20
21
22
23
24
25
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

CERTIFICATE OF REPORTER

        I, Myles A. Megee, a Certified Court
Reporter of the State of Kansas, do hereby certify:

        That prior to being examined, the witness
was first duly sworn;

        That said testimony was reported by me at
the time and place hereinbefore stated and was
thereafter reduced to typewriting under my
direction;

        That the foregoing transcript is a true
record of the testimony given by said witness;

        That I am not a relative or employee or
attorney or counsel of any of the parties or a
relative or employee of such attorney or counsel or
financially interested in the action.

        Witness my hand and seal this 24th day of
February, 2023.


                        **Myles A. Megee**
                        **Certified Court Reporter**
                        **KS #1224, MO #540, IA #1338**

                        Myles A. Megee

                        Myles A. Megee

                        Certified Court Reporter

                        State of Kansas

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1                        ERRATA SHEET

 2    RE:  Floyd Bledsoe v. Jefferson County, KS, et al.

 3    PG/LN          Correction and Reason for Change

 4    _____  _____

 5    _____  _____

 6    _____  _____

 7    _____  _____

 8    _____  _____

 9    _____  _____

10    _____  _____

11    _____  _____

12    _____  _____

13    _____  _____

14    _____  _____

15    _____  _____

16    _____  _____

17    _____  _____

18    _____  _____

19    _____  _____

20    _____  _____

21    _____  _____

22

23             _____

24                   Terry L. Morgan

25    MAM
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

```
 1                     SIGNATURE PAGE
 2    RE:  Floyd Bledsoe v. Jefferson County, KS, et al.
 3
 4    _____ I certify that I have read my testimony and
 5          request that NO changes be made.
 6
 7    _____ I certify that I have read my testimony and
 8          request that the above changes be made.
 9
10
11
12          _____
13          Terry L. Morgan
14
15
16          Subscribed and sworn to before me this
17    _____ day of _____, 20_____
18
19
20          _____
21          Notary Public
22          State of _____
23          County of _____
24          My commission expires _____
25    MAM
```

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**Exhibits**

**Ex (5) Field notes - Jeff County** 3:11,12 83:10,23 90:5,19 91:4 92:4,10

**Ex (46) Suicide notes** 3:14 189:4,6

**Ex (53) 1999.11. 10 Field note re Winchester Hardware** 3:15 61:19,21 62:3 67:1 74:5

**Ex (54) 1999.11. 10 Frost Report ( Winchester Hardware; Karen Edmonds)** 3:16 68:10 75:12

**Ex (56) Field notes - Morgan** 3:18 71:10, 12,23 72:11 79:23,24 80:22 81:11,25 86:24 89:5 94:22,25 95:3,23 96:12 97:23 102:14,17,19 111:1 114:25 119:17,23 142:1 143:1 146:13,23 147:1,22 152:4 158:4,11 159:25 161:1 163:13,20 164:12 166:4 168:4 171:1,10,17 172:18 173:1,7

**Ex (57) KBI Subpoena 00 0878-000880 Report 26 - Morgan report re 11-9 receipt of 9mm rounds from Floyd L** 3:20 108:14,15 109:9 112:19 113:4

**Ex (58) KBI Subpoena 00 0892-000899 Report 33 - Morgan report re 11-10 interview w Richard Zule** 3:22 63:13,16 64:23 65:2 67:17,18 68:22 69:22 74:3

**Ex (60) KBI Subpoena 00 0935-000940 Report 45 - Morgan report re 11-16 interview w James Gardner** 3:24 173:19,23 175:10 176:7 177:19

**Ex (64) KBI Subpoena 00 0954-000954 Report 54 - Morgan report re driving time from hardware store to Floyd's house to Zule's** 4:3 75:15 79:6

**Ex (66) KBI Subpoena 00 1189-KBI Subpoena 001 195 Report 16 Morgan interview** 4:5 49:21 54:21

**Ex (67) KBI Subpoena 00 0807-000810 Report 9 - Morgan report re 11-8 interview w Floyd Sr** 4:7 96:23,25

100:2,9 103:10 105:19 110:2 114:4,7

**Ex (68) KBI Subpoena 00 0805-000806 Report 8 - Morgan report re 11-8 interview w Shane Gatewood** 4:9 144:23,25 145:6

**Ex (69) KBI Subpoena 00 0801-000804 Report 7 - Morgan report re 11-8 interview of Floyd** 4:11 177:24

**Ex (70) 2021-07-30 Deft Morgan's Resp. to Roggs** 4:13 178:23,25 179:4,7

_____

**$**

**$3,500** 202:14

**$5,000** 204:12

**$50** 65:5

**$800** 202:6,17

_____

**0**

**02296** 5:9

_____

**1**

**1** 64:23 109:9 173:23

**10** 6:16 12:3,10

**10-23** 84:2

**10059** 165:16

**10138** 164:13

**10215** 163:21

**1030-** 162:8

**10365** 162:10

**10561** 167:6

**106th** 76:18 169:16 175:13

**10:00** 165:22

**10:27** 62:1

**10:30** 160:10,12

**10:31** 49:8

**10:43** 49:11

**10th** 62:1 64:15 72:6 92:6 93:13 152:6,15 158:8

**114** 169:8

**11477** 104:24 105:6 147:8

**115** 158:23 159:7 170:25

**116** 171:9,16

**118** 172:17

**119** 172:21

**11:00** 164:16 172:22

**11:23** 111:15 112:6 113:21,23

**11:32** 91:5,17

**11:38** 84:2

**11:49** 68:24

**11:51** 69:3,14,15

**11:52** 91:10

**12** 6:16 12:3,10

**120** 173:1

**121** 173:4

**12:00** 161:20

**12:06** 99:5

**12:30** 161:20 174:7,8

**12:33** 91:21

**12:40** 164:24 165:2

**12:45** 164:25

**12:48** 69:2,8,17

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**12:51**  69:7,12,15

**12th**  121:21,25 122:3,
16 131:1,5,19 133:10
134:18 135:19 136:6,15
137:2,19 138:6,13 139:14
141:15

**13**  5:4 143:2

**130**  80:10

**14**  9:8 190:1

**14-year-old**  118:15
125:19 126:22 130:11
132:7 141:16 155:23
157:15 190:13

**15**  62:14 70:23 71:6
73:16

**16**  9:7 25:8

**160**  104:23 105:3
106:25

**1645**  83:24

**16th**  68:23 174:2
175:11

**17**  75:24 76:7

**17:20**  68:3 69:23

**17th**  75:21

**18**  83:22

**1969**  152:7,12

**1972**  16:5

**1974**  16:14

**1975**  15:1

**1976**  12:22 15:1

**1977**  16:14,16 23:25

**1978**  23:14 25:6

**1980**  22:16

**1980s**  200:22

**1987**  24:1

**1988**  16:16 23:14,21
25:7

**1990-**  131:1

**1990s**  149:11

**1998**  25:13

**1999**  27:15 30:2 31:22

32:17 51:9 53:15 57:19
62:1 64:5,8,15 67:24 72:6
75:21 76:7 79:9 80:7,14
81:14 82:6 84:1 85:3
86:1,7,17 87:5 92:6
93:13,22 94:3 95:8,14
96:7 97:3 100:23 103:6
104:22 105:20 108:19,21
131:5,19 143:7 144:15
145:4 148:5 152:15 174:2
175:11 176:23 178:3
189:12,14

**1:00**  91:23 92:22

**1:03**  99:8

**1:20**  109:2

**1:25**  109:5

**1:30**  172:8

**1:45**  104:22

**1:51**  105:19 110:3

**1st**  8:25

**2**

**2**  65:2 100:8 113:3 114:7
176:6

**20**  27:16 58:4 62:14,15
70:23 71:6 73:16 77:13
94:25 95:3 190:20,22
191:2

**20-**  191:6

**2002**  202:3

**2004**  15:15,18 16:1
25:2,11

**2006**  11:7 16:1

**2008**  11:8

**2015**  191:7

**2016**  49:23 191:7,21
200:21 202:3

**2020**  8:25

**2023**  5:4

**21**  94:23 95:23 96:11
97:23 102:17

**2110**  71:24

**2111**  72:10

**22**  102:19

**22-caliber**  81:15,20

**2217**  71:15

**2244**  79:25

**2247**  81:24

**2248**  95:1

**23**  86:4 147:1

**23:30**  84:1

**24**  77:6,13 147:2

**25**  27:16 58:4

**26**  43:18 93:20 103:19

**2607**  68:11

**2608**  68:12

**275,000**  203:22

**280**  80:16

**2:00**  143:14 163:25
172:8

**2:08**  142:21

**2:12**  142:24

**2:16**  5:9

**2:26**  92:1

**2:27**  92:5

**3**

**3**  179:7 195:9

**3-**  196:3

**30**  84:3,4,9,11 111:1
114:25 119:17 125:12
126:12 132:24 197:24

**30-year-old**  72:25

**33**  147:21 205:2

**34**  86:25

**35**  119:17,24 120:6

**37**  89:5

**38**  205:1

**3:00**  143:14

**3:02**  173:14

**3:07**  173:17

**3:39**  196:4

**3:40**  76:12

**3:41**  193:21

**3:46**  193:24

**3:47**  76:15

**3:50**  76:17 194:24

**3:51**  195:2

**3:58**  92:10

**4**

**4**  105:19

**40**  195:9

**44**  201:8

**45**  58:5

**45-minute**  95:8

**46**  189:4,6

**47**  90:6

**4701**  61:22

**4702**  61:22

**4:00**  72:11 73:14 80:22
199:5

**4:01**  76:20

**4:03**  199:8

**4:04**  76:22

**4:15**  81:4,7

**4:16**  206:15

**4:20**  89:6 153:14 154:8
186:14

**4:23**  70:2 73:23 74:9
77:10 153:14 154:7
186:12

**4:25**  77:10

**4:30**  189:14

**4:45**  65:13 72:18 73:4,
15 77:11

**5**

**5**  79:24 83:10,23 90:5,19
91:4 92:4,10 173:21
179:8

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**50** 76:19

**500,000** 201:21

**51** 71:23 158:6

**52** 72:10 160:1

**53** 61:19,21 62:3 67:1 74:5

**54** 68:10,22 75:12,13 91:4 158:3,11

**5411** 197:9

**55** 76:13 152:5

**56** 71:10,12,23 72:11 79:23,24 80:22 81:11,25 86:24 89:5 94:22,25 95:3, 23 96:12 97:23 102:14, 17,19 111:1 114:25 119:17,23 142:1 143:1,2 146:13,23 147:1,22 152:4 158:4,11,16 159:25 161:1 163:13,20 164:12 166:4 167:5 168:4,8 171:1,10, 17 172:18,21 173:1,7

**57** 69:6,9,10,18 70:1 90:19 91:2 108:14,15 109:9 112:19 113:4 158:17

**58** 63:13,16 64:23 65:2 67:17,18 68:22 69:22 74:3 158:21

**5:00** 79:9 189:15

**5:05** 172:7

**5:10** 160:4

**5:20** 69:23

**5th** 51:14 57:19 67:24 79:9 143:14 144:15 145:11 156:12 158:23 189:12,13

---

**6**

**6** 64:4 80:21 174:6 175:10 201:8

**6-0** 173:20

**6.29** 68:17

**6.39** 67:20 68:18

**6.77** 67:21

**60** 69:11 173:19,23 175:10 176:7 177:19

**62** 160:24 161:1

**64** 75:14,15 79:6 91:25 92:4 161:14

**66** 49:21 54:21

**67** 69:10 96:23,25 100:2, 9 103:10 105:19 110:2 114:4,7

**68** 144:23,25

**68's** 145:6

**69** 72:23,24 77:21 78:2 163:12 177:19,24

**6:10** 160:6

**6:30** 95:25 97:25 98:6

**6:45** 172:6

**6th** 51:12,14,15 64:7 161:18 164:25 165:20

---

**7**

**7** 67:17 69:22 84:1

**7,500** 203:15

**70** 163:20 178:23,25 179:4,7

**71** 92:10 164:12

**72** 165:15

**73** 166:3

**75** 167:5

**78** 167:22

**7:15** 160:8

**7th** 51:13,14,15 52:1 103:6 104:1 148:11 163:24 164:15 165:22 167:8

---

**8**

**8** 51:9 53:15 80:4,7 81:11,14 97:3 104:2,22 143:7 145:4

**8,000** 203:15

**80** 161:7 175:12

**801** 177:25

**804** 178:1

**805** 145:1

**806** 145:1

**807** 97:1

**810** 97:1

**86** 168:3

**863-2351** 171:18

**878** 108:16

**88** 25:3

**880** 108:16

**89** 168:8

**892** 63:14

**899** 63:14

**8:00** 87:11

**8:05** 87:13

**8:30** 96:2 97:25

**8th** 51:15 52:4,10,13 53:22 80:3 82:6 85:11 95:8 96:7 100:23 105:20 110:7 114:23 178:3,7

---

**9**

**9** 142:2

**9-millimeter** 88:7 96:13 101:8 109:11 111:14 190:8,22 191:4

**90s** 42:13

**911** 166:7

**935** 173:21

**94** 119:23

**940** 173:21

**954** 75:16

**98** 23:22 25:3

**9872** 163:14

**9:00** 96:2,4,9 97:17 98:1,7,11 100:11 172:22

**9:17** 109:15 111:8 112:3 113:19,22

**9:32** 5:5

**9:45** 160:9

**9th** 85:3,7,11 86:1,7,17 87:5 88:2 93:12,22 94:3 108:18,21 109:16 110:12 114:24 148:4 176:23 178:12

---

**A**

**a.m** 174:7

**a.m.** 5:5 49:8,11 62:1 91:21,23 95:25 96:9 97:17,25 98:7,11 99:5 100:11 109:15 111:8,15 112:3,6 113:19,21,23 164:16,25 165:22 172:7

**aban-** 43:15

**abduct** 79:7

**abducted** 78:6 144:1 166:1 167:10

**ability** 7:21,24 8:2,15, 19 31:15 33:21 34:2 129:8 180:11

**Absolutely** 142:13

**abuse** 103:2

**academy** 24:15,18,19 25:19,22

**accepted** 32:23

**accident** 24:9 44:2,16 190:11

**account** 203:7,8,9,12

**accounts** 203:1,2,3

**accurate** 40:16 95:11, 12,21 162:22 195:25

**accurately** 7:22,24 8:3 192:12

**acknowledged** 155:25

**acres** 104:23 105:3 106:25 161:7 175:12

**act** 45:20

**action** 12:17 14:9,11 179:9,11,13,14

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**actions** 179:18,21 180:12

**active** 16:19,23 17:3, 21,23 20:15 21:21 122:19

**activities** 12:11 79:17 108:18 121:25 178:20 180:9 184:12

**activity** 64:16 179:6, 11,13,14 184:18

**acts** 18:7

**actual** 19:13 40:10 75:11

**added** 59:2

**addition** 115:24

**additional** 18:10 34:21 115:25 116:6 121:6

**address** 162:8 194:21

**administered** 121:22

**administrator** 9:3 11:7,17 12:9,13 15:20 103:23

**admits** 184:1

**admitted** 84:11 153:11 156:1 183:19 185:14

**admitting** 186:24

**advise** 87:20

**advised** 84:10,11 87:13 145:14

**advisement** 88:14

**affect** 7:21,23 8:2,18

**affiliated** 42:11

**AFLAC** 15:23

**afternoon** 57:19 62:5 69:24 79:8 109:20 110:12 156:12 181:10

**AG** 198:15

**agencies** 24:3 38:21

**agency** 38:22 39:6,18 54:23

**agent** 12:6,12,13 15:23 18:22 26:10,11,21 27:10, 12,14 29:4 30:14 38:10

39:12,13,17 40:5 50:12, 23 51:3 59:17 76:7 104:13 114:9 133:22,24 134:9,15 145:14,15 176:10 180:2 191:24,25 192:9,23 193:6 194:2 196:9 198:19

**agents** 37:21,22

**agree** 70:5 93:9 140:16 141:9,12 205:13

**agreed** 104:16

**ahead** 34:5 69:6,7 78:10 108:25 111:18 119:20 132:1 190:12

**aid** 95:15

**Ainsworth** 5:14,15 6:1,8 29:16,23 30:13,18, 25 31:7,17 32:4,14,24 33:11 34:4 35:8 39:14,25 41:4,14 46:12,16,18 49:2, 5,12 54:20 55:16 56:11 57:10 59:1,9,23 60:14,25 61:12,18 67:6 70:6,15 71:3 73:10,22 74:2,13 75:8 78:12,19 79:14 83:17,20 85:16 86:14,23 87:17 88:12 89:4,10 90:4, 18 91:1,16 93:9,18 94:10 98:20 99:2,9 103:9,18 104:7 106:3,10,17 108:25 109:6 117:25 118:6 123:9,16,21 124:2,13,21 125:10,25 126:9 127:10, 25 128:13,24 129:6 131:10 132:4,10,15 133:7,15 134:7,14,25 135:16,23 136:9 137:8,22 138:9,17 139:17 140:2,9 141:24 142:5,8,12,15,25 149:2,8 150:9,19 151:4 153:9,17 154:2,15 156:9, 18 157:7,22 163:10 166:23 169:7 173:12,18 175:9 177:7 182:25 183:15 184:7 186:10,20 192:7,15,22 193:5,11,17, 25 194:8,12,15,17 195:3, 12 196:8,23 197:7,13,24 198:2,4 199:3,9,25 200:11 205:20,23 206:6, 10

**Alabama** 18:14

**alcohol** 103:2

**alerting** 142:13

**alive** 161:22

**allegation** 168:24

**alleged** 44:8

**Allen** 22:20 23:1

**ammunition** 28:12 108:4 111:25 112:18

**amount** 79:16 159:14 202:9 204:14

**and/or** 9:12

**angles** 140:4

**angry** 187:22

**annual** 42:1 43:3,7,10, 14

**answering** 200:24

**anybody's** 200:19

**anyplace** 183:23

**anytime** 83:18 142:15

**apologies** 68:22 147:20 148:17 178:9

**apology** 73:10

**appeared** 58:11 166:24

**appearing** 5:15,18,19

**appears** 61:25 72:4 75:19 80:1 91:17 143:2 148:3 178:2 199:10

**apprised** 180:8 181:22

**approval** 129:18

**approximately** 5:4 12:3 23:15 47:1 68:24 80:7,14 113:15 174:6 201:21

**area** 79:18 147:8 153:11 154:13 157:15 180:1

**Arfmann** 26:17 27:4, 14,19 51:20 52:19 53:1 54:14 55:1 57:24 60:2,5 78:6,12,20 79:8 84:16,23 88:3 112:23 179:22 182:1,15,19 184:25

185:13 186:24 189:12

**Arfmann's** 52:11 93:1 175:23

**Argh** 114:1

**argument** 164:23

**armed** 114:21

**Army** 16:13,16,20,23 17:9 20:16 35:25 44:25 45:3,5,16

**arrest** 13:24 18:9 27:22 28:15 58:12 122:23 127:18 128:2,8,17,23 129:12,16,17 130:3,5,16

**arrested** 84:22 121:23 182:20

**arrests** 128:5,21,25

**arrival** 84:8

**Arrived** 76:15,22

**arrives** 77:11

**ask-** 38:6

**asks** 179:8

**asleep** 98:7

**ass** 60:17 61:10 195:16 196:11 200:20

**assessed** 201:16

**assigned** 9:19 26:2 55:7,19 74:14,17,20 75:5 123:11 141:10 144:9,13 179:12 180:3,18,21 181:7 197:6

**assignment** 25:22,24 26:2 57:16,23 107:15 119:11,12 166:13 180:17

**assignments** 52:17, 24 121:6 123:14 140:13 180:14 181:10,12,15

**assist** 51:9 180:3

**assistance** 179:25

**assistant** 135:10

**assisting** 26:9 27:10, 12,14 39:13,19 133:22

**Associate's** 23:3

**assume** 7:17 54:2,4 67:4 68:4 78:18 112:17

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

116:11 120:5 148:21
170:12 177:4 188:22
195:21 196:15

**Assuming** 186:18

**assured** 197:16

**Atchison** 26:24 27:2

**ate** 60:17 61:10 195:16
196:10

**attached** 104:18
176:12

**attempt** 34:20

**attempting** 34:24

**attend** 22:17 24:15,18
25:19

**attended** 23:10 53:14
59:3 183:24

**attending** 6:2

**attention** 94:23
166:17 167:2

**attorney** 11:13,19,25
33:12,14 38:23,25 39:8,
20 40:8 46:24 54:1,5,7
59:2 88:6 93:3 100:24
103:22 125:8 127:15
128:3 129:15,16,19
130:21,22 182:2,6,12
185:1,2 189:9 191:17
206:11

**attorneys** 9:12 183:16

**audio** 48:3 59:13
195:11,23 196:7 197:11,
14,23 198:1,3,11 199:10,
24 200:8,10 201:12

**authority** 105:23
181:17

**avoid** 36:12

**awards** 45:2

**aware** 32:17 71:7
81:19 83:1,5 102:7 131:9
132:21 136:12 138:8
184:9,13 191:7

------

**B**

**bachelor** 22:12

**back** 12:20 31:22 49:10
57:21 62:12 66:16,25
69:21 72:18 74:25 77:11
80:14 89:13 90:5 94:21
95:14 97:23 99:7 100:1,8
101:1,5 102:14 103:10
107:21 108:24 109:4
112:19 113:25 114:13
118:22 119:15 122:4,6
125:2,18 126:8,11,15,21
130:9 137:6 142:2,17,23
144:12 146:13 151:6
152:14 158:3,6 159:25
160:6,9 166:8 173:16
188:4,14,22 193:23 195:1
199:7

**background** 103:21

**bad** 142:17

**bank** 203:1,2,3,7,12

**banks** 203:6

**Baptist** 102:21

**bar** 204:19

**Barton** 22:21

**base** 13:3

**based** 71:7 79:6,16
85:19 134:22 136:13
137:23 138:11 139:12
151:16,18 185:9 186:13,
22 188:24

**basic** 204:20

**basically** 43:14

**basis** 43:3 128:14

**Bates** 61:21 63:14
68:11 71:13,15,23 75:16
79:24 83:23 95:1 96:25
108:15 144:25 173:20
177:25 197:9

**bathroom** 38:3

**bear** 107:17 195:6

**bed** 160:10,11,12
189:23

**begin** 7:3,8

**beginning** 38:8 59:14
85:22 94:24 114:8 197:15
198:5 199:13 200:14

**behalf** 5:15,18,20,24
15:13

**believed** 53:8 110:4

**believes** 51:8

**belonged** 58:17

**belt** 103:20

**Belton** 21:1,10 22:3,5

**bigger** 49:24 71:19,25
75:18

**bill** 65:5 148:19 198:12,
13 200:3,4,5,9

**Billie** 67:8 167:24
168:4,9,11,14,20 169:1

**bit** 30:1 49:24 98:15
148:15 200:7

**black** 62:18 66:3 80:18,
25 143:16 149:11

**blank** 189:17

**Bledsoe** 5:7 27:9 48:18
55:24 56:4,21 57:1,12,14,
18 58:5,10,18 65:3,5,11,
16,19,24 66:2,7,10,16
67:8 79:7 80:3,8 81:13
82:15 84:10 85:2,12,17,
25 86:7,17 87:5,11,20,23
88:1 89:24 92:5,25 93:11
95:7 96:6 97:10 98:16
100:6,20 101:1,7 103:13,
14 104:14,16,24 105:4,9
109:12 110:15 113:22
114:22 116:10,17 117:1,3
118:4 119:24 120:17,19
122:23 126:17 127:18,19
128:2 130:5 135:2 137:4
145:10 146:15 148:8,20
149:9,14 152:14,17,24
155:21 156:19 157:25
159:11 161:19 162:23
163:24 164:16 166:5
167:8,16,17 174:14,15,
19,23 176:7,20 177:1
178:4,12 184:11 190:18,
19 191:11

**Bledsoe's** 48:23
58:17,21 75:25 76:9,16
77:2,5 87:23 110:15
119:7 120:18,24 121:2
152:16 156:12,23 172:2

**block** 101:11

**blond-haired** 164:16

**blood** 28:8,24 78:24
132:17 133:1,8,20 136:25
138:5,12,22

**bloodhound** 165:19

**bloody** 134:11,16
135:18 136:4

**blouse** 166:4,6

**blue** 62:18

**Board** 5:20

**boats** 202:24

**body** 51:23 52:3,11,14
85:9 87:21 88:5 93:1,4
101:25 125:21 126:25
132:8 147:19 150:24
153:1,3 156:1 183:18

**Bollinger** 102:5

**bonds** 202:5,6

**boots** 66:5,8

**borrowed** 152:17
154:4

**bottom** 39:4 68:2
81:23 96:11 168:8 194:10

**bought** 62:10,21,25
63:3 74:6 80:25

**box** 112:20

**boy** 109:7

**brain** 131:2

**break** 8:6,7,10 38:2
49:3 91:21 98:22 100:3
107:19 108:24 142:4,7,8,
10 173:11 193:18

**breaks** 37:15 38:8

**Brenda** 164:12 165:6

**bribe** 32:13,15,23

**briefing** 53:14,18

**bring** 101:1 109:7
205:16

**bringing** 130:9

**broke** 99:21

**brome** 147:9

**brother** 126:2 127:3

**brother's** 189:14

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**brought** 15:12 101:5 114:13 116:10 125:5 183:17

**bruises** 44:19

**brush** 172:22

**bullet** 84:12,17 130:13

**bullets** 96:16,17 116:16

**Bumps** 44:19

**Bureau** 12:7 25:8 43:20 49:21

**burial** 78:14,22

**buried** 87:23 88:4,5 126:23 130:11,14 132:8 139:19 141:17 153:1 155:23 183:10 184:1 190:21 191:4

**Burk** 50:11,15 59:14, 18 60:15,16,20 61:9 191:23,24,25 192:9,23 193:6 194:2 196:10

**Burk's** 192:16

**bury** 41:8

**bus** 81:4 153:12,14,15, 18,24 154:5,14,21 155:4, 17 156:8 157:16 185:15, 19,20,24 186:7,25 187:1

**busy** 54:9 121:16 122:9,12,24

**button** 194:10

**buy** 31:23 32:9,21 62:17 65:4

**buying** 70:19 74:22

---

**C**

**calf** 160:5

**California** 13:4 15:8 16:24 17:13

**call** 102:3 129:24 130:2 144:23 166:8 174:18,24 176:3

**called** 17:3 60:17 61:10 102:4,10 166:7 195:16 196:10 204:6

**calling** 170:21

**calls** 6:25

**calved** 160:4

**calves** 160:8

**camera** 56:11

**cameras** 56:16

**Camille** 51:20 78:6, 12,20 79:8 84:16,23 88:3 90:21 93:1 102:25 112:22,23 146:15 184:25 185:12,19,23 186:24 189:12,15

**Camille's** 81:3,25 82:5 87:21 102:20

**canvasses** 52:19,25

**capacities** 5:22

**captured** 143:22

**car** 24:13 44:3,11,13,14 65:19

**career** 128:25

**cares** 189:6

**Carreno** 5:22 47:13 50:24 51:3 55:7,11 84:1 85:6 90:10,13 91:17 92:18 123:16 178:14,15 192:1,23 193:7,13

**Carreno's** 196:24

**carried** 106:21

**cars** 161:21

**Carter** 15:4

**case** 5:9 9:19 12:18 13:14,16,20 14:1,4 20:5,6 26:11,21 27:2,9 28:19 29:17 31:6 33:17 34:12 35:16 36:22 38:10 39:12, 13,16,17 45:19 49:18 50:16,23 51:3,10,22 54:7 55:1,3 59:3 70:7 95:18 123:20 124:4,5 125:3 126:16 133:24 134:9,15 138:10 177:17 179:1 180:2 183:22 192:5 199:18 205:12

**cases** 9:12 26:7,11,23 27:8,11,13 54:23 126:14 182:11

**cash** 62:6 68:25 69:6

**casual** 19:18

**Catherine** 96:2 97:16 98:1,10 100:10 104:24 105:4

**causing** 44:16

**cell** 164:2

**center** 52:2 84:2,10 103:25 121:10,17 123:5 130:6 182:15

**certificates** 204:2

**chain** 14:17

**chance** 87:7 187:11 201:14 204:15

**change** 49:2 66:16

**changed** 66:7 69:1

**charge** 32:10 198:19

**charged** 29:8 33:9 82:23,24 84:23 126:2 127:4 191:12

**charges** 13:20,21,23 29:19,21 30:3 31:23,24 32:5,6,7,8,18,19 33:2,3, 16,24 34:10 35:1,18 36:3, 11 124:23 125:4

**chat** 83:11,21 96:22 177:18 178:23 194:19,21

**check** 74:21,24 75:2 110:10 143:23 145:11 146:5 160:3,15

**checked** 96:16 101:4 114:12 160:5 203:23

**checking** 73:11 203:7

**Chevrolet** 65:12 80:24 152:7,12

**Chevy** 65:16 72:23,24, 25 164:1 165:23 167:9

**chewing** 200:19

**children** 204:23,25

**choose** 204:17

**chosen** 192:2,25

**Christmas** 62:11

**church** 102:5,20,21 125:15 126:19

**CID** 16:17,18 18:22 21:8,11,12,16,18,24 23:16 37:22

**circumstances** 88:13

**cited** 45:12

**civilian** 17:20 35:2

**claimed** 57:18

**claiming** 187:10

**clarification** 73:9

**clarified** 38:15

**clarify** 29:25 57:9 79:20 119:14

**classes** 18:20 19:1,2 22:22

**clear** 8:12 132:23 158:14 181:19 199:14

**clearing** 201:10

**clerk** 21:4,5

**clip** 96:15 194:1 195:4 197:9 198:23 199:15

**clips** 197:4

**close** 114:2

**closed** 114:3

**clothes** 189:24

**clothing** 28:9 132:17 133:1,8,20 134:11,16 135:18 136:4

**club** 13:3,7

**coffee** 95:25 97:25

**Coffey** 167:7,13,15 169:20

**collect** 18:9

**college** 22:9,10,20,22

**colonel** 161:9 175:22 176:1

**color** 96:13

**Colorado** 42:5

**Commendation** 45:5,8

**commendations** 45:3

---

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**comment** 65:23 159:8

**commented** 66:3 67:8

**comments** 195:23

**Commerce** 203:7

**commission** 9:6,10, 15

**Commissioners** 5:20

**committed** 84:25 117:6 187:25 188:2

**committing** 118:2

**communicated** 130:12 151:12 153:2,3

**communicates** 126:23

**communicating** 125:20

**Community** 22:22 203:9,11,12

**compensation** 203:18,21

**competent** 86:15

**compiled** 173:24 178:2

**complainant** 10:3

**complaint** 9:18,22,25 10:15,18,19,23 11:5,16, 21 13:13

**complete** 22:2

**composed** 41:24

**concerned** 33:15

**conclusion** 10:4,5 57:8 104:13

**conclusions** 10:7

**condition** 7:20,25 105:14

**conduct** 18:8,15,19,24 19:4 36:24 52:18,24 56:4 73:1 106:11 120:19

**conducted** 10:13 13:7 36:15 37:13 48:7,8,11 49:23 58:11 60:2 70:11 72:5 80:2 89:2 90:9,12

107:23 121:9,14 122:10, 17 143:6 161:15 172:14 180:9 185:4,10 191:16

**conducting** 44:10 55:23 122:15 191:10

**conference** 41:22 42:8,12,17,23 43:7,8,12 183:23

**confused** 24:25 98:15

**connection** 175:21

**consensual** 168:11,21

**Consensus** 104:21

**consent** 104:15,16,17, 21 105:9,17 106:2 107:13 109:16,17,19 110:8,13 120:17 133:16,18 135:1, 2,7 137:4 146:23 147:3,5, 19 152:8,10 156:19,22 157:9 161:3,6

**consideration** 34:18,19

**considered** 32:15

**consult** 40:14

**contact** 19:7 144:13 146:14 157:4 166:14

**contacted** 13:17 51:8 52:11,14 102:10 164:3

**contacting** 167:3 170:12 175:3

**content** 59:12 198:7

**contents** 50:17

**context** 196:6

**continuation** 81:13

**continue** 37:4,8,25 153:7 158:11

**continued** 92:19

**continues** 55:21 198:1,3 200:10

**contributed** 45:15

**control** 33:7

**conversation** 61:1,4 100:21 101:22,23 103:11 114:22 149:20 183:1,6 189:19

**conversations** 46:23 103:5,24 104:8 124:20

**convicted** 35:10 191:12

**convince** 190:4

**cooperate** 167:18

**copies** 46:5 47:8

**copy** 39:12,16,17,19 47:12 67:17 90:6,13 104:18 108:5 176:12,22

**corner** 63:17 64:15

**correct** 8:16,20 11:8, 20,23 12:14,21 15:16,17 20:22 23:13 25:11,12,15 26:19 29:2 38:10,20 40:3, 12 41:19 48:21 51:1,10 52:15 53:4,11 54:24 55:8 56:25 57:13 58:13,20,25 59:4 61:23,24 63:24 65:9, 14 66:8,20 68:3,8 69:15 72:7 74:12 75:7,22 85:13 86:18 91:13,14 93:13,24 97:4,10,11 102:1,8 107:3, 6,24 108:22 111:21 112:11,13,14 113:5 116:9 124:25 129:2 135:4 140:19 143:4 144:3 145:2 146:11,16 149:12 155:7, 10,14 158:1,2 160:22,23 161:4 162:15 163:18 165:13,14 167:4 169:13 172:20 173:24 174:3,9 175:25 180:13 184:16 186:4,18 196:16 200:16, 17

**correcting** 38:16

**correction** 9:7 12:21

**correctly** 171:22

**correlate** 169:10

**correlating** 171:25

**corresponds** 198:24

**corroborate** 30:5,6 33:19,20 34:8 155:6

**corroborated** 155:19

**corroborating** 30:9

**corroboration** 31:18

**counsel** 5:12

**counties** 25:24,25 26:3

**countless** 129:11

**Countryside** 102:20

**county** 5:8,20,21 11:13,18,25 15:8 22:20, 21 23:2 25:23 26:5,8,12, 15,24 27:2,18 33:12 38:23,25 39:1,7,8,19,20 40:8 47:11 50:25 51:4,17 53:15 54:1,5,7 55:25 56:15,18 59:2 64:4 68:13 76:1,10,23 100:24,25 103:12 122:11,19,20 125:8 129:15,18 130:22 175:14 180:1,3,7 181:4 182:3,5,8,10,12 185:2 189:8,9 191:17 203:10 205:25

**County's** 100:25

**couple** 22:6 181:9

**courses** 22:1

**court** 5:2 9:4 205:15

**covering** 101:12

**cow** 158:23 160:3,5,14

**cows** 159:12,20 160:6, 7,17,22

**cramp** 98:19

**created** 63:21

**creating** 40:13

**Credit** 203:9,13

**crime** 19:9 28:6 29:2,9 41:22 42:8,12,17,23 43:8, 12 64:10,12 102:6 103:15 117:6 118:2 127:4,19 133:21 152:24 154:5 183:19 190:20 191:13

**crimes** 93:21

**criminal** 13:14,21 18:7 21:13,14,19 29:19 30:2 31:23,24 32:5,6,18 33:2,16,24 34:10,11 35:1, 18 36:3,10 40:22 41:9 88:16 145:12

**crossed** 140:12

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**cryptocurrency**
204:4

**current** 12:17

**custody** 67:14 111:19
112:18,20 118:25 119:1
127:3 130:25 131:5,19
134:2 176:10,11,12
183:2,7

**cut** 34:6 134:12

**cutting** 77:22

**CV** 5:9

---

**D**

**dad** 97:12 102:3,10
103:15,24 108:7,9

**daily** 128:14

**dairy** 57:20 62:11 75:1,
3

**Dale** 161:15,23 162:3
169:23

**damages** 201:15

**Danielle** 161:16 162:3
169:23 172:21

**dark** 62:18

**date** 5:3 19:8 64:3,10,
11,12 67:24 68:1 97:3
108:20 111:8,9 122:20
123:6 144:2,14 188:24

**dated** 62:1 104:21
145:4 175:10

**dates** 23:20 42:14
121:19

**daughter** 165:25

**daughters** 205:1

**day** 85:3,8 87:21 88:2
92:25 121:22 122:21,24
143:25 150:23 151:9
159:15 176:1

**daylight** 69:1

**days** 44:5

**dealing** 9:13 111:5
116:25 117:4,11 118:15,
20

**death** 28:10 82:1,5
88:4 93:2 111:5 116:25
117:5,11,14 118:16,21
183:9

**debris** 191:4

**deceive** 31:12

**December** 114:24

**decide** 33:9

**decision** 135:22,24
136:1 138:16,18

**decline** 205:11

**Dee** 165:16

**deemed** 180:4

**defendant** 5:25 6:5
12:15,19 15:10 40:22
41:9,18 206:1

**defending** 40:22

**deferred** 203:18,20

**degree** 22:13,14,15,21
23:1,3

**Del** 172:21

**Delaney** 198:12,13
199:1,13,18 200:3,4,5,9

**Delaney's** 200:13

**delay** 73:6

**deliberate** 30:22

**department** 47:11
51:18 53:24 56:18 100:25
101:2 103:13 106:22
110:20 119:11 174:19
180:4,8,25 181:1,4,18

**Depend** 77:24

**depending** 20:5
30:12 31:6 39:1,8,20

**Depends** 35:15

**deposed** 6:12,18 12:3,
6

**deposit** 204:2

**deposition** 5:6 6:3
46:4,8 47:3,6 49:14 50:3
87:8 99:13,16 136:22

**depositions** 12:4,8

**deputy** 166:7,8,9

**derived** 76:11

**describe** 179:12

**Description** 119:4

**desktop** 201:5

**detailed** 120:9 149:23

**details** 104:18 176:13
183:18

**Detective** 50:23 53:10
68:15,23 85:6

**determination**
128:15 132:3

**determine** 31:10,15,
19 34:22 129:12 132:5
143:24

**developed** 185:11

**Dick** 148:4

**dictate** 63:25

**difference** 19:12,15

**differences** 19:10

**differently** 188:6,9,
15,23

**direct** 19:21 63:15
71:18 79:23 94:23 107:7
143:1 166:16 177:4

**directly** 89:15,20

**disappearance**
51:13 175:23

**disbanded** 43:16

**disbarment** 10:21

**disbarred** 10:10

**discharge** 45:25

**disciplinary** 9:2,6,
10,14 11:7,17 12:9,13
15:20

**discipline** 10:23 44:21

**disciplined** 14:12
43:22,25 44:24

**discourage** 175:2

**discovered** 51:23
88:3 113:20 153:3 191:3

**discuss** 78:20

**discussion** 173:15
194:25 199:6

**dismissed** 14:8,10
125:4

**dispute** 192:13,14
195:22

**disputing** 50:10

**disseminated** 38:18,
19 39:4,16 40:1,7

**distance** 89:12

**distinct** 21:21

**district** 33:14 38:25
39:7,20 40:8 129:15

**ditch** 141:17 190:3,23

**Division** 21:19

**DNA** 28:25 187:18,23
189:24

**document** 62:3 64:23
68:11 71:13 75:16 83:9,
23 84:7 86:16 105:19
144:25 146:8,9,10 147:4
148:15 149:21 173:20
177:8,13,25 178:1 201:11

**documentation**
178:13

**documented** 86:8,
11,22 93:10,23 94:4
107:2 141:2,4,7 146:1
158:1

**documenting** 121:25
174:1

**documents** 19:25
20:3,14 99:23 143:5

**dollars** 31:25 32:11

**domestic** 164:22

**door** 164:17

**doubt** 162:15

**drainpipes** 62:8

**draw** 167:2

**dresser** 96:15 101:3
111:3 112:4 114:11,18
115:2,11,13,21

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**drink** 38:3

**drive** 74:15,21,24 75:2,
11 77:12,23 89:10,19
172:7

**driven** 77:16,21 79:18
152:20

**driver** 153:15,24

**driveway** 76:21

**driving** 72:25 74:21
75:24 79:16 81:7 130:2
143:15 154:6 155:18

**drop** 83:10 96:22

**dropped** 43:15 124:23
154:7,13 157:16 186:9
203:23

**drove** 72:21 76:8,17,20
77:15,25 80:17 89:13
152:14 160:4 190:3

**drugs** 103:2

**duct** 62:6,7,21,24 63:4,
6 65:4,17 66:17,22 67:2,4
68:17 70:10,19 71:5
72:13,15 73:23 74:6,9,22
80:24 185:16

**due** 188:11

**duly** 6:5

**dumped** 190:4

**Dunfield** 163:14

**Dunnaway** 54:11,12,
13 84:4,5 179:19,23,24
180:6,8,13,20 181:3,14,
20

**Dunnaway's** 56:1,7,
12 57:1

**Dunnlap's** 172:7

**duties** 9:9 18:4,5 21:2
24:8,23 33:9 55:23
159:11

**duty** 16:19,23 17:3,13,
23 20:15 21:21 44:3

---

**E**

---

**ear** 199:12

**early** 11:6 172:7

**early-morning** 52:4
85:10 104:1

**earned** 45:13

**east** 76:1,18

**ECR** 111:16,19

**educational** 22:8,18,
23 23:9

**effort** 30:22 31:3,12

**eight-hour** 92:13,14

**else's** 121:12

**email** 194:21

**embarrassing**
150:3,22 151:9

**emory** 57:6

**employed** 25:15

**Employees** 202:16

**employer** 143:11
144:7,14

**employment** 15:19,
22 23:23

**Emporia** 22:13,19
23:6

**empty** 190:22

**encompassing** 105:3

**encounter** 187:12

**end** 38:8 58:15 90:3
163:6 199:11 200:25

**ended** 37:20 201:7

**enforcement** 18:8
22:22 24:3,9 29:10 30:3,
14 33:4 36:4 38:22 39:6,
18 43:4 44:10 52:2 58:9
84:2,10 88:7,17 93:20
103:19,25 121:10,17
123:5 125:13 126:12
130:6 182:15

**enjoyed** 21:14 24:24

**ensure** 40:15

**ensuring** 40:5

**enter** 41:3 191:19

**Eric** 5:19

**errand** 73:1

**error** 25:16 38:16
174:9

**establish** 144:6

**established** 52:8

**estimate** 11:10

**evening** 52:1 167:10

**event** 40:11 83:1

**events** 8:15

**eventually** 43:15

**evidence** 18:9 19:22,
24 20:1,4,8,9 28:3,4,6,18,
21 57:7 78:25 79:5 108:7,
9 110:14 111:15,19
112:20 113:8,12,16
118:24 119:1,2,8 129:14
131:8 133:5 136:4 137:1
138:5,13,22 139:6,7
151:16,18 152:23 154:2
176:10,11,12 184:8,13,
19,21,23 191:17

**exact** 42:14 188:19

**exam** 83:3

**EXAMINATION**
6:7

**exams** 121:22 122:22

**exchange** 32:19

**excuse** 82:21 85:20
98:17 101:11 167:6

**exhibit** 49:21 54:21
59:10 61:19,21 62:3
63:13,16 64:23 65:2 67:1,
17,18 68:10,22 69:22
71:10,12,23 72:11 74:3,5
75:12,15 79:6,23,24
80:22 81:11,25 83:10,11,
22,23 86:24 89:5 90:5,19
91:4 92:4,10 94:22,25
95:3,23 96:12,23,25
97:23 100:2,9 102:14,17,
19 103:10 105:19 108:14,
15 109:9 110:2 111:1
112:19 113:4 114:1,4,7,
25 119:3,17,23 142:1
143:1 144:23,25 145:6
146:13,23 147:1,22 152:4
158:4,11,16 159:25 161:1
163:13,20 164:12 166:4
168:4 171:1,10,17 172:18
173:1,7,19,22,23 175:10

176:7 177:19,24 178:23,
25 179:4,7 189:4,6 197:6

**expect** 54:6 86:15
126:10 141:5

**experience** 22:8,24
23:18 27:17 29:7 30:1
36:10 40:19 93:21
103:20,22 125:13 126:12,
13 132:25

**experienced** 93:19
138:10,20

**explain** 36:2 180:15

**explaining** 117:5
168:21

**explan-** 118:1

**explanation** 61:8
113:18 117:9,18 168:19
184:8

**expletives** 200:20

**expressly** 46:22

**extent** 191:18

**externally** 5:10

---

**F**

---

**F-150** 202:4

**facing** 29:19 30:2 32:5,
7,18 33:2,16,23 34:10
35:1,11,18 36:3,10

**fact** 32:25 94:3 100:15
124:3 154:20 157:20
183:6,16 185:14 197:18

**factor** 185:16 188:11

**facts** 110:11 150:22
151:9 155:13 157:24
185:4,10 186:23 187:3

**factual** 10:6 41:2,13,
16 117:24 132:14 151:16,
18 184:21 191:16

**failed** 190:9

**faint** 64:6

**fair** 7:18 31:13 67:6
115:13 126:9 157:12
158:5 184:14

**Fairview** 76:14,18

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**false** 29:9 30:14,19,21 31:1 34:22,25

**family** 190:4 204:16

**farm** 74:16 76:1,10,22 77:6,11,21 78:3 89:11,14, 16,21 152:21,22 154:4

**fast** 69:9,11,14,19 70:1 77:24 189:22 190:5

**faster** 77:18,21

**father** 102:11 119:25

**father's** 189:24

**fatigue** 8:1,14

**fault** 44:17 85:22

**February** 5:4 49:23 131:1

**fed** 160:8

**feel** 49:17 127:23 187:21

**feelings** 191:19

**fellow** 78:20 92:24

**fibers** 28:25

**field** 38:12 39:25 40:6, 9,14 47:13,20 71:11 72:5 79:22 84:12,17 86:25 90:6 94:22 102:15 110:23 147:9 148:3 176:20 177:9 178:15,18

**file** 83:14,21 125:3 126:16 179:17 194:19 201:12

**filed** 13:23 47:9 97:6 100:5

**fill** 113:8

**filled** 108:18

**filling** 148:8,13

**finances** 201:16

**find** 15:3 19:3 25:4 80:4 89:19 90:21 94:24 97:22 102:13 107:16,19 110:25 119:22 120:3 138:2 140:10 143:21 145:22 146:19 152:1 170:18 190:21 198:23

**fine** 135:9,25 204:18

**fingerprints** 28:25

**finish** 37:14

**Fire** 202:12

**fit** 52:4

**five-foot-two** 80:10

**five-minute** 142:10 193:17

**fix** 147:24

**flip** 7:16

**Floyd** 5:7 48:18,23 55:24 56:4 57:18 58:18 62:5 67:1 70:8,10,18 72:12,18 73:3,14,16 75:25 76:9,15,16 77:2,5, 8,20 78:6,13 79:7 80:2,8, 10,17,21,22,24 81:3,6,13, 16,19 82:4,11,15 83:2,6 85:2,12,16,25 86:7,17 87:5,11,20 88:1,24 89:5, 24 90:20 92:5,25 93:11, 21 94:2 95:7,24 96:6,14 97:9 98:6,15 100:5,15,20 101:1,7,23 102:16 103:5, 11,12 104:8,14,24 105:3, 9,18 109:12 110:14,15 113:22 114:10,16,22 116:9,17 117:1,3,10,18 118:4,19 119:6,7,24 120:17,18,19,24 121:2,23 122:23 124:4,15,24 125:5 127:18,19 128:2 135:2 137:4 146:15,18 148:8, 13,19,22 149:9,14,25 150:2,10,12,14,21,25 151:7,22,23 152:13,16,17 153:10 154:3,4,5 155:16 156:2,11,19,23 157:13,25 159:11,19 160:3,6,8,9,10, 16,22 162:23 163:24 164:6,7,16 166:5,6,8,9, 12,16,25 167:8 169:17, 19,21,24 170:4,7 171:14, 23 172:2 174:14 175:2 176:1,16,20,21 177:1 178:4,12 182:20 184:19, 24 185:6,12,18 186:23 187:3,11 190:18 191:11 192:4

**Floyd's** 151:13 154:8 155:11

**follow** 145:20,21

170:10

**follow-ups** 51:10

**Forces** 16:17 20:21,24 21:1,3,6

**Ford** 13:3 15:4,5 202:4

**forgiveness** 190:16

**form** 29:12,22 30:11, 16,23 31:5,14 32:2,22 33:6,25 35:4 39:10,22 40:24 55:12 56:9 57:4 58:22 59:5,19 60:10,22 61:11,14 67:3 70:3,13,25 73:18,25 74:11 75:4 78:9, 16 79:10 85:15 86:10,19 87:15 88:8,25 89:7 90:1, 15,22 91:15 93:5,14 94:5 103:7,16 104:3,16 105:24,25 106:5,6,12 110:8 117:20 118:3 123:1,12,18,24 124:9,16 125:6 126:3,4 127:5,20 128:10,18,19 129:4 131:6,20,22 132:9 133:2, 11,12 134:3,19 135:20 136:7 137:3,20 138:7,14 139:15,23 140:5 141:19 146:24 147:3,5 150:5,16 151:1 153:5,16,20 154:9 156:4,13,25 157:17 161:3,6 168:19 169:3 175:5 177:3 182:22 183:11 184:3 186:6,15 192:6,10,19 193:1,9,15 196:19

**formal** 13:23 14:9,11 19:1,17,20 35:24

**former-sheriff** 55:25

**Fort** 15:8 16:24 17:12 18:3,13

**found** 52:15,20 53:2 67:12 101:2,5 111:3 112:4 113:16,23 114:10, 12 115:1,7,10,21 116:4 122:18 132:25 145:13 150:24 161:22 166:4 174:19,24 176:4 190:1

**four-door** 202:3

**four-page** 177:24

**four-wheeler** 160:4

**four-year** 22:13

**frame** 102:10

**freaked** 190:2

**Friday** 47:1 62:5 98:5, 6,10 143:25 161:11,21 165:1 167:10 172:6 174:16

**friend** 126:19

**front** 44:13,15 75:10 109:8 111:4 115:17 116:1,22

**Frost** 5:23 68:15,23 196:24

**Frost's** 73:15

**Fuck** 60:21 195:18 196:13

**fucking** 60:21 195:18 196:12

**full** 104:18 105:22 176:13

**full-screen** 177:21

**full-time** 23:23

**funds** 13:9 42:25 203:17,25

**furniture** 204:13

**future** 145:16

## G

**G-R-E-E-L-E-Y** 16:7

**gain** 33:4

**Gardner** 169:15 172:18 174:2,11,15,17, 18,23 175:16,19 176:8,17

**Gary** 148:19,20

**Gatewood** 143:6,18 144:5 145:7,10,14,22,25

**gave** 63:6 65:5 66:16 67:13 90:13 96:17 159:21 164:2 176:7 181:10

**general** 22:12 23:5,7

**generalized** 23:8

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

 

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**Georgia** 18:4

**Gerald** 163:14

**girl** 118:15 125:20 126:23 130:11 132:7 155:23 157:16 164:18 165:25 166:9 170:17 174:15 183:9 190:13

**girlfriends** 102:25

**give** 29:9 30:14 31:1 35:19 36:11 42:14 83:14 88:1 104:14 108:20 117:18 120:19 137:4 171:14,23 181:11

**giving** 30:3 31:9 32:20 33:17 34:10 36:3 105:9 107:15 176:21 181:14

**Glenn** 167:13 169:21

**glitched** 148:25 149:4

**God** 190:17

**gold** 204:7

**good** 5:1,14 17:17 40:20,22 41:7,8,17 42:18, 19 45:14 49:1 129:3 138:11 141:13 199:12 206:12

**Gordon** 18:3

**graduate** 16:2,4,6

**graduated** 25:21

**grains** 30:4

**Grammer** 163:21

**grandchildren** 205:9

**grandmother's** 111:5 116:25 117:5,11,14 118:16,21

**grant** 138:1

**granting** 104:17

**gravel** 76:19

**gravesite** 190:21 191:2,3

**gray** 96:13

**Greeley** 16:7,8

**green** 65:12,16 72:21, 24 77:21 78:7 80:23

161:19 163:25 165:23

**ground** 6:21 190:9

**group** 16:17 21:1,3 123:10

**guess** 15:3,5 19:3 27:16 32:15 34:23 41:4 59:25 64:1 89:18 97:22 120:8

**guilt** 184:22 185:3

**guilty** 33:3 184:9,14, 19,24 185:7,8,12 186:23 187:4 190:19

**gun** 87:24 88:7 93:3 96:14,15,16,18 101:1,5 111:2 112:4 114:13,19 115:1,10,25 116:10,15 125:22 127:1 130:10 155:24 190:8,10

**guns** 96:12 102:18

**gunshots** 158:12

**guy** 102:4 164:17 176:2 183:17 191:21

**guys** 60:18 61:12 123:10 124:3 195:16 196:11

---

## H

**hair** 28:25

**hairs** 185:17

**half** 80:13 172:7

**half-hour** 142:17

**half-mile** 175:13

**handed** 10:22

**handle** 81:16

**handwriting** 61:23 72:1 87:1 91:6,9,11 95:4, 5 113:1 143:3 148:1 161:1 168:5 169:12 171:16,21 172:2,9,19

**hang** 60:15 147:24

**happen** 11:4

**happened** 30:24 113:14 151:11 189:22

**happening** 55:18 58:7 190:5

**happy** 192:3 193:7,13

**hard** 111:5 116:25 117:4,10 118:15,20

**hardware** 57:20 62:2 65:4,20 66:12 67:9 68:25 70:9,11,23 71:4 72:12 73:16 74:16,25 75:3,25 76:9,12 77:4,8 79:17 80:23 89:6,11,13,16,21 152:14,18 153:13 154:6, 23 155:5,9,19,20 186:3, 11

**hardworking** 45:15, 17

**Hawk** 161:16 169:23 172:22

**Hawks** 163:3

**Hayes** 6:2 52:2 96:13 100:21,23 101:6,24 103:13 104:2 105:15 114:13 116:10 181:25 182:12,14 206:8

**head** 84:12,17 125:22 126:25 130:13 153:2 155:24,25 168:2 172:16 180:7 188:16 190:10

**headed** 185:21 187:1

**hear** 46:18,23 149:5,24 195:14,19 196:17 198:5 206:5,7

**heard** 60:8 158:12 161:10,20 162:24 164:1, 8,19,20 165:7 166:5 167:1,11,12,13 170:8 172:24 174:17 175:3,22 176:2 182:7 183:22 192:3 193:6,12 195:15 198:11 200:14,23

**hearing** 194:5,6

**heat** 150:24

**Heidi's** 78:14

**held** 44:16

**helped** 189:17

**helpful** 201:9

**helping** 17:16 51:19

**Herrig** 5:21

**hid** 151:13

**high** 16:2,4,6,7

**highway** 23:25 24:6,7, 16,19,21 25:6 35:25 43:19 44:22 202:13

**Hill's** 165:23

**hired** 24:16 25:18

**history** 103:1

**hold** 143:18 145:12

**home** 64:25 76:20 78:13,14,22 79:8 101:1,2 105:10 110:16,17,19 138:23 139:18 141:17 154:19,22 155:3 175:19 185:21 186:4,8 187:1,2 201:18,20,22 202:19

**homicide** 26:17 27:5, 8,13,14,17,19,21,22 28:16 32:6,7,8,10 54:14 55:1,4 57:8,24 60:3,5 84:19,23 86:3,4 138:10, 20 179:22 182:1,15,19

**homicides** 26:20

**honest** 126:8 136:17

**honor** 17:18

**honorable** 45:25

**hoped** 161:21

**hopes** 29:10

**Horse** 161:7,10 162:4, 10,13,18,24 163:14,18,21 164:7,13 165:17 166:17 167:1,2,4,6 169:16,19,20 170:1,5,9,13,17,22 171:15,24 175:4,14,22

**Hose** 171:15,24

**hour** 47:1 49:1 69:7,8, 14 76:13,19 80:7

**hours** 36:17,19 37:3 52:4 84:2 85:10 91:5 92:17,25 93:12 104:1 113:15

**house** 27:24 28:3,5 58:17,21 76:9,16,17 77:2, 5 78:14 87:23 88:4 93:2 96:4 105:6,23 106:4,11, 16 107:4,9,12,14 119:7 120:18,24 121:2 130:14,

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

24 131:4,9,12,14,17
132:6,8,16 133:9,19
134:1 135:3 147:9 154:8
155:24 162:17 165:23
166:9 167:10,17 183:10
186:1,12 189:14,16

**household** 204:13

**human** 188:11

**hundred** 28:1 31:25
32:10

**hunter** 167:11

**hurling** 200:20

**hurt** 44:18 161:22
167:12

**hypothesis** 78:6

**hypothetical** 134:8

**I**

**idea** 77:24 117:7 138:12
141:13

**identifiers** 64:22

**identify** 5:12 31:8
197:7 198:23

**illness** 103:2

**immediately** 70:19

**Impala** 202:3

**implicated** 124:4

**important** 34:8
107:20 127:9,10 159:9

**inaudible** 134:10
148:24

**include** 28:21 40:20
100:15 105:6,8 170:22

**included** 107:14

**including** 70:4 71:5

**incoming** 42:25 55:5

**inconsistencies**
31:9,11

**incriminatory** 88:20

**independent** 177:6

**indicating** 131:8

**indication** 28:2
122:18 123:4

**indiscernible** 163:4
179:4 205:18

**individual** 5:22

**influence** 130:2

**informant** 34:9,16

**informants** 29:5

**information** 29:9
30:3,4,6,9,15,19,21 31:1,
9,19 32:20 33:4,17,18,23
34:9,11,16,21,24,25 35:2,
13,19 36:4,11 40:5,20,21
41:13,15,16 52:10 65:8
70:16 71:7 76:11 79:19
84:24 85:20 88:20 94:8,
11,17 116:6 117:13,24
120:6,10 123:22 127:9,11
131:8 132:2,5,10,14,18,
19,21 133:5 134:23 137:6
138:25 141:22 152:2,3
162:21 169:1,6 170:11

**initial** 58:12

**injuries** 44:19,20

**injury** 28:10,25

**innocence** 184:22
185:3

**innocent** 185:8 189:7
190:18 191:14

**inquire** 78:1

**inside** 115:3 133:1,8
134:11 137:14

**institution** 23:10

**institutions** 22:18

**instructed** 133:22

**insurance** 15:23,24

**integrity** 17:18

**intent** 191:15

**intentional** 31:12,16

**inter-** 154:16

**interaction** 19:18

**interest** 41:19 43:14
178:9

**interrogation** 19:11,
16,17,20 36:16,25 37:9,
19 38:7 56:14 121:14

**interrogations**
18:16,19,24 19:5 37:2,13
121:8

**interrogatories**
179:1

**Interrogatory** 179:8

**interview** 11:1 19:9,
11,16,18 36:14,15,24
37:8,9,19,23 38:4 47:14
49:22 50:13 55:24 58:10,
11,16 59:12,13,15,24
62:1 64:20,24 65:21 72:5
80:2,6,21 81:13 82:6,10
85:14 87:4,10 88:24
89:24 90:3,10,12,14 92:9,
13,14,18,19,20 95:7,8
96:7,21 97:9 100:5,19
104:13 121:13 122:22
143:6 145:7 148:4 153:25
158:7,11,17,21 160:1,2
163:14,21 167:24 168:7
169:4 172:14 174:1
178:3,7,12,13,16 192:17,
18 194:2 195:10,24
197:10,12 198:7,25
199:16

**interviewed** 10:1,3
13:18 37:16 50:7,12 57:1
85:2,13,25 146:17
154:16,17 163:13 177:8
191:21

**interviewer** 37:6

**interviewing** 20:14
57:14 92:25 163:17

**interviews** 18:8 37:12
48:6,8,10 52:18,25 53:13
56:3 57:12 89:3 121:9
122:9,13,15,16 157:5
161:15

**introductions** 198:5,
6

**inventory** 116:7

**investigate** 9:12,24
14:1 18:7 31:10 161:11

**investigated** 9:19
10:20,24 11:4,16 13:13
34:3

**investigating** 13:15
74:15 93:21 103:22

**investigation** 10:5,8,
13 12:7,23,25 13:2,5,6,12
20:2 21:13,19 24:10 25:8
34:1,13,15,21 43:20
49:22 54:14 57:13 58:1
60:3,9 73:15 75:9,20
88:16 94:9,12,16,19 97:3
121:19 123:23 128:22
132:20 145:13 153:6,8
155:14 171:4,6,7 179:22
180:10,19 181:21 182:1,
16,19 184:12 185:5,9,11
186:14,22 188:4,7,11,13
191:11,16 192:2,4,24
193:8,14 197:1 199:20

**investigations** 10:6
122:13

**investigative** 24:23
64:16 121:25 143:20
179:10 184:18

**investigator** 9:11
12:8,20,22 14:4 16:15,17
18:12,21 20:18 21:8,14,
16 24:24 45:11 50:24
51:4 117:17 132:24
138:10,21 150:15 151:20,
25 188:9

**investigator's** 40:10

**investigators** 52:3
78:20 86:12 93:4 123:20
130:11,23 131:3,11,17
132:7 135:8 137:6 153:1
155:22 191:1,6

**involved** 19:25 28:10,
19 42:3 43:1,11 44:2
51:19,22 57:11,14 81:25
82:4 84:11 106:18 119:9
121:20 124:19 132:20
140:21 153:25 156:16
168:14,22 171:4,5 184:10

**involvement** 125:9,
11 126:24 130:12 151:13,
14 153:4 156:1 183:9,19
184:1 191:18

**involves** 189:7

**involving** 11:5 44:3

**Iola** 22:20

**item** 204:11

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**ivory** 81:15

**J**

**Jacket** 62:10

**Jackets** 62:11

**jail** 36:7,12 133:10
134:17 135:19 136:5
137:19 138:23 139:13
152:24 153:7 155:22

**jailhouse** 29:5 34:9,16

**jam** 62:7

**James** 167:15 169:15
174:2

**January** 8:25

**JC** 61:22 83:24

**Jeff** 5:21

**Jefferson** 5:8,21
11:13 26:5,7,12,14 27:18
47:11 50:24 51:4,17
53:10,14 55:24 56:15,17
61:21 64:4 68:13 100:24
122:11,19 175:14 180:1,
3,7 181:4 182:3,5 189:8
205:25

**Jim** 5:25 9:13,17,22
10:9,22 11:1,5,12,15,24
47:5 53:23 60:8,13,21,24
61:5 102:5 134:6 172:18
175:16,19 176:16 180:1
181:7,10,11 189:9 195:18
196:13,17 200:19

**Jimmie** 59:2

**job** 30:8 60:21 129:7
140:14,16 195:18 196:12

**Johnson** 25:23,25
26:3 103:12 203:9

**join** 39:11,23 40:25
41:1,11,12 55:13 57:5
58:24 59:6 60:11,12
61:15,16 73:19,20 78:17
79:11,12 86:20,21 88:9,
10 90:23,24 93:6,7,15,16
94:6,7 106:1,7,13,14
117:21,22 123:2,3,13,25
124:10,11,17,18 125:7
127:6,7,21,22 128:11,20
131:23 132:12,13 133:13
134:4,5,21 139:24,25

141:20 150:6,7 151:2
153:21,22 154:10,11
156:5,6,14,15 157:1,2,18,
19 166:19,20 175:6,7
182:23 183:12,13 184:4,5
186:16,17 196:21

**joined** 17:9 23:24

**joint** 47:14

**Jr** 48:18 152:14

**JRC** 91:17

**judge** 185:3

**judges** 9:12

**jump** 119:20

**Junior** 22:20

**jurisdiction** 183:23

**justice** 29:11

**K**

**Kansas** 5:8 9:3,4 12:7
16:8 22:20 23:25 24:6,7,
16,19,20,21 25:7,23 42:4,
5,6 43:19,25 44:22 49:21
64:4 76:1,11 104:25
202:12,16 203:19

**Kansas-certified**
5:2

**Karen** 68:17

**KBI** 15:15,18 23:13,18,
20,24 24:23 25:1,5,13,18
26:4,21 29:4 36:1 37:21
38:12 39:13 43:17,23
50:23 60:6 63:14 68:11
71:13,15,24 72:10 75:16
79:25 81:24 95:1 97:1
108:16 111:19 145:1
173:20 176:11 177:25
179:17,25 197:8 198:20
200:21 202:13

**KCK** 172:18

**keeping** 151:10 177:2
181:21

**KHP** 44:3

**kids** 164:4

**kill** 190:11

**killed** 125:20 187:23
189:12,13

**killing** 187:17

**kind** 8:5 93:11

**kinds** 126:14

**Kirk** 53:10 61:1,4
91:25

**knew** 29:18 30:1 31:22
40:18 54:15,16 60:16
79:18 94:2 102:2,4,9
103:10 126:24 128:7
139:17 157:24 162:25
182:2 188:21 196:25
203:16

**Knock** 164:17

**knowledge** 8:17
50:14 114:21 117:13,15
139:16 175:24 180:19
182:13 184:11 199:19
203:5

**KPERS** 202:16

**L**

**lady** 165:24 172:23

**land** 175:20

**Lane** 164:13

**larger** 83:14

**lasted** 89:25

**law** 22:22 24:2 29:9
30:3,13 33:4 36:4 38:22
39:6,18 43:3 52:2 58:9
84:2,9 88:6,17 93:20
103:19,25 121:9,17 123:5
125:13 126:12 130:5
182:14

**Lawrence** 10:2

**lawsuit** 12:16,19 14:7,
19,23 15:7,10,12

**layman's** 69:23

**lead** 10:20 44:11 50:24
51:4 57:8 74:17,19 75:5,
24 107:15 119:11,12,17,
21,24 120:3,6,10,13
121:6,7 123:14,20 133:23
135:8 137:6 140:13
144:10,13,17 157:25

166:13 180:14,17

**leading** 186:23

**leads** 54:23 55:6,10,18
123:11 125:19 169:10
180:18,21 181:2 183:25

**Leanna** 163:21

**learn** 84:24 187:10,14

**learned** 29:8 36:9
73:13 123:22 145:19
170:16

**learning** 187:23

**leave** 24:21 25:13
37:24 38:1 43:17 70:19
120:20

**Leavenworth** 76:1,
10,23

**leaves** 77:10

**leaving** 37:9 38:4
130:6 189:25

**led** 52:3 93:3 122:23
132:6 155:22 183:18
191:11

**left** 59:16 65:12 66:5
73:14 76:12,17 77:8 96:3,
9 102:5 125:14 189:1

**left-hand** 64:14

**leg** 98:19

**legal** 105:22

**leniency** 32:19 33:5

**lenient** 29:10

**letter** 44:4

**life** 17:20 125:17 126:21
130:8

**lights** 172:8

**limit** 77:15,22

**limited** 184:11

**Linden** 5:24 39:11,23
41:1,12 55:13 57:5 58:24
59:5 60:12 61:16 73:20
78:17 79:11 86:21 88:10
90:24 91:15 93:7,16 94:7
106:1,7,14 117:22 123:3,
13,25 124:11,18 125:6,24
126:4 127:7,21 128:11,20
131:23 132:13 133:13

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

134:5,21 139:25 141:20
150:6 151:2 153:22
154:11 156:6,15 157:2,19
166:20 175:7 182:23
183:13 184:5 186:17
196:21 206:1

**link** 28:13 29:1 133:21

**linked** 187:18,24

**list** 38:18 119:1 122:1
169:8

**listed** 14:19 39:4 64:11
96:23

**listen** 190:14 196:1

**live** 125:16 126:20
130:7 162:20

**lived** 52:19 53:1 82:7
105:12 107:5,9 130:24
131:4,14,18 132:17
133:9,19 134:1 157:20
162:3,12,19 165:16 170:1

**lives** 169:20 170:5

**loading** 83:13

**local** 39:18 54:23

**location** 19:8 52:19
53:1 104:22 143:25 147:8
175:11 185:25

**log** 120:9 180:18

**logical** 114:20 138:24
139:3,21

**long** 8:24 9:5 11:1 21:5
22:4 26:1 36:25 46:25
65:24 89:20,24 165:7
168:6

**longer** 92:20 124:14
158:24

**longest** 36:14

**looked** 47:18 109:20
146:23 191:2

**loose** 115:3

**lot** 88:23 128:25 183:10
199:18

**Lou** 167:15

**loud** 6:24

**Luger** 109:11 111:14

**lunch** 62:6 98:24
99:10,13,16,18

**M**

**M-O-R-G-A-N**
6:11

**made** 55:3 62:10 65:23
103:15 121:6 128:25
129:17 136:1 152:22
155:12 159:8 189:9

**magazine** 101:4 111:3
114:11,17 115:2,3,7,11,
13 116:4,8,11,16,17

**mails** 126:19

**major** 23:6 54:23 55:1,
3

**majority** 21:25 38:11

**make** 7:4 13:24 31:25
32:8 33:18 46:19 49:24
52:10 65:17 71:14,19,24
75:17 95:12 110:24
128:5,15,21 129:24 130:2
132:3 133:25 135:22
151:14,15,17 186:12
195:22

**makes** 19:20 94:17

**making** 73:6 135:24
178:19

**man** 174:13 189:8
190:18

**managed** 55:5

**manager** 13:4

**mark** 61:19 177:19
178:22

**marked** 24:12 49:20
61:20 63:13 68:10 71:10
83:10 86:24 96:25 100:2
108:14 114:6 144:24
173:19 177:23 178:24
189:3

**market** 203:24

**married** 102:25
204:21

**Mary** 167:15

**materials** 136:25

**Matt** 165:23

**matter** 5:7

**max** 36:18

**Mazda** 80:18 143:16

**Mcclellan** 18:13

**meaning** 8:18 31:23
67:7 85:16 176:7 193:7,
13

**means** 84:14 117:5
137:15 139:20,21 141:15

**meantime** 194:18

**medal** 45:5,9,13,21

**medic** 167:17

**medical** 7:20

**medication** 7:21,23
8:6,7,13

**meet** 11:15,18 47:2

**meeting** 54:6 182:18

**meetings** 59:3 121:1,4
192:3 193:7,11,12

**Megee** 5:2

**member** 42:9 180:24
181:1,4,18

**members** 42:1 45:4,6
53:24 132:20 182:19

**membership** 41:25
42:1

**memory** 11:9 14:3
15:14 21:7 26:13,22
36:21 37:11 40:15 43:24
44:5,23 45:24 47:13
50:21 51:2,21,24 52:5
53:17 55:9,20 56:5,10
57:6,15 58:14,25 59:7,21
74:18 78:4 85:1,5 89:22
90:2 95:15 100:18 104:5,
11 105:5 106:21 108:12
110:18 111:23 112:9,14
116:6,9,13 118:11 120:25
123:19 124:22 125:1
133:6 139:16 140:18,20,
25 149:22 157:4,11
161:13 170:24 176:24
177:6 181:6 182:13 184:6

**mental** 103:1

**mention** 78:24

**mentioned** 12:2 24:4
150:8

**messages** 102:6
125:14 130:7

**met** 46:9,24 54:16 84:9
123:10 176:22

**metals** 204:7

**Michael** 6:2 181:25
182:11,14 206:3

**microphone** 200:23

**midnight** 165:4

**Midwest** 41:22,24
42:7,12,17,22 43:8,12

**Mike** 52:2 96:13,17
100:21,23 103:13 104:2
105:15 116:10 206:8

**miles** 76:13,19

**military** 12:21 14:18
16:9,12,14 17:10,14,25
18:4,5,11,16,20,21,25
20:17 23:12 45:10,16
103:21

**milk** 158:22,24 159:14,
18,21 160:14

**milked** 158:24 159:15,
23

**milking** 62:18 159:12,
20 160:7,10,17,21

**mind** 32:16 40:10
83:15 140:12 189:17

**minimum** 186:13

**Minor** 44:19

**minute** 26:24 83:16
194:24

**minutes** 49:5 58:4,5
62:14,15 69:6,8,9,11,18
70:1,23 71:6 73:17 77:1,
6,13,14 165:12 186:13
195:9,13 199:15,22 201:8

**Miranda** 87:18,21
88:2

**Mirandized** 177:9,
11,12

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**mislead** 30:22 31:3

**misleading** 192:16

**misled** 201:10

**misremembering** 31:2

**misrepresenting** 52:9

**missed** 154:18

**missing** 13:9 110:24 146:16 148:23 149:10,16 164:18 165:25 174:15

**mission** 45:16

**Missouri** 21:1,10 22:3 42:5

**mistake** 31:2,12,16

**mistakes** 63:24

**mode** 177:21

**moment** 49:4,8 54:18

**Monday** 51:16

**money** 32:9,21

**monitored** 5:10

**Monterey** 15:8

**month** 128:22 202:14, 17

**monthly** 202:10

**months** 22:6 95:18 128:22

**Morgan** 5:7,18 6:4,11 50:22 51:7 52:16,23 53:8, 13 54:21 55:6,23 56:21 57:11,17 58:3,10,16 59:1 63:18 76:8 83:17 104:14 114:9 124:14 142:6,15 145:14 176:10 197:10 201:12 205:21

**Morgan/woods** 119:25

**morning** 5:1,14 53:14, 18 92:6,11,22 96:8 98:3, 10,13,18 100:17 148:11 160:15 165:2,3

**mortgage** 201:22

**mother** 97:16 165:24

**Mother's** 96:4

**motive** 166:22,24

**motorcycles** 202:22

**mouth** 189:10 190:15

**move** 107:20 148:15 160:24 194:13

**moved** 189:19

**murder** 28:13 56:22 57:3 82:23 84:25 118:14 125:23 127:1 130:10 132:6 149:25 150:1 151:7,11 152:25 162:25 183:8,18,25 184:25 185:12 186:24 187:11,18, 24

**murdered** 52:20 53:2 155:23 190:13

**murders** 26:14 187:24

**mutual** 203:25

**Myles** 5:2 194:21

---

**N**

**named** 14:23

**nature** 14:13 19:22 35:7,9

**Nebraska** 42:5

**necessarily** 117:23

**needed** 18:9 25:24 26:6 30:4 106:4 123:11 145:20,21

**neighbor** 174:12

**neighborhood** 52:18,25 164:23

**neighbors** 156:23 157:8

**nervous** 46:19 167:18

**news** 187:16

**night** 101:24 103:6,25 104:9 147:19 158:23 159:7,15 161:21 164:24 165:1 172:6

**Noise** 172:22

**noon** 163:25

**north** 147:8

**notation** 171:8

**note** 92:1 176:10 188:25

**notebook** 171:1,3,8 172:12 176:8,22

**notes** 38:13,14 39:25 40:6,9,14 46:6 47:13,21 62:24 67:1 71:11 72:5 74:12 79:22 80:20 81:22 83:25 86:25 87:4,7 88:23 89:2 90:3,7,14,25 91:2,4, 18 92:1,10 94:22 95:7,10, 11,14,16,21 96:10 97:24 102:15 110:23 115:5,23 116:2,5 118:17 148:3 149:23 158:7,10 163:13 176:20 177:1,9 178:15,18 189:1

**noticed** 174:11

**Nova** 161:19 164:1 165:23 167:9

**november** 51:9,14 52:4,10,13 53:15,22 57:19 62:1 64:4,7,15 67:24 68:23 72:6 75:21 76:7 79:9 80:3,4,7 81:14 82:6 84:1 85:3,11 86:1,7, 17 87:5 88:2 92:6 93:12, 13,22 94:3 95:8 96:7 97:3 100:23 103:6 104:1,2,22 105:20 108:18,21 109:16 110:12 114:23,25 121:21 122:3,16 131:5,19 133:10 134:18 135:19 136:6,15 137:2,19 138:6,13 139:14 141:15 143:7,14 144:15 145:4,11 148:4,11 152:6, 15 156:12 158:8,23 161:18 163:24 164:15,25 174:2,6 175:11 176:23 178:3,7,12 189:12,13

**number** 84:4,11 146:14 164:2 171:10,12, 13,22 172:24 176:9 180:16,17 187:7 197:6

**numbered** 63:14 68:11 71:13,24 75:16 79:25 83:23 95:1 97:1 108:15 144:25 173:20 177:25

**numbers** 71:15 171:11

**numerical** 180:17

---

**O**

**oath** 6:6

**object** 29:12,22 30:11, 16,23 31:5,14 32:2,22 33:6,25 35:4 39:10,22 40:24 55:12 56:9 57:4 58:22 59:5,19 60:10,22 61:11,14 67:3 70:3,13,25 73:18,25 74:11 75:4 78:9, 16 79:10 85:15 86:10,19 87:15 88:8,25 89:7 90:1, 15,22 91:15 93:5,14 94:5 103:7,16 104:3 105:24,25 106:5,6,12 117:20 118:3 123:1,12,18,24 124:9,16 125:6 126:3,4 127:5,20 128:10,18,19 129:4 131:6,20,21 132:9 133:2, 11,12 134:3,19 135:20 136:7 137:3,20 138:7,14 139:15,23 140:5 141:19 150:5,16 151:1 153:5,16, 20 154:9 156:4,13,25 157:17 166:18 169:3 175:5 177:3 182:22 183:11 184:3 186:6,15 192:6,10,19 193:1,9,15 196:19

**objection** 32:12 41:10 58:23 134:20 196:20

**observe** 121:8,12

**observed** 102:17

**obtain** 116:17

**obtained** 111:24 119:2 120:17 147:19

**occasions** 6:15 15:9 129:11

**occupation** 17:17

**occupations** 205:3,8

**occur** 58:12,18,21 151:21

**occurred** 56:6 75:20 125:1

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**odd** 125:3 126:1,16 127:2,8,13 150:9,12,15, 20

**offered** 24:23

**office** 9:2 11:6,17 12:9 15:19 50:25 53:10,15 55:25 56:1,7,12,16 57:1 63:23 68:13 96:14,17 101:6 114:14 122:7 198:20

**officer** 20:17 30:9 31:8 84:9 86:15 93:20 94:1,2 128:4,8,14 129:3 140:3 141:6 167:14

**officers** 35:19 92:24 121:14 165:19

**official** 5:22 88:18

**officing** 10:2

**Oklahoma** 42:4

**one's** 205:1

**one-page** 75:15

**online** 187:15

**oop** 83:12

**open** 114:2

**opinion** 41:2 55:2

**opportunity** 49:15 79:7

**opposite** 33:1

**Ord** 13:3 15:8 16:24 17:12

**order** 31:18 62:12 63:2 106:4 120:13

**organization** 41:23 42:18,21

**orient** 51:25 143:10

**originated** 181:16

**Osage** 104:24 105:6 147:8

**Oskaloosa** 104:25

**otherwhere** 54:9

**outgoing** 42:25

**Overland** 122:6 198:20

**overseas** 16:20 17:6

**owe** 204:11

**owned** 96:12 104:23 105:3 176:3

**owner** 169:16,18 175:16,20

**owners** 171:14,23

---

**P**

**p.m.** 65:13 70:2 72:11, 18 73:14,15,23 76:12,15, 17,20,22 77:11 79:9 81:7 87:11,13 89:6 99:5,8 104:22 105:19 109:2,5 142:21,24 160:4,6,9,10, 12 172:6,22 173:14,17 174:8 193:21,24 194:24 195:2 199:5,8 206:15

**package** 72:16

**pages** 89:1 176:20

**paid** 62:6,21 63:4 67:4 74:5

**pair** 53:9 54:22

**paired** 53:9

**pants** 66:5,8

**paper** 22:1

**paperwork** 13:19

**paragraph** 52:22 55:22 101:12 114:8,9

**parents** 167:15

**parents'** 189:16,23

**park** 122:6 156:10,24 198:20

**parse** 185:17

**part** 21:20,21,24 30:8 42:15 52:14 92:14,20 100:22 168:7 174:10 177:17 191:11

**partially** 44:17 101:11

**participant** 86:3

**participated** 121:11 179:10

**partner** 39:6

**partnered** 38:23

**parts** 37:23

**passed** 44:15 154:5

**past** 35:21 103:1

**pasture** 167:16

**path** 57:17

**Patric** 5:24

**patrol** 23:25 24:11,12, 16,19,22 25:6 35:25 43:19 44:3,22 202:13

**pause** 7:3 200:1,12

**pausing** 195:13

**pay** 31:25 65:5

**paycheck** 143:15 144:7

**paying** 32:9,10

**pays** 110:10

**pending** 8:9

**pension** 202:7,10,15

**people** 17:16 29:8,18 30:14 31:1,9 35:18 36:10 83:11 88:13 146:14 157:4 163:18 166:15 167:3 169:8 170:13 175:3

**percent** 28:1

**perfect** 188:10

**perfectly** 135:25

**period** 121:16,18

**person** 14:5 30:2 32:18,20 33:16 35:5,13, 15 36:3 37:6,19,20 54:16 94:18 113:11 125:14 126:1 129:13 143:10 156:10 164:7 172:15 179:12,13 181:17

**personal** 186:22 191:19

**personally** 180:23 185:10

**perspective** 126:13

**pertaining** 19:9 120:6 184:12

**pertinent** 169:4

**Phillip** 164:11 165:6

**phone** 160:13 164:2 165:7 166:7 171:10,11,13 172:24

**photocopy** 171:1 176:18

**photographs** 47:23, 24

**photos** 20:1,3

**pick** 144:10,19

**picked** 143:15 144:4,8

**picking** 108:3 143:23 144:7

**pickup** 65:12,16 72:23,24 73:1 78:2,3,25 80:18 143:16 152:7,12 202:4

**pipe** 62:7

**pistol** 81:15,20 96:13 101:3,4,8,24 114:10,12

**place** 63:1 64:3 74:9 114:18 118:25 120:2,8

**places** 166:11

**plaintiff** 5:16

**plastic** 66:23

**play** 140:3 194:1,12,20 195:4 197:4,15 199:14,21

**played** 195:11 196:7 197:23 199:24 200:8

**playing** 197:14 198:1, 3 200:6,10

**pleading** 33:3

**pocket** 201:4

**point** 32:17 105:22 138:24 139:4

**police** 12:21 16:15 18:11,21 20:17 30:8,15, 22 31:2,3,8,13 35:19 41:17 45:10,16 86:8,15 94:1,2 125:19,22 126:17, 22 128:4,7,13 129:3 140:3 149:15 150:23 160:25 161:11,23 167:14 168:10,13,20,22 170:17,

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

21 174:24 175:3,20 176:4
177:8 183:8,24,25 189:8
202:12

**policeman** 16:14
17:10,14,19,25 18:4,6,20

**polygraph** 82:1,5,9,
12,16,22,25 83:2,3,7
121:22 122:22

**polygraphs** 123:7

**Poppa** 5:23

**posed** 7:18

**position** 135:21 185:3

**positions** 42:23

**possession** 172:11

**possibilities** 140:4

**possibility** 133:4

**possibly** 15:5 19:21,23
20:1 122:7

**post-high** 22:7,18,23
23:9

**posted** 77:22

**potential** 53:19

**potentially** 34:17

**pounds** 80:10 158:23
159:7

**power** 33:8

**precious** 204:7

**premises** 104:23
175:11

**preparation** 47:3
49:14 50:3 87:8 136:22

**prepare** 46:3,7 49:13
147:17

**prepared** 13:22 20:14
49:17 90:16 176:11

**prerogative** 60:6

**present** 105:15 188:24
199:13 206:11

**president** 12:24
14:15,17,20,24 15:1
42:10,16 43:1

**previous** 148:9

**previously** 83:10,12
100:2 146:24 152:19
154:12 173:19 189:4

**price** 68:18

**primarily** 38:6
119:10

**primary** 25:24 26:2

**prior** 129:18

**prison** 35:11 36:7,12
136:5 189:8 191:12,15

**probable** 127:17
128:1,9,16 129:12,16,21
130:4,16,17 133:14
134:23 135:1,5

**problem** 60:1

**procedure** 54:22
90:17

**proceeded** 76:19

**productive** 129:9

**promise** 71:20

**proof** 190:20

**property** 104:15,17
105:3,8,11 106:2,19,25
107:14 137:5 156:17
161:24 169:16,18 171:14,
23 174:13,16,20 175:17
176:3 202:18

**prosecute** 127:18,19

**prosecution** 40:21
41:8 88:21 122:24

**prosecutor** 182:5

**provide** 88:13,18
178:19 191:17

**provided** 47:18,25
88:6 152:25 177:5 178:15

**providing** 33:3

**Public** 202:16

**pull** 114:4

**punitive** 201:15

**purchase** 65:5 70:20
71:2,5 73:24

**purchased** 66:3,11
67:2 70:8,10,21

**pushed** 190:8

**put** 41:6,13,14,25 42:19
43:8 114:17 118:17
124:24 135:11 140:22
177:18 178:23 186:1
194:19

---

## Q

**qualified** 127:23

**Qualseth** 5:17 29:12,
15,22 30:16,23 31:5,14
32:2,12,22 33:6,25 35:4
39:10,22 40:24 41:10
46:10,11,15,17 48:25
58:23 59:19 60:10 61:14
70:3,13 73:18 75:4 78:9
79:10 86:10,19 88:8 89:8
90:22 93:5,14 94:5 98:23
99:17,19 103:16 104:3
105:25 106:6,8,12,15
108:23 117:20 118:3
123:1 124:9,16 126:3,5
127:5,20 128:19 131:21,
24 132:9 133:12 134:3,
12,20 135:14 139:23
142:3,6 148:25 149:4
150:5,16 153:5,20 154:9
156:4,13,25 157:17
166:18 169:3 175:5
183:11 184:3 186:15
196:5,20 206:3,4,8,12

**question** 6:25 7:4,9,
11,12,13,14,17,18 8:9
32:3,16 115:9 117:8
118:5,18,23 126:6
131:16,25 134:6,13 136:2
137:12 143:21 149:1,5,7
150:17 154:1 163:7,9
183:5 187:20 192:7 193:3
197:22

**questioned** 85:12
93:12

**questioning** 168:14

**questions** 6:24 19:21
38:7,11 49:17 79:22
103:5 137:11 200:25
201:17 204:17,20 205:7,
21,24 206:2,4,9

**quick** 108:24 110:25

---

## R

**radar** 44:10,12

**radio** 172:23

**ran** 69:2

**Randy** 5:22 47:13
50:23 83:25 90:10,13
91:17 165:15 166:4 170:4
178:14,15 196:24

**rang** 160:13

**rape** 168:24

**raped** 190:13

**reach** 10:5

**reached** 164:3

**reaction** 187:17

**read** 100:22 172:25
206:12

**reading** 115:14

**readout** 44:12

**reads** 145:18

**real** 110:25 165:7
170:15 202:18

**reask** 7:12

**reason** 8:8 41:20 85:18
86:2,6,8,16 93:10,22
94:2,10 95:16 100:14
103:4,8 104:7 107:11
110:1 116:7,15,16,20
119:5 135:17 136:3,10,
14,24 137:13,18,25
138:1,2,3 139:11,12
157:13 158:2 159:16
162:15 170:12,16 192:11,
13 193:3 195:21

**reasons** 127:16

**Rebecca** 167:7 169:20

**recall** 8:15 10:7,9,19,
25 11:9 13:8,22,25 14:6,
9,11,12,25 19:12,13
26:25 36:7 37:10 38:4
47:24 50:7,15,25 53:16
54:3,15 55:18 56:13,17
57:11 58:7 59:20 60:19,
23 61:6,17 64:13 71:1
77:3 78:11,23 82:13,24
85:18 86:5 88:11 92:16,

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

17,21,23 93:17 103:8,17
104:5 106:9,18 107:10
116:6,19,23 121:3,24
124:12,19 126:7,10
132:18 136:8,16,23
137:21,23 138:25 141:25
151:3 152:3 157:6,10,23
159:23 168:2 176:21
181:7,8,13,14 182:17,24
183:3,14,21 187:13
192:13,18 193:2,10,16
196:14,22

**recalled** 50:22 57:17

**receipt** 63:6 66:17
67:12,13,14,17,20,23,25
69:2,22 73:23 109:10
111:20 112:20 118:25
119:1 153:13 155:6
176:11,12

**receipts** 68:7

**receive** 17:24 18:2,15,
18 21:15,23 22:15,17
23:1 45:2,8 55:10 113:8
120:20 202:7,11,15

**received** 18:3,14 22:3,
5,12 33:23 44:12,21 45:5,
7 68:6 108:7,9 110:14
111:13 112:5 113:10,16,
20,24 131:7 152:2,3

**receiving** 19:13

**recently** 203:23

**recess** 49:9 99:6 109:3
142:22 193:22

**recognize** 196:9 200:1

**recollection** 50:19

**recontact** 145:16

**record** 5:3 6:1,10 49:7,
11 99:1,3,5,8 109:2,4
113:3 142:20,23 173:14,
15,16 193:20,23 194:25
195:2 197:8 198:22
199:4,5,6,7 201:7 206:14

**recorded** 5:10

**recording** 5:9 48:11
59:13,24 199:10

**recordings** 48:4
56:19

**recount** 114:9

**recover** 116:3,21
119:8

**recovered** 52:12
85:10 87:22 93:1 101:25
113:24 125:21 126:25
147:20 156:1

**recreation** 202:21

**refer** 64:16 95:6

**reference** 13:9 48:18
74:22 91:20 92:5 98:10
102:20,23 106:15 116:24
119:24 120:13 144:14
172:14,18

**referenced** 45:19

**references** 198:8

**referencing** 20:10

**referring** 37:25 87:17
93:25 94:1 98:2 105:2
106:24 109:13 115:19,20
120:4 148:20 193:12

**refers** 64:19 109:9

**reflect** 6:2

**reflected** 55:14,17
67:11 73:21

**reflecting** 168:1

**reflects** 102:12 195:24

**refresh** 40:10,14
108:12 111:23

**refreshes** 50:19,21

**refuse** 204:17

**register** 68:25 69:6
70:1

**reinter-** 60:1

**reinterviewed** 85:6

**reinterviews** 85:19

**reinvestigation**
60:2 61:2 196:18

**related** 51:10 112:3
152:23 177:5

**relation** 118:2

**relayed** 137:5

**released** 121:23 126:1
127:2,14,16 130:25
131:5,18 133:9 134:1,17
135:19 136:5 137:1,19
138:6,13,23 139:13
141:14 183:2,7,20 184:2

**relevancy** 205:12

**relevant** 41:16 94:8,
11,18 118:1,23 205:4

**reliable** 31:20 35:14,
19 36:5

**relying** 33:19

**rem-** 78:8

**remainder** 107:11

**remember** 9:23 11:3,
12 14:22 26:25 27:3 61:3
74:1 75:11 89:1 93:8,19
96:8 122:7 136:11,20
170:11 171:3,22 172:15
187:6 189:23 191:5,8,9
192:21 196:22

**remembered** 55:23
58:3

**remorse** 191:10

**removed** 101:3
114:11

**Renee** 168:9,15,17

**reorient** 100:4

**repair** 62:7

**repeat** 134:13 149:1,6
163:9

**rephrase** 7:12 32:16

**report** 39:5 49:21 50:3,
10,17 52:16 54:21 55:14,
17,21 57:10 61:9 63:13
66:2,15 67:7,11 68:12,17,
19 69:5 70:16,18 73:21
75:10,19 76:6 79:2 86:8
89:17 90:14,16 93:24
96:21 97:6,15 98:9,15
100:4,15 102:12 103:10
107:2,17 108:3,11,17
109:12 110:18,21 111:9
121:24 144:21 145:2
146:21 160:13 168:1
170:8 171:25 172:5,13
173:23 175:8 177:13,14
178:2,10,11,14 180:16

**185:4 192:16 193:4
198:24**

**reported** 58:5 161:18
162:12 179:14

**reporter** 5:1,3 49:4,7,
10 54:18 73:9 98:25 99:4,
7 109:1,4 142:20,23
163:6 173:14,16 193:20,
23 194:5,9,23 195:1
199:5,7 206:14

**reporting** 64:17 81:6
84:9

**reports** 13:22 38:13,
14,17,18 39:3,15 40:7,13,
15,19 41:2,3,6 46:5 47:9,
10,12,15 63:20,22,25
68:23 112:17 121:16
122:2,7,14 169:10 178:19
184:20,24 187:5,8
199:18,19

**represent** 5:13 83:24

**request** 179:18,22
180:13

**requested** 179:24

**reserve** 206:2

**reserves** 16:16 17:2,5
20:20 21:9,20

**residence** 75:25

**response** 187:22
197:9

**responses** 178:25

**responsibility**
125:11 144:11 180:2

**responsible** 40:4
42:24

**rest** 59:10 125:17
126:20 130:8

**restart** 92:2

**restate** 150:17

**result** 10:12,23 13:1
14:7 31:11 33:10 44:4

**retall** 36:7

**retire** 9:1 43:21

**retired** 8:22,24 15:15
25:1

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**retirement** 15:18
202:16 203:17

**retracing** 57:17

**retrieve** 108:10

**return** 91:23

**returned** 17:20 65:13
73:4,14

**reveal** 75:9 150:3,22
151:8

**revealed** 73:15 169:2,
6

**review** 19:21,23 20:7
47:8,15,16,20,23 48:3,6,
7,10,13,16 50:2 60:18
61:13 87:7 136:24 146:2
172:4 195:17 196:11

**reviewed** 13:18 46:5
48:19,23 63:23

**reviewing** 67:22

**Richard** 64:20,24
65:3,8,11,21 66:19,22
67:13 72:6,11 73:3 78:24
156:20 158:8,22 160:2,3,
11,12,14,19,21 164:22

**rifles** 81:17

**right-hand** 63:17

**rights** 87:14,18,21
88:2,14,18

**road** 76:13,14,18,19
81:4 104:25 105:7 147:8
161:7,10 162:4,10,13,18,
24 163:15,18,22 164:7,13
165:17 166:17 167:1,2,4,
6,15 169:19,20 170:1,5,9,
13,18,22 171:15,24
174:12 175:4,14,22

**roadside** 52:18,25
187:12

**Robert** 5:23

**role** 9:14 13:11 42:7
171:6 198:10

**roll** 65:4 66:17 67:2,5
72:12

**Ronnie** 50:11,15
59:14,18 60:15,16,20
61:9

**room** 37:8 38:8 96:15
98:7 101:3 106:20 107:1,
4,6,8,12,23,25 108:2,10
111:4 112:8,10,16 114:11
115:17 116:1,22 123:7
133:1 134:10,11,15
135:17 136:3,15,25
137:15,16,18 138:5,12
139:2,6,7

**rooms** 56:14

**round** 101:5 109:11
114:12

**round-trip** 58:4

**rounds** 108:4 109:11
111:2,3,4,14,24 112:3,4,5
113:15,19,23 114:18
115:1,2,7,10,11,12,16,21,
25 116:3,8,12,18,21
120:20

**route** 58:6 77:12 89:20
154:19 185:25 187:2

**Roy** 54:12,13 55:25
84:4 179:18,23 180:6,13,
20 181:3

**rules** 6:21

**running** 69:6 181:20

**Russell** 5:15 48:25
106:16 108:23 134:13
142:3 149:1 197:5

**S**

**S-A-T** 98:4

**Salina** 24:20

**salt** 30:5

**Saturday** 51:15 95:25
96:8 97:20,21 98:2,4,13,
18 100:10 102:17 161:19
165:2,3 172:7 174:6

**savings** 69:1 203:8,9,
12

**scare** 190:9

**scene** 190:20 191:2

**school** 16:2,4,6,7 22:7,
10,18,23 23:9 153:12,15
154:14,21 155:4,17 156:8
157:16 185:15,19,23
186:7 187:1

**science** 22:12 23:7

**scream** 52:9 165:7

**screaming** 164:2,20
170:8,17

**screams** 158:12
161:10 164:8 172:8
175:22 176:2

**screen** 177:22 194:9

**screw** 149:3

**screwed** 87:24 163:10

**scroll** 75:17 111:13
114:7 143:16 179:6

**scrolling** 67:16 169:22

**search** 27:23 28:16
51:19 58:17,21 104:15,
17,21 105:10,23 106:2,4,
11,20,23 107:11,13,23,25
109:17,19 110:13 112:10
120:17,19,23 121:2
132:16 134:15 135:2,17
136:3,10,14,25 137:5,18
138:4,12 139:1,13 140:21
141:10 146:24 147:3,5
152:7,11,16,21 156:10,22
157:9 161:3,6,24 170:22
175:20

**searched** 104:23
107:3,24 108:1 130:24
131:4,11,17 133:25
140:17,19,22,24 141:1,3,
6,13,22 175:12

**searches** 105:15
106:19 119:10 156:16

**searching** 137:16

**seat** 190:8

**seconds** 83:14 195:9,
13 197:25 199:22 201:8

**secret** 151:22,23

**secretary** 63:23

**sedan** 202:3

**seek** 13:20 156:22

**select** 17:14 194:10

**selected** 17:12

**self-explanatory**
147:6

**seminars** 43:15

**send** 39:16 148:19
194:22

**senior** 12:12 76:7
104:13 114:8 145:14,15
176:9

**sense** 52:11 151:14,15,
18

**sentence** 167:20

**sentenced** 191:12

**separate** 10:15,17

**sequential** 63:2
71:16,17

**serve** 16:12 20:16 21:5

**served** 16:9,13,15,23
17:2,5 43:13,18

**serves** 116:9

**set** 19:7 56:12,16 189:11

**setting** 43:2

**sex** 168:9,11,14,21
189:13,19,20,23

**Shane** 143:6 145:7

**share** 71:12 96:24
123:21 177:22 194:9,11
196:4

**she'd** 189:19

**sheet** 119:21 120:9
121:7 194:16

**shell** 190:22 191:4

**sheriff** 5:21 53:24
54:11,12,13,17 56:12
84:5 179:18,23,24 180:6,
8,13,20 181:3,14,19,24

**sheriff's** 47:11 50:25
51:17 53:10,15,24 55:25
56:15,18 68:13 96:14,17
100:24,25 101:2,6 103:13
106:21 110:19 114:14
119:11 174:19 180:4,7,24
181:1,4

**Sherri** 67:12 158:17,22
160:7,9

**Shirey** 164:12

**Shirley** 172:8

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**shirt** 166:10

**shoe** 174:20,25

**Shon** 5:17 46:9 206:3,6

**shoot** 71:14 110:3

**shooting** 28:11

**short** 20:23 46:9
173:11

**short-sleeved**
166:10

**shot** 87:22 88:4 93:2
125:21 126:24 141:18
153:2 155:24,25

**shotgun** 81:17

**show** 49:20 50:6 68:9
71:9 73:7,12 79:22 83:9
84:7 86:24 96:20 107:17
108:13 109:7 111:2
119:23 132:17 143:1
144:22 146:22 158:16
173:19,21 178:22 189:3,5
194:1

**showed** 75:13 193:3

**showing** 61:20 83:22
114:6 130:10 147:21
155:8 178:24

**shown** 88:5 152:25

**shows** 126:22 146:6

**shrill** 165:7

**shut** 172:23 189:10
190:15

**shy** 142:16

**side** 7:16 143:17

**sign** 206:13

**signature** 179:2

**signed** 104:16 105:18
109:20 110:3,5,8,13
113:12

**significantly** 203:24

**silver** 204:9

**simply** 131:17

**sir** 6:9,13 8:22 32:23
49:12,25 51:11 52:22
53:4,16 56:1 61:20 72:1
86:22 87:1 96:24 98:19

99:9 101:8,11 102:22
103:3 109:13 118:5 125:8
126:7 127:15 132:24
135:13,21 136:2 137:8,
12,21 142:19,25 143:8
145:2,5 147:10,20 148:1
164:5 173:10 177:22
178:9 179:15,19 190:24
192:8 193:25 195:14,20
196:1,8 199:9 200:9
201:13 204:10

**sister-in-law** 146:20
148:23 149:10 155:17
164:19 167:9

**sit** 124:22 125:2

**site** 78:14,22 139:19

**sitting** 103:19

**situation** 30:12 139:1

**six-four** 80:13

**skepticism** 33:18

**skimping** 159:11

**slow** 69:8

**slower** 69:18

**small** 71:14 201:17

**smart** 143:20

**solved** 192:5

**some-** 130:16

**somebody's** 32:4,7
33:1 94:11

**Someone'** 167:11

**son** 104:9 118:13

**son-in-law** 165:24
196:24

**sound** 194:11 196:15

**sounded** 200:22

**sounds** 114:20 201:1

**souped** 78:2

**south** 161:7 172:24
175:13

**southbound** 76:13

**spate** 179:8

**speaking** 200:2

**special** 9:11 12:6,12,20
16:17 20:21,24,25 21:2,6
40:5 50:12 59:17 76:7
104:13 114:8 145:14,15
176:9 191:24,25 192:8,23
193:6 194:2 196:9 198:19

**specialty** 17:11,15

**specific** 45:12,19,20
85:18 124:25

**specifically** 56:17
97:21 124:12 170:14
181:13

**specificity** 179:9

**speed** 77:15,22

**speeding** 44:12

**spell** 6:9

**spending** 159:19

**spent** 70:23 71:2

**spoke** 63:9 169:9

**spot** 113:4

**spots** 172:24

**squad** 24:12

**Sr** 81:16 95:24 101:23
103:5,11,12 104:8 105:18
113:22 114:10,16 116:10
117:10,18 118:4,19 137:4

**stamp** 144:2

**stand** 21:18 83:15

**standard** 27:23 54:22

**star** 159:6

**starred** 159:17

**starring** 159:4

**start** 37:14 90:2 173:22
195:8

**started** 37:19 87:10
149:9 160:7

**starting** 196:3 197:24
199:15,22

**state** 6:9 9:4 22:13,19
23:6,25 43:18 44:1 55:22
76:8 179:9 203:19

**stated** 58:16 75:5
154:12 170:16 179:17
184:20 185:1

**statement** 155:2
157:14

**statements** 103:15
155:12

**states** 16:13,16 35:24
41:24 42:2,6 43:3 45:3,16
52:16 54:21 57:11 58:15
66:2,15 96:12 104:12
189:7

**stating** 146:19 196:9

**station** 17:13 183:8

**stationed** 16:20,22

**statutory** 168:25

**stay** 40:1 192:1,2,24,25

**stayed** 70:20

**step** 109:1 144:19
194:23

**Stephens** 148:4,7,22
149:9,19

**stick** 85:24

**stock** 203:24

**stocks** 202:5,6

**stones** 59:15

**stop** 43:11 49:1 77:1
83:12 142:16 153:6

**stopped** 79:19 161:19
163:25 167:8 189:14

**store** 57:20 62:2 65:4,
20 66:12 67:9 68:25
70:11,24 71:5 73:16
74:16,25 75:3,25 76:9,12
77:5,8 79:17 80:23 89:6,
11,13,16,21 152:14,18
153:14 154:7,24 155:5,9,
19,20 186:3,11

**story** 151:7

**straight** 37:17

**street** 35:3 76:18

**stress** 8:1

**strike** 17:8 27:12 30:20
70:17 76:4 87:24 102:3
131:2 150:11

**stuck** 177:20

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net



(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**studies** 23:5,8

**stuff** 41:7,8 136:21,22

**subdivision** 9:3

**subject** 13:4

**Subject's** 119:24

**submit** 82:9,12,15

**submitted** 129:15
198:24

**Subpoena** 63:14
68:11 71:15,24 72:10
75:16 79:25 81:24 95:1
97:1 108:16 145:1 173:20
177:25 197:8

**subsequent** 55:22

**success** 45:15

**sued** 12:22,23 14:5,15,
20

**sufficient** 128:16
132:2

**suggest** 84:24 117:17
154:3 159:10 184:19,24
186:23 187:3

**suggested** 167:14
185:11

**suggesting** 32:24

**suggests** 115:12,20
153:10 159:19 184:9,14

**suicide** 187:14,25
188:2,25

**suit** 13:1

**summary** 59:11 64:23
145:6 176:5

**summation** 40:11

**summer** 168:10

**Summerville** 67:9
167:25 168:4 169:1

**Sunday** 51:15 52:1
148:9 164:15 167:7

**super-** 198:16

**supervisor** 51:9
143:12,13 198:17

**supper** 160:8

**supposed** 40:20 53:9
74:23,24 119:1,13 174:7
175:13

**Supreme** 9:3

**surprised** 187:21,25
188:1 195:22

**surrounding** 25:23
42:6

**suspect** 13:17 19:6,19
20:9,11 27:22 28:13,16
29:1 35:5 37:16 38:2 57:7
82:18 86:2,7,17 88:15
93:11,23 94:3,11,16,18
113:5,9 124:5,14,15
132:6 143:22 156:2
157:13,25 177:7,12

**suspect's** 27:23 28:5,
8,16,21 138:23 139:22
153:7

**suspected** 56:22 57:2
93:22

**suspects** 82:9

**suspension** 44:6

**sweatshirt** 62:17,22,
25 63:3 66:3,11 70:9,20,
21 71:2 73:24 74:6,8
80:25

**sworn** 6:5

**system** 29:11 202:17

---

**T**

**T-E-R-R-Y** 6:11

**T-SHIRT** 66:4

**table** 111:4 115:16
116:1,21

**tabs** 114:2

**tag** 37:2

**takes** 91:17

**taking** 8:14 38:8 90:19
91:18 92:1 114:18 178:1

**talk** 46:15 47:5 53:19
85:20 97:24 99:12,15
102:16,18 111:22 123:10
167:14 191:8 199:17

**talk-** 112:22

**talked** 46:17 60:13
67:10 99:20 124:2 135:1
146:14 148:13 163:8
167:6 169:16,19,21,23
170:4 182:20 183:15
189:15,18

**talking** 7:5 32:13
50:15 98:13 100:10
112:22 114:23 126:11
146:18 148:8,23 149:10
165:6 171:18 174:12
176:2 200:5,19 201:9

**tall** 80:12

**tape** 62:6,7,21,24 63:4,
6 65:4,17,24 66:17,22
67:2,4 68:17 70:10,19
71:5 72:13,15 73:23 74:6,
10,22 80:24 143:18 144:5
145:14 185:16 199:16,23

**task** 179:10,11,13,15

**tax** 67:21

**team** 37:2

**technology** 200:22

**telephone** 145:8
176:9

**telling** 46:22 90:20
117:1,3 118:9,13 174:23
176:3 190:14

**ten** 23:15,21 25:3

**terms** 69:23

**Terry** 5:7,18 6:4,11
63:18 76:7 197:10 201:12

**testified** 6:5

**testify** 7:22 8:2,19
95:17 201:15 204:16
205:6

**testifying** 204:19

**testimony** 48:14,22

**text** 59:11

**thereabouts** 81:9

**thing** 6:23 7:2 28:15
200:4

**things** 19:22 27:23
28:5,20,25 31:17 136:23
150:3 151:6 188:8,22

189:11 204:9

**thinking** 98:23,24
126:7,10

**thinks** 192:4

**Thomas** 57:12 190:19

**thought** 17:16,22
23:17 25:1 42:18,19,20
43:20 44:14 53:13 55:6
74:17 108:6 122:8 124:3
145:10 159:8 165:25
188:8 194:12 198:4

**thousand** 31:25 32:10

**threatened** 150:10,
13,21 151:21

**three-day** 44:6

**three-minute** 70:4

**till** 7:8 23:22 85:23

**time** 5:4 6:17 7:5 10:2
11:13 19:8 20:23 24:13
26:4 27:18 28:1 35:11
36:13 43:21 46:9 49:1
51:16 52:1 56:22,25 57:3
58:4 59:2 64:9 68:2,4
71:1,4 74:15,21,24 75:3,
6,11,24 77:12,19,23
79:13,15,16,19 82:20,22
85:12,13,14 86:1 94:15
96:18 101:7 102:10
103:14 104:22 111:5,9
113:7,10,23 116:25
117:4,11 118:15,20
121:16,18 122:9 130:3,9
134:23 136:12 140:14
144:2 151:3 155:21
159:20 170:12 186:18
188:24 194:24 196:25
198:17,20

**times** 12:3,10 59:8 82:8
141:18 165:8,12 168:10
181:9

**timing** 57:17

**tired** 37:4

**tiring** 36:24

**titled** 201:12

**today** 7:22 8:3 99:24
124:22 125:2 136:21
187:8

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net




(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**Today's** 5:3

**told** 19:4 25:1 35:20,22
45:23 46:10,19 60:20
65:3,9,15 66:15,19,22
67:10 72:11 80:11,17
81:21 89:5 96:6 100:15,
20 101:23 108:10 114:10
117:10 118:7 126:18
127:12 128:3 140:23
143:13 146:18 148:7
149:20 150:1,2,13,23
151:6,10 152:19 160:2,3
166:6,8 168:10,20 174:5,
17,24 181:9 183:18
187:11 189:10,19 190:15
191:16,20,25 192:1,12,24
195:17 196:12 197:1

**Tom** 52:1 57:14 58:10,
17,21 80:17 81:12,15
82:17,18,22 84:10,22
87:22,23 88:5 93:3 96:2,
3,8,12 97:16 98:1,6,10,16
100:10,16 102:2,4,9,18,
20,24,25 103:6,13,14,24
104:9 105:12 107:5,9
111:4 116:24 117:4,10,
17,19 118:2,20 121:22
124:5,14,23 125:5 126:17
130:5,24 131:4,14,18
132:16 133:9,19,21
134:1,17 135:18 136:5
137:1,18 138:5,13
143:14,21 144:6 145:10,
13,19,22,24 146:6 149:24
150:4,13,23 151:10,21
152:24 155:21 183:1,6
184:9,10,14 187:10,17,23
189:1

**Tom's** 78:14 81:16
88:4,6,7 93:2,3 96:15
97:12 101:3 103:24
105:23 106:4,11,16,19
107:1,4,6,8,12,23 108:7,
9,10 112:8,10,15 114:11
130:24 132:17 133:1
134:10,15 135:2,17
136:3,14,25 137:15,16,18
138:4,12 139:13 140:17,
24 141:1,3,6,10,14
143:11 151:7 187:14

**top** 52:23 75:17 95:2
168:2 172:15 173:22
178:1 188:16

**Topeka** 25:20

**topic** 35:22

**topics** 49:3

**tore** 190:15

**total** 23:19 71:4 203:15

**total's** 203:15

**totally** 27:7

**trace** 28:6,21 136:4
137:1 138:5,12,22

**tracking** 120:4

**trade** 22:10 37:5 38:6

**traffic** 18:8 24:9 44:16

**trailer** 76:9,16,17 77:2
156:10,12,23,24 186:1

**trailers** 157:4,6,8

**trained** 18:23 19:10
35:18,23 40:18 86:16

**training** 17:24 18:2,3,
11,14,15,18 19:13 21:15,
23 22:3,4 29:7 30:1
35:20,24 36:2 42:1,19
43:2,4,14

**trainings** 43:9

**Trans** 149:12

**transaction** 63:1
70:12 74:8,9 77:10
186:12

**transcript** 48:22

**transcripts** 48:13,16,
19

**transfer** 21:12

**transferred** 21:11
40:6

**transferring** 113:11

**transmit** 194:20

**transmitted** 83:21

**transported** 78:13,
21 139:18 140:1,7,11
141:16

**trash** 190:4

**traveled** 57:18

**treasurer** 42:9,16,24

**treatment** 29:11

**trial** 48:17,23 137:9
204:16,19 206:2

**trip** 65:17 77:4

**trooper** 23:25 24:7,12
44:13 130:1

**troopers** 44:1

**Troy** 5:23 68:15

**truck** 65:12,16 73:1
77:21 78:2,3,7,25 80:18,
24 139:13,22 140:17,21,
24 141:2,3,6,10,14,22
143:16 152:17,20,22,23
154:4 190:7

**true** 34:25

**truth** 151:19 190:14

**truthful** 34:22

**truthfully** 7:22,24 8:2

**turn** 86:25 100:1
126:17 130:6,9 142:1
158:21 163:12,20

**turned** 44:13,15 94:16
104:9 118:14

**Turner** 5:19 30:11
40:25 41:11 55:12 56:9
57:4 58:22 59:6 60:11,22
61:11,15 67:3 70:25
73:19,25 74:11 78:16
79:12 85:15 86:20 87:15
88:9,25 89:7 90:1,15,23
93:6,15 94:6 103:7
105:24 106:5,13 117:21
123:2,12,18,24 124:10,17
125:7 127:6,22 128:10,18
129:4 131:6,20 132:12
133:2,11 134:4,19 135:20
136:7 137:3,20 138:7,14
139:15,24 140:5 141:19
150:7 151:1 153:16,21
154:10 156:5,14 157:1,18
165:16 166:19 170:4
175:6 177:3 182:22
183:12 184:4 186:6,16
192:6,10,19 193:1,9,15
196:19 197:5 205:25

**turning** 103:10 125:14

**TV** 96:1 97:25

**two-page** 68:11
144:25

**two-year** 22:21 23:3

**type** 13:6 63:20

**typed** 38:14 63:22,25
75:19 119:21

**typewritten** 38:17
39:3,15 40:7,15,19 63:18
68:12 177:14

**typically** 39:5,14

**typing** 122:7

---

**U**

**U.S.** 44:24

**uncommon** 85:19

**understand** 7:11,14,
19 19:2 32:3 52:6 55:16
115:6 138:17 187:19
205:17

**understanding**
84:18 105:13 172:1
179:25

**understood** 7:6,18

**uniform** 24:12

**unintentionally**
30:19

**Union** 203:9,13

**unit** 16:18 20:21,24
21:6,10,11,12 44:12 45:4,
6

**United** 16:13,15 35:24
45:3,16

**University** 22:13

**unreliable** 34:17
36:11

**unsure** 11:8 52:13

**unturned** 59:16

**unusual** 164:20,21

**upper** 63:17 64:14

**upset** 60:8

**upside** 147:23

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net

Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net

**usual** 159:21

**utilized** 56:19

---

**V**

**Vanderbilt** 5:25
9:14,17,18,22 10:9,22
11:1,5,12,15,24 59:3
189:9,10 206:1

**varies** 20:5

**vehicle** 28:17,18,21
76:8 152:13

**vehicles** 201:25 202:2,
21

**verbal** 6:24

**verify** 33:20 34:20,24
75:6

**Vernon** 53:11 60:17,
20 61:1,5,10 91:25
195:16,17 196:10,12

**versus** 5:8

**vic-** 28:8

**vice** 42:10,16,25

**vicinity** 154:20 155:3
156:7,11 157:15 162:6
185:15,18,23 186:25

**victim** 84:12,14,19
112:21,23,25 139:18
141:16 143:25 151:11
154:7 184:1

**victim's** 85:9

**video** 5:9 48:3,11
56:16,19 137:14 143:22
145:22,24 146:2,4 193:2,
4 197:9,10,11,13,14
198:6 199:11

**video-recorded**
56:7

**videos** 48:7

**videotape** 61:8
143:17 144:5,10,20
145:12,20

**view** 138:24 139:4

**vindicated** 200:18

**violence** 103:1

**VLC** 195:5

**voice** 102:5 126:19
196:9,15 198:9,11,12
200:1,13,21,24 201:8

**voluntarily** 176:21

**volunteer** 117:12

**volunteered** 17:11
159:16

---

**W**

**wait** 7:8 44:14 85:23

**wanted** 17:19 49:13
62:11 73:7,11 140:10
146:22 152:7 161:11
167:13 175:20 194:15
197:4

**warranted** 45:21

**watch** 69:3,14

**watching** 121:13

**water** 38:3

**weapon** 125:23 127:1
130:10 152:25 183:8,18,
25

**wear** 62:18

**wearing** 66:4,11
166:10

**week** 126:1 127:3,14

**weekend** 146:15

**weekly** 128:15,21

**weeks** 62:12

**weigh** 80:15

**Wellman** 76:13 81:4

**west** 76:14 174:12

**western** 76:10

**whichever** 15:1

**white/green** 167:9

**whomever** 189:6

**wife** 98:7 157:21

**Wild** 161:7,10 162:3,4,
10,12,18,24 163:14,18,21
164:7,13 165:17 166:17
167:1,2,3,6 169:16,18,20

170:1,5,9,13,17,21
171:15,24 175:4,13,22

**Winchester** 57:20
62:2 65:3 68:24 72:12
75:24 76:8,12 80:23
111:14

**wished** 125:18

**wishes** 126:21 130:8

**withdraw** 163:12
183:4

**witnesses** 10:3 13:18
53:20 82:8 146:17 170:19

**woman** 170:8

**wondering** 196:5

**Woods** 47:5 50:23
51:3,9 53:23 55:7,11
60:8,13,17,21,24 61:5,9
123:17 134:6 145:15,21
181:7,10,11 195:15
196:10,17 200:19

**Woods'** 195:18 196:13

**Woods's** 180:1

**word** 109:24 197:19

**work** 9:5 25:7 26:5,7,
11,14,20 27:18 45:10,13,
14 54:23 144:16

**worked** 23:12,20,21
24:2,6,11 25:2,4,6,8 27:8,
10,11,13 29:5 37:21
38:12 164:21 182:9,11
202:12

**working** 27:21 39:7
78:5 201:11

**works** 123:8

**worst** 200:22

**worth** 201:20

**wrapped** 66:23

**write** 113:7 119:3

**writing** 41:6 147:12,14
173:2,4

**written** 38:13,14 50:20
62:3 67:25 104:15 105:17
109:17 171:11 176:9
177:13

**wrong** 44:9 75:14
110:4

**wrote** 72:15 81:12
97:16 199:17,19

**Wyandotte** 25:25
26:3

---

**Y**

**yards** 190:20,22 191:2

**year** 21:7

**years** 6:19 9:7,8 15:24
23:15,22 25:3,8 42:11
43:13,18 54:17 86:4
95:18 103:19 125:12
126:12 132:24

**years'** 93:20

**yell** 52:8

---

**Z**

**Zoom-recorded** 5:6

**Zule** 57:20 62:11 63:10
64:20,24 65:3,8,11,15,22,
23 66:9,10,14,15,19,22
67:10,12 72:6 73:3 74:16,
25 75:3 78:24 89:11,14,
15,16,21 156:20 158:8,17
159:23 160:1,2 164:22
167:23

**Zule's** 65:12 76:1,10,
20,22 77:5 80:23

8700 Monrovia, Suite 310
Lenexa, Kansas 66215-3500
www.cornerstonekc.net


Cornerstone
Court Reporting Company LLC

(913) 825-2510
Fax (913) 825-2530
office@cornerstonekc.net